## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ALVIN BALDUS, et al.,

          Plaintiffs,

TAMMY BALDWIN, et al.,

          Intervenor-Plaintiffs,

                                  Case No. 11-CV-562
vs.                              JPS-DPW-RMD

MICHAEL BRENNAN, et al.,

          Defendants,

F. JAMES SENSENBRENNER, JR., et al.,

          Intervenor-Defendants.

_____

VOCES DE LA FRONTERA, INC., et al.,

          Plaintiffs,

                                  Case No. 11-CV-1011
vs.                              JPS-DPW-RMD

MICHAEL BRENNAN, et al.,

          Defendants.

---

**BRIEF IN SUPPORT OF MOTIONS BY INTERVENOR-DEFENDANTS (1) FOR JUDGMENT ON THE PLEADINGS DISMISSING ALL CLAIMS OF PLAINTIFFS' SECOND AMENDED COMPLAINT RELATING TO 2011 WISCONSIN ACT 44, CREATING CONGRESSIONAL DISTRICTS, AND (2) TO DISMISS ALL CLAIMS OF INTERVENOR-PLAINTIFFS' COMPLAINT, FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED (No. 11-CV-562)**

---

The intervenor-defendants, five Republican members of the United States House of Representatives from Wisconsin (Republican House Members), have been granted leave to intervene in this action, solely to defend against the plaintiffs' challenge to 2011 Wisconsin Act 44, the Congressional redistricting statute. (Dkt. #32; Dkt. #49.) The Republican House Members now move, pursuant to Fed. R. Civ. P. 12(c), for judgment on the pleadings, dismissing the second amended complaint for failure to state a claim upon which relief can be granted as to Act 44.

On December 2, the Intervenor-Plaintiffs, the three Democratic members of the House from Wisconsin (Democratic House Members), entered their previously proposed complaint on the docket. (Dkt. #67.) The Democratic House Members' pleading closely tracks the plaintiffs' first amended complaint (Dkt. #12). While this brief refers to paragraphs of the second amended complaint in seeking dismissal of the Act 44 claims, the Democratic House Members' complaint contains no materially different, additional allegations beyond those included in the second amended complaint. Further, the Democratic House Members' complaint applies only to the Act 44 claims. Therefore, for all of the reasons set forth in this brief, the Republican House Members also move, pursuant to Fed. R. Civ. P. 12(b)(6), for an order dismissing the entirety of the Democratic House Members' complaint.[1]

## **INTRODUCTION**

The plaintiffs challenge two different redistricting statutes passed by the Legislature and approved by the Governor on August 9, 2011. The first, 2011 Wisconsin Act 43, redrew the boundaries of the state legislative districts following the 2010 Census. The second, 2011 Wisconsin Act 44, created new boundaries for Wisconsin's eight Congressional districts.

---

[1] The plaintiffs in No. 11-CV-1011, *Voces de la Frontera, Inc. v. Brennan*, assert claims only with respect to Act 43. And, though the cases have been consolidated, the Republican House Members are not parties to that case. This motion, therefore, is not directed to anything in that case.

The plaintiffs filed their initial complaint on June 10, 2011 (Dkt. #1), before either statute had been passed. That complaint attacked the failure of the Legislature to properly redistrict the state Legislature only, making no mention of Congressional redistricting. After both houses of the Legislature adopted Acts 43 and 44 on July 19 and 20, but three weeks before the Governor approved them, the plaintiffs filed their first amended complaint, which included an attack on Congressional redistricting. (Dkt. #21.) Finally, on November 22, the plaintiffs filed their second amended complaint. (Dkt. #58.) In this brief, for simplicity's sake, the Republican House Members will refer to this second amended complaint, the plaintiffs' currently operative pleading, as "the Complaint."

In the Complaint, the plaintiffs assert a total of nine claims. Eight of the nine apply to Act 43 and the redistricting of the Legislature. Conversely, only three of the nine deal in any way with Act 44 – the Complaint's Fourth, Fifth, and Eighth claims. All of the three Act 44 claims assert that the new Congressional district lines violate the United States Constitution by enacting a "political" gerrymander. None of the Act 44 claims asserts any violation of the federal Voting Rights Act, 42 U.S.C. § 1973, *et seq.*, nor, indeed, do they allege that there are any improper racial considerations involved in the Congressional redistricting. Finally, none of these three Act 44 claims attempts to state any claim under Wisconsin law.[2]

By any fair reading, the focus of the Complaint is its attack on Act 43. The Act 44 claims seem, by comparison, flat and perfunctory, a sort of throw-away challenge tacked onto the Act 43 claims. However seriously the Act 44 challenge was put forward, it must be dismissed, for it fails to state a claim under applicable law. The Court should pluck this low-

---

[2] There are a couple of references in the three claims to the Wisconsin Constitution and "Wisconsin's redistricting principles," but none of these matters is asserted as the basis for a claim. Were the plaintiffs challenging Act 44 under state law, this Court could not grant relief on that ground, for such a claim would seek to have a federal court conform the conduct of state officials to state law. *Pennhurst v. State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984), precludes such a claim.

3

hanging fruit and, for the reasons explained herein, dismiss each of the claims in the Complaint insofar as they implicate Act 44.

## **ARGUMENT**

The plaintiffs do not and cannot state a valid claim on the basis of any purported political gerrymandering in Act 44's creation of Congressional districts. Any such claim, whether said to arise under the Equal Protection Clause of the Fourteenth Amendment or the First Amendment, fails as a matter of law.

Under Fed. R. Civ. P. 12(c), a party may move for a judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." The timing of this motion is, therefore, proper, as the Republican House Members have only recently been granted intervenor status, and trial is scheduled to begin in late February.

A motion for judgment on the pleadings for failure to state a claim is governed by the same standard as a motion to dismiss under Rule 12(b)(6). *Doe v. Galster*, No. 09-C-1089, 2011 U.S. Dist. 77706 (E.D. Wis. July 14, 2011) (citing *Forseth v. Village of Sussex*, 199 F.3d 363, 368 n.8 (7th Cir. 2000), and *Evans v. Lederle Labs.*, 167 F.3d 1106, 1008 (7th Cir. 1999)). That is, to avoid dismissal a complaint must state a claim for relief that is "plausible on its face" and rises above the "merely speculative." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Claims should be dismissed "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Id.* at 558. Here, the Complaint does not plausibly give rise to any entitlement to relief as to Act 44. Therefore, the Court should dismiss the Fourth, Fifth, and Eighth claims of the Complaint insofar as they relate to Congressional redistricting.

I.    **THE COMPLAINT FAILS TO STATE ANY CLAIM UPON WHICH RELIEF CAN BE GRANTED UNDER THE EQUAL PROTECTION CLAUSE FOR POLITICAL GERRYMANDERING OF CONGRESSIONAL DISTRICTS.**

A.    **Political Considerations in Redistricting Are Proper, and No Court Has Ever Discovered Workable Standards to Measure the Burdens Said to Be Imposed by an Alleged Political Gerrymander.**

The Complaint weakly alleges that Act 44 was improperly crafted for political ends. The Complaint's allegations of partisan motivations behind Act 44 are vanishingly thin. However, even were partisan motivations for redistricting proved, that would import nothing of constitutional significance. Efforts to redraw legislative or Congressional district lines for political advantage are not new in American politics. And, generally, there is nothing wrong with them. In fact, the practice predates the establishment of the American Republic. *See Vieth v. Jubelirer*, 541 U.S. 267, 274–275 (2004) (detailing long history of gerrymandering). As a result, the plaintiffs tread uphill in seeking relief from either the presence, or a supposed excess, of political motivation behind this redistricting statute.

In *Davis v. Bandemer*, 478 U.S. 109, 123 (1986), the Supreme Court said that political gerrymandering claims were justiciable, but the Court did not agree with the district court that the redistricting plan before it was unconstitutional, and it could not identify any particular standard that was up to the task of adjudicating such claims. Instead, *Bandemer* reversed the district court because it had "applied an insufficiently demanding standard in finding unconstitutional vote dilution." 478 U.S. at 113. In retrospect, this result is unsurprising. No court anywhere in the country, in the subsequent quarter century, has ever invalidated a legislative redistricting plan on political gerrymandering grounds – not on the basis of the Equal Protection Clause, the First Amendment, or any other constitutional provision. No acceptable standard for deciding such claims has ever been discovered.

5

In *Vieth*, the Supreme Court revisited the issue in connection with an appeal from a district court's dismissal of a political gerrymandering complaint for failure to state a claim. A four-Justice plurality cited the unfruitful history since *Bandemer* and determined that political gerrymandering claims are nonjusticiable, since "no judicially discernible and manageable standards for adjudicating political gerrymandering claims have emerged." *Vieth*, 541 U.S. at 281 (Scalia, J., plurality opinion).[3] The plurality determined that no such standards could exist. Justice Kennedy concurred with the *Vieth* plurality, holding that the plaintiffs had failed to overcome the obstacles to justiciability in that case and that no sufficient standard had yet been found. 541 U.S. at 307–08. Both of the opinions underlying the Court's affirmance of the complaint's dismissal specifically rejected the sundry standards proposed by different Justices in *Bandemer*, by the *Vieth* dissenting Justices, and by the parties to the case. *Vieth*, 541 U.S. at 284–301 (Scalia, J., plurality opinion); *id.* at 308 (Kennedy, J., concurring) (stating that "[t]he plurality demonstrates the shortcomings of the other standards that have been considered to date").

Besides agreeing with the plurality that none of the offered or considered possible standards was legally sufficient, Justice Kennedy explained why the Court was forced to abstain from intervention:

> Our attention has not been drawn to statements of principled, well-accepted rules of fairness that should govern districting, or to helpful formulations of the legislator's duty in drawing district lines.
>
> Second, even those criteria that might seem promising at the outset (*e.g.*, contiguity and compactness) are not altogether sound as independent judicial standards for measuring a burden on

---

[3] As the *Vieth* plurality said, "[t]hroughout its subsequent history, *Bandemer* has served almost exclusively as an invitation to litigation without much prospect of redress." *Vieth*, 541 U.S. at 279 (quoting S. Issacharoff, *et al.*, The Law of Democracy 886 (rev. 2d ed. 2002)).

6

representational rights. They cannot promise political neutrality when used as the basis for relief.

*Id.* at 308 (Kennedy, J., concurring). Therefore, Justice Kennedy said, "[b]ecause, in the case before us, we have no standard by which to measure the burden appellants claim has been imposed on their representational rights, appellants cannot establish that the alleged political classifications burden those same rights." *Id.* at 313.

Taking the plurality's and Justice Kennedy's opinions together, a majority in *Vieth* rejected all of the standards considered as not sufficiently discernable or manageable for courts' use in considering such claims and, as set forth above, confirmed that a nearly insuperable obstacle lay before future plaintiffs. In *Vieth*, Justice Kennedy said that the plaintiffs, if successful, would "at best demonstrate[] only that the legislature adopted political classifications." *Id.* For good reason, Justice Kennedy recognized that this would not suffice to state a claim. As the narrowest statement of the grounds underlying the Court's judgment, Justice Kennedy's opinion should guide this Court in resolving the instant motion. *Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. . . .") (internal quotation marks omitted); *Freedom from Religion Found., Inc. v. Nicholson*, 536 F.3d 730, 738 n.11 (7th Cir. 2008) (applying *Marks*); *Comm. for a Fair and Balanced Map v. Ill. State Bd. of Elections*, No. 1:11-cv-5065, 2011 U.S. Dist. LEXIS 126278, at *30–31 (N.D. Ill. Nov. 1, 2011) (citing *Marks* in applying Justice Kennedy's *Vieth* concurrence).

Two years later, in *League of United Latin American Citizens (LULAC) v. Perry*, the Supreme Court chose not to revisit the justiciability issue but proceeded "to examine whether appellants' claims offer[ed] the Court a manageable, reliable measure of fairness for determining

7

whether a partisan gerrymander violates the Constitution." 548 U.S. 399, 414 (2006). In

*LULAC*, as in *Vieth*, Justice Kennedy concluded that the plaintiffs had failed to surmount the

formidable challenge of delineating a reliable standard. 548 U.S. at 423 ("We conclude that

appellants have established no legally impermissible use of political classifications. For this

reason, they state no claim on which relief may be granted for their statewide challenge."). In so

doing, he spoke as the most narrowly-targeted voice on the Court, with a majority of the Court

finding dismissal of the political gerrymandering claims appropriate, for differing reasons

explained in the Justices' opinions.[4] The *LULAC* plaintiffs failed even though the lead opinion

recognized that one of their proposed tests had an advantage in that "it does not quibble with the

drawing of individual district lines." *Id.* at 417. Despite this, the Court found each of the

standards proposed in *LULAC* – a sole-motivation test, a categorical assertion that mid-decennial

redistricting is unconstitutional, and a "symmetry" standard based on hypothetical election

results – to be insufficient. 548 U.S. at 420-23. Thus, a viable standard continues to elude

plaintiffs and the courts.

   The failures in *Vieth* and *LULAC*, and in district court cases across the United

States, to arrive at a workable standard results from a simple fact: the involvement of politics in

the redistricting process, where shown, is unremarkable. The Supreme Court has long held that

"[p]olitics and political considerations are inseparable from districting and apportionment. The

---

[4] In *LULAC*, seven Justices agreed that the district court's rejection of the constitutional gerrymandering claims ought to be affirmed. Justices Scalia and Thomas reasserted their position that political gerrymandering claims were not justiciable. 548 U.S. at 511–12 (Scalia, J., concurring in part). Chief Justice Roberts and Justice Alito joined the disposition of the political gerrymandering claim as to the redistricting plan at issue but did not specify whether they believed the plaintiffs had failed to present a justiciable controversy, or had failed to state a claim upon which relief could be granted. 548 U.S. at 492–93 (Roberts, C.J., concurring in part). Justices Souter and Ginsburg agreed that the redistricting plan was not invalid on the basis of its mid-decade timing but declined to rule on the remaining proposed standards since it was clear no majority existed for any of them, treating those issues as showing an improvident grant of certiorari. 548 U.S. at 483–84 (Souter, J., concurring in part, dissenting in part). Even for those portions of Justice Kennedy's opinion not joined by other Justices, namely Sections II.B and II.C, Justice Kennedy remains the center of gravity of the Court in that at least four and up to six additional Justices joined in his disposition on other, or ambiguous, grounds.

political profile of a State, its party registration, and voting records are available precinct by precinct, ward by ward. . . . The reality is that districting inevitably has and is intended to have substantial political consequences." *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973). In short, such political considerations are perfectly constitutional. However the plaintiffs may bristle at this truth (at least while their political party lacks a legislative majority), it has not changed. In *Vieth*, Justice Kennedy reaffirmed that a complaint alleging political classifications in redistricting "describes no constitutional flaw . . . under the governing Fourteenth Amendment standard." 541 U.S. at 313 (citing *Gaffney*, 412 U.S. at 752). As a result, the mere alleged involvement of political considerations in the redrawing of district lines for purposes of Act 44 (or Act 43) gets plaintiffs nowhere. The Complaint here goes no further.

Therefore, as in previous cases, "[t]he crucial theoretical problem is that partisanship will *always* play *some* role in the redistricting process. As a matter of fact, the use of partisan considerations is inevitable; as a matter of law, the practice is constitutionally acceptable." *Radogno v. Ill. State Bd. of Elections*, No. 11-cv-4884, 2011 U.S. Dist. LEXIS 134520, at *8 (N.D. Ill. Nov. 22, 2011) (citing *Vieth* plurality and concurring opinions). On this point, the Supreme Court's opinions evince a clear majority for thinking the presence of political considerations in a legislature's redistricting process utterly banal. *See Vieth*, 541 U.S. at 285 ("The Constitution clearly contemplates districting by political entities, see Article I, § 4, and unsurprisingly that turns out to be root-and-branch a matter of politics.") (Scalia, J., plurality opinion); *id.* at 306 ("A decision ordering the correction of all election district lines drawn for partisan reasons would commit federal and state courts to unprecedented intervention in the American political process.") (Kennedy, J., concurring). Even a blunt and well-founded allegation that Congressional lines have been drawn solely for political purposes, to the

exclusion of any other purpose, does not suffice. *LULAC*, 548 U.S. at 416–20 (rejecting political gerrymandering claim where mid-decade redistricting was done "solely for the purpose of seizing between five and seven seats from Democratic [Congressional] incumbents," *id.* at 453 (Stevens, J., concurring and dissenting), and where political gain was "the entire motivation" for the plan). *Id.*

Here, redrawing the Congressional districts was required after the 2010 Census. Further, no incumbent Member of Congress was districted into another member's district, and the claims here are on their face far weaker than those in *LULAC* and elsewhere. At bottom, the Complaint alleges nothing more about Act 44 than that it resulted – to some unquantifiable degree – from considerations of politics. With nothing more substantial to offer, the plaintiffs' Act 44 claims do not state a basis for judicial relief and should be dismissed.

**B.    The Complaint's Limited Allegations as to Act 44 Exemplify the Difficulty in Discovering a Workable Standard and Show That under No Workable Standard Could Act 44 Be Held Unconstitutional.**

The great majority of the Complaint's allegations strike at Act 43, and those specifically targeting Act 44 are weak and exceedingly limited in scope. Even so, their brief appearance in the Complaint exemplifies why fashioning a workable standard – one that both is based upon "comprehensive and neutral principles for drawing electoral boundaries" and allows for "rules to limit and confine judicial intervention," *Vieth*, 541 U.S. at 306–07 (Kennedy, J., concurring) – continues to prove an insurmountable task. As long recognized by the Supreme Court, "[t]he key concept to grasp is that there are no neutral lines for legislative districts . . . every line drawn aligns partisans and interest blocs in a particular way different from the alignment that would result from putting the line in some other place." Robert G. Dixon, Jr., *Fair Criteria and Procedures for Establishing Legislative Districts* 7–8, *in* REPRESENTATION

AND REDISTRICTING ISSUES (B. Grofman, *et al.*, eds. 1982) (quoted in *Bandemer*, 478 U.S. at 129 n.10).  Here, the only allegations specific to Congressional redistricting are contained in paragraphs 52 and 55 of the Complaint.  These allegations lend themselves to assessment under no workable standard and, further, are so weak that they could not possibly end up establishing a claim under any theoretical workable standard as an unconstitutionally excessive political gerrymander.

### 1.     The Allegations of Paragraph 52.

The allegations found in paragraph 52 relate to purported violations of unidentified "standards of compactness":

> The congressional districts fail to meet constitutional standards of compactness.
>
> a.     The 7th Congressional District unnecessarily spans a vast area – from Superior in the northwest to just north of Madison in the south, and from the Minnesota boarder [*sic*] in the west to Florence County in the east.
>
> b.     The 3rd Congressional District similarly and unnecessarily spans the far southwest corner of the state north almost to the Twin Cities and west [*sic*] to the center of the state.
>
> c.     The large expanse covered by these new districts results in districts that are difficult and quite costly for residents to effectively communicate with their  representative  in  Congress and for the elected member to effectively communicate with his or her constituents.
>
> d.     Act  44  unnecessarily  shifts  congressional  district populations to satisfy partisan political goals.

In fact, to provide some context as to these allegations, beginning with those in paragraph 52(a), Act 44 extends the southernmost boundary of the 7th Congressional District roughly 30 miles south, into Jackson, Juneau, and Monroe Counties, *see* Act 44, § 3 (creating 2011-12 Wis. Stat. §§ 3.17(3)-(5)), as compared to the previous Congressional districting

legislation adopted with bi-partisan support in 2002, under which the southern border of Wood and Portage Counties formed the southernmost boundary of the district. *See* 2009–10 Wis. Stat. § 3.17(1). The Village of Necedah and the surrounding townships, located in Juneau County, are the municipalities in the 7th Congressional District closest to the City of Madison under Act 44, but each lies approximately 70 miles northwest of Madison, which is hardly "just north" of that city. Moreover, changes to the northern border of the 3rd Congressional District permit the joining of the entire City of Eau Claire and its nearby municipalities within the same district (*see* Act 44, § 3, creating 2011-12 Wis. Stat. §§ 3.13(1), (2)), whereas the City of Eau Claire, which lies partly in Eau Claire County and partly in Chippewa County, was split under the previous legislation. *See* 2009–10 Wis. Stat. §§ 3.13(1), 3.17(1). Likewise, extending the 7th Congressional District further northeast to include all of Vilas, Oneida, Langlade, Forest, and Florence Counties joins the northern lakes region of Wisconsin together in the same district. *See* Act 44, § 3 (creating 2011–12 Wis. Stat. §§ 3.17(1)). This shift, along with other minor changes to the south, also substantially improves the compactness of the 8th Congressional District around the regional center of Green Bay.

As for the allegations of paragraph 52(b), Act 44 places the southwest corner of Wisconsin in the 3rd Congressional District. But the previous Congressional districting legislation did so as well. And, contrary to the allegation that the district extends "almost to the Twin Cities," Act 44, as compared to the previous legislation, actually decreases the portion of the 3rd District bordering on the Twin Cities region of Minnesota, inasmuch as it places St. Croix County – the Wisconsin county nearest to the Twin Cities and one that used to be in the 3rd District (*see* 2009–10 Wis. Stat. § 3.13(1)) – in the 7th Congressional District instead. *See* Act 44, § 3 (creating 2011-12 Wis. Stat. § 3.17(1)). Additionally, the farthest distance between

any two points in the 3rd Congressional District is actually shorter under Act 44 than it was under the previous legislation. Act 44 accomplishes this by shifting the southeast corner of the 3rd Congressional District to the west, by moving Lafayette County, previously in the 3rd District, *see* 2009–10 Wis. Stat. § 3.13(1), into the 2nd District, *see* Act 44, § 3 (creating 2011-12 Wis. Stat. § 3.12(1)), and by shifting the northwest corner of the district to the east and south by placing St. Croix County, previously in the 3rd District, *see* 2009–10 Wis. Stat. § 3.13(1), in the 7th District, *see* Act 44, § 3 (creating 2011-12 Wis. Stat. § 3.17(1)).

Under the previous legislation, the 3rd and 7th Congressional Districts spanned larger geographic areas than those of other districts, and they continue to do so under Act 44. This is an inevitable result of the relatively low population density of certain areas in the western and northern portions of Wisconsin, given the constitutional requirement of minimum deviation in the populations of a state's Congressional districts (the "one-person, one vote" requirement). Additionally, to the extent that the relatively minor changes in the shapes of the 3rd and 7th Districts may benefit current Representative Duffy and other Republicans in the 7th District, the shape will correspondingly benefit current Representative Kind and other Democrats in the 3rd District. No partisan advantage or disadvantage can be asserted with respect to the change of the location of the border between those two districts.

Overall, the Act 44 map also reflects changes resulting from the lack of growth from 2000 to 2010 in Milwaukee County, particularly as compared to relatively large increases in population in the Fox River Valley, the Madison area, the Milwaukee suburbs, and the Wisconsin suburbs of Minneapolis-St. Paul. This flat-lining of Milwaukee County's population is reflected in the shifting of most districts in the southern half of Wisconsin to the north and west and most districts in the northern half of the state to the south and east.

## 2.	The Allegations of Paragraph 55.

Similar to those found in paragraph 52, the factual allegations of paragraph 55, discussing alleged divisions of "communities of interest" (an apparent "standard" that is also unexplained), are extremely short and of limited scope:

> The congressional districts created by Act 44 impermissibly divide communities of interest:
>
> a.	Fox Valley Area:  The new statute unnecessarily fractures the Fox Valley area.  The City of Appleton is split between the 8th and 6th Congressional Districts, and the Cities of Neenah and Menasha are separated from the remaining Fox Valley municipalities.
>
> b.	Milwaukee Area:  Milwaukee County is now fractured into four separate districts, compared with the 2002 boundaries established by this Court[5] where the county was represented by only three members of Congress.

The allegations in paragraph 55(a) all stem from Act 44's joining together all of Calumet County as part of the 8th Congressional District, *see* Act 44, § 3 (creating 2011-12 Wis. Stat. § 3.18(1)), instead of splitting that county between the 6th and 8th Congressional Districts, as it had been under the 2002 legislation.  *See* 2009–10 Wis. Stat. §§ 3.16(2), 3.18(2).  Of particular import, Act 44's provisions deal with the fact that the City of Appleton lies in three separate counties:  Calumet, Winnebago, and Outagamie.  The act joins all portions of Appleton lying in Calumet County together in the 8th District, *see* Act 44, § 3 (creating 2011-12 Wis. Stat.

---

[5]  This is a telling misstatement of fact.  Congressional redistricting in 2002 resulted from legislative action, 2001 Wisconsin Act 46, which was necessarily bi-partisan legislation  At the time, the Governor was a Republican, as were a majority of the members of the Assembly.  The Senate was controlled by the Democratic Party.  Redistricting of the Legislature, on the other hand, proved impossible because of the partisan divide, and this Court's decree in *Baumgart v. Wendelberger*, No. 01-C-121, 2002 WL 34127471 (E.D. Wis. May 30, 2002), redistricted the Legislature.  This error in the Complaint's description of the source of  the Congressional redistricting that immediately preceded Act 44 is further indication of the plaintiffs' real focus in this case on Act 43.  Moreover, that Act 44's redistricting plan was the product of legislative action is constitutionally significant.  *LULAC*, 548 U.S. at 416 ("As the Constitution vests redistricting responsibilities foremost in the legislatures of the States and in Congress, a lawful, legislatively enacted plan should be preferable to one drawn by the courts.")  (Kennedy, J., lead opinion).

§ 3.18(1)), whereas the previous legislation resulted in those portions of Appleton being split between the 6th and 8th Districts.  *See* 2009–10 Wis. Stat. §§ 3.16(2)(e), 3.18(2)(b).  Meanwhile, Act 44 further respects the integrity of county boundaries by leaving the portion of the City of Appleton lying in Winnebago County in the 6th District, *see* Act 44, § 3 (creating 2011-12 Wis. Stat. § 3.16(4)(g)), and the portion of Appleton lying in Outagamie County in the 8th District, *see* Act 44, § 3 (creating 2011-12 Wis. Stat. § 3.18(1)), consistent with their placement under the previous legislation.  *See* 2009–10 Wis. Stat. §§ 3.16(1), 3.18(5)(f).

Likewise, Act 44 joins that portion of the City of Menasha lying in Calumet County with the rest of Calumet County as part of the 8th District, *see* Act 44, § 3 (creating 2011-12 Wis. Stat. § 3.18(1)), while leaving those portions of the City of Menasha lying in Winnebago County, along with all of the City and Town of Neenah (which lie in Winnebago County), in the 6th District, *see* Act 44, § 3 (creating 2011-12 Wis. Stat. §§ 3.16(4)(a), (f), (h)), where they were also placed in the previous districting legislation.  *See* 2009–10 Wis. Stat. § 3.16(1).  Respecting county boundaries, Act 44 results in the joining of all of Outagamie County, like Calumet County, in the 8th Congressional District, *see* Act 44, § 3 (creating 2011–12 Wis. Stat. § 3.18(1)), whereas Outagamie County had been split between the 6th and 8th Congressional Districts under the previous legislation.  *See* 2009–10 Wis. Stat. §§ 3.16(4), 3.18(5).

Finally, to put the allegations of paragraph 55(b) in context, Act 44 moves the Village of River Hills (2010 population: 1,597) and portions of the Village of Bayside lying in Milwaukee County (two-county 2010 population: 4,389) from the 5th Congressional District, *see* 2009–10 Wis. Stat. §§ 3.15(3)(a), (b), into the 6th Congressional District, *see* Act 44, § 3 (creating 2011-12 Wis. Stat. §§ 3.16(3)(a), (b)), which is the only reason that portions of

15

Milwaukee County – still by far the most populous county in the state – now lie in four Congressional districts, rather than the previous total of three different districts under the 2002 legislation. Act 44 joins the portion of the City of Milwaukee lying in Waukesha County with those portions of the City of Milwaukee lying in Milwaukee County, in the 4th Congressional District, *see* 2009–10 Wis. Stat. §§ 3.14(2)(b)), rather than separating those portions of the City of Milwaukee as the previous legislation did. *See* 2009–10 Wis. Stat. § 3.15(4)(f). Under the previous legislation, River Hills, Bayside, and other suburbs in northern Milwaukee County were not in the same Congressional district as the portions of the City of Milwaukee lying in Milwaukee County, *see* 2009–10 Wis. Stat. §§ 3.14(4), 3.15(3)(a)–(c)); other than River Hills and portions of Bayside, these suburbs now do lie in the 4th District. *See* Act 44, § 3 (creating 2011-12 Wis. Stat. §§ 3.14(1)(a)–(d)). In turn, this allows the entire City of West Allis, under Act 44, to be in a single Congressional district, the 5th, *see* Act 44, § 3 (creating 2011-12 Wis. Stat. § 3.15(3)), rather than having that city split among three districts (the 1st, 4th, and 5th Congressional Districts), as it was under the previous legislation. *See* 2009–10 Wis. Stat. §§ 3.11(2)(c), 3.14(3), 3.15(3)(d). Further, the adjustments to the 5th District allow Jefferson County to be joined in a single district, *see* Act 44, § 3 (creating 2011-12 Wis. Stat. § 3.15(1)), rather than having that county split among three different Congressional districts (the 2nd, 5th, and 6th Congressional Districts), as it was under the previous legislation. *See* 2009–10 Wis. Stat. §§ 3.12(2), 3.15(2), 3.16(3).

Overall, the sheer complexity of inquiry into even these short, bare allegations as to Act 44 leads to considerations much wider in scope than allowed by this brief. As the foregoing explains, within a more limited scope, mundane neutral results inhere in the Act 44 map, contrary to the Complaint's paragraphs 52 and 55, and the plaintiffs cannot possibly deny

that "partisan aims did not guide every line [the legislature] drew." *LULAC*, 548 U.S. at 417.

Equally clearly, however, these weak assertions show why plaintiffs and courts have failed to

arrive at an acceptably workable standard for delving into political gerrymandering claims. As

the foregoing shows, each of the purported missteps embodied in Act 44 is either wholly trifling

or advances countervailing considerations in drawing individual district lines.

<p style="padding-left:2em">

**C.**    **The Plaintiffs Fail to Identify a Workable Standard Upon Which Their Partisan Gerrymandering Claim Can Be Adjudicated Under the Equal Protection Clause.**

</p>

The courts do not presently have adequate tools at their disposal with which to

make justiciable such otherwise unwieldy claims, and the plaintiffs provide none. The *Vieth*

opinions require the dismissal of the Act 44 claims brought by the plaintiffs here. In advising

district courts how to interpret Justice Kennedy's concurrence, the *Vieth* plurality "suggest[ed]

that they must treat it as a reluctant fifth vote against justiciability at district and statewide levels

– a vote that may change in some future case but that holds, for the time being, that this matter is

nonjusticiable." 541 U.S. at 305 (Scalia, J., plurality opinion); *see also Kidd v. Cox*, No. 06-cv-

997, 2006 U.S. Dist. LEXIS 29689, at *44 (N.D. Ga. May 16, 2006) (noting that "*Vieth* comes

close to establishing that political gerrymandering cases are not justiciable" as a categorical rule).

This suggestion aside, Justice Kennedy's opinions in *Vieth* and *LULAC* do undoubtedly

acknowledge that political gerrymandering claims "are currently 'unsolvable.'" *See Radogno*,

2011 U.S. Dist. LEXIS 134520, at *8.

The plaintiffs ask this Court to join them in their fervent wish to solve the

unsolvable, but the Court should decline the invitation. Justice Kennedy's opinion allows for the

possibility that some day plaintiffs may find a way past the justiciability obstacle if everything

lines up perfectly in some future complaint. Even so construed, however, political

gerrymandering claims will only be viable if and when a reliable legal standard is adequately alleged and applied for the first time. At the time of *Vieth*, since there were "no agreed upon substantive principles of fairness in districting, [courts] have no basis on which to define clear, manageable, and politically neutral standards for measuring the particular burden a given partisan classification imposes on representational rights." 541 U.S. at 307–08 (Kennedy, J., concurring).

Under *Vieth*, the burden of discovering and alleging such reliable standards falls upon plaintiffs seeking to allege political gerrymandering claims: "[A]ppellants' complaint alleges no impermissible use of political classifications and so states no valid claim on which relief may be granted. It must be dismissed as a result." *Id.* at 313. In rejecting the proposed standards in *LULAC*, Justice Kennedy confirmed that "a successful claim attempting to identify unconstitutional acts of partisan gerrymandering must . . . show a burden, *as measured by a reliable standard*, on the complainants' representational rights." 548 U.S. at 418 (emphasis added). The *Vieth* plaintiffs failed in this task; so did the plaintiffs in *LULAC*. In each case, the political gerrymandering claims were dismissed because of the failure to allege a sufficient standard by which the Court could grant relief. Therefore, district courts "are bound by that approach, which accords with the black-letter principle that a complaint must state a valid claim for relief for litigation to move forward." *Perez v. State of Tex.*, No. 5:11-cv-360, Dkt. #285, at 22 (W.D. Tex. Sept. 2, 2011) (dismissing political gerrymandering claim on Rule 12(c) motion because plaintiffs failed to provide a reliable standard); *see also Comm. for a Fair and Balanced Map*, 2011 U.S. Dist. LEXIS 126278, at *31 (noting that Justice Kennedy "concluded that a complaint will fail to state a claim if the plaintiffs cannot articulate a justiciable standard").

Thus, allegation of a sufficiently reliable standard is a prerequisite for a viable political gerrymandering claim such as that asserted by the plaintiffs against Act 44.

Nevertheless, the plaintiffs here have not even attempted to delineate any standards for the Court to follow. Much less have they succeeded in becoming the first parties in the history of American jurisprudence to crystallize an adequately discernable and manageable standard. This failure is fatal to their claims of unconstitutional political gerrymandering in Act 44. These claims should be dismissed.

### D. Any Standard that the Complaint Could Be Read to Allege Has Already Been Rejected by the Supreme Court.

While district courts cannot be sure – because no one knows whether one exists – what the proper standard *is*, they can be assured of at least seven examples of what the proper standard is *not*. Between *Vieth* and *LULAC*, a majority of the Supreme Court has explicitly rejected at least seven proposed standards as deficient. *See Radogno*, 2011 U.S. Dist. LEXIS 134520, at *9–11 (collecting standards rejected by majorities of Court in *Vieth* and *LULAC*). Logically, where a plaintiff's proposed standard mimics one of those previously rejected by the Supreme Court, a district court is bound to reject the "new" standard proposed.

To begin with – and significantly in light of the teaching of *Vieth* and *LULAC* – the Complaint does not even try to articulate a standard. Nevertheless, to the extent that the allegations can be woven together to form any test at all, they can offer nothing beyond the tests already rejected. Indeed, they bear a very strong resemblance to the approach recommended by Justice Powell's opinion in *Bandemer*, an approach considered and rejected by a majority of the Court in *Vieth*. 541 U.S. at 290–91 (Scalia, J., plurality opinion); *id.* at 308 (Kennedy, J., concurring). Justice Powell's inquiry would have focused on comparing the shapes of the resulting districts, on the one hand, with neutral principles and existing political subdivision

boundaries, on the other, along with other considerations such as the legislative process by which the redistricting proposal was adopted. *Bandemer*, 478 U.S. at 173 (Powell, J., concurring in part, dissenting in part). This test was rejected in *Vieth* as an unworkable "totality-of-the-circumstances analysis" attempting to determine what would be "fair." *Vieth*, 541 U.S. at 291 ("'Fairness' does not seem to us a judicially manageable standard."). Instead, as with other plans proposed and rejected, and as with any standard that the Complaint here could be read to include, "[s]ome criterion more solid and more demonstrably met than that seems to us necessary to enable the state legislatures to discern the limits of their districting discretion, to meaningfully constrain the discretion of the courts, and to win public acceptance for the courts' intrusion into a process that is the very foundation of democratic decisionmaking." *Id.*

Here, the Complaint cannot be fairly read to suggest anything but a totality-of-the-circumstances approach. The Complaint itself makes this clear, despite its failure even to assert that it proposes or defines a standard. Most of the allegations that would presumably have to guide any attempt by the plaintiffs belatedly to formulate a standard for political gerrymandering claims would appear to be found in the Fifth Claim. However, several of these allegations do not even implicate Act 44; they are alleged only as to Act 43. (*See* Compl. ¶ 63 (regarding placement of incumbents in shared legislative districts); *id.* ¶ 64 (regarding theoretical effect on size of Republican legislative majority).) Further, significant allegations in the Eighth Claim apply only to Act 43. (*See* Compl. ¶ 91 (regarding unnecessary population deviations).) Either these allegations are necessary factors in the test put forward by the plaintiffs (in which case their not being alleged as to Act 44 is fatal), or they are merely a few among the many, unenumerated factors to be weighed against others in a totality-of-the-circumstances analysis (in which case the standard is foreclosed by *Vieth*'s rejection of Justice Powell's proposal).

Whichever position the plaintiffs may take, the Complaint's terms demand dismissal of the political gerrymandering claims as to Act 44.

Similarly, the examples offered in the Fifth Claim – a claim supposedly alleging wrongdoing as to both Act 43 and Act 44 – are drawn exclusively from Act 43's redistricting of the Legislature, not from Act 44's Congressional redistricting. (*See* Compl. ¶¶ 60(a), 60(b), 62(a), 62(b).) The plaintiffs' focus on Act 43 to provide support for any allegations of political gerrymandering shows that their entire criticism of the Congressional districts lies in their quibbles with the Act 44 map's district shapes, allegations found in paragraphs 52 and 55 of the Complaint and discussed in subsection I.B above.

The inadequacy of the Complaint's trivial "political gerrymandering" objections to state a claim for relief, whether viewed singly or globally, is thus apparent. Further, the plaintiffs' dependence upon these types of allegations shows that the Complaint in fact approximates Justice Powell's unworkable "totality of the circumstances" standard, which likewise gave primacy to the shapes of voting districts. Stripped down to its hollow core, the Complaint fails to state a claim under the Equal Protection Clause and must be dismissed.

## II.    ANY PURPORTED FIRST AMENDMENT BASIS FOR A POLITICAL GERRYMANDERING CLAIM IS INAPPROPRIATE AND BASELESS.

In addition to asserting violation of the Fourteenth Amendment, the Complaint also takes a second bite at the political gerrymandering apple by claiming that Act 44 violates the plaintiffs' First Amendment rights. The plaintiffs allege conclusorily in this regard that Acts 43 and 44 will (i) prevent Democrats from achieving a majority in the Wisconsin Senate, the Wisconsin Assembly, or in Wisconsin's Congressional delegation; (ii) impair the party's association and expression rights by limiting candidate recruitment and deterring Democratic

voters from casting ballots that "are likely to be meaningless"; and (iii) impair the ability of Democratic candidates or donors to raise campaign contributions.  (Compl. ¶¶ 65–67.)

These novel First Amendment allegations fail to state a claim as to Act 44. Initially, there is no reason to believe that any such claim is justiciable; the Supreme Court has never acknowledged the justiciability of First Amendment claims of political gerrymandering. Rather, the *Vieth* plurality rejected the very idea that the First Amendment could be used for such a claim, since "if sustained, [it] would render unlawful *all* consideration of political affiliation in districting, just as it renders *all* consideration of political affiliation in hiring for non-policy-level government jobs."  541 U.S. at 294 (discussing *Elrod v. Burns*, 427 U.S. 347 (1976)).  Justice Kennedy also recognized that the justiciability obstacle for a First Amendment claim remains to be tackled.  *Vieth*, 541 U.S. at 315.

Even aside from these grave concerns, however, it is clear that the allegations here simply do not implicate anyone's First Amendment rights.  *See, e.g.*, *Comm. for a Fair and Balanced Map*, 2011 U.S. Dist. LEXIS 126278, at *37; *Radogno*, 2011 U.S. Dist. LEXIS 122053, at *21. *Cf. Meese v. Keene*, 481 U.S. 465, 480–82 (1987) (finding statute's regulation of "political propaganda" was constitutional where it posed no obstacle to access to or distribution of materials and, therefore, "place[d] no burden on protected expression").  Where a state law does not prevent a party from engaging in political speech, it does not violate the Constitution. *Dobrovolny v. Moore*, 126 F.3d 1111, 1112 (8th Cir. 1997) (finding initiative process constitutional despite requirement for signatures equal to 10% of registered voters without notice of exact number needed, since it "in no way restricted their ability to circulate petitions or otherwise engage in political speech"). The plaintiffs remain free to campaign in hopes of electing their preferred candidates to more Congressional seats from Wisconsin, to recruit

candidates to run for such offices, to cast ballots to be counted in Congressional elections, and to raise money for use in Congressional campaigns. *See Kidd*, 2006 U.S. Dist. LEXIS 29689, at *49; *Radogno*, 2011 U.S. Dist. LEXIS 122053, at *21–22. The plaintiffs remain able to influence the political process through all such means of expression that they claim Act 44 infringes. *See League of Women Voters v. Quinn*, No. 11-cv-5569, 2011 U.S. Dist. LEXIS 125531, *10 (N.D. Ill. Oct. 27, 2011).

Instead, the plaintiffs seem to be asking the Court to redraw the map created by Act 44 to ensure that their political efforts are successful in future Congressional elections in Wisconsin.[6] No corresponding constitutional right exists. "The first amendment's protection of the freedom of association and of the rights to run for office, have one's name on the ballot, and present one's views to the electorate do not also include entitlement to success in those endeavors." *Washington v. Finlay*, 664 F.2d 913, 927–28 (4th Cir. 1981). *Cf. Bandemer*, 478 U.S. at 132 (finding that "a group's electoral power is not unconstitutionally diminished by the simple fact of an apportionment scheme that makes winning elections more difficult"). The plaintiffs' First Amendment rights have not been threatened by Act 44. The Complaint, therefore, fails to state a claim upon which relief can be granted with respect to any First Amendment claim.

## CONCLUSION

Expedited and complex redistricting litigation need not be made additionally burdensome by the inclusion of superfluous and meritless claims. Here, all the plaintiffs' claims as to Act 44 are meritless. Further consideration of them would not assist the Court in its

---

[6] Of course, if any marginal decrease in one party's ability to elect as many of its preferred candidates to office sufficed to state a political gerrymandering claim, no plan would be immune. In the world of decennial censuses and required redistricting, every periodic change to a districting map – however "neutral" by whatever standard a plaintiff or a court could one day hope to divine – would necessarily cause some shift in political prospects, inevitably in favor of some parties and to the detriment of others.

attempts to resolve the remaining Act 43 claims in an appropriately efficient manner.  The Act 44 claims, comprised of unsupported allegations of political gerrymandering in the creation of Congressional districts, fail to state any claim upon which relief can be granted.  The factual allegations can support no such relief, and, in any event, the plaintiffs have failed to offer discernible and manageable standards upon which this Court could rely in fashioning the requested relief.  All claims in this action should be dismissed to the extent that they implicate the provisions of Act 44.

Respectfully submitted,

FOLEY & LARDNER LLP

Dated this 8th day of December, 2011.

*s/ Thomas L. Shriner, Jr.*
Thomas L. Shriner, Jr. (WBN 1015208)
Kellen C. Kasper (WBN 1081365)
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin  53202-5306
414.297.5601 (TLS)
414.297.5783 (KCK)
414.297.4900 (facsimile)

Attorneys for Intervenor-Defendants
F. James Sensenbrenner, Jr., Thomas E. Petri, Paul D. Ryan, Jr., Reid J. Ribble, and Sean P. Duffy