# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ALVIN BALDUS, CARLENE BECHEN,
ELVIRA BUMPUS, RONALD
BIENDSEI, LESLIE W. DAVIS, III,
BRETT ECKSTEIN, GEORGIA
ROGERS, RICHARD KRESBACH,
ROCHELLE MOORE, AMY RISSEEUW,
JUDY ROBSON, JEANNE SANCHEZ-
BELL, CECELIA SCHLIEPP, TRAVIS
THYSSEN and
CINDY BARBERA,

Case No. 11-C-562
JPS-DPW-RMD

                 Plaintiffs,

TAMMY BALDWIN, GWENDOLYNNE
MOORE, and RONALD KIND,

                 Intervenor-Plaintiffs,

         v.

Members of the Wisconsin Government
Accountability Board, each only in his
official capacity: MICHAEL BRENNAN,
DAVID DEININGER, GERALD
NICHOL, THOMAS CANE, THOMAS
BARLAND, TIMOTHY VOCKE, and
KEVIN KENNEDY, Director and General
Counsel for the Wisconsin Government
Accountability Board,

                 Defendants,

F. JAMES SENSENBRENNER, JR.,
THOMAS E. PETRI, PAUL D. RYAN,
JR.,
REID J. RIBBLE, and SEAN P. DUFFY,

                 Intervenor-Defendants

VOCES DE LA FRONTERA, INC.,
RAMIRO VARA, OLGA VARA, JOSE
PEREZ, and ERICA RAMIREZ,

                    Plaintiffs,                    Case No. 11-CV-1011
                                                        JPS-DPW-RMD

          v.

Members of the Wisconsin Government
Accountability Board, each only in his
official capacity: MICHAEL BRENNAN,
DAVID DEININGER, GERALD
NICHOL, THOMAS CANE, THOMAS
BARLAND, TIMOTHY VOCKE, and
KEVIN KENNEDY, Director and General
Counsel for the Wisconsin Government
Accountability Board,

                    Defendants.

---

## Defendants' Memorandum In Support Of Motion For Protective Order

---

Defendants, Michael Brennan, David Deininger, Gerald Nichol, Thomas

Cane, Thomas Barland, Timothy Vocke, and Kevin Kennedy (each in their official

capacity), by their attorneys, J.B. Van Hollen, Attorney General, and

Maria S. Lazar, Assistant Attorney General, and Reinhart Boerner Van Deuren,

s.c., by Patrick J. Hodan, Daniel Kelly, and Colleen E. Fielkow, move the Court

for an order protecting them from the undue burden and expense of producing

material to the plaintiffs that is neither relevant nor reasonably calculated to lead

to the discovery of admissible evidence.

**Introduction**

Portions of the plaintiffs' second set of discovery requests seek information related to errors in the federal census. But there is no relationship between that information and anything in their complaint. Because information related to census errors will play no role in this case, the defendants should not be subjected to the extraordinary burden and expense of searching for and producing it.

The plaintiffs' twice-amended complaint challenges the constitutionality of Wisconsin's new state and congressional legislative district maps. Now that primary expert reports have been exchanged, and the plaintiffs have learned there is no merit to the claims they have made, they wish to start over and make this case about inaccuracies in the 2010 census (the "Census"). So, the day before exchanging the experts' rebuttal reports, the plaintiffs served a set of discovery requests that, in large part, relate not to their claims, but to whether the Government Accountability Board discovered errors in Census data as it implemented the new maps.

*Of course* the Government Accountability Board discovered Census errors while implementing the new maps. Everyone knows the Census is inaccurate. The Government Accountability Board knows it. Courts know it. The Federal government itself even publicly disclaims the accuracy of Census information. But the Census is the best information available for redistricting purposes, so courts treat it *as if* it was accurate in determining whether a legislature adopted constitutionally sound district maps.

3

Census data accuracy has always been a legal fiction. But it is a necessary one because, without it, neither Legislatures nor courts could ever draw new maps. So it is pointless to waste the limited amount of time between now and the trial gathering and producing information on a question that, as far as this case is concerned, is entirely academic.

The plaintiffs' discovery requests might, if properly limited, become sound (although misdirected). Some courts have suggested that if a redistricting authority obtains reliable information about a specific census inaccuracy *before* it adopts a new map, it may have an obligation to account for that error. Thus, it might be legitimate to ask for information related to Census errors the Wisconsin Legislature knew about before it adopted 2011 Wisconsin Acts 43 and 44. But errors discovered by the Government Accountability Board while *implementing* Acts 43 and 44 cannot, by definition, constitute errors known by the Legislature before *adopting* those Acts.

The only reliable source of information related to errors of which the Legislature knew before adopting the maps is the Legislature itself. The Government Accountability Board does not know what errors the Legislature learned of prior to passing Acts 43 and 44. Thus, should the court determine that errors known before adoption are relevant, it should order the plaintiffs to seek the information from the proper source, to wit, the Legislature.

4

**Facts**

**Universally-Known Census Errors**

Every ten years, as part of the decennial Census, the U.S. Census Bureau collects demographic and geographical information across the country and compiles the data for use by states, counties, and municipalities to draw new district lines.[1] The census data is broken down by census blocks, which provide the basic building block for electoral districts.[2] Census blocks contain population and demographic information necessary to draw constitutional maps.[3] The boundaries for the census blocks frequently follow administrative boundaries such as municipal and school boundaries and physical features such as roads and waterways.[4] In Wisconsin, census blocks are used to build wards. State Assembly, State Senate and Congressional districts.[5]

The geographic information that results from the census, including census blocks, roads and waterways, municipal and school boundaries, and other geographical data sets maintained by the Census Bureau are provided to states in what is known as TIGER maps files ("Topologically Integrated Geographic Encoding and Referencing").[6] Those TIGER map files and demographic

---

[1] Declaration of Kevin Kennedy ¶6 (dated January 16, 2012) ("Kennedy Dec.").

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.*

5

information are then loaded into a WISE-LR, a tool administered by the

Legislative Technology Services Board ("LTSB").[7]  The State Legislature or

federal court panel then uses WISE-LR to draw redistricting maps.[8]

Historically, the census data used by the State Legislature or federal three-

judge court panels to draw redistricting maps has been inaccurate and incomplete.[9]

These inaccuracies stem from three primary sources.[10]

First, the census itself (that is, the counting of people by the Census

Bureau) is never entirely accurate.[11]  That is, the Census Bureau misses some

people during its count.[12]

Second, the boundary lines in the geographical maps used by the census are

not always accurate.[13]  The Census Bureau openly acknowledges this.[14]

According to the U.S. Census Bureau website (www.census.gov), the boundaries

in the TIGER map files are for Census Bureau statistical data collection and

tabulation purposes only.[15]  As a result, when superimposing TIGER maps over

---

[7] *Id.* at ¶7.

[8] *Id.*

[9] *Id.* at ¶8.

[10] *Id.*

[11] *Id.* at 9.

[12] *Id.*

[13] *Id.* at ¶10.

[14] *Id.*

[15] *Id.*

more accurate political subdivision maps, the census blocks sometimes appear in the wrong political subdivisions, or straddle them.[16]

Third, the census is outdated as soon as it is released to the public.[17] In the intervening period between release of the census data and adoption of redistricting maps, as in 1982, 1992 and 2002 (which can be almost two years in some cases), some voters have moved, other voters have died, babies have been born, non-voting age citizens have become of voting age, and some boundary lines have shifted through annexations.[18]

After every redistricting, it is a challenge for defendants and municipal and county clerks alike to reconcile the maps the court or State Legislature has drawn using the flawed census data with the "reality" on the ground.[19] For example, following the passage of the 2002 court drawn map, there were widespread complaints that the TIGER data from the 2000 Census was inaccurate in both geographical and administrative boundaries.[20] Specifically, when the TIGER data was overlaid with actual municipal boundaries, road lines and bodies of water, the TIGER data did not match the municipal boundaries.[21] This further became apparent during the 2011 recall elections where addresses that were challenged

---

[16] *Id.*

[17] *Id.* at ¶11.

[18] *Id.*

[19] *Id.* at ¶12.

[20] *Id.*

[21] *Id.*

using the legislative maps were then overturned by the Government Accountability Board based on more accurate information in the Statewide Voter Registration System ("SVRS").[22]

Based on information gathered from state and local GIS authorities thus far relating to the 2011 redistricting, there appears to be consensus that the TIGER data from the 2010 census was more accurate in terms of geography (roads, waterways) than it was in 2000.[23]  However, the data still contains inaccuracies with boundaries, specifically municipal and school district boundaries.[24]  These inaccuracies are due to several factors, including correct boundaries appearing in the wrong place, annexations that occurred prior to the 2010 census but which were not included in the TIGER 2010 dataset, and other general inaccuracies.[25]

### Discovery Requests For Which Protective Order Needed

The following discovery requests, either in whole or in part, seek information that is neither relevant to this case, nor reasonably calculated to lead to the discovery of admissible evidence:

### Interrogatory No. 11

Identify every person with whom any GAB member or employee has communicated, verbally or in writing , about the "anomalies" referenced in Interrogatory No. 10 and describe the circumstances and the substance of the communication. This

---

[22] *Id.*

[23] *Id.* at ¶13.

[24] *Id.*

[25] *Id.*

includes but is not limited to any local government officials with responsibility for voter registration or voting in any election.[26]

**Interrogatory No. 15:**

Identify every person with whom any GAB member or employee has communicated, verbally or in writing, about the planning, development, negotiation, drawing, revision, redrawing, or discussion of the districts and maps codified in Wisconsin Acts 43 or 44 or any other draft, potential, or proposed redistricting plan. This includes but is not limited to the"implementation" of Act 43 and 44.[27]

**Request for Production No. 15:**

Provide every document that discusses, describes, or relates to the "anomalies" referred to in Interrogatory Nos. 10 and 11.[28]

## Argument

Courts have developed the legal fiction that the census is accurate so that legislatures (and, sometimes, courts) may rely on that data in developing new legislative district maps. Consequently, inaccuracies in the census are only potentially relevant to this case if the Legislature knew of specific errors *before* adopting Acts 43 and 44. Errors discovered by the Government Accountability Board *after* the new maps were adopted can say nothing about the validity of Acts

---

[26] Declaration of Daniel Kelly ¶ 2, Ex. A ("Kelly Dec.")). Interrogatory No. 10, while seeking irrelevant information, is not unduly burdensome and so the Government Accountability Board is providing a response to it. That interrogatory asks:

> When and in what manner did you become aware of the "anomalies" described in the January 10, 2012 news article in the Wisconsin State Journal with the headline "Errors in redistricting process could affect thousands of voters" and, apparently, described in at least one Government Accountability Board ("GAB") memorandum?

*Id.* (footnote omitted).

[27] *Id.*

[28] *Id.*

43 and 44. Thus, the Government Accountability Board should not be subjected to the extraordinary burden and expense of producing information in this case that is of only academic interest.

If the plaintiffs are interested in census inaccuracies about which the Legislature knew before adopting Acts 43 and 44, that will have to come from the Legislature itself. The Government Accountability Board does not know whether the Legislature was aware of them before adopting the new maps.[29]

## I.      Standard for Protective Order

Rule 26(b)(1) permits "discovery regarding any nonprivileged matter that is *relevant to any party's claim or defense . . .*" Fed. R. Civ. P. 26(b)(1). Although courts allow parties significant latitude with their discovery requests, there are limits. A party may not demand production of material unless it appears reasonably calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26(b)(1).

When someone exceeds proper discovery boundaries, Rule 26(c) allows a party to request an order to protect against annoyance, embarrassment, oppression, or undue burden or expense. Fed. R. Civ. P. 26(c)(1). District courts have "broad discretion" to fashion an appropriate protective order limiting discovery. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002). For the following reasons, the Government Accountability Board needs an order to protect

---

[29] Kennedy Dec. at ¶4.

it from the undue burden and expense of producing material that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

## II.    Census Errors Are Not Relevant To This Case

The plaintiffs have filed three complaints in this case so far.  And in none of them do they claim that 2011 Acts 43 and 44 are unsound because of errors in the census.  They say the maps do not honor traditional redistricting principles, split too many municipalities, cause too much delayed voting, are influenced by partisan considerations, and violate the Voting Rights Act.  But in none of the three versions of their complaint do they say anything about census inaccuracies causing any infirmities.

Now, at the last minute, the plaintiffs have acquired a great interest in the specific census errors the Government Accountability Board discovered while implementing Acts 43 and 44.  Errors, that is to say, that no one knew about when the Legislature was drafting, considering, and adopting the new maps.  And this new-found interest arose only after the parties had already exchanged their primary expert witness reports and just one day before they exchanged their rebuttal expert reports.

These discovery requests are, in reality, nothing more than a back-door attempt to amend their complaint (yet again) to assert some new cause of action related to census inaccuracies.  If the plaintiffs are allowed to proceed in this manner, there will need to be new deadlines for amending pleadings, answering or otherwise responding to those amended pleadings, exchanging expert reports on

the irrelevancy of census errors, exchanging rebuttal reports to further establish the errors' irrelevancy, close of discovery, motion filings, submission of stipulated and contested statements of fact, filing of trial briefs, and conduct of the final pre-trial conference.. There is no conceivable way of accomplishing all of this before trial (currently scheduled to begin on February 21, 2012).

Fortunately, none of this is even remotely necessary. The fact that every decennial census contains errors has been known for decades. And for just as long, courts have held those errors are irrelevant to determining whether district maps are constitutionally sound.

### A. Census Data Is Presumed Accurate For Redistricting Purposes.

Census inaccuracies discovered after a new legislative map has been adopted cannot possibly be relevant to the constitutionality of the maps. Redistricting authorities are entitled to presume the accuracy of the census as they perform their duties. This is an unremarkable principle in the Seventh Circuit, which has said that "[t]he census is presumed accurate until proven otherwise." *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 946 (7th Cir. 1988).

That presumption holds even though everyone, including the United States Supreme Court, knows the census is *not*, in fact, accurate:

> [T]he basic statistical materials which legislatures and courts usually have to work with are the results of the United States census taken at 10-year intervals and published as soon as possible after the beginning of each decade. These figures may be as accurate as such immense undertakings can be, but they are inherently less than absolutely accurate. Those who know about such things recognize this fact, and, unless they are to be wholly ignored, it makes little sense to conclude from relatively minor

'census population' variations among legislative districts that any person's vote is being substantially diluted. The 'population' of a legislative district is just not that knowable to be used for such refined judgments.

*Gaffney v. Cummings*, 412 U.S. 735, 745-46 (1973) (footnote omitted).[30]

Courts recognize this presumption of accuracy, even when everyone knows there are errors, as a legal fiction. But it is a necessary fiction, because without it redistricting would be an impossible project: "States operate under the legal fiction that their plans are constitutionally apportioned throughout the decade, a presumption that is necessary to avoid constant redistricting, with accompanying costs and instability." *League of United Latin American Citizens v. Perry,* 548 U.S. 399, 421 (2006). This is a fiction to which courts across the country adhere.[31]

---

[30] The Supreme Court approvingly quoted an authority on census errors who noted that:

> A census, by its nature, can never be an exact count of a nation. This is especially true of the United States . . .. Thus, an error of 1 or 2 percent in the count of the total population is to be expected; professionally, it is regarded as an 'acceptable' error.'

> The Census Bureau estimates that the 1970 census had an under-coverage rate of 2.5%, or about 5,300,000 people. Address of J. S. Siegel, Population Association of America Annual Meeting, in New Orleans, La., Apr. 26, 1973. See N.Y. Times, Apr. 26, 1973, p. 1, col. 1.

*Gaffney*, 412 U.S. 735, 746 n.10 (quoting H. Alterman, Counting People: The Census in History 262 (1969)).

[31] *Georgia v. Ashcroft*, 539 U.S. 461, 489, n. 2 (2003) ("When the decennial census numbers are released, States must redistrict to account for any changes or shifts in population. But before the new census, States operate under the legal fiction that even 10 years later, the plans are constitutionally apportioned."); *Dickinson v. Indiana State Election Bd.*, 933 F.2d 497 (7th Cir. 1991) (1980 census data best available evidence of population in a particular data as of 1990, even though the data is old); *Johnson v. Miller*, 922 F.Supp. 1556, 1563 (S.D. Ga. 1995) (three judge panel) ("In the calculus of district population deviation, our only measure of the state's demographics is the decennial census. Since the population is not static, we adhered to the fiction that the census block figures are accurate to the exclusion of all others."); *People ex rel. Salazar v. Davidson*, 79 P.3d 1221, 1233 (Colo. 2003) ("The United States Supreme Court has recognized the legal fiction that these figures remain accurate for the entire ten years between censuses. Consequently, according to this legal fiction, when states create same-size districts that adhere to one-person, one-vote standards at the beginning of the decade, these districts remain

---

13

If census errors are relevant, as the plaintiffs' discovery requests imply, legislative district maps would be under constant danger of challenge. Whatever current or past errors the plaintiffs might think they can identify, there are innumerable others being created with each passing moment. That is because populations are inherently dynamic, and people do not stand still for long after being counted. They are born, they die, they move into or out of Wisconsin, and they move about inside our borders. Every one of those events, each time they occur, makes the census more and more erroneous. And not only *will* those events occur between now and the trial, they have *already occurred* to a largely unknowable extent over the past nearly two years since the effective date of the census.

But we can estimate the magnitude of error some of these events are introducing. It has been about 21 months since "Census Day" (April 1, 2010). In 2010, 66,386 children were born in this state, and 47,212 people died.[32] Thus, assuming for the sake of this rough estimate that Wisconsin experienced the same demographic changes in 2011, there have been 124,473 additions to population, and 88,522 subtractions since Census Day. None of these changes are reflected anywhere in the Census, and it is impossible to know in which census blocks they

---

constitutionally valid on equal population grounds until the next census, even though the states' populations actually shift and change in the intervening years.") (citing *Georgia,* 539 U.S. at 489, n. 2); *Silver v. Reagan*, 67 Cal.2d 452, 457, 432 P.2d 26, 62 Cal. Rpt. 424 (1967) ("inequalities resulting from population shifts during the 10 years between regular censuses are reasonable") (citing *Reynolds v. Sims*, 377 U.S. 533, 583-84 (1944)).

[32] Kelly Dec. ¶¶ 3-4, Exs. B, C.

occurred. Nor does the Census account for the unknown number of people who have moved over the past 21 months.

If the census errors the Government Accountability Board has discovered are relevant to determining the constitutionality of Acts 43 and 44, then the Court must account for *all* of the errors that have crept into the data – including births, deaths, and individuals who moved. And even if the Court could accomplish such a daunting task, its job would not be done. In fact, it would never be done. The day after determining with finality the true and accurate census data, it would once again change. And this change would, presumably, lead the plaintiffs to send yet another round of discovery requests seeking information about the new inaccuracies.

This is the reason for the "presumption of accuracy" of which the courts speak. Essentially, it creates an "as-of" date for purposes of determining the constitutionality of legislative district maps. That is, the census data is presumed accurate "as-of" the date the new maps are being developed. This allows the redistricting authorities to do their work without fear that it will be challenged when census errors (unknown at the time) inevitably surface during the implementation of the new maps.

If, however, someone can rebut the presumption of accuracy *before* adoption of the new maps, then the redistricting authority may need to correct the data on which it relies in establishing new district boundaries. Following the 2000 census, the Oregon Secretary of State learned of specific census errors at a public

hearing related to the State's apportionment plan, but did nothing to correct them before adopting new maps. *Hartung v. Bradbury,* 332 Or. 570, 598, 33 P.2d 972, 986 (2001). The Oregon Supreme Court held that, having learned of specific errors, "the Secretary of State's decision not to attempt to obtain additional or different reliable data regarding the population of the prison census block was one that no reasonable Secretary of State would make." *Id.* at 987.

The objectionable portion of plaintiffs' discovery requests, however, do not seek evidence of census errors of which the Legislature was aware before adopting Acts 43 and 44. As we discuss below, they instead seek information about errors the Government Accountability Board discovered only *after* the Legislature passed the new maps.

### B. The Objectionable Discovery Requests.

The interrogatories and document production request discussed below seek irrelevant information. Additionally, searching for and producing this irrelevant information would be extraordinarily burdensome, require considerable time to accomplish, and would be done at significant expense.[33] And if the discovery is allowed, defendants will likely need to search for documents that were created ten years ago to show the Court that the 2002 court plan contained the same types of census errors.[34] This will impose additional burdens on defendants.[35]

---

[33] Kennedy Dec. at ¶18.

[34] *Id.*

[35] *Id.*

1.      **Interrogatory No. 11.**

The plaintiffs ask the Government Accountability Board to

> Identify every person with whom any GAB member or employee has communicated, verbally or in writing , about the "anomalies" referenced in Interrogatory No. 10 and describe the circumstances and the substance of the communication. This includes but is not limited to any local government officials with responsibility for voter registration or voting in any election.[36]

Presumably, the "anomalies" to which this interrogatory refers are the census errors the Government Accountability Board has discovered while implementing Acts 43 and 44.  If that is indeed the case, the Government Accountability Board did not learn of them until sometime in the Fall of 2011, long after Acts 43 and 44 were already adopted.[37]

Because the Government Accountability Board only discovered these census errors *after* the Legislature adopted Acts 43 and 44, they can say nothing about what the Legislature did or did not know while drafting the new legislative district maps.  And because specific census errors can only be relevant if known before adoption of a map, the information this interrogatory seeks is irrelevant.

Not only does this interrogatory seek an irrelevancy, it would be extraordinarily burdensome to search for the responsive information.[38]  There are 72 county clerks and 1,851 municipal clerks in Wisconsin.[39]  Defendants have

---

[36] Kelly Dec. ¶ 2, Ex. A.

[37] Kennedy Dec. at ¶3.

[38] *Id*. at ¶18.

[39] *Id*. at ¶15.

likely had some sort of communication with each of those clerks about census errors since the fall of 2011.[40]  In addition, defendants have likely had conversations about the errors with (1) numerous county and municipal Geographic Information Systems specialists or other technical people; (2) the Legislative Reference Bureau, and (3) the Legislative Technology Services Bureau.[41]  As a result, there are likely tens of thousands of documents on defendants' computer database that would need to be retrieved and reviewed to respond to this request.[42]

### 2.    Interrogatory No. 15.

This interrogatory asks the defendants to

> Identify every person with whom any GAB member or employee has communicated, verbally or in writing, about the planning, development, negotiation, drawing, revision, redrawing, or discussion of the districts and maps codified in Wisconsin Acts 43 or 44 or any other draft, potential, or proposed redistricting plan. This includes but is not limited to the "implementation" of Act 43 and 44.[43]

It is the second sentence of this interrogatory that makes it objectionable. The defendants can, and will, provide information known to them that is responsive to the first sentence.  But to the extent this interrogatory seeks this information as it relates to implementation of Acts 43 and 44, it seeks an

---

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] Kelly Dec. ¶ 2, Ex. A.

irrelevancy for the same reasons discussed with respect to Interrogatory 11. And it would cause the same extraordinary burden and expense in trying to respond.[44]

### 2. Request for Production No. 15.

This document production request, although seemingly simple, creates a greater burden than any of the other discovery requests. It asks the Government Accountability Board to "[p]rovide every document that discusses, describes, or relates to the "anomalies" referred to in Interrogatory Nos. 10 and 11."[45]

As described above, just identifying the individuals with whom the defendants have discussed the census errors they have discovered while implementing Acts 43 and 44 would require searching for and reviewing tens of thousands of documents. This document production request would add to that burden by requiring defendants to incur the massive expense of producing all of those documents.[46]

Defendants can ill-afford the manpower that would be necessary to search for, review, and produce tens of thousands of irrelevant documents just to satisfy the plaintiffs academic curiosity. They are already facing considerable challenges that are straining its resources.[47] On Tuesday, January 17, 2012, defendants expect that six recall petitions will be filed containing approximately 1.5 million signatures that the GAB must carefully examine under Wisconsin law and in

---

[44] Kennedy Dec. at ¶16.

[45] Kelly Dec. ¶ 2, Ex. A.

[46] Kennedy Dec. at ¶17.

[47] *Id.* at ¶19.

accord with a recent state court order.[48]  As a result of those obligations alone, defendants will be forced to hire approximately 50 additional employees and devote substantial resources exclusively to recall matters.[49]  Additionally, due to the voter identification law recently passed, defendants must spend considerable efforts working with local community groups and providing information to the general public.[50]

## Conclusion

For the reasons discussed above, the Government Accountability Board asks this Court to issue an order that it need not produce the irrelevant information requested by the plaintiffs in Interrogatories 11 and 15, and Document Production Request 15.

---

[48] *Id.*

[49] *Id.*

[50] *Id.*

Dated this 16th day of January, 2012.

J.B. VAN HOLLEN
Attorney General

s/Maria S. Lazar
MARIA S. LAZAR
Assistant Attorney General
State Bar #1017150

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-3519
(608) 267-2223 (fax)
lazarms@doj.state.wi.us

Reinhart Boerner Van Deuren s.c.          s/Daniel Kelly
1000 North Water Street, Suite            Daniel Kelly
1700                                      WI State Bar ID No. 1001941
Milwaukee, WI 53202                       dkelly@reinhartlaw.com
Telephone:  414-298-1000                  Patrick J. Hodan
Facsimile:  414-298-8097                  WI State Bar ID No. 1001233
                                          phodan@reinhartlaw.com
                                          Colleen E. Fielkow
                                          WI State Bar ID No. 1038437
                                          cfielkow@reinhartlaw.com
                                          Attorneys for Defendants

REINHART\8231813

21