# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ALVIN BALDUS, CINDY BARBERA, CARLENE
BECHEN, RONALD BIENDSEIL, RON BOONE, VERA
BOONE, ELVIRA BUMPUS, EVANJELINA
CLEEREMAN, SHEILA COCHRAN, LESLIE W.
DAVIS III, BRETT ECKSTEIN, MAXINE HOUGH,
CLARENCE JOHNSON, RICHARD KRESBACH,
RICHARD LANGE, GLADYS MANZANET,
ROCHELLE MOORE, AMY RISSEEUW, JUDY
ROBSON, GLORIA ROGERS, JEANNE SANCHEZ-
BELL, CECELIA SCHLIEPP, TRAVIS THYSSEN,

         Plaintiffs,

TAMMY BALDWIN, GWENDOLYNNE MOORE
and RONALD KIND,

         Intervenor-Plaintiffs,

   v.

Members of the Wisconsin Government Accountability
Board, each only in his official capacity:
MICHAEL BRENNAN, DAVID DEININGER, GERALD
NICHOL, THOMAS CANE, THOMAS BARLAND, and
TIMOTHY VOCKE, and KEVIN KENNEDY, Director
and General Counsel for the Wisconsin Government
Accountability Board,

         Defendants,

F. JAMES SENSENBRENNER, JR., THOMAS E. PETRI,
PAUL D. RYAN, JR., REID J. RIBBLE,
and SEAN P. DUFFY,

         Intervenor-Defendants.

Civil Action
File No. 11-CV-562

Three-judge panel
28 U.S.C. § 2284

(caption continued on next page)

---

## RULE 26 EXPERT REPORT OF DR. KENNETH R. MAYER


EXHIBIT
F
tabbies

1

VOCES DE LA FRONTERA, INC., RAMIRO VARA,
OLGA WARA, JOSE PEREZ, and ERICA RAMIREZ,

        Plaintiffs,

v.

        Case No. 11-CV-1011
        JPS-DPW-RMD

Members of the Wisconsin Government Accountability
Board, each only in his official capacity:
MICHAEL BRENNAN, DAVID DEININGER, GERALD
NICHOL, THOMAS CANE, THOMAS BARLAND, and
TIMOTHY VOCKE, and KEVIN KENNEDY, Director
and General Counsel for the Wisconsin Government
Accountability Board,

        Defendants.

## I.    Introduction

My name is Ken Mayer and I currently am a Professor of Political Science at the

University of Wisconsin – Madison, and a faculty affiliate at the Lafollette School of Public

Affairs, at the University. I joined the faculty in 1989. I teach courses on American politics, the

presidency, Congress, campaign finance, election law, and electoral systems.

I have been asked by counsel representing the plaintiffs in this lawsuit (the "Plaintiffs")

to analyze and provide expert opinions in the above-captioned case. Specifically, I have been

asked to evaluate whether, in my opinion, whether the redistricting plans enacted in Acts 43

and 44 comply with traditional redistricting principles and adhere to Section 2 of the Voting

Rights Act. I submit this report, which contains the opinions that I intend to give in this matter.

My opinions, which are based on the technical and specialized knowledge that I have

gained from my education, training and experience, are premised on widely accepted and reliable

methods of analysis and application of traditional redistricting criteria, and are based on my

review and analysis of the following information and materials:

2

- The pleadings filed in this case by the parties, including:

  - Plaintiffs' Second Amended Complaint dated November 18, 2011, Docket No. 48

  - December 8, 2011 Correspondence from Defendants' Counsel to Attorney Mason responding to Plaintiffs' December 5th letter and third-party data obtained on behalf of defendants

- Other documents:

  - Microsoft Excel Spreadsheet, filename "Act_44_Demographics"

  - Assembly Chart entitled, "Summary Core Constituency Report" dated December 9, 2011

  - Senate Chart entitled, "Summary Core Constituency Report" dated December 9, 2011

  - Microsoft Excel Spreadsheet, filename "Redistricting Population Movement by District"

  - Microsoft Excel Spreadsheet, filename "GOP 2266 Demographics All"

  - Microsoft Excel Spreadsheet, filename "City of Milwaukee Surname Svrs Counts"

  - Microsoft Excel Spreadsheet, filename "City of Milwaukee Surname Svrs Counts (1)"

  - Microsoft Excel Spreadsheet, filename "Assembly 2011 Split Geography"

  - Microsoft Excel Spreadsheet, filename "Senate 2011 Split Geography"

  - Senate 2011 Chart entitled, "Split Geography Report – By Geography" dated December 11, 2011

  - Senate 2011 Chart entitled, "Split Geography Report" dated December 11, 2011

  - Assembly 2011 Chart entitled, "Split Geography Report – By Geography" dated December 11, 2011

  - Assembly 2011 Chart entitled, "Split Geography Report" dated December 11, 2011

  - Map, filename "Mayer_Latino_07182011 autoBound Plan with Major Roads"

  - Map, filename "Mayer_Latino_07182011autoBound Plan"

3

- Microsoft Excel Spreadsheet, filename "Disenfranchisement by 2011 SD with Demographics"

- Microsoft Excel Spreadsheet, filename "Assembly 2011 Split Geography"

- Microsoft Excel Spreadsheet, filename "Senate 2011 Split Geography"

- Microsoft Excel Spreadsheet, filename "City of Milwaukee Surname Svrs Counts"

- Microsoft Excel Spreadsheet, filename "Latino Dist Pop Stats"

- Microsoft Excel Spreadsheet, filename "Assembly 2001 Compactness Report"

- Assembly 2001 Compactness Analysis Report dated December 10, 2011

- Microsoft Excel Spreadsheet, filename "Assembly 2001 Compactness Report" dated December 10, 2011

- Microsoft Excel Spreadsheet, filename "Assembly 2011 Compactness Report"

- Assembly Compactness Analysis Report dated December 10, 2011

- Microsoft Excel Spreadsheet, filename "Assembly 2011 Compactness Report" dated December 10, 2011

- Microsoft Excel Spreadsheet, filename "City of Milwaukee Surname Svrs Counts"

- Microsoft Excel Spreadsheet, filename "Senate 2001 Compactness Report"

- Senate 2001 Compactness Analysis Report dated December 10, 2011

- Microsoft Excel Spreadsheet, filename "Senate 2001 Compactness Report" dated December 10, 2011

- Microsoft Excel Spreadsheet, filename "Senate 2011 Compactness Report"

- Senate Compactness Analysis Report dated December 10, 2011

- Microsoft Excel Spreadsheet, filename "Senate 2011 Compactness Report"

- Mayer_Latino Auto-Bound Plan Single AD dated July 18, 2011

- Meyer_Latino_AD8 zip file

4

## II. Qualifications, Publications, Testimony, and Compensation

I have a Ph.D. in political science from Yale University, where my graduate training included courses in econometrics and statistics. My undergraduate degree is from the University of California, San Diego, where I majored in political science and minored in applied mathematics. My curriculum vitae is attached to this report as Exhibit 1.

All publications that I have authored and published in the past ten years appear in my curriculum vitae, attached as Exhibit 1. Those publications include the following peer-reviewed journals: Journal of Politics, The American Journal of Political Science, Legislative Studies Quarterly, Presidential Studies Quarterly, Congress and the Presidency, Public Administration Review, and PS: Political Science and Politics. I have also published in law reviews, including the Richmond Law Review and the UCLA Pacific Basin Law Journal. My work on campaign finance has been published in Legislative Studies Quarterly, Regulation, PS: Political Science and Politics, Richmond Law Review, the Democratic Audit of Australia, and in an edited volume on electoral competitiveness published by the Brookings Institution Press. My work on election administration has been published in the peer-reviewed Election Law Journal, and I have been retained as a consultant by the Government Accountability Board to review their compliance with federal mandates, reporting systems, and to survey local election officials throughout the state. I am currently beginning a project with the GAB to review their polling place incident log system.

My work on campaign finance has been cited by the Government Accountability Office, and by legislative research offices in Connecticut and Wisconsin.

In the past four years, I have testified as an expert witness in trial or deposition in the following cases: *McComish v. Brewer*, No. 08-1550 (D. Ariz.) (Arizona campaign finance case,

5

2008-2009); *Kenosha County v. City of Kenosha*, No. 11-CV-1813 (Kenosha County Circuit Court, Kenosha, WI, 2011).

I am being compensated at a rate of $250 per hour.

## III.  Opinions

### A.  Summary

My opinions may be summarized as follows.  Below, I set forth my opinions in greater detail.

- 2011 Wisconsin Act 43 does not sufficiently comply with traditional redistricting principles and demonstrate several examples of unnecessary and arbitrary deviations from these principles.  These include excessive population shifts that were not necessary to achieve population equality; failure to preserve core district populations; arbitrary and partisan decisions regarding the compactness of legislative districts; and excessively and unnecessarily disenfranchising voters who will lose their vote in the 2012 state Senate elections.

- 2011 Wisconsin Act 43 does not comply with Section 2 of the Voting Rights Act because it fails to create any state Assembly districts with an effective majority of a Latino citizen voting-age population, and it packs African-Americans into five Assembly districts with excessively and unnecessarily high concentrations of African-American voters.

- It appears that the confessional redistricting plan has the same flaws as the legislative plan, with respect to the arbitrary movement of more people than was necessary to achieve population equality and failure to adhere to traditional redistricting principles. Absent explanation, there is no apparent apolitical reason for the changes made.

### B.  The Redistricting Act Does Not Comply With Traditional Redistricting Principles.

Under the Wisconsin Constitution, both congressional and state legislative redistricting acts must comply with federal and state constitutional requirements.  The Wisconsin Constitution (Article IV, Section 4) requires the legislature to draw Senate and Assembly districts that consist of contiguous territory and be in as compact form as practicable.  In addition to the statutory and constitutional requirements, states are bound to comply with traditional redistricting principles, which include:

6

(1)    respect for existing political subdivisions, and minimizing the number of
       jurisdictions split among legislative districts;

(2)    maintaining communities of interest;

(3)    preserving core population of existing districts where possible;

(4)    disenfranchising as few voters as required under the applicable standards.

These traditional criteria have the effect of enhancing voting equality while at the same time protecting relationships between voters and their representatives.

It is apparent that the existing redistricting plan (codified in Acts 43 and 44) departs substantially from these principles. In particular, in four major respects the plan does not comply with these principles: (a) the plan shifts far more individuals between districts than is necessary to achieve acceptable population deviations; (b) the plan does not adequately preserve core district populations; (c) the plan needlessly and arbitrarily splits local political subdivisions, and fails to preserve important communities of interest; and (d) the plan disenfranchises an excessive number of individuals by moving them out of even numbered Senate districts and into odd-numbered districts, therefore depriving these voters of the opportunity to vote in the 2012 legislative elections. I discuss each of these conclusions in more detail below.

### 1.    The redistricting plan shifts an excessive and unnecessary number of individuals between districts in the process of equalizing district populations.

In redrawing district lines after each decennial census, the primary goal is to equalize population in accordance with the U.S. Supreme Court's longstanding "one person-one vote" jurisprudence. Over the course of the previous decade, population shifts, migration, population growth, and population declines across a state invariably result in legislative districts that have unequal populations; the result is that voters in smaller districts have more voting power, in the sense that their votes have more weight in legislative elections, than voters in more populous

7

districts. The solution is to redraw district lines so that the populations are once again equal, based on the results of the decennial census.[1]

Redrawing lines inevitably means that some districts must be altered to include more people, while others must be altered to exclude some people. But the need to equalize population must be balanced against other redistricting criteria, such as the need to maintain core district population, so that voters are not arbitrarily moved from one district to another every 10 years. Such whipsawing will have the effect of disrupting the relationship between voters and their representatives, if voters are simply shifted into new districts; without some degree of stability, voters who may have established relationships with their legislators will be forced to begin anew with a different slate of legislators (or with each other as constituents and community leaders) and legislators who may lack familiarity with the needs and interests of a constituency or population that is arbitrarily added to their district.

This discussion does not deny that some population shifts are necessary, or that the need for population equality – although not necessarily exact population equality – is trumped by the interest in representational stability. Rather, it is to say that the process of obtaining constitutional equality must occur while recognizing the importance of minimizing the number of dramatic changes in district configurations (as measured, by proxy, by core population retention).

On this score, it is apparent that the enacted redistricting plan shifts an entirely unnecessary and excessive number of individuals between districts. In Exhibit 2, the first three columns list, for the 99 State Assembly districts, the population of existing districts (pre-

---

[1] States are permitted some latitude in how equal the populations must be in order to comply with court-established standards. Congressional districts must be nearly exactly equal in populations. State legislative districts are permitted to vary somewhat more, – indeed, by as much as 10% or more – although any deviations from ideal population must be justified by some valid state interest.

8

redistricting), the number of people who must be moved in order to achieve zero deviation from the ideal district population, and the number of people who were actually moved to obtain a district population that falls within an acceptable range of population deviations. The net change in population is achieved by moving people into and out of the district in order to obtain an acceptable population that is close to the ideal Assembly district population of 57,444. But it is apparent that the plan often moves far more people in and out of the district than is necessary to equalize population, without any apparent apolitical justification.

Consider, for example, Assembly District 1. The population of this district, prior to redistricting, was 54,189, which is 3,255 fewer than the ideal population (column [3]). The redistricting plan moved 3,031 people into the district (column [4]). This net change was achieved by moving 3,044 individuals into the district [column 5] and 13 individuals out [column 6]. The total population shift is the sum of the number of people moved in and the number moved out (column 5+ column 6). In this instance, the total shift of 3,057 is very close to the actual population change of 3,031, signifying that there were very few people moved unnecessarily into or out of the district. In other words, the shifts were minimal and appropriate. In column [7], I calculate the ratio of the total population shift to the actual population change, and denote this the shift/change ratio. Numbers close to 1 show that the number of people moved into or out of a district is close to the actual population change required to equalize populations across districts. As this ratio gets larger, it signifies that more people are moved in or out than necessary. A ratio of 3, for example, shows that 3 times as many people were moved than was necessary to achieve population equality.[2]

---

[2] To give an extreme example, a district that required a population change of 1 person could achieve that change by moving one person into the district, or alternatively, by moving 10,000 people out of the district and 10,001 people into the district (both achieve a net increase of 1 person). In the first instance, the ratio of shift/change would be 1. In the 2nd instance, the ratio would be (10,000+10,001)/1=20,001.

9

A quick look at Exhibit 2 shows that, on average, far more people are shifted into and out of each district than is necessary to achieve population equality. On *average*, the plan shifts 53.5 times as many people as necessary, often moving tens of thousands of people into and out of a single district to achieve a net population change of a few hundred.

The most extreme example of this is district 99, which under the redistricting plan subtracted only 20 people from the existing population of 57,299. This change was obtained, however, by shifting 13,524 people into the district, and shifting 13,544 out of the district. Ultimately, a net change of 20 involved moving around 27,068 people, for a shift/change ratio of 1,354. It should be obvious on inspection that such a large shift of population was wholly unnecessary to achieve a net change of only 20 people. It is not at all clear what justification there might be for such large population shifts.

This pattern is repeated throughout the Assembly redistricting process. Of the 99 Assembly districts, only 9 had a shift/change ratio of 2 or less, showing that in over 90% of the districts at least twice as many people as necessary were shifted. In 11 districts, the ratio was greater than 100, signifying that 100 times as many people as necessary were moved to achieve population equality.

Exhibit 3 shows the same calculations for the 33 Senate districts. Senate districts are wholly comprised of 3 nested Assembly districts, of course, and the population shifts in the Senate districts will generally be smaller than the population shifts in Assembly districts. Within a single Senate district population shifts among the three nested Assembly district components will not appear as population shifts in the Senate district as a whole.

Nevertheless, the analogous calculations show that at the Senate level significantly more people than necessary were shifted from one district to another. In six Senate districts, at least

10

50 times more people were moved than necessary to achieve an acceptable degree population equality. Again it is not all clear why this was necessary. Here, by far the most extreme example is the 17th Senate district, which required that only 58 people be moved to achieve a perfect ideal population; ultimately, 159 people were moved out of the district. But this small change was achieved by moving 19,666 individuals into the district and 19,507 people out, for a total population shift of 39,173. This was more than 675 times the number of people who actually had to be moved, resulting in a population shift/population change ratio of 675.4.

In all, considering both Assembly and Senate districts, these calculations show that the new populations of all districts were achieved by a net change of only 554,067 people. But to achieve this, the enacted plan shifted more than 3.5 million individuals around from one district to another – in effect, a small net population change was achieved by moving a large fraction of the state's population.

The clear conclusion of this analysis is that a significant portion of the state population, and far more than was necessary, was moved from one district to another. These shifts were unnecessary to achieve population equality, since that equality could, by definition, have been achieved by a general shift/change ratio much closer to 1 than the overall average ratio of 53.5 for the Assembly or 55.0 for the Senate.

### 2. The redistricting plan does not adequately preserve core district population.

The preceding discussion of the unnecessary shifts in population is related to the concept of core population retention, or a measure of the percentage of each district's population that is preserved after redistricting. In core population retention analysis, the largest portion of the existing district that is maintained in the new district is identified, and the measure itself is simply the number of people in the old district who are also in the new district. The higher the

11

core retention measure, the greater the cohesiveness of the district and respect for traditional voting and civic participation standards.

Core population retention calculations can be complicated by the fact that some entirely new districts must be created when some parts of the state grow faster than others and therefore require additional legislative districts (this is precisely analogous to the reapportionment process which reallocates House districts among states as a result of population changes). In these instances, I simply identify the largest bloc of individuals, no matter what district they might have been in under the existing plan.[3]

I show the results of these calculations in Exhibit 4 for the state Assembly. Districts in red are those that were created in new areas, with core population retention calculated as described in the previous paragraph. Overall, the average core population retention – as calculated as the simple mean of the core population retention of each district – is 61.7%, meaning that, on average, less than 2/3 of each district was preserved in the redistricting plan. By way of contrast, in the 2002 Court-drawn plan, 77% of the core population of the existing plan was preserved.

In Exhibit 5, I show the core population retention for Senate districts. Because Senate districts are much larger than Assembly districts, I expect the core population retention to be higher (as indeed it is, at 79.2%).

One other fact suggests a pattern of arbitrariness in decisions about which districts to preserve. For districts represented by Democrats after the 2010 elections, the average core population retention was 53.7%. For districts represented by Republicans, the average core population retention was 66.5% – over a 13 percentage point difference. This is indisputable

---

[3] This accounts for the differences between my calculations and those in the Second Amended complaint. In the complaint, newly created districts are calculated as having a core district retention of zero.

evidence that the redistricting plan was *intended* to put Democrats at a disadvantage by preserving a significantly smaller share of their existing districts than what Republicans enjoyed. Democrats, under the plan, are forced to work with larger populations that they have not represented before, undercutting the stability of the voter-representative relationship. Republicans, with a significant edge in district retention, face far fewer problems in maintaining ties with existing constituents. For Senators in office after the 2010 elections, and before the Summer 2011 Recall elections (in which Republican incumbents in the 25th and 32nd districts lost), Republicans had a slightly higher core population retention than Democrats, 79.9% to 78.2%.

### 3.    The redistricting plan does not create compact legislative districts.

The Wisconsin Constitution (Article IV, section 4) requires the legislature to create districts that are "in as compact form as practicable." There are a variety of methods typically used to calculate compactness measures, and no universally agreed upon measure. A standard practice, therefore, is to calculate multiple indicators of compactness and analyze the results. I calculated four values of compactness, each with distinct characteristics. These measures are the following:

(1)    Circularity Ratio – The ratio of the area of the district to the area of a circle (the most compact shape) having the same perimeter of the district.

(2)    Circumference measure -- the area of a circle with the same area as a district divided by the perimeter of the district.

(3)    Convex hull (Roeck) – the ratio of the district area and the smallest simple convex shape that completely encloses the district.

(4)    Minimum circumscribing circle – the ratio of district area to the area of the smallest circle that completely encloses the district.

The overall compactness of the 2011 plan does not differ substantially from the overall compactness of the court-drawn 2002 plan.

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/10/12   Page 13 of 57   Document 131-6

Even though the districts do not vary dramatically in overall compactness, there is, once again, a distinct pattern in the partisanship in the compactness measures. For the Assembly, of the ten least compact districts as measured by the minimum circumscribing circle, six are represented by Democrats. And, of the 20 *most* compact districts using the same measure, 15 are represented by Republicans.

This pattern is independent of the measure used. Applying the circularity ratio, the mean compactness of Republican districts in the 2011 plan was 54.35; for Democrats, the mean compactness measure was 48.53, a difference of over 10 percent.

### 4. The redistricting plan disenfranchises an excessive number of Senate electors.

Wisconsin's 33 Senators are elected to four year terms in staggered elections. Senators from even-numbered districts were elected in 2008, while those from odd-numbered districts were elected in 2010. During the redistricting process, individuals who are moved from an even-numbered district to an odd numbered district will lose their ability to vote in the 2012 elections, and will go six years – from 2008 to 2014 – between Senate elections.

The enacted redistricting plan moves 299,639 individuals from even to odd-numbered Senate districts, thus disenfranchising them for the 2012 election. By comparison, the 2002 court-drawn plan resulted in only approximately 170,000 voters.

Of the 299,639 disenfranchised voters, over 120,000 occur through shifts of voters into the 21st Senate district, in Racine and Kenosha County (72, 431), and shifts of voters into the 27th Senate district (49,867). In the Racine/Kenosha area, historically each county had comprised the bulk of two separate Senate districts – Racine County comprised most of the 21st Senate district, and Kenosha County most of the 22nd Senate district. Under the redistricting plan, the cities of Racine and Kenosha are combined into a single Senate district (a reconfigured 22nd Senate

14

district), while the remainder of Kenosha and Racine counties are split off into a reconfigured 21st Senate district. Virtually the entire population of Kenosha County outside of the City of Kenosha is moved from the old 22nd district into the new 21st district, and is therefore disenfranchised.

Similarly, in Dane County a substantial number of individuals on the western edge of Madison were moved from the 26th Senate district into the new 27th Senate district. These 49,687 individuals will also lose their vote in the 2012 Elections.

In both of these instances, there was no compelling reason to redraw the districts in a manner that resulted in such large numbers of disenfranchised voters. More marginal changes, or even leaving the existing Senate district structures in Kenosha and Racine counties would have resulted in substantially fewer disenfranchised individuals. The changes were unnecessary, and appear to be arbitrary.

### C. The Redistricting Plan Does Not Comply with Section 2 of the Voting Rights Act.

The 1982 Amendments to the Voting Rights Act require that minority voters be given an equal opportunity to White voters to elect candidates of their choice. The precise conditions under which the Act applies were set out in the landmark Supreme Court decision *Thornburg v. Gingles* 478 U.S. 30 (1986), which specified three conditions (or "prongs") that bring Section 2 into effect. *First*, a minority group must be sufficiently large and compact to permit the creation of majority-minority districts; *second*, the minority group must be politically cohesive; and *third*, there must be evidence of racial-bloc voting, in which minority voters are denied opportunities to elect candidates of choice because (as a rule) White voters will not vote for minority candidates. When these conditions are met, states may be permitted to draw deliberately race-conscious districts comprised of a majority of a minority group (or, majority-minority districts), under a

15

"totality of circumstances" test that assesses whether minority voters have not had an equal opportunity to participate in the political process.

To establish the first prong of the *Gingles* test, it is necessary to analyze the size and concentration of different minority groups. To meet the second and third prongs, the common practice is to analyze voting patterns among minority and nonminority groups. The degree to which a minority group votes for the same candidates – particularly if those candidates are from the same minority group – can be taken as evidence of the political cohesion of that group, in the sense of shared attitudes and voting preference. The third prong – racially polarized voting – is necessary to establish that minority groups are denied the opportunity to elect candidates of choice, because White voters vote against minority candidates by casting their votes for White candidates when presented with the opportunity to do so.

Establishing the second and third prongs of the *Gingles* test invariably involves analysis of voting patterns by race. This, in turn, presents one of the thorniest problems in statistics, that of making inferences about individual voters using only aggregate data. Because we cannot observe how specific individuals voted, we are forced to rely on aggregate reported data – typically vote totals reported by ward – along with data on the racial composition of each ward. To move from this aggregate-level data to estimates about how individuals cast their vote – since we need to know whether individual minority or White voters cast their ballots for minority or White candidates – we must rely on ecological inference techniques (*see* King 1997, chapter 1).

The most common methods used to reconstruct individual behavior from aggregate data in voting rights analysis (as endorsed by the Court in *Gingles*) are: (1) homogeneous precinct analysis, in which we analyze data from overwhelmingly minority or White voting precincts, typically those with concentrations of 90% or more; (2) double-regression, a statistical technique

16

that estimates the percentages of minority and White voters who cast their ballots for candidates of the same race; and (3) the Method of Bounds, which uses available data to establish upper and lower limits on the percentages of minority and White voters who cast their ballots for candidates of the same race.

Unfortunately, all of these methods have identifiable shortcomings, and in addition rely on assumptions that are often questionable. In particular, double regression routinely produces estimates that purport to show that more than 100% of minority (or White) voters voted for the minority (or White) candidate, and less than 0% of minority (or White) voters voted for the White (or minority) candidate. Homogeneous precinct analysis is not possible unless the demographics of wards have specific characteristics, and the method of bounds often fails to provide meaningful limits on estimates of voting behavior (King 1997, chapters 3 and 4).

A relatively new method, denoted *Ecological Inference* (EI) by its developer, Harvard professor Gary King, offers a feasible solution to problems of the commonly used methods, and has the advantage of producing meaningful estimates that are between 0 and 100 (a critical property when estimating the percentage of racial groups who cast their ballot for specific candidates). In effect, EI is a generalized method that combines information from the method of bounds with a "maximum likelihood" technique that identifies parameter values (in this case, the percentage of different racial groups that cast their ballots for certain candidates) that have the greatest probability of generating the actual data observed. This method is reliable, is comparable to other methods where coefficients can be computed, and is regarded in political science as an improvement on existing methods of making inferences about individual behavior from aggregate data. (King, Rosen, and Tanner 2004). To implement the method, I use software

17

generated by Professor King that runs on the open-source statistical package R. The EI software is available at http://gking.harvard.edu/ei. (*See* Wittenberg, et al. 2007.)

There are two minority groups that meet the Section 2 criteria for the drawing of majority-minority districts in the City of Milwaukee, Latinos and African-Americans. Below, I apply the *Gingles* criteria to each of these minority groups under Act 43.

      1.     **Act 43 fails to create any districts with effective Latino voting-age majorities.**

The Latino population of the City of Milwaukee is, according to the 2010 Census, 103,001 (17.3% of total), and the Latino Voting Age Population (VAP)[4] is 63,202 (14.6% of total VAP). The redistricting plan (Acts 43 and 44) appears to recognize the applicability of Section 2, by drawing six majority-minority African-American Assembly districts (the 10th, 11th, 12th, and 16th, 17th and 18th, constituting two Senate districts, the 4th and the 6th), and *appearing* to create 2 majority-minority Latino Assembly districts (the 8th and the 9th, as defined by VAP).[5] The Latino population, which is the fastest growing demographic group in the city, is concentrated in a small geographic area south of the main East-West Interstate highway. Of the 103,007 Latinos in Milwaukee county, 70,779 (68.71%) are concentrated within 939 contiguous census blocks on the near south-side. The Latino population makes up 65.6% of the population within those census blocks. This area of concentration is roughly square and is approximately bounded by I-94 on the north, 1st street and I94/43 on the east, Howard Street to the South and 42nd Street to the west. Here as well, the Latino community is both sufficiently large and geographically compact to meet the first prong of the *Gingles* test.

---

[4] In this context, the VAP is simply the percentage of population, or of a particularly minority group, that is 18 years of age or older.

[5] The apparent creation of these two majority-minority Latino districts is illusory. As I demonstrate below, the Latino voting-age population is insufficient to create an effective Latino majority.

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/10/12   Page 18 of 57   Document 131-6

In Exhibit 6, I show an alternative 8th Assembly District with a Latino VAP of 70.07%. This district shows that it is possible to construct a compact district with high Latino VAP.

In Exhibit 7, I show the results of analysis for several races, in which one or more Latino candidates runs against one or more White candidates. The first row of the table shows the results for the 2011 primary for Milwaukee County Circuit Court Judge, in which Latino candidate Pedro Colon ran against multiple White candidates. King's EI method estimated that 58.2% of Latinos voted for Colon, while only 32% of Whites voted for him (in other words, 68% of Whites voted for one of the White candidates). The difference in these two percentages – the percentage of Latinos who voted for the Latino candidate, minus the percentage of Whites who voted for the Latino candidate – is 26.2%. In the general election, which pitted the top two primary candidates against each other, Colon faced non-Latino Christopher Lipscomb. In this race, 66.2% of Latinos voted for Colon, compared to 45.3% of White candidates (again, in other words, 54.7% of Whites voted for the White candidate). The difference is 20.9 percentage points. This is indicative of a relatively high rate of racially polarized voting.[6]

Two races on this list show a very high degree of racially polarized voting. In the 2008 State Superintendent of Public Instruction general election, Latina Rose Fernandez ran against Tony Evers. Here, 95.7% of Latino voters in Milwaukee County voted for Fernandez, against only 40.5% of White voters. The difference in support, 55.2%, suggests a very high degree of racial polarization. The second example is the 2004 State Senate election, in which Latina Jennifer Morales ran against incumbent State Senator Alberta Darling. Morales received the

---

[6] Colon narrowly won the judicial election, 50.7% to 49.3%. Within the city, however, Colon's majority was much larger, and he carried 59.1% of the vote.

support of 89.2% of Latino voters, compared to less than 50% of White Voters, a difference that suggests a high degree of racially polarized voting (both Fernandez and Morales lost).[7]

To these tests, we can add evidence that a racial or language minority has historically been discriminated against, or faces disadvantages in the electoral process, to fill out the "totality of circumstances" test outlined in *Gingles*. Common indicators of discrimination or electoral disadvantages include lower rates of participation, differences in registration rates, or socioeconomic differences that interfere with the ability to fully participate in the electoral process and elect candidates of choice.

Using data from the Milwaukee County Elections Commission, I identified 36 elections since 1989 in which one or more Latino candidates ran against one or more White candidates. Only four Latino candidates won over this entire period (or 11.1%).

I obtained data from the Statewide Voter Registration System (SVRS) for the City of Milwaukee. This database includes information on every registered voter, including name, address, and ward assignments. Using it, it is possible to calculate registration rates for different populations, and to do so by direct observation, without relying on any aggregate data that requires any kind of ecological inference. For Latino individuals, the most accurate and most common practice is to identify them by surname (in method known as "surname analysis"; see Word and Perkins 1996; Abrahamse, Morrison and Bolton 1994; Barreto, Seguro, and Woods 2004 ). To identify Latino voters, I use the list in Word and Perkins (1994, 20-21) that displays

---

[7] A key fact in the Evers-Fernandez race was that Rose Fernandez was not, in fact Latina. Still, in a low salience race lacking party labels, the overwhelming percentage of Latino voters clearly used her name as an information short cut, and voted as if she were a Latina. Similarly, a clear majority of White voters preferred Evers. In this case, voter beliefs about a candidate's ethnicity were more important than the actuality of that candidate's ethnicity. This is about as pure a test of racially polarized voting as can be created.

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/10/12   Page 20 of 57   Document 131-6

the 639 most frequently occurring heavily Hispanic surnames. For each individual with a surname on this list, I classified them as Latino.[8]

A simple calculation of registration rates among Latino and non-Latino individuals shows a huge disparity within the City of Milwaukee. Citywide, the SVRS data show that over 76% of non-Latinos are registered to vote, compared with only 26% of Latinos.

This data is displayed at the ward level in Exhibit 8. Here, I plot the percentage of Latino individuals registered in each ward, against the percentage of non-Latino registrants. The diagonal line in the graph is the 45 degree line that would show equality between Latino and no-Latino registration rates if the data points fell on this line. Instead, all of the data points are above the graph, demonstrating clearly that *everywhere* in the city ,Latino registration rates lag far behind non-Latino rates. To emphasize: non-Latino registration rates are significantly higher than Latino registration rates in every ward in the city.

There are two main sources for this disparity. The first is that Latinos, as a group, tend to have demographic characteristics – lower income, higher poverty levels, less formal education – that make them less likely to register and vote. The second is that a significant numbers of Latinos in Wisconsin are ineligible to vote because they are not citizens. Estimating the percentage of noncitizens in any population can be difficult, as there are many possible sources of over-reporting and under-reporting. However, the best data in existence comes from the American Community Survey, a detailed survey conducted by the Census Bureau between 2006 and 2010. The 2010 Census did not include questions about citizenship, but that data remain important for a variety of purposes. The ACS provides a measure of non-citizenship rates for

---

[8] There is, of course, a small error rate in this method, as non-Latinos occasionally have Latino surnames, and Latinos occasionally have non-Latino surnames. Nevertheless, it remains the most accurate way of identifying individuals who are Hispanic, as opposed to aggregate data from the Census, which does not identify individuals, and has been accepted as a method by federal courts adjudicating voting rights claims.

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/10/12   Page 21 of 57   Document 131-6

various demographic groups in the U.S. Using the 2008 ACS data for Wisconsin, I calculated a non-citizenship rate among the Voting Age Population of 35.75%.

The newly enacted redistricting plan appears to create two majority-minority Latino Assembly districts, the 8th and 9th. These two districts have, respectively, Latino voting age populations of 60.54% and 54.0%. However, once the non-citizenship rate is taken into account, as well as the historic low rates of registration even among otherwise eligible Latinos, neither of these districts has concentrations high enough to create effective Latino majorities.[9]

Incorporating the non-citizenship rate into district demographics involves straightforward calculations. Under the redistricting plan, the 8th Assembly district has the following demographic characteristics:

(1)     Total Voting Age Population: 38,021

(2)     Total Hispanic VAP: 23,016

(3)     Total non-Hispanic VAP (1-2): 15,005

(4)     Total Hispanic CVAP: 23,016*(1-35.75) = 14,788

This gives a total voting age population of the 8th district of 15,005+14,788 = 29,793. Given a Latino citizen voting age population of 14,788, eligible Latinos constitute 49.6% of the district voting age population. This is not enough Latino voters to constitute a numerical majority in the district.

By contrast, the reconfigured 8th district I drew has a higher percentage of Latinos, and results in populations large enough to provide for effective majority control. My proposed 8th district has the following demographic characteristics:

(1)     Total Voting Age Population: 35,943

---

[9] The 8th and 9th Assembly districts are split by 16th St., which is the main business district in the neighborhood and a center of the community of interest. Act 43 places one side of 16th street in the 8th district, and the other side in the 9th, splitting the neighborhood in half.

22

      (2)     Total Hispanic VAP: 25,285

      (3)     Total non Hispanic VAP: 10,758

      (4)     Total Hispanic CVAP: $25,285*(1-37.75) = 16,181$

The total eligible VAP in this proposed district is 26,939, giving a Latino CVAP percentage of $16,181/28,939 = 60.06\%$. This concentration has a much better probability of resulting in an effective majority-minority district.[10]

### 2. Act 43 packs African-American voters by creating districts with excessive and unnecessarily high concentrations of African-American VAP.

According to the 2010 Census, the City of Milwaukee had a population of 594,833, and a voting age population (VAP) of 433,442. The African-American population in the city is 239,923 (40.3% of total population), and the African-American Voting Age Population is 156,153 (36.0% of total VAP).

The African-American population is concentrated in the North-central portion of the city, and in large part lives in areas that are at least 75% African-American. 85.7% (217,551) of the total African-American population in Milwaukee County (253,764) resides in 3790 contiguous census blocks (of 13,231 total blocks within the county). Within these blocks, the African-American population represents 70.6% of the total population. This area of high concentration is generally in the northern half of the county, and more specifically runs to the northwest away from downtown Milwaukee and is broadly bounded by the Milwaukee county line on the north edge, variously the Milwaukee river and the Canadian national rail line on the east, I-94 on the southern edge and Highway 41 and the NW county line to the west. In terms of

---

[10] Recall the results of the SVRS surname analysis, which demonstrated that the registration rate among non-Latinos was three times as high as the rate for Latinos.

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/10/12   Page 23 of 57   Document 131-6

size and compactness, therefore, the African-American population meets the first prong of the *Gingles* test.

In Exhibit 9, I show the results of analysis for several races, in which one or more African-American candidates runs against one or more White candidates. In all of these races, African-Americans were almost always close to unanimous in their support for the African-American candidate. At the same time, White voters were uniformly less likely to support the African-American candidate, often by huge margins.

The one race in this list with a relatively small difference in support for the African-American candidate among White and African-American voters was the 2010 4th Congressional District primary, with African-American Gwen Moore running against White candidate Paul Morel. Moore had first been elected to the seat in 2004, so this was a case of a long-shot challenger with no political experience running against an incumbent who had won every general election with at least 70% of the vote, and who had received 88% of the vote in the 2008 general. Morel received only 14.1% of the vote in the primary. Still, there was a significant difference in support among White and African-American voters: 93.5% of African-American voters supported Moore, while only 74.9% of White voters supported her.

In all of these races, African-Americans were almost always close to unanimous in their support for the African-American candidate. At the same time, White voters were uniformly less likely to support the African-American candidate, often by huge margins.

Act 43 creates 6 majority-minority African-American districts, with African-Americans comprising the following concentrations of VAP:

| District | % African-American VAP |
|----------|------------------------|
| 10       | 61.8%                  |

24

| 11 | 61.9% |
| 12 | 51.5% |
| 16 | 61.3% |
| 17 | 61.3% |
| 18 | 60.4% |

In the 10th, 11th, 16th, 17th, and 18th Assembly districts the concentration of African-American voters is excessive, far above the thresholds most commonly accepted as necessary to achieve effective majority status – 55% is typical. This is a classic case of "packing," or placing more African-American voters into a district than is necessary to achieve effective majority status. These "extra" votes are not necessary for effective African-American majority status, and are therefore wasted, in the sense that they would almost certainly be cast for candidates who would have won in any event.

I can calculate what would happen if these concentrations were reduced to more appropriate levels. If the African-American VAP concentrations were changed to 55% in the 10th, 11th, 16th, 17th, and 18th districts, 12,919 African-American voters would be available for distribution to other districts, while still retaining effective majorities in the existing majority-minority districts. These redistributed voters could enhance the influence of African-Americans in other districts, even if the numbers are not large enough to create a 7th majority-minority African-American Assembly district.

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/10/12   Page 25 of 57   Document 131-6

## Sources Cited

Abrahamse, Allan F., Peter A. Morrison, and Nancy Minter Bolton. 1994. "Surname Analysis for Estimating Local Concentration of Hispanics and Asians." Population Research and Policy Review 13:383-398

Barreto, Matt, Gary Seguro, and Nathan D. Woods. 2004. The Mobilizing Effect of Majority Minority Districts on Latino Turnout." American Political Science Review 98:65-75 (no. 1, February)

King, Gary. 1997. A Solution to the Ecological Inference Problem: Reconstructing Individual Behavior from Aggregate Data. Princeton: Princeton University Press.

King, Gary, Ori Rosen, and Martin A. Tanner. 2004. Ecological Inference: New Methodological Strategies. New York: Cambridge University Press.

Jason Wittenberg, Ferdinand Alimadhi, Badri Narayan Bhaskar, and Olivia Lau. 2007. "ei.RxC: Hierarchical Multinomial-Dirichlet Ecological Inference Model for R x C Tables" in Kosuke Imai, Gary King, and Olivia Lau, "Zelig: Every-one's Statistical Software," http://gking.harvard.edu/zelig.

Word, David L. and Colby Perkins, Jr. 1996. Building a Spanish Surname List for the 1990s – a New Approach to an Old Problem. U.S. Bureau of the Census, Population Division. Technical Working Paper 13. March.

Respectfully submitted,

Kenneth R. Mayer

December 14, 2011

Tab 1

**Kenneth R. Mayer**
**Curriculum Vitae**

Professor of Political Science
Department of Political Science
Affiliate Faculty, La Follette School of Public Affairs
110 North Hall / 1050 Bascom Mall
University of Wisconsin - Madison
Madison, WI 53706

voice: 608-263-2286 / cell: 608-216-6554/ fax: 608-265-2663
kmayer@polisci.wisc.edu
http://www. polisci.wisc.edu/users/kmayer

Education
Ph.D. Yale University, 1988 (Political Science)
M.A., M.Phil. Yale University, 1987 (Political Science)
B.A. University of California, San Diego 1982 (Political Science)

Positions Held
Fulbright-ANU Distinguished Chair in Political Science, Australian National University
        (Canberra, ACT), July – December 2006.
Professor, Department of Political Science, University of Wisconsin-Madison, July 2000 –
        present
Director, Data and Computation Center, College of Letters and Science, University of
        Wisconsin-Madison, June 1996-September 2003
Associate Professor, Department of Political Science, University of Wisconsin-Madison, June
        1996-June 2000.
Assistant Professor, Department of Political Science, University of Wisconsin-Madison, August
        1989-June 1996.
Consultant, The RAND Corporation, Washington DC, 1988-1994.  Conducted study of
        acquisition reform, and the effects of acquisition policy on the defense industrial base.
        Also performed computer simulations of U.S. strategic force posture and capabilities.
Contract Specialist, Naval Air Systems Command, Washington D.C., 1985-1986.  Responsible
        for cost and price analysis, contract negotiation, and contract administration for aerial
        target missile programs in the $5 million - $100 million range.

Honors and Awards
Alliant Underkofler Excellence in Teaching Award, University of Wisconsin System, 2006
Pi Sigma Alpha Teaching Award,  Fall 2006
Vilas Associate, 2003-2004, University of Wisconsin-Madison Graduate School.
2002 Neustadt Award (awarded by the Presidency Research Group of the American Political
        Science Association, for best book published on the American presidency in 2001).
        Awarded for *With the Stroke of a Pen.*
Lilly Teaching Fellow, University of Wisconsin-Madison, 1993-1994.

Interfraternity Council award for Outstanding Teaching, University of Wisconsin-Madison, 1993.

Selected as one of the 100 best professors at University of Wisconsin-Madison, Wisconsin Student Association, March 1992.

Olin Dissertation Fellow, Center for International Affairs, Harvard University, 1987-1988

Professional and Public Service

Expert Consultant and Witness, *County of Kenosha v. City of Kenosha* (redistricting dispute in the city of Kenosha, 2011)

Expert Consultant, *Voces de la Frontera* (Milwaukee Aldermanic Redistricting, 2011)

Expert Consultant, Prosser for Supreme Court (Wisconsin Supreme Court recount, 2011)

Consultant and Expert Witness, *McComish et al. v Brewer et al.* (Arizona campaign finance case, 2008-2009)

Chair, Blue Ribbon Commission on Clean Elections (Madison), August 2007-present

Consultant, Consulate of the Government of Japan (Chicago) on state politics in Illinois, Indiana, Minnesota, and Wisconsin, 2006-present.

Section head, Presidency Studies, 2006 Annual Meeting of the American Political Science Association.

Co-Chair, Committee on Redistricting, Supreme Court of Wisconsin, November 2003-December 2009

Section Head, Presidency and Executive Politics, 2004 Annual Meeting of the Midwest Political Science Association, Chicago, IL.

Presidency Research Group (organized section of the American Political Science Association) Board, September 2002-present

Consultant and Expert Witness, *Baumgart et al. v. Wendelberger et al.* (Wisconsin state legislative redistricting case, 2001-2002)

Book Review Editor, *Congress and the Presidency*, 2001-2006

Editorial Board, *American Political Science Review*, September 2001-September 2007

Books and Monographs

Mayer, Kenneth R. 2009. *2008 Election Data Collection Grant Program: Wisconsin Evaluation Report*. Report to the Wisconsin Government Accountability Board, September 2009. With Barry C. Burden, David T. Canon, Stéphane Lavertu, and Donald P. Moynihan.

-----, ed. 2011 *The Enduring Debate: Classic and Contemporary Readings in American Government*. 6th ed. New York: W.W. Norton & Co. (with David T. Canon and John Coleman). Forthcoming. Previous editions 1st (1997), 2nd (2000), 3rd (2002), 4th (2006) 5th (2009).

-----, ed. 2007. *Faultines: Readings in American Government*, 2nd ed. New York: W.W. Norton & Co. (with David T. Canon and John Coleman). Previous editions 1st (2004)

-----, ed. 2002. *Readings in American Government*, 7th edition. New York: W.W. Norton & Co. (with Theodore J. Lowi, Benjamin Ginsberg, David T. Canon, and John Coleman). Previous editions 4th (1996), 5th (1998), 6th (2000).

-----. 2001. *With the Stroke of a Pen: Executive Orders and Presidential Power*. Princeton,

NJ: Princeton University Press. Winner of the 2002 Neustadt Award.

-----. 1999. *The Dysfunctional Congress? The Individual Roots of an Institutional Dilemma.* Boulder, CO: Westview Press. (with David T. Canon). 2nd edition in process, expected publication date 2010.

-----. 1999. *Issue Advocacy in Wisconsin: Analysis of the 1998 Elections and A Proposal for Enhanced Disclosure.* September.

-----. 1998. *Public Financing and Electoral Competition in Minnesota and Wisconsin.* Citizens' Research Foundation. April.

-----. 1993. *The Development of the Advanced Medium Range Air-to-Air Missile: A Case Study of Risk and Reward in Weapon System Acquisition.* N-3620-AF. Santa Monica: RAND Corporation.

-----. 1992. *Barriers to Managing Risk in Large Scale Weapons System Development Programs.* N-4624-AF. Santa Monica: RAND Corporation (with Thomas K. Glennan, Jr., Susan J. Bodily, Frank Camm, and Timothy J. Webb).

-----. 1991. *The Political Economy of Defense Contracting.* New Haven: Yale University Press.


Articles and Other Scholarly Papers

Mayer, Kenneth R. 2011. "Early Voting and Election Day Registration in the Trenches: Local Officials' Perceptions of Election Reform." *Election Law Journal* 10:89-102 (No. 2). With Barry C. Burden, David T. Canon, and Donald Moynihan.

-----. 2010. "Is Political Science Relevant? Ask an Expert Witness," *The Forum*: Vol. 8 : Iss. 3, Article 6. **DOI:** 10.2202/1540-8884.1391 **Available at:** http://www.bepress.com/forum/vol8/iss3/art6

-----. 2009. "Thoughts on the Revolution in Presidency Studies," *Presidential Studies Quarterly* 39 (no. 4, December)

-----. 2009. "Unilateral Action." George C. Edwards, III, and William G. Howell, *Oxford Handbook of the American Presidency* (New York: Oxford University Press, 2009)

-----. 2009. "Executive Orders," in Joseph Bessette and Jeffrey Tulis, *The Constitutional Presidency.* (Baltimore: Johns Hopkins University Press, 2009)

-----. 2008. "Does Australia Have a Constitution? Part I – Powers: A Constitution Without Constitutionalism." *UCLA Pacific Basin Law Journal* 25:228-264 (No. 2, Spring). With Howard Schweber.

-----. 2008. "Does Australia Have a Constitution? Part II: The Rights Constitution." *UCLA Pacific Basin Law Journal* 25:265-355 (No. 2, Spring). With Howard Schweber.

-----. 2007. "The Base Realignment and Closure Process: Is It Possible to Make Rational Policy?" Brademas Center for the Study of Congress, New York University.

-----. 2007 "Controlling Executive Authority in a Constitutional System" (comparative analysis of executive power in the U.S. and Australia), manuscript, February 2007.

-----. 2007. "Public Election Funding, Competition, and Candidate Gender." *PS: Political Science and Politics* XL:661-667 (No. 4,October). With Timothy Werner

-----. 2006. "Do Public Funding Programs Enhance Electoral Competition?" In Michael P. McDonald and John Samples, eds., *The Marketplace of Democracy: Electoral Competition and American Politics* (Washington, DC: Brookings Institution Press, 2006). With Timothy Werner and Amanda Williams. Excerpted in Daniel H. Lowenstein, Richard L. Hasen, and Daniel P. Tokaji, *Election Law: Cases and*

*Materials* (Durham, NC: Carolina Academic Press, 2008).

-----. 2005. "The Last 100 Days." *Presidential Studies Quarterly* 35:533-553 (No. 3, September). With William Howell.

-----. 2004. "The Return of the King? Presidential Power and the Law," *PRG Report* XXVI, No. 2 (Spring).

-----. 2003. "Political Reality and Unforeseen Consequences: Why Campaign Finance Reform is Too Important To Be Left To The Lawyers," *University of Richmond Law Review* 37:1069-1110 (No. 4, May).

-----. 2002. "Unilateral Presidential Powers: Significant Executive Orders, 1949-1999." *Presidential Studies Quarterly* 32:367-386 (No. 2, June).

-----. 2002. "Review Essay: Assessing The 2000 Presidential Election – Judicial and Social Science Perspectives." *Congress and the Presidency* 29: 91-98 (No. 1, Spring)

-----. 2001. "Answering Ayres: Requiring Campaign Contributors to Remain Anonymous Would Not Resolve Corruption Concerns." *Regulation* 24 (No. 4, Winter):24-29.

-----. 2001. "Presidential Emergency Powers." *Oxford Analytica Daily Brief*, December 18.

-----. 2001. "Hey, Wait a Minute: The Assumptions Behind the Case for Campaign Finance Reform." Gerald C. Lubenow, ed., *A User's Guide to Campaign Finance Reform* (Lanham, MD: Rowman & Littlefield).

-----. 2001. "Everything You Thought You Knew About Impeachment Was Wrong." Leonard V. Kaplan and Beverly I. Moran, ed., *Aftermath: The Clinton Impeachment and the Presidency in the Age of Political Spectacle* (New York: New York University Press). With David T. Canon.

-----. 2000. "Student Attitudes Toward Instructional Technology in the Large Introductory US Government Course." *PS: Political Science and Politics* 33: no. 3 (September). With John Coleman.

-----. 2000. "The Institutionalization of Power." Robert Y. Shapiro, Martha Joynt Kumar, and Lawrence R. Jacobs, ed. *Presidential Power: Forging the Presidency for the 21st Century* (New York: Columbia University Press). With Thomas J. Weko.

-----. 1999. "The Limits of Delegation – the Rise and Fall of BRAC." *Regulation* 22:32-38 (No. 3, October)

-----. 1999. "Executive Orders and Presidential Power." *The Journal of Politics* 61:445-466 (No. 2, May).

-----. 1997. *Campaign Finance Reform in the States*. Report prepared for and presented to the Governor's Blue Ribbon Commission on Campaign Finance Reform (State of Wisconsin). February. Portions reprinted in Anthony Corrado, Thomas E. Mann, Daniel R. Ortiz, Trevor Potter, and Frank J. Sorauf, ed. 1997. *Campaign Finance Reform: A Sourcebook* (Washington, D.C.: Brookings Institution)

-----. 1996. "Bringing Politics Back In: Defense Policy and the Theoretical Study of Institutions and Processes." *Public Administration Review* 56:180-190 (with Anne Khademian).

-----. 1996. "Does Public Financing of Campaigns Work?" *Trends in Campaign Financing*, no. 3. Occasional Paper Series, Citizens' Research Foundation, Los Angeles, CA (with John M. Wood).

-----. 1995. "Closing Military Bases (Finally): Solving Collective Dilemmas Through Delegation." *Legislative Studies Quarterly*, 20:393-414.

-----. 1995. "Electoral Cycles in Federal Government Prime Contract Awards: State-Level

Evidence from the 1988 and 1992 Presidential Elections." *American Journal of Political Science* 40:162-185.

-----. 1995. "The Impact of Public Financing on Electoral Competitiveness: Evidence from Wisconsin, 1964-1990." *Legislative Studies Quarterly* 20:69-88 (with John M. Wood).

-----. 1993. "Policy Disputes as a Source of Administrative Controls: Congressional Micromanagement of the Department of Defense," *Public Administration Review* 53:293-302.

-----. 1993. "Congressional-DoD Relations After the Cold War: The Politics of Uncertainty," in *Downsizing Defense*, Ethan Kapstein ed. Washington DC: Congressional Quarterly Press.

-----. 1993. "Combat Aircraft Production in the United States, 1950-2000: Maintaining Industry Capability in an Era of Shrinking Budgets." *Defense Analysis* 9:159-169.

-----. 1991. "Elections, Business Cycles, and the Timing of Defense Contract Awards in the United States," in *The Political Economy of Military Spending*, Alex Mintz ed. London: Routledge.

-----. 1990. "Patterns of Congressional Influence In Defense Contracting," in *Arms, Politics, and the Economy: Contemporary and Historical Perspectives*, Robert Higgs ed. New York: Holmes and Meier.


Other Publications and Book Reviews

Kenneth R. Mayer. 2011. Review of Jason K. Dempsey, *Our Army: Soldiers, Politicians, and American Civil-Military Relations. The Forum* 9 (No. 3). Available at: http://www.bepress.com/forum/vol9/iss3/art10

-----. 2010. "Voting Early, but Not Often." *New York Times*, October 25. With Barry C. Burden

-----. 2008. Review of John Samples, *The Fallacy of Campaign Finance Reform* and Raymond J. La Raja, *Small Change: Money, Political Parties, and Campaign Finance Reform* , in *The Forum* 6 (No. 1). Available at http://www.bepress.com/forum/vol6/iss1/art18/

-----. 2007. Review Essay, *Executing the Constitution: Putting the President Back Into the Constitution*, Christopher S, Kelley, ed; *Presidents in Culture: The Meaning of Presidential Communication*, David Michael Ryfe; *Executive Orders and the Modern Presidency: Legislating from the Oval Office*, Adam L. Warber. In *Perspective on Politics* 5:635-637 (No. 3, September)

-----. 2006. "Campaigns, Elections, and Campaign Finance Reform." *Focus on Law Studies*, XXI, No. 2 (Spring 2006). American Bar Association, Division for Public Education.

-----. 2006. Issue Briefs (Midterm Elections, Homeland Security; Foreign Affairs and Defense Policy; Education; Budget and Economy; Entitlement Reform) *2006 Reporter's Source Book.* Project Vote Smart. With Meghan Condon.

-----. 2006. , "Sunlight as the Best Disinfectant: Campaign Finance in Australia." Democratic Audit of Australia, Australian National University, October.

-----. 2006. "Return to the Norm," *Brisbane Courier-Mail*, November 10.

-----. 2004. Issue Briefs (Campaign Finance Reform, Homeland Security; Foreign Affairs and Defense Policy; Education; Budget and Economy; Entitlement Reform), *2004 Reporter's Source Book.* Project Vote Smart. With Patricia Strach and Arnold Shober.

-----. 2004. "Where's That Crystal Ball When You Need It? Finicky Voters and Creaky Campaigns Made for a Surprise Electoral Season. And the Fun's Just Begun." *Madison Magazine*. April.

-----. 2002. "Capitol Overkill." *Madison Magazine*, July.

-----. 2002. Issue Briefs (Homeland Security; Foreign Affairs and Defense Policy; Education; Economy, Budget and Taxes; Social Welfare Policy), *2002 Reporter's Source Book*. Project Vote Smart. With Patricia Strach and Paul Manna.

-----. 1999. "An Analysis of the Issue of Issue Ads." Guest Column Op-ed. *Wisconsin State Journal*, November 7.

-----. 1999. "Background of Issue Ad Controversy." Guest Column Op-ed. *Wisconsin State Journal*, November 7.

-----. 1999. "Eliminating Public Funding Reduces Election Competition." Guest Column Op-ed. *Wisconsin State Journal*, June 27.

-----. 1998. Review of *Executive Privilege: The Dilemma of Secrecy and Democratic Accountability*, by Mark J. Rozell. *Congress and the Presidency*, 25.

-----. 1996. "Like Marriage, New Presidency Starts In Hope." *Wisconsin State Journal*. March 31.

-----. 1994. Review of *The Tyranny of the Majority: Fundamental Fairness in Representative Democracy*, by Lani Guinier. *Congress and the Presidency* 21: 149-151.

-----. 1994. Review of *The Best Defense: Policy Alternatives for U.S. Nuclear Security From the 1950s to the 1990s*, by David Goldfischer. *Science, Technology, and Environmental Politics Newsletter* 6.

-----. 1993. Review of *The Strategic Defense Initiative*, by Edward Reiss. *American Political Science Review* 87: 1061-1062

-----. 1993. Review of *The Political Economy of Defense: Issues and Perspectives*, Andrew L. Ross ed. *Armed Forces and Society* 19:460-462.

-----. 1993. Review of *Space Weapons and the Strategic Defense Initiative*, by Crockett Grabbe. *Annals of the American Academy of Political and Social Science* 527: 193-194.

-----. 1992. "Limits Wouldn't Solve the Problem." Guest Column Op-ed. *Wisconsin State Journal*, November 5 (with David T. Canon).

-----. 1992. "Convention Ceded Middle Ground." Guest Column Op-ed. *Wisconsin State Journal*, August 23.

-----. 1992. "CBS Economy Poll Meaningless." Guest Column Op-ed. *Wisconsin State Journal*, February 3.

-----. 1988. "It's a Matter of Character: Pentagon Doesn't Need New Laws, it Needs Good People." Op-ed. *Los Angeles Times*, July 8.

Convention and Conference Papers

Mayer, Kenneth R. 2010. "Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform." With Barry C. Burden, David T. Canon, Stéphane Lavertu and Donald P. Moynihan. Presented at the 2010 Annual Meeting of the American Political Science Association, Washington, DC, September 2-5.

-----. 2010. "Selection Methods, Partisanship, and the Administration of Elections." With Barry C. Burden, David T. Canon, Stéphane Lavertu and Donald P. Moynihan. Paper presented at the 2010 Annual Meeting of the Midwest Political Science Association,

Chicago, IL, April 22-25. Revised version presented at the 2011 Annual Meeting of the European Political Science Association, June 16-19, Dublin, Ireland.

-----. 2009. "The Effects and Costs of Early Voting, Election Day Registration, and Same Day Registration in the 2008 Elections." With Barry C. Burden, David T. Canon, and Donald P. Moynihan. Paper presented at the 2009 Annual Meeting of the American Political Science Association, Toronto, Canada, September 3-5.

-----. 2007. "Comparative Election Administration: Can We Learn Anything From the Australian Electoral Commission?" Paper presented at the 2007 Annual Meeting of the American Political Science Association, Chicago, IL, August 29-September 1.

-----. 2007. "Electoral Transitions in Connecticut: Implementation of Public Funding for State Legislative Elections." Paper presented at the 2007 Annual Meeting of the American Political Science Association, Chicago, IL, August 29-September 1. With Timothy Werner.

-----. 2005. "Candidate Gender and Participation in Public Campaign Finance Programs." Paper delivered at the 2005 Annual Meeting of the Midwest Political Science Association, Chicago IL, April 7-10, 2005. With Timothy Werner.

-----. 2004. "Do Public Funding Programs Enhance Electoral Competition?" Paper delivered at the 4th Annual State Politics and Policy Conference," April 30-May 1, Akron, OH. With Timothy Werner and Amanda Williams. Updated April 2005.

-----. 2003. "The Last 100 Days." Presented at the 2003 Annual Meeting of the American Political Science Association, August 28-31, Philadelphia PA.

-----. 2000. "Hey, Wait a Minute: The Assumptions Behind the Case for Campaign Finance Reform." Paper presented at the Citizens' Research Foundation Forum on Campaign Finance Reform, Institute for Governmental Studies, University of California Berkeley. August.

-----. 1996. "The Importance of Moving First: Presidential Initiative and Executive Orders." Presented at the 1996 Annual Meeting of the American Political Science Association, San Francisco, CA, August 28-September 1

-----. 1993. "Department of Defense Contracts, Presidential Elections, and the Political-Business Cycle." Presented at the 1993 Annual Meeting of the American Political Science Association, Washington, DC, September 2-5.

-----. 1993. " Informational vs. Distributive Theories of Legislative Organization: Committee Membership and Defense Policy in the House." Presented at the 1993 Annual Meeting of the American Political Science Association, Washington, DC, September 2-5.

-----. 1991. "Problem? What Problem? Congressional Micromanagement of the Department of Defense." Presented at the 1991 Annual Meeting of the American Political Science Association, Washington DC, August 29 - September 2.


Grants and Research Activities

" Study and Recommendations for the Government Accountability Board Chief Inspectors' Statements and Election Incident Report Logs." $43,234. Co-PI. With Barry C. Burden (PI), David T. Canon (co-PI), and Donald Moynihan (co-PI). October 2011-May 2012.

"Public Funding in Connecticut Legislative Elections." Open Society Institute. September 2009- December 2010. $55,000.

"Early Voting and Same Day Registration in Wisconsin and Beyond." Co-PI. October 2008-September 2009. Pew Charitable Trusts. $49,400. With Barry C. Burden (PI), David T. Canon (Co-PI), Kevin J. Kennedy (Co-PI), and Donald P. Moynihan (Co-PI).

City of Madison, Blue Ribbon Commission on Clean Elections. Joyce Foundation, Chicago, IL. $16,188. January-July 2008.

"Wisconsin Campaign Finance Project: Public Funding in Connecticut State Legislative Elections." JEHT Foundation, New York, NY $84,735. November 2006-November 2007.

"Does Public Election Funding Change Public Policy? Evaluating the State of Knowledge." JEHT Foundation, New York, NY. $42,291. October 2005-April 2006.

"The Wisconsin Campaign Finance Project: Disseminating Data to the Academic, Reform, and Policy Communities." Joyce Foundation, Chicago, IL. $20,900. September 2005-August 2006.

"Enhancing Electoral Competition: Do Public Funding Programs for State and Local Elections Work?" Smith Richardson Foundation, Westport, CT. $129,611. December 2002-June 2005

WebWorks Grant (implementation of web-based instructional technologies), Division of Information Technology, UW-Madison, $1,000. November 1999.

"Issue Advocacy in Wisconsin during the 1998 Election." Joyce Foundation, Chicago, IL. $15,499. April 1999.

Instructional Technology in the Multimedia Environment (IN-TIME) grant, Learning Support Services, University of Wisconsin. $5,000. March 1997.

"Public Financing and Electoral Competitiveness in the Minnesota State Legislature." Citizens' Research Foundation, Los Angeles, CA, $2,000. May-November 1996.

"The Reach of Presidential Power: Policy Making Through Executive Orders." Graduate School Research Committee, University of Wisconsin, $21,965. July 1, 1995-August 31,1995. National Science Foundation (SBR-9511444), $60,004. September 1, 1995 - August 31, 1998. Additional support provided by the Gerald R. Ford Library Foundation, the Eisenhower World Affairs Institute, and the Harry S. Truman Library Foundation.

"The Future of the Combat Aircraft Industrial Base." Changing Security Environment Project, John M. Olin Institute for Strategic Studies, Harvard University (with Ethan B. Kapstein). June 1993-January 1995. $15,000.

Hilldale Student Faculty Research Grant, College of Letters and Sciences, University of Wisconsin (with John M. Wood). 1992. Amount: $1,000 ($3,000 award to student)

"Electoral Cycles in Federal Government Prime Contract Awards," March 1992 - February 1995. National Science Foundation (SES-9121931), the Graduate School Research Committee at the University of Wisconsin, and the MacArthur Foundation. Amounts: National Science Foundation, $74,216; Graduate School Research Committee: $2,600; MacArthur Foundation, $2,500

C-SPAN In the Classroom Faculty Development Grant, 1991. $500


Professional Activities

Panel Participant, "Redistricting in the 2010 Cycle," Midwest Democracy Network,

Speaker, "Redistricting and Election Administration," Dane County League of Women Voters,

March 4, 2010

Keynote Speaker, "Engaging the Electorate: The Dynamics of Politics and Participation in 2008." Foreign Fulbright Enrichment Seminar, Chicago, IL, March 2008.

Participant, Election Visitor Program, Australian Electoral Commission, Canberra, ACT. November 2007.

Invited Talk, "Public Funding in State and Local Elections." Reed College Public Policy Lecture Series. Portland, Oregon, March 19, 2007.

Fulbright Distinguished Chair Lecture Tour, 2006. Public lectures on election administration and executive power. University of Tasmania, Hobart (TAS); Flinders University and University of South Australia, Adelaide (SA); University of Melbourne, Melbourne (VIC); University of Western Australia, Perth (WA); Griffith University and University of Queensland, Brisbane (QLD); Institute for Public Affairs, Sydney (NSW); The Australian National University, Canberra (ACT)

Discussant, "Both Ends of the Avenue: Congress and the President Revisited," 2004 American Political Science Association Meeting, September 2-5, 2004, Chicago, IL.

Presenter, "Researching the Presidency," Short Course, 2004 American Political Science Association Meeting, September 2-5, 2004, Chicago, IL.

Discussant, Conference on Presidential Rhetoric, Texas A&M University, February 2004, College Station, TX

Presenter, "Author Meets Author: New Research on the Presidency," 2004 Southern Political Science Association Meeting, January 8-11, New Orleans, LA.

Chair, "Presidential Secrecy," 2003 American Political Science Association Meeting, August 28-31, Philadelphia, PA

Discussant, "New Looks at Public Approval of Presidents." 2003 Midwest Political Science Association Meeting, April 3-6, 2003, Chicago, IL

Discussant, "Presidential Use of Strategic Tools." 2002 American Political Science Association Meeting, August 28-September 1, 2002, Boston, MA

Chair and Discussant, "Branching Out: Congress and the President." 2001 Midwest Political Science Association Meeting, April 19-22, 2001, Chicago, IL

Invited witness, Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, U.S. House of Representatives. *Hearing on Executive Orders and Presidential Power*, Washington, DC. March 22, 2001

Invited Presenter, "The History of the Executive Order," Miller Center for Public Affairs, University of Virginia (with Griffin Bell and Will Howell), January 26, 2001

Presenter and Discussant, Future Voting Technologies Symposium (meeting organized by Dane County Clerk's Office), Madison, WI May 2, 2000

Moderator, Panel on Electric Utility Reliability. Assembly Staff Leadership Development Seminar, Madison, WI. August 11, 1999

Chair, Panel on "Legal Aspects of the Presidency: Clinton and Beyond." 1999 Midwest Political Science Association Annual Meeting, April 15-17, Chicago, IL

Consultant, Governor's Blue Ribbon Commission on Campaign Finance Reform. State of Wisconsin. 1997

Session Moderator, National Performance Review Acquisition Working Summit, Milwaukee, WI, June 1995

Invited Speaker, American Politics Seminar, The George Washington University, Washington

D.C., April 1995.

Invited speaker, Defense and Arms Control Studies Program, Massachusetts Institute of Technology, Cambridge, MA, March 1994.

Discussant, International Studies Association (Midwest Chapter) Annual Meeting, Chicago IL, October 29-30, 1993

Invited speaker, Seminar on American Politics, Princeton University, January 16-17,1992

Participant, Conference on Defense Downsizing and Economic Conversion, October 4, 1991, Harvard University.

Participant, Conference on Congress and New Foreign and Defense Policy Challenges, The Ohio State University, Columbus OH, September 21-22, 1990, and September 19-21, 1991.

Presenter, "A New Look at Short Term Change in Party Identification," 1990 Meeting of the American Political Science Association, San Francisco, CA.

Journal Manuscript Reviewer: *American Political Science Review, American Journal of Political Science, Journal of Politics, Political Research Quarterly, Legislative Studies Quarterly, International Studies Quarterly, Public Administration Review, Journal of Policy History*

Peer Reviewer, National Science Foundation; Carnegie Corporation


Department and University Service

General Education Requirements Committee (Letters and Science)

Communications-B Implementation Committee(Letters and Science)

Curriculum Committee (Letters and Science)

Verbal Assessment Committee (University)

Institutional Review Board (Human Subjects, Letters and Science). 2009- present. Acting Chair, Summer 2011.

Faculty Appeals Committee (for students dismissed for academic reasons)

Committee on Information Technology, Distance Education and Outreach, 1997-98.

Hilldale Faculty-Student Research Grants, Evaluation Committee, 1997, 1998

Department Computer Committee, 1996-1997; 1997-1998, 2005-2006.

Faculty Senate Delegate, 2000-2001, 2001-2002, 2002-2005. Alternate Delegate, Department of Political Science, 1994-1995; 1996-1997; 1997-1998, 1998-1999

Preliminary Exam Appeals Committee, Department of Political Science, 1994-1995

Faculty Advisor, Pi Sigma Alpha (Political Science Honors Society), 1993-1994

Department Honors Advisor, 1991-1992; 1992-1993

Brown-bag Seminar Series on Job Talks (for graduate students), 1992

Keynote speaker, Undergraduate Honors Symposium, April 13 1991

Brown Bag Seminar on the Persian Gulf War, Medical Scholars Program, February 15 1991

Undergraduate Curriculum Committee, Department of Political Science, 1990-1991; 1991-1992; 1993-1994

Individual Majors Committee, College of Letters and Sciences, 1990-1991

Dean Reading Room Committee, Department of Political Science, 1989-1990; 1994-1995


Teaching

Undergraduate: Introduction to American Government; Honors Introduction to American
      Government; Legislative Process; The American Presidency; Theories of Legislative
      Organization; Defense and Foreign Policy; Classics of American Politics; Senior Honors
      Thesis Seminar; Campaign Finance; Election Law; Presidential Debates; Comparative
      Electoral Systems
Graduate: Contemporary Presidency; Legislative Process; American National Institutions

Tab 2

## Exhibit 2 – Population Shifts in Assembly Districts

| [1] A 2002 Districts | [2] | [3] Population Shift Required | [4] Actual Population Change | [5] Population Added | [6] Population Subtracted | [6] Total Population Shift | [7] Ratio of Total Population Shift to Required Shift | [8] New District Population |
|---|---|---|---|---|---|---|---|---|
| 1 | 54,189 | -3,255 | 3,031 | 3,044 | 13 | 3,057 | 1.0 | 57,220 |
| 2 | 61,009 | 3,565 | -3,360 | 20,115 | 23,475 | 43,590 | 13.0 | 57,649 |
| 3 | 65,789 | 8,345 | -8,345 | 3,014 | 11,359 | 14,373 | 1.7 | 57,444 |
| 4 | 54,953 | -2,491 | 2,533 | 25,464 | 22,931 | 48,395 | 19.1 | 57,486 |
| 5 | 61,133 | 3,689 | -3,663 | 11,883 | 15,546 | 27,429 | 7.5 | 57,470 |
| 6 | 55,963 | -1,481 | 1,542 | 23,324 | 21,782 | 45,106 | 29.3 | 57,505 |
| 7 | 55,825 | -1,619 | 1,673 | 39,742 | 38,069 | 77,811 | 46.5 | 57,498 |
| 8 | 54,616 | -2,828 | 2,642 | 25,590 | 22,948 | 48,538 | 18.4 | 57,258 |
| 9 | 60,880 | 3,436 | -3,659 | 28,689 | 32,348 | 61,037 | 16.7 | 57,221 |
| 10 | 51,419 | -6,025 | 6,009 | 19,333 | 13,324 | 32,657 | 5.4 | 57,428 |
| 11 | 52,178 | -5,266 | 5,325 | 30,013 | 24,688 | 54,701 | 10.3 | 57,503 |
| 12 | 55,275 | -2,169 | 2,219 | 27,680 | 25,461 | 53,141 | 23.9 | 57,494 |
| 13 | 53,867 | -3,577 | 3,585 | 43,406 | 39,821 | 83,227 | 23.2 | 57,452 |
| 14 | 52,656 | -4,788 | 4,941 | 36,975 | 32,034 | 69,009 | 14.0 | 57,597 |
| 15 | 53,448 | -3,996 | 3,924 | 30,223 | 26,299 | 56,522 | 14.4 | 57,372 |
| 16 | 52,510 | -4,934 | 4,948 | 18,097 | 13,149 | 31,246 | 6.3 | 57,458 |
| 17 | 51,861 | -5,583 | 5,493 | 22,128 | 16,635 | 38,763 | 7.1 | 57,354 |
| 18 | 48,387 | -9,057 | 9,093 | 23,770 | 14,677 | 38,447 | 4.2 | 57,480 |
| 19 | 56,827 | -617 | 719 | 6,698 | 5,979 | 12,677 | 17.6 | 57,546 |
| 20 | 54,999 | -2,445 | 2,429 | 11,661 | 9,232 | 20,893 | 8.6 | 57,428 |
| 21 | 60,177 | 2,733 | -2,728 | 1,842 | 4,570 | 6,412 | 2.4 | 57,449 |
| 22 | 53,017 | -4,427 | 4,478 | 57,495 | 53,017 | 110,512 | 24.7 | 57,495 |
| 23 | 55,249 | -2,195 | 2,330 | 36,323 | 33,993 | 70,316 | 30.2 | 57,579 |
| 24 | 57,065 | -379 | 217 | 29,936 | 29,719 | 59,655 | 274.9 | 57,282 |
| 25 | 53,380 | -4,064 | 3,942 | 6,689 | 2,747 | 9,436 | 2.4 | 57,322 |
| 26 | 52,702 | -4,742 | 4,879 | 24,731 | 19,852 | 44,583 | 9.1 | 57,581 |
| 27 | 56,118 | -1,326 | 1,418 | 22,597 | 21,179 | 43,776 | 30.9 | 57,536 |
| 28 | 59,273 | 1,829 | -1,806 | 1,414 | 3,220 | 4,634 | 2.6 | 57,467 |
| 29 | 66,814 | 9,370 | -9,277 | 1,974 | 11,251 | 13,225 | 1.4 | 57,537 |
| 30 | 66,560 | 9,116 | -9,319 | 6,929 | 16,248 | 23,177 | 2.5 | 57,241 |
| 31 | 61,755 | 4,311 | -4,515 | 43,674 | 48,189 | 91,863 | 20.3 | 57,240 |
| 32 | 60,157 | 2,713 | -2,633 | 12,367 | 15,000 | 27,367 | 10.4 | 57,524 |
| 33 | 59,460 | 2,016 | -1,895 | 52,868 | 54,763 | 107,631 | 56.8 | 57,565 |
| 34 | 53,812 | -3,632 | 3,575 | 7,718 | 4,143 | 11,861 | 3.3 | 57,387 |
| 35 | 52,716 | -4,728 | 4,846 | 8,056 | 3,210 | 11,266 | 2.3 | 57,562 |
| 36 | 50,788 | -6,656 | 6,644 | 22,760 | 16,116 | 38,876 | 5.9 | 57,432 |
| 37 | 58,965 | 1,521 | -1,458 | 50,684 | 52,142 | 102,826 | 70.5 | 57,507 |
| 38 | 59,797 | 2,353 | -2,304 | 41,512 | 43,816 | 85,328 | 37.0 | 57,493 |
| 39 | 56,515 | -929 | 872 | 11,850 | 10,978 | 22,828 | 26.2 | 57,387 |
| 40 | 55,223 | -2,221 | 2,143 | 13,001 | 10,858 | 23,859 | 11.1 | 57,366 |
| 41 | 55,581 | -1,863 | 1,756 | 28,764 | 27,008 | 55,772 | 31.8 | 57,337 |
| 42 | 57,975 | 531 | -690 | 47,843 | 48,533 | 96,376 | 139.7 | 57,285 |
| 43 | 57,584 | 140 | -141 | 12,491 | 12,632 | 25,123 | 178.2 | 57,443 |
| 44 | 53,057 | -4,387 | 4,338 | 4,430 | 92 | 4,522 | 1.0 | 57,395 |
| 45 | 59,610 | 2,166 | -1,952 | 28,227 | 30,179 | 58,406 | 29.9 | 57,658 |
| 46 | 65,835 | 8,391 | -8,377 | 51 | 8,428 | 8,479 | 1.0 | 57,458 |
| 47 | 61,700 | 4,256 | -4,235 | 57,465 | 61,700 | 119,165 | 28.1 | 57,465 |
| 48 | 61,400 | 3,956 | -3,894 | 32,312 | 36,206 | 68,518 | 17.6 | 57,506 |
| 49 | 55,456 | -1,988 | 1,890 | 2,469 | 579 | 3,048 | 1.6 | 57,346 |
| 50 | 59,182 | 1,738 | -1,558 | 1,340 | 2,898 | 4,238 | 2.7 | 57,624 |

| [1] | [2] | [3] | [4] | [5] | [6] | [6] | [7] | [8] |
|---|---|---|---|---|---|---|---|---|
| | AD 2002 Districts | Population Shift Required | Actual Population Change | Population Added | Population Subtracted | Total Population Shift | Ratio of Total Population Shift to Required Shift | New District Population |
| 51 | 57,753 | 309 | -173 | 18,280 | 18,453 | 36,733 | 212.3 | 57,580 |
| 52 | 56,377 | -1,067 | 855 | 10,006 | 9,151 | 19,157 | 22.4 | 57,232 |
| 53 | 59,677 | 2,233 | -2,437 | 9,230 | 11,667 | 20,897 | 8.6 | 57,240 |
| 54 | 54,863 | -2,581 | 2,387 | 2,443 | 56 | 2,499 | 1.0 | 57,250 |
| 55 | 54,157 | -3,287 | 3,336 | 27,880 | 24,544 | 52,424 | 15.7 | 57,493 |
| 56 | 67,841 | 10,397 | -10,259 | 20,057 | 30,316 | 50,373 | 4.9 | 57,582 |
| 57 | 53,999 | -3,445 | 3,502 | 24,544 | 21,042 | 45,586 | 13.0 | 57,501 |
| 58 | 60,111 | 2,667 | -2,884 | 6,629 | 9,513 | 16,142 | 5.6 | 57,227 |
| 59 | 58,855 | 1,411 | -1,464 | 30,720 | 32,184 | 62,904 | 43.0 | 57,391 |
| 60 | 57,434 | -10 | -49 | 17,594 | 17,643 | 35,237 | 719.1 | 57,385 |
| 61 | 51,968 | -5,476 | 5,646 | 57,614 | 51,968 | 109,582 | 19.4 | 57,614 |
| 62 | 55,886 | -1,558 | 1,459 | 52,442 | 50,983 | 103,425 | 70.9 | 57,345 |
| 63 | 58,881 | 1,437 | -1,516 | 34,205 | 35,721 | 69,926 | 46.1 | 57,365 |
| 64 | 56,844 | -600 | 426 | 29,244 | 28,818 | 58,062 | 136.3 | 57,270 |
| 65 | 61,608 | 4,164 | -4,153 | 28,818 | 32,971 | 61,789 | 14.9 | 57,455 |
| 66 | 61,567 | 4,123 | -4,022 | 57,545 | 61,567 | 119,112 | 29.6 | 57,545 |
| 67 | 58,722 | 1,278 | -1,600 | 3,529 | 5,129 | 8,658 | 5.4 | 57,122 |
| 68 | 59,129 | 1,685 | -1,868 | 31,611 | 33,479 | 65,090 | 34.8 | 57,261 |
| 69 | 59,102 | 1,658 | -1,453 | 17,855 | 19,308 | 37,163 | 25.6 | 57,649 |
| 70 | 53,904 | -3,540 | 3,648 | 32,418 | 28,770 | 61,188 | 16.8 | 57,552 |
| 71 | 57,415 | -29 | 104 | 6,298 | 6,194 | 12,492 | 120.1 | 57,519 |
| 72 | 55,764 | -1,680 | 1,685 | 14,960 | 13,275 | 28,235 | 16.8 | 57,449 |
| 73 | 54,962 | -2,482 | 2,491 | 4,440 | 1,949 | 6,389 | 2.6 | 57,453 |
| 74 | 52,623 | -4,821 | 4,871 | 18,777 | 13,906 | 32,683 | 6.7 | 57,494 |
| 75 | 54,961 | -2,483 | 2,501 | 6,724 | 4,223 | 10,947 | 4.4 | 57,462 |
| 76 | 61,547 | 4,103 | -3,930 | 50,653 | 54,583 | 105,236 | 26.8 | 57,617 |
| 77 | 51,957 | -5,487 | 5,476 | 34,916 | 29,440 | 64,356 | 11.8 | 57,433 |
| 78 | 55,031 | -2,413 | 2,515 | 57,546 | 55,031 | 112,577 | 44.8 | 57,546 |
| 79 | 76,164 | 18,720 | -18,703 | 39,380 | 58,083 | 97,463 | 5.2 | 57,461 |
| 80 | 60,352 | 2,908 | -2,767 | 31,625 | 34,392 | 66,017 | 23.9 | 57,585 |
| 81 | 61,351 | 3,907 | -3,948 | 53,984 | 57,932 | 111,916 | 28.3 | 57,403 |
| 82 | 60,035 | 2,591 | -2,605 | 10,715 | 13,320 | 24,035 | 9.2 | 57,430 |
| 83 | 61,206 | 3,762 | -3,783 | 11,867 | 15,650 | 27,517 | 7.3 | 57,423 |
| 84 | 56,225 | -1,219 | 1,140 | 38,389 | 37,249 | 75,638 | 66.3 | 57,365 |
| 85 | 54,856 | -2,588 | 2,624 | 8,939 | 6,315 | 15,254 | 5.8 | 57,480 |
| 86 | 59,763 | 2,319 | -2,309 | 10,903 | 13,212 | 24,115 | 10.4 | 57,454 |
| 87 | 52,712 | -4,732 | 4,646 | 18,874 | 14,228 | 33,102 | 7.1 | 57,358 |
| 88 | 58,089 | 645 | -533 | 29,991 | 30,524 | 60,515 | 113.5 | 57,556 |
| 89 | 58,999 | 1,555 | -1,365 | 10,224 | 11,589 | 21,813 | 16.0 | 57,634 |
| 90 | 56,344 | -1,100 | 1,264 | 30,418 | 29,154 | 59,572 | 47.1 | 57,608 |
| 91 | 56,651 | -793 | 708 | 57,359 | 56,651 | 114,010 | 161.0 | 57,359 |
| 92 | 58,894 | 1,450 | -1,463 | 40,682 | 42,145 | 82,827 | 56.6 | 57,431 |
| 93 | 57,822 | 378 | -274 | 36,918 | 37,192 | 74,110 | 270.5 | 57,548 |
| 94 | 62,641 | 5,197 | -5,375 | 1,178 | 6,553 | 7,731 | 1.4 | 57,266 |
| 95 | 53,998 | -3,446 | 3,374 | 4,552 | 1,178 | 5,730 | 1.7 | 57,372 |
| 96 | 55,740 | -1,704 | 1,744 | 5,457 | 3,713 | 9,170 | 5.3 | 57,484 |
| 97 | 57,299 | -145 | -20 | 13,524 | 13,544 | 27,068 | 1353.4 | 57,279 |
| 98 | 56,450 | -994 | 1,063 | 35,690 | 34,627 | 70,317 | 66.1 | 57,513 |
| 99 | 63,750 | 6,306 | -6,254 | 45,467 | 51,721 | 97,188 | 15.5 | 57,496 |

Tab 3

## Exhibit 3 – Population Shifts in Senate Districts

| [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] |
|---|---|---|---|---|---|---|---|---|
| SD | 2002 District Population | Population Change Required | Actual Population Change | Population Added | Population Subtracted | Total Population Shift | Shift/change ratio | New District Population |
| 1 | 180989 | 8,656 | 8676 | 20117 | 28793 | 48910 | 5.7 | 172313 |
| 2 | 172047 | -286 | -414 | 49705 | 49291 | 98996 | 346.1 | 172461 |
| 3 | 171321 | -1,012 | -656 | 40209 | 39553 | 79762 | 78.8 | 171977 |
| 4 | 158872 | -13,461 | -13553 | 38717 | 25164 | 63881 | 4.7 | 172425 |
| 5 | 159971 | -12,362 | -12450 | 54659 | 42209 | 96868 | 7.8 | 172421 |
| 6 | 152758 | -19,575 | -19534 | 22795 | 3261 | 26056 | 1.3 | 172292 |
| 7 | 172003 | -330 | -420 | 13741 | 13321 | 27062 | 82.0 | 172423 |
| 8 | 165331 | -7,002 | -7025 | 46064 | 39039 | 85103 | 12.2 | 172356 |
| 9 | 162200 | -10,133 | -10239 | 23152 | 12913 | 36065 | 3.6 | 172439 |
| 10 | 192647 | 20,314 | 20402 | 2809 | 23211 | 26020 | 1.3 | 172245 |
| 11 | 181372 | 9,039 | 9043 | 72563 | 81606 | 154169 | 17.1 | 172329 |
| 12 | 157316 | -15,017 | -15085 | 24705 | 9640 | 34345 | 2.3 | 172381 |
| 13 | 175277 | 2,944 | 2890 | 40182 | 43072 | 83254 | 28.3 | 172387 |
| 14 | 168779 | -3,554 | -3209 | 55689 | 52480 | 108169 | 30.4 | 171988 |
| 15 | 170251 | -2,082 | -2245 | 30919 | 28674 | 59593 | 28.6 | 172496 |
| 16 | 188935 | 16,602 | 16506 | 60283 | 76789 | 137072 | 8.3 | 172429 |
| 17 | 172391 | 58 | -159 | 19666 | 19507 | 39173 | 675.4 | 172550 |
| 18 | 170917 | -1,416 | -805 | 805 | 0 | 805 | 0.6 | 171722 |
| 19 | 175997 | 3,664 | 3421 | 133 | 3554 | 3687 | 1.0 | 172576 |
| 20 | 176400 | 4,067 | 4397 | 31816 | 36213 | 68029 | 16.7 | 172003 |
| 21 | 166735 | -5,598 | -5589 | 72431 | 66842 | 139273 | 24.9 | 172324 |
| 22 | 180019 | 7,886 | 7749 | 66837 | 74586 | 141423 | 18.4 | 172270 |
| 23 | 176953 | 4,620 | 4921 | 32335 | 37256 | 69591 | 15.1 | 172032 |
| 24 | 167083 | -5,250 | -5437 | 42379 | 36942 | 79321 | 15.1 | 172520 |
| 25 | 162546 | -9,787 | -9863 | 24604 | 14741 | 39345 | 4.0 | 172409 |
| 26 | 168528 | -3,805 | -4068 | 29547 | 25479 | 55026 | 14.5 | 172596 |
| 27 | 197874 | 25,541 | 25425 | 69372 | 94797 | 164169 | 6.4 | 172449 |
| 28 | 177466 | 5,133 | 5248 | 38832 | 44080 | 82912 | 16.2 | 172218 |
| 29 | 167331 | -5,002 | -4961 | 24385 | 19424 | 43809 | 8.8 | 172292 |
| 30 | 173432 | 1,099 | 634 | 31847 | 32481 | 64328 | 58.5 | 172798 |
| 31 | 173367 | 1,034 | 1029 | 50132 | 51161 | 101293 | 98.0 | 172338 |
| 32 | 172379 | 46 | 257 | 3458 | 3715 | 7173 | 155.9 | 172122 |
| 33 | 177499 | 5,166 | 5211 | 70328 | 75539 | 145867 | 28.2 | 172288 |

Tab 4

### Exhibit 4 – Core District Population Retention – Assembly

| District | Unchanged Core | Tot Population of New Dist | Core Pop Retention | Inc Party |
|---|---|---|---|---|
| 1 | 54176 | 57220 | 94.7% | R |
| 2 | 37534 | 57649 | 65.1% | R |
| 3 | 54430 | 57444 | 94.8% | R |
| 4 | 32022 | 57486 | 55.7% | R |
| 5 | 45587 | 57470 | 79.3% | R |
| 6 | 34181 | 57505 | 59.4% | R |
| 7 | 17756 | 57498 | 30.9% | D |
| 8 | 31668 | 57258 | 55.3% | D |
| 9 | 28532 | 57221 | 49.9% | D |
| 10 | 38095 | 57428 | 66.3% | D |
| 11 | 27490 | 57503 | 47.8% | D |
| 12 | 29814 | 57494 | 51.9% | D |
| 13 | 14046 | 57452 | 24.4% | D |
| 14 | 20622 | 57597 | 35.8% | R |
| 15 | 27149 | 57372 | 47.3% | D |
| 16 | 39361 | 57458 | 68.5% | D |
| 17 | 35226 | 57354 | 61.4% | D |
| 18 | 33710 | 57480 | 58.6% | D |
| 19 | 50848 | 57546 | 88.4% | D |
| 20 | 45767 | 57428 | 79.7% | D |
| 21 | 55607 | 57449 | 96.8% | R |
| 22 | 28069 | 57495 | 48.8% | D |
| 23 | 21256 | 57579 | 36.9% | R |
| 24 | 27346 | 57282 | 47.7% | R |
| 25 | 50633 | 57322 | 88.3% | I |
| 26 | 32850 | 57581 | 57.1% | R |
| 27 | 34939 | 57536 | 60.7% | R |
| 28 | 56053 | 57467 | 97.5% | R |
| 29 | 55563 | 57537 | 96.6% | R |
| 30 | 50312 | 57241 | 87.9% | R |
| 31 | 13566 | 57240 | 23.7% | R |
| 32 | 45157 | 57524 | 78.5% | R |
| 33 | 4697 | 57565 | 8.2% | R |
| 34 | 49669 | 57387 | 86.6% | R |
| 35 | 49506 | 57562 | 86.0% | R |
| 36 | 34672 | 57432 | 60.4% | R |
| 37 | 6823 | 57507 | 11.9% | D |
| 38 | 15981 | 57493 | 27.8% | R |

| | | | | |
|---|---|---|---|---|
| 39 | 45537 | 57387 | 79.4% | R |
| 40 | 44365 | 57366 | 77.3% | R |
| 41 | 28573 | 57337 | 49.8% | R |
| 42 | 9442 | 57285 | 16.5% | D |
| 43 | 44952 | 57443 | 78.3% | R |
| 44 | 52965 | 57395 | 92.3% | R |
| 45 | 29431 | 57658 | 51.0% | R |
| 46 | 57407 | 57458 | 99.9% | D |
| 47 | 26771 | 57465 | 46.6% | R |
| 48 | 25194 | 57506 | 43.8% | D |
| 49 | 54877 | 57346 | 95.7% | R |
| 50 | 56284 | 57624 | 97.7% | R |
| 51 | 39300 | 57580 | 68.3% | R |
| 52 | 47226 | 57232 | 82.5% | R |
| 53 | 48010 | 57240 | 83.9% | R |
| 54 | 54807 | 57250 | 95.7% | D |
| 55 | 29613 | 57493 | 51.5% | R |
| 56 | 34525 | 57582 | 60.0% | R |
| 57 | 32957 | 57501 | 57.3% | D |
| 58 | 50598 | 57227 | 88.4% | R |
| 59 | 26671 | 57391 | 46.5% | R |
| 60 | 39791 | 57385 | 69.3% | R |
| 61 | 36834 | 57614 | 63.9% | D |
| 62 | 4903 | 57345 | 8.6% | D |
| 63 | 23160 | 57365 | 40.4% | R |
| 64 | 28026 | 57270 | 48.9% | D |
| 65 | 28637 | 57455 | 49.8% | D |
| 66 | 34343 | 57545 | 59.7% | R |
| 67 | 53593 | 57122 | 93.8% | R |
| 68 | 25650 | 57261 | 44.8% | R |
| 69 | 39794 | 57649 | 69.0% | R |
| 70 | 25134 | 57552 | 43.7% | D |
| 71 | 51221 | 57519 | 89.1% | D |
| 72 | 42489 | 57449 | 74.0% | R |
| 73 | 53013 | 57453 | 92.3% | D |
| 74 | 38717 | 57494 | 67.3% | D |
| 75 | 50738 | 57462 | 88.3% | R |
| 76 | 6964 | 57617 | 12.1% | D |
| 77 | 22517 | 57433 | 39.2% | D |
| 78 | 20108 | 57546 | 34.9% | D |
| 79 | 18081 | 57461 | 31.5% | D |
| 80 | 25690 | 57585 | 44.6% | D |
| 81 | 3419 | 57403 | 6.0% | D |
| 82 | 56715 | 57430 | 98.8% | R |
| 83 | 45556 | 57423 | 79.3% | R |

| 84 | 18976 | 57365 | 33.1% | R |
|----|-------|-------|-------|---|
| 85 | 48541 | 57480 | 84.4% | D |
| 86 | 46551 | 57454 | 81.0% | R |
| 87 | 38484 | 57358 | 67.1% | R |
| 88 | 27565 | 57556 | 47.9% | R |
| 89 | 47410 | 57634 | 82.3% | R |
| 90 | 27190 | 57608 | 47.2% | R |
| 91 | 30687 | 57359 | 53.5% | D |
| 92 | 16749 | 57431 | 29.2% | D |
| 93 | 20630 | 57548 | 35.8% | R |
| 94 | 56088 | 57266 | 97.9% | D |
| 95 | 52820 | 57372 | 92.1% | D |
| 96 | 52027 | 57484 | 90.5% | R |
| 97 | 43755 | 57279 | 76.4% | R |
| 98 | 21823 | 57513 | 37.9% | R |
| 99 | 12029 | 57496 | 20.9% | R |

Tab 5

**Exhibit 5 – Core District Population Retention, Senate**

| Districrt | Unchanged Core | Total Population of New District | Core Pop Retention | Inc. Party |
|---|---|---|---|---|
| 1 | 152196 | 172313 | 88.3% | R |
| 2 | 122756 | 172461 | 71.2% | R |
| 3 | 131768 | 171977 | 76.6% | D |
| 4 | 133708 | 172425 | 77.5% | D |
| 5 | 117762 | 172421 | 68.3% | R |
| 6 | 149497 | 172292 | 86.8% | D |
| 7 | 158682 | 172423 | 92.0% | D |
| 8 | 126292 | 172356 | 73.3% | R |
| 9 | 149287 | 172439 | 86.6% | R |
| 10 | 169436 | 172245 | 98.4% | R |
| 11 | 99766 | 172329 | 57.9% | R |
| 12 | 147676 | 172381 | 85.7% | D |
| 13 | 132205 | 172387 | 76.7% | R |
| 14 | 116299 | 171988 | 67.6% | R |
| 15 | 141577 | 172496 | 82.1% | D |
| 16 | 112146 | 172429 | 65.0% | D |
| 17 | 152884 | 172550 | 88.6% | R |
| 18 | 170917 | 171722 | 99.5% | R |
| 19 | 172443 | 172576 | 99.9% | R |
| 20 | 140187 | 172003 | 81.5% | R |
| 21 | 99893 | 172324 | 58.0% | R |
| 22 | 125777 | 172270 | 73.0% | D |
| 23 | 139697 | 172032 | 81.2% | R |
| 24 | 130141 | 172520 | 75.4% | D |
| 25 | 147805 | 172409 | 85.7% | D |
| 26 | 143049 | 172596 | 82.9% | D |
| 27 | 103077 | 172449 | 59.8% | D |
| 28 | 133386 | 172218 | 77.5% | R |
| 29 | 147907 | 172292 | 85.8% | R |
| 30 | 140951 | 172798 | 81.6% | D |
| 31 | 122206 | 172338 | 70.9% | D |
| 32 | 168664 | 172122 | 98.0% | R |
| 33 | 101960 | 172288 | 59.2% | R |

Table



Tab 7

| Exhibit 7 — Racially Polarized Voting Among Latino and White Voters in Milwaukee County | | | | | | |
|---|---|---|---|---|---|---|
| Election | Latino Candidate | White Candidate | % Latinos Voting for Latino Candidate (King EI) | % Whites Voting for Latino Candidate (King EI) | Difference in King EI Estimates | No. of Wards |
| 2011 Cir. Ct. Primary | Pedro Colon | Multiple | 58.2 | 32.0 | +26.2 | 451 |
| 2011 Cir Ct. General | Pedro Colon | Christopher Lipscomb | 66.2 | 45.3 | +20.9 | 454 |
| 2008 State Supt. Public Instr. Primary | Rose Fernandez | Multiple | 93.5 | 74.9 | +18.6 | 449 |
| 2008 State Supt. Public Instr. General | Rose Fernandez | Tony Evers | 95.7 | 40.5 | +55.2 | 457 |
| 2004 State Senate District 8 | Jennifer Morales | Alberta Darling | 89.2 | 49.6 | +39.6 | 36 |

Tab 8

Exhibit 8



Tab 9

| Election | African American Candidate | White Candidate | % Blacks Voting for Black Candidate (Goodman) | % Blacks Voting for Black Candidate (King EI) | % Whites Voting for Black Candidate (Goodman) | % Whites Voting for Black Candidate (King EI) | Difference in King EI Estimates | No. of Wards |
|---|---|---|---|---|---|---|---|---|
| 2008 U.S. President | Barack Obama | John McCain | n.a. | 99.5 | n.a | 53.4 | +46.1 | 481 |
| 2008 Court of Appeals | Louis Butler | Michael Gableman | 92.6 | 89.3 | 29.1 | 29.7 | +59.6 | 451 |
| 2010 U.S. Congress District 4 Primary | Gwen Moore | Paul Morel | n.a. | 93.5 | n.a. | 74.9 | +18.6 | 340 |
| 2008 Assembly District 23 | Rene Settle-Robinson | Jim Ott | n.a. | 95.7 | n.a. | 40.5 | +55.2 | 15 |
| 2010 County Sheriff | David Clarke | Steve Duckhorn | 98.8 | 97.7 | 65.3 | 67.6 | +30.1 | 457 |

**Exhibit 9**
**Racially Polarized Voting Among African American and White Voters in Milwaukee County**