STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ALVIN BALDUS, CINDY BARBERA, CARLENE
BECHEN, RONALD BIENDSEIL, RON BOONE, VERA
BOONE, ELVIRA BUMPUS, EVANJELINA
CLEEREMAN, SHEILA COCHRAN, LESLIE W.
DAVIS III, BRETT ECKSTEIN, MAXINE HOUGH,
CLARENCE JOHNSON, RICHARD KRESBACH,
RICHARD LANGE, GLADYS MANZANET,
ROCHELLE MOORE, AMY RISSEEUW, JUDY
ROBSON, GLORIA ROGERS, JEANNE SANCHEZ-
BELL, CECELIA SCHLIEPP, TRAVIS THYSSEN,                   Civil Action
                                                         File No. 11-CV-562
                    Plaintiffs,
                                                         Three-judge panel
                                                         28 U.S.C. § 2284
TAMMY BALDWIN, GWENDOLYNNE MOORE
and RONALD KIND,

                    Intervenor-Plaintiffs,

          v.

Members of the Wisconsin Government Accountability
Board, each only in his official capacity:
MICHAEL BRENNAN, DAVID DEININGER, GERALD
NICHOL, THOMAS CANE, THOMAS BARLAND, and
TIMOTHY VOCKE, and KEVIN KENNEDY, Director
and General Counsel
for the Wisconsin Government Accountability Board,

                    Defendants,

F. JAMES SENSENBRENNER, JR., THOMAS E. PETRI,
PAUL D. RYAN, JR., REID J. RIBBLE,
and SEAN P. DUFFY,

                    Intervenor-Defendants,

(caption continued on next page)

**JOINT FINAL PRETRIAL REPORT**

VOCES DE LA FRONTERA, INC., RAMIRO VARA,
OLGA VARA, JOSE PEREZ, and ERICA RAMIREZ,

        Plaintiffs,

                                  Case No. 11-CV-1011
   v.                               JPS-DPW-RMD

Members of the Wisconsin Government Accountability
Board, each only in his official capacity:
MICHAEL BRENNAN, DAVID DEININGER, GERALD
NICHOL, THOMAS CANE, THOMAS BARLAND, and
TIMOTHY VOCKE, and KEVIN KENNEDY, Director
and General Counsel for the Wisconsin Government
Accountability Board,

        Defendants.

# TABLE OF CONTENTS

<u>Page No.</u>

ELEMENTS OF CLAIMS AND DEFENSES ............................................................................. 1

I.     BALDUS PLAINTIFFS ................................................................................................... 1

     A.    Failure To Justify Population Deviations With Established Redistricting Criteria Violates The Equal Protection Clause (First, Second, And Eighth Claims) *(Act 43)*. ............................................................................... 1

     B.    Failure To Honor Traditional Redistricting Criteria Or Maintain Local Government Boundaries Violates The Wisconsin Constitution (First And Second Claims) *(Act 43)*. ....................................................................... 2

     C.    Voter Disenfranchisement/Core Retention (Third Claim) *(Act 43)*. ...................... 2

     D.    Congressional Districts: Failure To Conform To The Principles Of Compactness, Core Retention, And Preservation Of Communities Of Interest (Fourth Claim) *(Act 44)*. ........................................................... 3

     E.    Unconstitutional Gerrymandering Of Legislative Districts (Fifth Claim) *(Act 43)*. .............................................................................................................. 4

     F.    Unconstitutional Gerrymandering Of Congressional Districts (Fifth Claim) *(Act 44)*. .............................................................................................................. 4

     G.    Section 2 Of The Voting Rights Act (Sixth Claim) *(Act 43)*. ................................ 4

     H.    Use of Race as Predominant Redistricting Factor in Violation of the Equal Protection Clause (Seventh Claim) *(Act 43)*. ......................................... 7

     I.    Conduct of Special or Recall Elections Under Act 43 (Ninth Claim) *(Act 43)*. .............................................................................................................. 7

II.    VOCES PLAINTIFFS ................................................................................................... 8

     A.    Section 2 Voting Rights Act Claim. .......................................................................... 9

III.   INTERVENOR PLAINTIFFS ..................................................................................... 9

     A.    The 2011 Congressional Redistricting Plan Does Not Conform To The Principle Of Compactness. ....................................................................................... 9

     B.    The 2011 Congressional Redistricting Plan Does Not Conform To The Principle Of Community Of Interest. ....................................................................... 9

C.    The 2011 Congressional Redistricting Plan Does Not Conform To The Principle Of Core Retention.................................................................... 10

D.    The 2011 Congressional Redistricting Plan Does Not Conform To The Principle Of Representative Democracy..................................................... 10

IV.   GAB DEFENDANTS ............................................................................................. 11

A.    GAB Defendants' Response To Baldus Plaintiffs' Elements.............................. 11

1.    "Legislative boundaries unconstitutionally sacrifice redistricting principles." ................................................................................................. 11

2.    "The legislation does not recognize local government boundaries.".......... 12

3.    "The legislative district unnecessarily disenfranchise 300,000 Wisconsin citizens." ................................................................................... 12

4.    "Congressional districts are not compact and fail to preserve communities of interest." ............................................................................ 13

5.    "Congressional and legislative districts constitute unconstitutional gerrymandering." ....................................................................................... 14

6.    "Legislative districts violate the Federal Voting Rights Act." ................. 14

7.    "Legislative districts unconstitutionally use race as a predominant factor." ...................................................................................................... 16

8.    "New congressional and legislative districts are not justified by any legitimate state interest." .................................................................... 16

9.    "Any special or recall elections cannot be conducted under Act 43." ...................................................................................................... 17

B.    GAB Defendants' Response To Voces Plaintiffs' Elements.............................. 17

1.    Section 2 voting rights claim. ................................................................... 17

C.    GAB Defendants' Response To Intervenor Plaintiffs' Elements. ....................... 19

1.    Congressional districts are not compact and fail to preserve communities of interest.............................................................................. 19

2.    Congressional and Legislative Districts Constitute Unconstitutional Gerrymandering. ........................................................... 19

3.    Untitled "Seventh Claim" that the Legislature failed to consider principles of compactness, communities of interest and preserving

core populations in drawing the new boundaries (Intervenor
Complaint at ¶ 74)...................................................................... 20

V.      INTERVENOR DEFENDANTS.................................................................. 20

JOINT STATEMENT OF STIPULATED FACTS ................................................ 22

I.      2010 CENSUS AND POPULATION FIGURES............................................. 22

II.     STATUTORY HISTORY .......................................................................... 23

III.    PROCEDURAL HISTORY........................................................................ 24

IV.     PARTIES .............................................................................................. 26

V.      STATE SENATE AND ASSEMBLY DISTRICTS (ACT 43)........................... 34

        A.      Minority Populations. ............................................................. 34

        B.      Equal Population...................................................................... 38

        C.      Delayed Voting / Disenfranchisement. ................................... 39

        D.      Treatment Of Political Subdivisions........................................ 40

        E.      Compactness. ......................................................................... 41

        F.      Incumbent Pairing................................................................... 43

VI.     CONGRESSIONAL DISTRICTS (ACT 44) ................................................ 43

        A.      Equal Population...................................................................... 43

        B.      Treatment Of Political Subdivisions........................................ 43

        C.      Communities Of Interest.......................................................... 45

        D.      Core Retention........................................................................ 45

        E.      Population Movement............................................................... 48

        F.      Compactness. ......................................................................... 48

        G.      Pairing Of Incumbents. .......................................................... 48

        H.      Process of Drafting Congressional Boundaries. ...................... 48

JOINT PROPOSED CONCLUSIONS OF LAW.......................................................... 54

I.      JURISDICTION AND VENUE ................................................................. 54

II.     THE U.S. CONSTITUTION AND THE WISCONSIN CONSTITUTION .................... 54

III.    STATE STATUTES ................................................................................ 56

STATEMENTS OF CONTESTED FACTS ................................................................ 57

I.     BALDUS PLAINTIFFS ........................................................................... 57

II.    VOCES PLAINTIFFS .............................................................................. 78

III.    INTERVENOR PLAINTIFFS .................................................................... 78

    A.    Zero Deviation. .......................................................................... 78

    B.    Core Retention. ......................................................................... 79

    C.    Compactness. ............................................................................ 82

    D.    Communities Of Interest. ............................................................ 84

IV.    GAB DEFENDANTS AND INTERVENOR-DEFENDANTS ....................................... 90

    A.    Delayed Voting (Act 43) ............................................................. 90

    B.    Core Retention. ......................................................................... 91

    C.    Racial Fairness And Treatment Of Minority-Majority Districts. ......... 92

        1.    African-American Majority-Minority Districts ....................... 92

    D.    Treatment of Political Subdivisions. .............................................. 95

    E.    Incumbent Pairings. ................................................................... 95

    F.    Hispanic Majority-Minority Assembly Districts. .............................. 95

    G.    Map Creation Considerations. ...................................................... 100

    H.    Congressional Districts. .............................................................. 105

        1.    Population movement. ..................................................... 105

        2.    Communities of interest. .................................................. 106

        3.    Core retention. .............................................................. 107

        4.    Compactness. ................................................................ 107

    I.    Partisan Issues. ......................................................................... 107

1.      Participation in redistricting process.................................................. 107

2.      1983 Legislative Redistricting. ............................................... 111

PROPOSED CONCLUSIONS OF LAW ..................................................................... 114

I.      BALDUS PLAINTIFFS ................................................................................ 114

II.     VOCES PLAINTIFFS ................................................................................... 122

III.    INTERVENOR PLAINTIFFS ....................................................................... 123

        A.      Zero Deviation. .................................................................................. 123

        B.      Core Retention. .................................................................................. 124

        C.      Compactness. ...................................................................................... 124

        D.      Communities Of Interest. ................................................................... 124

        E.      Representative Democracy. ................................................................ 125

IV.     GAB DEFENDANTS .................................................................................... 125

        A.      Count I: "Legislative Boundaries Unconstitutionally Sacrifice
                Redistricting Principles" .................................................................... 125

        B.      Count II: "The Legislation Does Not Recognize Local Government
                Boundaries"........................................................................................ 126

        C.      Count III: "The Legislative Districts Unnecessarily Disenfranchise
                300,000 Wisconsin Citizens"............................................................. 126

        D.      Count IV: "Congressional Districts Are Not Compact and Fail to Preserve
                Communities of Interest."................................................................... 126

        E.      Count V: "Congressional and Legislative Districts Constitute
                Unconstitutional Gerrymandering."................................................... 126

        F.      Count VI: "Legislative Districts Violate the Federal Voting Rights Act."......... 127

        G.      Count VII: "Legislative Districts Unconstitutionally Use Race as a
                Predominant Factor." .......................................................................... 127

        H.      Count VIII: "New Congressional and Legislative Districts Are Not
                Justified By Any Legitimate State Interest." ...................................... 127

        I.      Count IX: "Any Special or Recall Elections Cannot Be Conducted Under
                Act 43."................................................................................................ 127

V.      INTERVENOR DEFENDANTS .................................................................. 128

CIVIL LOCAL RULE 16(c)(1) ...................................................................... 130

     A.      A Short Summary Of The Facts, Claims, And Defenses.................................... 130

     B.      A Statement Of The Issues. .................................................................... 130

     C.      The Names And Addresses Of All Witnesses Expected To Testify.................. 130

          1.      Baldus plaintiffs. ................................................................... 130

          2.      Voces plaintiffs. ................................................................... 130

          3.      Intervenor plaintiffs. ............................................................. 131

          4.      GAB defendants and Intervenor-Defendants............................... 131

     D.      A Statement Of The Background Of All Expert Witnesses Listed. .................. 132

     E.      A List Of Exhibits To Be Offered At Trial....................................................... 135

     F.      A Designation Of All Depositions Or Portions Of Transcripts To Be Read Into The Record Or Played At Trial As Substantive Evidence. ......................... 135

     G.      An Estimate Of The Time Needed To Try The Case. ....................................... 135

     H.      Proposed Findings Of Fact And Conclusions Of Law....................................... 135

This action for declaratory and injunctive relief challenges 2011 Wisconsin Acts 43 and 44, which adopted new boundaries for the state's legislative and congressional districts,[1] and codified them in chapters 4 and 3 of the Wisconsin Statutes, respectively.  The case is scheduled for trial on February 21 with a final pretrial conference on February 16, 2012.  In accordance with the Court's December 15, 2011 Trial Scheduling Order (Dkt. 79) and Civil L.R. 16(c)(1), the parties through their respective counsel submit the following pretrial report.

## ELEMENTS OF CLAIMS AND DEFENSES

### I.    BALDUS PLAINTIFFS

The original plaintiffs with several additional plaintiffs (collectively, "the Baldus Plaintiffs") filed their Second Amended Complaint (Dkt. 48) on November 18, 2011.  In the recitation of elements that follows, separate claims from the Second Amended Complaint are merged where appropriate.  Plaintiffs have also divided claims to ensure that violations of the U.S. Constitution and Wisconsin Constitution are alleged separately, and that allegations related to Acts 43 and 44 are distinct.  Any one claim would invalidate the statute at issue.

**A.    Failure To Justify Population Deviations With Established Redistricting Criteria Violates The Equal Protection Clause (First, Second, And Eighth Claims) *(Act 43)*.**

1.    The Equal Protection Clause requires "substantially equal state legislative representation for all citizens."  *Reynolds v. Sims*, 377 U.S. 533, 568 (1964).  Regardless of size, however, population deviations that cannot be justified by traditional redistricting criteria violate the Equal Protection Clause.

2.    Deviations from population equality in legislative districts can only be based on "legitimate considerations incident to the effectuation of a rational state policy," *Reynolds v.*

---

[1] Unless otherwise noted, the term "legislative districts" refers to state legislative districts and does not include congressional districts.

*Sims*, 377 U.S. at 579, including established redistricting criteria, *Baumgart v. Wendelberger*, No. 01-C-0121, 02-C-0366, 2002 WL 34127471 (E.D. Wis. May 30, 2002).  A partial list:

   a.   contiguity, Wis. Const. art. IV, § 4;

   b.   compactness, *id.*;

   c.   respect for "county, precinct, town or ward lines," *id*.;

   d.   maintaining communities of interest, *Baumgart*, 2002 WL 34127471, at *3; and

   e.   core population retention, *id*.

**B.    Failure To Honor Traditional Redistricting Criteria Or Maintain Local Government Boundaries Violates The Wisconsin Constitution (First And Second Claims) *(Act 43).***

3.    The Wisconsin Constitution requires that legislative districts "be bounded by county, precinct, town or ward lines . . . and be in as compact form as practicable."  Wis. Const. art. IV, § 4.

4.    "[R]espect for the prerogatives of the Wisconsin Constitution dictate that . . . municipalities be kept whole where possible."  *Baumgart*, 2002 WL 34127471, at *3.

5.    Legislative districts that unnecessarily divide municipalities or are not compact violate the Wisconsin Constitution.

6.    To the extent it relies exclusively on Act 39's permissive use of other boundaries (including census blocks), Act 43 violates Article IV, § 4 of the Wisconsin Constitution.

**C.    Voter Disenfranchisement/Core Retention (Third Claim) *(Act 43).***

7.    State senators "shall be chosen alternately from the odd and even-numbered districts for the term of 4 years."  Wis. Const. art. IV, § 5.

8.    The movement of voters from an even-numbered senate district, in which the last regular election was held in 2008, to an odd-numbered senate district, in which the next regular

election is to be held in 2014, deprives those voters of the constitutional right to vote in a regular election for two additional years.

9.      Deprivation of the right to vote in a regular election temporarily disenfranchises voters—notwithstanding the rare ability, for some, to vote in extraordinary recall elections.

10.     The Equal Protection Clause "requires that a State make an honest and good faith effort" to avoid vote dilution.  *Reynolds v. Sims*, 377 U.S. at 577.  A vote is diluted when, gratuitously, the delay between regular elections in which a citizen can vote is increased through redistricting.

11.     The disenfranchisement of more voters than necessary to reconfigure legislative districts violates the Equal Protection Clause.  *See Republican Party of Wisconsin v. Elections Bd.*, 585 F. Supp. 603, 606 (E.D. Wis. 1984) (allowing temporary disenfranchisement only when it is an "absolute necessity" or when it is "unavoidable"), *vacated and remanded for dismissal of complaint*, *Wisconsin Elections Bd. v. Republican Party of Wisconsin*, 469 U.S. 1081 (1984).

12.     Act 43 moves at least three plaintiffs from an even- to an odd-numbered district, depriving them of the ability to vote for a state senator in 2012.

13.     The transfer of voters from district to district through Act 43—without justification—violates the Equal Protection Clause.

**D.      Congressional Districts: Failure To Conform To The Principles Of Compactness, Core Retention, And Preservation Of Communities Of Interest (Fourth Claim)** *(Act 44).*

14.     The state has a duty to make congressional districts compact, to retain core district populations, and to preserve communities of interest.

15.     Act 44 makes Wisconsin's congressional districts less compact than the previous plan, fails to honor the principle of core retention, and fails to preserve communities of interest.

16. There is no legitimate governmental interest in failing to honor established redistricting principles.

17. Failure to honor established redistricting principles is not rationally related to any legitimate governmental interest.

**E.     Unconstitutional Gerrymandering Of Legislative Districts (Fifth Claim)** *(Act 43).*

18. A *prima facie* case of unconstitutional gerrymandering is established by showing that:

    a.     The redistricting legislation moved significantly more people than necessary to achieve the ideal population; and

    b.     No traditional redistricting criteria can justify the movement.

19. Defendants can rebut the *prima facie* case by showing that the movement was necessitated by justified changes in other district boundaries or by traditional redistricting criteria.

20. Plaintiffs can sustain their burden of proving an unconstitutional gerrymander by establishing that defendants' explanations are pretextual or unfounded.

**F.     Unconstitutional Gerrymandering Of Congressional Districts (Fifth Claim)** *(Act 44).*

21. *See* paragraphs 18-20, *supra.*  The elements of the unconstitutional political gerrymandering claim are identical with respect to congressional and legislative districts.

**G.     Section 2 Of The Voting Rights Act (Sixth Claim)** *(Act 43).*

22. Section 2 of the Voting Rights Act, as amended, provides:

    (a)     No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right . . . to vote on account of race or color, or in contravention of the

guarantees set forth in section 1973b(f)(2) of this title, as provided by subsection (b) of this section.

(b)    A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

23.    Plaintiffs must meet three threshold requirements to establish a violation of section 2 of the Voting Rights Act:

a.    the minority groups at issue are sufficiently large and geographically compact enough to permit the creation of a majority-minority district, or more majority-minority districts than the redistricting plan created; and,

b.    the minority groups are "politically cohesive," meaning that their members vote in a similar fashion; and,

c.    there must be evidence of racial-bloc voting (*i.e.*, racially polarized voting) in which the majority tends to vote as a bloc, usually allowing majority voters to defeat the minority's preferred candidates.  *See Thornburg v. Gingles*, 478 U.S. 30, 48-51 (1986); *see also Growe v. Emison*, 507 U.S. 25, 401-41 (1993).

24.    The *Gingles* requirements "cannot be applied mechanically and without regard to the nature of the claim."  *See Voinovich v. Quilter*, 507 U.S. 146, 158 (1993).

25.     Discriminatory effect may be demonstrated through circumstantial evidence of discriminatory intent.  *See Johnson v. DeGrandy*, U.S.  512 U.S. 997, 1565 (1994); *Ketchum v. Byrne*, 740 F.2d 1398, 1406 (7th Cir. 1984).

26.     After the plaintiffs have met the three requirements, the Court decides based on the totality of the circumstances whether the minority groups have been denied an equal opportunity to participate in the political process and elect legislators of their choice.  *See* 42 U.S.C. § 1973(b); *see also Gingles*, 478 U.S. at 46.

27.     The following factors, while neither cumulative nor exhaustive, are relevant to the totality of the circumstances analysis:

        a.      the history of voting-related discrimination in the state or political subdivision;

        b.      the extent to which voting in the elections of the state or political subdivision is racially polarized;

        c.      the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority groups, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting;

        d.      the exclusion of members of the minority groups from candidate slating processes;

        e.      the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

        f.      the use of overt or subtle racial appeals in political campaigns; and

g.       the extent to which members of the minority groups have been elected to public office in the jurisdiction.  *See Gingles*, 478 U.S. at 44-45.

**H.       Use of Race as Predominant Redistricting Factor in Violation of the Equal Protection Clause (Seventh Claim)** *(Act 43).*

28.       To prove a constitutional violation in redistricting, plaintiffs must show that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district."  *See Miller v. Johnson*, 515 U.S. 900, 916 (1995).

29.       Plaintiffs bear the burden of proving impermissible motives and may do so either through "circumstantial evidence of a district's shape and demographics," including the redistricting process, or through "more direct evidence going to legislative purpose."  *See id.*

30.       When race is the predominant consideration in drawing district lines, such that the legislature subordinated race-neutral districting principles (for example, compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests) to racial considerations, the challenged majority-minority districts are subject to strict scrutiny.  *See Miller*, 515 U.S. at 920; *see also Shaw v. Reno*, 509 U.S. 630, 646 (1993) (*Shaw I*).

31.       After race is shown to be the predominant consideration in drawing district lines, the burden shifts to the defendants to demonstrate that the redistricting plan is in pursuit of a compelling state interest, narrowly tailored to serve that interest.  *See Miller*, 515 U.S. at 920; *Shaw I*, 509 U.S. at 646.

**I.       Conduct of Special or Recall Elections Under Act 43 (Ninth Claim)** *(Act 43).*

32.       Section 10 of 2011 Act 43 states: "(1) This act first applies, with respect to regular elections, to offices filled at the 2012 general election.  (2) This act first applies, with respect to special or recall elections, to offices filled or contested concurrently with the 2012 general election."  2011 Wis. Act 43.

33.     The Wisconsin Constitution permits legislative redistricting only after a decennial census.  Wis. Const. art. IV, § 3.

34.     Where a state statute provides for redistricting after a decennial census, it may not impose an interim remedy to address subsequent population changes that allegedly render the redistricting invalid.  *See Mississippi State Conf. of N.A.A.C.P. v. Barbour*, No. 11-cv-159, 2011 WL 1870222, *2, *6-*8 (S.D. Miss. May 16, 2011), *summarily aff'd*, 132 S. Ct. 542 (Oct. 31, 2011); *see also Holt v. 2011 Legislative Reapportionment Comm'n*, No. 7 MM 2012 (Pa. Jan. 25, 2012).

35.     The Government Accountability Board has concluded, based on the plain language of Act 43, that any special or recall elections to offices filled or contested prior to the fall 2012 elections are to be conducted in the legislative districts established by the 2002 judicially-approved redistricting plan.  *See* Tr. Ex. 186 (Memorandum Regarding Legislative Redistricting: Effective Date and Use of State Funds from Kevin J. Kennedy, Dir. and Gen. Counsel, Gov't Accountability Bd., to Robert Marchant, Senate Chief Clerk, and Patrick Fuller, Assembly Chief Clerk (Oct. 19, 2011)).

36.     Tens of thousands of recall petition signatures were submitted in direct reliance upon Section 10 of 2011 Act 43 and the defendants' own opinion.  *See Friends of Scott Walker v. Brennan*, No. 2012AP32-AC (Wis. Ct. App. Feb. 3, 2012).

## II.    VOCES PLAINTIFFS

The Voces de la Frontera, Inc.  ("Voces" or "Voces de la Frontera") Plaintiffs filed a complaint on October 31, 2011, which this Court consolidated with the Baldus Plaintiffs' Complaint in an order dated November 22, 2011 (Dkt. 55).

A. **Section 2 Voting Rights Act Claim.**

37. The Voces Plaintiffs join in and adopt the Baldus Plaintiffs' statement of their claim under Section 2 of the Voting Rights Act.

III. **INTERVENOR PLAINTIFFS**

The Intervenor Plaintiffs (the Democratic members of the Wisconsin Congressional delegation) filed a motion to intervene and a complementary pleading on November 17, 2011 (Dkt. 44, 45), which the Court granted in an order on November 21, 2011 (Dkt. 56).

A. **The 2011 Congressional Redistricting Plan Does Not Conform To The Principle Of Compactness.**

38. States have a duty to make congressional districts compact. *Prosser v. Elections Bd.*, 793 F. Supp. 859 (W.D. Wis. 1992); *Bush v. Vera*, 517 U.S. 952, 1048 (1996) (Souter, J., with J. Ginsburg and J. Breyer, dissenting).

39. Wisconsin's 2011 Congressional Redistricting plan, as enacted by 2011 Wisconsin Act 44, makes Wisconsin's Congressional districts less compact than the previous plan.

40. There is no legitimate governmental interest in making the districts less compact.

41. Less compact districts are not rationally related to any legitimate governmental interest.

B. **The 2011 Congressional Redistricting Plan Does Not Conform To The Principle Of Community Of Interest.**

42. States have a duty to preserve communities of interest in forming Congressional Districts. *Prosser v. Elections Bd.*, 793 F. Supp. 859 (W.D. Wis. 1992); *Bush v. Vera*, 517 U.S. 952, 1048 (1996) (Souter, J., with J. Ginsburg and J. Breyer, dissenting).

43. Wisconsin's 2011 Congressional Redistricting plan, as enacted by 2011 Wisconsin Act 44, fails to preserve communities of interest.

44.     There is no legitimate governmental interest in failing to preserve communities of interest.

45.     The failure to preserve communities of interest is not rationally related to any legitimate governmental interest.

**C.      The 2011 Congressional Redistricting Plan Does Not Conform To The Principle Of Core Retention.**

46.     States have a duty to make congressional districts conform to the principle of core retention.  *See Abrams v. Johnson*, 521 U.S. 74, 99-100 (1997); *Larios v. Cox*, 300 F. Supp. 2d 1320, 1349 (N.D. Ga. 2004).

47.     Wisconsin's 2011 Congressional Redistricting plan, as enacted by 2011 Wisconsin Act 44, fails to conform to the principle of core retention.

48.     There is no legitimate governmental interest in failing to conform to the principle of core retention.

49.     Failure to conform to the principle of core retention is not rationally related to any legitimate governmental interest.

**D.      The 2011 Congressional Redistricting Plan Does Not Conform To The Principle Of Representative Democracy.**

50.     States have a duty to make congressional districts conform to the principle of representative democracy.  *Prosser v. Elections Bd.*, 793 F. Supp. 859 (W.D. Wis. 1992).

51.     Wisconsin's 2011 Congressional Redistricting plan, as enacted by 2011 Wisconsin Act 44, fails to conform to the principle of representative democracy.

52.     There is no legitimate governmental interest in failing to conform to the principle of representative democracy.

53.     Failure to conform to the principle of representative democracy is not rationally related to any legitimate governmental interest.

## IV.   GAB DEFENDANTS

### A.   GAB Defendants' Response To Baldus Plaintiffs' Elements.

54.    The GAB Defendants join the Intervenor-Defendants' responses to the elements

of claims put forward by the Baldus Plaintiffs and Intervenor-Plaintiffs.

#### 1.   "Legislative boundaries unconstitutionally sacrifice redistricting principles."

##### i.   *State Legislative Districts*

55.    A party challenging the population equality of Assembly and Senate Districts

must demonstrate: (1) a population deviation between districts that is not a close approximation

to exactness; and (2) the deviation is not the result of considering the boundaries of local political

units.[2]

##### ii.   *Congressional Districts*

56.    The Constitutional directive that members of the House of Representatives be

chosen "by the People of the Several States," U.S. CONST, art. I, § 2, cl. 1, has been interpreted

to "mean [ ] that as nearly as is practicable one man's vote in a congressional election is to be

worth as much as another's." *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964).

57.    A party challenging Congressional redistricting must demonstrate: (1) The

existence of a population disparity that (2)"could have been reduced or eliminated altogether by

(3) a good-faith effort to draw districts of equal proportion."  *Karcher v. Daggett*, 462 U.S. 725,

730 (1983); *see also Tennant v. Jefferson County Commission*, 565 U.S. __ (Jan. 20, 2012)

(ordering stay of district-court ruling that struck down map for nonconformance with population-

disparity principles).

---

[2] "[A] mathematical equality of population in each senate and assembly district is impossible to achieve, given the requirement that the boundaries of local political units must be considered in the execution of the standard of per capita equality of representation. . . .[A] valid reapportionment 'should be as close an approximation to exactness as possible, and that this is the utmost limit for the exercise of legislative discretion." *Reynolds v. Zimmerman*, 22 Wis.2d 544, 565, 126 N.W.2d 551 (1964).

58.     Upon such a showing, the burden shifts to the state to prove "that each significant variance between districts was necessary to achieve some legitimate goal." Id. at 731. Previously recognized legitimate goals include "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." *Karcher*, 462 U.S. at 740.

> **2.     "The legislation does not recognize local government boundaries."**

59.     No such federal claim exists.  "[C]ompactness, contiguity, and respect for political subdivisions … are important not because they are constitutionally required—they are not—but because they are objective factors that may serve to defeat a claim [of unconstitutional redistricting]." *Shaw v. Reno*, 509 U.S. 630, 647 (1993) (internal citation to *Gaffney v. Cummings*, 412 U.S. 735, 752, n. 18 (1973)).

60.     Wis. Const. art IV § 4 requires that Wisconsin state legislative boundaries, "be bounded by county, precinct, town or ward lines, to consist of contiguous territory and be in as compact form as practicable."  Plaintiffs must first prove that this Court has jurisdiction to instruct state officials on how to conform to state law. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

> **3.     "The legislative district unnecessarily disenfranchise 300,000 Wisconsin citizens."**

61.     The plaintiffs pled this cause of action solely as a violation of the Wisconsin Constitution.  However, no such cause of action exists under the Wisconsin Constitution:

> The complaint charges that the senate districts are so numbered in chapter 482 that large numbers of electors who were last permitted to vote for senators in 1888 cannot do so again until 1894, while other large numbers of electors who voted for senators in 1890 may again do so in 1892. This is alleged as a reason why the act is invalid. The court finds in the constitution no authority conferred upon it to interfere with the numbering of the senate districts. In that respect the power of the legislature is absolute.

*State ex rel. Attorney General v. Cunningham*, 81 Wis. 440, 468, 51 N.W. 724 (1892).

62.    Further, plaintiffs must first prove that this Court has jurisdiction to instruct state officials on how to conform to state law. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

63.    Even if the plaintiffs had alleged a violation of the United States Constitution, "delayed voting" as a consequence of redistricting is not, as a matter of law, a violation of the equal protection clause. "Temporary disenfranchisement resulting from the combined effect of reapportionment and a staggered election system meets the rational-basis test and therefore does not violate the Equal Protection Clause." *Donatelli v. Mitchell*, 2 F.3d 508, 515 (3rd Cir. 1993). "In the context of reapportionment, a temporary dilution of voting power that does not unduly burden a particular group does not violate the equal protection clause." *Republican Party of Oregon v. Keisling*, 959 F.2d 144, 145-46 (9th Cir. 1992).

    **4.    "Congressional districts are not compact and fail to preserve communities of interest."**

64.    There is no such federal claim. "[C]ompactness, contiguity, and respect for political subdivisions … are important not because they are constitutionally required—they are not—but because they are objective factors that may serve to defeat a claim [of unconstitutional redistricting]." *Shaw v. Reno*, 509 U.S. 630, 647 (1993) (internal citation to *Gaffney v. Cummings*, 412 U.S. 735, 752, n. 18 (1973)).

65.    Wis. Const. art IV § 4 requires that Wisconsin state legislative boundaries, "be bounded by county, precinct, town or ward lines, to consist of contiguous territory and be in as compact form as practicable." However, no provision of the Wisconsin Constitution or any state statute requires that congressional boundaries comply with any particular principles. Plaintiffs

must first prove that this Court has jurisdiction to instruct state officials on how to conform to

state law. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

### 5. "Congressional and legislative districts constitute unconstitutional gerrymandering."

66.     "The relevant question is not whether a partisan gerrymander has occurred, but

whether it is so excessive or burdensome as to rise to the level of an actionable equal-protection

violation." *Radogno v. Illinois State Bd. of Elections*, 2011 WL 5025251, *2 (N.D. Ill. Oct. 21,

2011).  No judicially discernible and manageable standards for adjudicating political

gerrymandering claims have emerged."  *Veith v. Jubilerer*, 541 U.S. 267, 281 (2004)(Scalia, J.,

plurality opinion).

### 6. "Legislative districts violate the Federal Voting Rights Act."

67.     In order to establish a violation of § 2 of the Voting Rights Act, a minority group

must prove (1) that it is "sufficiently large and geographically compact to constitute a majority in

a single-member district";  (2) that it is also "politically cohesive"; and (3) that the "white

majority votes sufficiently as a bloc to enable it — in the absence of special circumstances, such

as the minority candidate running unopposed, . . . to defeat the minority's preferred candidate."

*Thornburg v. Gingles*, 478 U.S. 30, 50-51(1986).

68.     Failure to establish any one of the Gingles factors by a preponderance of the

evidence precludes a finding of vote dilution, because "[t]hese circumstances are necessary

preconditions for multimember districts to operate to impair minority voters' ability to elect

representatives of their choice." *Id.* at 50.

69.     If a minority group can establish these three elements, the court must then

"consider whether, under the totality of the circumstances, the challenged practice impairs the

ability of the minority voters to participate equally in the political process." *Goosby v. Bd. of the*

*Town of Hempstead*, 956 F. Supp. 326, 329 (E.D.N.Y. 1997). Judicial assessment of the totality of the circumstances requires a "searching practical evaluation of the past and present reality." *Gingles*, 478 U.S. at 45. Central to this assessment is an examination of the following seven factors, which were set forth in the Senate Judiciary Committee Report accompanying the 1982 amendments to Section 2 of the Voting Rights Act:

     a.    the extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process;

     b.    the extent to which voting in the elections of the state or political subdivision is racially polarized;

     c.    the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

     d.    if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

     e.    the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder the ability to participate effectively in the political process;

     f.    whether political campaigns have been characterized by overt or subtle racial appeals; [and]

     g.    the extent to which members of the minority group have been elected to public office in the jurisdiction.

*See* S. Rep. No. 97-417, 97th Cong. 2nd Sess. 28 (1982) (the "Senate Report"). The Senate Report recognized two further factors that, in some cases, warrant consideration as part of plaintiffs' evidence to establish a violation: (1) "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;" and (2) whether "the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." Id. at 29 (footnotes omitted).

7.     **"Legislative districts unconstitutionally use race as a predominant factor."**

70.     A districting plan violates the equal protection clause when it is shown (either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose) that race was the predominant factor motivating the placement of a significant number of voters within or without a particular district. *Stabler v. County of Thurston, Neb.*, 129 F.3d 1015, 1025 (8th Cir. 1997); *citing Harvell v. Blytheville Sch. Dist. No. 5,* 126 F.3d 1038, 1039 (8th Cir.1997), quoting *Miller v. Johnson*, 515 U.S. 900, 916, 115 S.Ct. 2475, 2488 (1995).

8.     **"New congressional and legislative districts are not justified by any legitimate state interest."**

71.     There is no such federal claim. "[C]ompactness, contiguity, and respect for political subdivisions … are important not because they are constitutionally required—they are not—but because they are objective factors that may serve to defeat a claim [of unconstitutional redistricting]." *Shaw v. Reno*, 509 U.S. 630, 647 (1993) (internal citation to *Gaffney v. Cummings*, 412 U.S. 735, 752, n. 18 (1973)).

9. **"Any special or recall elections cannot be conducted under Act 43."**

72.    This is a claim premised solely on the Wisconsin Constitution. To establish a violation of a Wisconsin State Constitution provision, plaintiffs must first prove that this Court has jurisdiction to instruct state officials on how to conform to state law. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

73.    Further, there is no case or controversy with respect to this claim because the Wisconsin Government Accountability Board does not intend to conduct recall elections in accord with the legislative districts created by Act 43.

B.    **GAB Defendants' Response To Voces Plaintiffs' Elements.**

1.    **Section 2 voting rights claim.**

74.    In order to establish a violation of § 2 of the Voting Rights Act, a minority group must prove (1) that it is "sufficiently large and geographically compact to constitute a majority in a single-member district";  (2) that it is also "politically cohesive"; and (3) that the "white majority votes sufficiently as a bloc to enable it — in the absence of special circumstances, such as the minority candidate running unopposed, . . . to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50-51(1986).

75.    Failure to establish any one of the Gingles factors by a preponderance of the evidence precludes a finding of vote dilution, because "[t]hese circumstances are necessary preconditions for multimember districts to operate to impair minority voters' ability to elect representatives of their choice." *Id*. at 50.

76.    If a minority group can establish these three elements, the court must then "consider whether, under the totality of the circumstances, the challenged practice impairs the ability of the minority voters to participate equally in the political process." *Goosby v. Bd. of the Town of Hempstead*, 956 F. Supp. 326, 329 (E.D.N.Y. 1997).  Judicial assessment of the totality

of the circumstances requires a "searching practical evaluation of the past and present reality."
*Gingles*, 478 U.S. at 45. Central to this assessment is an examination of the following seven factors, which were set forth in the Senate Judiciary Committee Report accompanying the 1982 amendments to Section 2 of the Voting Rights Act:

      a.      the extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process;

      b.      the extent to which voting in the elections of the state or political subdivision is racially polarized;

      c.      the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

      d.      if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

      e.      the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder the ability to participate effectively in the political process;

      f.      whether political campaigns have been characterized by overt or subtle racial appeals; [and]

      g.      the extent to which members of the minority group have been elected to public office in the jurisdiction.

*See* S. Rep. No. 97-417, 97th Cong. 2nd Sess. 28 (1982) (the "Senate Report"). The Senate

Report recognized two further factors that, in some cases, warrant consideration as part of

plaintiffs' evidence to establish a violation: (1) "whether there is a significant lack of

responsiveness on the part of elected officials to the particularized needs of the members of the

minority group;" and (2) whether "the policy underlying the state or political subdivision's use of

such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."

Id. at 29 (footnotes omitted).

### C. GAB Defendants' Response To Intervenor Plaintiffs' Elements.

#### 1. Congressional districts are not compact and fail to preserve communities of interest.

77.     There is no such federal claim. "[C]ompactness, contiguity, and respect for

political subdivisions … are important not because they are constitutionally required—they are

not—but because they are objective factors that may serve to defeat a claim [of unconstitutional

redistricting]." *Shaw v. Reno*, 509 U.S. 630, 647 (1993) (internal citation to Gaffney v.

Cummings, 412 U.S. 735, 752, n. 18 (1973)).

#### 2. Congressional and Legislative Districts Constitute Unconstitutional Gerrymandering.

78.     "The relevant question is not whether a partisan gerrymander has occurred, but

whether it is so excessive or burdensome as to rise to the level of an actionable equal-protection

violation." *Radogno v. Illinois State Bd. of Elections*, 2011 WL 5025251, *2 (N.D. Ill. Oct. 21,

2011). No judicially discernible and manageable standards for adjudicating political

gerrymandering claims have emerged." *Veith v. Jubilerer*, 541 U.S. 267, 281 (2004)(Scalia, J.,

plurality opinion).

### 3. Untitled "Seventh Claim" that the Legislature failed to consider principles of compactness, communities of interest and preserving core populations in drawing the new boundaries (Intervenor Complaint at ¶ 74).

79.     There is no such federal claim.  "[C]ompactness, contiguity, and respect for political subdivisions … are important not because they are constitutionally required—they are not—but because they are objective factors that may serve to defeat a claim [of unconstitutional redistricting]."  *Shaw v. Reno*, 509 U.S. 630, 647 (1993) (internal citation to *Gaffney v. Cummings*, 412 U.S. 735, 752, n. 18 (1973)).

## V.     INTERVENOR DEFENDANTS

80.     The intervenor-defendants filed a motion to intervene in this action on November 20, 2011.  (Dkt. 32.)  This Court granted that motion (Dkt. 49), and the intervenor-defendants filed an answer to the Second Amended Complaint (Dkt. 60).  On December 8, 2011, they filed a motion for judgment on the pleadings of that complaint as to Act 44 issues and a corresponding motion to dismiss the intervenor-plaintiffs' complaint in its entirety.  (Dkt. 75.)

81.     The intervenor-defendants join the GAB defendants' responses to the elements of the claims put forward by the Baldus plaintiffs and the intervenor-plaintiffs to the extent they implicate Act 44.

82.     The various grounds on which the plaintiffs and intervenor-plaintiffs purport to attack Act 44 amount to nothing other than successive attempts to state a political gerrymandering claim, which a four-justice plurality of the U.S. Supreme Court considers to be a non-justiciable question and for which a majority of that Court has held no workable standard presently exists or has ever been proffered.

83.     The plaintiffs and the intervenor-plaintiffs have failed to state a claim upon which relief can be granted as to Act 44, because they have failed to provide the Court with a workable

standard with which to measure any purported burden upon their representational rights under the Equal Protection Clause by any political considerations that may have affected the drawing of congressional districts embodied in Act 44.

84.     The plaintiffs and the intervenor-plaintiffs have failed to state a claim upon which relief can be granted as to Act 44 under the First Amendment, because the provisions of Act 44 do not implicate any recognized First Amendment right of the plaintiffs or the intervenor-plaintiffs.

85.     The intervenor-plaintiffs have failed to state a claim upon which relief can be granted for any purported "damage to representative democracy," because such an assertion does not support any independent claim for relief.

86.     No provision in the U.S. Constitution (or the Wisconsin Constitution) requires that congressional districting lines adopted by the Wisconsin Legislature conform with the so-called redistricting "principles" of compactness, communities of interest, or core retention.

87.     Even if the Wisconsin Constitution did contain any such general mandate to consider some such so-called "principles," enforcement by this federal Court of that or any other provision of state law against agents of the state of Wisconsin would be barred by the teaching of *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1983) and subsequent cases.

88.     The plaintiffs and the intervenor-plaintiffs cannot show that Act 44 embodies excessive and unconstitutional, rather than permissible and constitutional, political considerations.

89.     The intervenor-plaintiffs had input into the congressional district boundaries embodied in Act 44, and those boundaries reflect certain preferences of both the Republican and the Democratic incumbent members of the House of Representatives.

**JOINT STATEMENT OF STIPULATED FACTS**

90.　　By agreeing that the following facts may be treated as true for purposes of this trial, the parties are not necessarily agreeing that each of them is material or relevant.

**I.　　2010 CENSUS AND POPULATION FIGURES**

91.　　The Bureau of the Census, U.S. Department of Commerce, conducted a decennial census in 2010 of Wisconsin and of all the other states under Article I, Section 2, of the U.S. Constitution.

92.　　The Census Bureau on December 21, 2010 announced and certified the official enumeration of the population of Wisconsin at 5,686,986 as of April 1, 2010.  For comparison, the 2000 Census had determined that the population of Wisconsin was 5,363,675.

93.　　Based on the April 2010 census, the precise ideal population for each of the 33 senate districts in Wisconsin is 172,333 and for each of the 99 assembly districts 57,444.  For comparison, under the 2000 Census, the precise ideal population for each senate district had been 162,536, and for each assembly district had been 54,179.

94.　　Based on the April 2010 census, the precise ideal population for each of the eight congressional districts in Wisconsin is approximately 710,873.  However, because dividing the population of Wisconsin (5,686,986) by eight results in a fraction, two districts must each have one additional person.

95.　　In 2011, there were recall elections—compelled by petition under the state constitution—for nine state senators: July 19, for District 30; August 9, for Districts 2, 8, 10, 14, 18 and 32; and, for Districts 12 and 22, on August 16.  All of these elections were conducted within the districts established by this Court in 2002.

96.     Recall petitions have been filed to require elections, on a date in 2012 to be determined by GAB, if sufficient signatures have been certified by the GAB, in the following state senate districts: 13, 21, 23 and 29.

97.     Defendants have approved a guideline stating that any special or recall elections scheduled before the fall 2012 general elections shall be conducted under the boundaries established by this Court in 2002 and in effect since then.  *See* Tr. Ex. 166.

98.     At least one plaintiff has signed a state senate recall petition.

## II.     STATUTORY HISTORY

99.     The state legislature has the responsibility—under Article I, sections 2 and 4, and the Fourteenth Amendment, section 2, of the U.S. Constitution, and under 2 U.S.C. § 2c—to enact a constitutionally valid plan establishing the boundaries for the state's eight congressional districts based on the 2010 Census.

100.     Article IV, section 3, of the Wisconsin Constitution imposes a specific responsibility on the legislature to enact statutes after each decennial census redrawing the lines of the state's legislative districts.

101.     The bill that would become Act 43, and a companion bill that would become Act 39, were released to the public on July 8, 2011.

102.     The bill that would become Act 44 was based on maps drafted at the direction of Wisconsin's Republican members of the House of Representatives, following some consultation with the Democratic members of the House, and was introduced by the Republican leadership of the Wisconsin Legislature.  The bill was also made public on July 8, 2011.

103.     On July 13, 2011, the legislature held a public hearing to take testimony on the bills that would become Acts 43 and 44.  A transcript of the hearing appears as Trial Exhibit 19.

104.    The Senate Judiciary Committee recommended the passage of an amended version of the bill that would become Act 43 on July 15, 2011.

105.    The senate approved the amended bill that would become Act 43 on July 19, 2011.  The assembly approved the bill on July 20, 2011.  It was signed into law on August 9, 2011.  A copy of Act 43 appears as Trial Exhibit 174.  A copy of the legislative history of Act 43 appears as Trial Exhibit 1055.

106.    Act 43 provides that it shall first apply "with respect to regular elections, to offices filled at the 2012 general election," and "with respect to special or recall elections, to offices filled or contested concurrently with the 2012 general election."

107.    On July 15, the Senate Judiciary Committee recommended passage of the bill that would become Act 44.  On July 19 and 20, the Wisconsin legislature adopted Act 44, and the Governor signed Act 44 into law on August 9, 2011.  A copy of Act 44 appears as Trial Exhibit 175.  A copy of the legislative history of Act 44 appears as Trial Exhibit 1056.

## III.    PROCEDURAL HISTORY

108.    The Baldus plaintiffs have filed three complaints:  an initial complaint on June 10, 2011 (Dkt. 1), the First Amended Complaint on July 21, 2011 (Dkt. 12), and the Second Amended Complaint (Dkt. 48), filed on November 18, 2011, and answered on November 25, 2011 (Dkt. 57) by the Wisconsin Government Accountability Board ("GAB") and on November 29, 2011 by the Intervenor-Defendants (Dkt. 60).

109.    The defendants filed a Motion to Dismiss (Dkt. 6) on June 30, 2011, to which the plaintiffs responded, in part, with an Amended Complaint on July 21, 2011, which the defendants subsequently answered on November 4, 2011 (Dkt. 29).  The defendants filed a Motion to Dismiss the Amended Complaint (Dkt. 16) on August 4, 2011.

110.     On September 21, 2011, the Chief Judge of the U.S. Court of Appeals entered an order designating the members of the three-judge Court under 28 U.S.C. § 2284 (Dkt. 24).

111.     The panel entered an order denying the Motion to Dismiss on October 21, 2011 (Dkt. 25), and immediately scheduled an initial conference, which it conducted on October 24, 2011 (Dkt. 26).  There followed an order on scheduling and discovery entered on November 14, 2011 (Dkt. 35) and, on December 15, 2011, a superseding Trial Scheduling Order (Dkt. 79).

112.     In response to two motions to intervene with accompanying pleadings, the Court entered an order on November 21, 2011 permitting the intervention of Republican members of Congress and, separately, Democratic member of Congress.  Voces De La Frontera, Inc. filed a separate redistricting action (Case No. 11-CV-1011) on October 31, 2011 and the Court consolidated it with this case in a November 22, 2011 order (Dkt. 55).

113.     On December 8, 2011, the intervenor-defendants filed a Motion for Judgment on the Pleadings requesting the dismissal of all of the claims related to Act 44's establishment of boundaries for the state's eight congressional districts (Dkt. 75).  That motion, fully briefed, remains pending.

114.     On January 24, 2012, six individuals filed a Motion for Leave to Appear as Amicus Curiae and submitted a brief and a proposed state legislative redistricting map (Dkt. 126).  That motion, which the defendants oppose, remains pending.

115.     On February 10, 2012, defendants filed a motion for summary judgment on counts 2-6 and 8 of the plaintiffs' Second Amended Complaint, counts 4 and 5 of the Intervenor Plaintiffs, and the single count of the Complaint filed by the consolidated Voces de la Frontera plaintiffs.  That motion remains pending.

116.    On February 13, 2012, the Baldus plaintiffs filed a letter with the Court objecting to the summary judgment motion (Dkt. 133), and the Intervenor-Plaintiffs filed a letter concurring with plaintiffs (Dkt. 135).

117.    On February 14, 2012, the defendants filed a letter response (Dkt. 154).

## IV.    PARTIES

118.    The Baldus plaintiffs are citizens, residents and qualified voters of the United States and the State of Wisconsin, residing in various counties and various legislative and congressional districts (as now re-established by Wisconsin Acts 43 and 44).  Regardless of their place of residence, they allege their rights are harmed or threatened with harm by political district boundaries that violate federal and state law.

a.    Alvin Baldus, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of Menomonie, Dunn County, Wisconsin, with his residence in the 3rd Congressional District, 67th Assembly District and 23rd Senate District as those districts have been established by law.

b.    Cindy Barbera, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of the City of Madison, Dane County, Wisconsin, with her residence in the 2nd Congressional District, 78th Assembly District and 26th Senate District as those districts have been established by law.

c.    Carlene Bechen, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of the Village of Brooklyn, Dane County, Wisconsin, with her residence in the 2nd Congressional District, 80th Assembly District and the 27th Senate District as those districts have been established by law.

d.    Ronald Biendseil, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of Middleton, Dane County, Wisconsin, with

his residence in the 2nd Congressional District, 79th Assembly District and 27th Senate District as those districts have been established by law.

e.     Ross Boone, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of the Village of Twin Lakes, Kenosha County, Wisconsin, with his residence in the 1st Congressional District, 61st Assembly District and the 21st Senate District as those districts have been established by law.

f.     Vera Boone, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of the Village of Twin Lakes, Kenosha County, Wisconsin, with her residence in the 1st Congressional District, 61st Assembly District and the 21st Senate District as those districts have been established by law.

g.     Elvira Bumpus, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of the City of Racine, Racine County, Wisconsin, with her residence in the 1st Congressional District, 66th Assembly District and 22nd Senate District as those districts have been established by law.

h.     Evanjelina Cleereman, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of the City of Milwaukee, Milwaukee County, Wisconsin, with her residence in the 4th Congressional District, 8th Assembly District and 3rd Senate District as those districts have been established by law.

i.     Sheila Cochran, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of the City of Milwaukee, Milwaukee County, Wisconsin, with her residence in the 4th Congressional District, 17th Assembly District and the 4th Senate District as those districts have been established by law.

j.    Leslie W. Davis III, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of the City of Stoughton, Dane County, Wisconsin, with his residence in the 2nd Congressional District, 46th Assembly District and 16th Senate District as those districts have been established by law.

k.    Brett Eckstein, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of the Village of Sussex, Waukesha County, Wisconsin, with his residence in the 5th Congressional District, 22nd Assembly District and 8th Senate District as those districts have been established by law.

l.    Maxine Hough, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of the Town of East Troy, Walworth County, Wisconsin, with her residence in the 1st Congressional District, 32nd Assembly District and the 11th Senate District as those districts have been established by law.

m.    Clarence Johnson, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of the City of Milwaukee, Milwaukee County, Wisconsin, with his residence in the 4th Congressional District, 22nd Assembly District and the 8th Senate District as those districts have been established by law.

n.    Richard Kresbach, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of the Village of Wales, Waukesha County, Wisconsin, with his residence in the 1st Congressional District, 99th Assembly District and the 33rd Senate District as those districts have been established by law.

o.    Richard Lange, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of South Range, Douglas County,

Wisconsin, with his residence in the 7th Congressional District, 73rd Assembly District and 25th Senate District as those districts have been established by law.

p.      Gladys Manzanet, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of the City of Milwaukee, Milwaukee County, Wisconsin, with her residence in the 4th Congressional District, 9th Assembly District and 3rd Senate District as those districts have been established by law.

q.      Rochelle Moore, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of the City of Kenosha, Kenosha County, Wisconsin, with her residence in the 1st Congressional District, 64th Assembly District and the 22nd Senate District as those districts have been established by law.

r.      Amy Risseeuw, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of the Town of Menasha, Outagamie County, Wisconsin, with her residence in the 8th Congressional District, 3rd state Assembly District and 1st Senate District as those districts have been established by law.

s.      Judy Robson, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of the City of Beloit, Rock County, Wisconsin, with her residence in the 2nd Congressional District, 31st Assembly District and 11th Senate District as those districts have been established by law.

t.      Gloria Rogers, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter of the City of Racine, Racine County, Wisconsin, with her residence in the 1st Congressional District, 64th Assembly District and the 22nd Senate District as those districts have been established by law.

u.      Jeanne Sanchez-Bell, a citizen of the United States and of the State of
Wisconsin, is a resident and registered voter of the City of Kenosha, Kenosha County,
Wisconsin, with her residence in the 1st Congressional District, 65th Assembly District
and 22nd Senate District as those districts have been established by law.

v.      Cecelia Schliepp, a citizen of the United States and of the State of
Wisconsin, is a resident and registered voter of the Town of Erin, Washington County,
Wisconsin, with her residence in the 5th Congressional District, 22nd Assembly District
and the 8th Senate District as those districts have been established by law.

w.      Travis Thyssen, a citizen of the United States and of the State of
Wisconsin, is a resident and registered voter of the Town of Grand Chute, Outagamie
County, Wisconsin, with his residence in the 8th Congressional District, 56th Assembly
District and the 19th Senate District as those districts have been established by law.

119.    The Voces plaintiffs consist of Voces de la Frontera, Inc., which is a not-for-profit
grassroots organization organized under the laws of Wisconsin with its principal place of
business at 1027 South 5th Street, Milwaukee, Wisconsin and is located in the 8th Assembly
District.

a.      Ramiro Vara is a Latino citizen of the United States of Mexican American
national origin and a registered voter of the City of Milwaukee, Milwaukee County, with
his residence in the 8th Assembly District as that district has been established by law.

b.      Olga Vara is a Latina citizen of the United States of Puerto Rican national
origin and a registered voter of the City of Milwaukee, Milwaukee County, with her
residence in the 8th Assembly District as that district has been established by law.

c.       Jose Perez is a Latino citizen of the United States of Puerto Rican national origin and a registered voter of the City of Milwaukee, Milwaukee County, with his residence in the 8th Assembly District as that district has been established by law.

d.       Erica Ramirez is a Latina citizen of the United States of Mexican American national origin and a registered voter of the City of Milwaukee, Milwaukee County, with her residence in the 8th Assembly District as that district has been established by law.

120.    Michael Brennan, resident of Marshfield, Wisconsin; David G. Deininger, resident of Monroe, Wisconsin; Gerald C. Nichol, resident of Madison, Wisconsin; Thomas Cane, resident of Wausau, Wisconsin; and, Thomas Barland, resident of Eau Claire, Wisconsin, each named as a defendant personally and individually but only in his official capacity, are all members of the GAB.  Kevin Kennedy, resident of Dane County, Wisconsin, also named only in his official capacity, is the Director and General Counsel for the GAB  Timothy Vocke, whose name appears in the caption, is no longer a GAB member, and there remains a vacancy on the six-member GAB

a.       The GAB is an independent state agency under section 15.60 of the Wisconsin Statutes.  The GAB has "general authority" over and the "responsibility for the administration of … [the state's] laws relating to elections and election campaigns," Wis. Stat. § 5.05(1) (2009-10), including the election every two years of Wisconsin's representatives in the assembly and every four years its representatives in the senate.  It also has general responsibility for the administration of laws involving the election, every two years, of the eight members of the Wisconsin congressional delegation.

b.     Among its statutory responsibilities, the GAB must notify each county clerk, under Wis. Stat. §§ 10.01(2)(a), 10.06(1)(f), and 10.72, of the date of the primary (August 14, 2012) and general (November 6, 2012) elections and the offices to be filled at those elections by the voters.  The GAB also transmits to each county clerk a certified list of candidates for whom the voters of that county may vote.  Wis. Stat. § 7.08(2).

c.     The GAB issues certificates of election under section 7.70(5) of the Wisconsin Statutes to the candidates elected to serve in the senate and assembly and in the U.S. House of Representatives.  The GAB also provides support to local units of government and their public employees, including the county clerks in each of Wisconsin's 72 counties, in administering and preparing for the election of members of the legislature and the U.S. House of Representatives.

121.     Intervenor-Plaintiffs Tammy Baldwin, Ronald Kind, and Gwendolynne Moore are all adult citizens of the State of Wisconsin and are all of Wisconsin's incumbent Democratic Members of the United States House of Representatives, representing three of Wisconsin's Congressional districts.

a.     Congressperson Tammy Baldwin represents Wisconsin's Second Congressional District.

b.     Congressperson Ronald Kind represents Wisconsin's Third Congressional District.

c.     Congressperson Gwendolynne Moore represents Wisconsin's Fourth Congressional District.

122.     Intervenor-Defendants F. James Sensenbrenner, Jr., Thomas E. Petri, Paul D. Ryan, Jr., Reid J. Ribble, and Sean P. Duffy are all adult citizens of the State of Wisconsin and

are all of Wisconsin's incumbent Republican Members of the United States House of Representatives, representing five of Wisconsin's Congressional districts.

      a.      Congressperson Paul D. Ryan, Jr. represents Wisconsin's First Congressional District.

      b.      Congressperson F. James Sensenbrenner, Jr. represents Wisconsin's Fifth Congressional District.

      c.      Congressperson Thomas E. Petri represents Wisconsin's Sixth Congressional District.

      d.      Congressperson Sean P. Duffy represents Wisconsin's Seventh Congressional District.

      e.      Congressperson Reid J. Ribble represents Wisconsin's Eighth Congressional District.

123.     In 1981-82, 1991-92 and 2001-02, the Wisconsin Legislature, because of partisan divisions between its houses or between the Legislature and the Governor, failed to redraw its legislative districts in order to comply with the Constitution's "one-person, one-vote" rule. *See Georgia v. Ashcroft*, 539 U.S. 461, 488 n.2 (2003). In each instance, a federal district court adopted and enforced a redistricting map for Wisconsin's state legislative districts. *AFL CIO v. Elections Board*, 543 F. Supp. 630 (E.D. Wis. 1982); *Prosser v. Elections Board*, 793 F. Supp. 859 (W.D. Wis. 1992); *Baumgart v. Wendelberger*, Nos. 01 121 and 02 366, 2002 WL 34127471 (E.D. Wis. May 30, 2002) (*per curiam*), amended by 2002 WL 34127473 (E.D. Wis. July 11, 2002). In 1971-72, the Legislature had enacted its own legislative redistricting plan. 1971 Wis. L. chs. 304, 305.

124.     The Wisconsin Legislature has always redrawn the state's congressional districts, and no court has ever done so in Wisconsin.  After the censuses in 1970, 1980, 1990, and 2000, the Legislature enacted congressional redistricting plans.  1971 Wis. L. chs. 133; 1981 Wis. L. chs. 154, 155; 1991 Wis. Act 256; 2001 Wis. Act 46.

## V.     STATE SENATE AND ASSEMBLY DISTRICTS (ACT 43)

125.     The 2010 census populations in the newly adopted assembly districts range from a low of 57,220 in the 1st Assembly District (224 fewer than the ideal population of 57,444) to a high of 57,658 in the 45th Assembly District (214 more than the ideal population).  Thus, the total population deviation, from the most populous to the least populous district, is 438 persons.

126.     The 2010 census populations in the newly adopted senate districts range from a low of 171,722 (611 fewer than the ideal population, the 18th Senate District) to a high of 172,798 (465 more than the ideal population, the 30th Senate District).  Thus, the total population deviation, from the most populous to the least populous district, is 1,076 persons.

### A.     Minority Populations.

127.     **Table 6 (partial stipulation)** reflects the racial composition of the African American majority-minority districts in Milwaukee County, as drawn by federal courts in 1992 and 2002.  (**All tables are attached to the Joint Pretrial Report as Exhibit A.**  The parties have stipulated or partially stipulated to all tables referenced in the stipulated facts section; they have not stipulated to tables referenced in the statements of contested facts.  The terms of any partial stipulations are noted for each table in Exhibit A.)

128.     Act 43 creates six Assembly Districts on the north side of Milwaukee in which African-Americans of voting age comprise more than 50 percent of the voting age population living in each of those districts.  Those six Assembly Districts are: AD 10, 11, 12, 16, 17, and 18.

a.    African Americans comprise 61.79 percent of the voting age population living in AD 10.

b.    African Americans comprise 61.94 percent of the voting age population living in AD 11.

c.    African Americans comprise 51.48 percent of the voting age population living in AD 12.

d.    African Americans comprise 61.34 percent of the voting age population living in AD 16.

e.    African Americans comprise 61.33 percent of the voting age population living in AD 17.

f.    African Americans comprise 60.43 percent of the voting age population living in AD 18.

129.    **Table 7** shows the racial demographic data on population and voting age population characteristics of Act 43 African American majority-minority legislative districts, using 2010 census data.

130.    Act 43 creates two Senate Districts on the north side of Milwaukee in which African-Americans of voting age comprise more than 50 percent of the voting age population of those districts.  Those two Senate Districts are SD 4 and 6.

a.    African Americans comprise 58.4 percent of the voting age population living in SD 4.

b.    African Americans comprise 61.0 percent of the voting age population living in SD 6.

131.     Milwaukee's African-American community bears the socioeconomic effects of historic discrimination in employment, education, health, and other areas.

132.     According to the 2010 U.S. Census, the Latino population of the City of Milwaukee grew from 71,646 in 2000 to 103,007 in 2010, representing an increase of approximately 44 percent.

133.     The data from the April 2010 census indicates that the area of most rapid growth of Milwaukee's Latino community has been on the city's near south side.

134.     Act 43 creates two Assembly Districts on the near south side of Milwaukee in which Latinos of voting age comprise more than 50 percent of the voting age population living in each of those districts. Those two Assembly Districts are AD 8 and 9.

135.     Latinos comprise 37,750 of the total population living in AD 8, or 65.9 percent of the total population living in AD 8.

136.     The core retention for AD 8 is 55.3 percent.

137.      **Table 9 (partial stipulation)** reflects available data related to the racial composition of the Hispanic majority-minority districts in Milwaukee County, as drawn by federal courts in 1992 and 2002.  **Table 10** shows Hispanic demographic data on population and voting age population characteristics of the court-drawn 2002 legislative districts, using 2010 census data.

138.     **Table 11 (partial stipulation)** shows the Hispanic demographic data on population and voting age population characteristics of Act 43 Hispanic majority-minority legislative districts, using 2010 census data.  **Table 12 (partial stipulation)** shows the demographics of the Assembly District 8 map proposed by Professor Mayer.

139.     **Table 13 (partial stipulation)** describes the Hispanic population in Wisconsin as a whole and in Milwaukee County in particular in 2000 and in 2010.  **Table 14 (partial stipulation)** describes age-related information about the Hispanic community in Wisconsin as a whole, and more specifically in Milwaukee County, and Assembly Districts 8 and 9.

140.     Latinos comprise 60.52 percent of the voting age population living in AD 8.

141.     Latinos comprise 34,647 of the total population living in AD 9, or 60.54 percent of the total population living in AD 9.

142.     Latinos comprise 54.03 percent of the voting age population living in AD 9.

143.     The voting-age population of Latinos living in AD 8 and 9 consists of all Latinos above the age of 18 who live in those districts, as measured by the U.S. Census.

144.     The actual number of Latinos living in AD 8 and 9 who are eligible to vote consists of the Latino voting-age population who are U.S. citizens.  The percentage of the voting-age population of Latinos living in AD 8 and 9 and who are citizens is lower than the overall percentage of Latinos living in AD 8 and 9 who are of voting age.

145.     **Tables 16(a)-(f) (partial stipulation)** reflect election data in Assembly District 8 from 1998 to 2010.

146.     Milwaukee's Latino community bears the socioeconomic effects of historic discrimination in employment, education, health, and other areas, and its depressed socioeconomic status hinders the ability to participate in the electoral process on an equal basis with other members of the electorate.

147.     Jesus "Zeus" Rodriguez (of Hispanics for Leadership) was consulted about the map drawing between July 8 and July 12, 2011 and submitted a written statement at the Legislature's public hearing on July 13, 2011.  Tr. Ex. 1002.  During the course of the map

drawing, the MALDEF Chicago regional office was consulted. Neither Voces de la Frontera, Inc., nor the Latino Redistricting Committee in Milwaukee, nor any of its members were consulted. The Latino community in Milwaukee is diverse; some people in the Latino community supported Act 43 and some did not.

**B.    Equal Population.**

148.    Application of the 2010 census to the existing district boundaries shows that 44 of 99 Assembly seats had populations more than 5.0 percent above or below the ideal, as did 11 of 33 Senate districts.

149.    **Table 1** describes the population deviation from the ideal for each Assembly and Senate district (using 2010 Census data).

150.    **Table 2** describes the population for each Assembly District under Act 43 (using 2010 Census data).

151.    **Table 3** describes the population for each Senate District created by Act 43 (using 2010 Census data).

152.    The 1992 Assembly plan met a 1 percent standard (+/-0.5 percent) with an overall range of deviation of 0.91 percent, with 48 districts below the ideal and 51 above the ideal. Only one district was more than a half point away from the idea. In the Senate, the 1992 plan had an overall deviation range 0.52 percent with 15 districts above the ideal population and 18 below the ideal.

153.    The 2002 federal-court Assembly map had an overall range of 1.59 percent deviation, with 47 districts above the ideal, 51 below the ideal, and one exactly apportioned district. In the Senate, the overall deviation range of the 2002 map was 0.98 percent with 15 districts above the ideal population, 17 below, and one perfectly apportioned. Of the 99

Assembly districts in 2002, 77 districts were within +/- 0.5 percent of the ideal population; in the Senate, 32 of 33 districts fell in this range.

154. Act 43 creates 99 Assembly districts with populations falling within a range of 0.76 percent (+0.39 percent to -0.37 percent) of the ideal population; 56 districts are above the ideal population, 41 are below the ideal, and two districts are perfectly apportioned. In the Senate, population variations fall within a range of 0.62 percent (+0.35 percent to -0.27 percent); 17 districts are above the ideal population, 14 are below the ideal, and two districts are perfectly apportioned.

155. Population deviation in Assembly districts (both under Act 43 and historically, appear in **Table 4**.

156. Population deviation in Senate districts (both under Act 43 and historically, appear in **Table 5**.

## C. Delayed Voting / Disenfranchisement.

157. Each state Senate district is composed of three entire state Assembly districts. Changes in the Assembly districts will necessarily carry through to the Senate districts.

158. Assembly members serve two-year terms. Senators serve four-year, staggered terms with half elected in presidential years and the other half coincident with gubernatorial elections.

159. Redistricting results in shifts of voters among Senate districts in such a way that some voters will experience delayed voting or disenfranchisement. Voters who previously resided in even-numbered Senate districts (which vote in presidential years) but who are moved to odd-numbered Senate districts (which vote in midterm years) by redistricting will go six years between opportunities to vote for a state senator.

160.    Only voters in even-numbered senate districts can vote for a senator in the 2012 regular election.  Residents of odd-numbered senate districts cannot vote in a regular senate election until 2014.  The last regular senate election for even-numbered districts was in 2008; for odd-numbered districts, the last regular election was in 2010.

161.    For voters moved from even-numbered senate districts to odd-numbered senate districts, the most recent opportunity to vote for a state senator in a regular election was in 2008; the next opportunity to do so will be in 2014.  This creates a six-year gap between regular senate elections in which they can vote.

162.    In 2011, Act 43 moved 299,704 persons (5.26 percent of all persons in Wisconsin according to the 2010 census) into new districts that result in similar delayed voting or disenfranchisement. The number of persons per district experiencing delayed voting or disenfranchisement ranges from a low of 133 to a high of 72,431, with an average for the 17 districts involved of 17,630 persons per district.

163.    **Table 28** shows the number of persons shifted into each odd-numbered district from an even-numbered district.

164.    At least three plaintiffs were moved from an even-numbered district to an odd-numbered district.

**D.    Treatment Of Political Subdivisions.**

165.    The 1992 Federal Court map for the Assembly split 72 municipalities and the Senate map split 45 municipalities.

166.    In 2002, the Federal Court's Assembly map split 50 municipalities and the Senate map split 24 municipalities.

167.    Act 43 splits 62 municipalities in the Assembly and 37 in the Senate, which is between the numbers of municipal splits in the previous two court-ordered maps.

168.    The 1992 Federal Court map split 47 counties in the Assembly and 35 in the Senate.

169.    In 2002, the Federal Court divided 51 counties in the Assembly and 42 in the Senate.

170.    Act 43 splits 58 counties in the Assembly and 46 in the Senate, which continues a pattern of greater numbers of counties getting split over time.

171.    Act 43 splits the City of Beloit into two Assembly Districts, AD 45 and 31.

172.    According to the 2010 Census, the City of Beloit has a population of 36,966.

173.    Act 43 splits the City of Marshfield into two Assembly Districts, AD 69 and 86.

174.    According to the 2010 Census, the City of Marshfield has a population of 19,118.

175.    Act 43 splits the City of Appleton into four Assembly Districts, AD 3, 55, 56, and 57.

176.    Act 43 splits the City of Racine into three Assembly Districts, AD 62, 64, and 66.

177.    Act 43 combines portions of the City of Racine and the City of Kenosha into the same Assembly District, AD 64.

**E.    Compactness.**

178.    A variety of statistical measures has evolved to assess compactness, though they usually fall into two categories: those that indicate how closely a district resembles a circle (the most compact shape), and those that measure circular filling.  Richard G. Niemi, Bernard Grofman, Carl Carlucci, and Thomas Hofeller. 1990.  "Measuring Compactness and the Role of Compactness Standard in a Test for Partisan and Racial Gerrymandering." *Journal of Politics* 52: 1155-1181; *see also* H. P. Young. 1988. "Measuring the Compactness of Legislative Districts." *Legislative Studies Quarterly* 13: 105-115.

179.     The two most widely used measures of compactness applied to legislative districts are the Perimeter-to-Area measure and the Smallest Circle score.  These measures were regularly offered in post-Shaw litigation of the 1990s.

180.     Traditionally, districting plans are assessed in the context of total (average) plan compactness.

181.     The Perimeter-to-Area (PTA) measure compares the relative length of the perimeter of a district to its area. It represents the area of the district as the proportion of the area of a circle with the same perimeter.  The score ranges from 0 to 1, with a value of 1 indicating perfect compactness. This score is achieved if a district is a circle. Most redistricting software generates this measure as the Polsby-Popper statistic.

182.     Smallest Circle (SC) scores measure the space occupied by the district as a proportion of the space of the smallest encompassing circle, with values ranging from 0 to 1. A value of 1 indicates perfect compactness and is achieved if a district is a circle.  This statistic is often termed the Reock measure by redistricting applications.  Ernest C. Reock, Jr. 1961, "A Note: Measuring Compactness as a Requirement of Legislative Apportionment," *Midwest Journal of Political Science* 5: 70-74.

183.     Compactness scores for Act 43 appear in **Table 21**.

184.     The average Smallest Circle score for the entire Assembly map is .28 (range from .06 to .63).

185.     The average Perimeter To Area score for the Assembly map is .28 (range of .05 to .56), and the Senate map has a mean Perimeter To Area score of .29 (range from .06 to .58).

186.     The average Assembly compactness scores are marginally lower for Act 43 than for the 2002 court-crafted plan.

187.    For the ten least compact districts (as measured by the Smallest Circumscribing Circle method), **Table 22** lists their compactness scores using other compactness equations.

### F.    Incumbent Pairing.

188.    The Act 43 map contained ten pairings when adopted.  An additional pairing occurred when Rep. Chris Taylor (D) was elected to Assembly District 48 in a July 2011 special election.

189.    Of the 11 Assembly pairings, three involve two Democrats, three involve two Republicans, and five involve bipartisan pairings.  Until Rep. Taylor's election, more Republicans than Democrats were paired under Act 43.

## VI.    CONGRESSIONAL DISTRICTS (ACT 44)

190.    The populations of the congressional districts created by Act 44, according to the 2010 Census, are either 710,874 (the 1st and 2nd districts) or 710,873 (the remaining districts).  Thus, there is no population deviation from the ideal.

### A.    Equal Population.

191.    Act 44 apportions the 2010 census population of the state of Wisconsin perfectly, into eight districts with a variance of one person. Districts 3, 4, 5, 6, 7, and 8 have a population of 710,873, while Districts 1 and 2 have a population of 710,874.

### B.    Treatment Of Political Subdivisions.

192.    The congressional map crafted under Act 44 contains 26 splits in 12 counties.  Of the 72 counties in the state, only Milwaukee County (947,735) is large enough to wholly contain a congressional district.  The county splits are as follows:

        Chippewa:  3, 7
        Dodge:  5, 6
        Jackson:  3, 7
        Juneau:  3, 7
        Milwaukee:  1, 4 (wholly in the county), 5, 6

Monroe:  3, 7
Richland:  2, 3
Rock:  1, 2
Walworth:  1, 5
Winnebago:  6, 8
Wood:  7, 8
Waukesha:  1, 5

193.    The following municipalities are also split under Act 44. There are a total of 32

split municipalities encompassing 64 splits:

Alma: 3, 7
Anson: 3, 7
Bayside: 4, 6
Beaver Dam: 5, 6
Beloit: 1, 2
Buena Vista: 2, 3
Butler: 4, 5
Clearfield: 3, 7
Dousman: 1, 5
Edson: 3, 7
Germantown: 3, 7
Goetz: 3, 7
Harmony: 1, 2
Hubbard: 5, 6
Janesville: 1, 2
LaGrange: 3, 7
LaPrairie: 1, 2
Libson: 3, 7
Lomira: 5, 6
Milton: 1, 2
New Berlin: 1, 5
Oak Grove: 5, 6
Oshkosk: 6, 8
Rock: 1, 2
Theresa: 5, 6
Tomah: 3, 7
Turtle: 1, 2
Vinland: 6, 8
Waukesha: 1, 5
Whitewater: 1, 2
Winneconne: 6, 8
Wolf River: 6, 8

## C.   Communities Of Interest.

194.   Stipulations (a)-(f) that follow are given in lieu of the testimony of Professor Randy Cray, a consulting economist hired by the Intervenor-Plaintiffs:

   a.   Centergy Inc. is an economic development organization located in Wausau that is supported by most of the economic development agencies in central Wisconsin. Centergy, among many other things, lobbies on the behalf of central Wisconsin's economic development.

   b.   The commuting patterns of workers suggest there is a common labor pool in the region.

   c.   In 2010, of Wisconsin's 72 counties, The University of Wisconsin Stevens Point  drew 27% of its students from Marathon, Portage and Wood Counties.

   d.   Wausau is the retail hub of central Wisconsin.  The Wausau Mall and the Rib Mountain shopping area draw heavily from the area population.  The Crossroads Commons in Stevens Point-Plover also serves as a regional shopping area.

   e.   The agricultural base of the area is predicated on potatoes, green beans, ginseng, corn, cranberries and dairy/cheese production.  Moreover, food manufacturing is a large employer in the area.

   f.   Attached as Trial Exhibit 181 is a portion of a Wisconsin highway map that includes Marathon, Portage, and Wood Counties and portions of surrounding counties.

## D.   Core Retention.

195.   All of the congressional districts retain their incumbents.

196.   The Largest Constituency Core Retention and the Incumbent Core Retention scores for the Act 44 Congressional Districts are identical.

197.    The average core retention for Act 44 is 84.33 percent, with a high of

96.52 percent (District 1) and a low of 74.99 percent (District 5).

198.    The average core retention for Democratic incumbents is 83.70 percent, and

85.36 percent for Republican incumbents.

199.    The lowest Democratic incumbent core is 75.91 percent, the highest is

91.12 percent; for Republicans, the low is 74.99 percent and the high is 96.52 percent.

200.    Stipulations (a)-(k) that follow are given in lieu of the testimony of Professor Erik

Nordheim, a consulting statistician hired by the Intervenor-Plaintiffs:

a.    If the 2002 Congressional boundaries for the 7th and 3rd Congressional

Districts had been maintained these districts would have retained 100% of their core

populations.

b.    If nothing had been done to the 2002 Congressional boundary of the 8th

Congressional District following the 2010 census it would have been .57% below the

precise average population for the other Wisconsin congressional districts and 6.6%

above the average population for Minnesota Congressional Districts.

c.    Had there been no changes to the 8th Congressional District by Act 44, it

would have retained 100% of its core population.

d.    Before the 2011 redistricting, the 7th Congressional District deviated from

the ideal population by 21,594 people under the 2010 Census.  Act 44 shifted 171,989

people into the District and shifted 150,395 people out of the District.

e.    Before the 2011 redistricting, the 3rd Congressional District deviated from

the ideal population by 19,084 people under the 2010 Census.  Act 44 shifted 171,270

people into the District and shifted 190,354 people out of the District.

f.      Before the 2011 redistricting, the 8th Congressional District deviated from the ideal population by 4,031 people under the 2010 Census.  Act 44 shifted 59,752 people into the District and shifted 55,721 people out of the District.

g.      **Table 29, Table 30, and Table 31** accurately depict the population movements in the Districts.  Table 29 examines the population for each congressional district using the 2010 census.  Tables 30 and 31 reflect actual population shifts from one congressional district to another under Act 44.

h.      Using the Smallest Circle method of measurement, the boundaries of Wisconsin Congressional District Three pursuant to Act 44 are as compact as they previously were, but less compact using the Perimeter-to-Area method.

i.      Using the Smallest Circle method of measurement, the boundaries of Wisconsin Congressional District Seven pursuant to Act 44 are as compact as they previously were, but less compact using the Perimeter-to-Area method.

j.      Using the Smallest Circle method of measurement, the boundaries of Wisconsin Congressional District Eight pursuant to Act 44 are more compact than they previously were, but less compact using the Perimeter-to-Area method.

k.      It is further stipulated that Professor Nordheim would dispute the rebuttal report of Professor Gaddie, a consultant for the Defendants and the Intervenor-Defendants regarding the relevance of the Iowa redistricting in 2002 and his statistical methods in analyzing compactness.  (Nordheim Deposition page 58 line 6 to page 64 line 23).  The parties agree that the court may consider the deposition testimony, but the Defendants and the Intervenor-Defendants do not agree with Dr. Nordheim's analysis presented in those pages.

### E.   Population Movement.

201.   The number of people moved in Wisconsin in 2011 under Act 44 is just under 892,000—15.67 percent of the state.

### F.   Compactness.

202.   The average Smallest Circle score is .44; for Republican incumbent districts, the average is .46; for Democratic incumbent districts, the average is .40.  The average Perimeter-to-Area score is .21; for Republican incumbent districts, the average is .20; for Democratic incumbent districts, the average is .24.

203.   The Act 44 map has increased average compactness on the Smallest Circle score when compared to the 2002 court-drawn map, while average compactness has decreased on the Perimeter-to-Area score.

204.   The changes in compactness between the 2002 map and Act 44 are not statistically significant.  A paired-samples t-test of the district compactness for the 2002 and 2011 maps showed no significant difference on any of the five compactness measures used by Prof. Nordheim.

### G.   Pairing Of Incumbents.

205.   No incumbent members of Congress are paired in one district.

### H.   Process of Drafting Congressional Boundaries.

206.   As has been the case in previous decades, the Wisconsin Legislature in 2011 permitted the incumbent Wisconsin members of the House of Representatives to draft a map containing the new congressional boundaries to comply with the 2010 Census.

207.   In 2011, Andrew D. Speth, chief of staff to Congressman Paul D. Ryan, Jr., a Republican, took primary responsibility for drafting the map that would eventually be reflected in Act 44.

208.    Mr. Speth's primary contact person with Wisconsin's Democratic delegation to the House of Representatives was Erik Olson, chief of staff to Congressman Ronald Kind.

209.    In early May 2011, Mr. Speth met individually with the chief of staff for each member of Wisconsin's Republican delegation to the House of Representatives to solicit their input into the new congressional boundaries. Congressman Duffy's primary concern, as communicated by his chief of staff, was to shift the Seventh Congressional District from a strong Democratic district closer to being a Republican district. The chiefs of staff to Congressmen Ribble, Sensenbrenner, and Petri also expressed preferences for changes to their respective district boundaries.

210.    Mr. Speth did not have individual meetings with the chiefs of staff for Wisconsin's Democratic delegation at that time.

211.    Congressman Ryan consulted the three Democratic members of Wisconsin's delegation about their preferences for their respective district boundaries, which he communicated to Mr. Speth. These expressed preferences included, for example, Congresswoman Baldwin's concerns with the size of her district and commute times from Madison to certain parts of her district, specifically as to Jefferson County, as well as Congresswoman Moore's interest in representing the north shore of Milwaukee, given that her district had to grow.

212.    In May and June 2011, Mr. Speth created several successive drafts of new congressional districting lines, the first of which was completed on or about May 13, 2011.

213.    The May 13 draft incorporated what Mr. Speth understood to be specific preferences and features favorable to both Republican and Democratic members of Wisconsin's delegation to the House of Representatives.

214.    Mr. Speth shared the May 13 draft with the chiefs of staff for the Republican members of the Wisconsin delegation, who made recommendations for changes to the draft. Some of these recommendations were incorporated into subsequent drafts of the map, and others of them were rejected.

215.    The May 13 draft was not shared with Democratic members of the Wisconsin delegation or their staffs at that time.

216.    After May 13, Mr. Speth incorporated certain changes that Mr. Speth understood to reflect features preferred by certain Democratic and Republican members of Wisconsin's delegation the House of Representatives.  Some of the changes preferable to Democratic members had been recommended to Mr. Speth by Congressman Ryan.  For example, the boundary between the Second and Third Congressional Districts was shifted to the east, a change that simultaneously addressed Congressman Kind's desire to preserve the Mississippi River corridor of his district and Congresswoman Baldwin's interest in reducing drive times from Madison to various locations in her district.

217.    Mr. Speth shared the second draft of the congressional districting lines with the chiefs of staff of the Republican members of the Wisconsin congressional delegation.  The second draft was not shared with Democratic members of the Wisconsin delegation or their staffs.

218.    Mr. Speth completed another draft of the district map on or about June 1.

219.    In early June, Congressman Ryan and Mr. Speth met individually with all members of Wisconsin's delegation to the House of Representatives, along with their respective chiefs of staff, to review the June 1 draft map of the congressional districting lines.  This was the first time Democratic members of the Wisconsin delegation or their chiefs of staff were shown a

draft of the congressional district map. These individual sessions were followed by a meeting of the entire Wisconsin congressional delegation.

220. Congressman Ronald Kind asked whether the revised boundaries of the Third Congressional District, which he represents, still contained the Fort McCoy military base. He expressed his preference that Fort McCoy be retained as part of that district. Mr. Speth told Congressman Kind that he would determine the location of Fort McCoy under the draft map by making a closer inspection of the map details.

221. Congressman Kind also expressed concern about the shift of Portage and Wood Counties from the Seventh District to the Third District, because he believed this shift contributed to the Third District having an unusual look. Congressman Ryan explained in response that those changes were intended to create a better political balance in the Seventh District.

222. The addition of Ozaukee County to the Sixth Congressional District was intended to lessen the change in the political balance of the district for Congressman Petri caused by the district's shift to the west.

223. On June 2, Erik Olson sent an email to Bill Murat (chief of staff to Congresswoman Baldwin) and Andrew Stevens (deputy chief of staff to Congresswoman Moore). In the email, Mr. Olson stated: "The map isn't too unreasonable. We have some tweaks we want to see. Five counties in our district are chopped up."

224. On June 3, Andrew Stevens sent an email discussing various features of the map shared by Congressman Ryan and Mr. Speth, and attaching the Democratic members' draft counterproposal. In that email, "GSM" refers to Congresswoman Moore.

225.     NCEC Services, Inc., is a Washington, D.C.-based Democratic political consulting firm.  In April 2011, the Democratic members of the Wisconsin delegation retained NCEC as consultants in the redistricting process and to draft a set of possible redistricting expectations and scenarios.

226.     On June 3, Mr. Olson emailed to Mr. Speth a map drawn with the assistance of the Democratic Congressional Campaign Committee on behalf of the Democratic members.  At this point, Mr. Olson had not received a copy of the draft map developed by Mr. Speth, although he had seen it at the June 2 meeting and at the previous individual meeting earlier in the week. This exchange represented the first time any Democratic member (or staff member) had sent Mr. Speth a draft congressional districting map.

227.     Mr. Speth concluded that the map received from Mr. Olson on June 3 did not reflect minimal deviation from the ideal population for congressional districts under the 2010 Census.

228.     That same day, June 3, Mr. Speth emailed to Mr. Olson an electronic copy of the June 1 draft congressional districting map that all members of the Wisconsin delegation had discussed with Mr. Speth and Congressman Ryan that week, based on a previous agreement that such an electronic copy would be provided once the Democrats provided Mr. Speth with their own proposed map.

229.     On or about June 8, Mr. Speth sent the chiefs of staff of the Democratic members revised drafts of the congressional districting lines, including a change to place Fort McCoy in the Third Congressional District, rather than in the Seventh Congressional District, of which it had been a part under the June 1 draft.

230.    In drawing up the drafts and the final version of the congressional districting lines in 2011, Mr. Speth did not consult at any time with Mr. David Obey, a former member of the House of Representatives.

231.    The congressional redistricting map and boundary lines enacted as Act 44 are substantially identical to those circulated by Mr. Speth on June 8.

## JOINT PROPOSED CONCLUSIONS OF LAW

## I.     JURISDICTION AND VENUE

232.    The parties agree, except as set forth in paragraph (a) below, that this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), as well as under 28 U.S.C. § 1367, to hear the claims for legal and equitable relief, in that (a) this is a civil action arising under the U.S. Constitution and laws of the United States; (b) this civil action seeks to redress the alleged deprivation, under color of state law, of rights secured by the Constitution and by Acts of Congress providing for equal rights of citizens; and (c) this civil action seeks to secure equitable and declaratory relief under Acts of Congress providing for the protection of civil rights, including the right to vote.

a.      The defendants and intervenor-defendants assert that the Eleventh Amendment deprives this federal Court of jurisdiction to enforce state law against the defendants. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1983).

233.    Venue is properly in this Court under 28 U.S.C. § 1391(b), in that at least one of the defendants resides in the Eastern District of Wisconsin. Neither the defendants nor the intervenor-defendants have challenged venue.

## II.    THE U.S. CONSTITUTION AND THE WISCONSIN CONSTITUTION

234.    The U.S. Constitution requires that the members of Congress be elected from districts with equal populations. The Wisconsin Constitution requires that state legislative districts be "substantially equal" in population and establishes other requirements.

235.    The U.S. Constitution, in Article 1, Section 2, provides, in part, that "Representatives … shall be apportioned among the several states … according to their respective numbers…." It further provides that "[t]he House of Representatives shall be composed of members chosen every second year by the people of the several states…." These

provisions, as construed by the U.S. Supreme Court, establish a minimum constitutional guarantee of "one-person, one-vote."

236.    The Equal Protection Clause provides, in pertinent part:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

237.    Article IV, section 3, of the Wisconsin Constitution requires that the legislature "apportion and district anew" its senate and assembly districts following each federal census "according to the number of inhabitants."

238.    The Wisconsin Constitution also requires that legislative districts be "bounded by county, precinct, town or ward lines, [] consist of contiguous territory and be in as compact form as practicable."  Wis. Const. art. IV, § 4.  It further requires that state senators "shall be chosen alternately from the odd and even numbered districts for the term of 4 years."  It also gives citizens, in article XIII, section 12, the right to "petition for the recall of any incumbent elective officer."  Upon a recall election, the person receiving the "highest number of votes in the recall election shall be elected for the remainder of the term."

239.    The Wisconsin Constitution contains no provision addressing the creation of congressional districts.

240.    Pursuant to 2 U.S.C. § 2a, the President transmits to Congress, based on the decennial census, "the number of persons in each State" and "the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives…."  Under 2 U.S.C. § 2c, "there shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established…."

241.    Within the meaning of the first prong of *Thornburg v. Gingles*, 478 U.S. 30, 48-51 (1986), the Latino community is sufficiently large and geographically compact enough to permit the creation of an assembly district with a majority of eligible Latino voters in the vicinity of the 8th Assembly District.

**III.    STATE STATUTES**

242.    Under a previous statute, local governments were first required to draw local political and ward boundaries.  Wis. Stats. §§ 5.15(1)(b) and 59.10(3)(b) (2009-10).  Pursuant to Act 39, a bill related to Acts 43 and 44, also passed on July 19 and 20, and signed into law on July 25, 2011, state law now requires local communities to draw their local political boundaries to conform with state legislative redistricting.  A copy of this statute appears as Trial Exhibit 173.

## STATEMENTS OF CONTESTED FACTS

### I.    BALDUS PLAINTIFFS

243.    On January 4, 2011, the Republican legislative leadership announced to members of the Democratic minority, including Assembly Minority Leader Peter Barca, that the Republican majority would be provided unlimited funds to hire counsel and consultants for purposes of redistricting legislative districts based on the 2010 census.  The Democratic minority was denied any funding for use in the redistricting process.  Barca Depo. (Dkt. 152) at 13:12-14:13.

244.    Representative Barca and Senate Minority Leader Mark Miller requested that the legislative majority reconsider its decision on redistricting funds by sending a letter to Assembly Speaker Jeff Fitzgerald and Senate Majority Leader Scott Fitzgerald.  That request was denied. Barca Depo. (Dkt. 152) at 14:14-18.

245.    The Republican majority in the assembly and senate retained the law firm of Michael Best & Friedrich LLP ("Michael Best") to advise the assembly and senate in the redistricting process.  Handrick Depo. (Dkt. 136) at 175:9-14; Declaration of Eric M. McLeod (Dkt. 78) ¶ 1.

246.    The redistricting legislation was drafted on behalf of the assembly and senate at the direction of the majority party's political leadership in the assembly and senate.  *See infra.*

247.    The legislative district boundaries codified in Act 43 were drafted by Adam Foltz, a staff member to Assembly Speaker Fitzgerald; Tad Ottman, a staff member to Senate Majority Leader Fitzgerald; and Joseph Handrick, a consultant with the law firm of Reinhart Boerner Van Deuren s.c.  Foltz Depo. (Dkt. 138) at 11:25-12:1, 106:10-108:21, 285:11-12; Ottman Depo. (Dkt. 140) at 105:11-106:4, 151:8-156:3, 185:4-23; Handrick Depo. (Dkt. 136) at 96:19-99:3, 101:16-21, 102:6-9.

248. Attorneys from Michael Best and Troupis Law Office LLC, consultants retained by Michael Best, and Republican leadership of the assembly and senate met regularly with Foltz, Ottman, and Handrick at the offices of Michael Best to provide guidance on drawing the legislative districts. Foltz Depo. (Dkt. 138) at 32:25-36:2; Handrick Depo. (Dkt. 136) at 41:15-42:20; Gaddie Depo. (Dkt. 148) at 176:12-179:18.

249. The bill that would become Act 43 was drafted in the offices of the law firm of Michael Best where Foltz and Ottman had offices. Foltz Depo. (Dkt. 138) at 13:16-14:2; Ottman Depo. (Dkt. 140) at 204:10-16; Handrick Depo. (Dkt. 136) at 32:9-24.

250. Foltz, Ottman, and Handrick began their work on the redistricting process at Michael Best in early 2011. Foltz Depo. (Dkt. 138) at 32:10-33:15; Handrick Depo. (Dkt. 136) at 33:23-37:9; Tr. Ex. 4.

251. Meetings with Republican legislators about the redistricting process were held at the Michael Best offices. Foltz Depo. (Dkt. 139) at 263:6-265:5. Democratic lawmakers were not invited to participate in this process. Foltz Depo. (Dkt. 139) at 269:19-270:13.

252. At those meetings, Republican legislators were provided with preliminary maps or a description of their respective legislative districts, along with a table showing the results of past elections in their districts and the results of those same races had they been held in the proposed new districts. Foltz Depo. (Dkt. 139) at 263:6-270:13; Ottman Depo. (Dkt. 141) at 265:22-274:5; Tr. Ex. 100.

253. The Republican legislators who participated in the meetings were shown or informed of "talking points" prepared by Foltz and Ottman. Among the "talking points" expressed to Republican members of the assembly were that they should not believe public comments about the new districts and that the real basis for the new districts was expressed to

them in the meetings.  Foltz Depo. (Dkt. 139) at 337:5-19, 340:16-344:12; Ottman Depo. (Dkt. 141) at 275:15-281:16; Tr. Ex. 113.

254.    Republican legislators who participated in meetings at Michael Best signed confidentiality agreements concerning the content of those meetings.  Foltz Depo. (Dkt. 139) at 353:5-20; Ottman Depo. (Dkt. 141) at 274:6-275:14.

255.    The public aspects of the redistricting process were completed in 12 days.  Act 43 and Act 44 were first made public on July 8, 2011, and the legislature adopted both bills on July 19 and 20, 2011.  *See supra* ¶¶ 101-107; Barca Depo. (Dkt. 152) at 15:21-16:3.

256.    The Democratic minority in the state legislature was not aware of the meetings at Michael Best and were not aware that the majority's redistricting bills would be introduced in July 2011.  Barca Depo. (Dkt. 152) at 41:8-19.

257.    In the months preceding the passage of Acts 43 and 44, the state legislative agenda was focused on public employees' collective bargaining rights and, in June, the budget process.  Barca Depo. (Dkt. 152) at 58:18-60:23, 63:23-65:14.

258.    Historically and by law, the Wisconsin legislature has waited for municipalities to develop new ward boundaries before introducing the new state legislative district boundaries, because wards are the traditional building blocks used to develop assembly and senate districts.  *See* Wis. Stats. §§ 5.15(1)(b) and 59.10(3)(b) (2009-10).  In light of this requirement, members of the Democratic minority in the state legislature did not expect any statewide redistricting legislation to be introduced until after municipalities had developed their ward boundaries.  Barca Depo. (Dkt. 152) at 57:2-16.

259.     As was later publicly revealed, Foltz and Ottman began drafting the legislative districts around April of 2011 using census blocks.  Foltz Depo. (Dkt. 138) at 138:4-140:6; Ottman Depo. (Dkt. 140) at 58:23-61:2.

260.     The bill that would become Act 39, introduced concurrently with Act 43, requires municipalities to draw or re-draw their local ward boundaries to conform with state legislative redistricting.  *See supra* ¶ 246.  This change in law allowed the statewide redistricting legislation to be introduced and passed in July 2011, before municipalities had drawn their ward boundaries. Barca Depo (Dkt. 152) at 57:2-16.

261.     The rushed, unprecedented, and secretive procedure used by the Legislature to create legislative and congressional districts resulted in discrepancies, including discrepancies between district and municipal boundaries, that the GAB addressed in a series of internal memorandums beginning in the fall of 2011.  Those "anomalies" have caused considerable confusion among municipal and count clerks, voters, and the GAB itself.  Kennedy Depo. (Dkt. 144) at 19:12-21, 74:1-76:11.

262.     Although the GAB has and local clerks have resolved most of those anomalies, some have yet to be resolved.  Kennedy Depo. (Dkt. 144) at 60:10-64:25, 132:25-135:12.

263.     The 12-day period between the public introduction of Acts 43 and 44 and their passage by the legislature was insufficient time for the Democratic minority to develop an alternative map, in particular given the absolute denial of any funding to hire consultants or legal counsel.  Barca Depo. (Dkt. 152) at 44:6-45:3, 48:12-49:1.  The limited time and lack of resources also made it impossible for the Democratic minority to thoroughly analyze a map proposed by the Wisconsin Democracy Campaign to determine whether it presented a viable and constitutional alternative to Act 43.  Barca Depo. (Dkt. 152) at 122:3-17, 124:5-16.

264.     It would not have been feasible for the Democratic minority to organize and conduct informational meetings about redistricting between the legislation's introduction and its ultimate passage.  Barca Depo. (Dkt. 152) at 76:2-77:1.

265.     The legislature held a single public hearing on Acts 43 and 44, on July 13, 2011. *See supra* ¶ 103.  No other public hearing was held.  Unlike during previous redistricting cycles, the public was denied access to redistricting software during the 2011 redistricting process. White Depo. (Dkt. 145) at 35:9-36:1.

266.     Technological advances in the past two decades have facilitated the redistricting process.  Modern computers allow districts to be drawn with greater precision and in more configurations than was possible in previous cycles of redistricting.  Barca Depo. at 39:2-16.

267.     The average core population retention of the assembly districts—calculated as the simple mean of the core population retention of each district—is 64.8 percent.  This means that, on average, less than two-thirds of each district was preserved in the redistricting plan.  Tr. Ex. 55 (Mayer Report) at 12; Tr. Ex. 1019 (corrected pages to Mayer Report) at 12.

268.     Act 43 shifts, on average, 53.5 times as many people as necessary to achieve population equality in every assembly district.  Tr. Ex. 55 (Mayer Report) at 11.

269.     In 90 percent of the assembly districts, at least twice as many people as necessary were shifted from one district to another.  In 11 districts, at least 100 times as many people as necessary were moved to achieve population equality.  Tr. Ex. 55 (Mayer Report) at 10.

270.     The new populations of the assembly districts represent a net change of 321,915 people.  To achieve this, Act 43 shifted 2,363,834 individuals from one assembly district to another (after controlling for double counting).  **Table 32** reflects the population shifted into and out of each assembly district.

271.	The new populations of the senate districts represent a net change of 231,501 people.  To achieve this, Act 43 shifted 1,205,275 individuals from one senate district to another (after controlling for double counting).  **Table 33** reflects the population shifted into and out of each senate district.

272.	Assembly districts represented by Democrats after the 2010 election have an average core population retention more than 9 percentage points less than that of Republican districts:  the average core population retention for Democrat districts was 59.1 percent, and 68.2 percent for districts represented by Republicans.  Tr. Ex. 55 (Mayer Report) at 12; Tr. Ex. 1019 (corrected pages to Mayer Report) at 12.

273.	The City of Racine is split into three different assembly districts, including one that stretches into the City of Kenosha (AD 64) and another that stretches west to Wind Lake and the Racine County line (AD 62).  *See supra* ¶ 177; Tr. Ex. 20 (Act 43 Assembly map)

274.	Act 43 combines parts of the cities of Racine and Kenosha in a single assembly district (AD 64), even though the two cities are separate communities of interest and have not traditionally been included in the same assembly district.  Tr. Ex. 20 (Act 43 Assembly map).  No rationale has been advanced for combining parts of Racine and Kenosha into a single assembly district.  Handrick Depo. (Dkt. 137) at 293:8-13.

275.	Act 43 combines the City of Racine and the City of Kenosha into a single senate district (SD 22), and combines the rural parts of Racine County and Kenosha County into a separate senate district (SD 21).  Tr. Ex. 22 (Act 43 Senate map).

276.	The City of Appleton, a majority of which has traditionally been within one assembly district (AD 57), is split in half with the northern half of the city now in the Assembly

District 56, which stretches west beyond the Outagamie County line and to the Winnebago County line. Tr. Ex. 20 (Act 43 Assembly map)

277. The City of Beloit, which has been contained traditionally and historically within one assembly district (AD 45), is split in half with the western part of the city falling within AD 45 and the eastern portion within AD 31, placing the City of Beloit in separate senate districts (SD 15 on the west and SD 11 on the east). Tr. Ex. 20 (Act 43 Assembly map).

278. Act 43 splits the City of Beloit between two assembly districts even though Beloit, with a population of 36,966, could be contained within a single district. *See supra* ¶ 172-173. No rationale has been advanced for splitting Beloit between two assembly districts. Foltz Depo. (Dkt. 138) at 207:19-208:17; Ottman Depo. (Dkt. 140) at 229:17-231:2; Handrick Depo. (Dkt. 137) at 299:4.

279. Act 43 splits the City of Marshfield, which has been part of Senate District 24 for a century, between two assembly districts (AD 69 and 86) and two senate districts (SD 23 and 29). Tr. Ex. 20 (Act 43 Assembly map), Tr. Ex. 22 (Act 43 Senate map).

280. Act 43 splits the City of Marshfield between two assembly and two senate districts even though Marshfield—with a population of 19,118—could be contained within a single assembly and single senate district. *See supra* ¶ 174-175. No rationale has been advanced for splitting Marshfield between two assembly and two senate districts. Foltz Depo. (Dkt. 138) at 217:25-219:7; Ottman Depo. (Dkt. 140) at 232:12-233:14.

281. Act 43 also divides Sheboygan into separate districts (AD 26 and AD 27). Tr. Ex. 20 (Act 43 Assembly map).

282. In Milwaukee, three assembly districts that historically have been within Milwaukee County are now stretched from the edge of the city well into Waukesha County. As

a result, Milwaukee voters in up to six Milwaukee assembly seats will lose their influence in choosing who represents them to voters outside of Milwaukee. Tr. Ex. 20 (Act 43 Assembly map).

283.     By splitting municipalities into more than one Assembly and/or Senate district, Act 43 imposes significant additional burdens on those municipalities. (Trial testimony of Steve Barg, City Administrator, City of Marshfield)

284.     Act 44 shifts substantially more people to different congressional districts than necessary for population equality. Act 44 shifts (a) 171,270 people into District 3, and 190,354 people out of the district, for a net loss of 19,084; (b) 177,822 people into District 5, and 174,529 people out of the district, for a net gain of 3,293; (c) 144,923 people into District 6, and 139,152 out of the district, for a net gain of 5,771; and (d) 171,989 into District 7, and 150,395 out of the district, for a net gain of 21,594. *See* Ex. A to Joint Pretrial Report, Table 31; Tr. Ex. 45 (Nordheim Report), Ex. B at 5.

285.     Act 43 moves more than 49,000 individuals on the western edge of Madison from the 26th senate district into the new 27th senate district. The last regular election in which residents of the 26th district voted for a state senator was in 2008; the next regular senate election in the 27th district will take place in 2014. Tr. Ex. 31 (Diez Report, "Core Constituencies Report: Senate Districts (Act 43)"); Ex. A to Joint Pretrial Report, Table 28.

286.     The population of the 27th senate district under the 2002 boundaries is 197,874, or 25,541 greater than the ideal population. Its population as redrawn in Act 43 is 172,449. The net population decrease of 25,425 was achieved by shifting 69,372 people into the 27th district—including more than 49,000 individuals formerly in SD 14, 16, and 26—and shifting another

94,797 people out of the district.  Tr. Ex. 55 (Mayer Report), Ex. 3 ("Population Shifts in Senate Districts"); Tr. Ex. 31 (Diez Report, "Core Constituencies Report: Senate Districts (Act 43)").

287.     In the 2002 court-drawn plan, Racine County comprised most of the 21st senate district, and Kenosha County most of the 22nd senate district.  Act 43 combines the cities of Kenosha and Racine into the 22nd senate district, placing the remainder of Kenosha and Racine counties into the 21st senate district.  As a result, 72,431 voters are shifted into the 21st senate district from the 22nd senate district.  The last regular election in which residents of the 22nd district voted for a state senator was in 2008; the next regular senate election in the 21st district will take place in 2014.  Tr. Ex. 31 (Diez Report, "Core Constituencies Report: Senate Districts (Act 43)").

288.     The population of the 21st senate district under the 2002 boundaries is 166,735, or 5,598 less than the ideal population.  Its population as redrawn in Act 43 is 172,324.  The net population increase of 5,589 was achieved by shifting 72,431 people into the 21st district—all of whom were formerly in the 22nd district—and shifting another 66,842 people out of the district, all but five of whom were moved into the 22nd district.  Tr. Ex. 55 (Mayer Report), Ex. 3 ("Population Shifts in Senate Districts"); Tr. Ex. 31 (Diez Report, "Core Constituencies Report: Senate Districts (Act 43)").

289.     The boundaries of the senate districts were not intended to minimize disenfranchisement.  In drawing the district boundaries, Foltz and Ottman targeted a disenfranchisement rate of 5.25 percent, a figure derived from the percentage of people disenfranchised by the 1992 court-drawn senate map.  As a result, rather than reducing disenfranchisement to the extent possible—which, in light of technological advances over the past two decades, would likely have resulted in a disenfranchisement rate far lower than that

achieved in 1992—Foltz and Ottman affirmatively sought to disenfranchise 5.25 percent of the population.  Tr. Ex. 19 at 30-31; Foltz Depo. (Dkt. 138) at 185:4-191:3; Ottman Depo. (Dkt. 140) at 190:15-193:2.

290.    Recall elections occur in a very specific constitutional and political context that differs substantially from the fixed elections held every four years.  Tr. Ex. 55 (Mayer Report) at 8.

291.    In the 2011 senate recall elections, all nine candidates who faced recalls attempted to stop the recall elections through litigation.  Tr. Ex. 55 (Mayer Report) at 8.

292.    The recall campaigns were unusually chaotic, with both parties running "fake" or "placeholder" candidates to force primaries in the other party, giving incumbents more time to campaign by further delaying the date of the final recall.  Tr. Ex. 55 (Mayer Report) at 8.

293.    Turnout in the recall elections was, on average, 35 percent lower than in the 2008 elections, even though two senators who faced recalls previously ran unopposed.  Tr. Ex. 55 (Mayer Report) at 8.

294.    An action has been filed in the Circuit Court for Waukesha County against GAB seeking a judicial determination of the appropriate districts under which recall elections must be held.  *Clinard et al. v. Brennan et al.*, Case No. 11-cv-03995.  In its answer to the Amended Complaint for Declaratory and Other Relief, *see* Tr. Ex. 167, GAB answered the paragraphs of the complaint as follows:

a.    "Summary Paragraph 1:  Following the enactment of 2011 Wisconsin Acts 43 and 44 by the State Legislature ('2011 Redistricting Plan'), the Government Accountability Board ('GAB'), which is the state agency responsible for administering the laws concerning the conduct of elections in the State of Wisconsin, issued formal

guidance that any recall elections which may be initiated and held prior to the general election in November of 2012, are to be conducted in the old legislative districts established by the 2002 court-adopted redistricting plan (the '2002 Court Plan'). GAB issued this formal guidance despite the fact there is no dispute that the prior legislative districts are unconstitutionally malapportioned.

      b.      "Answer to Summary Paragraph 1:  Defendants ADMIT the allegations of the first sentence in Summary Paragraph 1.  Defendants ADMIT that the legislative districts created in the 2002 Court Plan are malapportioned.  The remainder of this paragraph consists of plaintiffs' conclusions of law, so no response is necessary.  To the extent any court should construe the remainder of this paragraph to contain allegations of fact, defendants lack information sufficient to form a belief as to the truth of the matters asserted and so DENY the same."

      c.      * * * "[Paragraph No.] 32.  There is no dispute that based on the 2010 Census data the legislative districts established under the 2002 Court Plan are unconstitutionally malapportioned and violate the central principle of one-person, one-vote."

      d.      "Answer to Paragraph No. 32:  Defendants ADMIT that, based on the 2010 Census data, the legislative districts established by the 2002 Court Plan are now malapportioned.  The remainder of this paragraph consists of plaintiffs' conclusions of law, so no response is necessary.  To the extent any court should construe the remainder of this paragraph to contain allegations of fact, defendants lack information sufficient to form a belief as to the truth of the matters asserted and so DENY the same."  Tr. Ex. 167.

295.     According to the 2010 Census, the Latino population of the city of Milwaukee is 103,001 (17.3 percent of the total), and the Latino voting age population (VAP) is 63,202 (14.6 percent of the total VAP).  *See* Tr. Ex. 55 (Mayer Report) at 18.

296.     Of the 103,007 Latinos in Milwaukee County, 70,779 (68.1 percent) are concentrated within 939 contiguous census blocks on the near south side.  The Latino population makes up 65.6 percent of the population within those census blocks.  The area of concentration is roughly square—approximately bounded by I-94 on the north, 1st Street and I-94/43 on the east, Howard Street to the south and 42nd Street to the west.  In this area, the Latino community is both sufficiently large and geographically compact to meet the first prong of the *Gingles* test. *See* Tr. Ex. 55 (Mayer Report) at 18.

297.     The statistical analysis by the Wisconsin Legislative Reference Bureau of the 8th Assembly District, as promulgated on May 30, 2002, by U.S. District Court for the Eastern District of Wisconsin, indicated a total population in the year 2000 of 54,074 of which 33,602 were Latino for a Latino population percentage of 62 percent at that time.  *See* Tr. Ex. 55 (Mayer Report) at 18.

298.     Assembly Districts 8 and 9, as created by Act 43, do not have a sufficient Latino voting age citizen populations to create effective Latino majorities.  *See* Tr. Ex. 55 (Mayer Report) at 22; *see* Tr. Ex. 60 (Mayer Rebuttal) at 11-12.

299.     Assembly District 8 purports to have a Latino voting age population of 60.54 percent, and Assembly District 9 purports to have a Latino voting age population of 54.0 percent.  The Latino population spread between the two districts is diluted.  *See* Tr. Ex. 55 (Mayer Report) at 22.

300.     The data from the April 2010 census and the annual American Community Survey indicate that the current population of the Latino community on Milwaukee's near south side in the vicinity of the re-apportioned 8th and 9th Assembly Districts as adopted by the Legislature is now sufficiently large and geographically compact to allow for one Assembly District with an effective voting majority of voting age Latinos who are United States citizens. *See, e.g.,* Tr. Ex. 55 (Mayer Report) at 18, 19, 22-23, and Ex. 6; *see* Tr. Ex. 60 (Mayer Rebuttal) at 12-15.

301.     Voting age population percentages significantly overstate the appearance of effective political influence of any minority group, and this is especially true for Latinos.  *See* Tr. Ex. 60 (Mayer Rebuttal) at 11.

302.     Given the historically low voter registration for Latinos, the actual concentration of eligible Latino voters must be well above 50 percent to insure that Latinos have a meaningful opportunity to elect candidates of their choice.  *See* Tr. Ex. 60 (Mayer Rebuttal) at 11, 15.

303.     The percentage of non-Latino whites of voting age who turn out to vote is larger than the percentage of Latino citizens of voting age who turn out to vote in AD 8 and AD 9.  *See* Tr. Ex. 1025 (spreadsheet produced by Mayer); *see* Grofman Depo. (Dkt. 150) at 178:10-179:24, Gaddie Depo. (Dkt. 148) at 139:17-140:16.

304.     The percentage of non-Latino whites of voting age who register to vote is larger than the percentage of Latino citizens of voting age who register to vote in AD 8 and AD 9.  *See* Tr. Ex. 1019 (corrected Exhibit 8 to Mayer Report); *see* Morrison Depo. (Dkt. 149) at 154:10-13.

305.     The areas of the predecessor AD 9 that were added to AD 8 pursuant to Act 43 had larger percentages of non-Latino whites of voting age than the areas of the predecessor AD 8

that were retained with the new AD 8 pursuant to Act 43.  *See* Tr. Ex. 184 (Map of AD 8 and 9 with Turnout Rate).

306.    The areas of the predecessor AD 9 that were added to AD 8 pursuant to Act 43 have a higher percentage of voter turnout than the areas of the predecessor AD 8 that were retained with the new AD 8 pursuant to Act 43.  *See* Tr. Ex. 184 (Map of AD 8 and 9 with Turnout Rate); *see* Grofman Depo. (Dkt. 150) at 182:13-22.

307.    In every general election since 1998, including 2000, 2002, 2004, 2006, 2008, 2010, AD 8 had the fewest total votes cast of any regular general assembly election held in those years.  *See* Wis. Bluebook 1997-1998, 1999-2000, 2001-2002, 2003-2004, 2005-2006, 2007-2008.

308.    The areas of the predecessor AD 9 that were added to AD 8 pursuant to Act 43 constitute a different community of interest than the areas of the predecessor AD 8 that were retained under new AD 8, created pursuant to Act 43.  The residents of the Wilson Park area do not consider themselves to be part of Milwaukee's near south side Latino community.  The areas from the predecessor AD 9 added to the new AD 8 represent a different neighborhood known as Wilson Park which has a lower percentage of Latinos who are eligible voters and a higher percentage of non-Latino white voters who have higher voter registration rates and higher turnout rates than do the Latinos who are eligible voters in those portions of the predecessor AD 8 that were retained in the new AD 8.  (Anticipated testimony of John Bartkowski and Christine Neuman-Ortiz.  Defendants opted not to depose these witnesses.)

309.    Act 43 divides the predecessor AD 8 almost in half along Cesar Chavez Drive (16th Street) retaining a mere 55% of the predecessor district in the new AD 8 and adding the Wilson Park areas from the predecessor AD 9.  *See* Tr. Ex. 144 (comparing total registered

voters with total voter turnout in these newly joined communities of interest during the 2008 presidential election).

310.     The area of most rapid growth of Milwaukee's Latino community has been on the city's near south side, centered in the area of the 8th Assembly District.  *See* Tr. Exs. 55 (Mayer Report), 1019 (corrected Exhibit 8 from Mayer Report).

311.     A comparison of the voter registration rates between Latino and non-Latino individuals demonstrates a large disparity within the City of Milwaukee.  The data obtained from the Statewide Voter Registration System (SVRS) for the City of Milwaukee show that more than 76 percent of non-Latinos are registered to vote versus 26 percent of Latinos.  *See* Tr. Ex. 55 (Mayer Report) at 21 and Ex. 8.

312.     Voter registration rates for Latinos lag far behind non-Latinos everywhere in the City of Milwaukee due to demographic characteristics (lower income, higher poverty levels, less formal education), and because significant numbers of Latinos in Wisconsin and the City of Milwaukee are ineligible to vote because they are not citizens.  *See* Tr. Ex. 55 (Mayer Report) at 21.

313.     The noncitizenship rate for Latinos in the City of Milwaukee, using the 2005-2009 five-year American Community Survey (ACS) data, is 42 percent.  *See* Tr. Ex. 60 (Mayer Rebuttal) at 11.

314.     The noncitizenship rate for Latinos in the City of Milwaukee, using the 2008 ACS data, is 35.75 percent.  *See* Tr. Ex. 55 (Mayer Report) at 22.

315.     When the noncitizenship rate of 35.75 percent is taken into account (as it must), as well as the historic low rates of registration even among otherwise eligible Latinos, the percentage of *eligible* Latinos constituting the voting age population in Assembly District 8 is

49.6 percent and is 43.02 percent in Assembly District 9. *See* Tr. Ex. 55 (Mayer Report) at 22; *see* Tr. Ex. 60 (Mayer Rebuttal) at 11.

316. Using the 42 percent noncitizen rate derived from the five-year ACS data reduces the eligible Latino majorities in Assembly Districts 8 and 9 to 47.07 percent and 40.53 percent, respectively. *See* Tr. Ex. 60 (Mayer Rebuttal) at 11.

317. Latinos who are U.S. citizens comprise between 47.07 percent and 49.6 percent of the voting age population living in AD 8. *See* Tr. Ex. 55 (Mayer Report) at 22; Tr. Ex. 60 (Mayer Rebuttal) at 11.

318. Latinos who are U.S. citizens comprise between 40.53 percent and 43.02 percent of the voting age population living in AD 9. *See* Tr. Ex. 55 (Mayer Report) at 22; Tr. Ex. 60 (Mayer Rebuttal) at 11.

319. As created by Act 43, Assembly Districts 8 and 9 do not contain enough citizen voting age Latinos to constitute a numerical majority. *See* Tr. Ex. 55 (Mayer Report) at 21; *see* Tr. Ex. 60 (Mayer Rebuttal) at 11-12.

320. It is possible to construct an alternative Assembly District 8 with a Latino voting age population of 70.07 percent and a Latino citizen voting age population of 60.06 percent. *See* Tr. Ex. 55 (Mayer Report) at 19, 22-23, and Ex. 6; *see* Tr. Ex. 60 (Mayer Rebuttal) at 12-15. It is possible and, therefore, necessary to construct a compact Assembly District with a sufficiently large and effective Latino voting population. *Id.*

321. Over the course of the last decade, the political and electoral conduct of Latino voters on Milwaukee's near south side in the vicinity of the predecessor 8th Assembly District demonstrates that the Latino community is politically cohesive. *See* Gaddie Depo. (Dkt. 148) at 90:9-20; Grofman Depo. (Dkt. 150) at 165:5-15.

322.     Minority cohesion and racial bloc voting are evidenced by analyzing voting percentages in elections where one or more Latino candidates ran against one or more white candidates.  For example, in the 2011 primary for Milwaukee County Circuit Court Judge in which Latino candidate Pedro Colón ran against multiple white candidates, it was estimated that 58.2 percent of Latinos voted for Colón and 68 percent of white voters cast their ballots for one of the white candidates (*i.e.*, only 32 percent of white voters cast their ballots for Colón).  The percentage difference in support was 26.2 percent.  In the general election, 66.2 percent of Latinos voted for Colón while 54.7 percent of white voters cast their ballot for the white candidate.  *See* Tr. Ex. 55 (Mayer Report) at 19-20, and Ex. 7.  These results demonstrate a high rate of racially polarized voting.  *See id.* at 19.

323.     A very high degree of racially polarized voting is again demonstrated by analyzing the results of the 2008 general election for State Superintendent of Public Instruction where Spanish-surnamed Rose Fernandez ran against Tony Evers.  95.7 percent of Latino voters in Milwaukee County voted for Fernandez versus 40.5 percent of white voters.  The difference in support, 55.2 percent, evidences a high degree of racial polarization.  *See* Tr. Ex. 55 (Mayer Report) at 19-20, and Ex. 7.

324.     Latinos in the City of Milwaukee are less likely to participate in an election as demonstrated by the disparity in voter registration rates between non-Latinos (over 76 percent) and Latinos (26 percent).  *See* Tr. Ex. 55 (Mayer Report) at 21, and Ex. 8.

325.     Barriers to electoral participation also include Wisconsin's newly enacted voter identification law.  2011 Wis. Act 23; *see* Tr. Ex. 60 (Mayer Rebuttal) at 15-16.  These photographic identification requirements will disproportionately affect Latino citizens and

thereby further hinder the ability of Latino citizens to participate in the electoral process on an equal basis with other members of the electorate.

326.     Socioeconomic differences between non-Latinos and Latinos—such as lower income, higher poverty levels, and less formal education—all interfere with the ability of Latinos in the City of Milwaukee and Wisconsin to fully participate in the electoral process and elect candidates of their choice.  *See* Grofman Depo. (Dkt. 150) at 172:15-172:24; *see also* Rodriguez Depo. (Dkt. 142) at 178:7-179:1, 179:17-180:5.

327.     Voces de la Frontera is the largest membership-based Latino organization in the State of Wisconsin with over 3,000 members who are concentrated mostly in the near-southside area of Milwaukee in the vicinity of the AD 8 and AD 9.  Each year, Voces de la Frontera sponsors May Day marches on May 1st in Milwaukee with attendance ranging from 20,000 to over 65,000 members of the Latino community.  Voces de la Frontera has focused on Get-Out-The- Vote campaigns and in 2004 successfully registered 5,100 new voters in the predecessor AD 8 and increased voter turnout by 6% in 10 of the wards in that district.  In 2006, the civic participation program increased the voter turnout by 32 percent in Milwaukee targeted wards and by 20 percent in Racine targeted wards.  (Anticipated testimony of Christine Neumann-Ortiz).

328.     Voces de la Frontera actively participated in the redistricting process for the City of Milwaukee and joined with a number of other Latino organizations to form the Latino Redistricting Committee, a bipartisan coalition to advocate on behalf of the Latino community's interests during the redistricting process.  Neither organization was contacted by persons involved in the legislative redistricting process that led to the passage of Act 43.  Neither organization was provided with an opportunity to provide input regarding the legislative redistricting process.  (Anticipated testimony of Christine Neumann-Ortiz).

329.    Hispanics for Leadership is not a formal organization and consists of a couple of dozen individuals.  *See* Rodriguez Depo. (Dkt. 142) at 19:21-20:2.

330.    Between July 8, 2011, and July 13, 2011, Jesus ("Zeus") Rodriguez consulted with two individuals regarding the legislative redistricting plan that resulted in Act 43, but he does not recall providing the two individuals with copies of the proposed maps, rather he just "explained to them."  *See* Rodriguez Depo. (Dkt. 142) at 73:20-74:10, 194:23-195:17.

331.    Hispanics for Leadership does not speak for the entire Latino community.  *See* Rodriguez Depo. (Dkt. 142) at 187:22-187:24.

332.    According to the 2010 Census, the City of Milwaukee had a population of 594,833 and a voting age population of 433,442.  The African-American population in the city of Milwaukee is 239,923 (40.3 percent of the total population) and the African-American voting age population is 156,153 (36 percent of the total voting age population).  *See* Tr. Ex. 55 (Mayer Report) at 23.

333.    The African-American population is concentrated in the north-central portion of Milwaukee, and a large part lives in areas that are at least 75 percent African-American. 85.7 percent (217,551) of the total African-American population in Milwaukee County (253,764) resides in 3790 contiguous census blocks (of 13,231 blocks within the county).  Within these blocks, the African-American population represents 70.6 percent of the total population.  *See* Tr. Ex. 55 (Mayer Report) at 23.

334.    This area of high concentration is generally in the northern half of the county, and more specifically runs to the northwest away from downtown Milwaukee—broadly bounded by the Milwaukee County line on the north edge, variously the Milwaukee river and the Canadian

National Rail line on the east, I-94 on the southern edge and Highway 41 and the NW county line to the west. *See* Tr. Ex. 55 (Mayer Report) at 23-24.

335.    The depressed socioeconomic status of Milwaukee's African-American community hinders the ability to participate in the electoral process on an equal basis with other members of the electorate. *See* Grofman Depo. (Dkt. 150) at 208:23-209:17.

336.    Minority cohesion and racial bloc voting are evidenced by analyzing voting percentages in elections where one or more African-American candidates ran against one or more white candidates. *See* Tr. Ex. 55 (Mayer Report) at 24, and Ex. 9. In all of these races, African-American voters were almost always close to unanimous in their support for the African-American candidate, and white voters were uniformly less likely to support the African-American candidate by large margins. These results show a high rate of racially polarized voting. *See id.*

337.    In Assembly Districts 10, 11, 16, 17, and 18, the concentration of African-American voters is excessive, far above the threshold (typically, 55 percent) commonly accepted as necessary to achieve effective majority status for African-American voters. *See* Tr. Ex. 55 (Mayer Report) at 25; *see also* Grofman Depo. (Dkt. 150) at 90:2-17.

338.    If the percentage of African-American voting age population is reduced to 55 percent in each of these districts, 12,919 African-American voters would be available for other districts, increasing African-American influence while still retaining effective majorities in the existing majority-minority districts and enhancing the influence of African-Americans in other districts. *See* Tr. Ex. 55 (Mayer Report) at 25.

339.    African-Americans in Milwaukee and Wisconsin are less likely to participate in an election as demonstrated by the disparity in voter registration rates, socioeconomic

differences, and other barriers to electoral participation.  *See* Grofman Depo. (Dkt. 150) at 208:23-209:17.

340.    Traditional race-neutral redistricting criteria, such as compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, were subordinated to race when the legislative majority decided to redraw the district lines under Act 43 so that an unnecessarily large number of African-American voters were concentrated in Assembly Districts 10, 11, 16, 17, and 18, and Latino voters were dispersed into Assembly Districts 8 and 9.  There is no race-neutral justification for the creation of these districts under Act 43.

341.    District lines could have been drawn in a way that reduces the African-American voting age population to more appropriate levels (*i.e.*, 55 percent) and enhances the influence of African-Americans in other districts, and creates a compact Assembly District 8 with a sufficiently large and effective Latino voting population.  *See* Tr. Ex. 55 (Mayer Report) at 19, 22-23, 25, and Ex. 6; *see* Tr. Ex. 60 (Mayer Rebuttal) at 12-15.

342.    The explicit mandate of Act 43, establishing the effective date for redistricting, means any special or recall elections to offices filled or contested prior to the fall 2012 elections are to be conducted in the legislative districts established by the 2002 judicially-approved redistricting plan.  *See* 2011 Wis. Act 43.

343.    Nine (9) recall elections were held in July and August 2011 under the 2002 district boundaries, and the Governor issued an Executive Order on September 2 to conduct a special election in the 95th Assembly District, which was conducted under the 2002 boundary.

344.     Recall petitions have been filed in Senate Districts 13, 21, 23, and 29, and the defendants are reviewing them for sufficiency to determine a date for recall elections under the 2002 boundaries.

## II.     VOCES PLAINTIFFS

345.     The Voces plaintiffs join in those foregoing statements of contested facts proffered by the Baldus plaintiffs including those that relate to AD 8 and AD 9 and the Latino community on Milwaukee's near southside.

## III.     INTERVENOR PLAINTIFFS

### A.     Zero Deviation.

346.     Zero deviation for a congressional district is determined by dividing the population of Wisconsin, as determined by the U.S. Census Bureau for the 2010 decennial Census, equally between the Eight Congressional Districts. This results in a population of 710,874 for Congressional Districts One and Two, and a population of 710,873 for Congressional Districts Three, Four, Five, Six, Seven, and Eight. Deposition of Andrew Speth, Chief of Staff for Intervening Defendant Congressman Paul Ryan (Dtk. 143) at 51:2-20.

347.     Historically the census data used by the State legislature or federal three-judge court panels to draw redistricting maps has been inaccurate and incomplete (Deposition of Kevin Kennedy Director and General Counsel for the Defendant Government Accountability Board) for the following reasons:

a.     The census itself (that is, the counting of people by the Census Bureau) is never entirely accurate. The Census Bureau misses some people during its count.

b.     The boundary lines in the geographical maps used by the census are not always accurate. The census bureau openly acknowledges this.

c.      The census is outdated as soon as it is released to the public.  In the intervening period between when the census is released and redistricting maps are drawn by either the State Legislature or federal three-judge panel, as in 1982, 1992, and 2002 (which can be almost two years in some cases), some people have moved, other people have died, babies have been born, non-voting age citizens have become of voting age, and some boundary lines have shifted through annexations.

348.    It is impossible to have precise equal population for all citizens of the United States because congressional boundaries cannot cross state lines.  This means that the citizens of some states will be underrepresented and the citizens of other states will be overrepresented.  For example the average congressional district in Minnesota has a population of 662,990 while the average congressional district in Wisconsin has a population of 710,874.  This is a deviation of 6.7%.  This means that the citizens of Wisconsin are underrepresented if precise average population figures are required.

349.    The boundaries for the Congressional Districts that became Act 44 were prepared by Andrew Speth, Chief of Staff for Intervening Defendant Congressman Paul Ryan.  Speth Depo. (Dkt. 143) at 32:3-9.

350.    The only legal principle that guided Mr. Speth in drawing the Congressional Boundaries that were enacted in Act 44 was zero deviation.  *Id.* at 50:22-51:20.

**B.      Core Retention.**

351.    Trial Exhibit 1014 is the Congressional boundary map that was adopted in 2002 as a result of the 2000 census.

352.    Trial Exhibit 1015 is the Congressional boundary map that was adopted by the passage of Act 44 following the 2010 census.

353.     The previous 2002 redistricting plan was recommended by a bipartisan congressional delegation.  It was passed by the Wisconsin legislature and signed into law by the Governor.  It was not challenged in court.  There would be no reason to change those districts following the 2010 census unless there had been large population shifts, the state had lost a congressional seat, or there had been changes in the ethnic composition of a district requiring changes because of the Voting Rights Act.  None of these considerations are relevant for the Third, Seventh, or Eighth Congressional Districts.  Affidavit of Congressman David Obey (Tr. Ex. 47) ¶ 12.

354.     Retention of the core population from a Congressional District is important for the following reasons, among others.

a.     One of the important duties of a member of congress is to provide constituent services to those he or she represents.  That is best accomplished if confusion about which district citizens live in is minimized to the greatest possible degree.  Constituent services can be a variety of things:  assistance with passports, providing information about government programs, helping to confront government agencies or expressing opinions on issues before Congress.  My staff and I would be constantly dealing with the needs of private citizens to understand how to gain access to government services and information.  These are usually people who cannot afford a lobbyist.  This access to government I believe falls under a citizens' right to petition government.

b.     People will best understand the positions taken by the representative in their district and will be better equipped to cast an informed vote than would be the case if they are continually confused about which district they now reside in.    Moving voters will cause them to be less informed and more confused.

c.     Parties form organizations that are based upon district boundaries. Unnecessarily moving voters disrupts those organizations, and their ability to provide useful information.

d.     Unnecessarily disrupting the link between constituents and their districts of residence will lower voter turnout and participation because of a lack of information. Voter turnout in U.S. elections is already lower than in many countries – not something to be desired in the world's oldest democracy.  Obey Aff., ¶ 17.

355.     Mr. Speth was not familiar with the concept of core retention and did not use the concept of core retention in preparing the map that was enacted as Act 44.  Speth Depo. (Dkt. 143) at 104:4-20, 105:19-22.

356.     The 7th Congressional District and the 3rd Congressional District share a common boundary.  Tr. Ex. 1014.

357.     In the boundaries drawn in 2002, Clark County was divided between the 7th Congressional District and the 3rd Congressional District.  Tr. Ex. 1014.

358.     According to the 2010 census the population of Clark County was 34,690 and Clark County had grown by 3.4% from 2000.  (2010 Census Data, available at: http://quickfacts.census.gov/qfd/states/55/55019.html)

359.     By maintaining the same boundaries for the 7th and 3rd Congressional Districts as had been approved by Wisconsin Legislature and signed into law by the Wisconsin Governor in 2002, but placing all of Clark County in the 7th Congressional District, the 3rd and 7th Congressional District would have largely accomplished equal population with the other Wisconsin Congressional Districts.  Obey Aff., ¶ 19.

360.     Mr. Speth agrees that zero deviation could have been achieved by maintaining the previous boundaries of the Third and Seventh Congressional Districts by simply moving all of Clark County to the Seventh Congressional District following the 2010 census, but he never considered doing it.  Speth Depo. (Dkt. 143) at 141:10–142:13.

### C.     Compactness.

361.     Compactness reduces travel time before elections, during campaigns and after campaigns in performing representational duties to make candidates and representatives more accessible to constituents.  Obey Aff., ¶ 22.

362.     Compactness also impacts the media market as television coverage, radio coverage, and newspaper coverage is limited to a specific geographic area.  Constituents receive considerable information concerning their congressional representative through those media markets, especially television.  Campaigning is also dominated by television ads and television coverage.  In western Wisconsin, the boundaries approved by the legislature further fragment the major media market for that area, making meaningful information less likely to be conveyed, and raising the cost of whatever communication is provided.  The primary television coverage for western Wisconsin is provided by Minnesota and Twin Cities media outlets.  Most of that coverage is presently provided to Third District counties such as Pepin, Pierce, Buffalo, and St. Croix counties.  The new map split St. Croix County from that Third District and moved it to the Seventh.  The result is that Third District candidates will need to continue to purchase Twin Cities media because it covers a major part of the district.  Up until now, Seventh district candidates purchased very little Twin Cities media because only a small part of the Seventh district, such as Polk county, is dominated by Twin Cities television.  This new map makes it more necessary for Seventh district candidates to also purchase Twin Cities media, unnecessarily raising the cost of campaigns.  *Id.* ¶ 23.

363.     Compactness makes it easier for democracy to work because it facilitates communications between the representative and the public.  Since Marathon, Wood, and Portage Counties are one media market, communications by a member of Congress can be broadcast throughout those three counties.  The new district boundaries reduces the ability of the Seventh District representative to communicate with the public since all of Portage County and much of Wood County have been moved from the Seventh Congressional District, to the Third Congressional District which receives most of its news from La Crosse television outlets.  Little information about Third district affairs will reach Portage County residents under this arrangement.  *Id.* ¶ 24.

364.     Mr. Speth did not consider media markets when he prepared the Congressional Boundaries for the map that was enacted in Act 44.  Speth Depo. (Dkt. 143) at 145:8-13.

365.     The new boundaries further reduce compactness by snaking the district boundary around Portage and part of Wood County and appending portions of Juneau, Jackson, and Monroe Counties so that these fractional counties could be added to the Seventh District.  This makes no sense.  Obey Aff., ¶ 25.

366.     In the northern portion of the district the new boundary line now extends to Florence County.  This increases travel time from west to east by about an hour as the community of Florence in Florence County is about a five hour drive from Superior in Douglas County whereas formerly it was about a four hour drive from Superior to Three Lakes which was on the eastern boundary of the former district.  The addition of territory as far southeast as Monroe County unnecessarily adds an hour's drive time to get from Superior to Monroe County and even more to get from the northeast regions of the new district to the southwest regions of Monroe and Juneau Counties.  This will reduce communications between the representative and

the populations in the far corners of the district.   The Seventh Congressional District was geographically already the largest congressional district in Wisconsin.  Now it is unnecessarily made even larger geographically.  *Id.* ¶ 26.

367.    If the boundaries of the Seventh and Third are merely adjusted as set forth above those districts will be more compact than the new districts.  *Id.* ¶ 27.

368.    Visual comparison of exhibit A and exhibit B confirm that the boundaries of Wisconsin Congressional Districts Three, Seven, and Eight as prescribed by Act 44 are less compact than the boundaries of those districts before the redistricting by Act 44.

369.    Mr. Speth did not consider the principle of compactness when he prepared the boundaries of the Wisconsin Congressional Districts that were enacted into law by Act 44.  Speth Depo. (Dkt. 143) at 121:8-10.

**D.    Communities Of Interest.**

370.    The collective power of a group of people or entities can become better informed and have a stronger influence on governmental action and legislation than can a single individual.  Communities of interest are usually more effective if the focus is upon a single representative.

371.    Since at least 1938 Marathon, Portage, and Wood County have been in one congressional district.  This has facilitated thinking of these counties as a single integrated economic and cultural unit.

372.    The single most unifying community of interest in the Seventh Congressional District before the recent redistricting is the Wisconsin River.  Obey Aff., ¶ 28.

a.    The Wisconsin River is called the hardest working river in the United States.  This is because the river has led to economic development.  In early years sawmills were built in Merrill, Wausau, Mosinee, and Stevens Point.

b.      In later years the river became a great source of hydro-electric power.

Today hydropower is still used to power paper mills on the river including:

        i.      Rhinelander Paper Co. in Rhinelander,

        ii.     Packaging Corp. of America in Tomahawk,

        iii.    Wausau Papers in Brokaw,

        iv.     Weyerhaeuser Papers in Rothschild,

        v.      Mosinee Papers in Mosinee,

        vi.     Stora Enso (Consolidated Paper) in:

                (1)     Stevens Point,

                (2)     Whiting,

                (3)     Biron,

                (4)     Wisconsin Rapids,

        vii.    Georgia Pacific in Nekoosa and Port Edwards.

c.      All of the above 11 sites were located in the Seventh Congressional

District for decades before the most recent redistricting.

d.      Today the six latter sites have been taken out of the Seventh District and

placed in the Third.

e.      The river and the numerous impoundments are also a major source of

recreation.

f.      The industrial development of the river has brought with it a number of

related community interests relating to water quality, water levels, air quality, real estate,

shoreland zoning, and tourism.

g.      One of the reservoirs is Lake Dubay.  It within or near the borders of Marathon, Portage, and Wood Counties.  It covers 6,830 acres and has 43 miles of shoreline.

h.      The Wisconsin Valley Improvement Corporation is located in Wausau, Wisconsin.  It manages the Wisconsin River flowage of Lake DuBay to ensure that community, recreation, and paper industry needs are fulfilled in the region as well as managing for flood control.  These needs were formerly all in the Seventh District now they are split between the Seventh and the Third Districts

i.      The Wisconsin River flows through Wausau (Marathon County), Stevens Point (Portage County), and Wisconsin Rapids (Wood County).  All three of these cities were formerly in the Seventh District.  Stevens Point and Wisconsin Rapids have now been moved to the Third District.

373.    Mr. Speth never considered the above factors set out in paragraph 39 relating to the Wisconsin River when he prepared the Congressional Boundaries that were enacted into law as Act 44.  Speth Depo. at 148:6-15.

374.    In the early 1980's, Wisconsin Governor Lee Sherman Dreyfus, himself a resident of Central Wisconsin, urged that the area be thought of as a common unit.  He referred to Marathon, Portage and Wood counties as the "Ruralplex."  This is because these three counties were a highly integrated economic and cultural hub for Central Wisconsin.  Obey Aff., ¶ 29.

a.      The Central Wisconsin Regional Airport is a joint venture between Marathon and Portage counties.

b.      Major highways connect the three counties.

c.      The University of Wisconsin Stevens Point draws from the three counties.

     d.     Wausau is the regional shopping hub of Central Wisconsin.  The Cross Road Commons in Stevens Point also serves the region.

     e.     Major Insurance Companies are headquartered in Wausau and Stevens Point.

     f.     The region has highly integrated medical services.  Ministry Health Care and Aspirus and their affiliates are major providers and major employers in the region.

     g.     The same ABC, CBS, NBC, Fox and Public Television affiliates serve all three counties.  Gannett Newspapers owns all four local newspapers.

375.     Mr. Speth never considered the above factors set out in paragraph 41 when he prepared the Congressional Boundaries that were enacted into law as Act 44.  (Speth Dep., p. 148, lines 16-22.)

376.     High Schools from Wausau, Marshfield, Stevens Point, and Wisconsin Rapids all are members of the Wisconsin Valley Conference.  Obey Aff., ¶ 30.

377.     For many decades the Third Congressional District has been considered the Mississippi River valley district.  The economic development of that area has been tied to the Mississippi River in ways similar to the Wisconsin River. *Id.* ¶ 31.

378.     Monroe and Jackson counties have now been unnecessarily split between the Third and the Seventh District.  These counties are more closely connected economically to La Crosse which is in the Third District than to any community in the Seventh District.  *Id.* ¶ 32.

379.     The Eighth Congressional District has always been considered the Fox River, Green Bay, and northwestern Lake Michigan area.  Its development has likewise been tied to these waterways.  *Id.* ¶ 33.

380.     In 2002 the bipartisan congressional delegation, the Wisconsin Legislature and the Governor all recognized that the boundaries set forth by the 2002 redistricting  incorporated the communities of interest of the Third, Seventh, and Eighth Congressional Districts.  *Id.* ¶ 34.

381.     Marathon, Portage and Wood counties are much more alike than the surrounding counties in terms of urbanization and employment levels.  *Id.* ¶ 4n.

382.     Mr. Speth's only consideration of communities of interest in drafting the Congressional boundaries that were enacted into law in Act 44 related to geographic  boundaries and never considered cultural or economic factors.  Speth Depo. at 137:5-19.

    a.     Under the alignment before Act 44 the Seventh District had three partial counties (Clark, Oneida, and Langlade).  If all of Clark is moved to the Seventh District only two counties would be divided.  Exhibit 1.

    b.     The boundaries that were drafted by Mr. Speth divides the geographic boundaries of five counties (Chippewa, Jackson,  Monroe, Juneau, and Richland) in the Seventh District and places these counties in two Congressional Districts.  Jackson County is further fractured since there are three townships in the north that are in the Seventh District and another three townships on the east that are also in the Seventh District.  However, the three townships in the north of Jackson County and the three townships in the east of Jackson County are not contiguous.  Exhibit 2.

    c.     Under the alignment before Act 44 the Third District only divided Clark and Sauk Counties.  Tr. Ex. 1014..

    d.     The boundaries that were drafted by Mr. Speth divides the geographic boundaries of six counties (Wood, Chippewa, Jackson, Monroe, Juneau, and Richland Counties).  Tr. Ex. 1014, 1015.

383.    Historically, the Wisconsin Congressional delegation, following the decennial census, would recommend a Congressional map to the Wisconsin Legislature based upon considerations of:

      a.      Core retention;

      b.      Communities of interest;

      c.      Compactness;

      d.      One man one vote.

384.    From at least 1972 until 2002 the Wisconsin Legislature and the Governor adopted Congressional District boundaries based upon the above four considerations.

385.    The boundaries drawn for Act 44 did not include consideration of core retention.

386.    The boundaries drawn for Act 44 did not include consideration of compactness.

387.    The boundaries drawn for Act 44 did not include consideration of communities of interest except for political boundaries.

388.    The redistricting of Iowa in 2002 was based upon the Iowa Constitution (Article III. Sec. 37) and Iowa Statute Sec. 42.4  The constitution and statute requires a population which varies by no more than one per cent of the ideal district population.  It also required keeping counties together to the greatest extent possible.

389.    The requirement of keeping counties together requires a greater shift of populations to obtain equal population than if counties could be divided.

390.    Wisconsin does not have the same statute as Iowa.

391.    Act 44 divides several counties.

## IV.    GAB DEFENDANTS AND INTERVENOR-DEFENDANTS

### A.    Delayed Voting (Act 43).

392.    The Intervenor-Defendants join the Government Accountability Board's statement of contested facts to the extent they address Act 44.

393.    In 2002, Democrats proposed four different maps with delayed voting effects shown in **Table 18**.

394.    **Table 19** reflects delayed voting effects in other states in the present redistricting cycle.

395.    In the summer of 2011, senators in nine of the sixteen even-numbered Senate districts were subject to recall. Expert Report of Ronald Keith Gaddie ("Gaddie Report ") (Trial Exhibit 30) at 5.

396.    A total of 164,843 persons who reside in districts in which they would otherwise experience delayed voting also lived in districts where a recall was conducted in 2011. Accounting for the use of the recall, the actual period between voting for a Senator for these 164,843 persons is just three years, not six. Thus, Act 43 will cause only 134,861 persons to wait six years between opportunities to vote for a Senator. *Id.*

397.    The delayed voting or disenfranchisement effects of the last three redistricting efforts appear in **Table 17**.

398.    In 1982, the map drawn by the Federal District Court moved 713,225 people (or about 15.2 percent of all persons in Wisconsin according to the 1980 census) into districts where voters would wait six years between opportunities to vote for state senator. *Wisconsin State AFL-CIO v. Elections Board*, 543 F. Supp. 630, 659 (E.D. Wis. 1982).

399.    In 1992, the map drawn by the Federal District Court moved 257,000 persons (or about 5.25 percent of all persons in Wisconsin according to the 1990 census) into districts where voters would wait six years between opportunities to vote for state senator.

400.    In 2002, the Federal District Court map moved 171,163 persons (3.14% of the state population according to the 2000 census) into districts where voters would wait six years between opportunities to vote for state senator.

**B.    Core Retention.**

401.    Core retention measures the extent to which constituencies are maintained or disrupted by a proposed map.  There are several ways to measure core constituency retention, including the following:

　　　　a.    *Largest Constituency Core Retention*: In the new district, what is the largest proportion in the district that was previously together in one particular, previous district?

　　　　b.    *Incumbent Core Retention*: In the Incumbent's new district, what proportion of the population comes from their old district?  Gaddie Report at ¶ 8 (Tr. Ex. 58).

402.    Under Act 43, the average Largest Constituency Core Retention is 66.30 percent in the Assembly, with a low of 30.88 percent and a high of 99.91 percent.  The average Senate Largest Constituency Core Retention is 78.82 percent with a low of 57.89 percent and a high of 99.92 percent.  **Table 23** illustrates the Largest Core Retention scores for the Assembly and Senate districts created by Act 43.  Gaddie Report at ¶ 1 (Tr. Ex. 58).

403.    In the Assembly, average Incumbent Core Retention is 61.72 percent, with a low of 8.55 percent and a high of 99.91 percent.  The average Incumbent Core Retention for Democratic incumbents is 54.74 percent, and 65.88 percent for Republican incumbents.  The

lowest Democratic Incumbent Core Retention is 8.55 percent, the highest is 99.91 percent; for Republicans, the low is 17.74 percent and the high is 97.67 percent. Gaddie Report at ¶ 8 (Tr. Ex. 58).

404.    In the Senate, average Incumbent Core Retention is 78.23 percent, with a low of 42.03 percent and a high of 99.92 percent. Democratic Senate Incumbent Core Retention averages 78.84 percent, compared to 77.64 percent for Republican incumbents. The low Democratic Senate Incumbent Core Retention score is 42.03 percent, the high is 99.53 percent. Among Republican Senate incumbents, the low is 57.97 percent; the high is 99.92 percent. Gaddie Report at ¶ 8 (Tr. Ex. 58).

405.    **Table 24** illustrates the Incumbent Core Retention scores for the Assembly and Senate districts created by Act 43. (Diez Report)

### C.    Racial Fairness And Treatment Of Minority-Majority Districts.

406.    No part of Wisconsin is subject to Section 5 of the Voting Rights Act.

### 1.    African-American Majority-Minority Districts

407.    African Americans are 6.3 percent of the Wisconsin statewide population and 26.8 percent of the population of Milwaukee County. Over 70 percent of the 358,280 African American Wisconsinites are in Milwaukee County, and then largely in the City of Milwaukee and north of the East-West Freeway. *Id*. at 3.

408.    The Milwaukee area is the only part of the State of Wisconsin with a sufficiently large and concentrated African-American population so as to be able to draw Assembly or State Senate districts containing an African-American population or voting age population majority. Expert Report of Bernard Grofman ("Grofman Report") (Tr. Ex. 140) at ¶ 7.

409.    Under the 2002 court-drawn plan, Assembly Districts 10, 11, 16, 17 and 18, have been continuously represented by an African-American since the plan was put into place.

Moreover, all major candidates in the Democratic primary in those districts have been black and the winner of the Democratic primary has then gone on to win the general election with between 91 percent and 100 percent of the vote—most commonly with 100 percent of the vote. *Id*. at ¶ 12(b).

410.   Under the 2002 court-drawn plan, in Assembly District 12, which has not been a majority black voting age population district during the decade (having begun at 32.77 percent black VAP according to the 2000 census, and ending up at 48.99 percent Black VAP according to the 2010 census), all winners of the Democratic primary have been white (with the last contested Democratic primary in 2004).  All winners of the Democratic primary in Assembly District 12 over the past decade have gone on to win the general election with vote shares ranging from 67 percent to 100 percent, with the last contested general election in 2004. *Id*. at ¶ 12(c).

411.   During the period 2002 to 2010, an African American won every primary and general election in Senate Districts 4 and 6, and the included Assembly Districts, in which there was an African American candidate with only one exception. *Id*. at ¶ 12(a).

412.   In 2002, the federal court created five majority African American Assembly Districts where minority voters elect a candidate of choice (5.05 percent of seats statewide); of the Senate districts created by the court in 2002, two are majority African American districts where minority voters elect a candidate of choice (6.06 percent of seats statewide). Gaddie Report at  3.

413.   2011 Wisconsin Act 43 created six majority African American Assembly districts and two majority African American Senate districts. Of the six Assembly districts, five are between 60.4 percent and 61.9 percent African American voting age population (VAP), and the

sixth is 51.5 percent African American VAP. *Id*.; see also  Gaddie Report at pg. 14 (Table 3); Grofman Report at Exhibit B.

414.    **Table 8** shows the racial demographic data on population and voting age population characteristics of the court-drawn 2002 African American majority-minority legislative districts, using 2010 census data.

415.    Even if the African-American population in Assembly Districts 10, 11, 16, 17, and 18 were redistributed so that each of these five districts were at exactly 55 percent black voting age population, the African American population is not large enough to create a seventh majority-minority African-American Assembly district.  Expert Report of Kenneth R. Mayer ("Mayer Report") (Tr. Ex. 55) at 25; *see also* Mayer Depo. (Dkt. 147) at 193:19-23.

416.    Senate Districts 4 and 6 (as created by Act 43) contain 98.4 percent of the African-American population found in either Senate Districts 4 or 6 as created by the federal court in 2002.  Grofman Report at ¶ 9(a); see also Expert Report of John Diez ("Diez Report") (Tr. Ex. 31) at  2 (referencing data provided by the State of Wisconsin Legislative Technology Service Bureau).

417.    In Milwaukee County, the 2002 court-drawn baseline map had sixteen Assembly districts wholly within the county, and another three districts that crossed the county line; the county population (940,164) would have accommodated seventeen whole districts plus a third of another. African-American majority districts constituted 28.8 percent of the potential whole districts that could have been crafted in Milwaukee County, compared to 24.6 percent African-Americans in the county population.  African-American majority districts were 26.3 percent of all districts that were wholly or partially in Milwaukee County. Gaddie Report at 4.

418.    Act 43 had thirteen Assembly districts wholly within the county, and another eight districts that crossed the county line; the county population (947,735) would have accommodated sixteen whole districts plus half of another.  African-American majority districts constitute 36.4 percent of the potential whole districts that could have been crafted in Milwaukee County, compared to 26.8 percent African-Americans in the county population. African-American majority districts are 28.6 percent of all districts that are wholly or partially in Milwaukee County. *Id*.

### D.    Treatment of Political Subdivisions.

419.    **Table 20** reflects the present and historical local governments split by assembly or senate districts.

### E.    Incumbent Pairings.

420.    The incumbent pairings and the associated core retentions of the involved incumbents appear in **Table 25**.

### F.    Hispanic Majority-Minority Assembly Districts.

421.    The state population is 5.9 percent Hispanic origin, and Milwaukee County is 13.3 percent Hispanic.  Milwaukee County comprises 37.5 percent of the 335,532 Hispanic Wisconsinites, and that population has its greatest concentration south of the East-West Freeway. *Id*. at 3.

422.    The Milwaukee area is the only part of the state with a sufficiently large and concentrated Hispanic population that would allow creation of Assembly districts that contain a Hispanic population or voting age population majority. Grofman Report at ¶ 16.

423.    Based on data from the 2010 census, the Hispanic population is not large enough and geographically concentrated enough to create a Hispanic population majority Senate district. *Id*. at ¶ 17(b).

424.     Under the 2002 court-drawn map there was one majority Hispanic Assembly seat and no majority Hispanic Senate seats.  Gaddie Report at 3.

425.     Under the 2002 court-drawn plan, Assembly District 8 has been continuously represented by a Hispanic Assembly member since the plan was put into place.  All candidates in the Democratic primary in that district have been Hispanic, and the winner of the Democratic primary has then gone on to win the general election with 100 percent of the vote, i.e., in an uncontested election.  The last contested election involving a Republican in the district was 1998 (under the 1992 plan).  In that year the Hispanic candidate won the general election with 76 percent of the vote. Grofman Report at ¶ 18.

426.     2011 Wisconsin Act 43 includes two majority Hispanic Assembly districts, one of which is 60.5 percent Hispanic VAP, and the other is 54.0 percent Hispanic VAP.  Gaddie Report at 4.

427.     The Hispanic citizen voting age population in Assembly District 8 (created by Act 43), as calculated by Prof. Mayer, is 49.6 percent. Mayer Report at 22.

428.     From 2000 to 2010, Wisconsin's total population grew 6 percent (from 5,363,675 to 5,686,986).  Expert Report of Peter A. Morrison ("Morrison Report") (Tr. Ex. 32) at ¶ 6.

429.     From 2000 to 2010, Wisconsin's Hispanic population increased 74 percent (from 192,921 to 336, 056).  The Hispanic share of Wisconsin's total population rose as a consequence from 3.6 percent to 5.9 percent. *Id*.

430.     Since 2000, Hispanic numbers within Milwaukee County have registered an overall increase of nearly 44,000 in a County that gained barely 8 thousand residents overall between 2000 and 2010.  *Id*. at ¶ 8.

431.    The Census Bureau's American Community Survey ("ACS") documents an annual influx of 1,812 Hispanic in-migrants to Milwaukee County from another state plus a further 1,140 Hispanic in-migrants from elsewhere in Wisconsin, for a total Hispanic influx of 2,952 domestic in-migrants into Milwaukee County.  The ACS data also register a further annual influx of 1,500 Hispanic in-migrants from abroad.  The corresponding domestic outflow of Hispanics moving from Milwaukee County to a different county or state totals 2,791.  *Id*. at ¶¶ 16-17.

432.    The net effect of these two domestic migration counterflows (4,452 minus 2,791) increases the County's resident population by 1,661 Hispanics each year.  *Id*.

433.    This net addition of as many as 1,661 incoming Hispanics to Milwaukee County's population of 126,039 resident Hispanics accounts for what is at most a 1.3 percent annual increase in the number of resident Hispanics.  That numerical increase translates into a 0.16 percentage-point increase per year in Hispanics' share of Milwaukee County's population (assuming no foreign-bound out-migration).  That is, if net migration continues at its present level, Hispanics' current share of population countywide would grow from 13.3 percent in 2010 to 14.9 percent by 2020. *Id*. at ¶ 18.

434.    Proportionally more Hispanics are in the under-18 age range relative to non-Hispanics (39 percent compared with 23 percent).  Conversely, proportionally fewer Hispanics are in the over-65 age range relative to non-Hispanics (3 percent compared with 13 percent), ages at which significant numbers of eligible voters die off.  Furthermore, Hispanics under age 18 are predominantly citizens, whereas many adult Hispanics have yet to become citizens.  *Id*. at ¶ 21.

435.     Professor Mayer testified that, as of 2010, the Hispanic citizen voting age population in Assembly District 8 as drawn by Act 43 is approximately 49.6%, based on ACS data. Mayer Report at 22.

436.     **Table 15** describes the growth of the Hispanic community in Assembly Districts 8 and 9.

437.     Jesus "Zeus" Rodriguez is a member/leader of a non-partisan group called the Hispanics for Leadership.  Rodriguez Depo. (Dkt. 142) at 19:17-20:2.  This group was formed to advocate in favor of representation for the Latino community at all levels of government in Wisconsin.  *Id*.

438.     Mr. Rodriguez was contacted by the republican map drawers in late June or early July, 2011 to see if he would be interested in commenting on the proposed redistricting maps for State Assembly Districts 8 and 9 and State Senate District 3, all of them located in the southern part of Milwaukee.  *Id*. at 31:17-32:21.

439.     On July 8, 2011, Mr. Rodriguez and Hispanics for Leadership were presented with two alternative maps for Assembly Districts 8 and 9 (the original legislation in SB148 and Amendment 1).  *Id*. at 30:23-31:10.  The first alternative had the Hispanic Voting Age Population (HVAP) at 57 percent/57 percent for Assembly Districts 8 and 9, and the second was a 64 percent/50 percent split.  *Id*. at 41:3-9

440.     After review of the two proposals, Mr. Rodriguez proposed a third alternative— one in between the two in which the percentage of HVAP was 60.5 percent/54 percent.  *Id*. at 48:8-16.  Hispanics for Leadership endorsed that third alternative.  *Id*. at 11-21.  They felt confident with the HVAP in Assembly District 8 and wanted to increase the HVAP in Assembly District 9.  *Id*. at 49:16-50:1.  Mr. Rodriguez was not concerned about the potential fracturing of

the Latino community by the boundaries of Assembly Districts 8 and 9. *Id*. at 98:20-99:17. He does not believe that Assembly Districts 8 and 9 fracture the Latino community's voting strength. *Id*. at 152:23-154:10.

441. On July 13, 2011, Mr. Rodriguez went to Madison, Wisconsin to attend the hearing on what became Acts 43 and 44, to testify on behalf of Hispanics for Leadership in support of the 60.54 percent/50 percent map for the 8th and 9th Assembly Districts. *Id*. at 158:13-159:3. He was unable to remain to testify in person, but he did submit written testimony in support. (*Id*., pp. 159-160). Deposition Exhibit 1002. *Id*.

442. Mr. Rodriguez was concerned that if you decreased the HVAP in Assembly District 8 to compensate for the lower Citizen Hispanic Voting Age Population, that you would also decrease the HVAP in Assembly District 9 and potentially decrease the Latino influence in that second district. *Id*. at 131:11-132:20. His primary concern was that the Hispanic community be able to elect a candidate of their choice. *Id*. at 132:25-133:8. Due to his belief that the Hispanic community was increasing in number, Mr. Rodriguez was comfortable with a lower CVAP in Assembly District 8. *Id*. at 133:9-20. It was equally important that the HVAP numbers for Assembly District 9 increase. *Id*. at 137:22-25.

443. Based upon Mr. Rodriguez's knowledge of the Latino community, the following candidates for office are Latino: Victor Huyke, Patricia Zamarripa, H. Nelson Goodson, Robert Escamilla, Laura Manriquez, Jose Guzman, JoCasta Zamarripa, Angel Zanchez and Romona Rivas. *Id*. at 165:2-166:17.

444. On behalf of the Latino community, Mr. Rodriguez was also involved in the redistricting process in Milwaukee County. *Id*. at 17:11-18:8; 154:11-24. In that process, there was much more time to evaluate the maps. However, even though he was given five days to

respond to the proposals regarding state-wide redistricting as compared to the months for Milwaukee County, he felt he was more effective with the state-wide process because they took his input and changed the maps. *Id*. at 170:14-171:9.

445. Mr. Rodriguez is aware of the group, Voces de la Frontera. *Id*. at 141:13-16. Just as Hispanics for Leadership do not speak for the entire Latino community in Milwaukee, Voces de la Frontera does not either. *Id*. at 143:8-10. This is, quite simply, because not all Latinos have the same political beliefs or economic interests. *Id*. at 144:22-145:3.

446. The Wisconsin Legislature also consulted with MALDEF in drafting Act 43. *Id*. at 188:8-18.

447. Under Act 43, Hispanic majority Assembly districts are 2.02 percent of all districts in the state, 12.1 percent of potential whole districts that might be drawn in Milwaukee County, and 9.5 percent of all districts that are wholly or partially in Milwaukee County. Gaddie Report at 4.

**G. Map Creation Considerations.**

448. When drawing redistricting maps in Wisconsin, the map drawers were advised to make certain to address the Voting Rights Act concerns (in Milwaukee County) first so that they wouldn't come back to that point and be unable to address the concerns. Handrick Depo. (Dkt. 137) at 398:1-13. The map drawers also took into account the malapportionment between Milwaukee and Dane County. *Id*. at 398:17-401:7.

449. When a district is underpopulated, it needs to expand in size to bring in additional population. *Id*. at 401:8-12. If the districts surrounding the underpopulated district also need to expand in size to bring in additional population, it causes a shift in population and increases the minimum number that each district had to increase. *Id*. at 401:13-402:9. This will cause a ripple or domino effect which will also have an impact on core retention. *Id*.

450.     When trying to compensate for this ripple effect, and by taking Voter Rights Act concerns into account, compactness of districts will be adversely impacted. *Id*. at 404:11-405:7.

451.     Several other redistricting principles could have an impact on the number of delayed voters. *Id*. at 405:8-406:14.  For instance, taking communities of interest or compactness into account may change the number of delayed voters. *Id*. at 406:15-25.

452.     Core retention reports for Assembly District 81 are incomplete in that they don't take into account the fact that Assembly District 81 switched numbers with Assembly District 42. *Id*. at 277:2-10.

453.     Pursuant to the figures in the 2010 decennial census, Milwaukee County had to lose an Assembly District and Dane County had to add one. *Id*. at 282:6-9.  Three Assembly Districts that had historically been inside the boundaries of Milwaukee County were stretched into Waukesha County due to the ripple/domino effect caused by the malapportionment in Milwaukee and Dane County which caused lines to shift between those two counties. *Id*. at 300:22-302:9.

454.     As one of the map drawers, Joseph Handrick considered population equality, municipal splits, compactness, contiguity, and communities of interest when drawing the maps. *Id*. at 282:16-22; 322:12-17.  He also considered core retention. *Id*. at 285:24-286:6.

455.     With respect to communities of interest, Mr. Handrick considered municipalities and tribal boundaries. *Id*. at 287:5-11.

456.     The City of Racine was too large to be contained in one Assembly District which is why it was split into two Assembly Districts. *Id*. at 289:3-292:7.  Mr. Handrick had a conversation with Senator Robert Wirch (Democrat from Kenosha) who mentioned that he felt safe in all future races in his district. *Id*. at 334:7-335:12.

457.    When splitting the City of Beloit, Mr. Handrick was careful not to split the minority population in that City.  *Id*. at 299:7-25.

458.    The city of Eau Claire, the city of Madison and the cities of Racine and Kenosha are examples of communities of interest that Mr. Handrick put together in the new maps.  *Id*. at 412:4-11.

459.    The overwhelming majority of members of the Oneida Nation live in two townships, in two counties, town of Hobart and the town of Oneida, and a very small portion is in the village of Ashwaubenon.  *Id*. at 304:18-22.  Just as the federal court did in 2002, the new maps keep those two towns together in one Assembly District.  *Id*. at 304:25-305:3.  The bulk of the Oneida Nation lives in two counties:  Brown and Outagamie.  *Id*. at 396:4-7.

460.    The Stockbridge-Munsee Nation is separate from the Menominee Nation.  The Menominee Nation is indigenous to Wisconsin.  *Id*. at 306:13-21.  The Stockbridge-Munsee Nation is not; they are of Mohican origin from the state of New York.  *Id*.  The Stockbridge-Munsee reservation is almost exclusively contained in two townships, the town of Bartelme and the town of Red Springs.  *Id*.  The new maps keep the Stockbridge-Munsee reservation in one District.  *Id*. at 306:22-307:1.

461.    Members of the Stockbridge-Munsee Nation and the Menominee Nation live throughout the State of Wisconsin.  *Id*. at 397:7-15.  Thus, the members of those two nations have not always been represented by the same Assembly person and Senator.  *Id*.

462.    When drawing maps inside Milwaukee County, Mr. Handrick took the African-American minority community into account.  *Id*. at 309:20-310:1.  The map drawers were given several guidelines to consider when drawing the African-American districts in Milwaukee County, these included the following:  (1) the 2002 court-drawn map had five

African-American majority districts and that number must not decrease; (2) if the African-American population had grown relative to the total population enough to create a sixth majority African-American district without violating  traditional redistricting principles, it would be acceptable to drawn another majority-minority district; and (3) unless dictated by greater forces of population malapportionment, African-American incumbents ideally would not be paired with each other or with a white incumbent.  *Id*. at 310:22-311:24.  In addition, Mr. Handrick was advised to stay within the ranges for minority voting age population established in the maps drawn by the federal courts in 1992 and 2002.  *Id*. at 371:19-372:4.

463.    A sixth majority African-American district was drawn in Milwaukee.  *Id*. at 312:16-19.

464.    When drawing maps inside Milwaukee, Mr. Handrick was given several guidelines to consider when drawing the Latino districts in Milwaukee County, including but not limited to the following:  (1) there was a majority Hispanic district in Milwaukee County, and therefore, any new map would, at the very least, have to maintain that district, (2) if population growth of the Hispanic community relative to the total community would permit the creation of a second Hispanic majority district, it would be acceptable to draw another district; and (3) unless dictated by greater forces of population malapportionment, Hispanic incumbents ideally would not be paired with another incumbent.  *Id*. at 314:11-315:4.  In addition, Mr. Handrick was advised to stay within the ranges for minority voting age population established in the maps drawn by the federal courts in 1992 and 2002.  *Id*. at 371:19-372:4.

465.    To address the Latino community, Mr. Handrick drew a larger Senate District and then worked on creating Assembly Districts inside that boundary.  *Id*. at 316:25-317:11. Mr. Handrick drew two alternatives for Assembly Districts 8 and 9; they had a HVAP of

57 percent/57 percent and 64 percent/51 percent. *Id*. at 388:5-7. Neither alternative was selected in the final version of Act 43.

466. Mr. Handrick spoke with Jesus "Zeus" Rodriguez regarding Assembly Districts 8 and 9. *Id*. at 319:10-14.

467. The amendment regarding Assembly Districts 8 and 9 that was adopted caused the final percentages of those districts to increase when compared to the past map, and in particular, the final voting age percentage of District 8 to be higher than the court-drawn percentage in 2002. *Id*. at 408:11-20. The final HVAP for Assembly Districts 8 and 9 was 60.5 percent/54 percent. The democrats voted against raising the Latino voting age population in Assembly District 8 from 57 to 60 percent. *Id*. at 410:15-20.

468. Mr. Handrick did not consider citizen voting age population for the Latino community when he was drawing the maps for Assembly Districts 8 and 9 because that data is not contained in the 2010 decennial census and he was unaware that such data existed. *Id*. at 334:1-6.

469. The only data available to the map drawers was from the United States Census – and the 2010 decennial census. *Id*. at 392:9-11. That census data does not include any information on citizenship. *Id*. at 393:21-24. Based on the computer system available to the map drawers, the software that was available to them, and the data that was available from the census, it was not possible to have drawn maps based on citizen voting age population. *Id*. at 394:21-395:5.

470. There is a public website called Dave's Redistricting where anybody in the public may go on to any state and draw redistricting maps. *Id*. at 391:6-10.

471.     Prior to Act 43, the urban and rural areas of Racine were paired in one Senate district (District 21), as were the urban and rural areas of Kenosha in another Senate district (District 22). Act 43 pairs the two urban areas of Racine and Kenosha counties in one Senate district (District 21), and the more rural parts of each county together in another Senate district (District 22).

472.     The Legislature was presented with the option of keeping the urban areas of Racine and Kenosha Counties in one district and the rural parts of Racine and Kenosha Counties in another district. The Legislature chose to keep the urban areas together and the rural parts together. *Id*. at 448:25-449:22.

473.     This results in two districts which now each share more in common –urban with urban, rural with rural—throughout each Senate district. Id. at 350:19-351:4, and Exhibit 121.

474.     A significant portion of the "delayed voting" relates to the Racine/Kenosha area. This results from the Legislative decision to combine urban areas from Racine and Kenosha Counties into one Senate District, and the rural areas of those Counties in a different Senate District. *Id*. at 449:7-450:12.

475.     During the development of the maps, the effects of the map on "delayed voting" were considered. When the initial "delayed voting" numbers were calculated, the Legislature made some changes to the map in order to reduce the number of persons who would be delayed. *Id*. at 450:3-451:9.

   **H.     Congressional Districts.**

      **1.     Population movement.**

476.     In 2002, Iowa adopted a new congressional district map in which 1,226,004 people were assigned to a new district.  Based on 2000 census data, Iowa needed to "move" only

181,419 people to achieve equal population in each congressional district.  Rebuttal Report of Ronald Gaddie ("Gaddie Rebuttal") at 9, Table 1.

> ### 2.    Communities of interest.

477.    The Northwoods region of Wisconsin includes over 3200 lakes, streams, and rivers, and over a half million acres of public forest for recreational use.  These shared features are an important part of tourism, the economy, and culture in the region. (http://www.northwoodswisconsin.com/area.htm.  *See also* http://www.fs.usda.gov/main/cnnf/about-forest/about-area.)

478.    Chequamegon-Nicolet National Forest includes lands located in counties including Bayfield County to the northwest and Florence County to the northeast. http://www.fs.usda.gov/cnnf (follow link to "Where is the Chequamegon-Nicolet National Forest?")

479.    High schools from Rhinelander, Tomahawk, Minocqua (Lakeland Union), Eagle River (Northland Pines), Antigo, Mosinee, and Medford comprise the entire membership of the Great Northern Conference.   These schools are located in Taylor, Lincoln, Marathon, Vilas (now in the 7th), and Oneida Counties (including both sides of the previous congressional-district boundary through Oneida).   (http://www.greatnorthernconference.org/g5-bin/client.cgi?G5button=7)

480.    Nicolet Area Technical College has campuses in both Minocqua (Nicolet-Lakeland) and Rhinelander.  http://www.nicoletcollege.edu/community/findpeopleplaces/campusmaps/index.html

481.    Nicolet Area Technical College's mission statement is, "In service to the people of Northern Wisconsin, we deliver superior community college education that transforms lives,

enriches communities, fosters economic development, and expands employment opportunities."
http://www.nicoletcollege.edu/currentstudents/aboutnicolet/mission/index.html

482.    NorthwoodsWisconsin.com serves the Northwoods region, including

municipalities such as Manitowish Waters, Boulder Junction,    Lac du Flambeau, Minocqua,

Rhinelander, and Eagle River.  NorthwoodsWisconsin.com.

### 3.    Core retention.

483.    The congressional districts created by Act 44 maintain an average core of

84.33 percent, as reflected in **Table 26**.

### 4.    Compactness.

484.    Compactness scores for both Act 44 Congressional Districts and the 2002 districts

appear in **Table 27**.

### I.    Partisan Issues.

### 1.    Participation in redistricting process.

485.    Mr. Joel Gratz worked for the Senate Democratic Caucus in 2000-2002.  Gratz

Dep. (Dkt. 146) at 22:7-9; 23:9-10.  During that time, he drew the legislative boundary map that

was ultimately passed by the Democratic State Senate.  *Id*. at 23:13-16.  The Senate and

Assembly in 2000-2002 could not agree on maps, so there was federal litigation.  *Id*. at 23:16-19.

486.    Mr. Gratz gave a presentation on redistricting and Acts 43 and 44 to the

Wisconsin Association of Lobbyists in Spring, Green, Wisconsin on August 2011.  *Id*. at 32:21-

24.  At that meeting, Gratz advised the audience that it was going to be a more difficult year for

Democrats to be elected under the new maps, but that the maps did not leave Democrats without

opportunities for election.  *Id*. at 66:2-7.  He also mentioned that there were some districts—in

Green Bay and Eau Claire—which were now tremendously or much more Democratic.  *Id*. at

66:8-15.

487.    There were other maps created by the Democrats or related entities following the introduction of the maps in Acts 43 and 44; to wit, there was a map started by Mr. Gratz in mid-July, 2011 which he drew after discussions with democrats "so that if they chose to introduce a map into the legislature as an alternative, one was available. *Id*. at 15:23-16:2.  In addition, the Wisconsin Democracy Campaign posted a map on their website (*Id*. at 95:20-23.) and Representative Fred Kessler drew a map.  *Id*. at 82:18-21.

488.    There was no impediment or ban preventing the Democratic legislators from introducing one of the maps described above in response or as an amendment to Acts 43 and 44. *Id*. at 28:13-15

489.    While still employed as a consultant to the Democrats, Mr. Gratz drafted a Memorandum to then-Speaker Michael Sheridan regarding the possibility of using census blocks to have the democrats draw legislative and congressional maps.  *Id*. at 85:22-86:1 (referencing Exhibit 1031).  The conclusion of that Memorandum mentioned a potential consideration to obtain the census data early while the Democrats were still in control of the Legislature and democrat Governor James Doyle was still in office and to draw maps and pass them in the first three days of January 2011—at the very end of the Democratic lame duck session.  *Id*. at 88:24-90:16.  This would have left practically no time for public hearings.

490.    The Shop Consulting, Inc., was retained by the Senate Democrats in 2009 pursuant to a retainer agreement by which the Shop Consulting was to provide redistricting services.  White Depo. (Dkt. 145) at 32:16-33:22.

491.    Upon a request from Senator Mark Miller's office, The Shop Consulting assisted in drawing a legislative redistricting map following the 2010 decennial census.  *Id*. at 16:24-17:10.  The map was drawn on terminals located in the State Capitol.  *Id.*at 18:20-19:4.

492.     Previously, The Shop Consulting had been retained by the Senate Democrats in 2001-2002 to assist in drafting a legislative redistricting plan.  *Id*. at 26:21-27:12.

493.     Autobound is a software program used to draw legislative maps. It was used to draw 19 maps that eventually became Acts 43 and 44. The software was provided to the majority and minority caucuses in the Senate and Assembly. The Assembly Democratic Caucus and the Senate 21 Democratic Caucus had the program available for use on a computer, as of approximately December 2010. Training on the use of Autobound was available through the Legislative Technology Services Bureau. There is no known work product indicating that either the Assembly Democratic Caucus or the Senate Democratic Caucus took the opportunity to use Autobound during the redistricting process. Ottman Depo. (Dkt. 141) at 439:11-442:7.

494.     Following the introduction of the bills which became Acts 43 and 44, there were numerous editorials written on the proposed redistricting maps and their impact on various communities, cities and counties.  Barca Depo. at 21:19-22.

495.     There was at least one amendment passed with respect to Act 43.  *Id*. at 22:4-6.

496.     Despite the republicans having majorities in both the Senate and Assembly, the democrats did continue to submit amendments to proposed legislation.  *Id*. at 43:1-44:5.

497.     At least some democratic legislators were aware of an alternative Wisconsin legislative redistricting map, drawn by Wisconsin Democracy Campaign, after the introduction of redistricting legislation and prior to the passage of Acts 43 and 44.  *Id*. at 40:3-22; 42:3-5. The democratic caucus was in communication with the Wisconsin Democracy Campaign regarding its alternative maps prior to the enactment of Acts 43 and 44.  *Id*. at 47:16-48:3.  But they did not introduce the maps.  *Id*. at 124:5-9.

498.     The Legislative Technology Services Bureau set up computer terminals for the Senate and Assembly democrats at the State Capitol in April or May, 2011.  *Id*. at 132:1-18. They contained the map-drawing program, AutoBound.  Gratz Depo. at 12:17-22. Representative Fred Kessler was capable of drawing redistricting maps on these terminals. Barca Depo. at 133:2-13.

499.     Between January 5, 2011 and July, 2011, the democrat assembly caucus spoke with republican leadership about redistricting expenditures a few times, wrote a letter of concern about such expenditures and spoke with Legislative Counsel regarding whether they could provide legal assistance on redistricting.  *Id*. at 61:17-62:14.  They did not take any legislative steps in that time frame regarding redistricting. *Id*. at 63:23-65:14.

500.     The democrat legislators did not take any procedural steps to slow down the legislative process of considering and enacting Acts 43 and 44.  *Id*. at 112:6-18.  In particular, they did not engage in a filibuster, although they could have if they had wanted.  *Id*. at 116:20-117:14.

501.     The democrat assembly caucus and democrat leadership did not consult with any redistricting experts between January, 2011 and July, 2011.  *Id*. at 71:11-72:6.  After the redistricting legislation was introduced in July, 2011, neither the Senate nor the Assembly democrat caucus held any informational hearings or town meetings on redistricting.  *Id*. at 76:2-6; 77:2-16.

502.     Representative Peter Barca admits that it was important that the Legislature adopt a redistricting map in time for the 2012 elections.  *Id*. at 80:16-18.  He agreed that there was some dispatch needed in adopting such a map,  and that if the Legislature did not act the Courts would have to.  *Id*. at 81:15-17.

503.     All of the democrats in the 2011 legislature signed on as authors of Substitute Amendment 1 to Senate Bill 149, dated July 20, 2011.  *Id*. at 88:16-22; 98:7-99:10; see also Exhibit 1039.  Substitute Amendment 1 would shift redistricting duties to the unelected Government Accountability Board, with assistance from the Legislative Reference Bureau.  The redistricting maps would be presented to the legislature which would have to vote on them within 7 days.  No substantive amendments would be allowed.  If the maps were not passed, the GAB would re-draw and resubmit them under the same time and procedure rules.  If the maps were not acceptable after a third attempt, there were no provisions for further maps.  *Id*. at 91:17-98:6; see also Exhibit 1039.

## 2.     1983 Legislative Redistricting.

504.     Democratic legislators introduced the 1983 Legislative maps as Assembly Bill 1 on July 11, 1983 ("the bill"). A single public hearing was held that same day. The Assembly passed the bill on July 13, the Senate did so on July 14, and the Governor signed it into law on July 15.

505.     On July 11, 1983, Assembly Bill 1 was introduced by the Committee on Assembly Organization. It was read for the first time and referred to the Committee on Elections the same day.

506.     On July 11, 1983 – the same day it was introduced—the first and only public hearing also was held.

507.     On July 12, 1983, the Committee on Elections recommended its passage, by a vote of 7 to 3.

508.     On July 13, 1983, it was read a second time.

509.     On July 13, 1983, the rules were suspended; it was read a third time; it passed the Assembly by a vote of 51 to 44; and it was ordered immediately messaged to the Senate.

510.    Twelve amendments were offered to the bill in the Assembly; 3 further amendments would be offered in the Senate.

511.    On July 14, 1983, it was read the first time in the Senate, and referred to the Committee on Urban Affairs and Government Operations. The Committee recommended passage by a 3 to 2 vote.

512.    On July 14, 1983, the rules were suspended and it was read a second time and a third time. The same day, the Senate passed the bill and ordered it immediately messaged.

513.    On July 15, 1983, the Governor signed it.  It was published as 1983 Wisconsin Act 29 on July 19, 1983.

514.    The Governor vetoed an earlier plan that was inserted into the state budget bill by the Democratic caucus—without public hearing—four weeks prior. *Id.*, ¶ 3, Ex. B.  The Assembly Democrats circulated an email with talking (Deposition Exhibit 1053) on July 1, 2011, before the redistricting maps were introduced to the Legislature.  Barca Depo. II, at 173-174. One of the talking points was that the Democrats' "message is the process and the map is unconstitutional, political and partisan.  It is not in the best interest of residents."  *Id.* at 176. Representative Barca admits the Assembly Democrats had not seen the redistricting map at that time, but had hear rumors the maps would be extremely partisan and not constitutional.  *Id.* at 176-177.  These talking points were based on the rumor grapevine and speculation.  *Id.*, 178-179.

515.    Another bullet point was that that the pending Democrat caucus meeting was to be kept confidential.  *Id.* at 183.  This was standard operating procedure.  *Id.*  Caucuses for both parties typically met in closed sessions not open to the public.  *Id.* at 187-188.

516.    Another bullet point was to make sure that there was not discussion of what the Democrats might do, especially not to the press.  *Id.* at 187, 188-189).  The next bullet point

asserted that the Democrats would not be passing a map and that everything they do "is about positioning both from a message and legal perspective." *Id.* at 190. The next bullet point indicated that they should "stick to the bigger picture message – the GOP map is unconstitutional, divisive, and a blatant attempt to reduce accountability and secure political advantage for republicans." *Id.* at 195-196. All of these decisions and talking points were made before the Democrats had even seen a redistricting map. *Id.* at 196.

517. The Assembly Democrat Caucus had decided on July 1, 2011, prior to the introduction of any redistricting map, that they would not be offering any alternative maps. (*Id*. 190-191.

518. At least one Democrat assemblyman contacted LRB because he was considering drafting an amendment to the redistricting map legislation. *Id.* at 198-99. No amendments were ever offered.

**PROPOSED CONCLUSIONS OF LAW**

**I.     BALDUS PLAINTIFFS**

519.     The Equal Protection Clause requires "substantially equal state legislative representation for all citizens." *Reynolds v. Sims*, 377 U.S. 533, 568 (1964). Regardless of size, population deviations that cannot be justified by traditional redistricting criteria violate the Equal Protection Clause.

520.     The Wisconsin Constitution requires that legislative districts "be bounded by county, precinct, town or ward lines . . . and be in as compact form as practicable." Wis. Const. art. IV, § 4.

521.     Deviations from population equality in legislative districts can only be based on "legitimate considerations incident to the effectuation of a rational state policy," *Reynolds v. Sims*, 377 U.S. 533, 579 (1964), including established redistricting criteria, *Baumgart v. Wendelberger*, No. 01-C-0121, 02-C-0366, 2002 WL 34127471 (E.D. Wis. May 30, 2002).

522.     Established redistricting criteria include contiguity, Wis. Const. art. IV, § 4; compactness, *id.*; respect for "county, precinct, town or ward lines," *id.*; maintaining communities of interest, *Baumgart*, 2002 WL 34127471, at *3; and core population retention, *id*.

523.     The failure to honor traditional redistricting criteria shifts the burden to defendants to justify the legitimacy of the legislative districts.

524.     Act 43 unnecessarily divides municipalities between legislative districts and otherwise divides communities of interest.

525.     Act 43 shifts substantially more people between legislative districts than necessary.

526.     Deviations from population equality in the assembly and senate districts cannot be justified by legitimate considerations and, therefore, violate the Equal Protection Clause.

527. "[R]espect for the prerogatives of the Wisconsin Constitution dictate that . . . municipalities be kept whole where possible." *Baumgart*, 2002 WL 34127471, at *3.

528. By splitting municipalities without any rational basis for doing so, Act 43 violates the Equal Protection Clause.

529. Legislative districts that unnecessarily divide municipalities or are not compact violate the Wisconsin Constitution.

530. Act 43 unnecessarily divides municipalities between assembly districts in violation of the Wisconsin Constitution.

531. To the extent it relies exclusively on Act 39's permissive use of other boundaries (including census blocks), Act 43 violates Article IV, § 4 of the Wisconsin Constitution.

532. A *prima facie* case of unconstitutional gerrymandering is established by showing that the redistricting legislation moved significantly more people than necessary to achieve the ideal population, and no traditional redistricting criteria can justify the movement.

533. Defendants can rebut the *prima facie* case by showing that the movement was necessitated by justified changes in other district boundaries or by traditional redistricting criteria.

534. Plaintiffs can sustain their burden of proving an unconstitutional gerrymander by establishing that defendants' explanations are pretextual or unfounded.

535. Acts 43 and 44 move significantly more people than necessary to achieve the ideal population, and no traditional redistricting criteria can justify the movement.

536. The movement of significantly more people than necessary to achieve population equality was not necessitated by justified changes in other district boundaries or by traditional redistricting criteria.

537.     The districts created by Acts 43 and 44 constitute an unconstitutional partisan gerrymander in violation of the Equal Protection Clause.

538.     Wisconsin voters have the right to vote in regularly scheduled representative elections for state senators every four years.  Wis. Const. art. IV, § 5.

539.     Voters moved from an even-numbered senate district, in which the last regular election was held in 2008, to an odd-numbered senate district, in which the next regular election is to be held in 2014, are deprived of the right to vote in a regular election for two additional years.

540.     The two-year delay in the exercise of their right to vote in regularly scheduled representative elections temporarily disenfranchises voters.

541.     "[A] redistricting plan cannot unnecessarily disenfranchise voters."  Order Denying Defendants' Motion to Dismiss (Dkt. 25) at 6.  The temporarily disenfranchisement of citizens is constitutionally tolerated only when, due to the complexities of the reapportionment process, the "delay" in the right to vote is an "absolute necessity" or is "unavoidable." *Republican Party of Wisconsin v. Elections Bd.*, 585 F. Supp. 603, 606 (E.D. Wis. 1984), *vacated and remanded for dismissal of complaint*, *Wisconsin Elections Bd. v. Republican Party of Wisconsin*, 469 U.S. 1081 (1984).  The disenfranchisement of more voters than necessary is a "fatal flaw" that renders a redistricting plan unconstitutional.  *Id.*

542.     Act 43 temporarily disenfranchises 299,639 individuals by moving them from even districts to odd districts.

543.     The temporary disenfranchisement of a significant number of the 299,639 individuals was unnecessary and avoidable and, without an appropriate explanation, a violation of the Equal Protection Clause.

544. The fact that some of these voters had or may have an opportunity to vote in an extraordinary recall election does not cure the constitutional violation. The Wisconsin constitution guarantees the right to vote in a regularly scheduled state senate election every four years. The right to vote every four years for a state senator cannot be denied based on the exercise of the separate constitutional right to petition for the recall of an incumbent elected official.

545. Section 2 of the Voting Rights Act, as amended, provides:

(a)     No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right . . . to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided by subsection (b) of this section.

(b)     A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

546. The Latino citizen voting age population in the City of Milwaukee is sufficiently large and geographically compact to permit the creation of a majority-minority district. The Latino citizen voting age population in the City of Milwaukee is "politically cohesive," meaning that its members vote in a similar fashion, and there is evidence of racial-bloc voting (*i.e.,*

racially polarized voting), in which the Latino citizen voting age population tends to vote as a bloc, usually allowing majority voters to defeat its preferred candidates.  *See Thornburg v. Gingles*, 478 U.S. 30, 48-51 (1986); *see also Growe v. Emison*, 507 U.S. 25, 401-41 (1993).

547.    The African-American voting age population in the City of Milwaukee is "politically cohesive," meaning that its members vote in a similar fashion, and there is evidence of racial-bloc voting (*i.e.*, racially polarized voting), in which the African-American voting age population tends to vote as a bloc, usually allowing majority voters to defeat its preferred candidates.  *See id.*

548.    The Latino citizen voting age populations dispersed in Assembly Districts 8 and 9, as created by Act 43, are insufficient to create an effective Latino majority.  *See Barnett v. City of Chicago*, 141 F.3d 699, 703 (7th Cir. 1998); *Ketchum v. Byrne*, 740 F.2d 1398, 1415 n.19 (7th Cir. 1984).

549.    It is possible to create an Assembly District 8 that is compact and has a Latino total population and citizen voting age population sufficient to elect a candidate of their choice.

550.    Either by intent or effect, Act 43 packs the African-American voting age population in the City of Milwaukee into six (6) Assembly Districts, a smaller number of districts than is necessary, with unnecessarily high concentrations to minimize their voting power in neighboring districts.  *See Voinovich v. Quilter*, 507 U.S. 146, 158 (1993).

551.    If the percentage of African-American voting age population is reduced in each of these districts, thousands more African-American voters would be available for other districts, while still retaining effective majorities in the existing majority-minority districts and enhancing the influence of African-Americans in other districts.

552.     The process by which Act 43 was created and the legislature's disregard for traditional redistricting criteria, such as communities of interest, demonstrate intentional dilution of minority voting strength for African-Americans and Latinos.  *See Bartlett v. Strickland*, 556 U.S. 1, 19-20 (2009); *see Ketchum,* 740 F.2d at 1406.

553.     Latinos are less likely to participate in elections as demonstrated by the disparity in voter registration rates, socioeconomic differences, and other barriers to electoral participation—including Wisconsin's newly enacted voter identification law.  *See Gingles*, 478 U.S. at 44-45; *see* 2011 Wis. Act 23.

554.     African-Americans in Milwaukee and Wisconsin are less likely to participate in election as demonstrated by the disparity in voter registration rates, socioeconomic differences, and other barriers to electoral participation.  *See id.*

555.     Based on the totality of the circumstances, Latinos have been denied an equal opportunity to participate in the political process and elect legislators of their choice because Act 43 dilutes the voting power of Latinos by reducing their concentration in the newly drawn Assembly District 8, especially as compared with Assembly District 8 created by the 2002 judicially-imposed plan.  *See* 42 U.S.C. § 1973(b); *see also Gingles*, 478 U.S. at 46.

556.     Based on the totality of the circumstances, African-Americans in the City of Milwaukee and in Wisconsin have been denied an equal opportunity to participate in the political process and elect legislators of their choice because Act 43 dilutes their voting power by packing them into a smaller number of districts than is necessary. *See id.*

557.     Although the Voting Rights Act necessitates, under narrow circumstances, that the legislature consider race in the redistricting context, the Equal Protection Clause of the 14th Amendment generally requires racial neutrality in governmental decision-making.  *See* U.S.

Const., amend. XIV, § 1 (providing that no State shall "deny to any person within its jurisdiction the equal protection of the laws").

558.    The Supreme Court has repeatedly held that dividing voters according to their race in the redistricting context is subject to the strictures of the Equal Protection Clause.  *See Shaw v. Hunt*, 517 U.S. 899, 904-05 (1996) ("*Shaw II* "); *Miller v. Johnson*, 515 U.S. 900, 905 (1995); *Shaw I*, 509 U.S. at 644.

559.    Racial gerrymandering presents a justiciable claim under the Equal Protection Clause, even when there is no population deviation among the districts or direct evidence of intentional discrimination.  *Davis v. Bandemer*, 478 U.S. 109 (1985) (*citing Rogers v. Lodge*, 458 U.S. 613 (1982)).

560.    Act 43 violates the Equal Protection Clause because, absent a race-neutral explanation, race was the predominant factor motivating the legislature's decision to place a significant number of African-American and Latino voters within or without particular districts. *See Miller v. Johnson*, 515 U.S. 900, 916 (1995).

561.    Plaintiffs have demonstrated the impermissible motives of the majority party of the legislature through, at the least, circumstantial evidence of the shape and demographics of the minority districts at issue, and the secrecy and inexplicable speed of the redistricting process. *See id.*

562.    Traditional race-neutral redistricting criteria, such as compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, were subordinated to race, and the legislature deliberately concealed the redistricting process from the public.  *See Miller*, 515 U.S. at 920; *see also Shaw v. Reno*, 509 U.S. 630, 646 (1993) (*Shaw I*).

563.    With respect to race, Act 43 is not justified by any compelling state interest, and is not narrowly tailored to achieve that interest.  *See Miller*, 515 U.S. at 920; *Shaw I*, 509 U.S. at 646.

564.    Section 10 of 2011 Act 43 states: "(1) This act first applies, with respect to regular elections, to offices filled at the 2012 general election.  (2) This act first applies, with respect to special or recall elections, to offices filled or contested concurrently with the 2012 general election."  2011 Wis. Act 43.

565.    The Wisconsin Constitution permits legislative redistricting only after a decennial census.  Wis. Const. art. IV, § 3.

566.    Where a state statute provides for redistricting after a decennial census, it may not impose an interim remedy to address subsequent population changes that allegedly render the redistricting invalid.  *See Mississippi State Conf. of N.A.A.C.P. v. Barbour*, No. 11-cv-159, 2011 WL 1870222, *2, *6-*8 (S.D. Miss. May 16, 2011), *summarily aff'd*, 132 S. Ct. 542 (Oct. 31, 2011); *see also Holt v. 2011 Legislative Reapportionment Comm'n*, No. 7 MM 2012 (Pa. Jan. 25, 2012).

567.    The Government Accountability Board has concluded, based on the plain language of Act 43, that any special or recall elections to offices filled or contested prior to the fall 2012 elections are to be conducted in the legislative districts established by the 2002 judicially-approved redistricting plan.  *See* Tr. Ex. 186 (Memorandum Regarding Legislative Redistricting: Effective Date and Use of State Funds from Kevin J. Kennedy, Dir. and Gen. Counsel, Gov't Accountability Bd., to Robert Marchant, Senate Chief Clerk, and Patrick Fuller, Assembly Chief Clerk (Oct. 19, 2011), *available at* http://wispolitics.com/1006/111019_Chief_Clerk_Guidance.pdf.)

568.    Tens of thousands of recall petition signatures were submitted in direct reliance upon Section 10 of 2011 Act 43 and the defendants' own opinion. *See Friends of Scott Walker v. Brennan*, No. 2012AP32-AC (Wis. Ct. App. Feb. 3, 2012).

569.    Any recall or special elections must be conducted under the 2002 boundaries established by this Court.

570.    In amending their answer to plaintiffs' Second Amended Complaint (*see* Dkt. 66), defendants continued to deny plaintiffs' claim that any recall or special elections must be conducted under the 2002 boundaries established by this Court (*see id., e.g.,* at paras. 100, 101) and requested relief on that question (*see id.* at request for affirmative relief para. 4). Furthermore, in answering a complaint in Waukesha County Circuit Court seeking a judicial determination of the appropriate districts under which recall elections must be held, *Clinard et al. v. Brennan et al.*, Case No. 11-cv-03995, the GAB has admitted an allegation that the 2002 district boundaries are now unconstitutionally malapportioned.

571.    There is a "case or controversy" within the meaning of the Declaratory Judgment Act concerning the constitutionality of applying the 2002 senate district boundaries to any recall elections that precede the November 2012 general election.

572.    Any arguments raised by defendants about the Court's authority to adjudicate state statutory or constitutional issues have been waived by defendants and are not supported by case law.

## II.    VOCES PLAINTIFFS

573.    The division of the Latino community into two separate adjacent assembly districts dilutes the voting strength of the citizen voting age Latino voters well below 45 percent of all eligible voters in each district, thereby denying the Latino community an effective voting majority in either district.

574. The division of the Latino community into two separate adjacent but diluted assembly districts divides the Latino community's established business district in a way that fractures the cohesiveness of the community and ignores natural community boundaries.

575. The Voting Rights Act of 1965, 42 U.S.C. § 1973, precludes the State of Wisconsin from minimizing the opportunities for minority groups, including Latino citizens, to participate in the political process and in the context of the recent reapportionment, said statute precludes the State from fracturing minorities into several districts to deprive them of an effective voting majority in situations where there exists a history of racially polarized voting.

576. The redistricting plan adopted by the Wisconsin Legislature on July 20, 2011, fails to create any assembly district with an effective Latino voting majority, despite the significant growth of the Latino community to such a degree that the creation of geographically compact district with an effective Latino voter majority is possible.

577. The redistricting plan adopted by the Wisconsin Legislature on July 20, 2011, fractures the Latino community's voting strength by dividing the Latino community into two districts in which the Latino citizen voting age population is substantially below 50 percent of the voting age population.

## III. INTERVENOR PLAINTIFFS

### A. Zero Deviation.

578. Census data accuracy has always been a legal fiction. (Defendant GAB Memorandum In Support of Motion For Protective Order, filed 01/16/12, page 4.)

579. Exact population equality is unattainable and is not the only goal of redistricting. *Prosser v. Elections Bd.*, 793 F. Supp. 859, 864 (W.D. Wis. 1992).

580. A deviation of 1% of population between congressional districts is not legally or politically relevant. *Prosser*, *supra*, 793 F. Supp. at 866.

B.     **Core Retention.**

581.     An important redistricting principle is core retention.  This means redistricting should uproot the smallest number of constituents from one district to another consistent with the needs of equal representation.  *Abrams v. Johnson*, 521 U.S. 74, 99-100 (1997); *Larios v. Cox*, 300 F. Supp. 2d 1320, 1349 (N.D. Ga. 2004).

582.     Act 44 violates the redistricting principle of core retention with regard to Congressional Districts Three, Seven, and Eight.

C.     **Compactness.**

583.     Compactness is a desirable principle feature in a redistricting plan.  *Prosser*, 793 F. Supp. at 863.

584.     Act 44 violates the redistricting principle of compactness with regard to Congressional Districts Three, Seven, and Eight.

585.     There is no rational basis for causing Districts Three, Seven, and Eight to be less compact than those Districts were before the enactment of Act 44.

D.     **Communities Of Interest.**

586.     The concept of a community of interest recognizes that groups of voters share similar concerns and values, and that such values must be represented in and addressed by their legislature in redistricting plans.  *Carstens v. Lamm*, 543 F. Supp. 68, 91 (D. Colo. 1982); *Legislature of the State of California v. Reinecke*, 516 P.2d 6, 24, 26-27, 30-31 (Cal. 1973); *Mellow v. Mitchell*, 607 A.2d 204, 220-221 (Pa. 1992), *cert. denied*, 506 U.S. 828 (1992); *Bandemer v. Davis*, 603 F. Supp. 1479 (S.D. Ind. 1984), *rev'd*, 478 U.S. 109 (1986); *Arizonans for Fair Representation v. Symington*, 828 F. Supp. 684, 688 (D. Ariz. 1992), *appeal dismissed sub nom Arizona State Senate v. Arizonans for Fair Representation*, 507 U.S. 980, *and aff'd sub nom. Hispanic Chamber of Commerce v. Arizonans for Fair Representation*, 507 U.S. 981

(1993); *Wisconsin State AFL-CIO v. Elections Bd.*, 543 F. Supp. 630, 636 (E.D. Wis. 1982); Stephen J. Malone, "Note: Recognizing Communities of Interest in a Legislative Apportionment Plan," 83 Va. Law Rev. 461, 465-466 (1997).

587.    Act 44 violates the redistricting concept of community of interest regarding the Third Congressional District and the Seventh Congressional District.

588.    There is no rational basis for violating the principle of community of interest for these districts.

**E.    Representative Democracy.**

589.    Redistricting plans should be designed to promote representative democracy. *Prosser*, 793 F. Supp. at 864.

590.    By violating the redistricting principles of retention of core populations, compactness, and communities of interest Act 44 diminishes representative democracy in Congressional Districts Three, Seven, and Eight.

591.    Act 44 is arbitrary and capricious and has no rational basis since it ignores the redistricting principles of core retention, compactness, and communities of interest.

**IV.    GAB DEFENDANTS**

**A.    Count I: "Legislative Boundaries Unconstitutionally Sacrifice Redistricting Principles"**

592.    Population deviation amongst the new Assembly or Senate Districts created by 2011 Wisconsin Act 43 is a close approximation to exactness when considering the need to respect boundaries of local political units.

593.    Plaintiffs did not demonstrate any population deviation capable of reduction amongst the new Congressional Districts created by 2011 Wisconsin Act 44.

**B.**     **Count II: "The Legislation Does Not Recognize Local Government Boundaries"**

594.     The Baldus Plaintiffs' second cause of action, "The Legislation Does Not Recognize Local Government Boundaries" fails to state a cause of action upon which relief might be granted.

**C.**     **Count III: "The Legislative Districts Unnecessarily Disenfranchise 300,000 Wisconsin Citizens"**

595.     Plaintiffs pled this claim solely as a violation of the Wisconsin Constitution.

596.     This Court does not have jurisdiction to compel state agents to comply with the Wisconsin Constitution.

597.     There is no claim under the Wisconsin Constitution for delayed voting consequent to new redistricting legislation.

598.     There is no claim under the United States Constitution for delayed voting consequent to new redistricting legislation.

**D.**     **Count IV: "Congressional Districts Are Not Compact and Fail to Preserve Communities of Interest."**

599.     The Baldus Plaintiffs' fourth cause of action, "Congressional Districts Are Not Compact and Fail to Preserve Communities of Interest" fails to state a cause of action upon which relief might be granted.

**E.**     **Count V: "Congressional and Legislative Districts Constitute Unconstitutional Gerrymandering."**

600.     The Baldus Plaintiffs have failed to articulate a judicially discernible and manageable standard for adjudicating political gerrymandering claims, and so their claim for political gerrymandering is nonjusticiable.

F.    **Count VI: "Legislative Districts Violate the Federal Voting Rights Act."**

601.    Act 43 did not violate section two of the Voting Rights Act because, with respect to Wisconsin's African American community, the Baldus plaintiffs failed to satisfy the threshold requirement described in *Thornburg v. Gingles*.

602.    Act 43 did not violate section two of the Voting Rights Act because, with respect to Wisconsin's Hispanic community, the Baldus plaintiffs failed to satisfy the threshold requirement described in *Thornburg v. Gingles*.

G.    **Count VII: "Legislative Districts Unconstitutionally Use Race as a Predominant Factor."**

603.    Plaintiffs have failed to demonstrate either through circumstantial evidence of any particular districts shape or demographics, or direct evidence of legislative intent, that race was the predominant motivating factor in placing a significant number of voters within or without particular voting districts.

H.    **Count VIII: "New Congressional and Legislative Districts Are Not Justified By Any Legitimate State Interest."**

604.    The Baldus Plaintiffs' eighth cause of action, "Congressional Districts Are Not Compact and Fail to Preserve Communities of Interest" fails to state a cause of action upon which relief might be granted.

I.    **Count IX: "Any Special or Recall Elections Cannot Be Conducted Under Act 43."**

605.    This court does not have subject matter jurisdiction over this claim because, based on defendants' representation that they do not intend to conduct the recall elections within the legislative districts created by Act 43, there is no case or controversy.

606.    This court also does not have jurisdiction over this claim because it seeks injunctive and declaratory relief that consists entirely of requiring state officials to comply with a

provision of the Wisconsin State Constitution. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

## V. INTERVENOR DEFENDANTS

607.     Congressional redistricting plans in Wisconsin and all states must comply with the "one-person, one-vote" principle, which the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution has been interpreted to impose.

608.     The Wisconsin Constitution—the applicability of which to this action the intervenor-defendants deny—places no additional restrictions or requirements on the drawing of congressional districts.

609.     After the 2010 Census, the congressional district boundaries reflected in the existing Wis. Stat. ch. 3 (2009–10) had to be replaced by legislation creating districts based on the new census data.

610.     The constitutional responsibility for adopting new congressional districting lines based on census data rests with the legislative and executive branches of state government. *See Perry v. Perez*, 565 U.S. ___ (2012).

611.     Numerous state interests necessarily inform the drawing of each of the lines that together make up any congressional districting plan, including that adopted as Act 44.

612.     No provision in the U.S. Constitution (or the Wisconsin Constitution) requires that congressional districting lines adopted by the Wisconsin Legislature conform with so-called "principles" of compactness, communities of interest, or core retention.

613.     Neither the intervenor-plaintiffs nor the intervenor-defendants have or could have had any constitutional right to have input into the creation of the map and the congressional district lines that are embodied in Act 44.

614.     The plaintiffs and the intervenor-plaintiffs have failed to state a claim upon which relief can be granted as to Act 44, because they have failed to provide the Court with a workable standard with which to measure any purported burden upon their representational rights under the Equal Protection Clause by any political considerations that may have affected the drawing of congressional districts embodied in Act 44.

615.     The plaintiffs and the intervenor-plaintiffs have failed to show that the provisions of Act 44 could be termed an "excessive political gerrymander" under the U.S. Constitution, even if a workable standard for evaluating such claims were to exist.

616.     Act 44 complies with the Equal Protection Clause and the requirement of "one-person, one-vote" as interpreted by the United States Supreme Court.

617.     Act 44 does not implicate any recognized First Amendment right of the plaintiffs and intervenor-plaintiffs.

618.     The purported "damage to representative democracy" claimed by the intervenor-defendants cannot and does not support any independent claim for relief.

619.     Act 44 is constitutional.

**A.     A Short Summary Of The Facts, Claims, And Defenses.**

620.     *See supra* and the parties' respective trial briefs.

**B.     A Statement Of The Issues.**

621.     *See supra* and the parties' respective trial briefs.

**C.     The Names And Addresses Of All Witnesses Expected To Testify.**

   **1.     Baldus plaintiffs.**

622.     The Baldus plaintiffs expect to call the following witnesses to testify, in addition

to witnesses listed by the Voces plaintiffs and the Intervenor Plaintiffs.

Kevin Kennedy                                  Hon. Peter Barca
Government Accountability Board                Room 201 West, State Capitol
212 East Washington, 3rd Floor                 Madison, WI  53708
Madison, WI  53703

Adam Foltz (by deposition)                     Tad Ottman (by deposition)
Room 211 West, State Capitol                   Room 211 South, State Capitol
Madison, WI  53708                             Madison, WI  53707

Joe Handrick (by deposition)                   Dr. Kenneth Mayer (expert witness)
1000 North Water Street, Suite 1700            7105 Longmeadow
Milwaukee, WI  53202                           Madison, Wisconsin 53717.

Steve Barg
City Administrator
City of Marshfield
7th Floor, 630 S. Central Ave.
Marshfield, WI 54449

   **2.     Voces plaintiffs.**

623.     The Voces plaintiffs expect to call the following witnesses to testify, in addition

to witnesses listed by the Baldus plaintiffs:

JoCasta Zamarippa                          Hon. Pedro Colón
Representative 8th Assembly District        Milwaukee County Circuit Court
1624 South 12th Street                     Judge Branch 18, Children's Division
Milwaukee, Wisconsin                       10201 Watertown Plank Road
                                           Wauwatosa, WI 53226

Christine Neumann Ortiz                    John Bartkowski
Executive Director, Voces de la            Executive Director
Frontera, Inc.                             Sixteenth Community Health Center
 1027 South Fifth Street                   1337 S. Cesar E. Chavez Drive
Milwaukee, WI 53204                        Milwaukee, WI 5320


### 3.    Intervenor plaintiffs.

624.    The Intervenor Plaintiffs expect to call the following witness to testify, in addition

to witnesses listed by the Baldus plaintiffs:

Congressman David Obey
3920 N. 36th Street
Arlington, VA 22207


### 4.    GAB defendants and Intervenor-Defendants

625.    The GAB defendants and Intervenor-Defendants expect to call the following

witnesses to testify:

Dr. Keith Gaddie                           Dr. Bernard Grofman
Professor of Political Science             University of California Irvine
The University of Oklahoma                 2291 Social Sciences  Plaza B
455 West Lindsey Street, Room              Irvine, CA 92697

Mr. Peter Morrison                         Mr. John Diez
3 Eat Fire Springs Rd.                     12491 Plantation Creek Drive
Nantucket, MA 02554                        Geismar, Louisiana 70734

Mr. Tad Ottman                             Mr. Joseph Handrick

Mr. Andrew Speth

**D.      A Statement Of The Background Of All Expert Witnesses Listed.**

626.    **Dr. Kenneth R. Mayer** is an expert witness for the Baldus plaintiffs and the Voces plaintiffs.  He currently is a Professor of Political Science at the University of Wisconsin-Madison, and a faculty affiliate at the Lafollette School of Public Affairs, at the University.  He joined the faculty in 1989.  He teaches courses on American politics, the presidency, Congress, campaign finance, election law, and electoral systems.  He has a Ph.D. in political science from Yale University, where his graduate training included courses in econometrics and statistics.  His undergraduate degree is from the University of California, San Diego, where he majored in political science and minored in applied mathematics.

627.    **Dr. Ronald Keith Gaddie** is an expert witness for defendants.  He is a tenured professor of political science at the University of Oklahoma.  He teaches course on electoral politics, research methods and southern politics at the undergraduate and graduate levels.  He is also the author of numerous books, law review articles and journal articles related to various election issues.  Dr. Gaddie has provided expert testimony related to voting rights, redistricting and other statistical issues in states across the country.  He has appeared as an expert witness before committees of the U.S. House of Representatives, the U.S. Senate and the U.S. Commission on Civil Rights.  He has a Ph.D. and a M.A. in political science from the University of Georgia.  His undergraduate degree is from the Florida State University, where he majored in political science and history.

628.    **Dr. Bernard Grofman** is an expert witness for defendants.  He is the Jack W. Peltason Endowed Chair and Professor of Political Science at the University of California, Irvine and the Director of the UCI Center for the Study of Democracy.  He is an internationally recognized expert in the study of redistricting and voting rights and has provided expert witness testimony or acted as a court appointed consultant in over twenty legal proceedings related to

voting rights and redistricting.  He has acted as a consultant to the Republican Parties of Colorado and Hawaii, the Democratic Party of Rhode Island, the NAACP Legal Defense Fund, the Republican National Committee, the Mexican American Legal Defense Fund and on multiple occasions, the U.S. Department of Justice.  He has served as an expert witness in several landmark voting rights and redistricting cases, including *Thornburg v. Gingles*, *Bandemer v. Davis* and *Garza v. County of Los Angeles Bd. Of Supervisors*.  Dr. Grofman has co-authored four books and over 250 articles and research notes on topics in comparative electoral systems, voting behavior, behavioral social choice, public choice, jury decision making, research methodology, the U.S. Congress and race and politics.  He received his B.S. in mathematics, a M.A. in political science and a Ph.D. in political science, all from the University of Chicago and has received an honorary doctorate from the University of Copenhagen for his lifetime contributions to political science in the area of electoral systems and representation.

629.    **Dr. Peter Morrison** is an expert witness for defendants.  He was the founding director of the RAND Corporation's Population Research Center and for forty years was a Senior Demographer for the RAND Corporation.  The RAND Corporation is a global policy think tank first established to provide research and analysis to the U.S. military.  Dr. Morrison has taught at the RAND Graduate School, has lectured to Congressional, academic and business audiences and has participated on advisory committees and working groups for the U.S. Census Bureau. He has a Ph.D. from Brown University and a B.A. degree from Dartmouth College, both in the field of sociology.

630.    **John Diez** is an expert witness for Defendants.  He is a principal and founder of Magellan Strategies BR, LLC, a firm recently awarded a contract to build the redistricting database used by 18 states.  Magellan specializes in redistricting, polling and voter data and over

the course of his seventeen year career, Mr. Diez has worked extensively with census data, provided redistricting services at the local, state and national levels and after the 2000 census cycle, was the Deputy Director of Redistricting Technology for the Republican National Committee. Mr. Diez holds a bachelor's degree in political science from Nicholls State University and attended graduate studies in political science George Washington University and the University of New Orleans.

631.    **Congressman David R. Obey** was born October 3, 1938 and raised in Marathon, County, Wisconsin. He graduated from Wausau East, High School, and received a Bachelor of Science and a Master of Arts in Political Science from the University of Wisconsin, Madison.

632.    David Obey was elected to the Wisconsin State Assembly in 1962. In 1969 he was elected to Congress from the congressional district in which Wausau is located (now the Seventh Congressional District) and was re-elected every two years until he did not seek re-election in 2010. Congressman Obey was the longest serving congressman in the history of Wisconsin. While in Congress, Congressman Obey served as:

   a.    Chair: House Appropriations Committee;

   b.    Chair: Labor, Health, Educations Appropriations Subcommittee;

   c.    Chair: Foreign Operations Appropriations Subcommittee;

   d.    Chair: Joint Economics Committee;

   e.    Chair: Special Committee to rewrite Congressional Code of Ethics.

633.    Congressman Obey has been involved in redistricting issues since he was elected to the Wisconsin Assembly. He was active in recommending congressional boundaries to the Wisconsin Legislature following the 1970, 1980, 1990, and 2000 decennial censuses.

634.    Congressman Obey is testifying as a fact witness. The preceding is biographical data submitted for the purpose of giving context to Congressman Obey's testimony.

**E.    A List Of Exhibits To Be Offered At Trial.**

635.    *See* **Exhibit F** to the Joint Pretrial Report for a listing of exhibits to be offered at trial by each party.

**F.    A Designation Of All Depositions Or Portions Of Transcripts To Be Read Into The Record Or Played At Trial As Substantive Evidence.**

636.    *See* **Exhibits B, C, D,** and **E** to the Joint Pretrial Report for a listing of all depositions excerpts designated as substantive evidence.  The parties do not intend for depositions or portions of transcripts to be read into the record or played at trial.

**G.    An Estimate Of The Time Needed To Try The Case.**

637.    The Court has allocated four days for the trial of this case.

**H.    Proposed Findings Of Fact And Conclusions Of Law.**

638.    *See supra*.

Dated: February 14, 2012.        GODFREY & KAHN, S.C.

By:     *s/ Douglas M. Poland*
Douglas M. Poland
State Bar No. 1055189
Dustin B. Brown
State Bar No. 1086277
One East Main Street, Suite 500
P.O. Box 2719
Madison, WI 53701-2719
608-257-3911
dpoland@gklaw.com
dbrown@gklaw.com

*Attorneys for Plaintiffs*


Dated: February 14, 2012.        WISCONSIN ATTORNEY GENERAL

By:     *s/ Maria Lazar*
Maria Lazar
Assistant Attorney General
State Bar No. 1017150
Wisconsin Department of Justice
17 West Main Street
P. O. Box 7857
Madison, WI 53707-7857
608-267-3519
lazarms@doj.state.wi.us

*Attorneys for Defendants*


Dated: February 14, 2012.        REINHART BOERNER VAN DEUREN s.c.

By:     *s/ Patrick J. Hodan*
Patrick J. Hodan
Daniel Kelly
State Bar No 1001233
1000 North Water Street, Suite 1700
Milwaukee, WI 53202
414-298-100
phodan@reinhartlaw.com

*Attorneys for Defendants*

Dated: February 14, 2012.            LAWTON & CATES, S.C.

                          By:      s/ P. Scott Hassett
                                 P. Scott Hassett
                                 State Bar No. 1013921
                                 10 E. Doty Street, Suite 400
                                 P.O. Box 2965
                                 Madison, WI 53701-2965
                                 608-282-6200
                                 shassett@lawtoncates.com

                                 *Attorneys for Intervenor-Plaintiffs*


Dated: February 14, 2012.            FOLEY & LARDNER LLP

                          By:      s/ Thomas L. Shriner, Jr.
                                 Thomas L. Shriner, Jr.
                                 State Bar No. 1015208
                                 Kellen C. Kasper
                                 State Bar No. 1081365
                                 777 East Wisconsin Avenue
                                 Milwaukee, WI 53202-5306
                                 414-297-5601
                                 tshriner@foley.com

                                 *Attorneys for Intervenor-Defendants*


Dated: February 14, 2012.            LAW OFFICE OF PETER EARLE LLC

                          By:      s/ Peter G. Earle
                                 Peter G. Earle
                                 State Bar No. 1012176
                                 Jackie Boynton
                                 State Bar No. 1014570
                                 839 North Jefferson Street, Suite 300
                                 Milwaukee, WI 53202
                                 414-276-1076
                                 peter@earle-law.com

                                 *Attorneys for Consolidated Plaintiffs*

7397745_10