# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**ALVIN BALDUS, CARLENE BECHEN, ELVIRA BUMPUS, RONALD BIENDSEIL, LESLIE W. DAVIS, III, BRETT ECKSTEIN, GLORIA ROGERS, RICHARD KRESBACH, ROCHELLE MOORE, AMY RISSEEUW, JUDY ROBSON, JEANNE SANCHEZ-BELL, CECELIA SCHLIEPP, TRAVIS THYSSEN, CINDY BARBERA, RON BOONE, VERA BOONE, EVANJELINA CLEERMAN, SHEILA COCHRAN, MAXINE HOUGH, CLARENCE JOHNSON, RICHARD LANGE, and GLADYS MANZANET,**
　　　　　**Plaintiffs,**　　　**Case No. 11-CV-562**
**TAMMY BALDWIN, GWENDOLYNNE MOORE and RONALD KIND,**
　　　　　**Intervenor-Plaintiffs,**
**v.**
**Members of the Wisconsin Government Accountability Board, each only in his official capacity; MICHAEL BRENNAN, DAVID DEININGER, GERALD NICHOL, THOMAS CANE, THOMAS BARLAND, and TIMOTHY VOCKE,**

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

**(caption continued on next page)**
### VIDEO DEPOSTION OF
### JAMES R. TROUPIS
### Milwaukee, Wisconsin
### February 22, 2012

### Michelle Hagen
### Registered Professional Reporter

Page 2

and KEVIN KENNEDY, Director and General
Counsel for the Wisconsin Government
Accountability Board,
    Defendants.
F. JAMES SENSENBRENNER, JR., THOMAS E.
PETRI, PAUL D. RYAN, JR., REID J.
RIBBLE, and SEAN P. DUFFY,
    Intervenor-Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
VOCES DE LA FRONTERA, INC., RAMIRO
VARA, OLGA VARA, JOSE PEREZ, and
ERICA RAMIREZ,
    Plaintiffs,
                              Case No. 11-CV-1011
v.

Members of the Wisconsin Government
Accountability Board, each only in his
official capacity; MICHAEL BRENNAN,
DAVID DEININGER, GERALD NICHOL, THOMAS
CANE, THOMAS BARLAND, and TIMOTHY VOCKE,
and KEVIN KENNEDY, Director and General
Counsel for the Wisconsin Government
Accountability Board,

    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

        VIDEO DEPOSITION of JAMES R. TROUPIS,
taken at the instance of the Plaintiffs, under and
pursuant to the provisions of the Federal Rules of Civil
Procedure and the acts amended, before me, MICHELLE
HAGEN, Registered Professional Reporter and Notary Public
in and for the State of Wisconsin, at Godfrey & Kahn,
S.C., 780 North Water Street, Milwaukee, Wisconsin, on

Page 3

1   the 22nd day of February, 2012, commencing at 3:34
2   o'clock in the afternoon.
3            A P P E A R A N C E S
4        GODFEY & KAHN, S.C., 780 North Water
5   Street, Milwaukee, Wisconsin 53202, by MR. DOUGLAS M.
6   POLAND, appeared on behalf of the Baldus Plaintiffs.
7        LAW OFFICES OF PETER EARLE, 839 North
8   Jefferson Street, Suite 300, Milwaukee, Wisconsin 53202,
9   by MR. PETER G. EARLE, appeared on behalf of the Voces de
10  la Frontera Plaintiffs.
11       REINHART, BOERNER, VAN DEUREN, S.C.,
12  1000 North Water Street, Suite 2100, Milwaukee, Wisconsin
13  53202, by MR. PATRICK J. HODAN and MS. COLLEEN E.
14  FIELKOW, appeared on behalf of the Defendants.
15       WISCONSIN DEPARTMENT OF JUSTICE,
16  OFFICE OF THE ATTORNEY GENERAL, 17 West Main Street, P.O.
17  Box 7857, Madison, Wisconsin 53707-7857, by MS. MARIA S.
18  LAZAR, appeared on behalf of the Defendants.
19       WHYTE HIRSCHBOECK DUDEK S.C., 555 East
20  Wells Street, Suite 1900, Milwaukee, Wisconsin 53202, by
21  MR. DONALD A. DAUGHERTY, JR., appeared on behalf of the
22  Deponent.
23       TROUPIS LAW OFFICE LLC, 7609 Elmwood
24  Avenue, Suite 102, Middleton, Wisconsin 53562, by MR.
25  BRANDON LEWIS, appeared on behalf of the Deponent.

Page 4

1              I N D E X
2   WITNESS     EXAMINATION          PAGE
3   JAMES R. TROUPIS     By Mr. Earle          7
4           By Mr. Poland          158
5           By Mr. Hodan          212
6           By Mr. Poland          264
7           By Mr. Earle          269
8            E X H I B I T S
9   EXHIBIT NO.:               MARKED   ID'D
10  219  Letter, Troupis to McLeod ..............14     14
11  220  Engagement letter ......................38     38
12  221  E-mail ..................................     77
13  222  E-mail, 7/12/11 ......................81     81
14  223  E-mail chain .........................83     83
15  224  E-mail, 7/13/11 ......................85     85
16  225  12/14/10 document ....................158    158
17  226  E-mail chain .........................170    170
18  227  E-mail chain .........................175    175
19  228  E-mail chain .........................178    179
20  229  E-mail ...............................184    184
21  230  E-mail ...............................187    188
22  231  E-mail ...............................193    193
23  232  E-mail chain .........................205    205
24  233  Sealed exhibit .......................264    265
25  234  E-mail chain .........................273    274

Page 5

1   (The original exhibits were attached to the original
2   transcript.)
3   (The original transcript was sent to Mr. Earle.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 to 5)

**Halma-Jilek Reporting, Inc.**     **Experience Quality Service!**     **(414) 271-4466**
Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 2 of 107   Document 188

Page 6

1       P R O C E E D I N G S
2       THE VIDEOGRAPHER:  My name is Steve
3  Peters, CLVS associated with Halma-Jilek Reporting
4  Incorporated, Milwaukee, Wisconsin.  This is the
5  beginning of the video deposition of James R.
6  Troupis on February 22, 2012.  The time, 3:34 p.m.
7       This is the case concerning Alvin
8  Baldus, et al., Plaintiffs, versus Members of the
9  Wisconsin Government Accountability Board, et al.
10  Defendants, case number 11-CV-562, pending in the
11  United States District Court for the Eastern
12  District of Wisconsin; also the case of Voces de
13  la Frontera, Incorporated, et al., Plaintiffs,
14  versus Members of the Wisconsin Government
15  Accountability Board, et al. Defendants, case
16  number 11-CV-1011, pending in the United States
17  District Court for the Eastern District of
18  Wisconsin.
19       Will counsel now please state their
20  appearances.  For the Plaintiffs.
21       MR. EARLE:  On behalf of the Voces de
22  la Frontera Plaintiffs, Attorney Peter Earle.
23       MR. POLAND:  On behalf of the Baldus
24  Plaintiffs, Doug Poland.
25       MR. HODAN:  On behalf of the GAB

Page 7

1  Defendants, Attorney Patrick Hodan and Attorney
2  Colleen Fielkow from the Reinhart Boerner law
3  firm.
4       MR. DAUGHTERY:  On behalf of the
5  witness, Don Daughtery of Whyte Hirschboeck Dudek
6       MR. LEWIS:  On behalf of the witness,
7  Brandon Lewis of Troupis Law Office.
8       THE VIDEOGRAPHER:  The court reporter
9  will now swear in the witness.
10       JAMES R. TROUPIS, called as a witness
11  herein by the Plaintiffs, after having been first
12  duly sworn, was examined and testified as follows:
13       EXAMINATION
14  BY MR. EARLE:
15  Q   Welcome to this deposition, Mr. Troupis.
16  A   **Good afternoon.**
17  Q   Am I -- is it correct to say that you are an
18  experienced election law lawyer?
19  A   **Reasonable, I suppose.**
20  Q   Okay.  You've been involved in a number of
21  redistricting efforts; correct?
22  A   **Yes, I have.  Yes, I have.**
23  Q   So it's also accurate to say that you are an
24  experienced redistricting lawyer?
25  A   **To the extent you can be.  It's sort of a ten-year**

Page 8

1  **cycle.  You only be experienced each ten years, so**
2  **that's true.**
3  Q   So you're familiar with the law that governs
4  redistricting?
5  A   **Reasonably, yes, yes.**
6  Q   Did you ever discuss with any of the legislative
7  aides or the legislators or the other attorneys
8  involved in representing them --
9  A   **A lot of people.**
10  Q   -- the subject of the citizen voting age
11  population of the Latino community in Milwaukee?
12       MR. DAUGHTERY:  Just for
13  clarification, at what point in time are you
14  talking about here?  At any time in history or --
15       MR. EARLE:  At any time during the
16  redistricting process related to Act 43.
17       THE WITNESS:  Yes.
18  BY MR. EARLE:
19  Q   And when did you have those discussions?
20  A   **I think you said citizen.  You mean -- the**
21  **question of citizenship and its relationship to**
22  **the voting age population, that's your question.**
23  **Okay.  The first time I actually remember**
24  **discussing it at any length was after the process,**
25  **after the hearings in which I believe you raised**

Page 9

1  **it, Peter, you know, at the hearings.  It**
2  **certainly had been certainly talked about before,**
3  **but it wouldn't have been talked in any**
4  **significant way until -- until -- until the**
5  **hearing.**
6  Q   Okay, and so I just wanted to be clear about that.
7  Prior to the hearing on July 13, 2011, no one on
8  the legal team advising the legislature discussed
9  the question of Latino citizen voting age
10  population percentages as they pertain to Assembly
11  Districts 8 or 9; correct?
12       MR. DAUGHTERY:  Object to form.  Go
13  ahead and answer.
14       THE WITNESS:  I will need to say --
15       MR. EARLE:  What's wrong with the
16  form?
17       MR. DAUGHTERY:  I think it's compound.
18       MR. EARLE:  Well, let's break it down.
19       THE WITNESS:  Sure.  I was a little
20  concerned but there's -- certainly I'm aware of
21  the issue.
22       MR. EARLE:  And this may be a trial, a
23  deposition that's used at trial.
24       THE WITNESS:  That's fine, and I
25  appreciate whatever you need to do.

3 (Pages 6 to 9)

Page 10

1  BY MR. EARLE:
2  Q    So we don't want to have lingering form questions
3       that are not resolved as we go. All right. So
4       I'm going to ask you a question about Assembly
5       Districts 8 and 9 and the work you did as part of
6       the redistricting team related to Assembly
7       Districts 8 and 9.
8  A    Sure.
9  Q    And the question is --
10 A    And those are the new districts, the districts as
11      designated in the present Act 43.
12 Q    That's correct.
13 A    Okay.
14 Q    And so the question is whether you discussed the
15      citizen voting age population of the Latino
16      community in the vicinity of those districts with
17      any member of the redistricting team prior to the
18      passage of Act 43.
19 A    I don't recall any specific discussion. I just
20      simply don't recall it.
21 Q    Same question with regards to whether the Latino
22      community constituted an effective voting majority
23      in the vicinity of those districts?
24 A    Well, we certainly discussed that.
25 Q    And when did you discuss the question of an

Page 11

1       effective voting majority in Assembly
2       Districts 8 and 9?
3  A    Throughout the progress. There wouldn't be any
4       specific date that I'd remember because it was
5       always a question that we would have been
6       concerned with or asked about in terms of those
7       districts and the Latino population.
8  Q    Did you generate any writings related to whether
9       there was an effective voting majority in the
10      Latino districts?
11 A    There's a lot of -- I think there's a lot of
12      e-mails and like that -- that discuss those sorts
13      of issues but I don't recall offhand.
14 Q    Now, you brought with you some documents today;
15      correct?
16 A    Oh, yeah. The only thing I brought with me were
17      the documents that we submitted last night to the
18      Court, so that's whatever.
19            MR. DAUGHTERY: JRT, Bate stamped JRT
20      1 through 127.
21 BY MR. EARLE:
22 Q    And they represent all the documents that are
23      related to you that are part of this discovery
24      process?
25 A    I don't have a clue, because there's apparently

Page 12

1       been a lot of discovery going on. These are the
2       only ones that I've looked at.
3  Q    But they're all the e-mails you generated;
4       correct?
5            MR. DAUGHTERY: Generated --
6            THE WITNESS: I don't know. I don't
7       think so. I mean, I assume there are other
8       e-mails and the like that have been produced
9       during discovery. This related to the
10      attorney-client privilege issues that had been
11      raised and that's -- that's the only ones I've
12      reviewed.
13 BY MR. EARLE:
14 Q    Okay. Well, we'll come back to this, okay, in
15      more detail. I'm going to ask you some questions
16      about your recordkeeping.
17 A    Certainly.
18 Q    During the time that you participated in this
19      redistricting process, what e-mail accounts did
20      you use for work related to the redistricting
21      process?
22 A    I would -- I would probably only have used my
23      office accounts as far as I know.
24 Q    What e-mail address is that?
25 A    Jrtroupis@troupislawoffice.com.

Page 13

1  Q    And did you -- did anybody at any point in time
2       ask you to assemble all communications related to
3       the redistricting process?
4  A    No.
5  Q    Okay. Did you receive a letter from Attorney
6       McLeod asking you to assemble documents?
7  A    No.
8  Q    Did you ever provide Attorney McLeod with
9       documents?
10 A    Yes.
11 Q    How did you decide what documents to provide
12      Attorney McLeod with?
13 A    On, about January the 8th while I was preparing
14      for another major trial, I received a phone call
15      from Mr. McLeod. I believe it was Mr. McLeod. It
16      could have been is Ray Taffora, but in any event,
17      you know, I -- it was ultimately from Eric and
18      informing --
19 Q    Keep going. I'm sorry.
20 A    He simply -- he had described to me that an order
21      had been entered and he asked me to gather
22      communications related to third parties that I had
23      discussions with.
24 Q    So did he ask -- and that was not -- so you
25      received nothing in writing?

4 (Pages 10 to 13)

Page 14

1  A   I received nothing.  Well, I mean --
2  Q   It's my understanding that you received something
3      in writing and I was informed by --
4  A   No.
5          MR. DAUGHERTY:  No, no.  There's a
6      letter that you wrote back.
7          THE WITNESS:  I wrote a letter back.
8      I apologize.  I did write a letter in response to
9      the -- that oral request and discussion that had
10     been -- that memorializes those discussions and
11     what I was providing to Mr. McLeod, who at that --
12     so that's -- I did do that.
13         MR. EARLE:  May I see a copy of the
14     letter please?
15         THE WITNESS:  Certainly.
16         MR. EARLE:  Can we mark it?  Do you
17     have another copy?
18         MR. DAUGHERTY:  We've got several
19     copies here.
20         (Exhibit No. 219 was marked for
21     identification.)
22  BY MR. EARLE:
23  Q   Showing you what's been marked as Exhibit 219, can
24     you identify it, please?
25  A   Yeah.  This is the letter that I wrote that we've

Page 15

1      just been discussing that I wrote back to
2      Mr. McLeod on January the 9th, but he had --
3      that -- pursuant to the discussions that we had on
4      January the 8th.
5  Q   I notice at the bottom of the first page you
6      indicate that -- that you -- did you withhold any
7      documents on the basis of privilege when you
8      produced these documents?
9  A   No, I did not.
10  Q  Did you withhold any documents on the basis of
11     attorney work product potentially?
12  A   No, I did not.
13  Q   So it's your testimony here today and you would be
14     confident certifying to the United States District
15     Court in this case that you have produced every
16     single document in your possession that is
17     responsive to the request you received from
18     Mr. McLeod?
19  A   The requests that he made, it was responsive to
20     the requests he made, yes.
21  Q   And would you define as precisely as possible the
22     request that was made?
23  A   Well, the letter tries to -- and if it doesn't, I
24     apologize.  I had been requested to gather
25     documents that related to my contacts with the

Page 16

1      people that are listed here.  That's what I did.
2  Q   So did you produce documents relative to your
3      contacts with Eric McLeod?
4  A   No.  That was not what I was requested to do.
5  Q   Do you have documents in your possession
6      related -- that -- relative -- where you're
7      communicating with Eric McLeod about the
8      redistricting process?
9  A   Certainly.  Certainly.
10  Q  And it's your testimony here today that you did
11     not produce those documents?
12  A   I didn't because he would presumably have had
13     them, but I wasn't requested to, so I didn't.
14  Q  And those documents included documents that
15     contain political and/or strategic advice about
16     the redistricting process; correct?
17  A   I wouldn't think so, but, you know, I don't know.
18     I don't know because I didn't gather them.
19  Q   Did you gather documents that you sent to
20     Scott Fitzgerald about the redistricting process?
21  A   I candidly don't know that I ever sent anything
22     directly to Scott Fitzgerald about the
23     redistricting process other than a letter, the
24     letter of retention, but no, I wasn't requested to
25     do that.

Page 17

1  Q   I notice that Scott Fitzgerald's name is not on
2      this list of individuals with whom you
3      corresponded and for whom you produced documents.
4  A   This is an inclusive list as opposed to an
5      exclusive list; that is, everyone included here I
6      did the search that's noted on the letter.  You
7      may assume I did not look for people who are not
8      on the list.
9  Q   So you are not prepared to certify to the Court
10     that you have provided all documents relative to
11     communications between you and Scott Fitzgerald
12     about the redistricting process; is that correct?
13  A   Presumably, presumably.  Anything -- any contacts
14     I had with any of the parties here would have
15     included -- would have been produced if they were
16     to be produced.  I haven't had any independent --
17     I have no knowledge of an independent contact with
18     Scott Fitzgerald or Tad Ottman or Joe Handrick or
19     any of the various people that was not sent to
20     them or -- and/or copied to Mr. McLeod or
21     Mr. Taffora.  So presumably they had all of that
22     and have produced it.  I have no knowledge what
23     they did or didn't produce, but I know of no --
24     I know of nothing other than to those people
25     that -- that wouldn't have been a subject of this.

5 (Pages 14 to 17)

Page 18

1     So I've never been asked.
2  Q    You've never been asked.  Okay.  Now, Mr. Troupis,
3     in this case discovery has dribbled out and --
4  A    I don't know that, but however you characterize
5     it, Peter, is fine.
6  Q    And you and I are both experienced lawyers and you
7     are a collegial guy and as a result we tend to
8     fall into a conversational mode where we talk over
9     each other, which is normal --
10 A    I apologize if I'm too formal -- if I'm not formal
11    enough.
12 Q    And poor Michelle sitting here has to take down
13    what we're saying.  So we should try and constrain
14    ourselves.  You know, as practitioners I know it's
15    hard for us to do when we ourselves are in the
16    chair, but maybe if you could try and do that,
17    that would be great.  Okay, number one.
18        And number two, discovery has been
19    very frustrating in this case, I'll represent that
20    to you, because it's been very difficult to obtain
21    documents.  The legislature, as characterized by
22    the court, has been less than cooperative and less
23    than forthright in producing the documents that
24    have been sought.
25        MR. HODAN:  Is there a question?

Page 19

1         MR. EARLE:  Wait.  I'm finishing.
2  BY MR. EARLE:
3  Q    And so I'm putting that down as a context.  I'm
4     simply trying to determine how close we are to the
5     point that we can have a certification that
6     discovery is complete.  So I'm going to ask you a
7     series of questions.
8  A    Sure --
9  Q    -- very pointed questions about individuals and
10    whether or not documents relative to those
11    individuals in the discovery process have been
12    produced or not.  Okay?  So if you can constrain
13    your answer, if you can constrain your answer to
14    that question, the questions as I phrase them
15    narrowly.  Okay?
16        MR. DAUGHERTY:  And just to clarify,
17    when you say have been produced in litigation,
18    have been produced by Mr. Troupis you're talking
19    about; right?
20        MR. EARLE:  Absolutely.
21        THE WITNESS:  I don't have any
22    knowledge about that.
23 BY MR. EARLE:
24 Q    So, you know, and since we don't have precision
25    about how -- the way Eric McLeod characterized his

Page 20

1     request to you, all we have is your reflection
2     upon it in Exhibit 219, you know, so we're going
3     to rely on your memory here.  Okay?  So did you
4     search for communications between you and
5     Scott Fitzgerald about the redistricting process?
6     That's the question.  Would you like some water?
7  A    No, I'm fine.  I was just waiting for you to come
8     back.
9  Q    Continue.  I can hear.
10 A    As I think the record reflects, we searched all of
11    our files for the individuals noted in this
12    exhibit.  I can, however, also say that in that
13    process I did search my files for anything related
14    to Scott or any other leaders simply because I was
15    looking for anything.  It wasn't because
16    Mr. McLeod had or hadn't requested it.  So I did
17    review all of our paper files.  I also reviewed
18    all of our Word document, all our PDF documents,
19    anything else contained on our servers that I
20    thought related to it at that -- at that time.
21        So with regard to the majority leader,
22    I certainly did look and that's why I answered
23    earlier that I didn't recall that there was any
24    direct communications at all between me and
25    Mr. Fitzgerald.  There may have been.  I just

Page 21

1     don't remember any.  Senator Fitzgerald.
2  Q    When you performed this search, you did so by way
3     of word query?
4  A    Yes.  We aren't that big an office, so it's fairly
5     simple.  All of the -- all of these matters would
6     have subfiles easily, so that's what we did.  We
7     actually searched all the files I had.
8  Q    And is one of the means the use of a word query?
9  A    Right, yes.
10 Q    Did you use the word query Scott Fitzgerald?
11 A    I don't recall.
12 Q    As I understand Exhibit 219, you used word queries
13    related to the individuals listed on Exhibit 219;
14    correct?
15 A    Yes, I did.
16 Q    And is it your testimony here today --
17 A    I may have used -- I want to be careful because I
18    may have used others in addition but I used these
19    at a minimum, yes.
20 Q    Okay.  Are you prepared to certify here under oath
21    today to the United States Circuit Court, District
22    Court for the Eastern District of Wisconsin that
23    you have produced every document related to
24    communications between you and Scott Fitzgerald in
25    the context of this redistricting process?

6 (Pages 18 to 21)

Page 22

1  A    I'm aware I'm under oath so you don't need to
2       remind me of that.  My testimony is what it is.
3       I searched accordingly and I've described exactly
4       as I have searched.  I haven't a clue what you
5       mean by certified, but I did search the files as
6       I've explained and did not find anything related
7       to the majority leader other than, you know, what
8       I've produced here.
9  Q    Have you produced every document related to
10      communications between you and Robin Vos with
11      regards to the redistricting process?
12 A    Peter, I don't mean to belabor this.  I haven't
13      produced anything in this case.  I haven't been
14      involved in this case.  Mr. McLeod requested that
15      I provide certain things to him.  I provided them
16      to him.  So I haven't had any responsibility.
17      I have never seen a document request to my
18      knowledge or otherwise in this case.  What you
19      have in front of you is what is the summary of
20      what I produced.
21 Q    Do you have in your possession any documents
22      reflecting communications between you and
23      Robin Vos about the redistricting process?
24 A    I can say that I did look at, again, as I was
25      looking at the majority leader, as I told you, no,

Page 23

1       it was not requested, and I do not recall any
2       direct communications of any sort with Robin Vos.
3  Q    How about with Senator Zipperer?
4  A    Senator Zipperer may have been copied on certain
5       communications.  My recollection is that he may
6       have been, maybe even some of the ones here.
7       Other than that I didn't make any inquiry into
8       Senator Zipperer, so I don't know.
9  Q    During the redistricting process, did you
10      communicate with Senator Zipperer?
11 A    We spoke regularly.
12 Q    Did you correspond electronically with him?
13 A    I don't recall that I did.  That's why I said that
14      a minute ago.  I just don't -- don't recall that I
15      had, but I may have.  That's what I'm saying.
16      I just don't recall.
17 Q    What about representative Jeff Fitzgerald?
18 A    The speaker would fall in the same category as the
19      majority leader.  It would have been rare and I do
20      not recall any direct communication with him other
21      than the letter of retention, by e-mail or
22      otherwise.
23 Q    So I guess I'm going to ask you the same question
24      as I have about prior individuals.  Are you
25      prepared to certify to the Court that all

Page 24

1       documents in your possession regarding
2       communications with those individuals have been
3       provided to Eric McLeod for production in this
4       case?
5  A    I'd answer the same way as before.  I mean, I
6       can't.  First of all, I don't know what you mean
7       by certified, but I do know that what I provided
8       to him and it's listed here.  So I didn't provide
9       him anything with regard to those other
10      individuals, whether I had it or not.
11 Q    Okay.  So the answer to the question about these
12      individuals, Scott Fitzgerald, Jeff Fitzgerald,
13      Senator Zipperer and Robin Vos, is that you don't
14      know whether all the documents in your possession
15      regarding communications about the redistricting
16      process have been produced to Eric McLeod for
17      disclosure to the Court in this case?
18 A    Because I -- well, that's not what I said.  I said
19      as to some of them that I believed I had, that
20      there were none, and as to the others that
21      Mr. McLeod presumably would have them because any
22      communication I had he was copied on, so he would
23      have it.
24          But in the course of this inquiry, the
25      one you're asking about now on January the 8th and

Page 25

1       January the 9th, I did not provide him any
2       additional documents, other than -- other than the
3       ones I'm referring to.
4  Q    Did Eric McLeod ever come back to you after
5       January 9th and ask you to search for further
6       documents?
7  A    No.
8  Q    Did Eric McLeod ever come back to you after
9       January 9 and ask you whether you were sure you
10      had produced all responsive documents to his
11      earlier request?
12 A    No.
13 Q    Did you discuss the redistricting process with
14      Scott Walker?
15 A    Scott Walker, in this redistricting process,
16      because he was supposed to be the primary witness
17      in 2002 in that redistricting process and then he
18      ran for county executive and I lost him as a
19      witness right before the trial.  So I am sure over
20      time I have had discussions with the governor but
21      not since he's been governor.
22 Q    Okay.  Well, that's actually -- I thank you for
23      that because I was -- I intended to ask you only
24      about this redistricting process.
25 A    That's why I did that for you, Peter.

7 (Pages 22 to 25)

Halma-Jilek Reporting, Inc.          Experience Quality Service!          (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 7 of 107   Document 188

Page 26

1  Q   I appreciate that.
2  A   No, I have not spoken to the governor since he has
3      been elected governor in any respect with regard
4      to redistricting.
5  Q   Okay. Could you identify everybody that you spoke
6      to who's an elected official in the legislature
7      with whom you spoke, with whom you discussed this
8      redistricting process?
9  A   I don't think I could. I don't think I could
10     accurately. You know, I had -- I've had no
11     direct -- well, I don't know. I mean, because --
12     because, for example, I've appeared at the
13     caucuses, and so, you know, various of the hundred
14     plus members would have asked questions or not,
15     and I mean, I -- I wouldn't -- I couldn't
16     accurately tell you that. I don't know.
17 Q   When you say you appeared at the caucuses, what do
18     you mean by that?
19 A   Well, there's some e-mails here that indicate that
20     there were caucus meetings where I would appear
21     and answer questions or queries that the caucus
22     members might have had.
23 Q   And these were meetings of the Republican caucus
24     you're addressing, you're referring to?
25 A   Yes, yes.

Page 27

1  Q   And who called those meetings?
2  A   I don't know. I assume the majority leader or the
3      speaker.
4  Q   And where were those meetings held?
5  A   In the caucus chambers for the assembly and
6      senate.
7  Q   Did you also meet with legislators separate and
8      apart from those meetings over at the law offices
9      of Michael Best?
10 A   No. Other than -- other than there were two
11     meetings in June, early in June and late in June
12     with what I would call the leaders, either the
13     speaker, the majority leader, Vos. I don't know
14     what his official title is. Senator Zipperer.
15     There might have been -- Assemblyman Suder might
16     have been involved. Those are all the leaders of
17     the two -- the two chambers.
18         So those meetings, which are reflected
19     in some of these e-mails, did occur over at
20     Michael Best's offices. Other than that, I
21     honestly don't recall other meetings, although
22     maybe there's an e-mail or something that would
23     remind me.
24 Q   I want to get an understanding about how it was
25     that the team worked, the legal team worked here.

Page 28

1      As I understand it, Michael Best was retained by
2      the leaders, the respective leaders of the
3      assembly and the senate; correct?
4  A   Yes, they were.
5  Q   And there was a retainer agreement between
6      Michael Best and the majority leader on behalf of
7      the legislature; correct?
8  A   I believe so, yes.
9  Q   And on behalf of the speaker and that respective
10     chamber.
11 A   I would assume so, yes.
12 Q   And showing you what's been marked as Exhibit 198.
13         MR. DAUGHERTY: Do you have a copy
14     I can use? Great, thank you.
15 BY MR. EARLE:
16 Q   This is an exhibit that's been in this case.
17 A   Okay.
18 Q   Have you ever seen this before?
19 A   Don't recall seeing this before. I must have
20     because I see that -- I see that under separate
21     counsel I'm -- we're listed, Troupis Law Office.
22     I just -- I don't remember the letter, that's what
23     I'm saying.
24 Q   So what is your testimony then? You don't
25     remember the letter, you may have seen it?

Page 29

1  A   That's pretty close to what my testimony is.
2      I just -- I mean, I would be surprised as I look
3      at it that I hadn't seen it, but honestly, I don't
4      remember. I don't remember seeing this. So if
5      I did, I did.
6  Q   Did you sign a separate retainer agreement with
7      Michael Best?
8  A   Yes.
9  Q   Do you have a copy of that with you?
10 A   No, I don't.
11 Q   When did you enter into that separate retainer
12     agreement with Michael Best?
13 A   I recall it was about this same time. Now, wait a
14     minute, wait a minute, wait a minute. Is there a
15     letter -- did we have a retention agreement
16     directly -- again, I haven't looked at this in a
17     very long time. We may have had a direct letter
18     because of the privilege issues with senator --
19     the senator and the speaker that reflected how --
20     how that relationship was. You would know better
21     than I. If you've got it, you've got it. I just
22     don't remember. I don't remember the nature of
23     the way the retention went forward. I just was
24     surprised because I looked at this and I saw that
25     I hadn't signed this, and so I thought, well --

Page 30

1  Q   So I -- Mr. Troupis, I don't understand what you
2      just testified to.
3  A   Well, what I'm saying is I don't remember the
4      sequence of events.  I do remember around this
5      time period in January or February that we
6      entered -- we would -- presumably we would have
7      had a letter of retention entered into at about
8      the same time and that we were to be paid out of a
9      trust.  That's why you're hearing all this
10     hesitation on my part, is that Michael Best pays
11     us.  I don't get paid by the speaker, majority
12     leader or the state.  I'm paid by Michael Best.
13     So without those letters in front of me, I don't
14     remember how that retention occurred.
15 Q   What was the mechanism by which you were paid by
16     Michael Best?
17 A   We would submit regular invoices to Michael Best
18     and then they would approve them and seek the --
19     they would review them presumably and then approve
20     them and then the -- they had some arrangement
21     with the speaker and the majority leader where
22     they would approve them or if they didn't approve
23     them we -- presumably we were automatically paid.
24     So we would be paid during the month following our
25     billing based on that process out of the trust

Page 31

1      account of Michael Best & Friedrich.
2  Q   So you were paid on the basis of a written
3      invoice?
4  A   Yes.
5  Q   And what was the format of this written invoice?
6  A   It was very simple.  It simply reflected the
7      amount of the hours, the dates on which services
8      were provided, and the total.
9  Q   Did it include -- did it include any descriptors
10     of the services that were provided?
11 A   Not that I recall.
12 Q   Was that -- was there an agreement by which you
13     could omit a descriptor, what it was you were
14     doing?
15 A   Well, no one ever asked for it, so I suppose
16     that's an agreement.
17 Q   So it would simply list the number of hours for
18     the month or on a daily basis?
19 A   For the month.  It just indicates the days on
20     which services are provided and the total hours
21     and the total amount due.
22 Q   Okay.  And --
23 A   It may also have costs.  If there were some costs
24     incurred, that may be there also.
25 Q   And at what rate were you compensated?

Page 32

1  A   $375 an hour.
2  Q   And how much have you been paid as a result of
3      this redistricting process?
4  A   I checked that before I came over here just to
5      see.  Somewhere between 40 and $50,000.
6  Q   Okay.  That's your total billing for the
7      redistricting?
8  A   Yes.
9  Q   And when was the last billing?
10 A   I believe it was August the 6th was the last time
11     we have had any involvement at all.  It was right
12     after the -- just about the time that the
13     governor signed the bill.  My -- my involvement
14     ended with the completion of the legislative
15     process.
16 Q   Did you provide any advice with regards to how
17     Joe Handrick's time should be billed?
18 A   I helped negotiate the arrangement with Joe.  We
19     go back a long way.  He'd been involved in the
20     1990's and again in 2000 and we've stayed I will
21     say close friends.  So -- so when Joe went to the
22     Reinhart law firm, you know, it was really
23     important, I thought, given his lengthy experience
24     that he participate.
25         So there's -- so that I just say that

Page 33

1      just to let you know that yes, I was involved with
2      Joe in terms of negotiating whatever and there was
3      a number of proposals going back and forth and
4      eventually the majority leader and speaker chose
5      an arrangement where he was paid on a monthly
6      basis a single amount as a retainer or a payment
7      as I recall.
8  Q   Were you involved in any decision to -- that -- to
9      the effect that Joe Handrick's billings, invoices
10     should not reflect the substance of what he was
11     doing on a -- as he was working?
12 A   You know, fairly interpreting your question,
13     I think that's right.  I mean, I think that, yeah,
14     yes.
15 Q   And you did that because you didn't want it to be
16     known -- you didn't want a paper trail, if you
17     will, as to what it was that Joe Handrick was
18     doing in the redistricting process; isn't that
19     correct, sir?
20 A   No, despite your conspiracy theories.  The reason
21     for it was -- and again, there may be e-mails to
22     this effect with the majority leader and speaker.
23     Again, I don't remember how it all transpired, but
24     if Joe had to write everything down and all the
25     stuff he was doing and he had to bill it,

9 (Pages 30 to 33)

Halma-Jilek Reporting, Inc.        Experience Quality Service!        (414) 271-4466
Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 9 of 107   Document 188

Page 34

1  I believe that the majority leader and speaker
2  believed it would be a lot bigger bill.
3          And so they believed, given Joe's
4  candid knowledge and honesty and desire to be
5  involved in the process, that they were better off
6  having essentially an unlimited engagement for
7  Mr. Handrick, and I did not disagree with that,
8  that his -- that candidly the amount of hours and
9  the effort that he would put in would far exceed
10  the amount of his monthly retainer and that it was
11  better to do it that way. So I went along with it
12  but it was mostly because I knew that it would be
13  much more expensive if he had gone the other way.
14  Q   But it was your suggestion that his -- his time
15      reports not include --
16  A   No.
17  Q   -- a descriptor of his work; isn't that true?
18  A   I don't recall ever making that recommendation on
19      the -- I don't recall that at all. I recall
20      simply that I agreed with the decision of the
21      speaker and the majority leader that that was a
22      wise use of their funds. I didn't -- I don't know
23      that I ever made a recommendation one way or the
24      other than what I've just testified to.
25  Q   Did you negotiate the agreement with the Reinhart

Page 35

1      law firm for Joe's services?
2  A   I wouldn't say I negotiated it but I was involved.
3      Don Millis represented the law firm in that,
4      Reinhart, and there were a number of
5      communications back and forth about what would
6      work and what wouldn't work and what was advisable
7      and what wasn't, but I -- so that's as much as
8      I remember. And again, you may have documents
9      about this. I just don't remember it other than
10      as I've described.
11  Q   But the contract was with the Reinhart law firm;
12      correct?
13  A   I believe so.
14  Q   Did you review the contract with the Reinhart law
15      firm prior to it being approved?
16  A   I probably did, yes. I don't remember but I
17      probably did.
18  Q   Did you make any recommendations about the nature
19      of that contract with the Reinhart law firm?
20  A   Actually I -- I don't remember the discussion but I -- I do
21      remember distinctly the discussion that I
22      reflected on just a minute ago with regard to
23      whether it should be on an hourly basis or whether
24      there should be a retainer set and which would be
25      the most efficient use of Joe's time. So I do

Page 36

1      remember that, but I -- I don't believe I made a
2      recommendation. I was kind of either way. It
3      didn't matter.
4  Q   And the contract with -- Reinhart's contract, who
5      was the other party to the contract that Reinhart
6      entered into?
7  A   I'd have to have the contract. Just as with the
8      retainer letter that we just talked about a minute
9      ago from my law firm, I don't know whether the
10      contract was directly with the speaker and the
11      majority leader or whether it was with
12      Michael Best. I just don't remember.
13  Q   Okay. We'll pull it out.
14  A   If you've got it, it would be easier to just show
15      it to me. That's fine. My memory may not be what
16      it once was.
17  Q   I assure you mine is not.
18  A   Well, you know, we're of a certain age, Peter.
19  Q   I'll match my deterioration rate to anybody's.
20  A   As I told you before, you know, a
21      six-month ordeal and one of the longest trials
22      I've ever been involved in, I could tell you
23      that's certainly where I'm at the moment.
24      With your outcome, I would imagine that would help
25      restore a lot of your memory.

Page 37

1  A   I don't need the memory.
2  Q   Showing you what's been marked as Exhibit 6 to the
3      Handrick deposition.
4  A   Oh, okay. So let's see what Joe said about it.
5  Q   You've seen this document before?
6  A   I'm sure that I did. I don't remember right now
7      but I'm sure I did. Yeah, I was cc'd on it so
8      I know that I was.
9  Q   And this is a follow-up letter concerning the
10      engagement; right?
11  A   Yeah, this is the -- this is the engagement we've
12      been discussing.
13  Q   Okay. And this indicates that the engagement is
14      by Michael Best & Friedrich and Reinhart Boerner
15      Van Deuren; correct?
16  A   Yes, that appears to be correct.
17  Q   And this is dated February 18, 2011; correct?
18  A   Yes, it is.
19  Q   You want to take a moment and review it and see if
20      it refreshes your recollection?
21  A   Yeah. Okay.
22  Q   How would you characterize the scope of the
23      engagement between Michael Best & Friedrich and
24      Reinhart Boerner Van Deuren regarding the
25      redistricting process?

10 (Pages 34 to 37)

Halma-Jilek Reporting, Inc.      Experience Quality Service!      (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 10 of 107   Document 188

1          MR. HODAN:  Objection, calls for a
2   legal conclusion.  Subject to that, go ahead.
3          THE WITNESS:  I don't know because
4   I don't have the engagement letter.
5   BY MR. EARLE:
6   Q    Would that help you?
7   A    Well, yeah.  As I said, I don't know.
8          MR. EARLE:  Let's mark that.
9          (Exhibit No. 220 was marked for
10   identification.)
11   BY MR. EARLE:
12   Q    Showing you what's been marked as Exhibit 220.
13   A    Thank you.
14   Q    Would you take a moment and review that.
15   A    Okay, I've reviewed it.
16   Q    You're cc'd on this letter; correct?
17   A    Yes, yes, I am.
18   Q    And the cc indicates there was a cc with
19   enclosures; correct?
20   A    That's what it says.
21   Q    Okay.  And -- and this is the engagement letter
22   where Michael Best hired the Reinhart law firm on
23   behalf of the Wisconsin state senate by its
24   majority leader, Scott Fitzgerald and the
25   Wisconsin state assembly by its speaker, Jeff

1   Fitzgerald; correct?
2   A    Is that a statement?  I don't know.  I mean,
3   that's what it appears to be.  I got copied on it
4   but it certainly appears to be just what you
5   described.
6   Q    Well, the question is that an accurate
7   statement.  You were copied -- you were part of a
8   negotiation, you said.
9   A    Yes.
10   Q    All right.  So is it an accurate statement that
11   this letter reflects the contract that -- between
12   the Reinhart law firm and the Wisconsin state
13   legislature as arranged by the Michael Best &
14   Friedrich law firm?
15   A    If you say so.  The reason I'm hesitating is
16   simply because as you point out, it says with
17   enclosures, and I have some recollection, and I
18   may be incorrect on this, that Reinhart does
19   include some additional materials vis-a-vis the
20   relationships and the firms, and I'm also -- so
21   that was -- that was the reason I was hesitating.
22   It certainly appears to memorialize an
23   understanding and agreement consistent with what
24   I've just testified to, but there may be another
25   piece there may be more to it.  That's why I

1   hesitated.
2   Q    With that caveat in mind, it's clear that the
3   client on whose behalf the Reinhart law firm was
4   hired was the state legislature; correct?
5   A    That's what it appears to be.  Well, not the state
6   legislature but, in fact, the -- the Wisconsin
7   state senate by its majority leader
8   Scott Fitzgerald and the Wisconsin state assembly
9   by its speaker, Jeff Fitzgerald.
10   Q    Those are the clients.
11   A    That's correct.  They are who the clients are.
12   Q    They are the Reinhart clients in the redistricting
13   process; correct?
14   A    That's a fair statement.  Yeah.
15   Q    Okay.  I mean, you agree with that statement
16   legally?
17   A    Yeah.  Yeah, that's a fair statement.  The
18   implication of it may not be fair, and that is
19   that Mr. Handrick, Joe, because he's not a partner
20   in a law firm, you know, you can't -- my
21   understanding under the ethics code and the like
22   would not have allowed him to have a direct
23   agreement.  So he's paid by the Reinhart law firm.
24   He's not a lawyer.  So there had to be a lawyer
25   and a partner in the law firm sign the letter.  So

1   that's all -- I don't -- I don't know how Reinhart
2   works, but my assumption, and that's why I was a
3   little surprised --
4   Q    Well, you don't need to speculate in a deposition,
5   sir.
6   A    I'm not trying to, Peter.  That's fine.  I'm just
7   trying to make sure that there's not a
8   misunderstanding of why that would be the case.
9   Q    The core of the question was to identify the
10   client and the law firm and you've done that --
11   A    Yes.
12   Q    -- and you would like to speculate about other
13   aspects of it.
14   A    In fairness -- in fairness, I have no -- I have no
15   ability to authenticate or otherwise address this
16   letter.  I was copied on this letter.  I was not
17   involved in writing it.  I didn't write it.  It
18   was written by the parties involved and they were
19   signing it.  If your objective was to have me
20   authenticate it, I can't.  I got a copy of it.
21   That's all I know.  So I'm trying to be as honest
22   with you as I can.
23   Q    That's good.
24   A    That's --
25   Q    I appreciate you trying to be as honest as you

Page 42

1      can.  That's the most we can expect under these
2      circumstances.
3    A    Sure.
4    Q    You, in fact, received it.
5    A    I assume I did.  It says cc'd, so --
6    Q    Okay.  And -- it's a true and accurate copy of
7      the letter you received; correct?
8    A    I don't have any independent recollection of it
9      but I have no reason to doubt that it is.
10   Q    Okay.
11   A    It is not a true and accurate -- it's a copy of a
12     letter but there were enclosures.  So it's not a
13     true and accurate copy of everything that was
14     there.
15   Q    It's not a complete.
16   A    That's fair.
17   Q    Okay.  Do you have the original?  Okay.  When did
18     the contract -- is the contract between the
19     Reinhart law firm and the state legislature still
20     in effect today?
21              MR. DAUGHERTY:  Object.  I think he's
22     indicated he can't necessarily -- I think there's
23     a lack of foundation based on his prior testimony,
24     but subject to that, go ahead and answer to the
25     best of your ability.

Page 43

1              THE WITNESS:  I don't know.  There's a
2      provision in here, for example, that allows for
3      termination at any time.  I don't know whether
4      it's terminated or not.  As I told you, I hadn't,
5      practically speaking, been involved since August
6      of last year.
7    BY MR. EARLE:
8    Q    I was curious, when you -- you qualified the
9      answer and I asked you to identify the client, I
10     referred to the legislature and you qualified the
11     answer as the Wisconsin state senate by its
12     majority leader Scott Fitzgerald and the Wisconsin
13     state assembly by its speaker Jeff Fitzgerald.
14   A    Correct.
15   Q    I appreciate the precision.  Would you explain to
16     me what you mean by that.
17   A    Well, there's been -- there's been
18     misunderstandings over the years going back to the
19     early 1990's about who and -- who is being
20     retained by whom when it comes to the senate and
21     assembly, and that's the reason I qualified it.
22     There's been various permutations of that.
23              You may remember in the 1990's that
24     each -- there was a long debate about the
25     caucuses, and the question I recall came up in

Page 44

1      that context, well, you know, if you're retained
2      by the Republican leader or the Republican
3      minority leader, for example, who's your client.
4      And so that is why I was as careful as I was.  So
5      it goes back two decades in dealings with the
6      legislature and how that -- how that would be
7      dealt with.
8              And I know that there's, for example,
9      been discussions over the years, I remembered this
10     from the 2000 cycle, where various members of the
11     other party, for example, would send a letter and
12     say you represent me.  And, you know, if I was
13     representing the then speaker or the majority
14     leader at the time, my attitude was no, I don't,
15     but that's why I was very careful.  I try to be
16     careful in that respect.
17   Q    It's not your position that Reinhart's client was
18     the caucus; correct?
19   A    I'm sorry, I don't understand the question.
20   Q    The -- when we -- when we have the words that
21     Reinhart's client was the Wisconsin state senate
22     by its majority leader Scott Fitzgerald, the
23     client of the Reinhart law firm was not the
24     Republican caucus of the legislature.
25   A    Correct.  You asked me the history -- you asked me

Page 45

1      why I was so precise, and I was simply explaining
2      there's a -- there's been a historical anomaly
3      that began with the caucuses in the nineties and
4      then in the 2000 cycles that, you know, has arisen
5      from time to time, and I'm sure it's arisen on the
6      other side as well.
7              The Democrats, for example, you know,
8      they would often have counsel and this question
9      might have -- I assume came up for them as well in
10     that -- in the last ten years.  So that's why
11     I was trying to be precise because there's --
12     because I don't know -- I'm not trying to say that
13     there's something beyond what's stated in the
14     letter as the client.
15   Q    Okay.  Well, let's just try to nail this down as
16     clearly as we can.
17   A    Sure.
18   Q    We have -- Reinhart has its client.  It's
19     basically the state legislature through the
20     leadership of that legislature; correct?
21   A    I think that's a misstatement because it
22     implies -- and the reason it's a misstatement is
23     because it implies that you -- that each and every
24     member of the legislature would somehow be able to
25     call upon Reinhart for services, and that would be

12 (Pages 42 to 45)

Page 46

1    incorrect because the -- the senate or in the --
2    I think you used the senate in Wisconsin, state
3    senate, by the majority leader is the client,
4    not -- not each and every member of the senate.
5    That would be my ethical view of it.
6  Q    Okay.  So let me see if I understand this
7    correctly.  Reinhart's client in the redistricting
8    process was the senate by -- through the leader of
9    the senate; correct?
10  A    By the leader, yes.
11  Q    All right.
12  A    Yes.
13  Q    And your client was the same client; correct?
14  A    I think that's accurate, yes.
15  Q    And Michael Best's client was the same client;
16    correct?
17  A    I believe that's accurate.
18  Q    So we had three law firms representing the senate
19    and the assembly by the leadership of each
20    respective chamber.
21  A    That seems accurate.
22  Q    So your firm was co-counsel with the Reinhart firm
23    and co-counsel with the Michael Best firm;
24    correct?
25        MR. HODAN:  Objection.

Page 47

1        THE WITNESS:  That's a -- slightly
2    different and it has to do with the question of
3    co-counsel.  You know, what's a counsel.  As I
4    explained earlier, the problem with regard to
5    Joe Handrick is that he's not a lawyer, and so the
6    retention of the Reinhart firm was for services
7    from Joe Handrick, not as a lawyer.  So I would
8    never have considered him a co-counsel, nor would
9    I have considered even Reinhart a co-counsel in
10    that representation, though they may technically
11    have been as you describe.  But I don't want to --
12    I wouldn't say that because Joe was the reason the
13    that retention was going forward.
14  BY MR. EARLE:
15  Q    Show me where in Exhibit 220 that distinction
16    evident.
17  A    I don't think it is.  That's why I said it.
18  Q    Show me where in the clarification to Exhibit 220,
19    which is Exhibit 219, that distinction is evident.
20        MR. DAUGHERTY:  To make clear, these
21    are -- at least document number 220 is incomplete
22    because there are enclosures that are noted that
23    are not here.  But subject to that, go ahead and
24    answer, Mr. Troupis.
25        THE WITNESS:  Well, on the e-mails

Page 48

1    that are attached and in the cc lines it shows
2    Joe Handrick and it refers to meetings with
3    Joe Handrick.  I mean, every -- everything in
4    Exhibit 220 is relative to Joe Handrick.  Not to
5    put a fine point on it, but that all indicates
6    that it was Joe Handrick.  But -- so --
7        MR. EARLE:  Let me take a quick break
8    here for a second.
9        THE WITNESS:  Sure.
10        THE VIDEOGRAPHER:  We are going off
11    the record at 4:29 p.m.
12        (A recess was taken.)
13        THE VIDEOGRAPHER:  We are back on the
14    record at 4:37 p.m.
15  BY MR. EARLE:
16  Q    Some more basic fundamentals.
17  A    Certainly.
18  Q    Who was the leader of this legal team representing
19    the legislature in the redistricting process?
20  A    Well, you'd probably get different opinions from
21    different people.  You know, how many lawyers can,
22    you know, claim to be the leader.  You know,
23    I don't think there was any specific person
24    designated.  You know, we had myself and Eric
25    McLeod and then Ray Taffora, so --

Page 49

1  Q    Were you the -- well, generally there's a senior
2    member of a team who calls the shots when shots
3    need to be called, and --
4  A    It would be a bit arrogant of me to say I was the
5    leader because I don't think there was any such
6    designation, but I clearly had the most experience
7    on the team.
8  Q    Okay.  And when there were questions that needed
9    to be decided and there were divergent views, who
10    made the final call?
11  A    The speaker or majority leader.
12  Q    All right.  Did there ever come a time where
13    divergent views were presented to the speaker or
14    majority leader and they made a call between the
15    divergent views?
16  A    I can't remember.  I can't remember any, and the
17    reason for that -- I mean, I can give you the
18    reason if you'd like, is that, you know, we had
19    worked together -- I was with Michael Best &
20    Friedrich for almost 25 years and Joe Handrick had
21    worked before with me and Eric, so -- and Ray.  So
22    it was unlikely that there would be serious
23    divergence of views among us.
24        So that when I say that, even though
25    lawyers may be quite contentious, the reality is

13 (Pages 46 to 49)

Page 50

1 we've known each other for two decades and I
2 wouldn't expect contentiousness.
3 Q So it's fair to say that you were a party to every
4 major decision that was made by the legal team; is
5 that correct?
6 A That would not be correct, and there's a lot of
7 good reasons for that.
8 Q Such as?
9 A I'm a very small office and I had left
10 Michael Best & Friedrich in the summer of 2010.
11 And so the redistricting remained at Michael Best
12 & Friedrich's offices. As you know, they had
13 space there. They would have -- they would have
14 had regular access to the people involved on a
15 daily basis; I would not.
16 It starts with that and it continues
17 to the fact that in the fall I had been retained
18 by Sandisk as their lead trial counsel on some
19 very significant litigation in the fall of 2011
20 which proceeded into February of 2010 in the
21 Western District. And then I was retained -- then
22 I participated very publicly in matters related to
23 the senators leaving the state, and so it's a
24 matter of public record that I was involved in
25 that.

Page 51

1 And then immediately on the heels of
2 that, I was on my way to Australia early in April
3 and got off a plane at the request of Mr. Justice
4 Prosser to represent him as lead counsel for the
5 recount, and that recount did not end until
6 sometime in late May. During that time period
7 there was a great deal that went on and I simply
8 would not have been available.
9 Q Did you make -- in that -- when you were retained
10 by Justice Prosser to represent him in the recall,
11 did you make the decision to hire Ken Mayer?
12 A Yes, I did.
13 Q Now, getting back to this question of the team, so
14 is it your testimony that the -- the major
15 day-to-day decisions in terms of the operation of
16 the team were in the hands of Eric McLeod?
17 A No, that would not be my testimony. The -- what
18 you describe as major and not major, I mean, who
19 knows? My testimony I -- I hope was that on a
20 daily basis there were decisions that would be
21 made of all types, and I wasn't around. So I
22 might have been copied on them, I might have been
23 told about them, but there are only so many hours
24 in the day and I've described to you my schedule
25 during that time period. I don't recall

Page 52

1 specific -- what I would characterize as major
2 decisions that I wasn't consulted on, but --
3 Q Well, let's take some decisions --
4 A Sure, sure.
5 Q -- and figure out who made those decisions.
6 A I told you --
7 Q How much ownership you want to --
8 A Without being arrogant or otherwise or too humble,
9 I'll try to answer your question.
10 Q You want to find a balance between arrogance and
11 humility?
12 A Somewhere between my Catholic guilt and you know
13 what I can and can't say, I'll do my best.
14 Q All right. Let's start with the decision to -- to
15 locate the redistricting staffing process in the
16 law firm of Michael Best. Who made that decision?
17 A Again, the speaker and majority leader but there
18 was a precedent for it because that --
19 Q Go ahead.
20 A The precedent involved me. That's why I was going
21 to say that, I was going to add that is that in
22 the year 2000, 2001, 2002, in the prior
23 redistricting where we represented, when I was at
24 Michael Best, Scott Jensen and Mary Panzer, we had
25 located the team in the Michael -- in Michael Best

Page 53

1 space. We had rented space to them.
2 So when that came around again, I was
3 still at Michael Best in 2010 and I'm sure -- and
4 I'm sure that there were discussions at that time
5 that I participated in to have them located again
6 there because it was such an efficient way of
7 dealing with this matter.
8 Q So you replicated the Jensen model.
9 A Well, we replicated the Michael Best model.
10 I don't think that that was Scott's decision at
11 the time back in 2001. So I wouldn't characterize
12 that. Certainly from Michael Best's perspective
13 where there's so much potential involvement and
14 you need to be across the street from the Capitol,
15 that's what we did.
16 Q So in 2012 it was the legislative leadership's
17 decision but in 2002 it was Michael Best's
18 decision. So Scott Jensen didn't have anything to
19 do with it in 2002 but the Fitzgeralds had
20 everything to do with it in 2012.
21 MR. HODAN: You mean 2011?
22 MR. EARLE: 2011, yes.
23 THE WITNESS: I don't think that's
24 what I said, but I was trying to -- I was trying
25 to be again very careful that you not think that I

14 (Pages 50 to 53)

Page 54

1    wasn't involved in decision-making.  That's all
2    I was trying to do.  I was just trying to,
3    because -- because I was at Michael Best in 2010
4    when those decisions were discussed, which were
5    then went into effect in 2011.  That was what
6    I was trying to communicate.  If I didn't do so, I
7    apologize.
8    BY MR. EARLE:
9    Q    That's why I got a little confused.
10   **A    I apologize.  I wasn't trying to.**
11   Q    That's all right.  You don't need to apologize but
12   you do need to help me understand.
13   **A    Sure.**
14   Q    All right.  So in 2002 or perhaps it was 2001, you
15   and Scott Jensen decided that the redistricting
16   process should be housed at Michael Best.  Is that
17   right or not right?
18   **A    You know, it was probably relatively speaking**
19   **accurate.  You know, Scott and Mary both and --**
20   **and at the time John McGiver, who was still alive**
21   **at Michael Best, who had a very close relationship**
22   **with those folks.  So there were a fair number of**
23   **people involved in the decision.  That's why --**
24   **that's why I questioned, you know, using Mr. --**
25   **then Speaker Jensen as sort of whipping boy.  He**

Page 55

1    **was involved in the decision-making and -- and --**
2    Q    How is he being used as a whipping boy?
3    **A    Well, I read the newspapers, so I see how he's**
4    **used as a whipping boy.**
5    Q    But how does that relate to the questions I've
6    asked you?
7              MR. DAUGHERTY:  I think it was
8    because --
9              THE WITNESS:  Because you referred to
10   it as Jensen's decision.
11             MR. DAUGHERTY:  The Jensen model, I
12   think, was I believe the statement which I'd
13   object to.
14             THE WITNESS:  And that's why when you
15   used the term Jensen model or whatever it was, I
16   took umbrage at that because I don't think that's
17   a correct characterization.  And I am aware,
18   because I live in the state and despite my
19   personal enormous respect for Scott Jensen, that
20   he has become a whipping boy to the press and
21   otherwise.  So if -- if I bristled at that, it was
22   in part because of my enormous respect for the
23   former speaker.
24   BY MR. EARLE:
25   Q    All right.  So in 2001, 2002, McGiver, you, Jensen

Page 56

1    and who else?
2    **A    Senator Panzer.**
3    Q    Senator Panzer make the decision to house the
4    redistricting process at Michael Best & Friedrich
5    and you found it to be an efficient process; is
6    that correct?
7    **A    Yes, that's accurate.**
8    Q    And then in 2011 you make the decision -- the
9    speaker makes the decision to do that again;
10   correct?
11   **A    Yes.  That's when they signed the agreements, as I**
12   **understand.  That's the best I can remember, yes.**
13   Q    He signed what agreements?
14   **A    Well, whatever agreements that allowed them to be**
15   **over at the law offices.  I mean, there were**
16   **retention agreements and the like that went**
17   **forward that allowed them to be in the offices.**
18   **I assume there's some documents.  I don't know.**
19   Q    Have you seen documents that allow them to be in
20   the offices over at Michael Best & Friedrich?
21   **A    Actually I don't.  No, I haven't, because I had**
22   **left there by then.  I had left Michael Best by**
23   **the time that arrangement for those office space**
24   **came into being.**
25   Q    Based on your knowledge of how Michael Best

Page 57

1    operates and how you operated in 2001, 2002, you
2    assume that the normal -- in the normal course of
3    business there would have been that allowed --
4    that allowed Ottman and Foltz and the -- and the --
5    **A    Handrick.**
6    Q    And Handrick from Reinhart to be in the
7    Michael Best office.
8    **A    To house that, yes, I assume so.**
9    Q    And who would be a party to those agreements?
10   **A    Well, again, I would speculate it would be the --**
11   **the law firm and the speaker and majority leader.**
12   I don't want you to speculate.
13   **A    You asked me about my experience.  That's the only**
14   **experience I have.  I have no independent**
15   **knowledge, none, zero.**
16   Q    I'm asking you based on your experience --
17   **A    Okay.**
18   Q    -- and knowledge of what the normal course of
19   business is --
20   **A    Yes.**
21   Q    -- having gone through it once before --
22   **A    Yes.**
23   Q    -- what do you assume the process would have been.
24             MR. DAUGHERTY:  Object.  I don't know
25   if there's a foundation, but subject to that, go

15 (Pages 54 to 57)

Halma-Jilek Reporting, Inc.          Experience Quality Service!          (414) 271-4466
Case 2:11-cv-00562-JPS-DPW-RMD    Filed 02/23/12    Page 15 of 107    Document 188

Page 58

1    ahead and answer.
2          THE WITNESS:  My expectation would be
3    that there would be some kind of arrangement that
4    would have some kind of written confirmation about
5    their being located in the Michael Best space.
6  BY MR. EARLE:
7    Q    And who would have been the signatures to that
8    agreement?
9          MR. DAUGHERTY:  Same objection.
10         THE WITNESS:  I seriously don't have a
11   clue.  Likely a partner of Michael Best &
12   Friedrich, I assume.
13  BY MR. EARLE:
14   Q    Who made the decision that each of the -- of the
15   three, Foltz, Ottman and Handrick, would be
16   provided with stand-alone computers over at
17   Michael Best & Friedrich?
18   A    I don't know.
19   Q    Do you know whether Foltz, Ottman and Handrick
20   signed secrecy agreements about the redistricting
21   process?
22   A    I don't know.
23   Q    Did you discuss having Foltz, Ottman and Handrick
24   sign secrecy agreements?
25   A    I don't recall any such agreements, any such

Page 59

1    discussions.  They could have occurred.  I just
2    don't recall.
3    Q    Were you involved in the decision to have
4    individual legislators sign secrecy agreements?
5    A    I don't think I was, but I -- if there's an e-mail
6    or something.  I don't remember being participant
7    in that.
8    Q    Were you consulted about whether the individual
9    legislators should sign secrecy agreements before
10   any information would be provided to them about
11   the redistricting process?
12   A    Not that I recall.
13   Q    Who made that decision?
14   A    I don't know.
15   Q    So just so -- I want to relate this back to how
16   the team operated, okay?  There were auton --
17   independent decisions being -- strike that.  Let
18   me rephrase it.  There were independent decisions
19   being made about how the -- how the legislative
20   process was going to go forward that you were not
21   a party to?
22   A    I don't know if I'd go that far.  There were
23   process issues that certainly on a day-to-day
24   basis would have been resolved without my
25   participation.

Page 60

1    Q    Okay.  There was a decision, would you agree that
2    there was a decision to conduct the redistricting
3    process at Michael Best & Friedrich under a cloak
4    of secrecy?
5    A    No, I would not.
6          MR. DAUGHERTY:  Object to the form.
7    Object to the characterization of cloak of
8    secrecy, but subject to that, he's answered
9    already.
10         THE WITNESS:  I would not use that
11   term.
12  BY MR. EARLE:
13   Q    You would not use that term, and why would you not
14   use that term?
15   A    Because everyone in Madison, everyone at the
16   legislature knew precisely what was going on
17   because they had to.  Those computers and the
18   like, as I understood it, were either owned by or
19   controlled by the state.  So there were --
20   virtually everybody who needed to know would have
21   known about that.  So I would certainly not -- it
22   was no secret.
23   Q    It's your understanding that the computers at
24   Michael Best & Friedrich were owned by the state?
25   A    Well, I understood they were using programs that

Page 61

1    the state provided.
2    Q    Who owned the hardware?
3    A    I speculated when I said that.  I don't know who
4    owned the exact hardware.  Certainly there's a
5    record of that somewhere.  I don't know.
6    Q    Mr. Troupis, I understand that this is a complex
7    set of facts and --
8    A    You're asking about contractual agreements and
9    that's why I --
10   Q    And this is a -- but this is a complex set of
11   facts and there's a lot of controversy associated
12   with this case.  So it's important that we be
13   precise, because we're going to trial tomorrow.
14   And so where are you -- sometimes in conversation
15   speculation can enter and it's good faith
16   speculation, but we need to know when you're
17   speculating and when you're testifying about what
18   you know.  So I need that distinction clear on the
19   record.
20         Do you know who owned the computers
21   that Tad Ottman, Adam Foltz and Joe Handrick were
22   working on at the law firm at Michael Best?
23   A    I do not know that.
24   Q    Do you know who made the decision to have every
25   legislator sign a secrecy agreement before they

16 (Pages 58 to 61)

Page 62

1    could enter the law firm and obtain any
2    information about the redistricting process?
3  A   I neither know the predicate to that and I
4    certainly don't know that.
5  Q   Well, let's focus on the predicate, okay? It's
6    your testimony that you do not know whether or not
7    individual legislators were required to sign
8    secrecy agreement before they could obtain
9    information about the redistricting process at
10   Michael Best & Friedrich?
11 A   As you've defined the term, no, I don't know that.
12 Q   And nothing that you did during the redistricting
13   process puts you in direct contact with any
14   information about that?
15 A   No. I certainly was in contact with regard to
16   information about that.
17 Q   So it's your testimony that this was entirely
18   Eric McLeod's doing.
19 A   No, that's not my testimony at all.
20 Q   Have you seen the individual secrecy agreements?
21 A   Not that I recall.
22 Q   Okay. We'll come back to that. We're getting
23   copies of the agreements.
24 A   Great. Maybe it will remind me.
25 Q   Well, have you read about that in the paper?

Page 63

1  A   Yes, I've read about that in the paper.
2  Q   Were you surprised when you read about that in the
3    paper?
4  A   No.
5  Q   You weren't surprised?
6  A   No.
7  Q   Why weren't you surprised?
8  A   Because that's the way the process has gone
9    forward in the past.
10 Q   Is it your testimony that you've been involved in
11   other legislative activity where secrecy
12   agreements are signed by legislators?
13 A   First of all, I wouldn't call it a secrecy
14   agreement. I would call them confidentiality
15   agreements and I would say that when one gets to
16   redistricting, because of the nature of the
17   relationship of legislators to each other, it's
18   extraordinarily important not to have legislators
19   concerned about a district that's on the other
20   side of their state.
21       And so it is the normal process and I
22   presume it would be the normal process on both
23   sides of the aisle, Democrat or Republican, that
24   they would attempt to, during the process of
25   talking to legislators to understand what they

Page 64

1    want, to ask them not to be discussing those
2    discussions with other members of the legislature,
3    because otherwise you would be herding cats. You
4    would have everybody concerned about what's going
5    on in Sheboygan when they live in La Crosse
6    because that's the nature of the legislature.
7  Q   So it's your testimony that you had legislators
8    sign secrecy agreements in 2001 and 2002?
9  A   I don't recall. First of all, I'd call them
10   confidentiality agreements, and second, I don't
11   recall signing documents. I just don't recall
12   that. You certainly would ask the legislators not
13   to discuss it with any other member of the
14   legislature until such time as the entire plan is
15   resolved, because otherwise it cannot work. It
16   simply cannot work.
17 Q   I'm confused by your testimony but it's easy to
18   confuse me, so let's -- let's try to unconfuse me
19   here. You said you were not surprised when you
20   read about the secrecy agreements.
21 A   The confidentiality agreements. I believe you're
22   calling them secrecy agreements. I'm curious what
23   they're titled, so I'll be interested to see.
24 Q   But you know what I mean when I say secrecy
25   agreements.

Page 65

1  A   I've been a trial lawyer a long time. I know what
2    you mean by secret versus confidential, but that's
3    okay. Call them what you will. I understand what
4    the agreements are that you're talking about.
5  Q   Is there a substantive difference between the
6    words that we're using?
7  A   Enormous difference between secret and
8    confidential, yes, an enormous, enormous
9    pejorative difference and rhetorical difference.
10   One will use the term "secret" to connote
11   something improper and one will use the term
12   "confidential" to connote something very proper
13   and is common in the workplace.
14 Q   So when we have a federal statute that deals with
15   the secret matters, that's pejorative?
16 A   No, not at all. There are trade secret matters,
17   of course.
18 Q   So it's not pejorative in a trade secret context.
19 A   No.
20       MR. DAUGHERTY: Object to the form as
21   to relevance.
22       THE WITNESS: Context. Context.
23       MR. EARLE: I made the mistake of
24   following the witness into this discussion.
25       THE WITNESS: You did, Peter. You

17 (Pages 62 to 65)

Page 66

1    know better than that.
2  BY MR. EARLE:
3  Q   I'm dealing with a very experienced litigator
4      here. I recognize that. Okay. But I guess what
5      I'm confused about is, as I understand your
6      testimony, you were not surprised about it when
7      you read about it in the newspapers because you
8      considered it to be a normal thing and then you
9      made a reference to the prior --
10  A   Yes.
11  Q   -- redistricting in which you were clearly in the
12      leadership position in that one and when you were
13      working with Panzer and Jensen, and -- and you
14      don't recall whether you had people sign secrecy
15      agreements then?
16  A   I don't recall that there were or were not
17      confidentiality agreements. I just don't recall.
18      But to be clear, don't misinterpret. The reason I
19      said that is because I expected that
20      confidentiality and -- in 2002. That's why I
21      answered your question so quickly. It's the
22      question of whether there's a signed agreement
23      that I'm -- I'm trying to point out. I just don't
24      know.
25  Q   When you found out about those secrecy agreements

Page 67

1      did you discuss them with Eric McLeod?
2  A   No. The confidentiality agreements I told you I
3      read about in the newspaper this week. I haven't
4      discussed it since then.
5  Q   Did you discuss it with anybody?
6  A   No. You.
7  Q   Me. Okay. So this is the first discussion that
8      you've had with anybody since you read about the
9      secrecy agreements.
10  A   The first discussions I've had with regard to the
11      confidentiality agreements is with you today,
12      that's correct.
13  Q   Did you sign a secrecy agreement?
14  A   I don't believe so, but as a lawyer I have certain
15      obligations, so there would be no need for a
16      confidentiality agreement.
17  Q   That's why we had to get a court order.
18  A   That's correct, to get me to talk.
19          MR. DAUGHERTY: Pesky Supreme Court
20      rules.
21          MR. EARLE: And the record should show
22      that everybody in the room is chuckling in good
23      faith.
24          MR. DAUGHERTY: Thank you.
25

Page 68

1  BY MR. EARLE:
2  Q   Did any of your staff who worked on the
3      redistricting process sign secrecy agreements?
4  A   No.
5          MR. HODAN: You're referring to a
6      confidentiality agreement?
7          MR. EARLE: We've had this ongoing
8      thing about secrecy and confidentiality.
9          MR. HODAN: There is a distinction.
10      So are you going to ask about a confidentiality
11      agreement?
12          MR. EARLE: I think it's a distinction
13      along the lines of disenfranchisement versus
14      underpopulation or delayed voting I think is
15      what --
16          MR. HODAN: Perhaps we'll show him a
17      copy of the agreement.
18          MR. DAUGHERTY: Here we go. You've
19      got them right now, so we'll know what the actual
20      title is.
21          THE WITNESS: You're not going to use
22      all those, are you? That's okay. It's your
23      deposition. It's your deposition.
24          MR. EARLE: Well, I just want to show
25      them to you.

Page 69

1          THE WITNESS: That's fine. That's
2      what I said, Peter.
3  BY MR. EARLE:
4  Q   And I'm showing you what's already been marked as
5      Exhibit 123 as part of the record. Okay? And
6      looking at the agreement, does it refresh your
7      recollection as to whether you've seen these
8      agreements before?
9  A   Let me read it. Give me a moment. Okay. Now I'm
10      sorry. What was the question?
11  Q   I just wanted to make sure that having now looked
12      at the exhibit whether that refreshes your
13      recollection as to whether you've ever seen these
14      agreements before.
15  A   I don't recall seeing them before.
16  Q   Showing you what's been marked as Exhibit 124.
17          MR. HODAN: Are we going to read the
18      title of the agreement?
19          MR. EARLE: Do you want to read the
20      title, Patrick?
21          MR. DAUGHERTY: I'll read it. It is
22      entitled confidentiality and nondisclosure related
23      to reapportionment.
24          MR. EARLE: And above that it says
25      privileged attorney-client communication.

18 (Pages 66 to 69)

Page 70

1       MR. DAUGHTERY: And it does not say
2   secrecy agreement anywhere.
3       MR. EARLE: You call a rose a red
4   flower, it's still a rose.
5       THE WITNESS: Are these identical?
6   No, they're not quite.
7       MR. EARLE: And just so the record's
8   clear, I've shown you what's been marked as
9   Exhibit 124 in this case. Let me switch with you.
10  This is the stapled version. Which one have you
11  got? 123? 124, you've got that?
12      MR. DAUGHTERY: Thank you.
13  BY MR. EARLE:
14  Q    Now, you're looking at 124; correct?
15  **A    Yes.**
16  Q    Okay. I will represent to you that the
17      Exhibit 124 is in chronological order. The first
18      one is signed by Andre Jacque on April 26th, 2011
19      and the last one is signed is by someone whose
20      signature I have no idea who it is.
21  **A    Neither do I.**
22  Q    May 12 of 2011.
23  **A    They're not quite in chronological order but the**
24      **second one is the 12th, but they contain**
25      **between those dates roughly.**

Page 71

1   Q    Exactly. What was your role on the redistricting
2       team between April 26 of 2011 and May 12th of
3       2011?
4   **A    Minimal. I was in the midst of the Prosser**
5       **recount.**
6       MR. HODAN: Let the record reflect
7       that Attorney Maria Lazar just joined us.
8       MS. LAZAR: Good afternoon. Welcome
9       from Madison.
10  BY MR. EARLE:
11  Q    Were you involved in the decision to have the
12      Foltz, Ottman and Handrick team meet with
13      individual legislators?
14  **A    I knew that they were doing it.**
15  Q    How did you know that?
16  **A    Because that would be the normal process by which**
17      **this would go forward. They would consult with**
18      **each member of the legislature to determine**
19      **various things about what they expected and how to**
20      **draw the map.**
21  Q    Who made the decision that those meetings would
22      happen at the Michael Best law firm as opposed to
23      in the Capitol?
24  **A    I don't know.**
25  Q    Were you involved in any discussions to make that

Page 72

1   decision?
2   **A    I certainly don't recall any but I might have**
3       **been.**
4   Q    Did you correspond with anybody about whether or
5       not to make the decision to hold the meetings in
6       secrecy at the law firm of Michael Best &
7       Friedrich?
8   **A    Again, confidential meetings with legislators were**
9       **the normal course. So in that sense yes, I was.**
10      **I would have been involved and I wouldn't have**
11      **been surprised at all.**
12  Q    Did you have similar meetings, secret meetings
13      with individual legislators at the law firm of
14      Michael Best & Friedrich in 2001 and 2002?
15  **A    I don't recall where the meetings took place, the**
16      **confidential meetings in 2001, 2002. I suspect**
17      **that they did occur primarily at the law offices**
18      **in the same way as apparently they did in this**
19      **last cycle.**
20  Q    Did you discuss the issue of how to maintain --
21      I'll use the word secret but you can use the word
22      confidential. We're talking about the same thing.
23      Did you discuss with Scott Fitzgerald and
24      Jeff Fitzgerald the idea of conducting this
25      process in secret?

Page 73

1       MR. DAUGHTERY: Just to clarify, when
2   you say this process --
3       MR. EARLE: The redistricting process.
4       MR. DAUGHTERY: Thank you.
5       THE WITNESS: I don't recall any
6   specific discussions regarding the confidential
7   way in which it would have gone forward. I don't.
8   I simply don't recall that.
9   BY MR. EARLE:
10  Q    Did you discuss with anybody the question of how
11      to set up the redistricting team?
12  **A    You mean the members of the team?**
13  Q    Yes.
14  **A    Oh, oh, sure.**
15  Q    How involved were you in that?
16  **A    Well, I would have been very involved. I mean,**
17      **that -- that process had occurred during -- as**
18      **early as 2010 before the 2010 elections and, you**
19      **know, I'm in and out of the Capitol on a regular**
20      **basis. So there would have been discussions about**
21      **who in the caucus, for example, would be a good**
22      **person to work with members of the caucus for**
23      **redistricting.**
24      **And again, I would assume this is**
25      **fairly common at the Capitol again on both sides**

19 (Pages 70 to 73)

Page 74

1    of the aisle, certainly has been for the 30 years
2    I've been involved, that this is a difficult
3    process. This is extremely difficult, involves --
4    as you've pointed out, it's not an easy thing.
5    And so you need people who are going to work 24/7,
6    who have an interest in it, who want to
7    participate and are prepared to take the slings
8    and arrows of trying to deal with redistricting.
9    And so those discussions had been certainly been
10    going on for a long time, and I'm sure I
11    participated in some of them.
12 Q   The discussions before the election were the
13    discussions of a minority caucus; correct?
14 A   No, they were never in the caucus as far as I
15    recall. They were simply discussions that occur
16    between people like me who would ultimately be
17    involved in redistricting and leadership and
18    members of the minority parties at the time.
19    I mean, we certainly would have had those
20    discussions.
21 Q   Now, I'm talking about the period of time after
22    the Republicans became the majority --
23 A   Okay.
24 Q   -- and your contacts with the legislature were
25    representational in nature as an attorney on

Page 75

1    behalf of the legislature by its leadership.
2 A   Yes.
3 Q   Okay. Who designed the legal team at that point
4    in time?
5 A   You -- I don't think any one person designed the
6    team.
7 Q   Who decided who was on the team?
8 A   The speaker and the majority leader.
9 Q   Would you identify the team at that point in time.
10 A   Which point in time?
11 Q   When you became -- when the Republicans became the
12    majority.
13 A   Oh, I think it was pretty, pretty quickly,
14    probably within days or weeks that Tad, Adam, Joe
15    became identified as people that would be
16    instrumental in the process and that people like
17    me and Eric -- Ray had not decided yet to leave
18    the attorney general's office, so I don't believe
19    Ray would have been involved. So that would have
20    been the way it transpired.
21 Q   Who was hired first, you or Eric McLeod?
22 A   I assume Eric but I don't know that. Because Eric
23    hired me.
24 Q   I'm going to ask you some questions about
25    Professor Esenberg. How long have you known

Page 76

1    Professor Esenberg?
2 A   Long enough. A while. He's been around a while,
3    probably ten years or so.
4 Q   Is that long enough?
5 A   Oh, yeah. I like Professor Esenberg. He's a good
6    guy. Do you know Rick? He's a good guy.
7 Q   When you said long enough, I was wondering, long
8    enough for what?
9 A   A fair comment. Long enough to know better than
10    to try to speculate how long I've known him, I
11    guess is what I'm trying to say.
12 Q   Did you seek to involve him in the redistricting
13    process?
14 A   Yes, yes. In June of -- June or July of this last
15    year.
16 Q   At the end of the process?
17 A   Near the end, yeah, very end. I had been --
18    that's not correct. That's not correct. I had
19    been asked to teach at Marquette Law School in his
20    class. He teaches a class on election law and
21    part of it is on redistricting, and so I had,
22    in fact, taught his class at Marquette Law School
23    on redistricting a year or two before. I don't
24    remember when, but I'm sure in that context, I'm
25    sure we talked about it as I talked about it with

Page 77

1    his class how redistricting would go forward and
2    the process and the constitutional issues.
3 Q   You made the decision to have him come testify at
4    the hearing on July 13, 2011; correct?
5 A   I made -- somebody made the decision for me to
6    call him to ask if he would testify at the
7    hearing. It might have been me. I don't know who
8    made the decision, so to speak. My impression
9    candidly was that it was Ray Taffora who suggested
10    we call Professor Esenberg, but I had a long
11    relationship with the professor, so I would be the
12    one to call him.
13 Q   I'm going to show you an e-mail, which we're going
14    to mark as Exhibit 221.
15 A   And what's the date on it? Let me just make sure
16    we check. Is this one of the ones that --
17 Q   This one, I'm pretty sure it's not on the list but
18    it may be so I'll give you the date. It's
19    July 12, 2011 at 8:42 a.m. and it's an e-mail from
20    Richard Esenberg, which I doubt it's on the list
21    because it involves a third party.
22 A   I wouldn't have thought so. This is the first
23    document that we've had here. I wasn't -- Brandon
24    here is my associate and he's got this terrible
25    responsibility of making sure he checks that,

20 (Pages 74 to 77)

Halma-Jilek Reporting, Inc.    Experience Quality Service!    (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 20 of 107   Document 188

Page 78

1    so --
2  Q    Well, I'm sure -- and he looks very capable of --
3  A    He's very good at it.
4  Q    I have no doubt.  So -- but this is an e-mail from
5        Professor Esenberg to you with cc's to Tad Ottman,
6        Adam Foltz, Eric McLeod, Ray Taffora and Sarah
7        Troupis.
8            MR. DAUGHTERY:  Is there a JRT Bates
9        number on that, please?
10           MR. EARLE:  No, there is not.  There's
11       a Foltz Bates number but -- which is Foltz 001028.
12       But we'll mark it as Exhibit 221 and that's how it
13       will be known in this case.
14           MR. DAUGHTERY:  Thank you.
15           (Exhibit No. 221 was marked for
16       identification.)
17  BY MR. EARLE:
18  Q    Do you recall this e-mail?
19  A    Yes.  This was part of a string of e-mails.
20  Q    And this e-mail is dated July 12, 2011 at
21       8:42 a.m; correct?
22  A    That's what it says.
23  Q    It was from Richard Esenberg to you about the
24       hearing which was going to occur the next day on
25       July 13, 2011; correct?

Page 79

1  A    That's what it appears to be, yes.
2  Q    You had already arranged for Professor Esenberg's
3        testimony at that point in time; correct?
4            MR. HODAN:  Objection.  What do you
5        mean by arranged?
6            MR. EARLE:  Arranged.  I mean
7        arranged.
8            MR. HODAN:  What do you mean by that?
9            MR. EARLE:  He had arranged it,
10       I mean, that's a word in the English language.
11           MR. HODAN:  There's a difference
12       between arranging for someone to come and
13       arranging someone's testimony.  I just wanted to
14       make sure we're clear.
15           MR. POLAND:  I think the witness is
16       the clear.  I think the witness can answer the
17       question.
18           THE WITNESS:  This is a part of a
19       series of e-mails and by this time I believe that
20       Professor Esenberg had agreed that he would
21       testify.
22  BY MR. EARLE:
23  Q    He had agreed because you had asked him to;
24       correct?
25  A    Well, you would have to ask him if he agreed

Page 80

1        because I asked him or for some other reason,
2        because you've been very careful about that, but
3        the answer is I certainly had asked him and he
4        had -- by this point I assumed he was going to
5        testify.
6  Q    Right, okay.  We'll put down the operative
7        language here since we have an objection to the
8        word "arranged."  You procured his testimony in
9        support of Act 43; isn't that correct?
10  A    Again, I invited him to testify and he was willing
11       to testify.
12  Q    Okay.  So you were successful in obtaining his
13       testimony?
14           MR. HODAN:  Objection.
15           THE WITNESS:  Well, success, I mean,
16       you know, he was going to testify.
17  BY MR. EARLE:
18  Q    And would you read into the record what the e-mail
19       says on July 12, 2011 at 8:42 a.m., the day before
20       the hearing.
21  A    Has anything changed on this?  Please let me know
22       how long you want me to talk.  I'm thinking 15
23       minutes, if not shorter.  Has there been any
24       analysis of the ability to create more
25       majority/minority districts.

Page 81

1  Q    Did you respond to this e-mail, do you recall?
2  A    I don't recall.
3  Q    I think you might have.
4  A    You know, this is the -- secret, you know,
5        item.  So that's good.  Go through them in proper
6        order.  I'm not trying to, Peter.  You do what you
7        got to do.
8            MR. EARLE:  I'm not trying to be
9        secret, that's for sure.
10           (Exhibit No. 222 was marked for
11       identification.)
12  BY MR. EARLE:
13  Q    Exhibit 222 this is an e-mail dated July 12, 2011,
14       9:44 a.m. from you to Rick Esenberg; correct?
15  A    Yes, it is.
16  Q    Would you read into the record what you wrote to
17       Rick, Professor Esenberg?
18  A    Rick, the schedule is for the hearing to start at
19       10:00 and you will be the second witness between
20       10:45 and 11:15.  We would like you to address
21       meeting the minority representation criteria.  We
22       match or better the last map drawn by the Court.
23       Tad will give you a call to give you the numbers
24       and process and whatever else you may need.  Jim.
25  Q    He had already agreed to address the minority

21 (Pages 78 to 81)

Page 82

1    representation criterion?
2  A   I don't know.  I just don't know.
3  Q   But it's clear from this e-mail that he had not
4      yet received the numbers and process and what he
5      would need; correct?
6  A   The reason I said I don't know is because
7      Professor Esenberg is extremely meticulous.
8      I co-counsel on any number of free speech cases
9      and other matters with him, and -- and he -- he
10     would never have agreed to something in advance of
11     knowing enough information to make that decision.
12     So if -- if an e-mail from me to Professor
13     Esenberg for Rick is familiar, that is, less
14     formal than otherwise, that wouldn't surprise me,
15     but I would absolutely not be able to read this
16     and know if he had made a decision because there
17     was other e-mails going back and forth and
18     Professor Esenberg is a very careful man.
19 Q   But we do know from this objectively that as of
20     9:44 a.m. on July 12, 2011, the day before the
21     hearing, Professor Esenberg had still not gotten
22     the numbers and process and whatever else he
23     needed; correct?
24 A   No, we do not know that.
25 Q   Is there anything on here that would indicate that

Page 83

1      he had received the numbers, the process or
2      anything else he needed?
3  A   Not on this e-mail, no.
4  Q   And the inference of this e-mail is that he had
5      not at that point in time received it because
6      you're still making the arrangements for him to
7      get it; correct?
8  A   No, that's not the inference I would draw from
9      this.  And I explained earlier why I would not
10     draw such inferences from the e-mail standing
11     alone.
12         (Exhibit No. 223 was marked for
13     identification.)
14 BY MR. EARLE:
15 Q   Showing you the next e-mail in the chain, which is
16     Tuesday, July 12, 2011, at 9:58 a.m.  This is an
17     e-mail from Professor Esenberg to you responding
18     to the prior e-mail; correct?
19 A   There's two pages to this.  Did you mean -- these
20     appear to be unrelated.
21 Q   Yes, you're right, and --
22 A   You want me to just give the second page back to
23     you?
24 Q   Yes.
25 A   Yeah, this appears to be a response to the earlier

Page 84

1      e-mail.
2  Q   Okay.  And in this e-mail, Professor Esenberg
3      tells you to have him call his mobile number
4      because he was at WILL.  What is that?
5  A   That's the -- is it Wisconsin Institute for Law
6      and Liberty.  The first name is Wisconsin, I
7      believe so.  It's the Institute for Law and
8      Liberty.  I believe it's Wisconsin is what its
9      first and it is an organization that Professor
10     Esenberg now heads here in Milwaukee.
11 Q   What is the nature of that organization?
12 A   He would be able to tell you better than me, but
13     it is an organization dedicated to bringing
14     matters of constitutional import that relate to
15     liberty primarily.  He and I have, as I told you
16     before, been very interested in constitutional
17     matters, particularly surrounding free speech,
18     open records, things of that type, and -- and this
19     was -- this was really a special organization that
20     he'd been trying to get together and put together
21     over the years and he was able to accomplish that
22     this last year.
23 Q   And this activity that you describe in the context
24     of this organization is that you and he share an
25     interest in open government?

Page 85

1  A   Yes.
2         (Exhibit No. 224 was marked for
3      identification.)
4  BY MR. EARLE:
5  Q   Mr. Troupis, this is an e-mail dated July 13,
6      2011?
7  A   I chuckle.  I remember this one.
8  Q   So this is July 13, 2011 at 10:53 a.m; correct?
9  A   That's what it appears to be, yes.
10 Q   This is the day of the hearing; right?
11 A   Yes.
12 Q   And it's from you to Professor Esenberg.  It's
13     from you to -- who is this from?
14 A   I can tell you why it appears to be.  It's from
15     me.  It's from me.
16 Q   It's from you to yourself?
17 A   Well, it was -- it was a -- you know when you have
18     that function on your phone, because I didn't have
19     Rick's e-mail in my phone but I had a prior e-mail
20     that had all the addresses in it.  So I used a
21     reply to all function.  That's what I did here,
22     something like that.
23 Q   Got it.  Okay.  So this actually -- so you went
24     back to an older e-mail that contained a reference
25     to WisPolitics report back on July 8?

Page 86

1 A It must have been, yeah. It must have been this
2 one that you showed me a minute ago. It looks
3 like it's all the same people.
4 Q You and Professor Esenberg had shared an e-mail
5 about a WisPolitics report dated July 8, 2010?
6 A You shared it with me a minute ago, 223, 222.
7 That's the e-mail.
8 Q No, I'm talking about the caption.
9 A No, that's the caption on the last four e-mails
10 you've shown me.
11 Q All right. So this is a -- this is an e-mail
12 where you're asking him -- you're informing him
13 that the meeting is now underway and you're
14 inquiring as to where he is.
15 A Exactly.
16 Q That's because he's running late?
17 A Well, I didn't know at the time. You know,
18 because I had said the day before that be there
19 between 10:45 and 11:15 and there was no Professor
20 Esenberg in the room. Actually it turned out he
21 had come in and I think I hadn't seen him. He was
22 on the other side.
23 Q So then you walked over and talked to him?
24 A Yeah, exactly.
25 Q Did you notice who was sitting around that

Page 87

1 vicinity at the time?
2 A No. You probably, Peter. Well, were you? Did
3 you see me? That's what I figured.
4 Q I was sitting right behind him.
5 A Well, that's right, see? I lost track of him.
6 MR. EARLE: Can we go off the record?
7 THE VIDEOGRAPHER: We are going off
8 the record at 5:27 p.m.
9 (A recess was taken.)
10 THE VIDEOGRAPHER: Videographer this
11 is the beginning of disk two of the video
12 deposition of James R. Troupis on February 22,
13 2012. The time, 5:48 p.m.
14 BY MR. EARLE:
15 Q Mr. Troupis, just to tie a few loose ends. You
16 work closely with Joe Handrick?
17 A Yes.
18 Q And you and him dialogue frequently during the
19 course of the redistricting process?
20 A No.
21 Q Not frequently?
22 A No.
23 Q Okay. Was most of your communication with the
24 legal team by e-mail as opposed to verbal?
25 A I don't know if I'd rate them one way or the other

Page 88

1 but it was a lot of both but it wasn't -- it
2 wasn't as much as I said earlier as you might have
3 thought, because of my other schedule issues.
4 Q And I'm trying to get a sense for that.
5 A That's what I was trying to give.
6 Q So here we have basically two senior lawyers
7 involved; right? You and Eric McLeod?
8 A Eric's a pretty young guy.
9 Q But senior in terms of --
10 A Experienced.
11 Q Experienced; right?
12 A Yes.
13 Q And the Michael Best lawyers who were in this --
14 in this redistricting process were subordinate to
15 Eric McLeod; correct?
16 A I assume so.
17 Q So he was the --
18 A Well, Ray Taffora wouldn't be subsumed is to
19 anybody, if you know Raymond.
20 Q Well, I don't.
21 A Ray was the former deputy assistant attorney
22 general under Van Hollen, so he was the number two
23 lawyer in the state. So he would -- he would be
24 considered considerably senior to Eric within
25 Michael Best & Friedrich.

Page 89

1 Q But from the Michael Best & Friedrich framework,
2 the lead lawyer on the redistricting case --
3 A I think Eric, that's a fair statement, would be
4 Eric.
5 Q Right, okay. So basically -- so the -- I'm trying
6 to get a sense is it accurate to say -- it's
7 accurate to say that the legal team for the
8 redistricting effort this time around had you as a
9 senior legal team member and Eric McLeod as a
10 senior legal team member.
11 A I think that's fair.
12 Q Okay. And the rest of the team kind of looked to
13 the both of you as the senior -- the senior
14 leaders; right?
15 A I won't speculate on their level of respect for
16 those of us who have lost hair and turned gray
17 over the years, but hope they thought that.
18 Q But I'm sure you maintain that; right?
19 A I would think that they would defer to Eric and I,
20 yes.
21 Q Okay. And so on complicated, important issues
22 related to the redistricting process, they would
23 seek -- they would seek guidance from you;
24 correct?
25 A I would assume if they didn't know the answer,

23 (Pages 86 to 89)

Page 90

1  that they would have come to one of us, or
2  Ray Taffora.
3  Q    So during his deposition, Joseph Handrick, at
4  page 386, line 16 through line 19, asked you the
5  following question. So I asked him --
6  A    You asked him the question. I got that. I was
7  okay on that one, Peter. I got that.
8  Q    Let me start over again. On February 1, 2012, the
9  deposition of Joseph Handrick at page 386, line 16
10  through line 19, I asked Mr. Handrick the
11  following question.
12      So you've never discussed with Eric
13  McLeod the importance of making sure that there
14  was a majority of eligible Latino voters in the
15  district. And his answer was that's correct, and
16  that's after an objection to form by Mr. Dan
17  Kelly.
18  A    Okay.
19  Q    Okay? And then the second question I asked after
20  that was: And you never spoke with Jim Troupis
21  about the importance of determining whether or not
22  it was possible to draw a district that had a
23  majority of eligible Latino voters in it, and
24  again Mr. Kelly objected to form and again
25  Mr. Handrick answered that's right, that's

Page 91

1  correct.
2  A    Okay.
3  Q    Okay? Do you dispute that statement?
4  A    I think I answered earlier that I didn't recall
5  having those kinds of conversations if eligible in
6  this case is citizenship. I don't think that --
7  my assumption is here when you're using the term
8  "eligible" there you're talking about whether or
9  not they were citizens or the like and there was
10  a -- I think I acknowledged earlier that we didn't
11  have any substantial discussions about that.
12  Q    Okay. So an eligible, meaning an eligible voter,
13  that means the voter has to qualify; correct?
14  A    Well, that's what I interpreted it as.
15  Q    Citizenship and voting age are the two salient
16  criteria; correct?
17  A    There are other criteria such as residency or not
18  being a felon or whatever, but, yeah, those are the
19  two primary ones.
20  Q    And the two primary ones that are customarily of
21  relevance to redistricting efforts are citizenship
22  and voting age; correct?
23  A    I don't believe citizenship is.
24  Q    So you think it's appropriate to redistrict
25  populations that include large numbers of Latinos

Page 92

1  without regard to the citizenship of the Latinos?
2      MR. HODAN: Objection. Calls for a
3  legal conclusion.
4      THE WITNESS: I don't believe I said
5  that.
6  BY MR. EARLE:
7  Q    Okay. So in other words, it is important in the
8  redistricting process to consider the eligibility
9  of the Latinos who are part of a population within
10  an area that's being redistricted, correct?
11      MR. HODAN: Objection. Calls for an
12  expert legal opinion or expert opinion.
13      THE WITNESS: Everything is not so
14  black and white as you're trying to make it
15  with your question.
16  BY MR. EARLE:
17  Q    What does that mean?
18  A    It means that there are a whole body of -- in the
19  social science literature, political science
20  literature and in law that's developed around what
21  are the appropriate criteria to determine, you
22  know, whether a specific district can elect a
23  representative of choice for that minority group.
24  You've chosen to isolate citizenship as one of
25  those and you're entitled to do that, but it's

Page 93

1  not, I don't think, generally accepted, at least
2  I don't believe it is, that that would be somehow
3  a trumping criteria, particularly in Milwaukee,
4  particularly in the districts you're involved with
5  here where they have consistently elected a
6  Latino. So it wouldn't be something that would
7  have come to mind as a serious question in that
8  district or those districts.
9  Q    Before you came here today, did you speak with any
10  lawyer from the Reinhart law firm about having to
11  be deposed?
12  A    I called Patrick Hodan on Friday night after I'd
13  been served. I think it was Friday night.
14  Patrick probably knows better. Friday night or
15  Saturday morning to say I just got a subpoena to
16  appear at trial. What's this about.
17  Q    And what did Mr. Hodan say to you?
18  A    I think he explained that he didn't know what it
19  was about. He assumed it was about my contacts
20  with MALDEF and was a consequence of the decision
21  the day before on the attorney privilege issues,
22  which had come out apparently on Thursday night.
23  And I think I then talked to him again on Saturday
24  morning and I asked him to call you, I believe, to
25  explain that I had just come off an incredibly

24 (Pages 90 to 93)

Halma-Jilek Reporting, Inc.        Experience Quality Service!        (414) 271-4466
Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 24 of 107   Document 188

Page 94

```
 1      long and difficult trial and I was supposed to be
 2      on vacation.  So that's -- that's what we
 3      discussed.
 4   Q   Which is why you're enjoying this evening so much.
 5   A   Yes.  I hope that tomorrow night I'm at Sandals or
 6      somewhere else, but, you know, I think my marriage
 7      is going to need that at this point.  So those are
 8      the conversations I had with him.
 9   Q   And the record should reflect that there is a
10      joking nature, joking about it.
11   A   We're not trying to -- I appreciate that.
12   Q   Nobody's being mean.
13   A   I appreciate that.
14   Q   All right.  So did you have any substantive
15      discussions with Mr. Hodan or anybody else from
16      the Reinhart law firm about the legal issues in
17      this case?
18   A   No.
19   Q   Did you have any substantive conversations with
20      anybody at the attorney general's office about the
21      legal issues in this case?
22   A   No.
23   Q   Did you have any substantive discussions about the
24      legal issues in this case with anybody other than
25      the lawyers at Whyte Hirschboeck?
```

Page 95

```
 1   A   No.
 2   Q   What is your understanding of the legal issues
 3      that pertain to your -- that your testimony
 4      pertains to?
 5   A   I told you that all I could figure out was that
 6      because of my third party contacts with MALDEF,
 7      that that was a reasonable area of inquiry and
 8      that's what I told Patrick.
 9   Q   Okay.  I'm going to -- going back to the Joseph
10      Handrick deposition of February 1, 2012 at
11      page 384, line 15 through line 19, I asked the
12      following question:  And is -- and it's accurate
13      to say that the team's strategic position was that
14      there was flexibility as far as drawing the 8th
15      and 9th relative to each other as long as it did
16      not cause a ripple effect outside the third senate
17      district; is that correct?  Answer:  Yes.
18   A   That's the question to Joe from you?
19   Q   Yes.
20   A   Okay.
21   Q   You follow it?
22   A   Yes.
23   Q   Do you disagree with that?
24   A   It's time sensitive.  The -- so I don't know.
25   Q   Well, I guess one of the questions in this case is
```

Page 96

```
 1      whether the configuration of the 8th and 9th
 2      relative to each other was constrained to the --
 3      the third senate district as it had been drawn.
 4      So that in other words, that the team felt that it
 5      was amenable to accommodating concerns or
 6      interests of the Latino community as long as those
 7      could be constrained within the third senate
 8      district so as not to affect the boundaries of the
 9      third senate district.  Is that an accurate
10      statement?
11   A   No.  As I told you before, it's time sensitive.
12   Q   You wrote some e-mails about it.
13   A   Right, and exactly what I said, it's time
14      sensitive.  The -- the time, it depends upon the
15      time period you're talking about.  Containing --
16      as legislation moves forward and gets closer and
17      closer in time, and because of the ripple effect
18      of any redistricting move, any change in a
19      particular district, some things become locked in
20      as a practical matter because the ripple effect
21      becomes so dramatic, especially when you're on a
22      time sensitive process, which at some point this
23      process became, you want to be careful to contain
24      the changes within particular areas.  So that's
25      why I answered the first question it was time
```

Page 97

```
 1      sensitive.  I haven't heard that question and
 2      answer before but that was my reason.
 3   Q   You don't disagree with the proposition that the
 4      redistricting team started with Milwaukee;
 5      correct?
 6   A   Oh, no, that's correct.  We started in -- we
 7      started in 2000 as well.  So did the Court.
 8      That's where you need to start.
 9   Q   And so just so I'm clear, putting aside your
10      explanation --
11   A   Okay.  I'm sorry if I -- added more than you
12      wanted.
13   Q   That's -- we're getting to the truth here.  That's
14      what this is about, and --
15   A   I appreciate that.
16   Q   And the truth is what the truth is.  So just so
17      that anybody reading this transcript, the finders
18      of fact in this case will understand clearly that
19      as far -- as long as the configuration of the
20      Latino community in effect was those elements of
21      the Latino community with whom you and other
22      members of the team had contact with, those
23      elements of the community, those Latinos were
24      invited to consider configurations as long as the
25      configurations did not alter or cause a ripple
```

25 (Pages 94 to 97)

Halma-Jilek Reporting, Inc.      Experience Quality Service!      (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 25 of 107   Document 188

Page 98

1    effect; correct?
2  A   As I said, that's extraordinarily time sensitive.
3       That would not have been a restriction early in
4       the process, nor was it necessarily a restriction
5       later even at the end if something might have been
6       achieved that would make it better.
7  Q   Okay.
8  A   In our view.  So it -- I understand why you're
9       saying that because -- because the -- as you
10      approach the final process -- product, you --
11      everyone is concerned that you not make changes
12      that are unnecessary in the effect they will have
13      elsewhere.  So it was -- but had a good argument
14      been made to get beyond those districts, then it
15      would have been made.
16 Q   Okay.  But just so we're precise about this,
17      during the time that the Latino community was
18      consulted -- strike that.  Let me rephrase the
19      question.  At those points in time where Latinos
20      were consulted about the redistricting process,
21      your time sensitive concern had already
22      constrained the configuration of the third senate
23      district such that you would accept alterations of
24      the map as it pertained to the 8th and 9th as long
25      as it did not cause a ripple effect that went

Page 99

1       beyond the third senate district; correct?
2  A   I don't mean to wrestle with the way -- there's a
3       lot of pieces to your question.
4           MR. DAUGHERTY:  Object.  I think it is
5       compound and.
6           MR. EARLE:  We're trying to devise
7       trial testimony.
8           THE WITNESS:  Anything you can do to
9       keep me from having to be here tomorrow, I'll
10      appreciate it.
11 BY MR. EARLE:
12 Q   So you're going to work with me on this.  Good.
13      So let's give it to you in pieces then.  I want
14      you to consider the time frame when you first had
15      contact with a Latino person about --
16 A   I, me.
17 Q   Or any other member of the team.
18 A   I can't speak for members of the team.  That was
19      why I was hesitant a minute ago is that the
20      moment, I mean, you know, I have no -- I've known
21      Pedro Colon for a long time and I've known a lot
22      of the Latinos in Milwaukee for a long time, not
23      closely because I'm not from here, and I assume
24      that other members of the team would also know
25      members of the Latino community in various

Page 100

1       capacities.  And so I want to be extremely careful
2       that I not misspeak.  I -- I had certain contacts
3       and I can talk about those contacts.  So that's
4       why I was being so hesitant here because I don't
5       want this record to misread that somehow I was the
6       only source of this.
7  Q   Okay.  So as the co-leader of this team, you did
8       not know what contacts other members of the team
9       were having with the Latino community; correct?
10 A   That's correct.  I would not have known all of the
11      contacts.
12 Q   But you do know the Latino community in Milwaukee;
13      correct?
14 A   I know members of the Latino community.
15 Q   You know Pedro Colon; right?
16 A   Right, yes.
17 Q   And did you call Pedro Colon?
18 A   No, I did not.
19 Q   And who else do you know in Milwaukee from the
20      Latino community in Milwaukee?
21          MR. DAUGHERTY:  Just to clarify,
22      anybody who's Latino descent who lives in
23      Milwaukee that Jim knows you want him to identify?
24      Anybody?
25

Page 101

1           MR. EARLE:  At this point anybody,
2       yes.  Let's start with the wide funnel here.
3           THE WITNESS:  Manuel, Manny.
4  BY MR. EARLE:
5  Q   Are you saying Manny, you mean Manny Perez?
6  A   Yes, I've known him over the years.  I've known
7       Zeus Rodriguez.
8  Q   Zeus Rodriguez.
9  A   And Pedro.
10 Q   Pedro?
11 A   And Jose Oliveri.
12 Q   Jose.  He's a shared friend.
13 A   Jerry Gonzalez.
14 Q   Jerry Gonzalez.
15 A   I'm sure there's others but those are the ones
16      that I've had contact with.
17 Q   So beyond Zeus, Manny -- Zeus and Manny, did you
18      contact any of those people about the remap in
19      Milwaukee?
20 A   No.
21 Q   Did you think it was important that there be
22      contact with the Latino community in the
23      redistricting process?
24 A   I -- I obviously did think that it was important
25      to contact certain people that I thought would

26 (Pages 98 to 101)

1  address the question of redistricting in the
2  **Latino community and that's the reason I contacted**
3  **MALDEF.**
4  Q    We'll get to MALDEF in a bit.  That's going to
5       be --
6  A    **But beyond that, I had no particular opinion.  It**
7       **was not my role in this process, so --**
8  Q    All right.  So -- but this is the -- this is the
9       question given that you've framed this such that
10      time sensitivity is critical.  So the question
11      that was compound that was objected to before.
12      What I want to get to is an understanding of when
13      relatively to the redistricting process progress
14      you made the first contact with the Latinos to get
15      input about the relative configuration of the 8th
16      and 9th assembly districts relative to each other.
17 A    **I don't know.  I just don't know.**
18 Q    Is it's fair to say -- well, strike that.  It
19      would be accurate to say that the truth is that by
20      the time the first contact was made by any member
21      of the team, your time-sensitive consideration had
22      come and gone and there was no flexibility in your
23      view relative to a ripple effect; is that true?
24              MR. HODAN:  Objection, lack of
25      foundation.

1              THE WITNESS:  That would be completely
2       inaccurate.
3  BY MR. EARLE:
4  Q    Okay.  So your testimony is that at some point
5       during the time that you contacted a Latino person
6       about the redistricting, you were not concerned
7       about whether or not a ripple effect would occur?
8  A    **That would be correct, I think, if I understood**
9       **the question.**
10 Q    Okay.  Okay.  Let me make sure that I understood
11      the question.
12 A    **Because I think you asked it correctly.**
13 Q    Because you're agreeing with me, so I want it read
14      back to I make sure I understood it.
15 A    **Oh, my goodness, he's finally agreed.**
16              MR. DAUGHERTY:  Can you read it back,
17      ma'am?
18              (The record was read as follows:
19              "So your testimony is that at some
20      point during the time that you contacted a Latino
21      person about the redistricting, you were not
22      concerned about whether or not a ripple effect
23      would occur?")
24              THE WITNESS:  There's a couple of nots
25      in there.

1  BY MR. EARLE:
2  Q    You want to state it affirmatively for me?
3              MR. DAUGHERTY:  In your own words?
4              THE WITNESS:  Sure, yes.  At the time
5       I first contacted a Latino group about the --
6       about the Milwaukee configuration for 8 and 9 and
7       you said senate District 3 -- I didn't remember
8       the senate number -- I was unconcerned about
9       potential ripple effects.
10 BY MR. EARLE:
11 Q    Okay.  So it's -- now, you don't dispute that
12      other members of the redistricting team understood
13      that Latino concerns about the 8th and 9th
14      relative to each other, the configuration of those
15      two districts could be considered as long as there
16      was no ripple effect?
17 A    **I'm sorry, I don't understand that question.  I**
18      **tried to follow the question.**
19 Q    And it's probably my fault but let's see if we can
20      read it back.
21              (The record was read as follows:
22              "So it's -- now, you don't dispute
23      that other members of the redistricting team
24      understood that Latino concerns about the 8th and
25      9th relative to each other, the configuration of

1       those two districts could be considered as long as
2       there was no ripple effect?")
3              MR. HODAN:  I'm not sure I understand
4       it.
5              MR. EARLE:  That's fair and I'll try
6       and redo it.
7  BY MR. EARLE:
8  Q    You don't dispute the testimony of some members of
9       the team that they understood that Latino concerns
10      about the configuration of the 8th and 9th were --
11      could be considered as long as there was no ripple
12      effect?
13 A    **I don't know what their testimony was.**
14 Q    Well, I read you Joe Handrick's --
15 A    **And I said that at some point I wish -- I wish**
16      **there was a black-and-white date on which that**
17      **would have been the case.  I don't know that there**
18      **is, you know, this date, this hour, and I**
19      **specifically said, if I recall my own testimony,**
20      **is that we were -- we would always have been**
21      **amenable even with ripple effects if we believed**
22      **that it was important as a legal proposition to**
23      **make the change that might have been there, but**
24      **that as a practical matter in a legislative**
25      **process, particularly in redistricting, there**

Page 106

1    comes a point where you simply have to make the
2    call, and it does not surprise me at all that
3    Joe Handrick or others would have said and would
4    have believed that it needed to be contained --
5    that the change as we approached committee
6    hearings and the like, the change would need not
7    to have ripple effects.  That does not surprise me
8    at all.
9  Q    Do you know when the first time that
10   Zeus Rodriguez was contacted by a member of the
11   legal team?
12 A    No, I don't.
13 Q    Do you understand -- do you have an understanding
14   generally when the first time he was contacted?
15 A    Sometime in June or July of that year.
16 Q    Were you involved in contacting him?
17 A    You know, I don't remember.  I might have been.
18 Q    Did you talk to Scott Jensen about Zeus Rodriguez?
19 A    No.
20 Q    Do you know Zeus Rodriguez through Scott Jensen?
21 A    I don't know how I know him.  He's a well-known
22   person.
23 Q    Who is?
24 A    Zeus.
25 Q    Do you know at what point in time Manny Perez was

Page 107

1    contacted by any member of the redistricting team?
2  A    Again, it was during that time period and I don't
3    know whether it was me or whether it was somebody
4    else offhand.
5         MR. EARLE:  Okay.  Can we take a brief
6    break?
7         THE WITNESS:  Certainly.
8         THE VIDEOGRAPHER:  We are going off
9    record at 6:13 p.m.
10        (A recess was taken.)
11        THE VIDEOGRAPHER:  We are back on the
12   record at 6:29 p.m.
13 BY MR. EARLE:
14 Q    Mr. Troupis, did you speak with Professor Gaddie
15   at any point during the redistricting process?
16 A    Oh, sure.
17 Q    How often did you speak with Professor Gaddie?
18 A    Not very often.  He had -- my recollection is, the
19   only significant conversations we had would have
20   been in early June of 2010 when he was here at the
21   meetings.  He came to -- one other occasion he had
22   come to town but it was during the middle of the
23   Prosser recount, and aside from having drinks with
24   him one night, I don't think I made it -- I might
25   have made it to the meetings but I don't recall.

Page 108

1  Q    You mean early June of 2011.  You said 2010.
2  A    Did I miss the year?  2011.  I -- it's getting
3    late, Peter.  So thank you for correcting me.
4  Q    And you were involved with the decision to hire
5    Professor Gaddie in particular to assist you in
6    putting together the map; right?
7  A    Yes.
8  Q    And were you involved -- and you were involved in
9    the decision to hire him to defend that map;
10   correct?
11        MR. HODAN:  Objection to the
12   characterization.
13        MR. EARLE:  What characterization are
14   you --
15        MR. HODAN:  You're suggesting to
16   defend, which suggests that he was given an
17   assignment to defend rather than asked for his
18   opinion regarding the matter.
19        MR. EARLE:  Wait.  Did you -- I want
20   to understand, Mr. Hodan, you're saying that
21   it's -- that using the word "defend" the map is
22   improper when -- with reference to Professor
23   Gaddie?
24        MR. HODAN:  You're suggesting,
25   counsel, that he was told what position to take,

Page 109

1    and so why don't you ask him a question.
2         MR. EARLE:  Were you present at the
3    deposition of Professor Gaddie where he
4    characterizes himself?
5         MR. HODAN:  Why don't you ask the
6    witness the question?
7         MR. EARLE:  I will but you --
8         MR. DAUGHERTY:  Objection is noted.
9         MR. EARLE:  Yes, objection is noted
10   and I'll note for the record and I'll represent to
11   you that Professor Gaddie indicated in his own
12   words that he was retained to defend the matter.
13        THE WITNESS:  Interesting choice of
14   words, but if that's what he said, that would be
15   fine.  I was -- I was actually thinking about a
16   different way is that because my representation
17   ended effectively at the end of the legislative
18   process, I don't know his role.  I have since
19   learned that his role, that he was retained for
20   purposes of the litigation.  So that's -- I would
21   just separate those.
22 BY MR. EARLE:
23 Q    And you had no -- no discussions with anybody on
24   the redistricting team about who would be hired
25   after the maps were adopted.

28 (Pages 106 to 109)

1 **A    That is -- that is correct except for Professor**
2 **Grofman.**
3 Q    Okay.  All right.  So, well, let's constrain then
4       the inquiry to the period before the adoption of
5       the maps.
6 **A    Yeah.**
7 Q    Okay?
8 **A    Sure.**
9 Q    Professor Gaddie testified repeatedly that he
10      had -- he advised the members of the redistricting
11      team to consult with the Latino community.  Do you
12      dispute that assertion?
13 **A    No.**
14 Q    Do you recall being advised of the importance to
15      consult with the Latino community?
16 **A    I'm not sure of the characterization because he --**
17 **he's the one who sent me to the MALDEF.  He and I**
18 **had discussions early on about the potential to**
19 **address the redistricting in the Latino community**
20 **and he gave me Nina, is it Nina Perales, I think**
21 **because he was working in the Illinois**
22 **redistricting.  So that was the context in which**
23 **he discussed with me the importance of the --**
24 **getting community involvement from the Latino**
25 **community.**

1 Q    But the Latino community in Milwaukee, he advised
2       the redistricting team to get -- to consult with
3       the Latino community in Milwaukee that was being
4       redistricted.  That was the essence of his
5       testimony.
6 **A    If you characterize it that way, that's fine.**
7 Q    Do you disagree with that testimony?
8           MR. HODAN:  Objection.  Lack of
9       foundation.  If you know.
10          THE WITNESS:  I -- your
11      characterization seems reasonable, you know,
12      because he encouraged us to get in touch with
13      MALDEF and to have them get in touch ultimately
14      with the Latino community here in Milwaukee.  So
15      that was my understanding.
16 BY MR. EARLE:
17 Q    Okay.  So I'm going to constrain my -- my
18      examination of you, the scope of this examination,
19      this direct examination, to the consultation,
20      the -- with the Latino community in Milwaukee,
21      okay?  That's what I'm focusing on.
22 **A    Okay.**
23 Q    The -- Chicago is in a different state and --
24          MR. DAUGHERTY:  We'll stipulate to
25      that.

1 BY MR. EARLE:
2 Q    And they have a different football team than we
3       do.  So the Latino community that I'm concerned
4       about, they're all Packers fans.
5 **A    Are you sure of that?**
6 Q    I'm pretty sure.  So -- so you don't dispute that
7       Professor Gaddie advised the redistricting team of
8       the importance of consulting with Milwaukee's
9       Latino community about redistricting; isn't that
10      correct?  You don't dispute that.
11 **A    I don't know that.  I think I've just testified to**
12 **what I know.  My role is the legal side of things.**
13 **I have no reason to dispute that he would have**
14 **talked to other people on the team about the**
15 **importance of contacting the Latino community**
16 **because of course this is both a legal and a**
17 **nonlegal legislative process.  So it certainly**
18 **wouldn't surprise me that he said something to get**
19 **the community, get the community input from**
20 **Milwaukee, which that doesn't surprise me.**
21 Q    And you don't remember any conversations of the
22      team in which this advice from Professor Gaddie
23      was discussed.
24 **A    No, I don't.  I mean, he talked -- I already told**
25 **you what he told us.  I mean, in my conversations**

1 **with him and the meetings we were in was to get**
2 **input from the Latino community and that's exactly**
3 **what we did, as he had advised me to do.**
4 Q    So you can't give us any testimony about when it
5       was that Professor Gaddie gave this advice to the
6       redistricting team.
7 **A    Yes, I can.  I said that he gave me that advice**
8 **I think as early as May when he gave me Nina**
9 **Perales' name and then I started making the**
10 **contacts.**
11 Q    All right.  Do you know when was the first time
12      that you contacted somebody in the Latino
13      community in Milwaukee?
14 **A    With a residence in this community?  I don't**
15 **remember.  If what you're saying is the residence.**
16 **I just don't remember.**
17 Q    Well, all right.  You testified at the very
18      beginning of this deposition that you were an
19      experienced election law lawyer, that you --
20 **A    I appreciate your characterization, okay, that's**
21 **fine.**
22 Q    And you testified that you taught a class for
23      Professor Esenberg on redistricting.
24 **A    Yes.**
25 Q    And you've described a decennial?

Page 114

1   A   Like the locusts, you know, what, they come every
2       ten, '80, '90, 2000, 2010, yes.
3   Q   Well, given all that experience and knowledge and
4       so forth, how important is it to consult with the
5       Latino community that's being redistricted?
6   A   As a legal matter or as a political matter?  This
7       is a very is different question when you take the
8       two, separate the two.  From a political
9       standpoint, you know, the legislature, it's always
10      important to be in touch with communities all over
11      the state and I don't put the Latino community in
12      any special or different category than the
13      African-American community or the community in
14      Madison or La Crosse or anywhere else.  That's
15      important.
16          As a legal matter, I'm concerned about
17      meeting certain legal criteria, and in that
18      respect to the extent that contact helps in that
19      regard, it's a good idea.
20  Q   What do you know about the Latino community in
21      Milwaukee?
22  A   I would apologize, I don't know a lot about the
23      Latino community.  I would not put myself -- as I
24      told you before, I'm not from here, so I -- I
25      certainly know very little about it on a personal

Page 115

1       level.
2   Q   What do you know -- have you ever heard of a
3       street called Cesar Chavez Drive?
4   A   Yes.
5   Q   What do you know about Cesar Chavez Drive?
6   A   Only what I've learned here, that it's an
7       important street in that part of the world, in
8       that part of the city.
9   Q   Where did you hear that when you said "I've heard
10      that here"?
11  A   The during the course of the discussions that
12      occurred, actually it was after the hearings and I
13      think maybe you mentioned it at the hearings.
14      I can't remember, but at about that time this idea
15      of this particular street where a lot of
16      businesses are located, because I've not -- I've
17      not been on the street -- was an important issue.
18      So that's, as I said, it may well have been your
19      testimony or somebody else's that day but it
20      was --
21  Q   It was after the hearing?
22  A   I remember just having discussions after the
23      hearing about it because, as I said, I had not
24      really known much about that street before that.
25      That's at least my recollection.

Page 116

1   Q   Well, your recollection is --
2   A   Is it pretty accurate or not?
3   Q   Better than mine.  I'm not sure I would remember
4       that but --
5   A   Well, I listen but maybe I'm incorrect.
6   Q   Well, I'll show you what's been marked as
7       Exhibit 99, which is -- was Exhibit -- yeah, it
8       was Exhibit 99 to the Handrick deposition, and do
9       you recognize this e-mail?
10  A   Give me a moment.
11          MR. HODAN:  Do you have another copy.
12          MR. EARLE:  Sure.
13          THE WITNESS:  I apologize, I'm reading
14      it.
15          MR. HODAN:  Can we go off the record
16      for a minute?
17          MR. EARLE:  Sure.
18          THE VIDEOGRAPHER:  We are going off
19      the record at 6:41 p.m.
20          (Discussion off the record.)
21          THE VIDEOGRAPHER:  We are back on the
22      record at 6:41 p.m.
23          THE WITNESS:  Okay.
24  BY MR. EARLE:
25  Q   Do you recall this?

Page 117

1   A   I do kind of, yes.
2   Q   Okay.  Let's place it in context.  The e-mail that
3       you sent to Adam Foltz, Tad Ottman, Joseph
4       Handrick, Eric McLeod and Ray Taffora was dated
5       July 25th, 2011 at 12:36 p.m; correct?
6   A   Yes.
7   Q   And this was after the hearing; correct?
8   A   Yes.
9   Q   When was this in relationship to the passage of
10      the act?
11  A   I don't know.  It was prior to the governor
12      signing it, I know that.
13  Q   So we can say that this was after the act was
14      passed before the governor signed it; correct?
15  A   I believe that's correct.
16  Q   So what do you mean, the process still dominates,
17      and you have the word "process" in quotes?
18  A   Because the article, I was referring to the fact
19      that the article made comments about the speed of
20      the process.  In fact, it was he wishes more time
21      were given to the process and that's Zeus, who I
22      told you, you know, Zeus Rodriguez.  So that's
23      what I was referring to.
24  Q   Okay.  So -- and Zeus was criticizing the -- the
25      redistricting process as being too fast to allow

30 (Pages 114 to 117)

Halma-Jilek Reporting, Inc.          Experience Quality Service!          (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 30 of 107   Document 188

Page 118

1  for the community to effectively participate in
2  if; correct?
3 A I don't know about the latter but I know about the
4  former, which is that I -- I understood him to be
5  upset that the process had gone forward too
6  quickly.
7 Q Did you ever discuss that with Zeus?
8 A I don't believe I did.
9 Q And you say notice the absence of the 50 percent
10  senate district claim.
11 A Yes.
12 Q You're reacting to a claim by JoCasta Zamarripa
13  that she thought it might be possible to draw a
14  senate district that had a 50 percent Latino
15  population?
16 A I had understood her testimony -- she was not
17  testifying but she was during the course of the
18  hearing that took place, I believe on the 13th,
19  JoCasta had repeatedly suggested that there could
20  be a majority senate district.  And in the course
21  of that, I did not understand it to be she
22  thought, she said it could be and I believe I
23  thought she said we actually have a map.  It
24  wouldn't have surprised me that she had maps
25  because -- because the Democrats had access to the

Page 119

1  same software and it was -- it was surprising to
2  me at the hearing that they did not present maps
3  and present alternatives because everybody had the
4  same software and the same information now for
5  six, eight months.
6    And so when he said that, I
7  immediately -- I was surprised and I -- I remember
8  that I went to our people because I didn't run the
9  maps.  So that's why I'm saying that because I was
10  very surprised that you could draw 50 percent,
11  because if we could, then we probably would have
12  tried.
13 Q Now, I must focus, the thing I'm most interested
14  in about Exhibit 99 is the last sentence where
15  you -- why don't you read the last sentence into
16  the record.
17 A Thus, the alternative of simply redrawing within
18  the area remains a real possibility.
19 Q Now, within the article, there is the -- the
20  suggestion that -- that the redistricting dilutes
21  the community by dividing it amongst two
22  districts; correct?
23 A I think that's a fair reading of what's said
24  there.
25 Q And that's what you're referring to in the last

Page 120

1  sentence of the -- of this e-mail?
2 A No, no, that's not what I'm referring to.  We just
3  discussed the Cesar, the Chavez Drive question,
4  which as I told you I was unaware of to speak for
5  all intents and purposes.  And the possibility
6  that meeting the Latino community's needs or
7  desires, even this late in the process, seemed
8  like something that might be able to be done given
9  the -- given Chavez Drive.  That was simply my
10  observation, but I had no specific knowledge of it
11  or otherwise.  I was observing that it appeared
12  that the concern was not the senate district but
13  was the way in which 8 and 9 had been divided.
14 Q So I just want to be clear.  On June 25th, after
15  the passage of the act before the governor had
16  signed it, you were --
17    MR. DAUGHTERY:  July 25th actually.
18    MR. EARLE:  Thank you.  I appreciate
19  that.  It's getting late.  I'm sorry.
20    MR. DAUGHTERY:  I understand.
21 BY MR. EARLE:
22 Q On July 25th, 2011 after the act had been passed,
23  Act 43 had been passed into law by the legislature
24  before the governor had signed it into law, you
25  were stating here that the alternative of

Page 121

1  redrawing within that area remains a possibility,
2  and you're speaking here in the context of
3  reconfiguring 8 and 9 within the boundaries of
4  those two districts; correct?
5 A That's a fair statement.
6 Q So at this point in time, as a member of the legal
7  team --
8 A Yes.
9 Q -- because you were still a member of the legal
10  team; correct?
11 A Yes.
12 Q It was your view that it was a possible to
13  reconfigure 8 and 9 in a way that -- that
14  satisfied concerns of the community that you had
15  been previously unaware of.
16 A There's a lot of editorial comment there, Peter.
17  Let me be very explicit.  At this point in time
18  that comment as it would have be today was that if as a
19  practical matter one could avoid litigation by a
20  simple change of boundary within 3, so it can be
21  confined within that, you know, I'm a trial
22  lawyer.  We try to solve problems and that comment
23  was about trying to solve a problem that
24  apparently some people in the community believed
25  but it was not a comment, it absolutely was not a

Page 122

1  comment on the legality or the legitimacy of the
2  districts that were there.
3  Q  But it was a comment that recognized the legality
4  of an effort to alter the district so as to
5  respond to concerns of a community.
6  A  There are an infinite number of ways to draw
7  districts, infinite in the state, and this was --
8  your comment is correct, I think, Peter.  You
9  know, at that point in time, as I would today, you
10  know, it -- it can be done.
11  Q  Okay.  Let's get to -- so I understand this.
12  You're saying today it could be done.
13  A  I understand that the discussions that are going
14  on.  I'm not -- I'm not oblivious to the
15  discussions that were going on based on the Court
16  trying to get the legislature to redo some things.
17  Q  I want to try and figure out when was the first
18  time you had contact with Manny Perez.
19  A  You probably have some e-mails.
20  Q  I do.
21  A  Okay.
22  Q  But we want to get to the -- truth of this as
23  accurately as we can, so I have two e-mails.
24  A  I wish life were so black and white.  I'll do the
25  best.

Page 123

1  Q  But let's talk about Manny Perez.  You know him;
2  correct?
3  A  I've known him, yes.  I've said that before.
4  Q  How do you know him?
5  A  I don't know how I know him.  He's a well-known
6  person.
7  Q  In what circle is he a well-known person?
8  A  Well, among the people I mentioned to you, I
9  suppose.  He's a community leader.  He was well
10  known.
11  Q  In what community is he a leader?
12  A  The state of Wisconsin.
13  Q  In the Wisconsin state community he's a leader?
14  A  He's extremely, he's well known, yes.
15  Q  And how is it that he's well known?
16  A  Well, if what you're fishing for is because he's a
17  Latino, I don't know.
18  Q  I'm not fishing.  I'm trying to figure out why it
19  is that you think he's a well-known person.
20  A  Because I've known him and I don't know a lot of
21  people from Milwaukee.
22  Q  Okay.  What position has he held?
23  A  I don't know.  I don't know.  I just know of him.
24  I know we've met on occasion.  That's how I know
25  him.

Page 124

1  Q  Do you know if Scott Walker ever appointed him to
2  a cabinet post?
3  A  No, I don't.  Did he?
4  Q  Yes, he did.
5  A  No, I didn't know that.
6  Q  Okay.  Okay.  All right.  But outside of -- in
7  what context do you know him then?
8  A  I said, I'm -- I don't know how I got to know him.
9  I just simply don't know but he's well known.
10  Q  Do you socialize?
11  A  No, no, I told you just in passing we've known
12  each other.
13  Q  I'm trying to figure out which one is the first
14  one.  I'm going to show you what's been marked
15  already as Exhibit 209 but -- I assume this is not
16  on the list.  It's July 12, 2011 at 3:32 p.m.  Why
17  don't you take a moment and read the --
18  A  Okay.
19  Q  That 209 is a trial exhibit number and it hasn't
20  been introduced at trial yet, so it will be.
21  A  It will be.
22  Q  So if we mark it here, it will have a different
23  number.  So you remember this e-mail?
24  A  Now that I've read it, yes.
25  Q  Okay.  And this is Tuesday, July 12th, 2011 at

Page 125

1  3:32 p.m., okay?  Will you read the e-mail into
2  the record, please?
3  A  MALDEF is going to publicly endorse the 60-54 map.
4  Q  And you put an exclamation after that sentence;
5  right?
6  A  Yes, yes.
7  Q  Continue.
8  A  The will send, there's a grammatical error there,
9  not surprising given my typing skills.  The will
10  send someone to testify, paren Alonzo Rivas, end
11  paren.  He is testifying in St. Charles,
12  Illinois -- that's IL in this case -- at 9, so he
13  may not get here until over the noon hour.  We
14  will --
15  Q  Before you go on to the next sentence, you meant
16  to say they; right?
17  A  What, did I misread it?
18  Q  You read it accurately as it's written.
19  A  They.  I think that's right.  I think it's they.
20  Q  So is the judges reading this exhibit will be able
21  to know that what you intended to write there was
22  they would send some.
23  A  I assume that's what I intended to write because
24  that makes sense.
25  Q  Is there any other possible --

32 (Pages 122 to 125)

Page 126

1   A    No. My wife is a great one for letters but I'm
2       not, so it certainly looks like "they" would be
3       the right word.
4   Q    I think we share the same typing skills.
5   A    Thank you. Please don't hold me too responsible
6       on this.
7   Q    Next sentence?
8   A    We will certainly want him to testify as this will
9       take the largest legal fund for the Latino
10      community off the table in any later court battle.
11      In the meantime, I am hooking them up with
12      Manny Perez to see if they can coordinate
13      testimony all in favor of the 60-54 option.
14      Period, Jim.
15   Q    Let's talk about the content of this. So you were
16      thinking ahead to the benefit of having Alonzo
17      Rivas testify because by doing so it was your view
18      that that would make unavailable to the Latino
19      community in Milwaukee the largest legal fund for
20      later courtroom challenges to the redistricting
21      plan. That's accurate; right?
22   A    Well, if you read the e-mail --
23           MR. HODAN: Objection only to the
24      extent that I believe there was already a pending
25      lawsuit. So I think you said later challenges but

Page 127

1      I believe there was already a challenge at that
2      time.
3           MR. EARLE: There was not a challenge
4      by any Latino community.
5           MR. HODAN: That's fine. Just so the
6      record's clear. There had already been a pending
7      lawsuit.
8           THE WITNESS: My comment in here is
9      what it is.
10 BY MR. EARLE:
11   Q    So but I just want to make the record very clear.
12      I mean, you're going to stand by this comment, and
13      the comment means that it was your intent that by
14      facilitating this testimony, one of the benefits
15      of facilitating the testimony of Alonzo Rivas, you
16      would be making unavailable to the Latino
17      community access to a potential funding source is
18      for a legal challenge to the redistricting plan.
19   A    Now you're assuming a lot of things and that would
20      not be correct.
21   Q    Okay. So you deny -- okay. Well, let's break it
22      down here. I mean, it's, these were your words,
23      you selected these words; correct?
24   A    Yeah, these words. Not the ones you just said but
25      these words I did say.

Page 128

1   Q    I'm just trying to interpret them as reasonably as
2      I can and I'm trying to get to the truth of this
3      matter.
4   A    You're trying to take certain inferences from that
5      and that's fine.
6           MR. HODAN: Why don't you ask him a
7      question?
8 BY MR. EARLE:
9   Q    So you wanted Alonzo Rivas to testify; correct?
10   A    Yes.
11   Q    That proposition is a fact?
12   A    Yes.
13   Q    And that covers the --
14   A    I wanted somebody from MALDEF to testify, whether
15      it was Alonzo. I did not meet him until yesterday
16      in court. That's the first time I met him.
17   Q    But you used the word "him" in that sentence.
18   A    That's what I said. I was told he was going to do
19      here, but the way you had said it suggested that
20      it mattered to me who was and it didn't. I was
21      more concerned about MALDEF taking a public
22      position.
23   Q    So the first part of that sentence says we will
24      certainly want him to testify. Those words, just
25      those words alone.

Page 129

1   A    That's what it says.
2   Q    So you wanted somebody from MALDEF to testify but
3      you used the word "him," referring to Alonzo Rivas
4      because he had been identified to you.
5   A    Yes.
6   Q    And you had never met him before?
7   A    No, not till yesterday.
8   Q    And then you have the second half of that
9      sentence, and you say as this will. Okay. That
10      means there is a purpose for wanting him to
11      testify; correct?
12   A    One of the purposes, yes.
13   Q    And one of those purposes was that it would take
14      the largest legal fund for the legal community off
15      the table in a later court battle; right?
16   A    That was one of the reasons, yes.
17   Q    Okay. You did not want MALDEF's funding to be
18      available to the Latino community for a possible
19      legal challenge; correct?
20   A    You'll forgive me but I did know that -- I look at
21      it today and it says will take the largest legal
22      fund. I don't think it ever occurred to me about
23      money the way you're suggesting it. MALDEF has an
24      extraordinary national reputation and they are a
25      legal fund, but you're suggesting that it had to

33 (Pages 126 to 129)

Page 130

1    do with money and that is simply not connect.
2    I would not have thought of it that way at that
3    time.
4            And I realize when you read those
5    words now they are the largest legal fund but it
6    had -- my interest there did not have to do with
7    money but certainly had to do with MALDEF taking a
8    public position given their prestige that this
9    matter had been resolved correctly and properly.
10   Q   All right. Well, let's go to the second
11   paragraph, okay? In the meantime and I'll read it
12   into the record to make it -- why don't you go
13   ahead.
14   A   Whatever. I think I already had. The last
15   paragraph?
16   Q   Yeah.
17   A   In the meantime I am hooking them up with
18   Manny Perez to see if they can coordinate
19   testimony all in favor of the 60-54 option.
20   Q   Okay. So this is the first -- is this the first
21   time that to your recollection that you dealt with
22   Manny Perez in terms of the redistricting plan?
23   A   I believe so and, in fact, the -- I probably
24   looked a little quizzical when I read that a
25   minute ago because I thought Ray Taffora had been

Page 131

1    involved in making that contact and I may be
2    incorrect but Ray must have given me the number
3    for Manny because I don't believe I would have had
4    his number without Ray.
5    Q   And you considered it was important to get Manny
6    to speak in favor of the map because in your view
7    he was a leader of the Latino community?
8    A   Among the reasons he is a leader and that is
9    certainly reasonable, yes.
10   Q   And this comment was made on July 12, 2011 at 3:30
11   in the afternoon, the day before the hearing;
12   correct?
13   A   Yes.
14   Q   Okay. And the fact of the matter is that
15   Manny Perez didn't even have a copy of the map at
16   that point; isn't that true?
17   A   I don't know that.
18   Q   You didn't provide him with a copy of the map,
19   isn't that true?
20   A   I don't know what I provided him. The maps were
21   published, so at this point presumably he had them
22   but I don't know.
23   Q   Okay. Let's go to the second e-mail involving
24   Manny Perez. It's already marked as trial
25   Exhibit 206.

Page 132

1    A   You guys are ready.
2    Q   Huh?
3    A   You guys are ready for trial on all these
4    exhibits.
5    Q   We were ready on Tuesday.
6    A   That's when I wanted to be on vacation.
7            MR. DAUGHTERY: Could I get a copy,
8    please.
9            MR. EARLE: Sorry.
10           THE WITNESS: Oh this is a bit later,
11   okay.
12   BY MR. EARLE:
13   Q   Well, to be precise, this is exactly --
14   A   These are all listed. Would you check these,
15   please? Just to make sure that -- and they're
16   actually marked 1 through 9, so if you look at my
17   documents there, you can just look at it. You
18   can look at your list. See if 1 through 9 are
19   okay.
20           MR. DAUGHTERY: Yeah, the handwritten
21   1 through 9.
22           THE WITNESS: Yes.
23           MR. DAUGHTERY: They're fine.
24           MR. EARLE: Okay.
25

Page 133

1    BY MR. EARLE:
2    Q   So let's go to the --
3    A   Is this running backward sequence?
4    Q   Well, there's a sequence here having to deal with
5    JoCasta Zamarripa, and I wasn't going to ask you
6    about that unless you want to talk about JoCasta
7    Zamarripa?
8    A   We talked about her earlier. And so I whichever
9    one you would like. Tell me which one you want.
10   Q   Well, I'm interested in the Manny Perez contact.
11           MR. DAUGHTERY: Which number?
12   BY MR. EARLE:
13   Q   Number one and which was exactly according to my
14   calculation here --
15   A   Thirteen minutes.
16   Q   Thirteen minutes after your prior e-mail.
17   A   Yeah.
18   Q   So now you -- so in those 13 minutes you had
19   confirmed with Manny Perez that he was willing to
20   come testify for the map?
21   A   I don't know. I could have talked to him before
22   that. It just says I'm hooking them up with
23   Manny Perez, which means I was presumably giving
24   MALDEF -- it would probably be Elisa Alfonso the
25   phone number for Manny. So that's what this --

34 (Pages 130 to 133)

Page 134

1    I'm looking -- I apologize.  I'm looking at 209.
2    I'm hooking them up with Manny.
3  Q    Let's look at the e-mail and see what we can
4    derive from that.  Why don't you read it into the
5    record.
6  A    Sure.  Tad and Adam, you can let the chair know
7    that Manny Perez and others from the Latino
8    community will be there to testify for a 60-54
9    map.  You will need to have a large map showing
10    that district.  You should prepare that and bring
11    it with.  You should still I think talk about the
12    three alternatives.  That way it looks like what
13    it is and -- again I misspelled.  I think it's
14    an, an effective negotiation of something the
15    community wants.  Congratulations.  Manny is
16    talking right now to MALDEF to coordinate their
17    testimony.  Jim.
18  Q    Okay.  So from the last sentence, we can tell that
19    your communication with Manny occurred in those 13
20    minutes; correct?
21  A    I --
22  Q    Because in the first sentence you were going to --
23    you were going to hook them up and in the second
24    sentence Manny is now doing it?
25  A    You read an awful lot into the words.  You know,

Page 135

1    and I might have.  I don't recall, but it looks to
2    me like I gave Manny's number to MALDEF, and so my
3    last comment about Manny is talking to MALDEF to
4    coordinate their testimony could candidly just be
5    an acknowledgment that I had given them their
6    number and they were going to talk.  It may have
7    been that I talked to Manny.  I just don't
8    remember.  I don't know why that would be
9    important one way or the other, but I just don't
10    know who talked to whom first.  I assumed MALDEF
11    was going to talk to Manny.
12  Q    Now, who were the others from the Latino community
13    who will be there to testify?
14  A    I don't know.
15  Q    Can you recollect anybody else besides Manny Perez
16    who would be there to testify?
17  A    Not as I sit here today.
18  Q    Is it accurate to say that you were in charge of
19    coordinating the appearance of the Latino
20    community as being supportive of that map?
21  A    No.
22  Q    That was part of Act 43?
23  A    No, that would not be correct.
24  Q    Because is it that that is not a truthful statement?
25  A    Because you used the term appearance to suggest

Page 136

1    that somehow it was not real and effective and
2    dealt with the legal issues that had to be dealt
3    with.
4  Q    Well, Mr. --
5  A    And that was not my purpose.  That's the way it
6    looks like what it is, an effective negotiation of
7    something the community wants.  I would not call
8    that appearance.  I would call that exactly what I
9    said, effective negotiation to lead to a result
10    that was legal and effective for the community and
11    the state.
12  Q    And that's predicated on Manny Perez' support when
13    starting the day before the hearing, the afternoon
14    before the hearing.
15  A    Now you're assuming all kinds of things that
16    aren't -- that aren't correct.
17  Q    Can you identify any document anywhere that would
18    indicate you had a prior contact with Manny Perez
19    or anybody on the legal team had a prior contact
20    with Manny Perez about the redistricting process?
21  A    I don't know what's been produced in this case, so
22    I don't know.  I don't have any recollection of
23    other documents.
24  Q    Now, you were monitoring the press as it pertained
25    to the activity of the Latino community in

Page 137

1    Milwaukee regarding redistricting; correct?
2  A    That would not be correct.  I was not monitoring
3    the press.
4  Q    Who was?
5  A    I don't know that anybody was.  From time to time
6    I would get articles but I don't think anybody --
7    I know of no effort to monitor the community's
8    press or the press in Milwaukee.
9  Q    Isn't it true that you -- whenever the Latino
10    community of Milwaukee appeared in the newspaper
11    and with regards to the redistricting process in
12    Milwaukee, that you would clip the article and
13    distribute it to the rest of the team?
14  A    I recall one instance of that prior to the hearing
15    but if there were others, I just don't recall
16    them.
17  Q    We just covered one of those instances; right?
18    There was an article that you distributed to the
19    rest of the team; correct?
20  A    I thought that was after the hearing.
21  Q    That's what I mean, after the hearing?
22  A    I thought you said before the hearing.
23  Q    You did before the hearing as well, didn't you?
24  A    Well, no, I told you I knew of -- I recall an
25    article, I believe it was about something you had

35 (Pages 134 to 137)

Page 138

1    been working on, that came to me sometime in June,
2    as I recall, but that's about all that I recall.
3  Q   Showing you what's been marked as Exhibit 96 from
4    the Handrick deposition.  I'm pretty sure it was
5    not on the list because it was a Handrick
6    deposition.
7  A   So it must have already gotten there.  That's
8    good.  Can you give me a moment to look at this?
9  Q   Sure.
10  A   Okay, now I do remember.
11    The article appears on the back page.
12  A   That's because you guys -- no, you're not -- yes,
13    you are environmentally conscious.  It's
14    two-sided.  Very good.
15  Q   Have you had an opportunity review it?
16  A   No, I'm still looking at it.  Okay.
17  Q   And I have to apologize, I mischaracterized when I
18    said you and it's, in fact -- perhaps it's a
19    function of my age or the hour of the day.  This
20    was clipped by Adam Foltz and sent to you?
21  A   Yes.
22  Q   And other members of the team?
23  A   That's my recollection.
24  Q   So just to be accurate, on June 6, 2011, at
25    8:00 p.m., Adam Foltz sent an e-mail to Keith

Page 139

1    Gaddie, you and Eric McLeod with copies to Tad
2    Ottman and Joseph Handrick; correct?
3  A   Yes.
4  Q   And the caption of the article was The Hispanic
5    Community Speaks in Milwaukee; correct?
6  A   That's the caption of the article.
7  Q   And it was a press release from Voces de la
8    Frontera?
9  A   Right.  Yes.
10  Q   So from this we know that you had been
11    receiving -- you had received information at least
12    once --
13  A   Yes.
14  Q   -- prior to the adoption of the map and relatively
15    early in the process, this is June 7 of 2011;
16    correct?
17  A   I'm not sure it was early in the process, but it's
18    consistent with my testimony a minute ago that I
19    recall receiving at least one clipping related to
20    the Milwaukee Latino community.
21  Q   And as a result of this, you certainly understood
22    that there was a group called Voces de la
23    Frontera; right?
24  A   I didn't know.
25  Q   What --

Page 140

1  A   Again, you're reading into it as if I would have
2    noticed that.  I do now and then I see there was a
3    group and I had no knowledge of this group before
4    this and I didn't take away that who they were or
5    what they were after this.  I simply knew there
6    was a group in Milwaukee that had filed a
7    statement on the aldermanic districts.  That's all
8    I knew.
9  Q   Well, the attached press release from Voces de la
10    Frontera describes the organization in substantial
11    detail, doesn't it?
12  A   Well, it does but I probably skipped that
13    paragraph because it wasn't what I would have been
14    interested in.  I would have been interested in
15    the numbers and the configurations of districts.
16    So I'm telling you I simply -- I wouldn't have --
17    it wouldn't have made any impression.  And I don't
18    mean that meanly.  I just mean that it wouldn't
19    have made any impression.
20  Q   So you responded to this e-mail like 40 minutes --
21    the next day in the morning; correct?
22  A   Yes.
23  Q   And now why did you take this particular e-mail
24    response and caption it in large bold type
25    attorney-client privileged, litigation

Page 141

1    preparation?
2  A   Why did I do that?
3  Q   Yeah.
4  A   Because the issue of percentages was a legal
5    question that needed to be addressed in the
6    context of minority districts.  And so I would
7    have viewed this and I would view it today as the
8    classic attorney-client privilege, certainly
9    attorney work product privileged.  So I view it
10    then and I view it now as that way.
11  Q   So on June 7 of 2011, more than a month before the
12    public hearing, you were preparing for litigation
13    relative to the Latino community?
14  A   We were preparing for litigation, period,
15    throughout the process.  That's why I was retained
16    in large measure was to make sure that our maps
17    could survive the inevitable litigation that comes
18    in this day and age.
19  Q   But you focused the litigation preparation
20    component of this e-mail on the Latino community;
21    isn't that correct?
22  A   That's what this e-mail's about, yes.
23  Q   So this is why you wanted to take MALDEF off the
24    table?
25  A   No.  I was in touch with MALDEF at this point.

36 (Pages 138 to 141)

Page 142

1    I'd already been in touch with them.
2  Q   All right. Okay. So why don't you read into the
3    record what the body of the e-mail says.
4  A   The top one?
5  Q   Yeah.
6  A   Just the top one. The problem here is that the
7    group wants -- another misspelling, want
8    70 percent. This is classic overkill. I am
9    already very worried about the 65 percent and now
10   we have groups wanting 70 percent. Can we see
11   what that would like look. I assume it makes the
12   second assembly district not much better than 50
13   to 55 percent. Jim.
14 Q   So when I read this, I concluded that you had
15   actually taken a look at a 70 percent district as
16   a result of your directive to the other members of
17   the team.
18 A   Well, I'm asking them, at this point in time I'm
19   asking them to -- what would it look like. So I
20   hadn't looked at a 70 percent district at this
21   point.
22 Q   But we established earlier that you were one of
23   two senior members of this team; correct?
24 A   Yeah.
25       MR. DAUGHERTY: Object as to misstates

Page 143

1    his prior testimony, but subject to that go ahead
2    and answer.
3       THE WITNESS: I'm an old guy that was
4    on the team, yeah.
5  BY MR. EARLE:
6  Q   Okay. So when you make a directive to the team,
7    you want to see what this looks like. I mean, I'm
8    assuming that actually happened; right? I mean,
9    that happened?
10 A   I hope it happened.
11 Q   So you took a look at a 70 percent district.
12 A   Subsequent to this e-mail. I assume I did.
13   I don't know that. I asked them to tell me what
14   it would look like.
15 Q   Well, what happened to the maps that demonstrated
16   the 70 percent district?
17 A   I don't know.
18 Q   Did they get destroyed?
19 A   I don't know that there was a map. You've made an
20   assumption about that. I asked for a map. I
21   asked for somebody, can you see what that would
22   look like.
23 Q   Okay.
24 A   And they undoubtedly got back and confirmed with
25   me that you couldn't do better than 50 to

Page 144

1    55 percent in the second district and thus would
2    lose the benefit of -- to the Latino community of
3    having two districts. So I wouldn't have needed a
4    map for that. I mean, a printed map.
5  Q   No one on the redistricting team ever contacted
6    Voces de la Frontera, isn't that true, before
7    the --
8  A   I don't know.
9  Q   Well, you're not aware of any information that
10   would indicate that anybody from the redistricting
11   team ever contacted Voces de la Frontera; right?
12 A   I'm not aware of any, no.
13 Q   And you never did.
14 A   I never personally did. The first time I met was
15   you at the hearing on the 13th of July when I saw
16   you testify.
17 Q   Okay. And nobody from the redistricting team ever
18   contacted the Latino -- well, let me strike. Let
19   me ask a couple of foundation questions first.
20   You knew that Latino organizations in Milwaukee
21   had formed a Latino Redistricting Committee;
22   correct?
23 A   I can't say that I knew that with certainty but
24   having looked at this e-mail, I must have known it
25   at the time.

Page 145

1  Q   Well, you knew that there was -- you knew --
2  A   This e-mail meaning the one you just showed me.
3    I just wanted to make clear I just was pointing to
4    it and it was 96.
5  Q   Got you. Putting 96 aside --
6  A   Yes.
7  Q   Okay. During the aldermanic redistricting for the
8    city of Milwaukee, you were aware that the Latino
9    community of Milwaukee had formed a group called
10   the Latino Redistricting Committee; correct?
11 A   The only knowledge I had would have been from --
12   that I can remember is from Exhibit 96. That
13   would have been the sum of my knowledge at the
14   time.
15 Q   You would have been aware of all articles that
16   appeared in the Milwaukee Journal or the Wheeler
17   Report or WisPolitics about advocacy on behalf of
18   the Latino community with regards to redistricting
19   at the municipal level; correct?
20 A   No, no, I wouldn't. I would not.
21 Q   So it's your testimony you never heard of the
22   Latino Redistricting Committee then?
23 A   No, I didn't say that. I hope I didn't say that
24   because I didn't mean to say that.
25 Q   I don't want to put words in your mouth.

37 (Pages 142 to 145)

Halma-Jilek Reporting, Inc.        Experience Quality Service!        (414) 271-4466
Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 37 of 107   Document 188

Page 146

1    A    I said that Exhibit 96 reminds me that there was
2         an article about a group that was involved in the
3         aldermanic process here in Milwaukee County.
4         I have no other recollection of knowing about this
5         group or other groups that might have been
6         involved at the aldermanic level in Milwaukee
7         County or the city of Milwaukee.
8    Q    The fact of the matter is there was no effort to
9         contact anybody in Milwaukee's Latino community
10        during the month of June; am I right?
11            MR. HODAN:  By whom?
12            MR. EARLE:  By anybody on the
13        redistricting team.
14            THE WITNESS:  I don't know.  I don't
15        know that.  That would be incorrect because I was
16        in touch with MALDEF and --
17   BY MR. EARLE:
18   Q    I said the Latino community in Milwaukee.
19   A    Well, they were being encouraged to talk to the
20        community here in Milwaukee.  I mean, I -- but
21        I had no connection.  I mean, the answer is no,
22        I didn't make any calls.
23   Q    What do you know about the, for lack of a better
24        term, the cultural geography of the area
25        surrounding Milwaukee's Latino community?

Page 147

1            MR. DAUGHERTY:  Object to the extent
2         in terms of ambiguous but subject to that, go
3         ahead and answer.
4             THE WITNESS:  I'm not terribly
5         familiar with it.  If you're talking about the
6         surrounding area, my --
7    BY MR. EARLE:
8    Q    Let me back up and since he objected to the term I
9         used.  It's -- I guess I can understand that.
10        It's a reasonable objection.  I present to you the
11        concept of a cultural geography, if you will.  Do
12        you know what I mean when I say that?
13   A    No.  I'm not trying to be difficult.
14   Q    No, I'm going to clarify.
15   A    A lot of people could mean a lot of things.
16   Q    But you recognize that in a city like Milwaukee
17        you have neighborhoods that have an ethnic
18        identity, ethnic identities of various types;
19        right?
20   A    Wonderfully, yes.
21   Q    And you're also familiar with the idea that some
22        neighborhoods undergo racial or ethnic transitions
23        as a result of movement of ethnic groups over
24        time; correct?
25   A    Yes, yes.

Page 148

1    Q    And you're aware that minority groups, as they
2         move into areas that were previously predominantly
3         white or populated by people of Caucasian
4         ethnicities, European ethnicities, that sometimes
5         those folks or in those neighborhoods react
6         negatively to the movement of the folks,
7         minorities into their neighborhoods; correct?
8    A    No.  I kind of -- no, I mean, I, you know, we all
9         read what goes on.  I have not lived in a
10        community where that has happened.  I grew up in a
11        community that was 40 percent Hispanic, and in
12        that community there was never one part of town or
13        another part of town.  So -- and I'm aware in
14        Chicago, where many members of my family live, that
15        they live in communities in which Hispanic
16        populations have moved in next door and nobody's
17        moved out.  So I don't think that's correct.
18            Now, I am aware, but I have to add
19        that one of the things we looked at in 1990, 2000
20        and in 2010 were the transitions that were
21        occurring in both the African-American community
22        and in the Latino community here, and you can see
23        that -- the very thing you're talking about.  You
24        can see it demographically.  You can see it on
25        what I call heat maps that show the growth of

Page 149

1         populations over time in certain areas.  In fact,
2         I've spoken about that.
3             And there's no question that in
4         Milwaukee based on those maps, that there has been
5         a tremendous growth in the Latino community in
6         certain directions that were fairly predictable
7         candidly even 20 years ago, ten years ago and the
8         present.  So that's what I know about it.  I'm
9         not -- because I'm looking at it from that
10        perspective.
11   Q    You sat here to say, though, that you don't know
12        anything about that transitioning neighborhood
13        south of the old 8th assembly district?
14   A    No, I have no -- I have no -- what I would call
15        really personal knowledge of that.  No, I don't.
16            MR. EARLE:  Let's pause for a second
17        and go off the record.
18            THE VIDEOGRAPHER:  We are going off
19        the record at 7:25 p.m.
20            (A recess was taken.)
21            THE VIDEOGRAPHER:  We are back on the
22        record at 7:37 p.m.
23   BY MR. EARLE:
24   Q    All right.  Showing you what's been marked already
25        as Exhibit 176.

38 (Pages 146 to 149)

Page 150

1     MR. EARLE: I'm sure, Patrick, you're
2  very well aware of this exhibit. You've seen it a
3  lot in depositions.
4  BY MR. EARLE:
5  Q    This is an exhibit that was prepared at the
6  request of professor Ken Mayer, and what it shows
7  is an overlay of the 8th and 9th assembly
8  districts as currently configured over the old
9  assembly districts.
10  A    So these are -- this 8th and 9th are the existing
11  presently, these are the proposed.
12  Q    8th and 9th are Act 43 in yellow.
13  A    Okay -- this -- I apologize. Tell me again.
14  Q    So 8 and 9 are the yellow lines and under Act 43.
15  A    Okay. So this is Act 43 and those are the old
16  districts. Got it.
17  Q    So that the tannish red is the old 8 and the kind
18  of tan, tan or whatever color is the old 9th. And
19  there's a portion of the 19th assembly district in
20  darker red that was appended. See it? Now, it's
21  accurate to say that the old 8th, when you -- you
22  essentially chop the old 8th in half; correct?
23  A    You know, so it looks like here visually.
24  Q    And you chop the old 9th basically in half as
25  well; correct?

Page 151

1  A    Again, that visually that's what it appears.
2  Q    And then you took the eastern piece of half of the
3  old 8th and you attached to it the eastern piece
4  of the old 9th; correct?
5  A    I like the attribution of you.
6     MR. HODAN: I was just -- you mean the
7  legislature.
8  BY MR. EARLE:
9  Q    Well, no, I mean you. You drew this.
10  A    I didn't. I didn't personally draw this.
11  Q    And presented it to the legislature; right?
12  A    I did not draw this.
13  Q    I thought this was drawn under your supervision.
14  A    That would be very different than me drawing it.
15  Q    Well, it was drawn under your supervision. It was
16  drawn at your behest; correct?
17  A    I don't even think that's correct. I think that
18  the map, the process by which this result occurred
19  was iterative. It went through a series of steps
20  to get to this final product and it was presented
21  to the legislature, so as one of three different
22  alternatives during the hearing on July 13th. Was
23  it three? I think it was three.
24  Q    But you'd already settled on the map that was to
25  be passed by the legislature; correct?

Page 152

1  A    No.
2  Q    All right. And I just want to be clear. The
3  section in the new Act 43 8th that was taken from
4  the old 9th, we talked earlier, this is the area
5  that you don't know anything about, correct, in
6  terms of what it's like as a neighborhood;
7  correct?
8  A    I know the demographic statistics about these
9  areas and the growth rates and where they were
10  going in the future and where they had been in the
11  past, and that's what I utilized. But as I said
12  before, I have spent no significant time in the
13  neighborhood.
14  Q    And as I used the term before and explained to you
15  the term "cultural geography," you didn't know
16  anything about the cultural geography of this area
17  from the old 9th; correct?
18  A    The reason I hesitated when you said that is
19  obviously we all know, I mean, if we pay attention
20  to Milwaukee, we all know something about these
21  various neighborhoods and, you know, but for me to
22  suggest that I was an expert or anything like that
23  would be just simply incorrect. I have not spent
24  a significant amount of time in the neighborhoods
25  on the south side of Milwaukee.

Page 153

1  Q    Okay. All right. Now, in drawing the new 8th,
2  the folks that actually did the -- the iterative?
3  A    Ultimately put it in the computer.
4  Q    Yeah, right. They did this under your
5  supervision. They ended up with 55.3 percent core
6  retention in that district; isn't that right?
7  A    If that's what you say. I don't know. Without
8  the statistics in front of me, I don't know.
9  Q    I'll represent to you that the parties have
10  stipulated to that fact.
11  A    Okay.
12  Q    Why such a dramatic movement of population?
13  I mean, I guess let me just ask you the question
14  straight out; all right? According to the facts
15  that we've stipulated to in this case, in order to
16  equalize the population in the 8th assembly
17  district, you and your colleagues drawing these
18  maps had to move 2,800 and a certain --
19  approximately 2,800 people. But you moved 22,000
20  people out and 25,000 people in to accomplish that
21  movement, that population adjustment of 2,800
22  people. So I ask you, why did you do that?
23  A    I don't know. I mean, I did -- as I said, there's
24  a lot of reasons that various things happen.
25  I think I described earlier the ripple effects and

Page 154

1 the changes that occur all over the state.
2 There's an infinite variety -- there are an
3 variety of ways even of doing these two districts.
4 I do -- what's not shown on here is where JoCasta
5 lives.  That usually is a significant factor when
6 you're making these kinds of changes.  Is she in
7 the new 8th?
8 Q Yes, she is.  She was not displaced.
9 A Well, then it makes some sense, because --
10 Q No, no, she's -- she lives -- but she's also
11 living in the old 8th.
12 A That's what I mean.  But she's in this 8th, right?
13 Q Yes.
14 A Okay.  Well, then, as I said, there's an
15 innumerable policy factors and legislative factors
16 and I don't want to try to speculate on how you
17 have to do it, but because of the infinite variety
18 of things, one of the things that -- that's why
19 I had this recollection, is in order to create
20 a -- to make sure that this community would have
21 the reasonable opportunity to elect in the second
22 district, we want to -- I'm sure that one of the
23 factors was which one's open, which one isn't,
24 where the representative lives, where they don't,
25 and that kind of factor factors into this.  And

Page 155

1 that's why I said I was trying to think, as you
2 asked that question, I -- I don't remember why it
3 went north and south versus east and west.  I just
4 don't remember.  But there's just so many
5 different factors that go into that.
6 Q And drawing your attention to the line between the
7 8th and 9th, I'll represent to you in the northern
8 part of the district there there's 16th Street or
9 what we've otherwise called Cesar Chavez Drive as
10 it's been renamed by the city.
11 A Okay.
12 Q There's a notch there.  You see that notch?
13 A I don't know which notch you've referring to.
14 Q Well, there's a notch as you go down the middle,
15 there's a straight line and then there's a dog leg
16 to the right, a dog leg down and then a dog leg
17 back and it goes down again; right?
18 A Yes.
19 Q There's a little notch down on 16th Street.  Why
20 was that notch put in there?
21 A I -- I don't know.
22 Q Do you have any idea of the consequences of that
23 notch?
24 A No.
25 Q Did anybody on the team make any effort to

Page 156

1 evaluate what the consequence of that notch on
2 16th Street or otherwise known as Cesar Chavez
3 Drive was?
4 A I don't know.
5 Q Would it surprise you to know that in putting that
6 notch there, you took out of the 8th assembly
7 district the single largest grocery store and the
8 single most important medical social service
9 agency in the Latino community out of the 8th
10 assembly district?
11 A It would not surprise me one way or the other, and
12 I have to add that if you -- you could say the
13 same thing about every assembly district in the
14 state of Wisconsin, because every assembly
15 district in the state of Wisconsin is going to --
16 everybody locally is going to see it one way or
17 another because there are an infinite number of
18 life choices that are made along the way.
19   That happens to be one of the choices
20 that was made along the way.  You could choose to
21 do it differently.  Ultimately from a legal
22 perspective it would make no difference
23 whatsoever, and so I wouldn't have known it and it
24 simply wouldn't have been of any importance as a
25 legal perspective, from a legal perspective.

Page 157

1 Q Well, to the extent you did not consult with
2 anybody who actually lived in the 8th assembly
3 district; isn't that true?
4 A I didn't personally.  I think I -- whatever my
5 testimony was, I did not personally talk to
6 somebody about it, no.
7 Q But nobody on the legal team talked to anybody who
8 actually lived in the 8th assembly district; isn't
9 that true?
10 A That I don't know and because the legal aspect of
11 this is only one aspect of how redistricting is
12 done, that wouldn't surprise me.
13   MR. EARLE:  Okay.  All done.  I'm
14 done.
15   THE WITNESS:  Thank you.
16   MR. DAUGHTERY:  Thank you.
17   THE WITNESS:  But I've got to go
18 through him too.
19   MR. HODAN:  Doug, about how long are
20 you expecting to go?
21   MR. POLAND:  I'm hoping to be about a
22 half an hour or so.  I've got other things to run
23 through, but that's what I'm hoping.
24
25

40 (Pages 154 to 157)

Page 158

1                    EXAMINATION
2   BY MR. POLAND:
3   Q     Mr. Troupis, I'm Doug Poland polled I
4         represent the Baldus plaintiffs in this case.
5   A     **Who are the Baldus plaintiffs?**
6   Q     It's a group of 23 citizens who are suing.
7   A     **I'm just curious.**
8   Q     When were you retained by the legislature to work
9         on what eventually -- the redistricting process
10        that eventually resulted in Acts 43 and 44?
11  A     **I think the letter of retention -- we talked about**
12        **this a little bit ago -- was probably around, was**
13        **it around February of 2011 or January of 2011?**
14        **Sometime shortly after the new legislature.**
15                    MR. POLAND:  Can I mark this as an
16        exhibit.
17                    (Exhibit No. 225 was marked for
18        identification.)
19  BY MR. POLAND:
20  Q     Mr. Troupis, I'd like you to take a look at
21        Exhibit 225 that the court reporter has just
22        handed to you and ask you if you can identify this
23        document.
24  A     **I mean, I recognize my name's on it and I**
25        **recognize it was written to a number of people on**

Page 159

1         **December the 14th.**
2   Q     And --
3   A     **And I recognize some of the content, but I don't**
4         **recall the exact context.**
5   Q     And I wanted to ask about the date because it's
6         dated December 14th, 2010.  Do you see that?
7   A     **Yes, I do.**
8   Q     And you are addressing in Exhibit 225
9         redistricting issues with Mr. Handrick, Mr. Ottman
10        and Mr. McLeod; is that correct?
11  A     **That's correct.**
12  Q     All right.  Do you recall whether you were
13        retained by the legislature or by anyone on or
14        before December 4th, 2010 to work on redistricting
15        matters?
16  A     **I think I just said that I thought I was retained**
17        **in the early part of the new session, which was in**
18        **January and February of 2011.**
19  Q     Why would you have been speaking with Mr. Handrick
20        and Mr. Ottman and Mr. McLeod about redistricting
21        matters if you hadn't yet been retained?
22  A     **I believe I said in my earlier testimony that one**
23        **of the things that we had been doing in the year**
24        **2011 was to identify those people that we thought**
25        **would be most important to the redistricting**

Page 160

1         **process, and among those were Joe and Tad, who had**
2         **stepped forward and I knew were interested and**
3         **involved.  So I would have contacted them because**
4         **I assumed they were going to be ultimately on the**
5         **team.**
6   Q     Were you under contract or did you have an
7         agreement at that time, a retention agreement with
8         the Republican caucus?
9   A     **I don't think so.  I don't think so but I don't**
10        **remember.  I was with Michael Best -- no.  Was I**
11        **with Michael Best at this point?  No, I wasn't, so**
12        **I had left.  I just don't remember.  I don't**
13        **believe I was personally.**
14  Q     You don't believe you'd been retained personally
15        at that time?
16  A     **I don't believe -- if by retained we mean paid,**
17        **the answer would be I don't believe so, but I have**
18        **to -- the reason I'm hesitating is I have to check**
19        **my records and I just don't remember being**
20        **retained before the January or February time**
21        **frame.**
22  Q     It may have been more of an advisory role; is that
23        fair to say?
24  A     **Yes.  You might call it client development role at**
25        **this point.**

Page 161

1   Q     You can set that document aside.  Do you still
2         have Exhibit No. 188 in front of you?
3   A     **Yes.**
4   Q     And we established before that this was the
5         engagement letter by which you, and I'll just say
6         it once and hopefully not to have repeat it again,
7         but the senate by its majority leader
8         Scott Fitzgerald apparently retained Michael Best
9         & Friedrich?
10  A     **Yes, that appears to be the case.**
11  Q     I'd like to draw your attention to the bottom of
12        first page of Exhibit 188.
13  A     **Okay.**
14  Q     And there is -- there is a statement at the very,
15        the very last line on that first page that says we
16        will represent the senate with respect to both
17        litigation and nonlitigation matters relating to
18        the reapportionment representation.  Do you see
19        that?
20  A     **Yes.**
21  Q     You had testified earlier in response to a
22        question from Mr. Earle that it was anticipated
23        initially from the outset of this process that the
24        matter very well could go to litigation; is that
25        fair to say?

41 (Pages 158 to 161)

Page 162

1  **A**    **Yes.**

2  Q    That's one of the reasons that it was intended

3      that these documents be covered by an

4      attorney-client privilege?

5  **A**    **It was one of the reasons they are covered by the**

6      **attorney-client privilege.**

7  Q    Did you understand that your representation of

8      the -- of the senate and of the assembly by their

9      majority, their respective majority leaders was

10     also be part of the -- or covered by the

11     attorney-client privilege?

12  **A**    **It was always my expectation that the work we did**

13     **would in substantial part be covered by an**

14     **attorney-client privilege, yes.**

15  Q    And that was in part because you anticipated that

16     it could very well go to litigation?

17  **A**    **From my perspective that -- that's true, yes, from**

18     **my personal perspective because I'm a trial**

19     **lawyer.**

20  Q    You can set that document aside. I'm going to

21     hand you a document that previously has been

22     marked as Exhibit No. 91. It was a deposition

23     exhibit and a trial exhibit as well, and so

24     I don't think this is one that is going to be on

25     the list. I'll give you a moment to take a look

Page 163

1     at it.

2  **A**    **Okay.**

3  Q    Mr. Troupis, I think that this is a reverse

4     chronology.

5  **A**    **Right, I went from the bottom.**

6  Q    Okay, terrific. I'm glad you did that. That's

7     what I wanted to ask you about. The bottom e-mail

8     appears to be an e-mail from Mr. Handrick to you

9     on January 14th, 2011; correct?

10  **A**    **That's what it appears to be.**

11  Q    All right. And Mr. Handrick refers to a meeting

12     that he had with Senator Fitzgerald, the previous

13     week; correct?

14  **A**    **That's what it says.**

15  Q    And Mr. Handrick's e-mail also says that --

16     reports that Senator Fitzgerald had asked him to

17     get together with you, Mr. Troupis, and/or

18     Mr. McLeod to figure out how to structure his

19     involvement with the team; correct? Do you see

20     that?

21  **A**    **Again, that's what it appears to say, yes.**

22  Q    All right. Do you know by the team, is he

23     referring to the redistricting team that was being

24     put together?

25  **A**    **That's what I understood.**

Page 164

1  Q    Did you have a conversation with Mr. Handrick on

2     or around January 4th, 2011 about his inclusion in

3     the redistricting team?

4  **A**    **Based upon this e-mail it appears we did. I don't**

5     **have an independent recollection of that at this**

6     **point.**

7  Q    Okay. And if we jump up to the e-mail just above

8     that, which is Friday, January 4th, 2011, the

9     third sentence in, you state I too spoke to the

10     leaders about your involvement. Do you see that?

11  **A**    **Yes.**

12  Q    Do you recall speaking with -- strike that

13     question. By the leaders, who are you referring

14     to there?

15  **A**    **I don't know but I assume it was the speaker and**

16     **majority leader.**

17  Q    Do you recall speaking with the speaker and the

18     majority leader about Mr. Handrick's involvement

19     in the redistricting process?

20  **A**    **I have no independent recollection right now.**

21     **I mean, I can read this and come to some**

22     **conclusions, but I don't remember that.**

23  Q    Any reason to believe that you didn't at that time

24     speak with them as indicated in your e-mail?

25  **A**    **Well, it says it in the e-mails. That's what it**

Page 165

1     says.

2  Q    Were you responsible for approaching Mr. Handrick

3     and asking him to be part of the redistricting

4     team?

5  **A**    **I don't know that I'd use the term "responsible."**

6     **I think I expressed earlier that Joe Handrick and**

7     **I have known each other a very long time. So it**

8     **wouldn't surprise me that he came and visited with**

9     **me. He was -- at that time and we talked about**

10     **it.**

11  Q    Were you -- were you one -- one of the people or

12     the person who recommended Mr. Handrick be

13     retained to work in the redistricting process?

14  **A**    **I would not be so arrogant to suggest that.**

15     **Joe Handrick is well known in the Capitol and he's**

16     **well known in for his involvement in redistricting**

17     **going back 20 years. So I doubt I was the sole**

18     **source of much of anything there.**

19  Q    You can set that document aside. Were there any

20     other members of the redistricting team that you

21     spoke with in early 2011 about participating in

22     the process?

23  **A**    **I assume I did.**

24          MR. POLAND: Actually this is already

25     marked so we don't have to worry about that.

42 (Pages 162 to 165)

Halma-Jilek Reporting, Inc.      Experience Quality Service!      (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD    Filed 02/23/12    Page 42 of 107    Document 188

Page 166

1    Again, I think Don, I think that the documents
2  that have previously been marked, I don't think we
3  have to worry about.
4         MR. DAUGHTERY:  Okay, great.  Thank
5  you.
6         THE WITNESS:  Yes.
7  BY MR. POLAND:
8  Q    And again we have a reverse chron order here, so
9  I'd like to start at the bottom of this e-mail
10  chain.  The first e-mail appears to be an e-mail
11  from Mr. Handrick to you dated January 24th, 2011.
12  Do you see that?
13  A    Yes, I do.
14  Q    And I'd like to jump to the second line down.  Do
15  you see where Mr. Handrick asks you the question
16  did you finish your consult retention memo yet.
17  A    I thought you were going to ask about Moscow.
18  Q    No.
19  A    There's another story behind that part.
20  Q    If we had more time I'd love to hear that one.
21  Maybe over a beer sometime.
22  A    There we go.  Did you finish your consult and
23  retention memo yet.  Is that the question?
24  Q    Yes.
25  A    Okay.  What's the question?

Page 167

1  Q    The question is what is that referring to?
2  A    I think at about this time it was reflected in the
3  prior e-mail there was a discussion going on on
4  what type of retention Mr. Handrick would be
5  involved with, and I think I reflected earlier on
6  the question had been raised whether he'd be on an
7  hourly basis or whether he'd be on a monthly
8  retention.  So I assume that's what this is
9  referring to.  At the time we were probably
10  talking about and someone was supposed to prepare
11  something that would then be exchanged on that
12  question.
13  Q    And then if you jump up to the e-mail directly
14  above, you'll see that you respond to Mr. Handrick
15  that same day a short time later and you say
16  working on it.  Do you see that?
17  A    Yes, do.
18  Q    Does that indicate that you were working on
19  Mr. Handrick's consult and retention memo?
20  A    It could mean that.  It could mean when I said
21  working on it, it could be that the team -- that
22  Eric McLeod was working on it.  At this point in
23  time I was preparing for a major trial, I think I
24  told you before, for the Sandisk Corporation.  So
25  it was being wedged in among a lot of tasks.  So I

Page 168

1  might have been but it wouldn't have been uncommon
2  if I said working on it that it might have been
3  Eric McLeod or Ray Taffora at this point.
4  Q    Now, the next sentence in that middle e-mail you
5  say Keith Gaddie is on board now as well.  Do you
6  see that statement?
7  A    Yes, I do.
8  Q    What are you referring to there?
9  A    I must have given him a call, I guess.  I don't
10  have any independent recollection of when I first
11  talked to Keith, Professor Gaddie.  But I must
12  have -- based on this I must have talked to him
13  somehow to know that he would be willing to
14  participate.
15  Q    You knew Dr. Gaddie before this time then?
16  A    Oh, yes.
17  Q    Fair to say?
18  A    Yes.
19  Q    Had you worked with him on redistricting
20  litigation previously?
21  A    Yes, I had.
22  Q    Was that back in 2002?
23  A    That's correct.
24  Q    Anytime before that?
25  A    I don't remember anytime before that.  Could have

Page 169

1  been.  Professor Gaddie's well known, you know,
2  and so I could have had some involvement with him
3  before that time.
4  Q    Do you know whether you were the first one to
5  reach out to Professor Gaddie for the purpose of
6  working on the 2011 redistricting?
7  A    I don't know if I was the first one or not.
8  Joe Handrick and Professor Gaddie -- Joe had been
9  featured in a book that Professor Gaddie did, and
10  so I know that he had a different kind of
11  friendship with him than I did.  So he might have
12  talked to him.
13  Q    The very next sentence continues on to say still
14  trying to get to Dr. Grofman.  Do you see that?
15  A    Yes, I do.
16  Q    And what are you referring to there?
17  A    I'm talking about Dr. Bernie Grofman.
18  Q    Were you attempting at this time also to get
19  Dr. Grofman to participate in the redistricting
20  process?
21  A    This is an embarrassment.  I think at this point
22  in time I was underwater and I didn't get ahold of
23  Dr. Grofman until much later.  So when I said
24  I was still trying, that's the appropriate word is
25  trying.  I don't believe that I had direct contact

43 (Pages 166 to 169)

Page 170

1    with him for many months later.
2  Q   We have a few documents here that we'll walk
3     through the sequence and I think that might show.
4  A   That's -- again, if that's not correct, but that's
5     what my recollection is now.
6         MR. POLAND:  You can set that document
7     to the side.  Don, here's one.  I don't know that
8     this is on our list.  You can take a look and see.
9     And I'm just going to ask about that first one,
10    number 21 there.
11        MR. DAUGHTERY:  Twenty-one, that's
12    fine.  21 is fine.
13        MR. POLAND:  Actually can I take that
14    one back?
15        (Exhibit No. 226 was marked for
16    identification.)
17 BY MR. POLAND:
18 Q   Mr. Troupis, the court reporter has handed you
19    Exhibit 226.  You certainly are free to read all
20    these if you'd like.  I'm only going to ask you
21    about the very first one on the first page.
22 A   Let me at least familiarize myself with what this
23    is.
24 Q   Of course.
25 A   Okay.  I think the only two that I -- I guess I

Page 171

1     wanted to look through.  I didn't recognize the
2     rest of them.  I don't know that I was ever copied
3     on any of those others.  The only two that I
4     appear to be on is 21 and 22.
5  Q   That's right, and 21 is the only one that I intend
6     to ask you about.
7  A   Okay.
8  Q   So 21 is an e-mail from you dated January 31st,
9     2011; correct?
10 A   Seems to be that.
11 Q   And you were sending this to Mr. Ottman and
12    Mr. Foltz; correct?
13 A   Yes, and copied to a number of others.
14 Q   All right.  Is it your understanding that you
15    would have been engaged certainly at least to
16    represent the senate and the assembly by their
17    respective majority leaders by this time?
18 A   I would have interpreted it that way but we need
19    to be a little careful here because we lawyers
20    tend to get out in front of formal retentions and
21    I don't know that I was being paid for this or
22    retained in that sense.  I certainly understood
23    I was going to be retained by this point and was
24    working on the projects that you see there.
25 Q   And there was a reference to Professor Gaddie

Page 172

1     drafted a retention letter?
2  A   Right.
3  Q   All right.  So by that time, by January 31st,
4     2011, it was your understanding Professor Gaddie
5     had agreed that he would work as a consultant --
6  A   No.
7  Q   -- on the redistricting process?
8  A   No.  At this point in time I was drafting a
9     retention letter.  So he was undoubtedly, I would
10    assume, waiting for something to look at and I was
11    circulating it to Eric, because I think, and
12    I could be mistaken on this, but I would assume
13    that the eventual retention letter came from
14    Michael Best and not from me, but I would have
15    drafted language about that.
16 Q   And just below that it appears you're still trying
17    to make contact with Mr. Grofman at that point or
18    Dr. Grofman at that point?
19 A   Yes.  As I told you, the embarrassment here, yes.
20 Q   Certainly don't mean to embarrass you.
21 A   No.  I still feel badly because I do like
22    Professor Grofman a great deal.
23 Q   The next sentence down, you are talking about
24    bills and there is a statement there that you were
25    making, monthly statement amount due from the

Page 173

1     trust, one line total from MB&F.  Once initialed,
2     MB&F will issue appropriate payment.  That refers
3     to the arrangement that you had testified about
4     earlier in response to a question from Mr. Earle;
5     is that correct?
6  A   I'm not sure what you're referring to.  I think,
7     I think it's referring to the Handrick arrangement
8     by this point in time, but I'm not certain of
9     that, so I -- I'm guessing that's true.
10 Q   Is it fair --
11 A   Contextually it appears to be correct.
12 Q   Is it fair to say that the way that the payments
13    worked is that there was a trust that was set up
14    and then Michael Best & Friedrich would pay the
15    outside consultants and lawyers who were retained?
16 A   Yes, that's correct.
17 Q   And then the very next line down, there's a
18    statement, meeting with legislators, you're each
19    about to start those.  Do you see that?
20 A   Yes.
21 Q   To what does that refer?
22 A   Well, the process -- the process of redistricting
23    has as an important element, actual ongoing
24    meetings with members of the legislature to
25    determine what was important to them.  At this

44 (Pages 170 to 173)

Page 174

1    stage you wouldn't be talking about districts.
2    You would be talking about, well, what's important
3    to you, what's really important to you.  Some of
4    them say, you know, Grandma Moses' farm on the
5    east end of Polk County, and some of them say
6    I don't care and some of them might say I'm
7    retiring.
8          And so the process begins with the Tad
9    and Adam consulting with the various members of
10   the legislature to determine what they consider to
11   be important before you start thinking about how
12   you would draw maps and it's the beginning of the
13   process.
14  Q   At that time was it the intention to have
15   Mr. Ottman and Mr. Foltz consult with members of
16   both the majority part and the minority party or
17   simply the majority party at that point?
18  A   I don't know.
19  Q   Did you ever instruct them to meet only with the
20   majority members?
21  A   I did not.
22  Q   Did you ever instruct them not to meet with any of
23   the members of the minority party?
24  A   I did not.
25  Q   You can set that document aside.

Page 175

1          MR. DAUGHERTY:  That's fine.  Let's go
2    ahead and mark that.
3          (Exhibit No. 227 was marked for
4    identification.)
5   BY MR. POLAND:
6   Q   Mr. Troupis, the court reporter has handed you
7    Exhibit 227.  I'll give you a minute here to look
8    at it.
9          MR. HODAN:  Doug, it's 8:15 at night
10   and we're talking about retention letters still?
11         MR. POLAND:  Yes, we are.  I've only
12   been asking questions for about 20 minutes.
13         MR. HODAN:  I understand.  I'm just
14   wondering how this is relevant to what we're going
15   to be talking about at trial tomorrow or Friday.
16         MR. POLAND:  Okay.  You'll find out.
17         THE WITNESS:  Okay.
18  BY MR. POLAND:
19  Q   Okay.  Can you identify Exhibit 227, please?
20  A   Well, it appears to be an e-mail from me to a
21   number of people and then an e-mail from
22   Tad Ottman to me and a number of people dated
23   February 9 and February 11 respectively, 2011.
24  Q   I'd like to start with the e-mail from you to
25   Mr. McLeod that February 9th e-mail.

Page 176

1   A   Yes.
2   Q   Do you see in the first paragraph it appears that
3    they're not attached to this e-mail, this
4    document, but it appears that you were sending
5    three draft letters of retention; correct?
6   A   Yes.  As I said before, we were working on --
7    there was wording that that was being put together
8    and I apparently had put something of that wording
9    together.
10  Q   It appears to reflect --
11  A   The wording that I previously said when I said we
12   were working on the retention letters, now
13   apparently I had done some drafts or something and
14   sent them along.
15  Q   Now, the third paragraph down in your e-mail
16   states:  I have kept these purposely vague on the
17   assumption they may one day be made public.  There
18   is, for example, no description of how Joe would
19   report his time and no allegation he provide
20   detail.  Do you see that?
21  A   Mm-hm.
22  Q   And was --
23  A   Yes, I do.
24  Q   Does that refer also to Mr. Earle's question to
25   you earlier, I think you had a question and answer

Page 177

1    about that?
2   A   I -- we talked about Mr. Handrick's retention.
3    I do remember that.
4   Q   All right.  And it was -- was it for the purpose
5    of litigation that you kept the retention letters
6    purposely vague?
7   A   No.  As I reflected down below, there was no need
8    for that.  In the second-to-last paragraph I
9    actually point out that given the relationship,
10   there just was -- it was simply not necessary.  So
11   I -- so among the reasons, I just didn't think it
12   was necessary and, in fact, I wanted to see Joe
13   work as hard as he would.
14  Q   Why would it not be necessary for both Joe and
15   Keith Gaddie not to have to have a comprehensive
16   time description?
17  A   Because normally the reason you would have that is
18   because you're concerned that perhaps people will
19   overcharge or undercharge -- not undercharge --
20   generally overcharge and you want to make sure
21   that they're doing the tasks that you're asking.
22   In this instance, I knew both Professor Gaddie and
23   Joe Handrick and that certainly was not any kind
24   of a concern that I would have had at that moment
25   in time.

45 (Pages 174 to 177)

Halma-Jilek Reporting, Inc.          Experience Quality Service!          (414) 271-4466
Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 45 of 107   Document 188

Page 178

1  Q    Did you also have a concern, though, that you did
2     not want their task descriptions to be made
3     public?
4  A    **Well, you know, as with any expert, any trial**
5     **lawyer who's worth their salt is not going to have**
6     **the experts describe everything going on because**
7     **it reveals certain work product and litigation**
8     **strategies and the like. So this is a very common**
9     **understanding. There's nothing uncommon about**
10    **that, if that's where you're thinking I was going.**
11    **But as I told you, my view was it just was not**
12    **necessary.**
13        THE VIDEOGRAPHER: Excuse me. Two
14    minutes of disk.
15        MR. POLAND: Why don't we just go
16    ahead and change the tape now. Let's go off the
17    record.
18        THE VIDEOGRAPHER: This ends disk
19    number two of the video deposition of James R.
20    Troupis on February 22, 2012. The time, 8:15 p.m.
21        (Discussion off the record.)
22        (Exhibit No. 228 was marked for
23    identification.)
24        THE VIDEOGRAPHER: This is the
25    beginning of disk number three of the video

Page 179

1    deposition of James R. Troupis on February 22,
2    2012. The time, 8:20 p.m.
3  BY MR. POLAND:
4  Q    Mr. Troupis, the court reporter has handed you a
5     document that we've marked as Exhibit No. 228.
6     Can you identify it for the Court, please?
7  A    **Well, it appears to be a series of e-mails from or**
8     **to me and Joe Handrick.**
9  Q    I'd like to draw your attention to the very last
10    e-mail that appears on the last page --
11  A    **Yes.**
12  Q    -- of page 1 and then page 2. It appears to be --
13  A    **The one dated January 28, 2011, 4:27 p.m.?**
14  Q    Yes, correct. I believe all the text is contained
15    on the second page. Mr. Handrick says to you are
16    you expecting me on Monday for the meeting with
17    the private groups. Do you see that?
18  A    **Yes, I do.**
19  Q    What is Mr. Handrick referred to by private
20    groups?
21  A    **If I remember the dates correctly, at about this**
22    **time there was a -- there was going to be a**
23    **meeting involving a number of the large membership**
24    **groups that are in Madison to explain the process**
25    **that we were about to begin for redistricting.**

Page 180

1  Q    And when you say -- I'm sorry, did you say
2     membership groups?
3  A    **Yes.**
4  Q    What do you mean by membership groups?
5  A    **Well, groups that have members from around the**
6     **state that often -- that are in Madison, that have**
7     **offices in Madison.**
8  Q    Okay. Can you give me examples of the membership
9     groups?
10  A    **Oh, sure. The ones I remember, and I don't**
11    **remember -- candidly I don't remember who was**
12    **there, but I do remember that the WMC, Jim Buchen,**
13    **I believe Jim was there. Maybe not, but I thought**
14    **there was representatives from WMC. I know that**
15    **there would have been a representative from the**
16    **realtors. Liki Theo, L-I-K-I, a fellow Greek, and**
17    **I think the bankers, but that's the type of group.**
18    **But I may be incorrect on those three because**
19    **I don't remember for sure who was there, but I do**
20    **remember that's the type of group that was being**
21    **invited.**
22  Q    There is a statement by Mr. Handrick after that
23    that says: Tad and I thought maybe it's better
24    not to have me there but I certainly can be if you
25    wish.

Page 181

1  A    **Yes.**
2  Q    Do you know why it was thought perhaps that it
3     would be better not to have Mr. Handrick there?
4  A    **Honestly I don't know but -- I mean, I could**
5    **speculate but I don't know.**
6  Q    Well, if you want to speculate, I'll be happy to
7     hear what you have to say.
8  A    **Better not speculate.**
9        MR. DAUGHERTY: I instruct the witness
10    not to speculate.
11        THE WITNESS: Don't speculate, Jim.
12    It's late. You know better.
13  BY MR. POLAND:
14  Q    Let's go up to the e-mail just above that.
15     There's an e-mail from you to Mr. Handrick on
16     Saturday, January 29th.
17  A    **Yes.**
18  Q    And you say: I will defer to Tad on this. It
19     appears to be referring to the previous question.
20  A    **That's why I said that, that I can surmise certain**
21    **things from this one actually.**
22  Q    You then say in your message: I think for you
23    that maintaining the appearance of independence is
24    potentially very important and lucrative for you.
25    What did you mean, maintaining the appearance of

46 (Pages 178 to 181)

Halma-Jilek Reporting, Inc.     Experience Quality Service!     (414) 271-4466
Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 46 of 107   Document 188

Page 182

1   independence?
2   A   What did I mean?  I hope that you asked Joe about
3       this, and I don't mean to misstate what Joe's
4       intentions were at the time.  Joe had just joined
5       the Reinhart firm just prior to this.  He had got
6       married or was about to get married and he was
7       moving back to Milwaukee or Madison.
8   Q   Port Washington, I think, perhaps?
9   A   It is Port Washington where he's living?  I knew
10      it was Milwaukee area.  And in the lobbying
11      practice, which is what he would be doing, it's
12      having -- maintaining that level of independence
13      from the speaker or majority leader or us, me,
14      whomever, or Michael Best, was -- would be
15      important, if you're going to build an effective
16      lobbying practice, you kind of have to make
17      choices and at this point I guess Joe had made his
18      choices, what he was going to emphasize, what he
19      might want to sell, so to speak, in the rest of
20      his practice.
21          And so that I would surmise from this
22      that, you know, he didn't -- for his sake it might
23      be better to not be associated so early and so
24      directly with the speaker and majority leader.
25   Q   Was that essentially counsel or guidance you were

Page 183

1   giving to him in that message?
2   A   Yes.  Joe had talked to me about whether he should
3       join the Reinhart firm and whether that would be
4       the right move for him.  I told you we were
5       friends and we go back a long way.  I told him it
6       would be a brilliant move and apparently he took
7       my advice.
8   Q   You can set that document to the side.
9       Mr. Troupis, do you still have Exhibit 220 in
10      front of you?  That's was Reinhart engagement
11      letter.
12   A   I don't know.  The stack's getting kind of big
13      here.
14   Q   We have a few more to add to it.
15   A   I'll tell you --
16          MR. DAUGHERTY:  Here, looks like this.
17   BY MR. POLAND:
18   Q   It has an e-mail on the front cover.
19   A   I don't mean to be -- I'm not purposely trying to
20      go slow here.  I can't find it.  Oh, there it is.
21      It's the bottom one.
22   Q   You recognize, this is karma.  This is payback for
23      doing this to other witnesses.
24   A   Exactly.  I appreciate that.  I appreciate that.
25      Let's see.  It's always on the bottom.

Page 184

1           MR. EARLE:  Just for the record, that
2   last comment was with levity as well.
3           THE WITNESS:  Okay, please.
4           MR. EARLE:  Sometimes when comments
5   that are intended to be and, in fact, are with
6   levity don't appear necessarily that way.
7           THE WITNESS:  Thank you.  I
8   appreciate that.
9           MR. POLAND:  We do have the videotape
10  as well.
11          THE WITNESS:  Let me take a second.  I
12  want to refresh my recollection what this was.
13          (Exhibit No. 229 was marked for
14          identification.)
15  BY MR. POLAND:
16  Q   Okay.  So you've taken a look again at
17      Exhibit 220, Mr. Troupis?
18  A   Yes.
19  Q   I'm going to hand you a document the court
20      reporter has marked as Exhibit No. 229.  I'd like
21      to give you a minute to take a look at that
22      document.  Mr. Troupis, have you seen Exhibit 229
23      before?
24  A   I don't recall seeing this before.
25  Q   I'd like you to take a look at the second page of

Page 185

1   Exhibit 229.  Do you see that you are identified
2   as a cc?
3   A   Yes, I do, now that you mention it, but I don't
4       recall it.
5   Q   I'd like you to just refer your attention back to
6       Exhibit 220, which is the Reinhart engagement
7       letter, the February 17th letter?
8   A   Yes.
9   Q   Do you see in the very first line of that letter
10      it states:  Please find enclosed the engagement
11      letter of February 15, 2011?  Do you see that?
12  A   This is the mysterious letter, yes.
13  Q   Is it your understanding that that references to
14      Exhibit 229?
15  A   I have no understanding one way or the other.
16      I mean, it's reasonable to assume that given the
17      dates.  I told you I just don't recognize it.
18  Q   You beat me to the next question.  That's what
19      I was going to ask you.  It's reasonable to assume
20      that.  If you look at the very first paragraph of
21      Exhibit 229, you see that the -- at the very end
22      of that first paragraph it states that the --
23      well, strike that question.  The very first
24      paragraph confirms the engagement of Mr. Handrick
25      correct?

47 (Pages 182 to 185)

Page 186

1  A    It appears to, yes.
2  Q    And it also states that the matter involves
3       potential litigation; correct?
4  A    Yes, that's what it says.
5  Q    And if you jump down three paragraphs below that,
6       the letter states: As this retention is in
7       anticipation of potential litigation, all matters
8       must remain confidential until such time as the
9       client determines otherwise.  Do you see that?
10  A    Yes, I do.
11  Q    Do you ever recall drafting language like that for
12       an engagement letter for Mr. Handrick?
13  A    This is -- my recollection is this is pretty
14       standard Michael Best & Friedrich expert retention
15       letter and you would normally put in a clause to
16       that effect in any retention letter of an expert
17       or consultant in these kind of cases.  So my --
18       I don't know whether I drafted it or somebody else
19       did, but I do know that my recollection is that
20       this is -- this is standard language.
21  Q    The subject matter line of Exhibit 229 --
22  A    The re line.
23  Q    The re line, you see it states Wisconsin state
24       senate by its majority leader Scott R. Fitzgerald
25       and the Wisconsin state assembly by its speaker

Page 187

1       Jeff Fitzgerald, dash, 2011, dash, 12
2       redistricting.  Do you see that?
3  A    Yes, I do.
4  Q    Are you aware of any other description of the
5       scope of the representation for which Mr. Handrick
6       was retained?
7  A    Again, there's a couple of letters here regarding
8       that, and I don't recall anything other than the
9       letters we're talking about.
10  Q    Did you ever have a conversation with Mr. Handrick
11       about the scope of his services?
12  A    I think I've already said it several times that
13       Joe would be assisting in this process and I had
14       no concerns at all that he would be giving us fair
15       measure in that process.  So I -- and he would
16       take assignments from the lawyers or the majority
17       leader, whatever it happened to be.
18  Q    You can set that document to the side.  We just
19       got shorter by a few minutes.
20  A    Thank you.  Thank you, judge, whichever judge.
21       MR. DAUGHERTY:  Judge Dow.  Thank you,
22       Judge Dow.
23       (Exhibit No. 230 was marked for
24       identification.)
25

Page 188

1  BY MR. POLAND:
2  Q    Okay.  Mr. Troupis, have you seen Exhibit No. 230
3       before?
4  A    I must have in reading it.
5       MR. HODAN:  Is this 230 or 234?
6       THE WITNESS:  230.
7  BY MR. POLAND:
8  Q    Mr. Troupis, this is an e-mail that you sent to a
9       number of people on Friday, April 1st; correct,
10       2011?
11  A    That's what it appears, yes.
12  Q    And you'll see that you at least direct your
13       comments, it appears, to Mr. Ottman and Mr. Foltz?
14  A    Yes.
15  Q    You state in the first sentence of your e-mail:
16       Finally heard back from Gaddie yesterday and after
17       talking things through with him, and then in
18       parens, in briefly visiting last week with Joe H.,
19       it seems the best time for him to come out would
20       be April 29th through 30, May 3 through 6, or
21       anytime after that in May.  Do you see that?
22  A    Yes, I do.
23  Q    Does that refer to Mr. or Dr. Gaddie coming to
24       Madison?
25  A    Yes, it does.

Page 189

1  Q    When was the first time that Dr. Gaddie came to
2       Madison to work on the redistricting in 2011?
3  A    I don't know.
4  Q    Did you ever meet with him when he came to Madison
5       for the purpose of redistricting?
6  A    I think that was asked a little bit earlier.
7       Here's the irony of this e-mail and you saw me
8       chuckle a second ago.  One of the reasons
9       April 29th and May 3rd were chosen was because
10       I was supposed to leave for Australia on April the
11       4th or 5th and that's the plane I was on headed to
12       the West Coast when I got a call from Mr. Justice
13       Prosser to get off the plane and come back.  So
14       I was supposed to be back at the end of the month
15       and I never took that trip and my family did, and
16       that was the reason those dates were chosen.
17       As it turned out, by the time he
18       arrived, which was either late April or early May,
19       I had absolutely no time to meet with him.  And so
20       I may have broken away at some point and met with
21       him when he was here, but I don't remember the
22       dates and the whole time period is a blur.
23       However, he did come out and have drinks with me
24       at the Village Green in Middleton, Wisconsin, one
25       night, and that I do remember.

48 (Pages 186 to 189)

Halma-Jilek Reporting, Inc.        Experience Quality Service!        (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 48 of 107   Document 188

Page 190

1  Q    Do you recall ever meeting with Professor Gaddie
2       at the Michael Best & Friedrich offices during the
3       redistricting process?
4  A    I have no independent recollection but that is
5       absolutely not to say that I didn't, because at
6       that time we were quite literally working 18 hours
7       a day, seven days a week.
8  Q    On the redistricting?
9  A    Mr. Justice Prosser's recount.
10 Q    Okay.  Do you recall working at all with
11      Professor Gaddie where any maps were displayed or
12      shown or created?
13 A    You know, he must have been in early June of 2011.
14      I thought that he came twice and I thought that he
15      was present at some of the meetings in early --
16      I think it was early June of 2011.  Again, there's
17      probably e-mails that will give you the exact
18      dates.  And I thought that he was present at those
19      meetings when we were looking at regional maps.
20      So that's -- that's my recollection.  But I don't
21      think in this earlier time period I certainly
22      don't have any recollection of -- I've told you
23      before even of the meeting, which doesn't mean it
24      didn't happen.
25 Q    Was Professor Gaddie asked to look at any specific

Page 191

1       regions or any specific areas of the state?
2  A    Not that I recall, no, but he might have been.  I
3       just don't recall that.
4  Q    And there were others on the redistricting team
5       who were working with him directly?
6  A    Correct, correct.
7  Q    Do you recall seeking out Professor Gaddie's
8       expertise or opinions in any specific area of the
9       redistricting, be it a geographic other or a
10      topical area?
11 A    Nothing, you know, separate or distinct from the
12      general tasks that we had.  I just don't remember
13      any.  Probably did but I don't remember anything
14      specifically.
15 Q    You can set that to the side.  This is a document
16      that we've previously marked as Exhibit No. 69 at
17      deposition and trial.
18 A    Oh, I see.  Professor Gaddie.  Okay.
19 Q    Mr. Troupis, have you seen Exhibit No. 69 before?
20 A    I don't recall it but apparently I did because
21      it's directed to me.
22 Q    You'll see in the subject line -- well, actually
23      let me take a step back.  This is an e-mail from
24      Professor Gaddie to you and Mr. McLeod; correct?
25 A    That's what it appears to be, yes.

Page 192

1  Q    And the date is May 9th, 2011?
2  A    That's what it appears to be.
3  Q    Professor Gaddie asks that you refresh his memory
4       on an issue.  He asks:  Is the disenfranchisement
5       issue in the Wisconsin senate a concern under the
6       Wisconsin state constitution or statute?
7  A    He actually misspelled.  It could be
8       disfranchisement.  Just so you know, I'm not the
9       only one and Peter with bad typing skills.
10 Q    I do the same thing.  I think we're all in the
11      same boat.  And continuing on, he says:  Or is
12      this an equal protection issue arising under the
13      14th amendment.  If you can direct me to an
14      appropriate citation, I would appreciate the
15      assistance.  Do you see that?
16 A    Yes.
17 Q    Do you recall Professor Gaddie asking this
18      question of you?
19 A    No, I don't.
20 Q    Do you ever recall responding to him?
21 A    No.  I might have.  I just don't recall that.
22 Q    Do you recall ever asking Professor Gaddie
23      specifically to look at the senate
24      disenfranchisement issue?
25 A    I don't.  Again, I might have but I don't recall

Page 193

1       me doing that.
2  Q    Do you recall speaking with him at all about the
3       senate disenfranchisement issue?
4  A    Well, we must have.  You know, because it's
5       something that, you know, we watched.  So we must
6       have but I don't have any independent recollection
7       of anything talking about it.
8  Q    Do you recall just generally speaking anything
9       that Professor Gaddie had to say on the topic
10      during the redistricting process?
11 A    No, no.
12          (Exhibit No. 231 was marked for
13      identification.)
14 BY MR. POLAND:
15 Q    Mr. Troupis, the court reporter has handed you a
16      document that's been marked as Exhibit 231.
17 A    Yes.
18 Q    Can you identify that document?
19 A    It's an e-mail from me to Tad and Adam regarding
20      scheduling a meeting with the leadership in early
21      June of 2011.
22 Q    Right, and it's dated June 3rd; correct?
23 A    Right.  These are some of the meetings I think I
24      referred to earlier.
25 Q    All right.  You're asking there, asking Mr. Ottman

49 (Pages 190 to 193)

Page 194

1    and Mr. Foltz whether Monday meetings are on with
2    the leadership to address Milwaukee. Do you see
3    that?
4  A    **Yes, I see that's what I said.**
5  Q    And again leadership, you're referring there to
6    presumably the leadership of the senate and
7    assembly?
8  A    **Correct, the people I identified before. The**
9    **senate and assembly.**
10 Q    Senate and assembly. When you identify or you use
11    the phrase there to address Milwaukee, do you see
12    that?
13 A    **Yes, I do.**
14 Q    What are you referring to?
15 A    **I mentioned a minute ago that we had regional**
16    **areas. You remember I just said that and that's**
17    **the way that you approach it. When you're doing a**
18    **state the size of Wisconsin, you have to do it**
19    **on -- you don't want to look at the whole map.**
20    **You're going to look at the regional areas and it**
21    **would have made sense. I assume this is the first**
22    **day of meetings because everything in Wisconsin**
23    **begins with Milwaukee. I mean, that's the way you**
24    **draw a map and that's -- that would be the first**
25    **one.**

Page 195

1  Q    Do you recall those meetings with the leadership
2    to address Milwaukee in June?
3  A    **I recall having those meetings and -- yes.**
4  Q    Were there any specific topics that were addressed
5    when you were looking at the region, the Milwaukee
6    region?
7  A    **Well, I suspect that -- but I -- we had to have**
8    **discussed the legal issues surrounding the**
9    **Milwaukee legislative districts because that's why**
10    **you start with Milwaukee, because it's the only**
11    **substantial area of the state where there's**
12    **substantial minority populations.**
13 Q    And so you would have been discussing voting
14    rights act types of issues?
15 A    **I would assume so, yes.**
16 Q    That would have been both in the African-American
17    and Latino districts as well?
18 A    **Again, I assume that. But as I sit here today,**
19    **I don't have -- if you have some document perhaps**
20    **but I don't have an independent recollection**
21    **except to say that of course I assume we would**
22    **have and we would have addressed them at that**
23    **point.**
24 Q    Do you recall specifically the -- any discussions
25    that were had about the Latino districts,

Page 196

1    Districts 8 and 9 in Milwaukee?
2  A    **I think I reflected a little bit earlier that**
3    **we -- we had been making contacts with national --**
4    **the national MALDEF organization and I don't know**
5    **the timing of that. As I recall, I had contacted**
6    **Nina Perales before this and I don't know whether**
7    **I had made contact with Elisa Alfonso at that**
8    **point. I don't remember. There would be a time**
9    **being issue, so I don't recall.**
10 Q    Do you know whether the Monday meetings that
11    you're referring to in this e-mail resulted in a
12    final decision about the orientation and makeup of
13    Districts 8 and 9?
14 A    **I am sure that it did not result in a final**
15    **determination.**
16 Q    Do you recall whether there were various options
17    that were presented at the Monday meetings
18    referred in here for the makeup of
19    Districts 8 and 9?
20 A    **I don't recall but it would have been a process,**
21    **so it would not surprise me if, in fact, there**
22    **were a number of options presented.**
23 Q    Were you present at a meeting where a final option
24    for Districts 8 and 9 was chosen to be presented
25    to the legislature?

Page 197

1  A    **Again, you make it sound very black and white.**
2    **I don't know that there ever was a final option.**
3    **There were three different proposals with regard**
4    **to the Latino community presented at a public**
5    **hearing. So, you know, even then I -- there was**
6    **no final option.**
7  Q    In terms of those proposals that were made at the
8    public hearing, there had to be a decision made
9    that --
10 A    **Yes.**
11 Q    -- those would be correct, the options that would
12    be presented; correct?
13 A    **Yes.**
14 Q    Who was it that made the decision that those would
15    be the options presented?
16 A    **Do you mean the decision to present those three?**
17 Q    Correct.
18 A    **The group. I don't think there was any one**
19    **individual involved. There are three options.**
20    **I don't think there was one person involved, one**
21    **person was involved.**
22 Q    That would have been the group at the regional
23    meetings that you're talking about?
24 A    **No, no. It would have been -- at this point in**
25    **time at about -- that's a little later in time, so**

50 (Pages 194 to 197)

Page 198

1    don't get your times confused here. In early
2    June, this is the first time there's any
3    presentation of maps at all. So until then my
4    recollection is Joe and Tad and Adam, there had
5    been a series of meetings with legislators. They
6    had gone through a process to get to these
7    regional proposals that I just mentioned, and so
8    that they could then, after meeting with leaders
9    early in June, address concerns that anybody on
10   the leadership would have about that.
11          So the leadership was the only people
12   that -- only people who would have access to the
13   entire map. So they now knew how, as I said, that
14   ripple effect, all of those different effects
15   could be, and so they would have had questions or
16   concerns or about various things in those maps.
17          And then -- and then during June they,
18   Tad and Adam and Joe would go back and they would
19   attempt to address those concerns and blend it
20   into a statewide map, which, as I said, there's an
21   infinite number of possibilities.
22          During that same time period we were
23   consulting with, as I said, national Latino or
24   MALDEF and that's what I was doing -- I don't
25   know, other people may have been doing different

Page 199

1    things -- in order to consider options that would
2    be legally acceptable, and so that's what we were
3    doing.
4           So that's the long answer to say even
5    as we got -- it wouldn't have been until the end
6    of June or early July that you would have started
7    to see configurations that you could safely say,
8    I think this is pretty well done. I -- that would
9    be my take.
10   Q    In your answer, Mr. Troupis, you referred to
11   leadership having access to the entire map?
12   A    I believe they are the only ones that had access
13   to the entire map.
14   Q    When you saw leadership, are your referring to the
15   majority leadership?
16   A    Yes, Scott, Jeff, the speaker, the majority
17   leader. I think I would add Senator Zipperer and
18   Robin Vos to that list, maybe Representative
19   Suder. I don't remember.
20   Q    It would not have included members of the minority
21   party at that point in time; correct?
22   A    That's correct.
23   Q    I think we're finally going to get to your answer
24   on Dr. Grofman.
25   A    Oh, good. Bernie would be happy.

Page 200

1    Q    If anything, it should settle a question.
2    A    Oh, okay.
3    Q    I've handed you --
4    A    This one's okay to look at; right? I don't
5    remember this one.
6           MR. EARLE: If you have a travel
7    company, it's a communication from a travel
8    company. I don't know how it could be privileged.
9           MR. POLAND: Well, it's actually --
10   BY MR. POLAND:
11   Q    Mr. Troupis, I've handed you a document that
12   previously was marked as Exhibit 139. I'll give
13   you a minute to look at it. And I really only
14   intend to ask you about what's on the first page
15   and it's simply to fix time.
16   A    Let me go ahead and look at this.
17   Q    Yes, please go ahead.
18   A    Okay.
19   Q    Mr. Troupis, can you identify Exhibit 139, please?
20   A    Well, it's a sequence of e-mails from me or my
21   daughter, Sarah, who is also one of the partners
22   in my law firm, to Professor Grofman.
23   Q    And I really only want to focus on the very first
24   page. You see that, looking at this second e-mail
25   down, which appears to be dated around July 7,

Page 201

1    2011. I think it's the same e-mail chain. It's a
2    little bit difficult to tell exactly, but I'm
3    focusing on the portion of the document that says:
4    My father, Jim Troupis, ask that I forward you
5    these maps while he is away for the next few days.
6    If this is not the information you were expecting,
7    please let me know and I will see about getting
8    you what are you looking for. Thanks. Do you see
9    that?
10   A    Yes, I do.
11   Q    Do you recall asking Sarah to send or forward maps
12   to Dr. Grofman?
13   A    Yes, I do.
14   Q    Why were you asking maps to be sent to Dr. Grofman
15   on or round July 7, 2011?
16   A    I was interested in his opinion about them.
17   Q    What maps were being sent?
18   A    I assume these are the maps from the Milwaukee
19   area.
20   Q    And I know we're having a hard time fixing dates.
21   Unfortunately there's a document on the list.
22   I can't ask you about it. It would help us to fix
23   date but we'll just have to --
24   A    Well, it says July 7, so that's about right.
25   Q    Do you recall, was it -- was it before or after

51 (Pages 198 to 201)

Page 202

1  the -- strike that question. Do you recall when
2  you first spoke with Dr. Grofman about looking at
3  maps pertaining to Act 43 or Act 44?
4  A    It would have been --
5         MR. HODAN: I would ask the counsel
6  not to speculate.
7         THE WITNESS: I don't know that we
8  ever spoke. These e-mails suggest that we
9  exchanged phone calls and I think that's probably
10  right because he was in Paris and -- so I don't
11  know -- I told you before the whole thing with
12  Professor Grofman was a little embarrassing for me
13  because I wasn't able to reach him and I wasn't
14  able to get ahold of him, and my very good friend,
15  Irwin Chemerinsky, who's the dean of the law
16  school at Irvine is -- I hadn't seen him in a
17  while and I was interested to hear if Professor
18  Grofman had gotten to Irwin. So the two of us
19  were -- in part it was a very personal thing to me
20  as well as a professional matter.
21         MR. EARLE: So you were obviously
22  influenced by Irwin.
23         THE WITNESS: Obviously, obviously.
24         MR. POLAND: This is still my
25  examination, Mr. Earle. Levity again.

Page 203

1         THE WITNESS: But we can talk about
2  Irwin, yes, if we'd like.
3         MR. DAUGHERTY: Let's go off the
4  record for that.
5  BY MR. POLAND:
6  Q    Mr. Troupis, do you know whether by July 7 you had
7  communicated with Dr. Grofman about potentially
8  serving as a consultant or an expert of some type
9  as part of the redistricting process?
10         MR. HODAN: Objection, asked and
11  answered.
12         THE WITNESS: Well, we didn't -- you
13  have to remember the difference in relationships
14  here. I've known Professor Grofman since probably
15  the late 1980's. He had been involved in two
16  prior redistricting efforts here. He had been,
17  you know -- he's internationally renowned and
18  whether he says of me or not, I consider him a
19  friend and I've always enjoyed his company.
20         So, you know, in this instance,
21  I didn't -- you've made it sound so formal and I
22  think that would be incorrect. I think at this
23  point in time I was more likely using him as a
24  sounding board. Obviously he hadn't been
25  retained. Obviously there hadn't been any money

Page 204

1  or anything like that, but I respected his opinion
2  and I think he respects mine. So at this point in
3  time I was -- I was going to use him as a sounding
4  board.
5  BY MR. POLAND:
6  Q    But you were seeking his input?
7  A    But you made it sound like -- and I just don't
8  want you to misunderstand, I had not been retained
9  at this point in time and I doubt there was any
10  even question about retention at this point in
11  time, so it never happened.
12  Q    And that's essentially what I'm getting to was
13  whether there was ever any formal retention for
14  the purpose of the redistricting.
15  A    No. Well, I -- I have heard now that he is a
16  witness in these proceedings and I can see that
17  because you've got Grofman here, so -- so
18  presumably you know, he's participating.
19  Q    Yes. Just to distinguish between his role as a
20  testifying expert in the litigation and a
21  consulting expert as part of the redistricting
22  process. That's the distinction I'm trying to
23  drawing.
24  A    Oh, sure, and at this point I don't even know.
25  Did he ever express any -- he asked about the

Page 205

1  number of districts. He's very familiar with
2  Milwaukee, I think. You know, that would have
3  been the sum total of what might have occurred.
4  It wasn't formal. It certainly wasn't formal.
5  Q    Did you ever get any feedback from Dr. Grofman on
6  the maps that were sent?
7  A    I don't recall getting any but I might have.
8  I just don't recall. The maps were shortly after
9  that, yeah, I don't recall. I'm trying to sit
10  here and think. I don't remember.
11  Q    And I note it's July 7th and the public hearing
12  was shortly after that.
13  A    Correct.
14  Q    Just the next week. Do you recall whether --
15  receiving any feedback from Dr. Grofman on the
16  maps before the July 13 hearing?
17  A    I don't recall any if I did. It may -- perhaps
18  there's an e-mail or something but I don't recall.
19         MR. POLAND: Let's go ahead and mark
20  this.
21         (Exhibit No. 232 was marked for
22  identification.)
23  BY MR. POLAND:
24  Q    Mr. Troupis, the court reporter has handed you a
25  copy of Exhibit 232, which appears to be a long

52 (Pages 202 to 205)

Page 206

1     chain of e-mails or a number of different e-mails.
2     I only have questions on two specifically. I will
3     tell you just on numbers 41 and 49. Of course
4     you're free to look at as many as you want to.
5  A  Okay. I think I know what this is.
6  Q  Mr. Troupis, I'd like to direct your attention to
7     two of the specific e-mails in this chain. To the
8     extent that you need to refer to others, of course
9     you may. Number -- I'm sorry. I think I said 41
10    before. I should have said 46, it looks like the
11    writing is a little bit hard to distinguish. This
12    is the last e-mail on the second page.
13 A  This is the one from Eric to me.
14 Q  This is the one from Eric on Friday, June 24th at
15    4:03 p.m.
16 A  Okay.
17 Q  Mr. McLeod is stating to you: I think all the
18    members are very happy with their new districts
19    based on Tad's and Adam's reports to date. Do you
20    see that?
21 A  Yes, I do.
22 Q  Do you know what the reports are that Mr. McLeod
23    is talking about there?
24 A  No.
25 Q  Did you ever have a discussion with Mr. McLeod

Page 207

1     about any of the members' reactions to new
2     districts?
3  A  No. This would have been all that I recall about
4     that. I'm pointing to number 46. His comment is
5     all I remember hearing from him about that.
6  Q  Did you speak with Mr. McLeod at all about the
7     process where members were able to see their
8     new districts looked like?
9  A  I don't recall any discussions about that.
10 Q  Did you ever discuss that with Mr. Ottman or
11    Mr. Foltz?
12 A  No, I don't recall any specific discussions about
13    that.
14 Q  Generally do you recall any discussions?
15 A  Yes.
16 Q  What do you recall generally?
17 A  Well, what I described earlier, which is the
18    series of meetings that would go on over a time
19    period that would involve first gathering
20    information from the members as to what was
21    important to them and then subsequently building
22    maps for the whole state to try as best they could
23    to take that information that they had gotten into
24    account.
25        And then there was the meetings in

Page 208

1     June among the leadership which I described a
2     minute ago as the regional meetings to go over it
3     where they would see sort of the sum total
4     product, and then after that you would now have to
5     deal with, okay, we've seen it all, we've got it
6     all here, and presumably at this point you would
7     have some members that you needed to go and talk
8     to because there would be changes that are
9     occurring during the June period, and I reflected
10    on some of those changes that were going on in
11    Milwaukee earlier with Peter. You know, that this
12    is a -- this is a time period when there's changes
13    going on.
14 Q  And if we flip back, as a matter of fact, just two
15    pages in the document to e-mail number 49?
16 A  Oh, okay, sure.
17 Q  Does that essentially reflect --
18 A  That certainly reflects what I just said, doesn't
19    it, I think?
20 Q  Mr. Ottman is taking is there we have a few
21    unhappy members?
22 A  Yes.
23 Q  Do you recall Mr. Ottman expressing that to you?
24 A  No, I don't.
25 Q  Mr. Ottman goes on in that e-mail to say the only

Page 209

1     problem with this draft is that they included the
2     language on municipalities redrawing their ward
3     boundaries in this legislation rather than in part
4     of the separate legislation that also deals with
5     venue changes. Do you see that?
6  A  Yes, I do.
7  Q  Do you recall discussing that topic at all with
8     Mr. Ottman or anyone else?
9  A  Well, the or anyone else, yes, I certainly do
10    recall that discussion.
11 Q  Who did you discuss that with?
12 A  Well, that would be with Ray Taffora primarily.
13 Q  Why would that have been a problem?
14 A  Well, it's only a problem in the sense of the
15    drafting and nature of drafting language. I'm not
16    a legislative expert when it comes to drafting
17    legislation but Ray Taffora is probably the single
18    expert in the state of Wisconsin on drafting of
19    legislation. He spends his entire legal career
20    doing it. And so Ray's role here was -- this is
21    what this is talking about, is he needed to
22    address the drafting of the language, vis-a-vis
23    the ward boundaries and the like, that were going
24    to be altering the prior structure of the process.
25    So Raymond would have to deal with that as a

53 (Pages 206 to 209)

Page 210

1  drafting issue. So I -- that's what that is.
2  Q   Did you have any discussions with Mr. Taffora
3      about drafting the language relating to ward
4      boundaries?
5  A   Oh, yeah, I'm sure I did.
6  Q   Were there any issues that had arisen as to ward
7      boundaries with the legislation that you're aware
8      of?
9  A   Yes.
10 Q   What were those issues?
11 A   Well, I can't delineate precisely what the ward
12     boundary issues were but the -- there was a lot of
13     misunderstanding about the process by which these
14     districts would be completed, and that
15     misunderstanding continued right through the
16     hearing on July 13, with regard to whether ward
17     boundaries that had already been settled upon by
18     local communities and the like would have to be
19     maintained or not and what's the sequence of these
20     things.
21         So when you were changing, because of
22     the nature of this particular legislation, the
23     ward boundary issue had arisen. So that's what
24     all this is referring to. And again, I was and
25     remain very deferential to another member of the

Page 211

1  team in this case, Mr. Taffora, who is a drafting
2  expert.
3  Q   Mr. Troupis, is it your understanding that in
4      previous redistricting efforts municipalities had
5      completed their ward process before the time that
6      maps were created and the districts were created?
7  A   Yes, and the other party had been attempting to
8      change that for quite some time, and the
9      Republicans were adopting that as one of the
10     proposals here, that it ought to start at the
11     state level and go to the local level rather than
12     the reverse. So this was -- this has been
13     something that people have talked about for a long
14     time on both sides of the aisle.
15 Q   And is it your understanding that in the 2011
16     redistricting, rather than waiting for the
17     municipalities to finish their process of creating
18     wards, census blocks were used to create assembly
19     district boundaries?
20 A   I don't know the latter part about census blocks
21     and the like because I wasn't involved in the
22     actual construction of these things, but the --
23     the process of ward boundaries was changed and how
24     those were adopted within the context of the state
25     legislative map.

Page 212

1  Q   Were you part of the discussion of whether the
2      census blocks or census tracts should be used to
3      create assembly districts?
4  A   You know, that's a level of detail I just don't
5      remember.
6          MR. POLAND: Why don't we go off the
7      record.
8          THE VIDEOGRAPHER: We are going off
9      the record at 9:06 p.m.
10         (A recess was taken.)
11         THE VIDEOGRAPHER: We are back on the
12     record at 9:20 p.m.
13         EXAMINATION
14 BY MR. HODAN:
15 Q   Good evening, Mr. Troupis.
16 A   Good evening.
17 Q   I represent the Government Accountability Board
18     members in their individual capacity and I have
19     some follow-up questions. You were asked the
20     questions about District 8 and 9. Those
21     are the Hispanic districts.
22 A   Yes.
23 Q   In this case there's an allegation that the maps
24     and the map drawers in particular tried to
25     intentionally discriminate against the Hispanic

Page 213

1  community in those districts. Was that your
2  intent and your role as counsel?
3  A   Absolutely not.
4  Q   And what was your intent and what was the group's
5      intent in drawing Districts 8 and 9?
6  A   Generally in District 8 and 9 --
7          MR. EARLE: I'm going to object to the
8      form.
9          THE WITNESS: In District 8 and 9
10     you're dealing with --
11         MR. HODAN: What's the --
12         MR. EARLE: It's compound. He asked
13     for the intent of two different entities, him and
14     the group, and as to the group I object on the
15     grounds of foundation.
16 BY MR. HODAN:
17 Q   Do you have an understanding as to how District 8
18     was drawn?
19 A   Yes.
20 Q   Do you have an understanding as to how District 9
21     was drawn?
22 A   Yes, I do.
23 Q   And 8 and 9 are adjoining districts; correct?
24 A   That's correct.
25 Q   And there's a line between 8 and 9; correct?

54 (Pages 210 to 213)

Halma-Jilek Reporting, Inc.    Experience Quality Service!    (414) 271-4466
Case 2:11-cv-00562-JPS-DPW-RMD    Filed 02/23/12    Page 54 of 107    Document 188

Page 214

1  A    Well, yes, technically, of course.
2  Q    So if you reconfigure that line, you affect
3       either -- you affect both 8 and 9; correct?
4  A    Yes, as a practical matter, of course.
5  Q    So with that background, can you tell me what the
6       intent was in drawing Districts 8 and 9?
7            MR. EARLE: I'm going to object to the
8       question on two grounds. Foundation. I think he
9       testified that he didn't remember the actual
10      designation of the lines. So --
11           MR. HODAN: You can go ahead and
12      answer.
13           MR. POLAND: Join in the objection to
14      form as well.
15           THE WITNESS: Okay. Whenever we would
16      look at -- whenever I would like at from a legal
17      perspective the map of a minority district, a
18      district in which there's a minority population,
19      in this case the Latino population, you're going
20      to be very conscious of a number of things, and
21      it's not an exhaustive list but we were certainly
22      very conscious of a number of things.
23           Number one was that the prior court in
24      2002 had drawn a minority/majority district for
25      the Latino community of approximately 58 percent

Page 215

1       voting age population, and that seat had been held
2       throughout the decade with, as I recall, Pedro
3       Colon and then JoCasta now. And so we certainly
4       wanted to -- we certainly wanted to make sure that you
5       would not retrograde, you would not go back. So
6       you had a minority/majority district. You want to
7       make sure that you don't do something to undo that
8       district.
9            The second thing that we want to make
10      sure in any minority situation, and it would not
11      be strictly in the Latino community, is that you
12      give the community an opportunity to elect a
13      representative of their choice. We didn't do a
14      precise Jingles analysis because it wasn't
15      necessarily. Again, it was already in place, a
16      Latino representative. We knew that the community
17      was growing.
18           I think I reflected a little bit
19      earlier in other testimony that we were very
20      conscious of the fact this community was large, it
21      was growing, it was likely to continue to grow.
22      And so we wanted to make sure that not only would
23      the original district remain able to elect a
24      representative of choice of that community but
25      that also, if it was possible to create a second

Page 216

1       district, that we would make that happen. And so
2       we -- we configured this in very significant
3       measure to make sure that if it was possible, you
4       could have two representatives from that community
5       in the state legislature if they so chose.
6            We also thought that there would be an
7       opportunity for a senate district over time and
8       again that's a trending question. We certainly
9       had what would be called an influence district
10      there because you had two assembly districts. So
11      we then -- we certainly wanted to focus on the
12      growth in the third assembly district and then the
13      senate district would encompass what we would hope
14      would be eventually a majority/minority district
15      for the state senate as well. So we were
16      conscious of trends, movements and we hoped that
17      in that process we could accomplish that goal as
18      well on the south side of Milwaukee.
19           We -- I reflected a minute ago that my
20      perspective, the legal perspective was to make
21      sure that we complied with all of the rules and
22      regulations as we understood them for creating
23      these minority districts.
24           MR. EARLE: I'm going to object to the
25      answer as nonresponsive, a long, winding,

Page 217

1       meandering narrative and move to strike.
2  BY MR. HODAN:
3  Q    How did the old District 8 compare to the new
4       District 8 in terms of voting age population, if
5       you recall?
6  A    Slightly larger.
7  Q    And did you view that as an improvement to the
8       district or a detriment to the Hispanic community?
9  A    I certainly thought it was an improvement. Again,
10      it could have been -- it was within the range that
11      you'd expect.
12 Q    And do you recall how old District 9 compared to
13      new District 9 with respect to voting age
14      population?
15 A    A dramatic increase.
16 Q    And did you view that as an improvement to the
17      district?
18 A    Very much so.
19 Q    Do you recall in District 9 whether that seat was
20      now an open seat?
21 A    You were mentioning a bit ago about various
22      factors that you take into account, and I think my
23      prior testimony I was also talking about that. It
24      was -- it would be an open seat in the new
25      configuration.

55 (Pages 214 to 217)

Halma-Jilek Reporting, Inc.    Experience Quality Service!    (414) 271-4466
Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 55 of 107   Document 188

Page 218

1   Q    And why was that significant?
2   A    Well, particularly in a new district, the district
3        that is now newly minority/majority, it would give
4        at the earliest possible time that community an
5        opportunity to elect a representative of their
6        choice.
7             If you have -- there's an incumbent
8        benefit that -- that you have.  So that if you
9        have a nonminority representative and was sitting
10       now in the new minority/majority district, it
11       might well -- there is a factor that has to be
12       taken into account.  This avoided that potential
13       pitfall.
14  Q    So is it fair to say that in your view Districts 8
15       and District 9 were improvements over the
16       Court-drawn plan?
17  A    They certainly were.
18  Q    Did you share that opinion with --
19            MR. EARLE:  I'm going to object to the
20       last question as leading.
21  BY MR. HODAN:
22  Q    How did you feel about the difference between old
23       District 8 and new Districts 8 and 9?
24  A    Well, we were -- we went to great lengths, at
25       least I thought we did, to ensure that we made a

Page 219

1        significant improvement in those two districts, 8,
2        9, and then potentially the senate district by
3        consulting with MALDEF directly.
4   Q    Did you share your view about Districts 8 and 9
5        with others?
6   A    Yes, I did.
7   Q    Did you share -- and who did you share those views
8        with?
9   A    Well, primarily from my perspective I shared them
10       with the Mexican American Legal Defense Fund,
11       which is MALDEF.  I've been referring to it by the
12       acronym.  And we shared with them all the
13       information that we could that they asked for.
14  Q    I'm going to show you what's been marked as
15       Exhibit 1168.  I don't have a copy.  You can look
16       at it.
17            MR. DAUGHTERY:  Is that one of the
18       ones that you had Bate stamped?  I'm just trying
19       to make sure it's not on my list here.
20            MR. HODAN:  It's not on your list.
21            MR. EARLE:  Why don't we do that.
22       I need to get a copy.
23            MR. HODAN:  Actually you have a copy.
24       It's JRT --
25            MR. EARLE:  I don't have a copy here.

Page 220

1             MR. HODAN:  It's JRT123.
2             MR. EARLE:  Why don't we --
3             THE WITNESS:  Why don't we get that
4        out of the folder there.
5             MR. HODAN:  I don't need one while the
6        witness has it.
7             MR. EARLE:  But, you know, what about
8        the other exhibits you have.  So we'll get them
9        done.
10            MR. HODAN:  Great.
11            THE WITNESS:  Make copies.
12            MR. EARLE:  This is going --
13            THE VIDEOGRAPHER:  You want to go off?
14            THE WITNESS:  Yes.
15            THE VIDEOGRAPHER:  We are going off
16       record at 9:31 p.m.
17            (Discussion off the record.)
18            THE VIDEOGRAPHER:  We are back on the
19       record at 9:38 p.m.
20            MR. HODAN:  Could you plead read back
21       the last question?
22            (The record was read as follows:
23            "I'm going to show you what's been
24       marked as Exhibit 1168.  I don't have a copy.  You
25       can look at it.")

Page 221

1   BY MR. HODAN:
2   Q    Mr. Troupis, I'm showing you what's been marked as
3        Exhibit 1168.  And I direct your attention to
4        the -- to the middle of the document that appears
5        to be an e-mail from you to Mr. McLeod; correct?
6   A    Yes.
7   Q    Ottman, Taffora?
8   A    The one dated July 26th.
9   Q    July 26th at 11:30 a.m.; is that correct?
10  A    Yes.
11  Q    Could you read that into the record, please?
12            MR. POLAND:  Object to the form of the
13       question.
14  BY MR. HODAN:
15  Q    This is an e-mail from you?
16  A    Yes, it is.
17  Q    And what did you say in this e-mail?
18            MR. POLAND:  Object to the form.
19            THE WITNESS:  I said I believe this is
20       the information I also just referred to.  We've
21       had some good articles come out about the Hispanic
22       districts, pointing out that the percent that
23       elected Hispanic reps -- rep in the past was lower
24       than ours and it is a nice contrast.  That's the
25       reason I like to add what the prior map had.  The

56 (Pages 218 to 221)

Halma-Jilek Reporting, Inc.        Experience Quality Service!        (414) 271-4466
Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 56 of 107   Document 188

Page 222

1    numbers demonstrate without comment how good this
2    is to for minority populations. No one should
3    comment, just provide the numbers. Jim.
4    BY MR. HODAN:
5    Q    That first sentence where you said I believe that
6         is the information I also just referred to, do you
7         know what you were talking about?
8    A    I assume it's the information about the specific
9         legislative districts and the minority populations
10        in those districts, I assume.
11             MR. EARLE: I'm going to object to the
12        question and move to strike. Speculation.
13   BY MR. HODAN:
14   Q    The second sentence when you said we've had some
15        good articles come out about the Hispanic
16        districts pointing out the percentage of elected
17        Hispanic reps in the past was lower than ours and
18        it is a nice contrast, that's the reason I like to
19        add what the prior map had, what are you referring
20        to there?
21   A    Just what I'm saying, it's that we, during the
22        course of the hearings which had taken place just
23        prior to this, there had been information
24        provided, quite explicit information about the
25        populations of all the districts, including

Page 223

1         information about the minority populations in
2         those district. This particular e-mail is
3         referring to those numbers relative to the
4         Hispanic or Latino Districts 8 and 9.
5    Q    And the last sentence in that e-mail where it
6         reads the numbers demonstrate without comment how
7         good this is for minority populations -- pardon
8         me. The second last sentence, it reads the
9         numbers demonstrate without comment how good this
10        is for the minority populations, what point were
11        you trying to make there?
12   A    That we had with this redistricting improved
13        dramatically the opportunity of a Latino
14        population in Milwaukee to elect representatives
15        of their choice.
16   Q    And the last sentence reads no one should comment,
17        just provide the numbers. What did you mean
18        there?
19   A    That's a -- the numbers speak for themselves.
20   Q    Now, you were asked some questions about seeking
21        the assistance of experts in the redistricting
22        process. Why were you looking for assistance from
23        experts?
24   A    Well, ultimately these questions are -- there's an
25        infinite variety of districts that can be drawn

Page 224

1         and it's truly infinite. You can draw lines any
2         number of ways. When we look to experts here
3         traditionally we're looking at experts to make
4         sure that we comply with federal laws, the Voting
5         Rights Act or otherwise and the districting laws
6         in a statistical analysis. I'm not imposing my
7         views or anybody else's views but you look at it
8         from a statistical perspective to make sure that
9         you are, in fact, achieving what you believe
10        you're achieving, compliance with those laws.
11   Q    Now, you were involved in the redistricting in the
12        1990's; is that correct?
13   A    Yes, I was.
14   Q    Were experts retained in connection with that
15        litigation?
16   A    Yes.
17   Q    Were experts, if you know, obtained prior to
18        litigation?
19   A    Yes.
20   Q    Do you know, did the Democrats retain experts in
21        the 1990's?
22   A    Yes, certainly they did.
23   Q    And you were involved in the 2000 redistricting;
24        is that right?
25   A    Yes, I was.

Page 225

1             MR. EARLE: Wait. On the question
2         about the Democrats I'm going to object on the
3         grounds of foundation.
4    BY MR. HODAN:
5    Q    Are you aware of the -- what particular experts
6         would have been retained by any of the Democrats
7         in the 1990's?
8    A    Yes.
9    Q    And who were some of those experts, if you recall?
10   A    Was I -- I said yes but you saw I hesitated
11        because my memory may not be as good as it once
12        was.
13            MR. EARLE: Move to strike the former
14        testimony.
15            THE WITNESS: No. I mean, like I
16        said, I know that they had experts. I'm just not
17        100 percent sure of the names because the -- the
18        record will reflect what it was in those federal
19        proceedings.
20   BY MR. HODAN:
21   Q    So, for example, if we were to look at
22        Mr. Grofman's declaration from 1992, we might be
23        able to discern what experts were there?
24            MR. EARLE: I'm going to object.
25        You're leading.

57 (Pages 222 to 225)

Page 226

1    THE WITNESS: In the next -- I can
2  explain how it would work.
3    MR. EARLE: You're asking him to
4  speculate as to what in Mr. Grofman's report.
5    THE WITNESS: I wouldn't be
6  speculating about what's in Mr. Grofman's report.
7  It would be there because of the way in which the
8  evidence went in.
9  BY MR. HODAN:
10  Q    And how did the evidence go in?
11  A    **We had direct testimony went in by way of**
12  **declarations and affidavits and there was only**
13  **cross-examination.**
14  Q    And are you familiar with a gentleman by the name
15  of Joel Gratz?
16  A    **Yes.**
17  Q    Okay. And do you recall what role he had in 2002?
18    MR. POLAND: Object to the form.
19    THE WITNESS: One of the people
20  involved on the other side of the case.
21  BY MR. HODAN:
22  Q    Do you know, did he have any involvement in
23  drawing maps for the Democrats in 2002?
24  A    **That my recollection is that he was one of the**
25  **people that actually drafted those maps in that**

Page 227

1    **time period.**
2  Q    Throughout this process, there has been a
3  suggestion that there's been this grand
4  conspiracy, everything is secretive. During this
5  process you indicated that each of the caucuses
6  received terminals; is that right?
7  A    **Yes.**
8    MR. POLAND: Object to the form of the
9  question.
10    MR. EARLE: Join.
11  BY MR. HODAN:
12  Q    Are you aware?
13  A    **Yes, I am aware.**
14  Q    Okay. And do you recall what type of terminal
15  that would be?
16  A    **I wouldn't know the precise terminal but we**
17  **participated in the negotiation of those**
18  **arrangements in the year before the 2011 cycle.**
19  Q    And was each caucus then able to use a terminal to
20  draw a map?
21  A    **Absolutely.**
22    MR. POLAND: Object to the form of the
23  question, foundation.
24    THE WITNESS: Yes.
25

Page 228

1  BY MR. HODAN:
2  Q    Did any of the Democrats ever attempt to share a
3  map with you or your group?
4  A    **No.**
5    MR. POLAND: Object to the form of the
6  question, foundation.
7    THE WITNESS: No.
8    MR. HODAN: Foundation as to whether
9  he ever received a map from the Democrats?
10    MR. POLAND: That wasn't your
11  question.
12  BY MR. HODAN:
13  Q    Did you ever receive a map from the Democrats?
14  A    **No.**
15  Q    They didn't share one with you?
16  A    **No, they did not.**
17  Q    Were they secretive about it?
18    MR. POLAND: Object to the form of the
19  question. Foundation.
20    THE WITNESS: I wouldn't necessarily
21  use secretive. It's a part of the redistricting
22  process that's been common for years.
23  BY MR. HODAN:
24  Q    And you've been part of that process for the last
25  30 years. During that last 30 years, do you ever

Page 229

1  recall a situation where the Democrats shared a
2  map with you prior to offering it to Court or to
3  the public?
4    MR. POLAND: Object to the form of the
5  question.
6    MR. EARLE: Join.
7    THE WITNESS: I do not recall that
8  ever happening.
9  BY MR. HODAN:
10  Q    And you would have known that as lead counsel in
11  both those cases; correct?
12    MR. POLAND: Object to the form.
13    MR. POLAND: Objection, leading.
14    THE WITNESS: Yes.
15  BY MR. HODAN:
16  Q    Would you have known that?
17  A    **Yes.**
18  Q    There is in this suggestion that somehow it was
19  improper and secretive that the terminal to draw
20  maps was moved over to Michael Best. Why was the
21  terminal moved over to Michael Best?
22    MR. POLAND: Object to the form of the
23  question.
24    MR. EARLE: Object to the form. Join.
25    THE WITNESS: Well, as I think I said

58 (Pages 226 to 229)

Page 230

1      earlier, it's a matter of efficiency above all
2      else. It's simply easier and more efficient to
3      have them in this case in a separate facility than
4      it would be to have them somewhere in the Capitol.
5      That's just the way it would work in a particular
6      office.
7   BY MR. HODAN:
8   Q    Is it more convenient for the lawyers?
9                MR. POLAND: Object to the form.
10               MR. EARLE: Join in the objection to
11     the question as well.
12               THE WITNESS: When I said efficient,
13     that's part of the process. The legal part of
14     this process, as I think I explained earlier, is a
15     very important part of it, and working with the
16     lawyers is an integral part of that to comply with
17     the laws that we've been talking about. So the
18     proximity is very important.
19  BY MR. HODAN:
20  Q    All right. There's been some testimony or
21     deposition testimony in this case, I'll represent
22     to you, that the Democrats might have sent one of
23     their terminals off-site. Were you aware of that?
24               MR. POLAND: Object to the form of the
25     question.

Page 231

1   BY MR. HODAN:
2   Q    You can go ahead and answer.
3   A    I had certainly heard that.
4                MR. POLAND: Move to strike. Hearsay.
5                MR. EARLE: Join.
6   BY MR. HODAN:
7   Q    Do you know, are you familiar with the entity
8      known as the Shop Consulting?
9   A    I apologize. I don't.
10  Q    Okay. Would you consider that somehow secretive
11     or nefarious or wrong if the Democrats had taken
12     one of their terminals and sent it somewhere else
13     to be used?
14               MR. POLAND: Object to the form of the
15     question.
16               MR. EARLE: Join.
17  BY MR. HODAN:
18  Q    You can go ahead and answer.
19  A    I would not think that. I would be surprised if
20     the reverse were true.
21  Q    You were present during the July 13, 2011
22     committee hearing?
23  A    Yes, I was.
24  Q    And that would have been the joint public hearing
25     of the Wisconsin redistricting plan?

Page 232

1   A    Yes, I was.
2   Q    And were you present for the entire testimony?
3   A    Yes, I was.
4                MR. HODAN: I have one copy. I assume
5      you have a copy.
6                MR. POLAND: We've got a bunch right
7      here copied.
8                MR. HODAN: Great. Why don't we pass
9      them out.
10               MR. POLAND: Did you want me to hand
11     it to the witness?
12               MR. HODAN: Please.
13               THE WITNESS: Thank you.
14  BY MR. HODAN:
15  Q    Mr. Troupis, before you is Exhibit 19, which I'll
16     represent to you is an official transcript of
17     those proceedings on July 13, 2011.
18  A    Yes.
19  Q    Would you turn to page 133, please?
20  A    Yes.
21  Q    Okay. Are you familiar with Representative
22     Zamarripa?
23  A    Yes, I am. Well, I am. We don't know each other.
24     Probably the first time I met her was at this
25     hearing.

Page 233

1   Q    Are you aware that she is the incumbent in
2      assembly district 8?
3   A    Yes.
4   Q    Are you aware that she sat on this committee?
5   A    Yes.
6   Q    Could you read in the record, please, what she
7      said?
8                MR. POLAND: Object to -- go ahead,
9      finish your question.
10  BY MR. HODAN:
11  Q    Could you read into the record -- first, you
12     indicated you were there. Do you recall what she
13     said about her districts?
14               MR. EARLE: I'm going to object to the
15     you're asking him to -- it's hearsay at this
16     point. You're offering this for the truth of
17     matter asserted.
18               MR. HODAN: Well, it's an official
19     government record. I think there is an exception
20     to the hearsay rule, but --
21               MR. POLAND: I'm sorry. I just want
22     to get my objection. Object to the form of the
23     question. It's leading having the witness just
24     read in sworn testimony into the record is an
25     improper question and it's leading.

59 (Pages 230 to 233)

Page 234

BY MR. HODAN:

Q   Well, let me ask you a question then. Do you
recall halfway down, and I'll read what she said
and then you can tell me whether you remember
hearing this. She said the 8th and the 9th, the
8th is my district, it is a Latino super majority
district. Do you recall her indicating that?

MR. POLAND: Object to the form.

THE WITNESS: Yes.

BY MR. HODAN:

Q   And she continued the 9th was trending that way.
It is already been a Latino influence district and
this does give us a larger percentage. Do you
recall hearing her say that?

A   Yes, I do.

MR. POLAND: Object to the form.

BY MR. HODAN:

Q   She continued but the truth is that you know that
the Latinos have grown by leaps and bounds here.
Do you recall her saying that?

A   Yes, I do.

MR. POLAND: Object to the form.

THE WITNESS: Yes, I do.

BY MR. HODAN:

Q   And we were trending that way anyway. Do you

Page 235

recall her saying that?

A   Yes.

MR. POLAND: Object to the form.

MR. EARLE: I join in all those
objections.

BY MR. HODAN:

Q   And she continued, it's almost inevitable we just
grew it, it's not that you created another one.
There's not three there now. Do you recall her
saying that?

A   Yes.

MR. POLAND: Object to the form.

MR. EARLE: I object to form as well.

BY MR. HODAN:

Q   And then she continues, there continues to be two
and I'm glad to hear that they're moving from a
majority to a super majority in the 8th and 9th.

MR. EARLE: I'm going to object.

BY MR. HODAN:

Q   Do you recall hearing that?

MR. EARLE: Let me expand on my
objection. For the last five in a row, the
deponent has said he remembers the statements
after you asked, you read them from the record.
He's now established clearly on the record that he

Page 236

does not need the assistance of a document to have
his refreshing -- his recollection refreshed. So
I'd request that you asked him the questions
without testimony. Ask him -- I think you need to
ask him what she testified about without use of
the document because --

BY MR. HODAN:

Q   Do you recall her saying there continues to be two
and I'm glad to hear that they're moving from a
majority to a super majority in the 8th and 9th?

A   Yes.

MR. POLAND: Object to form.

THE WITNESS: Yes, I do.

BY MR. HODAN:

Q   And that was an open hearing?

A   Yes, it was.

MR. POLAND: I move to strike the
entire line of questioning. Counsel's testifying
by reading sworn testimony into the record and
asking the witness if he recalls hearing it.

MR. EARLE: And I join in the motion.

MR. HODAN: And you agree this is
sworn testimony?

MR. POLAND: Well, that's what you
represented it was.

Page 237

MR. HODAN: Well, I thought you just
said it was sworn testimony.

MR. POLAND: It's from the
proceedings. It appears to be. Somebody said
it's an official document.

BY MR. HODAN:

Q   When you hear the term "super majority," does that
concern you with respect to -- strike that. I'm
looking for 96.

MR. POLAND: Is that one that's
already been marked, Patrick?

MR. EARLE: 96.

MR. HODAN: 96.

BY MR. HODAN:

Q   Mr. Troupis, before we get -- before we get to 96,
I want to go back to the claim of some of the
plaintiffs in this case that Act 43
intentionally discriminates against the Hispanic
community. Would it have been a prudent -- strike
that. Is District 8 a predominantly Democratic or
Republican district?

A   Democrat.

Q   Substantially Democratic district?

A   I would probably use the term prohibitively
Democratic.

60 (Pages 234 to 237)

Page 238

1  Q  So the Democrats have held District 8 for a long
2     time?
3  A  Yes. Well, they don't hold the district, so to
4     speak, but that part of the city of Milwaukee you
5     know, has consistently voted Democrat in a variety
6     of different elections. We haven't had elections
7     in the new 8, so --
8  Q  With respect to the allegation by the plaintiffs
9     that the map drawers were trying to intentionally
10    discriminate against the Hispanic community, would
11    that have made sense from the perspective of the
12    Republican leadership?
13        MR. EARLE: I'm going to -- that's
14    leading.
15        MR. POLAND: Join in the objection and
16    foundation too.
17 BY MR. HODAN:
18 Q  The question was would it have made sense?
19        MR. POLAND: Same objections.
20        THE WITNESS: Not from the perspective
21    of a legal matter from my perspective.
22 BY MR. HODAN:
23 Q  And why not?
24        MR. POLAND: Same objections, object
25    to form and foundation.

Page 239

1         MR. EARLE: Join.
2         THE WITNESS: Well, because the -- as
3  I explained a little bit earlier, the process by
4  which these -- we comply with the Voting Rights
5  Act and draw these involve a series of steps, none
6  of which, all of which could be followed
7  without -- without affecting any kind of a
8  partisan outcome, but from my standpoint I'm
9  saying as a lawyer we were obligated to look at
10 those matters and do the best we could in order to
11 comply with the Voting Rights Act. No client, at
12 least from my perspective, would hire me in order
13 to come up with a way of not complying with the
14 law. We were -- that was our job.
15 BY MR. HODAN:
16 Q  And if you had done that, if you had been out to
17    intentionally discriminate against the Hispanic
18    community, would that have increased the odds of a
19    court challenge being a successful court
20    challenge?
21        MR. EARLE: I'm going to object to
22    form of the question.
23        MR. POLAND: Same objection.
24 BY MR. HODAN:
25 Q  Go ahead and answer.

Page 240

1  A  Certainly it would and I would never been a part
2     to it.
3  Q  Now, I'd ask you to look at --
4         MR. EARLE: You wanted 96?
5  BY MR. HODAN:
6  Q  -- Exhibit 96, please.
7         MR. DAUGHTERY: He's got it.
8  BY MR. HODAN:
9  Q  You were asked some questions by I believe
10    Attorney Earle earlier --
11 A  Yes.
12 Q  I don't know if -- my text is on the second and
13    third page on the WisPolitics. This is a press
14    release. Mine seems to be highlighted. Do you
15    see the highlighted text?
16 A  Yes, I do.
17 Q  Okay. And I believe the highlighted text, I want
18    to ask you about this just to see what you know.
19    The highlighted text reads finally, this appears
20    to be a press release from Voces de la Frontera;
21    is that correct?
22 A  Yes.
23 Q  And this has to do with the city of Milwaukee
24    redistricting?
25 A  That was my understanding.

Page 241

1  Q  And the highlighted section reads: Finally, in
2     order to more effectively increase the
3     possibilities of Latinos being elected in the
4     proposed 8th and 12th, their voting age
5     populations need to be increased respectively from
6     62.3 percent in the former and 67.6 percent in the
7     latter to at least 70 percent. This can be done
8     with minor changes as there are a number of
9     adjacent boards that have majority of Hispanic
10    voting age populations.
11        My question to you is do you know if
12    the city of Milwaukee when it redistricted the
13    aldermanic district actually went along with what
14    Voces de la Frontera asked for?
15        MR. POLAND: Object to the form of the
16    question.
17        MR. EARLE: Object to the form as
18    well.
19        THE WITNESS: I do not know.
20 BY MR. HODAN:
21 Q  Would it surprise you to learn that the city of
22    Milwaukee didn't?
23        MR. EARLE: Object to the form of the
24    question.
25        MR. POLAND: Join.

61 (Pages 238 to 241)

Page 242

1      THE WITNESS: As I reflected --
2          MR. HODAN: I'll withdraw the
3    question.
4    BY MR. HODAN:
5    Q    I'd like to look at the first page of Exhibit 96.
6        You wrote here the problem here is that the group
7        wants 70 percent. What you were referring to what
8        Voces de la Frontera wanted in the aldermanic
9        districts?
10   A    Yes, that's exactly what I was referring to.
11   Q    And what's the problem that you thought that
12       created?
13   A    The next sentence said it's classic overkill.
14   Q    And what did you mean by that?
15   A    It's simply not necessary for the Latino or
16       Hispanic community here to have that level of a
17       percentage of voting age population in order to
18       elect a representative of their choice, and -- and
19       it's a bad idea. It's a bad idea because you're
20       wasting the opportunity to elect, for the
21       community to elect more representatives of choice
22       if you -- if you pack in that level of that --
23       those kind of numbers. That's what I was
24       referring to.
25   Q    And I take it you were referring in the context of

Page 243

1        Districts 8 and 9 in that regard.
2    A    That's correct.
3    Q    So you didn't -- let me ask you. So those
4        comments were directed to your view about a
5        problem that those numbers would create for
6        District 8 and 9?
7            MR. POLAND: Object to the form.
8            MR. EARLE: Yes, more than super
9        leading.
10   BY MR. HODAN:
11   Q    I'm just trying to understand what --
12           MR. EARLE: There's not an exception
13       for leading for your failing to understand.
14           MR. HODAN: Thank you, counsel.
15   BY MR. HODAN:
16   Q    Let me rephrase. Your -- the problem you were
17       referring to had to do with those numbers in
18       Districts 8 and 9.
19   A    That's correct.
20   Q    And you continued, I'm already very worried about
21       the 65 percent. What did you mean by that?
22   A    Well, you need to understand or appreciate, this
23       is voting age population. I mean, the percentage
24       of actual population is higher than this. And so
25       you're talking about an enormous number of

Page 244

1        minority citizens being packed into an area that
2        they don't -- that are unneeded. So that's --
3        that's what I was trying to get across and that in
4        a very classic sense this is the way much of the
5        modern Voting Rights Act and redistricting got
6        started is that in large urban areas in particular
7        and in the South they simply packed in large
8        numbers of minorities and thus they would lose
9        their effective representation because they could
10       have been in two or three different districts and
11       now you're locked into one.
12   Q    You were involved in the 1990 redistricting in
13       Milwaukee; correct?
14   A    That's correct.
15   Q    Can you tell us what the fight was in connection
16       with the African-American districts that was at
17       issue there?
18   A    Well, my, again, my recollection is that the --
19       the districts in Milwaukee could be drawn with
20       nearly 100 percent African-American population and
21       as a consequence you could have -- limit the
22       number of African-American representatives in
23       Milwaukee. So we spent a great deal of time and
24       efforts in that litigation and the court file, you
25       know, shows it, that trying to make sure that you

Page 245

1        didn't pack those numbers so large that the
2        African-American population would end up, in
3        effect, underrepresented in the city of Milwaukee.
4    Q    So in that regard, were you successful?
5    A    Yes.
6    Q    And to your knowledge did those districts perform
7        as -- as you had predicted?
8    A    Yes.
9            MR. EARLE: Object to the form of the
10       last question.
11   BY MR. HODAN:
12   Q    In 2000 you were involved in the Wisconsin
13       redistricting and there was a dispute over the
14       African-American districts; correct?
15   A    Yes, there was.
16   Q    And do you recall what that dispute was?
17   A    It was essentially the same problem as we faced in
18       the 1990's, that the African-American population
19       had grown dramatically in the districts that had
20       previously been drawn by the Western District
21       federal court in the earlier cycle. So the
22       question that map drawing faced in that situation
23       was how ought those districts be configured so as
24       to maximize the opportunity for the
25       African-American population to elect

62 (Pages 242 to 245)

Page 246

1  representatives of their choice.  And that meant
2  necessarily that certain districts had to be
3  reconfigured in order to reduce that total
4  African-American population to the best you could.
5  It's a very concentrated population and so in some
6  respects it's rather difficult.
7  Q    And were you successful in convincing the court to
8       draw the number of African-American districts in
9       2000?
10               MR. POLAND:  Object to the form.
11 BY MR. HODAN:
12 Q    You can go ahead and answer.
13 A    I believe we were and I believe, but I wouldn't
14      want to be the person to say that.  I think
15      Professor Grofman is the one who addressed that
16      directly with the Court.
17 Q    In both the 1990's and 2000 litigation, was there
18      testimony from individual legislators in the
19      African-American districts saying that they needed
20      higher percentages in order to be reelected?
21               MR. POLAND:  I'm going to object to
22      form and actually this goes way beyond the scope.
23               MR. EARLE:  I move to strike the
24      whole -- the whole line of questions as way beyond
25      the scope.  And just so it's clear, the Court

Page 247

1       requested that we consider the submission of
2       Mr. Troupis' testimony by transcript to the court,
3       and the same request was made by counsel for
4       Mr. Troupis and I agreed to try to do that.
5               And so at this point you're way beyond
6       the scope and he's not your witness.  He is our
7       witness.  We identified him as a witness and there
8       was a motion to the court.  You did not object to
9       us subpoenaing him to the trial as a witness, and
10      it was Judge Stadtmueller's request that you do
11      his deposition first and recommended that we then
12      submit the deposition in lieu of live testimony.
13      So under those circumstances you are so far astray
14      from the scope of the examination and I object and
15      move to strike the whole line of questioning.
16               MR. POLAND:  I also believe you're
17      trying to use him as an expert witness in
18      redistricting now and he's an undisclosed expert.
19      He can't testify as an expert.  He's a fact
20      witness.  That's what he's here for.
21               MR. HODAN:  Mr. Troupis was not named
22      by the plaintiffs in the pretrial report as a
23      witness, so I --
24               MR. EARLE:  He was named in the --
25               MR. HODAN:  This is my record to make,

Page 248

1       counsel, please.  I gave you an opportunity to
2       make your record.
3               MR. EARLE:  And I'm very appreciative
4       of that.
5               MR. HODAN:  Thank you.  He was not
6       disclosed in the pretrial report by the plaintiffs
7       as a witness.  It was only after the court
8       indicated that his deposition could be taken today
9       that we learned that he was going to be a witness
10      in the case and so we're entitled to ask him
11      questions regarding his knowledge and we'll move
12      on.
13               MR. EARLE:  Well, to complete the
14      record, it was disclosed at the Rule 26 disclosure
15      and the decision to call him as a witness was made
16      after review of the latest batch of previously
17      undisclosed e-mails.  That came from the legal
18      team on Friday, the 17th.
19 BY MR. HODAN:
20 Q    You were asked some questions about the
21      configuration of Districts 8 and 9.  Do you know
22      how the aldermanic districts in the city of
23      Milwaukee are configured within Assembly
24      Districts 8 and 9?
25 A    Not directly, no.

Page 249

1  Q    It was suggested during questioning of you that
2       somehow you should have reached out to more people
3       in the Hispanic community.  I believe there are 72
4       counties in the state.  Did you talk to someone in
5       every county about the redistricting process?
6  A    No.
7               MR. POLAND:  Object to the form.
8               MR. EARLE:  Join.
9               THE WITNESS:  No, of course not.
10 BY MR. HODAN:
11 Q    I believe there are other over a thousand
12      municipalities in the state.  Did you talk to
13      someone in each of municipalities about their
14      various concerns?
15 A    No, of course not.
16 Q    You were asked some questions about MALDEF?
17 A    Yes.
18 Q    Do you recall when it was that you contacted
19      MALDEF?
20 A    My best recollection is that I was first given
21      Nina Perales' name in May of last year, and that
22      I -- I placed a call to her first and then was
23      referred to Elisa Alfonso in the Chicago office
24      and called her in early June.
25 Q    And why did you reach out to MALDEF?

Page 250

1   A      Because the issue had been -- because there was an
2          issue raised with regard to the Latino districts
3          in Milwaukee, and MALDEF is -- in my view was the
4          premier defense, the premier fund or premier group
5          of lawyers working on behalf of redistricting
6          around the country on behalf of the various
7          Hispanic populations.  They've been involved in a
8          number of other legal battles over the years,
9          including Illinois.  So, you know, and so when
10         Dr. or Professor Gaddie suggested I give them a
11         call, I did.
12  Q      Okay.  Were you seeking their opinion about
13         Districts 8 and 9?
14  A      Yes.
15              MR. EARLE:  Form.
16              THE WITNESS:  Yes.
17  BY MR. HODAN:
18  Q      Were you seeking their opinion -- pardon me.  Were
19         you seeking -- tell me again, who at MALDEF did
20         you speak to?
21  A      Elisa Alfonso, I believe is her name.  I met her
22         for the first time yesterday.
23  Q      Did you talk to her on the phone?
24  A      Yes.
25  Q      All right.  Did you elicit her opinion about the

Page 251

1          configuration of District No. 8?
2   A      Well, not initially.  We -- we initially, I
3          offered to provide her with all of the information
4          regarding Milwaukee and the south side of
5          Milwaukee that we had with the expectation that
6          she could review it, MALDEF could review it and
7          decide what type of district, what kind of
8          district they believe would be most effective in
9          representing the community.  And so that's -- so
10         initially I provided her with information.
11  Q      Okay.  And do you recall what information you
12         provided her with?
13  A      We provided her all of the information we had on
14         that area from the demographic or the census data
15         by census tract through the -- through that entire
16         area.  She was very familiar with it because they
17         were involved in Illinois using the same census
18         date.  So she may have just asked me for it or I
19         said this is what we have, but either way, it's
20         the basic building block for redistricting.
21  Q      During your call did she indicate whether she
22         would review the information that you looked at,
23         that you provided her?
24  A      Yes.
25  Q      And did she tell you -- did you ask her for her

Page 252

1          opinion?
2   A      Yes.  I mean, throughout this process I asked her
3          and she had others on the phone on occasion that I
4          would ask as well.
5   Q      Okay.  And had you met her before?
6   A      No, no, I had not.
7   Q      Did you eventually get -- did she get back to you
8          at all after you sent information to her?
9   A      Yes, she did.
10  Q      Okay.  And what did she say when she got back to
11         you?
12  A      She indicated to me that when they looked at the
13         numbers to try to determine the most effective
14         districts, that for the community that --
15              MR. EARLE:  I'm going to object to the
16         questions and the answer on hearsay grounds.
17  BY MR. HODAN:
18  Q      Okay.  You can go ahead and answer.
19  A      Okay.  That they believed that a configuration of
20         60-53, 60-54 voting age population was -- was the
21         best alternative.  So that's what she indicated to
22         us and she sent us actually sent maps to that
23         effect.
24              MR. EARLE:  I'm going to object and
25         move to strike.

Page 253

1              MR. POLAND:  Join.
2   BY MR. HODAN:
3   Q      Did you ever memorialize -- strike that.  After
4          that conversation did you ever mention anything
5          about -- did you mention to anyone else that
6          conversation?
7   A      Yes.
8   Q      Okay.  And who would you have talked to?
9   A      Either Tad or Adam as well as Eric and others on
10         our team.
11  Q      I'd ask you to look at Exhibit 1166.
12  A      Yes, I looked at it.
13  Q      Okay.
14              MR. DAUGHERTY:  Just hold on one
15         second.  I'm going to check to make sure this
16         isn't one of the ones -- you're certain this is
17         not one of the ones that's off?
18              MR. HODAN:  This is JRT87, if you'll
19         just look at it and just confirm.
20              MR. DAUGHERTY:  JRT87.  Okay.  Okay,
21         we're fine, thanks.
22              MR. HODAN:  And you have a copy of
23         JRT87?
24              MR. EARLE:  87 is not on the list.
25              MR. DAUGHERTY:  It can be talked

64 (Pages 250 to 253)

Halma-Jilek Reporting, Inc.        Experience Quality Service!        (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD    Filed 02/23/12    Page 64 of 107    Document 188

Page 254

1    about.
2              MR. EARLE:  It can be talked about?
3              MR. DAUGHERTY:  Yes.
4    BY MR. HODAN:
5    Q    Can you tell me what -- is this an e-mail that
6         you sent?
7    A    Yes.  There's actually -- yes, it is.
8    Q    There are a number of e-mails.
9    A    Yeah, that's what I was trying to figure out.
10        Sometimes I'm a little obtuse in the way I write
11        these things.
12   Q    That's all right.  When we have the modern day
13        string e-mails, sometimes it's difficult to figure
14        out which is which.
15   A    Right.  It appears to be two separate e-mails.
16   Q    Well, let's talk about the one on the bottom.  Is
17        that an e-mail that you drafted on July 11, 2011
18        at 2:24 p.m.?
19   A    Yes, it is.
20   Q    And who did you draft it to?
21   A    I was writing to Tad and Adam.  As I reflected a
22        minute ago, I thought I had communicated with them
23        about this issue.
24   Q    In the first line appears to indicate that you
25        spoke to the attorneys at MALDEF.

Page 255

1    A    Yes.
2    Q    Who were you referring to when you said attorneys?
3    A    Elise and others.  I'm trying to think of the
4         other person's name.  I was certainly referring to
5         her that I talked to.
6    Q    And then it reads they had been working with the
7         maps and would like to propose a middle ground
8         where 8 has 65 percent total pop, 60 percent vap,
9         and 9 has 60 percent total pop, 53 percent vap,
10        and a north district, south district
11        configuration.  What did you mean by that?
12   A    Well, this is referring to the map that they had
13        sent us at this point in time and I think there
14        must be out there somewhere and these were the
15        percentages that they had thought would be most
16        effective for the community and they were making
17        this proposal in response to the specifics that
18        I had provided to them the month before.
19   Q    And how does the -- I believe you said before that
20        the Hispanic voting age population in District 8
21        under Act 43 is 60 percent; correct?
22   A    Yes.
23   Q    And that is the same percentage that, is that the
24        same percentage that MALDEF was suggesting?
25   A    Yes, it is.

Page 256

1              MR. EARLE:  Form.
2    BY MR. HODAN:
3    Q    And I believe you testified earlier that the
4         Hispanic voting age population under Act 43 in
5         District 9 is 54 percent; correct?
6    A    Yes.
7    Q    Okay.  And is that slightly -- is that higher or
8         lower than what MALDEF had proposed?
9    A    We were -- it's slightly higher.
10   Q    So that would have -- fair to say that would have
11        been an improvement over what MALDEF had proposed?
12   A    Yes.
13             MR. EARLE:  Object to the form for the
14        last question.
15   BY MR. HODAN:
16   Q    Well, do you believe that that's an improvement
17        over what MALDEF proposed?
18   A    Yes, I do.
19   Q    Now, you were also asked about whether anyone
20        reached out to the Milwaukee community and there
21        was some suggestion that no one in this process
22        had reached out to the Milwaukee community?
23             MR. EARLE:  I'm going to object to the
24        characterization of the testimony and the answer
25        to the question.  If there was a suggestion, it

Page 257

1         was by the deponent in answer to the questions.
2    BY MR. HODAN:
3    Q    Do you recall whether anyone on your team reached
4         out to anyone in Milwaukee regarding the assembly
5         Districts 8 or 9?
6    A    Yes.
7    Q    And anyone in the Milwaukee community?
8    A    Yes, they did.
9    Q    And who did they reach out to?
10   A    Well, I think we talked a little bit ago.  First
11        of all, I believe that I reached out to those,
12        that community fairly directly through MALDEF and
13        this, this e-mail actually reflects that and from
14        the beginning I had indicated that they --
15        certainly that they should do that if they wished
16        and if they believed it was appropriate and that I
17        assumed that they would.  In addition, as the
18        hearing ultimately reflects, there were a number
19        of, people, Zeus Rodriguez, Manny Perez, and Bob
20        Spindel and others that had been at least
21        contacted by the team for the purposes of the
22        hearing.
23   Q    Now, during the redistricting process had you ever
24        heard of plaintiffs Voces de la Frontera?
25   A    As I think I told Peter just a little bit ago, my

65 (Pages 254 to 257)

Page 258

1  first knowledge of it simply comes from that
2  e-mail we looked at a minute which had it attached
3  as a press release. That would have been the only
4  knowledge I have.
5  Q  So the second paragraph of your July 11, 2011
6  e-mail to Tad and Adam, you indicate they are also
7  reaching out today to Milwaukee connections in the
8  Latino community, so this will likely become a
9  more dynamic process. When you say they, who are
10 you referring to?
11 A  MALDEF.
12 Q  Do you know if they reached out to the -- their
13 Milwaukee connections?
14 A  I only know what they told me.
15 Q  And what did they tell you?
16       MR. EARLE: Object to hearsay.
17       MR. POLAND: Join in the objection.
18 BY MR. HODAN:
19 Q  What did they tell you?
20 A  That they had reached out and they had spoken to
21 members of the Latino community in Milwaukee.
22 Q  And did they tell you --
23       MR. EARLE: Move to strike.
24       THE WITNESS: That they were
25 supportive of this proposal that they were making,

Page 259

1  that MALDEF was making.
2       MR. EARLE: Object to the hearsay and
3  move to strike.
4       MR. POLAND: Join in the objections.
5  BY MR. HODAN:
6  Q  At any time during this entire process did anyone
7  from MALDEF ever tell you that they didn't approve
8  of the final maps?
9       MR. EARLE: I'm going to object.
10 You're asking him for a lengthy hearsay and you're
11 leading as well, and I'll move to strike his
12 answer as soon as it comes in.
13       THE WITNESS: Well, let's try another.
14 The -- not until the day of the hearing did I hear
15 anything from MALDEF that suggested that our --
16 that the proposal that was being suggested, the
17 60-54 proposal, was -- had any dissent at all.
18 BY MR. HODAN:
19 Q  And what did you hear?
20       MR. POLAND: Objection.
21       MR. EARLE: Same objection.
22       MR. HODAN: I'll withdraw.
23       MR. EARLE: Hearsay line and I'll move
24 to strike the answer.
25       MR. HODAN: I'll withdraw.

Page 260

1  BY MR. HODAN:
2  Q  You were asked about experts that you were trying
3  to reach out to. Did you ever reach out to
4  Professor Mayer?
5  A  Yes.
6  Q  And when was that?
7  A  Probably e-mails to this effect. I believe it was
8  in June of 2011.
9  Q  And did he ever indicate to you whether he would
10 be willing to testify on behalf of the maps?
11       MR. EARLE: Object to form of that
12 question. On behalf of the maps in June?
13 BY MR. HODAN:
14 Q  Did he ever indicate that he would be willing to
15 testify to defend the maps?
16       MR. EARLE: Same objection.
17       THE WITNESS: Yes.
18 BY MR. HODAN:
19 Q  And what did he say to you?
20 A  That he was --
21       MR. EARLE: I'm going to object on the
22 grounds of foundation. There's not even any
23 foundation that any maps existed in June that
24 would be defended.
25       MR. POLAND: It calls for hearsay.

Page 261

1       MR. EARLE: And it calls for hearsay
2  as well.
3       MR. HODAN: You can always ask your
4  expert at trial and we will.
5       MR. EARLE: He's being deposed right
6  now.
7  BY MR. HODAN:
8  Q  Can you tell us what he said?
9       MR. EARLE: I'm going to -- hearsay
10 objection, move to strike.
11       MR. POLAND: Join.
12 BY MR. HODAN:
13 Q  You can go ahead.
14 A  I believe there are maybe e-mails to this fact
15 but -- that memorialize this, but at the time it
16 was my understanding he was prepared to testify on
17 behalf of the maps.
18 Q  You were asked before some questions about the
19 process, and the -- the leadership and how they
20 would have access to the entire map but the other
21 legislators would not.
22 A  Yes.
23 Q  Why was that?
24       MR. EARLE: Form.
25       THE WITNESS: I thought I explained it

66 (Pages 258 to 261)

Page 262

1    a little bit earlier that traditionally that's the
2    best way to avoid members of the legislature in --
3    from themselves from dealing with matters that
4    frankly didn't affect them and it is commonplace
5    at the legislature that, you know, folks will,
6    in fact, think about some other part of the state
7    when it would thus become an impossible process
8    because individual legislators would not focus on
9    that -- their particular issues on which they knew
10   what was needed or not needed.
11         And so over time the process that
12   evolved that here in Wisconsin in the legislature,
13   I mean, again, this is not just today in the
14   cycle, is that you would traditionally not share
15   the entire map until all members had been
16   consulted on their areas of their districts and so
17   that they could have a complete map only at the
18   end of the process. It was the only practical way
19   of getting it done.
20 BY MR. HODAN:
21 Q   You were also asked questions about the process of
22   drawing the map. Do you have any familiarity with
23   the legislative process in terms of how bills are
24   drafted?
25 A   Yes.

Page 263

1  Q   Okay. Is it unusual in the legislative process
2    for an individual member or members to draft bills
3    and keep them secret before they share them with
4    the public?
5  A   **Oh, no.**
6        MR. EARLE: Object to form.
7  BY MR. HODAN:
8  Q   You can go ahead and answer.
9  A   **No, that's the normal process.**
10 Q   Nothing unusual about that?
11 A   **No, nothing.**
12       MR. EARLE: Leading.
13 BY MR. HODAN:
14 Q   Is there anything unusual about that?
15 A   **No. It's the normal process.**
16 Q   Was that -- were you following that process?
17 A   **Yes.**
18       MR. EARLE: Leading.
19 BY MR. HODAN:
20 Q   How would you compare your process with the normal
21   legislative process in terms of not disclosing the
22   maps until you were ready to go public with them?
23 A   **I would view that as the ordinary process by which**
24   **this would redistricting would go forward.**
25       MR. HODAN: I have no further

Page 264

1    questions at this time.
2        MR. EARLE: I have just a few.
3        MR. POLAND: Do you want me to go
4    first? I have just a couple.
5        MR. HODAN: It's only 10:30, so
6    whoever wants to go is free to go.
7        MR. POLAND: I don't have much. I do
8    want to mark this as an Exhibit 233. This is a
9    document --
10       THE WITNESS: Let the record reflect
11   to Judge Stadtmueller that Troupis has sat here
12   throughout and never complained.
13       MR. DAUGHTERY: And just to be clear
14   too, I think we're past the seven hours but in any
15   event --
16       MR. POLAND: This is a document that
17   is on the list. I just need to make a record,
18   okay?
19       MR. DAUGHTERY: Let me --
20       MR. POLAND: I just need to make a
21   record.
22          EXAMINATION
23   (Exhibit No. 233 was marked for
24   identification.)
25

Page 265

1  BY MR. POLAND:
2  Q   Mr. Troupis, the court reporter has handed you a
3    document that's marked as Exhibit 233. I'll
4    represent for the record that it is Bate stamped
5    MBF000218. This is a document, as I've informed
6    your counsel, that is on the record or is on the
7    list of documents that Judge Dow, I believe, had
8    indicated we're not to ask about.
9        MR. DAUGHTERY: This is Bate stamped
10   JRT81 amongst the submissions we made yesterday,
11   guess it was, and this morning the Court
12   instructed counsel not to ask questions about it.
13       MR. POLAND: Don, I'm sorry, JRT what?
14       MR. DAUGHTERY: 81.
15 BY MR. POLAND:
16 Q   Mr. Troupis, you recall that you were asked a
17   series of questions by Mr. Hodan about
18   conversations you had with Dr. Mayer; correct?
19 A   **I recall him asking some questions about**
20   **Dr. Mayer, yes.**
21 Q   And you indicated you had conversations with
22   Dr. Mayer about potentially coming to work as an
23   expert in the redistricting process; correct?
24 A   **Whatever Mr. Hodan asked, I answered.**
25 Q   You said that you thought that was reflected in

67 (Pages 262 to 265)

Halma-Jilek Reporting, Inc.        Experience Quality Service!        (414) 271-4466
Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 67 of 107   Document 188

Page 266

1    the series of e-mails, correct, the conversations
2    you had with Dr. Mayer?
3  A    If that's what I said, that's what I said. The
4    record is what it is.
5  Q    Okay. So I believe that Mr. Hodan has opened it
6    up by answering the questions that Mr. Troupis has
7    opened up, at least in the very first part of
8    Exhibit 233, for cross-examination.
9           MR. DAUGHERTY: He's not going to
10    answer.
11           MR. POLAND: I need to ask the
12    question. I know you have the instruction. I'm
13    just making my record. That's my -- that's my --
14    that's my --
15           MR. HODAN: And let me make a record.
16    I didn't ask him anything about this document and
17    I don't -- I don't believe Mr. Mayer was ever
18    retained by Mr. Troupis.
19           THE WITNESS: Let me make my record,
20    which is that it was not my intention in answering
21    any question here to open up any matter that is
22    otherwise attorney-client privilege and if I
23    inadvertently did so, I -- I apologize to
24    everybody concerned and indicate that it was not
25    my intention and I certainly would not do that in

Page 267

1    considering my ethical obligation not to.
2           MR. DAUGHERTY: And to be clear too,
3    the Court's order this morning pursuant to the
4    Supreme Court rules is in regards to documents
5    other than these ones that we've identified as not
6    being able to talk about. So you're not relieved
7    from that ethical obligation with regard to --
8    you're not relieved from your ethical obligations
9    with regard to this by the Supreme Court rule.
10           THE WITNESS: I certainly would not
11    comment. I just want to make the record clear
12    that if I inadvertently -- it was inadvertent and
13    I take it back.
14  BY MR. POLAND:
15  Q    Mr. Troupis, I'd like to ask you a question about
16    the first sentence -- the first three sentences of
17    Exhibit No. 233. Will you answer questions about
18    the first three sentences of Exhibit 233?
19           MR. DAUGHERTY: I'm instructing him
20    not to answer.
21  BY MR. POLAND:
22  Q    Mr. Troupis --
23  A    And I will follow my attorney's advice.
24           MR. HODAN: Let me make a suggestion.
25    So that we don't create -- I will withdraw and

Page 268

1    strike and agree to strike all questions relating
2    to Mayer.
3           MR. POLAND: That's fine.
4           MR. HODAN: And that should solve the
5    issue.
6           MR. POLAND: That's fine and I
7    withdraw the question.
8           MR. DAUGHERTY: Actually could we just
9    tear this up because I don't know what's going to
10    happen in regard to this being bound and who's
11    going to get it.
12           MR. HODAN: Let the record reflect
13    that we have reached an agreement where all
14    questions related to Dr. Ken Mayer that were asked
15    are withdrawn and stricken from the record by
16    agreement of counsel so that there isn't any
17    confusion or any disagreement about the scope or
18    of waiver.
19           THE WITNESS: Thank you. I appreciate
20    that.
21           THE VIDEOGRAPHER: Excuse me. Two
22    minutes of disk.
23           MR. POLAND: I'm ready.
24           MR. EARLE: Are you done?
25           MR. POLAND: That's it, I'm done.

Page 269

1           MR. EARLE: I might be able to get in
2    in two minutes.
3           EXAMINATION
4  BY MR. EARLE:
5  Q    96, you have it in front of you?
6  A    Yes.
7  Q    You said earlier you had mentioned that you didn't
8    do a full-blown Jingles type analysis but you
9    implied that you had considered those types of
10    criteria?
11  A    Oh, I considered all those factors, that's
12    correct.
13  Q    Okay. So did you consider what the differential
14    and turnout rates were between the higher level of
15    concentrations of Latinos in the northern parts of
16    the 8th assembly district as you configured it and
17    the lesser concentrations of Latinos in the lower
18    part of the 8th assembly district as you
19    configured it?
20           MR. HODAN: Object to form.
21           MR. EARLE: I'll rephrase it.
22  BY MR. EARLE:
23  Q    When you drew the 9th -- the 8th assembly
24    district, you will agree that the northern part of
25    the district had higher concentrations of Latinos

68 (Pages 266 to 269)

Halma-Jilek Reporting, Inc.        Experience Quality Service!        (414) 271-4466
Case 2:11-cv-00562-JPS-DPW-RMD    Filed 02/23/12    Page 68 of 107    Document 188

Page 270

1    than did the lower part of the district; correct?
2  A    I don't know that.
3            MR. HODAN: Lack of foundation.
4            THE WITNESS: I'm sorry, I just don't
5    know that.
6  BY MR. EARLE:
7  Q    Did you consider the turnout rate differentials
8    between those areas of the districts in the Latino
9    community that had higher levels of Latino
10   concentrations as compared to the areas that had
11   lower levels of Latino concentrations?
12           MR. HODAN: Object to the form.
13           MR. DAUGHTERY: To be clear, you,
14   you're talking about him personally?
15           MR. EARLE: Yes, that was the
16   question.
17           THE WITNESS: I don't recall.
18  BY MR. EARLE:
19  Q    Did any member of the team consider those factors
20   related to turnout differentials between Latinos
21   and whites in the 8th assembly district?
22           MR. HODAN: Lack of foundation.
23           THE WITNESS: Again, I don't recall.
24  BY MR. EARLE:
25  Q    Did you consider whether there was any patterns of

Page 271

1    racially polarized voting between -- amongst the
2    white voters in the vicinity of the Latino
3    community?
4  A    Yes, we did look at that.
5  Q    How did you look at that?
6  A    Well, we knew the election results from prior
7    series of -- a series of prior elections in the
8    area, and so we were aware that as an example,
9    that the 58th percent district had consistently
10   elected a Latino for almost ten years. So we
11   certainly from that could infer that there was not
12   the kind of polarized voting that one might
13   otherwise have thought.
14  Q    And you're referring to the election of Pedro
15   Colon?
16  A    Yes, and JoCasta.
17  Q    In the old 8th assembly district?
18  A    Correct, yes.
19  Q    Did you have any idea about patterns of racially
20   polarized voting in the areas that -- the
21   45 percent that you added on to the eastern half
22   of the 8th assembly district that came from the
23   old 9th?
24           MR. HODAN: When you say you, you mean
25   him?

Page 272

1            MR. EARLE: Yes.
2            THE WITNESS: You know, honestly
3    I don't. I just don't recall.
4  BY MR. EARLE:
5  Q    Did any member of your team have any understanding
6    of the racially polarized voting patterns in the
7    southern part of the new 8th?
8  A    Well, we certainly didn't believe that it -- that
9    that would overcome, that that racially polarized
10   voting was so great that it would overcome the
11   districts that we were creating. So in that sense
12   we certainly did.
13  Q    And you would agree that it turns out that it
14   would have overcome that -- strike the question.
15   I'm going to withdraw it. Draw your attention to
16   1166. Let's stop.
17           THE VIDEOGRAPHER: This ends disk
18   number three of the video of James R. Troupis on
19   February 22, 2012. The time 10:43 p.m.
20           (Discussion off the record.)
21           THE VIDEOGRAPHER: This is the
22   beginning of disk number four of the video
23   deposition of James R. Troupis on February 22,
24   2012. The time 10:47 p.m.
25

Page 273

1  BY MR. EARLE:
2  Q    Drawing your attention to Exhibit 1166, Attorney
3    Hodan asked you a series of questions about this
4    exhibit?
5  A    Did he? If he did, he did.
6  Q    In particular I want to draw your attention to
7    the configuration comment, north district, south
8    district configuration. Do you see that this?
9  A    Yes.
10  Q    This is referring to the MALDEF proposal?
11  A    It appears to be, yes.
12  Q    And the district submitted by MALDEF had an
13   east -- did not have a north-south configuration,
14   it had an east-west configuration; is that
15   correct?
16  A    I don't remember and maybe it's because I've been
17   sitting here for seven or eight hours. I just
18   don't remember. If you have what was attached.
19           MR. EARLE: Mark that as an exhibit.
20           (Exhibit No. 234 was marked for
21   identification.)
22  BY MR. EARLE:
23  Q    Let start at the back page. I'm pretty sure that
24   I'm certain that this is not on the list, but --
25           MR. DAUGHTERY: Okay. Yes, it's not.

69 (Pages 270 to 273)

Page 274

1    Go ahead.
2    BY MR. EARLE:
3    Q    If you start at the last page, if you start with
4         the e-mail dated July 11, 2011, at 6:41 p.m. Maybe
5    A    **I don't believe it's a complete document. Maybe**
6         **it is. I just --**
7    Q    I remove the hearsay components of it. So this is
8         your communication with the folks from MALDEF and
9         if you would look at the e-mail --
10            MR. HODAN: Excuse me. When you say
11       you remove the hearsay --
12            MR. EARLE: I remove the communication
13       from MALDEF to Mr. Troupis.
14            MR. HODAN: From this exhibit?
15            MR. EARLE: No, it's not an exhibit.
16       I mean, this is an e-mail string starting with Jim
17       Troupis' response. He sent an e-mail on July 11,
18       6:41, to Elisa Alfonso and Alonzo Rivas.
19            MR. HODAN: Counsel, what I'm just
20       trying to figure out is what you removed from the
21       document.
22            MR. EARLE: I didn't remove anything
23       from this document. This is a single e-mail.
24            MR. HODAN: Okay. I thought you said
25       you would remove. Maybe I misheard you.

Page 275

1            MR. DAUGHERTY: Just for the record,
2        I'm not sure, since it's not a complete document,
3        I would object on those grounds, but in any event,
4        go ahead.
5            THE WITNESS: Let me raise what I mean
6        by not complete here, folks. I'm looking at the
7        second page and it says our alternative and it
8        just shows one number and I don't know where the
9        other number is.
10   BY MR. EARLE:
11   Q    I'm not going to ask you about the maps that were
12        attached. You can see that they had an attachment
13        and an alternative and the --
14   A    **The record needs to reflect that I don't think**
15        **this is a complete version of these e-mails.**
16        **I don't know what's been removed. I will testify**
17        **as best I can, but I'm just saying based upon the**
18        **second page, there's pieces of this are missing.**
19        **So go ahead and ask me what you want and I'll do**
20        **the best I can.**
21   Q    All right. Well the date and time, it's Monday,
22        July 11 at 6:41 p.m., you responding to Elisa
23        Alfonso and Alonzo Rivas after having received
24        some -- some proposals from them; correct?
25   A    **Yes.**

Page 276

1    Q    Okay, and you communicate to them that you've
2         taken their proposal a bit further and you say you
3         think your proposal will work a little better than
4         theirs; correct?
5    A    **Well, I say exactly what I say.**
6    Q    Okay. Let's go to the first page. That e-mail
7         was sent at 6:41 p.m. to MALDEF; correct?
8    A    **It would appear so, yes, sir.**
9    Q    And this is two days before the hearing; right?
10   A    **July 11 is two days before July 13, yes.**
11   Q    Then at 6:42 on the 11th you sent an e-mail to
12        Ottman, Foltz and McLeod and Ray Taffora in
13        capital letters saying e-mail I sent below to try
14        to persuade MALDEF, will see.
15   A    **Yes.**
16   Q    And you're going to try to persuade them to drop
17        their east-west configuration in favor of a
18        north-south configuration; isn't that true?
19   A    **Had nothing to do with east-west, north-south. It**
20        **had everything to do with the percentages.**
21   Q    In fact, it had to do with the boundaries, didn't
22        it?
23   A    **It had to do with the percentages.**
24   Q    Mr. Troupis, it had to do with a ripple effect,
25        didn't it?

Page 277

1            MR. DAUGHERTY: Asked and answered.
2            MR. HODAN: Asked and answered,
3        argumentative.
4            THE WITNESS: And I will add again
5        that the second e-mail, 6:41 p.m., the one you're
6        referring to and now trying to imply or infer
7        things is not complete. So I mean, it's -- this
8        is misleading.
9    BY MR. EARLE:
10   Q    All right. So then the next communication from
11        you to the team about MALDEF is the next -- the
12        next day on the 12th; correct? That's
13        Exhibit 209.
14            MR. HODAN: Objection, foundation.
15       What exhibit are we looking at?
16            MR. DAUGHERTY: Exhibit 209.
17   BY MR. EARLE:
18   Q    And this is where you report that MALDEF is going
19        to publicly endorse your map; correct? We've
20        already asked you about that.
21   A    **Well, there were e-mails in between this. So**
22        **again, you're -- that -- you're inaccurate because**
23        **there are not complete e-mails and this is not the**
24        **next one in the sequence, this being 209.**
25   Q    What's the next one in the sequence?

70 (Pages 274 to 277)

Page 278

1   A    **Well, as far as I can tell, I don't know because**
2     **I don't have a complete record here.  It looks to**
3     **me like there's -- I can't even tell looking at**
4     **234.  For example, there's an e-mail at the top of**
5     **234 that doesn't have any heading at all.  Tad,**
6     **I'm going to go forward.**
7        **So what I'm saying is I just don't**
8     **know what was the next in the sequences.  I'm not**
9     **suggesting that this, that is, 209 that I**
10     **testified to earlier, happened -- I'm just -- your**
11     **suggestion that somehow this is the next one in**
12     **time is simply incorrect based on these documents.**
13   Q    And all of these e-mails culminate in your comment
14     about you succeeding in taking the largest legal
15     fund for the Latino community off the table in any
16     later court battle?
17        MR. HODAN:  Objection, asked and
18     answered.  I think you started with that question
19     before.
20        THE WITNESS:  We discussed that
21     before.
22   BY MR. EARLE:
23   Q    But this is the culminating e-mail of that string,
24     isn't that?  That's the question.  That has not
25     been asked before.

Page 279

1   A    **I don't know.**
2        MR. HODAN:  Objection, lack of
3     foundation.
4        THE WITNESS:  I don't know what the
5     last one.
6        MR. EARLE:  With that we'll end.
7     Thank you, Mr. Troupis.
8        THE WITNESS:  Thank you.  Is the trial
9     subpoena withdrawn so I can leave tomorrow?
10        MR. DAUGHERTY:  Yes.  I assume it's
11     withdrawn so --
12        MR. EARLE:  Yeah.
13        MR. DAUGHERTY:  It's withdrawn, yes.
14        MR. HODAN:  We have a seven-hour, when
15     did we start --
16        THE VIDEOGRAPHER:  This ends the video
17     deposition of James R. Troupis on February 22,
18     2012.  The time 10:56 p.m.
19        (At 10:56 p.m. the deposition
20     concluded.)
21
22
23
24
25

Page 280

1   STATE OF WISCONSIN )
2   MILWAUKEE COUNTY   )   SS:
3        I, MICHELLE HAGEN, Registered
4   Professional Reporter and Notary Public in and for the
5   State of Wisconsin, do hereby certify that the deposition
6   of JAMES R. TROUPIS was taken before me at Godfrey &
7   Kahn, S.C., 780 North Water Street, Milwaukee, Wisconsin,
8   on the 22nd day of February, 2012, commencing at 3:34
9   o'clock in the afternoon.
10        That it was taken at the instance of
11   the Plaintiffs upon verbal interrogatories.
12        That said deposition was taken to be
13   used in an action now pending in the United States
14   District Court for the Eastern District of Wisconsin, in
15   which Alvin Baldus, et al.,  are the Plaintiffs and
16   Members of the Wisconsin Government Accountability Board
17   et al., are the Defendants.
18        A P P E A R A N C E S
19        GODFREY & KAHN, S.C., 780 North Water
20   Street, Milwaukee, Wisconsin 53202, by MR. DOUGLAS M.
21   POLAND, appeared on behalf of the Baldus Plaintiffs.
22        LAW OFFICES OF PETER EARLE, 839 North
23   Jefferson Street, Suite 300, Milwaukee, Wisconsin 53202,
24   by MR. PETER G. EARLE, appeared on behalf of the Voces de
25   la Frontera Plaintiffs.

Page 281

1        REINHART, BOERNER, VAN DEUREN, S.C.,
2   1000 North Water Street, Suite 2100, Milwaukee, Wisconsin
3   53202, by MR. PATRICK J. HODAN and MS. COLLEEN E.
4   FIELKOW, appeared on behalf of the Defendants.
5        WISCONSIN DEPARTMENT OF JUSTICE,
6   OFFICE OF THE ATTORNEY GENERAL, 17 West Main Street, P.O.
7   Box 7857, Madison, Wisconsin 53707-7857, by MS. MARIA S.
8   LAZAR, appeared on behalf of the Defendants.
9        WHYTE HIRSCHBOECK DUDEK S.C., 555 East
10   Wells Street, Suite 1900, Milwaukee, Wisconsin 53202, by
11   MR. DONALD A. DAUGHERTY, JR., appeared on behalf of the
12   Deponent.
13        TROUPIS LAW OFFICE LLC, 7609 Elmwood
14   Avenue, Suite 102, Middleton, Wisconsin 53562, by MR.
15   BRANDON LEWIS, appeared on behalf of the Deponent.
16        That said deponent, before
17   examination, was sworn to testify the truth, the whole
18   truth, and nothing but the truth relative to said cause.
19        That the foregoing is a full, true and
20   correct record of all the proceedings had in the matter
21   of the taking of said deposition, as reflected by my
22
23
24
25

71 (Pages 278 to 281)

Case 2:11-cv-00562-JPS-DPW-RMD    Filed 02/23/12    Page 71 of 107    Document 188

Page 282

1  original machine shorthand notes taken at said time and
2  place.
3
4
5  _____
6        Notary Public in and for
7        the State of Wisconsin
8  Dated this 23rd day of February, 2012,
9  Milwaukee, Wisconsin.
10  My commission expires August 10, 2014.
11
12
13
14
15
16
17
18
19
20
21
22        HALMA-JILEK REPORTING, INC.
23           (414) 271-4466
24
25

Baldus vs. Brennan        2/22/12        Deposition of James R. Troupis

Page 283

**A**

**ability** 41:15
42:25 80:24
**able** 45:24 82:15
84:12,21 120:8
125:20 202:13
202:14 207:7
215:23 225:23
227:19 267:6
269:1
**absence** 118:9
**absolutely** 19:20
82:15 121:25
189:19 190:5
213:3 227:21
**accept** 98:23
**acceptable**
199:2
**accepted** 93:1
**access** 50:14
118:25 127:17
198:12 199:11
199:12 261:20
**accommodating**
96:5
**accomplish**
84:21 153:20
216:17
**account** 31:1
207:24 217:22
218:12
**Accountability**
1:13 2:2,12,15
6:9,15 212:17
280:16
**accounts** 12:19
12:23
**accurate** 7:23
39:6,10 42:6
42:11,13 46:14
46:17,21 54:19
56:7 89:6,7
95:12 96:9
102:19 116:2
126:21 135:18
138:24 150:21
**accurately**
26:10,16
122:23 125:18
**achieved** 89:6
**achieving** 224:9
224:10
**acknowledged**
91:10
**acknowledgm...**
135:5
**acronym** 219:12
**act** 8:16 10:11

10:18 80:9
117:10,13
120:15,22,23
135:22 150:12
150:14,15
152:3 195:14
202:3,3 224:5
237:17 239:5
239:11 244:5
255:21 256:4
**action** 280:13
**activity** 63:11
84:23 136:25
**acts** 2:22 158:10
**actual** 68:19
173:23 211:22
214:9 243:24
**Adam** 61:21
75:14 78:6
117:3 134:6
138:20,25
174:9 193:19
198:4,18 253:9
254:21 258:6
**Adam's** 206:19
**add** 52:21
148:18 156:12
183:14 199:17
221:25 222:19
277:4
**added** 97:11
271:21
**addition** 21:18
257:17
**additional** 25:2
39:19
**address** 12:24
41:15 81:20,25
102:1 110:19
194:2,11 195:2
198:9,19
209:22
**addressed** 141:5
195:4,22
246:15
**addresses** 85:20
**addressing**
26:24 159:8
**adjacent** 241:9
**adjoining**
213:23
**adjustment**
153:21
**adopted** 109:25
211:24
**adopting** 211:9
**adoption** 110:4
139:14

**advance** 82:10
**advice** 16:15
32:16 112:22
113:5,7 183:7
267:23
**advisable** 35:6
**advised** 110:10
110:14 111:1
112:7 113:3
**advising** 9:8
**advisory** 160:22
**advocacy**
145:17
**affect** 96:8
214:2,3 262:4
**affidavits**
226:21
**affirmatively**
104:2
**African-Ameri...**
114:13 148:21
195:16 244:16
244:20,22
245:2,14,18,25
246:4,8,19
**afternoon** 3:2
7:16 71:8
131:11 136:13
280:9
**age** 8:10,22 9:9
10:15 36:18
91:15,22
138:19 141:18
215:1 217:4,13
241:4,10
242:17 243:23
252:20 255:20
256:4
**agency** 156:9
**ago** 23:14 35:22
36:9 86:2,6
99:19 130:25
139:18 149:7,7
158:12 189:8
194:15 208:2
216:19 217:21
254:22 257:10
257:25
**agree** 40:15 60:1
236:22 268:1
269:24 272:13
**agreed** 34:20
79:20,23,25
81:25 82:10
103:15 172:5
247:4
**agreeing** 103:13
**agreement** 28:5

29:6,12,15
31:12,16 34:25
39:23 40:23
58:8 61:25
62:8 63:14
66:22 67:13,16
68:6,11,17
69:6,18 70:2
160:7,7 268:13
268:16
**agreements**
56:11,13,14,16
57:3,9 58:20
58:24,25 59:4
59:9 61:8
62:20,23 63:12
63:15 64:8,10
64:20,21,22,25
65:4 66:15,17
66:25 67:2,9
67:11 68:3
69:8,14
**ahead** 9:13 38:2
42:24 47:23
52:19 58:1
126:16 130:13
143:1 147:3
175:2 178:16
200:16,17
205:19 214:11
231:2,18 233:8
239:25 246:12
252:18 261:13
263:8 274:1
275:4,19
**ahold** 169:22
202:14
**aides** 8:7
**aisle** 63:23 74:1
211:14
**al** 6:8,9,13,15
280:15,17
**aldermanic**
140:7 145:7
146:3,6 241:13
242:8 248:22
**Alfonso** 133:24
196:7 249:23
250:21 274:18
275:23
**alive** 54:20
**allegation**
176:19 212:23
238:8
**allow** 56:19
117:25
**allowed** 40:22
56:14,17 57:4

**allows** 43:2
**Alonzo** 125:10
126:16 127:15
128:9,15 129:3
274:18 275:23
**alter** 97:25
122:4
**alterations**
98:23
**altering** 209:24
**alternative**
119:17 120:25
252:21 275:7
275:13
**alternatives**
119:3 134:12
151:22
**Alvin** 1:3 6:7
280:15
**ambiguous**
147:2
**amenable** 96:5
105:21
**amended** 2:22
**amendment**
192:13
**American**
219:10
**amount** 31:7,21
33:6 34:8,10
152:24 172:25
**AMY** 1:5
**analysis** 80:24
215:14 224:6
269:8
**Andre** 70:18
**and/or** 16:15
17:20 163:17
**anomaly** 45:2
**answer** 9:13
19:13,13 24:5
24:11 26:21
42:24 43:9,11
47:24 52:9
58:1 79:16
80:3 89:25
90:15 95:17
97:2 143:2
146:21 147:3
160:17 176:25
199:4,10,23
214:12 216:25
231:2,18
239:25 246:12
252:16,18
256:24 257:1
259:12,24
263:8 266:10

Halma-Jilek Reporting, Inc.        Experience Quality Service!        (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD    Filed 02/23/12    Page 73 of 107    Document 188

**Baldus vs. Brennan**     **2/22/12**     **Deposition of James R. Troupis**

Page 284

267:17,20
**answered** 20:22
60:8 66:21
90:25 91:4
96:25 203:11
265:24 277:1,2
278:18
**answering** 266:6
266:20
**anticipated**
161:22 162:15
**anticipation**
186:7
**anybody** 13:1
67:5,8 72:4
73:10 88:19
94:15,20,24
97:17 100:22
100:24 101:1
109:23 135:15
136:19 137:5,6
144:10 146:9
146:12 155:25
157:2,7 198:9
224:7
**anybody's** 36:19
**anytime** 168:24
168:25 188:21
**anyway** 234:25
**apart** 27:8
**apologize** 14:8
15:24 18:10
54:7,10,11
114:22 116:13
134:1 138:17
150:13 231:9
266:23
**apparently**
11:25 72:18
93:22 121:24
161:8 176:8,13
183:6 191:20
**appear** 26:20
83:20 93:16
171:4 184:6
276:8
**appearance**
135:19,25
136:8 181:23
181:25
**appearances**
6:20
**appeared** 3:6,9
3:14,18,21,25
26:12,17
120:11 137:10
145:16 280:21
280:24 281:4,8

281:11,15
**appears** 37:16
39:3,4,22 40:5
79:1 83:25
85:9,14 138:11
151:1 161:10
163:8,10,21
164:4 166:10
172:16 173:11
175:20 176:2,4
176:10 179:7
179:10,12
181:19 186:1
191:25 192:2
200:25 205:25
221:4 237:4
240:19 254:15
254:24 273:11
**appended**
150:20
**appointed** 124:1
**appreciate** 9:25
26:1 41:25
43:15 94:11,13
97:15 99:10
113:20 120:18
183:24,24
184:8 192:14
243:22 268:19
**appreciative**
248:3
**approach** 98:10
194:17
**approached**
106:5
**approaching**
165:2
**appropriate**
91:24 92:21
169:24 173:2
192:14 257:16
**approve** 30:18
30:19,22,22
259:7
**approved** 35:15
**approximately**
153:19 214:25
**April** 51:2 70:18
71:2 188:9,20
189:9,10,18
**area** 92:10 95:7
119:18 121:1
146:24 147:6
152:4,16
182:10 191:8
191:10 195:11
201:19 244:1

251:14,16
271:8
**areas** 96:24
148:2 149:1
152:9 191:1
194:16,20
244:6 262:16
270:8,10
271:20
**argument** 98:13
**argumentative**
277:3
**arisen** 45:4,5
210:6,23
**arising** 192:12
**arranged** 39:13
79:2,5,6,7,9
80:8
**arrangement**
30:20 32:18
33:5 56:23
58:3 173:3,7
**arrangements**
83:6 227:18
**arranging** 79:12
79:13
**arrived** 189:18
**arrogance** 52:10
**arrogant** 49:4
52:8 165:14
**arrows** 74:8
**article** 117:18
117:19 119:19
137:12,18,25
138:11 139:4,6
146:2
**articles** 137:6
145:15 221:21
222:15
**aside** 97:9
107:23 145:5
161:1 162:20
165:19 174:25
**asked** 11:6
13:21 18:1,2
26:14 31:15
43:9 44:25,25
55:6 57:13
76:19 79:23
80:1,3 90:4,5,6
90:10,19 93:24
95:11 103:12
108:17 143:13
143:20,21
155:2 163:16
182:2 189:6
190:25 203:10
204:25 212:19

213:12 219:13
223:20 235:24
236:3 240:9
241:14 248:20
249:16 251:18
252:2 256:19
260:2 261:18
262:21 265:16
265:24 268:14
273:3 277:1,2
277:20 278:17
278:25
**asking** 13:6
24:25 57:16
61:8 86:12
142:18,19
165:3 175:12
177:21 192:17
192:22 193:25
193:25 201:11
201:14 226:3
233:15 236:20
259:10 265:19
**asks** 166:15
192:3,4
**aspect** 157:10
157:11
**aspects** 41:13
**assemble** 13:2,6
**assembly** 9:10
10:4,6 11:1
27:5 28:3
38:25 40:8
43:13,21 46:19
102:16 142:12
149:13 150:7,9
150:19 153:16
156:6,10,13,14
157:2,8 162:8
171:16 186:25
194:7,9,10
211:18 212:3
216:10,12
233:2 248:23
257:4 269:16
270:21 271:17
271:22
**Assemblyman**
27:15
**asserted** 233:17
**assertion** 110:12
**assignment**
108:17
**assignments**
187:16
**assist** 108:5
**assistance**

192:15 223:21
223:22 236:1
**assistant** 88:21
**assisting** 187:13
**associate** 77:24
**associated** 6:3
61:11 182:23
**assume** 12:7
17:7 27:2
28:11 42:5
45:9 56:18
57:2,8,23
58:12 73:24
75:22 88:16
89:25 99:23
124:15 125:23
142:11 143:12
164:15 165:23
167:8 172:10
172:12 185:16
185:19 194:21
195:15,18,21
201:18 222:8
222:10 232:4
279:10
**assumed** 80:4
93:19 135:10
160:4 257:17
**assuming**
127:19 136:15
143:8
**assumption**
41:2 91:7
143:20 176:17
**assure** 36:17
**astray** 247:13
**attached** 5:1
48:1 140:9
151:3 176:3
258:2 273:18
275:12
**attachment**
275:12
**attempt** 63:24
198:19 228:2
**attempting**
169:18 211:7
**attention**
152:19 155:6
161:11 179:9
185:5 206:6
221:3 272:15
273:2,6
**attitude** 44:14
**attorney** 3:16
6:22 7:1,1 13:5
13:8,12 15:11
71:7 74:25

Baldus vs. Brennan     2/22/12     Deposition of James R. Troupis

Page 285

75:18 88:21
93:21 94:20
141:9 240:10
273:2 281:6
**attorneys** 8:7
254:25 255:2
**attorney's**
267:23
**attorney-client**
12:10 69:25
140:25 141:8
162:4,6,11,14
266:22
**attribution**
151:5
**August** 32:10
43:5 282:10
**Australia** 51:2
189:10
**authenticate**
41:15,20
**automatically**
30:23
**auton** 59:16
**available** 51:8
129:18
**Avenue** 3:24
281:14
**avoid** 121:19
262:2
**avoided** 218:12
**aware** 9:20 22:1
55:17 144:9,12
145:8,15 148:1
148:13,18
150:2 187:4
210:7 225:5
227:12,13
230:23 233:1,4
271:8
**awful** 134:25
**a.m** 77:19 78:21
80:19 81:14
82:20 83:16
85:8 221:9

**B**

**B** 4:8
**back** 12:14 14:6
14:7 15:1 20:8
25:4,8 32:19
33:3 35:5
43:18 44:5
48:13 51:13
53:11 59:15
62:22 82:17
83:22 85:24,25
95:9 103:14,16

104:20 107:11
116:21 138:11
143:24 147:8
149:21 155:17
165:17 168:22
170:14 182:7
183:5 185:5
188:16 189:13
189:14 191:23
198:18 208:14
212:11 215:5
220:18,20
237:16 252:7
252:10 267:13
273:23
**background**
214:5
**backward** 133:3
**bad** 192:9
242:19,19
**badly** 172:21
**balance** 52:10
**Baldus** 1:3 3:6
6:8,23 158:4,5
280:15,21
**BALDWIN** 1:10
**bankers** 180:17
**BARBERA** 1:6
**BARLAND** 1:15
2:14
**based** 30:25
42:23 56:25
57:16 122:15
149:4 164:4
168:12 206:19
275:17 278:12
**basic** 48:16
251:20
**basically** 45:19
88:6 89:5
150:24
**basis** 15:7,10
31:2,18 33:6
35:23 50:15
51:20 59:24
73:20 167:7
**batch** 248:16
**Bate** 11:19
219:18 265:4,9
**Bates** 78:8,11
**battle** 126:10
129:15 278:16
**battles** 250:8
**beat** 185:18
**BECHEN** 1:3
**beer** 166:21
**began** 45:3
**beginning** 6:5

87:11 113:18
174:12 178:25
257:14 272:22
**begins** 174:8
194:23
**behalf** 3:6,9,14
3:18,21,25
6:21,23,25 7:4
7:6 28:6,9
38:23 40:3
75:1 145:17
250:5,6 260:10
260:12 261:17
280:21,24
281:4,8,11,15
**behest** 151:16
**belabor** 22:12
**believe** 8:25
13:15 28:8
32:10 34:1
35:13 36:1
46:17 55:12
64:21 67:14
75:18 79:19
84:7,8 91:23
92:4 93:2,24
117:15 118:8
118:18,22
126:24 127:1
130:23 131:3
137:25 159:22
160:13,14,16
160:17 164:23
169:25 179:14
180:13 199:12
221:19 222:5
224:9 240:9,17
246:13,13
247:16 249:3
249:11 250:21
251:8 255:19
256:3,16
257:11 260:7
261:14 265:7
266:5,17 272:8
274:5
**believed** 24:19
34:2,3 105:21
106:4 121:24
252:19 257:16
**benefit** 126:16
144:2 218:8
**benefits** 127:14
**Bernie** 169:17
199:25
**best** 27:9 28:1,6
29:7,12 30:10
30:12,16,17

31:1 36:12
37:14,23 38:22
39:13 42:25
46:23 49:19
50:10,11 52:13
52:16,24,25
53:3,9 54:3,16
54:21 56:4,12
56:20,22,25
57:7 58:5,11
58:17 60:3,24
61:22 62:10
71:22 72:6,14
88:13,25 89:1
122:25 160:10
160:11 161:8
172:14 173:14
182:14 186:14
188:19 190:2
207:22 229:20
229:21 239:10
246:4 249:20
252:21 262:2
275:17,20
**Best's** 27:20
46:15 53:12,17
**better** 29:20
34:5,11 66:1
76:9 81:22
84:12 93:14
98:6 116:3
142:12 143:25
146:23 180:23
181:3,8,12
182:23 276:3
**beyond** 45:13
98:14 99:1
101:17 102:6
246:22,24
247:5
**BIENDSEIL** 1:4
**big** 21:4 183:12
**bigger** 34:2
**bill** 32:13 33:25
34:2
**billed** 32:17
**billing** 30:25
32:6,9
**billings** 33:9
**bills** 172:24
262:23 263:2
**bit** 49:4 102:4
132:10 158:12
189:6 196:2
201:2 206:11
215:18 217:21
239:3 257:10
257:25 262:1

276:2
**black** 92:14
122:24 197:1
**black-and-white**
105:16
**blend** 198:19
**block** 251:20
**blocks** 211:18
211:20 212:2
**blur** 189:22
**board** 1:13 2:2
2:12,15 6:9,15
168:5 203:24
204:4 212:17
280:16
**boards** 241:9
**boat** 192:11
**Bob** 257:19
**body** 92:18
142:3
**Boerner** 3:11 7:2
37:14,24 281:1
**bold** 140:24
**book** 169:9
**BOONE** 1:6,7
**bottom** 15:5
161:11 163:5,7
166:9 183:21
183:25 254:16
**bound** 268:10
**boundaries** 96:8
121:3 209:3,23
210:4,7,17
211:19,23
276:21
**boundary**
121:20 210:12
210:23
**bounds** 234:19
**Box** 3:17 281:7
**boy** 54:25 55:2,4
55:20
**Brandon** 3:25
7:7 77:23
281:15
**break** 9:18 48:7
107:6 127:21
**BRENNAN** 1:14
2:13
**BRETT** 1:4
**brief** 107:5
**briefly** 188:18
**brilliant** 183:6
**bring** 134:10
**bringing** 84:13
**bristled** 55:21
**broken** 189:20
**brought** 11:14

Baldus vs. Brennan 2/22/12 Deposition of James R. Troupis

Page 286

11:16
**Buchen** 180:12
**build** 182:15
**building** 207:21
251:20
**BUMPUS** 1:4
**bunch** 232:6
**business** 57:3,19
**businesses**
115:16

**C**

**C** 3:3 6:1 280:18
**cabinet** 124:2
**calculation**
133:14
**call** 13:14 27:12
45:25 49:10,14
63:13,14 64:9
65:3 70:3 77:6
77:10,12 81:23
84:3 93:24
100:17 106:2
136:7,8 148:25
149:14 160:24
168:9 189:12
248:15 249:22
250:11 251:21
**called** 7:10 27:1
49:3 93:12
115:3 139:22
145:9 155:9
216:9 249:24
**calling** 64:22
**calls** 38:1 49:2
92:2,11 146:22
202:9 260:25
261:1
**candid** 34:4
**candidly** 16:21
34:8 77:9
135:4 149:7
180:11
**CANE** 1:15 2:14
**capable** 78:2
**capacities** 100:1
**capacity** 1:14
2:13 212:18
**capital** 276:13
**Capitol** 53:14
71:23 73:19,25
165:15 230:4
**caption** 1:17
86:8,9 139:4,6
140:24
**care** 174:6
**career** 209:19
**careful** 21:17

44:4,15,16
53:25 80:2
82:18 96:23
100:1 171:19
**CARLENE** 1:3
**case** 1:9 2:10
6:7,10,12,15
15:15 18:3,19
22:13,14,18
24:4,17 28:16
41:8 61:12
70:9 78:13
89:2 91:6
94:17,21,24
95:25 97:18
105:17 125:12
136:21 153:15
158:4 161:10
211:1 212:23
214:19 226:20
230:3,21
237:17 248:10
**cases** 82:8
186:17 229:11
**category** 23:18
114:12
**Catholic** 52:12
**cats** 64:3
**Caucasian** 148:3
**caucus** 26:20,21
26:23 27:5
44:18,24 73:21
73:22 74:13,14
160:8 227:19
**caucuses** 26:13
26:17 43:25
45:3 227:5
**cause** 95:16
97:25 98:25
281:18
**caveat** 40:2
**cc** 38:18,18 48:1
185:2
**cc'd** 37:7 38:16
42:5
**cc's** 78:5
**CECELIA** 1:6
**census** 211:18
211:20 212:2,2
251:14,15,17
**certain** 22:15
23:4 36:18
67:14 100:2
101:25 114:17
128:4 149:1,6
153:18 173:8
178:7 181:20
246:2 253:16

273:24
**certainly** 9:2,2
9:20 10:24
12:17 14:15
16:9,9 20:22
36:23 39:4,22
48:17 53:12
59:23 60:21
61:4 62:4,15
64:12 72:2
74:1,9,19 80:3
107:7 112:17
114:25 126:2,8
128:24 130:7
131:9 139:21
141:8 170:19
171:15,22
172:20 177:23
180:24 190:21
205:4 208:18
209:9 214:21
215:4 216:8,11
217:9 218:17
224:22 231:3
240:1 255:4
257:15 266:25
267:10 271:11
272:8,12
**certainty** 144:23
**certification**
19:5
**certified** 22:5
24:7
**certify** 17:9
21:20 23:25
280:5
**certifying** 15:14
**Cesar** 115:3,5
120:3 155:9
156:2
**chain** 4:14,17,18
4:19,23,25
83:15 166:10
201:1 206:1,7
**chair** 18:16
134:6
**challenge** 127:1
127:3,18
129:19 239:19
239:20
**challenges**
126:20,25
**chamber** 28:10
46:20
**chambers** 27:5
27:17
**change** 96:18
105:23 106:5,6

121:20 178:16
211:8
**changed** 80:21
211:23
**changes** 96:24
98:11 154:1,6
208:8,10,12
209:5 241:8
**changing** 210:21
**characterizati...**
55:17 60:7
108:12,13
110:16 111:11
113:20 256:24
**characterize**
18:4 37:22
52:1 53:11
111:6
**characterized**
18:21 19:25
**characterizes**
109:4
**charge** 135:18
**Charles** 125:11
**Chavez** 115:3,5
120:3,9 155:9
156:2
**check** 77:16
132:14 160:18
253:15
**checked** 32:4
**checks** 77:25
**Chemerinsky**
202:15
**Chicago** 111:23
148:14 249:23
**choice** 92:23
109:13 215:13
215:24 218:6
223:15 242:18
242:21 246:1
**choices** 156:18
156:19 182:17
182:18
**choose** 156:20
**chop** 150:22,24
**chose** 33:4
216:5
**chosen** 92:24
189:9,16
196:24
**chron** 166:8
**chronological**
70:17,23
**chronology**
163:4
**chuckle** 85:7
189:8

**chuckling** 67:22
**CINDY** 1:6
**circle** 123:7
**Circuit** 21:21
**circulating**
172:11
**circumstances**
42:2 247:13
**citation** 192:14
**citizen** 8:10,20
9:9 10:15
**citizens** 91:9
158:6 244:1
**citizenship** 8:21
91:6,15,21,23
92:1,24
**city** 115:8 145:8
146:7 147:16
155:10 238:4
240:23 241:12
241:21 245:3
248:22
**Civil** 2:21
**claim** 48:22
118:10,12
237:16
**CLARENCE** 1:7
**clarification**
8:13 47:18
**clarify** 19:16
73:1 100:21
147:14
**class** 76:20,20
76:22 77:1
113:22
**classic** 141:8
142:8 242:13
244:4
**clause** 186:15
**clear** 9:6 40:2
47:20 61:18
66:18 70:8
79:14,16 82:3
97:9 120:14
127:6,11 145:3
152:2 246:25
264:13 267:2
267:11 270:13
**clearly** 45:16
49:6 66:11
97:18 235:25
**CLEERMAN** 1:7
**client** 40:3
41:10 43:9
44:3,17,21,23
45:14,18 46:3
46:7,13,13,15
46:15 160:24

Halma-Jilek Reporting, Inc. Experience Quality Service! (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD Filed 02/23/12 Page 76 of 107 Document 188

Baldus vs. Brennan                    2/22/12                    Deposition of James R. Troupis

Page 287

186:9 239:11
**clients** 40:10,11
  40:12
**clip** 137:12
**clipped** 138:20
**clipping** 139:19
**cloak** 60:3,7
**close** 19:4 29:1
  32:21 54:21
**closely** 87:16
  99:23
**closer** 96:16,17
**clue** 11:25 22:4
  58:11
**CLVS** 6:3
**Coast** 189:12
**COCHRAN** 1:7
**code** 40:21
**colleagues**
  153:17
**Colleen** 2:3 7:2
  281:3
**collegial** 18:7
**Colon** 99:21
  100:15,17
  215:3 271:15
**color** 150:18
**come** 12:14 20:7
  25:4,8 49:12
  62:22 77:3
  79:12 86:21
  90:1 93:7,22
  93:25 102:22
  107:22 114:1
  133:20 164:21
  188:19 189:13
  189:23 221:21
  222:15 239:13
**comes** 43:20
  106:1 141:17
  209:16 258:1
  259:12
**coming** 36:20
  188:23 265:22
**commencing**
  3:1 280:8
**comment** 76:9
  121:16,18,22
  121:25 122:1,3
  122:8 127:8,12
  127:13 131:10
  135:3 184:2
  207:4 222:1,3
  223:6,9,16
  267:11 273:7
  278:13
**comments**
  117:19 184:4

**commission**
  282:10
**committee**
  106:5 144:21
  145:10,22
  231:22 233:4
**common** 65:13
  73:25 178:8
  228:22
**commonplace**
  262:4
**communicate**
  23:10 54:6
  276:1
**communicated**
  203:7 254:22
**communicating**
  16:7
**communication**
  23:20 24:22
  69:25 87:23
  134:19 200:7
  274:8,12
  277:10
**communicati...**
  13:2,22 17:11
  20:4,24 21:24
  22:10,22 23:2
  23:5 24:2,15
  35:5
**communities**
  114:10 148:15
  210:18
**community** 8:11
  10:16,22 96:6
  97:20,21,23
  98:17 99:25
  100:9,12,14,20
  101:22 102:2
  110:11,15,19
  110:24,25
  111:1,3,14,20
  112:3,9,15,19
  112:19 113:2
  113:13,14
  114:5,11,13,13
  114:20,23
  121:14,24
  122:5 123:9,11
  123:13 126:10
  126:19 127:4
  127:17 129:14
  129:18 131:7
  134:8,15
  135:12,20
  136:7,10,25

137:10 139:5
  139:20 141:13
  141:20 144:2
  145:9,18 146:9
  146:18,20,25
  148:10,11,12
  148:21,22
  149:5 154:20
  156:9 197:4
  213:1 214:25
  215:11,12,16
  215:20,24
  216:4 217:8
  218:4 237:19
  238:10 239:18
  242:16,21
  249:3 251:9
  252:14 255:16
  256:20,22
  257:7,12 258:8
  258:21 270:9
  271:3 278:15
**community's**
  120:6 137:7
**company** 200:7
  200:8 203:19
**compare** 217:3
  263:20
**compared**
  217:12 270:10
**compensated**
  31:25
**complained**
  264:12
**complete** 19:6
  42:15 248:13
  262:17 274:5
  275:2,6,15
  277:7,23 278:2
**completed**
  210:14 211:5
**completely**
  103:1
**completion**
  32:14
**complex** 61:6,10
**compliance**
  224:10
**complicated**
  89:21
**complied** 216:21
**comply** 224:4
  230:16 239:4
  239:11
**complying**
  239:13
**component**
  141:20

**components**
  274:7
**compound** 9:17
  99:5 102:11
  213:12
**comprehensive**
  177:15
**computer** 153:3
**computers**
  58:16 60:17,23
  61:20
**concentrated**
  246:5
**concentrations**
  269:15,17,25
  270:10,11
**concept** 147:11
**concern** 98:21
  120:12 177:24
  178:1 192:5
  237:8
**concerned** 9:20
  11:6 63:19
  64:4 98:11
  103:6,22 112:3
  114:16 128:21
  177:18 266:24
**concerning** 6:7
  37:9
**concerns** 96:5
  104:13,24
  105:9 121:14
  122:5 187:14
  198:9,16,19
  249:14
**concluded**
  142:14 279:20
**conclusion** 38:2
  92:3
**conclusions**
  164:22
**conduct** 60:2
**conducting**
  72:24
**confident** 15:14
**confidential**
  65:2,8,12 72:8
  72:16,22 73:6
  186:8
**confidentiality**
  63:14 64:10,21
  66:17,20 67:2
  67:11,16 68:6
  68:8,10 69:22
**configuration**
  96:1 97:19
  98:22 102:15
  104:6,14,25

105:10 217:25
  248:21 251:1
  252:19 255:11
  273:7,8,13,14
  276:17,18
**configurations**
  97:24,25
  140:15 199:7
**configured**
  150:8 216:2
  245:23 248:23
  269:16,19
**confined** 121:21
**confirm** 253:19
**confirmation**
  58:4
**confirmed**
  133:19 143:24
**confirms** 185:24
**confuse** 64:18
**confused** 54:9
  64:17 66:5
  198:1
**confusion**
  268:17
**Congratulations**
  134:15
**connect** 130:1
**connection**
  146:21 224:14
  244:15
**connections**
  258:7,13
**connote** 65:10
  65:12
**conscious**
  138:13 214:20
  214:22 215:20
  216:16
**consequence**
  93:20 156:1
  244:21
**consequences**
  155:22
**consider** 92:8
  97:24 99:14
  174:10 199:1
  203:18 231:10
  247:1 269:13
  270:7,19,25
**considerably**
  88:24
**consideration**
  102:21
**considered** 47:8
  47:9 66:8
  88:24 104:15
  105:1,11 131:5

Halma-Jilek Reporting, Inc.        Experience Quality Service!        (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD    Filed 02/23/12    Page 77 of 107    Document 188

Baldus vs. Brennan                    2/22/12                    Deposition of James R. Troupis

Page 288

269:9,11
considering
267:1
consistent
39:23 139:18
consistently
93:5 238:5
271:9
conspiracy
33:20 227:4
constituted
10:22
constitution
192:6
constitutional
77:2 84:14,16
constrain 18:13
19:12,13 110:3
111:17
constrained
96:2,7 98:22
construction
211:22
consult 71:17
110:11,15
111:2 114:4
157:1 166:16
166:22 167:19
174:15
consultant
172:5 186:17
203:8
consultants
173:15
consultation
111:19
consulted 52:2
59:8 98:18,20
262:16
consulting
112:8 174:9
198:23 204:21
219:3 231:8
contact 17:17
62:13,15 97:22
99:15 101:16
101:18,22,25
102:14,20
114:18 122:18
131:1 133:10
136:18,19
146:9 169:25
172:17 196:7
contacted 102:2
103:5,20 104:5
106:10,14
107:1 113:12
144:5,11,18

160:3 196:5
249:18 257:21
contacting
106:16 112:15
contacts 15:25
16:3 17:13
74:24 93:19
95:6 100:2,3,8
100:11 113:10
196:3
contain 16:15
70:24 96:23
contained 20:19
85:24 106:4
179:14
Containing
96:15
content 126:15
159:3
contentious
49:25
contentiousn...
50:2
context 19:3
21:25 44:1
65:18,22,22
76:24 84:23
110:22 117:2
121:2 124:7
141:6 159:4
211:24 242:25
Contextually
173:11
continue 20:9
125:7 215:21
continued 1:17
210:15 234:11
234:18 235:7
243:20
continues 50:16
169:13 235:15
235:15 236:8
continuing
192:11
contract 35:11
35:14,19 36:4
36:4,5,7,10
39:11 42:18,18
160:6
contractual 61:8
contrast 221:24
222:18
controlled 60:19
controversy
61:11
convenient
230:8
conversation

61:14 164:1
187:10 253:4,6
conversational
18:8
conversations
91:5 94:8,19
107:19 112:21
112:25 265:18
265:21 266:1
convincing
246:7
cooperative
18:22
coordinate
126:12 130:18
134:16 135:4
coordinating
135:19
copied 17:20
23:4 24:22
39:3,7 41:16
51:22 171:2,13
232:7
copies 14:19
62:23 139:1
220:11
copy 14:13,17
28:13 29:9
41:20 42:6,11
42:13 68:17
116:11 131:15
131:18 132:7
205:25 219:15
219:22,23,25
220:24 232:4,5
253:22
core 41:9 153:5
Corporation
167:24
correct 7:17,21
9:11 10:12
11:15 12:4
16:16 17:12
21:14 28:3,7
33:19 35:12
37:15,16,17
38:16,19 39:1
40:4,11,13
42:7 43:14
44:18,25 45:20
46:9,13,16,24
50:5,6 55:17
56:6,10 67:12
67:18 70:14
74:13 76:18,18
77:4 78:21,25
79:3,24 80:9
81:14 82:5,23

83:7,18 85:8
88:15 89:24
90:15 91:1,13
91:16,22 92:10
95:17 97:5,6
98:1 99:1
100:9,10,13
103:8 108:10
110:1 112:10
117:5,7,14,15
118:2 119:22
121:4,10 122:8
123:2 127:20
127:23 128:9
129:11,19
131:12 134:20
135:23 136:16
137:1,2,19
139:2,5,16
140:21 141:21
142:23 144:22
145:10,19
147:24 148:7
148:17 150:22
150:25 151:4
151:16,17,25
152:5,7,17
159:10,11
163:9,13,19
168:23 170:4
171:9,12 173:5
173:11,16
176:5 179:14
185:25 186:3
188:9 191:6,6
191:24 193:22
194:8 197:11
197:12,17
199:21,22
205:13 213:23
213:24,25
214:3 221:5,9
224:12 229:11
240:21 243:2
243:19 244:13
244:14 245:14
255:21 256:5
265:18,23
266:1 269:12
270:1 271:18
273:15 275:24
276:4,7 277:12
277:19 281:20
correcting 108:3
correctly 46:7
103:12 130:9
179:21
correspond

23:12 72:4
corresponded
17:3
costs 31:23,23
counsel 2:1,15
6:19 28:21
45:8 47:3
50:18 51:4
108:25 182:25
202:5 213:2
229:10 243:14
247:3 248:1
265:6,12
268:16 274:19
Counsel's
236:18
counties 249:4
country 250:6
county 25:18
146:3,7 174:5
249:5 280:2
couple 103:24
144:19 187:7
264:4
course 24:24
57:2,16 65:17
72:9 87:19
112:16 115:11
118:17,20
170:24 195:21
206:3,8 214:1
214:4 222:22
249:9,15
court 1:1 6:11
6:17 7:8 11:18
15:15 17:9
18:22 21:21,22
23:25 24:17
67:17,19 81:22
97:7 122:15
126:10 128:16
129:15 158:21
170:18 175:6
179:4,6 184:19
193:15 205:24
214:23 229:2
239:19,19
244:24 245:21
246:7,16,25
247:2,8 248:7
265:2,11 267:4
267:9 278:16
280:14
courtroom
126:20
Court's 267:3
Court-drawn
218:16

Halma-Jilek Reporting, Inc.          Experience Quality Service!          (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD    Filed 02/23/12    Page 78 of 107    Document 188

**Baldus vs. Brennan**      **2/22/12**      **Deposition of James R. Troupis**

Page 289

**cover** 183:18
**covered** 137:17
  162:3,5,10,13
**covers** 128:13
**co-counsel**
  46:22,23 47:3
  47:8,9 82:8
**co-leader** 100:7
**create** 80:24
  154:19 211:18
  212:3 215:25
  243:5 267:25
**created** 190:12
  211:6,6 235:8
  242:12
**creating** 211:17
  216:22 272:11
**criteria** 81:21
  91:16,17 92:21
  93:3 114:17
  269:10
**criterion** 82:1
**critical** 102:10
**criticizing**
  117:24
**Crosse** 64:5
  114:14
**cross-examin...**
  226:13 266:8
**culminate**
  278:13
**culminating**
  278:23
**cultural** 146:24
  147:11 152:15
  152:16
**curious** 43:8
  64:22 158:7
**currently** 150:8
**customarily**
  91:20
**cycle** 8:1 44:10
  72:19 227:18
  245:21 262:14
**cycles** 45:4

**D**

**D** 2:4 4:1 6:1
**daily** 31:18
  50:15 51:20
**Dan** 90:16
**darker** 150:20
**dash** 187:1,1
**data** 251:14
**date** 11:4 77:15
  77:18 105:16
  105:18 159:5
  192:1 201:23

206:19 251:18
  275:21
**dated** 37:17
  78:20 81:13
  85:5 86:5
  117:4 159:6
  166:11 171:8
  175:22 179:13
  193:22 200:25
  221:8 274:4
  282:8
**dates** 31:7 70:25
  179:21 185:17
  189:16,22
  190:18 201:20
**DAUGHERTY**
  3:21 281:11
**daughter** 200:21
**Daugherty** 7:4,5
  8:12 9:12,17
  11:19 12:5
  14:5,18 19:16
  28:13 42:21
  47:20 55:7,11
  57:24 58:9
  60:6 65:20
  67:19,24 68:18
  69:21 70:1,12
  73:1,4 78:8,14
  99:4 100:21
  103:16 104:3
  109:8 111:24
  120:17,20
  132:7,20,23
  133:11 142:25
  147:1 157:16
  166:4 170:11
  175:1 181:9
  183:16 187:21
  203:3 219:17
  240:7 253:14
  253:20,25
  254:3 264:13
  264:19 265:9
  265:14 266:9
  267:2,19 268:8
  270:13 273:25
  275:1 277:1,16
  279:10,13
**DAVID** 1:14 2:13
**DAVIS** 1:4
**day** 3:1 51:24
  78:24 80:19
  82:20 85:10
  86:18 93:21
  115:19 131:11
  136:13 138:19
  140:21 141:18

167:15 176:17
  190:7 194:22
  254:12 259:14
  277:12 280:8
  282:8
**days** 31:19
  75:14 190:7
  201:5 276:9,10
**day-to-day**
  51:15 59:23
**de** 2:8 3:9 6:12
  6:21 139:7,22
  140:9 144:6,11
  240:20 241:14
  242:8 257:24
  280:24
**deal** 51:7 74:8
  133:4 172:22
  208:5 209:25
  244:23
**dealing** 53:7
  66:3 213:10
  262:3
**dealings** 44:5
**deals** 65:14
  209:4
**dealt** 44:7
  130:21 136:2,2
**dean** 202:15
**debate** 43:24
**decade** 215:2
**decades** 44:5
  50:1
**December** 159:1
  159:6,14
**decennial**
  113:25
**decide** 13:11
  251:7
**decided** 49:9
  54:15 75:7,17
**decision** 33:8
  34:20 50:4
  51:11 52:14,16
  53:10,17,18
  54:23 55:10
  56:3,8,9 58:14
  59:3,13 60:1,2
  61:24 71:11,21
  72:1,5 77:3,5,8
  82:11,16 93:20
  108:4,9 196:12
  197:8,14,16
  248:15
**decisions** 51:15
  51:20 52:2,3,5
  54:4 59:17,18
**decision-maki...**

54:1 55:1
**declaration**
  225:22
**declarations**
  226:12
**dedicated** 84:13
**defend** 108:9,16
  108:17,21
  109:12 260:15
**Defendants** 2:3
  2:16 3:14,18
  6:10,15 7:1
  280:17 281:4,8
**defended** 260:24
**defense** 219:10
  250:4
**defer** 89:19
  181:18
**deferential**
  210:25
**define** 15:21
**defined** 62:11
**DEININGER**
  1:14 2:13
**delayed** 68:14
**delineate**
  210:11
**Democrat** 63:23
  237:22 238:5
**Democratic**
  237:20,23,25
**Democrats** 45:7
  118:25 224:20
  225:2,6 226:23
  228:2,9,13
  229:1 230:22
  231:11 238:1
**demographic**
  152:8 251:14
**demographica...**
  148:24
**demonstrate**
  222:1 223:6,9
**demonstrated**
  143:15
**deny** 127:21
**DEPARTMENT**
  3:15 281:5
**depends** 96:14
**deponent** 3:22
  3:25 235:23
  257:1 281:12
  281:15,16
**deposed** 93:11
  261:5
**deposition** 2:19
  6:5 7:15 9:23
  37:3 41:4

68:23,23 87:12
  90:3,9 95:10
  109:3 113:18
  116:8 138:4,6
  162:22 178:19
  179:1 191:17
  230:21 247:11
  247:12 248:8
  272:23 279:17
  279:19 280:5
  280:12 281:21
**depositions**
  150:3
**DEPOSTION**
  1:18
**deputy** 88:21
**derive** 134:4
**descent** 100:22
**describe** 47:11
  51:18 84:23
  178:6
**described** 13:20
  22:3 35:10
  39:5 51:24
  113:25 153:25
  207:17 208:1
**describes**
  140:10
**description**
  176:18 177:16
  187:4
**descriptions**
  178:2
**descriptor** 31:13
  34:17
**descriptors** 31:9
**designated**
  10:11 48:24
**designation**
  49:6 214:10
**designed** 75:3,5
**desire** 34:4
**desires** 120:7
**despite** 33:20
  55:18
**destroyed**
  143:18
**detail** 12:15
  140:11 176:20
  212:4
**deterioration**
  36:19
**determination**
  196:15
**determine** 19:4
  71:18 92:21
  173:25 174:10
  252:13

Baldus vs. Brennan                    2/22/12            Deposition of James R. Troupis

Page 290

**determines**
186:9
**determining**
90:21
**detriment** 217:8
**Deuren** 3:11
37:15,24 281:1
**developed** 92:20
**development**
160:24
**devise** 99:6
**dialogue** 87:18
**difference** 65:5
65:7,9,9 79:11
156:22 203:13
218:22
**different** 47:2
48:20,21
109:16 111:23
112:2 114:7,12
124:22 151:14
151:21 155:5
169:10 197:3
198:14,25
206:1 213:13
238:6 244:10
**differential**
269:13
**differentials**
270:7,20
**differently**
156:21
**difficult** 18:20
74:2,3 94:1
147:13 201:2
246:6 254:13
**dilutes** 119:20
**direct** 20:24
23:2,20 26:11
29:17 40:22
62:13 111:19
169:25 188:12
192:13 206:6
221:3 226:11
**directed** 191:21
243:4
**directions** 149:6
**directive** 142:16
143:6
**directly** 16:22
29:16 36:10
167:13 182:24
191:5 219:3
246:16 248:25
257:12
**Director** 2:1,14
**disagree** 34:7
95:23 97:3

111:7
**disagreement**
268:17
**discern** 225:23
**disclosed** 248:6
248:14
**disclosing**
263:21
**disclosure** 24:17
248:14
**discovery** 11:23
12:1,9 18:3,18
19:6,11
**discriminate**
212:25 238:10
239:17
**discriminates**
237:18
**discuss** 8:6
10:25 11:12
25:13 58:23
64:13 67:1,5
72:20,23 73:10
118:7 207:10
209:11
**discussed** 9:8
10:14,24 26:7
54:4 67:4
90:12 94:3
110:23 112:23
120:3 195:8
278:20
**discussing** 8:24
15:1 37:12
64:1 195:13
209:7
**discussion**
10:19 14:9
35:21 65:24
67:7 116:20
167:3 178:21
206:25 209:10
212:1 220:17
272:20
**discussions** 8:19
13:23 14:10
15:3 25:20
44:9 53:4 59:1
64:2 67:10
71:25 73:6,20
74:9,12,13,15
74:20 91:11
94:15,23
109:23 110:18
115:11,22
122:13,15
195:24 207:9
207:12,14

210:2
**disenfranchis...**
68:13 192:4,24
193:3
**disfranchisem...**
192:8
**disk** 87:11
178:14,18,25
268:22 272:17
272:22
**displaced** 154:8
**displayed**
190:11
**dispute** 91:3
104:11,22
105:8 110:12
112:6,10,13
245:13,16
**dissent** 259:17
**distinct** 191:11
**distinction**
47:15,19 61:18
68:9,12 204:22
**distinctly** 35:21
**distinguish**
204:19 206:11
**distribute**
137:13
**distributed**
137:18
**district** 1:1,1
6:11,12,17,17
15:14 21:21,22
50:21 63:19
90:15,22 92:22
93:8 95:17
96:3,8,9,19
98:23 99:1
104:7 118:10
118:14,20
120:12 122:4
134:10 142:12
142:15,20
143:11,16
144:1 149:13
150:19 153:6
153:17 154:22
155:8 156:7,10
156:13,15
157:3,8 211:19
212:20,20
213:6,9,17,20
214:17,18,24
215:6,8,23
216:1,7,9,12
216:13,14
217:3,4,8,12
217:13,17,19

218:2,2,10,15
218:23 219:2
223:2 233:2
234:6,7,12
237:20,21,23
238:1,3 241:13
243:6 245:20
251:1,7,8
255:10,10,20
256:5 269:16
269:18,24,25
270:1,21 271:9
271:17,22
273:7,8,12
280:14,14
**districting**
224:5
**districts** 9:11
10:5,7,10,10
10:16,23 11:2
11:7,10 80:25
93:4,8 98:14
102:16 104:15
105:1 119:22
121:4 122:2,7
140:7,15 141:6
144:3 150:8,9
150:16 154:3
174:1 195:9,17
195:25 196:1
196:13,19,24
205:1 206:18
207:2,8 210:14
211:6 212:3,21
213:1,5,23
214:6 216:10
216:23 218:14
218:23 219:1,4
221:22 222:9
222:10,16,25
223:4,25
233:13 242:9
243:1,18
244:10,16,19
245:6,14,19,23
246:2,8,19
248:21,22,24
250:2,13
252:14 257:5
262:16 270:8
272:11
**divergence**
49:23
**divergent** 49:9
49:13,15
**divided** 120:13
**dividing** 119:21
**document** 4:16

15:16 20:18
21:23 22:9,17
37:5 47:21
77:23 136:17
158:23 161:1
162:20,21
165:19 170:6
174:25 176:4
179:5 183:8
184:19,22
187:18 191:15
193:16,18
195:19 200:11
201:3,21
208:15 221:4
236:1,6 237:5
264:9,16 265:3
265:5 266:16
274:5,21,23
275:2
**documents**
11:14,17,22
13:6,9,11 15:7
15:8,10,25
16:2,5,11,14
16:14,19 17:3
17:10 18:21,23
19:10 20:18
22:21 24:1,14
25:2,6,10 35:8
56:18,19 64:11
132:17 136:23
162:3 166:1
170:2 265:7
267:4 278:12
**dog** 155:15,16
155:16
**doing** 31:14
33:11,18,25
62:18 71:14
126:17 134:24
154:3 159:23
177:21 182:11
183:23 193:1
194:17 198:24
198:25 199:3
209:20
**dominates**
117:16
**Don** 7:5 35:3
166:1 170:7
265:13
**DONALD** 3:21
281:11
**door** 148:16
**doubt** 42:9
77:20 78:4
165:17 182:17

Halma-Jilek Reporting, Inc.      Experience Quality Service!      (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 80 of 107   Document 188

Baldus vs. Brennan     2/22/12     Deposition of James R. Troupis

Page 291

204:9
**Doug** 6:24
  157:19 158:3
  175:9
**DOUGLAS** 3:5
  280:20
**Dow** 187:21,22
  265:7
**Dr** 168:15
  169:14,17,19
  169:23 172:18
  188:23 189:1
  199:24 201:12
  201:14 202:2
  203:7 205:5,15
  250:10 265:18
  265:20,22
  266:2 268:14
**draft** 176:5
  209:1 254:20
  263:2
**drafted** 172:1,15
  186:18 226:25
  254:17 262:24
**drafting** 172:8
  186:11 209:15
  209:15,16,18
  209:22 210:1,3
  211:1
**drafts** 176:13
**dramatic** 96:21
  153:12 217:15
**dramatically**
  223:13 245:19
**draw** 71:20 83:8
  83:10 90:22
  118:13 119:10
  122:6 151:10
  151:12 161:11
  174:12 179:9
  194:24 224:1
  227:20 229:19
  239:5 246:8
  272:15 273:6
**drawers** 212:24
  238:9
**drawing** 95:14
  151:14 153:1
  153:17 155:6
  204:23 213:5
  214:6 226:23
  245:22 262:22
  273:2
**drawn** 81:22
  96:3 151:13,15
  151:16 213:18
  213:21 214:24
  223:25 244:19

245:20
**drew** 151:9
  269:23
**dribbled** 18:3
**drinks** 107:23
  189:23
**Drive** 115:3,5
  120:3,9 155:9
  156:3
**drop** 276:16
**Dudek** 3:19 7:5
  281:9
**due** 31:21
  172:25
**DUFFY** 2:5
**duly** 7:12
**dynamic** 258:9

_____

**E**

**E** 2:4 3:3,3,13
  4:1,8 6:1,1
  280:18,18
  281:3
**Earle** 3:7,9 4:3,7
  5:3 6:21,22
  7:14 8:15,18
  9:15,18,22
  10:1 11:21
  12:13 14:13,16
  14:22 19:1,2
  19:20,23 28:15
  38:5,8,11 43:7
  47:14 48:7,15
  53:22 54:8
  55:24 58:6,13
  60:12 65:23
  66:2 67:21
  68:1,7,12,24
  69:3,19,24
  70:3,7,13
  71:10 73:3,9
  78:10,17 79:6
  79:9,22 80:17
  81:8,12 83:14
  85:4 87:6,14
  92:6,16 99:6
  99:11 101:1,4
  103:3 104:1,10
  105:5,7 107:5
  107:13 108:13
  108:19 109:2,7
  109:9,22
  111:16 112:1
  116:12,17,24
  120:18,21
  127:3,10 128:8
  132:9,12,24
  133:1,12 143:5

146:12,17
147:7 149:16
149:23 150:1,4
151:8 157:13
161:22 173:4
184:1,4 200:6
202:21,25
213:7,12 214:7
216:24 218:19
219:21,25
220:2,7,12
222:11 225:1
225:13,24
226:3 227:10
229:6,12,24
230:10 231:5
231:16 233:14
235:4,13,18,21
236:21 237:12
238:13 239:1
239:21 240:4
240:10 241:17
241:23 243:8
243:12 245:9
246:23 247:24
248:3,13 249:8
250:15 252:15
252:24 253:24
254:2 256:1,13
256:23 258:16
258:23 259:2,9
259:21,23
260:11,16,21
261:1,5,9,24
263:6,12,18
264:2 268:24
269:1,4,21,22
270:6,15,18,24
272:1,4 273:1
273:19,22
274:2,12,15,22
275:10 277:9
277:17 278:22
279:6,12
280:22,24
**Earle's** 176:24
**earlier** 20:23
  25:11 47:4
  83:9,25 88:2
  91:4,10 133:8
  142:22 152:4
  153:25 159:22
  161:21 165:6
  167:5 173:4
  176:25 189:6
  190:21 193:24
  196:2 207:17
  208:11 215:19

230:1,14 239:3
240:10 245:21
256:3 262:1
269:7 278:10
**earliest** 218:4
**early** 27:11
  43:19 51:2
  73:18 98:3
  107:20 108:1
  110:18 113:8
  139:15,17
  159:17 165:21
  182:23 189:18
  190:13,15,16
  193:20 198:1,9
  199:6 249:24
**easier** 36:14
  230:2
**easily** 21:6
**east** 3:19 155:3
  174:5 273:13
  281:9
**eastern** 1:1 6:11
  6:17 21:22
  151:2,3 271:21
  280:14
**east-west**
  273:14 276:17
  276:19
**easy** 64:17 74:4
**ECKSTEIN** 1:4
**editorial** 121:16
**effect** 33:9,22
  42:20 54:5
  95:16 96:17,20
  97:20 98:1,12
  98:25 102:23
  103:7,22
  104:16 105:2
  105:12 186:16
  198:14 245:3
  252:23 260:7
  276:24
**effective** 10:22
  11:1,9 134:14
  136:1,6,9,10
  182:15 244:9
  251:8 252:13
  255:16
**effectively**
  109:17 118:1
  241:2
**effects** 104:9
  105:21 106:7
  153:25 198:14
**efficiency** 230:1
**efficient** 35:25
  53:6 56:5

230:2,12
**effort** 34:9 89:8
  122:4 137:7
  146:8 155:25
**efforts** 7:21
  91:21 203:16
  211:4 244:24
**eight** 119:5
  273:17
**either** 27:12
  36:2 60:18
  189:18 214:3
  251:19 253:9
**elect** 92:22
  154:21 215:12
  215:23 218:5
  223:14 242:18
  242:20,21
  245:25
**elected** 26:3,6
  93:5 221:23
  222:16 241:3
  271:10
**election** 7:18
  74:12 76:20
  113:19 271:6
  271:14
**elections** 73:18
  238:6,6 271:7
**electronically**
  23:12
**element** 173:23
**elements** 97:20
  97:23
**elicit** 250:25
**eligibility** 92:8
**eligible** 90:14,23
  91:5,8,12,16
**Elisa** 133:24
  196:7 249:23
  250:21 274:18
  275:22
**Elise** 255:3
**Elmwood** 3:23
  281:13
**else's** 115:19
  224:7
**ELVIRA** 1:3
**embarrass**
  172:20
**embarrassing**
  202:12
**embarrassment**
  169:21 172:19
**emphasize**
  182:18
**enclosed** 185:10
**enclosures**

Halma-Jilek Reporting, Inc.    Experience Quality Service!    (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 81 of 107   Document 188

Baldus vs. Brennan                2/22/12                Deposition of James R. Troupis

Page 292

38:19 39:17
42:12 47:22
**encompass**
216:13
**encouraged**
111:12 146:19
**ended** 32:14
109:17 153:5
**endorse** 125:3
277:19
**ends** 87:15
178:18 272:17
279:16
**engaged** 171:15
**engagement**
4:11 34:6
37:10,11,13,23
38:4,21 161:5
183:10 185:6
185:10,24
186:12
**English** 79:10
**enjoyed** 203:19
**enjoying** 94:4
**enormous** 55:19
55:22 65:7,8,8
243:25
**ensure** 218:25
**enter** 29:11
61:15 62:1
**entered** 13:21
30:6,7 36:6
**entire** 64:14
198:13 199:11
199:13 209:19
232:2 236:18
251:15 259:6
261:20 262:15
**entirely** 62:17
**entities** 213:13
**entitled** 69:22
92:25 248:10
**entity** 231:7
**environmenta...**
138:13
**equal** 192:12
**equalize** 153:16
**Eric** 13:17 16:3
16:7 19:25
24:3,16 25:4,8
48:24 49:21
51:16 62:18
67:1 75:17,21
75:22,22 78:6
88:7,15,24
89:3,4,9,19
90:12 117:4
139:1 167:22

168:3 172:11
206:13,14
253:9
**ERICA** 2:9
**Eric's** 88:8
**error** 125:8
**Esenberg** 75:25
76:1,5 77:10
77:20 78:5,23
79:20 81:14,17
82:7,13,18,21
83:17 84:2,10
85:12 86:4,20
113:23
**Esenberg's** 79:2
**especially** 96:21
**essence** 111:4
**essentially** 34:6
150:22 182:25
204:12 208:17
245:17
**established**
142:22 161:4
235:25
**et** 6:8,9,13,15
280:15,17
**ethical** 46:5
267:1,7,8
**ethics** 40:21
**ethnic** 147:17
147:18,22,23
**ethnicities**
148:4,4
**European** 148:4
**evaluate** 156:1
**EVANJELINA**
1:7
**evening** 94:4
212:15,16
**event** 13:16
264:15 275:3
**events** 30:4
**eventual** 172:13
**eventually** 33:4
158:9,10
216:14 252:7
**everybody** 26:5
60:20 64:4
67:22 119:3
156:16 266:24
**evidence** 226:8
226:10
**evident** 47:16
47:19
**evolved** 262:12
**exact** 61:4 159:4
190:17
**exactly** 22:3

71:1 86:15,24
96:13 113:2
132:13 133:13
136:8 183:24
201:2 242:10
276:5
**examination** 4:2
7:13 111:18,18
111:19 158:1
202:25 212:13
247:14 264:22
269:3 281:17
**examined** 7:12
**example** 26:12
43:2 44:3,8,11
45:7 73:21
176:18 225:21
271:8 278:4
**examples** 180:8
**exceed** 34:9
**exception**
233:19 243:12
**exchanged**
167:11 202:9
**exclamation**
125:4
**exclusive** 17:5
**Excuse** 178:13
268:21 274:10
**executive** 25:18
**exhaustive**
214:21
**exhibit** 4:9,24
14:20,23 20:2
20:12 21:12,13
28:12,16 37:2
38:9,12 47:15
47:18,19 48:4
69:5,12,16
70:9,17 77:14
78:12,15 81:10
81:13 83:12
85:2 116:7,7,8
119:14 124:15
124:19 125:20
131:25 138:3
145:12 146:1
149:25 150:2,5
158:16,17,21
159:8 161:2,12
162:22,23,23
170:15,19
175:3,7,19
178:22 179:5
183:9 184:13
184:17,20,22
185:1,6,14,21
186:21 187:23

188:2 191:16
191:19 193:12
193:16 200:12
200:19 205:21
205:25 219:15
220:24 221:3
232:15 240:6
242:5 253:11
264:8,23 265:3
266:8 267:17
267:18 273:2,4
273:19,20
274:14,15
277:13,15,16
**exhibits** 5:1
132:4 220:8
**existed** 260:23
**existing** 150:10
**expand** 235:21
**expect** 42:1 50:2
217:11
**expectation**
58:2 162:12
251:5
**expected** 66:19
71:19
**expecting**
157:20 179:16
201:6
**expensive** 34:13
**experience**
32:23 49:6
57:13,14,16
114:3
**experienced**
7:18,24 8:1
18:6 66:3
88:10,11
113:19
**expert** 92:12,12
152:22 178:4
186:14,16
203:8 204:20
204:21 209:16
209:18 211:2
247:17,18,19
261:4 265:23
**expertise** 191:8
**experts** 178:6
223:21,23
224:2,3,14,17
224:20 225:5,9
225:16,23
260:2
**expires** 282:10
**explain** 43:15
93:25 179:24
226:2

**explained** 22:6
47:4 83:9
93:18 152:14
230:14 239:3
261:25
**explaining** 45:1
**explanation**
97:10
**explicit** 121:17
222:24
**express** 204:25
**expressed** 165:6
**expressing**
208:23
**extent** 7:25
114:18 126:24
147:1 157:1
206:8
**extraordinarily**
63:18 98:2
**extraordinary**
129:24
**extremely** 74:3
82:7 100:1
123:14
**e-mail** 4:12,13
4:14,15,17,18
4:19,20,21,22
4:23,25 12:19
12:24 23:21
27:22 59:5
77:13,19 78:4
78:18,20 80:18
81:1,13 82:3
82:12 83:3,4
83:10,15,17,18
84:1,2 85:5,19
85:19,24 86:4
86:7,11 87:24
116:9 117:2
120:1 124:23
125:1 126:22
131:23 133:16
134:3 138:25
140:20,23
141:20 142:3
143:12 144:24
145:2 163:7,8
163:15 164:4,7
164:24 166:9
166:10,10
167:3,13 168:4
171:8 175:20
175:21,24,25
176:3,15
179:10 181:14
181:15 183:18
188:8,15 189:7

Halma-Jilek Reporting, Inc.        Experience Quality Service!        (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 82 of 107   Document 188

Baldus vs. Brennan        2/22/12        Deposition of James R. Troupis

Page 293

196:11 200:24
201:1 205:18
206:12 208:15
208:25 221:5
221:15,17
223:2,5 254:5
254:17 257:13
258:2,6 274:4
274:9,16,17,23
276:6,11,13
277:5 278:4,23
**e-mails** 11:12
12:3,8 26:19
27:19 33:21
47:25 78:19
79:19 82:17
86:9 96:12
122:19,23
164:25 179:7
190:17 200:20
202:8 206:1,1
206:7 248:17
254:8,13,15
260:7 261:14
266:1 275:15
277:21,23
278:13
**e-mail's** 141:22

**F**

**F** 2:4
**faced** 245:17,22
**facilitating**
127:14,15
**facility** 230:3
**fact** 40:6 42:4
50:17 76:22
97:18 117:18
117:20 128:11
130:23 131:14
138:18 146:8
149:1 153:10
177:12 184:5
196:21 208:14
215:20 224:9
247:19 261:14
262:6 276:21
**factor** 154:5,25
218:11
**factors** 154:15
154:15,23,25
155:5 217:22
269:11 270:19
**facts** 61:7,11
153:14
**failing** 243:13
**fair** 40:14,17,18
42:16 50:3

54:22 76:9
89:3,11 102:18
105:5 119:23
121:5 160:23
161:25 168:17
173:10,12
187:14 218:14
256:10
**fairly** 21:4 33:12
73:25 149:6
257:12
**fairness** 41:14
41:14
**faith** 61:15
67:23
**fall** 18:8 23:18
50:17,19
**familiar** 8:3
82:13 147:5,21
205:1 226:14
231:7 232:21
251:16
**familiarity**
262:22
**familiarize**
170:22
**family** 148:14
189:15
**fans** 112:4
**far** 12:23 34:9
59:22 74:14
95:14 97:19
247:13 278:1
**farm** 174:4
**fast** 117:25
**father** 201:4
**fault** 104:19
**favor** 126:13
130:19 131:6
276:17
**featured** 169:9
**February** 1:20
3:1 6:6 30:5
37:17 50:20
87:12 90:8
95:10 158:13
159:18 160:20
175:23,23,25
178:20 179:1
185:7,11
272:19,23
279:17 280:8
282:8
**federal** 2:21
65:14 224:4
225:18 245:21
**feedback** 205:5
205:15

**feel** 172:21
218:22
**fellow** 180:16
**felon** 91:18
**felt** 96:4
**Fielkow** 3:14 7:2
281:4
**fight** 244:15
**figure** 52:5 95:5
122:17 123:18
124:13 163:18
254:9,13
274:20
**figured** 87:3
**file** 244:24
**filed** 140:6
**files** 20:11,13,17
21:7 22:5
**final** 49:10
98:10 151:20
196:12,14,23
197:2,6 259:8
**finally** 103:15
188:16 199:23
240:19 241:1
**find** 22:6 52:10
175:16 183:20
185:10
**finders** 97:17
**fine** 9:24 18:5
20:7 36:15
41:6 48:5 69:1
109:15 111:6
113:21 127:5
128:5 132:23
170:12,12
175:1 253:21
268:3,6
**finish** 166:16,22
211:17 233:9
**finishing** 19:1
**firm** 7:3 32:22
35:1,3,11,15
35:19 36:9
38:22 39:12,14
40:3,20,23,25
41:10 42:19
44:23 46:22,22
46:23 47:6
52:16 57:11
61:22 62:1
71:22 72:6,13
93:10 94:16
182:5 183:3
200:22
**firms** 39:20
46:18
**first** 7:11 8:23

15:5 24:6
63:13 64:9
67:7,10 70:17
75:21 77:22
84:6,9 96:25
99:14 102:14
102:20 104:5
106:9,14
113:11 122:17
124:13 128:16
128:23 130:20
130:20 134:22
135:10 144:14
144:19 161:12
161:15 166:10
168:10 169:4,7
170:9,21,21
176:2 185:9,20
185:22,23
188:15 189:1
194:21,24
198:2 200:14
200:23 202:2
207:19 222:5
232:24 233:11
242:5 247:11
249:20,22
250:22 254:24
257:10 258:1
264:4 266:7
267:16,16,18
276:6
**fishing** 123:16
123:18
**Fitzgerald** 16:20
16:22 17:11,18
20:5,25 21:1
21:10,24 23:17
24:12,12 38:24
39:1 40:8,9
43:12,13 44:22
72:23,24 161:8
163:12,16
186:24 187:1
**Fitzgeralds**
53:19
**Fitzgerald's** 17:1
**five** 235:22
**fix** 200:15
201:22
**fixing** 201:20
**flexibility** 95:14
102:22
**flip** 208:14
**flower** 70:4
**focus** 62:5
119:13 200:23
216:11 262:8

**focused** 141:19
**focusing** 111:21
201:3
**folder** 220:4
**folks** 54:22
148:5,6 153:2
262:5 274:8
275:6
**follow** 95:21
104:18 267:23
**followed** 239:6
**following** 30:24
65:24 90:5,11
95:12 263:16
**follows** 7:12
103:18 104:21
220:22
**follow-up** 37:9
212:19
**Foltz** 57:4 58:15
58:19,23 61:21
71:12 78:6,11
78:11 117:3
138:20,25
171:12 174:15
188:13 194:1
207:11 276:12
**football** 112:2
**foregoing**
281:19
**forgive** 129:20
**form** 9:12,16
10:2 60:6
65:20 90:16,24
213:8 214:14
221:12,18
226:18 227:8
227:22 228:5
228:18 229:4
229:12,22,24
230:9,24
231:14 233:22
234:8,16,22
235:3,12,13
236:12 238:25
239:22 241:15
241:17,23
243:7 245:9
246:10,22
249:7 250:15
256:1,13
260:11 261:24
263:6 269:20
270:12
**formal** 18:10,10
82:14 171:20
203:21 204:13
205:4,4

Halma-Jilek Reporting, Inc.      Experience Quality Service!      (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 83 of 107   Document 188

Baldus vs. Brennan          2/22/12          Deposition of James R. Troupis

Page 294

format 31:5
formed 144:21
    145:9
former 55:23
    88:21 118:4
    225:13 241:6
forth 33:3 35:5
    82:17 114:4
forthright 18:23
forward 29:23
    47:13 56:17
    59:20 63:9
    71:17 73:7
    77:1 96:16
    118:5 160:2
    201:4,11
    263:24 278:6
found 56:5
    66:25
foundation
    42:23 57:25
    102:25 111:9
    144:19 213:15
    214:8 225:3
    227:23 228:6,8
    228:19 238:16
    238:25 260:22
    260:23 270:3
    270:22 277:14
    279:3
four 86:9 272:22
frame 99:14
    160:21
framed 102:9
framework 89:1
frankly 262:4
free 82:8 84:17
    170:19 206:4
    264:6
frequently 87:18
    87:21
Friday 93:12,13
    93:14 164:8
    175:15 188:9
    206:14 248:18
Friedrich 31:1
    37:14,23 39:14
    49:20 50:10
    56:4,20 58:12
    58:17 60:3,24
    62:10 72:7,14
    88:25 89:1
    161:9 173:14
    186:14 190:2
Friedrich's
    50:12
friend 101:12
    202:14 203:19

friends 32:21
    183:5
friendship
    169:11
front 22:19
    30:13 153:8
    161:2 171:20
    183:10,18
    269:5
Frontera 2:8
    3:10 6:13,22
    139:8,23
    140:10 144:6
    144:11 240:20
    241:14 242:8
    257:24 280:25
frustrating
    18:19
full 281:19
full-blown 269:8
function 85:18
    85:21 138:19
fund 126:9,19
    129:14,22,25
    130:5 219:10
    250:4 278:15
fundamentals
    48:16
funding 127:17
    129:17
funds 34:22
funnel 101:2
further 25:5
    263:25 276:2
future 152:10

**G**

G 3:9 6:1 280:24
GAB 6:25
Gaddie 107:14
    107:17 108:5
    108:23 109:3
    109:11 110:9
    112:7,22 113:5
    139:1 168:5,11
    168:15 169:5,8
    169:9 171:25
    172:4 177:15
    177:22 188:16
    188:23 189:1
    190:1,11,25
    191:18,24
    192:3,17,22
    193:9 250:10
Gaddie's 169:1
    191:7
gather 13:21
    15:24 16:18,19

gathering
    207:19
general 2:1,14
    3:16 88:22
    191:12 281:6
generally 49:1
    93:1 106:14
    177:20 193:8
    207:14,16
    213:6
general's 75:18
    94:20
generate 11:8
generated 12:3
    12:5
gentleman
    226:14
geographic
    191:9
geography
    146:24 147:11
    152:15,16
GERALD 1:14
    2:13
getting 51:13
    62:22 97:13
    108:2 110:24
    120:19 183:12
    201:7 204:12
    205:7 262:19
give 49:17 69:9
    77:18 81:23,23
    83:22 88:5
    99:13 113:4
    116:10 138:8
    162:25 175:7
    180:8 184:21
    190:17 200:12
    215:12 218:3
    234:13 250:10
given 32:23 34:3
    102:9 108:16
    114:3 117:21
    120:8,9 125:9
    130:8 131:2
    135:5 168:9
    177:9 185:16
    249:20
giving 133:23
    183:1 187:14
glad 163:6
    235:16 236:9
GLADYS 1:8
GLORIA 1:4
go 9:12 10:3
    32:19 38:2
    42:24 47:23
    52:19 57:25

59:20,22 68:18
    71:17 77:1
    81:5 87:6
    116:15 125:15
    130:10,12
    131:23 133:2
    143:1 147:2
    149:17 155:5
    155:14 157:17
    157:20 161:24
    162:16 166:22
    175:1 178:15
    178:16 181:14
    183:5,20
    198:18 200:16
    200:17 203:3
    205:19 207:18
    208:2,7 211:11
    212:6 214:11
    215:5 220:13
    226:10 231:2
    231:18 233:8
    237:16 239:25
    246:12 252:18
    261:13 263:8
    263:22,24
    264:3,6,6
    274:1 275:4,19
    276:6 278:6
goal 216:17
GODFEY 3:4
    280:19
Godfrey 2:24
    280:6
goes 44:5 148:9
    155:17 208:25
    246:22
going 10:4 12:1
    12:15 13:19
    19:6 20:2
    23:23 33:3
    43:18 47:13
    48:10 52:20,21
    59:20 60:16
    61:13 64:4
    68:10,21 69:17
    74:5,10 75:24
    77:13,13 78:24
    80:4,16 82:17
    87:7 94:7 95:9
    95:9 99:12
    102:4 107:8
    111:17 116:18
    122:13,15
    124:14 125:3
    127:12 128:18
    133:5 134:22
    134:23 135:6

135:11 147:14
    149:18 152:10
    156:15,16
    160:4 162:20
    162:24 165:17
    166:17 167:3
    170:9,20
    171:23 175:14
    178:5,6,10
    179:22 182:15
    182:18 184:19
    185:19 194:20
    199:23 204:3
    208:10,13
    209:23 212:8
    213:7 214:7,19
    216:24 218:19
    219:14 220:12
    220:15,23
    222:11 225:2
    225:24 233:14
    235:18 238:13
    239:21 246:21
    248:9 252:15
    252:24 253:15
    256:23 259:9
    260:21 261:9
    266:9 268:9,11
    272:15 275:11
    276:16 277:18
    278:6
Gonzalez 101:13
    101:14
good 7:16 41:23
    50:7 61:15
    67:22 71:8
    73:21 76:5,6
    78:3 81:5
    98:13 99:12
    114:19 138:8
    138:14 199:25
    202:14 212:15
    212:16 221:21
    222:1,15 223:7
    223:9 225:11
goodness 103:15
gotten 82:21
    138:7 202:18
    207:23
government
    1:13 2:1,12,15
    6:9,14 84:25
    212:17 233:19
    280:16
governor 25:20
    25:21 26:2,3
    32:13 117:11
    117:14 120:15

Halma-Jilek Reporting, Inc.     Experience Quality Service!     (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD    Filed 02/23/12    Page 84 of 107    Document 188

Baldus vs. Brennan          2/22/12          Deposition of James R. Troupis

Page 295

120:24
governs 8:3
grammatical
   125:8
grand 227:3
Grandma 174:4
Gratz 226:15
gray 89:16
great 18:17
   28:14 51:7
   62:24 126:1
   166:4 172:22
   218:24 220:10
   232:8 244:23
   272:10
Greek 180:16
Green 189:24
grew 148:10
   235:8
grocery 156:7
Grofman 110:2
   169:14,17,19
   169:23 172:17
   172:18,22
   199:24 200:22
   201:12,14
   202:2,12,18
   203:7,14
   204:17 205:5
   205:15 246:15
Grofman's
   225:22 226:4,6
ground 255:7
grounds 213:15
   214:8 225:3
   252:16 260:22
   275:3
group 92:23
   104:5 139:22
   140:3,3,6
   142:7 145:9
   146:2,5 158:6
   180:17,20
   197:18,22
   213:14,14
   228:3 242:6
   250:4
groups 142:10
   146:5 147:23
   148:1 179:17
   179:20,24
   180:2,4,5,9
group's 213:4
grow 215:21
growing 215:17
   215:21
grown 234:19
   245:19

growth 148:25
   149:5 152:9
   216:12
guess 23:23 66:4
   76:11 95:25
   147:9 153:13
   168:9 170:25
   265:11
guessing 173:9
guidance 89:23
   182:25
guilt 52:12
guy 18:7 76:6,6
   88:8 143:3
guys 132:1,3
   138:12
GWENDOLYNNE
   1:10

_____ H _____

H 4:8 188:18
Hagen 1:21 2:23
   280:3
hair 89:16
half 129:8
   150:22,24
   151:2 157:22
   271:21
halfway 234:3
Halma-Jilek 6:3
   282:22
hand 162:21
   184:19 232:10
handed 158:22
   170:18 175:6
   179:4 193:15
   200:3,11
   205:24 265:2
Handrick 17:18
   33:17 34:7
   37:3 40:19
   47:5,7 48:2,3,4
   48:6 49:20
   57:5,6 58:15
   58:19,23 61:21
   71:12 87:16
   90:3,9,10,25
   95:10 106:3
   116:8 117:4
   138:4,5 139:2
   159:9,19 163:8
   163:11 164:1
   165:2,6,12,15
   166:11,15
   167:4,14 169:8
   173:7 177:23
   179:8,15,19
   180:22 181:3

181:15 185:24
   186:12 187:5
   187:10
Handrick's
   32:17 33:9
   105:14 163:15
   164:18 167:19
   177:2
hands 51:16
handwritten
   132:20
happen 71:22
   153:24 190:24
   216:1 268:10
happened 143:8
   143:9,10,15
   148:10 187:17
   204:11 278:10
happening
   229:8
happens 156:19
happy 181:6
   199:25 206:18
hard 18:15
   177:13 201:20
   206:11
hardware 61:2,4
headed 189:11
heading 278:5
heads 84:10
hear 20:9 115:9
   166:20 181:7
   202:17 235:16
   236:9 237:7
   259:14,19
heard 97:1
   115:2,9 145:21
   188:16 204:15
   231:3 257:24
hearing 9:5,7
   30:9 77:4,7
   78:24 80:20
   81:18 82:21
   85:10 115:21
   115:23 117:7
   118:18 119:2
   131:11 136:13
   136:14 137:14
   137:20,21,22
   137:23 141:12
   144:15 151:22
   197:5,8 205:11
   205:16 207:5
   210:16 231:22
   231:24 232:25
   234:5,14
   235:20 236:15
   236:20 257:18

257:22 259:14
   276:9
hearings 8:25
   9:1 106:6
   115:12,13
   222:22
hearsay 231:4
   233:15,20
   252:16 258:16
   259:2,10,23
   260:25 261:1,9
   274:7,11
heat 148:25
heels 51:1
held 27:4 123:22
   215:1 238:1
help 36:24 38:6
   54:12 201:22
helped 32:18
helps 114:18
herding 64:3
hesitant 99:19
   100:4
hesitated 40:1
   152:18 225:10
hesitating 39:15
   39:21 160:18
hesitation 30:10
higher 243:24
   246:20 256:7,9
   269:14,25
   270:9
highlighted
   240:14,15,17
   240:19 241:1
hire 51:11 108:4
   108:9 239:12
hired 38:22 40:4
   75:21,23
   109:24
Hirschboeck
   3:19 7:5 94:25
   281:9
Hispanic 139:4
   148:11,15
   212:21,25
   217:8 221:21
   221:23 222:15
   222:17 223:4
   237:18 238:10
   239:17 241:9
   242:16 249:3
   250:7 255:20
   256:4
historical 45:2
history 8:14
   44:25
Hodan 3:13 4:5

6:25 7:1 18:25
   38:1 46:25
   53:21 68:5,9
   68:16 69:17
   71:6 79:4,8,11
   80:14 92:2,11
   93:12,17 94:15
   102:24 105:3
   108:11,15,20
   108:24 109:5
   111:8 116:11
   116:15 126:23
   127:5 128:6
   146:11 151:6
   157:19 175:9
   175:13 188:5
   202:5 203:10
   212:14 213:11
   213:16 214:11
   217:2 218:21
   219:20,23
   220:1,5,10,20
   221:1,14 222:4
   222:13 225:4
   225:20 226:9
   226:21 227:11
   228:1,8,12,23
   229:9,15 230:7
   230:19 231:1,6
   231:17 232:4,8
   232:12,14
   233:10,18
   234:1,10,17,24
   235:6,14,19
   236:7,14,22
   237:1,6,13,14
   238:17,22
   239:15,24
   240:5,8 241:20
   242:2,4 243:10
   243:14,15
   245:11 246:11
   247:21,25
   248:5,19
   249:10 250:17
   252:17 253:2
   253:18,22
   254:4 256:2,15
   257:2 258:18
   259:5,18,22,25
   260:1,13,18
   261:3,7,12
   262:20 263:7
   263:13,19,25
   264:5 265:17
   265:24 266:5
   266:15 267:24
   268:4,12

Halma-Jilek Reporting, Inc.          Experience Quality Service!          (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 85 of 107   Document 188

Baldus vs. Brennan       2/22/12       Deposition of James R. Troupis

Page 296

269:20 270:3
270:12,22
271:24 273:3
274:10,14,19
274:24 277:2
277:14 278:17
279:2,14 281:3
**hold** 72:5 126:5
238:3 253:14
**Hollen** 88:22
**honest** 41:21,25
**honestly** 27:21
29:3 181:4
272:2
**honesty** 34:4
**hook** 134:23
**hooking** 126:11
130:17 133:22
134:2
**hope** 51:19
89:17 94:5
143:10 145:23
182:2 216:13
**hoped** 216:16
**hopefully** 161:6
**hoping** 157:21
157:23
**HOUGH** 1:7
**hour** 32:1
105:18 125:13
138:19 157:22
**hourly** 35:23
167:7
**hours** 31:7,17
31:20 34:8
51:23 190:6
264:14 273:17
**house** 56:3 57:8
**housed** 54:16
**Huh** 132:2
**humble** 52:8
**humility** 52:11
**hundred** 26:13

— I —

**idea** 70:20 72:24
114:19 115:14
147:21 155:22
242:19,19
271:19
**identical** 70:5
**identification**
14:21 38:10
78:16 81:11
83:13 85:3
158:18 170:16
175:4 178:23
184:14 187:24

193:13 205:22
264:24 273:21
**identified** 75:15
129:4 185:1
194:8 247:7
267:5
**identify** 14:24
26:5 41:9 43:9
75:9 100:23
136:17 158:22
159:24 175:19
179:6 193:18
194:10 200:19
**identities**
147:18
**identity** 147:18
**ID'D** 4:9
**III** 1:4
**IL** 125:12
**Illinois** 110:21
125:12 250:9
251:17
**imagine** 36:24
**immediately**
51:1 119:7
**implication**
40:18
**implied** 269:9
**implies** 45:22,23
**imply** 277:6
**import** 84:14
**importance**
90:13,21
110:14,23
112:8,15
156:24
**important** 32:23
61:12 63:18
89:21 92:7
101:21,24
105:22 114:4
114:10,15
115:7,17 131:5
135:9 156:8
159:25 173:23
173:25 174:2,3
174:11 181:24
182:15 207:21
230:15,18
**imposing** 224:6
**impossible**
262:7
**impression** 77:8
140:17,19
**improper** 65:11
108:22 229:19
233:25
**improved**

223:12
**improvement**
217:7,9,16
219:1 256:11
256:16
**improvements**
218:15
**inaccurate**
103:2 277:22
**inadvertent**
267:12
**inadvertently**
266:23 267:12
**include** 31:9,9
34:15 39:19
91:25
**included** 16:14
17:5,15 199:20
209:1
**including**
222:25 250:9
**inclusion** 164:2
**inclusive** 17:4
**incomplete**
47:21
**Incorporated**
6:4,13
**incorrect** 39:18
46:1 116:5
131:2 146:15
152:23 180:18
203:22 278:12
**increase** 217:15
241:2
**increased**
239:18 241:5
**incredibly** 93:25
**incumbent**
218:7 233:1
**incurred** 31:24
**independence**
181:23 182:1
182:12
**independent**
17:16,17 42:8
57:14 59:17,18
164:5,20
168:10 190:4
193:6 195:20
**indicate** 15:6
26:19 82:25
136:18 144:10
167:18 251:21
254:24 258:6
260:9,14
266:24
**indicated** 42:22
109:11 164:24

227:5 233:12
248:8 252:12
252:21 257:14
265:8,21
**indicates** 31:19
37:13 38:18
48:5
**indicating** 234:7
**individual** 59:4
59:8 62:7,20
71:13 72:13
197:19 212:18
246:18 262:8
263:2
**individuals** 17:2
19:9,11 20:11
21:13 23:24
24:2,10,12
**inevitable**
141:17 235:7
**infer** 271:11
277:6
**inference** 83:4,8
**inferences** 83:10
128:4
**infinite** 122:6,7
154:2,17
156:17 198:21
223:25 224:1
**influence** 216:9
234:12
**influenced**
202:22
**information**
59:10 62:2,9
62:14,16 82:11
119:4 139:11
144:9 201:6
207:20,23
219:13 221:20
222:6,8,23,24
223:1 251:3,10
251:11,13,22
252:8
**informed** 14:3
265:5
**informing** 13:18
86:12
**initialed** 173:1
**initially** 161:23
251:2,2,10
**innumerable**
154:15
**input** 102:15
112:19 113:2
204:6
**inquiring** 86:14
**inquiry** 23:7

24:24 95:7
110:4
**instance** 2:20
137:14 177:22
203:20 280:10
**instances**
137:17
**Institute** 84:5,7
**instruct** 174:19
174:22 181:9
**instructed**
265:12
**instructing**
267:19
**instruction**
266:12
**instrumental**
75:16
**integral** 230:16
**intend** 171:5
200:14
**intended** 25:23
125:21,23
162:2 184:5
**intent** 127:13
213:2,4,5,13
214:6
**intention**
174:14 266:20
266:25
**intentionally**
212:25 237:18
238:9 239:17
**intentions** 182:4
**intents** 120:5
**interest** 74:6
84:25 130:6
**interested** 64:23
84:16 119:13
133:10 140:14
140:14 160:2
201:16 202:17
**Interesting**
109:13
**interests** 96:6
**internationally**
203:17
**interpret** 128:1
**interpreted**
91:14 171:18
**interpreting**
33:12
**interrogatories**
280:11
**Intervenor-De...**
2:6
**Intervenor-Pl...**
1:11

Halma-Jilek Reporting, Inc.    Experience Quality Service!    (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 86 of 107   Document 188

Baldus vs. Brennan     2/22/12     Deposition of James R. Troupis

Page 297

**introduced**
124:20
**invited** 80:10
97:24 180:21
**invoice** 31:3,5
**invoices** 30:17
33:9
**involve** 76:12
207:19 239:5
**involved** 7:20
8:8 22:14
27:16 32:19
33:1,8 34:5
35:2 36:22
41:17,18 43:5
50:14,24 52:20
54:1,23 55:1
59:3 63:10
71:11,25 72:10
73:15,16 74:2
74:17 75:19
88:7 93:4
106:16 108:4,8
108:8 131:1
146:2,6 160:3
167:5 197:19
197:20,21
203:15 211:21
224:11,23
226:20 244:12
245:12 250:7
251:17
**involvement**
32:11,13 53:13
110:24 163:19
164:10,18
165:16 169:2
226:22
**involves** 74:3
77:21 186:2
**involving**
131:23 179:23
**irony** 189:7
**Irvine** 202:16
**Irwin** 202:15,18
202:22 203:2
**isolate** 92:24
**issue** 9:21 72:20
115:17 141:4
173:2 192:4,5
192:12,24
193:3 196:9
210:1,23
244:17 250:1,2
254:23 268:5
**issues** 11:13
12:10 29:18
59:23 77:2

88:3 89:21
93:21 94:16,21
94:24 95:2
136:2 159:9
195:8,14 210:6
210:10,12
262:9
**item** 81:5
**iterative** 151:19
153:2

**J**

**J** 2:4 3:13 281:3
**Jacque** 70:18
**James** 1:19 2:4
2:19 4:3 6:5
7:10 87:12
178:19 179:1
272:18,23
279:17 280:6
**January** 13:13
15:2,4 24:25
25:1,5,9 30:5
158:13 159:18
160:20 163:9
164:2,8 166:11
171:8 172:3
179:13 181:16
**JEANNE** 1:5
**Jeff** 23:17 24:12
38:25 40:9
43:13 72:24
187:1 199:16
**Jefferson** 3:8
280:23
**Jensen** 52:24
53:8,18 54:15
54:25 55:11,15
55:19,25 66:13
106:18,20
**Jensen's** 55:10
**Jerry** 101:13,14
**Jim** 81:24 90:20
100:23 126:14
134:17 142:13
180:12,13
181:11 201:4
222:3 274:16
**Jingles** 215:14
269:8
**job** 239:14
**JoCasta** 118:12
118:19 133:5,6
154:4 215:3
271:16
**Joe** 17:18 32:17
32:18,21 33:2
33:9,17,24

37:4 40:19
47:5,7,12 48:2
48:3,4,6 49:20
61:21 75:14
87:16 95:18
105:14 106:3
160:1 165:6,15
169:8,8 176:18
177:12,14,23
179:8 182:2,4
182:17 183:2
187:13 188:18
198:4,18
**Joel** 226:15
**Joe's** 34:3 35:1
35:25 182:3
**John** 54:20
**JOHNSON** 1:7
**join** 183:3
214:13 227:10
229:6,24
230:10 231:5
231:16 235:4
236:21 238:15
239:1 241:25
249:8 253:1
258:17 259:4
261:11
**joined** 71:7
182:4
**joint** 231:24
**joking** 94:10,10
**Jose** 2:8 101:11
101:12
**Joseph** 90:3,9
95:9 117:3
139:2
**Journal** 145:16
**JR** 2:4,4 3:21
281:11
**JRT** 11:19,19
78:8 219:24
265:13
**Jrtroupis@tro...**
12:25
**JRT123** 220:1
**JRT81** 265:10
**JRT87** 253:18
253:20,23
**judge** 187:20,20
187:21,22
247:10 264:11
265:7
**judges** 125:20
**JUDY** 1:5
**July** 9:7 76:14
77:4,19 78:20
78:25 80:19

81:13 82:20
83:16 85:5,8
85:25 86:5
106:15 117:5
120:17,22
124:16,25
131:10 144:15
151:22 199:6
200:25 201:15
201:24 203:16
205:11,16
210:16 221:8,9
231:21 232:17
254:17 258:5
274:4,17
275:22 276:10
276:10
**jump** 164:7
166:14 167:13
186:5
**June** 27:11,11
27:11 76:14,14
106:15 107:20
108:1 120:14
138:1,24
139:15 141:11
146:10 190:13
190:16 193:21
193:22 195:2
198:2,9,17
199:6 206:14
208:1,9 249:24
260:8,12,23
**Justice** 3:15
51:3,10 189:12
190:9 281:5

**K**

**Kahn** 2:24 3:4
280:7,19
**karma** 183:22
**keep** 13:19 99:9
263:3
**Keith** 138:25
168:5,11
177:15
**Kelly** 90:17,24
**Ken** 51:11 150:6
268:14
**KENNEDY** 2:1
2:14
**kept** 176:16
177:5
**KEVIN** 2:1,14
**kind** 1:10 36:2
58:3,4 89:12
117:1 148:8
150:17 154:25

169:10 177:23
182:16 183:12
186:17 239:7
242:23 251:7
271:12
**kinds** 91:5
136:15 154:6
**knew** 34:12
60:16 71:14
137:24 140:5,8
144:20,23
145:1,1 160:2
168:15 177:22
182:9 198:13
215:16 262:9
271:6
**know** 9:1 12:6
12:23 13:17
16:17,17,18,21
17:23,24 18:4
18:14,14 19:24
20:2 22:7 23:8
24:6,7,14
26:10,11,13,16
27:2,13 29:20
32:22 33:1,12
34:22 36:9,18
36:20 37:8
38:3,7 39:2
40:20 41:1,21
43:1,3 44:1,8
44:12 45:4,7
45:12 47:3
48:21,22,22,24
49:18 50:12
52:12 54:18,19
54:24 56:18
57:24 58:18,19
58:22 59:14,22
60:20 61:3,5
61:16,18,20,23
61:24 62:3,4,6
62:11 64:24
65:1 66:1,24
68:19 71:15,24
73:19 75:22
76:6,9 77:7
80:16,21 81:4
81:4 82:2,2,6
82:16,19,24
85:17 86:17,17
87:25 88:19
89:25 92:22
93:18 94:6
95:24 99:20,24
100:8,12,14,15
100:19 102:17
102:17 105:13

Halma-Jilek Reporting, Inc.    Experience Quality Service!    (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 87 of 107   Document 188

**Baldus vs. Brennan**　　　　**2/22/12**　　　　**Deposition of James R. Troupis**

Page 298

105:17,18
106:9,17,20,21
106:21,25
107:3 109:18
111:9,11
112:11,12
113:11 114:1,9
114:20,22,25
115:2,5 117:11
117:12,22
118:3,3 121:21
122:9,10 123:1
123:4,5,5,17
123:20,23,23
123:23,24,24
124:1,5,7,8,8,9
125:21 129:20
131:17,20,22
133:21 134:6
134:25 135:8
135:10,14
136:21,22
137:5,7 139:10
139:24 143:13
143:17,19
144:8 146:14
146:15,23
147:12 148:8
149:8,11
150:23 152:5,8
152:15,19,20
152:21 153:7,8
153:23 155:13
155:21 156:4,5
157:10 163:22
164:15 165:5
168:13 169:1,4
169:7,10 170:7
171:2,21 174:4
174:18 178:4
180:14 181:2,4
181:5,12
182:22 183:12
186:18,19
189:3 190:13
191:11 192:8
193:4,5 196:4
196:6,10 197:2
197:5 198:25
200:8 201:7,20
202:7,11 203:6
203:17,20
204:18,24
205:2 206:5,22
208:11 211:20
212:4 220:7
222:7 224:17
224:20 225:16

226:22 227:16
231:7 232:23
234:18 238:5
240:12,18
241:11,19
244:25 248:21
250:9 258:12
258:14 262:5
266:12 268:9
270:2,5 272:2
275:8,16 278:1
278:8 279:1,4
**knowing** 82:11
146:4
**knowledge**
17:17,22 19:22
22:18 34:4
56:25 57:15,18
114:3 120:10
140:3 145:11
145:13 149:15
245:6 248:11
258:1,4
**known** 33:16
50:1 60:21
75:25 76:10
78:13 99:20,21
100:10 101:6,6
115:24 123:5
123:10,14,15
123:20 124:9
124:11 144:24
156:2,23 165:7
165:15,16
169:1 203:14
229:10,16
231:8
**knows** 51:19
93:14 100:23
**KRESBACH** 1:5

─────── **L** ───────

**la** 2:8 3:10 6:13
6:22 64:5
114:14 139:7
139:22 140:9
144:6,11
240:20 241:14
242:8 257:24
280:25
**lack** 42:23
102:24 111:8
146:23 270:3
270:22 279:2
**LANGE** 1:8
**language** 79:10
80:7 172:15
186:11,20

209:2,15,22
210:3
**large** 91:25
134:9 140:24
141:16 179:23
215:20 244:6,7
245:1
**larger** 217:6
234:13
**largest** 126:9,19
129:14,21
130:5 156:7
278:14
**late** 27:11 51:6
86:16 108:3
120:7,19
181:12 189:18
203:15
**latest** 248:16
**Latino** 8:11 9:9
10:15,21 11:7
11:10 90:14,23
93:6 96:6
97:20,21 98:17
99:15,25 100:9
100:12,14,20
100:22 101:22
102:2 103:5,20
104:5,13,24
105:9 110:11
110:15,19,24
111:1,3,14,20
112:3,9,15
113:2,12 114:5
114:11,20,23
118:14 120:6
123:17 126:9
126:18 127:4
127:16 129:18
131:7 134:7
135:12,19
136:25 137:9
139:20 141:13
141:20 144:2
144:18,20,21
145:8,10,18,22
146:9,18,25
148:22 149:5
156:9 195:17
195:25 197:4
198:23 214:19
214:25 215:11
215:16 223:4
223:13 234:6
234:12 242:15
250:2 258:8,21
270:8,9,11
271:2,10

278:15
**Latinos** 91:25
92:1,9 97:23
98:19 99:22
102:14 234:19
241:3 269:15
269:17,25
270:20
**law** 3:7,23 7:2,7
7:18 8:3 27:8
28:21 32:22
35:1,3,11,14
35:19 36:9
38:22 39:12,14
40:3,20,23,25
41:10 42:19
44:23 46:18
52:16 56:15
57:11 61:22
62:1 71:22
72:6,13,17
76:19,20,22
84:5,7 92:20
93:10 94:16
113:19 120:23
120:24 200:22
202:15 239:14
280:22 281:13
**laws** 224:4,5,10
230:17
**lawsuit** 126:25
127:7
**lawyer** 7:18,24
40:24,24 47:5
47:7 65:1
67:14 88:23
89:2 93:10
113:19 121:22
162:19 178:5
239:9
**lawyers** 18:6
48:21 49:25
88:6,13 94:25
171:19 173:15
187:16 230:8
230:16 250:5
**Lazar** 3:18 71:7
71:8 281:8
**lead** 50:18 51:4
89:2 136:9
229:10
**leader** 20:21
22:7,25 23:19
27:2,13 28:6
30:12,21 33:4
33:22 34:1,21
36:11 38:24
40:7 43:12

44:2,3,14,22
46:3,8,10
48:18,22 49:5
49:11,14 52:17
57:11 75:8
123:9,11,13
131:7,8 161:7
164:16,18
182:13,24
186:24 187:17
199:17
**leaders** 20:14
27:12,16 28:2
28:2 89:14
162:9 164:10
164:13 171:17
198:8
**leadership** 45:20
46:19 66:12
74:17 75:1
193:20 194:2,5
194:6 195:1
198:10,11
199:11,14,15
208:1 238:12
261:19
**leadership's**
53:16
**leading** 218:20
225:25 229:13
233:23,25
238:14 243:9
243:13 259:11
263:12,18
**leaps** 234:19
**learn** 241:21
**learned** 109:19
115:6 248:9
**leave** 75:17
189:10 279:9
**leaving** 50:23
**left** 50:9 56:22
56:22 160:12
**leg** 155:15,16,16
**legal** 9:8 27:25
38:2 48:18
50:4 75:3
87:24 89:7,9
89:10 92:3,12
94:16,21,24
95:2 105:22
106:11 112:12
112:16 114:6
114:16,17
121:6,9 126:9
126:19 127:18
129:14,14,19
129:21,25

Baldus vs. Brennan    2/22/12    Deposition of James R. Troupis

Page 299

130:5 136:2,10
136:19 141:4
156:21,25,25
157:7,10 195:8
209:19 214:16
216:20 219:10
230:13 238:21
248:17 250:8
278:14
**legality** 122:1,3
**legally** 40:16
199:2
**legislation**
96:16 209:3,4
209:17,19
210:7,22
**legislative** 8:6
32:14 53:16
59:19 63:11
105:24 109:17
112:17 154:15
195:9 209:16
211:25 222:9
262:23 263:1
263:21
**legislator** 61:25
**legislators** 8:7
27:7 59:4,9
62:7 63:12,17
63:18,25 64:7
64:12 71:13
72:8,13 173:18
198:5 246:18
261:21 262:8
**legislature** 9:8
18:21 26:6
28:7 39:13
40:4,6 42:19
43:10 44:6,24
45:19,20,24
48:19 60:16
64:2,6,14
71:18 74:24
75:1 114:9
120:23 122:16
151:7,11,21,25
158:8,14
159:13 173:24
174:10 196:25
216:5 262:2,5
262:12
**legitimacy**
122:1
**length** 8:24
**lengths** 218:24
**lengthy** 32:23
259:10
**LESLIE** 1:4

**lesser** 269:17
**letter** 4:10,11
13:5 14:6,7,8
14:14,25 15:23
16:23,24 17:6
23:21 28:22,25
29:15,17 30:7
36:8 37:9 38:4
38:16,21 39:11
40:25 41:16,16
42:7,12 44:11
45:14 158:11
161:5 172:1,9
172:13 183:11
185:7,7,9,11
185:12 186:6
186:12,15,16
**letters** 30:13
126:1 175:10
176:5,12 177:5
187:7,9 276:13
**let's** 9:18 37:4
38:8 45:15
52:3,14 62:5
64:18,18 99:13
101:2 104:19
110:3 117:2
122:11 123:1
126:15 127:21
130:10 131:23
133:2 134:3
149:16 175:1
178:16 181:14
183:25 203:3
205:19 254:16
259:13 272:16
276:6
**level** 89:15
115:1 145:19
146:6 182:12
211:11,11
212:4 242:16
242:22 269:14
**levels** 270:9,11
**levity** 184:2,6
202:25
**Lewis** 3:25 7:6,7
281:15
**liberty** 84:6,8,15
**lieu** 247:12
**life** 122:24
156:18
**Liki** 180:16
**limit** 244:21
**line** 90:4,4,9,10
95:11,11 155:6
155:15 161:15
166:14 173:1

173:17 185:9
186:21,22,23
191:22 213:25
214:2 236:18
246:24 247:15
254:24 259:23
**lines** 48:1 68:13
150:14 214:10
224:1
**lingering** 10:2
**list** 17:2,4,5,8
31:17 77:17,20
124:16 132:18
138:5 162:25
170:8 199:18
201:21 214:21
219:19,20
253:24 264:17
265:7 273:24
**listed** 16:1 21:13
24:8 28:21
132:14
**listen** 116:5
**literally** 190:6
**literature** 92:19
92:20
**litigation** 19:17
50:19 109:20
121:19 140:25
141:12,14,17
141:19 161:17
161:24 162:16
168:20 177:5
178:7 186:3,7
204:20 224:15
224:18 244:24
246:17
**litigator** 66:3
**little** 9:19 41:3
54:9 114:25
130:24 155:19
158:12 171:19
189:6 196:2
197:25 201:2
202:12 206:11
215:18 239:3
254:10 257:10
257:25 262:1
276:3
**live** 55:18 64:5
148:14,15
247:12
**lived** 148:9
157:2,8
**lives** 100:22
154:5,10,24
**living** 154:11
182:9

**LLC** 3:23 281:13
**lobbying** 182:10
182:16
**local** 210:18
211:11
**locally** 156:16
**locate** 52:15
**located** 52:25
53:5 58:5
115:16
**locked** 96:19
244:11
**locusts** 114:1
**long** 29:17 32:19
43:24 65:1
74:10 75:25
76:2,4,7,7,9,10
77:10 80:22
94:1 95:15
96:6 97:19,24
98:24 99:21,22
104:15 105:1
105:11 157:19
165:7 183:5
199:4 205:25
211:13 216:25
238:1
**longest** 36:21
**look** 17:7 20:22
22:24 29:2
129:20 132:16
132:17,18
134:3 138:8
142:11,15,19
143:11,14,22
158:20 162:25
170:8 171:1
172:10 175:7
184:16,21,25
185:20 190:25
192:23 194:19
194:20 200:4
200:13,16
206:4 214:16
219:15 220:25
224:2,7 225:21
239:9 240:3
242:5 253:11
253:19 271:4,5
274:9
**looked** 12:2
29:16,24 69:11
89:12 130:24
142:20 144:24
148:19 207:8
251:22 252:12
253:12 258:2
**looking** 20:15

22:25 69:6
70:14 134:1,1
138:16 149:9
190:19 195:5
200:24 201:8
202:2 223:22
224:3 237:9
275:6 277:15
278:3
**looks** 78:2 86:2
126:2 134:12
135:1 136:6
143:7 150:23
183:16 206:10
278:2
**loose** 87:15
**lose** 144:2 244:8
**lost** 25:18 87:5
89:16
**lot** 8:9 11:11,11
12:1 34:2
36:25 50:6
61:11 88:1
99:3,21 114:22
115:15 121:16
123:20 127:19
134:25 147:15
147:15 150:3
153:24 167:25
210:12
**love** 166:20
**lower** 221:23
222:17 256:8
269:17 270:1
270:11
**lucrative** 181:24
**L-I-K-I** 180:16

--- M ---

**M** 3:5 280:20
**machine** 282:1
**Madison** 3:17
60:15 71:9
114:14 179:24
180:6,7 182:7
188:24 189:2,4
281:7
**Main** 3:16 281:6
**maintain** 72:20
89:18
**maintained**
210:19
**maintaining**
181:23,25
182:12
**major** 13:14
50:4 51:14,18
51:18 52:1

Halma-Jilek Reporting, Inc.    Experience Quality Service!    (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD    Filed 02/23/12    Page 89 of 107    Document 188

**Baldus vs. Brennan**          **2/22/12**          **Deposition of James R. Troupis**

Page 300

167:23
**majority** 10:22
  11:1,9 20:21
  22:7,25 23:19
  27:2,13 28:6
  30:11,21 33:4
  33:22 34:1,21
  36:11 38:24
  40:7 43:12
  44:13,22 46:3
  49:11,14 52:17
  57:11 74:22
  75:8,12 90:14
  90:23 118:20
  161:7 162:9,9
  164:16,18
  171:17 174:16
  174:17,20
  182:13,24
  186:24 187:16
  199:15,16
  234:6 235:17
  235:17 236:10
  236:10 237:7
  241:9
**majority/min...**
  80:25 216:14
**makeup** 196:12
  196:18
**making** 34:18
  77:25 83:6
  90:13 113:9
  127:16 131:1
  154:6 172:25
  196:3 255:16
  258:25 259:1
  266:13
**MALDEF** 93:20
  95:6 102:3,4
  110:17 111:13
  125:3 128:14
  128:21 129:2
  129:23 130:7
  133:24 134:16
  135:2,3,10
  141:23,25
  146:16 196:4
  198:24 219:3
  219:11 249:16
  249:19,25
  250:3,19 251:6
  254:25 255:24
  256:8,11,17
  257:12 258:11
  259:1,7,15
  273:10,12
  274:8,13 276:7
  276:14 277:11

277:18
**MALDEF's**
  129:17
**man** 82:18
**Manny** 101:3,5,5
  101:17,17
  106:25 122:18
  123:1 126:12
  130:18,22
  131:3,5,15,24
  133:10,19,23
  133:25 134:2,7
  134:15,19,24
  135:3,7,11,15
  136:12,18,20
  257:19
**Manny's** 135:2
**Manuel** 101:3
**MANZANET** 1:8
**map** 71:20 81:22
  98:24 108:6,9
  108:21 118:23
  125:3 131:6,15
  131:18 133:20
  134:9,9 135:20
  139:14 143:19
  143:20 144:4,4
  151:18,24
  194:19,24
  198:13,20
  199:11,13
  211:25 212:24
  214:17 221:25
  222:19 227:20
  228:3,9,13
  229:2 238:9
  245:22 255:12
  261:20 262:15
  262:17,22
  277:19
**maps** 109:25
  110:5 118:24
  119:2,9 131:20
  141:16 143:15
  148:25 149:4
  153:18 174:12
  190:11,19
  198:3,16 201:5
  201:11,14,17
  201:18 202:3
  205:6,8,16
  207:22 211:6
  212:23 226:23
  226:25 229:20
  252:22 255:7
  259:8 260:10
  260:12,15,23
  261:17 263:22

275:11
**Maria** 3:17 71:7
  281:7
**mark** 14:16 38:8
  77:14 78:12
  124:22 158:15
  175:2 205:19
  264:8 273:19
**marked** 4:9
  14:20,23 28:12
  37:2 38:9,12
  69:4,16 70:8
  78:15 81:10
  83:12 85:2
  116:6 124:14
  131:24 132:16
  138:3 149:24
  158:17 162:22
  165:25 166:2
  170:15 175:3
  178:22 179:5
  184:13,20
  187:23 191:16
  193:12,16
  200:12 205:21
  219:14 220:24
  221:2 237:11
  264:23 265:3
  273:20
**Marquette** 76:19
  76:22
**marriage** 94:6
**married** 182:6,6
**Mary** 52:24
  54:19
**match** 36:19
  81:22
**materials** 39:19
**matter** 36:3
  50:24 53:7
  96:20 105:24
  108:18 109:12
  114:6,6,16
  121:19 128:3
  130:9 131:14
  146:8 161:24
  186:2,21
  202:20 208:14
  214:4 230:1
  233:17 238:21
  266:21 281:20
**mattered** 128:20
**matters** 21:5
  50:22 65:15,16
  82:9 84:14,17
  159:15,21
  161:17 186:7
  239:10 262:3

**maximize**
  245:24
**MAXINE** 1:7
**Mayer** 51:11
  150:6 260:4
  265:18,20,22
  266:2,17 268:2
  268:14
**ma'am** 103:17
**MBF000218**
  265:5
**MB&F** 173:1,2
**McGiver** 54:20
  55:25
**McLeod** 4:10
  13:6,8,12,15
  13:15 14:11
  15:2,18 16:3,7
  17:20 19:25
  20:16 22:14
  24:3,16,21
  25:4,8 48:25
  51:16 67:1
  75:21 78:6
  88:7,15 89:9
  90:13 117:4
  139:1 159:10
  159:20 163:18
  167:22 168:3
  175:25 191:24
  206:17,22,25
  207:6 221:5
  276:12
**McLeod's** 62:18
**mean** 8:20 12:7
  14:1 22:5,12
  24:5,6 26:11
  26:15,18 29:2
  33:13 39:2
  40:15 43:16
  48:3 49:17
  51:18 53:21
  56:15 64:24
  65:2 73:12,16
  74:19 79:5,6,8
  79:10 80:15
  83:19 92:17
  94:12 99:2,20
  101:5 108:1
  112:24,25
  117:16 127:12
  127:22 137:21
  140:18,18
  143:7,8 144:4
  145:24 146:20
  146:21 147:12
  147:15 148:8
  151:6,9 152:19

153:13,23
  154:12 158:24
  160:16 164:21
  167:20,20
  172:20 180:4
  181:4,25 182:2
  182:3 183:19
  185:16 190:23
  194:23 197:16
  223:17 225:15
  242:14 243:21
  243:23 252:2
  255:11 262:13
  271:24 274:16
  275:5 277:7
**meandering**
  217:1
**meaning** 91:12
  145:2
**meanly** 140:18
**means** 21:8
  91:13 92:18
  127:13 129:10
  133:23
**meant** 125:15
  246:1
**measure** 141:16
  187:15 216:3
**mechanism**
  30:15
**medical** 156:8
**meet** 27:7 71:12
  128:15 174:19
  174:22 189:4
  189:19
**meeting** 81:21
  86:13 114:17
  120:6 163:11
  173:18 179:16
  179:23 190:1
  190:23 193:20
  196:23 198:8
**meetings** 26:20
  26:23 27:1,4,8
  27:11,18,21
  48:2 71:21
  72:5,8,12,12
  72:15,16
  107:21,25
  113:1 173:24
  190:15,19
  193:23 194:1
  194:22 195:1,3
  196:10,17
  197:23 198:5
  207:18,25
  208:2
**member** 10:17

**Baldus vs. Brennan**          **2/22/12**          **Deposition of James R. Troupis**

Page 301

45:24 46:4
49:2 64:13
71:18 89:9,10
99:17 102:20
106:10 107:1
121:6,9 210:25
263:2 270:19
272:5
**members** 1:13
2:12 6:8,14
26:14,22 44:10
64:2 73:12,22
74:18 97:22
99:18,24,25
100:8,14
104:12,23
105:8 110:10
138:22 142:16
142:23 148:14
165:20 173:24
174:9,15,20,23
180:5 199:20
206:18 207:1,7
207:20 208:7
208:21 212:18
258:21 262:2
262:15 263:2
280:16
**membership**
179:23 180:2,4
180:8
**memo** 166:16,23
167:19
**memorialize**
39:22 253:3
261:15
**memorializes**
14:10
**memory** 20:3
36:15,25 37:1
192:3 225:11
**mention** 185:3
253:4,5
**mentioned**
115:13 123:8
194:15 198:7
269:7
**mentioning**
217:21
**message** 181:22
183:1
**met** 123:24
128:16 129:6
144:14 189:20
232:24 250:21
252:5
**meticulous** 82:7
**Mexican** 219:10

**Michael** 1:14
2:13 27:9,20
28:1,6 29:7,12
30:10,12,16,17
31:1 36:12
37:14,23 38:22
39:13 46:15,23
49:19 50:10,11
52:16,24,25,25
53:3,9,12,17
54:3,16,21
56:4,20,22,25
57:7 58:5,11
58:17 60:3,24
61:22 62:10
71:22 72:6,14
88:13,25 89:1
160:10,11
161:8 172:14
173:14 182:14
186:14 190:2
229:20,21
**Michelle** 1:21
2:22 18:12
280:3
**middle** 107:22
155:14 168:4
221:4 255:7
**Middleton** 3:24
189:24 281:14
**midst** 71:4
**Millis** 35:3
**Milwaukee** 1:20
2:25 3:5,8,12
3:20 6:4 8:11
84:10 93:3
97:4 99:22
100:12,19,20
100:23 101:19
104:6 111:1,3
111:14,20
112:20 113:13
114:21 123:21
126:19 137:1,8
137:10,12
139:5,20 140:6
144:20 145:8,9
145:16 146:3,6
146:7,18,20
147:16 149:4
152:20,25
182:7,10 194:2
194:11,23
195:2,5,9,10
196:1 201:18
205:2 208:11
216:18 223:14
238:4 240:23

241:12,22
244:13,19,23
245:3 248:23
250:3 251:4,5
256:20,22
257:4,7 258:7
258:13,21
280:2,7,20,23
281:2,10 282:9
**Milwaukee's**
112:8 146:9,25
**mind** 40:2 93:7
**mine** 36:17
116:3 204:2
240:14
**Minimal** 71:4
**minimum** 21:19
**minor** 241:8
**minorities** 148:7
244:8
**minority** 44:3
74:13,18 81:21
81:25 92:23
141:6 148:1
174:16,23
195:12 199:20
214:17,18
215:10 216:23
222:2,9 223:1
223:7,10 241:1
**minority/maj...**
214:24 215:6
218:3,10
**minute** 23:14
29:14,14,14
35:22 36:8
86:2,6 99:19
116:16 130:25
139:18 175:7
184:21 194:15
200:13 208:2
216:19 254:22
258:2
**minutes** 80:23
133:15,16,18
134:20 140:20
175:12 178:14
187:19 268:22
269:2
**mischaracteri...**
138:17
**misheard**
274:25
**misinterpret**
66:18
**misleading**
277:8
**misread** 100:5

125:17
**missing** 275:18
**misspeak** 100:2
**misspelled**
134:13 192:7
**misspelling**
142:7
**misstate** 182:3
**misstatement**
45:21,22
**misstates**
142:25
**mistake** 65:23
**mistaken**
172:12
**misunderstand**
204:8
**misunderstan...**
41:8 210:13,15
**misunderstan...**
43:18
**Mm-hm** 176:21
**mobile** 84:3
**mode** 18:8
**model** 53:8,9
55:11,15
**modern** 244:5
254:12
**moment** 36:23
37:19 38:14
69:9 99:20
116:10 124:17
138:8 162:25
177:24
**Monday** 179:16
194:1 196:10
196:17 275:21
**money** 129:23
130:1,7 203:25
**monitor** 137:7
**monitoring**
136:24 137:2
**month** 30:24
31:18,19
141:11 146:10
189:14 255:18
**monthly** 33:5
34:10 167:7
172:25
**months** 119:5
170:1
**MOORE** 1:5,10
**morning** 93:15
93:24 140:21
265:11 267:3
**Moscow** 166:17
**Moses** 174:4
**motion** 236:21

247:8
**mouth** 145:25
**move** 96:18
148:2 153:18
183:4,6 217:1
222:12 225:13
231:4 236:17
246:23 247:15
248:11 252:25
258:23 259:3
259:11,23
261:10
**moved** 148:16
148:17 153:19
229:20,21
**movement**
147:23 148:6
153:12,21
**movements**
216:16
**moves** 96:16
**moving** 182:7
235:16 236:9
**municipal**
145:19
**municipalities**
209:2 211:4,17
249:12,13
**mysterious**
185:12

_____
**N**
_____

**N** 3:3 4:1 6:1
280:18
**nail** 45:15
**name** 6:2 17:1
84:6 113:9
226:14 249:21
250:21 255:4
**named** 247:21
247:24
**names** 225:17
**name's** 158:24
**narrative** 217:1
**narrowly** 19:15
**national** 129:24
196:3,4 198:23
**nature** 29:22
35:18 63:16
64:6 74:25
84:11 94:10
209:15 210:22
**Near** 76:17
**nearly** 244:20
**necessarily**
42:22 98:4
184:6 215:15
228:20 246:2

Baldus vs. Brennan 2/22/12 Deposition of James R. Troupis

Page 302

necessary
177:10,12,14
178:12 242:15
need 9:14,25
22:1 37:1 41:4
49:3 53:14
54:11,12 61:16
61:18 67:15
74:5 81:24
82:5 94:7 97:8
106:6 134:9
171:18 177:7
206:8 219:22
220:5 236:1,4
241:5 243:22
264:17,20
266:11
needed 49:8
60:20 82:23
83:2 106:4
141:5 144:3
208:7 209:21
246:19 262:10
262:10
needs 120:6
275:14
nefarious
231:11
negatively 148:6
negotiate 32:18
34:25
negotiated 35:2
negotiating 33:2
negotiation 39:8
134:14 136:6,9
227:17
neighborhood
149:12 152:6
152:13
neighborhoods
147:17,22
148:5,7 152:21
152:24
neither 62:3
70:21
never 18:1,2
22:17 47:8
74:14 82:10
90:12,20 129:6
144:13,14
145:21 148:12
189:15 204:11
240:1 264:12
new 10:10 152:3
153:1 154:7
158:14 159:17
206:18 207:1,8
217:3,13,24

218:2,10,23
238:7 272:7
newly 218:3
newspaper 67:3
137:10
newspapers 55:3
66:7
nice 221:24
222:18
NICHOL 1:14
2:13
night 11:17
93:12,13,14,22
94:5 107:24
175:9 189:25
Nina 110:20,20
113:8 196:6
249:21
nineties 45:3
nobody's 94:12
148:16
nondisclosure
69:22
nonlegal 112:17
nonlitigation
161:17
nonminority
218:9
nonresponsive
216:25
noon 125:13
normal 18:9
57:2,2,18
63:21,22 66:8
71:16 72:9
263:9,15,20
normally 177:17
186:15
north 2:25 3:4,7
3:12 155:3
255:10 273:7
280:7,19,22
281:2
northern 155:7
269:15,24
north-south
273:13 276:18
276:19
Notary 2:23
280:4 282:6
notch 155:12,12
155:13,14,19
155:20,23
156:1,6
note 109:10
205:11
noted 17:6
20:11 47:22

109:8,9
notes 282:1
notice 15:5 17:1
86:25 118:9
noticed 140:2
nots 103:24
number 6:10,16
7:20 18:17,18
31:17 33:3
35:4 47:21
54:22 78:9,11
82:8 84:3
88:22 104:8
122:6 124:19
124:23 131:2,4
133:11,13,25
135:2,6 156:17
158:25 170:10
171:13 175:21
175:22 178:19
178:25 179:23
188:9 196:22
198:21 205:1
206:1,9 207:4
208:15 214:20
214:22,23
224:2 241:8
243:25 244:22
246:8 250:8
254:8 257:18
272:18,22
275:8,9
numbers 81:23
82:4,22 83:1
91:25 140:15
206:3 222:1,3
223:3,6,9,17
223:19 242:23
243:5,17 244:8
245:1 252:13

─────────
O
─────────

O 6:1
oath 21:20 22:1
object 9:12
42:21 55:13
57:24 60:6,7
65:20 99:4
142:25 147:1
213:7,14 214:7
216:24 218:19
221:12,18
222:11 225:2
225:24 226:18
227:8,22 228:5
228:18 229:4
229:12,22,24
230:9,24

231:14 233:8
233:14,22
234:8,16,22
235:3,12,13,18
236:12 238:24
239:21 241:15
241:17,23
243:7 245:9
246:10,21
247:8,14 249:7
252:15,24
256:13,23
258:16 259:2,9
260:11,21
263:6 269:20
270:12 275:3
objected 90:24
102:11 147:8
objection 38:1
46:25 58:9
79:4 80:7,14
90:16 92:2,11
102:24 108:11
109:8,9 111:8
126:23 147:10
203:10 214:13
229:13 230:10
233:22 235:22
238:15 239:23
258:17 259:20
259:21 260:16
261:10 277:14
278:17 279:2
objections 235:5
238:19,24
259:4
objective 41:19
objectively
82:19
obligated 239:9
obligation 267:1
267:7
obligations
67:15 267:8
oblivious 122:14
observation
120:10
observing
120:11
obtain 18:20
62:1,8
obtained 224:17
obtaining 80:12
obtuse 254:10
obviously
101:24 152:19
202:21,23,23
203:24,25

occasion 107:21
123:24 252:3
occur 27:19
72:17 74:15
78:24 103:7,23
154:1
occurred 30:14
59:1 73:17
115:12 129:22
134:19 151:18
205:3
occurring
148:21 208:9
odds 239:18
offered 251:3
offering 229:2
233:16
offhand 11:13
107:4
office 3:16,23
7:7 12:23 21:4
28:21 50:9
56:23 57:7
75:18 94:20
230:6 249:23
281:6,13
offices 3:7 27:8
27:20 50:12
56:15,17,20
72:17 180:7
190:2 280:22
official 1:14
2:13 26:6
27:14 232:16
233:18 237:5
off-site 230:23
oh 11:16 37:4
73:14,14 75:13
76:5 97:6
103:15 107:16
132:10 168:16
180:10 183:20
191:18 199:25
200:2 204:24
208:16 210:5
263:5 269:11
okay 7:20 8:23
9:6 10:13
12:14,14 13:5
18:2,17 19:12
19:15 20:3
21:20 24:11
25:22 26:5
28:17 31:22
32:6 36:13
37:4,13,21
38:15,21 40:15
42:6,10,17,17

Baldus vs. Brennan 2/22/12 Deposition of James R. Troupis

Page 303

45:15 46:6
49:8 57:17
59:16 60:1
62:5,22 65:3
66:4 67:7
68:22 69:5,9
70:16 74:23
75:3 80:6,12
84:2 85:23
87:23 89:5,12
89:21 90:7,18
90:19 91:2,3
91:12 92:7
95:9,20 97:11
98:7,16 100:7
103:4,10,10
104:11 107:5
110:3,7 111:17
111:21,22
113:20 116:23
117:2,24
122:11,21
123:22 124:6,6
124:18,25
125:1 127:21
127:21 129:9
129:17 130:11
130:20 131:14
131:23 132:11
132:19,24
134:18 138:10
138:16 142:2
143:6,23
144:17 145:7
150:13,15
153:1,11
154:14 155:11
157:13 161:13
163:2,6 164:7
166:4,25
170:25 171:7
175:16,17,19
180:8 184:3,16
188:2 190:10
191:18 200:2,4
200:18 206:5
206:16 208:5
208:16 214:15
226:17 227:14
231:10 232:21
240:17 250:12
251:11 252:5
252:10,18,19
253:8,13,20,20
256:7 263:1
264:18 266:5
269:13 273:25
274:24 276:1,6

**old** 143:3 149:13
150:8,15,17,18
150:21,22,24
151:3,4 152:4
152:17 154:11
217:3,12
218:22 271:17
271:23
**older** 85:24
**OLGA** 2:8
**Oliveri** 101:11
**omit** 31:13
**once** 36:16
57:21 139:12
161:6 173:1
225:11
**ones** 12:2,11
23:6 25:3
77:16 91:19,20
101:15 127:24
180:10 199:12
219:18 253:16
253:17 267:5
**one's** 154:23
200:4
**ongoing** 68:7
173:23
**open** 84:18,25
154:23 217:20
217:24 236:15
266:21
**opened** 266:5,7
**operated** 57:1
59:16
**operates** 57:1
**operation** 51:15
**operative** 80:6
**opinion** 92:12
92:12 102:6
108:18 201:16
204:1 218:18
250:12,18,25
252:1
**opinions** 48:20
191:8
**opportunity**
138:15 154:21
215:12 216:7
218:5 223:13
242:20 245:24
248:1
**opposed** 17:4
71:22 87:24
**option** 126:13
130:19 196:23
197:2,6
**options** 196:16
196:22 197:11

197:15,19
199:1
**oral** 14:9
**ordeal** 36:21
**order** 13:20
67:17 70:17,23
81:6 153:15
154:19 166:8
199:1 239:10
239:12 241:2
242:17 246:3
246:20 267:3
**ordinary** 263:23
**organization**
84:9,11,13,19
84:24 140:10
196:4
**organizations**
144:20
**orientation**
196:12
**original** 5:1,1,3
42:17 215:23
282:1
**Ottman** 17:18
57:4 58:15,19
58:23 61:21
71:12 78:5
117:3 139:2
159:9,20
171:11 174:15
175:22 188:13
193:25 207:10
208:20,23,25
209:8 221:7
276:12
**ought** 211:10
245:23
**outcome** 36:24
239:8
**outset** 161:23
**outside** 95:16
124:6 173:15
**overcharge**
177:19,20
**overcome** 272:9
272:10,14
**overkill** 142:8
242:13
**overlay** 150:7
**owned** 60:18,24
61:2,4,20
**ownership** 52:7
**o'clock** 3:2
280:9

_____
        **P**
_____
**P** 2:5 3:3,3 6:1

280:18,18
**pack** 242:22
245:1
**packed** 244:1,7
**Packers** 112:4
**page** 1:17 4:2
15:5 83:22
90:4,9 95:11
138:11 161:12
161:15 170:21
179:10,12,12
179:15 184:25
200:14,24
206:12 232:19
240:13 242:5
273:23 274:3
275:7,18 276:6
**pages** 83:19
208:15
**paid** 30:8,11,12
30:15,23,24
31:2 32:2 33:5
40:23 160:16
171:21
**Panzer** 52:24
56:2,3 66:13
**paper** 20:17
33:16 62:25
63:1,3
**paragraph**
130:11,15
140:13 176:2
176:15 177:8
185:20,22,24
258:5
**paragraphs**
186:5
**pardon** 223:7
250:18
**paren** 125:10,11
**parens** 188:18
**Paris** 202:10
**part** 10:5 11:23
30:10 39:7
55:22 69:5
76:21 78:19
79:18 92:9
115:7,8 128:23
135:22 148:12
148:13 155:8
159:17 162:10
162:13,15
165:3 166:19
174:16 202:19
203:9 204:21
209:3 211:20
212:1 228:21
228:24 230:13

230:13,15,16
238:4 240:1
262:6 266:7
269:18,24
270:1 272:7
**participant** 59:6
**participate**
32:24 74:7
118:1 168:14
169:19
**participated**
12:18 50:22
53:5 74:11
227:17
**participating**
165:21 204:18
**participation**
59:25
**particular** 96:19
96:24 102:6
108:5 115:15
140:23 210:22
212:24 223:2
225:5 230:5
244:6 262:9
273:6
**particularly**
84:17 93:3,4
105:25 218:2
**parties** 13:22
17:14 41:18
74:18 153:9
**partisan** 239:8
**partner** 40:19
40:25 58:11
**partners** 200:21
**parts** 269:15
**party** 36:5 44:11
50:3 57:9
59:21 77:21
95:6 174:16,17
174:23 199:21
211:7
**pass** 232:8
**passage** 10:18
117:9 120:15
**passed** 117:14
120:22,23
151:25
**passing** 124:11
**Patrick** 3:13 7:1
69:20 93:12,14
95:8 150:1
237:11 281:3
**patterns** 270:25
271:19 272:6
**PAUL** 2:4
**pause** 149:16

Halma-Jilek Reporting, Inc. Experience Quality Service! (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD Filed 02/23/12 Page 93 of 107 Document 188

Baldus vs. Brennan     2/22/12     Deposition of James R. Troupis

Page 304

**pay** 152:19
173:14
**payback** 183:22
**payment** 33:6
173:2
**payments**
173:12
**pays** 30:10
**PDF** 20:18
**Pedro** 99:21
100:15,17
101:9,10 215:2
271:14
**pejorative** 65:9
65:15,18
**pending** 6:10,16
126:24 127:6
280:13
**people** 8:9 16:1
17:7,19,24
48:21 50:14
54:23 66:14
74:5,16 75:15
75:16 86:3
101:18,25
112:14 119:8
121:24 123:8
123:21 147:15
148:3 153:19
153:20,20,22
158:25 159:24
165:11 175:21
175:22 177:18
188:9 194:8
198:11,12,25
211:13 226:19
226:25 249:2
257:19
**Perales** 110:20
113:9 196:6
249:21
**percent** 118:9
118:14 119:10
142:8,9,10,13
142:15,20
143:11,16
144:1 148:11
153:5 214:25
221:22 225:17
241:6,6,7
242:7 243:21
244:20 255:8,8
255:9,9,21
256:5 271:9,21
**percentage**
222:16 234:13
242:17 243:23
255:23,24

**percentages**
9:10 141:4
246:20 255:15
276:20,23
**Perez** 2:8 101:5
106:25 122:18
123:1 126:12
130:18,22
131:15,24
133:10,19,23
134:7 135:15
136:12,18,20
257:19
**perform** 245:6
**performed** 21:2
**period** 30:5 51:6
51:25 74:21
96:15 107:2
110:4 126:14
141:14 189:22
190:21 198:22
207:19 208:9
208:12 227:1
**permutations**
43:22
**person** 48:23
73:22 75:5
99:15 103:5,21
106:22 123:6,7
123:19 165:12
197:20,21
246:14
**personal** 55:19
114:25 149:15
162:18 202:19
**personally**
144:14 151:10
157:4,5 160:13
160:14 270:14
**person's** 255:4
**perspective**
53:12 149:10
156:22,25,25
162:17,18
214:17 216:20
216:20 219:9
224:8 238:11
238:20,21
239:12
**persuade** 276:14
276:16
**pertain** 9:10
95:3
**pertained** 98:24
136:24
**pertaining** 202:3
**pertains** 95:4
**Pesky** 67:19

**Peter** 3:7,9 6:22
9:1 18:5 22:12
25:25 36:18
41:6 65:25
69:2 81:6 87:2
90:7 108:3
121:16 122:8
192:9 208:11
257:25 280:22
280:24
**Peters** 6:3
**PETRI** 2:4
**phone** 13:14
85:18,19
133:25 202:9
250:23 252:3
**phrase** 19:14
194:11
**piece** 39:25
151:2,3
**pieces** 99:3,13
275:18
**pitfall** 218:13
**place** 72:15
117:2 118:18
215:15 222:22
282:2
**placed** 249:22
**plaintiffs** 1:9
2:10,20 3:6,10
6:8,13,20,22
6:24 7:11
158:4,5 237:17
238:8 247:22
248:6 257:24
280:11,15,21
280:25
**plan** 64:14
126:21 127:18
130:22 218:16
231:25
**plane** 51:3
189:11,13
**plead** 220:20
**please** 6:19
14:14,24 78:9
80:21 125:2
126:5 132:8,15
175:19 179:6
184:3 185:10
200:17,19
201:7 221:11
232:12,19
233:6 240:6
248:1
**plus** 26:14
**point** 8:13 13:1
19:5 39:16

48:5 66:23
75:3,9,10 79:3
80:4 83:5 94:7
96:22 101:1
103:4,20
105:15 106:1
106:25 107:15
121:6,17 122:9
131:16,21
141:25 142:18
142:21 160:11
160:25 164:6
167:22 168:3
169:21 171:23
172:8,17,18
173:8 174:17
177:9 182:17
189:20 195:23
196:8 197:24
199:21 203:23
204:2,9,10,24
208:6 223:10
233:16 247:5
255:13
**pointed** 19:9
74:4
**pointing** 145:3
207:4 221:22
222:16
**points** 98:19
**Poland** 3:6 4:4,6
6:23,24 79:15
157:21 158:2,3
158:15,19
165:24 166:7
170:6,13,17
175:5,11,16,18
178:15 179:3
181:13 183:17
184:9,15 188:1
188:7 193:14
200:9,10
202:24 203:5
204:5 205:19
205:23 212:6
214:13 221:12
221:18 226:18
227:8,22 228:5
228:10,18
229:4,13,22
230:9,24 231:4
231:14 232:6
232:10 233:8
233:21 234:8
234:16,22
235:3,12
236:12,17,24
237:3,10

238:15,19,24
239:23 241:15
241:25 243:7
246:10,21
247:16 249:7
253:1 258:17
259:4,20
260:25 261:11
264:3,7,16,20
265:1,13,15
266:11 267:14
267:21 268:3,6
268:23,25
280:21
**polarized** 271:1
271:12,20
272:6,9
**policy** 154:15
**political** 16:15
92:19 114:6,8
**Polk** 174:5
**polled** 158:3
**poor** 18:12
**pop** 255:8,9
**populated** 148:3
**population** 8:11
8:22 9:10
10:15 11:7
92:9 118:15
153:12,16,21
214:18,19
215:1 217:4,14
223:14 242:17
243:23,24
244:20 245:2
245:18,25
246:4,5 252:20
255:20 256:4
**populations**
91:25 148:16
149:1 195:12
222:2,9,25
223:1,7,10
241:5,10 250:7
**Port** 182:8,9
**portion** 150:19
201:3
**position** 44:17
66:12 95:13
108:25 123:22
128:22 130:8
**possession**
15:16 16:5
22:21 24:1,14
**possibilities**
198:21 241:3
**possibility**
119:18 120:5

Halma-Jilek Reporting, Inc.     Experience Quality Service!     (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 94 of 107   Document 188

Baldus vs. Brennan      2/22/12      Deposition of James R. Troupis

Page 305

121:1
**possible** 15:21
90:22 118:13
121:12 125:25
129:18 215:25
216:3 218:4
**post** 124:2
**potential** 53:13
104:9 110:18
127:17 186:3,7
218:12
**potentially**
15:11 181:24
203:7 219:2
265:22
**practical** 96:20
105:24 121:19
214:4 262:18
**practically** 43:5
**practice** 182:11
182:16,20
**practitioners**
18:14
**precedent** 52:18
52:20
**precise** 45:1,11
61:13 98:16
132:13 215:14
227:16
**precisely** 15:21
60:16 210:11
**precision** 19:24
43:15
**predicate** 62:3,5
**predicated**
136:12
**predictable**
149:6
**predicted** 245:7
**predominantly**
148:2 237:20
**premier** 250:4,4
250:4
**preparation**
141:1,19
**prepare** 134:10
167:10
**prepared** 17:9
21:20 23:25
74:7 150:5
261:16
**preparing** 13:13
141:12,14
167:23
**present** 10:11
109:2 119:2,3
147:10 149:8
190:15,18

196:23 197:16
231:21 232:2
**presentation**
198:3
**presented** 49:13
151:11,20
196:17,22,24
197:4,12,15
**presently**
150:11
**press** 55:20
136:24 137:3,8
137:8 139:7
140:9 240:13
240:20 258:3
**prestige** 130:8
**presumably**
16:12 17:13,13
17:21 24:21
30:6,19,23
131:21 133:23
194:6 204:18
208:6
**presume** 63:22
**pretrial** 247:22
248:6
**pretty** 29:1
75:13,13 77:17
88:8 112:6
116:2 138:4
186:13 199:8
273:23
**previous** 163:12
181:19 211:4
**previously**
121:15 148:2
162:21 166:2
168:20 176:11
191:16 200:12
245:20 248:16
**primarily** 72:17
84:15 209:12
219:9
**primary** 25:16
91:19,20
**printed** 144:4
**prior** 9:7 10:17
23:24 35:15
42:23 52:22
66:9 83:18
85:19 117:11
133:16 136:18
136:19 137:14
139:14 143:1
167:3 182:5
203:16 209:24
214:23 217:23
221:25 222:19

222:23 224:17
229:2 271:6,7
**private** 179:17
179:19
**privilege** 12:10
15:7 29:18
93:21 141:8
162:4,6,11,14
266:22
**privileged** 69:25
140:25 141:9
200:8
**probably** 12:22
35:16,17 48:20
54:18 75:14
76:3 87:2
93:14 104:19
119:11 122:19
130:23 133:24
140:12 158:12
167:9 190:17
191:13 202:9
203:14 209:17
232:24 237:24
260:7
**problem** 47:4
121:23 142:6
209:1,13,14
242:6,11 243:5
243:16 245:17
**problems** 121:22
**Procedure** 2:22
**proceeded** 50:20
**proceedings**
204:16 225:19
232:17 237:4
281:20
**process** 8:16,24
11:24 12:19,21
13:3 16:8,16
16:20,23 17:12
19:11 20:5,13
21:25 22:11,23
23:9 24:16
25:13,15,17,24
26:8 30:25
32:3,15 33:18
34:5 37:25
40:13 46:8
48:19 52:15
54:16 56:4,5
57:23 58:21
59:11,20,23
60:3 62:2,9,13
63:8,21,22,24
68:3 71:16
72:25 73:2,3
73:17 74:3

75:16 76:13,16
77:2 81:24
82:4,22 83:1
87:19 88:14
89:22 92:8
96:22,23 98:4
98:10,20
101:23 102:7
102:13 105:25
107:15 109:18
112:17 117:16
117:17,20,21
117:25 118:5
120:7 136:20
137:11 139:15
139:17 141:15
146:3 151:18
158:9 160:1
161:23 164:19
165:13,22
169:20 172:7
173:22,22
174:8,13
179:24 187:13
187:15 190:3
193:10 196:20
198:6 203:9
204:22 207:7
209:24 210:13
211:5,17,23
216:17 223:22
227:2,5 228:22
228:24 230:13
230:14 239:3
249:5 252:2
256:21 257:23
258:9 259:6
261:19 262:7
262:11,18,21
262:23 263:1,9
263:15,16,20
263:21,23
265:23
**procured** 80:8
**produce** 16:2,11
17:23
**produced** 12:8
15:8,15 17:3
17:15,16,22
19:12,17,18
21:23 22:8,9
22:13,20 24:16
25:10 136:21
**producing** 18:23
**product** 15:11
98:10 141:9
151:20 178:7
208:4

**production** 24:3
**professional**
1:22 2:23
202:20 280:4
**professor** 75:25
76:1,5 77:10
77:11 78:5
79:2,20 81:17
82:7,12,18,21
85:12 86:4,19
107:14,17
108:5,22 109:3
109:11 110:1,9
112:7,22 113:5
113:23 150:6
168:11 169:1,5
169:8,9 171:25
172:4,22
177:22 190:1
190:11,25
191:7,18,24
192:3,17,22
193:9 200:22
202:12,17
203:14 246:15
250:10 260:4
**programs** 60:25
**progress** 11:3
102:13
**prohibitively**
237:24
**projects** 171:24
**proper** 65:12
81:5
**properly** 130:9
**proposal** 255:17
258:25 259:16
259:17 273:10
276:2,3
**proposals** 33:3
197:3,7 198:7
211:10 275:24
**propose** 255:7
**proposed** 150:11
241:4 256:8,11
256:17
**proposition** 97:3
105:22 128:11
**Prosser** 51:4,10
71:4 107:23
189:13
**Prosser's** 190:9
**protection**
192:12
**provide** 13:8,11
22:15 24:8
25:1 32:16

Halma-Jilek Reporting, Inc.    Experience Quality Service!    (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 95 of 107   Document 188

Baldus vs. Brennan 2/22/12 Deposition of James R. Troupis

Page 306

131:18 176:19
222:3 223:17
251:3
**provided** 17:10
22:15 24:3,7
31:8,10,20
58:16 59:10
61:1 131:20
222:24 251:10
251:12,13,23
255:18
**providing** 14:11
**provision** 43:2
**provisions** 2:21
**proximity**
230:18
**prudent** 237:19
**public** 2:23
50:24 128:21
130:8 141:12
176:17 178:3
197:4,8 205:11
229:3 231:24
263:4,22 280:4
282:6
**publicly** 50:22
125:3 277:19
**published**
131:21
**pull** 36:13
**purpose** 129:10
136:5 169:5
177:4 189:5
204:14
**purposely**
176:16 177:6
183:19
**purposes** 109:20
120:5 129:12
129:13 257:21
**pursuant** 2:21
15:3 267:3
**put** 34:9 48:5
80:6 84:20
114:11,23
125:4 145:25
153:3 155:20
163:24 176:7,8
186:15
**puts** 62:13
**putting** 19:3
97:9 108:6
145:5 156:5
**p.m** 6:6 48:11
48:14 87:8,13
107:9,12
116:19,22
117:5 124:16

125:1 138:25
149:19,22
178:20 179:2
179:13 206:15
212:9,12
220:16,19
254:18 272:19
272:24 274:4
275:22 276:7
277:5 279:18
279:19
**P.O** 3:16 281:6

_____

**Q**

**qualified** 43:8
43:10,21
**qualify** 91:13
**queries** 21:12
26:21
**query** 21:3,8,10
**question** 8:21
8:22 9:9 10:4,9
10:14,21,25
11:5 18:25
19:14 20:6
23:23 24:11
33:12 39:6
41:9 43:25
44:19 45:8
47:2 51:13
52:9 66:21,22
69:10 73:10
79:17 90:5,6
90:11,19 92:15
93:7 95:12,18
96:25 97:1
98:19 99:3
102:1,9,10
103:9,11
104:17,18
109:1,6 114:7
120:3 128:7
141:5 149:3
153:13 155:2
161:22 164:13
166:15,23,25
167:1,6,12
173:4 176:24
176:25 181:19
185:18,23
192:18 200:1
202:1 204:10
214:8 216:8
218:20 220:21
221:13 222:12
225:1 227:9,23
228:6,11,19
229:5,23

230:11,25
231:15 233:9
233:23,25
234:2 238:18
239:22 241:11
241:16,24
242:3 245:10
245:22 256:14
256:25 260:12
266:12,21
267:15 268:7
270:16 272:14
278:18,24
**questioned**
54:24
**questioning**
236:18 247:15
249:1
**questions** 10:2
12:15 19:7,9
19:14 26:14,21
49:8 55:5
75:24 95:25
144:19 175:12
198:15 206:2
212:19,20
223:20,24
236:3 240:9
246:24 248:11
248:20 249:16
252:16 257:1
261:18 262:21
264:1 265:12
265:17,19
266:6 267:17
268:1,14 273:3
**quick** 48:7
**quickly** 66:21
75:13 118:6
**quite** 49:25 70:6
70:23 190:6
211:8 222:24
**quizzical** 130:24
**quotes** 117:17

_____

**R**

**R** 1:19 2:19 3:3
4:3 6:1,5 7:10
87:12 178:19
179:1 186:24
272:18,23
279:17 280:6
280:18
**racial** 147:22
**racially** 271:1
271:19 272:6,9
**raise** 275:5
**raised** 8:25

12:11 167:6
50:2
**RAMIREZ** 2:9
**RAMIRO** 2:8
**ran** 25:18
**range** 217:10
**rare** 23:19
**rate** 31:25 36:19
87:25 270:7
**rates** 152:9
269:14
**Ray** 13:16 48:25
49:21 75:17,19
77:9 78:6
88:18,21 90:2
117:4 130:25
131:2,4 168:3
209:12,17
276:12
**Raymond** 88:19
209:25
**Ray's** 209:20
**reach** 169:5
202:13 249:25
257:9 260:3,3
**reached** 249:2
256:20,22
257:3,11
258:12,20
268:13
**reaching** 258:7
**react** 148:5
**reacting** 118:12
**reactions** 207:1
**read** 55:5 62:25
63:1,2 64:20
66:7 67:3,8
69:9,17,19,21
80:18 81:16
82:15 103:13
103:16,18
104:20,21
105:14 119:15
124:17,24
125:1,18
126:22 130:4
130:11,24
134:4,25 142:2
142:14 148:9
164:21 170:19
220:20,22
221:11 233:6
233:11,24
234:3 235:24
**reading** 97:17
116:13 119:23
125:20 140:1
188:4 236:19

**reads** 223:6,8,16
240:19 241:1
255:6
**ready** 132:1,3,5
263:22 268:23
**real** 119:18
136:1
**reality** 49:25
**realize** 130:4
**really** 32:22
84:19 115:24
149:15 174:3
200:13,23
**realtors** 180:16
**reapportionm...**
69:23 161:18
**reason** 33:20
39:15,21 42:9
43:21 45:22
47:12 49:17,18
66:18 80:1
82:6 97:2
102:2 112:13
152:18 160:18
164:23 177:17
189:16 221:25
222:18
**reasonable** 7:19
95:7 111:11
131:9 147:10
154:21 185:16
185:19
**reasonably** 8:5
128:1
**reasons** 50:7
129:16 131:8
153:24 162:2,5
177:11 189:8
**recall** 10:19,20
11:13 20:23
21:11 23:1,13
23:14,16,20
27:21 28:19
29:13 31:11
33:7 34:18,19
34:19 43:25
51:10,25 58:25
59:2,12 62:21
64:9,11,11
66:14,16,17
69:15 72:2,15
73:5,8 74:15
78:18 81:1,2
91:4 105:19
107:25 110:14
116:25 135:1
137:14,15,24
138:2,2 139:19

Halma-Jilek Reporting, Inc. Experience Quality Service! (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD Filed 02/23/12 Page 96 of 107 Document 188

Baldus vs. Brennan        2/22/12        Deposition of James R. Troupis

Page 307

159:4,12
164:12,17
184:24 185:4
186:11 187:8
190:1,10 191:2
191:3,7,20
192:17,20,21
192:22,25
193:2,8 195:1
195:3,24 196:5
196:9,16,20
201:11,25
202:1 205:7,8
205:9,14,17,18
207:3,9,12,14
207:16 208:23
209:7,10 215:2
217:5,12,19
225:9 226:17
227:14 229:1,7
233:12 234:3,7
234:14,20
235:1,9,20
236:8 245:16
249:18 251:11
257:3 265:16
265:19 270:17
270:23 272:3
**recalls** 236:20
**receive** 13:5
228:13
**received** 13:14
13:25 14:1,2
15:17 42:4,7
82:4 83:1,5
139:11 227:6
228:9 275:23
**receiving** 139:11
139:19 205:15
**recess** 48:12
87:9 107:10
149:20 212:10
**recognize** 66:4
116:9 147:16
158:24,25
159:3 171:1
183:22 185:17
**recognized**
122:3
**recollect** 135:15
**recollection**
23:5 37:20
39:17 42:8
69:7,13 107:18
115:25 116:1
130:21 136:22
138:23 146:4
154:19 164:5

164:20 168:10
170:5 184:12
186:13,19
190:4,20,22
193:6 195:20
198:4 226:24
236:2 244:18
249:20
**recommendat...**
34:18,23 36:2
**recommendat...**
35:18
**recommended**
165:12 247:11
**reconfigure**
121:13 214:2
**reconfigured**
246:3
**reconfiguring**
121:3
**record** 20:10
48:11,14 50:24
61:5,19 67:21
69:5 71:6
80:18 81:16
87:6,8 94:9
100:5 103:18
104:21 107:9
107:12 109:10
116:15,19,20
116:22 119:16
125:2 127:11
130:12 134:5
142:3 149:17
149:19,22
178:17,21
184:1 203:4
212:7,9,12
220:16,17,19
220:22 221:11
225:18 233:6
233:11,19,24
235:24,25
236:19 247:25
248:2,14
264:10,17,21
265:4,6 266:4
266:13,15,19
267:11 268:12
268:15 272:20
275:1,14 278:2
281:20
**recordkeeping**
12:16
**records** 84:18
160:19
**record's** 70:7
127:6

**recount** 51:5,5
71:5 107:23
190:9
**red** 70:3 150:17
150:20
**redistrict** 91:24
**redistricted**
92:10 111:4
114:5 241:12
**redistricting**
7:21,24 8:4,16
10:6,17 12:19
12:20 13:3
16:8,16,20,23
17:12 20:5
21:25 22:11,23
23:9 24:15
25:13,15,17,24
26:4,8 32:3,7
33:18 37:25
40:12 46:7
48:19 50:11
52:15,23 54:15
56:4 58:20
59:11 60:2
62:2,9,12
63:16 66:11
68:3 71:1 73:3
73:11,23 74:8
74:17 76:12,21
76:23 77:1
87:19 88:14
89:2,8,22
91:21 92:8
96:18 97:4
98:20 101:23
102:1,13 103:6
103:21 104:12
104:23 105:25
107:1,15
109:24 110:10
110:19,22
111:2 112:7,9
113:6,23
117:25 119:20
126:20 127:18
130:22 136:20
137:1,11 144:5
144:10,17,21
145:7,10,18,22
146:13 157:11
158:9 159:9,14
159:20,25
163:23 164:3
164:19 165:3
165:13,16,20
168:19 169:6
169:19 172:7

173:22 179:25
187:2 189:2,5
190:3,8 191:4
191:9 193:10
203:9,16
204:14,21
211:4,16
223:12,21
224:11,23
228:21 231:25
240:24 244:5
244:12 245:13
247:18 249:5
250:5 251:20
257:23 263:24
265:23
**redo** 105:6
122:16
**redrawing**
119:17 121:1
209:2
**reduce** 246:3
**reelected**
246:20
**refer** 173:21
176:24 185:5
188:23 206:8
**reference** 66:9
85:24 108:22
171:25
**references**
185:13
**referred** 43:10
55:9 179:19
193:24 196:18
199:10 221:20
222:6 249:23
**referring** 25:3
26:24 68:5
117:18,23
119:25 120:2
129:3 155:13
163:23 164:13
167:1,9 168:8
169:16 173:6,7
181:19 194:5
194:14 196:11
199:14 210:24
219:11 222:19
223:3 242:7,10
242:24,25
243:17 255:2,4
255:12 258:10
271:14 273:10
277:6
**refers** 48:2
163:11 173:2
**reflect** 33:10

71:6 94:9
176:10 208:17
225:18 264:10
268:12 275:14
**reflected** 27:18
29:19 31:6
35:22 167:2,5
177:7 196:2
208:9 215:18
216:19 242:1
254:21 265:25
281:21
**reflecting** 22:22
**reflection** 20:1
**reflects** 20:10
39:11 208:18
257:13,18
**refresh** 69:6
184:12 192:3
**refreshed** 236:2
**refreshes** 37:20
69:12
**refreshing** 236:2
**regard** 20:21
24:9 26:3
35:22 47:4
62:15 67:10
92:1 114:19
197:3 210:16
243:1 245:4
250:2 267:7,9
268:10
**regarding** 24:1
24:15 37:24
73:6 108:18
137:1 187:7
193:19 248:11
251:4 257:4
**regards** 10:21
22:11 32:16
137:11 145:18
267:4
**region** 195:5,6
**regional** 190:19
194:15,20
197:22 198:7
208:2
**regions** 191:1
**Registered** 1:22
2:23 280:3
**regular** 30:17
50:14 73:19
**regularly** 23:11
**regulations**
216:22
**REID** 2:4
**Reinhart** 3:11
7:2 32:22

Halma-Jilek Reporting, Inc.    Experience Quality Service!    (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 97 of 107   Document 188

Baldus vs. Brennan                    2/22/12                    Deposition of James R. Troupis

Page 308

34:25 35:4,11
35:14,19 36:5
37:14,24 38:22
39:12,18 40:3
40:12,23 41:1
42:19 44:23
45:18,25 46:22
47:6,9 57:6
93:10 94:16
182:5 183:3,10
185:6 281:1
**Reinhart's** 36:4
44:17,21 46:7
**relate** 55:5
59:15 84:14
**related** 8:16
10:6 11:8,23
12:9,20 13:2
13:22 15:25
16:6 20:13,20
21:13,23 22:6
22:9 50:22
69:22 89:22
139:19 268:14
270:20
**relating** 161:17
210:3 268:1
**relationship**
8:21 29:20
54:21 63:17
77:11 117:9
177:9
**relationships**
39:20 203:13
**relative** 16:2,6
17:10 19:10
48:4 95:15
96:2 102:15,16
102:23 104:14
104:25 141:13
223:3 281:18
**relatively** 54:18
102:13 139:14
**release** 139:7
140:9 240:14
240:20 258:3
**relevance** 65:21
91:21
**relevant** 175:14
**relieved** 267:6,8
**rely** 20:3
**remain** 186:8
210:25 215:23
**remained** 50:11
**remains** 119:18
121:1
**remap** 101:18
**remember** 8:23

11:4 21:1
28:22,25 29:4
29:4,22,22
30:3,4,14
33:23 35:8,9
35:16,20,21
36:1,12 37:6
43:23 49:16,16
56:12 59:6
76:24 85:7
104:7 106:17
112:21 113:15
113:16 115:14
115:22 116:3
119:7 124:23
135:8 138:10
145:12 155:2,4
160:10,12,19
164:22 168:25
177:3 179:21
180:10,11,11
180:12,19,20
189:21,25
191:12,13
194:16 196:8
199:19 200:5
203:13 205:10
207:5 212:5
214:9 234:4
273:16,18
**remembered**
44:9
**remembers**
235:23
**remind** 22:2
27:23 62:24
**reminds** 146:1
**remove** 274:7,11
274:12,22,25
**removed** 274:20
275:16
**renamed** 155:10
**renowned**
203:17
**rented** 53:1
**rep** 221:23
**repeat** 161:6
**repeatedly**
110:9 118:19
98:18 243:16
269:21
**replicated** 53:8
53:9
**reply** 85:21
**report** 85:25
86:5 145:17
176:19 226:4,6

247:22 248:6
277:18
**reporter** 1:22
2:23 7:8
158:21 170:18
175:6 179:4
184:20 193:15
205:24 265:2
280:4
**Reporting** 6:3
282:22
**reports** 34:15
163:16 206:19
206:22
**represent** 11:22
18:19 44:12
51:4,10 70:16
109:10 153:9
155:7 158:4
161:16 171:16
212:17 230:21
232:16 265:4
**representation**
47:10 81:21
82:1 109:16
161:18 162:7
187:5 244:9
**representatio...**
74:25
**representative**
23:17 92:23
154:24 180:15
199:18 215:13
215:16,24
218:5,9 232:21
242:18
**representatives**
180:14 216:4
223:14 242:21
244:22 246:1
**represented**
35:3 52:23
236:25
**representing** 8:8
44:13 46:18
48:18 251:9
**reps** 221:23
222:17
**Republican**
26:23 44:2,2
44:24 63:23
160:8 237:21
238:12
**Republicans**
74:22 75:11
211:9
**reputation**
129:24

**request** 14:9
15:17,22 20:1
22:17 25:11
51:3 150:6
236:3 247:3,10
**requested** 15:24
16:4,13,24
20:16 22:14
23:1 247:1
**requests** 15:19
15:20
**required** 62:7
**residence**
113:14,15
**residency** 91:17
**resolved** 10:3
59:24 64:15
130:9
**respect** 26:3
44:16 55:19,22
89:15 114:18
161:16 217:13
237:8 238:8
**respected** 204:1
**respective** 28:2
28:9 46:20
162:9 171:17
**respectively**
175:23 241:5
**respects** 204:2
246:6
**respond** 81:1
122:5 167:14
**responded**
140:20
**responding**
83:17 192:20
275:22
**response** 14:8
83:25 140:24
161:21 173:4
255:17 274:17
**responsibility**
22:16 77:25
**responsible**
126:5 165:2,5
**responsive**
15:17,19 25:10
**rest** 89:12
137:13,19
171:2 182:19
**restore** 36:25
**restriction** 98:3
98:4
**result** 18:7 32:2
136:9 139:21
142:16 147:23
151:18 196:14

**resulted** 158:10
196:11
**results** 271:6
**retain** 224:20
**retained** 28:1
43:20 44:1
50:17,21 51:9
109:12,19
141:15 158:8
159:13,16,21
160:14,16,20
161:8 165:13
171:22,23
173:15 187:6
203:25 204:8
224:14 225:6
266:18
**retainer** 28:5
29:6,11 33:6
34:10 35:24
36:8
**retention** 16:24
23:21 29:15,23
30:7,14 47:6
47:13 56:16
153:6 158:11
160:7 166:16
166:23 167:4,8
167:19 172:1,9
172:13 175:10
176:5,12 177:2
177:5 186:6,14
186:16 204:10
204:13
**retentions**
171:20
**retiring** 174:7
**retrograde**
215:5
**reveals** 178:7
**reverse** 163:3
166:8 211:12
231:20
**review** 20:17
30:19 35:14
37:19 38:14
138:15 248:16
251:6,6,22
**reviewed** 12:12
20:17 38:15
**rhetorical** 65:9
**RIBBLE** 2:5
**Richard** 1:5,8
77:20 78:23
**Rick** 76:6 81:14
81:17,18 82:13
**Rick's** 85:19
**right** 10:3 19:19

Halma-Jilek Reporting, Inc.        Experience Quality Service!        (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD    Filed 02/23/12    Page 98 of 107    Document 188

**Baldus vs. Brennan**      **2/22/12**      **Deposition of James R. Troupis**

Page 309

21:9 25:19
32:11 33:13
37:6,10 39:10
46:11 49:12
52:14 54:11,14
54:17,17 55:25
68:19 80:6
83:21 85:10
86:11 87:4,5
88:7,11 89:5
89:14,18 90:25
94:14 96:13
100:15,16
102:8 108:6
110:3 113:11
113:17 124:6
125:5,16,19
126:3,21
129:15 130:10
134:16 137:17
139:9,23 142:2
143:8 144:11
146:10 147:19
149:24 151:11
152:2 153:1,4
153:6,14
154:12 155:16
155:17 159:12
163:5,11,22
164:20 171:5
171:14 172:2,3
177:4 183:4
193:22,23,25
200:4 201:24
202:10 210:15
224:24 227:6
230:20 232:6
250:25 254:12
254:15 261:5
275:21 276:9
277:10
**rights** 195:14
224:5 239:4,11
244:5
**ripple** 95:16
96:17,20 97:25
98:25 102:23
103:7,22 104:9
104:16 105:2
105:11,21
106:7 153:25
198:14 276:24
**RISSEEUW** 1:5
**Rivas** 125:10
126:17 127:15
128:9 129:3
274:18 275:23
**Robin** 22:10,23

23:2 24:13
199:18
**ROBSON** 1:5
**ROCHELLE** 1:5
**Rodriguez** 101:7
101:8 106:10
106:18,20
117:22 257:19
**ROGERS** 1:5
**role** 71:1 102:7
109:18,19
112:12 160:22
160:24 204:19
209:20 213:2
226:17
**RON** 1:6
**RONALD** 1:4,10
**room** 67:22
86:20
**rose** 70:3,4
**roughly** 70:25
**round** 201:15
**row** 235:22
**rule** 233:20
248:14 267:9
**rules** 2:21 67:20
216:21 267:4
**run** 119:8
157:22
**running** 86:16
133:3
**RYAN** 2:4

---

**S**

**S** 3:3,17 4:8 6:1
280:18 281:7
**safely** 199:7
**sake** 182:22
**salient** 91:15
**salt** 178:5
**SANCHEZ-BELL**
1:6
**Sandals** 94:5
**Sandisk** 50:18
167:24
**Sarah** 78:6
200:21 201:11
**sat** 149:11 233:4
264:11
**satisfied** 121:14
**Saturday** 93:15
93:23 181:16
**saw** 29:24
144:15 189:7
199:14 225:10
**saying** 18:13
23:15 28:23
30:3 98:9

101:5 108:20
113:15 119:9
122:12 222:21
234:20 235:1
235:10 236:8
239:9 246:19
275:17 276:13
278:7
**says** 38:20 39:16
42:5 69:24
78:22 80:19
128:23 129:1
129:21 133:22
142:3 161:15
163:14,15
164:25 165:1
179:15 180:23
186:4 192:11
201:3,24
203:18 275:7
**schedule** 51:24
81:18 88:3
**scheduling**
193:20
**SCHLIEPP** 1:6
**school** 76:19,22
202:16
**science** 92:19
92:19
**scope** 37:22
111:18 187:5
187:11 246:22
246:25 247:6
247:14 268:17
**Scott** 16:20,22
17:1,11,18
20:5,14 21:10
21:24 24:12
25:14,15 38:24
40:8 43:12
44:22 52:24
53:18 54:15,19
55:19 72:23
106:18,20
124:1 161:8
186:24 199:16
**Scott's** 53:10
**Sealed** 4:24
**SEAN** 2:5
**search** 17:6 20:4
20:13 21:2
22:5 25:5
**searched** 20:10
21:7 22:3,4
**seat** 215:1
217:19,20,24
**second** 48:8
64:10 70:24

81:19 83:22
90:19 129:8
130:10 131:23
134:23 142:12
144:1 149:16
154:21 166:14
179:15 184:11
184:25 189:8
200:24 206:12
215:9,25
222:14 223:8
240:12 253:15
258:5 275:7,18
277:5
**second-to-last**
177:8
**secrecy** 58:20
58:24 59:4,9
60:4,8 61:25
62:8,20 63:11
63:13 64:8,20
64:22,24 66:14
66:25 67:9,13
68:3,8 70:2
72:6
**secret** 60:22
65:2,7,10,15
65:16,18 72:12
72:21,25 81:4
81:9 263:3
**secretive** 227:4
228:17,21
229:19 231:10
**section** 152:3
241:1
**see** 14:13 28:20
28:20 32:5
37:4,19 46:6
55:3 64:23
87:3,5 104:19
126:12 130:18
132:18 134:3
140:2 142:10
143:7,21
148:22,24,24
150:20 155:12
156:16 159:6
161:18 163:19
164:10 166:12
166:15 167:14
167:16 168:6
169:14 170:8
171:24 173:19
176:2,20
177:12 179:17
183:25 185:1,9
185:11,21
186:9,23 187:2

188:12,21
191:18,22
192:15 194:2,4
194:11 199:7
200:24 201:7,8
204:16 206:20
207:7 208:3
209:5 240:15
240:18 273:8
275:12 276:14
**seeing** 28:19
29:4 69:15
184:24
**seek** 30:18
76:12 89:23,23
**seeking** 191:7
204:6 223:20
250:12,18,19
**seen** 22:17
28:18,25 29:3
37:5 56:19
62:20 69:7,13
86:21 150:2
184:22 188:2
191:19 202:16
208:5
**selected** 127:23
**sell** 182:19
**senate** 27:6 28:3
38:23 40:7
43:11,20 44:21
46:1,2,3,4,8,9
46:18 95:16
96:3,7,9 98:22
99:1 104:7,8
118:10,14,20
120:12 161:7
161:16 162:8
171:16 186:24
192:5,23 193:3
194:6,9,10
216:7,13,15
219:2
**senator** 21:1
23:3,4,8,10
24:13 27:14
29:18,19 56:2
56:3 163:12,16
199:17
**senators** 50:23
**send** 44:11
125:8,10,22
201:11
**sending** 171:11
176:4
**senior** 49:1 88:6
88:9,24 89:9
89:10,13,13

Baldus vs. Brennan     2/22/12     Deposition of James R. Troupis

Page 310

142:23
**sense** 72:9 88:4
  89:6 125:24
  154:9 171:22
  194:21 209:14
  238:11,18
  244:4 272:11
**SENSENBREN...**
  2:4
**sensitive** 95:24
  96:11,14,22
  97:1 98:2,21
**sensitivity**
  102:10
**sent** 5:3 16:19
  16:21 17:19
  110:17 117:3
  138:20,25
  176:14 188:8
  201:14,17
  205:6 230:22
  231:12 252:8
  252:22,22
  254:6 255:13
  274:17 276:7
  276:11,13
**sentence** 119:14
  119:15 120:1
  125:4,15 126:7
  128:17,23
  129:9 134:18
  134:22,24
  164:9 168:4
  169:13 172:23
  188:15 222:5
  222:14 223:5,8
  223:16 242:13
  267:16
**sentences**
  267:16,18
**separate** 27:7
  28:20 29:6,11
  109:21 114:8
  191:11 209:4
  230:3 254:15
**sequence** 30:4
  133:3,4 170:3
  200:20 210:19
  277:24,25
**sequences** 278:8
**series** 19:7
  79:19 151:19
  179:7 198:5
  207:18 239:5
  265:17 266:1
  271:7,7 273:3
**serious** 49:22
  93:7

**seriously** 58:10
**served** 93:13
**servers** 20:19
**service** 156:8
**services** 31:7,10
  31:20 35:1
  45:25 47:6
  187:11
**serving** 203:8
**session** 159:17
**set** 35:24 61:7
  61:10 73:11
  161:1 162:20
  165:19 170:6
  173:13 174:25
  183:8 187:18
  191:15
**settle** 200:1
**settled** 151:24
  210:17
**seven** 190:7
  264:14 273:17
**seven-hour**
  279:14
**share** 84:24
  126:4 218:18
  219:4,7,7
  228:2,15
  262:14 263:3
**shared** 86:4,6
  101:12 219:9
  219:12 229:1
**Sheboygan** 64:5
**SHEILA** 1:7
**Shop** 231:8
**short** 167:15
**shorter** 80:23
  187:19
**shorthand** 282:1
**shortly** 158:14
  205:8,12
**shots** 49:2,2
**show** 36:14
  47:15,18 67:21
  68:16,24 77:13
  116:6 124:14
  148:25 170:3
  219:14 220:23
**showed** 86:2
  145:2
**showing** 14:23
  28:12 37:2
  38:12 69:4,16
  83:15 134:9
  138:3 149:24
  221:2
**shown** 70:8
  86:10 154:4

190:12
**shows** 48:1
  150:6 244:25
  275:8
**side** 45:6 63:20
  86:22 112:12
  152:25 170:7
  183:8 187:18
  191:15 216:18
  226:20 251:4
**sides** 63:23
  73:25 211:14
**sign** 29:6 40:25
  58:24 59:4,9
  61:25 62:7
  64:8 66:14
  67:13 68:3
**signature** 70:20
**signatures** 58:7
**signed** 29:25
  32:13 56:11,13
  58:20 63:12
  66:22 70:18,19
  117:14 120:16
  120:24
**significant** 9:4
  50:19 107:19
  152:12,24
  154:5 216:2
  218:1 219:1
**signing** 41:19
  64:11 117:12
**similar** 72:12
**simple** 21:5 31:6
  121:20
**simply** 10:20
  13:20 19:4
  20:14 31:6,17
  34:20 39:16
  45:1 51:7
  64:16 73:8
  74:15 106:1
  119:17 120:9
  124:9 130:1
  140:5,16
  152:23 156:24
  174:17 177:10
  200:15 230:2
  242:15 244:7
  258:1 278:12
**single** 15:16
  33:6 156:7,8
  209:17 274:23
**sir** 33:19 41:5
  276:8
**sit** 135:17
  195:18 205:9
**sitting** 18:12

86:25 87:4
  218:9 273:17
**situation** 215:10
  229:1 245:22
**six** 119:5
**six-month** 36:21
**size** 194:18
**skills** 125:9
  126:4 192:9
**skipped** 140:12
**slightly** 47:1
  217:6 256:7,9
**slings** 74:7
**slow** 183:20
**small** 50:9
**social** 92:19
  156:8
**socialize** 124:10
**software** 119:1,4
**sole** 165:17
**solve** 121:22,23
  268:4
**somebody** 77:5
  107:3 113:12
  115:19 128:14
  129:2 143:21
  157:6 186:18
  237:4
**someone's** 79:13
**soon** 259:12
**sorry** 13:19
  44:19 69:10
  97:11 104:17
  120:19 132:9
  180:1 206:9
  233:21 265:13
  270:4
**sort** 7:25 23:2
  54:25 208:3
**sorts** 11:12
**sought** 18:24
**sound** 197:1
  203:21 204:7
**sounding** 203:24
  204:3
**source** 100:6
  127:17 165:18
**south** 149:13
  152:25 155:3
  216:18 244:7
  251:4 255:10
  273:7
**southern** 272:7
**space** 50:13 53:1
  53:1 56:23
  58:5
**speak** 77:8 93:9
  99:18 107:14

107:17 120:4
  131:6 164:24
  182:19 207:6
  223:19 238:4
  250:20
**speaker** 23:18
  27:3,13 28:9
  29:19 30:11,21
  33:4,22 34:1
  34:21 36:10
  38:25 40:9
  43:13 44:13
  49:11,13 52:17
  54:25 55:23
  56:9 57:11
  75:8 164:15,17
  182:13,24
  186:25 199:16
**speaking** 43:5
  54:18 121:2
  159:19 164:12
  164:17 193:2,8
**Speaks** 139:5
**special** 84:19
  114:12
**specific** 10:19
  11:4 48:23
  52:1 73:6
  92:22 120:10
  190:25 191:1,8
  195:4 206:7
  207:12 222:8
**specifically**
  105:19 191:14
  192:23 195:24
  206:2
**specifics** 255:17
**speculate** 41:4
  41:12 57:10,12
  76:10 89:15
  154:16 181:5,6
  181:8,10,11
  202:6 226:4
**speculated** 61:3
**speculating**
  61:17 226:6
**speculation**
  61:15,16
  222:12
**speech** 82:8
  84:17
**speed** 117:19
**spends** 209:19
**spent** 152:12,23
  244:23
**Spindel** 257:20
**spoke** 23:11
  26:5,7 90:20

Halma-Jilek Reporting, Inc.    Experience Quality Service!    (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 100 of 107   Document 188

Baldus vs. Brennan 2/22/12 Deposition of James R. Troupis

Page 311

164:9 165:21
202:2,8 254:25
**spoken** 26:2
149:2 258:20
**SS** 280:2
**St** 125:11
**stack's** 183:12
**Stadtmueller**
264:11
**Stadtmueller's**
247:10
**staff** 68:2
**staffing** 52:15
**stage** 174:1
**stamped** 11:19
219:18 265:4,9
**stand** 127:12
**standard** 186:14
186:20
**standing** 83:10
**standpoint**
114:9 239:8
**stand-alone**
58:16
**stapled** 70:10
**start** 52:14
81:18 90:8
97:8 101:2
166:9 173:19
174:11 175:24
195:10 211:10
273:23 274:3,3
279:15
**started** 97:4,6,7
113:9 199:6
244:6 278:18
**starting** 136:13
274:16
**starts** 50:16
**state** 2:24 6:19
30:12 38:23,25
39:12 40:4,5,7
40:8 42:19
43:11,13 44:21
45:19 46:2
50:23 55:18
60:19,24 61:1
63:20 88:23
104:2 111:23
114:11 122:7
123:12,13
136:11 154:1
156:14,15
164:9 180:6
186:23,25
188:15 191:1
192:6 194:18
195:11 207:22

209:18 211:11
211:24 216:5
216:15 249:4
249:12 262:6
280:1,5 282:7
**stated** 45:13
**statement** 39:2
39:7,10 40:14
40:15,17 55:12
89:3 91:3
96:10 121:5
135:24 140:7
161:14 168:6
172:24,25
173:18 180:22
**statements**
235:23
**states** 1:1 6:11
6:16 15:14
21:21 176:16
185:10,22
186:2,6,23
280:13
**statewide**
198:20
**stating** 120:25
206:17
**statistical** 224:6
224:8
**statistics** 152:8
153:8
**statute** 65:14
192:6
**stayed** 32:20
**step** 191:23
**stepped** 160:2
**steps** 151:19
239:5
**Steve** 6:2
**stipulate** 111:24
**stipulated**
153:10,15
**stop** 272:16
**store** 156:7
**story** 166:19
**straight** 153:14
155:15
**strategic** 16:15
95:13
**strategies** 178:8
**street** 2:25 3:5,8
3:12,16,20
53:14 115:3,7
115:15,17,24
155:8,19 156:2
280:7,20,23
281:2,6,10
**stricken** 268:15

**strictly** 215:11
**strike** 59:17
98:18 102:18
144:18 164:12
185:23 202:1
217:1 222:12
225:13 231:4
236:17 237:8
237:19 246:23
247:15 252:25
253:3 258:23
259:3,11,24
261:10 268:1,1
272:14
**string** 78:19
254:13 274:16
278:23
**structure**
163:18 209:24
**stuff** 33:25
**subfiles** 21:6
**subject** 8:10
17:25 38:2
42:24 47:23
57:25 60:8
143:1 147:2
186:21 191:22
**submission**
247:1
**submissions**
265:10
**submit** 30:17
247:12
**submitted** 11:17
273:12
**subordinate**
88:14
**subpoena** 93:15
279:9
**subpoenaing**
247:9
**Subsequent**
143:12
**subsequently**
207:21
**substance** 33:10
**substantial**
91:11 140:10
162:13 195:11
195:12
**Substantially**
237:23
**substantive**
65:5 94:14,19
94:23
**subsumed** 88:18
**succeeding**
278:14

**success** 80:15
**successful** 80:12
239:19 245:4
246:7
**Suder** 27:15
199:19
**suggest** 135:25
152:22 165:14
202:8
**suggested** 77:9
118:19 128:19
249:1 250:10
259:15,16
**suggesting**
108:15,24
129:23,25
255:24 278:9
**suggestion**
34:14 119:20
227:3 229:18
256:21,25
267:24 278:11
**suggests** 108:16
**suing** 158:6
**Suite** 3:8,12,20
3:24 280:23
281:2,10,14
**sum** 145:13
205:3 208:3
**summary** 22:19
**summer** 50:10
**super** 234:6
235:17 236:10
237:7 243:8
**supervision**
151:13,15
153:5
**support** 80:9
136:12
**supportive**
135:20 258:25
**suppose** 7:19
31:15 123:9
**supposed** 25:16
94:1 167:10
189:10,14
**Supreme** 67:19
267:4,9
**sure** 9:19 10:8
19:8 25:9,19
37:6,7 41:7
42:3 45:5,17
48:9 52:4,4
53:3,4 54:13
69:11 73:14
74:10 76:24,25
77:15,17,25
78:2 79:14

81:9 89:18
90:13 101:15
103:10,14
104:4 105:3
107:16 110:8
110:16 112:5,6
116:3,12,17
132:15 134:6
138:4,9 139:17
141:16 150:1
154:20,22
173:6 177:20
180:10,19
196:14 204:24
208:16 210:5
215:4,7,10,22
216:3,21
219:19 224:4,8
225:17 244:25
253:15 273:23
**surmise** 181:20
182:21
**surprise** 82:14
106:2,7 112:18
112:20 156:5
156:11 157:12
165:8 196:21
241:21
**surprised** 29:2
29:24 41:3
63:2,5,7 64:19
66:6 72:11
118:24 119:7
119:10 231:19
**surprising** 119:1
125:9
**surrounding**
84:17 146:25
147:6 195:8
**survive** 141:17
**suspect** 72:16
195:7
**swear** 7:9
**switch** 70:9
**sworn** 7:12
233:24 236:19
236:23 237:2
281:17
**S.C** 2:25 3:4,11
3:19 280:7,19
281:1,9

---

**T**

**T** 4:8
**table** 126:10
129:15 141:24
278:15

Halma-Jilek Reporting, Inc. Experience Quality Service! (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD Filed 02/23/12 Page 101 of 107 Document 188

Baldus vs. Brennan      2/22/12      Deposition of James R. Troupis

Page 312

**Tad** 17:18 61:21
  75:14 78:5
  81:23 117:3
  134:6 139:1
  160:1 174:8
  175:22 180:23
  181:18 193:19
  198:4,18 253:9
  254:21 258:6
  278:5
**Tad's** 206:19
**Taffora** 13:16
  17:21 48:25
  77:9 78:6
  88:18 90:2
  117:4 130:25
  168:3 209:12
  209:17 210:2
  211:1 221:7
  276:12
**take** 18:12 37:19
  38:14 48:7
  52:3 74:7
  107:5 108:25
  114:7 124:17
  126:9 128:4
  129:13,21
  140:4,23
  141:23 158:20
  162:25 170:8
  170:13 184:11
  184:21,25
  187:16 191:23
  199:9 207:23
  217:22 242:25
  267:13
**taken** 2:20
  48:12 87:9
  107:10 142:15
  149:20 152:3
  184:16 212:10
  218:12 222:22
  231:11 248:8
  276:2 280:6,10
  280:12 282:1
**talk** 18:8 67:18
  80:22 100:3
  106:18 123:1
  126:15 133:6
  134:11 135:6
  135:11 146:19
  157:5 203:1
  208:7 249:4,12
  250:23 254:16
  267:6
**talked** 9:2,3
  36:8 76:25,25
  86:23 93:23

112:14,24
133:8,21 135:7
135:10 152:4
157:7 158:11
165:9 168:11
168:12 169:12
177:2 183:2
211:13 253:8
253:25 254:2
255:5 257:10
**talking** 8:14
  19:18 63:25
  65:4 72:22
  74:21 86:8
  91:8 96:15
  134:16 135:3
  147:5 148:23
  167:10 169:17
  172:23 174:1,2
  175:10,15
  187:9 188:17
  193:7 197:23
  206:23 209:21
  217:23 222:7
  230:17 243:25
  270:14
**TAMMY** 1:10
**tan** 150:18,18
**tannish** 150:17
**tape** 178:16
**task** 178:2
**tasks** 167:25
  177:21 191:12
**taught** 76:22
  113:22
**teach** 76:19
**teaches** 76:20
**team** 9:8 10:6
  10:17 27:25,25
  48:18 49:2,7
  50:4 51:13,16
  52:25 59:16
  71:2,12 73:11
  73:12 75:3,6,7
  75:9 87:24
  89:7,9,10,12
  96:4 97:4,22
  99:17,18,24
  100:7,8 102:21
  104:12,23
  105:9 106:11
  107:1 109:24
  110:11 111:2
  112:2,7,14,22
  113:6 121:7,10
  136:19 137:13
  137:19 138:22
  142:17,23

143:4,6 144:5
144:11,17
146:13 155:25
157:7 160:5
163:19,22,23
164:3 165:4,20
167:21 191:4
211:1 248:18
253:10 257:3
257:21 270:19
272:5 277:11
**team's** 95:13
**tear** 268:9
**technically**
  47:10 214:1
**tell** 26:16 36:22
  84:12 85:14
  133:9 134:18
  143:13 150:13
  183:15 201:2
  206:3 214:5
  234:4 244:15
  250:19 251:25
  254:5 258:15
  258:19,22
  259:7 261:8
  278:1,3
**telling** 140:16
**tells** 84:3
**ten** 8:1 45:10
  76:3 114:2
  149:7 271:10
**tend** 18:7
  171:20
**ten-year** 7:25
**term** 55:15
  60:11,13,14
  62:11 65:10,11
  91:7 135:25
  146:24 147:8
  152:14,15
  165:5 237:7,24
**terminal** 227:14
  227:16,19
  229:19,21
**terminals** 227:6
  230:23 231:12
**terminated** 43:4
**termination**
  43:3
**terms** 11:6 33:2
  51:15 88:9
  130:22 147:2
  152:6 197:7
  217:4 262:23
  263:21
**terrible** 77:24
**terribly** 147:4

**terrific** 163:6
**testified** 7:12
  30:2 34:24
  39:24 110:9
  112:11 113:17
  113:22 161:21
  173:3 214:9
  236:5 256:3
  278:10
**testify** 77:3,6
  79:21 80:5,10
  80:11,16
  125:10 126:8
  126:17 128:9
  128:14,24
  129:2,11
  133:20 134:8
  135:13,16
  144:16 247:19
  260:10,15
  261:16 275:16
  281:17
**testifying** 61:17
  118:17 125:11
  204:20 236:18
**testimony** 15:13
  16:10 21:16
  22:2 28:24
  29:1 42:23
  51:14,17,19
  62:6,17,19
  63:10 64:7,17
  66:6 79:3,13
  80:8,13 95:3
  99:7 103:4,19
  105:8,13,19
  111:5,7 113:4
  115:19 118:16
  126:13 127:14
  127:15 130:19
  134:17 135:4
  139:18 143:1
  145:21 157:5
  159:22 215:19
  217:23 225:14
  226:11 230:20
  230:21 232:2
  233:24 236:4
  236:19,23
  237:2 246:18
  247:2,12
  256:24
**text** 179:14
  240:12,15,17
  240:19
**thank** 25:22
  28:14 38:13
  67:24 70:12

73:4 78:14
108:3 120:18
126:5 157:15
157:16 166:4
184:7 187:20
187:20,21
232:13 243:14
248:5 268:19
279:7,8
**thanks** 201:8
  253:21
**theirs** 276:4
**Theo** 180:16
**theories** 33:20
**thing** 11:16 66:8
  68:8 72:22
  74:4 119:13
  148:23 156:13
  192:10 202:11
  202:19 215:9
**things** 22:15
  71:19 84:18
  96:19 112:12
  122:16 127:19
  136:15 147:15
  148:19 153:24
  154:18,18
  157:22 159:23
  181:21 188:17
  198:16 199:1
  210:20 211:22
  214:20,22
  254:11 277:7
**think** 8:20 9:17
  11:11 12:7
  16:17 20:10
  26:9,9 33:13
  33:13 42:21,22
  45:21 46:2,14
  47:17 48:23
  49:5 53:10,23
  53:25 55:7,12
  55:16 59:5
  68:12,14 75:5
  75:13 79:15,16
  81:3 86:21
  89:3,11,19
  91:4,6,10,24
  93:1,13,18,23
  94:6 99:4
  101:21,24
  103:8,12
  107:24 110:20
  112:11 113:8
  115:13 119:23
  122:8 123:19
  125:19,19
  126:4,25

Halma-Jilek Reporting, Inc.    Experience Quality Service!    (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 102 of 107   Document 188

Baldus vs. Brennan        2/22/12        Deposition of James R. Troupis

Page 313

129:22 130:14
134:11,13
137:6 148:17
151:17,17,23
153:25 155:1
157:4 158:11
159:16 160:9,9
162:24 163:3
165:6 166:1,1
166:2 167:2,5
167:23 169:21
170:3,25
172:11 173:6,7
176:25 177:11
180:17 181:22
182:8 187:12
189:6 190:16
190:21 192:10
193:23 196:2
197:18,20
199:8,17,23
201:1 202:9
203:22,22
204:2 205:2,10
206:5,9,17
208:19 214:8
215:18 217:22
229:25 230:14
231:19 233:19
236:4 246:14
255:3,13
257:10,25
262:6 264:14
275:14 276:3
278:18
**thinking** 80:22
109:15 126:16
174:11 178:10
**third** 13:22
77:21 95:6,16
96:3,7,9 98:22
99:1 164:9
176:15 216:12
240:13
**Thirteen** 133:15
133:16
**THOMAS** 1:14
1:15 2:4,13,14
**thought** 20:20
29:25 32:23
77:22 88:3
89:17 101:25
118:13,22,23
130:2,25
137:20,22
151:13 159:16
159:24 166:17
180:13,23

181:2 190:14
190:14,18
216:6 217:9
218:25 237:1
242:11 254:22
255:15 261:25
265:25 271:13
274:24
**thousand**
249:11
**three** 46:18
58:15 134:12
151:21,23,23
176:5 178:25
180:18 186:5
197:3,16,19
235:9 244:10
267:16,18
272:18
**Thursday** 93:22
**THYSSEN** 1:6
**tie** 87:15
**till** 129:7
**time** 6:6 8:13,14
8:15,23 12:18
13:1 20:20
25:20 29:13,17
30:5,8 32:10
32:12,17 34:14
35:25 43:3
44:14 45:5,5
49:12 51:6,25
53:4,11 54:20
56:23 64:14
65:1 74:10,18
74:21 75:4,9
75:10 79:3,19
83:5 86:17
87:1,13 89:8
95:24 96:11,13
96:14,15,17,22
96:25 98:2,17
98:19,21 99:14
99:21,22
102:10,20
103:5,20 104:4
106:9,14,25
107:2 113:11
115:14 117:20
121:6,17 122:9
122:18 127:2
128:16 130:3
130:21 137:5,5
142:18 144:14
144:25 145:14
147:24 149:1
152:12,24
160:7,15,20

164:23 165:7,9
166:20 167:2,9
167:15,23
168:15 169:3
169:18,22
171:17 172:3,8
173:8 174:14
176:19 177:16
177:25 178:20
179:2,22 182:4
186:8 188:19
189:1,17,19,22
190:6,21 196:8
197:25,25
198:2,22
199:21 200:15
201:20 203:23
204:3,9,11
207:18 208:12
211:5,8,14
216:7 218:4
227:1 232:24
238:2 244:23
250:22 255:13
259:6 261:15
262:11 264:1
272:19,24
275:21 278:12
279:18 282:1
**times** 187:12
198:1
**time-sensitive**
102:21
**timing** 196:5
**TIMOTHY** 1:15
2:14
**title** 27:14 68:20
69:18,20
**titled** 64:23
**today** 11:14
15:13 16:10
21:16,21 42:20
67:11 93:9
121:18 122:9
122:12 129:21
135:17 141:7
195:18 248:8
258:7 262:13
**told** 22:25 36:20
43:4 51:23
52:6 67:2
84:15 95:5,8
96:11 108:25
112:24,25
114:24 117:22
120:4 124:11
128:18 137:24
167:24 172:19

178:11 183:4,5
185:17 190:22
202:11 257:25
258:14
**tomorrow** 61:13
94:5 99:9
175:15 279:9
**top** 142:4,6
278:4
**topic** 193:9
209:7
**topical** 191:10
**topics** 195:4
**total** 31:8,20,21
32:6 163:1
205:3 208:3
246:3 255:8,9
**touch** 111:12,13
114:10 141:25
142:1 146:16
**town** 107:22
148:12,13
**track** 87:5
**tract** 251:15
**tracts** 212:2
**trade** 65:16,18
**traditionally**
224:3 262:1,14
**trail** 33:16
**transcript** 5:2,3
97:17 232:16
247:2
**transitioning**
149:12
**transitions**
147:22 148:20
**transpired** 33:23
75:20
**travel** 200:6,7
**TRAVIS** 1:6
**tremendous**
149:5
**trending** 216:8
234:11,25
**trends** 216:16
**trial** 9:22,23
13:14 25:19
50:18 61:13
65:1 93:16
94:1 99:7
121:21 124:19
124:20 131:24
132:3 162:18
162:23 167:23
175:15 178:4
191:17 247:9
261:4 279:8
**trials** 36:21

**tried** 104:18
119:12 212:24
**tries** 15:23
**trip** 189:15
**Troupis** 1:19
2:19 3:23 4:3
4:10 6:6 7:7,10
7:15 18:2
19:18 28:21
30:1 47:24
61:6 78:7 85:5
87:12,15 90:20
107:14 158:3
158:20 163:3
163:17 170:18
175:6 178:20
179:1,4 183:9
184:17,22
188:2,8 191:19
193:15 199:10
200:11,19
201:4 203:6
205:24 206:6
211:3 212:15
221:2 232:15
237:15 247:2,4
247:21 264:11
265:2,16 266:6
266:18 267:15
267:22 272:18
272:23 274:13
274:17 276:24
279:7,17 280:6
281:13
**true** 8:2 34:17
42:6,11,13
102:23 131:16
131:19 137:9
144:6 157:3,9
162:17 173:9
231:20 276:18
281:19
**truly** 224:1
**trumping** 93:3
**trust** 30:9,25
173:1,13
**truth** 97:13,16
97:16 102:19
122:22 128:2
233:16 234:18
281:17,18,18
**truthful** 135:24
**try** 18:13,16
44:15 45:15
52:9 64:18
76:10 105:5
121:22 122:17
154:16 207:22

Halma-Jilek Reporting, Inc.    Experience Quality Service!    (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 103 of 107   Document 188

Baldus vs. Brennan                    2/22/12                    Deposition of James R. Troupis

Page 314

247:4 252:13
259:13 276:13
276:16
**trying** 19:4 41:6
41:7,21,25
45:11,12 53:24
53:24 54:2,2,6
54:10 66:23
74:8 76:11
81:6,8 84:20
88:4,5 89:5
92:14 94:11
99:6 121:23
122:16 123:18
124:13 128:1,2
128:4 147:13
155:1 169:14
169:24,25
172:16 183:19
204:22 205:9
219:18 223:11
238:9 243:11
244:3,25
247:17 254:9
255:3 260:2
274:20 277:6
**Tuesday** 83:16
124:25 132:5
**turn** 232:19
**turned** 86:20
89:16 189:17
**turnout** 269:14
270:7,20
**turns** 272:13
**Twenty-one**
170:11
**twice** 190:14
**two** 18:18 27:10
27:17,17 44:5
50:1 76:23
83:19 87:11
88:6,22 91:15
91:19,20
104:15 105:1
114:8,8 119:21
121:4 122:23
142:23 144:3
154:3 170:25
171:3 178:13
178:19 202:18
203:15 206:2,7
208:14 213:13
214:8 216:4,10
219:1 235:15
236:8 244:10
254:15 268:21
269:2 276:9,10
**two-sided**

138:14
**type** 84:18
140:24 167:4
180:17,20
203:8 227:14
251:7 269:8
**types** 51:21
147:18 195:14
269:9
**typing** 125:9
126:4 192:9

_____
**U**
**ultimately** 13:17
74:16 111:13
153:3 156:21
160:4 223:24
257:18
**umbrage** 55:16
**unavailable**
126:18 127:16
**unaware** 120:4
121:15
**uncommon**
168:1 178:9
**unconcerned**
104:8
**unconfuse** 64:18
**undercharge**
177:19,19
**undergo** 147:22
**underpopulati...**
68:14
**underreprese...**
245:3
**understand**
21:12 28:1
30:1 44:19
46:6 54:12
56:12 61:6
63:25 65:3
66:5 97:18
98:8 104:17
105:3 106:13
108:20 118:21
120:20 122:11
122:13 147:9
162:7 175:13
243:11,13,22
**understanding**
14:2 27:24
39:23 40:21
60:23 95:2
102:12 106:13
111:15 171:14
172:4 178:9
185:13,15
211:3,15

213:17,20
240:25 261:16
272:5
**understood**
60:18,25 103:8
103:10,14
104:12,24
105:9 118:4,16
139:21 163:25
171:22 216:22
**underwater**
169:22
**underway** 86:13
**undisclosed**
247:18 248:17
**undo** 215:7
**undoubtedly**
143:24 172:9
**Unfortunately**
201:21
**unhappy** 208:21
**United** 1:1 6:11
6:16 15:14
21:21 280:13
**unlimited** 34:6
**unnecessary**
98:12
**unneeded** 244:2
**unrelated** 83:20
**unusual** 263:1
263:10,14
**upset** 118:5
**urban** 244:6
**use** 12:20 21:8
21:10 28:14
34:22 35:25
60:10,13,14
65:10,11 68:21
72:21,21 165:5
194:10 204:3
227:19 228:21
236:5 237:24
247:17
**usually** 154:5
**utilized** 152:11

_____
**V**
**v** 1:12 2:11
**vacation** 94:2
132:6
**vague** 176:16
177:6
**Van** 3:11 37:15
37:24 88:22
281:1
**vap** 255:8,9
**VARA** 2:8,8
**variety** 154:2,3

154:17 223:25
238:5
**various** 17:19
26:13 43:22
44:10 71:19
99:25 147:18
152:21 153:24
174:9 196:16
198:16 217:21
249:14 250:6
**venue** 209:5
**VERA** 1:6
**verbal** 87:24
280:11
**version** 70:10
275:15
**versus** 6:8,14
65:2 68:13
155:3
**vicinity** 10:16
10:23 87:1
271:2
**video** 1:18 2:19
6:5 87:11
178:19,25
272:18,22
279:16
**Videographer**
6:2 7:8 48:10
48:13 87:7,10
87:10 107:8,11
116:18,21
149:18,21
178:13,18,24
212:8,11
220:13,15,18
268:21 272:17
272:21 279:16
**videotape** 184:9
**view** 46:5 98:8
102:23 121:12
126:17 131:6
141:7,9,10
178:11 217:7
217:16 218:14
219:4 243:4
250:3 263:23
**viewed** 141:7
**views** 49:9,13,15
49:23 219:7
224:7,7
**Village** 189:24
**virtually** 60:20
**visited** 165:8
**visiting** 188:18
**visually** 150:23
151:1
**vis-a-vis** 39:19

209:22
**Voces** 2:8 3:9
6:12,21 139:7
139:22 140:9
144:6,11
240:20 241:14
242:8 257:24
280:24
**VOCKE** 1:15
2:14
**Vos** 22:10,23
23:2 24:13
27:13 199:18
**voted** 238:5
**voter** 91:12,13
**voters** 90:14,23
271:2
**voting** 8:10,22
9:9 10:15,22
11:1,9 68:14
91:15,22
195:13 215:1
217:4,13 224:4
239:4,11 241:4
241:10 242:17
243:23 244:5
252:20 255:20
256:4 271:1,12
271:20 272:6
272:10

_____
**W**
**W** 1:4
**wait** 19:1 29:13
29:14,14
108:19 225:1
**waiting** 20:7
172:10 211:16
**waiver** 268:18
**walk** 170:2
**walked** 86:23
**Walker** 25:14,15
124:1
**want** 10:2 21:17
27:24 33:15,16
37:19 47:11
52:7,10 57:12
59:15 64:1
68:24 69:19
74:6 80:22
83:22 96:23
99:13 100:1,5
100:23 102:12
103:13 104:2
108:19 120:14
122:17,22
126:8 127:11
128:24 129:17

Halma-Jilek Reporting, Inc.          Experience Quality Service!          (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 104 of 107   Document 188

**Baldus vs. Brennan**          **2/22/12**          **Deposition of James R. Troupis**

Page 315

133:6,9 142:7
143:7 145:25
152:2 154:16
154:22 177:20
178:2 181:6
182:19 184:12
194:19 200:23
204:8 206:4
215:6,9 220:13
232:10 233:21
237:16 240:17
246:14 264:3,8
267:11 273:6
275:19
**wanted** 9:6
69:11 79:13
97:12 128:9,14
129:2 132:6
141:23 145:3
159:5 163:7
171:1 177:12
215:3,4,22
216:11 240:4
242:8
**wanting** 129:10
142:10
**wants** 134:15
136:7 142:7
242:7 246:6
**ward** 209:2,23
210:3,6,11,16
210:23 211:5
211:23
**wards** 211:18
**Washington**
182:8,9
**wasn't** 16:13,24
20:15 35:7
51:21 52:2
54:1,10 77:23
88:1,2 133:5
140:13 160:11
202:13,13
205:4,4 211:21
215:14 228:10
**wasting** 242:20
**watched** 193:5
**water** 2:25 3:4
3:12 20:6
280:7,19 281:2
**way** 9:4 19:25
21:2 24:5
29:23 32:19
34:11,13,23
36:2 51:2 53:6
63:8 72:18
73:7 75:20
87:25 99:2

109:16 111:6
120:13 121:13
128:19 129:23
130:2 134:12
135:9 136:5
141:10 156:11
156:16,18,20
171:18 173:12
183:5 184:6
185:15 194:17
194:23 226:7
226:11 230:5
234:11,25
239:13 244:4
246:22,24
247:5 251:19
254:10 262:2
262:18
**ways** 122:6
154:3 224:2
**wedged** 167:25
**week** 67:3
163:13 188:18
190:7 205:14
**weeks** 75:14
**Welcome** 7:15
71:8
**Wells** 3:20
281:10
**well-known**
106:21 123:5,7
123:19
**went** 29:23
32:21 34:11
51:7 54:5
56:16 85:23
98:25 119:8
151:19 155:3
163:5 218:24
226:8,11
241:13
**weren't** 63:5,7
**west** 3:16 155:3
189:12 281:6
**Western** 50:21
245:20
**we'll** 12:14
36:13 62:22
68:16,19 78:12
80:6 102:4
111:24 170:2
201:23 220:8
248:11 279:6
**we're** 18:13 20:2
28:21 36:18
61:13 62:22
65:6 72:22
77:13 79:14

94:11 97:13
98:16 99:6
175:10,14
187:9 192:10
199:23 201:20
224:3 248:10
253:21 264:14
265:8
**we've** 14:18,25
32:20 37:11
50:1 68:7
77:23 123:24
124:11 153:15
155:9 179:5
191:16 208:5,5
221:20 222:14
230:17 232:6
267:5 277:19
**whatsoever**
156:23
**Wheeler** 145:16
**whichever** 133:8
187:20
**whipping** 54:25
55:2,4,20
**white** 92:14
122:24 148:3
197:1 271:2
**whites** 270:21
**Whyte** 3:19 7:5
94:25 281:9
**wide** 101:2
**wife** 126:1
**willing** 80:10
133:19 168:13
260:10,14
**winding** 216:25
**Wisconsin** 1:1
1:13,20 2:1,12
2:15,24,25 3:5
3:8,12,15,17
3:20,24 6:4,9
6:12,14,18
21:22 38:23,25
39:12 40:6,8
43:11,12 44:21
46:2 84:5,6,8
123:12,13
156:14,15
186:23,25
189:24 192:5,6
194:18,22
209:18 231:25
245:12 262:12
280:1,5,7,14
280:16,20,23
281:2,5,7,10
281:14 282:7,9

**wise** 34:22
**wish** 105:15,15
122:24 180:25
**wished** 257:15
**wishes** 117:20
**WisPolitics**
85:25 86:5
145:17 240:13
**withdraw** 242:2
259:22,25
267:25 268:7
272:15
**withdrawn**
268:15 279:9
279:11,13
**withhold** 15:6
15:10
**witness** 4:2 7:5
7:6,9,10 8:17
9:14,19,24
12:6 14:7,15
19:21 25:16,19
38:3 43:1 47:1
47:25 48:9
53:23 55:9,14
58:2,10 60:10
65:22,24,25
68:21 69:1
70:5 73:5
79:15,16,18
80:15 81:19
92:4,13 99:8
101:3 103:1,24
104:4 107:7
109:6,13
111:10 116:13
116:23 127:8
132:10,22
143:3 146:14
147:4 157:15
157:17 166:6
175:17 181:9
181:11 184:3,7
184:11 188:6
202:7,23 203:1
203:12 204:16
213:9 214:15
220:3,6,11,14
221:19 225:15
226:1,5,19
227:24 228:7
228:20 229:7
229:14,25
230:12 232:11
232:13 233:23
234:9,23
236:13,20
238:20 239:2

241:19 242:1
247:6,7,7,9,17
247:20,23
248:7,9,15
249:9 250:16
258:24 259:13
260:17 261:25
264:10 266:19
267:10 268:19
270:4,17,23
272:2 275:5
277:4 278:20
279:4,8
**witnesses**
183:23
**WMC** 180:12,14
**Wonderfully**
147:20
**wondering** 76:7
175:14
**word** 20:18 21:3
21:8,10,12
72:21,21 79:10
80:8 108:21
117:17 126:3
128:17 129:3
169:24
**wording** 176:7,8
176:11
**words** 44:20
65:6 92:7 96:4
104:3 109:12
109:14 127:22
127:23,24,25
128:24,25
130:5 134:25
145:25
**work** 10:5 12:20
15:11 34:17
35:6,6 64:15
64:16 73:22
74:5 87:16
99:12 141:9
158:8 159:14
162:12 165:13
172:5 177:13
178:7 189:2
226:2 230:5
265:22 276:3
**worked** 27:25,25
49:19,21 68:2
168:19 173:13
**working** 33:11
61:22 66:13
110:21 138:1
167:16,18,21
167:22 168:2
169:6 171:24

Baldus vs. Brennan     2/22/12     Deposition of James R. Troupis

Page 316

176:6,12 190:6
190:10 191:5
230:15 250:5
255:6
**workplace** 65:13
**works** 41:2
**world** 115:7
**worried** 142:9
243:20
**worry** 165:25
166:3
**worth** 178:5
**wouldn't** 9:3
11:3 16:17
17:25 26:15
35:2,6 47:12
50:2 53:11
63:13 72:10
77:22 82:14
88:18 93:6
112:18 118:24
140:16,17,18
144:3 145:20
156:23,24
157:12 165:8
168:1 174:1
199:5 226:5
227:16 228:20
246:13
**wrestle** 99:2
**write** 14:8 33:24
41:17 125:21
125:23 254:10
**writing** 13:25
14:3 41:17
206:11 254:21
**writings** 11:8
**written** 31:2,5
41:18 58:4
125:18 158:25
**wrong** 9:15
231:11
**wrote** 14:6,7,25
15:1 81:16
96:12 242:6

**X**

**X** 4:1,8

**Y**

**yeah** 11:16
14:25 33:13
37:7,11,21
38:7 40:14,17
40:17 76:5,17
83:25 86:1,24
91:18 110:6
116:7 127:24

130:16 132:20
133:17 141:3
142:5,24 143:4
153:4 205:9
210:5 254:9
279:12
**year** 43:6 52:22
76:15,23 84:22
106:15 108:2
159:23 227:18
249:21
**years** 8:1 43:18
44:9 45:10
49:20 74:1
76:3 84:21
89:17 101:6
149:7,7 165:17
228:22,25,25
250:8 271:10
**yellow** 150:12
150:14
**yesterday**
128:15 129:7
188:16 250:22
265:10
**young** 88:8

**Z**

**Zamarripa**
118:12 133:5,7
232:22
**zero** 57:15
**Zeus** 101:7,8,17
101:17 106:10
106:18,20,24
117:21,22,24
118:7 257:19
**Zipperer** 23:3,4
23:8,10 24:13
27:14 199:17

**$**

**$375** 32:1
**$50,000** 32:5

**0**

**001028** 78:11

**1**

**1** 11:20 90:8
95:10 132:16
132:18,21
179:12
**1st** 188:9
**10** 282:10
**10:00** 81:19
**10:30** 264:5
**10:43** 272:19

**10:45** 81:20
86:19
**10:47** 272:24
**10:53** 85:8
**10:56** 279:18,19
**100** 225:17
244:20
**1000** 3:12 281:2
**102** 3:24 281:14
**11** 175:23
254:17 258:5
274:4,17
275:22 276:10
**11th** 276:11
**11-CV-1011**
2:10 6:16
**11-CV-562** 1:9
6:10
**11:15** 81:20
86:19
**11:30** 221:9
**1166** 253:11
272:16 273:2
**1168** 219:15
220:24 221:3
**12** 70:22 77:19
78:20 80:19
81:13 82:20
83:16 124:16
131:10 187:1
**12th** 70:24 71:2
124:25 241:4
277:12
**12/14/10** 4:16
**12:36** 117:5
**123** 69:5 70:11
**124** 69:16 70:9
70:11,14,17
**127** 11:20
**13** 9:7 77:4
78:25 85:5,8
133:18 134:19
205:16 210:16
231:21 232:17
276:10
**13th** 118:18
144:15 151:22
**133** 232:19
**139** 200:12,19
**14** 4:10,10
**14th** 159:1,6
163:9 192:13
**15** 80:22 95:11
185:11
**158** 4:4,16,16
**16** 90:4,9
**16th** 155:8,19
156:2

**17** 3:16 281:6
**17th** 185:7
248:18
**170** 4:17,17
**175** 4:18,18
**176** 149:25
**178** 4:19
**179** 4:19
**18** 37:17 190:6
**184** 4:20,20
**187** 4:21
**188** 4:21 161:2
161:12
**19** 90:4,10 95:11
232:15
**19th** 150:19
**1900** 3:20
281:10
**193** 4:22,22
**198** 28:12
**1980's** 203:15
**1990** 148:19
244:12
**1990's** 32:20
43:19,23
224:12,21
225:7 245:18
246:17
**1992** 225:22

**2**

**2** 179:12
**2,800** 153:18,19
153:21
**2:24** 254:18
**20** 149:7 165:17
175:12
**2000** 32:20
44:10 45:4
52:22 97:7
114:2 148:19
224:23 245:12
246:9,17
**2001** 52:22
53:11 54:14
55:25 57:1
64:8 72:14,16
**2002** 25:17
52:22 53:17,19
54:14 55:25
57:1 64:8
66:20 72:14,16
168:22 214:24
226:17,23
**2010** 50:10,20
53:3 54:3
73:18,18 86:5
107:20 108:1

114:2 148:20
159:6,14
**2011** 9:7 37:17
50:19 53:21,22
54:5 56:8
70:18,22 71:2
71:3 77:4,19
78:20,25 80:19
81:13 82:20
83:16 85:6,8
108:1,2 117:5
120:22 124:16
124:25 131:10
138:24 139:15
141:11 158:13
158:13 159:18
159:24 163:9
164:2,8 165:21
166:11 169:6
171:9 172:4
175:23 179:13
185:11 187:1
188:10 189:2
190:13,16
192:1 193:21
201:1,15
211:15 227:18
231:21 232:17
254:17 258:5
260:8 274:4
**2012** 1:20 3:1
6:6 53:16,20
87:13 90:8
95:10 178:20
179:2 272:19
272:24 279:18
280:8 282:8
**2014** 282:10
**205** 4:23,23
**206** 131:25
**209** 124:15,19
134:1 277:13
277:16,24
278:9
**21** 170:10,12
171:4,5,8
**2100** 3:12 281:2
**212** 4:5
**219** 4:10 14:20
14:23 20:2
21:12,13 47:19
**22** 1:20 6:6
87:12 171:4
178:20 179:1
272:19,23
279:17
**22nd** 3:1 280:8
**22,000** 153:19

Halma-Jilek Reporting, Inc.     Experience Quality Service!     (414) 271-4466

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 02/23/12   Page 106 of 107   Document 188

**Baldus vs. Brennan**          **2/22/12**          **Deposition of James R. Troupis**

Page 317

**220** 4:11 38:9
38:12 47:15,18
47:21 48:4
183:9 184:17
185:6
**221** 4:12 77:14
78:12,15
**222** 4:13 81:10
81:13 86:6
**223** 4:14 83:12
86:6
**224** 4:15 85:2
**225** 4:16 158:17
158:21 159:8
**226** 4:17 170:15
170:19
**227** 4:18 175:3
175:7,19
**228** 4:19 178:22
179:5
**229** 4:20 184:13
184:20,22
185:1,14,21
186:21
**23** 158:6
**23rd** 282:8
**230** 4:21 187:23
188:2,5,6
**231** 4:22 193:12
193:16
**232** 4:23 205:21
205:25
**233** 4:24 264:8
264:23 265:3
266:8 267:17
267:18
**234** 4:25 188:5
273:20 278:4,5
**24th** 166:11
206:14
**24/7** 74:5
**25** 49:20
**25th** 117:5
120:14,17,22
**25,000** 153:20
**26** 71:2 248:14
**26th** 70:18
221:8,9
**264** 4:6,24
**265** 4:24
**269** 4:7
**271-4466**
282:23
**273** 4:25
**274** 4:25
**28** 179:13
**29th** 181:16
188:20 189:9

---

**3**

**3** 104:7 121:20
188:20
**3rd** 189:9
193:22
**3:30** 131:10
**3:32** 124:16
125:1
**3:34** 3:1 6:6
280:8
**30** 74:1 188:20
228:25,25
**300** 3:8 280:23
**31st** 171:8
172:3
**38** 4:11,11
**384** 95:11
**386** 90:4,9

---

**4**

**4th** 159:14
164:2,8 189:11
**4:03** 206:15
**4:27** 179:13
**4:29** 48:11
**4:37** 48:14
**40** 32:5 140:20
148:11
**41** 206:3,9
**414** 282:23
**43** 8:16 10:11,18
80:9 120:23
135:22 150:12
150:14,15
152:3 158:10
202:3 237:17
255:21 256:4
**44** 158:10 202:3
**45** 271:21
**46** 206:10 207:4
**49** 206:3 208:15

---

**5**

**5th** 189:11
**5:27** 87:8
**5:48** 87:13
**50** 118:9,14
119:10 142:12
143:25
**53** 255:9
**53202** 3:5,8,13
3:20 280:20,23
281:3,10
**53562** 3:24
281:14
**53707-7857**
3:17 281:7

---

**54** 256:5
**55** 142:13 144:1
**55.3** 153:5
**555** 3:19 281:9
**58** 214:25
**58th** 271:9

---

**6**

**6** 37:2 138:24
188:20
**6th** 32:10
**6:13** 107:9
**6:29** 107:12
**6:41** 116:19,22
274:4,18
275:22 276:7
277:5
**6:42** 276:11
**60** 255:8,9,21
**60-53** 252:20
**60-54** 125:3
126:13 130:19
134:8 252:20
259:17
**62.3** 241:6
**65** 142:9 243:21
255:8
**67.6** 241:6
**69** 191:16,19

---

**7**

**7** 4:3 139:15
141:11 200:25
201:15,24
203:6
**7th** 205:11
**7/12/11** 4:13
**7/13/11** 4:15
**7:25** 149:19
**7:37** 149:22
**70** 142:8,10,15
142:20 143:11
143:16 241:7
242:7
**72** 249:3
**7609** 3:23
281:13
**77** 4:12
**780** 2:25 3:4
280:7,19
**7857** 3:17 281:7

---

**8**

**8** 9:11 10:5,7
11:2 85:25
86:5 104:6
120:13 121:3
121:13 150:14

---

**150**:17 196:1
196:13,19,24
212:20 213:5,6
213:9,17,23,25
214:3,6 217:3
217:4 218:14
218:23,23
219:1,4 223:4
233:2 237:20
238:1,7 243:1
243:6,18
248:21,24
250:13 251:1
255:8,20 257:5
**8th** 13:13 15:4
24:25 95:14
96:1 98:24
102:15 104:13
104:24 105:10
149:13 150:7
150:10,12,21
150:22 151:3
152:3 153:1,16
154:7,11,12
155:7 156:6,9
157:2,8 234:5
234:6 235:17
236:10 241:4
269:16,18,23
270:21 271:17
271:22 272:7
**8:00** 138:25
**8:15** 175:9
178:20
**8:20** 179:2
**8:42** 77:19
78:21 80:19
**80** 114:2
**81** 4:13,13
265:14
**83** 4:14,14
**839** 3:7 280:22
**85** 4:15,15
**87** 253:24

---

**9**

**9** 9:11 10:5,7
11:2 25:9
104:6 120:13
121:3,13
125:12 132:16
132:18,21
150:14 175:23
196:1,13,19,24
212:20 213:5,6
213:9,20,23,25
214:3,6 217:12
217:13,19

---

**218**:15,23
219:2,4 223:4
243:1,6,18
248:21,24
250:13 255:9
256:5 257:5
**9th** 15:2 25:1,5
95:15 96:1
98:24 102:16
104:13,25
105:10 150:7
150:10,12,18
150:24 151:4
152:4,17 155:7
175:25 192:1
234:5,11
235:17 236:10
269:23 271:23
**9:06** 212:9
**9:20** 212:12
**9:31** 220:16
**9:38** 220:19
**9:44** 81:14
82:20
**9:58** 83:16
**90** 114:2
**91** 162:22
**96** 138:3 145:4,5
145:12 146:1
237:9,12,13,15
240:4,6 242:5
269:5
**99** 116:7,8
119:14