UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

_____

ALVIN BALDUS, CARLENE BECHEN, ELVIRA      )
BUMPUS, RONALD BIENDSEIL, LESLIE W.       )
DAVIS, III, BRETT ECKSTEIN, GLORIA        )
ROGERS, RICHARD KRESBACH, ROCHELLE        )
MOORE, AMY RISSEEUW, JUDY ROBSON, JEANNE  )
SANCHEZ-BELL, CECELIA SCHLIEPP, TRAVIS    )
THYSSEN, CINDY BARBERA, RON BOONE, VERA   )
BOONE, EVANJELINA CLEERMAN, SHEILA        )
COCHRAN, MAXINE HOUGH, CLARENCE JOHNSON,  )Case No. 11-CV-562
RICHARD LANGE, and GLADYS MANZANET,       )  JPS-DPW-RMD
                                          )
                  Plaintiffs,             )Milwaukee, Wisconsin
                                          )
TAMMY BALDWIN, GWENDOLYNNE MOORE and      )February 23, 2012
RONALD KIND,                              )8:30 a.m.
                                          )
             Intervenor-Plaintiffs,       )**VOLUME IV**
                                          )**A.M. SESSION**
v.                                        )
                                          )
Members of the Wisconsin Government       )
Accountability Board, each only in his    )
official capacity:  MICHAEL BRENNAN,      )
DAVID DEININGER, GERALD NICHOL, THOMAS    )
CANE, THOMAS BARLAND, and TIMOTHY VOCKE,  )
and KEVIN KENNEDY, Director and General   )
Counsel for the Wisconsin Government      )
Accountability Board,                     )
                                          )
                  Defendants,             )
                                          )
(caption continued on next page)          )
_____

### TRANSCRIPT OF COURT TRIAL

BEFORE DIANE WOOD, CIRCUIT JUDGE, ROBERT DOW, JR., DISTRICT
     JUDGE, and J. P. STADTMUELLER, DISTRICT JUDGE

Contract Reporters:          Halma-Jilek Reporting 414-271-4466

Proceedings recorded by computerized stenography, transcript
produced by computer aided transcription.

```
 1 │ F. JAMES SENSENBRENNER, JR., THOMAS E.   )
   │ PETRI, PAUL D. RYAN, JR., REID J.        )
 2 │ RIBBLE, and SEAN P. DUFFY,               )
   │                                          )
 3 │                 Intervenor-Defendants.   )
   │ ─────────────────────────────────────    )
 4 │                                          )
   │ VOCES DE LA FRONTERA, INC., RAMIRO       )
 5 │ VARA, OLGA VARA, JOSE PEREZ, and         )
   │ ERICA RAMIREZ,                           )
 6 │                                          )
   │                 Plaintiffs,              )
 7 │                                          )
   │ v.                                       )Case No. 11-CV-1011
 8 │                                          )  JPS-DPW-RMD
   │ Members of the Wisconsin Government       )
 9 │ Accountability Board, each only in his   )
   │ official capacity: MICHAEL BRENNAN,      )
10 │ DAVID DEININGER, GERALD NICHOL, THOMAS   )
   │ CANE, THOMAS BARLAND, and TIMOTHY        )
11 │ VOCKE, and KEVIN KENNEDY, Director and   )
   │ General Counsel for the Wisconsin        )
12 │ Government Accountability Board,         )
   │                                          )
13 │                 Defendants.              )
   │ ────────────────────────────────────────────────
14 │
15 │ A P P E A R A N C E S
16 │ For the Plaintiffs:        DOUGLAS M. POLAND
   │                            Godfrey & Kahn, S.C.
17 │                            780 North Water Street
   │                            Milwaukee, WI 53202-3590
18 │                            414-273-3500
   │                            Fax: 414-273-5198
19 │                            Email:  dpoland@gklaw.com
20 │                            DUSTIN B. BROWN
   │                            Godfrey & Kahn, S.C.
21 │                            1 East Main Street - Suite 500
   │                            Madison, WI 53701-2719
22 │                            608-257-3911
   │                            Fax: 608-257-0609
23 │                            Email:  dbrown@gklaw.com
24 │
25 │
```

```
 1   FOR THE CONSOLIDATED
     PLAINTIFFS:                    JACQUELINE E. BOYNTON
 2                                  Law Offices of Jacqueline Boynton
                                    2266 N. Prospect Ave - Ste. 505
 3                                  Milwaukee, WI 53202-6306
                                    414-276-1066
 4                                  Fax:414-276-9119
                                    Email: jackie@jboynton.com
 5
                                    PETER G. EARLE
 6                                  Law Offices of Peter Earle, LLC
                                    839 North Jefferson - Suite 303
 7                                  Milwaukee, WI 53202
                                    414-276-1076
 8                                  Fax: 414-276-0460
                                    Email: peter@earle-law.com
 9
     FOR THE DEFENDANTS:            DANIEL KELLY
10                                  Reinhart Boerner Van Deuren, S.C.
                                    1000 North Water Street
11                                  Milwaukee, WI 53202
                                    414-298-1000
12                                  Fax: 414-298-8097
                                    Email: dkelly@reinhartlaw.com
13
                                    PATRICK J. HODAN
14                                  Reinhart Boerner Van Deuren, S.C.
                                    1000 North Water Street
15                                  Milwaukee, WI 53202
                                    414-298-1000
16                                  Fax: 414-298-8097
                                    Email: phodan@reinhartlaw.com
17
                                    COLLEEN E. FIELKOW
18                                  Reinhart Boerner Van Deuren, S.C.
                                    1000 North Water Street
19                                  Milwaukee, WI 53202
                                    414-298-1000
20                                  Fax: 414-298-8097
                                    Email: cfielkow@reinhartlaw.com
21
                                    MARIA S. LAZAR
22                                  Wisconsin Department of Justice
                                    Office of Attorney General
23                                  17 West Main Street
                                    Madison, WI 53707-7857
24                                  608-267-3519
                                    Fax: 608-267-2223
25                                  Email: lazarms@doj.state.wi.us
```

```
 1   FOR INTERVENOR PLAINTIFFS:    SCOTT HASSETT
                                   Lawton & Cates, S.C.
 2                                 10 East Doty Street - Suite 400
                                   P.O. Box 2965
 3                                 Madison, WI 53701-2965
                                   608-282-6200
 4                                 Fax:  608-282-6252
                                   Email: shassett@lawtoncates.com
 5
     FOR THE INTERVENOR
 6   DEFENDANTS:                   KELLEN C. KASPER
                                   Foley & Lardner, LLP
 7                                 777 East Wisconsin Avenue
                                   Milwaukee, WI 53202-5300
 8                                 414-297-5783
                                   Fax: 414-297-4900
 9                                 Email: kkasper@foley.com

10                                 THOMAS L. SHRINER, JR.
                                   FOLEY & LARDNER, LLP
11                                 777 East Wisconsin Avenue
                                   Milwaukee, WI 53202-5300
12                                 414-297-5601
                                   Fax: 414-297-4900
13                                 Email: tshriner@foley.com

14   FOR THE MOVANTS:              JOSEPH LOUIS OLSON
                                   Michael Best & Friedrich, LLP
15                                 100 East Wisconsin Avenue
                                   Suite 3300
16                                 Milwaukee, WI 53202-4108
                                   414-271-6560
17                                 Fax: 414-277-0656
                                   Email: jlolson@michaelbest.com
18
                                    I N D E X
19
```

```
20   Opening Statement of Ms. Lazar.............................96

21   JOHN BARTKOWSKI

22   Direct by Mr. Earle.......................................110

23   Cross by Ms. Lazar........................................120

24   Redirect by Mr. Earle.....................................120

25
```

1   PEDRO COLON

2   Direct by Mr. Earle.......................................122

3   Cross by Ms. Lazar.......................................129

4   Redirect by Mr. Earle....................................139

5   CHRISTINE NEUMANN-ORTIZ

6   Direct by Mr. Earle......................................141

7   Cross by Mr. Kelly.......................................150

8   Redirect by Mr. Earle....................................169

9   DR. KENNETH MAYER

10  Direct by Mr. Earle......................................173

11  Direct by Mr. Poland.....................................218

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2     THE BAILIFF:  Hear Ye, Hear Ye, Hear Ye, the United

3  States District Court for the Eastern District of Wisconsin is

4  now open, the Honorable Judges J. P. Stadtmueller, District

5  Judge, Eastern District of Wisconsin, Diane P. Wood, Circuit

6  Court Judge, United States Court of Appeals for the Seventh

7  Circuit, and Robert M. Dow, Jr., District Judge, Northern

8  District of Illinois, presiding.

9     All persons having business before this Honorable

10  Court are admonished to draw near and give their attention for

11  this special three-judge court convened pursuant to Title 28,

12  United States Code, Section 2284 is now in session.

13     God save the United States and this Honorable Court.

14  Please be seated and come to order.

15     THE CLERK:  The Court calls Alvin Baldus, et al,

16  versus Michael Brennan, et al, Case No. 11-CV-562 for a court

17  trial.  May I have the appearances, beginning with the

18  plaintiffs.

19     MR. POLAND:  Good morning, Your Honors.  Doug Poland,

20  Dustin Brown and Wendy Arends on behalf of the Baldus

21  Plaintiffs.

22     MR. EARLE:  Good morning, Your Honors.  Peter Earle

23  and Jackie Boynton on behalf of Voces de la Frontera, Ramiro

24  Vara, Olga Vara, Jose Perez and Erica Ramirez.

25     MR. HASSETT:  Good morning, Your Honors.  Scott

Hassett and Jim Olson on behalf of the Intervenor Plaintiffs.

MS. LAZAR: Good morning, Your Honors. Assistant Lazar on behalf of the members of the Wisconsin Accountability Board and their director and general counsel in their official capacity only, along with Attorneys Dan Kelly, Patrick Hodan Colleen Fielkow and Jake Curtis.

MR. SHRINER: Good morning, Your Honors. Thomas L. Shriner, Jr., and Kellen Kasper for the Intervenor Defendants.

JUDGE STADTMUELLER: Good morning. Thank you. Good morning, Counsel. At the outset, on behalf of myself and Judge Wood and Judge Dow, I want to express our sincere appreciation for the good faith that was exercised in counsels' endeavors to perhaps through an alternative means bring this litigation to a suitable resolution, and while we certainly appreciate those good faith efforts, unfortunately in this instance it didn't work out.

That said, we are now ready to proceed with the receipt of such testimony as may be required, particularly as related to those factual matters that remain in dispute. My clerk has advised me that with respect to Act 44, counsel for the Intervenor Defendants and the balance of the parties have apparently reached an accommodation, so at this time, Mr. Shriner, I will call upon you and Mr. Hassett to the make that matter of record.

MR. SHRINER: Your Honor, that is correct. We have

agreed, Mr. Olson and Mr. Hassett and I, with the concurrence

of the other parties involved in the challenge to Act 44, that

in lieu of live testimony we will submit certain matters which

the Court can take as if they had been testified to; some

things that the Court can take as true, some things that the

Court can take simply as testimony that it would have heard.

There is a stipulation being circulated, the contents of which

have all been agreed to, so I think it's a matter of getting it

on paper.  We expect to be in a position to file that by noon,

and will not be presenting any live testimony on the subject of

Act 44.

JUDGE STADTMUELLER:  All right.  Thank you.

Mr. Hassett?

MR. HASSETT:  I would agree with that, Your Honor,

and we speak for the Baldus Plaintiffs, as well.

JUDGE STADTMUELLER:  Thank you.  Mr. Poland and Mr.

Earle, do you agree?

MR. POLAND:  Yes, Your Honor, we do.

MR. EARLE:  Yes, Your Honor, we do.

JUDGE STADTMUELLER:  Thank you.  That being the case,

we will await your written submissions and we will move forward

this morning with the receipt of such testimony as I indicated

as may be required dealing with the balance of the issues and

suitable stipulations, exhibits and the like.

On the subject of opening statements, as counsel may

1  have gleaned from the court's comments earlier in the week, we

2  would genuinely appreciate your focusing for purposes of today

3  and tomorrow on those matters that remain in dispute,

4  specifically factual matters and specifically those exhibits

5  which support each parties' view with respect to these disputed

6  facts.  Obviously, at the end of the trial you will have ample

7  opportunity in a summation to pull it all together, but we're

8  not interested this morning in hearing anyone recount either

9  the claims of the legal issues or legal authority or case

10 cites.  Our purpose is to take factual testimony, including

11 expert testimony, on these issues, and hopefully we can

12 conclude all of the testimony in a matter of several hours as

13 opposed to several days.  I reminded everyone earlier in the

14 week that when we tried the case back in 2002 when some of you

15 in the room were actually here during that trial, the actual

16 testimony took little more than a day and the arguments of

17 counsel took a little more than four hours.  So instead of a

18 two-day trial, it was actually about a day and one-half.  Now I

19 appreciate, like this case and the earlier case, you have an

20 incredible amount of written submissions and we, like the

21 earlier court, are prepared to synthesize those materials in

22 light of your written submissions, including the trial briefs

23 and motions for summary judgment and the like.  So it would be

24 of enormous help to the court if we simply focused for the next

25 several hours on those matters that are truly in dispute.  So I

1  will now call upon Plaintiffs' counsel for their opening, and

2  then we will move to the Intervenor Plaintiffs and then the

3  Defendants.

4          MR. POLAND:  Your Honor, if I may, Doug Poland on

5  behalf of the Baldus Plaintiffs.  Before we get to opening

6  statements, I have one other housekeeping matter.  In the

7  interest of speeding things along, we had a witness who we

8  planned to put on live, Steve Barg, the City Administrator for

9  the City of Marshfield.  We prepared a declaration.  We have

10 given it to counsel, and they have agreed we can submit that by

11 declaration as opposed to calling Mr. Barg live.  I wanted to

12 ask Your Honors how you prefer that we submit that testimony to

13 the court.  Should it be filed via ECF?

14         JUDGE STADTMUELLER:  I think that probably would be

15 preferable.  There's no need to read it into the record, if

16 it's -- and the same with depositions.  If you have an exhibit

17 that includes line by line of a particular witness' testimony

18 that you believe to be relevant and defense counsel have

19 included the appropriate cross-examination that deals with the

20 same subject, there's no need to read it into the trial record.

21         MR. POLAND:  Thank you, Your Honor.  If I may, then,

22 given what the Court has said and admonished about moving

23 quickly, the Baldus Plaintiffs will waive their opening

24 statement.

25         JUDGE STADTMUELLER:  Thank you.  Mr. Earle?

1          MR. EARLE:  Your Honor, Peter Earle.  The Voces

2     Plaintiffs will also waive their opening statement in an effort

3     to get this entire case put in by close of business on Friday.

4          JUDGE STADTMUELLER:  Thank you.  Mr. Kelly?

5          MS. LAZAR:  Just one moment, Your Honor.  I just have

6     to strike two exhibits they we were going to show, because I'm

7     taking out all Act 44 references in the opening.  I will give

8     it to the trial consultant in one second.

9          Good morning.  May it please the Court, I'm Assistant

10     Attorney General Maria Lazar.  In preparing the opening

11     statement this morning, I took to heart the Court's admonition

12     on the first day we were here that we should get to the crux of

13     the matter and avoid all minutia.  I'm just going to try to

14     point out a few points and issues that are important to our

15     case.

16          When all is said and done here, the principal concept

17     is the one that this court has been focusing upon and has been

18     trying to work with, which is that redistricting is the

19     province of the Legislature.  The Legislature has the duty to

20     do the redistricting every ten years.  For the first time in

21     Wisconsin since 1983, the Legislature actually did what it was

22     supposed to do and created and passed Acts 43 and 44.  We won't

23     discuss Act 44 this morning.  But as the Plaintiffs concede in

24     their trial briefs, these laws are presumed constitutional, and

25     that is where the case should start.  And as a point of

1   reference and something we'll bring up in some of our evidence

2   later on this morning or tomorrow, the 1983 Legislature, a

3   Democratic Legislature, when it passed the redistricting plan

4   that year did it in five days starting with the hearing one

5   public hearing on Monday afternoon and the bill and law being

6   passed on Friday.

7           It's the Court's responsibility in this case to

8   determine whether the redistricting plan complies with the

9   constitution.  It's not supposed to substitute its judgment

10  about the wisdom of the plan, it's just supposed to ascertain

11  whether, as you have indicated before, it passes constitutional

12  muster, not whether there could be a better plan or not whether

13  the plan or the maps met the most vocal group's wishes.

14          In point of fact here, the maps that we have we're

15  well drawn.  They must comply with the constitution, we concede

16  that, but they have to be responsive to the legislative

17  judgment as to what will be best for the people of Wisconsin.

18  There's no requirement to take politics out of the

19  redistricting process, as this Court has noted I believe on

20  Tuesday.

21          The Plaintiffs have made some comments in their

22  briefs that they are concerned that our case and our defense of

23  our case will be mainly through experts, but that's because

24  they made a legal challenge as to the constitutionality of the

25  maps, and it's best addressed through expert analysis of what

1    they actually say and do.

2           It's not necessary to look behind the intent of the

3    Legislature.  As Justice Scalia noted, it's almost impossible

4    to discern the intent of legislators, and I will give you a

5    quote on that later on.  The court in Illinois in Committee for

6    a Fair and Balanced Map versus Illinois State Board of

7    Elections acknowledged the point by saying that you can almost

8    never determine the motives and objectives of the legislators,

9    but they said the proof, so they say, is in the pudding, and

10   the pudding is the 2011 map.  That's precisely what we have in

11   this case.  The proof and the issues are what are in the maps

12   and what's before this court.

13      So for the next two days the case is going to be centered on

14   Act 43, which is the legislative boundaries.  The Court

15   mentioned on Tuesday morning that there were several points

16   that they were expressly interested in.  One of them was the

17   political gerrymandering claim that's Count 5.  This claim is

18   inapplicable for Act 43, as it is for Act 44, because as we put

19   in our briefs and pleadings which are before the Court, and I

20   will not repeat, there is no legal justiciable standard, so

21   that leaves several issues that we should address; population

22   equality, the Voting Rights Act, delayed voting or

23   disenfranchisement and general redistricting principles.

24      So going through these, after the 2010 census, the 2002

25   court-drawn map had several districts outside the legal

1   boundaries, and that's Stipulated Fact Paragraph 148 in the

2   Joint Pretrial Report.  Act 43 addressed those concerns.  It

3   has to be noted that State Senate and Assembly Districts are

4   not subject to the same strict standards of equal population as

5   congressional districts.  Minor deviations are allowed.

6       In fact, the United States Supreme Court has never struck

7   down a case or a map with a population deviation of less than

8   9.9 percent.  Here, under Act 43, it's less than one-tenth of

9   that number.  The parties have stipulated, and if we can show

10  Joint Pretrial Report Paragraph 154, that the maximum deviation

11  for assembly district, 7.6 -- I mean for assembly district is

12  .76, and it's .62 for senate districts.  As a point of

13  reference, the 2002 federal court-drawn assembly map, and this

14  is in Stipulated Fact Paragraph 153, that assembly map had a

15  range of 1.59 percent deviation and a senate overall deviation

16  range of .098.  The Plaintiffs have the burden here.  They have

17  to show this minuscule population deviation affects

18  constitutional provisions.  They have not done so, and they

19  will not be able to do so today.

20      Next, the Voting Rights Act.  These are the claims of Voces

21  de la Frontera and Count 6 and 7 of the Baldus Second Amended

22  Complaint.  In 2002, the court drew five majority

23  African-American assembly districts, two majority

24  African-American senate districts, and one majority Latino

25  assembly district.  Act 43, and this will be found in

1  stipulated Paragraph 128, Act 43 increased the majority
2  African-American assembly districts by one, so there were a
3  total of six African-American assembly districts, and increased
4  the Latino majority assembly districts by one, making two, and
5  that's shown in Stipulated Fact Paragraph 134.

6  The Plaintiffs' Voting Rights Act claim focuses upon
7  African-Americans, Native Americans and Latinos or Hispanics.
8  First, the Plaintiffs own experts in this case concede that you
9  cannot draw a seventh African-American assembly district in
10  Milwaukee no matter how hard you try, and that's shown in the
11  expert report of Kenneth Mayer at Page 25, the last paragraph,
12  the last sentence, and it is also shown in his deposition when
13  he was questioned about that expert report.  That's in his
14  deposition.  The question was, "Given your analysis of the six
15  African-American districts, is there a large enough population
16  in that area to create a seventh African majority-minority
17  district.  Answer:  I don't believe there is."  Accordingly,
18  that part of the VRA claim has to fall.

19  Now, next the Plaintiffs have alleged in their complaint
20  allegations about the native American community, but they
21  haven't put on any experts, there's no reports on that, there's
22  no witnesses.  That leaves only the Latino or Hispanic
23  districts as the only remaining VRA claims.  Now both groups of
24  Plaintiffs argue that Act 43 should have created one
25  supermajority Latino assembly district, but the VRA does not

require that.  If it did, then the court in 2002 would have violated the VRA when it created one district, Assembly 8, under Act 43.

The Baldus and Voces Plaintiffs will not be able to show that the Latino community in Assembly Districts 8 and 9 have been diluted in violation of the VRA.  There will be no evidence at trial that the population in Assembly District 8 is insufficient under the VRA.  They will not be able to show that the Latino community has not been able to elect a candidate of their choice in District 8.  That's simply because it is not true.  A Latino candidate has won each and every election in Assembly District 8 since 1998, and that's the best evidence we can put on.

The Plaintiffs will then rely upon their expert's late-filed report in an analysis on racial polarized voting, but they cannot address how the Latino candidate has won as judge in 2010 and each time he ran for assembly district, and that will be The Honorable Pedro Colon.

The Plaintiffs will not be able to show that Act 43 will impair or prevent minorities from electing their chosen representatives.  Without that, they cannot prove a violation of the VRA.  Ironically, it is the Latino-based group Voces de la Frontera which is seeking to reduce the number of Latino assembly districts majority districts.  In fact, the current representative of Assembly District 8, JoCasta Zamarripa, at

 1   the Joint Public Hearing for the Wisconsin Redistricting Plan

 2   on July 13th, 2011 said, and this is shown in the testimony in

 3   Trial Exhibit 19, that the 8th Assembly District was a

 4   supermajority, this is the new one, and the 9th was trending

 5   that way, and that she was, quote, "Glad to hearing that they

 6   are moving from a majority to a supermajority in the 8th and

 7   the 9th."

 8       Our experts, which we will put on tomorrow, are renown in

 9   this field.  They will demonstrate that Act 43 gives minority

10   voters, in particular Latino voters, the equal opportunity to

11   participate in the political process and to elect

12   representatives of their choice in one assembly district and

13   have a greater influence in the second assembly district.  They

14   will have the chance, our experts will show, that as time

15   passes, with the fact that the age and the group members of the

16   Latino group are younger, that they will grow that second

17   district and they will have a majority in it way before the

18   next census.

19       The Latino community itself is divided on this point.  If

20   you look at Stipulated Fact No. 147, some members want the

21   chance to have a second seat, they want 8 and 9 as they were

22   prepared.  Others, such as Voces, appear to want to make a

23   100-percent guarantee in 8 sacrificing the influence that was

24   given to them in 9.  Our experts will testify that there is

25   this, as I said, the youth growth in the Latino community.  So

1    the Plaintiffs in this case will not be able to establish the

2    second or the third prong of Thornburg versus Gingles.

3        So then we move to the delayed voting or disenfranchisement

4    claim.  That's Claim 3.  We don't believe this is applicable in

5    the case, and we can explain why.  The Baldus Plaintiffs allege

6    that Act 43 disenfranchises 299,533 citizens by moving them

7    from even to odd state senate districts.  Now I have to preface

8    and state that we do not take claims of delayed voting lightly,

9    and we take this very seriously.  We're very conscious of the

10   Court's concern and interest in this claim, but there are

11   several facts that have to be taken into account.

12       The first is that for the first time in awhile there have

13   been recall elections in the State of Wisconsin, and a total of

14   164,843 people who reside in districts which would have

15   otherwise experienced delayed voting have already had a chance

16   to vote in 2011, and we're not even going to discuss the fact

17   that there could be more on that issue, as well.  So,

18   therefore, the actual number of individuals who are impacted by

19   delayed voting is really 134,861.  But, regardless of whose

20   number you accept, our number of 134,861 or their number of

21   299,533, that number alone is not a sufficient basis to

22   invalidate Act 43.

23       Now remembering that Wisconsin hasn't drawn maps as the

24   Legislature since 1983, court-drawn maps are subject to a

25   greater scrutiny than legislative-drawn maps, and they have to

meet higher standards. So when you look at what happened in
1983, it's instructive to what's happening now. In 1982 the
three-judge panel drew a map that would have made more than
500,000 people, that's more than half-a-million people, wait
six years to vote for state senate, and that's the AFL-CIO
versus Elections Board case. That figure was the basis for a
challenge by individuals to the court, which the court rejected
calling it, quote, "A house of cards that collapses when
exposed to even the gentle breeze of cursory analysis," and
said that the challenge was contrary to both Wisconsin law and
common sense.

Now later in 1983 the Wisconsin Legislature enacted a new
plan, a redistricting plan, and that plan moved an additional
173,976 people to a district where they would have had to have
waited to vote. Now that number, the 173,976, is what's in the
case and what people look at failing to take into account there
was already 500,000 or more that were impacted. The same
three-judge panel that had allowed the over one-half-million
found that the additional delays were impermissible and said
that they had no trouble sustaining a challenge. Now remember
it was that lower number, the 173,976 which is in the case, and
that's the number that the Plaintiffs in this case have
compared our 299 number or our lower number of 134. In reality
they have to add that to the half-a-million.

So when you look at those numbers, you can see that there

1   isn't a valid case for disenfranchisement or delayed voting
2   and, more important and most significant, when you look at the
3   Plaintiffs' briefs in this case, and a point which we have
4   raised several time in ours, the case that they rely upon has
5   been vacated by the U. S. Supreme Court in 1984.  They
6   continually quote and rely upon Republican Party of Wisconsin
7   versus Election Board.  That's an Eastern District of Wisconsin
8   case in 1984.  That case was vacated.  It has no precedential
9   value.  It should not be quoted again.

10      So once the delayed voting part of this case falls, all that
11   you have left and all you can argue about are the redistricting
12   principles which the Plaintiffs attempt to tie to the Wisconsin
13   Constitution.  Before we address those claims, I just want to
14   again reiterate and point out and address the Court to our
15   briefs regarding Pennhurst State School and Hospital versus
16   Halmderman and the fact that these issues cannot be addressed
17   here and that there's sovereign immunity for the State of
18   Wisconsin which has not been waived.  We have addressed that in
19   the briefs; I won't cite legal quotes here.

20      Even assuming that Pennhurst does not apply, Act 43 does not
21   divide community boundaries and communities of interest
22   sufficient to rise to a level of unconstitutionality.  That's
23   all that's left for the Plaintiffs, and it doesn't stand.  So
24   despite all the allegations and protests of the Plaintiffs,
25   they continually fail to realize that these are not

1   constitutional standards, they are really just best practices.

2   They are things that a court will look at, if they find that a

3   constitutional standard has not been followed.  Then you go

4   down and look to here.  The Plaintiffs have the burden of proof

5   on constitutional issues, and they will not be able to meet

6   that, and because of that fact, there's no reason to delve

7   further down into those redistricting principles.

8       Lastly, there is a claim in this case that we think this

9   Court could dismiss this morning, and that's the last claim of

10   the Baldus complaint.  It's the claim which asks the Court to

11   issue a declaration that the districts created by Act 43, if

12   upheld, will not apply to any recall or special elections

13   taking place prior to the regular elections scheduled for this

14   November 2012.  There are several reasons why this claim should

15   just be dismissed.

16       First, this claim also implicates the Pennhurst situation

17   where it's asking this Court to order state agent to comply

18   with state law, which is not permissible.  Take that aside.

19   There's also already a state court action filed in Waukesha

20   County which is presently before the state Supreme Court,

21   Clinard versus Brennan, and that's Case No. 11-CV-3995.

22   Actually, there's two cases there.  But most significantly, the

23   Defendants do not disagree that Act 43 districts should not be

24   applied until November of 2012, if you look at Stipulated Fact

25   No. 97.  Accordingly, there is no controversy here.  The

 1    controversy is in the state court action, which is where it

 2    belongs.  The jurisdiction of the federal courts to issue

 3    declaratory judgments is bounded by a requirement that there be

 4    a substantial controversy between the parties having adverse

 5    legal interests, and that controversy has to not only be at the

 6    beginning of the case, but it has to continue throughout the

 7    entire case.  It has to remain at all stages of review, not

 8    just when the complaint was filed.  Controversy doesn't exist

 9    here.  It never really did.  That last claim should be

10    dismissed and we shouldn't spend any time or testimony on that.

11        Finally, I will end how I started.  Redistricting is the

12    province of the State Legislature.  That body does not have to

13    draw a map that satisfies everybody.  That will be impossible,

14    because this is a political process.  The map has to comply

15    with the basic laws, including equal population and the Voting

16    Rights Act.  Legislation passed by the Legislature and signed

17    by the governor is presumed constitutional.  Act 43 is

18    constitutional for the reasons that I have stated above.

19        Now a lot has been said by Plaintiffs, and the Court has

20    looked at the manner in which this legislative process has

21    taken place, and the speed and manner in which Act 43 and Act

22    44 were created.  But we would direct the Court back to 1982

23    where our 12 days here looks relatively long compared to the

24    five days it took in 1982.

25        It also has to be remembered, though, that the process of

1   legislation is not on trial.  The courts are not supposed to

2   delve into the legislative process; they probably don't even

3   want to.  In fact, we just had a case in Wisconsin just this

4   year which affirmed the centuries' old standard, and that was

5   Ozanne versus Fitzgerald regarding the separation of powers.  I

6   ask the court to remember that this lawsuit was filed before

7   any maps were drawn, and the evidence will show that the

8   Democrats talking points that they circulated railing against

9   the maps were circulated before the maps were introduced.

10      Simply put, quite simply, whichever maps were drawn,

11  whatever lines they made, whatever districts were created in

12  the Latino District, this suit would have been filed and we

13  would have been here today.  Just as obvious, had the Democrat

14  party held the majority in the Legislature and the Governor's

15  Office, a similar legislative process would have been

16  implemented as it was in 1983.  Now we do not represent the

17  Legislature, and we just have to say that neither party,

18  neither political party, could ever be accused of not acting

19  politically.  But as I first noted, that is not a basis upon

20  which to find these Acts unconstitutional.

21      In summary, the lawsuits that were filed and the cases that

22  remain have no legal basis, there's no real merit, and we urge

23  the Court to tailor this case and to look at the witnesses and

24  to make sure that the testimony that's being presented to the

25  Court in this sort of shortened time frame is relevant to the

1   facts that are at issue here.  Those facts are whether or not
2   the proof is in the pudding, and whether or not Act 43, and we
3   also say Act 44, are constitutional.  We believe that both of
4   them are.  Thank you.
5           JUDGE STADTMUELLER:  Thank you, Ms. Lazar.  You may
6   call your first witness.
7           MR. POLAND:  Your Honor, we do have one other
8   preliminary matter before our first witness is called.  We do
9   have exhibit binders for each of the members of the Court.
10  These are the exhibits that will be used with each of the
11  witnesses today.  If it would be convenient for Your Honors to
12  have and you would like to have them, we have them available
13  for you.
14          JUDGE STADTMUELLER:  Certainly.
15          MR. EARLE:  While they are attending to that, Your
16  Honors, the Voces Plaintiffs will go first.
17          JUDGE STADTMUELLER:  All right.  And keep in mind the
18  admonition that I gave you on Tuesday, or it may have been
19  during the final pretrial, you need to have an order in which
20  witnesses will be examined by your colleagues and
21  cross-examined, and I would prefer that counsel having the
22  greatest interest in the cross-examination go first so that we
23  don't spend a lot of unnecessary time repeating things.  I will
24  let counsel work that out.
25          MR. EARLE:  Thank you, Your Honor.  Our first witness

1  will be Dr. John Bartkowski.  It says Steven Bartkowski, but

2  that's a typographical error.  His name is John Bartkowski.

3  Your Honors, may I address the podium?

4          JUDGE STADTMUELLER:  Certainly.

5          JOHN BARTKOWSKI, PhD, having been first duly sworn,

6  was examined and testified as follows:

7          THE CLERK::  Would you please state and spell your

8  full name for the court reporter.

9          THE WITNESS:  John Bartkowski, B-A-R-T-K-O-W-S-K-I.

10         JUDGE STADTMUELLER:  Mr. Bartkowski, there are a lot

11  of people in the courtroom who are very interested in your

12  testimony.  I'd invite you to move forward and speak directly

13  into the microphone when you respond to Mr. Earle's questions.

14                      DIRECT EXAMINATION

15  BY MR. EARLE:

16  Q  Good morning, Dr. Bartkowski.  Where are you employed?

17  A  The 16th Street Community Health Center.

18  Q  And what's your position there?

19  A  I'm the president and CEO.

20  Q  And how long have you been the president and CEO of the 16th

21  Street Community Health Center?

22  A  I have been the president and CEO for 22 years, and prior to

23  that I was on the board of directors for eight years.

24  Q  Okay.  And, Dr. Bartkowski, would you briefly review your

25  background for the Court?

1  A  My educational background?

2  Q  Yes.  Educational background, yes.

3  A  I have a bachelor's and a master's degree in nursing and a

4  doctorate in public health.

5  Q  And have you made any presentations in the area of your

6  expertise?

7  A  I have given testimony in Congress around public health

8  issues.  I have taught at the Medical College of Wisconsin in

9  their master's of public health program, and I regularly give

10  talks around public health and community health across the

11  country.

12  Q  And would you describe the 16th Street Community Health

13  Center and what it does?

14         MS. LAZAR:  I would like to make an objection, Your

15  Honor.  I don't know whether this witness' testimony will be

16  relevant to the constitutionality of Act 43 or Act 44.  There's

17  already a stipulated fact that's 147 that the Latino community

18  in Milwaukee is diverse.  Some people in the Latino community

19  supported Act 43, some did not.  Mr. Bartkowski is not an

20  expert in redistricting, and he hasn't been identified as such.

21  We don't believe that his testimony will be relevant to the

22  Court today.

23         JUDGE STADTMUELLER:  Mr. Earle?

24         MR. EARLE:  Your Honor, Mr. Bartkowski will be

25  testifying about the effect of Act 43 and how it has fractured

1  the Latino community, and he will be testifying about the areas

2  in the southern area of the new Act 43 Assembly District 8 and

3  the, if you will, cultural geography that's involved in this

4  redistricting and how that affects the ability of the Latino

5  community to elect its candidates of choice.

6          JUDGE STADTMUELLER:  All right.  Well, with that

7  understanding, although perhaps only marginally relevant, I

8  will allow Mr. Bartkowski to respond to those types of

9  questions, but in terms of all this background, I'm not sure

10  that it independently is terribly relevant, Mr. Earle.

11          MR. EARLE:  Thank you, Your Honor.  May I have the

12  question read back again?

13          (The last question was read.)

14          THE WITNESS:  We provide primary medical care, social

15  services, health education.  Basically that's it.

16  BY MR. EARLE:

17  Q  How many employees do you have?

18  A  300.

19  Q  Okay.  And what is the -- What are the areas that you serve?

20  A  We are located in the heart of the Hispanic community, and

21  we have three sites, two right in the heart of the Hispanic

22  community and one a little further south.

23  Q  Okay.  Drawing your attention to Exhibit 203, you can see

24  the zip codes are overlaid over Act 43 Assembly Districts 8 and

25  9.  Could you use the pointer, the laser pointer there, and

1  indicate where the clinic is located?

2  A  Where is the pointer?

3  Q  It should be in a little box like this (indicating).

4  A  Could you repeat the question?

5  Q  Will you show us where the clinic -- where the clinic that

6  sees patients is located, the main location of the clinic?

7  A  Right about there (indicating).

8  Q  Okay.  Is it currently in Assembly District 8 or 9?

9  A  It was currently in 8, but that has been -- El Rey Market at

10 16th Street has been now put into 9.

11 Q  Would you describe that demarcation there between 8 and 9?

12 A  Yes, that would be 16th Street, Cesar Chavez Drive.

13 Q  And can you tell us about that street and its significance

14 to the community?

15 A  Well, back in the late '90s there was a community effort to

16 rename 16th Street to Cesar Chavez Drive because Cesar Chavez

17 had such an impact on the Latino community nationally.

18 Q  And what does that street represent to the community, if you

19 know?

20 A  Well, it represents the heart of the Hispanic community.

21 It's the cultural hub of the Latino community in Milwaukee.

22 It's the commercial hub, the cultural hub, of that community.

23 Q  And coming back to the clinic, the 16th Street Community

24 Health Center, do you encounter citizenship issues with regards

25 to your patients?

1    A   Citizenship?

2    Q   Yes.

3    A   Well --

4            MS. LAZAR:  Your Honor, I'd make another objection on

5    relevance.

6            MR. EARLE:  I will withdraw the question, Your Honor.

7    BY MR. EARLE:

8    Q   Have you ever lived in the areas represented on the map in

9    front of you?

10   A   I have.

11   Q   Will you show us where you lived?

12   A   I can give you a basic.  I lived on 27th and Scott, which is

13   right around in there (indicating).

14   Q   Is that located in the old 8th Assembly District?

15   A   It was, yes.

16   Q   Okay.  And how long did you live there?

17   A   I lived there about 18 years.

18   Q   Okay.  Where were you raised?

19   A   I was raised on 17th and Howard, which is -- It's kind of

20   hard to tell, but it's down in here (indicating).  It's the

21   old -- It's the Wilson Park neighborhood.

22   Q   Okay.  How long were you -- did you live in that area while

23   you were being raised?

24   A   Until I went into the military, which was 18.

25   Q   Could you describe that area for the -- Before I ask you

1  that question, does the 16th Street Community Health Center

2  provide any services in that area, the North Wilson Park area?

3  A  Sure.  In our Parkway Clinic, which is further south, we

4  provide a lot of services to people who live in that geographic

5  location.

6  Q  And where do most of your patients come from?

7  A  By far the most of our patients come from the clinic on

8  Cesar Chavez Drive.

9  Q  Which is in that notch you pointed to?

10  A  Right, right in there (indicating).

11  Q  Okay.  Now concentrating on the clinic that serves the North

12  Wilson Park area, what has been the experience of the 16th

13  Street Community Health Center with regards to the types of

14  patients that you encounter in that area?

15          MS. LAZAR:  Your Honor, objection on relevance.

16          MR. EARLE:  Your Honor --

17          JUDGE STADTMUELLER:  Yes, Mr. Earle.

18          MR. EARLE:  Your Honor, I intend to ask questions

19  about the nature of the patients served by the 16th Street

20  Community Health Center in both the 8th Assembly area, the old

21  8th Assembly area and the new area that's being added in terms

22  of issues related to compliance, the quality -- the degree to

23  which the lives of the families in these areas are organized

24  and interfere with the ability to come to doctor's appointments

25  and the like.  This has an impact on the ability -- And I'd

1    like him to explain some of the background on vote turnout and

2    why vote turnout is so important in this case.

3              JUDGE STADTMUELLER:  Well, again, it's bordering on

4    not being terribly relevant, so you can put a few questions to

5    the witness in this area, but I think we really need to move

6    on, Mr. Earle.

7              MR. EARLE:  I will, Your Honor.

8    BY MR. EARLE:

9    Q   Could you compare the patients served by 16th Street in the

10   Latino community as compared to the Wilson Park area in terms

11   of medical compliance, the observations that clinic staff has

12   had with regards to the organization and issues related to

13   those patients?

14   A   Well, the patients we see at the Cesar Chavez site are more

15   vulnerable populations.  They have greater needs, they are

16   younger.  They are almost 100 percent Latino, and they come to

17   our site with many, many problems.  At our Parkway location

18   it's a different population.  It's mainly elderly, mainly White

19   people who have insurance, rather than at Cesar Chavez where

20   30 percent of the people we see are uninsured and 60 percent

21   have Medicaid.  So it's a poorer population and a younger

22   population and a mainly Hispanic population.

23   Q   Are there transportation issues?

24             MS. LAZAR:  Your Honor, I would object again and note

25   in addition to relevance is the fact that these clinics are not

1    being moved by the new Acts, and I don't understand what the

2    relevance is as to who the patients are at one of the three or

3    four sites of this clinic.

4              MR. EARLE:  Your Honor, the clinics are being moved

5    by the Act, number one, and, number two, this goes to the

6    totality of the circumstances.  One of the questions before the

7    Court that is going to be a factual question is whether under

8    the totality of the circumstances, the socioeconomic burdens

9    that weigh upon the Latino community, affect their ability to

10   elect the candidates of their choice under the reconfigured

11   map.  This evidence goes directly to that question.

12             JUDGE STADTMUELLER:  Well, the clinics are not being

13   moved physically, correct?

14             MR. EARLE:  No, they are being moved politically in

15   terms of which districts they are located in.

16             JUDGE STADTMUELLER:  Well, to be very candid, Mr.

17   Earle, I think we're starting to steer the ship of state a

18   little bit off course here by getting into this.  The

19   demographics of each district, to be sure, are important, but

20   where the residents obtain medical services or where they may

21   buy their sundries and groceries I think is really irrelevant.

22             MR. EARLE:  Okay.  Your Honor, I will move on to a

23   different subject.  Thank you.

24   BY MR. EARLE:

25   Q  Mr. Bartkowski -- Can we leave the exhibit up, please.

Focusing on the Wilson Park area where you grew up and you have

a clinic, the Parkview Clinic, can you describe the nature of

the relationship between Latinos who are moving into that area

and the ethnic community that is receiving that Latino

emigration?

MS. LAZAR:  Objection, foundation.

MR. EARLE:  I will lay more foundation, Your Honor.

JUDGE STADTMUELLER:  Very well.

BY MR. EARLE:

Q  As a result of the operation of the Parkview Clinic, are you

aware or have the staff of the 16th Street Community Health

Center been aware of cultural issues between the Latino

community and other residents of that area?

A  Well, it's an area in transition.  The Latino community is

moving more south and has been for about ten years.  At times

that is difficult for the residents who currently reside there,

again, mainly Polish, elderly people.  So there are tensions

that arise, and we see that in the clinic.  People tend to stay

amongst themselves.  You can see a clear demarcation when

people come into the clinic.

Q  How is it that you see that?  Can we put Exhibit 176 up,

please?  I'm sorry.  Wrong one.  Can you describe how it is

that you see that in the clinic?

A  Well, the elderly population tends to sit by themselves in

one end of the clinic lobby and the Latino population tends to

1   be by themselves, you know, one end of the lobby speaking

2   English, the other end of the lobby speaking Spanish.

3           MS. LAZAR:  Your Honor, I would object again on

4   grounds of relevancy.

5           MR. EARLE:  Your Honor, I think this is extremely

6   relevant.  It goes to the question of the fact of importing

7   45 percent of a different district into what was previously a

8   cohesive political community where there is racial tension,

9   there is -- It's a transitioning neighborhood.  There's a

10  cultural reaction that is operative.  As we speak, we're going

11  to show additional evidence about this.  I wanted Dr.

12  Bartkowski to lay some foundation in terms of the real-life

13  conditions in the communities that are being redistricted and

14  joined together here.  We have basically two separate

15  communities being joined, two separate halves being joined.  In

16  the totality of the circumstances we believe it will have -- it

17  will be relevant to the question of whether or not this new

18  community that's being added in will overwhelm the ability of

19  the Latino community, according to the 55 percent that's left

20  of the Latino community, to elect candidates of its choice.

21          JUDGE STADTMUELLER:  With all due respect, Mr. Earle

22  if we were talking about a particular specialty school or if we

23  were talking about a compound in which new residents were being

24  forced to reside in, but this is none of these.  Again, my

25  colleagues may feel differently, but I genuinely concur with

1    Ms. Lazar that we are really going quite off course here.  At

2    this juncture, I'm obliged to sustain the objection.

3                 MR. EARLE:  Thank you, Your Honor.  I have no further

4    questions for the witness.  Thank you.

5                 JUDGE STADTMUELLER:  Does anyone have any

6    cross-examination of the witness?

7                 MS. LAZAR:  I just have one question, and I can -- I

8    will quickly jump up there and do it up there.

9                              CROSS-EXAMINATION

10   BY MS. LAZAR:

11   Q  Good morning, Mr. Bartkowski.  I just wanted you to -- I

12   wanted to confirm that you indicated before that the Latino

13   population is moving more south at this point in time?

14   A  Well, we have to do -- For our federal grant we have to

15   follow the migration of populations, and for the last 15 years

16   the population has been migrating slowly south, probably a

17   half-mile in the last ten years.

18   Q  And what you are saying there is they are moving down from

19   where that assembly district was, correct?

20   A  Right.

21                 MS. LAZAR:  Thank you.  I have no further questions,

22   Your Honors.

23                 MR. EARLE:  Redirect, Your Honor.  May I have

24   Exhibit 185, please?

25                            REDIRECT EXAMINATION

1  BY MR. EARLE:

2  Q  Dr. Bartkowski, can you take your pointer there?  You

3  described, as I understood your testimony, you said the Latino

4  community is moving slowly south.  Can you elaborate on that,

5  please?

6  A  Well, in our studies we found that, you know, between 1990

7  to 2000 the Latino population was mainly right in that area by

8  far (indicating).  Over the last 10, 15 years, it's sort of

9  gone down a little bit.  It probably goes all the way to

10  Oklahoma right now.  But that's about it.  I mean, there are

11  certain stores, there might be a store here and there, but the

12  bulk of the Latino community is still right in that area

13  (indicating).

14  Q  And as part of the study that you have conducted, did you --

15  did you arrive at any conclusions about why that movement south

16  was slow?

17          MS. LAZAR:  Objection, Your Honor.  There's no

18  foundation.  We don't know what study this is, and this is

19  getting beyond the scope of my cross.

20          JUDGE STADTMUELLER:  The last point is certainly the

21  most valid, Ms. Lazar, and the court will sustain the

22  objection.

23          MR. EARLE:  Your Honor, I -- Okay.  That's my last

24  question.  Thank you.

25          JUDGE STADTMUELLER:  Anything further, Ms. Lazar?

1          MS. LAZAR:  No.  No, Your Honors.

2          JUDGE STADTMUELLER:  Thank you.  You may step down.

3     You are now excused, Mr. Bartkowski.

4          MR. EARLE:  My next witness is Pedro Colon.

5          PEDRO COLON, having been first duly sworn, was

6     examined and testified as follows:

7          THE CLERK:  Mr. Colon, would you please state and

8     spell your full name for the court reporter.

9          THE WITNESS:  Pedro, P-E-D-R-O, Colon, C-O-L-O-N.

10                    EXAMINATION

11    BY MR. EARLE:

12    Q  Judge Colon, could you inform the court what your occupation

13    is currently?

14    A  I'm a judge in Milwaukee County.

15    Q  Okay.  And prior to your position as a judge in Milwaukee

16    County, what position did you hold?

17    A  I was a State Representative for what used to be the old 8th

18    District.

19    Q  Okay.  How long were you a State Representative for the -- a

20    State Representative representing the 8th Assembly District?

21    A  Eleven years.

22    Q  Showing you Exhibit 176, could you point to the 8th Assembly

23    District that you represented, sir?

24    A  My old district is right here, this area (indicating).

25    Q  Do you live in that neighborhood?

1  A  Yes.

2  Q  How long have you lived in that neighborhood?

3  A  About 20 years.

4  Q  Did you ever live in the Wilson Park area?

5           MS. LAZAR:  I will make the same objection that I

6  made before.  I don't know that this witness' testimony is

7  relevant to the constitutionality of Act 43, which is the

8  subject of this morning's hearing.  We already have a

9  stipulated fact, No. 147, which states the Latino community in

10 Milwaukee is diverse; some people in the community supported

11 Act 43 and others did not.

12          MR. EARLE:  Your Honor, I will withdraw the question

13 in light of the objection and the prior rulings of the Court.

14          JUDGE STADTMUELLER:  All right.

15 BY MR. EARLE:

16 Q  Judge Colon, did you ever run for city attorney?

17 A  Yes.

18 Q  Okay.  When did you run for city attorney?

19 A  2008, I believe.

20 Q  If you would look at -- If we could call up Exhibit 201.

21 How did that race turn out on April 1st of 2008 when you ran

22 for city attorney?

23 A  In my view, not very well.

24 Q  All right.

25 A  I lost.

1  Q  And what was the race of your opponent?

2  A  Mr. Langley is of European descent.  I'm not sure where

3  from.

4  Q  And your national origin, sir?

5  A  I'm Puerto Rican.

6  Q  And when you ran for city attorney, how long had you been

7  the assembly person representing -- assembly representative for

8  District 8?

9  A  About nine years, eight years.

10  Q  If we could go to Page 134 of Exhibit 201.  Can you tell the

11  court what the vote totals were in that race?

12  A  Well, City Attorney Langley obtained 45,627 and I obtained

13  31,332 votes.

14  Q  The word "totals" are listed in that biennial report,

15  correct?

16  A  It appears so, yes.

17  Q  Okay.  And, Judge Colon, did you ask me to prepare an

18  exhibit that isolated the wards for the Act 43 8th Assembly

19  District?

20  A  Yes.

21  Q  Could we go to Exhibit 1 -- 200.  I'm sorry.  Oh, I'm sorry.

22  199.

23          MS. LAZAR:  Your Honor, we have a general objection

24  to this exhibit.  It was prepared by counsel?

25          MR. EARLE:  No.  I'm sorry.  This is the wrong

1  exhibit.  200, I mean.  I'm sorry.  I have these reversed.

2            MS. LAZAR:  So --

3            MR. EARLE:  I'm sorry.

4            JUDGE STADTMUELLER:  I think what you are looking

5  for, Mr. Earle, is 202.

6            MR. EARLE:  Yes, Your Honor.  Thank you.  202.

7            MS. LAZAR:  That's the exhibit I thought we were

8  looking at.  This was prepared by counsel and not the witness?

9            MR. EARLE:  It was at the request of the witness.

10 BY MR. EARLE:

11 Q  Mr. Colon, is it accurate to say you asked me to prepare a

12 list of the wards in the Act 43 8th Assembly District showing

13 the totals?

14            MS. LAZAR:  Your Honor, is counsel going to testify

15 that they prepared this and become a witness in this case?

16            JUDGE DOW:  Is this just a summary of what's in this

17 other document?  Are you going to make him produce it on the

18 stand right now?

19            MS. LAZAR:  Is this a summary?  I'm not sure what

20 this is, Your Honor.

21            JUDGE WOOD:  It looks like a summary of what's here

22 in Exhibit 201.  If you look at first line, Ward No. 63, Ward

23 No. 63 in Exhibit 201 is these numbers.  Is that correct,

24 Counsel?

25            MR. EARLE:  That's correct.

1          JUDGE WOOD:  You could have highlighted them.

2          MR. EARLE:  We could have, Your Honor, but we wanted

3     to be able to show the totals, because they are not contiguous

4     and it would be easier for the Court to see the results.  It's

5     just simply a demonstrative exhibit.

6          JUDGE WOOD:  There's no different information in

7     this?

8          MR. EARLE:  There's no different information, Your

9     Honor.  There's no interpretation, there's no different

10    information whatsoever.  May I proceed?

11         JUDGE STADTMUELLER:  You may.

12         MR. EARLE:  Thank you.

13    BY MR. EARLE:

14    Q  Mr. Colon, how did you do in terms of election results in

15    that portion of the 8th Assembly District that was retained

16    within the Act 43?

17    A  In the 8th -- Well, the vote totals were 1,413, and the

18    new --

19    Q  How about between you and Grant Langley in the -- that

20    portion of the 8th Assembly District that was retained?

21    A  Well, you know, it's listed by ward number, and it

22    encompasses what I understand to be the new 8th and the old

23    8th, and the vote totals are at the bottom.  There were 3,483

24    votes in what appears to be the new wards, and he obtained,

25    that, is Mr. Langley, City Attorney Langley, obtained 1,950 and

1    I obtained 1,553.

2    Q  But I'm going to draw your attention, Mr. Colon, to the vote

3    totals at the bottom of the first box in this area right here

4    (indicating).

5    A  All right.

6    Q  How did you do within the old 8th Assembly District that was

7    retained within the Act 43?

8    A  I did very well.  I obtained 828 votes to Mr. Langley's 585.

9    Q  Okay.  Now I would like you to contrast that to how you did

10   in those wards that came from the old 9th Assembly District and

11   were imported into the new 8th Assembly District under Act 43,

12   the area right there (indicating).

13   A  I did half as well.  Mr. Langley obtained 1,250 votes and I

14   obtained 652 votes.

15   Q  How did the turnout compare between those two portions of

16   the new 8th Assembly District?

17   A  I can't tell from this exhibit.

18   Q  Okay.  Let's focus on the single ward that was imported from

19   the 19th Assembly District.  How did you do in that ward?  You

20   can look at your monitor, if it's easier for you.

21   A  I obtained 73 votes to City Attorney Langley's 95.

22   Q  So, in other words, you would have lost an election for --

23   against a non-Hispanic candidate in the new Act 43 8th Assembly

24   District, isn't that correct?

25          MS. LAZAR:  Objection, leading.

1  BY MR. EARLE:

2  Q  Mr. Colon, how would you --

3          MR. EARLE:  I will rephrase the question, Your Honor.

4          JUDGE STADTMUELLER:  Thank you.

5  BY MR. EARLE:

6  Q  How would you have done in the Act 43 8th Assembly District

7  if you ran against a non-Hispanic candidate, in your view?

8  A  I'm sorry.  State the question again.

9          (The last question was read.)

10         MS. LAZAR:  Objection, calls for speculation.

11         JUDGE STADTMUELLER:  Well, what you are talking about

12  is these numbers, correct?

13         MR. EARLE:  Yes, it is based on his experience,

14  electoral experience, in the exact area that's in question in

15  this case, Your Honor.

16         JUDGE STADTMUELLER:  Isn't it obvious, based on these

17  numbers, he would have lost?

18         MR. EARLE:  I wanted to elicit that testimony.

19         JUDGE STADTMUELLER:  Everyone in the room who's

20  looking at the monitor can figure that out.

21         MR. EARLE:  Thank you, Your Honor.  That was my

22  point.  With that, I have no further questions.

23         JUDGE STADTMUELLER:  All right.  Thank you.

24  Ms. Lazar, do you have any questions of the witness?

25         MS. LAZAR:  Yes, I do, Your Honor.

                              EXAMINATION

1   BY MS. LAZAR:

2   Q   Good morning, Your Honor.

3   A   Good morning.

4   Q   It's Your Honor and Your Honors.  You were first elected to
    Assembly District 8 as Assembly Representative in 1998, is that
    correct?

5   A   The fall of '98, correct.

6   Q   And at that time you were the first Latino elected to the
    Wisconsin Legislature, is that correct?

7   A   As far as I know, yes.

8   Q   When you served in the Assembly, did Latinos from other
    districts come to you for help on various issues?

9   A   There were times.

10  Q   And when you served in the Assembly, did you work closely
    with a African-American legislators and the African-American
    community to promote minority interests?

11              MR. EARLE:  Objection, Your Honor, scope.

12              JUDGE STADTMUELLER:  That objection is overruled.
    You may answer the question.

13              THE WITNESS:  I worked with everybody in the
    Legislature, whether African-American or not, to obtain good
    results for everyone.

14  BY MS. LAZAR:

15  Q   Okay.  You ran again, Your Honor, in 2000 for representative

1    in Assembly District 8, is that correct?

2    A  Correct, and subsequently until 2010, I believe, every

3    election.

4    Q  2008, but --

5    A  2008.

6    Q  And in the race, though, in 2000, were there any Republican

7    or Independent challengers?  There were no Republican or

8    Independent challengers that year, were there?

9    A  In 2002?

10   Q  No, in 2000.

11   A  No.

12   Q  And if you would like, there's a little folder on the desk

13   there, a little brown binder.  If you want to take out Trial

14   Exhibit 1099, which is a table, Table 16 in the Joint Trial

15   Report.

16   A  Yes, I see it.

17   Q  At 16B that would be the description and the results from

18   your 2000 race, is that correct?

19           MR. EARLE:  Objection, Your Honor, foundation.

20           THE WITNESS:  I have no reason to doubt those are the

21   results.

22           MS. LAZAR:  Sorry.  You have to wait until the Court

23   rules on the objection.

24           JUDGE STADTMUELLER:  First of all, is this one of the

25   exhibits that has been stipulated to?

1          MS. LAZAR:  Table 16, if you look at the end of it,

2     there's probably a stipulation as to -- I think the whole table

3     was stipulated to.

4          JUDGE STADTMUELLER:  With that knowledge, the

5     objection is overruled.

6          MS. LAZAR:  If the trial consultant can go to the

7     very last page of Exhibit 1099, there will be a paragraph

8     which -- Is that the last page?  We need to look at the Joint

9     Pretrial Report, but I believe this table is stipulated to.

10    The only question there might be that there was a question

11    about regarding this table was the question about the --

12    whether or not the candidates were Hispanic or Latino.

13         JUDGE WOOD:  Who prepared this table?

14         MS. LAZAR:  This table was prepared by counsel for

15    Defendants.

16         JUDGE DOW:  Does anybody have -- It says, "Source:

17    Wisconsin Blue Book."  There's one sitting in my office.  Does

18    anyone have any reason to dispute these numbers?

19         MR. POLAND:  Your Honor, as to that aspect of the

20    exhibit, we did stipulate.  There's no objection.

21    BY MS. LAZAR:

22    Q  All right.  After the decennial census -- Actually, did you

23    answer that question that there were no Republican or

24    Independent challengers in 2000 against you?

25    A  It appears that there weren't.

1    Q   Okay.

2    A   And I'm not going to dispute the Blue Book.  Nobody does.

3    Q   That's good to know.  All right.  Blue Book is good.  After

4    the decennial census in 2000, the court drew a new legislative

5    map in 2002.  Under that new map you were given what would be

6    considered a heavily Latino assembly district, is that correct?

7    A   As I recall, without any reference to the actual maps, my

8    district in the 1992 redistricting -- my district in the 2002

9    redistricting was virtually the same.  In fact, if you go back

10   in history, you can probably find that map has probably not

11   changed much due to the nature of the neighborhood and the

12   natural nature in which people interact all the way back to

13   Congressman Kleczka, not the one that retired, but his

14   grandfather.

15   Q   But you will agree that your new assembly district was

16   heavily Latino, correct?

17   A   It was probably more heavily Latino over time, yes.

18   Q   Okay.  Do you know the percentage of Latino voters in your

19   new district?

20            JUDGE WOOD:  What new district?

21            THE WITNESS:  You mean in the 2002 district?

22            MS. LAZAR:  In 2002 district, yes.

23            THE WITNESS:  You know, I would guess in the high

24   50s, maybe reaching 60.

25

1  BY MS. LAZAR:

2  Q  We could show Stipulated Fact 137, which would indicate that

3  the voting age population was 58.3 percent.  Does that sound

4  correct?

5  A  That sounds correct.  Voting age, you know, the district is

6  heavily young, due to the nature of the Latino population not

7  only in my district in this city, but in the whole nation.  So

8  you are talking about -- So voting age, if you all stipulated

9  to that fact, I have no reason to dispute it.

10  Q  So when you say that district is heavily young, what do you

11  mean by that?

12  A  Last time I checked, I think half of my district or close to

13  half my district, the residents are anywhere under the age of

14  18.

15  Q  So they will soon be 18 and able to vote?

16  A  Not necessarily.  That is from 0 to 18.

17  Q  Okay.  Following redistricting you ran again in 2002 in

18  Assembly District 8, is that correct?

19  A  I'm sorry?

20  Q  Following redistricting you ran again in 2002 in Assembly

21  District 8?

22  A  Correct.

23  Q  And if we can show again Table 16, which is Exhibit 1099,

24  16C, did you have a Republican or an Independent challenger

25  that year?

1    A   No, in 2002 I didn't.

2    Q   And in 2004, which is the next paragraph, 16D, were you also

3    unopposed for Assembly District 8?

4    A   Yes.

5    Q   And you were unopposed in 2006, Paragraph 16E?

6    A   Correct.

7    Q   Now in 2008 you did have primary challengers, did you not?

8    A   Correct.

9    Q   And --

10   A   Yes.

11   Q   And their names were Laura Manriquez and Jose Guzman?

12   A   Yes.

13   Q   Let's take Laura Manriquez.  Do you know if Ms. Manriquez is

14   Latino or Hispanic?

15   A   I believe so.  I believe she is, yes.

16   Q   And do you know if Joe Guzman is Latino or Hispanic?  Just

17   if you know.

18   A   I assume by his name.  I have never seen the guy.  I don't

19   think he even lived in the district.

20   Q   Okay.  All right.  In 2010 you ran for Circuit County

21   Judge -- Circuit Court Judge -- of Milwaukee County Branch 18,

22   correct?

23   A   Yes.

24   Q   And in that election when you ran for judge, did you receive

25   substantial support from the African-American community?

1  A  I received substantial support from every part of this

2  county.

3  Q  Okay.  And do you know if you received more than about

4  60 percent of the vote from the African-American wards?

5  A  I haven't looked at the totals to that degree of certainty

6  or detail, but I have no reason to dispute it, if it's reported

7  in the outcome.

8        JUDGE STADTMUELLER:  Ms. Lazar, certainly I don't

9  want to interrupt you, but like the objections you made to

10  Mr. Earle's questions, I must say that although very

11  interesting from a historical perspective, I don't think any of

12  this is going to be very helpful at all to the Court's

13  discharge of its fact finding in this process, and so I would

14  invite you to move on.

15        MS. LAZAR:  And that was the last question in that

16  line.  However, I would note to the Court that the issue is

17  going to be whether or not the Latino community has an equal

18  opportunity to elect a candidate of their choice, and in this

19  case Judge Colon would have been that candidate of choice, but

20  I will move on.

21        JUDGE WOOD:  And I would just point out, Ms. Lazar,

22  that had you kept Assembly District 8 the same, I suppose you

23  have done a wonderful job of showing that that old district

24  could elect the Latino candidate of its choice, but I'm not

25  sure what the relevance is to the question before the Court.

1          MS. LAZAR:  Well, respectfully, the relevance is our

2     experts will show that the race Judge Colon ran in Milwaukee

3     County, which is county wide, will show his support and will

4     also show the impact for what the candidates in the voting age

5     population of Hispanics is in the new Assembly Districts 8 and

6     9 to show what their impact is.

7          JUDGE WOOD:  Sure, but that's not what you were

8     asking about, you were asking about 1992, 2000, 2002, 2004,

9     2006 and 2008, correct?

10          MS. LAZAR:  Correct.

11     BY MS. LAZAR:

12     Q  Would you say, Judge Colon, that the Latino turnout rate in

13     your race for Circuit Court Judge was low?

14     A  I don't know.

15     Q  If you can look at Trial Exhibit 1025.  It's in your stack,

16     but they will also pull it up.  I will reference to the Court

17     that this exhibit was prepared by the Plaintiffs' expert,

18     Professor Mayer on behalf of the Voces Plaintiffs.  It's a

19     racial polarization study.  If you go to the second page of

20     that document --

21          MR. EARLE:  Your Honor, I'm going to object.  I don't

22     think this witness has ever seen this document, much less had

23     an opportunity to consider its content.

24          JUDGE STADTMUELLER:  Well, if that's the case, he can

25     so indicate and Ms. Lazar can move on.

1   BY MS. LAZAR:

2   Q  Actually, I don't think it is the second page.  Can you turn

3   back to the first page.  You will see, if you go down on this

4   exhibit, you will see there's a race for Circuit Court Judge on

5   the last set of --

6   A  Correct.

7   Q  And it has Judge Colon?

8   A  Yes, I see that.

9   Q  And if you go down in the bottom column, that's six lines

10  down, is that correct?  Now it's a little bit hard because you

11  have to go to the next page and then look six lines down on the

12  last column and that would still be the same race.  Go all the

13  way to the bottom.

14  A  So it continues from the prior one.  Okay.

15  Q  Right.  You will see that there's a 3 percent Latino turnout

16  rate?

17          MR. EARLE:  Objection, Your Honor, foundation.

18          JUDGE STADTMUELLER:  First of all, Judge Colon, have

19  you ever seen this exhibit before?

20          THE WITNESS:  No, I have not.

21          JUDGE STADTMUELLER:  Are you comfortable --

22          THE WITNESS:  Like I said, I don't know what the

23  turnout was.  Turnout is, you know, turnout depends largely on

24  the race.  It depends on when you are running, whether you run

25  in the fall, whether you run a non-partisan race.  Turnout is

1   very difficult to gauge.  I don't know.

2               MS. LAZAR:  I will withdraw the question.

3               JUDGE STADTMUELLER:  Ms. Lazar, with all due respect,

4   I appreciate that Dr. Mayer has done a pretty good job of

5   pulling a lot of data together, and I think this is a subject

6   that you would be wisely advised to deal with with him rather

7   than Judge Colon.

8   BY MS. LAZAR:

9   Q  Judge Colon, you won that race for judge in 2010, correct?

10  A  Yes, I did.

11  Q  You mentioned earlier in your direct examination that you

12  challenged for city attorney against City Attorney Grant

13  Langley, is that correct?

14  A  Yes.

15  Q  And now City Attorney Grant Langley was the incumbent, is

16  that correct?

17  A  Yes, he was the incumbent.

18  Q  And he's been the incumbent for quite a number of years as

19  city years?

20  A  I think he holds the record of incumbency in the City of

21  Milwaukee.

22              MS. LAZAR:  Thank you.  No further questions.

23              JUDGE STADTMUELLER:  Thank you, Ms. Lazar.

24              MR. EARLE:  Very brief redirect, Your Honor.

25                      REDIRECT EXAMINATION

1  BY MR. EARLE:

2  Q  Judge Colon, drawing your attention to Exhibit 200, please,

3  it's on the screen there and it's also in your binder.

4  A  All right.

5  Q  I want to represent to you that this demonstrates the 1992

6  8th Assembly District overlaid over the 2002 8th Assembly

7  District.  Which map was in play when you were first elected in

8  1998?

9  A  What do you mean "in play?"

10 Q  Which map configured the district in which you ran in 1998?

11 A  It was largely the same.  The '98 and '92 were largely the

12 same.

13 Q  Okay.  So, in other words, there was a high degree of core

14 retention from one district to the next?

15 A  Yes.

16 Q  Okay.  Was there any substantial change in terms of the core

17 population in that district between the district you ran in in

18 1998 and then when you ran for re-election in, I guess, 2002?

19         MS. LAZAR:  Objection, Your Honor.  This goes beyond

20 the scope of my cross.

21         JUDGE STADTMUELLER:  Yes, it does.

22         MR. EARLE:  I will withdraw the question, Your Honor.

23 BY MR. EARLE:

24 Q  Drawing your attention to Exhibit 199, Judge Colon, the blue

25 areas represent those wards that you won during your race

1   against Grant Langley, and the tan and brown areas represent

2   the areas that Grant Langley won during that race in 2008.  Can

3   you describe for us the areas that you lost in the 8th and 9th

4   Assembly Districts?

5           MS. LAZAR:  I would object, again, that this goes

6   beyond my scope, Your Honor.

7           JUDGE STADTMUELLER:  Yes, and the Court is

8   constrained to sustain the objection.

9           MR. EARLE:  Thank you, Your Honor.  No further

10  questions.

11          MS. LAZAR:  No further questions.

12          JUDGE STADTMUELLER:  Thank you, Judge Colon.  You are

13  excused.  You may call your next witness.

14          MR. EARLE:  Your Honors, in light of the rulings so

15  far as of this point in the trial, this testimony will be very

16  constrained and brief.

17          JUDGE STADTMUELLER:  Thank you.

18          CHRISTINE NEUMANN-ORTIZ, having been first duly

19  sworn, was examined and testified as follows:

20          THE CLERK:  Ms. Neumann-Ortiz, would you please state

21  and spell your full name for the court reporter.

22          THE WITNESS:  Christine Neumann-Ortiz.

23  C-H-R-I-S-T-I-N-E  N-E-U-M-A-N-N hypen O-R-T-I-Z.

24          THE CLERK:  Thank you.

25          THE WITNESS:  Sure.

1          DIRECT EXAMINATION

2    BY MR. EARLE:

3    Q   Ms. Neumann-Ortiz, would you tell the court where you work?

4    A   I'm Executive Director of Voces de la Frontera.

5    Q   And how long have you been in that position?

6    A   I started in 2004.  I was the founder, and we opened the

7    Workers Center in 2001.

8    Q   Would you please describe your organization for the Court.

9    A   Voces de la Frontera is a civil rights, membership-based

10   organization.  We have around 3,000 members, mostly Latino and

11   majority, which live in Assembly District 8.  We have worked --

12   Our primary issues are worker rights, immigration rights and

13   education rights.  In 2004 we came to the realization that we

14   felt it was important to get involved in electoral work in

15   order to win on the policy issues that we were advocating for.

16   So since 2004 we have been involved in a Latino

17   get-out-the-vote program mostly in Assembly District 8 in every

18   election cycle up to the present.  That runs the gamut.

19       We have done voter registration, we do a lot of work on

20   voter education, a lot of work on language access, and we were

21   part of the south side agency around election protection

22   activity in Assembly District 8, and of course voter turnout.

23   We have also worked to try to expand the pool of Latino voters

24   with a program called the New American Program, some of those

25   folks are with us here today, in helping folks in the

1    naturalization process to get lawful, permanent residence to

2    become U. S. citizens, as well as encouraging young people, who

3    are born in the United States who are children of immigrants to

4    participate in the political process when they turn 18.

5    Q   Did you say how many members Voces has?

6    A   Yes, I did.  It was around 3,000.

7    Q   Okay.  And how is Voces de la Frontera governed?

8    A   We have Voces de la Frontera, which is a C3 organization.

9    It is, again, membership based.  We have a board and we have an

10   annual meeting at which the board members are elected and set

11   what the priority issues are for the organization.  We formed a

12   C-4 organization in 2008 which allows us to do unrestricted

13   lobbying activity, as well as to be able to make endorsements.

14   We are a non-partisan organization, and we measure candidates

15   on the basis of where they stand on the issues that are

16   important to us, immigration rights being a critical issue,

17   worker rights, as well as education rights.

18   Q   Did Voces de la Frontera participate in the municipal

19   redistricting in Milwaukee?

20   A   Yes, we did.  We were part of a Latino redistricting

21   committee.  This was a coalition.  It represented different

22   organizations and individuals who really represented a

23   political cross-section.  We had Latino Republicans, we had

24   Latino Independent, as well as Latino Democrats who were

25   involved, and we worked together very well around the city

1  redistricting process.

2  Q  And what time frame was that, did that redistricting

3  activity occur?

4  A  I can't recollect now.  It certainly happened right before

5  the state and some finalization of the county, so --

6  Q  So is it your testimony that it was in the period leading up

7  to the state legislative redistricting?

8  A  Oh, yes, absolutely.

9  Q  What kind of proximity temporally?

10  A  It was close.

11  Q  Was Voces de la Frontera ever contacted by anybody related

12  to the legislative redistricting?

13  A  To the state legislative redistricting?

14  Q  Yes.

15  A  No, we were not.  We were very interested and involved in,

16  obviously, the entire redistricting process, because we have

17  worked so hard over the years to encourage and increase Latino

18  voter turnout.

19  Q  Did anybody in Voces de la Frontera have any knowledge about

20  what was going on with regards to the legislative redistricting

21  prior to July 8th, 2011?

22  A  I know that it was in sharp contrast to our experience at

23  the city level.  At the city level the city made available

24  through various computers and software programs the information

25  to the public so that they could come in and look at how the

1    process would unfold.  We had the ability to have numerous
2    meetings with various common council members, so it was a very
3    Democratic process.  In sharp contrast, we had no information
4    and the only thing that we knew was that on a Friday it was
5    made public and then we had to rush to get some folks over
6    there on Wednesday to testify.
7    Q  Okay.  Was there any opportunity for Voces de la Frontera to
8    evaluate how the redistricting plan would affect the Latino
9    community on the near south side of Milwaukee between that
10   Friday and that Wednesday?
11   A  No.

12         MR. KELLY:  Your Honor, I object.  The process by
13   which Acts 43 and 44 were adopted is not before the court.

14         JUDGE STADTMUELLER:  I understand, Mr. Kelly, but
15   this is new ground and the answer will stand.  You may continue
16   with your questions, Mr. Earle.

17         MR. EARLE:  Thank you, Your Honor.
18   BY MR. EARLE:
19   Q  I'm going to change to a slightly different subject at this
20   point.  Has Voces de la Frontera worked with the legislative
21   representatives for the area in which it's located?
22   A  Absolutely.  We have worked very closely with State
23   Representative Pedro Colon when he served in that capacity, and
24   currently with State Representative JoCasta Zamarria.  They are
25   both people that are very intimately aware of the circumstances

1  and the challenges that low wage, Latino working class families

2  face, the issues relating to immigration status both for lawful

3  permanent residents, as well as for the undocumented.  They

4  have been important champions for the Latino community in the

5  State Legislature.  They have been our voice, our consciousness

6  in the State Legislature in bringing that community to the

7  State Legislature.

8  Q  Who else represents the Latino community in the State

9  Legislature besides the assembly person from the 8th Assembly

10 District?

11 A  You mean at a larger level?

12 Q  At the state senate level.

13 A  At the state senate level.  We are represented by State

14 Senator Tim Carpenter.  He has Assembly Districts 7, 8 and 9.

15 Q  And has Voces de la Frontera worked with State Senator Tim

16 carpenter?

17 A  We have found it -- We have been very disappointed with the

18 representation from State Senator Carpenter.  State Senator

19 Carpenter, just to give an example, in 2009 when the biennial

20 budget was being developed, two very important provisions had

21 been included there.  One was in-state tuition rights for

22 immigrant youth who graduated from Wisconsin high schools and

23 want to pay their own way to go to college, as well as a driver

24 card provision, which was supported by many law enforcement

25 officials, as an important issue for the Latino and immigrant

community. These provisions successfully passed, actually also very much with the support of State Representative Pedro Colon through the Assembly process, but when it hit the State Senate level, Tim Carpenter took it upon himself to really even take on a public role, and he worked to get the two measures pulled out of the budget. The in-state tuition budget eventually prevailed, but the driver card provision was taken out. This was really seen, from our point of view, and from many prominent Latino leaders in the larger community who sent several hundred people to meet with him in the State Legislature and subsequents town halls, to really condemn his action.

He told us that 90 percent of his constituents since 2005 had supported the -- or had opposed the driver card provision. He also stated that Latino voters in Assembly District 8 also opposed these measures. We know that in his district that a majority of voters --

MR. KELLY: Your Honor, excuse me. I'm sorry. I don't mean to be rude, but all of this testimony appears to be centering around Senate District 3, which is not at issue in this case.

JUDGE STADTMUELLER: I agree, Mr. Kelly. We need to move on. What all of this underscores, of course, is that representatives have very divergent constituencies, and whether there is redistricting or not, we are always going to have

1  people who are supportive and those who are opposed to given

2  measures, and that's not an issue that is before the court.

3  The court is obliged to sustain the objection.

4          MR. EARLE:  Thank you, Your Honor.  Where I was going

5  to go with this is the area of racially inflammatory appeals by

6  White elected officials from the White or transitioning

7  portions of legislative districts that represent the Latino

8  community and result in a political dynamic that's very

9  difficult for the Latino minority with lower turnout within

10 those districts.

11         JUDGE WOOD:  So is this of any relevance to the

12 question whether new Districts 8 or 9 are effective influence

13 districts?

14         MR. EARLE:  Yes, Your Honor, because the evidence

15 will show that Districts 8 and 9, the areas that have been

16 added to District 8 from the old 9th and the new 9th that goes

17 farther south and is very much of a racially transitioning area

18 where there's a very reactive White community to the Latino

19 community, and those voters --

20         MR. KELLY:  I object to this line of argument.

21         MR. EARLE:  -- are subject to racial appeals,

22 inflammatory racial appeals.

23         MR. KELLY:  Mr. Earle is now engaged in testimony.

24         MR. EARLE:  I'm explaining the relevance, Your Honor.

25         MR. KELLY:  And it relates to nothing that this

1   witness has been discussing.

2           JUDGE STADTMUELLER:  So, again, Mr. Earle, with all

3   due respect, it's time to move on.  I think the court has full

4   appreciation of the dynamic and how it will impact on these two

5   districts.  But when we overlay the whole Senate district area,

6   which is apparently not in question insofar as the

7   redistricting is concerned, I mean, we're really honing in on

8   the Assembly breakup, correct?

9           MR. EARLE:  Thank you, Your Honor.  I will proceed

10   accordingly.

11   BY MR. EARLE:

12   Q  Drawing your attention to Exhibit 176, Ms. Neumann-Ortiz, I

13   will represent to you that this is an overlay of the new 8th

14   and 9th assembly districts over the old assembly districts.

15   The old 9th is the tan-colored district in the southern part of

16   the new 8th.  Do you follow there?

17   A  Um-hum.

18   Q  Okay.  Drawing your attention to the race for city attorney

19   in 2008 of City Attorney Grant Langley versus Pedro Colon, do

20   you recall that race?

21   A  Yes, I do.

22   Q  Do you recall whether that race involved any racially

23   inflammatory appeals?

24   A  Yes, I do, because I remember the Langley campaign accusing

25   Pedro Colon on supporting sanctuary cities, and that was never

1   an issue.  I really thought that was a very inflammatory

2   allegation really intended to kind of wipe up White voters who

3   are less connected and informed about the issues that are

4   impacting the Latino community, particularly as they relate to

5   immigration issues and, so, yes, I thought it was very

6   inflammatory and catered to a White vote.

7   Q   Okay.  Now drawing your attention to the map in front of

8   you, the portions of the old 8th that have been retained in the

9   new 8th, you are familiar with that area, correct?

10  A   The old Assembly District 8?

11  Q   Yes.

12  A   Yes.

13  Q   Is that where most of the members of Voces live?

14  A   A majority.

15  Q   Drawing your attention to the area of the old 9th that's now

16  been brought in, imported into the 8th Assembly District, what,

17  if anything, does that area have in common with the Latino

18  community on the near south side?

19  A   Our concern is that from our past experience in doing

20  political work around issues that matter to the Latino

21  community, our experience has been that basically by splitting

22  it up this way, you are reducing the number of Latino voters

23  who are eligible to vote because of citizenship status and

24  because of age, and that number is already low, with low voter

25  registration, low levels of participation, and now you are

1   bringing in a different constituency, voting constituency, that

2   we know from past experience has been hostile to the issues

3   that the Latino community cares about.

4   So, for instance, we know that when we worked on the -- in

5   the city redistricting process, there was, you know, in the

6   initial map that was being -- that was brought forward, it was

7   supported by two alderpeople that represent neighborhoods in

8   this area and, you know, that was a map that you had the head

9   of I believe it was the Department of Civil Rights.  He had

10  retired from the Department of Civil Rights.  He said that if

11  they would have passed that map, it would have violated the

12  Voting Rights Act.  That is what they were supporting

13  initially.  That did get voted down.  Those were the

14  alderpeople in that area.

15  And just issues like bilingual education, understanding the

16  kinds of needs that the Latino community face, that it's just,

17  as was being stated earlier, there are differences in these

18  demographics, and people do vote differently and it's

19  definitely weighted in terms of having this new voting

20  constituency have higher voting representation and not having

21  the same understanding of what the issues are that the Latino

22  community has.

23              MR. EARLE:  Thank you.  I have no further questions.

24              JUDGE STADTMUELLER:  Mr. Kelly?

25                       CROSS-EXAMINATION

1   BY MR. KELLY:

2   Q   Good morning, Your Honors.   Good morning.

3   A   Good morning.

4   Q   You mentioned that there was an organization that Voces de

5   la Frontera created to do lobbying.   What was the name of that

6   organization?

7   A   Voces de la Frontera Action.   It's a C4 non-partisan

8   organization.   It does allow us to do unrestricted lobbying

9   activity, as well as to endorse candidates, and we formed it at

10  the request of the community, because when we had done election

11  work in earlier years, we did get folks in the Latino community

12  saying, "Can you please recommend who we should vote for," and

13  we would always have to say, "No, we cannot," so we did form

14  this arm.

15  Q   And that's the arm that worked with the Milwaukee Latino

16  Redistricting Community?

17  A   No.   The redistricting process has been strictly a C3

18  activity.

19  Q   Okay.

20  A   Because we still do a lot of the C3 activity, such as

21  information on the photo ID requirements, things like that,

22  voter registration, language access, voter rights.

23  Q   Sure.   Let's do this.   Can we pull up Exhibit 1178 and go to

24  the second page.   Do you recognize this as the Milwaukee Latino

25  Redistricting Committee page, Ms. Neumann-Ortiz?

1  A  Yes.

2  Q  Okay.  If you look in the paragraph under the -- where it

3  says, "Coalition Partners Include," and towards the bottom of

4  that paragraph it says, "Voces de la Frontera Action."  Do you

5  see that?

6  A  Yes.  That is a typo.  LULAC, if you see, created the

7  document, and that is inaccurate.

8  Q  So is it Voces de la Frontera, the party to this case, that

9  is a partner with the Milwaukee Latino Redistricting Committee?

10  A  Yes, the C3 was involved in the Redistricting Committee.  It

11  was strictly a C3 activity.  This document was created by

12  LULAC, one of the partners, but that's a typo.

13  Q  Okay.  I'd like to address a few of the statements on this

14  page with you.  If you go down to the second bullet point

15  towards the bottom of the page, it says, "In Wisconsin, the

16  Latino population has grown 74 percent since the 2000 census

17  data."  Do you see that?

18  A  Yes.

19  Q  Do you know if that's true?

20  A  Yes, I know -- I don't know if it's exactly 74 percent, but

21  it's been around 70 percent statewide and 44 percent in the

22  City of Milwaukee.

23  Q  Okay.  Let's look at the second bullet point there -- the

24  third one.  It's right under the one we looked at.  It says,

25  "Milwaukee has maintained a similar number of residents,

1   according to the census, but the racial makeup has had a

2   considerable shift."  Do you know if that's true?

3   A  I'm not sure exactly what it's referencing, but, obviously,

4   Latinos have had the greatest ethnic population growth in this

5   last census.

6   Q  And the City of Milwaukee in particular?

7   A  As well.

8   Q  Okay.  So let's go down to the next bullet point.  It says,

9   "The White population has decreased by about 50,000 residents.

10  This was offset by persons of color, most notably Asian

11  Americans grew by a 3,000, Black Americans by 15,000 and

12  Latinos by 32,000 residents."  Do you see that?

13  A  Yes, I do.

14  Q  Does that sound about right to you?

15  A  Again, not knowing the precise numbers, but, yes, I mean, I

16  would say we do know that the -- Actually, I guess I won't

17  speak to it, if I don't know 100 percent.

18  Q  That's fair.  Let's turn to the next page of this exhibit.

19  We will go about halfway down.  There's a larger break there,

20  and it's the second bullet under that.  All right.  You see

21  where it says, "The U. S. Department of Justice and many civil

22  rights organizations have sued many governmental bodies that

23  violate the Voting Rights Act, and we want to ensure that our

24  city is not exposed to a suit by the DOJ?"  Do you see that?

25          MR. EARLE:  Your Honor, at this point I'm going to

1  object.  It's gone fair afield of the direct examination.  This

2  is relative to the city redistricting process and the dynamic

3  between the Latino Redistricting Committee and that process.

4          MR. KELLY:  It is, Your Honor.  The objection has

5  been launched by the Plaintiffs that Assembly Districts 8 and 9

6  impermissibly fractured a community of interest.  This is

7  laying the foundation to look at the city aldermanic district

8  that does the same thing.

9          JUDGE STADTMUELLER:  And, more significantly, while

10 it may be beyond the scope of the direct, our interest is

11 getting all the witness' testimony out in one setting so that

12 neither party has to call a witness back for their part of the

13 case, so the objection as to the question before the witness is

14 overruled.

15         MR. KELLY:  Thank you, Your Honor.

16 BY MR. KELLY:

17 Q  Okay.  It was important to Voces de la Frontera that they

18 would have an aldermanic map that would comply with the

19 constitutional requirements, is that true?

20 A  Absolutely.

21 Q  You wanted to make sure that it wouldn't be subject to a

22 suit by the DOJ?

23 A  Yes, and I think with limited funding, including, I mean,

24 just even, obviously, in terms of the civil rights

25 considerations would be number one, but secondly, yes, not

1  frivolous lawsuits.

2  Q  And Voces de la Frontera worked with the Milwaukee Latino

3  Redistricting Community to make sure that a map would be at

4  least proposed to the city that would be able to survive a

5  constitutional challenge?

6  A  Yes.

7  Q  So looking down towards the bottom of that page, the second

8  bullet point from the bottom, it says, "It is in this spirit of

9  fair representation that the Latino Redistricting Committee has

10  determined key principles on the redistricting map process.

11  These principals have guided us to draw three districts in

12  which Latinos are fairly represented."  Do you see that?

13  A  Um-hum.

14  Q  And that was your goal?

15  A  I guess I would want to refresh my memory on the principles.

16  Q  Well, making sure that Latinos have adequate representation

17  in the city government?

18  A  Absolutely.

19  Q  Okay.  All right.  And the last bullet point on that page

20  says, "In our proposed map, the 8th and the 12th districts will

21  have 62 and 67 percent Latino representation respectively."  Do

22  you see that?

23  A  That's right.

24  Q  And is that Latino voting age population, is that what that

25  percentage refers to?

1    A  I know that we were trying to get as close to 70 percent as

2    possible, because we recognize that to have an effective Latino

3    voting block you need to have U. S. citizens, they need to be

4    18-years-old, so those are, you know, plus the other factors,

5    but citizenship and age are huge factors in our -- in the

6    Latino population.

7    Q  So the districts you proposed, however, were 62 and

8    67 percent, right?

9    A  I can't recollect exactly now.  I haven't looked at it most

10   recently, but I do know we were shooting for as close to

11   70 percent as possible.

12   Q  Okay.  Let's turn to the first page of that exhibit.  Ms.

13   Neumann-Ortiz, do you recognize this as the aldermanic district

14   map that the Latino Redistricting Community proposed?

15   A  I believe this was one of the maps that we proposed, if my

16   memory serves me correct.  Yes, we were trying to get to two

17   supermajorities and a third influence district that accounted

18   for all of the growth.

19   Q  Can you locate on there for me Aldermanic Districts 8 and 12

20   as they were proposed on this map?

21   A  I think this is 8 (indicating).

22   Q  If you wouldn't mind using a laser pointer so the court can

23   be able to follow along with you.

24   A  Eight and 12.

25   Q  Can you shine it up on the screen?

1    A    Twelve, 8.

2    Q    That's 8, and then 12 is where?

3    A    (Indicating.)

4    Q    There was some testimony earlier this morning about the

5    significance of 16th Street, also known as Cesar Chavez Drive.

6    Can you locate that on the map for me?

7    A    It goes exactly down Cesar Chavez, 16th Street, and I really

8    can't see perfectly here to indicate that.

9    Q    Is it your understanding that the upper, say, half of the

10   divide between Aldermanic Districts 8 and 12, that that's

11   approximately 16th Street there?

12   A    I'd have to look at a closer map with more detail.

13   Q    From your personal knowledge in working on the -- in working

14   with the Latino Redistricting Community, do you understand that

15   the map that was proposed divided Aldermanic Districts 8 and 12

16   at least in the upper half along 16th Street?

17   A    I don't know.  I do know that an important consideration,

18   maybe the greatest consideration, from all of us was getting to

19   the as high as possible to the 70 percent citizenship number,

20   for total Latino population in order to have a critical Latino

21   voting block.

22   Q    Sure.  What I want to focus on here for a moment is the

23   communities of interest aspect that we have heard about this

24   morning.  Do you know approximately on this map where Dr.

25   Bartkowski's clinics would be located?

1   A   Yes, for me I'd have to look at a closer map.  I can tell

2   you in terms of the community of interest, if this speaks in

3   part to that.

4   Q   Well, what I'm interested in is there's a business community

5   on the near south side of Milwaukee, is that right?

6   A   The south side community is very rich in terms of -- I mean

7   not rich, it's actually one of the lowest income -- Assembly

8   District 8 is actually one of the lowest income areas, you

9   know, it's a very low income, low wage worker Latino community

10  by and large, and you have a lot of entrepreneurship.  In that

11  sense there's a lot of wealth.

12  Q   The near south side of Milwaukee, perhaps around National

13  Avenue?

14  A   Yes.

15  Q   And Aldermanic Districts 8 and 12 as proposed by the Latino

16  Redistricting Community have a part of that in one district and

17  part in another, is that right?

18  A   Yes.  I don't want to speak, if I'm not 100 percent sure,

19  so, I mean, I'd have to see here how far -- I mean, National

20  runs this way (indicating).

21  Q   Can you tell me of your own personal knowledge if the

22  aldermanic districts proposed by the Latino Redistricting

23  Community had part of the hub of the economic Latino community

24  partly in one district and partly in the other?

25  A   I do know that we definitely considered -- we thought it was

1   a very important criteria that, you know, where you had kind of

2   a living economic area, that that be one of the factors that

3   definitely, obviously, be considered in terms of trying to

4   preserve that, because, obviously, it's for elected officials

5   to be able to advocate and promote.  So that was one of the

6   strong factors we included, as well, besides the voting -- an

7   effective Latino voting block.

8   Q  Let's take a look at Exhibit 1179.

9            MR. EARLE:  What was the last one?  I missed it.

10           MR. KELLY:  That was 1178.

11  BY MR. KELLY:

12  Q  All right.  Ms. Neumann-Ortiz, do you recognize Exhibit 1179

13  as the aldermanic district map that was actually passed by the

14  City of Milwaukee?

15  A  Yes.

16  Q  And the Latino Redistricting Community was satisfied with

17  Aldermanic Districts 8 and 12?

18  A  Yes, we were.  It was not our ideal map, but we were.

19  Q  But it was good enough?

20  A  We believed that the importance of a supermajority was

21  fundamental to protecting Latino voting rights.

22  Q  Is there any possibility we can put 1178 and 1179 up next to

23  each other?  All right.  Let's focus in on Aldermanic Districts

24  8 and 12 and go through them.  So the aldermanic district

25  mapped proposed by the Latino Redistricting Committee is on the

1  left, the actual aldermanic map is on the right, is that

2  correct?

3  A  That's right.

4  Q  And do you see that in the upper part of the actual

5  aldermanic map that the division between 8 and 12 follows very

6  closely the division proposed by the Latino Redistricting

7  Community?

8  A  Yes.

9  Q  Thank you.  Ms. Neumann-Ortiz, you expressed some concern

10 about the change in Latino population of Assembly Districts 8

11 and 9 from before the adoption of Act 43 to now?

12 A  Yes.

13 Q  Do you know what the percentage of Latino voting age

14 population existed in Assembly District 8 in 2002?

15 A  Not off the top of my head.

16 Q  Do you know if the percentage of Latino voting age

17 population in the new Assembly District 8 is higher or lower

18 than in 2002?

19 A  Our biggest concern is that you cannot look -- When you are

20 talking about the Latino community, and this is someone who

21 maybe doesn't work in the Latino community would not -- In our

22 area.  I don't want to generalize for the country, but in our

23 area you cannot just look at Latino voting age as a factor.

24 You have to look at --

25 Q  There are other factors?

1  A  Absolutely.

2  Q  But what I'm interested in --

3       MR. EARLE:  Your Honor, I object because the witness

4  was interrupted.

5       MR. KELLY:  Yes, because -- I asked a very pointed

6  question.

7       MR. EARLE:  I'm directing my objection to the court,

8  Mr. Kelly.

9       JUDGE STADTMUELLER:  Ms. Neumann-Ortiz, did you have

10  Mr. Kelly's full question in mind when you answered?

11       THE WITNESS:  Your question again?

12       MR. KELLY:  Let me try that again.

13  BY MR. KELLY:

14  Q  Do you know if the Latino voting age population percentage

15  was higher in the new Act 43 Assembly District 8 than it was in

16  2002?  Was it higher or lower?

17  A  Oh.  Since I can't recollect off the top of my head, I,

18  again, don't want to answer.

19  Q  Would that be significant?  If the new Assembly District 8

20  had a higher Latino age population than Assembly District 8 had

21  in 2002, would that be significant to you?

22  A  Well, I guess the numbers that I would be looking at are not

23  really going back that far.  I mean, it would be looking at,

24  you know, from my experience as an organization where we have

25  done neighborhood-based canvassing, we have worked Assembly

1  District 8 and every ward reaching out to Latino voters, we
2  know that, you know, that it is important, and that is where
3  the Latino Redistricting Committee emphasized the importance of
4  not just getting to a, you know, as the map is being redrawn to
5  account for the tremendous growth of not just saying, you know,
6  it's enough to get to a majority Latino voting age population.
7  We know that because there are many factors that prevent Latino
8  voters from increasing their participation.  One of them I
9  mentioned earlier was, you know, in Assembly District 8, the
10  current one, I think in 2006 there was a study that said
11  26 percent of lawful permanent residents are concentrated in
12  Assembly District 8, the old map.  That's a significant number.
13  That was around 10,500 people.
14     You also have poverty.  It's a very high mobile area.  One
15  of the challenges for us has been sustaining a relationship
16  with voters, because they are always moving.  So there's
17  language barriers in terms of new citizens, an unfamiliarity
18  with the voting process.  So I guess what I'm saying is that
19  growth is good, growth is good, but when you are dealing with
20  the community that we have been working with, and this was a
21  recognition of Latino Redistricting Committee, you know, we
22  would like to see a map that can guarantee -- can ensure that
23  we can continue to elect a candidate of our choice that will
24  continue to represent us in the State Legislature.
25     We are very concerned that in diluting that Latino voting

1   block and bringing in a voting constituency that has higher

2   rates of voter registration, has higher rates of voter

3   participation and that for now at least is, you know, doesn't

4   understand in many ways and is hostile to some of the issues

5   that are fundamental civil rights issue for the Latino

6   community, that that is a real danger.

7   Q   Sure.  I understand the --

8           MR. EARLE:  Your Honor, Mr. Kelly is cutting off the

9   witness mid-sentence.

10          MR. KELLY:  I am, and I apologize, but it is going

11  fairly far afield of the question I asked.

12          JUDGE STADTMUELLER:  Sure.  I appreciate both

13  parties' concerns in that regard.  We have reached that point

14  where we're going to take our morning recess.  As counsel is

15  aware, we're going to go for two hours at a time and give our

16  court reporters a break, so we will stand in recess for 15

17  minutes.

18          THE BAILIFF:  All rise.

19          (A recess wad taken.)

20          THE BAILIFF:  All rise.  The court is now in session.

21  The Honorable Judges J. P. Stadtmueller, Diane P. Wood and

22  Robert M. Dow, Jr., presiding.  Please be seated and come to

23  order.

24          JUDGE STADTMUELLER:  Mr. Kelly, you may continue with

25  your questions.

1          MR. KELLY:  Thank you, Your Honor.

2   BY MR. KELLY:

3   Q  Ms. Neumann-Ortiz, I'd like to take a step back to a comment

4   you made just a little bit earlier this morning when we were

5   talking about growth from 2002 to the present.  You mentioned

6   that growth is a good thing, yes?

7   A  Yes.

8   Q  All right.  And we were talking about growth of the Hispanic

9   community in Assembly Districts 8 and 9?

10  A  That's right.

11  Q  All right.  Now that's a good thing because that gives more

12  of an opportunity for the Latino community to elect a candidate

13  of their choice?

14  A  Yes, it does.

15  Q  So if we were to -- and I won't ask you to validate any

16  numbers here, but if we were able to show you that the

17  percentage of Latino voters in Assembly District 8 as created

18  by Act 43 is higher than it was in 2002, that would be a good

19  thing, wouldn't it?

20  A  Not necessarily.  What we are looking for, what we are

21  concerned with with the map that Assembly Act 43 has created is

22  that it's splitting the largest -- the largest concentration of

23  the Latino population and within it Latino voters directly down

24  the middle.  So it's cutting it in half as opposed to

25  acknowledging that that growth is there and where it's most

1  concentrated in order to ensure the growth of that Latino

2  voting block.  That's been one of our big goals.

3  Q  But if the Hispanic population percentage in Assembly

4  District 8 under Act 43 is higher than it was in 2002, that

5  wouldn't be a bad thing, would it?

6  A  I guess I would disagree with the way the question is being

7  posed.

8  Q  It might be a bad thing?

9  A  We believe that the way the map is being drawn is a bad

10 thing because it's not bringing in the -- it's not bringing

11 in -- concentrating the Latino population into getting up to

12 that, as we advocated at the city level and which prevailed,

13 which was getting as close to a 70 percent population in order

14 to ensure that we could elect a candidate of our choice that

15 could bring that voice to the State Legislature.

16 Q  And I understand that you have a different perspective on

17 how you would like the map to be drawn, but I'm focusing on a

18 very narrow question, and that question is is it good or bad to

19 have the Hispanic population grow in a district over time?

20 A  I mean, the bottom line is how the lines are being drawn.

21 Growth is good; how the political boundaries are drawn is

22 everything.

23 Q  That's more important than the percentage of the Hispanic

24 community in a given district?

25 A  Political lines, how they are drawn, definitely can and we

1   believe in Act 43 does disenfranchise Latino voters.

2   Q  So if we were to create a Latino district, let's call it 8,

3   and we draw the lines essentially the same way north to south,

4   but it had an even higher population, that would be a bad thing

5   because the lines aren't where you wanted them to be?

6   A  I didn't understand the question.

7            MR. EARLE:  I will object to the hypothetical as

8   being, I think, incomplete.  I mean, I'm not sure what is in

9   this hypothetical district.

10           MR. KELLY:  The hypothetical district --

11           MR. EARLE:  My objection is to the judge, Mr. Kelly.

12           JUDGE STADTMUELLER:  I think the witness has

13  addressed Mr. Kelly's question with what she believed to be an

14  appropriate answer, and that is there are considerations beyond

15  where the lines are drawn that need to be factored into the

16  equation.  Beyond that, if you have some further questions,

17  whether on that or other subjects, Mr. Kelly, proceed.

18           MR. KELLY:  Fair enough.  Thank you, Your Honor.

19  BY MR. KELLY:

20  Q  So you are not especially concerned about the numbers, you

21  are more concerned about where the lines are actually drawn?

22  A  Both.  The demographic growth of the Latino community should

23  be reflected in a map where the -- that growth also brings with

24  it political representation, and the way Act 43 is being done

25  right now, because of the challenges of issues around obtaining

1   the Latino voting block, because of citizenship, because of age

2   and going so far south that you are bringing in a constituency,

3   a voting constituency that we know has been hostile to a lot of

4   the issues that the Latino community desperately needs and

5   wants to have addressed, and that, yeah, that that -- the way

6   that map is being drawn that we are not gaining political

7   power, but it's actually being diminished at a time of

8   significant population growth.

9   Q   Well, let's look at it this way.  Let's turn to Exhibit 1061

10  at Page 2, if you would.  Now these are the responses to some

11  interrogatories that the Government Accountability Board sent

12  to your organization, Voces de la Frontera.  In Interrogatory

13  No. 7, if we could look at the question, it asks you to please

14  identify all facts that support any claim in your Complaint

15  that Wisconsin Act 43 violates any state or federal statute

16  and/or state or federal constitutional provision.  Do you see

17  that?

18  A   I see it.

19  Q   Okay.  And let's go to the third paragraph in the Answer

20  that begins, "The data from the April 10."  Do you see there

21  where it says, "The data from the April 2010 census indicates

22  the area of most rapid growth in Milwaukee's Latino community

23  has been on the City's near south side centered in the area of

24  the 8th and 9th assembly districts?"  Do you see that?

25  A   Yes.

1    Q   Do you agree that that's true?   That is your answer.

2    A   Yes.   Yes.   I mean, yes, the Latino population is

3    concentrated in the 8th and in the 9th.

4    Q   Okay.   And before Act 43 the orientation of Assembly

5    Districts 8 and 9 where 8 was to the north, 9 was to the south?

6    A   Um-hum.

7    Q   So when we say that the area of most rapid growth of

8    Milwaukee's Latino community has been on the City's near south

9    side centered in the area of the 8th and 9th assembly

10   districts, that growth is happening in the southern part of

11   that, as well?

12   A   I think our problem with Act 43 --

13   Q   I'm sorry.   Ms. Neumann-Ortiz --

14   A   How far south it goes.   I mean, you are suggesting south,

15   that there's movement to the south, and, yes, there is movement

16   to the south, definitely, but not -- not as far south as is

17   being proposed in -- as Act 43 has in that it's actually

18   bringing in -- it's diluting the Latino voting block because of

19   how far south it goes.

20   Q   Were you in the courtroom when Dr. Bartkowski was

21   testifying?

22   A   Yes, I was.

23   Q   Do you recall him testifying that the Hispanic community is

24   moving south?

25   A   I did.   I remember agreeing with his observation that it's a

1   very slow growth, and that it's just very -- just below

2   Assembly District 8, maybe half-a-mile below, and not to the

3   extent that's being proposed in Act 43.

4   Q   Sure.  But it is moving south?

5   A   At a very slow rate.

6           MR. KELLY:  Thank you.

7           JUDGE STADTMUELLER:  Thank you, Mr. Kelly.  Mr.

8   Earle, anything further?

9           MR. EARLE:  Yes, Your Honor.

10                      REDIRECT EXAMINATION

11  BY MR. EARLE:

12  Q   Your cross-examination began with an inquiry about the

13  Latino Redistricting Committee in which Voces de la Frontera

14  participated.  Do you recall that?

15  A   Yes, I do.

16  Q   Did anybody from the Legislature or anybody involved with

17  the legislative redistricting process contact anybody within

18  the Latino Redistricting Committee, to your knowledge, for

19  input?

20  A   To my knowledge, no.

21  Q   Okay.  You were asked a series of questions about the

22  aldermanic districts.  Do you recall that?

23  A   Yes.

24  Q   Okay.  And in particular the configuration of Aldermanic

25  District 12 and Aldermanic District 8?

1   A   Yes.

2   Q   Okay.  Do you know offhand the approximate size of an

3   aldermanic district in the City of Milwaukee?  I know I'm

4   testing you here.

5   A   I cannot -- I don't want to guess exactly.

6   Q   Okay.  Do you know whether the Latino community had grown to

7   a point where it could reasonably be argued that it was large

8   enough to constitute effective voting majorities in two

9   aldermanic districts?

10  A   Absolutely.  That was our case, and we had also support from

11  various experts.

12  Q   Okay.  And the lines that you see now on the screen, and I

13  think that's Exhibit 11, in particular the one that was

14  actually passed, is that 1178?  79?  Yes, 1179.  Do those two

15  aldermanic districts reasonably encompass the Latino community

16  where the population is concentrated?

17  A   Absolutely.

18  Q   Does Act 43 go further south than Aldermanic District 12?

19  A   Yes, it does.  It goes as far down as Howard.

20  Q   Okay.  And if we could call up Exhibit 237.  Do you know

21  what the southern boundary of the 12th Aldermanic District is?

22  A   More or less it's on Cleveland.

23  Q   Okay.  Could we enlarge this exhibit so that -- Can you

24  point to more or less -- Can you see where Cleveland is on that

25  map, if we could enlarge it a little bit, further south?

1  A  Okay.

2  Q  A little bit further.  Okay.  There you go.

3  A  I can't really read too well there.  Cleveland.  There it

4  is.

5  Q  It's by the line.

6  A  Yes, there it is.

7  Q  Okay.  And how far would you have to go south to get to

8  Howard?

9  A  A long ways.  Again, I haven't checked the exact mileage,

10  but I have driven it and I know it's a long way.

11  Q  I will represent to you that the darker red represents

12  Latino concentrations and the yellow represents substantially

13  diminished Latino concentrations.  How much yellow would we

14  have to pass over to get to Howard?

15  A  I haven't checked the exact miles, but if you could scroll

16  down farther, it's substantial.  It's Howard.  Howard is the

17  end.

18  Q  Okay.  All right.

19  A  So it continues much, much farther south, yes.

20  Q  Now Mr. Kelly asked you a series of questions about whether

21  it was a good thing that there were more Latinos of voting age

22  in 2012 on Act 43's 8th Assembly District than there were in

23  the 2002 Assembly District 8 when it was first drawn.

24  A  Yes.

25  Q  Okay.  Do you know how the current 8th Assembly District --

1   Strike that.  Let me rephrase that question.

2       Do you know how District 8 before Act 43 fared in terms of

3   Latino concentration on census day?

4   A  Oh, well I know that --

5   Q  This is before the redistricting.

6   A  Before the redistricting.  I know we have focused our

7   activity, almost all of our get-out-out-the-vote efforts in the

8   Latino community nearly exclusively in Assembly District 8

9   because it has the highest concentration of Latinos of any

10  assembly district in the state.

11  Q  Was the concentration of Latinos in Assembly District 8

12  reduced by Act 43?

13  A  Absolutely.

14          MR. EARLE:  No further questions, Your Honor.

15          JUDGE STADTMUELLER:  Anything further, Mr. Kelly?

16          MR. KELLY:  Nothing further, Your Honor.

17          JUDGE STADTMUELLER:  All right.  Thank you, Ms.

18  Neumann-Ortiz.  You are excused.  You may step down.  You may

19  call your next witness, Counsel.

20          MR. EARLE:  Professor Ken Mayer.

21          KENNETH MAYER, having been first duly sworn, was

22  examined and testified as follows:

23          THE CLERK::  Mr. Mayer, would you please state and

24  spell your full name for the court reporter.

25          THE WITNESS:  My name is Kenneth R. Mayer.  Last name

1   is M-A-Y-E-R.

2                    DIRECT EXAMINATION

3   BY MR. EARLE:

4   Q   Professor Mayer, what do you do for a living?

5   A   I'm a professor of political science at the University

6   Wisconsin-Madison.

7   Q   Okay.  Showing you what's been marked as Exhibit 55, do you

8   have it there?

9   A   Yes.

10  Q   Okay.  Can you identify it, please?

11  A   This is my CV taken from my expert report produced in this

12  case.

13  Q   You mean your CV is attached to Exhibit 55?

14  A   Yes.

15  Q   Okay?

16  A   Exhibit 55 is my expert report.

17  Q   Okay.  And drawing your attention to Exhibit 1 of

18  Exhibit 55?

19  A   This is my CV.

20  Q   Okay.  Is that CV up-to-date?

21  A   There are a couple things missing, but it's largely

22  up-to-date.

23  Q   Okay.  I don't want to go through the CV in too much detail,

24  but I'd like to kind of go over a few things to allow the court

25  to be introduced to your qualifications, if you will.  Could

1  you hit some of the highlights of your career?

2  A  I received my PhD from Yale university in 1988.  My

3  bachelor's is from the University of California-San Diego where

4  I majored in political science and minored in applied

5  mathematics.  I have been at the University of Wisconsin since

6  1989.  In 2006 I was named Fulbright Distinguished Chair at the

7  Australian National University, and those are what I consider

8  the highlights.

9  Q  Okay.  What courses do you teach, Professor Mayer?

10  A  I teach courses in American government on the presidency,

11  campaign finance, electoral systems, the introductory course in

12  American politics, courses on election law and occasionally

13  courses on Congress.

14  Q  Do you have any graduate students?

15  A  Yes, I do.  I supervise -- or have supervised graduate

16  students either as a member of the Dissertation Committee or as

17  Chair of the Dissertation Committee.

18  Q  Okay.  Have you published in peer-reviewed scholarly

19  journals?

20  A  Yes, I have.

21  Q  Could you describe some of those for us, please?

22  A  The major peer-reviewed journals that I have published in

23  are the American Journal of Political Science, the Journal of

24  Politics, the Election Law Journal, Congress and the

25  Presidency, PS, Political Science and Politics, Presidential

1  Studies Quarterly, Legislative Studies Quarterly, and a number

2  of peer-reviewed books and book chapters.

3  Q  Have you published in any Law Review Journals?

4  A  Yes, I have.  I have an article on campaign finance that was

5  published in the University of Richmond Law Review in 2006, and

6  an article on Australian constitutional history that was

7  published in the UCLA Pacific Basin Law Journal.

8  Q  Okay.  Have you done any consulting work?

9  A  Yes.

10  Q  Before I ask you that question, let me ask you this.  Has

11  redistricting played a role in any of your published articles?

12  A  Yes.  The primary avenue for considering redistricting in my

13  published work has been as a component of my research on

14  campaign finance where my particular interest is in -- is on

15  how various regulatory regimes affect the competitiveness of

16  elections, and it's necessary to examine the effect of

17  redistricting, because that has a very clear effect on

18  electoral competitiveness.

19  Q  Okay.  Can you describe your consulting work in the areas

20  relevant to this redistricting?

21  A  In 1992 I was an expert witness before this court in the

22  Baumgart case.

23  Q  Was your testimony received in that case?

24  A  Yes, it was.

25  Q  Okay.

1   A   I have served as an expert witness in a campaign finance

2   case in Arizona, which at the time that I worked on it was

3   called McComis, et al, versus Brewer, et al.  By the time it

4   got to the Supreme Court, the name had changed.  More recently

5   I was an expert witness for the City of Kenosha in the County

6   of Kenosha versus City of Kenosha, which was a redistricting

7   dispute between the city and the county.  I served as an expert

8   consultant for Voces de la Frontera in the Milwaukee Aldermanic

9   District in 2011.  I have also served as a consultant -- expert

10  consultant -- for the Prosser for Supreme Court Committee

11  advising them on issues related to the recount.

12  Q   Okay.  Have you been appointed to any committees that have

13  anything to do with redistricting?

14  A   Yes.  In 2003 Shirley Abrahamson, the Chief Justice of the

15  Wisconsin Supreme Court, appointed me to a committee on

16  redistricting on which I served as co-chair between 2003 and

17  2009.  We were charged with creating procedures that the State

18  Courts would use in the event that the 2010 census and

19  subsequent redistricting process triggered litigation.

20  Q   Okay.  And what kinds of work did that committee do

21  substantively?

22  A   Well, working within the bounds of what we read to be the

23  authority that we had, we created a commission of retired

24  appellate court judges who would serve as sort of a special

25  master to the court in creating a redistricting map, but only

1    in the event that the Legislature had failed to act by a

2    specific point in time.

3    Q  Have you done any consulting work for the Government

4    Accountability Board?

5    A  Yes.  Since 2008 I and several of my colleagues at the UW

6    have been asked by the Government Accountability Board to

7    advise and consult with them on several issues.  Initially we

8    worked -- we partnered with them on a $2 million grant that

9    they received from the Election Assistance Commission, the

10   federal advisory body, and we evaluated and reported on their

11   election data collection program, the program that they -- they

12   used the grant money to upgrade their system for collecting

13   election day information.

14     More recently we have been retained, I suppose is the right

15   word, to partner with them again on advising them on how they

16   might improve what they called their incident reporting system,

17   which is a system used in each ward in the state by poll

18   workers to identify and report on different events, such as

19   spoiled ballots or voters being turned away for one reason or

20   another.

21   Q  Did you do some work for Voces de la Frontera unrelated to

22   this case?

23   A  Yes, I did.  I was asked in the summer of 2011 to provide

24   some advice to them in the process of the aldermanic

25   redistricting in the City of Milwaukee.

1  Q  Are you being compensated for your work in this case?

2  A  Yes, I am.

3  Q  At what rate are you being compensated?

4  A  $250.

5  Q  How does that compare to your standard rate?

6  A  It's my standard rate.

7  Q  What were you asked to do in this case?  Before I ask that,

8  who were you retained by?

9  A  I was retained by both Voces de la Frontera and by the

10  Baldus Plaintiffs.

11  Q  Okay.  So I'm going to ask you about the work that you did

12  for Voces de la Frontera.  Will you describe the work that you

13  did for Voces de la Frontera.

14  A  I was asked to evaluate Act 43, in particular the manner in

15  which Districts 8 and 9 had been drawn to evaluate the

16  likelihood that or the effect that the new district

17  configurations would have on the Latino community and its

18  ability to elect candidates of its choice, and also to analyze

19  data to determine whether, in my view, that Act 43 had complied

20  with the Voting Rights Act in that area of the city.

21  Q  Okay.  Did you receive a similar assignment from the Baldus

22  Plaintiffs in that regard?

23  A  Yes, I did.

24  Q  Okay.  So it was basically the same work for both sets of

25  Plaintiffs?

1   A  That's true.  What I did is submitted one report as part of

2  the Baldus litigation and then broke out the section on

3  Districts 8 and 9, which were identical save for some minor

4  stylistic changes which I submitted as part of the Voces

5  litigation.

6  Q  Okay.  And did you do the same thing with regards to your

7  rebuttal report?

8  A  Yes, I did.

9  Q  Okay.  Is Exhibit 55 an accurate copy of your report?

10  A  Yes, it is.

11  Q  Okay.  Are there any typos or corrections?

12  A  There are a couple of typos.  Well, first I submitted some

13  corrected pages to correct some -- a table of core district

14  retention.  There are also two typos on Page 23.  One is in the

15  line -- Let's see if I can draw on this.  Right here where I

16  show that the non-citizenship rate that I initially used in

17  this report was 37.75.  That should actually be 35.75, although

18  the result was correct.  There was also a typo which is now

19  covered by the part that I --

20  Q  There's a button on your screen?

21  A  Clear all.  All right.  So this number -- Well, that doesn't

22  work, either.  Here we go.  This number, 28,939, should be

23  26,939 to match that number, but other than that, it's correct.

24  Q  Showing you Exhibit 60, can you identify this, please?

25  A  This is my rebuttal report.

1  Q  Okay.  Is it accurate?  Did you make any corrections in that

2  report?

3  A  I don't believe so, no.

4  Q  All right.  Drawing your attention to Exhibit 200, could you

5  identify this exhibit, please?

6  A  Yes, this is a map which shows the 1992 Assembly District 8

7  outlined in yellow overlaid with the 2002 Assembly District 8

8  which is shown in color.  So it basically is an overlay of the

9  '92 and 2002 districts.

10 Q  And why did you ask to have this exhibit created?

11 A  I wanted to determine whether the 2002 district was

12 substantially similar in terms of core retention to the 1992

13 district.

14 Q  Okay.  Could you define for the Court what you mean when you

15 say "core retention?"

16 A  Core retention is the percentage of the population of the

17 old district that is retained when the district lines are

18 shifted as the result of population changes and the

19 redistricting that occurs as a result of the decennial census.

20 Q  Can you describe the degree of core retention that occurred

21 between the 1992 map and the 2002 map?

22 A  It shows that the 2002 map is fairly close to identical.

23 The main area that was added here is a large industrial area

24 which is largely unpopulated, so there was an area here that

25 was added, and a small area here that was added, and again an

area that was taken out here, which again is the industrial

area that runs along I-94.  Overall, 94 percent of the core

population -- of the population in the 1992 district was

retained in the 2002 district.

Q  Was anything done to the 1992 district in the creation of

the 2002 district beyond adjusting the population requirements

for equalization purposes?

A  I don't believe so.

Q  Have you reviewed Assembly Districts 8 and 9 as they have

been treated under Act 43?

A  Yes, I have.

Q  And do you have any observations of how those districts were

treated under Act 43?

A  They were both, in my view, radically reconfigured.  In 2002

the orientation of both the 8th and the 9th was essentially

horizontal.

Q  Can we get 76 up?  I'm sorry.  I mean 176.  I'm sorry.

A  So this shows the orientation of the 2002 8th and 9th

Districts.  The 2002 districts are shown in color.  The Act 43

districts are shown in yellow outline.  It's quite clear that

the orientation of the districts were dramatically changed.

Instead of running north to south, they were shifted to a

vertical orientation and essentially split down the middle with

substantial populations added to the 8th District and also a

substantial portion of the old 8th, which was cleaved off and

1 placed or shifted into the 9th Assembly District.

2 Q  Okay.  Professor Mayer, why did the 8th Assembly District

3 have to change at all under Act 43?

4 A  It was slightly underpopulated.  It needed to add -- They

5 needed to add approximately 2,800 people.

6 Q  Are you referring to Exhibit 1084?

7 A  Yes, that's correct.

8 Q  Put 1084 up next to 176.  Thank you.

9 A  So the 8th District -- The 8th District is here, and it

10 shows that it was underpopulated by approximately 2,800 people.

11 So it was necessary to add roughly that number of people to

12 bring it into acceptable compliance with the ideal district

13 population.

14 Q  In order to equalize the 8th Assembly District with the

15 other -- with the 99 other assembly districts in the State of

16 Wisconsin, correct?

17 A  That's correct.

18 Q  And how was this achieved under Act 43?

19 A  Well, in Exhibit 2 in my expert report which is noted as

20 Exhibit 5 --

21            JUDGE WOOD:  I believe it's 55.

22            THE WITNESS:  Fifty-five.  I'm sorry.

23 BY MR. EARLE:

24 Q  You are drawing our attention to Exhibit 5 of 55?

25 A  Exhibit 2.

1  Q  Exhibit 2.  I'm sorry.

2  A  So if you could highlight District 8.  This shows the

3  population of the 2002 districts that was determined on census

4  day in 2010.  The next column is the population shift that was

5  required to bring the district into population equality,

6  although the numbers don't have to be exact.  The third column

7  here shows the actual population change that was achieved.  So

8  there were 2,642 people added to the 8th.  The next two columns

9  show the numbers of people who were shifted into the district

10  and then shifted out of the district, and it shows that the --

11  a net shift of 2,642 people was achieved by moving 25,590

12  people out of the existing District 8 shifting almost 23,000

13  people in the --

14         JUDGE WOOD:  I think --

15         THE WITNESS:  Oh, I'm sorry.  25,590 people added,

16  22,948 taken out, for a total population shift, adding up these

17  two numbers, of over 48,000.  Then I calculated the ratio of

18  the population shift divided by the population change that was

19  required to produce a ratio.  So I calculated that there were

20  more than 18 times as many people moved as was necessary in

21  order to achieve population equality.

22  BY MR. EARLE:

23  Q  Okay.  And after all is said and done with all of those

24  folks moving around, what was the core retention percentage of

25  the new 8th Assembly District under Act 43?

1  A  It was roughly 55 percent.

2  Q  Okay.  So, in other words, approximately 45 percent were

3  new?

4  A  That's correct.

5  Q  Okay.  Now focusing on the people who were moved out of the

6  district, okay, the 45 percent who were moved out of the old

7  8th Assembly District, what was the Latino voting age

8  population of that group?

9  A  Of the people who were moved out, the Latino voting age

10  population was approximately 64.5 percent.

11  Q  What was the Latino voting age population of the group that

12  was moved in, the 25,000 people who were moved in?

13  A  This population was added to the south of the old 8th, and

14  it had a Latino voting age population of slightly under

15  52 percent.

16  Q  Okay.  What is the Latino voting age population of the 8th

17  Assembly District under Act 43?

18  A  60.54 percent.

19  Q  You said 60.54 percent?

20  A  That's correct.

21  Q  And what was the Latino population of the old 8th Assembly

22  District, 2002 district, on census day?

23  A  65.5 percent.

24  Q  So the Latino voting age population decreased?

25  A  That's correct.

1   Q   Okay.

2   A   By 5 percentage points.

3   Q   Using Exhibit 176, can you demonstrate for the judges how

4   the reconfiguration was accomplished?

5   A   Again, this shows the old 8th District in red.  This area

6   was moved out and shifted into the 9th, and this area was taken

7   out of the 9th and moved in, so I will just -- It was

8   essentially two roughly equivalent size populations shifted,

9   although the number of people moved in was slightly larger than

10  the number of people moved out.

11  Q   What effect did this reconfiguration of the 8th Assembly

12  District have on the Latino community's ability to have a

13  reasonable opportunity to elect a candidate of choice?

14  A   In my view, based on the analysis that I have done, it

15  significantly diminished that opportunity.

16  Q   Okay.  Are there any voter eligibility considerations that

17  would make it more difficult for the Latino community to elect

18  candidates of its choice as a result of the reconfiguration of

19  the new 8th Assembly District under Act 43?

20  A   Well, there are demographics --

21          MR. KELLY:  Objection.  Your Honor, I don't believe

22  it's relevant and I don't believe there's been a foundation

23  laid for it.

24  BY MR. EARLE:

25  Q   Did you endeavor to make a determination of whether there

1  were any voter eligibility considerations that would make it

2  more difficult for the Latino community to elect its candidates

3  of choice as a result of a reconfiguration we have on

4  Exhibit 176?

5  A  Yes, I did.

6        MR. KELLY:  Then I object, Your Honor, on the basis

7  that that was not included in his expert report.

8        MR. EARLE:  Your Honor, I think there's a very

9  significant section in his expert report dealing with

10  citizenship and voting age percentages.

11        JUDGE STADTMUELLER:  The objection is noted and

12  overruled.  You may continue.

13        THE WITNESS:  So the most important factor that is

14  essentially unique to the Latino community is that a

15  substantial number -- a substantial percentage of the voting

16  age population are not U. S. citizens and are, therefore,

17  ineligible to vote.  There are also socioeconomic factors that

18  are not unique to the Latino community, but are associated with

19  lower turnout.  I also formed an analysis that showed much

20  lower rates of voter registration among Latino voting age

21  populations than non-Latino Whites, and so those are the

22  demographic factors, but there are also factors related to the

23  orientation of the districts.

24  BY MR. EARLE:

25  Q  Okay.  Well, let's go back to the citizenship question,

1  okay?

2  A  Okay.

3  Q  Can you determine the percentage of the Latino population in

4  the 8th Assembly District who are eligible to vote on the basis

5  of citizenship?

6  A  It's possible to estimate it.

7  Q  Okay.  And how do you go about doing that or how did you go

8  about doing it?

9  A  The Census Bureau conducts a detailed survey called the

10  American Community Survey which was developed after citizenship

11  questions were dropped from the long form in the 2000 census,

12  and so the ACS is a large scale survey that does a lot of

13  things, but one of the most important purposes is that it

14  asks -- it attempts -- it estimates the number of citizens and

15  non-citizens at all different geographic aggregations down to

16  the census tract level.  It's a sample that's drawn, it's not a

17  comprehensive enumeration like the census, but it is possible

18  to -- that the data that is collected by the census makes it

19  possible to make a fairly accurate estimate of the percentage

20  of voting age populations among different demographic groups,

21  including what the census calls Hispanics, and estimate the

22  percentage of the voting age population that is non-citizen.

23  Q  Okay.  Drawing your attention to your rebuttal report,

24  Exhibit 60, can you draw the Court's attention to that portion

25  of the report where you address the question of citizenship?

1    A   The question that addresses citizenship begins on Page 10

2    and continues through the rest of the -- through Page 17.

3    There's also an exhibit, Exhibit 2, which shows my calculations

4    for the Latino voting age population concentrations, what they

5    become when one controls for the non-citizenship rate among

6    this population.

7    Q   Okay.  Now walk us through the database that you used and

8    what the calculations were.

9    A   Well, I used two numbers.  The ACS does three types of

10   surveys.  They do annual surveys, they do a three-year

11   compilation of the annual surveys and then they do a five-year

12   survey, and they also produce estimates for different

13   aggregations.  In my initial report I calculated a Latino

14   non-citizen rate of 35.75 percent statewide for Wisconsin

15   and --

16   Q   What data was that based on?

17   A   That was based on the 2008 American Community Survey, but I

18   continued to investigate because I wanted to use the five-year

19   data, which is universally considered to produce better

20   estimates, because you have five times as much data, and I also

21   wanted to limit that analysis to the geographic aggregation of

22   Milwaukee city.  Using the 2006 to 2010 ACS, I was -- There is

23   a table that Census produces, these aren't my calculations,

24   they are the Census Bureau's calculations, estimated that the

25   non-citizenship rate among the Latino voting age population in

1  the City of Milwaukee was 42 percent.

2  Q  Okay.  And you consider that to be the more accurate rate?

3  A  Absolutely.

4  Q  Okay.  When you apply that 42 percent based on the five-year

5  ACS data to district -- Act 43's 8th Assembly District, what

6  did you find?

7  A  I found that the voting age population, once I corrected --

8  The voting age population of 60.54 percent, once you correct

9  for citizenship, as I show on the bottom of this table, which

10 is this portion, drops from 60.5 percent to 47.07 percent.

11     In doing a similar calculation for District 9, which had --

12 has a Latino voting age population of 54 percent, again

13 controlling for citizenship and removing ineligible

14 populations, that drops to 40.5 percent.

15 Q  Okay.  Did you make a determination of what the -- Yes, did

16 you make a determination of what the 8th Assembly District was

17 before it was redistricted?

18 A  Before it was redistricted, I believe, again, controlling

19 for citizenship, the 65 percent voting age population

20 translated to, I believe, 54 percent of the citizen voting age

21 population.

22 Q  Okay.  And what did Act 43 do to the Latino citizen voting

23 age population of the 8th Assembly District as configured on

24 census day after all was said and done with Act 43?

25 A  It reduced it from approximately 54 percent to 47 percent.

1  Q  Okay.  Did you look at any other voter participation issues?

2  Well, you listed several before.

3  A  Yes.

4  Q  Okay.  Let's go to registration.

5  A  Okay.  In my --

6  Q  That's Table 8 of Exhibit 55?

7  A  That's correct.

8  Q  Okay.

9  A  It's possible to -- Neither the census nor the American

10  Community Survey collects or reports individually identifiable

11  data, and I was interested in determining what the registration

12  percentage was, what the registration rates were in the Latino

13  voting age population and the non-Latino White.  I estimated

14  this by obtaining a voter registration list from the Government

15  Accountability Board, a portion of the Statewide Voter

16  Registration System for the City of Milwaukee.  I then

17  identified -- And that last actually lists names and addresses.

18  I was able to --

19  Q  So you focused on the last name?

20  A  Yes.  I used a technique known as surname analysis, which is

21  a widely accepted technique for identifying likely Hispanic or

22  Latino individuals.  I was then able to estimate the percentage

23  of the Latino voting age population using census data in each

24  of the City of Milwaukee's -- I believe there are 313 wards,

25  and I simply calculated the percentage of that population that

1   was actually registered to vote.  I did a similar calculation

2   for non-Latino Whites and then plotted those two.

3   Q  This is on Table 8?

4   A  Yes.

5   Q  Corrected Exhibit 8?

6   A  Yes.

7         MR. EARLE:  Can we get that up on the screen?

8   BY MR. EARLE:

9   Q  Now that seems --

10  A  This is not a pretty version.

11  Q  Something has happened here.  I think the version in the

12  report -- The version in the exhibit is hopefully better than

13  what we have on the screen.  Perhaps you could refer to the

14  table that you have in your report in front of you.

15  A  Yes.  So this shows a plot of each of the wards in the City

16  of Milwaukee.  The X axis is Latino registration rate as

17  calculated using my analysis of the Statewide Voter

18  Registration System, and then the Y axis, the vertical axis, is

19  the non-Latino White registration rate in that same ward.  The

20  45-degree line is essentially the 50/50 line.  Any point that's

21  above this line shows a higher non-Latino White registration

22  rate than Latino registration rate.  Any point below this shows

23  a Latino registration rate that is higher than the White

24  registration rate.

25  Q  Okay.  And could you explain to the Court what list you used

1  to identify the surname?

2  A  Yes, there are a number of different ways of doing this.  I

3  used a 1996 list that was produced by the Department of the

4  Census in one of their technical documents in which they

5  identified the 639 surnames that had shown up in the 1990

6  census as being the most likely to be Hispanic.  I performed a

7  simple name match, controlling for obvious spelling errors in

8  the SVRS, and simply counted the number of people with each

9  surname that appeared in the registration list.

10  Q  And what were your overall findings?

11  A  Overall I found that the Latino -- citywide the Latino

12  registration rate among the voting age population was

13  26 percent.  There are a few points here where, you know, here

14  where they are very high rates of Latino registration and White

15  registration, but these are all in wards with very, very small

16  Latino populations.  In fact, all of them I believe have less

17  than 60 Latino voting age population in them.  It's very clear,

18  just looking at -- looking here, that everywhere in the city

19  virtually non-Latino White registration rates dramatically

20  exceed the Latino registration rate.  The registration rate for

21  non-Latino Whites calculated at 76 percent.

22  Q  Okay.  Now did you adjust that 26 percent registration rate

23  for citizenship?

24  A  I did not.

25  Q  Okay.  If you did, what would it be?  I mean, do you know?

1  A  Using the 42 percent five year ACS non-citizenship rate for

2  the City of Milwaukee, the adjusted -- and everyone -- You

3  can't register, if you're not a citizen, so everyone on that

4  list is a citizen.  It's necessary to reduce the denominator

5  removing those individuals who are counted in the census as

6  Latino, but are not citizens.  If you do that, the registration

7  rate among the eligible Latino population is 44 percent.

8  Q  And, again, this is still in comparison to the 76 percent

9  for the White community?

10 A  That's correct.

11 Q  Could we go to Exhibit 182, please.  I guess I would now ask

12 you to address the question of turnout.

13 A  It is not possible to directly observe Latino turnout,

14 because we or I didn't have access to data that would allow me

15 to attack that question.  So I used the same method that I

16 used, which I'll talk about later, the racially polarized

17 voting analysis, to use a statistical technique known as

18 ecological inference to make inferences about individual

19 behavior or, in this case, making estimates about the number of

20 Latinos or percentage of Latinos who voted and based on

21 aggregate turnout vote figures at the ward level.  This table

22 shows the results of this analysis for several races.  For

23 purposes of this analysis --

24 Q  Before you get into the actual showing the results, I mean,

25 is this technique widely accepted in your profession for this

1  purpose?

2  A  Yes.  The technique I used, which was developed by a Harvard

3  professor named Gary King in 1997, is considered state of the

4  art and it's widely accepted, I'd say universally accepted, as

5  the best way.  There are people who have suggested some

6  improvements, but no radical changes.  So this is what was most

7  widely used to make these sorts of inferences.

8  Q  Okay.  Proceed.

9  A  And so using this method, and these are all the State

10  Superintendent of Public Instruction, the primary general,

11  Milwaukee Circuit Court primary general and the 12th Aldermanic

12  Districts, these are all districts that are low salience, low

13  turnout.  The key is the Latino turnout, which is here using

14  the King ecological inference method, and it shows the Latino

15  turnout is exceptionally low and, again, this is calculated as

16  a percentage of the voting age population.  It ranges between

17  2.3 percent for the February 2009 State Superintendent of

18  Public Instruction primary to a high of 5.1 percent in the 200

19  8 12th Aldermanic District general election.

20     If you compare that to the White turnout, you see in every

21  case the turnout among non-Latino Whites is significantly

22  higher, twice as high in the State Superintendent primary, four

23  times as high in the State Superintendent General, five times

24  as high in the Circuit Court primary, ten times as high in the

25  Circuit Court -- Sorry.  That should be general election.

1  That's listed as primary.  That should be general.

2  Approximately five and one-half or three and one-half times as

3  high in the 2008 general election in the 12th aldermanic

4  district.  So this shows the turnout is dramatically higher

5  among non-Latino Whites than among Latinos.

6  Q  Okay.  Have you compared the turnout in the 8th Assembly

7  District to the turnout in other assembly districts around the

8  state?

9  A  Yes.

10  Q  And could you describe your findings, please.

11  A  Using the authoritative Blue Book, I examined voting in

12  assembly district elections beginning in 1998, and it turns out

13  that in the 8th Assembly District, extending back to 1998 when

14  Judge Colon was first elected, every year, and this extends all

15  the way through 2010, in every general election for the

16  assembly, the number of votes cast in District 8 is the lowest

17  of any election district, any assembly district that year, even

18  looking at other uncontested districts.

19      The number of votes cast for Judge Colon ranged from a low

20  of perhaps 3,800 in a mid-year election to I believe over 8,000

21  in 2008, whereas the number of votes cast in an uncontested

22  assembly district in other areas easily can exceed, 10, 15,

23  sometimes 20,000.  So the 8th District elections are the lowest

24  turnout elections statewide of any of the 99 assembly district

25  elections held that year.

1  Q  So from 1998 to 2010 the 8th Assembly District was number 99

2  out of 99?

3  A  That's correct.

4  Q  Drawing your attention to -- Well, what is the significance

5  of that turnout differential as applied to the Act 43 8th

6  Assembly District?

7  A  The significance is that it doesn't take much of a

8  demographic change of adding areas to the district that are --

9  that have both lower Latino populations and that have higher

10  turnouts.  It doesn't take much of a change to create a

11  situation in which non-Latino Whites who turn out at far higher

12  rates and participate at far higher rates would overwhelm the

13  voting power of Latino voters in the district.

14  Q  Can we put up Exhibit 185 and 184.  Can you explain to the

15  judges what we have represented between these two exhibits?

16  A  Would it be possible to make the legends somewhat larger?

17  Q  Sure.  On both of them?  Do you want to start on the green

18  map first?

19  A  Just start with the legends.  So in Exhibit 184, this is a

20  map that shows the 2002 wards where we had election data.  This

21  shows the turnout as a percentage of the voting age population

22  from the 2008 -- November 2008 election, which was a

23  presidential election, which was the highest turnout election

24  in Wisconsin in decades, and the lighter areas show areas of

25  lower turnout.  This area here, which is both really the core

1  of the Latino community, corresponds to a turnout rate of

2  between 0 and 30 percent.  Again, this is in a statewide

3  election where I think statewide turnout was close to

4  70 percent.

5      The darker areas show, as the shades of green get darker,

6  and, again, outside these districts these colors are correct.

7  It shows that outside these districts the turnout often

8  exceeded 60 percent.  It shows that the blue is the outline of

9  the 2002 8th Assembly District, and it shows that the farther

10  south that you go, particularly in this area here, you have

11  added areas to the 8th District that are both very low

12  concentrations of Latino voters and very, very high turnout.

13  So these areas are essentially 50, 55, 60 percent or higher

14  compared to turnouts of -- which may be as low as 5 or

15  10 percent of the voting age population.

16      Let me clear that.  So can we go to Exhibit 185.  185 is a

17  map of the same geographic features, the old 2002 Assembly

18  District 8, the new assembly district which is outlined in

19  black showing the Latino voting age population concentration

20  in, again, each of the 2002 wards.  Again, it shows that in the

21  core of the Latino community, which is roughly there

22  (indicating), that the Latino voting age population is quite

23  high.  In fact, the highest concentration, I don't know what

24  ward it is, but it has a Latino voting age population of

25  77 percent.  As you move south, you can see some growth in the

1   Latino community extending south beyond the boarders of the old

2   8th, but, again, this ring on the southern tip consists of an

3   area that is essentially below 40 percent concentrations of

4   Latino voting age population.  In fact, where non-Latino Whites

5   have a clear majority.  So what has happened is that this

6   district has had -- has been reconfigured to add an entirely

7   new population that was from the old 9th, which adds on a

8   population that is both much higher turnout and much higher

9   concentrations of non-Latino White voting age population.

10  Q  What would happen if we reduced the legend and we overlaid

11  the two maps on each other?  Do they correspond, the high

12  turnout rate areas and the higher White percentages of the

13  population?  Can we have a solo of just that overlay?  I'm

14  sorry.  You had it right.  There.  Can we have just that map

15  that you just overlaid on the screen or do we have to have both

16  up?  I'm sorry.

17  A  So it's possible to overlay these areas right on top of each

18  other.  The colors change a little bit because they are

19  filtered through, and what was formerly light green becomes

20  somewhat sort of a light beige, but, again, this is the core of

21  the Latino community, which is both very high concentrations of

22  Latino voting age population and very low turnout, and there is

23  a one-to-one correspondence between these areas which are both

24  much lower percentage Latino voting age population

25  concentrations and much higher turnout.

1  Q  Do your findings regarding the turnout differential between

2  Latino voters and White voters have any significance for the

3  effect that Act 43 will have on the ability of the Latino

4  community to elect candidates of its choice?

5  A  Yes, they do.

6  Q  Can you explain.

7  A  When you make all of the adjustments to the Latino voting

8  age population and account for the citizenship differentials

9  and the dramatic differences in turnouts, in this new district

10 it is quite possible, in fact, I believe it's likely that the

11 votes in just this part of the district, given turnout rates

12 that varied by as much as a factor of 10, that that could

13 simply overwhelm the voting power of the Latino community and

14 severely diminish their ability to elect a candidate of choice.

15 Q  Could you now take it to Table 7 of Exhibit 55, your report.

16 Can you explain this table for us, please.

17 A  This is a table showing the results of what is called a

18 racially polarized voting analysis in which, again, we can't

19 directly observe the voting behavior of Latinos and non-Latino

20 Whites, but, again, using the ecological inference technique,

21 it's possible to make -- to derive estimates of the percentages

22 of each population that voted for each candidate, and it is

23 also necessary in order to conduct this analysis that there be

24 at least one Latino candidate and one non-Latino White

25 candidate so that there are choices for both White voters and

1   Latino voters.

2   Q  So does that mean that you are not able to do a racially

3   polarized voting analysis in the 8th Assembly District for

4   assembly races?

5   A  Not since 1998, because there was either only one candidate

6   or only Latino candidates.  There were no White candidates that

7   won who received more than a minuscule and trivial percentage

8   of the vote, which didn't permit any analysis.

9   Q  So racially polarized voting in that district for those

10   races is empirically unavailable?  Is that what your testimony

11   is?

12   A  That's correct.

13   Q  Okay.  Continue.

14   A  So working with the races over the last decade in which the

15   conditions were appropriate, meaning at least one Latino

16   candidate and one non-Latino candidate, this column, the

17   percentage of Latinos voting for the Latino candidate, shows

18   the estimate for exactly that, the percentage of Latino voters

19   who I estimate voted for the Latino candidate, and then this

20   column shows the estimates for the percentage of Whites who

21   vote for the Latino candidate, and in every case the

22   differences were dramatic.  In fact, of these five races, in

23   four of them the Latino voters cast a supermajority of their

24   votes, ranging from 58 to 96 percent of Latinos voting for the

25   Latino candidate, whereas White voters in this race, this race,

this race and this race did not even cast a majority of their
votes for the Latino candidate.  The only race where that
occurred was this one where 93 percent of Latino voters voted
for the Latino candidate and 75 percent of Whites voted for the
Latino candidate, and this column shows the differences, and
they range from a low of 18.6 percent to a high of 55
percentage points.  Actually, these are all expressed as
percentage points, not as a percent of the underlying numbers.
I take this to -- I interpret this as evidence of a significant
degree of racially polarized voting.

Q  Is this type of analysis accepted within your profession for
determining the factors related to racially polarized voting
patterns?

A  Yes.

Q  Is there anything significant about the Rose Fernandez race?

A  Yes.  As it happens, Rose Fernandez, who has a name that is
immediately recognized as Latina, is, in fact, not Latina, and
this raises one of the difficulties with surname analysis, that
no matter how long the list is or how carefully you try to
identify people, you are always going to get false positives in
which people with Latino surnames are not Latino, and you are
going to get some false negatives in which people with
non-Latino surnames, such as Earle, to pick one example, are,
in fact, Latino.

    I take from that the fact that, again, this is a very low

1  salience race which didn't involve a great deal of information
2  about the candidates.  It was non-partisan, so there were no
3  party cues, and so my inference from this is that Latino voters
4  in particular were taking their cue from the candidate's name.
5  They looked at it.  It's, obviously, a Latino name, and you get
6  the highest level of polarized voting for that race.
7  Q  So does the fact that Rose Fernandez is not Latina, in fact,
8  affect your analysis or the validity of this analysis?
9  A  Well, in my view it doesn't, because it requires an
10 assumption that voters are responding to the name, which in a
11 low salience race and with such an obviously -- I believe
12 Fernandez is the 12th -- the census name that has the 12th
13 highest percentage of people with that last name identifying as
14 Latino, that that's what they were responding to in the absence
15 of other information cues, such as party.
16 Q  Did your surname analysis we discussed earlier from that
17 list of 639 names, did that enter into your King's ecological
18 inference analysis of racially polarized voting in any way?
19 A  No.  In fact, I did not rely on surnames to even identify
20 candidates who were non-Latino or Latino.  I relied on
21 information that was provided to me by informed members of the
22 community.  So the surname analysis -- The only part of the
23 analysis that I did in this case that relied on surname
24 analysis is the voter registration percentages.  It didn't
25 enter into anything else.

1  Q  Now have you reviewed the deposition transcript of the

2  Defendant's expert, Professor Grafman, Bernard Grafman?

3  A  Yes, I have.

4  Q  Are you familiar with what Professor Grafman had to say

5  about your racially polarized voting analysis that you just

6  described?

7  A  He criticized it.

8  Q  And what was his criticism?

9  A  His criticism was that I was using what he termed exogenous

10 data in doing my analysis and ignoring the best available data,

11 which in his view was the results of the assembly elections

12 from 2008.

13 Q  But that analysis is not possible for the reasons you

14 testified to earlier, correct?

15 A  That's correct.

16 Q  Well, this best evidence issue, did you respond to it?

17 A  Yes, I did.  There was another element of Professor

18 Grafman's criticism, which is when the best evidence is not

19 available, what you need to do is look not at other races in

20 other areas, but focus on the results of exogenous races as the

21 second best evidence in the area of where you were attempting

22 to make estimates or make inferences about racially polarized

23 voting, and I wanted to test that and see whether he was

24 correct.

25 Q  Let's get up Exhibit 198 then.  Showing you what's been

1  marked as Exhibit 198, I will represent to the court that

2  Exhibit 198 is a cleaned-up version of Exhibit 1025 in terms of

3  allowing the fields to be widened so that the captions can be

4  read.  Proceed.

5  A  This is an analysis of voting behavior in the areas -- in

6  the wards, which were either entirely contained in the areas of

7  District 8 and 9 or mostly contained in that.  So we need to go

8  to the second page of this.  So, again, down the left-hand two

9  columns.

10  Q  Not cleaned up so well, I guess.

11  A  I can still read it.

12  Q  Okay.

13  A  The races that I looked at, the column that is titled

14  "Goodman's Regression" was a technique that was long used as

15  the state of the art, but it has the pretty serious flaw that

16  it frequently produces estimates of the percentage of voting

17  populations that vote for a candidate that either exceed

18  100 percent or less than 0, which is not possible.  But where I

19  could calculate those, I did, just as a validity check.  Again,

20  the key columns are here and here (indicating).

21  Q  And you are referring to the King's ecological inference

22  columns?

23  A  Yes.  These two columns show estimates for the percentage.

24  This one is the percentage of Latino voters who are voting for

25  the Latino candidate, and this column is the percentage -- the

1   estimates for the percentage of White voters who vote for the
2   Latino candidate.  Again, in every case but one, which is the
3   State Superintendent primary, I find -- I estimate that a
4   majority of Latino voters cast their ballot for the Latino
5   candidate, and in that one race where it's less than
6   50 percent, it's 49.8, which is very close.

7       Then if you compared these to support for the Latino
8   candidate among White voters, the percentages are always lower,
9   and this column shows the estimated differences in the -- I
10  should say the numbers in brackets are the 95 percent
11  confidence intervals in which 95 percent of the time the true
12  value of that quantity will be within that interval.  So the
13  differences here range from a low of about 7 percentage points
14  for the 12th Aldermanic race in 2008 to a high of about 25
15  percentage points for the Circuit Court primary.  The key to
16  determine whether -- The easiest way to determine whether these
17  differences are statistically significant is you simply look at
18  the confidence intervals to see whether it contains 0.  If it
19  contains 0, you conclude that it's possible that -- possible
20  that it doesn't meet the 95 percent confidence interval, but in
21  the one case that it does exceed 0, which is minus .0005 --
22  Q  You are referring to the April 1, 2008 aldermanic race
23  between Alderman Witkowiak and Angel Sanchez, is that correct?
24  A  Correct.  Witkowiak won that race, and there was a
25  difference of 7 percentage points, which just barely fails to

1    meet the 95 percent confidence interval.  But in all the other

2    cases there are statistically significant differences between

3    the support from the Latino candidate from Latino voters

4    compared to the support for the Latino candidate among

5    non-Latino White voters.

6    Q  Are the findings reflected in this Exhibit 198 consistent

7    with Table 7 of your report?

8    A  Well, Table 7 -- Let me make sure we're talking about the

9    same thing.  Table 7 of my report, Exhibit 55, shows the racial

10   polarization for Milwaukee County.  There are two reasons, I

11   think, the results are consistent and why it was appropriate to

12   look at races in Milwaukee County.

13       The first is that the more data, the more wards that I

14   examined, the more precise my estimates will be.  The second is

15   that given the overwhelming majority of Latino voting age

16   population is, in fact, concentrated in the areas of 8 and 9,

17   the analysis of the behavior of Latino voters outside of this

18   area is not going to skew the results much.  The overwhelming

19   amount of weight from a statistical standpoint will still be in

20   that area.  In my view the two are consistent.

21   Q  Okay.  Before we move into the next aspect of this, I

22   believe one of the candidates in Exhibit 198 was a candidate

23   named Peggy West?

24   A  That's correct.

25   Q  Is there anything significant about Peggy West?

1    A  Well, Peggy West has a surname that is, obviously,

2    non-Latino and she is, in fact, Latino.

3    Q  Latina.

4    A  I'm sorry.  My Spanish is terrible.  Recognizing the

5    importance of that, if you go around the community now, her

6    campaign signs, she's running for county supervisor, I believe,

7    her campaign literature and campaign signs now say Peggy

8    Romo-West, so she's attempting to -- Well, she's using a more

9    recognizable Latina name as a way of gaining support in the

10   community.

11   Q  Well, what about during the years that encompassed the data

12   that you captured in Exhibit 198?

13   A  Well, in a perfect world --

14   Q  I mean, did she use the Romo name?

15   A  No, she did not.  She ran as Peggy West.

16   Q  Does that anomaly alter your findings in any way,

17   significant way?

18   A  Not in a significant way, no.

19   Q  So I guess to capture the data on both Table 7 and

20   Exhibit 198, does that data or do that data, I guess, reveal a

21   statistically significant correlation between the race of the

22   voter and the selection of certain candidates?

23   A  Clearly it does.

24   Q  Okay.  And the only caveat to that is what you described

25   with regards to the aldermanic race?

1   A  That's correct, and that one just barely failed to meet the

2   statistically significant -- I still regard that as

3   substantively significant.

4   Q  Did the data reflected in these two exhibits reveal a

5   substantively significant difference between the voting

6   patterns of the Latino and White voters?

7   A  Very much so.

8   Q  Were you able to formulate a Latino majority district on the

9   near south side of Milwaukee?

10  A  Yes, I was.

11  Q  Well, let's go to Exhibit 6 of Exhibit 55.  If you can

12  enlarge that exhibit, please.  There you go.

13  A  This was a notional district that I drew in an effort to see

14  whether it was possible to draw a majority-minority district

15  with a supermajority of citizen eligible Latino voting age

16  population that had the virtue of being reasonably compact and

17  contiguous and meeting all the other traditional redistricting

18  criteria.  This is what the district looks like.  This is not

19  an attempt to show what I think the 8th District ought to look

20  like, it's simply an attempt to demonstrate that it can be done

21  very easily to draw a district which does produce a

22  supermajority of eligible Latino voting age population.

23  Q  Okay.  Does this illustrative district satisfy equalization

24  criteria?

25  A  Yes.

1  Q  Does it satisfy traditional redistricting principles?

2  A  Yes.

3  Q  If you could draw your attention to Page 23 of your report,

4  Exhibit 55, and in particular there's a 60 percent Latino

5  citizen voting age population number in that report?

6  A  That's correct.

7  Q  Okay.  Does that number reflect the more accurate 2006-2010

8  ACS citywide data?

9  A  No, this is based on the 35.75 percent non-citizenship rate

10  in the one year 2008 ACS data.

11  Q  Did you recalculate that statistic using the more accurate

12  five-year ACS data with the 42 percent threshold?

13  A  Yes, I did.

14  Q  What did that result in?

15  A  It lowered the eligible voting age Latino population

16  concentration to approximately 57.4 percent.

17  Q  Do you have an opinion to a reasonable degree of certainty

18  as to whether the district you have drawn in Exhibit 6 of your

19  report, whether that would provide the Latino community with an

20  equal opportunity to elect a representative of its choice?

21  A  Yes, I have.

22  Q  And what is that opinion?

23  A  That this would.

24  Q  Okay.  Given the analysis you have performed, do you have an

25  opinion to a reasonable degree of certainty as to whether the

1  Latino community on the near south side in the vicinity of the

2  8th Assembly District is politically cohesive?

3  A  In Act 43?

4  Q  I'm sorry.  Without regard to Act 43, the community as a

5  whole.  I'm sorry.

6  A  Of the Latino community, yes, very much so.

7  Q  Would you expand on that a little bit?

8  A  There are two elements to that.  One is simply looking at

9  how the community is configured and the degree of geographic

10  concentration.  The second is looking at the voting behavior,

11  which shows a very clear tendency to support Latina or Latino

12  candidates when they are presented with an opportunity to cast

13  their votes for such candidates.  So I take that as a sign, and

14  these are -- the races that I looked at were all non-partisan.

15  These are Democratic districts, but even without those cues,

16  there's a significant degree of voting behavior that suggests a

17  very high degree of cohesiveness in terms of participation.

18  Q  Okay.  Thank you.  Do you have an opinion to a reasonable

19  degree of certainty as to whether, given the new boundaries of

20  the 8th Assembly District under Act 43, the non-Latino voters

21  in the new 8th Assembly District vote sufficiently as a block

22  to enable them to defeat the Latino community's preferred

23  candidate?

24  A  Yes, I have.

25  Q  And what is that opinion?

1    A  Looking at the voting behavior and the differentials in

2    turnouts, I believe they do have that ability.

3    Q  Okay.  Professor Mayer, were you in the courtroom when Judge

4    Pedro Colon testified earlier?

5    A  Yes, I was.

6    Q  Were you able to observe Exhibit 189 -- 199 and Exhibit 202?

7    A  Yes.

8    Q  Keeping those exhibits in minds, do you have an opinion

9    about the significance of the election results depicted in

10   these two exhibits with regards to your evaluation of the

11   impact of Act 43 on the Latino community on the near south side

12   of Milwaukee?

13   A  Yes.

14   Q  Okay.  What is that opinion?

15   A  And that is that if you look at the actual voting behavior,

16   which is even more direct evidence than any statistical

17   inferences that one can draw, you simply tally up the votes

18   that Judge Colon received in the areas of the old 8th District

19   and the areas of the new 8th District.  The results are

20   apparent that he wins in the area of the old 8th District and

21   he lost in the area of the reconfigured 8th District.

22       The second point to make, if we could enlarge Exhibit 202 --

23            MR. KELLY:  Your Honor, while there's a break in the

24   testimony, I object to the use of these exhibits by Dr. Mayer.

25   We have not seen these in sufficient time to have our experts

1   evaluate them.  These were not produced as part of the original

2   reports and were produced probably within, I believe, the last

3   day or two.  We have had no opportunity to analyze this.

4           MR. EARLE:  Your Honor, I don't believe that's

5   accurate.  These exhibits were produced in connection with the

6   testimony of Pedro Colon before the initial trial date and --

7           MR. KELLY:  And after the date had passed for expert

8   reports and depositions and any ability for us to analyze this

9   material.

10          MR. EARLE:  Your Honor, these are statistics of

11  actual results connected to the factual testimony of Judge

12  Colon, and the question is whether they are corroborative of

13  the opinions expressed by Professor Mayer.

14          MR. KELLY:  This is an attempt to get a racial

15  polarization study in after the expert deadline has passed and

16  after deposition deadlines have passed, after we have had an

17  opportunity for our experts to analyze this racial polarization

18  study.

19          JUDGE STADTMUELLER:  Well, if he doesn't do it with

20  Mr. Mayer, he certainly could do it with your experts, Counsel.

21          MR. KELLY:  And, Your Honor, if he's limited to

22  addressing this with our expert, that would be fine, but we

23  have not had an opportunity to analyze this, nor have our

24  experts.

25          JUDGE STADTMUELLER:  The documents have been out

1   there, just like the aldermanic districts, and, unfortunately,

2   this is one of the foibles of not being able to have a do-over

3   in the Legislature, so we're going to move forward.  The

4   objection is noted and overruled.

5   BY MR. EARLE:

6   Q  Is this the portion of Exhibit 202 that you were calling up?

7   A  No, I wanted to see the turnout in here and here, so these

8   two tables (indicating).  There was another point I wanted to

9   demonstrate, and that is the following:  In addition to Judge

10  Colon winning in this district, that the population of this

11  table is actually larger than the population from this area,

12  because the core was 55 percent of the population, and here the

13  population reflects 45 percent of the core retention.  But the

14  number of votes that were cast here is 1,413, which is

15  approximately 30 percent or 25 percent less than the total

16  number of votes that were cast in the smaller community

17  reflecting the differences in turnout that I noted.

18     It's also important to note that at the time that Judge

19  Colon ran in this district, he was, in fact, the incumbent 8th

20  Assembly District Representative.  So he was essentially

21  running from the same standpoint as an incumbent would have,

22  which normally would have provided a significant advantage.  So

23  there are a number of elements of this table that I think are

24  important to note about what the new configuration of the

25  district means for the Latino community's ability to elect a

1  candidate of choice, because it's clear that Judge Colon had,

2  in fact, been their candidate of choice, but that's in the old

3  district, and those comparisons, in my view, are no longer apt

4  now that the district has been so radically reconfigured.

5  Q  So past electoral conduct in the 8th Assembly District with

6  regards to Judge Colon are of limited value in analyzing

7  whether the ability to elect a candidate of choice will

8  continue forward under Act 43?

9  A  That's correct.

10 Q  Is that like an apples and oranges paradigm?

11 A  No, it's looking at what actually happened in the new

12 district.  It doesn't require any fruit.

13 Q  And are any of the facts related to what actually happened

14 in this race inconsistent with your analysis that you did of

15 racially polarized voting patterns and turnout patterns?

16 A  No, I believe entirely consistent.

17 Q  Okay.  Switching gears a little bit, Professor Mayer, do you

18 have an opinion regarding whether Wisconsin's new voter photo

19 ID law will have an effect on the electoral participation on

20 the near south side of Milwaukee's Latino community?

21 A  Yes, I do.

22         MR. KELLY:  Your Honor, I object.  This is no part of

23 the expert report.  You have seen no analysis and no data on

24 this.

25         MR. EARLE:  Did you address this issue in your

1  report?

2          THE WITNESS:  I believe I mentioned it.

3          MR. KELLY:  It was a conclusory statement that

4  contained no analysis, no supporting documentation.

5          MR. EARLE:  Professor was present for deposition and

6  the Defendants had every opportunity to examine him about the

7  content of his report.  They chose to ignore what was plainly

8  written in the report.

9          MR. KELLY:  There was one statement in the report.

10 There was no supporting data, there was no analysis, nothing.

11         MR. EARLE:  Can we call up the sentence that was

12 written in the report?

13         JUDGE STADTMUELLER:  The objection is noted and

14 overruled.

15 BY MR. EARLE:

16 Q  What do you base your opinion on that you wrote in your

17 report, Professor Mayer?

18 A  It's based on two sets of data.  One is a study that was

19 done by a man named John Klauser at the University of

20 Wisconsin-Milwaukee Employer Training Institute and was

21 published in 2005, I believe, which was an analysis of the

22 Department of Transportation database of individuals who

23 possess a current driver's license and those who possess a

24 current photo ID, and it's also based on studies that have

25 occurred in increasingly extensive literature in political

1  science that comes from other states, Indiana, Florida, Idaho,

2  that have enacted even less restrictive photo ID requirements

3  for voting.

4  Q  Okay.  And based on those studies, what is your -- what is

5  your opinion?

6  A  That certain populations, including minority populations and

7  elderly populations, are significantly less likely to possess

8  forms of ID that would be necessary to cast a ballot in

9  Wisconsin.

10  Q  That the differences are statistically significant?

11  A  I can't speak to the differences in the Wisconsin study,

12  because there were no confidence intervals produced, but in

13  other studies, particularly work that's been done in Indiana,

14  the differences are statistically significant.

15  Q  Okay.  And do you consider those studies that you reviewed

16  to be a reliable basis to render an opinion as to the effect of

17  the Wisconsin voter photo ID law in this case?

18  A  I believe it's sufficient for me to make inferences about

19  the likely impact.

20  Q  Okay.  Professor Mayer, do you have an opinion to a

21  reasonable degree of certainty based on the totality of the

22  circumstances whether as a result of Act 43 the Latino

23  community on the near south side of Milwaukee has less

24  opportunity than other members of the electoral to participate

25  in the political process and elect candidates of their choice

1   to the Legislature of the State of Wisconsin?

2   A  Yes, I do.

3   Q  And what is that opinion?

4   A  In my view, Act 43 significantly diminishes those

5   opportunities.

6   Q  Would you identify and discuss the factors that you have

7   taken into consideration under the totality of the

8   circumstances to arrive at that opinion?

9   A  It's a function of the demographics of the reconfigured

10   districts, differences in turnout, differences in

11   participation, differences in the existence of racially

12   polarized voting, the issues pertaining to citizenship and the

13   ability of members of the Latino community to participate in

14   the political process and the manner in which Act 43 District 8

15   was drawn in a vertical orientation rather than preserving the

16   core population of the existing district.

17         MR. EARLE:  Thank you, Professor Mayer.  With that,

18   Your Honor, this is timed perfectly.  I think I am finished

19   with my direct examination with regards to the Voces component

20   of Professor Mayer's opinion.

21         JUDGE STADTMUELLER:  All right.  Thank you.

22   Mr. Poland, do you have some additional questions?

23         MR. POLAND:  I do, Your Honor.  I plan to cover --

24   I'm not going to go back over and do anything.  I plan on doing

25   the other opinions that Dr. Mayer has referenced.

1       JUDGE STADTMUELLER:  All right.  You may proceed.

2    We're going to go until 12:45, so everybody is aware, and for

3    the balance of the day we will be in recess from 12:45 until

4    1:45.  We'll go from 1:45 until 3:45.  We'll recess for 15

5    minutes.  We're going to go at least until 6:00 o'clock tonight

6    beginning at 4:00 o'clock.  So for counsel's planning purposes,

7    that is the schedule for the balance of the day.  If we are all

8    in agreement that we can go beyond 6:00 o'clock tonight, we

9    certainly will.  You may proceed, Mr. Poland.

10                     DIRECT EXAMINATION

11   BY MR. POLAND:

12   Q  Dr. Mayer, have you examined Act 43's configuration of

13   assembly districts with respect to Milwaukee's African-American

14   community?

15   A  Yes, I have.

16   Q  How many majority-minority African-American districts are

17   there in Act 43?

18   A  There are six.

19   Q  Could we please have Exhibit 20 up on the screen.  Can you

20   zoom in on the lower, left-hand corner, please.  Dr. Mayer,

21   with reference to the numbers of the districts --

22   A  Is it possible to make that larger?

23   Q  Dr. Mayer, with reference to the districts, can you describe

24   the percentage of African-American voting age population in

25   each of those districts?

```
 1    A  Yes.  Perhaps the easiest way to do it is in the 10th, 11th,
 2    16th, 17th and 18th, all of those districts have majority of
 3    African-American age population of between 60.5 and roughly
 4    62 percent.  I think 61.8 is the largest.  The 12th has an
 5    African-American majority voting age population of
 6    51.5 percent.
 7    Q  Would it be helpful for you -- I believe those percentages
 8    are stipulated to.  I believe we can pull that up in Paragraph
 9    128 to A through F of the Pretrial Report.  Can we get that on
10    the screen at the same time as the map?  Dr. Mayer, can you run
11    through those numbers one more time now that we have the
12    percentages up and the map up?
13    A  Sure.  In the 10th the African-American voting age
14    population concentration is 61.8 percent.  In the 11th it's
15    61.9 percent, almost 62.  In the 12th it's 51.5.  In the 16th
16    it's 61.34.  Seventeenth, 61.33, and 60.43 in the 18th.
17    Q  Dr. Mayer, into which set of districts do those assembly
18    districts fall?
19    A  Well, the 10th, 11th and 12th fall into the 4th Senate
20    District.  The 16th, 17th and 18th are in the 6th Senate
21    District.
22    Q  Dr. Mayer, in your expert report, which is Exhibit 55, you
23    provided that you believed that a 60.5 to 62 percent
24    African-American population is excessive.  Is that correct?
25    A  That's correct.
```

Q  Why is that?

A  There say general rule of thumb, which is not iron clad, but it was confirmed by Dr. Grafman in his deposition, that generally a level of 55 percent is considered a minimum to ensure a sufficient voting age population supermajority to allow minority groups an equal opportunity to elect candidates of choice.  The number needs to be higher than 50 because of turnout differentials and other characteristics.  That while citizenship is not a significant issue in the African American community, other barriers, low turnout and so forth, do apply. As far as I can tell, I was unable to discern what the justification was for the map drawers aiming at a concentration of 60.5 to 62 percent when in my view of the ability to elect candidates of choice would still have been preserved with lower levels of concentration, which at a minimum, if those concentrations in the five assembly districts that were above 50 percent, above 60 percent, had been taken down even a percentage point, you know, between 59 and 61, at least some of that population could have been shifted into the 12th District thereby raising the African-American voting age population from what Dr. Grafman would consider insufficient to guarantee or to protect an opportunity to elect candidates of choice to a level that was closer to 55.  In fact, it might have even exceeded it.

Q  Dr. Mayer, in your opinion from your analysis can you see

1   any justification for including African-American voting age

2   populations in excess of 55 percent in those five assembly

3   districts?

4   A   I could not find any in the record.

5   Q   Do you have any other concerns about the way that the

6   minority majority-minority African-American districts were

7   drawn?

8   A   Yes, I have a particular concern with the way that District

9   12 was constructed.

10  Q   And what is that?

11  A   Well, we need to get a much larger -- Let's see.  Can we

12  show Exhibit 235?  Am I allowed to ask for that?

13          MR. KELLY:  Your Honor, I'm going to object to this

14  line of questioning.  This does go beyond the scope of his

15  report.  This is not included in his expert report.  We are

16  hearing this argument for the first time this morning.

17          MR. POLAND:  We won't show that exhibit.  I agreed

18  with Mr. Hodan we would not show that exhibit.  We can use

19  another exhibit to show that.

20          MR. KELLY:  The objection goes to Dr. Mayer's

21  testimony about what we may or may not be able to do with

22  respect to Assembly District 12 and what may or may not be

23  required to be done with respect to Assembly District 12.  He

24  did not opine on that in his report.

25          JUDGE STADTMUELLER:  Mr. Poland?

1          MR. POLAND:  Your Honor, I think that Dr. Mayer very

2   clearly included in his report the treatment of these different

3   districts and the African-American populations in them.  We can

4   pull up specifically his report, if we need to.

5          MR. KELLY:  Perhaps we could see where that is in the

6   report.

7          JUDGE STADTMUELLER:  Dr. Mayer, could you point us to

8   where that discussion might appear in your report or in your

9   deposition.

10          THE WITNESS:  I was not asked any questions about the

11   African-American majority-minority districts in my deposition,

12   and I did include on Page 25 of my report a discussion of what

13   would happen if the concentrations in the districts that were

14   above 60 percent were reduced to 55 percent, which would

15   provide for a freed-up population of voting age population

16   African-Americans, which was part of the argument about why I

17   thought these populations were higher than -- were excessive.

18          MR. KELLY:  And he mentioned --

19          JUDGE WOOD:  It's actually the next paragraph, I

20   think.  I don't think you are talking about that paragraph.

21          THE WITNESS:  It's the last paragraph on Page 25.

22          MR. KELLY:  It's mentions nothing about District 12.

23          JUDGE WOOD:  It says "other districts."

24          MR. KELLY:  By the way, Your Honor, I did question

25   Dr. Mayer about the African-American districts, and he never

1    said anything about District 12 there, either.

2                  JUDGE STADTMUELLER:  Well, such being the case, why

3    don't you start with 10, 11, 16, 17 and 18, Mr. Poland.

4                  MR. POLAND:  Well, we did talk about the overages in

5    those particular districts, Your Honor.

6                  JUDGE WOOD:  Sir, did you ever explore in the

7    deposition this question of what other districts meant?

8                  MR. KELLY:  I'm sorry, Your Honor?

9                  JUDGE WOOD:  In Line 4 of that paragraph it says

10   "other districts," and I was wondering whether in the

11   deposition the meaning of that phrase was ever explored.

12                  MR. KELLY:  I did.  I asked him if, in the context of

13   satisfying the Gingles threshold analysis, I asked him if there

14   would be sufficient population freed up in the -- if they

15   reduced the population in the districts he identified to create

16   a seventh African-American majority-minority district as

17   alleged in the complaint, which was the complaint in this case,

18   and he said no.  Having failed that, there can be no VRA

19   violation here.  In fact, this is what I asked him.  "Given

20   your analysis of the six African-American districts, is there a

21   large enough minority population in that area to create a

22   seventh African-American majority-minority district."  He said,

23   "I don't believe there is."  That's Dr. Mayer's deposition on

24   Page 193.

25                  JUDGE WOOD:  It's a little bit off point, but --

1          MR. KELLY:  Without meeting the Gingles threshold,

2     there can be no violation of the Voting Rights Act.

3          MR. POLAND:  We also have a racial gerrymandering

4     claim, Your Honors.

5          JUDGE STADTMUELLER:  Well, earlier on Page 25 in the

6     single lines, actually it starts on the bottom of Page 24,

7     Dr. Mayer does include District 12, 51.5 percent, but it's not

8     discussed in the balance of the materials on Page 25, so I

9     guess for one I'm at a loss as to what the significance of that

10    is, whether that was a typographical omission in the succeeding

11    paragraphs or whether because of the difference in the

12    percentages it's significant.  If you have any thought as to

13    what this is all about, Dr. Mayer.

14         THE WITNESS:  Your Honor, the reason I didn't mention

15    the 12th District in the last paragraph is that I didn't

16    believe it would have made any sense to try to further reduce

17    the population of the 12th District.  So it was not a

18    typographical error, it was in the context of what the

19    significance of the -- what I considered to be excessive

20    populations and what possibilities would exist if those

21    concentrations were reduced to more -- to lower levels that are

22    still regarded as generally sufficient to allow opportunities

23    to elect candidates of choice.

24         MR. KELLY:  Your Honor, in that case this is a clear

25    case of sandbagging.  The complaint alleges the violation of

1   the Voting Rights Act because there's a sufficient population

2   to create a seventh African-American majority-minority

3   district.  Dr. Mayer testified that there's not, and he said in

4   his report that there's not.

5           JUDGE DOW:  I thought I just heard counsel just say

6   that this may go for racial gerrymandering and not the Voting

7   Rights Act.  Is that where you are going?

8           MR. POLAND:  Yes, Your Honor.

9           JUDGE DOW:  Now that that's eaten up ten minutes --

10          MR. POLAND:  I had a single question that I was going

11  to ask, and Dr. Mayer was going to give a single response, I

12  believe.

13          MR. KELLY:  My objection stands, Your Honor.  We have

14  been sandbagged on this issue.  There's no analysis at all.

15  There's a passing reference to Assembly District 12 and no

16  analysis whatsoever about the significance of that percentage.

17  Dr. Mayer presents no opinion in this section of his report

18  about what ought to be done with the effects or anything.

19  There's no analysis whatsoever.  We're hearing this for the

20  first time today.

21          JUDGE DOW:  Is there an analysis of this District 12

22  in the racial gerrymandering part of his report?

23          MR. POLAND:  Your Honor, I don't believe we set forth

24  a separate -- We had Dr. Mayer in his report address the

25  African-American districts generally.

1    JUDGE DOW:  So there's no separate reference where he

2    might have picked this up separately as to racial

3    gerrymandering?

4        MR. POLAND:  We did not include a separate section on

5    racial --

6        JUDGE DOW:  I don't care if it's a section, but is

7    there a discussion of it?

8        JUDGE WOOD:  I don't think we should be arguing about

9    the obvious here in that 12 is 51.2 and his report says

10   55 percent is typical, and he says there's not enough for a

11   seventh district, which is precisely what the Government

12   Accountability Board has said.  I don't see the harm.

13       JUDGE STADTMUELLER:  Put the question to the witness

14   and let's move on.

15   BY MR. POLAND:

16   Q  Yes.  Dr. Mayer, do you have any other concerns about the

17   way the majority-minority African-American districts were drawn

18   specifically with respect to District 12?

19   A  Yes.

20   Q  And what is that?

21   A  District 12, as all of the majority-minority

22   African-American districts were, they were all underpopulated,

23   which means that they all needed to add population.  The

24   figures for the 12th District, I believe that it needed to add

25   approximately 2,200 people, and that population, net population

1  change, was achieved by adding nearly 28,000 people to the

2  district and subtracting 25,461. So there was a significant

3  population change that was 24 times as large as what was

4  necessary to achieve population equality, and there were two

5  characteristics of the way that District 12 was configured that

6  both had an effect, in my view, on the African-American

7  community that had previously been part of the 12th District

8  and for which I could -- I saw no justification.

9  Q  And what were those, Dr. Mayer?

10  A  District 12 -- The old part of District 12 included --

11  That's not a great way to put it. District 12 included this

12  little section which has a population of approximately 7,000

13  people. It has an African-American population of approximately

14  1,800, a voting age population of 1,800, and it was simply

15  carved out of the district and placed into the 22nd District,

16  which extends into Waukesha County. I have simply concluded

17  that it struck me as ranging from odd to unjustifiable how a

18  district that needed to add 2,200 people started off by carving

19  out a portion of the district that contained nearly 12 percent

20  of the population.

21          MR. KELLY: Your Honor, I will renew my objection

22  here. There is in his report no analysis of racial

23  gerrymandering. There's simply none. It does not appear.

24          MR. POLAND: Dr. Mayer very clearly in his report --

25          JUDGE STADTMUELLER: The objection is noted. The

1    answer will stand.  You may proceed with your next question.

2    BY MR. POLAND:

3    Q  Did you have one other effect that you noted?

4    A  In District 12, yes.  This area up here had not been part of

5    any of the African-American majority-minority districts, even

6    though it contains a fairly substantial African-American

7    population of about I think the voting age population

8    concentration was roughly 30 percent, perhaps a little bit

9    higher, and, again, that's a population that was –– that was

10   left in the 24th District, which places it into a district that

11   extends into Ozaukee County.  Again, it struck me as strange

12   how a district that simply needed to add population of

13   4 percent underwent such a significant addition and continued

14   to leave a significant population out of the whole area.

15   Q  Dr. Mayer, were any sitting legislators affected by that

16   configuration, the new configuration of 12?

17   A  Yes.

18   Q  Who is that?

19   A  Fred Kessler, who represents the 12th and has done so since,

20   I believe, 2006.  He lives right about there in the area that

21   was carved out (indicating).

22        MR. POLAND:  Your Honors, if this would be –– I'm

23   about to change topics in a major way to a very different

24   subject matter, and this would be a very good place to break.

25        JUDGE STADTMUELLER:  We will recess for one hour.  We

1    will resume with the balance of Dr. Mayer's testimony.

2                THE BAILIFF:  All rise.

3    UNITED STATES DISTRICT COURT  )
                                   )SS
4    EASTERN DISTRICT OF WISCONSIN )

5

6

7

8

9

10               I, KATHY A. HALMA, Official Court Reporter

11   for the United States District Court, Eastern District of

12   Wisconsin, do hereby certify that I reported the foregoing

13   proceedings and that the same is true and correct in accordance

14   with my original shorthand notes taken at said time and place.

15

16

17               _____

18   KATHY A. HALMA
     Official Court Reporter
19   United States District Court

20

21

22

23

24

25