1                    UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF WISCONSIN
2
     -----------------------------------------------------------------
3
     ALVIN BALDUS, CARLENE BECHEN, ELVIRA       )
4    BUMPUS, RONALD BIENDSEIL, LESLIE W.        )
     DAVIS, III, BRETT ECKSTEIN, GLORIA         )
5    ROGERS, RICHARD KRESBACH, ROCHELLE         )
     MOORE, AMY RISSEEUW, JUDY ROBSON, JEANNE   )
6    SANCHEZ-BELL, CECELIA SCHLIEPP, TRAVIS     )
     THYSSEN, CINDY BARBERA, RON BOONE, VERA    )
7    BOONE, EVANJELINA CLEERMAN, SHEILA         )
     COCHRAN, MAXINE HOUGH, CLARENCE JOHNSON,   ) Case No. 11-CV-562
8    RICHARD LANGE, and GLADYS MANZANET,        )    JPS-DPW-RMD
                                                )
9                  Plaintiffs,                  )
                                                ) Milwaukee, Wisconsin
10   TAMMY BALDWIN, GWENDOLYNNE MOORE and       )
     RONALD KIND,                               ) February 23, 2012
11                                              ) 1:45 p.m.
                  Intervenor-Plaintiffs,        )
12                                              ) VOLUME V
     v.                                         ) P.M. SESSION
13                                              )
     Members of the Wisconsin Government        )
14   Accountability Board, each only in his     )
     official capacity; MICHAEL BRENNAN,        )
15   DAVID DEININGER, GERALD NICHOL, THOMAS     )
     CANE, THOMAS BARLAND, and TIMOTHY VOCKE,   )
16   and KEVIN KENNEDY, Director and General    )
     Counsel for the Wisconsin Government       )
17   Accountability Board,                      )
                                                )
18                 Defendants,                  )
                                                )
19   (caption continued on next page)           )

20   -----------------------------------------------------------------

21                  TRANSCRIPT OF COURT TRIAL

22   BEFORE DIANE WOOD, CIRCUIT JUDGE; ROBERT DOW, JR., DISTRICT
               JUDGE, and J.P. STADTMUELLER, DISTRICT JUDGE
23
     Contract Reporters:      Halma-Jilek Reporting 414-271-4466
24
     Proceedings recorded by computerized stenography, transcript
25   produced by computer-aided transcription.

```
1   F. JAMES SENSENBRENNER, JR., THOMAS E.    )
    PETRI, PAUL D. RYAN, JR., REID J.          )
2   RIBBLE, and SEAN P. DUFFY,                 )
                                               )
3               Intervenor-Defendants.         )
                                               )
4   ---------------------------------------    )
                                               )
5   VOCES DE LA FRONTERA, INC., RAMIRO         )
    VARA, OLGA VARA, JOSE PEREZ, and           )
6   ERICA RAMIREZ,                             )
                                               )
7               Plaintiffs,                    )
                                               ) Case No. 11-CV-1011
8   v.                                         )       JPS-DPW-RMD
                                               )
9   Members of the Wisconsin Government        )
    Accountability Board, each only in his     )
10  official capacity; MICHAEL BRENNAN,        )
    DAVID DEININGER, GERALD NICHOL, THOMAS     )
11  CANE, THOMAS BARLAND, and TIMOTHY VOCKE,   )
    and KEVIN KENNEDY, Director and General    )
12  Counsel for the Wisconsin Government       )
    Accountability Board,                      )
13                                             )
                Defendants.                    )
14
    ----------------------------------------------------------------
15

16  APPEARANCES:

17
    For the Plaintiffs:        Douglas M Poland
18                             Godfrey & Kahn, SC
                               780 N Water St
19                             Milwaukee, WI 53202-3590
                               414-273-3500
20                             Fax:  414-273-5198
                               Email: dpoland@gklaw.com
21
                               Dustin B Brown
22                             Godfrey & Kahn SC
                               1 E Main St - Ste 500
23                             Madison, WI 53701-2719
                               608-257-3911
24                             Fax:  608-257-0609
                               Email: dbrown@gklaw.com
25
```

```
1                                    Brady C Williamson
                                     Godfrey & Kahn SC
2                                    1 E Main St - Ste 500
                                     Madison, WI 53701-2719
3                                    608-257-3911
                                     Fax:  608-257-0609
4                                    Email: bwilliam@gklaw.com

5                                    Rebecca K Mason
                                     Godfrey & Kahn, SC
6                                    780 N Water St
                                     Milwaukee, WI 53202-3590
7                                    414-273-3500
                                     Fax:  414-273-5198
8                                    Email: rmason@gklaw.com

9    FOR THE CONSOLIDATED
     PLAINTIFFS:                     Jacqueline E Boynton
10                                   Law Offices of Jacqueline Boynton
                                     2266 N Prospect Ave - Ste 505
11                                   Milwaukee, WI 53202-6306
                                     414-276-1066
12                                   Fax: 414-276-9119
                                     Email: jackie@jboynton.com
13
                                     Peter G Earle
14                                   Law Offices of Peter Earle LLC
                                     839 N Jefferson St - Ste 300
15                                   Milwaukee, WI 53202
                                     414-276-1076
16                                   Fax: 414-276-0460
                                     Email: peter@earle-law.com
17
     FOR THE DEFENDANTS:             Colleen E Fielkow
18                                   Reinhart Boerner Van Deuren SC
                                     1000 N Water St - Ste 1700
19                                   PO Box 2965
                                     Milwaukee, WI 53202
20                                   414-298-1000
                                     Fax: 414-298-8097
21                                   Email: cfielkow@reinhartlaw.com

22

23

24

25
```

```
 1                                      Patrick J Hodan
                                        Reinhart Boerner Van Deuren SC
 2                                      1000 N Water St – Ste 1700
                                        PO Box 2965
 3                                      Milwaukee, WI 53202
                                        414-298-1000
 4                                      Fax: 414-298-8097
                                        Email: phodan@reinhartlaw.com
 5
                                        Daniel Kelly
 6                                      Reinhart Boerner Van Deuren SC
                                        1000 N Water St – Ste 1700
 7                                      PO Box 2965
                                        Milwaukee, WI 53202
 8                                      414-298-1000
                                        Fax: 414-298-8097
 9                                      Email: dkelly@reinhartlaw.com

10                                      Joseph W Voiland
                                        Reinhart Boerner Van Deuren SC
11                                      1000 N Water St – Ste 1700
                                        PO Box 2965
12                                      Milwaukee, WI 53202
                                        414-298-1000
13                                      Fax: 414-298-8097
                                        Email: jvoiland@reinhartlaw.com
14
                                        Maria S Lazar
15                                      Wisconsin Department of Justice
                                        Office of the Attorney General
16                                      17 W Main St
                                        PO Box 7857
17                                      Madison, WI 53707-7857
                                        608-267-3519
18                                      Fax: 608-267-2223
                                        Email: lazarms@doj.state.wi.us
19
       FOR INTERVENOR PLAINTIFFS:       Daniel S Lenz
20                                      Lawton & Cates SC
                                        10 E Doty St – Ste 400
21                                      PO Box 2965
                                        Madison, WI 53701-2965
22                                      608-282-6200
                                        Fax: 608-282-6252
23                                      Email: dlenz@lawtoncates.com

24

25
```

1                      I N D E X

2    WITNESS            EXAMINATION                   PAGE

3    KEVIN KENNEDY          Direct by Mr. Poland      244

4                          Cross by Mr. Kelly         275

5                          Redirect by Mr. Poland     280

6                          Recross by Mr. Kelly       281

7    PETER BARCA           Direct by Mr. Brown        282

8                          Cross by Mr. Kelly         300

9    KENNETH MAYER         Direct by Mr. Poland       335

10                         Cross by Mr. Kelly         368

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    TRANSCRIPT OF PROCEEDINGS

2                    JUDGE STADTMUELLER:  And let the record reflect that

3        we've reconvened once again in the bench trial of Baldus, et

4        al., versus Brennan, et al.  And Mr. Poland, you may continue

5        with your questions, and the witness, Dr. Mayer, you may resume

6        the witness stand.

7                    MR. POLAND:  Your Honor, we do actually have a

8        scheduling issue.  I've conferred with counsel for the

9        Government Accountability Board.  We have two witnesses who

10       have -- are a little bit more limited in their time that

11       they're available for trial.  We have both Representative Barca

12       and then also Mr. Kennedy from the Government Accountability

13       Board, both of whom would need to go on the stand today.  After

14       conferring with counsel for the Government Accountability

15       Board, what we'd like to do with the Court's permission would

16       be to interrupt Dr. Mayer's testimony to be able to get the

17       testimony of those two gentlemen on today.

18                    JUDGE STADTMUELLER:  All right.  That's certainly

19       acceptable.

20                    MR. POLAND:  Thank you, your Honor.

21                    JUDGE STADTMUELLER:  I think it's also appropriate

22       for the Court to make a couple of additional comments with

23       reference to objections about matters that are either beyond

24       the scope of direct or matters pertaining to things that might

25       not have been as thoroughly addressed as counsel may believe in

1    the context of the adversarial process in the crucible of the

2    courtroom to suggest that while it is certainly appropriate for

3    all of you to make objections as you deem appropriate, I think

4    it goes without saying that this is unlike a jury trial, a

5    bench trial, and to the extent that there be matters addressed

6    that counsel believe were not vetted during the pretrial

7    process, you're certainly free to note those for the record,

8    and to the extent that the Court in the final analysis ought

9    not consider them, rest assured, we will not.  So with that

10   thought, you may proceed with your next witness out of order.

11        MR. POLAND:  Thank you, your Honor, and we'd like to

12   call Mr. Kennedy.  But before we do that, there is a pending

13   motion in limine that the Government Accountability Board has

14   filed to -- it goes to the scope of Mr. Kennedy's testimony.

15   I don't know if your Honors would like to hear argument on

16   that.

17        JUDGE STADTMUELLER:  Certainly.

18        MR. KELLY:  Thank you, your Honor.  We learned at the

19   beginning of this week that the plaintiffs intend to talk with

20   Mr. Kennedy about matters that are clearly outside the scope of

21   what this Court is supposed to be considering.  We know that

22   because that's what they told us.  In an e-mail exchange that

23   we had with them about the scope of Mr. Kennedy's testimony,

24   the plaintiffs' counsel admitted to us they didn't believe that

25   the evidence that he would testify to had any impact whatsoever

1    on the constitutionality of Acts 43 or 44.  As a result, it

2    can't have any relevance to the proceedings here today.  They

3    want to talk about implementation of the map, they want to talk

4    about some concerns about census data that have nothing to do

5    with anything that we're doing here today.

6         The significance of this further to this, to learning

7    this at a very late stage of the proceedings, is this was the

8    subject of a motion for protective order.  And as the Court may

9    recall, that motion was withdrawn because we came to a

10   stipulated resolution of our concerns, and that resolution was

11   this.  They would take Mr. Kennedy's deposition on these

12   topics.  If they learned of anything that would affect the

13   constitutionality of Acts 43 or 44, they would be permitted to

14   amend their complaint, to add a new claim; they would be

15   permitted to amend their expert reports to opine on the topic;

16   and then we would have an opportunity to do the same.

17        The deadline came and went for amending their

18   complaint and they didn't.  When they -- when they told us that

19   they nonetheless intended to talk about these things that were

20   part of this agreement that caused us our to withdraw our

21   motion for protective order, we inquired into what possible

22   significance it could have to the proceedings before this

23   Court, and at that point they admitted it has nothing to do

24   with the constitutionality of the acts.  For whatever reason

25   they simply want to talk about it.  In the limited time

1    available to us, Mr. Kennedy's full schedule, I don't think it

2    would be appropriate to use the Court's time to talk about

3    irrelevancies.

4            JUDGE WOOD:  I have a question of clarification for

5    you, please.  When you speak of the constitutionality of the

6    two acts, do you mean by that to include their consistency with

7    the Voting Rights Act?

8            MR. KELLY:  I do.

9            JUDGE WOOD:  So actually statutory and

10   constitutional.

11           MR. KELLY:  Yes, your Honor.

12           JUDGE WOOD:  Thank you.

13           MR. EARLE:  I have a misbehaving computer.

14   I apologize.

15           JUDGE STADTMUELLER:  All right.  Mr. Poland, you want

16   to address Mr. Kelly's concerns?

17           MR. POLAND:  I would, your Honor, and I would like to

18   go back also to the time that we first learned about the

19   undisclosed anomalies and we entered into our stipulation.

20   This was in January, and at that time -- this is a fairly

21   complex subject area and we were attempting to learn as much as

22   we could.  We deposed someone from LTSB.  We deposed another

23   technical person from the Government Accountability Board, and

24   then we took Mr. Kennedy's deposition as well to try to

25   understand what we were looking at.

1          At the time from the memorandums that were produced

2     in January, we were concerned about population deviations and

3     population movements.  That's what was really the focus of what

4     we were looking at.  And we had agreed, it was part of the

5     stipulation, we had agreed that if we saw something that was

6     going to affect those and require expert testimony or require

7     amendment to the complaint, that we would move the Court to do

8     that, for leave to do that, and that we would also seek leave

9     to supplement Dr. Mayer's expert report.

10         Now, what happened, what we found was that there

11    really was nothing that had substance as far as population

12    deviations as far as we could tell.  There still may be.  We

13    don't know, but they've convinced me, at least, that it would

14    be too hard to prove anyways, and so we're not making that a

15    part of this.

16         However, a couple of points that are very -- that are

17    of significant difference from what Mr. Kelly said.  First of

18    all, we do have in our complaint, and this was in the

19    opposition to motion in limine that we did file.  In our

20    complaint we did plead a claim for unconstitutionality of

21    Acts 43 and 44 because they -- let me find it.  It's in count

22    two in paragraphs 39 and 40.  As your Honors will see, Baldus

23    plaintiffs have pleaded the new districts are not bound by

24    county, precinct, town or ward lines already established by

25    local governments.  Okay.  That was a count in our complaint.

1    In other words, that the -- that the district lines do not

2    match up with the ward lines.  That is pled as a count in our

3    complaint.  It requires no amendment, requires no expert

4    testimony.  It simply will require Mr. Kennedy's testimony and

5    that will be it.  So it didn't require anything different.

6        Second of all, as to Mr. Kelly's claim that we had an

7    agreement that we wouldn't do anything that goes to the

8    constitutionality, you won't find that in an e-mail.  Now, they

9    did attempt to bait me into it and say "So do we have an

10   understanding that you're not challenging the

11   constitutionality," and I said "No, no, that's not what we're

12   talking about."  All right.

13       And I would note as well that Mr. Kelly's e-mail that he's

14   tendered to the Court left off my final e-mail as well that did

15   say where we intend to ask Mr. Kennedy about a host of other

16   subjects.  So I also had conversations on the telephone with

17   Mr. Hodan as well.  He was the one the weekend before.  He was

18   the one that I had spoken with.

19       So in other words, Mr. Kennedy has very relevant testimony.

20   The Court's already seen documentary evidence that I will ask

21   Mr. Kennedy about.  The Court has actually cited to it the

22   other day, and these are documents that Mr. Kennedy testified

23   to in his deposition as well.  It's relevant, it's highly

24   relevant testimony and it goes directly to one of the claims

25   that's already pled.  It doesn't require expert testimony.  And

1    I'll sit down.

2         MR. KELLY:  Let me just read from the e-mail from

3    Mr. Poland.  February 14th, 10:46 a.m.  Patrick -- addressing

4    my partner, Patrick Hodan -- we do not intend to challenge the

5    accuracy of the census data itself.  As I said in our call

6    yesterday, although we do not intend to argue that the

7    anomalies issue caused legislative or congressional districts

8    to become unconstitutionally unbalanced or cause voters to move

9    districts, he doesn't want to talk about it anyway.

10         Well, the only issue about before this Court is

11    not -- is the constitutionality of Acts 43 and 44.  It has

12    nothing to do with the implementation of the map.  That's got

13    nothing to do with it.  Mr. Kennedy will follow the law, of

14    course, and he will apply Acts 43 and 44 faithfully and

15    Mr. Poland said he has intention of questioning the

16    constitutionality of these acts based on that census data.

17         Now, based on that and in our prior agreement that we

18    would not pursue the motion for protective order because we

19    believed it was irrelevant, we believe it was unduly burdensome

20    to produce the information.  We had a very explicit and

21    thorough understanding of what would cause us to withdraw our

22    motion for protective order, and it was -- and it was on these

23    terms.  They would not be available to use the information

24    unless they amended their complaint to allege that this caused

25    it to be unconstitutional, and in such an event, they would be

1    able to amend their expert's report and then perhaps most

2    importantly, we would have an opportunity to seek expert

3    testimony on this.

4            Now, that date came and went and Mr. Poland was

5    silent.  Now he wishes to sandbag us on yet another issue so he

6    can play in Court with issues that have not been explored and

7    not had an opportunity to be explored by the Government

8    Accountability Board.  Now, we don't have the ability to put on

9    anyone to answer these allegations that Mr. Poland intends to

10   make and we've had no opportunity to get expert testimony on

11   it.  We've had no opportunity to come to the Court to ask for

12   that protective order again once he breached our agreement.

13   Your Honor, I think this is -- this is shark practice at its

14   worst.

15           MR. SHRINER:  Your Honor, may I be heard?

16           JUDGE STADTMUELLER:  Well, when it comes to shark

17   practice and sandbagging, we could have a wonderful

18   conversation about those terms in other contexts, but today is

19   not that day.  First of all, I think you and Mr. Poland are

20   talking past one another.  First of all, as the complaint now

21   stands, the subject matter that Mr. Poland has raised was

22   raised in the complaint, it's been raised in the media and

23   obviously there are ongoing efforts to correct it.  Whether it

24   rises to the level of constitutional proportions is perhaps a

25   whole 'nother question, but to suggest that Mr. Kennedy not be

1    permitted to have an inquiry put to him about the very subject

2    that he and the legislature have been trying to grapple with

3    is, frankly, as the Court commented the other day, a little bit

4    beyond the pale.

5            So the objection is overruled and the witness will be

6    permitted to have questions put to him on these subjects.

7    Again, in the end, what impact it will have on terms of the

8    Court's decision-making process is a whole 'nother subject, but

9    to suggest that there has been sandbagging is I think a bit too

10   much.  You may call the witness.

11           MR. POLAND:  Thank you, your Honor.

12           MR. SHRINER:  Your Honor, I am sorry I didn't

13   interject earlier.  I tried.  I am troubled only by one thing

14   that Mr. Poland said, which is he read from a count of the

15   complaint suggesting that something about district lines not

16   coinciding with ward lines affects Act 44.  We had an agreement

17   that Act 44 was going to be submitted on the evidence that the

18   parties have agreed to.  The responsibility for negotiating

19   that was delegated to Mr. Olson and Mr. Hassett, and we've

20   reached that agreement and I think Mr. Poland told us he'd

21   signed off on that.

22           There's nothing about this subject in that agreement.

23   This material should not be admitted on Act 44.  Mr. Olson and

24   Mr. Hassett have gone home on the representation that Act 44 is

25   coming in by stipulation rather than by live testimony.  And

1    frankly, I have no idea how whether the ward lines coincide

2    with the district lines violates anything other than maybe

3    state law, which I think under the 11th amendment this Court

4    shouldn't be asked to enforce.

5            MR. POLAND:  Your Honor, I think that I can address

6    Mr. Shriner's concern.  I will limit my examination to Act 43

7    and not Act 44 issues.

8            MR. SHRINER:  Thank you.

9            JUDGE STADTMUELLER:  You may proceed.

10           MR. POLAND:  Thank you, your Honor.  The Baldus

11   plaintiffs call Kevin Kennedy.

12           KEVIN KENNEDY, PLAINTIFF WITNESS, DULY SWORN

13           THE CLERK:  Mr. Kennedy, would you please state and

14   spell your full name for the court reporter.

15           THE WITNESS:  My name is Kevin Kennedy, K-E-V-I-N,

16   middle initial J., Kennedy, K-E-N-N-E-D-Y.

17                        DIRECT EXAMINATION

18   BY MR. POLAND:

19   Q  Good afternoon, Mr. Kennedy.

20   A  Hello.

21   Q  Mr. Kennedy, what is your position with the Government

22   Accountability Board?

23   A  I'm the board's director and general counsel.

24   Q  Do you have law degree, sir?

25   A  Yes, I do.

1  Q  From where?

2  A  University of Wisconsin.

3  Q  Mr. Kennedy, what is the Government Accountability Board?

4  A  The Government Accountability Board is an independent agency

5  of the state of Wisconsin.  It's part of the executive branch.

6  It consists of six citizen members who are all former state

7  judges and it has a staff of 17 permanent people plus a number

8  of federally funded and temporary positions.

9  Q  Mr. Kennedy, when was the Government Accountability Board

10  created?

11  A  It was created in 2007.

12  Q  And what is its role?

13  A  Its role is to administer and enforce Wisconsin's laws

14  related to campaign finance, elections, ethics, lobbying and

15  certain contract disclosure.

16  Q  Is the Government Accountability Board an independent,

17  nonpartisan agency?

18  A  It is an independent agency.  Its members and its staff are

19  required by law to be nonpartisan.

20  Q  To whom, if anyone, does the Government Accountability Board

21  answer?

22  A  Well, it's an independent agency, so it's not a cabinet

23  agency.  Its members, while appointed by the governor and

24  confirmed by the Senate, act independently of them and the

25  staff reports directly to the board.

1    Q   And the six members of the board are all judges; is that

2    correct?

3    A   They're all former judges, yes.

4    Q   So virtually every day you report to six retired judges; is

5    that correct?

6    A   Six former judges, yes.

7    Q   And if I missed it in your testimony before, how long have

8    you worked at the Government Accountability Board or its

9    predecessor agencies?

10   A   I began with the State Elections Board on April 1st of 1979

11   as its staff counsel.  I became its acting director in '82 and

12   its full-time director in August of 1983, and then when the

13   Government Accountability Board made its first hire, I was

14   hired in November of 2008.

15   Q   Mr. Kennedy --

16   A   I'm sorry, 2007.

17   Q   I'm sorry.  Didn't mean to interrupt.  Did the Government

18   Accountability Board play a role at all -- I'm sorry.  Strike

19   that question.  You did work for the Government Accountability

20   Board then during the last redistricting cycle.

21   A   I worked for the State Elections Board during the last

22   redistricting cycle.

23   Q   The predecessor agency to GAB?

24   A   One of those two, yes.

25   Q   Did the GAB play a role at all in the redistricting process

1    before Acts 43 and 44 were enacted in August 2011?

2    A  I'm sorry.  Play a role at all?

3    Q  In the redistricting process, the process actually of

4    creating the statutes that resulted in Acts 43 and 44?

5    A  Not in creating the statutes, no.

6    Q  Did anyone with the legislature consult with you or the

7    Government Accountability Board before settling on the process

8    by which redistricting was accomplished in Wisconsin in 2011?

9    A  No.

10   Q  Do you consider the implementation of Acts 43 and 44 to be

11   GAB's responsibility?

12   A  Yes.

13   Q  Other than the adoption of statutes that affect elections,

14   is implementation of Acts 43 and 44 in any way the

15   legislature's responsibility?

16   A  I can't answer that.  I don't -- I can't speak to that.

17   Q  Mr. Kennedy, I'd like to ask you a little bit about the

18   timing for the elections under Acts 43 and 44.

19           MR. SHRINER:  Your Honor, if I may interrupt to

20   remind Mr. Poland we're not talking about Act 44 as his outline

21   didn't reflect that.

22           MR. POLAND:  I withdraw the question, your Honors.

23   BY MR. POLAND:

24   Q  Mr. Kennedy, I'd like to talk about the timing for the

25   general elections under Act 43.  What is the petition

1  circulation date to get on the ballot for the primary for

2  Assembly districts and Senate districts?

3  A  Candidates may begin circulating nomination papers on

4  April 15 of 2012.  They have to be filed in our office no later

5  than 5:00 p.m. on June 1st.  I think that might be a weekend,

6  in which case it's the next business day.

7  Q  Are those dates that can be changed by the legislature or by

8  a Court?

9  A  If they're changed, it would have to be by legislature or

10 court.  We cannot.

11 Q  And what about the timing for the recall elections -- well,

12 let me ask this question.  Have recall elections been certified

13 yet?

14 A  No, they have not.

15 Q  The deadline for objections to recall petitions for State

16 Senate has passed; is that correct?

17 A  The challenge deadline passed as well as the response and

18 reply period, yes.

19 Q  When do you expect to set an election date for any recall

20 elections that might go forward?

21 A  We have not determined that.  We are still reviewing the

22 challenges.  We have a number of issues that the board has to

23 consider separately.  The trial court has given us till

24 March 19 to make that decision.

25 Q  And Mr. Kennedy, it's correct, isn't it, that under the

1  express text of Act 43, the Assembly and Senate district
2  boundaries do not become effective until the general elections
3  next fall; is that correct?
4  A  If you mean by effective for conducting elections, yes.
5  Q  Correct.  Could we get Exhibit 186, please.  Mr. Kennedy,
6  would you please turn to Exhibit 186 in your binder.  I'm
7  sorry, make that 166.  I apologize.  Mr. Kennedy, can you
8  identify what Exhibit 166 is, please.
9  A  It's a series of documents that were prepared by the staff
10  of the Government Accountability Board.  The first document is
11  a document entitled Legislative Redistricting Act 43 Effective
12  Dates for Election and Representation Purposes.  That's what we
13  call a guideline.  It's sort of a short summary to provide
14  direction to help people answer questions without calling us
15  for specific answers that relate to that.
16      The next three pages are -- is a memorandum that was
17  prepared for the Government Accountability Board's November 9th
18  meeting, which was the basis for adopting the guideline that
19  preceded that.  And then following that is a communication that
20  went out to local election officials that were impacted by the
21  board's decision in terms of how to apply Act 43.
22  Q  Mr. Kennedy, I'd like to turn your attention to the second
23  page of the memorandum that says that it's for the meeting of
24  November 9th, 2011.  And up at the top there's some language
25  that sets forth from Section 10 initial applicability, and that

1    states, I believe it's reading from -- it's right from the

2    statute, the express language.  It states this act first

3    applies with respect to regular elections to offices filled at

4    the 2012 general election.  Do you see that?

5    A  Yes, I do.

6    Q  And then the text that follows, would you read that, please

7    in the second enumerated paragraph?

8    A  Sub 2 of Section 10 reads "This act first applies, with

9    respect to special or recall elections, to offices filled or

10   contested concurrently with the 2012 general election."

11   Q  Mr. Kennedy, if you turn to the previous page of the

12   memorandum, you'll see that it states that it's from you; is

13   that correct?

14   A  That's correct.

15   Q  If you would turn back to where we just left off on page 2,

16   would you read the first sentence of the paragraph directly

17   below the paragraphs enumerated 1 and 2, please, just the first

18   sentence.

19   A  Based upon the plain language of Section 10(2) of Act 43,

20   staff has concluded that any special or recall election to be

21   filled or contested prior to the 2012 general election must be

22   conducted using the legislative district boundaries which

23   existed prior to the enactment of Act 43.

24   Q  And those would be the boundaries were put into place by

25   this Court in 2002; is that correct?

1    A   That's correct.

2    Q   And did you make a recommendation -- was that a

3    recommendation that you made to the board itself?

4    A   Yes.  The recommendations actually on page 72 are the

5    recommended motions for the board to adopt.

6    Q   And so that's under the enumerated paragraph 1 on the

7    following page then where it states "The board adopts the

8    analysis and conclusions contained in the attached staff

9    memorandum dated October 19, 2011"?

10   A   Yes.

11   Q   Is that correct?  So the Government Accountability Board,

12   the board itself, the independent board of six judges adopted

13   that position?

14   A   That's correct.

15   Q   Now, Mr. Kennedy, that is currently the Government

16   Accountability's position that it will run the recall elections

17   for State Senate, if any do occur, under the 2002 district

18   boundaries drawn by this Court?

19   A   Yes.

20   Q   Are you aware of any legislative effort to make the

21   effective date of Act 43 and the new boundaries any sooner than

22   it is now?

23   A   My understanding is there's been legislation introduced to

24   change that.  Nothing has passed, the legislature even passed,

25   that I'm aware of.

1  Q  So nothing has come of that legislation or proposed

2  legislation, at least not yet.

3  A  That's right.

4  Q  Is it GAB's position that conducting the recall elections

5  for State Senate will not result in the violation of the

6  plaintiffs' rights under the Wisconsin or federal

7  constitutions?

8  A  I can't speak to the GAB's position.  What the GAB

9  determined was the information set out here on how we're going

10  to conduct the elections.

11  Q  Do you know, are you familiar with the positions that the

12  GAB has taken in this particular case in response to the

13  plaintiffs' claims?

14  A  Yes.

15  Q  I'd like to please have you turn to Exhibit No. 12 in your

16  binder, please.  Mr. Kennedy, you'll see that Exhibit 12 is the

17  GAB's answer and affirmative defenses to the second amended

18  complaint for declaratory and injunctive relief.  Do you see

19  that?

20  A  Yes.

21  Q  And I'd like you to turn to page number 39 of this document.

22  It's paragraph 94.  Mr. Kennedy, do you see that in responding

23  to the allegation in paragraph 94 the GAB admits that any

24  elections conducted under the now unconstitutional boundaries

25  established by this Court in Baumgart, and it gives the

1    citation, will deprive the individual plaintiffs of their civil

2    rights under color of state law in violation of 42 USC

3    Sections 1983 and 88.  Do you see that?

4    A  Yes.

5    Q  And was that an answer that you saw and approved of when it

6    was filed?

7    A  That was an answer that was prepared by our attorneys.

8    Q  And who are the attorneys who prepared that, Mr. Kennedy?

9    A  The attorneys that are representatives here in Court today.

10   Q  And so if we turn to page 45 and 46, you'll see that is the

11   Wisconsin Department of Justice; correct?

12   A  That's correct.

13   Q  And an outside counsel, the Reinhart Boerner Van Deuren law

14   firm; correct?

15   A  That's correct.

16   Q  I'd like to turn back to paragraph 94, please, and do you

17   see the last sentence in the answer to paragraph 94 alleges

18   "However, conducting elections under 2011 Wisconsin Acts 43 and

19   44 will not deprive anyone of their civil rights.  Defendants

20   deny all remaining allegations in paragraph 94."  Do you see

21   that?

22   A  I do.

23   Q  Did you prepare that language, Mr. Kennedy?

24   A  No, I did not.

25   Q  Was that your counsel in this case again who prepared that?

1    A   That's correct.

2    Q   I'd like you to turn then, please, to page 45 once more.

3    And I'd like to turn your attention to paragraph 4 where there

4    is a demand for judgment.  Do you see that the Government

5    Accountability Board asked in this paragraph that this Court,

6    quote, "declare and establish the election district boundaries

7    under which the defendants should conduct the recall and

8    special elections prior to the regular primary and general 2012

9    elections"?

10   A   Yes.

11   Q   And again, that was language that was drafted by your

12   counsel; correct?

13   A   That's correct.

14   Q   Mr. Kennedy, did you review each of these pleadings that

15   were -- in advance that were signed by your counsel?

16   A   Yes.

17   Q   Other than your own staff -- strike that.  All right, now,

18   Mr. Kennedy, are you aware that another lawsuit has been filed

19   against the Government Accountability Board in Waukesha County

20   Circuit Court?

21   A   Yes.

22   Q   And that was filed the very week after or just several days

23   actually after the GAB's answer to the second amended complaint

24   in this case was filed; correct?

25   A   That's correct.

1    Q  I'd like you to turn to tab 17, please, in your binder.  Are
2    you aware that in this complaint a group of plaintiffs sued the
3    Government Accountability Board asserting a claim that Act 43,
4    the Act 43 State Senate boundaries must be used for any State
5    Senate recall elections and that using the 2002 Senate district
6    boundaries drawn by this Court, meaning this federal Court here
7    in the Baumgart case, for the recall elections would be
8    unconstitutional?
9    A  Yes.
10   Q  I'd like you to turn to paragraph 57, please, which is on
11   page 16 of Exhibit 17.
12   A  Sorry, which paragraph?
13   Q  Paragraph 57.  Do you see paragraph 57 alleges plaintiffs
14   respectfully request that an order been issued declaring the
15   2011 redistricting plan as enacted by 2011 Wisconsin Acts 43
16   and 44 to be legally valid?  Do you see that allegation?
17   A  Yes.
18   Q  Do you know whether that allegation is still pending?
19   A  I -- I can't speak to the status of the case at this point.
20   Q  And do you see the allegation in paragraph 58 that the
21   plaintiffs in the Clinard case filed in Waukesha County Circuit
22   Court requested that an order be issued declaring the
23   legislative districts established by the 2002 court plan, that
24   was this Court in the Baumgart case, are unconstitutional?
25   A  I see that.

1   Q   And do you see that paragraph 59, the allegation is that the

2   plaintiffs request an order be issued enjoining the GAB from

3   taking any action related to the conduct of any recall election

4   in the unconstitutionally malapportioned legislative district

5   established by the 2002 Court plan?

6   A   I see that.

7   Q   Do you know what the status of those claims is?

8   A   I have not been advised that these claims have been

9   adjudicated.

10  Q   Mr. Kennedy, if you look on the next page, page 17, you see

11  that the plaintiffs who filed the lawsuit are represented by

12  the law firm of Michael Best & Friedrich?

13  A   Yes.

14  Q   Now, those are the very same lawyers at Michael Best &

15  Friedrich who also represent the Wisconsin legislature and who

16  were representing the legislature at that time; is that true?

17  Do you know that?

18  A   That's my understanding, yes.

19  Q   Okay.  I'd like you to turn to Exhibit 188, please, and I'd

20  like to draw your attention to the very first paragraph.

21          MR. KELLY:  Your Honor, I object.  The engagement

22  letter between Michael Best and the state legislature couldn't

23  possibly have anything to do with the constitutionality or

24  conforming to the Voting Rights Act of Acts 43 and 44.

25          JUDGE STADTMUELLER:  The objection is noted and

1   consistent with the Court's comments earlier, you may proceed.

2               MR. POLAND:  Thank you, your Honor.

3   BY MR. POLAND:

4   Q  Mr. Kennedy, do you see in the first paragraph that

5   Exhibit 188 states that Michael Best & Friedrich is pleased to

6   confirm the engagement to represent the Wisconsin State Senate

7   by its majority leader in connection with matters relating to

8   reapportionment in Wisconsin Senate Assembly, Wisconsin Senate

9   and Assembly districts arising out of the year 2010 census?  Do

10  you see that?

11  A  Yes.

12  Q  And I'd like to draw your attention to the very last

13  sentence on that same page.  Do you see that they were --

14  Michael Best & Friedrich was retained to represent the Senate

15  with respect to both litigation and nonlitigation matters

16  relating to the reapportionment representation?

17  A  I see that.

18  Q  Now, Mr. Kennedy, the day after the Waukesha County action

19  was filed on November 30, the Government Accountability Board

20  in this action, the Baldus case, amended its answer to the

21  second amended complaint; is that correct?

22  A  I don't know for sure.

23  Q  I'd like you to turn to tab 12 or Exhibit 12A in your

24  binder, please.  And I'd like to draw your attention to

25  page 46, specifically noting do you see that it is dated as of

1    the 30th day of November, 2011?

2    A  Yes.

3    Q  And that's actually two days after the Waukesha County

4    complaint was filed; correct?

5    A  Again, I don't know for sure but based on what we said

6    before.

7    Q  All right.  Mr. Kennedy, I'd like to -- I'd like to compare

8    the amendments between this amended answer to the second

9    amended complaint and then the original answer to the second

10   amended complaint.  So we're going to compare what's in

11   Exhibit 12, a few things, with Exhibit 12A, okay?  First of

12   all, I'd like you to look at paragraph 100 in Exhibit 12A.  I'm

13   sorry, make that paragraph 94 in Exhibit 12A.

14   A  Exhibit 12A.

15   Q  12A, correct.  And could we have -- could we have both

16   paragraph 94 and Exhibit 12A and paragraph 94 and Exhibit 12

17   put up on the screen, please, pages -- page 40 in 12A and

18   page 39 in 12.

19       Mr. Kennedy, do you see that in answer to paragraph 94 in

20   the amended answer that's Exhibit 12A, it states paragraph 94

21   sets forth allegations of law which require no response.

22   Subject to the foregoing, defendants lack knowledge and

23   information sufficient to form a belief as to whether any

24   elections conducted under the boundaries established by this

25   Court in Baumgart versus Wendelberger, and it goes on and on,

1  will deprive any of the individual plaintiffs of their civil

2  rights and therefore deny the same.  Do you see that?

3  A  I see that.

4  Q  And that is a change in the position and the answer from

5  what was contained in the answer to paragraph 94 in the

6  original answer to the amended complaint; correct?

7  A  That's correct.

8  Q  Now, in answering the second amended complaint, however, I'd

9  like you to turn to paragraph number 100 in Exhibit 12A.  The

10  paragraph alleges that the challenged 2011 districts cannot

11  serve as districts for any future elections or the regular,

12  special or recall elections unless and until this Court rules

13  on the constitutionality of the districts.  Do you see that?

14  A  Yes.

15  Q  And that allegation is denied; correct?

16  A  Yes.

17  Q  Is that still the Government Accountability Board's

18  position?

19  A  That is the position that our attorneys put forth, yes.

20  Q  And if we look at paragraph 101, the allegation is that the

21  2002 districts therefore are the only legal, valid and proper

22  districts for any election prior to final disposition in this

23  case.  Do you see that?

24  A  Yes.

25  Q  And do you see that's denied as well?

1    A   Yes.

2    Q   And is that still the GAB's position?

3    A   That's the position our attorneys are taking, yes.

4    Q   Finally, Mr. Kennedy, I'd like to draw your attention to

5    page 46 of Exhibit 12A.  Do you see the paragraph 4 requests

6    the following.  It states, If the Court determines that the

7    Government Accountability Board's compliance with Act 43,

8    Section 10(2) and Act 44, Section 4(2) will violate any law

9    with regard to the allegations herein, that this Court declare

10   and establish the election district boundaries under which the

11   defendants should conduct the recall and special elections

12   prior to the regular primary and general 2012 elections.  Do

13   you see that?

14   A   I do.

15   Q   Mr. Kennedy, are you aware that the Government

16   Accountability Board has raised a 11th amendment argument that

17   it believes bars the plaintiffs' count nine in this case?

18   A   I'm not entirely aware, no.  I'd have to be -- it would have

19   to be directed to me.  I couldn't tell you that right this

20   minute.

21   Q   Was that something -- was that bar something that you or the

22   GAB raised or did your lawyers raise it?

23   A   Our attorneys are representatives in developing legal

24   strategies.

25   Q   If I represent to you that the first time that that was

1    raised in this case to the plaintiffs' knowledge was in a

2    motion in limine filed with respect to your testimony on

3    February 15, do you have any reason to dispute that or any

4    other information?

5              MR. KELLY:  I object.  That question mischaracterizes

6    the state of the records in writing.

7              THE WITNESS:  I would like you to restate the

8    question so I can formulate an answer.

9              MR. POLAND:  Could you read that back?

10             (The record was read as follows:

11             "If I represent to you that the first time that that

12   was raised in this case to the plaintiffs' knowledge was in a

13   motion in limine filed with respect to your testimony on

14   February 15, do you have any reason to dispute that or any

15   other information?")

16             THE WITNESS:  I'm sorry.  Because of the breaks I

17   missed.

18   BY MR. POLAND:

19   Q   If I represent to you that the first time that position was

20   raised by the Government Accountability Board in this case was

21   in a motion in limine filed with respect to your testimony --

22   I believe that motion was filed on February 15, 2012 -- do you

23   have any reason to dispute that or do you have any information

24   to the contrary?

25   A   I have no information to the contrary.

1    Q   And it was the Government Accountability Board's counsel,

2    the lawyers at Department of Justice and the Reinhart law firm

3    that prepared the pleadings and the motion in limine that were

4    filed; correct?

5    A   I have not seen the motion.

6            MR. KELLY:   Your Honor, this is all fascinating

7    pretrial process but I think we can cut to the heart of the

8    matter by saying that there is no case or controversy with

9    respect to where the recall elections are going to be held.

10   They're going to be held under the 2002 district lines.

11           JUDGE STADTMUELLER:   Well, unless and until the

12   affected parties file a stipulation to that effect, that does

13   not appear to be the case from the pleadings that we have.

14           MR. KELLY:   Your Honor, it becomes the case when we

15   make the representation in open Court on the record.   When

16   there is no further case or controversy, the Court's

17   jurisdiction is done.

18           JUDGE STADTMUELLER:   Then I would suggest that you

19   and Mr. Poland, Mr. Earle reduce it to writing and file it as a

20   stipulation and we'll dismiss the count, but as the pleadings

21   stand, that's not the case.

22           MR. POLAND:   I may proceed, your Honor?

23           JUDGE STADTMUELLER:   You may proceed.

24           MR. POLAND:   Thank you.

25

1  BY MR. POLAND:

2  Q  Mr. Kennedy, when was the Reinhart law firm appointed as the

3  Government Accountability Board's counsel?

4  A  I don't know.

5  Q  Who appointed Reinhart as the GAB's counsel?

6  A  I don't know.

7  Q  Do you consider yourself on the Government Accountability

8  Board to be clients of the Reinhart law firm?

9  A  Yes.

10  Q  Mr. Kennedy, when Reinhart was appointed as GAB's counsel,

11  did they or anyone else tell you they had been retained to

12  advise the legislature on the redistricting process including

13  in litigation matters?

14          MR. KELLY:  I object.  Now we're getting into

15  attorney-client privileged conversations.

16          JUDGE STADTMUELLER:  It's a fact, so the witness is

17  instructed to answer the question.

18          THE WITNESS:  We were made aware of that.  It was --

19  that's all I can say.

20  BY MR. POLAND:

21  Q  So you were aware that Reinhart was acting as counsel for

22  the legislature as well?

23  A  We understood that at that period of time one of our

24  employees had worked for the legislature.

25  Q  Okay.  I'd like you to turn to Exhibit No. 5 in your binder,

1    please.

2          MR. KELLY:  I'm sorry.  Did -- I may have misheard

3    this.  Did you ask him if he was aware of the Reinhart firm

4    acting as the legislature's counsel?

5          MR. POLAND:  I don't believe I did.

6          MR. KELLY:  I think you did.

7          MR. POLAND:  I'll withdraw that question then and I

8    can ask a different question.  No, I actually I think I asked

9    the right question.  I think I asked whether -- let me ask the

10   question again just to make sure we're clear.

11   BY MR. POLAND:

12   Q  When Reinhart was appointed as the GAB's counsel for the

13   purpose of representing the GAB in this case, did they or

14   anyone else tell you or inform the Government Accountability

15   Board that the Reinhart law firm had been retained to advise

16   the legislature in the redistricting process including

17   potentially litigation?

18          MR. KELLY:  Objection.  That mischaracterizes the

19   record.  Reinhart was not engaged to represent the legislature

20   with respect to any litigation.  I don't know where you're

21   getting that from.

22          MR. POLAND:  Well, we've got the documents and we'll

23   see if they say that's what they say.

24          JUDGE STADTMUELLER:  Why don't you cut to the chase,

25   Mr. Poland, and let's have Mr. Kennedy go through the

1   documents.

2   BY MR. POLAND:

3   Q  Okay.  Exhibit No. 5, please, Mr. Kennedy.  And do you see

4   that's a letter dated February 17, 2011?

5   A  Yes.

6   Q  And that's from the -- if you turn to the third page of the

7   document, you'll see that it's signed by a representative,

8   Reinhart Boerner Van Deuren law firm.  If you turn to the

9   front, the very first page again, you'll see it's to Mr. McLeod

10  at Michael Best & Friedrich; correct?

11  A  Yes.

12  Q  And the first paragraph states "Please find enclosed the

13  engagement letter of February 15, 2011 that I have signed on

14  behalf of Reinhart Boerner Van Deuren, S.C.  I am providing

15  this letter to ensure our mutual understanding of the

16  engagement and to provide required disclosures to the client."

17  Do you see that?

18  A  Yes.

19  Q  And you see directly below that it identifies the clients,

20  and the clients are the Wisconsin State Senate by its majority

21  leader Scott L. Fitzgerald and the Wisconsin State Assembly by

22  its speaker Jeff Fitzgerald.  Do you see that?

23  A  I see that.

24  Q  I would like you, please, to turn then to tab number 229 in

25  your binder.  Do you see that's a letter dated February 15,

1    2011?

2            MR. KELLY:  Counsel, may we have a copy of this

3    exhibit?

4            MR. POLAND:  I think you do.

5            MR. KELLY:  Thank you.

6    BY MR. POLAND:

7    Q  Mr. Kennedy, do you see Exhibit No. 229?

8    A  I do.

9    Q  And do you see it appears to be a letter from Mr. McLeod at

10   Michael Best & Friedrich to Don N. Millis and Joseph Handrick

11   at Reinhart Boerner Van Deuren; correct?

12   A  Yes.

13   Q  And it's dated February 15, 2011; correct?

14   A  That's correct.

15   Q  Do you see that in the first paragraph it confirms the

16   engagement of the Mr. Handrick as a consultant in connection

17   with our representation of the Wisconsin State Senate by its

18   majority leader Scott Fitzgerald and the Wisconsin State

19   Assembly by its speaker Jeff Fitzgerald in the above matter

20   which involves potential litigation.  Do you see that?

21   A  Yes.

22   Q  If you look down the fourth full paragraph on that page, do

23   you see again it restates "As this retention is in anticipation

24   of potential litigation, all matters must remain confidential

25   until such time as the client determines otherwise."  Do you

1   see that?

2   A   I do.

3   Q   I would like you then to turn back, please, to tab number

4   six.  Directing your attention to the first paragraph, do you

5   see that this letter from Mr. Millis to Mr. McLeod states "I am

6   writing to correct my letter of February 17, 2011 concerning

7   the engagement letter dated February 15, 2011 that I signed on

8   behalf of Reinhart Boerner Van Deuren, S.C.  My letter of

9   February 17, 2011 incorrectly stated the payment of fees was to

10  end on May 15, 2011.  As the engagement letter indicates, it is

11  anticipated that this engagement will continue through May of

12  2012."  Do you see that?

13  A   I see that.

14  Q   Were you ever told that Reinhart's engagement by the

15  legislature for the purpose of redistricting was accomplished

16  pursuant to an agreement with Michael Best & Friedrich that was

17  intended to last through May of 2012?

18  A   No.

19  Q   Mr. Kennedy, there is one other proceeding that's currently

20  pending that challenges the petitions for the recall, for the

21  State Senate recalls; is that correct?

22  A   I'm not sure what you're referring to.

23  Q   There is a process by which challenges may be put forth

24  against petitions that have been submitted for the recall

25  elections; is that correct?

1    A   That's correct.

2    Q   And there had been challenges that have been filed; correct?

3    A   On behalf of the Senate, yes.

4    Q   And on behalf of individual members, Republican members of

5    the State Senate who are potentially subject to recall?

6    A   The four members of the Senate who are named in recall

7    petitions that are filed with our office have each filed

8    challenges with our office.

9    Q   Do any of those challenges contend that the 2002 boundaries

10   drawn by this Court in 2002 cannot be used for recall

11   elections?

12   A   That's my understanding of the challenges, yes.

13   Q   And they -- those challenges similarly allege or state that

14   the Act 43 Senate district boundaries must be used for recall

15   elections; correct?

16   A   I'm sorry?

17   Q   They -- in addition those challenges to the recall petitions

18   contend that the Act 43 boundaries must be used for any recall

19   elections that might be held; is that correct?

20   A   I'd have to review the challenges to be sure.

21   Q   I'd like to switch topics, Mr. Kennedy.  Is it your

22   understanding that in previous redistricting efforts in

23   Wisconsin, the municipalities and counties completed their

24   local redistricting process before legislative districts were

25   finalized?

1  A  Yes.

2  Q  Now, a different procedure was followed in 2011; is that

3  correct?

4  A  Yes.

5  Q  Do you know why that was done?

6  A  No.

7  Q  Did anyone ask your opinion or GAB's opinion whether it was

8  a good idea to change the process in that way?

9  A  At what time?

10  Q  Before it was, before it occurred.

11  A  No.

12  Q  Now, as the district boundaries are currently composed,

13  there are some conflicts with ward boundaries; correct?  And by

14  district boundaries, I'm referring to Assembly district

15  boundaries.

16  A  I'm sorry, ask the question again.

17  Q  Sure.  As the Assembly district boundaries are currently

18  composed, there are some conflict with ward boundaries; is that

19  correct?

20  A  Are we talking about under Act 43?

21  Q  Under Act 43; correct.

22  A  That's my understanding.

23  Q  Now, I'd like you to turn, please, to Exhibit No. 79 in your

24  binder.

25  A  I'm sorry, what exhibit?

1    Q   Exhibit 79, please, Mr. Kennedy.

2    A   I don't see that in your binder here.  Is it 179?

3    Q   No, I'm sorry, 79, sir?

4    A   Again, it goes from 17 through 188.

5            JUDGE STADTMUELLER:  Mr. Kennedy, it's probably

6    behind tab number 229 because they cover one another.

7            MR. POLAND:  My apologies.

8            THE WITNESS:  And again --

9            JUDGE STADTMUELLER:  Get to 229.

10            THE WITNESS:  I'm at 229.  Oh, there it is, sorry.

11            MR. POLAND:  Didn't mean to hide it.  I apologize.

12    BY MR. POLAND:

13    Q   Mr. Kennedy, can you identify what Exhibit 79 is?

14    A   It is a memorandum from two of my staff to -- to two

15    additional members.  The memorandum's from Sarah Witt, who

16    works with our statewide voter registration system, and one of

17    my staff counsel, Jane Falk, and it's addressed to the

18    elections division administrator in our agency, Matt Robinson,

19    and our election supervisor Ross Hein.

20    Q   And this memorandum is dated November 10, 2011; correct?

21    A   That's correct.

22    Q   Do you see the subject line is census blocks conflicting

23    with municipal boundaries?

24    A   Yes.

25    Q   Mr. Kennedy, you're familiar with this memorandum?

1    A  Yes, I am.

2    Q  Turn, please, to page 3.  I'd like to direct your attention

3    to the heading at the top of page 3 that states districts

4    created by Acts 43 -- I'll just leave out the 44 part --

5    conflict with Act 39.  Do you see that, sir?

6    A  I see that.

7              MR. POLAND:  Now, and again, there is some language

8    in here, your Honors, that does refer to Act 44.  I don't

9    intend to bring that out.  I'm really addressing it only to

10   Act 43, the languages in there.

11   BY MR. POLAND:

12   Q  Would you please read the first two sentences of that

13   paragraph, Mr. Kennedy.

14   A  Because Acts 43 and 44 were passed creating the new senate,

15   assembly and congressional districts, the four municipalities

16   have finished creating their local wards.  These districts were

17   built using census blocks.  The text of these acts, now in

18   statute, specifies the district boundaries according to

19   individual census blocks.

20   Q  So the district boundaries in Act 43 were specified by

21   census blocks; correct?

22   A  Yes.

23   Q  Now, the two sentences further down, the memorandum goes on

24   to state this is problematic for enforcement purposes because

25   those census blocks do not reflect the correct municipal

1  boundaries and the result of implementing these incorrect

2  boundaries in SVRS would place voters on the wrong poll books

3  for each election.  After local clerks make these corrections,

4  the districts in SP would not match Acts 43 and 44 precisely.

5  In addition, these corrections also require splitting census

6  blocks which may conflict with Act 39's prohibition on

7  splitting census blocks.  Do you see that?

8  A  Yes.

9  Q  I would like you to turn to the top of page 4, please, where

10  it refers to use of corrected wards in SVRS.  And looking at

11  the very first paragraph, the memo states "Approximately 21

12  counties thus far have asked that we use their corrected wards

13  and/or municipal boundaries in SVRS rather than the

14  census-based lines we are getting from the legislature to

15  ensure that the lines are placed accurately and thus voters

16  show up in the correct poll lists.  Because wards are the

17  buildings blocks for all the other representational districts,

18  if we use the corrected wards, this also corrects the municipal

19  boundaries, county supervisor, aldermanic, state senate, state

20  assembly, and congressional districts."  Do you see that?

21  A  Yes.

22  Q  Mr. Kennedy, is it in the Wisconsin constitution that the

23  Assembly district boundaries must follow county, town, precinct

24  and ward lines?

25  A  I don't recall.

1  Q  Down at the bottom of that same page in conclusion, it says
2  "The GAB will use corrected ward and municipal boundaries at
3  the earliest possible stage of implementing the new districts."
4  Do you see that?
5  A  Yes.
6  Q  Now, is it your understanding that there have been conflicts
7  between the district boundaries under Act 43 and ward lines or
8  municipal boundaries?
9  A  Yes.
10 Q  Do those still exist?
11 A  I don't know.
12 Q  When was the last time that you spoke with someone about --
13 in your staff about whether there were still -- strike that
14 question.  Do you know whether counties and municipalities are
15 in the process of revising ward boundaries to make them conform
16 to Assembly district boundaries?
17 A  I do.
18 Q  Okay.  Is that something that's ongoing?
19 A  Yes.
20 Q  That's -- the process is not yet complete, is it?
21 A  No.
22 Q  It's an ongoing process?
23 A  It's an ongoing process.  There's also provisions for them
24 to make these changes by April 10.
25 Q  By April 10?

1    A  Yeah, Act 39 as amended by subsequent statute requires them,

2    meaning the municipalities, to adjust their boundaries.

3    Q  Is it no longer -- I believe it was May 15 as originally

4    passed in Act 39.

5    A  It was adjusted by subsequent legislation that moved the

6    circulation date for nomination papers from June 1st to

7    April 15.

8    Q  I see.  So until April, until April 10, you said?

9    A  That's my recollection, yes.

10   Q  So until April 10 is the deadline for municipalities to

11   adjust their ward boundaries or municipal boundaries, precinct

12   lines to match Act 43; is that correct?

13   A  Yes.

14   Q  Until that time, is it your understanding that there might

15   continue to be conflicts between Assembly district boundaries

16   and local municipal or ward boundaries?

17   A  That's my understanding.

18   Q  And currently there are at least some of Assembly districts

19   that are not bound by county, precinct, town or ward lines?

20   A  I don't know.

21          MR. POLAND:  I have no further questions.

22          JUDGE STADTMUELLER:  All right.  Thank you,

23   Mr. Poland.

24          MR. SHRINER:  Your Honor, from the back of the room,

25   may I observe Mr. Kennedy's voice is dropping off.  It's

1 difficult to hear back here.

2          JUDGE STADTMUELLER:  Thank you, Mr. Shriner.

3 Mr. Kennedy, if you would, you can tilt the mic perhaps to

4 position it that your voice will project more directly.

5          THE WITNESS:  I'll move closer to the microphone.

6 How's that?

7          JUDGE STADTMUELLER:  Thank you.  Mr. Earle, do you

8 have any questions?

9          MR. EARLE:  No, your Honor.

10         JUDGE STADTMUELLER:  All right.  Mr. Kelly, you may

11 proceed.

12                     CROSS-EXAMINATION

13 BY MR. KELLY:

14 Q  Good afternoon, Mr. Kennedy.

15 A  Good afternoon.

16 Q  A couple preliminary matters.  I want to make sure that I

17 understood in your testimony, the GAB did not play any role in

18 adopting Acts 43 or 44?

19 A  That's correct, we did not.

20 Q  What is the GAB's responsibility with respect to Acts 43 --

21 Act 43?

22 A  We used those boundaries to run the elections for the state

23 of Wisconsin.

24 Q  So the terms of Act 43, they control what the GAB does with

25 respect to elections?

1    A    That's correct.

2    Q    And is it your job to faithfully follow the terms of Act 43?

3    A    Yes.

4    Q    Do you believe you are capable of faithfully following the

5    terms of Act 43?

6    A    We are making every effort to make sure that we do that.

7    Q    And your efforts will be successful before the elections are

8    held, won't they?

9    A    That's our plan.

10   Q    Mr. Kennedy, there has been some question about census block

11   boundaries and how they might relate to other boundaries.  Has

12   this ever come up before?

13   A    I don't recall.

14   Q    Do you know if in the last redistricting there was

15   circumstances in which there were some difficulties in

16   identifying where the actual boundaries were supposed to be?

17   A    Yes.

18   Q    What were those difficulties?

19   A    I just know that election officials routinely have problems

20   with census data, having it match up with the information that

21   they have in their offices based on the maps that are done at

22   their local level or information they have.

23   Q    And the difficulties that are being experienced currently,

24   are those any different from what they were ten years ago?

25   A    No.

1  Q  Are there more or fewer problems this year than ten years

2  ago?

3  A  I don't know.

4  Q  Did you have -- have any of the clerks mentioned to you that

5  perhaps the scope of the problems this time around were not as

6  severe as last time around?

7  A  That's one of the things that's been represented to me, yes,

8  by local election officials.

9  Q  Mr. Kennedy, is it the GAB's position here today that the

10  recall elections that occur prior to November of 2012 will be

11  conducted in the district lines established by the federal

12  court in 2002?

13  A  That's our position now, yes.

14  Q  Mr. Kennedy, whose responsibility is it to engage outside

15  counsel for matters such as this?

16  A  The Department of Justice.

17  Q  Did the Department of Justice fulfill that responsibility

18  with respect to this case?

19  A  They are the ones that I assume made the arrangement for

20  you.  My understanding it was also governor -- gubernatorial

21  approval is what my understanding is required as well.

22  Q  Now, in -- in engaging outside counsel, is it your

23  responsibility to make sure all prior engagements have been

24  included or would that be the Department of Justice's

25  responsibility?

1   A  I would rely on the Department of Justice to do that.

2   Q  Do you have any reason to believe that the Department of

3   Justice failed to discharge that responsibility?

4   A  I can't respond to that.  I don't know.

5   Q  Do you have any information to suggest that they did fail in

6   that responsibility?

7   A  No, I don't.

8   Q  Mr. Poland was -- showed you Exhibits 229 and Exhibit 6.

9   You don't need to put them up.  These were the engagement

10  letters with respect to assisting the legislature in developing

11  Acts 43 and 44.  One of them referred to Joe Handrick being

12  retained as consultant to assist in that process.  Do you

13  recall that?

14  A  Yes.

15  Q  Do you know when -- did you -- I'm sorry.  Were you aware

16  that his engagement ended last summer?

17  A  No, I was -- I don't know.  I know that there was a

18  discussion we had with the Department of Justice.

19  Q  About the length of that engagement?

20  A  That's right.

21  Q  And the Department of Justice informed you that that

22  engagement had terminated?

23  A  That's my recollection.

24  Q  Could you put up Exhibit 12, please.  If you could go to the

25  affirmative defenses towards the end of that exhibit.  Let's go

1   to the next page.  The next page, please.  We have many

2   affirmative defenses.  Next page, please.  The next page.  One

3   moment, please.  I need to check an exhibit.  Well, that was

4   fun.  Let's do that with 12A.  The next page.  All right.

5   Thank you.  Let's take a look at paragraph 16.

6       All right.  Mr. Kennedy, do you see where it says in

7   paragraph 16 "Defendants hereby incorporate by reference and

8   reserve the right to assert any and all of the affirmative

9   defenses set forth by any of the other defendants or intervenor

10  defendants"?

11  A  Yes.

12  Q  Now, you're an attorney, Mr. Kennedy?  That's correct?

13  A  Yes, I am.

14  Q  You understand that when a pleading incorporates by

15  reference other material, it is as if it is in that document

16  itself.

17  A  That's my understanding, yes.

18  Q  Have you reviewed any of the affirmative defenses set forth

19  by any of the other defendants or intervenor defendants?

20  A  It's been a long time since I've looked at them.  I didn't

21  do that in preparation for this trial.

22  Q  Well, let me test your memory here a little bit.  Do you

23  recall the intervenor defendants raising the Pennhurst defense?

24  A  I don't recall.

25          MR. KELLY:  Nothing further.  Thank you.

1      JUDGE STADTMUELLER:  Thank you, Mr. Kelly.  Anything

2  further, Mr. Poland?

3      MR. POLAND:  Two very quick questions, your Honor.

4                    REDIRECT EXAMINATION

5  BY MR. POLAND:

6  Q  Mr. Kennedy, I believe that Mr. Kelly asked you, I believe

7  that you testified that there might have been two entities or

8  people involved in appointing the Reinhart law firm as your

9  outside counsel; is that correct?

10  A  That's correct.

11  Q  That's the Department of Justice on the one hand; correct?

12  A  Yes.

13  Q  And the head of that is the attorney general of the state of

14  Wisconsin; is that correct?

15  A  That's correct.

16  Q  On which political party's ticket did the attorney general

17  run in the last election?

18  A  He ran as a Republican.

19  Q  And the other person that you mentioned was the governor; is

20  that correct?

21  A  That's correct.

22  Q  On which political party's ticket did the governor run in

23  the last election?

24  A  He ran as a Republican.

25      MR. POLAND:  I have no further questions.  Thank you.

1          MR. KELLY:  Just a few.

2                    RECROSS-EXAMINATION

3     BY MR. KELLY:

4     Q  Mr. Kennedy, I believe that in Mr. Poland's first set of

5     questions, he asked about the nonpartisanship of the board.  Do

6     you recall that?

7     A  I do.

8     Q  And the Government Accountability Board is nonpartisan?

9     A  That's correct.

10    Q  And you endeavor your very best to observe that

11    nonpartisanship?

12    A  Absolutely.

13    Q  Does it matter to you whether the attorney general or the

14    governor are Republicans or Democrats?

15    A  No.

16          MR. KELLY:  Thank you.

17          JUDGE STADTMUELLER:  Anyone have anything further?

18    Mr. Kennedy, the Court has a couple of questions for you.  As

19    you may recall, you were part of the Baumgart case that was

20    actually tried, I assume to be ten years ago.

21          THE WITNESS:  Yes.

22          JUDGE STADTMUELLER:  And if you recall that trial

23    took place in early April and the Court rendered a decision in

24    May, and I think you may have already answered the question

25    that was on the Court's mind, and if I recall correctly, the

1   date by which candidates could take out nomination papers back

2   in 2002 was still June 1st; correct?

3               THE WITNESS:  That's correct.

4               JUDGE STADTMUELLER:  And it's currently April 15;

5   correct?

6               THE WITNESS:  That's correct.

7               JUDGE STADTMUELLER:  And when did that change come

8   about?

9               THE WITNESS:  I believe that change took effect as a

10  part of Act 75, which would have been in the fall of 2011.

11              JUDGE STADTMUELLER:  Very well.  Thank you.  Anyone

12  have anything further?

13              MR. POLAND:  No, your Honor.

14              JUDGE STADTMUELLER:  Thank you much.  You may step

15  down.  Counsel, you may call your next witness.

16              MR. BROWN:  Plaintiffs call Representative Peter

17  Barca.

18              PETER BARCA, PLAINTIFF WITNESS, DULY SWORN

19              THE CLERK:  Please be seated.  Representative Barca,

20  would you please state your full name and spell it for the

21  court reporter.

22              THE WITNESS:  Peter Barca, P-E-T-E-R, B-A-R-C-A.

23                        DIRECT EXAMINATION

24  BY MR. BROWN:

25  Q   Representative Barca, good afternoon.

1    A   Good afternoon.

2    Q   Representative Barca, you're a member of the Wisconsin State

3    Assembly?

4    A   That's correct.

5    Q   What area do you represent?

6    A   I represent the greater Kenosha area, city of Kenosha and

7    part of the Town of Somers.

8    Q   And for how long have you represented that area?

9    A   Well, I've represented that area in this part of my tenure

10   for a little over three years.  Prior to that I represented

11   that area for approximately eight and a half years in the

12   Assembly and for a short -- a couple of years in the Congress.

13   Q   And do you recall the years for each of those tenures?

14   A   I'm sorry?

15   Q   Do you recall the years during which you held each of those

16   tenures, your previous tenure in the Assembly?

17   A   Yes.

18   Q   And also in Congress?  And what time period were those?

19   A   I was first elected in 1984 and I served from 1985 to -- for

20   part of 1993 in the state Assembly and Congress and the rest of

21   '93 and '94 and then I was reelected to the Assembly in 2007 to

22   serve -- or 2008, excuse me, and I served a little over three

23   years.

24   Q   And you've also served as a representative in Congress?

25   A   That's correct.

1   Q   And during what time period did you represent the area in

2   Congress?

3   A   '93 and '94.  Part of '93 and all of '94.

4   Q   And what area did you represent as a congressman?

5   A   In that area I represented Kenosha County, Racine County,

6   Walworth County, Rock County, part of Green and part of

7   Waukesha.

8   Q   And where do you live?

9   A   I live in the city of Kenosha.

10  Q   And for how long are you lived there?

11  A   For approximately eight years.  I lived in the town of

12  Somers most of my life.

13  Q   And so you're familiar with the geography of the counties of

14  Kenosha and Racine?

15  A   Very much so.

16  Q   Can we call up Exhibit 197?  Representative Barca, what does

17  that map depict?

18  A   It shows primarily the entire county of Kenosha, the entire

19  county of Racine, a little bit of the surrounding areas,

20  Milwaukee, Waukesha, Walworth and Lake County, Illinois.

21  Q   And to put this map in perspective, can you explain where

22  Kenosha County is in relation to the rest of Wisconsin?

23  A   It's in the far southeastern corner of the state of

24  Wisconsin.

25  Q   And what's the largest city in Kenosha County?

1  A  City of Kenosha.

2  Q  And can you see the city of Kenosha on the map?

3  A  Yes, I can.

4  Q  I believe actually with that screen you can circle that if

5  you like and it will show up, if you touch the screen.  Thank

6  you.

7  A  Keep trying here.

8  Q  So it's --

9  A  I left out a little bit of area that should have been

10  included.

11  Q  So it's the area that's already shaded on the map represents

12  the city of Kenosha?

13  A  Yes.

14  Q  And the county of Racine, can you explain where that is in

15  relation to the county of Kenosha?

16  A  It's north of Kenosha County.  You have to go through parts

17  of Mount Pleasant to get to the city of Racine.

18  Q  And you mentioned the city of Racine.  Is that the largest

19  city in Racine County?

20  A  Yes, it is.

21  Q  And can you indicate -- I believe you already have an

22  indication of where the city of Racine is.  And if we could

23  return to the full map, please.  Thank you.  And actually

24  I believe is there a button you can press to clear that.  We

25  appreciate your drawing.

1   A   I'm not seeing any buttons.  Oh, here, clear all.  There we

2   go.

3   Q   That's fine.  We don't need to worry about that.  So have

4   you driven between the Downtown Kenosha area and the Downtown

5   Racine area, referring to the cities of Kenosha and Racine?

6   A   Yes, I have.

7   Q   And about how long a drive is that?

8   A   Probably about 10 miles.

9   Q   Are you familiar with how the State Senate districts in

10  southeastern Wisconsin are configured under the 2002

11  legislative map?

12  A   Yes, I am.

13  Q   What State Senate districts encompass Kenosha and Racine

14  counties?

15  A   Well, there's two different State Senate districts.  The one

16  for Kenosha represents, you know, basically all of Kenosha

17  County, short of the Town of Wheatland and a little bit of the

18  area of Burlington, which is in Racine County.  And then

19  Racine, the Racine County Senate district is represented, you

20  know, primarily with almost all of Racine absent part of

21  Burlington.

22  Q   And can we pull up Exhibit 178.  Actually would it -- would

23  it be possible to try again with the clear button?

24  A   I think that would be great.  I feel humiliated by my

25  drawing skills.

1          JUDGE STADTMUELLER:  The bong does not want to go

2   away.

3   BY MR. BROWN:

4   Q   Thank you.  So you were describing the State Senate

5   districts under the 2002 boundaries that encompass the county

6   of Racine and the county of Kenosha.  Can you just point them

7   out on this map.  You don't need to touch the screen.

8   A   Well, Kenosha County, you want to point at the screen?

9   Q   That's fine.

10  A   Kenosha County Senate district you can see is in the

11  southern portion outlined by the red lines that are drawn much

12  more precisely than I could have, absent that town of

13  Wheatland, which is also in Kenosha.  And then the

14  Racine County Senate district is the part just north of there

15  which is all of -- represents most of Racine County absent the

16  town of Waterford and part of Burlington.

17  Q   So in the 21st Senate District, we have the city of Racine

18  as well as the county of Racine; correct?

19  A   Correct.

20  Q   And in the 22nd District we have the city of Kenosha as well

21  as the county of Kenosha?

22  A   Correct.

23  Q   Are you familiar with 2011 Wisconsin Act 43?

24  A   Yes, I am.

25  Q   What is it?

1    A    You mean for the Racine and Kenosha County?

2    Q    If you can just explain what 2011 Wisconsin Act 43

3    accomplished.  What kind of law was it?

4    A    You mean the reapportionment law that redid the various

5    districts for the Assembly and the Senate throughout the state.

6    Yeah.

7    Q    Yes.  And did you vote on the bill that became Act 43?

8    A    Yes, I did vote on that measure.

9    Q    And what was your vote?  Was it for or against?

10   A    I voted against that.

11   Q    Are you aware of the way the 21st and 22nd Senate Districts

12   are configured under Act 43?

13   A    Yes, I am.

14   Q    And can you see that new configuration in the same map?

15   A    Yes.  I believe it's the part that's highlighted by the

16   darker blue would be the new 22nd Senate District and then the

17   pale blue would be the 21st.

18   Q    Would you consider this to be a significant reconfiguration

19   of the Senate districts?

20   A    Astonishingly different.  For about a hundred years you've

21   had the Kenosha County area separate from the Racine County

22   State Senate district.

23   Q    And you're referring to the entire county of Kenosha and the

24   entire county of Racine being separate?

25   A    Essentially, other than for population shifts that from time

1  to time, you know, small portions in the county have gone back
2  and forth between the two Senate districts.  But essentially
3  for about a hundred years you've had a Kenosha County state
4  senator and a Racine County state senator.
5  Q  And under Act 43 what would you have?
6  A  Well, you would obviously cross those county lines and you
7  would have a state senator for, you know, two state senators,
8  each representing different parts of each.  You would have on
9  the eastern side what we would refer to as the Kenosha County
10 Senate district would have -- primarily they'd have all the
11 city of Kenosha and most of the city of Racine, and then the
12 town of Somers, most of the town of Somers and part of the town
13 of Mount Pleasant, and then the 21st Senate District would
14 have -- which typically we refer as the Racine County seat,
15 would now have the parts west of the city and Mount Pleasant
16 and the parts west of the city of -- the city of Kenosha and
17 the town of Somers.
18 Q  And the community you represent, how did your constituents
19 and other community leaders react to this reconfiguration of
20 Senate Districts 21 and 22?
21 A  Not well.
22         MR. KELLY:  Objection, hearsay.
23         MR. BROWN:  Your Honor, we're not asking for this to
24 be entered for the truth of the matter asserted.  We just want
25 to find out what their opinions were.

1          MR. KELLY:  No, they are offering it for the truth of

2     the matter asserted.

3          JUDGE STADTMUELLER:  Well, that's your view,

4     Mr. Kelly.  The objection is noted.  Overruled.  The witness

5     has already said he voted against it and obviously he was

6     speaking on behalf of his constituents.  After all, let's be

7     pragmatic here for at least a bit.

8          MR. KELLY:  Well, your Honor, I am.  I can't

9     interview all of these people that he says he's talked to.

10          JUDGE STADTMUELLER:  It's not being offered for the

11     truth of the matter asserted.  That's the way the Court

12     understands it.  You may continue, Mr. Brown.

13     BY MR. BROWN:

14     Q  Again, Representative Barca, in the community you represent,

15     how did constituents and community leaders react to this

16     reconfiguration?

17     A  Well, people were extremely surprised just because of the

18     history of a hundred years of having their own state senators.

19     To be factual, the newspapers in both communities had

20     editorialized against the proposed map.  You know, the Racine

21     Journal Times in particular I remember had a very creative

22     editorial addressing the citizens of Kenosha in saying how this

23     map would not serve either, it would diminish the voice of

24     both, it would take away communities of interest.  They noted

25     the fact that they have separate newspapers, separate media

1    markets, separate school districts, separate cities, separate

2    organizations and so on.

3        And then in the Kenosha News they also editorialized against

4    this proposed map and people throughout the community, whether

5    they be the Chamber of Commerce or veterans organizations or

6    labor groups, community activists were all very astonished

7    because of the fact that we had such a long history and because

8    the communities are so different and have such disparate

9    interests in so many cases and in many cases are rivals,

10   whether it be economic development or other kinds of

11   activities.

12   Q  Mm-hm.  You mentioned the differences between the

13   communities and you specifically mentioned differences in their

14   approach to economic development.  Can you elaborate on those

15   specific differences?

16   A  Certainly.  In a couple ways.  For instance, both

17   communities decided to build marinas at approximately the same

18   time.  So there was a competition in terms of trying to garner

19   resources for those marinas and then trying to market and

20   promote them.  Kenosha had built -- we actually passed a bill

21   back in the late nineties to try and diversify our economy and

22   created a very large industrial park in Pleasant Prairie, the

23   city built one, and then in Racine they were building their own

24   industrial parks around the same time.

25       And I know the mayors of communities, when businesses came

1    in to look to locate in Kenosha, for instance, our former

2    mayor, the longest serving mayor ever, would always try first

3    to get them in the city industrial park in Kenosha and then

4    Pleasant Prairie and then Somers or Bristol, and only as a last

5    resort would we ever consider Racine, and vice versa.

6        The current mayor of Racine is a former staff person of

7    mine, a friend, and they conversely try to get businesses to

8    locate in their city park, and within the city of Racine they

9    sell water and Kenosha sells water and so they compete in many

10   instances.

11   Q  How about with respect to political structures or

12   organizations.  Are there significant differences in that

13   respect?

14   A  Well, there certainly are.  You know, I mean, first of all,

15   there's differing organizations in each community.  I mean,

16   Kenosha has American Association for University Women.  Racine

17   has American Association for University Women.  There's

18   veterans groups that represent each community.  There's, you

19   know, community festivals, typically are separate for each

20   community, whether it be, you know, Columbus Day activity in

21   each of the communities or Cinco de Mayo or things of that

22   sort.

23            MR. KELLY:  Your Honor, there could be a very long --

24   I object.  There could be a very long list of this, none of

25   which are impacted by where the Assembly district is.  They can

1   still have Cinco de Mayo, they can still have their community

2   interests, they can their flotillas and their yacht clubs and

3   whatever.

4             JUDGE STADTMUELLER:  But they don't have dissimilar

5   representatives and I think that's Mr. Brown's point, which he

6   has, I think, adequately made.  So if you want to move on to

7   something else, Mr. Brown, I think the Court gets your point.

8             MR. BROWN:  Thank you.

9   BY MR. BROWN:

10  Q  Continuing on from that, you know, your opinion as a

11  representative of this community for many years, does this new

12  configuration cause any concerns for you as far as the ability

13  of someone to represent both the city, the city of Kenosha and

14  the city of Racine as well as separately someone else to

15  represent the county of Kenosha and the county of Racine?

16  A  Well, the concerns expressed obviously in those editorials

17  and by community leaders is, you know, has been of great

18  concern because in many cases you, as I indicated, you have

19  competing interests.  But in addition to that, you know, just

20  from a representation standpoint, historically in Racine, for

21  instance, in that State Senate district, it's gone back and

22  forth I think over the last six elections between a Democrat

23  and a Republican and a Democrat and a Republican, you know, for

24  quite a long period of time.

25      In addition to that, under this map, for the city of Racine

1    they almost certainly would never be able to elect a state

2    senator from Racine because two-thirds of that population or

3    nearly two-thirds would be represented in the Kenosha County.

4    I mean, the city of Kenosha and town of Somers have a much

5    bigger proportionate population base.  So if you had one person

6    running from Racine and one from Kenosha, provided they both

7    were, let's say, representatives or aldermen, almost certainly

8    the Kenosha representative would win.  So I think for people

9    living in the city of Racine I think they would be concerned

10   about that.

11       In addition to that, other concerns would be that currently

12   for interests at that each city has, they have two state

13   senators.  You know, for urban issues in Racine, for instance,

14   they have a very large proportion of African-American

15   community.  You know, you have a state senator that has to

16   focus on that.  Kenosha has similarly populations of people and

17   they have a state senator.  So for urban interests, you have

18   two different state senators that are representing those kinds

19   of urban interests.  Now you'll only have one, and that comes

20   to play sometimes in shared revenue formulas or school aid

21   formulas and oftentimes you're going to bat for, you know, the

22   interests of, you know, the urban part of the district.  That

23   would no longer be the case.

24   Q  Among your constituents and among community leaders, have

25   you heard of support for this new configuration?

1    A   I've heard of no support whatsoever.

2    Q   As a legislative leader from this area, was your opinion

3    ever sought about this configuration of Senate Districts 21 and

4    22?

5    A   No.

6    Q   When did the 2011 legislative session begin, if you recall?

7    A   January 4th.

8    Q   And in that new session do you recall when you first

9    discussed redistricting with legislative leadership?

10   A   I believe it was on the first day that the Republicans

11   quickly called an organizational committee meeting, of which we

12   really didn't even know the topic until minutes before we went

13   in there, and they sprung upon us this notion that they would

14   have unlimited resources for attorneys and consultants and

15   specialists to represent the interests of the Republicans, and

16   the Democrats would have no representation whatsoever.

17       We proposed an amendment to have our legislative counsel

18   attorneys handle this so that not only would Democrats and

19   Republicans have the same representation but so would any other

20   political party, whether it be the Green Party or Libertarian

21   Party or any citizen of the state for that matter.  But they

22   ignored that and they decided to give the Republicans unlimited

23   resources and no resources for either Democrats or anybody else

24   in the state for that matter.

25   Q   Historically, do you know if it's customary for only one

1   party to receive funding for redistricting purposes?

2   A  No, it's not customary.  Historically there's always been

3   equal resources provided.  In the State Senate, for instance,

4   they passed a provision in the Senate or committee six or nine

5   months earlier to give equal resources to both the Democrat and

6   Republican party.  On the Assembly side we did not do that

7   until going into this year, but in the last reapportionment

8   that took place in 2001 or in 1991 when I was in the

9   legislature back then, there were, you know, it was always

10  basically equal resources provided so that you would have

11  access to attorneys and consultants to help ensure that both

12  parties would be equally equipped with information to be able

13  to be make informed decisions.

14  Q  Did you ever secure counsel for purposes of redistricting?

15  A  No.

16  Q  And why not?

17  A  Well, we were not given any resources.  We did seek out the

18  head of the legislative counsel.  Those are the attorneys that

19  generally represent legislators in bills, and asked the degree

20  to which they would be able to provide us with legal counsel,

21  and they indicated that we could expect very little support in

22  this regard because they didn't have anybody that was very

23  knowledgeable in this area and they didn't have the resources

24  to be able to have somebody research and spend much time on

25  this.  Their resources were allocated already.

1    Q  You did, however, have access to computer terminals with

2    mapping software; is that correct?

3    A  Yes, we did.

4    Q  Did you use the computer terminal to draw maps?

5    A  Well, we did have a computer terminal available to us.  At

6    one point we did set that up and began to analyze data to at

7    least get some sense of, you know, what -- how proportion --

8    how proportionately populations had shifted, but we never

9    really got to the point where we felt we had adequate resources

10   to draw a map and be able to bring it up and try and garner

11   support for it.

12   Q  What kind of resources beyond the computer itself would you

13   have needed to draw a map?

14   A  Well, I mean, typically you have people who are, you know,

15   experts that can be strictly dedicated on this issue.  I mean,

16   the Republicans, I believe, spent over half a million dollars

17   in attorneys and mapping experts and people that could help

18   them put this together, and we had no such resources.

19   Q  Do you know if the Republican caucus also had access to a

20   computer terminal or computer terminals?

21   A  Yes, they did.

22   Q  And at the time that this was happening, did you know that

23   the Republicans were drafting maps out of the offices of the

24   law firm of Michael Best & Friedrich?

25   A  No, I had no idea of that.

1    Q  Did you know at the time that Republican members of the
2    legislature had signed secrecy agreements concerning meetings
3    about the maps that they were developing?
4    A  No, I've never heard of anybody signing a secrecy agreement
5    that's been in the legislature.  I was astounded to learn of
6    that a couple weeks ago.
7    Q  So that's not something that you've ever seen before in any
8    legislative context?
9    A  Never, and neither has people like Senator Risser who's
10   served 50 years.
11   Q  When was the bill that became Act 43 introduced to the
12   public?
13   A  It was introduced to the public, draft versions were made
14   available on July 8.
15   Q  And do you know how much time elapsed before it was actually
16   passed by the legislature?
17   A  Well, on July 11 they were formally introduced so they no
18   longer were drafts.  So on that date the public would have had
19   access to the maps that they would have a public hearing on
20   just two days later, and two days after that on July 15 they
21   were voted out of the Senate committee that has oversight for
22   that bill.  And -- and then on July 19, which would have been
23   four days after that, they were passed by the Senate on a party
24   line vote, and on July 20 the next day they were taken up in
25   the Assembly and passed.

1    Q  Did you or any other Democrats propose an alternative to

2    Act 43?

3    A  No, we did not.

4    Q  And why not?

5    A  Well, we just didn't feel again, as I stated earlier, that

6    we had adequate resources to be able to do that.  The other

7    issue, though, was just the timing of it.  Historically in

8    Wisconsin we've always relied upon ward lines that were brought

9    forward by the city councils and county boards.  So you would

10   start with that as a building block for the process.

11       So we had assumed that -- that we had certainly would have

12   had much more time, because under the timeline given to us back

13   in January by our LTSB, which is our Information Technology

14   Bureau of the legislature, they mapped out a timeline that

15   indicated that in the fall is when we would actually begin this

16   process.  And, of course, they were depending upon the historic

17   tradition of waiting till ward lines were drawn by the local

18   units of government.

19       So, of course, I'm sure the Court is familiar with just how

20   chaotic of a year it was in 2011 with everything from

21   collective bargaining to, you know, budgeting processes and

22   severe cuts in education.  So up until the time the budget

23   passed on, you know, June 25 or 27, somewhere thereabout, you

24   know, our time was entirely dedicated to all of those issues

25   that capture the public's attention with tens of thousands of

1   people at the Capitol protesting.

2       So up until the budget was passed, we really were not -- we

3   didn't have much time nor did we think it was necessary to

4   focus on something like reapportionment, thinking that we'd

5   have the entire summer until after the local units of

6   government had completed their process. So it was both the

7   resources and also sort of the timeline and the tradition that

8   had been followed that we never expected that, you know, they

9   would spring this on us and 12 days later after they had --

10  just even a draft was introduced that they would actually be

11  passed.

12              MR. BROWN:  Thank you very much.  No further

13  questions.

14              JUDGE STADTMUELLER:  Thank you, Mr. Brown.

15  Mr. Kelly?

16                      CROSS-EXAMINATION

17  BY MR. KELLY:

18  Q  Good afternoon, Mr. Barca.

19  A  Mr. Kelly, nice to see you again.

20  Q  It's good to see you as well.  I want to start with the

21  basic principle and I think it's important to have that

22  established right away.  You are a representative of the people

23  of the state of Wisconsin, are you not?

24  A  Correct.  I'm specifically elected by the people of Kenosha

25  and greater Kenosha and town of Somers.

1  Q  And that's Assembly district -- which assembly district is

2  that?

3  A  64.

4  Q  And we have how many assembly districts in the state of

5  Wisconsin?

6  A  99.

7  Q  So you are one of 99 voices in the state legislative

8  Assembly?

9  A  This is correct.

10  Q  Am I to take it that there is -- that there are divisions in

11  philosophy and objectives and priorities amongst the

12  representatives of people of the state of Wisconsin duly

13  assembled in their legislature?

14  A  Occasionally.  Much more regularity this last year.

15  Q  And there's nothing untoward about those differences, is

16  there?

17  A  No.

18  Q  You wouldn't seek to impose your will on all 98 other

19  assembly members, would you?

20  A  I would seek to convince them that my point of view is the

21  best one.

22  Q  Of course, and you would expect that they would try to do

23  the same with respect to you.

24  A  Right.

25  Q  So there's a give and take in the legislative process.

1   A   True.

2   Q   It's important that there's a give and take in the

3   legislative process, isn't it?

4   A   True.

5   Q   You represent the people of the state of Wisconsin to adopt

6   matters of important policy?

7   A   Correct.

8   Q   And Mr. Barca, it's important that important decisions on

9   policy be made by representatives of the people of the state of

10  Wisconsin, isn't it?

11  A   Correct.

12  Q   In fact, isn't it true that it is the fact that important

13  policy decisions are made by representatives that gives them

14  legitimacy?

15  A   Yes, and hopefully reflects obviously the will of the

16  people.

17  Q   Of course.  We are -- we are governed by the consent of

18  those who are governed.

19  A   Correct.

20  Q   And the consent of those who are governed have elected a

21  certain number of Republicans and a certain number of Democrats

22  to the state legislature.

23  A   Correct.

24  Q   And in the Assembly, the current balance favors one party

25  over another.

1  A  Correct.

2  Q  This time it's the Republicans over the Democrats.

3  A  Correct.

4  Q  Prior to that it was the Democrats over the Republicans.

5  A  Yes.

6  Q  And so on and so forth back and forth over time.

7  A  Yes.

8  Q  Now, when we talked last we talked a little bit about your

9  background in redistricting, and I wonder if you'll recall you

10  told me that you don't consider yourself an expert on

11  redistricting.

12  A  That's correct.

13  Q  All right.  And you also said that it's not really even a

14  policy issue that you spend a lot of time on.

15  A  Correct.

16  Q  In fact, I don't think you had ever heard of the

17  redistricting staff working group at that time; is that right?

18  A  That's correct.

19  Q  And at the time that we talked last --

20  A  I want to just make it sure that we're cheer.  I knew that

21  there was staff working on this but I had not heard of this

22  particular group.

23  Q  And that's a good point, because you knew on the first day

24  of the legislative session the redistricting was going to be an

25  issue during the session.

1    A  Yes.

2    Q  You were told that by legislative leadership.

3    A  Told that by the constitution.

4    Q  So you knew from the constitution it was going to be an

5    issue.

6    A  Yes.

7    Q  And you talked with other legislators and you knew from them

8    as well that at some point this was going to have to come up.

9    A  That's right.

10   Q  Now, at some point I think you mentioned something about a

11   computer work station being made available.  Do you recall

12   that?

13   A  Yes.

14   Q  And that had a program by the name of autoBound on it?

15   A  Could be.  I don't remember the exact program but certainly

16   there's software that allows people to use computers.

17   Q  So you're not familiar with the types of software available

18   to assist with redistricting?

19   A  Not completely, no, I'm not.

20   Q  All right.  So you decided you were not going to have the

21   computer work station in your office?

22   A  Correct.

23   Q  But there was some discussion about where to put it.

24   A  Yes.

25   Q  Now, there were, if I recall correctly, there were four

1   computer work stations made available to the legislature, one
2   to each caucus; is that right?
3   A   That's correct.
4   Q   And each of the caucus leaders were given the authority to
5   determine where that computer work station went.
6   A   That's correct.
7   Q   So for the Assembly Democrats, it was your decision to make
8   where that computer work station went.
9   A   Yes.
10  Q   And you decided that it would go to Representative Kessler.
11  A   That's correct.
12  Q   And you decided it would go to Representative Kessler
13  because, I think as you put it to me, he likes to draw maps
14  like other people like to go to the gym.
15  A   That's correct.
16  Q   All right.  Now, there was -- there was some measure of
17  concern, however, in giving that computer work station to
18  Representative Kessler.  Do you recall telling me that?
19  A   There were some members of our caucus that would not be too
20  enthusiastic about him having it in his office.
21  Q   And they weren't enthusiastic because they were worried that
22  he might draw a map that would -- that would disadvantage them.
23  A   Perhaps.
24  Q   Members of your own caucus.
25  A   Perhaps that might be part of it.

1    Q  In fact, I think what you told me was, if I might quote,

2    there was considerable concern some of the parts of members of

3    our caucus that there be input from all members before maps be

4    drawn and there was some concern about Representative Kessler

5    drawing them because of where he would be -- he might do

6    something unfavorable to them specifically.  Do you remember

7    telling me that?

8    A  Yes, that would be one of the issues.

9    Q  So you as a result, you told Mr. Kessler not to draw any

10   maps.

11   A  Correct.

12   Q  He could have drawn maps but you told him not to.

13   A  Well, I told him to hold off because we would want to get

14   the input of all the members of the caucus prior to drawing a

15   map that we would bring forward.

16   Q  And you never got any of that input of the members of the

17   caucus such that would allow Representative Kessler to draw a

18   map.

19   A  That's correct.

20   Q  So your instructions stood that he was not to draw a map.

21   A  Mm-hm, right.

22   Q  Now, the input that the other members of the caucus wanted

23   to have, I think you said -- I asked you they would want to

24   know how the map Representative Kessler drew would affect them;

25   right?

1  A  Certainly that would be part of it.  Part of it I think they

2  would want to see the ward lines that came out of their

3  communities.  They'd want to understand what the population

4  shifts were, if they had to lose population or gain population.

5  Those would be the kinds of considerations they would want to

6  look at so they would have some sense if they had to lose a

7  thousand citizens out of their district, how these borders

8  might change.

9  Q  Mm-hm.  And one of the thoughts, one of the areas of input

10  they wanted to have, one of their concern was how the change in

11  the districts might affect their ability to be reelected.

12  A  That would certainly be a consideration, I'm sure, for many

13  people.

14  Q  And members of your caucus?

15  A  There was -- there wasn't -- members of any caucus.

16  Independent, Republican, Democrat, that would be one issue.

17  Q  That makes sense.  You want to make sure that you get back

18  into the legislature.

19  A  Mm-hm.

20  Q  Is it in any way illegitimate for the members of the

21  caucuses to be concerned about their chances for reelection?

22  A  No, but that certainly that wouldn't be their only

23  consideration, but it certainly is not illegitimate for that to

24  be one consideration that people would have.

25  Q  Now, Mr. Kessler then throughout the redistricting process,

1  he had this autoBound work station in his office.

2  A  Yes.

3  Q  Now, under instructions from you not to draw any maps.

4  A  Mm-hm.

5  Q  Now, I know Mr. Kessler's not a lawyer but when we talked

6  last, you indicated that he knows of the legal standards that

7  are involved in writing maps.

8  A  He has a general sense of it, yes, he does.

9  Q  So he could have drawn a map and proposed it to -- well,

10  let's say, he could have proposed it to the Republicans.

11  A  Correct.

12  Q  Could have proposed it to your caucus.

13  A  Correct.

14  Q  Could have had it open for discussion.

15  A  Yes.

16  Q  And that -- and that computer work station was available as

17  early as February, was it?

18  A  February or March.  I'm not sure of the exact date.

19  Q  Mm-hm.  So during that period of time between February and

20  March and July, now, when the legislation that became Act 43

21  was introduced, there was several months there where

22  Mr. Kessler could have been writing maps while other people

23  went to the gym.

24  A  Well, that's true, although I do want to remind you of my --

25  both of my depositions I stated just shortly before that that

1  was a period in which people were not focused on

2  reapportionment.  His time, as well as everybody else's time,

3  would have been on the budget, would have been on many other

4  bills that were coming forward.  We fully expected that there

5  would be plenty of time throughout the summer and early fall to

6  focus on this issue.

7  Q  Sure, and I understand that.  That was apparently based on a

8  faulty assumption that it wouldn't come up until later.

9  A  Yes, that's correct.  It was a faulty assumption.  We

10  expected, as we'd done over the last 50 years, you would wait

11  for ward maps to be completed.

12  Q  Now, you mentioned that you don't have -- that you're not an

13  expert in redistricting and that you don't spend a lot of your

14  time on that subject, so perhaps you don't know this, but I'll

15  ask.  We'll see if you do.  Are you aware that the legislative

16  districts are always ultimately based on census blocks?

17  A  I would imagine that when the city councils and county

18  boards are drawing their ward maps, that that's what they look

19  at, but I don't know to what degree it's exactly that, that

20  terminology.

21  Q  Well, the terminology of the census block is simply data

22  that the Census Bureau gives you; right?

23  A  Sure.

24  Q  And you build wards out of that.

25  A  Right, I believe that's right.

1   Q   Okay.  So what's happened this time is instead of drawing
2   wards based on census blocks and then building those into
3   districts, this time the districts built the census blocks and
4   then the wards were based on that; right?
5   A   Right.  Essentially I guess you flipped it upside down.
6   Q   Sure.  One way or the other it's going to be census blocks.
7   Yes?
8   A   That would be the building block, yes.
9   Q   Now, there is -- there's no constitutional infirmity in
10  building an Assembly district based on a census block as
11  opposed to a ward, is there?
12  A   Well, my understanding is that the constitution actually
13  states that reapportionment should occur based upon, you know,
14  county boundaries, city boundaries, town boundaries and ward
15  lines.  So, in fact, the law itself stated that you had to use
16  ward lines.  So my understanding is when they passed the law,
17  they actually had to change the law that very same time that
18  they were passing it to no longer respect what the previous law
19  was, and it's not clear to me exactly whether or not that would
20  be constitutional since the constitution specifically does
21  mention ward lines.
22  Q   Thank you for bringing that up.  The legislature did change
23  the order of precedence and they said we will build the
24  districts out of census blocks and then the wards will be based
25  on that and when the process is done, Assembly districts are

1    based on -- encompass the ward blocks.

2    A  Yes, that's correct.

3    Q  All right.  So it's a procedural difference.

4    A  Well, I think that with all due respect, I think it's far

5    more than procedural.  It's -- the whole concept of it is that

6    typically legislators rely upon input from their local

7    officials, from citizens in their district, and so it's more

8    than just procedural.  After those ward lines are completed,

9    then typically local officials will talk to their

10    representatives about where they think boundaries could shift

11    proportionately and citizens will weigh in and give their

12    advice and ideas to their legislators in terms of how you can

13    take into account citizen input.  I mean, you know, as you and

14    I both agreed earlier, you know, the will of the people should

15    be the law of the land.

16    Q  Exactly.  So additional political process ensuring the

17    decisions that we make are the result of the consent of the

18    governed; right?

19    A  Correct.

20    Q  Okay.  Now, I'd like to change our focus of attention for a

21    moment and let's put up Exhibit 1053.  Now, I believe you

22    mentioned that the legislation that became Act 43 was

23    introduced on July 11; is that right?

24    A  Correct.

25    Q  Okay.  Can we go to the second page of this exhibit.  Well,

1    actually let's -- yes, right there for a moment.  Let's look at

2    the top of Exhibit 1053, and this appears to be an e-mail from

3    Rich Judge to pbarca7@yahoo.com.  Now, pbarca7@yahoo.com,

4    that's you.

5    A  Yes, that's correct.

6    Q  Rich Judge is your chief of staff?

7    A  Chief of staff.

8    Q  And this is sent on July 1st, 2011?

9    A  Correct.

10   Q  So this is ten days before Senate Bill 148 or 149 were

11   introduced?

12   A  Right.  It's seven days before the draft versions were made

13   available.

14   Q  Right.  Let's turn to the next page.  All right.  So let's

15   look at that first bullet point and this is -- this is

16   Rich Judge writing to you.  We anticipate redistricting is

17   coming in the next couple of weeks with maps being released

18   possibly today or the next few days.  So at the time this was

19   written, nobody had seen any maps yet.

20   A  Not to my knowledge.  I mean, you know, of course the rumor

21   mill in the Capitol is people start talking with one another

22   and you start getting rumblings that perhaps something's going

23   to be sprung upon you, so you begin to prepare immediately,

24   and, you know, based on what you're hearing though what we call

25   the grapevine of people talking to their colleagues and people

1    overhearing things being said.  So during that period we were

2    getting some rumblings that they might try and spring something

3    on us and also it was during the period when the recalls were

4    going on and we were hearing rumors that they wanted to quick

5    rush something through before the recall so in the event that

6    they lost the majority.

7    Q  So the rumors were flying thick?

8    A  Right.

9    Q  All right.  So we continue with this, with this exhibit and

10   the third bullet point.  Well, actually let's do the second

11   bullet point.  We'll do it in order.  All right.  We anticipate

12   that the map they are going to put out -- they being the

13   Republicans; right?

14   A  Yeah.

15   Q  We anticipate that the map they're going to put out, given

16   their need to pass it before the locals are done with their

17   ward maps, is going to include political gerrymandering.  Do

18   you see that?

19   A  Yes.

20   Q  Now, Rich Judge wrote that to you before he saw any maps?

21   A  Right.

22   Q  This is all just rumor.

23   A  Just based on rumors.

24   Q  All right.  So let's look at the next bullet point.  Our

25   message, our message -- well, that would be the Democrat

1   caucus; is that correct?

2   A   Right.

3   Q   Our message is the process and the map is unconstitutional,

4   political and partisan.   Those are on the lines.   That's

5   important to you and Rich Judge?

6   A   Right.

7   Q   It's not in the best interests of residents?

8   A   Correct.

9   Q   And Rich Judge, well, he hasn't seen the map either, has he,

10  because it hasn't been released.

11  A   No, only the rumors.

12  Q   So you can't -- is he in a position to judge the

13  constitutionality of the map on rumor?

14  A   No, only just based on what he had heard and the concerns

15  that were being provided at that time.

16  Q   All right.   Well, he says it's political.   Well, that's --

17  it's a political process, isn't it?

18  A   Yes.

19  Q   And the redistricting map is a political act?

20  A   Yes, that's correct.

21  Q   And the political act involves the judgment of the

22  legislators.   Yes?

23  A   Correct.

24  Q   And those would be the legislators who represent the people

25  of the state of Wisconsin.

1    A   Correct.

2    Q   In their legislature duly assembled to give legitimacy to

3    the decisions that they make because they are the

4    representatives of the government who are giving their consent;

5    is that right?

6    A   That's right.

7    Q   All right.  Now, let's go on to next bullet point.

8    All right.  It says we will be meeting as a caucus to talk

9    strategy.  We will need to keep our caucus strategy

10   confidential.  Do you see that?

11   A   Yes, I do.

12   Q   I understand there was some concern expressed earlier about

13   some secrecy agreements.  This is Rich Judge telling you you

14   need to keep your caucus strategy confidential.  Yes?

15   A   That's correct, although I certainly want to draw the

16   distinction between a strategy of whether you're going to offer

17   amendments or not offer amendments versus letting the public

18   know exactly what the substance is that you're attempting to

19   accomplish.  There's quite a distinct difference there.

20   Q   There is.  Let's go to the next bullet point.  It's actually

21   not the next one in line but the one that starts -- I'm sorry,

22   the one that starts remember.  If we could highlight that one.

23   A   Right.

24   Q   All right.  So there's a difference in secrecy when you're

25   developing strategy to pass a map or your legislative strategy

1  and something else.  So here's your strategy.  Remember, we

2  will not be passing a map.

3  A  Right.

4  Q  Everything we do is about positioning both from a message

5  and legal perspective.

6  A  Mm-hm.

7  Q  And that's what you wanted to keep secret.

8  A  Well, the strategy would be whether or not we would offer a

9  map, whether or not we would offer amendments, and that, of

10  course, is something you don't -- typically don't share what

11  your strategy is going to be.  And we're not passing that

12  meaning that up until that point I think we had 400 and some

13  amendments and the Republican side had not adopted any.  So we

14  knew that they in all likelihood were not taking into account

15  our point of view.

16  Q  And was it the Democratic caucus's position that they would

17  throw their hands in up defeat before any legislation has

18  actually been introduced?

19  A  No, because first of all, at that juncture we didn't know if

20  they would, when they'd offer it and when they would pass it.

21  So we just were at that point trying to speculate.  I mean,

22  given the nature of the way 2011 had transpired with the

23  governor and, you know, springing upon the public after the

24  election he was going to close down all collective bargaining

25  and he wanted it passed in six days and given so much of what

1    had transpired, we were worried that they would do what

2    ultimately they did, although we didn't know they would do

3    this, which is introduce a bill and seven days later roughly

4    you'd pass it into law.

5    Q  That would be 12, I think, right?

6    A  From when it became public, yes.  From when it was

7    introduced on the 11th until it passed was I think eight days.

8    Q  All right.  So -- but before any legislation had hit the

9    floor, before it had even circulated, before it had been

10   offered, the Democratic Assembly caucus' strategy secret was

11   we're going to posture.  We're not going to pass a map.

12   A  We were saying that we doubted the Republicans would pass

13   our map.  It would be quite amazing if they would even pass an

14   amendment, much less a map that we would offer.

15           JUDGE STADTMUELLER:  Mr. Kelly, we have reached that

16   point where it's time to take our afternoon break.  If I may

17   stand in recess for 15 minutes and we'll pick up with the

18   balance of Representative Barca's testimony at 2:00 o'clock.

19           THE BAILIFF:  All rise.

20           (A recess was taken.)

21           JUDGE STADTMUELLER:  Mr. Kelly, you may continue with

22   your questions.

23           MR. KELLY:  Thank you, your Honor.

24   BY MR. KELLY:

25   Q  Now, let's see where we were.  Oh, yes.  Could we move up to

1   the second bullet point on this page.  All right.  So this

2   says, Mr. Barca, do you see, please make sure there is no

3   discussion of what Democrats might do with anyone, especially

4   press?

5   A   Mm-hm.

6   Q   Do you see that?

7   A   Yes, I do.

8   Q   That was -- that was your position that you needed to keep

9   secret what the Democrats might do from the press?

10  A   I want to make sure we're clear from the strategy point in

11  terms of what amendments we might offer.  Again, there's a

12  clear distinction between we -- as you can see from the bottom

13  couple points, we wanted the public to have access to the

14  information, we wanted to reflect public input, we wanted to

15  make sure that a map was constitutional.  We weren't trying to

16  hide from the public the facts and the information, just the

17  strategy is a clear distinction I'm sure you would recognize.

18  Q   And that strategy was we're not passing any maps, we're just

19  posturing.

20  A   No, not that -- the strategy was that to remind people,

21  because oftentimes people can think that, well, maybe the

22  Republicans actually will pass something this time and we felt

23  pretty confident they wouldn't pass anything we offered.  I at

24  times will go to them trying to get them to offer an amendment

25  and say don't pass Democratic amendments.

1    Q  All right.  So the next bullet point, in order to have the

2    best chance, we will need to have the unified strategy with

3    Senate Democrats.  We will need to coordinate so we don't want

4    to be commenting and speculating on problems with the GOP map

5    prematurely.  Do you see that?

6    A  Yes, I do.

7    Q  Now, I want you to turn back two pages.  And what we see

8    here and on most of the next page is a call list.  Yes?

9    A  Yes.

10   Q  And these were other members of the Assembly caucus.

11   A  Yeah.

12   Q  That were being called to give them the talking points?

13   A  Correct.

14   Q  And all before anyone had seen any maps.

15   A  Right, and in particular because of the fact that rumors

16   were running rampant and different members had relationships

17   with Republicans on the other side of the aisle and they want

18   to make sure that they weren't commenting on information that

19   might be completely inaccurate, because obviously at that point

20   nobody had officially seen any maps but they might have

21   overheard a conversation or a Republican might have said "I'm

22   concerned about what I see with my district" or something of

23   that sort.

24   Q  So you were concerned with accuracy?

25   A  We wanted to make sure that a number of things.  First of

1    all, that people weren't commenting on something that we had no

2    idea if that would be what the map was or not; and secondly,

3    with, you know, until we actually had the information before

4    us.

5    Q  So you wanted to be accurate?

6    A  Right.

7    Q  So let's go to the third page, the fifth bullet point.  So

8    here's what you told them with respect to that accuracy.  We

9    need to stick to the bigger picture message.  The GOP map is

10   yet another abuse of power.  The map is unconstitutional,

11   divisive and a blatant attempt to reduce the accountability and

12   secure political advantage for Republicans, all before you saw

13   the map.

14   A  That's what we were hearing, that they would pass something

15   that, you know, would be very highly partisan and would not

16   necessarily respect the community interest, and I know that

17   some of the minority caucus members were concerned with what

18   they were hearing what happened to their districts.

19   Q  And this is based on the rumors you'd heard?

20   A  That's correct.

21   Q  Isn't that sometimes known as rumor mongering, Mr. Barca?

22   A  Well, there's no word telling people not to rumor monger,

23   not to go out and say things, because then we would be

24   perpetuating rumors.

25   Q  Here's your message.  It says -- this is the message that

1    you gave.  The GOP map is yet another abuse of power and so on

2    and so forth.  That's your message, before you saw it, based on

3    rumors.

4    A   Yeah.  We were very worried, again, that they would do

5    exactly what they did, which is spring it upon us and with very

6    little time and try and ram it through the process without much

7    public input or without us having a chance to really adequately

8    respond, and that's exactly what happened ironically.

9    Q   Ironically.  But what you weren't worried about is the

10   accuracy of the message that you were getting out to your

11   members.

12   A   Well, as you know, this is -- we were telling people we

13   thought could happen, what we projected very well might happen,

14   which did, in fact, come true.  But we were telling people

15   let's not go out and talk to the press and perpetuate rumors.

16   Let's wait until we see the maps.

17   Q   Now, Mr. Barca, you and I talked about all the things that

18   the Assembly Democratic caucus did with respect to

19   redistricting in the period between the beginning of January

20   when the bill eventually passed.  Do you remember that?

21   A   Yes.

22   Q   Okay.  So I asked you, and if you recall, tell me everything

23   that you all did with respect to redistricting between

24   January 4, 2011 and July 11, 2011 to address the topic of

25   redistricting.  And you said, well, it's in the record that we

1    met, we went to leg counsel.  That would be legislative
2    counsel; correct?
3    A   Correct.
4    Q   And we sent a letter, and that letter was sent to the
5    Republican leadership?
6    A   Yes.  We sent a couple of letters to the Republican leaders,
7    first of all asking that they reconsider their -- their
8    provisions they had passed to give themselves unlimited access
9    to attorneys and experts and not allow that for anybody else
10   besides the Republican caucus, and so that's correct and I
11   think there was a letter sent a number of months later.  So
12   there was a number of them.
13   Q   So you got a couple of letters, and if you'll recall I asked
14   you what else, if anything, did the Democratic caucus do about
15   redistricting in that time period, and you said, well, we
16   provided updates, you know, to our members in terms of anything
17   that we knew.  Do you remember that?
18   A   Yes, I do.
19   Q   And that was the sum total of what you told me about what
20   the Democratic caucus did between January 4th and the passage
21   of the bill with respect to redistricting.
22   A   I don't recall exactly what time frame you outlined at that
23   time, but anyway.
24   Q   Well, let me back up and I'll read the question that I asked
25   you.  So tell me everything that you did or that you know that

1   the Democratic caucus and either the Assembly or the Senate did

2   between January 4, 2011 and July 11, 2011 to address the topic

3   of redistricting, and those were the things you gave me.

4   A   Okay, very good.   You read the record there so I'm sure

5   that's true.

6   Q   So you -- you didn't call any public meetings at any time in

7   that period of time to address redistricting?

8   A   No, we did not.

9   Q   You didn't go have your members go out and start canvassing

10  the people they represent to find out their impressions and

11  their ideas with respect to redistricting?

12  A   No.   I mean, although I'll tell you, that was certainly our

13  intent after the ward maps were passed we certainly were

14  looking to do that.   But as I indicated, between January 4 and

15  June 30, you know, we had our hands full with dealings with the

16  agenda that was before us and we were anticipating the calendar

17  that was provided to us that this would come about in the late

18  summer or fall.   So up until July 1st, you know, we weren't

19  hearing that they were going to fast forward this.

20  Q   Everybody had their hands full; right?

21  A   Everybody what?

22  Q   Everybody had their hands full, Democrats, Republicans.

23  A   Yes, we did, although we didn't have hundreds of thousands

24  of dollars like they did to hire outside counsel and have them

25  be, you know, had enough money for firms like yours that could

1  work around the clock on this.  As legislators with -- we were

2  focused on our agenda.  Outside experts, of course, have the

3  luxury of being able to focus on other things.

4  Q  It wasn't my firm.

5  A  No, I understand.  Firms like yours.

6  Q  Fair enough.  Well, it wouldn't have cost you any money to

7  call a public hearing; right?

8  A  Correct, and we undoubtedly would have done that had they

9  followed the process that we expected.

10  Q  So you were just caught off guard.

11  A  To some degree caught off guard and also, as I indicated, we

12  were focused on other issues.

13          JUDGE STADTMUELLER:  How about sandbagged?

14          THE WITNESS:  It's another way of describing it.

15          JUDGE STADTMUELLER:  Fair.

16  BY MR. KELLY:

17  Q  And once you did find out that it was coming along, you

18  didn't call any emergency town hall meetings?

19  A  No.  I mean, obviously, my timeline again with, you know, we

20  were hearing right after the budget passed around the 31st in

21  that period, we were starting to hear rumors that they may come

22  forward with something, and, you know, eight days later the

23  draft versions came out and the whole thing was completed by

24  the 20th.  So it would have been very difficult to call an

25  emergency public hearing, but until you actually had the maps

1  on the 11th, the 11th to the 20th is nine days.  That doesn't

2  allow much time to even reserve halls and get the word out to

3  people, but --

4  Q  But you didn't do that.  It might have been difficult but

5  you didn't do it.

6  A  That's correct, we did not.

7  Q  But you could have?

8  A  We could have.

9  Q  If you wanted.

10  A  That's right.

11  Q  All right.  Let's take a --

12  A  I'm not sure what kind of input we would have gotten.  If

13  you just call a hearing and you don't have anything to be able

14  to put in front of them, it makes it more difficult.  Because

15  when you have hearings, you at least have a draft bill,

16  proposed ideas on what you're going to bring forward.

17  Q  Well, you never know until you try.  Let's take a look at

18  Exhibit 1055.  Have you ever seen this before, Mr. Barca?

19  Let's -- okay, there we go.  Can you see that easily enough,

20  Mr. Barca?

21  A  Yes, I do.

22  Q  Okay.  Do you recognize that as being the legislative

23  history for Senate Bill 148?

24  A  Yes, I do.

25  Q  And Senate Bill 148 was the redistricting legislation that

1  was entered, introduced in the Senate?

2  A  That's correct.

3  Q  All right.  Eventually that made its way to the Assembly.

4  Yes?

5  A  That's right, that's right.

6  Q  Okay.  All right.  Let's turn to the third page of the

7  exhibit, because the Assembly Democrats did have input in the

8  redistricting process eventually, didn't they?

9  A  Well, it depends on what your definition of input is.

10  Q  My definition is an amendment was offered by the Democrats.

11  Yes?

12  A  Yes.  There was an amendment offered in terms of the process

13  that would be utilized, you know, for the past number of years.

14  There's been a lot of interest by what we call the big

15  government groups in trying to have sort of Iowa model that is

16  a nonpartisan redistricting process.  So yes, that would be a

17  different approach to take in redistricting as opposed to,

18  let's say, an alternative to specific maps that are offered.

19  Q  Okay.  Let's take a look at the -- excuse me -- the

20  paragraph beginning July 20, 2011.

21  A  Yes.

22  Q  All right.  So this says that the Assembly substituted

23  Amendment 1 to 2011 Senate Bill 148 offered July 20, 2011 by --

24  well, a whole list of people beginning with Representative

25  Hulsey?

1    A   Yes.

2    Q   And the third person on that list is you; is that right?

3    A   Yes.  If you mean sponsors were Representative Brett Hulsey

4    and Representative Mark Pocan and they list everybody

5    alphabetically after that.

6    Q   Okay.  Now, those are all Democratic legislators on that

7    list?

8    A   Yes, it is.

9    Q   Are there any Republicans on there at all?

10   A   No, there are none.

11   Q   You didn't seek out Republicans to join you in that bill?

12   A   I'm not -- I don't know if Representative Hulsey sent out a

13   cosponsorship memo or not.

14   Q   You didn't though.

15   A   No.  It wasn't my amendment.

16   Q   But you're a cosponsor.

17   A   That's correct.  So whenever he'd send a cosponsorship memo,

18   I would have added my name.

19   Q   And as it says, it's offered by Representatives Hulsey,

20   Pocan, you and a whole list of others.

21   A   That's correct.

22   Q   All right.  Let's take a look at what this is -- just

23   substitute Amendment 1.  We did.  This was your proposal.

24   Section 2 on the third page of the exhibit.  Let's go to the

25   next.  Fourth page, I'm sorry.  Are you on 1055?

1  A  Are you asking me?

2  Q  No.  There we go.  Let's look at 4.006, sub 2, if we could

3  highlight that.  So it says not later than January 1 of the

4  second year following the decennial federal census, the

5  Legislative Reference Bureau and the Government Accountability

6  Board shall jointly deliver to the majority leader of the

7  Senate and speaker of the Assembly identical bills creating

8  plans of legislative and congressional redistricting, prepared

9  in accordance with standards developed by the Legislative

10  Reference Bureau and the Government Accountability Board under

11  subsection 1.  Do you see that?

12  A  Yes, I do.

13  Q  All right.  So your proposal was to take the responsibility

14  for redistricting out of the hands of the legislature and give

15  it to the Government Accountability Board.

16  A  Mm-hm.  This proposal would do that.  It would adopt

17  essentially the Iowa model, that's correct.

18  Q  And who elects the members of the Government Accountability

19  Board?

20  A  Nobody.  They're appointed by the governor.  They're

21  appointed by the governor subject to confirmation by the State

22  Senate.

23  Q  Now I want to return to our conversation earlier.  We were

24  talking about the importance of a representational form of

25  government.

1    A  Yes.

2    Q  And we -- that important matters of policy gain their

3    credibility and their legitimacy from the consent of the

4    governed as expressed by their elected representatives.  Do you

5    remember talking about that?

6    A  Yes, I do.

7    Q  All right.  But this redistricting, that's an important

8    policy issue, isn't it, Mr. Barca?

9    A  Yes, it is.

10   Q  But what you wanted to do was take it out of the people's

11   representatives' hands and put it in an unelected bureaucracy's

12   responsibility; is that right?

13   A  Well, I wouldn't depict it that way at all.  Under the Iowa

14   model and other models that other states have adopted, the idea

15   behind it gives citizens much more input and involvement where

16   they have hearings around the state, they've collected input

17   from people and then they bring forward what's called a

18   nonpartisan bill so that you're collecting input from those

19   people.  But eventually the legislature does have to either

20   vote for it or vote against it.  So if it's not something that

21   the legislature believes is constitutional or appropriate, then

22   they are free to vote it down.

23   Q  Well, let's take a look and you tell me where we find the

24   provisions in this amendment for all of these public hearings

25   where the public would have input into the map that the GAB was

1  developing.  Where do I find that?

2  A  I don't -- you know, I'd have to read through the bill more

3  carefully.  I don't know if it's actually outlined in that

4  manner, but it's commonly understood when you follow models

5  that Iowa and other states who have adopted more recent

6  nonpartisan approaches that they have public input processes

7  built into that mapping process.  So that would be the

8  expectation were the legislature ultimately to adopt this kind

9  of a process.

10  Q  But this amendment that you cosponsored doesn't have any

11  provision for public hearings.

12  A  I'd have to read it more carefully to be able say it but

13  I don't believe -- you probably are accurate.

14          MR. KELLY:  One moment, please.  I forgot to put

15  these on the witness stand prior to the examination.  With your

16  leave I'll do that, your Honor.

17          JUDGE STADTMUELLER:  All right.

18          THE WITNESS:  You want me to read these?

19  BY MR. KELLY:

20  Q  Well, let's do this.  I'd like you to find in there

21  Exhibit 1055.

22  A  Okay, I have it in front of me now.

23  Q  Please read through that and tell me where we will find the

24  provision for providing for all of these public hearings.

25          JUDGE STADTMUELLER:  And again with all due respect,

1    Mr. Kelly, I'm not sure what the relevance of any of this is to

2    the issues that are before the Court, and we are wasting time

3    because as everyone in this courtroom knows, this case is

4    coming to an end tomorrow evening.  So if this is the way you

5    and your colleagues want to spend your time, you're going to be

6    cutting yourself all very short with regard to the balance of

7    the witnesses to be called and the arguments of counsel.

8             So you're going to have to decide collectively how

9    you want to use the balance of the time, because we're at a

10   point with Representative Barca's testimony, while this is all,

11   indeed, very interesting, it really in the final analysis

12   doesn't have an awful lot to do with the issues that are

13   currently before the Court.

14            MR. KELLY:  Well, thank you, your Honor, and the

15   reason I was going through it was to address the Court's

16   expressed concerns about the process that led to Acts 43 and

17   44, but if that's not an issue that's important to the Court,

18   I'll be happy to move a little more fast.

19            JUDGE WOOD:  If you could move on.

20            MR. KELLY:  Thank you.

21   BY MR. KELLY:

22   Q  All right.  So let's -- instead of having you spend your

23   time looking through the -- these provisions for public

24   hearings, I'll represent to you that there are none.  So then

25   let's do this.  So following along from where we were at before

1  on the fourth page of this exhibit, next page, please.  I count

2  differently apparently.  So it says either -- we're up in the

3  first paragraph.

4  A  Yes.

5  Q  Sub 1.  So now once the GAB gets done writing the map, your

6  proposal is that either the Assembly or the Senate shall

7  expeditiously introduce and bring a bill to a vote not less

8  than seven days after the date of introduction and the vote

9  shall be under a procedure or rule permitting no amendments

10  except those of a purely corrective nature.  Do you see that?

11  A  I see that.

12  Q  Okay.  Now, I understand that it's your position that you

13  would have liked to have seen that language amended.

14  A  That's correct.  Yes, in my deposition I stated such.

15  I assume that's before the Court already.

16  Q  But nonetheless, your name was on this bill and that's what

17  got introduced.  All right.  Now, I would like to turn your

18  attention to Exhibit 1068, and for purposes of expediting

19  matters, I'll represent to you that this is the bulletin of the

20  proceedings of the Wisconsin legislature, 1983-1984 session.

21  Mr. Barca, were you aware that in 1983, which was the last time

22  that the legislature passed a redistricting statute and it was

23  signed by the governor, that that was 1983?  Did you know that?

24  A  I believe I've been made aware of that through this process.

25  Q  Okay.  And in 1983, did you know that the Assembly had a

1   majority of Democrats?

2   A  I'm aware that that was the case.  I wasn't elected then but

3   that was the term before I got there, but I was aware that

4   there was a Democrat majority.

5   Q  So in the Senate, the Senate had a majority of Democrats as

6   well; is that right?

7   A  Yes, I believe that's correct.

8   Q  And in 1983 the governor was a Democrat.

9   A  Correct.

10  Q  Now, are you aware that in 1983 the legislature introduced,

11  passed, signed a redistricting legislation in four days?

12  A  I was not aware of that.

13  Q  Were you aware that they held only one public hearing on

14  that bill?

15  A  No, I was not aware of that.  You know, again, I was in the

16  legislature when we did the redistricting in the nineties, so

17  I'm much more aware of that during that period.  So I was not

18  aware of that, but could very well have been the case.

19      The other issue I would say, though, like in the nineties,

20  for instance, when I was there, I know that there were other

21  competing bills, there were hearings on other competing bills

22  before the bill had ultimately passed, did pass.  So I don't

23  know if this was the only bill offered and it was similar to

24  the process followed here.  I'm sure there were no secrecy

25  oaths, but beyond that, I don't know if there were other bills

1    that were considered during that same time period or not.

2            MR. KELLY:  Your Honor, we are interested in

3    expediting the process, and in that spirit I would like to

4    offer that the Court would receive Exhibits 1057, 1068, 1069,

5    1070, and 75, all of which are legislative history or bills for

6    the bluebook.  And if we can do that, I can dispense with

7    further questioning of Mr. Barca.

8            JUDGE STADTMUELLER:  Well, again, subject to the

9    Court's comments earlier today on the whole notion of relevance

10   to the issues that are before the Court, namely the

11   constitutionality of certain provisions, some of which we have

12   learned quite a bit about today, I see no problem with the

13   Court receiving those exhibits and we will give them

14   consideration as may be appropriate.

15           MR. KELLY:  Thank you, your Honor.  No further

16   questions.  Thank you, Mr. Barca.

17           THE WITNESS:  Thank you very much.

18           MR. BROWN:  And we have no redirect.

19           JUDGE STADTMUELLER:  Thank you, Representative Barca.

20   I appreciate your taking the time to contribute to the Court's

21   decision-making process.  You may call your next witness or

22   recall Dr. Mayer as the case may be.

23           MR. POLAND:  Thank you, your Honor.  The Baldus

24   plaintiffs recall Dr. Mayer to the stand.

25

1          KENNETH MAYER, PLAINTIFF WITNESS, PREVIOUSLY SWORN

2          JUDGE STADTMUELLER:  Dr. Mayer, you may assume you're

3     under the same oath that you took earlier when you began your

4     testimony.

5          THE WITNESS:  Yes, your Honor.

6          JUDGE STADTMUELLER:  Mr. Poland, you may continue

7     with your questions.  Does the witness have all the exhibits

8     before him?

9          MR. POLAND:  I think he does, your Honor.

10          DIRECT EXAMINATION (Continued)

11     BY MR. POLAND:

12     Q  Dr. Mayer, have you reviewed Act 43 for purposes other than

13     how it treats Latino and African-American districts?

14     A  Yes, I have.

15     Q  And for what purposes have you reviewed it?

16     A  I reviewed Act 43 in terms of its compliance with

17     traditional redistricting principles.  In addition to equal

18     population I looked specifically at population movements, core

19     district retention, disenfranchisement and municipal splits.

20     Q  You just mentioned a number of different things.  Is that

21     what you were referring to when you used the term

22     "redistricting criteria"?

23     A  Yes, in terms of what I looked at.  There are some others

24     but that's what I focused on.

25     Q  Where does one find these traditional redistricting

1    criteria?

2    A   They -- depending on the state that one is in, they emerged

3    through the jurisprudence on redistricting that emerged after

4    the initial decisions in the 1960's in what's commonly known as

5    the Reapportionment Revolution, and these are standards that

6    the courts have fleshed out in terms of what -- what is

7    expected and what is considered the appropriate means of

8    conducting redistricting, in addition to the quantitative

9    requirement for equal population.

10   Q   And you mentioned around the country.  How about in

11   Wisconsin, where does one find these traditional redistricting

12   criteria?

13   A   Some of them are in the constitution.  Some of them are in

14   statutes.  A number of them were elucidated in the 2002

15   Baumgart decision, which set out a number of standards.  In

16   particular the constitution, Wisconsin constitution refers to

17   county ward, precinct or towns.  There are a number of other

18   types of municipalities in the state, including villages,

19   townships, cities, and the Baumgart Court made clear that they

20   interpreted this language to apply to municipalities generally.

21   Q   We'll get into each of the redistricting criteria that you

22   looked at specifically in a little more detail, but first let

23   me just ask you generally why did the traditional redistricting

24   criteria matter?

25   A   The redistricting criteria, in addition to the other

1  standards in Wisconsin, which are contiguity and compactness,

2  have to do with preserving the integrity of the

3  representational structure of geographically based districts.

4  For example, if one's only concern was equal population, it

5  would be possible, in fact, it would be -- with modern

6  computers it would be relatively trivial task to construct a

7  perfectly ideally populated district that ran from the Illinois

8  border all the way up to the northern edge of Wisconsin that

9  met the population equality of 57,444 for assembly districts,

10  but there's no possible way that that could be considered a

11  meaningful district in terms of representation of communities

12  of interest, the ability of a representative to travel around

13  and to facilitate contact with his or her constituents.

14     And so these other standards have the effect of giving some

15  flesh and bones to the fundamental basis of the equal

16  population, which is to ensure equal voting and equal

17  representation.

18  Q  Dr. Mayer, when you reviewed Act 43, did you identify any of

19  the traditional redistricting criteria that were particularly

20  important to your opinions in this case?

21  A  Yes, I did.  In looking at core district retention, I

22  examined not only the specific statistics of core district

23  retention but also the population movements that were

24  implemented in order to achieve a net population shifts up or

25  down necessary to bring Assembly and Senate districts into

1    rough equality.

2        I examined disenfranchisement, which in Wisconsin occurs

3    because we have staggered Senate elections in which even

4    senators from even numbered district are elected in

5    presidential election years and senators from odd numbered

6    districts are elected in midterm years.  And during

7    redistricting which occurs in 2011, early 2012, individuals who

8    are moved from an even district into an odd district lose their

9    right to vote in the 2012 Senate elections and they go six

10   years between Senate elections.

11       I also paid careful attention to municipal splits, not just

12   in terms of the total number of splits but focusing on the

13   particular set of examples that I concluded had no

14   justification that I could ascertain.

15   Q  Dr. Mayer, let's start with core district retention.  What

16   does that term mean?

17   A  As I mentioned earlier, core district retention is a measure

18   of the percentage of the population of a previous district that

19   is retained in a new district, and so it's a number between

20   zero and 100 that simply reflects the percentage of the

21   individuals who are preserved in the core of the existing

22   district as the boundaries are changed and as the districts are

23   reconfigured.

24   Q  Why is any population movement at all necessary as part of

25   the redistricting process?

1    A   Well, it's because the population changes that occur in the

2    decade after the previous redistricting people migrate, people

3    are born, people die, people move into the state, out of the

4    state, and all these population shifts invariably mean that the

5    differences in population that occur over the succeeding decade

6    always render the existing districts as having an unacceptably

7    high population deviation in terms of some districts having far

8    more people than other districts, and the deviations can be as

9    high as 50, 60, 70 percent, particularly when some parts of the

10   state grow faster than others or some parts grow and others

11   shrink.

12   Q   So it's necessary to rebalance the population after a new

13   decennial census?

14   A   Always.

15   Q   Dr. Mayer, as a general rule, how many people should be

16   moved as part of equalizing population?

17   A   Well, there's no specific threshold, but the general idea is

18   that you move people as necessary and that's in the interest of

19   preserving the core of the previous districts that you don't

20   move people arbitrarily or capriciously, which has the effect

21   of disrupting relationships between constituents and their

22   representatives and representatives and their constituents.

23   Q   Dr. Mayer, what did you do to examine core district

24   retention under Act 43?

25   A   Relied on reports that were generated by the mapping program

1   autoBound, which will produce a set report, it's one of the

2   standard reports that the program produces, which tells you for

3   each Assembly district or Senate district which pieces of old

4   districts are shifted into the new district, and from that it's

5   possible to calculate the percentage of the old districts that

6   are retained in the new district.  And most of the time that's

7   a straightforward calculation.  There are times when it can

8   become more complicated, but usually it's straightforward.

9   Q  Have you performed or prepared a summary of the analysis

10  that you performed of core district retention in Act 43?

11  A  Yes, I have.

12  Q  Dr. Mayer, I'd like to turn your attention to Exhibit 55 and

13  the Table 1 in your Exhibit 55.

14  A  It's Exhibit 2 to my expert report.

15  Q  Exhibit 2 in Exhibit 55.  Thank you.  Dr. Mayer, could you

16  please explain the analysis that you performed that's portrayed

17  in Exhibit 2 to your expert report.

18  A  This is a table that shows for each Assembly district

19  denoted in column 1, which is the number of the assembly

20  district, column 2 is the population of the 2002 districts

21  based on the census and taken in 2010.  Column 3 is the

22  population shift that would be required to bring the 2002

23  districts or to change the 2002 districts to bring them into

24  exact compliance with exact population equality of 57,442 --

25  444.  It's not necessary to achieve exact population equality.

1   Table 4 shows the actual population change that occurred in

2   each of those districts as the result of Act 43.

3       Tables 5 and 6 shows how that net population change was

4   achieved by showing the number of people who were added to a

5   district.  Column 6 shows the number of people that were taken

6   out of or shifted out of a district into a different district.

7   Those two numbers added together produce the number in

8   column 6, which is the total population shift.

9       In column 7 I divided the total population shift by the

10  population shift that would have been required to create exact

11  population equality, which produces a ratio, the number of

12  people who were shifted.  A ratio that -- a ratio of one

13  indicates that the same number of people were shifted in and

14  out as was necessary to achieve population equality, and the

15  larger that number gets, it signifies that more and more and

16  more people were shifted in and out as was necessary to achieve

17  population equality.

18  Q   Dr. Mayer, after performing the analysis that is set forth

19  in Exhibit 2 to your expert report, did you reach any

20  conclusions?

21  A   Yes, I did.

22  Q   And what conclusions did you reach?

23  A   My conclusion was that far more people were shifted in and

24  out of districts than was necessary in order to achieve

25  occupation population equality.  Over all for all assembly

1    districts it was approximately 50 times as many people moved as

2    was necessary, but there are some particularly notable examples

3    where the population shifts were wildly out of proportion to

4    what was required.

5    Q   Can you tell us what those examples are?

6    A   So if we could highlight Assembly District 24.  Right there.

7    So this is a district that was underpopulated by 379 people;

8    217 people were added.  So this district was probably close

9    enough to the ideal district population that it could have been

10   left alone, but the map drawers added 217 people to the

11   district.  They achieved that as seen in column 5 by moving

12   29,936 people into the district, moving out of the district

13   29,719 people, for a total population shift of 59,655, which

14   was 275 times as many people as was necessary in order to

15   achieve population equality.

16       If we continue down the table to Assembly District 60, which

17   is on the next page, Assembly District 60 was underpopulated by

18   ten people, which is essentially a population deviation of

19   zero.  So it could have been left entirely alone.  The effect

20   of the redistricting had the effect of removing 49 people from

21   the district, thereby taking it farther away from the ideal

22   population.  This net population decrease of 49 people was

23   achieved by moving 17,595 people into the district, moving

24   17,643 out of the district, for a total population shift of

25   35,237 people, which was 719 times as many people as was

1  necessary.  And then if we move down to --

2  Q  Dr. Mayer, if I could interrupt you before you go on.  With

3  the example that you gave of Assembly District 24, have you

4  seen any justification for the kind of population movement in

5  Assembly District 24 that you testified to?

6  A  I have not.

7  Q  Have you seen any justification for that kind of large

8  population movement?

9  A  I have not.

10  Q  Please continue.

11  A  If we go down to Assembly District 97, which is at the

12  bottom of this page, Assembly District 97 was underpopulated by

13  145 people.  So to bring it into exact population equality the

14  map drawers would have had to add 145 people.  The actual

15  redistrict in 97th Assembly District subtracted 20 people.  So

16  again, it was a net change of virtually zero.  They achieved

17  this change by adding 13,524 people into the district, shifting

18  13,544 people out of the district, for a total population shift

19  of 27,068 people, which was more than 1300 times as many people

20  as was necessary.  And, in fact, that number could very well

21  have been infinite because the actual population shift could

22  well have been zero.

23  Q  Have you seen any justification for that kind of a

24  population shift, Dr. Mayer?

25  A  I have not.  I should say that in reviewing the depositions

1   of the people who indicate that they drew the maps, they said

2   that their only concern as far as populations was equalizing

3   population.  But I -- other than that, which I don't see as a

4   justification for this degree of population shifts, I see

5   nothing else.

6   Q  Dr. Mayer, did you perform the same analysis for Senate

7   districts?

8   A  Yes, I did.

9   Q  And are those set forth in your expert report as well?

10  A  They are in Table 3.

11  Q  That would be Exhibit 3 on the next page?

12  A  Exhibit 3, that's correct.

13  Q  Which Senate districts did you examine for the population

14  shift?

15  A  I looked at them all.  The ones I would like to focus on are

16  the 2nd Senate district, which was underpopulated by -- well,

17  actually the signs in this table are reversed, so the minus

18  sign indicates that it was underpopulated.  In the actual

19  population change a minus sign indicates a population was

20  added.  The 2nd was underpopulated by 286 individuals.  They

21  added, map drawers added 414, and I'll skip to the chase.  The

22  total population shift was nearly 99,000, more than 300 times

23  as many people as was necessary.

24  Q  Dr. Mayer, have you seen any justification for the

25  population movement in Senate district 2?

1   A   I have not.  Another example is Senate District 17, which

2   was actually over populated by 58 people.  I'm sorry, yes,

3   overpopulated by 58 people.  The actual map subtracted 159

4   people -- no, it added a 159 people to it.  No, subtracted 159

5   people and achieved that by moving 39,173, for a population

6   shift of change ratio of nearly 700.

7       The other notable pattern occurred in the 21st and 22nd

8   Senate districts which Representative Barca testified, this was

9   the reconfiguration of those districts, and in the 22nd Senate

10  district, for example, it was only necessary to subtract 7,686

11  people.  That shift was achieved by adding 66,837 people, and

12  I should note that all of these population changes between the

13  21st and the 22nd occurred only between those two districts.

14  The configuration of the two districts together did not change.

15      And in Senate District 22, there were 74,586 people moved

16  out.  These were all moved into the 21st Senate district,

17  thereby losing their right to vote in 2012, which represents a

18  total that is 18.4 times as large as the population shift

19  required.  Similar calculation for the 21st shows that the

20  population shift was 25 times as large as was necessary.

21  Q   Dr. Mayer, have you seen any justification for the

22  population shifts in Senate District 17 or in 21 and 22?

23  A   In 17 I have not.  The only justification offered in the

24  evidence that I examined for 21 and 22, Senate Districts 21 and

25  22 was the desire of the map drawers to place the cities of

1  Racine and Kenosha into the same Senate district.

2  Q  Did you -- were you present before for Representative

3  Barca's testimony?

4  A  Yes, I was.

5  Q  And did you hear his testimony about Racine and Kenosha

6  being in the same Senate district?

7  A  I did.

8  Q  Do you have any opinions about Racine and Kenosha being in

9  the same Senate district?

10  A  I agree with Representative Barca.  I was able to form my

11  own impressions as the result of the work I did in the

12  litigation between -- for the city of Kenosha.  I spent a good

13  deal of time speaking with the elected leaders, members of

14  Common Council and other people in the city, and they simply do

15  not see themselves as having anything in common with the city

16  of Racine.  There's quite a bit of rivalry.

17          MR. KELLY:  Your Honor, excuse me.  I'll object to

18  that based on hearsay.  He's not a representative.

19          MR. POLAND:  I believe experts can rely on hearsay,

20  your Honor.

21          JUDGE STADTMUELLER:  Certainly, and again, subject to

22  the Court's earlier admonition about this sort of thing, there

23  is bit of a distinction with Dr. Mayer, because as Mr. Poland

24  correctly notes, he is entitled to rely on matters that serve

25  as the foundation for his opinions.  So it is all noted and

1   will be duly considered as appropriate.

2            MR. POLAND:  Thank you, your Honor.

3   BY MR. POLAND:

4   Q  Dr. Mayer, after reviewing the core district retention of

5   Assembly and Senate districts under Act 43, have you reached

6   any opinions?

7   A  Well, I should say that in addition to the population

8   shifts, I did perform the calculations which calculated the

9   actual population core retention for each of the districts,

10  some of which is shown in Exhibit 4 to my report, Exhibit 55,

11  but there are also some corrections that I made, which I don't

12  know which exhibit they are.  I'll find it in a moment.  I did

13  go back and revisit these calculations because I concluded --

14  Q  Is that Exhibit 1020, Dr. Mayer?

15  A  Yes.  After seeing, reviewing Professor Gaddie's report, the

16  calculations and noting that his numbers for core district

17  retention were very different than mine in a number of

18  districts, I investigated and spent some time trying to assess

19  whether I had done these calculations correctly.  Usually this

20  occurs when there is a significant change or sometimes

21  districts are renumbered and then you don't have a core

22  population from an old district of the same number and you have

23  to examine them to see which was the largest population core

24  that existed and these show my spreadsheet which went through

25  and looked at each of the cases where my numbers and

1  Professor Gaddie's numbers were different and assessment of

2  which -- which number was correct.  Sometimes I concluded that

3  Professor Gaddie was correct, sometimes I concluded that my

4  calculations were correct, and my handwritten notes about why

5  I had reached the conclusion about which numbers needed to be

6  corrected.

7  Q  Dr. Mayer, does Exhibit 1020 set forth any of your opinions

8  on the issue of core population retention or core district

9  retention?

10  A  Yes.  When I performed these calculations I submitted

11  corrected pages to my report which are set out on page 12 of my

12  expert report in the second and third full paragraphs.  I noted

13  that the simple mean of the core population for each district

14  was 64.8 percent, indicating that overall less than two-thirds

15  of the core of each district had been retained.

16    By way of comparison, the 2002 Baumgart plan indicated that

17  the core retention in the district, redistricting plan there,

18  the Court noted that they had achieved a 77 percent core

19  population retention, although there is some ambiguity there

20  because it's not clear from the language of the opinion whether

21  that refers only to Assembly district or the Assembly and

22  Senate districts combined.

23    I also noted that the core population for Senate districts

24  is significantly higher at about 79 percent and that there were

25  significant differences between the core retention of

1  Democratic versus Republican districts based on the party of
2  the incumbent who was elected in 2010.
3  Q  Dr. Mayer, for the Assembly and Senate districts that you
4  specifically identified before, do you have any opinions as to
5  the core population retention in those districts?
6  A  It was significantly lower than it needed to be.  There are
7  a number of other cases where districts that needed to shed
8  population, such as the 27th Senate district which needed to
9  lose 25,000 people because that district is in western Dane
10 County, which is an area of substantial population growth.
11 Instead of simply putting 25,000 people into another district,
12 there were many, many times as many people moved, and I can
13 look at the exact figures from my Table 3.  So in Exhibit or
14 Table 3, Exhibit 3 of -- on the 27th, it needed to shed 25,541
15 people.  That net population shift was achieved by adding
16 69,372 individuals, shifting nearly 95,000 people out, for a
17 net shift of 164,169, which is close to the population of the
18 Senate district, which was more than six times as many people
19 that needed to be moved in a district that simply needed to
20 lose population.
21 Q  Dr. Mayer, overall, do you have an opinion as to whether
22 Act 43 adhered to traditional redistricting criterion that core
23 population of districts be retained?
24 A  Yes, I do.
25 Q  What is that opinion?

1   A   That it did not adhere to that, not only in terms of the

2   overall average but in terms of the wild swings that occurred

3   in a number of districts.

4   Q   Dr. Mayer, I'd like to move on to the second top that you

5   mentioned in the core redistricting -- I'm sorry -- in the

6   traditional redistricting criteria and that's the topic of

7   disenfranchisement.  What do you mean when you use the term

8   "disenfranchisement"?

9   A   Well, it's a something that happens whenever you have

10  staggered Senate elections where one-half of the districts are

11  elected in one year the other half, or in the case of Wisconsin

12  it's 16 and 17, are elected in an intervening year, that people

13  who are moved in the case of Wisconsin from an even numbered

14  Senate district or shifted from an even numbered Senate

15  district into an odd numbered Senate district, if they had not

16  been shifted they would be able to vote in the 2012 Senate

17  elections.  Because they are shifted they have to wait until

18  2014 to cast their next vote in a regular Senate election.

19  Q   Dr. Mayer, is it possible to avoid this disenfranchisement

20  in all instances?  In other words, can you ever have a

21  situation where no one is disenfranchised as a result of

22  redistricting?

23  A   You cannot.

24  Q   And that's because you're moving people from one district to

25  another?

1    A  Yes, and there's going to be some population movement that

2    is inevitable.  To give just one example, there's a Senate

3    district in the northwest part of the state, which is the 10th

4    Senate district, which is just across the border from the

5    Twin Cities.  That has a population that I believe needed to

6    lose 20,000 people, so you needed to shift 20,000 people out.

7    The only possibilities were there were three Senate districts

8    that contacted the 10th and they were all odd numbered Senate

9    districts.  So there was nothing you could do.  You had to move

10   people out, and so simply because of the existing structure of

11   the districts, there were 20,000 people for which there was no

12   alternative but to move them into an even numbered Senate

13   district -- or an odd numbered Senate district.

14   Q  Dr. Mayer, are there limits on the number of people who can

15   or who can or should be disenfranchised?

16   A  Well, it would be possible to disenfranchise as much as half

17   the population of the state if you simply renumbered all the

18   districts.  So you converted all the even numbered districts to

19   odd numbered districts and all the odd to the even.  So that's

20   the upper limit, but in no sense would that be justifiable and

21   as the Baumgart Court clearly stated that the number of people

22   so disenfranchised should be minimized.

23   Q  Dr. Mayer, have you evaluated Act 43 from the standpoint of

24   voter disenfranchisement?

25   A  Yes, I have.

1    Q   What have you done?

2    A   I examined the -- I believe it's Table 28.

3    Q   And that's Table 28.  I believe that's in the pretrial

4    report.  It should also be in the binders, your Honors.

5              JUDGE WOOD:  What number are we?

6              MR. POLAND:  Table 28.  It's in the pretrial report.

7    It should be under the tab that is labeled 28.

8    BY MR. POLAND:

9    Q   Dr. Mayer, would you please explain Table 28 briefly?

10   A   This is a table that shows for every odd numbered Senate

11   district the number of persons shifted into that district from

12   an even numbered district.

13   Q   Dr. Mayer, if I could stop you there.  I note that this is

14   only for Senate districts.  Did you perform the same analysis

15   for Assembly districts?

16   A   I did not.

17   Q   Why not?

18   A   Because the Senate, the Assembly districts don't pose the

19   same potential for disenfranchisement because every member of

20   the Senate is elected in each two-year cycle.  So irrespective

21   of what Assembly district you are shifted into or out of, you

22   retain the right to vote in the next cycle.

23   Q   I interrupted you as you were explaining.  Please continue.

24   A   This is a table that shows for each odd numbered Senate

25   district the number of people who were shifted into that

1    district from an even numbered district, thus losing their
2    right to vote in 2012.  You add up the number of people so
3    disenfranchised.  It reaches a total of 299,639 people.
4    Q  Dr. Mayer, as a result of your work reflected in Table 28,
5    have you formulated any opinions on the topic of
6    disenfranchisement?
7    A  Yes, I have.
8    Q  What is your opinion?
9    A  That this number is significantly higher than it could have
10   been and should have been.
11   Q  Do you have any specific examples?
12   A  Yes.  The two instances which together make up over a third
13   and close to a quarter of -- actually almost half of the people
14   who were disenfranchised occurred in the 21st and 27th Senate
15   district.  In the 21st, that population shift of 72,431 people,
16   every one of those people was moved into the 21st from the 22nd
17   Senate districts.
18   Q  And again, we're talking those are the same Racine and
19   Kenosha districts that Representative Barca was testifying
20   about before?
21   A  That's correct, but it shifted from a county level basis of
22   Senate representation to the Senate District 22 comprising the
23   city of Racine, extending down to the city of Kenosha and then
24   leaving the rest of two counties, shifting them to Senate
25   District 21.  And that occurred because of the significant

1    reconfiguration of those districts.

2        Senate District 27 is another example where the population

3    shift into that district seems unwarranted, because as I noted

4    earlier, that was a Senate district that needed to shed 25,000

5    people.  There was no need to move anybody into that district,

6    and even accepting that in the normal course of redistricting

7    that there will be some residual populations that occur because

8    of ripple effects and so forth, I can't see any justification

9    for moving 49,000 or nearly 50,000 people into that district.

10   And they came from, I believe, either Senate District 27 or

11   Senate District 14.  Those two districts alone are nearly

12   122,000 people, which is 40 percent of the number of people

13   disenfranchised.  If those two problems or those two particular

14   configurations were altered, the number of people

15   disenfranchised would have been in the range of 160,000.

16   Q  Now, Dr. Mayer, you refer to voters who were removed from

17   Senate District 22 to 21 as being disenfranchised by Act 43;

18   correct?

19   A  That's correct.

20   Q  But didn't some of those voters get to vote in a recall

21   election in August 2011?

22   A  Yes, the -- some of them did, that's correct.

23   Q  So they didn't really lose the right to vote, did they?

24   A  Well, that depends on the assumption that the right to vote

25   in a recall election is the equivalent of the right to vote in

1    a regular Senate election, and that's an argument that

2    Professor Gaddie makes and I do not find it persuasive.

3    Q   Why do you not find it persuasive?

4    A   Two reasons.  One is that the recall elections occur in a

5    very specific political context that renders them very

6    different from regular elections.  They occur or up until 2011

7    they had occurred infrequently.  They are by their nature

8    unpredictable.  They occur at a much shorter time frame, the

9    campaign process is compressed, and in my view the right to

10   exercise the right of recall, which is guaranteed under the

11   Wisconsin constitution, should not mean that you can deprive

12   people of another right, which is the right to vote in Senate

13   elections every four years.

14        The second reason, which actually is an extension of the

15   different context, is that in the Senate recall elections that

16   occurred in the spring and summer of 2011, this occurred in the

17   context of enormous state controversy over the budget and

18   legislation affecting the collective bargaining rights of

19   public employees and teachers.  The control of the Senate was

20   very much in contest because it would have taken a net shift of

21   I believe three Senate seats to shift partisan control of the

22   Senate.  Spending, according to data collected by the Wisconsin

23   Democracy Campaign concluded that somewhere in the neighborhood

24   of $40 million had been spent on these nine elections, which

25   positively shattered previous records.

1    Even given all of that, the tremendous attention, the amount
2    of money, the stakes of these elections, turnout in the nine
3    recall elections was overall about 35 percent lower than it was
4    in 2008, even accounting for the fact that two of the senators
5    who ran in recall elections were actually unopposed in 2008.
6    So there's -- even with all the characteristics of the
7    elections, there was significantly lower turnout and
8    significantly less voter interest in the elections.
9    Q  Dr. Mayer, when there are voters who move from one Senate
10   district to another, does that do anything with respect to the
11   relationship of the number of times that one voter gets to vote
12   versus another voter?
13   A  Yes.  If you happen to be shifted from an odd numbered
14   Senate district into and even numbered Senate district, you
15   wind up with the right to vote in two successive Senate cycles.
16   So if you were in the 21st Senate district in the city of
17   Racine and you're shifted into the 22nd, you get to vote in
18   2010 for Senate, you get to vote in 2012, and so you get an
19   extra vote in a two-year cycle that those who were shifted from
20   an even to an odd district don't get.  So no matter how you do
21   it, some people are deprived of the right to vote and other
22   people get an extra vote.
23   Q  Dr. Mayer, turning your attention back to the 27th Senate
24   district, how many voters were disenfranchised as a result of
25   the move into that district?

1    A  49,867.

2    Q  Now, did any of those voters get to vote in the recall

3    elections?

4    A  No.

5    Q  And why is that?

6    A  Because there was no recall in the 26th or 14th Senate

7    districts.

8    Q  So even if you were to consider voting in a recall election

9    to be the same as a regular election, those 50,000 people still

10   lost their right to vote for six years?

11   A  That's correct.

12   Q  You mentioned some criticisms raised by Dr. Gaddie to your

13   opinions; correct?

14   A  Correct.

15   Q  And did Dr. Gaddie have any opinions that you reviewed and

16   you analyzed with respect to process -- with respect to

17   disenfranchisement in other states other than Wisconsin, that

18   is?

19   A  Yes.  In his rebuttal report Professor Gaddie produced a

20   table that compared the percentage of voters disenfranchised in

21   Wisconsin to five other states, Oregon, Missouri, Ohio,

22   Oklahoma and California.  And he argued that because in that

23   ranking of states which have similarly staggered elections,

24   that the percentage of people disenfranchised in Wisconsin was

25   actually lower than the rate in four of the other five states,

1    all except for Oregon -- Oregon, not the city, the state --

2    which had a disenfranchisement rate of approximately 3 percent,

3    I believe.

4    Q  And what is your opinion, Dr. Mayer, of the argument that

5    Dr. Gaddie had set forth on that point?

6    A  I think those comparisons are in opposite.

7    Q  Why is that?

8    A  In large part because in three of the states, Missouri, Ohio

9    and California, then use radically different mechanisms for

10   conducting their redistricting.  They -- California actually

11   because of a referendum no longer leaves it in the hands of

12   legislature.  They have a Citizens Redistricting Commission,

13   but both Ohio and Missouri use a form of commission which is

14   either -- in the case of Ohio it's a commission, I believe,

15   headed by the secretary of state and the governor.  They are

16   the group that drafts the plan, which is then submitted to the

17   legislature.  And in Missouri it is similarly the plans are

18   drawn by not -- it's not necessarily an independent commission

19   but they are drawn by someone other than the legislature,

20   leaving it to the legislature for final approval.  But

21   California takes that out of the legislature's hand entirely.

22   Q  Dr. Mayer, did you bring with you an example of what

23   California does in the area of redistricting?

24   A  Yes.  I examined California's redistricting, Citizens

25   Redistricting Commission, which is produced at Exhibit 204, and

this is the final report that the commission produced which describes its procedures, its criteria. And in particular on page 25 of the report they present their analysis of the effects of what they called deferred voting.

And I should preface this by saying that in California the referendum that established the Citizens Redistricting Commission established a different set of criteria that is normally used. In effect, the California Redistricting Commission was charged with de-gerrymandering a state legislative redistricting scheme that had become egregiously gerrymandered over the previous decades and they were forced because of the statute or actually constitutional amendment to radically reconfigure many of the districts in the state, and that would necessarily, when you're forced to fundamentally reconfigure districts, that's naturally going to lead to a higher number of people who were disenfranchised when you have staggered elections.

But in the middle of page 26, which is the last paragraph in Section 8, numbering of districts, the commission said that they did seriously consider alternative numbering systems for the Senate districts, such as a simple north-to-south consecutive numbering scheme, but made the determination that an approach that minimized deferrals would result in the most fair and effective representation for voters throughout the state, which I take to mean that they chose the map which based

1   on the parameters with which they had to work which

2   disenfranchised the fewest number of voters.

3   Q   Thank you.  Dr. Mayer, did you also review the percentage of

4   voter disenfranchisement statewide under Act 43?

5   A   Yes.  It was approximately 5.24 percent.

6   Q   How does that compare to voter disenfranchisement under

7   previous redistricting efforts in Wisconsin?

8   A   It was significantly higher than in 2002.  And it was almost

9   exactly equal to the percentage of voters disenfranchised as a

10  result of the 1992 Prosser decision in which a Court also

11  performed the redistricting process when the legislature was at

12  an impasse.

13  Q   Dr. Mayer, in your opinion is the 5.24 percent

14  disenfranchisement rate under Act 43 acceptable under the

15  traditional redistricting criteria?

16  A   It is not for two reasons.  One is that while some

17  disenfranchisement is inevitable, there were several obvious

18  instances where the legislature, where the map drawers,

19  I should say, made decisions which had the immediate effect of

20  disenfranchising many, many people who simply didn't need to be

21  disenfranchised.

22      The other is that simply looking at the percentages take no

23  notice of fact that between 1990, which is what the 2002

24  redistricting was based on and the -- this Act 43, that the

25  population of the state had grown.  And so even looking at the

1   precise equivalents in the percentages, it had the effect of

2   disenfranchising an additional, I believe, 30,000 individuals.

3   Q  Dr. Mayer, do you have an overall opinion on how Act 43

4   fared with respect to the traditional redistricting criterion

5   of disenfranchisement?

6   A  Yes, I do.

7   Q  What is that opinion?

8   A  It did not adhere to those criteria by simply not minimizing

9   the number of people who were disenfranchised.

10  Q  Dr. Mayer, I'd like to move on to the final area of

11  traditional redistricting criteria that you reviewed, and that

12  is the area of municipal splits.  You identified the subject

13  matter of municipal splits as a traditional redistricting

14  criteria.  What are we talking about when we talk about

15  municipal splits?

16  A  Well, we're talking about the criteria in which one attempts

17  to minimize the number of local jurisdictions, whether county

18  or municipality.  It also applies to wards, but usually wards

19  are not split.  And the idea there is that these subunits of

20  state governments, they are there for a reason.  The counties

21  and cities have their own distinct political culture and

22  economic and social interests.  They form a community of

23  interest, and that ought not to be split by dividing it into

24  separate Assembly or Senate districts when it's not necessary

25  to do so.

1  Q  So is it prohibited, does the constitution prohibit the

2  legislature from splitting municipalities when it redistricts?

3  A  I would say no, but there is a very clear admonition again

4  coming from the Baumgart Court that such splits should be

5  minimized and should only be done where necessary to achieve

6  other goals, especially equal population.

7  Q  Dr. Mayer, did you review Act 43 to determine whether any

8  municipalities were split between Assembly districts or Senate

9  districts unnecessarily?

10  A  I did.

11  Q  And what did you find?

12  A  I found that although the total number of splits of county,

13  municipality, villages and so forth was, in fact, exactly equal

14  to the total number of splits from the 1992 Court-drawn plan,

15  and in that sense it wasn't exceptional, there were several

16  instances of particular municipal splits that did not appear to

17  me to be justified on the basis of the need to achieve equal

18  population because they involve small towns, small cities that

19  could easily have been fit into a single Assembly district and

20  in one case had been in a single Assembly and Senate district,

21  as best as I can determine, for at least a hundred years and it

22  may have been as far back as the creation of the state of

23  Wisconsin.

24  Q  Dr. Mayer, what municipalities are we talking about?

25  A  We're talking about the city of Beloit, which was split

1   between two Assembly and Senate districts, and the city of
2   Marshfield, which was split between two Assembly and two Senate
3   districts.
4   Q  Now, how about Beloit?  How was Beloit split?
5   A  Beloit is basically split right down the middle.  Beloit had
6   population based on the 2010 census of approximately 39,000
7   people, which easily could have been fit into an Assembly
8   district.  And even if it had been split into two Assembly
9   districts, there is no justification that I could see for
10  splitting it between two Senate districts.  Fitting a town of
11  39,000 people into a district of 172,000 should not have been
12  an issue.  And it's notable because it quite literally splits
13  the city right down the middle.
14  Q  Do you know whether Beloit had been in the same Assembly
15  district for some period of time before?
16  A  It had been split in the 1983 redistricting plan.  It was
17  reunited by the Court-drawn plan in 1992 and had been in the
18  same Assembly district from that point until Act 43.
19  Q  Were there any other municipalities that you reviewed from
20  the standpoint of municipal splits?
21  A  In my view, the most inexplicable municipal split occurred
22  in the city of Marshfield, which is in the north central
23  Wisconsin.  The city of Marshfield has a population in 2010 of
24  approximately 19,000 people, which was only about 5 percent
25  larger than its population in 2000.  I compared -- I examined

1  using the bluebook previous redistricting configurations from

2  the 2000, nineties, eighties, and seventies, and going back to

3  the 1950's when the maps and the bluebook are no longer of

4  sufficient resolution to allow for a complete analysis of how

5  municipalities might be split, but at that point in the 1950's

6  Assembly districts in Wisconsin were apportioned on the basis

7  of counties.  So an Assembly district was either an entire

8  county or a part of a county.

9      And the city of Marshfield sits on the very northern border

10  of Wood County and there are actually a couple of minor little

11  parts of the city that have grown into Marathon County, which

12  based on the pre-1960's apportionment mechanism might have put

13  it into two Assembly districts.  But I obtained a map from the

14  city administrator in Marshfield that compare the city in 2012

15  to what the city looked like in 1959, which was the earliest

16  map I was able to obtain.

17  Q  Dr. Mayer, is that map at Exhibit 169?

18  A  Yes, it is.

19  Q  And what did you -- what did you draw from Exhibit 169?

20  A  Well, let me make one line here.  This -- well, no, that's

21  not it.  This is the line where Wood County is to the south and

22  Marathon County is to the north and the yellow area of the city

23  was the city as it looked in 1959.  The gray areas of the city

24  are those that were added to the city or annexed by the city

25  between 1959 and 2012.  And so I inferred from this that as

1    long as -- during the period when Wisconsin apportioned the
2    Assembly districts on a county basis, that the city of
3    Marshfield was almost certainly in the same Assembly district
4    because it's on the very northern border of a county and it had
5    been in the same Assembly districts from the 1960's through
6    Act 43.
7        And I deduced from this or concluded from this that the city
8    had been in the same Assembly districts for as long as anyone
9    can determine.  The city administrator I spoke to said that he
10   believed it was at least a century and I'm not sure when the
11   city was actually founded, but I'm not sure there had ever been
12   a time before Act 43 when the municipality was split.
13   Q  Dr. Mayer, how did the city of Marshfield fare under Act 43?
14   A  I show the municipal split in Marshfield in Exhibit 177.
15   And again, this shows the 23rd and 29th Senate district, which
16   implies that the city is also split between two Assembly
17   districts.  And you can see that the Senate District 29 reaches
18   in and carves out essentially the southeast quadrant of the
19   city, which has by my estimation probably on the order of
20   between five and 7,000 people, assuming that the -- it may
21   actually be less densely populated than that.  In here the red
22   line indicates the municipal boundary and also the Assembly
23   district boundary in plans that existed prior to Act 43.
24   Q  Dr. Mayer, would it have been possible to include all of
25   Marshfield in one Assembly district and a single Senate

1    district?

2    A   In my view it ought to have been a trivial matter to find a

3    way to not split the city of Marshfield and find the four or

4    five or 6,000 people that apparently -- in fact, I'm not even

5    sure Senate District 29 needed to add people, but given the

6    distribution of population, this is not a densely populated

7    area, I can see to justification for this split.

8    Q   Dr. Mayer, other than the constitutional preference for

9    avoiding municipal splits, is there any harm to municipalities

10   when they're split between Assembly or Senate districts?

11   A   Well, as Representative Barca pointed out, when you split

12   and in the case of the county of Kenosha and the county of

13   Racine, you divide the attention of administrators or

14   legislators.  So instead of having a single legislator or two

15   legislators, one in the Assembly, one in the Senate -- and the

16   city of Marshfield has some very distinct industries.  It's got

17   an large healthcare and hospital and there's some paper and

18   heavy industry.  You now have to deal with four legislators

19   whose attention will be divided because the city comprises a

20   much smaller fraction of their overall constituency.  It also

21   imposes concrete costs on municipalities because they now have

22   to administer -- the number of elections they have to

23   administer double and the number of ballots.  And in the case

24   of Marshfield I'm not sure if they had already completed their

25   ward drawing process before Act 43 was enacted, but they may

1  have had to redraw their ward boundaries, which can require

2  moving polling places.  And I know from talking to the city

3  administrator that they regard this as a significant burden

4  just on the concrete cost of the administrative consequences of

5  the split just for elections.

6  Q Dr. Mayer, after reviewing the way that Act 43 splits

7  municipalities, have you reached any opinions?

8  A Yes, I have.

9  Q And what are those opinions?

10 A That at least in these two cases, and I should note in

11 reviewing the testimony of the people who drew the map, not

12 only did they offer no specific justification but they couldn't

13 even remember who made the decision.  So it's not at all clear

14 why these splits existed, and I concluded that there was no

15 justification that I could see for these particular splits.

16 Q Dr. Mayer, one final question.  Your testimony today, the

17 opinions that you've rendered, have you stated all those

18 opinions to a reasonable degree of scientific certainty?

19 A Yes, I have.

20      MR. POLAND:  Thank you.  No further questions at this

21 time.

22      JUDGE STADTMUELLER:  All right.  Thank you,

23 Mr. Poland.  Mr. Kelly?

24

25

1          CROSS-EXAMINATION

2     BY MR. KELLY:

3     Q   Good afternoon, Dr. Mayer.

4     A   We shall see, I suppose.

5     Q   Yes, we shall.  I think this will be pleasant.  I want to

6     pick up a little bit on what you said about traditional

7     redistricting principles.  Obviously you and I have had an

8     opportunity to discuss this before in deposition, and I believe

9     you told me at that point that you considered these things,

10    these factors to be traditional redistricting principles.  You

11    mentioned equal population, contiguity, compactness, respect

12    for local political subdivisions, maintaining communities of

13    interest, following federal law, preserving core district

14    population, not shifting too much population, and to

15    disenfranchise a minimum number of voters.  Do you recall that

16    discussion?

17    A   I do.

18    Q   Okay.  And there was -- we also talked about how those

19    factors interplay, because when you draw a map, if you -- if

20    you're paying particular attention to one traditional

21    redistricting principle, it's going to have an effect on

22    others; isn't that true?

23    A   That's correct.

24    Q   Okay.  So when -- when we focus on one particular area,

25    let's say core retention, that's going to have adverse effects

1    potentially on other factors that the map drawers should take

2    into account when they're making a new legislative district

3    map.

4    A  It's possible, yes.

5    Q  Now, within that and putting equal population to one side

6    for a moment, because that's what redistricting is all about,

7    is getting to equal population.  Let's set that aside for a

8    moment.  The remaining factors that you described as

9    traditional redistricting principle, there's no agreement in

10   the -- in political science as to a ranking of those factors,

11   is there?

12   A  I don't think that's correct.  I think you can rank them in

13   terms of broad categories, although, for example, adherence to

14   the Voting Rights Act has got to be close to the top.

15   Q  Certainly.

16   A  But once you get down to things like, you know, core

17   retention and splits and so forth, I would say you're correct

18   that there's no universal agreement on how they should be

19   ranked and which ones should be considered more important than

20   the others.

21   Q  Good.  Well, let's go with that.  We'll say -- we'll take

22   equal population and we'll take compliance with the Voting

23   Rights Act and we'll say those two, they -- they're definitely

24   at the top of the list, and then the factors below that,

25   there's no recognized agreement in the hierarchy that they

1    have.

2    A  I would say that's largely correct.

3    Q  Okay.  Now, Dr. Mayer, I think we talked about this in the

4    deposition.  You didn't actually draw a map for the entire

5    state of Wisconsin that would incorporate all of the principles

6    that Mr. Poland has spent so much careful time going over with

7    you.

8    A  That's correct.

9    Q  So you don't really know how a complete map would look

10   trying to account for all of those competing interests in

11   redistricting.

12   A  Well, in some cases I could.  To take two examples, the

13   configuration, the collective configuration of the Senate

14   Districts 21 and 22 didn't change at all.  It was simply

15   reconfigured within an existing boundary which had no ripple

16   effects.  So although I did not examine every district to see

17   whether it was possible to reconfigure it, although there are

18   virtually an infinite number of ways that a particular map can

19   be configured, I was able to make some determinations.

20        Another example is how Assembly Districts 8 and 9 were

21   reconfigured, that the orientation of those districts changed

22   because of an amendment to the redistricting plan which changed

23   them from a north-south orientation to the -- I'm sorry, the

24   east, the 8th on the top and the 9th on the bottom to the 9th

25   on the west and the 8th on the east.

1    So although you're correct that having not drawn a

2    comprehensive map for the state, I don't believe that means

3    that I'm unable to render an opinion on the parts of the state

4    that I looked at.

5    Q  Well, let's take a look at that a little bit further, and

6    you mentioned Senate Districts 21 and 22, Assembly Districts 8

7    and 9, and those just seemed to be a reorientation of the

8    districts within essentially the same boundaries.

9    A  That's correct.

10   Q  All right, but with the -- with respect to the rest of the

11   communities and factors that you looked at around the state,

12   you've not taken a holistic look at that.  You've looked at

13   individual spots.  Yes?

14   A  That's correct.

15   Q  All right.  And we know that making certain decisions in one

16   part of a map are going to have branching consequences

17   I believe is the term that you used.

18   A  That's correct, but there's going to be limits to that, that

19   a decision that you make in the, for example, the southwest

20   corner of the state, while it may have ripple effects in that

21   area, you wouldn't expect to see those effects carrying through

22   large distances to the father north and the far northeast and

23   so forth.  So there are limits to that, and --

24   Q  Well, let me stop you right there for a moment.

25        MR. EARLE:  Your Honor, we have an interruption.

1    I think the deponent should be allowed to finish his answer.

2    Is that okay?

3            JUDGE STADTMUELLER:  I understood him to have

4    finished but if you haven't, Dr. Mayer --

5            THE WITNESS:  I actually lost my train of thought.

6    I'm sorry.

7    BY MR. KELLY:

8    Q  Well, I am sorry.  All right.  Perhaps you'll pick it up as

9    I ask the next question.

10   A  Oh, I remember.  Can I elaborate?

11   Q  Certainly.

12   A  In the areas that I looked at these were not areas of the

13   state where one saw dramatic growth and these were areas that

14   had previously been encompassed in a single Assembly district,

15   and I deduced from examining those areas that I don't think it

16   would have been a difficult problem to reconfigure the

17   districts in those areas.  Yes, you may have lost something

18   with compactness.  You may have lost not necessarily core

19   retention but I think that those particular problems were

20   eminently solvable.

21   Q  And certainly if you looked at that isolated event, then if

22   it should be the map drawers' decision to address the factors

23   that you chose to focus on, it probably wouldn't be that hard,

24   but the map drawers for Acts 43 and 44, they didn't have that

25   luxury, did they?  They had to draw an entire state map.

1   A  That's true, but as I understand the process, the way that

2   it worked is that each of the map drawers took a region of the

3   state.  So I'm not even sure if it's correct to say that the

4   map drawers themselves drew a comprehensive map.  They divided

5   the state up into regions and then matched them up.

6   Q  And when you divide them up into regions, the decisions you

7   make on where to start, what factors to concentrate on, those

8   are going to affect the decisions that are made later in

9   working the rest of the way through that region.  Wouldn't that

10  make sense?

11  A  Well, there's also a process point that the boundaries of

12  the regions you choose to focus on are going to have a

13  significant effect on how the districts look within that

14  region, and again I'm not aware of the specific boundaries that

15  are used, but if you attempted to draw Senate districts in one

16  quadrant or one-third of the state with the expectation that

17  there would be minimal or no spillover into other areas, that

18  would significantly affect the decisions that you made within

19  that region which you might not have had to make had you

20  started in one spot and continued through to the rest of the

21  state.

22  Q  All right.  But in point of fact with respect to this map,

23  you don't -- you can't really say because you didn't go through

24  that exercise.

25  A  Well, I believe I can make an inference about the

1  consequences of dividing it up by region, although you're
2  correct, I did not go through the process of drawing a
3  statewide map.
4  Q  And you -- we discussed this before, you said that, that the
5  effect of these different redistricting principles on each
6  other is cumulative.  For instance, you said I would say that
7  the effect is cumulative, that if you start drawing a map in
8  this place, you'll make certain decisions because you will stop
9  and conclude that you've achieved a proper population or
10  sufficient population that's within your goals for achieving
11  population equality, and then you start the drawing the next
12  districts and the next district off of that, and the decisions
13  you make early in the process are going to affect what happens
14  throughout the process; right?
15  A  That's correct.
16  Q  Okay.  And then I asked you is that the case here, small
17  changes made in the beginning can affect major changes later
18  on.  Do you recall that you answered, well, certainly as a
19  conceptual basis they can.  That's true, isn't it?
20  A  Sounds correct.
21  Q  As you continued your answer, you said it's very clear to me
22  that at virtually every stage of the process you have, the
23  decisions will branch.  You can decided to go off in one
24  direction and go off into another and maybe four or five
25  different decisions and those decisions will have an impact on

1  what happens later on in the process.  And that's all true,
2  isn't it?
3  A  That's correct, although I should say that the branching
4  decisions that occur later on down the road, those are not
5  fixed.  You can make different decisions at every point in
6  process based on which branch of the process you wish to go
7  down.
8  Q  And in fact, the decision also you can make are nearly
9  infinity.
10  A  That's correct.
11  Q  Now, you do understand, Dr. Mayer, that it is first and
12  foremost, as the Court has reminded us several times since the
13  beginning of the case, the legislature's responsibility and
14  purview and privilege to make those decisions?
15  A  I would say it's the legislature's constitutional power to
16  make that decision.
17  Q  And they, therefore, then have the right to make those
18  decisions.
19  A  I suppose that's correct.
20  Q  Let's talk about some of the specific traditional
21  redistricting principles that you went through with Mr. Poland.
22  I'd like to start with compactness.  Now, could we take a look
23  at Exhibit 1021?
24          MR. POLAND:  Your Honor, if I could object, we did
25  not go over compactness.  Dr. Mayer's not expressed any

1    opinions on compactness.

2            MR. KELLY:  Then we can skip that.  Thank you,

3    Mr. Poland.

4    BY MR. KELLY:

5    Q   And similarly, I don't believe that you've expressed any

6    opinion on whether the population of the districts exceeds any

7    boundaries?

8    A   That's correct.

9    Q   So you have no problem with equal -- the allocation of

10   population in the districts?

11   A   That's correct.  In terms of the numbers, I should qualify

12   that.

13   Q   We'll talk about the other aspects shortly.

14   A   Okay.

15   Q   All right.  So let's talk about population movement, and

16   that's closely related to the concept of the core retention,

17   isn't it?

18   A   That's correct.

19   Q   And, in fact, it's nearly two sides of the same coin.

20   A   Yes, that's true.

21   Q   Okay.  And that's one of those concepts, you identified

22   those as being part of the traditional redistricting

23   principles.

24   A   Correct.

25   Q   And those are in the classification where there's no

1   agreement in political science about how those relate to each
2   other in a hierarchy.
3   A  Well, again, I don't think that you can specifically rank
4   order them, but I think there is an agreement that some are in
5   a conceptual sense more significant than others.  So I would
6   place core district retention as one of the more important
7   ones, although it's not possible to specifically rank them or
8   identify how much more important.
9   Q  Well, let's see if we can make it -- let's call it a break
10  point in how we organize these.  Equal population, that the --
11  there's a legal context to that; right?  You have to get to a
12  certain amount of equal population and deviation beyond that is
13  unacceptable; right?  There's a legal line.
14  A  Generally that's true, although the definition of what's
15  acceptable can differ depending on the nature of the context,
16  but as a general principle I agree with that.
17  Q  So it's kind of a fuzzy line but there's a line.
18  A  For legislative districts it's a little fuzzier than it is
19  for congressional districts.
20  Q  Sure.  Compliance with the Voting Rights Act, mandatory, you
21  have to do that; right?
22  A  That's correct, when it's applicable.
23  Q  Okay.  Core retention, population movement, that we don't
24  find in the constitution?
25  A  That's correct.

1   Q  We don't find it in the statutes.

2   A  That's correct, but you do find it the jurisprudence which

3   fleshes out those requirements.

4   Q  And we can talk a little bit more about that later.  I'm

5   wondering -- well, maybe we'll talk about it now.  I'm

6   wondering, do you know if the jurisprudence talks about those

7   principles in terms of you have a mandatory duty to minimize

8   population movement or does it speak of it in terms of

9   analyzing whether a constitutional or statutory requirement has

10  been violated?  Do you know?

11  A  I don't believe there's any set threshold which triggers a

12  finding that there's a violation.  It's a more conceptual

13  question.

14  Q  But what I'm wondering is whether you know if the courts

15  talk about these traditional redistricting principles in terms

16  of assessing whether a separate constitutional or statutory

17  requirement has been violated, like equal population or Voting

18  Rights Act?

19  A  It can enter into a finding of racial gerrymandering or the

20  appropriateness of drawing an majority/minority district in a

21  particular configuration, so they're not hermetically sealed.

22  Q  And certainly the courts consider those when they're talking

23  about constitution or statutory requirement.

24  A  That's correct.

25  Q  Okay.  Now, in your report, Dr. Mayer, you mention that the

1  enacted plan shifted more than three and a half million
2  individuals around from one district to another.  Do you recall
3  that?
4  A  That's correct.
5  Q  Now, that was a combination of numbers, wasn't it?  It was
6  additive.  You added people moved out of Senate districts and
7  people moved out of Assembly districts.
8  A  That's correct.
9  Q  Now, isn't it true -- well, let's tart with a little bit of
10  political science here.  In Wisconsin Senate districts are
11  composed entirely of three Assembly districts; is that correct?
12  A  That's correct.
13  Q  So there's a standard reason that if you're moved out of a
14  Senate district, you'll probably be moved out of an Assembly
15  district as well.
16  A  Not probably.  By definition.
17  Q  Okay.  So wouldn't it be more appropriate to simply look at
18  the Assembly numbers to see how many people got moved from
19  district to district, because otherwise we're adding in a
20  1.2 million number that's additive, isn't it?
21  A  Well, but they're -- they involve different sets of
22  decisions that -- that although the movement in one area
23  implies a movement in another, I think it's appropriate to
24  appropriate to look at both of them.
25  Q  But then we have let's take for example Joe Smith, and he

1   lives in Senate District 1, Assembly District 1, and after

2   redistricting he lives in Assembly District 2,

3   Senate District 2.  Now, he's going to have been counted as two

4   people being moved, wouldn't he?

5   A  Well, I don't mean to be argumentative but that particular

6   hypothetical is not possible because the movement from Assembly

7   District 1 to 2 would not involve moving from a Senate

8   district.  You would have to move from 3 to 4.  So there's a

9   limit to --

10  Q  It was an ill-constructed hypothetical, but the truth is

11  that one person moving from both a Senate and Assembly district

12  would be counted twice for your three and a half million

13  number.

14  A  That's correct.

15  Q  So we don't really know the three and a half million people

16  got moved from one district to another.

17  A  Well, they did.  It's just -- I don't know if it's anything

18  more than a semantic point, but the people who were moved from

19  one Senate district to another are by definition moved from one

20  Assembly district to another.

21  Q  Right, so we don't want to count them twice.  We want to get

22  an accurate number; right?

23  A  I suppose you could.  There are different ways of doing

24  that.  I'd have to think about it.

25  Q  Well, you didn't think about it before you did the report

1    and gave that number.

2    A  Not in this context, that's correct.

3    Q  Okay.  Now, Dr. Mayer, I'm a little curious about some of

4    your comments with respect to core retention, and you talked

5    about the necessity of moving people, and I'd like to explore

6    that with you a little bit, if I could.  And you gave several

7    examples where you said you could see no justification for the

8    movement.  Do you recall saying that?

9    A  That's correct.

10   Q  And I think you mentioned Senate Districts 2, 17, 21 and 22?

11   A  In the context of the number of people who were shifted

12   compared to the number of people who had to be moved in order

13   to achieve population equality.

14   Q  Had to be moved, that's what I want to pick up on.

15   All right.  So we start out trying to equalize population,

16   right, and we start in a district which is underpopulated and

17   if we look at it and we see that it's surrounded by areas that

18   are also underpopulated, that's going to -- that's going to

19   require more movement cumulatively than if you were to simply

20   take the over or under number for that one district, won't it?

21   A  I guess I would agree with the first part of the question.

22   I'm not sure that the second part necessarily follows.

23   Q  All right.  Let's --

24   A  Because if you had a series of underpopulated districts that

25   were, for example, bounded by, you know, formed a perimeter

1    that was bounded by the state border and they all had to grow,

2    they all would have to move out in some sense to pick up

3    additional population.  But that doesn't necessarily require

4    large shifts into and out of each district.

5    Q  Let's take a look at that more and just for the sake of

6    simplicity in numbers let's say that we have two districts next

7    to each other and District number 1 is underpopulated.  So a

8    hundred people live in the district and let's say a hundred ten

9    is what you need to get to; right?  So we look at District 1

10   and we say, well, the necessary number of people to move into

11   that district is ten; right?

12   A  Correct.

13   Q  And that's how you'd score it.  You'd say it's ten.

14   A  If the goal was absolute population equality, that's

15   correct.

16   Q  So next door is District number 2, also has a hundred people

17   in it and also has to pick up ten people.  All right?  So now

18   District 1 takes ten people from District 2 to get to its 110.

19   Now District 2, now they're 20 short, aren't they?

20   A  Well, but that's an incomplete hypothetical because you're

21   almost never faced with a situation where you only have two

22   districts to work with.  You will almost always, unless you're

23   dealing with the first Assembly district which is on the

24   northern tip of Door County which only has one place to go and

25   that's down, you will typically have many more than a single

1   option.

2   Q  Sure, and I made the hypothetical simple just to get the

3   point across but we can make it a little more complex.  We can

4   say that it surrounds it all around with other districts that

5   are also short on population; right?  Not an unusual situation.

6   A  Depending on where you are, that's possible.

7   Q  We actually saw that in Milwaukee County, didn't we?

8   A  That's correct.

9   Q  So districts that are short on population?

10  A  I would say more in the city of Milwaukee rather than the

11  county.

12  Q  So we've got districts that are low in population surrounded

13  by districts that are low in population and whether you pick

14  from the one to the north or the south or the west, they're

15  going to come up more short than they were before.

16  A  That's true, but that wouldn't be a justification for moving

17  people out of one district and then moving people back into

18  that district.  So it might trigger a cascading series of -- as

19  each district has to grow, but what we observed is significant

20  shift into and out of districts irrespective of how many people

21  they needed to shrink by or grow by.  So --

22  Q  Well, let's put the analysis in slow motion a little bit so

23  we can keep track of what we're doing.  So we start off first

24  with the understanding that simply because a district is ten

25  people under doesn't necessarily mean that only ten people need

1   to be moved to make it equal. Right?

2   A   That could very well be true.

3   Q   Okay. Because it has that cascading effect that you talked

4   about.

5   A   Well, I'm not sure that the cascading effect would by itself

6   involve moving people out of -- into that district and moving

7   people out. I was thinking of the cascading effect as the

8   interior districts, district expanding a little bit and then

9   the districts around there would have to expand and then -- but

10   that wouldn't necessarily explain why people were moving, you

11   know, back and forth between underpopulated districts.

12   Q   Good. All right. So part one is we know that you can't

13   just look at a district and see it shows as being ten people

14   under so the necessary number of people to move is ten. We

15   know we can't look at it that way; right?

16   A   I'm not sure I would agree with that, that that may not be

17   the only thing that you look at because there are other

18   considerations. But I believe that the calculation I did of

19   the ratio of people who were actually moved divided by the

20   people who needed to be moved is a meaningful number and it's

21   one thing to have a handful of districts where that number is

22   large. It's another thing to have the overall numbers

23   extremely large, which suggests significant reconfiguration of

24   every district that wouldn't necessarily be required in order

25   to achieve population equality.

1    Q  All right.  It's that necessary part that we've got to tease

2    out.  You acknowledge that simply looking at the number of

3    people in a district, any given district is over or under does

4    not necessarily represent the number of people that would be --

5    would be necessary to move in and out or get to the population

6    equality because there is this cascade effect changing district

7    boundaries around them will affect how many people you have to

8    move to get the population equality in that district.

9    A  Well, I would say that the number by itself isn't the full

10   picture, but if that number, I would say that it -- that number

11   is not meaningless in terms of reaching an inference about the

12   appropriateness or arbitrariness of the number of people who

13   were moved.  So I would agree that it's not the only number

14   that you need to look at but it's more than telling you

15   nothing.

16   Q  Sure.  Well, let's look at it this way then.  You -- you

17   didn't write a statewide map that would move what you would

18   calculate as being the least number necessary to move.

19   A  That's correct.

20   Q  And if you did draw a map like that, you'd be sacrificing

21   other redistricting principles.

22   A  If I took the effort to do it, I suspect that I might have

23   had to make some decisions, but I'm quite confident I could

24   have drawn a statewide map that shifted far fewer people.

25   Q  You're quite confident about that having never done it.

1   A   Well, based on what I know about redistricting and my

2   experience with maps, you know, it's not necessary to have done

3   it or make an inference about what's possible and what's not

4   possible.

5   Q   Well, let's think about that.  Do you know how long it took

6   to develop the map that became Act 43?

7   A   I know that it took months and several people.  So it's not

8   a trivial process, that's true.

9   Q   So you've not engaged in that non-trivial process to see if

10  you could draw a map that does nothing but move the least

11  necessary, the fewest people necessary as you calculate it.

12  A   That's correct.  But there are some models which -- from

13  Baumgart in 1992.  So it's not as if I'm, you know, punching

14  wildly in the dark.

15  Q   Well, certainly, and I think you make a good point there.

16  You could maybe draw a map that has less than this but you

17  don't know what effect that's going to have on other of the

18  redistricting principles that you said the legislature needs to

19  keep in mind.

20  A   Not with certainty, that's correct.

21  Q   Okay.  Not with certainty.  Thank you.  When you talked

22  about some of the -- some of the movements in the districts

23  that you had concern about, you said you had the impression

24  that there was no justification for the movement.  Do you

25  recall that?

1    A  That's correct.

2    Q  All right.  What about the legislature's impression of what

3    was good for the people of state of Wisconsin?

4    A  Well, the notion that one can divine specific intent on

5    specific decisions from the collective action of the

6    legislature is not what I looked at.  I examined the record,

7    the testimony, depositions, reports that the people who drew

8    the maps said were their justifications, and in examining that

9    record -- and the legislature can only act based on that --

10   based on alternatives that are presented to it.  So the notion

11   that this legislature makes this decision out of ether is

12   demonstrably incorrect, that the legislature can only act on

13   what is presented to it.

14       And so I don't think that falling back on the collective

15   wisdom of the legislature exhausts the process of trying to

16   figure out the justification for specific the decisions.  And

17   when one looks at the evidentiary record of the people who say

18   they drew the map, they don't offer as a general statement of

19   equal population and concern for minority interests, but when

20   it came to specific decisions why did you do this, why did you

21   do that, no answer and in many cases there was no recollection

22   of who had actually made the decision.  So that's what I base

23   that on.

24   Q  And you recall, I'm sure, the testimony that that showed

25   that those maps were presented to the legislature for their

1   consideration.

2   A   Well, that's -- in a formal sense, yes, there was a map that

3   was presented to the legislature which went through a minor

4   modification, amendment process which was subsequently adopted.

5   So you know, in a formal sense, yes, that counts as legislative

6   action.

7   Q   Well, and the legislature could have rejected the map that

8   was brought to it, couldn't it?

9   A   In theory that's correct.

10  Q   Well, it's more than theory.  They vote on it.

11  A   Well, when you look at the real world configuration that the

12  legislature found itself, I think it's highly unlikely that

13  when presented with a single alternative that that was a --

14  that was a plausible scenario that the legislature would reject

15  the map.

16  Q   All right.  Now, you understand that the maps are not drawn

17  by 99 assemblymen and 33 senators getting together in a room

18  that are pushing buttons on a computer; right?

19  A   That's correct.

20  Q   There's always going to be somebody, some small group of

21  people who are going to draft the map.

22  A   That's correct.

23  Q   And the legislature gives direction on what they ought to be

24  doing.

25  A   Well, in this case again by the testimony of Mr. Ottman,

1  Mr. Foltz and Mr. Handrick, they were very vague about what

2  specific direction they got about who directed them or what

3  input they received from legislators in drawing the maps.  So

4  I think it's incorrect to characterize this as a collective

5  deliberation of the Senate or Assembly Republican caucus

6  deliberating at length on the map configuration.  That's not

7  what happened.

8  Q  Well, they told their agents to draft a map.  They drafted

9  the map.  Brought it back to the legislature.  The legislature

10  looked at it and apparently their judgment was well done;

11  right?  They voted for it.

12  A  Well, they voted to approve the map, they did.

13        JUDGE STADTMUELLER:  Mr. Kelly, I think that brings

14  us to the end of today's trial session.  I would invite you and

15  your colleagues to caucus and let Mr. Willenbrink know before

16  you depart this afternoon how much time you collectively

17  believe will be needed to complete this case tomorrow, keeping

18  in mind that we are going into whatever amount of time it takes

19  in the evening.  And the only reason that the Court needs to

20  know that tonight is we need to make appropriate arrangements

21  for access to the building as well as security and the

22  utilities.  So please confer with your colleagues and the

23  plaintiffs' counsel and let Mr. Willenbrink know before you

24  leave tonight how much time you believe will be necessary to

25  complete the case, including any arguments that counsel wish to

1  make.

2        MR. KELLY:  Very good.  Thank you.

3        MR. POLAND:  Your Honor, if I could ask for just

4  clarification, in terms of closing argument, I would be

5  interested in knowing what your Honors would expect in terms

6  of -- I would like some guidance on that.

7        JUDGE STADTMUELLER:  Well, we can start with how many

8  white flags of surrender are going to be raised on some of the

9  claims so that we are all on the same page as to what the Court

10  needs to decide, including claim nine.  I'm not sure based upon

11  the pleadings, based upon the testimony, based upon the

12  pendency if a bill in the legislature to make Act 43 applicable

13  to these recall elections as well as the litigation pending in

14  Waukesha County Circuit Court, what impact any of this has with

15  respect to either our ability to render an opinion as to that

16  matter, because it certainly ill-behooves the Court to tell the

17  legislature what it can and cannot legislate, any more than we

18  can tell the state Court what it can and cannot adjudicate

19  under state law.  So that's just one little vignette in all of

20  this.

21        So I would simply suggest that you gather your

22  collective resources and just give us some guidance as to what

23  you believe is appropriate and put your arms around it, whether

24  in Summation or Power Point presentation or a list of the

25  exhibits, a list of the depositions, and frankly, that's why we

wanted these proposed findings of fact and conclusions of law,

of which there are hundreds, no question about it.

And I appreciate all that you have tried to pull

together, but as we go forward, just listening to today's

testimony, it is becoming more evident that a lot of these

proposals simply are not going to find their way into an

ultimate opinion because they're not relevant.  So that's the

first question that you need to come to grips with so the Court

can discharge its responsibility and be guided.  I put no

limits on how long anybody can argue.  The only limit is we're

going to finish tomorrow, whether it's at 6:00 o'clock or

10:00 o'clock or 12:30 on Saturday morning, and the only other

limit is after we conclude tomorrow, there will be no more

briefing, no more proposed findings, no more conclusions of

law.  This case was front end loaded given the compression of

time and we're going to stay with that time schedule,

particularly against the backdrop of the impending April 15th

deadline for nomination papers.

And we've tried in every order that this Court has

issued to be incredibly timely responsive.  This case has taken

an equal amount of time for these three judges as it has for

each of you, and we want to deliver on our promise not only to

counsel but to the citizens of Wisconsin.

MR. POLAND:  Thank you, your Honor.

JUDGE STADTMUELLER:  The Court stands in recess.

1          THE BAILIFF:  All rise.

2          (Proceedings concluded for the day at 6:03 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   UNITED STATED DISTRICT COURT

2   EASTERN DISTRICT OF WISCONSIN

3

4       I, MICHELLE HAGEN, RPR, Official Court Reporter for the

5   United States District Court, Eastern District of Wisconsin, do

6   hereby certify that I reported the foregoing proceedings, and

7   that the same is true and correct in accordance with my

8   original machine shorthand notes taken at said time and place.

9

10

11  Dated this 23rd day of February, 2012,

12  Milwaukee, Wisconsin

13

14

15  _____

16  Michelle Hagen

17  Official Court Reporter

18  United States  District Court

19

20

21

22

23

24

25