UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

_____

ALVIN BALDUS, CARLENE BECHEN, ELVIRA    )
BUMPUS, RONALD BIENDSEIL, LESLIE W.     )
DAVIS, III, BRETT ECKSTEIN, GLORIA      )
ROGERS, RICHARD KRESBACH, ROCHELLE      )
MOORE, AMY RISSEEUW, JUDY ROBSON, JEANNE )
SANCHEZ-BELL, CECELIA SCHLIEPP, TRAVIS  )
THYSSEN, CINDY BARBERA, RON BOONE, VERA )
BOONE, EVANJELINA CLEERMAN, SHEILA      )
COCHRAN, MAXINE HOUGH, CLARENCE JOHNSON, )Case No. 11-CV-562
RICHARD LANGE, and GLADYS MANZANET,     )  JPS-DPW-RMD
                                        )
               Plaintiffs,              )Milwaukee, Wisconsin
                                        )
TAMMY BALDWIN, GWENDOLYNNE MOORE and    )February 24, 2012
RONALD KIND,                            )8:30 a.m.
                                        )
          Intervenor-Plaintiffs,        )**VOLUME VII**
                                        )**A.M. SESSION**
v.                                      )
                                        )
Members of the Wisconsin Government     )
Accountability Board, each only in his  )
official capacity:  MICHAEL BRENNAN,    )
DAVID DEININGER, GERALD NICHOL, THOMAS  )
CANE, THOMAS BARLAND, and TIMOTHY VOCKE, )
and KEVIN KENNEDY, Director and General )
Counsel for the Wisconsin Government    )
Accountability Board,                   )
                                        )
               Defendants,              )
                                        )
(caption continued on next page)        )
_____

**TRANSCRIPT OF COURT TRIAL**

BEFORE DIANE WOOD, CIRCUIT JUDGE, ROBERT DOW, JR., DISTRICT
     JUDGE, and J. P. STADTMUELLER, DISTRICT JUDGE

Contract Reporters:        Halma-Jilek Reporting 414-271-4466

Proceedings recorded by computerized stenography, transcript
produced by computer aided transcription.

```
 1   F. JAMES SENSENBRENNER, JR., THOMAS E.    )
     PETRI, PAUL D. RYAN, JR., REID J.          )
 2   RIBBLE, and SEAN P. DUFFY,                 )
                                                )
 3               Intervenor-Defendants.         )
     _____       )
 4                                              )
     VOCES DE LA FRONTERA, INC., RAMIRO         )
 5   VARA, OLGA VARA, JOSE PEREZ, and           )
     ERICA RAMIREZ,                             )
 6                                              )
                    Plaintiffs,                 )
 7                                              )
     v.                                         )Case No. 11-CV-1011
 8                                              )   JPS-DPW-RMD
     Members of the Wisconsin Government        )
 9   Accountability Board, each only in his     )
     official capacity: MICHAEL BRENNAN,        )
10   DAVID DEININGER, GERALD NICHOL, THOMAS     )
     CANE, THOMAS BARLAND, and TIMOTHY          )
11   VOCKE, and KEVIN KENNEDY, Director and     )
     General Counsel for the Wisconsin          )
12   Government Accountability Board,           )
                                                )
13                  Defendants.                 )
     _____
14
15   A P P E A R A N C E S
16   For the Plaintiffs:        DOUGLAS M. POLAND
                                Godfrey & Kahn, S.C.
17                              780 North Water Street
                                Milwaukee, WI 53202-3590
18                              414-273-3500
                                Fax: 414-273-5198
19                              Email:  Dpoland@gklaw.com
20                              DUSTIN B. BROWN
                                Godfrey & Kahn, S.C.
21                              1 East Main Street - Suite 500
                                Madison, WI 53701-2719
22                              608-257-3911
                                Fax: 608-257-0609
23                              Email:  Dbrown@gklaw.com
24
25
```

```
 1   FOR THE CONSOLIDATED
     PLAINTIFFS:                JACQUELINE E. BOYNTON
 2                              Law Offices of Jacqueline Boynton
                                2266 N. Prospect Ave – Ste. 505
 3                              Milwaukee, WI 53202-6306
                                414-276-1066
 4                              Fax:414-276-9119
                                Email: jackie@jboynton.com
 5
                                PETER G. EARLE
 6                              Law Offices of Peter Earle, LLC
                                839 North Jefferson – Suite 303
 7                              Milwaukee, WI 53202
                                414-276-1076
 8                              Fax: 414-276-0460
                                Email: peter@earle-law.com
 9
     FOR THE DEFENDANTS:        DANIEL KELLY
10                              Reinhart Boerner Van Deuren, S.C.
                                1000 North Water Street
11                              Milwaukee, WI 53202
                                414-298-1000
12                              Fax: 414-298-8097
                                Email: dkelly@reinhartlaw.com
13
                                PATRICK J. HODAN
14                              Reinhart Boerner Van Deuren, S.C.
                                1000 North Water Street
15                              Milwaukee, WI 53202
                                414-298-1000
16                              Fax: 414-298-8097
                                Email: phodan@reinhartlaw.com
17
                                COLLEEN E. FIELKOW
18                              Reinhart Boerner Van Deuren, S.C.
                                1000 North Water Street
19                              Milwaukee, WI 53202
                                414-298-1000
20                              Fax: 414-298-8097
                                Email: cfielkow@reinhartlaw.com
21
                                MARIA S. LAZAR
22                              Wisconsin Department of Justice
                                Office of Attorney General
23                              17 West Main Street
                                Madison, WI 53707-7857
24                              608-267-3519
                                Fax: 608-267-2223
25                              Email: lazarms@doj.state.wi.us
```

```
 1   FOR INTERVENOR PLAINTIFFS:    SCOTT HASSETT
                                   Lawton & Cates, S.C.
 2                                 10 East Doty Street - Suite 400
                                   P.O. Box 2965
 3                                 Madison, WI 53701-2965
                                   608-282-6200
 4                                 Fax:  608-282-6252
                                   Email: shassett@lawtoncates.com
 5
     FOR THE INTERVENOR
 6   DEFENDANTS:                   KELLEN C. KASPER
                                   Foley & Lardner, LLP
 7                                 777 East Wisconsin Avenue
                                   Milwaukee, WI 53202-5300
 8                                 414-297-5783
                                   Fax: 414-297-4900
 9                                 Email: kkasper@foley.com

10                                 THOMAS L. SHRINER, JR.
                                   FOLEY & LARDNER, LLP
11                                 777 East Wisconsin Avenue
                                   Milwaukee, WI 53202-5300
12                                 414-297-5601
                                   Fax: 414-297-4900
13                                 Email: tshriner@foley.com

14                              I N D E X
```

```
15   KENNETH MAYER

16   Cross (Cont'd) by Mr. Kelly.............................414
     Redirect by Mr. Earle..................................467
17   Redirect by Mr. Poland.................................470

18   PETER MORRISON

19   Direct by Ms. Lazar....................................475
     Cross by Mr. Earle.....................................490
20   Redirect by Ms. Lazar..................................499

21   RONALD KEITH GADDIE

22   Direct by Mr. Kelly....................................500
     Cross by Mr. Earle.....................................526
23   Cross by Mr. Poland....................................531

24

25
```

1                    P R O C E E D I N G S

2            THE BAILIFF:  Hear Ye, Hear Ye, Hear Ye, the United

3    States District Court for the Eastern District of Wisconsin is

4    now open, the Honorable Judges J. P. Stadtmueller, District

5    Judge, Eastern District of Wisconsin, Diane P. Wood, Circuit

6    Court Judge, United States Court of Appeals for the Seventh

7    Circuit, and Robert M. Dow, Jr., District Judge, Northern

8    District of Illinois, presiding.

9            All persons having business before this Honorable

10   Court are admonished to draw near and give their attention for

11   this special three-judge court convened pursuant to Title 28,

12   United States Code, Section 2284 is now in session.

13           God save the United States and this Honorable Court.

14   Please be seated and come to order.

15           THE CLERK:  The Court calls Alvin Baldus, et al,

16   versus Michael Brennan, et al, Case No. 11-CV-562 for a court

17   trial.  May I have the appearances, beginning with the

18   plaintiffs.

19           MR. POLAND:  Good morning, Your Honors.  Doug Poland,

20   Dustin Brown and Wendy Arends for the Baldus Plaintiffs.

21           MR. EARLE:  Good morning, Your Honors.  Peter Earle

22   and Jackie Boynton on behalf of the Voces de La Frontera

23   Plaintiffs.

24           MR. HASSETT:  Good morning, Your Honors.  Scott

25   Hassett on behalf of the Plaintiff-Intervenors.

1          MS. LAZAR:  Good morning, Your Honors.  Assistant

2     Attorney General Maria Lazar and Dan Kelly, Patrick Hodan and

3     Colleen Fielkow on behalf of the Defendants Government

4     Accountability Board and their director and general counsel in

5     their official capacities only.

6          MR. SHRINER:  Good morning, Your Honors.  Thomas L.

7     Shriner, Jr., and Kellen Kasper for the Defendant-Intervenors.

8          JUDGE STADTMUELLER:  Good morning, Counsel.  We are

9     very grateful for your efforts in further streamlining the case

10    such that I believe we can, at a reasonable hour this evening,

11    bring it to a conclusion and begin that exercise today.  We

12    will continue with the cross-examination of Dr. Mayer.

13    Dr. Mayer, if you would be so kind as to resume the witness

14    stand, keeping in mind that you are under the same oath that

15    you took when you began your testimony yesterday.  Mr. Poland?

16         MR. POLAND:  Your Honor, thank you.  If I may, after

17    listening to Your Honor's comments yesterday evening before we

18    reconvened, and in the further interest of streamlining the

19    case further, we have proposed a two-part stipulation to the

20    Government Accountability Board.  We would agree to dismiss our

21    Count 9, if they will enter into a stipulation.

22         The stipulation would be that the Government

23    Accountability Board has stated and continues to maintain that

24    any recall or special elections conducted between now and the

25    effective date of Act 43 for elections, that is November 6,

1   2012, the date of the 2012 general election, shall be conducted

2   under the 2002 boundaries established by this Court.  The

3   second part would be it is constitutional to conduct any recall

4   or special elections between now and the date of the 2012

5   general election under the 2002 boundaries.  Recall and special

6   elections conducted in 2011 were validly conducted under those

7   boundaries.  We would dismiss Count 9, if we get that

8   stipulation, Your Honor.

9       MS. LAZAR:  Good morning, Your Honors.  As I told

10  counsel this morning, the Government Accountability Board,

11  through the Department of Justice, is not willing to make that

12  stipulation.  Our position was pretty clearly stated on the

13  record by Attorney Kelly yesterday as to case or controversy

14  and whether or not this is a state court matter, and we

15  respectfully decline.

16      JUDGE STADTMUELLER:  All right.  Thank you.  Anything

17  further, Mr. Kelly, before you resume?

18      MR. KELLY:  Yes, Your Honor.  We had further

19  discussions with counsel for the Plaintiffs on this issue of

20  streamlining.  We wanted to bring some clarification to what we

21  discussed last night about what was remaining in the case.  The

22  counts in the complaint are written broadly, and just to avoid

23  any confusion and to tighten up our examination, we want to

24  make clear that the issues remaining for the Court to decide

25  would be population movement/core retention, equal population

1   and the VRA claim -- delayed voting and the VRA claim as it

2   relates to the Latino districts, and then, of course, Count 9.

3   Then I spoke separately with Mr. Earle, and he has agreed that

4   he is dropping any plan that there was an intent to

5   discriminate against the Latino community in the drafting of

6   Assembly Districts 8 and 9.  Have I stated that correctly?

7           MR. EARLE:  Yes, that correctly states the

8   understanding between the -- at least between the Voces de La

9   Frontera Plaintiffs and the Defendants on that issue.  We still

10  have some criticisms of the process that we think are relevant

11  to the argument, but we won't argue or pursue further proof

12  that there was intentional discrimination against the Latino

13  community in the redistricting process.

14          JUDGE WOOD:  Just to be clear, are you still

15  asserting that there was a discriminatory effect for VRA

16  purposes?

17          MR. EARLE:  Yes.  I mean, yes.  Well, I am not sure I

18  comprehend completely the scope of the question, Your Honor.

19          JUDGE WOOD:  Well, there are two theories of

20  discrimination, typically, intentional discrimination and

21  discriminatory effect, and the VRA in its language includes the

22  latter, and I just want to know whether you are dropping that

23  or whether you are keeping that.

24          MR. EARLE:  No, we are keeping the discriminatory

25  effect, that the Latino community has been, in effect, deprived

1   of its ability to elect the candidates of its choice by this

2   redistricting and the radical reconfiguration.

3           JUDGE WOOD:  Okay.

4           MR. POLAND:  I believe that does accurately state it.

5   I want to go over the list one more time to make sure we have

6   got it right.

7           Population movement,which is sort of the flip side of

8   core retention, I should say, equal population, delayed voting

9   or disenfranchisement, our Voting Rights Act claim with respect

10  to the Latino districts, and then Count 9, which is the recall

11  elections.

12          MR. KELLY:  And then your count with respect to the

13  Latino districts does not include an intentional discrimination

14  element?

15          MR. POLAND:  We will join with the stipulation that

16  Mr. Earle has reached.

17          MR. KELLY:  Very good.

18          MR. HASSETT:  Your Honor, if I may, the Act 44 claim

19  remains on behalf of the Plaintiff-Intervenors.

20          JUDGE STADTMUELLER:  All right.  Thank you.  With all

21  of those understandings, I believe, Mr. Kelly, we're now ready

22  to proceed with the balance of your examination of Dr. Mayer.

23          MR. KELLY:  Thank you, Your Honor.

24          (Kenneth Mayer resumes the stand.)

25              CROSS-EXAMINATION (CONT'D)

1  BY MR. KELLY:

2  Q  Good morning, Dr. Mayer.

3  A  Good morning.

4  Q  If you will give me just a few seconds here as I get myself

5  situated.  All right.  Dr. Mayer, if we could, I'd like to

6  circle back to something you mentioned yesterday on several

7  occasions.  You said that you had seen no justification for any

8  of the concerns that you had noted with respect to population

9  movement, core retention or delayed voting, is that right?

10 A  Other than the claims by the people who drew the map that

11 they elaborated or that they stated a general goal of reaching

12 equal population.  Other than that, there was no specific

13 justifications for the things that I had noted.

14 Q  All right.  So that's the only thing that you recall about

15 the depositions, that they said that they were after equal

16 population?

17 A  That's correct.

18 Q  Okay.  Do you recall Mr. Handrick testifying that they were

19 given specific instructions to address the Voting Rights Act

20 and how that would affect the districts that they drew?

21 A  I don't recall that.

22 Q  Did Mr. Handrick also discuss the need to take into account

23 the malapportionment specifically between the Milwaukee and

24 Dane County area?

25 A  Yes.

1  Q  Okay.  And how that would require losing I believe it was .8

2  seats in the Milwaukee County area and adding it back into the

3  Dane County area?

4  A  Again, I recall that, but I don't find that plausible

5  because as the map was drawn it was, in fact, entirely possible

6  to draw at least one additional district, assembly district,

7  within the county -- within Milwaukee County.  So there were

8  justifications that were offered, and as far as the specific

9  ones that I mentioned or the specific concerns that I mentioned

10  as far as the municipal splits, I did not find any

11  justification.

12     I did mention that for the reconfiguration of Senate

13  Districts 21 and 22 there was a justification offered, which

14  was a claim that uniting the cities of Racine and Kenosha into

15  a single senate district placed together what the map drawers

16  considered a community of interest.

17  Q  All right.  So there were other justifications offered

18  besides equal population?

19  A  That's correct, but I did not say that I saw no

20  justification for any of the moves.  I believe I testified

21  about specific issues that came up on specific areas of the

22  map, not a general statement that there was no justification

23  for any of the decisions that the map drawers made.

24  Q  Okay.  So you recognized that the map drawers took into

25  account the fact that when there's a district that's

1  underpopulated and it's surrounded by districts that are
2  underpopulated, that there's going to be a ripple effect that's
3  going to affect population movement?  You understood that?
4  A  I don't intend to quibble, but the notion of a ripple effect
5  is, I think, a little bit of a more ambiguous issue.  But, yes,
6  it is entirely correct the districts that are underpopulated,
7  the boundaries are going to have to shift.
8  Q  Yes.  And just harkening back to yesterday, you didn't draw
9  a map to see what the net effect of population movement would
10  be taking into account all of these different redistricting
11  criteria?
12  A  That's correct.
13  Q  Do you recall Mr. Handrick testifying that the core
14  retention reports, especially for Assembly District 81, were
15  incomplete because they didn't take into account that there was
16  some flipping of assembly numbering?
17  A  I don't recall that specifically.
18  Q  Okay.  Did you review Mr. Handrick's second deposition
19  transcript?
20  A  I did.
21  Q  You didn't see it there?
22  A  I don't recall.
23  Q  Okay.  Did you recall reading that Mr. Handrick testified
24  that as they were drawing the map, they specifically took into
25  account the issue of municipal splits?

1  A  I do recall him testifying to that, yes.

2  Q  Okay.  And do you recall him testifying that he specifically

3  talked about how he addressed the City of Beloit and the split

4  that was there?

5  A  I do believe I recall that, but, again, I inferred from that

6  that it was a general statement that it was necessary in order

7  to achieve equal population, and my point is that -- and in

8  that specific area, even without having drawn a statewide map,

9  that it would have been a relatively trivial process to

10  reconfigure the map in that area to not divide the City of

11  Beloit.

12  Q  Well, sure.  When you are not drawing a full statewide map,

13  any specific split is a trivial matter to address?

14  A  Well, that's not what I said.  What I testified to is in

15  those areas there were alternative configurations in that area

16  that if you move 19,000 people or shift 19,000 people and

17  redraw the assembly lines in the southern most city of the

18  state, the ripple effects are not necessarily going to be large

19  and it ought to be -- well, I believe it is possible to contain

20  them in the areas surrounding that city.

21  Q  Okay.  So you have a quibble with the prudential decision

22  that they made in the way that Beloit was handled?

23  A  I'm not quite sure what you mean by the word "prudential."

24  Q  Well, it's a subjective decision on how to handle a split

25  with respect to the City of Beloit, whether you have one, how

1  to split it, if you do, right?

2  A  Except it's not an entirely subjective decision.  It's a

3  decision that they made.  The justification offered was a

4  general one about the need to do so in order to achieve equal

5  population.  I believe that it should have been and was

6  possible to configure a map in that area that would not have

7  involved splitting the city not just between two assembly

8  districts, but the two senate districts.

9  Q  Okay.  Your testimony has not been that there were too many

10 municipal splits, is that right?

11 A  That's correct.

12 Q  So tell me, which municipalities would you have split, if

13 you had been drawing a full statewide map?

14 A  I would have split as few as I could possibly have split.

15 Q  But which ones?

16       MR. POLAND:  Your Honor, may I object.  We have

17 already stipulated we are not going to pursue municipal splits,

18 so I don't think we need to cover this area.

19       MR. KELLY:  That's fine.

20 BY MR. KELLY:

21 Q  Dr. Mayer, with respect to population movement, which

22 specific districts would you change to the population movement?

23 A  Well, if I began with the -- with Act 43, I would have taken

24 another look at the districts where the number of people

25 shifted was widely out of proportion to the number who needed

1   to be shifted.

2   Q  Okay.  But which one?

3   A  I can go through the list and tell you which districts I

4   would have looked at closely.

5   Q  Well, pick one.

6   A  Well, the 2nd Senate District which, by my calculation,

7   moved 346 times as many people as were necessary.

8   Q  And you would have started there with your map?

9   A  Well, no, not necessarily.  If I were drawing the map, I

10  would -- I wouldn't just draw one map and conclude that was

11  sufficient.  I would have explored a number of different

12  alternatives determining what happens when you begin in

13  different parts of the state.  Obviously, it makes a good deal

14  of sense to start in Milwaukee, because it's the state's

15  largest city and it's also the city that presents the most

16  complex decisions not only because of the voting rights issues,

17  but because the relative population growth there -- Actually,

18  the city I believe lost a little bit of population.  So if I

19  were drawing a map, that's where I would start, but you asked

20  which districts I would look most closely at.

21  Q  I did.  So let's do this.  What senate district was that, 2,

22  did you say?

23  A  Yes.

24  Q  Okay.  But that's not where you would start?  You would

25  start somewhere else?

1  A  Well, but I didn't draw a statewide map, as you have pointed

2  out.

3  Q  Yes, I know.  So here's what I want to know, though, because

4  you have testified to a reasonable degree of scientific

5  certainty that they moved too many people.  You pick a starting

6  place.  You say it's not Senate District 2.  I want to know how

7  many people would you need to move in and out of Senate

8  District 2 by the time you got to that senate district?

9  A  It's difficult to say.

10  Q  It is, isn't it.  You don't know?

11  A  Sitting here, that's correct.

12  Q  Okay.  Do you care to pick any other district?

13  A  We can go through the exercise, and the answer will be the

14  same, that my position is that it should have been possible and

15  was possible to create an alternate configuration that moved

16  less people.  I will leave it at that.

17  Q  All right.  You believe it was possible, but you have not

18  tried to see if it was?

19  A  I mean, I can state with virtual certainty that it was

20  possible, because it involves a number of decisions that were

21  made, and at any branch you have an ability to move in one

22  direction or the other.

23  Q  Um-hum.  And in going back through the map and controlling

24  for population movement as you would like to do, what would

25  be -- Can you tell me how many delayed voters there would be as

1  a result of that?

2  A  I can tell you I can eliminate 72,000 right off the bat by

3  leaving the existing configuration of Senate Districts 21 and

4  22 unchanged other than the adjustments that are necessary in

5  order to achieve population equality.

6  Q  All right.  So you have 227,000 delayed votes left.  After

7  you do your map, how many are there?

8  A  I would also take a close look at Senate District 27 which

9  disenfranchised 49,000, nearly 50,000, and I'm quite certain

10  that I would have been able to adjust the boundaries there

11  making different decisions that reduced that disenfranchisement

12  perhaps not to zero, but -- And that's a senate district, as I

13  testified yesterday, that needed to shed 25,000 people.

14  Instead, there were 90,000 -- 60,000 moved in and 90,000 moved

15  out.  I understand that that's an area of growth and that it

16  was necessary to reconfigure the districts, but, again, this is

17  not, you know, the hands of the map drawers are not tied when

18  they are in an area of the state such as that where they have

19  no alternative but to pursue only one path.

20  Q  So what's your final number?

21  A  If I could fix all 72 of the 50,000, 49,000, I infer that I

22  could probably drop that by probably 80 percent and get that

23  number down to 10,000, perhaps lower, so now I'm down to below

24  200,000.

25  Q  All right.  So you are still above, let's say, 17-some-odd

1  thousand?

2  A  Okay.

3  Q  Yes?

4  A  Yes.

5  Q  And would you find that to be an unconstitutionally large

6  number of delayed votes?

7  A  Well, I would have taken a look -- Again, if I had gone

8  through the process of drawing the map, that would have been

9  one of the issues that I was concerned about.  It is not

10  possible, and I testified so yesterday, that that number is

11  never going to be zero.  Based on the last two court-drawn

12  maps, particularly the 2002 map, which I believe the

13  disenfranchisement number was 177,000, just making these two

14  changes I would be able to get it below that.

15  Q  Well, let's talk about 2002.  Can be put up Exhibit 1021 and

16  turn to Exhibit 29.  Dr. Mayer, you were a retained expert in

17  the redistricting case in 2002, is that correct?

18  A  Yes.

19  Q  You were representing Democratic members of the Legislature?

20  A  I was working for them, yes.

21  Q  Now the situation there was a little bit different.  There

22  wasn't a legislatively created map, right?

23  A  That's correct.

24  Q  The contest was to figure out how to draw -- how to have the

25  court draw an appropriate map?

1    A   That's correct.

2    Q   Now when we are having a court draw a map, is it even more

3    important that they look at issues such as delayed voting, or

4    does it not matter?

5    A   Well, based on the decision, one of the key principles

6    articulated by the court was the principle of minimizing the

7    number of people who are disenfranchised.

8    Q   All right.  So let's take a look at Exhibit 1021.  Would I

9    be correct -- And perhaps you will recall that in your chart

10   there are two proffered Democratic maps?

11   A   Yes.

12   Q   Dem A is --

13   A   Can you raise this a little bit higher?  Thank you.

14   Q   Dem A and SB463, those were the Democratic maps?

15   A   Yes.

16   Q   Now this is a chart that you prepared, yes?

17   A   That's correct.

18   Q   And in that chart we see that the Dem Plan A --

19   A   Let me save you some time, Counsel.  I will focus on this

20   statement where I was comparing the two maps and concluded

21   explicitly that the Republican maps were better on this.

22   Q   Well, thank you, but that doesn't quite get us to the end.

23   I do want to take a look at the numbers and then one of your

24   other conclusions in your report.  So Dem A, your report that

25   you were supporting --

1    A  Let's -- I don't mean to quibble, but my task in that case

2    was evaluate comparatively the maps that were provided, that

3    were offered by the different parties.  Again, I did not

4    participate in the drawing of the maps.  My task was to analyze

5    the maps on a number of criteria and present the results of

6    those analyses to the court.

7    Q  Very good.

8    A  Well, let me finish.  I basically -- I think it's correct to

9    say that I had zero input into how the maps were drawn.  I

10   believe there may have been some changes, although I can't say

11   for sure, about -- Well, actually, I am fairly sure that the

12   maps, once they had been presented to the court, were complete

13   and that I was not involved in the participation of drawing

14   those maps.  I was simply offering an analysis of the

15   characteristics of the different maps and assessing which of

16   the maps were better on different sets of criteria.

17   Q  Well, let's explore that.  You would say that delayed

18   voting, that would be a neutral factor when you are talking

19   about a map in terms of partisan versus non-partisan.  That's

20   neutral, right?

21   A  Not necessarily.

22   Q  Well, let's take a look at what you concluded in your report

23   to the Court in 2002.  Let's turn to Page 39.  All right.  The

24   last sentence of the first paragraph under "Conclusion."  Do

25   you see where it says "I," and that would be you, "I conclude

1  that the Democratic plans are marginally preferable on the

2  neutral factors, although the difference is very small?"  Do

3  you see that?

4  A  Yes.

5  Q  Okay.  And you were including delayed voting in your

6  representation to the Court that the Democratic plans were

7  marginally preferable overall on the neutral factors?

8  A  Well, again, this is a semantic issue.  There were two

9  elements of what I was -- what I did in these reports.  The

10  bulk of the analysis was a very detailed and lengthy study of

11  the likely partisan implications of the map, the different

12  maps, which was appropriate because it was the court that was

13  being asked to draw the maps.  So the issues of partisan

14  fairness, while not really an issue when a legislature draws a

15  map, are very important to the court.

16    So this signifies that I simply placed more emphasis on

17  the -- on my analysis of the partisan implications, but you are

18  suggesting that because I wrote a report that presented plans

19  where the disenfranchisement numbers were higher than they were

20  under this plan, that means that I'm being hypocritical in

21  claiming that the Republican -- that Act 43 disenfranchises too

22  high a number of people.  In that case I was not asked to

23  explore alternatives, I was not asked to offer suggestions on

24  how the maps could be revised.  I was presented with actually

25  not even the maps, which I did not look at physically or

1  visually inspect.  I analyzed the data that was generated as

2  the result of these maps.  So my task in that case was very

3  different than the task in this case.

4  Q  Sure.  So you were comparing partisan impact of plans versus

5  the neutral factors of a plan?

6  A  Again, this is a semantic quibble, but I separated out the

7  partisan implications of the plan from things like compactness

8  and disenfranchisement and municipal splits, which were not

9  part of my partisan analysis.  So that's where this language of

10  the neutral factors was in terms of how I was dividing the

11  components of my report.

12  Q  That's fair enough.  So you didn't go to the court and say,

13  "Whoa, hang on a second, the Democrat plans are not preferable

14  on the neutral factors, you can't adopt those because of the

15  amount of delayed voting it would cause?"

16  A  On the contrary.  I said very clearly that the Republican

17  maps were superior because they had lower disenfranchisement

18  numbers.

19  Q  Right.  But then you concluded, "I conclude that the

20  Democratic plans are marginally preferable on the neutral

21  factors."

22  A  Well, there were --

23  Q  Let me finish.  So you lumped together all of those neutral

24  factors that you just listed, and you said on balance the

25  Democratic plans are preferable on those factors?

1    A   That's what that says.

2    Q   All right.  So let's turn back to Page 29 for a moment.  Now

3    it was possible to draw maps with less delayed voting

4    consequences, wasn't it?

5    A   I'm sure it was, and that's exactly what the court did.

6    Q   Okay.  And, in fact, the Republicans offered three maps.  If

7    we can blow that up, that would be great.  Thank you.  They

8    offered three maps each of which had less delayed voting

9    consequences than either of the ones that you supported?

10   A   Well, I'm going to quibble with your use of the term

11   "supported."  I was asked to analyze the maps, and to say that

12   I was supporting them implies that I went into this, I mean,

13   with the goal of writing reports that justified the maps.

14   That's not what I do.  I analyze the maps, and if I had

15   concluded that the Republican maps were superior, I would have

16   so advised counsel.  So I'm going to quibble with your use of

17   the term "supporting the map."  I did not draw the maps, I had

18   no partisan stake in this fight, nor do I have one now.  I see

19   my role as analyzing the facts and the data with which I'm

20   presented and rendering my opinion based on my experience and

21   knowledge.

22   Q   All right.  But I just want to make sure I'm clear that you

23   didn't believe that delayed voting and the amounts that were in

24   the Democratic proposed plans, you didn't believe that that

25   disqualified those maps?

1  A  That was not the goal here.  The goal was not to present a

2  single map and have the court rule up or down on it.  The goal

3  was to compare the maps.  So, you know, I did not go to counsel

4  and say, "These numbers need to be lowered because there's no

5  way I can possibly continue in this case unless those numbers

6  are lower."  I performed my analysis and I said that on this

7  score the Republican maps were better.

8  Q  So when you said that on the neutral factors Democratic

9  plans were marginally preferable, you understood that there

10  could be competing interests with respect to those neutral

11  factors, that they would have an interplay, one might take

12  precedence and that would be okay?

13  A  Well, I mean, I don't want to go through the whole report,

14  but I also concluded that the Republican maps were egregiously

15  gerrymandered from a partisan perspective.  Forty-five, 50

16  pages of the analysis deals with that fact.  So, yes, there

17  were other factors that were in play, but the bulk of my

18  analysis and conclusions and testimony were about the partisan

19  implications of this, of these plans.

20  Q  Mr. Mayer, do you know in 1982 there was a court-drawn map,

21  is that right?

22  A  I'm aware of that.

23  Q  Okay.  Do you know if that had any delayed voting

24  consequences?

25  A  Well, again, here you are comparing apples and oranges,

1 because I was not comparing this map against the 1982 map.

2 Q  I understand.  I'm sorry.  I'm shifting gears.

3 A  Okay.

4 Q  You aware there was a 1982 court-drawn map?

5 A  That's correct.

6 Q  And do you know if it had any delayed voting consequences?

7 A  I believe there were large numbers of people disenfranchised

8 in that map.

9 Q  Do you know how many?

10 A  I believe it was 550,000, roughly.

11 Q  Now you don't think that the court was involved in an effort

12 to deny anybody their rights when they did that, do you?

13 A  I am not able to offer any conclusions or speculate about

14 what the court was doing.  As far as I know, they may have made

15 a serious effort to minimize the number of people

16 disenfranchised.  I had just started graduate school at that

17 point; I was not an expert in anything.  I can't really say --

18 offer any basis for comparison between the two maps.

19 Q  All right.  But you wouldn't suggest that they were trying

20 to deny anybody any rights?

21 A  You are asking me to speculate about something that happened

22 30 years ago, but I will say that, yes, I presume that courts

23 act in good faith.

24 Q  Fair enough.  I'd like to turn your attention back for just

25 a moment to the topic of core retention.  You are aware of the

1  recall elections that took place this past summer?

2  A  That's correct.

3  Q  Did your report take into account the results of those

4  recall elections on the question of core retention?

5  A  No, because unlike Professor Gaddie, I made no distinction

6  between incumbent core retention and overall core retention.

7  Q  Is it your position that the incumbent core retention number

8  is not something that the court needs to look at?

9  A  Incumbents don't have any particular right to their seats,

10 so I don't think it's a meaningful distinction.

11 Q  You are not proposing that there was any political bias

12 behind that?

13 A  Again, focusing on the testimony of the map drawers in their

14 first and second depositions, they were adamant that political

15 considerations played no role in how they made decisions on the

16 map.

17 Q  Now you did mention in your report that there was a

18 difference in core retention with respect to Republican seats

19 and Democratic seats?

20 A  Yes.

21 Q  You'll recall we talked about that a little bit at your

22 deposition.  "There is a 59.1 percent core retention for an

23 average for Democrats versus an average of 68.2 percent core

24 retention for Republicans.  Does that make Act 43 an invalid

25 map."  Do you recall that you answered, "No, not by itself?"

1  A  That's correct.

2  Q  And that's still true?

3  A  Yes, but it does certainly create a question in my mind,

4  taking the map drawers at their word that politics played no

5  role in it, what might explain that.

6  Q  Forgive me as I page through a few of these things that we

7  can skip.  Could we put up Exhibit 1128, please.  All right.

8  Thank you.  Dr. Mayer, what's on the screen is a table with

9  some demography information about Assembly District 8.  I'm

10  wondering if you can just walk through that with me.

11  A  I don't believe this is a table that I prepared.

12  Q  It's not.  But do you understand total population of

13  Assembly District 8 to have been 57,498?

14  A  Nothing personal, Counsel, but I'm going to double-check.

15  Q  By all means.

16  A  Yes.

17  Q  All right.  And the Hispanic population in Assembly District

18  8 is 37,914?

19  A  Well, again, without having a calculator in front of me to

20  verify that that is 60.54, I'm unable to do that in my head.

21  Q  Sure.  Can we get Table 11?  What's the exhibit number for

22  Table 11?

23  A  I believe that was in Professor Gaddie's report.

24  Q  I believe it was one of the stipulated tables.  Just one

25  moment, please.  All right.  Can we put up 1094.

1      MR. POLAND:  Your Honor, I believe Table 11 that was

2  included in the Pretrial Report, actually there's a stipulation

3  that's extremely important.  There's an important distinction

4  to make.  I can read it into the record, but I would like it to

5  be on the screen when Dr. Mayer is testifying.  It's that the

6  Plaintiffs stipulate to the percentages listed -- There you go.

7  It's there at the bottom.  I just want to make sure that the

8  entire -- There is a caveat on the bottom.  There's something

9  that we didn't stipulate to.  I just wanted to make sure that

10  was displayed.  Thank you.

11  BY MR. KELLY:

12  Q  All right.  Can we just move that over to the side just a

13  moment so we can see.  So the Hispanic population as a

14  percentage is 60.52 percent, correct?

15  A  That's correct.

16  Q  All right.  Now I can hand you a calculator or you can take

17  my word that 60.52 percent is 37,314.

18  A  I just did the rough calculation in my head, and that looks

19  about right.

20  Q  Okay.  So then we move down to the non-Hispanic minority

21  population, and we are taking these numbers also from Table 11,

22  so we look at the 77.17 total minority versus -- minus

23  65.94 percent Hispanic population, and we come up with 11.23

24  total non-Hispanic minority.  Would that be right?

25  A  That appears correct.

1  Q  Okay.  So we take 11.23 percent of 50,498 and we get 6,457

2  non-Hispanic minority population in District 8, is that

3  correct?

4  A  Okay.  That number is correct, but, again, I am -- I don't

5  believe that that number is relevant in the context.

6  Q  Sure, and we will get to that.  And then the next line is

7  non-Hispanic White population, so we take the total population

8  minus the sum of Hispanic population in the non-Hispanic

9  minority population and come up with 13,127 non-Hispanic White

10  population.  Does that look about right?

11  A  Again, I dispute the relevance of that number, but the

12  number itself appears to be correctly calculated.

13          MR. POLAND:  Your Honor, if I could, if we are going

14  to have this portion of Table 11 up, I'd like to make sure that

15  we have got the stipulation up on the screen, as well.  If you

16  can pull that up, too, Bob.  The table can be up, but I want to

17  make sure that the caveat stipulation is up, as well.  Thank

18  you.

19          MR. KELLY:  I understand that you don't stipulate to

20  the relevance.

21          MR. POLAND:  No, but it's more than that.  The

22  stipulation will speak for itself.

23  BY MR. KELLY:

24  Q  Okay.  All right.  So let's look at the voting age

25  population.  Now it shows 38,021, and that's taken from your

1  report, Dr. Mayer, Exhibit 1017 at Page 22.

2  A  That number is correct.  That number is correct.  Okay, the

3  top two numbers are from my table, but, again, the bottom two

4  are not calculations that I performed.

5  Q  Right.  The non-Hispanic minority age population, if we go

6  back to Table 11, what we do is we take the non-White voting

7  age population and we subtract the Hispanic voting age

8  population and we come up with the non-Hispanic minority voting

9  age population of 10.01 percent.  I understand that's not a

10  calculation you did, but that would be the correct methodology

11  to get to a non-Hispanic minority voting age population?

12  A  I'm sorry.  Say the second part of that again, please.

13  Q  Sure.  This would be a correct way for us to calculate the

14  non-Hispanic minority voting age population.  You take the

15  stipulated number from Table 11, the percentages, 70.53 minus

16  60.52 --

17  A  So you are talking about this number here (indicating)?

18  Q  Eventually, yes, ultimately.  So as a percentage we get

19  10.01 percent non-Hispanic minority voting age population, and

20  then that gives us 3,806 people.

21  A  I'm just trying to see how you get 3,806 from 10.01 percent

22  from 38,021.  Given that I haven't prepared this table --

23  Q  The exact number is 3,805.9.

24  A  It's not that.  But if we're looking at that number, the

25  non-Hispanic voting age population is 10.01 percent, that ought

1  to be 10.01 percent of that number.

2  Q  Right.

3  A  And 10 percent of that number -- Oh, I see.  Okay.  I'm

4  sorry.  Yes.  All right.

5  Q  So we are good?

6  A  I had a misplaced decimal point.  Yes.

7  Q  So then to get to non-Hispanic White voting age population

8  you do the similar exercise that we did above, and we take the

9  total voting age population minus the sum of the Hispanic

10  voting age population plus the non-Hispanic minority voting age

11  population?

12  A  Yes.

13  Q  And we get 11,199?

14  A  Correct.

15  Q  All right.  Let's put up Exhibit 1125 next to Exhibit 1128.

16  We want to keep 1125 up.  You can take away Table 11.  Let's

17  walk our way now through 1125.  Let's blow up the first half

18  there.  Now these are your calculations?

19  A  This was one set of calculations that I did.

20  Q  Yes.  And you recall these numbers being correct, 38,021?

21  You can check them against your report.

22  A  This number was updated.  The 35.75 non-citizen rate for the

23  Hispanic voting age population, I updated that calculation with

24  what I considered to be the more accurate number from the

25  five-year ACS, which was 42 percent, so this calculation is not

1  the most accurate one.

2  Q  Well, I understand that you have changed the numbers that

3  you are using, but I want to walk through the numbers that you

4  used in your report that you showed to us.

5  A  But I have updated that based on what I presented as a more

6  accurate set of numbers.  So if you want to walk through this

7  table, I'm happy to, but that number needs to be 42 percent,

8  not 35.75.

9  Q  I would, because that was -- I'm assuming that when you gave

10  us your report, you gave us your best effort at the time?

11  A  That's correct.

12        MR. EARLE:  Your Honor, I object.  The record is

13  pretty clear that in Professor Mayer's rebuttal report the

14  calculation was 42 percent based on a more accurate assessment

15  of the American Communities Survey data, and he testified at

16  length about that distinction in his direction examination.

17  It's an exercise in futility to take him through this exercise

18  with a number he's already indicated is less accurate.

19        MR. KELLY:  I understand that is the Plaintiffs'

20  current position, but it was their position when they submitted

21  the report that this was accurate.  We do not agree with them

22  that their updated number is the most accurate available.

23        JUDGE STADTMUELLER:  Now you are talking about

24  argument, Mr. Kelly, and looking at the schedule, the argument

25  comes this evening.  So in terms of taking your time, your

1  colleagues' time, the Court's time and Dr. Mayer's time, I'm

2  not sure why we're taking the time to go through this.  If you

3  want to argue that his earlier report is the better report, you

4  and your clients are certainly entitled to make that argument.

5          MR. KELLY:  And that certainly is part of our

6  position, is that his later report is not the most accurate.

7          JUDGE STADTMUELLER:  Well, why don't we talk about

8  the later report instead of the earlier report which everybody

9  apparently now agrees is less than accurate.

10          MR. KELLY:  Your Honor, we do not agree that it's

11  less than accurate.  That's why we are going through this

12  report.

13          JUDGE STADTMUELLER:  Okay.  Well, you have made your

14  point.  I'm speaking for my colleagues.  It's time to move on.

15          MR. KELLY:  Your Honor, are you instructing me that I

16  cannot pursue a line of questioning --

17          JUDGE STADTMUELLER:  You can do whatever you want.

18  You know the Court's position.  It's your case.

19          MR. KELLY:  Thank you, Your Honor.

20  BY MR. KELLY:

21  Q  All right.  Let's look at the bottom of that exhibit.  Now,

22  Dr. Mayer, when you performed your calculations to arrive at

23  the Latino citizen voting age, you adjusted it for citizenship?

24  A  I adjusted the Latino population for citizenship.

25  Q  You didn't adjust the rest of the population for

1  citizenship?

2  A   That's correct.

3  Q   So your calculations, this one and the later one, assume

4  that 100 percent of non-Hispanics are citizens eligible to

5  vote?

6  A   Well, the number is so close to 100 that I felt that it

7  was -- would be clearer to simply not make that calculation,

8  because, as you note, it's less than one and one-half percent.

9  Q   Um-hum.  And that is a readily ascertainable number, isn't

10 it, the less than one and one-half percent?

11 A   Working from the five-year table, I don't know whether

12 that's from the City of Milwaukee or statewide, but, again, if

13 that number is taken from the City of Milwaukee, this number

14 has to be taken from the City of Milwaukee, because otherwise

15 you are mixing two disparate statistics and you are not going

16 to wind up with meaningful results.

17 Q   Absolutely.  Let me walk through this.

18 A   Well, can you indicate or represent to me whether that .0148

19 is a statewide number from 2008 or the five-year ACS for the

20 City of Milwaukee?

21 Q   My understanding is that that number was taken from the same

22 source as the 35.75.

23 A   Okay.  It's not something that I have looked at, and that

24 may be true, but I don't know.

25 Q   Okay.  But let's just walk through this quickly.  If the

1  project is to find out the actual percentage of --

2  A  I dispute the word "actual," because we are dealing with

3  estimates here.  To represent that these numbers are the

4  equivalent of census and that there is no margin of error is

5  incorrect.  So these are not actual numbers, these are

6  estimates, and in this case it's not even a particularly --

7  Well, there are better ways of deriving more precise estimates.

8  Q  Well, and thank you for skipping ahead to the -- and

9  answering the next set of questions.  These are ballpark

10 estimates, correct?

11 A  They are not ballpark estimates, they are very precise

12 estimates, but they are estimates.  Ballpark presumes you are

13 guessing and you are happy to be within a significant margin of

14 error.

15 Q  All right.  But if we are to do the most accurate job

16 possible --

17 A  You would use the 2006 to 2010 American Community Survey,

18 which has a significantly smaller standard of error than the

19 estimates, and a significantly smaller confidence level of

20 these estimates than the 2008 survey.

21 Q  And continuing on the theme of being as accurate as

22 possible, we want to make sure that we are comparing apples to

23 apples, Latino citizens versus non-Latino citizens.

24 A  Fair enough.

25 Q  All right.  So if we use those numbers in the original

1  report that you did, we actually come up with a very slight

2  Hispanic citizen voting age population majority?

3  A  Which is 50.01 percent.

4  Q  Um-hum.

5  A  And you are asking me if I consider that to be an effective

6  citizen voting age majority in that district?

7  Q  No, I'm not asking you that at all.  I'm asking you is it a

8  majority.

9  A  It is one one-hundredths of a percent over 50, and that

10  would almost universally be regarded as a number that ought to

11  be rounded to 50.  Again, if you do the numbers on the more

12  accurate data, it's not 50.1, it would be 47 -- It goes up by

13  five-tenths of a percentage point, so it would go up to 47.57.

14  Q  I understand your position.  All right.  So let's take a

15  look at Exhibit 1126.  Now this is --

16  A  Well, again, I am not allowed to raise formal objections,

17  but I object to this because this is not the right set of

18  numbers.

19         MR. EARLE:  I will adopt my witness' objection, Your

20  Honor.

21  BY MR. KELLY:

22  Q  Dr. Mayer, I understand your position.

23  A  Well, but --

24  Q  Dr. Mayer, this is based on information that you provided in

25  this case.  I understand --

1  A  And it's also based on information that I updated with a new

2  set of numbers that I testified under oath are more accurate.

3  Q  I understand it's your position that it's more accurate.

4  A  It's not my position, it's a fact.

5  Q  Dr. Mayer, I understand it's your position.  Now what I

6  would like to do --

7  A  Well, okay, it's not my position, it's the position of the

8  U. S. Census Bureau.

9  Q  Dr. Mayer, let me get this straight.  Did you just pick a

10  number out of the thin blue air when you created the first

11  report?

12  A  No.

13  Q  You based it on what you thought was accurate?

14  A  I based it on the number that I was able to derive subject

15  to the constraints that were there at the time.

16  Q  All right.  Now we can have a conversation later about

17  whether your current estimate is more accurate than the earlier

18  estimate, but that's a conversation I'm not having with you

19  right now.

20  A  It's a conversation we ought to have right now.

21  Q  Okay.

22              JUDGE STADTMUELLER:  And I agree with Dr. Mayer,

23  Mr. Kelly.  I indicated earlier I'm not going to stand in the

24  way of how you want to conduct your trial, but you are not

25  being very helpful to the adjudicative process.  We understand

1    that Dr. Mayer had one set of data and made a report which has

2    been updated.

3         JUDGE WOOD:  I just had one question about that,

4    which is what lay behind the updating, whether the new numbers

5    had been available all along and you didn't use them or whether

6    new numbers became available.

7         THE WITNESS:  To answer that question, I was

8    attempting to derive the numbers on my own.  In my attempt to

9    download the five-year survey onto my computer, it caused it to

10   crash because the files were very large.  So as a pragmatic

11   matter I had no choice at that point but to use the one-year

12   survey.  After continued investigation I discovered an easier

13   way to obtain data from the five-year survey, which was

14   actually calculated by the Census Bureau, and so once I found

15   that, I determined that that was the better number and the more

16   accurate number.

17        JUDGE DOW:  The reason that's true is that it's more

18   specific to Milwaukee and also a longer duration?

19        THE WITNESS:  That's correct, Your Honor, and the

20   longer duration means that you have five times as many

21   responses as you do in the one-year survey.

22        JUDGE DOW:  And that reduces your rate of error as

23   you said before then?

24        THE WITNESS:  That's correct.

25   BY MR. KELLY:

1  Q  All right.  Let's take a look at the proposed Assembly

2  District 8 that you created.  That would be Exhibit 1127.  Can

3  we highlight the top half, please.  All right.  Professor

4  Mayer, you proposed a different Assembly District 8, is that

5  correct?

6  A  Well, no, that's not correct.  I drew a notional district

7  that I do not represent should be the way that District 8 ought

8  to look or that District 8 should have those boundaries.  I

9  drew that district with the specific intent of demonstrating

10  that it was possible to draw a district that met the equal

11  population requirements and was reasonably compact and that

12  was -- had a sufficiently high Latino citizen voting age

13  population to constitute a supermajority which I regarded as

14  necessary in order to protect the Latino community's ability to

15  elect candidates of choice.  So it's not my proposed 8th

16  District, it's simply a demonstration that such a district

17  could -- such a district could be drawn.

18  Q  Okay.  In isolation from all of the other districts and

19  other redistricting principles?

20  A  Not at all.  I mean, even if you took 8 and 9 as a fixed

21  boundary, it would be possible to draw a District 8 that fit

22  within those boundaries simply by retaining the pre-Act 43

23  orientation of District 8 in the north and District 9 in the

24  south.

25  Q  All right.

1   A   And you wouldn't have to change any other boundaries.

2   Q   Good.  Let's take a look at what that would look like.

3           MR. EARLE:  It was not clear to me that Professor

4   Mayer had finished his answer before you said "good."

5           MR. KELLY:  Please.

6           THE WITNESS:  I'm finished.

7           MR. EARLE:  Oh, you are.  I can't quite see with the

8   monitor in the way there.  I apologize to the court.

9   BY MR. KELLY:

10  Q   This table is taken from your reports, Exhibit 1017 at Pages

11  22 and 23, and your conclusion was that there was a total

12  Hispanic citizen voting age population of 60.06?

13  A   Yes, I also have redone these calculations using the more

14  accurate 42 percent non-citizenship rate, and using those

15  numbers the 60.6 becomes 57.7, so it's lower than this, but

16  still clearly constitutes a supermajority.

17  Q   So about a 2.3 percentage point difference?

18  A   Closer to 3.

19  Q   Okay.  Let's look at the bottom half.  Now --

20  A   Again, I didn't prepare this table.

21  Q   Right.  Do you know what the total minority citizen voting

22  age population would be in the district that you drew?

23  A   I did not calculate that.

24  Q   Okay.

25  A   Because in this context I don't believe it has any

1    relevance.

2    Q  You don't believe it's relevant to look at the total

3    minority population?

4    A  Not in the context of this district.  Usually when you are

5    combining minority populations, and Dr. Grafman has written

6    extensively about this, the typical cases where that's done are

7    where you have large -- where you have minority populations --

8    two different minority populations, neither of which by

9    themselves constitutes a majority, such as a district with

10   40 percent African-American and 40 percent Hispanic voting age

11   population.  At that point it's appropriate to explore whether

12   or not there's any evidence of coalitions or engagement between

13   the two communities so that their combined voting power is

14   sufficient to constitute a supermajority.  It's not appropriate

15   when you have a very, you know, when you have a 65 or

16   60 percent minority population of one type and then another of

17   8 or 10.

18      In this case you are adding African-Americans, you are

19   adding -- the bulk of it is African-American, but there's also

20   2 or 3 percent Asian population in District 8, and I have seen

21   no evidence that there's any coalition building.  In fact, the

22   testimony yesterday suggests that there's quite a bit of

23   tension.  So I don't see this as having much relevance to the

24   question of whether the Latino community, which is the

25   community at issue here, whether under the new configuration of

1   District 8 under Act 43 maintains or protects their ability to

2   elect a candidate of choice.

3   Q  All right.  So I understand, your position is that there's

4   no -- that other minority groups would be unwilling to vote for

5   a Hispanic candidate?

6   A  That's not what I'm saying.  I'm saying there's no evidence

7   that the groups work together.  It may well be that -- and I

8   did not perform a racially polarized voting analysis to attempt

9   to estimate racially polarized voting in District 8 between

10  White voters and African-American voters, because the number of

11  African-American voters are simply not sufficient to permit any

12  meaningful estimates.

13  Q  All right.  Dr. Mayer, let's turn to your testimony about

14  registration and turnout rates for the Hispanic community.

15  Before I do that, let's adjust that 75.6 percent at the bottom

16  for the close to 3 percent difference to account for your

17  updated numbers.

18  A  Well, I can't say what it would be, because the -- when you

19  are adding populations together, you can't just subtract a

20  fixed version.  You would have to redo the calculations.  So I

21  don't know that you can -- You can't just simply assume that

22  you can subtract 3 percentages points from this and that's the

23  accurate answer.

24  Q  Do you understand it would still be, even making that

25  adjustment, it would still be about 70 percent?

1  A  I suspect it would be.

2  Q  Okay.  All right.  So let's look at turnout.  You calculated

3  I believe it was 76 percent for the non-Hispanic community and

4  26 percent registration rate for the Hispanic community?

5  A  Correct, but that's not an issue of turnout, that was an

6  estimate of registration rates.

7  Q  Thank you.  How did you calculate those numbers?

8  A  As I explained yesterday, I attained a voter registration

9  list for the City of Milwaukee and then used the technique

10  known as surname analysis to identify registered voters with

11  Latino surnames and divided that by the total number -- the

12  total voting age population in the City of Milwaukee to derive

13  the figure of 26 percent, and then I did the same for the

14  non-Latino White population.

15  Q  Okay.  Did you do that specifically for Assembly Districts 8

16  and 9 and the wards contained in those districts, or was that

17  city-wide?

18  A  That's city-wide.  I suspect, in fact, I'm quite sure that

19  the numbers specifically in those wards in 8 and 9 would be

20  even lower.

21  Q  Let's take a look at the surname analysis just real quickly.

22  I believe you used what's known as the Word and Perkins Short

23  List?

24  A  I'm not sure it's called "the short list," but I did use

25  what you have as Exhibit 54, the Census Technical Working Paper

1   No. 13 from March of 1996.

2   Q  Do you know if this technical working paper notes at all how

3   that list of 639 Spanish surnames should be used?

4   A  It's an attempt to -- It represents an attempt to devise a

5   more direct way of identifying the most likely -- the names

6   that have the highest likelihood of -- How can I explain this.

7   The list of 639 names reflects an analysis of the 1990 census

8   and the surnames in the 1990 census that are most likely to be

9   Hispanic, because in 1990 there was a data file that provided

10  actual surnames of individuals along with their

11  self-identification as Hispanic.  So it reflected an effort to

12  update previous efforts to construct a surname analysis which

13  were not based on direct evidence.  In particular, the list

14  that they were comparing this to was a list that was developed

15  in 1980, I believe, or in the early 80s which was a much longer

16  list, but that list was not based on any direct connection.

17  That list was based on the names on individual tax returns that

18  were filed from areas known to be heavily Hispanic, and so it's

19  a much more indirect inference than this is.

20  Q  So let's turn to Page 20 of Exhibit 54.  Are you there?

21  A  Yes.

22  Q  Okay.  So this is Appendix Table A, and do you recognize

23  this as the list of the 639 most frequently occurring heavily

24  Hispanic surnames?

25  A  That's correct.

1  Q  Let's turn back now to Page 15, and let's look at that first

2  paragraph on the page.  So this says, "A significant portion of

3  the appendix is written for persons requiring electronic access

4  to individual surname data.  Consequently, persons with only a

5  causal interest in Spanish surnames can be adequately served by

6  reading Section 10.3 and browsing the contents of Appendix

7  Table A."  Do you see that?

8  A  Yes.

9  Q  This is not a causal endeavor that we are in, is it?

10 A  Well, and it also says that there are purposes for which

11 browsing the contents of the appendix will be sufficient, and

12 that's hardly what I did.

13 Q  Okay.  Well, let's take a look down and see what the

14 consequences might be according to the Technical Working Paper

15 of using this list.  Let's go to the second paragraph from the

16 bottom.  All right.  "For many purposes this abridged 639

17 surname list is sufficient for making a reasonably accurate

18 assessment on the number of proportion Hispanic within a

19 group," and it gives an example.  "Consider an organization of

20 100 persons.  Twenty of the organization's members have

21 surnames that match the abbreviated 639 entry surname list.

22 Armed with this information, one can reasonably conclude that

23 between 20 and 30 members are Hispanic."  Do you see that?

24 A  Yes.

25 Q  All right.  So it could be 20 to 30.  That 30 number is

1   50 percent higher than the 20 number, isn't it?

2   A   Well, you are talking about a small population.   That

3   wouldn't necessarily translate to a 50 percent difference, if

4   you were looking at a larger population.   Again, there's also,

5   I'm looking for it, there's also a paragraph in here where it

6   specifically notes that the length of a surname list is not a

7   major factor in the accuracy of the inferences that you make.

8       So if I can explain this, surname analysis always produces

9   false positives and false negatives where people with Latino

10  surnames are not Latino and people with non-Latino surnames

11  are, in fact, Latino.   That's been well established.   I use

12  this list because of the characteristics and, again, the reason

13  that reports like this are done reflect an effort by the census

14  to update the earlier list and derive better and more feasible

15  solutions to the problem of trying to identify people.

16  Q   Okay.   So let's now look at 10.1.1 on this page.   Just that

17  first paragraph would be fine.   Thank you.   All right.   So

18  persons who are satisfied with the minimal number of surnames,

19  preferably on a piece of paper, and adequately cover a large

20  proportion of the Hispanic origin surnamed population within

21  the United States can use this list.   So it says persons with

22  these surnames, with those surnames, represent more than

23  two-thirds of the Hispanic origin population and approximately

24  80 percent of the Spanish surnamed population.   So it doesn't

25  represent the 20 percent of the Spanish surnamed population,

1  right?

2  A  Well, there's no list that's going to capture everybody, and

3  the longer the list, the more likely you are to have false

4  positives.

5  Q  This is saying that the 639 list would miss approximately

6  20 percent of the Spanish surnamed population?

7  A  That's what that paragraph says.

8  Q  Okay.  All right.  So let's bring up Exhibit 1099.  Okay.

9  Dr. Mayer, this is -- I will represent to you this is a

10  stipulated table.  It's shows the election results of Assembly

11  District 8 since 1998.  What I'd like to do is take a look at

12  the names of the people who ran and check them against that 639

13  Spanish surname list and see if they are on there.

14  A  Okay.  Larriuz is not going to be on that list because you

15  misspelled it.

16  Q  I'm sorry.  Who?

17  A  Victor Larriuz.

18  Q  Larriuz?

19  A  It's Larriuz.

20  Q  Well, let's start with Pedro Colon.  He's on the list,

21  right?

22  A  We can check.

23  Q  Sure.  Let's check.

24  A  He is.

25  Q  All right.  How about JoCasta Zamarripa?

1    A  She is not.

2    Q  Victor Pike?

3    A  I don't believe that's a Latino surname.  That wouldn't

4    appear on even the longer list, although I can't say for sure.

5    Q  Can you take that piece off.  I believe he's listed as being

6    Hispanic.

7    A  That's true, but that's because that would be a case of a

8    false negative.

9    Q  So he's one person that that list would miss?

10   A  No, it would be -- I mean, just by looking at it I would

11   suspect that that name is likely European, so, you know, if

12   we -- I examined the voter registration list -- well, I

13   won't -- I'm not sure how that -- from the 1990 census, 2000

14   census, which also included information.  There are a number of

15   names on that list that are held -- that are held by people who

16   are listed as Hispanic that are quite obviously non-Hispanic.

17   So, again, there's no list that's perfect.

18      I'd also say this only constituted a very small piece of my

19   analysis, which was simply that registration study, nothing

20   regarded to turnout or election results or racially polarized

21   voting had anything to do with the use of the surname analysis.

22   In reading this report there is a section in here, I can't find

23   it, I'm not quite sure why, where they explicitly state that

24   the length of a surname list is not going to be a major factor,

25   and whether or not the inferences that you draw are going to be

1 any more accurate.

2 Q  Well, the people that wrote the list, they said there might

3 be a difference of 50 percent, the number that it actually

4 reflects?

5 A  Well, that's if you are talking about a population of 20,

6 and, yes, it is not a foolproof method.

7 Q  We really can't have any confidence in that 26 percent

8 number as being accurate?

9 A  I disagree.  I think that number might need to be adjusted,

10 and even if we adjust it by, you know, 10 or 20 percent, it's

11 not off by 50 percent.  There aren't that many people in the

12 community in the City of Milwaukee, and I should also note that

13 the longer list of 12,00 names that was the prior list, that

14 was developed in order to study Latino populations in the

15 southwest when you are talking about populations of tens of

16 millions of people.  It really was not developed and I don't

17 believe was intended to be use used for smaller populations.

18    In my view, this list is more than sufficient to draw

19 inferences about a small population.  Again, we're talking

20 about a voting age population of approximately 77,000

21 individuals.  So, yes, they are going to be infrequently

22 occurring surnames that are not on this list, but it's not like

23 there are 8,000 people in Milwaukee whose last name is

24 Zamarripa.

25 Q  Okay.  Let's do this, just in the interest of time.  I will

1  represent to you, even accounting for your representation of

2  Victor Larriuz's name is misspelled, I will represent to you

3  that 6 of the 11 people that ran in Assembly District 8 don't

4  show up on the 639-name list.

5  A  In 2008?

6  Q  Since 1998.

7  A  Of the people who are listed as Hispanic?

8  Q  Yes.

9  A  Can we blow up Table 16, make it larger?  Goodson is clearly

10  a non-Hispanic name.  That's not going to show up.  Well --

11  Q  I will tell you the ones that --

12  A  If they are not on the list, they are not on the list.  I'm

13  not going to argue with you there.  Again, the surname analysis

14  played only a very, very small role in my overall assessment of

15  participation.  It's just one piece of a much larger puzzle.

16  Q  Since that was a small piece of your analysis, let's move on

17  to talking a little bit about Gingles.  Can you tell me what

18  the three Gingles prongs are?

19  A  I can tell you my understanding of them as a social

20  scientist.

21  Q  Sure.

22  A  The three prongs of the Gingles test which flushed out the

23  practical requirements of the 1982 amendments to the Voting

24  Rights Act establishes three conditions for a finding of the

25  applicability of Section 2.  The first is the -- is a minority

1    or protected class of voters must constitute a sufficiently

2    large and geographically compact community so that it is

3    feasible to -- so it's feasible to contain it or to place it

4    into a district where it constitutes a majority.

5        The second is that that group must show evidence of

6    political cohesiveness, and the third is that there must be

7    evidence of racially polarized voting so that the voting of

8    non-minority voters is sufficient to deny the minority or

9    protected class of voters the opportunity to elect their

10   candidates of choice.

11   Q   All right.  Let's focus for a moment on that second prong,

12   this idea of cohesiveness.  To figure out the cohesiveness we

13   look at that community's voting behavior, yes?

14   A   That's one piece of it, yes.

15   Q   And the behavior that we are looking for there is evidence

16   that they will, on a more than 50-percent basis, prefer a

17   Hispanic candidate or a non-Hispanic candidate.

18   A   Well, again, that's only one piece of a much more detailed

19   analysis.

20   Q   It's an important piece, isn't it?

21   A   It is.

22   Q   Let's bring up Exhibits 1025 and 1017.  All right.  And

23   let's go to Table 7 in Exhibit 1017.  It's near the end.  It's

24   about five pages from the end of that exhibit.  All right.

25   Dr. Mayer, Exhibit 7 as it's on the screen, that's part of a

1    racial polarization analysis that you did to analyze voting

2    behavior in Assembly Districts 8 and 9, is that right?

3    A  No, that's incorrect.  This was the first table that I did,

4    which examines voting among Latino and White voters in

5    Milwaukee County.

6    Q  The whole of Milwaukee County?

7    A  That's correct.

8    Q  Not just 8 and 9?

9    A  Although the weight of those results, given how the Latino

10   community is concentrated, I believe it's approximately

11   two-thirds, perhaps a little bit more, but, yes, this was for

12   voting in Milwaukee County.

13   Q  Okay.  Can we blow up the first three columns on

14   Exhibit 1025 in the upper third and over to the right?

15   A  Here, Counsel, you are comparing apples and oranges, because

16   the second table was something that I produced in response to

17   the criticisms that Professor Gaddie made.  So these numbers

18   are not going to be the same as those appearing in Exhibit 7.

19   Q  Sure.  First I just want to ask you what it is.  So

20   Exhibit 1025 is a racial polarization analysis looking at most

21   of the same races as on Exhibit 7, but focusing simply on the

22   results of those races in 8 and 9, is that right?

23   A  That's correct.

24   Q  All right.  Can we capture one more column on Exhibit 1025.

25   A little bit further over.  Actually, we have to turn to the

1  second page of 1025.  Now this is a little bit difficult to

2  look at on the screen, but you can look at the hard copies.

3  The list of races there are the same as on Exhibit 7 except for

4  the -- except for the state senate district -- 2004 State

5  Senate District 8 race, correct?  You didn't use that on

6  Exhibit 1025?

7  A  I'm sorry.  Say that again.

8  Q  On Exhibit 7 the last race you have on there is the 2004

9  State Senate District 8 race?

10  A  That's correct.

11  Q  And that's not on Exhibit 1025?

12  A  That's correct.

13  Q  The bottom race on Exhibit 1025 is the city aldermanic race?

14  A  That's correct.

15  Q  So what I'd like to do is compare a couple of numbers, and

16  perhaps you can explain to me how they differ.  In particular,

17  the Rose Fernandez races.  You show percentage Latino voting

18  age voting for a Latino candidate as being 93.5 and 95.7

19  respectively for those two races?

20  A  That's correct.

21  Q  And looking just at Assembly Districts 8 and 9, how do those

22  numbers compare to the performance there?

23  A  These numbers are lower.

24  Q  Why is that?

25  A  Well, it's in large part because we're looking at different

1  data.  The last column of Exhibit 7 shows that we are talking

2  about -- we're dealing with over 450 wards, and that additional

3  data allows you to get much better estimates, and in these

4  races I believe the number or wards was typically on the order

5  of 40 or 50, so that's going to produce estimates with larger

6  errors.  So that's the first difference.

7  Q  Let's talk about the difference between looking at

8  county-wide results versus in 8 and 9.  I believe that you

9  testified earlier that the best evidence --

10       MR. EARLE:  Your Honor, may I object.  The parties

11  had agreed on a schedule, pursuant to the Court's request, for

12  dividing up the time today, and in light of Mr. Kelly's

13  disregard of the Court's admonition to how he should use his

14  time, we have now reached 10:00 o'clock and we are actually

15  past 10:00 o'clock, and the cross of Dr. Mayer, Professor

16  Mayer, was supposed to end at 10:00 o'clock.  A half-hour has

17  been allocated to the plaintiff for redirect prior to the

18  break, and so I would object at this point to further

19  examination under these circumstances.

20       MS. LAZAR:  Your Honor, I would address that and say

21  as being the one who drafted the outline for last night, we

22  started, because of Mr. Poland's discussion this morning, at

23  8:40, so it would be until 10:10, and we agreed yesterday that

24  these were not firm and tight, we should be close to them, but

25  there is still about ten minutes left.

1          JUDGE STADTMUELLER:  Well, I think, with all due

2     respect, we do need to stay on a locked-in schedule for the

3     rest of today.  Both all of you and the court and the court

4     staff and building security and utilities have all been

5     consulted about this, and so literally everyone associated with

6     this case is going to be out of the building by 9:30.  There

7     are travel arrangements for my colleagues and their staff and

8     the building custodians and the utilities.  So how you all want

9     to use the balance of your time today, whether there may be

10    further stipulations or whatever, the doors close at 9:30.  Be

11    guided accordingly.

12         MR. KELLY:  Thank you, Your Honor.

13    BY MR. KELLY:

14    Q  In the interest of moving this along, what I'd like to do is

15    take a look at -- Focusing our attention on Exhibit 1025, that

16    first race is the county supervisor race, is that right?

17    A  I believe so.  Is there a paper copy of this that I can

18    refer to?

19    Q  Exhibit 1025.  It's in your binder there.

20    A  Thank you.

21    Q  So what we have here is Daniel Cortez versus Peggy West and

22    Laurie King, right?

23    A  Yes, and I removed this from further analysis upon

24    discovering that Peggy West was, in fact, Latina.

25    Q  So we take out those two races, is that correct?

1    A    Right.

2    Q    Okay.  So now we move down to the third, state

3    superintendent with Ms. Fernandez?

4    A    Yes.

5    Q    All right.  Before we go any further, I just want to make

6    sure I understand what our project here is about.  Our project

7    is to try and figure out if the Hispanic community in Assembly

8    Districts 8 and 9 are cohesive in the way they vote for other

9    Hispanics, right?

10   A    Well, and also, Counsel, this includes populations in

11   District 9, so this is not limited to District 8.  It includes

12   the much lower percent of Latino voting age population in

13   Assembly District 9 as created in Act 43.

14   Q    Okay.  With that in mind, let's look at the King's

15   Ecological Inference result that you calculated that shows that

16   49.8 percent of the Hispanic population voted for

17   Ms. Fernandez.

18   A    That's correct.

19   Q    Okay.  That's below 50 percent just a little bit, but it's

20   below 50 percent?

21   A    That's correct.

22   Q    All right.  So according to that number it doesn't look like

23   Ms. Fernandez was the Latino community's candidate of choice.

24   A    Well, based on this estimate, which, again, is based on a

25   particular set of data that includes Latino and non-Latino

1    White voters in areas that are in District 8 and also areas

2    that are in District 9.  The estimate is, yes, she got

3    49.8 percent of the vote in the primary.

4    Q  And I'm glad you mentioned that this is an estimate, because

5    let's look at the next one.  This is also with Ms. Fernandez,

6    correct?

7    A  That's the general.

8    Q  And that's the general.  And that shows in Assembly

9    Districts 8 and 9 that she received 50.5 percent of the

10   Hispanic vote?

11   A  That's the estimate, yes.

12   Q  Okay.  So that calculated number there is just slightly

13   above 50 percent?

14   A  That's correct.

15   Q  Okay.  Now we have got these parenthetical numbers that

16   follow that.  Can you tell me what those are?

17   A  Those are the 95 percent confidence intervals which are --

18   specify the range in which the true value of that number will

19   fall 95 percent of the time.

20   Q  Okay.  Let's look at the next two races, and those were the

21   ones in which Pedro Colon ran for Circuit Court judge, is that

22   right?

23   A  That's correct.

24   Q  All right.  Now that shows that he was the Hispanic

25   community candidate of choice to the extent of 54.8 percent,

1 right?  Am I reading that right?

2 A  That's correct.

3 Q  And then that was the primary, and then in the general 64.4?

4 A  Right.

5 Q  Now Judge Colon won both of those races?

6 A  That's correct.

7 Q  Okay.  So in those two instances there certainly wasn't --

8 the non-Hispanic community didn't vote in such a way that they

9 were able to prevent him from winning those races, right?

10 A  Although it is true that in the City of Milwaukee the race

11 was very, very close, and that he won -- Actually, he won a

12 very large percentage of the vote in the City of Milwaukee and

13 performed much more poorly in the areas outside of the City of

14 Milwaukee, but still inside the county.

15 Q  Okay.  What we are interested in then is his 8 and 9.  The

16 project here is to see if Assembly Districts 8 and 9, Assembly

17 District 8 in particular, will be able to elect the Hispanic

18 community's candidate of choice.

19 A  Okay.  Yes.

20 Q  And in this case they did, Judge Colon won.

21 A  That's true, but, again, this racially polarized voting

22 analysis is only one piece of the larger puzzle.  One must take

23 into account turnout, and if you look at the bottom of the

24 table which shows the estimates of the racially polarized

25 voting, when we were dealing with the citizens adjusted Latino

1    voting age percentage, you will see that all these numbers get

2    larger.

3   Q   All right.  But he won?

4   A   The Circuit Court race, yes, he did, but he lost in

5    Districts 8 and 9 in the 2008 city attorney race.

6   Q   Right.  So there's no guarantees in life, but he can

7    certainly win in Assembly Districts 8 and 9 certainly when he

8    runs for judge?

9   A   I would have to look at the overall -- the actual vote

10   totals which would be more -- The thing is, this estimates a

11   particular quantity, or two particular quantities, which is the

12   percentage of Latinos and Whites who are estimated to vote for

13   the Latino candidate.  It doesn't tell you with any certainty

14   who won.  There's no need to rely on this to tell you who won.

15   You can go and actually look at the vote to determine that.

16   Q   Right.  I just want to make sure that we are looking at

17   races that indicate whether the Latino community can elect a

18   candidate of choice.

19   A   No, that is not what this is saying.  This is an estimate of

20   the percentage of Latino or White voters who vote for the

21   Latinos' candidate.  The only thing that this does is establish

22   whether or not there were patterns of racially polarized

23   voting, and it doesn't exhaust the task of determining whether

24   these numbers are sufficient to deny a community the

25   opportunity to elect a candidate of choice.  That requires

1   further analysis of the sort that I provided yesterday morning

2   about turnout and adding to the population.  I mean, the best

3   evidence of what will happen in Assembly District 8 comes from

4   the analysis of the 2008 city attorney race between, at that

5   point, Representative Colon and City Attorney Langley, which

6   shows that in those areas Pedro Colon lost that race.  And,

7   yes, he won in the areas constituting the old 8th District

8   under the 2002 district, but he lost in the new areas of the

9   8th that were added to that, and overall he lost.

10  Q  And, yes, I understand that that is your analysis of that

11  race.  But this is a different race and he won.  Now what I

12  want to do is circle back real briefly to your discussion of

13  these confidence intervals here.  So what you are saying is

14  that 95 percent of the time the actual value will fall within

15  that range?

16  A  Right, but it's not an equal probability at every point in

17  that range.  The confidence intervals are expressed as

18  probabilities with essentially a normal shaped bell curve.  So

19  the actual quantity -- The estimate of that percentage, the

20  first number, is the most likely outcome, and as you move out

21  you have a nice -- I will draw it here.  You have a nice

22  bell-shaped curve, and this is where the point estimate is, but

23  an estimate out here, which is the 95 percent confidence

24  interval, basically extends to the area of the curve that has

25  the area of 95 percent, but it's not true that a value here is

1    as likely to occur as a value there (indicating).

2    Q  Okay.  But what I want to make sure that I understand is

3    that in five of the races, five of the seven races you listed

4    here, that confidence interval extends below 50 percent?

5    A  Yes, but that does not mean that a number below 50 percent

6    is as likely to occur as a number above 50 percent.

7             MR. KELLY:  I understand.  If I might confer with my

8    colleagues a quick moment, I think we are just about done.

9    BY MR. KELLY:

10   Q  All right.  Dr. Mayer, just a few things and I think we will

11   be able to close up shop on this.  When we are looking at

12   whether the Latino community can elect a candidate of their

13   choice, we look at what happens when a Hispanic runs, we look

14   at how the Hispanic community reacts to the candidacy of that

15   individual, we look at the action of the non-Hispanic community

16   to that individual, basically speaking, right?

17   A  In rough outline, that's correct.

18   Q  Okay.  So in Assembly District 8 as it is configured, if an

19   Hispanic wins the Democratic primary, is he going to lose the

20   general election?

21   A  Probably not, because this is -- Milwaukee is a very

22   Democratic city.

23   Q  So what we're -- the race that is really going to be

24   important is the primary?

25   A  I would say yes, that the candidate who wins the primary

1    is -- the Democratic who wins the primary is very likely to win

2    the general.

3    Q   Okay.  Now your Table 7, Exhibit 7 to your report, that does

4    not look at or it doesn't tell you what the results of a

5    Democratic primary is going to be in Assembly District 8?

6    A   That's correct.

7    Q   Okay.  And then when we are looking at Exhibit 1025, that

8    doesn't tell us what the result of a Democratic primary in

9    Assembly District 8 would be?

10   A   That's correct.

11   Q   All right.  That's what we need to know?  We need to know

12   who's going to win the primary?

13   A   That's one piece of information you need to know.  There are

14   elections in the new area of Act 43 where the Hispanic

15   candidate lost.

16   Q   But we are concentrating on whether Assembly District 8 can

17   elect a Hispanic representative to the State Legislature.

18           JUDGE WOOD:  Are we talking about the new one or the

19   old one?  I just want to make sure I understand.

20           MR. KELLY:  The new one.

21   BY MR. KELLY:

22   Q   All right.  So would it be fair to conclude that if a Latino

23   candidate won the Democratic primary for the Assembly District

24   8 seat, the likelihood is that candidate is going to go on to

25   win the general election?

1    A    That's correct.

2    Q    Okay.  So what we need to figure out is whether a Hispanic

3    candidate is likely able to win the Democratic primary in

4    Assembly District 8?

5    A    Yes.

6    Q    And Exhibit 7 and Exhibit 1025 don't tell us if that's

7    possible?

8    A    That's correct.  They weren't designed to answer that

9    question.

10            MR. KELLY:  Okay.  One further moment, please.  No

11   further questions at this time.  Thank you, Dr. Mayer.

12            MR. EARLE:  Your Honors, we're 20 minutes into the

13   time that we had allocated amongst ourselves for the

14   Plaintiffs' redirect.  In agreement with counsel, I will, in an

15   effort to get us back on course, keep this as narrow and

16   focused as possible and see if we can get back on schedule.

17                    REDIRECT EXAMINATION

18   BY MR. EARLE:

19   Q    Earlier, Professor Mayer, you were searching for a paragraph

20   in exhibit -- I think it was the short list -- 54?

21   A    That's correct.

22   Q    And you were unable to find that in order to explain to the

23   court the question that was before you.  If you look to Page 13

24   under the caption "Conclusion" and look at the last paragraph

25   of that, is that the paragraph you were looking for?

1  A  Not completely.  There was a specific reference to the

2  length of a surname list that --

3  Q  Does this paragraph address the question that you were

4  discussing regarding false positives and negatives as you add

5  more names to the list?

6  A  Yes, it says that the longer the surname list is, the more

7  likely you are going to have false positives and false

8  negatives.

9  Q  Okay.  Thank you.  Is there anything more you want to

10  explain about that?

11  A  Well, that's just -- Again, the problem is the examples they

12  use in this report is that Smith is an, obviously,

13  non-Hispanic, non-Latino surname, but there are a lot of

14  people -- a lot.  There are certainly a non-zero number of

15  people with the last name of Smith or Brown who do identify as

16  Latino, just as there are individuals with the last name

17  Martinez or Hernandez or Garcia who identify as non-Hispanic.

18  So there's no -- this is not -- no matter how long or short the

19  list, you are never going to attain 100 percent accuracy.

20  Q  I think we might have found your page.  How about Page 11.

21  A  Yes, this is it.

22  Q  Okay.  Thanks.

23  A  At the bottom of Page 11 it indicates some of the

24  differences between the 1980 list which has over 12,000 names,

25  and it says that the database used in assembling the 1980 list

consisted of 80 million observations.  This sample uses only

1.8 million records.  In any case, the length or number of

names of a surname list has little correlation to its

effectiveness.

Q   Thank you.  And then you were asked other questions about

the decision to -- I'm switching now over to the American

Communities Survey and the decision to go from the single-year

2008 analysis to the five-year 2006 to 2010 data for Milwaukee

County.

A   Milwaukee city.

Q   Milwaukee city.  What was the date of your rebuttal report?

That would be Exhibit 60.

A   January 13th.

Q   Okay.  Do you recall the date of your deposition?

A   January 27th.

Q   Okay.  So you updated the data prior to your deposition,

isn't that correct?

A   Yes, as far as the table about the racial polarization

analysis in 8 and 9, but the correction or the updating to the

more accurate 42 percent non-citizenship rate I had done prior

to my rebuttal report.

Q   Okay.  Professor Mayer, you are familiar with the first

prong of Gingles, correct?

A   That's correct.

Q   Does Act 43 Assembly District 9 satisfy the first prong?

1  A  No.

2            MR. EARLE:  No further questions, Your Honor.

3            MR. KELLY:  Just -- Oh, I'm sorry.

4                    REDIRECT EXAMINATION

5  BY MR. POLAND:

6  Q  A switch of topics here, Dr. Mayer.  Going back to your

7  testimony yesterday, do you recall that Mr. Kelly asked you

8  yesterday about the overall population deviation in assembly

9  districts under Act 43?

10  A  Yes, I do.

11  Q  Do you recall what the population deviation is?

12  A  I believe it was less than 1 percent.

13  Q  Is that an acceptable population deviation considered in

14  conjunction with the traditional redistricting criteria you

15  examined?

16  A  Well, it's more complicated than that.  When I answered that

17  question, I was responding solely to whether I thought that

18  population deviation was within permissible bounds, but that

19  judgment doesn't occur in isolation.  No matter how small the

20  population deviation is, as long as it's not exactly zero,

21  there is still an obligation to comply with further

22  redistricting criteria and other statutory and constitutional

23  and jurisprudential requirements.  So just noting that the

24  population deviation by itself is less than 1 percent and

25  doesn't appear to exceed any threshold that triggers a much

1  higher degree of scrutiny, that doesn't exhaust the analysis.

2  You don't stop there and say, "We're done; everything else is

3  fine.  It doesn't matter what the plan looks like."

4  Q  And you have examined the traditional redistricting criteria

5  that you testified to in this proceeding, is that correct?

6  A  That's correct.

7  Q  Is it correct that it's your opinion that the population

8  deviations are not justified under the traditional

9  redistricting criteria that is in Act 43?

10  A  Subject to the problems that I noted, the fact that the

11  population deviations are small, doesn't free the map drawers

12  to do whatever they want.

13          MR. POLAND:  Thank you.  No further questions.

14                  RECROSS EXAMINATION

15  BY MR. KELLY:

16  Q  Dr. Mayer, just so I understand this completely, you have

17  not prepared or produced a racial polarization analysis that

18  would show us how the Latino candidate would fare in the

19  Democratic primary in Assembly District 8?

20  A  It's not possible to do that kind of analysis, because one

21  can only perform that analysis when you have one Latino

22  candidate and one non-Latino candidate.  It's also important

23  that the non-Latino candidate in that context get more than a

24  trivial amount of votes.

25  Q  So you don't have an opinion on how a Latino candidate in

1    Assembly District 8 would fare in the Democratic primary?

2    A  I do based on the actual election results that have occurred

3    in the area of the Act 43 Assembly District 9 -- District 8,

4    I'm sorry -- with respect to the differences and the

5    performance of what -- of the candidate who was actually the

6    incumbent of District 8, how he fared in the areas of the

7    previous District 8 and how he did in the new areas. Here you

8    had a race involving the incumbent for District 8 who loses an

9    election to a non-Latino candidate in those areas. That

10   strikes me as quite significant.

11   Q  Okay. But that was not a partisan primary race in Assembly

12   District 8?

13   A  That's correct.

14        MR. KELLY: Okay. Thank you.

15        JUDGE STADTMUELLER: All right. Thank you,

16   Dr. Mayer. You may step down. You are excused. At this time

17   we will take our morning break and we will reconvene at 10:45.

18        THE BAILIFF: All rise.

19        (A recess was taken.)

20        THE BAILIFF: All rise. The court is now in session.

21   The Honorable Judges J. P. Stadtmueller, Diane P. Wood and

22   Robert M. Dow, Jr., presiding. Please be seated and come to

23   order.

24        JUDGE STADTMUELLER: Call your next witness, please.

25        MR. POLAND: Your Honor, at this time the Baldus

1   Plaintiffs are going to rest our case.  Before we do, we have

2   some things that we need to do.  First of all, it's my

3   understanding in conferring with the Court's clerk that we will

4   be moving all of our exhibits into evidence en masse, so to

5   speak.  I believe we have reached an agreement that we will do

6   that based on the agreement that exhibits used with witnesses

7   are going to be moved into evidence.  In addition, any exhibits

8   that are used in depositions that have been designated, we

9   would move those exhibits, as well.  So we would move those

10  into evidence at this time, your Honor.

11          In addition, there is deposition testimony that we

12  have designated, as well, and we would tender that to the

13  Court, as well, in the Baldus case in chief.  We have two

14  exceptions.  One is that we just received Mr. Troupis'

15  testimony yesterday.  We are still in the process of

16  designating that testimony.  With the Court's leave, we will be

17  able to submit that before the end of the day today so the

18  Court will have it.  It simply will not be in the Court's

19  possession until the end of the day.

20          JUDGE STADTMUELLER:  For purposes of housekeeping

21  with regards to the witness' deposition transcripts that are

22  going to be substituted in lieu of actual testimony, I want you

23  to make an actual record in front of the court reporter,

24  whether providing a list or a stipulation or a designation,

25  because as you are aware, there have been a lot of items filed

 1   either as part of the pretrial report or successively.  There
 2   are few of these exhibits that counsel have found some errors
 3   in and have asked Mr. Willenbrink to substitute corrections.
 4   So you and your colleagues and Mr. Willenbrink, with the aid of
 5   the court reporter, need to make a record on all of this,
 6   because the last thing the Court wants to encounter is a
 7   dispute later as to what iteration of either a transcript or an
 8   exhibit is actually part of the official record of the trial.

 9            MR. POLAND:  If I'm understanding Your Honor
10   correctly, you'd like the specific numbers and the specifics
11   names of the components?

12            JUDGE STADTMUELLER:  Correct.

13            MR. POLAND:  We can do that.  We will work on it over
14   lunch and we'll do that before the end of the day.  We will
15   make sure we make that record.  The other caveat that I have is
16   on the deposition designations.  Ms. Lazar and I have agreed
17   that Dr. Morrison's report will be submitted, as well, as an
18   exhibit.  We may have a couple of things to do on
19   cross-examination, but we'll submit essentially
20   cross-examination based on the cross at deposition.

21            MR. SHRINER:  Your Honor, this may be a good time, if
22   I may.  Mr. Hassett and I have agreed and stipulated and the
23   principal defendants also agreed that the record on the Act 44
24   claims made by -- now only by the intervening plaintiffs may be
25   what is set forth in the stipulation, and we're going to e-file

1    it, but I have copies for the clerk.  There are also exhibits

2    attached to that, new exhibits, and so I would move the

3    admission into evidence of all of the matters referred to in

4    the stipulation.

5              JUDGE STADTMUELLER:  All right.  Implicit in that,

6    Mr. Shriner, is that other counsel received a copy?

7              MR. SHRINER:  Yes.

8              JUDGE STADTMUELLER:  Thank you.  The Court will

9    receive the stipulation.

10             MR. EARLE:  Your Honor, on behalf of the Voces de La

11   Frontera Plaintiffs I'd like to make a mirror motion with

12   regards to receipt of exhibits to that of Mr. Poland.  I won't

13   go into much detail, but with regards to all the exhibits

14   relative to -- that were presented through the testimony of my

15   examinations.

16             JUDGE STADTMUELLER:  With the same understanding that

17   I reached with Mr. Poland and Ms. Lazar, that request will be

18   granted.  Again, you need to review them with opposing counsel

19   and Mr. Willenbrink at the appropriate time.  We may now

20   proceed.

21             MS. LAZAR:  Thank, Your Honor.  We call to the stand

22   Dr. Peter Morrison.

23             PETER MORRISON, having been first duly sworn, was

24   examined and testified as follows:

25             MS. LAZAR:  Good morning, Dr. Morrison.

1          THE CLERK:  Dr. Morrison, would you state and spell

2     your full name for the court reporter.

3          THE WITNESS:  Peter A. Morrison.  That's P-E-T-E-R,

4     middle initial A, M-O-R-R-I-S-O-N.

5          MS. LAZAR:  Your Honors, in the interest of moving

6     this matter along, counsel for Plaintiffs and Defendants have

7     agreed that we're going to do sort of an expedited examination

8     of Dr. Morrison, and in that regard we would refer the Court to

9     the more detailed CV and the information that's entailed in his

10    report.

11                         DIRECT EXAMINATION

12    BY MS. LAZAR:

13    Q  I would ask you, Dr. Morrison, if you can give me maybe a

14    minute summary of your expertise in the area of demography.

15    A  Sure.  I characterize myself as an applied demographer.

16    That is someone who uses demographic techniques and data to

17    address concrete questions rather than pressing forward the

18    frontiers of knowledge.  My professional experience, briefly,

19    is I was on the faculty of the University of Pennsylvania as an

20    assistant professor affiliated with the Population Study Center

21    there for two years.  I then went to the Rand Corporation from

22    1969 through about 1995 or so where I was a staff demographer.

23    Then I was promoted to a senior staff demographer, and I also

24    was the founding director of Rand's Population Research Center,

25    which is the only NIH-funded research center outside of an

1  academic setting.

2     I have published extensively on a variety of applied

3  demographic topics with a substantial number of publications in

4  peer-reviewed journals concerning technical aspects of

5  measuring minority presence in particular neighborhoods of

6  cities, changes in minority share of the population.  I have

7  also published extensively about the applications of technical

8  demographic analysis to redistricting and addressing issues

9  that arise before the court in voting rights cases.

10    I have served on a number of professional committees, the U.

11  S. Census Bureau's working group on 2010 race ethnicity.  I

12  also was a member of and chaired their advisory committee on

13  population statistics.  I have worked also with the -- I have

14  been on review committees of the National Institutes of Health

15  and the National Science Foundation.

16    In terms of my professional field, I have held elected

17  office in the two principal professional associations of

18  demographers, Population Association of America where I have

19  been elected to the board of directors, and the Southern

20  Demographer Association where I was elected to the board of

21  directors and also as president of the association.

22  Q  Okay.  Thank you.  In this case, Dr. Morrison, were you

23  retained on behalf of counsel for the Defendants?

24  A  Yes, I was.

25  Q  And you were retained to undertake a demographic analysis of

1 the Latino population growth in Wisconsin, specifically

2 Milwaukee County?

3 A  Yes.

4 Q  And in that regard did you submit an expert report?

5 A  Yes, I did.  I submitted two expert reports.  One was my

6 declaration and expert report dated December 14th, and the

7 second one was a rebuttal report.

8 Q  Thank you.  If you could pull up Trial Exhibit 32, and in

9 front of you, Dr. Morrison, is Exhibit 32.  Is that a copy of

10 your expert report that was dated December 14th?

11 A  Yes.

12 Q  And in that expert report you list the information that you

13 base your report on, which we will not go into today, but on

14 Page 12 of your report you reach four conclusions, is that

15 correct?

16 A  That's correct.

17 Q  Can you quickly summarize what those conclusions are?

18 A  Yes.  Since 2000, and I'm referring here to 2000 census data

19 compared with 2010 census data, since 2000 Hispanics numbers

20 have increased in the State of Wisconsin, a slowly growing

21 state, and much of that growth has occurred within Milwaukee

22 County.  It is apparent that there is a well defined Hispanic

23 residential enclave that consists of various communities that

24 together are increasingly gaining Hispanic population both

25 through the influx of Hispanics into the state, and

1  specifically into the county, and also through the maturation

2  and growth of the Hispanic population as a predominantly

3  youthful Hispanic population ages into the voting ages and

4  thereby buttresses Hispanics' presence among potential voters.

5  That's the crux of what I found.

6  Q  Okay.  And was that opinion made to a reasonable degree of

7  certainty to the best of your scientific knowledge and

8  expertise?

9  A  Yes.

10  Q  We're going to go through a few points, not detailing most

11  of your report.  Just a preliminary comment.  You heard

12  Professor Mayer this morning discussing the American Community

13  Survey and the fact that that data regarding citizenship is not

14  included in the 2010 census.  Can you give me a few -- There

15  was also some reference to whether or not these were ballpark

16  figures.  Could you elaborate on that point?

17  A  Well, I think he's correct in stating that they are not

18  ballpark figures, they are the best available estimates of

19  Hispanics -- of the Hispanic share of the citizen voting age

20  population.  One can think of them as being measured in several

21  ways.  The American Community Survey is a national -- you can

22  think of it as a national miniature census that is conducted

23  annually.  There's an ACS survey that was conducted in 2006,

24  2007, et cetera, et cetera.  The latest one was in 2010.

25      The number of interviews conducted nationwide is so small

1    that it does not give a very precise estimate of anything down

2    to much smaller than a city level or a county level.  What

3    Dr. Mayer has used is an aggregation of five years of data.

4    That is to say, imagine you took a survey every year, added all

5    the interviews together covering a period of 2006 to 2010 and

6    that gave you a measure that told you about the population

7    during the period 2006 to 2010.  It's not a measure as of 2010

8    or as of 2006 or as of the midpoint 2008, it is during that

9    period.  That's as precise a statement as you can make.  If you

10   want the latest data, you would want 2010.

11   Q  Okay.  Going to one of your conclusions, you have a

12   conclusion that deals with the fact that the Latino or Hispanic

13   voting age population is likely to increase in the next decade.

14   Can you explain why that is?

15   A  Well, there are two demographic processes that are underway

16   that are the basis for my reaching that conclusion.  The first

17   is there is clear-cut evidence that Hispanics are moving into

18   the state, and specifically into the county, and also within

19   the county Hispanics are moving locally.  They are

20   redistributing themselves within the county and in a sense

21   gravitating toward the Hispanic enclave.  So one process

22   underway is Hispanics moving about.  No one can predict that

23   with 100 percent certainty into the future.  That could stop,

24   it could change.

25       There's a second process that's underway that is built into

 1   the populations structure, and that has to do with Hispanics'

 2   disproportionate concentration in the youthful ages, that is to

 3   say, underage 18.  If you look at the Hispanic population -- If

 4   you look at the under 18 population as a whole, Hispanics

 5   within Milwaukee County constitute approximately 7 out of every

 6   10 persons under 18.  In addition, the vast majority, virtually

 7   all of the Hispanics under 18, are citizens.  So with each

 8   passing year, 1/18th of that predominantly Hispanic population

 9   ages forward, enters the voting age as citizens and strengthens

10   Hispanics' concentration among persons who are eligible to

11   vote.

12     At the same time, if you look at the population 65 and

13   older, the majority of those persons are non-Hispanics.  These

14   are people who are passing through the ages of increasing

15   mortality and will, over a period of time, gradually die off.

16   So you have a process whereby people are being added to the

17   voting age population who are mostly Hispanic, and people who

18   are -- people are being subtracted from the voting age

19   population who are mostly non-Hispanic.  This process is built

20   into the population's structure, and it virtually guarantees

21   that Hispanics will inextricably increase as a share of

22   eligible voters.

23     I have done some estimates of the rate at which this change

24   with occur, and the easy way to think about it is the Hispanic

25   share of registered voters, I should say the Hispanic share of

1   the citizen voting age population over time within Assembly

2   Districts 8 and 9 will increase approximately 1 percent per

3   year going forward, and that is virtually guaranteed by

4   population structure, even if people stopped moving into the

5   county.

6   Q  Okay.  If the consultant can turn to exhibit -- Keep up

7   Trial Exhibit 32, but also pull up Trial Exhibit 1191.  Oh,

8   it's really hard to see.  I was going to say if you could bring

9   up the legend from that, but I don't think it's going to be on

10  any help.

11  A  I think I can help you here by just explaining --

12  Q  Yes, ignore that.  Dr. Morrison, if you can explain what

13  Exhibit 1191 is.

14  A  Yes, this is a map showing in color the degree of Hispanic

15  population change by census tracts between 2000 and 2010.  So

16  it's a picture of where the sheer numbers of Hispanics are

17  increasing.  The deepest shade of green corresponds to those

18  census tracts in which the number of Hispanics gained over that

19  ten-year period exceeded 1,000.  So you can see there is a

20  broad block of territory here deep green, and in each of those

21  boxes with a number in it that, represents more than a thousand

22  increase in Hispanics.  There's another one over here

23  (indicating).  These two things that I have circled are the

24  cores of the Hispanic -- of the growing part of this Hispanic

25  enclave.  The lesser shades of green are areas in which growth

1    is between 250 and 1,000 persons over this ten-year period.

2    The yellow -- I'm not sure if it's the yellow or the orange.  I

3    believe it's the yellow is slight growth, 0 to 250, and the red

4    area is an area of Hispanic population decline.

5        That red area corresponds to a small area which is a

6    combination of land that is -- that has moved from residential

7    into industrial use, and also a small area of gentrification.

8    The black boundaries that you see here which are outlined along

9    the top are the boundaries of Assembly Districts 8 and 9.  My

10   point here is simply to indicate that in terms of sheer

11   numbers, what you have here is a well-defined Hispanic enclave

12   that is growing as Hispanics are drawn to it as an area of

13   Hispanic cultural concentration.

14       As with any enclave in which people are present by choice

15   rather than by ghettoization, that is to say a process of

16   subtraction where everybody moved out leaving them stuck

17   somewhere, this is an area that is growing in the classic --

18   through the classic mechanism of an ethnic enclave through a

19   process of spacial diffusion, which means that as areas get

20   filled up with people and housing is occupied, other people are

21   drawn to it and they move into the more peripheral areas.  So

22   that what can be envisioned here is a spacial expansion in

23   terms of the sheer spacial reach of this enclave through both

24   the mechanisms of population movements as one mechanism, and

25   also the maturation of the Hispanic youthful population,

1    citizen population, who are resident here now.

2    Q  Okay.  If you can take that off the screen.  Let's try and

3    clear that.  If you can put back up or keep up Exhibit 32.

4    Turn to Page 10, please.  That's Table 4.  Dr. Morrison, if you

5    can explain to me the significance of Table 4.

6    A  This is simply a summary of the numerical change that

7    occurred over the ten-year period 2000-2010 in the area that

8    encompasses Districts 8 and 9.  As you can see, the total

9    population -- the first row here -- the total population all

10   ages increased only 7 percent.  Not much of a gain.  However,

11   if you look at the changes in the Hispanic population, 23 and

12   one-half thousand gained replacing a loss of 16,000

13   non-Hispanics.  Now that doesn't mean that there were 16,584

14   Hispanics who moved out.  It's a combination of people moving

15   out and people dying off, because the non-Hispanic population

16   is an -- is more heavily concentrated in the elderly ages.  So

17   what you have here is one group replacing another group in a

18   relatively fixed stock of housing, because the overall change

19   is only 7 percent, less than 1 percent per year.

20   Q  Okay.  In the course of this case, Dr. Morrison, you also

21   prepared a rebuttal report which is Exhibit 53?

22   A  Yes.

23   Q  If you could clear all of the exhibits and put up

24   Exhibit 53.  On Page 5 of your rebuttal report did you reach

25   some conclusions?

1   A  Yes, I did.  I reached three conclusions.  First of all,

2   Professor Mayer has pointed to the large disparity between the

3   Latino and non-Latino registration rates, and my analysis shows

4   that his comparison is fraught with limitations that in my

5   opinion invalidate any comparisons that one would make using

6   these measures.  It simply renders the comparison

7   uninformative.  He has really set up an apples and oranges

8   comparison because he has neglected to, first of all, account

9   for the fact that the denominator, he stated on the stand,

10  included non-citizens in calculating the registration rates.

11      Secondly, he has failed to adjust for the fact that the

12  Hispanic and non-Hispanic populations differ so dramatically in

13  their age structure.  The consequence of that is that he's not

14  accounting for the fact that because so many of the Hispanics

15  are in the young adult ages at which registration rates are

16  relatively low, and so many of the non-Hispanic registered

17  population is in the more mature ages where registration rates

18  are high, you really can't make a valid comparison.

19      My second conclusion is that Dr. Mayer has used the wrong

20  surname list for the analysis that he performed.  The list that

21  he used, as some of the text he referred to in his testimony

22  shows, is it's a quick and dirty list that's designed to give

23  you an approximate idea of what's going on, and I think the

24  figure that was cited in the text was that the technical

25  documentation indicates that that list will detect two-thirds

1    of the Hispanics and it will detect 80 percent of the Spanish

2    surname population.

3        So if you want to look at the -- at a neighborhood where

4    there's a supermarket and you want to pick out a neighborhood

5    where you ought to be stocking Hispanic food products on the

6    shelf, this is a good product to use for that purpose.  It

7    doesn't matter if you have got the right level, but in a

8    comparative sense you can get it.

9        My understanding of how Dr. Mayer proceeded is that he used

10   this short list rather than the longer one, which I have

11   actually published peer-reviewed research on in terms of why

12   it's the one to use and what its advantages are and what its

13   strengths are.  I believe that Professor Mayer has used this

14   foreshortened list in calculating the Hispanic share or

15   Hispanic number of registrants precinct by precinct in the data

16   matrices that he would have used for his ecological inference

17   analysis, and if that is so, and I believe it to be so from

18   reading his report, then this incomplete detection of Hispanics

19   basically totally infects his statistical analysis.

20       It's not just a matter of mismeasuring registration rates,

21   it's a matter of using a data matrix in a regression analysis

22   that is basically distorted and erroneous and could have been

23   corrected.  The only way to know whether it makes a difference

24   would be to replicate his work using the entire long list of

25   12,000-plus surnames, the one that is known as the census

1  bureaus list of Spanish surnames, and I would have hoped that
2  given the advance notice he would have replicated his analysis
3  using that list, because that's the way that it's done in my
4  field, and that's the list that's used in any analysis that I
5  have been a part of or seen for purposes of figuring out which
6  group favored which candidate.
7  Q  And you also had a third conclusion, and that was?
8  A  The third conclusion is I was asked to gauge the Latino
9  share, the Hispanic share, of eligible voters in the newly
10 enacted 8th Assembly District relative to what that Hispanic
11 share was in the former assembly district, and I can state with
12 a high level of confidence --
13      MR. EARLE:  I'm going to object to foundation.  What
14 it is it's being compared to in terms of the former AD8 in 2002
15 or on census day, it's not clear.  We're getting an opinion
16 about -- We don't know what we are getting an opinion about,
17 Your Honor.  The foundation hasn't been laid.
18      JUDGE STADTMUELLER:  That's something that Ms. Lazar
19 will have to develop, and you can certainly inquire about on
20 cross-examination, Mr. Earle.
21 BY MS. LAZAR:
22 Q  Dr. Morrison, when you did your comparison, when you are
23 saying that the Latinos now comprise a larger share of all
24 eligible voters in the newly enacted 8th Assembly District than
25 they did in the former 8th Assembly District, were you looking

1 at the former 8th Assembly District as of the 2000 census or as
2 it stood in 2010?
3 A  As of the 2000 census.  That is to say, the former 8th
4 Assembly District as of 2002.
5 Q  As of 2002?
6 A  Right.
7 Q  Thank you.  Now were the conclusions made in your report to
8 the best of your scientific knowledge and based on your
9 reasonable probability and certainty?
10 A  Yes.
11 Q  And you indicated, if I can just ask you, you indicated that
12 Professor Mayer's reliance on the abbreviated surname list,
13 which if you heard him testify on the stand today, he indicated
14 was a very small piece of his analysis and really sort of
15 didn't matter in the larger puzzle.  Would you agree with that
16 statement?
17 A  If I understand his procedures, I think that statement is
18 totally misleading because the dataset that he would have used
19 for his ecological inference analysis was a dataset that
20 required him to measure the Hispanic share of registrants or
21 voters, one or the other.  I believe he used registrants.
22 There are only two ways he could have measured that.
23     One would be to gauge Hispanics as a share of the voting age
24 population in each precinct at each point in time, and there
25 are only two points in time when you have a census, 2010 or

1    2000, and all of the intervening years would be kind of a

2    guesstimate.  I shouldn't say a guesstimate, an estimate, an

3    interpolation.

4        The normal way it's done, and I suspect the way he did it,

5    was to, as he says in his report, I checked the surname against

6    the abbreviated list of surnames, and if that surname was on

7    the list, I called that person Hispanic, and if it was not on

8    the list, I called them non-Hispanic.  What we know is a lot of

9    the non-Hispanics, just because they don't have a Spanish

10   surname, are not necessarily non-Hispanic, and the longer list

11   would have detected a larger number.  We already have the

12   measure of it.  It would have detected at least another quarter

13   count.  The numbers would be higher.

14       All of that distortion would creep into all of his

15   ecological inference analyses referring to all of the elections

16   that he has made statements about.  I don't know what effect it

17   would have.  I'm not saying that I know what the effect would

18   be, but I know that if you are using a thermometer that is

19   calibrated and you are trying to figure out who has a fever,

20   you are going to get wrong answers.

21   Q  You know that Professor Mayer submitted a rebuttal report,

22   and in that rebuttal report he had some comments to make about

23   your expert report.  Since we don't have time, I would just

24   refer the Court to Pages 13 and 16 of Dr. Morrison's rebuttal

25   report which responds to Professor Mayer's comments.  Do you

1  still stand by, after hearing the testimony this morning of

2  Professor Mayer, do you still stand by the opinions and

3  conclusions in your expert report and rebuttal report?

4  A  I do.

5  Q  And in conclusion, at the end you heard Professor Mayer

6  indicating that he based it on a number of -- based his

7  conclusions on a number of factors.  What's your opinion

8  regarding the factors he based his conclusions upon?

9  A  I think having based his conclusions on the use of the short

10  surname list kind of -- not kind of, but does undermine all of

11  his conclusions in the sense that the supporting data could

12  easily -- I could easily envision that they would change

13  direction in terms of conclusion, not just magnitude.  So I

14  would say there's a cloud of uncertainty floating over those

15  conclusions.  Some of them probably would be sustained, but I

16  think many of them might not.

17            MS. LAZAR:  Thank you, Dr. Morrison.

18            JUDGE STADTMUELLER:  Mr. Earle?

19            MR. EARLE:  Thank you, Your Honor.

20                    CROSS-EXAMINATION

21  BY MR. EARLE:

22  Q  Good morning, Dr. Morrison.

23  A  Good morning.

24  Q  Nice to see you again.  I guess I want to start with you

25  said the Latino community grows at a rate of 1 percent per

1  year.

2  A  I said that I project that this growth is built into the

3  population as it is now structured, and that was what I would

4  envision happening year by year.

5  Q  And I guess your report is -- let's go first to -- I'm

6  sorry -- Exhibit 32, Page 9.  Based on your projected growth

7  rate, you anticipate that or you predict that the Act 43 8th

8  Assembly District will not achieve a majority of Latino

9  citizens, in other words, eligible voters, until November of

10  2018, isn't that correct?

11  A  That's correct.

12  Q  Okay.  And as far as Assembly District No. 9, according to

13  your growth rate and your projections and the way you approach

14  this analysis, the 9th Assembly District will not acquire an

15  effective voting majority of Latino citizens at all in the next

16  decade, isn't that true?

17  A  It will not have attained it as of November 2020, and that's

18  a long time out into the future, yes.

19  Q  Okay.  So by your calculations Act 43 is not reasonably

20  calculated to produce a district in which the Latino community

21  can obtain an effective voting majority.  Isn't that true?

22  A  I'm a demographer.  I don't render opinions about effective

23  voting majorities.  That's a political science question.  I

24  will be happy to tell you what my understanding of that is and

25  what political scientists say about that.

1   Q  You are not a political scientist?

2   A  No.

3   Q  You won't quarrel with what I just asked you?

4   A  I have no reason to quarrel with it, no.

5   Q  That's the important thing.  Now and you said, I guess in

6  Conclusion No. 3 on the prior screen -- It was Exhibit 53, the

7  three conclusions.  Yes.  The conclusion in the Paragraph

8  No. 22 is the one I'm interested in because what you are saying

9  here is that there are more Latinos who are eligible to vote

10  under Act 43 in the 8th Assembly District now today than there

11  were in the year 2000 in the old 8th Assembly District, right?

12  A  That's correct.

13  Q  But you would agree with me that there are fewer Latinos who

14  are eligible to vote in the new Act 43 8th Assembly District

15  than there were on census day in the old 8th Assembly District,

16  isn't that true?

17  A  I don't know that I calculated that figure for the old one,

18  but, I mean, the two numbers can be compared and one can be

19  larger than the other or not.  It is what it is.  I don't know

20  what the old number was.

21  Q  But you sat here and you listened to Professor Mayer's

22  testimony about that question, correct?

23  A  I remember him testifying about it, but I don't remember the

24  number exactly.

25  Q  But you have no quarrel with what he testified with regards

1   to that question, isn't that true?

2   A   Not with that specific number.

3   Q   Okay.  Good.  All right.  Now you also testified that a vast

4   majority of Latinos under age 18 are US citizens?

5   A   Correct.

6   Q   Okay.  And that's based on the ACS data?

7   A   Yes.

8   Q   Okay.  But you didn't tell us about what the age

9   distribution is under the age of 18, correct?

10  A   Correct.

11  Q   So the percentage of Latinos who, for example, let's say who

12  are 16 to 18 who are U. S. citizens is going to be lower --

13  substantially lower than the percentage of Latinos who are 1 to

14  4 years of age?

15  A   I don't know that for a fact at all.  I don't know how you

16  know it for a fact.  There may be some fluctuations, but I

17  wouldn't think there would be anything like what you have

18  described.  I would have to collect the data.  But the point is

19  that the under 18 population is predominantly citizens.

20  Q   Okay.  But you are not prepared and you have no opinion as

21  to -- and you can't sit here today and tell us how that age

22  distribution skews across that 0 to 18 age range?

23  A   I don't think that one could get an accurate measure of it

24  with the ACS, because you are getting into a very fine degree

25  of detail by age.  You might be able to talk about the, you

know, the age group under 10 and 10 to 18 as an aggregate, but

the underlying understanding about Hispanic youth in this

country, and that would apply to the state and to this county,

is that when you are talking about the under 18 Hispanic

population, you are talking predominantly about native born

Hispanics. You are talking about the adult population. You

are talking about many people who could be non-citizens having

moved here in adulthood. That's how that comes about. But I

don't agree with your characterization about knowing any

substantial differences within the under 18 group, because I

think that's an unknowable point at this geographic scale. You

might know it for the nation as a whole, but at this geographic

scale, the American Community Survey data would just be too

thin to provide any meaningful measure of that.

Q  It doesn't make sense to you that the younger you are, the

more likely you are to have been born here as opposed to the

older you are, maybe you arrived through emigration?

A  The premise is that Latinos under 18 do not venture forth

from Mexico seeking economic opportunity on their own.

Q  They don't come with their families?

A  Some of them come with their families, but typically the

adult worker migrates separately, leaves the family behind. As

I say, the bulk of the under 18 Latino population has been

measured to be citizens nationwide, and I have no reason to

think that that would not be so in this county.

1    Q   And what percentage of the total Latino population is the

2    migrant worker who leaves his family behind?

3    A   I don't have a number for that.

4    Q   Have you ever done a racially polarized voting analysis?

5    A   I have not conducted it myself, but I have provided the

6    input data to statisticians who have conducted it.

7    Q   I would like you to tell me exactly how it is that Professor

8    Mayer used surname analysis in the course of conducting his

9    King's ecological inference racially polarized voting analysis.

10   A   I'm reading from Page 20 of his report.

11   Q   Fifty-five, Page 20?

12   A   I'm not sure what report it is, because I have two Professor

13   Mayer reports which both have the identical title, but if you

14   go to Page 20, I can tell you if that is the one.

15   Q   Is it there on the screen?

16   A   Yes, that's the one there.

17   Q   Okay.  Why don't we take Dr. Morrison's report off.  Okay.

18   Why don't you put a circle around the paragraph you are reading

19   from.

20   A   I'm going to be referring to this section here (indicating).

21   Q   Okay.

22   A   What I have read here is Professor Mayer says, "I obtained

23   data from the Statewide Voter Registration System for the City

24   of Milwaukee.  This database includes information on every

25   registered voter, including name -- I assume that 'including

1  name' is a meaningful phrase in this sentence -- address and

2  ward assignment.  Using it -- I assume by that he means the

3  data in that database -- it's possible to calculate

4  registration rates for different populations -- we already know

5  that he said that's where he used it -- and to do so by direct

6  observation without relying on any aggregate data that requires

7  any kind of ecological inference."

8  Q  Exactly.

9  A  That's what he's said about calculating registration rates.

10  I was unable to find any reference in his reports as to how he

11  calculated the Hispanic share of registered voters that he

12  would have had to use precinct by precinct, election by

13  election, in doing his ecological inference analysis.  I know

14  that he would have to have a variable like that.  Where he got

15  it could be either as an approximation using census data, which

16  would be a poor one, or a preferable one, which I believe is

17  the way he did it, would be to have matched the surnames of

18  these registered voters which he says he's already working

19  with, and then for Precinct 1 he would have 500 registered

20  voters and he would say, "Of those 500, I found 100 were people

21  whose surname appeared on the short list, so I would say that

22  gives me the fraction Hispanic in that precinct."  He says in

23  his report that's how he did it.

24  Q  He says in his report how he did what?

25  A  How he -- He said that is how he used the surname data.  I

1  don't know if he used it.  He doesn't say explicitly that he
2  used it for calculating precinct level registration rates, but
3  I am reading his report to be that that's what he did.
4  Q  So you are guessing that he used that data.  Am I
5  misinterpreting what you just testified?
6  A  I'd say I'm inferring that if he did, in fact, perform
7  ecological inference analyses, rather than lying that he did,
8  if he did it, he would have had to have a measure of the
9  Hispanic share of registrants or the Hispanic share of actual
10 voters.  He could have gotten that in either of two ways,
11 census data or surname data.  I don't know which he used, but I
12 believe he used surname data, because he had that data and that
13 would have been the data of choice.
14 Q  So this inference of yours that that's how he did it, that
15 he went and he counted precinct by precinct the Latino
16 registrants is based on your knowledge of how it is that a
17 racially polarized voting analysis is conducted, never having
18 done one yourself?
19 A  No, I have been part of actually assembling the data.  I'm
20 talking about the phase of the analysis that I participate in,
21 which is to assemble the variables that a statistician uses and
22 then interprets.  So I'm at the -- kind the mechanic ends of it
23 where people say, "I need precinct-level data measuring this so
24 I can do the statistical analysis."  I don't do the statistical
25 analysis, I provide the front-end data, and I'm inferring that

1    that's what he did.

2        You can ask him if that's what he did, but if he didn't do

3    that, he would have had to use census data, and the census data

4    would be for two points in time.  He'd either know what the

5    world was like in 2000 or he would know what the world was like

6    in 2010, and for any election in between he would be

7    interpolating, and he would also be one step removed from the

8    Hispanic share of registrants because he would simply have the

9    Hispanic's share of the voting age population, which is the

10   less desirable metric.

11   Q  So this inference of yours, do you hold that inference to a

12   reasonable degree of empirical certainty?

13   A  I can only say it's an inference.  I don't think I have

14   enough information to say that I'm -- I can't tell you how

15   certain or uncertain I am.  I would like to hear what the

16   answer is directly from him, but he hasn't reported in his --

17   any of his reports how he did it, at least none that I read.

18   Q  So you not asking this court to rely on your inference?

19   A  I'm asking the court to question the possibility that this

20   may have been how he proceeded, and if he did proceed this way,

21   that the entire set of analyses of elections would be called

22   into question until it was properly replicated.

23   Q  I see.  Switching gears here, there was a map up that you

24   prepared that showed the growth rate.  What exhibit number was

25   that?

1              MS. LAZAR:  1191.

2    BY MR. EARLE:

3    Q   1191.  Thank you.  Could you call that up, please.  Could we

4    call up -- Well, let's get something clear about 1191 first.

5    The darker the green, the faster the growth rate, right?

6    A   The darker the green, the larger the number of Hispanics

7    added.  It's not a growth rate, it's an absolute count.

8    Q   The number of folks added?

9    A   That's correct.

10   Q   That doesn't tell us how many Latinos were actually there,

11   correct?

12   A   No.

13   Q   So let's call up 185.  You have seen this map before, right?

14   A   Yes.

15   Q   Okay.  You don't quarrel with Exhibit 185, do you?

16   A   I don't have any reason to, no.

17             MR. EARLE:  Okay.  I just wanted to make sure.  Thank

18   you, Dr. Morrison.  I'm done.

19             JUDGE STADTMUELLER:  Ms. Lazar, do you have some

20   additional questions?

21                     REDIRECT EXAMINATION

22   BY MS. LAZAR:

23   Q   Dr. Morrison, I have just one quick question for you.  When

24   you were looking at Professor Mayer's report and you were asked

25   about the ways that Dr. Mayer calculated the registration rate,

 1  did you -- did I hear you say correctly that there are only two

 2  ways that you know of that it could have been done?

 3  A  Yes.

 4  Q  And those two ways were using the census data, which is not

 5  very accurate, or using the surname list, is that correct?

 6  A  I would say the census data, it's not that it's not

 7  accurate, it's one step removed from the measure you want.

 8  It's the less preferable way of proceeding, if you had the

 9  choice of methods.

10          MS. LAZAR:  That's all I have.  Thank you,

11  Dr. Morrison.

12          JUDGE STADTMUELLER:  Thank you, Doctor.  You may step

13  down.  You may call your next witness, Counsel.

14          MR. KELLY:  Thank you, Your Honor.  The GAB calls

15  Dr. Keith Gaddie.

16          RONALD KEITH GADDIE, having been first duly sworn,

17  was examined and testified as follows:

18          THE CLERK::  Mr. Gaddie, would you please state and

19  spell your full name for the court reporter.

20          THE WITNESS:  Ronald Keith Gaddie, G-A-D-D-I-E.

21                    DIRECT EXAMINATION

22  BY MR. KELLY:

23  Q  Good morning, Mr. Gaddie.

24  A  Good morning, Mr. Kelly.

25  Q  Dr. Gaddie, have you been retained by the Government

1    Accountability Board with respect to this case?

2    A   That's correct.

3    Q   Could you describe for me if you have any experience in

4    redistricting matters?

5    A   Yes, I have worked as a -- Pardon me.  I have worked as a

6    testifying expert, litigation consultant and a consultant to

7    jurisdictions in redistricting matters for about 12 years.

8    Q   And what types of subjects have you worked on within that

9    field of redistricting?

10   A   I have worked with issues of electoral competitiveness, the

11   application and use of traditional redistricting criteria in

12   crafting maps.  I have been involved in voting rights

13   litigation and dealings with maps that are designed to address

14   voting rights remedies.  I have worked with local and state

15   jurisdictions in this process.

16   Q   Dr. Gaddie, you are being compensated for your time here?

17   A   Yes.

18   Q   And at what rate?

19   A   $300 an hour.

20   Q   Dr. Gaddie, did you submit expert reports in connection with

21   this case?

22   A   Yes.

23   Q   Okay.  Could you take a look at Exhibit 30.  While we are

24   waiting for the arrival of your exhibits for your reference,

25   could you describe for me how you first became associated with

1  the redistricting efforts in the State of Wisconsin?

2  A  Yes.  Last winter I was contacted by attorneys from Michael,

3  Best & Friedrich to be retained by them to assist them as

4  counsel to the Legislature on the crafting of the assembly and

5  congressional districts.

6  Q  And what did you do in connection with that retention?

7  A  A variety of things.  As we have seen in the course of this

8  trial, there's a great deal of quantitative information that

9  goes into redistricting, there is information that needs to be

10  measured and considered.  I worked with Michael Best and with

11  redistricting staff in identifying measures that they should

12  use in the process of redistricting, development of measures of

13  partisan responsiveness, identification of measures

14  traditionally used in redistricting, such as measures of

15  compactness, measures of core retention, measures of delay in

16  voter franchise and attempted to explain to them in some

17  instances how some of the more detailed measures, such as

18  compactness measures, worked and exactly what they contained.

19  I worked with them in the application of these measures in

20  their efforts to produce maps for the State of Wisconsin.

21  Q  And, Dr. Gaddie, what qualifies you to provide that kind of

22  guidance and information to those who draw maps?

23  A  Well, I have been testifying as an expert witness in

24  redistricting cases since 2001.  I have been retained in other

25  states in a similar role and by local jurisdictions in that

1   capacity.  So examination of my vitae, which is attached to the

2   back of Exhibit 30, details a variety of cases and

3   jurisdictions that I have been involved in, and ten years ago I

4   was retained as a testifying expert by litigants in the

5   Wisconsin redistricting.

6   Q  Very good.  For the sake of time, we won't go through all of

7   the items in your lengthy vitae.  Could you tell me what type

8   of guidance did you give?

9   A  When we go to redistrict, we have two top priorities, which

10  are two equalize the population of districts and to also ensure

11  that we act in the interest of racial fairness, that we don't

12  produce a map that has a discriminatory result.  To that end,

13  my first guidance to the map makers was to ensure that we

14  crafted districts of as nearly equal population as practicable.

15  We discussed the existing minority opportunities that existed

16  in the State of Wisconsin.  I discussed the need for the

17  continuity of those opportunities.

18     We attempted to identify data that would -- that I could use

19  to give me a sense of rates of voter participation in these

20  areas and to use that to attempt to give guidance to the map

21  makers regarding how they might proceed in assuring continued

22  fairness of the map for minority representation opportunities,

23  primary voter access.  We discussed a variety of redistricting

24  principles that might be applied in the map, and we also

25  discussed distinct redistricting principles that are applied in

1  Wisconsin.

2  Q  Like what?

3  A  Well, the State of Wisconsin requires that, to the extent

4  practicable, consideration be given to county and municipal

5  boundaries, so we discussed the importance of those criteria

6  and we discussed how they were going to deal with it.  We also

7  discussed this issue of disenfranchisement.  In the previous

8  litigation ten years ago, this was a prominent area of

9  discussion in the expert reports not so much in testimony, but

10  it did come up in depositions, and Wisconsin has a history of

11  taking notes of this characteristic of their state senate

12  elections.

13      This is the only state I have come into where in the use of

14  a four-year senate with staggered terms this issue comes up, so

15  I was mindful of it and offered guidance to the map makers

16  regarding it.  Specifically what I told them was that they

17  needed to look at prior map making, to the actions of the court

18  in previous map making, and to consult with counsel in crafting

19  a map.

20  Q  Do you believe that the people that you were counseling with

21  respect to these issues, do you believe they understood what

22  your counsel was?

23  A  Yes.

24  Q  And do you believe that they followed that counsel?

25  A  Yes.

1  Q  Dr. Gaddie, I'm going to hand you a stack of exhibits.  For

2  your reference, please take a look at Exhibit 30.

3  A  Yes.

4  Q  Can you tell me what that is?

5  A  This appears to be a copy of my expert report submitted

6  December 13, 2011.

7  Q  Okay.  And would you also take a look at Exhibit 58, which

8  is the third exhibit from the back, actually.

9  A  Yes, this is a copy of my rebuttal report submitted

10  January 13th.

11  Q  All right.  Are there any corrections that need to be made

12  to your original report, Exhibit 30?

13  A  Yes.  At the very front of the rebuttal report I note

14  corrections to the report of December 13th with regard to

15  incumbent pairing, and that appears in Table 9 of that report.

16  I also note that there are corrections that have to be made to

17  incumbent core retention.  The largest core retention numbers

18  were recalculated.  Professor Mayer and I discovered common

19  errors in our data and corrected those, and the analysis

20  conducted in the initial report related to core retentions is

21  repeated again with corrected data at the back of the rebuttal

22  report.

23     Now in addition to that, I would direct the Court to one

24  other correction, which is that on what would be Page 4, in the

25  second full paragraph just above Section 8, this would be the

second to the last paragraph of Section 7, I have a notation

regarding delayed voting effects, and I noted that I had

observed states that had delayed voting effects in state

senates.  I had not made that observation in my initial report.

The footnote that was recorded there was intended to indicate

the states that do have delayed voting.  In the process of

dropping the note in, I dropped in the note that indicated the

jurisdictions that use recall.  So Footnote 5 should be

disregarded.  Because I could not get on the internet to pull

the information that I have archived, I was not able to pull

that data up for the correction at this time.

Q  Very good.  Let's talk about some of the additional

redistricting principles that the plaintiffs have been

concentrating on in this case.  One of the issues that they

mentioned was equal population amongst the districts.  Are you

aware of that?

A  Yes.

Q  All right.  Have you analyzed the population deviation in

Act 43 with respect to the assembly and senate districts?

A  Yes, I have.

Q  All right.  Do the tables relating to that appear on Pages

12 and 13 of your report, Exhibit 30?

A  Yes.

Q  All right.  Can you tell me what those tables tell us?

A  Tables 1 and 2 on Pages 12 and 13 indicate the population

1    deviations of districts for the Wisconsin Assembly and

2    Wisconsin Senate both for the previous two court-crafted maps

3    of 1992 and 2002, then for the application of 2010 census data

4    to the 2002 court-drawn map, and then finally the application

5    of the 2010 census data through Act 43 in 2011.

6        Entering this redistricting in the Assembly, the range of

7    population deviation was over 48 points for the Wisconsin

8    Assembly, meaning that the assembly districts, due to

9    demographic shift, population shift, population growth, no

10   longer satisfied the one person, one vote standard.

11       Similarly, for the state senate the range is in excess of 26

12   points.  Population deviations within 5 points, as the Court

13   well knows, are permissible, but there is no diminimous

14   standard of population deviation.  There's an expectation of

15   population equality as equal as practicable, and then

16   population deviations can be explained by certain neutral or

17   state policies.

18       Act 43 produces a map that has an overall population range

19   in the assembly of from minus .39 percent to plus .37 percent

20   for an overall range of 76 one-hundredths of a percentage

21   point.  In the state senate the overall population deviation

22   range is .62 percent with a low of minus .27 percent and a high

23   of plus .35 percent.  These are not the most equally populous

24   districts I have seen drawn this cycle.

25       The State of Illinois zeroed out all of their population

1  deviations for the state legislature, but this is a very tight

2  map with regard to overall population equality.

3  Q  How does it compare to the last two redistricting maps that

4  have been drawn for the State of Wisconsin?

5  A  Population deviations are actually smaller in the assembly

6  for each of the last two court-crafted maps.  In the senate the

7  population range is smaller than the 2002 map, but slightly

8  larger, a tenth of a point larger than for the 1992 court map.

9  Q  All right.  Dr. Gaddie, have you formed an opinion as to

10  whether Act 43 meets acceptable population deviation standards?

11  A  It does.

12  Q  How did you arrive at that conclusion?

13  A  Well, again, the population deviations are very small, and

14  this is the first principle.  These are highly equalized state

15  legislative districts.  As I indicated, for this year from the

16  maps that I have reviewed in several states, among maps adopted

17  this is the second most equalized set of maps I have observed.

18  Q  And the most equalized map is the one that went to zero?

19  A  Yes.

20  Q  What affects does reducing population deviation have on

21  other redistricting factors?

22  A  When you go in pursuit of population equality, other

23  redistricting criteria might need to be relaxed.  One thing we

24  discover is sometimes districts will become somewhat less

25  compact.  Necessarily, core retention will go down.  In

1  equalizing population we'll often discover that you have lower

2  degrees of core retention than if you had simply pursued trying

3  to bring districts into some presumed safe harbor.  Sometimes

4  in pursuit of absolute zero we will find that municipalities,

5  townships or counties will be split.  In pursuing population

6  equality other criteria fall away.

7  Q  And in particular, with respect to core retention, why would

8  core retention go down when you are pursuing very, very equal

9  populations in the districts?

10  A  Because as a general rule you are going to have to take

11  population from somewhere to make up for underpopulated

12  districts.  If we worked with a larger population range, a plus

13  or minus 5 point range, and then we were to attempt -- and then

14  we attempted to only get just within that range, we would be

15  moving fewer people around by definition.

16     The consequence of this, though, would be that in

17  underpopulated districts, if we only made it up to a minimum

18  threshold of being within a 10 point range, which we should

19  note is not a safe harbor, is not a safe harbor, we have been

20  taught that lesson in the last decade in the Larios case, you

21  are not going to have to move as many people around.  It really

22  is that simple.  But the consequence is that areas that are not

23  growing as quickly or have been losing population continue to

24  be underpopulated.  The areas that have grown rapidly, if you

25  bring them down to the minimally acceptable maximum population

1  will be overpopulated and will probably grow to be

2  overpopulated.

3      Moving towards zero population deviation, towards tight

4  deviations, is one way of precluding -- is one way of

5  precluding letting other interests enter into the map and

6  having the relative strength of the vote structured by it.

7  Q  So this is the, in all of the maps that you have seen in

8  this redistricting cycle, this is the second best with respect

9  to population deviation?

10  A  That's been enacted, yes.

11  Q  Okay.  Now your opinion with respect to how Act 43 addresses

12  population equality, do you hold that to a reasonable degree of

13  scientific certainty?

14  A  Yes.

15  Q  Now did the map makers pursue population equality with

16  respect to this map?

17  A  Yes.  This was a priority.  This was a priority for them,

18  was to have very low population deviations.

19  Q  And you mentioned that pursuing small population deviations

20  has an impact on core retention/population movement?

21  A  Yes.

22  Q  Let's explore that a little bit more.  Can you tell me how

23  that relationship works a little bit more?

24  A  Well, let's suppose we have a series of districts that are

25  arranged and that are generally underpopulated and one of the

districts is 15 points under population.  If we're going to

bring it to absolute zero, we need to go find 15 percent more

population from surrounding districts.  If we only bring it to

within 5 points of the ideal, we only have to go find 10

percent of population from surrounding districts.

The more we pursue population equality when we have got

regionally concentrated underpopulation or regionally

concentrated overpopulation the more people we will move around

by definition, because if we don't purchase population

equality, we will take fewer people from the surrounding

districts, which lessens the necessity for those districts to

go out and find additional people to bring them up to

population.  So what it does is it smoothes out the ripple

effect that occurs in equalizing population.

Q  All right.  Now are you familiar with Dr. Mayer's testimony

with respect to this idea of least change to get to population

equality?

A  Yes.

Q  Do you have any opinion on the topic of least change?

A  Well, least change maps are great maps for courts is the

first thing.  You know, if I were to direct the Court to a

citation, there's a 2005 George Washington University article

by Professor Nathan Pearsley that talks about the various

strategies used by courts in crafting maps, and one of the

strategies is to take the steps to remedy the illegal defects

1    of any given map and to put no greater political thumb than

2    necessary on the map otherwise.

3        One way of doing this is to pursue moving no more people

4    than necessary to equalize population while also being mindful

5    of other redistricting criteria.  You know, courts have

6    tremendous latitude to pursue the crafting of legal maps, but

7    as Professor Mayer noted in his testimony earlier today,

8    legislatures and courts approach redistricting differently.

9        Legislatures consider a variety of factors, including

10   political factors, in crafting maps, and we expect courts to

11   be -- to deal with those issues of the law and to rectify those

12   issues and to not induce any greater political change than

13   necessary.  But the Court, the panel, doesn't need to be

14   lectured from me about that.

15       Where least change comes into play is in ascertaining the

16   extent to which the baseline map can continue forward.  Now the

17   thing about least change is that you are starting with the

18   assumption that the baseline map is the only acceptable

19   foundation for crafting a map, and the baseline map will

20   represent the last legal map that a court will attempt to

21   address.

22       For a legislature, unless the state constitution or statute

23   requires them to be bound by least change, they are not bound

24   by least change.  They can enact political change.  The State

25   of California, you know, as Professor Mayer correctly noted,

the California Commission was put into place to attempt to pull a degree of politics out of their redistricting. One consequence is they do have a high degree of disfranchisement occurring or delayed voting occurring, but they saw this as an effort to undue a previous political gerrymander. The California map by definition was not meant to be a least change map, because the voters of California created a commission which is an entity of the state to create a map, and it was bound by different principles and had different priorities set to it.

So least change can be a principle to be pursued, and it's a principle often pursued by courts, it can be pursued by legislatures. But what it does is it starts with the assumption that you're institutionalizing the incumbent districts, you are maintaining the continuity of representation between the incumbents and their constituents. Again, Professor Mayer correctly notes incumbents do not have a property right to their district. Professor Mayer and I have both said this in public before, and it's true. But when you enact least change, you are maintaining a continuity of representation, and who does the voter have a continuity of representation relationship with.

Let me start over. When you assume least change, you are assuming a continuity of representation for the voter. Who does the voter have that representative relationship with other

1  than the law maker.  So the incumbent is a component of core
2  retention, and the incumbent is a component of the least change
3  criteria.  Now it's permissible to have least change in the
4  context of the constituency in general, as well.  The incumbent
5  retires, the constituency is based upon a identifiable
6  community of interest.  But most often when we hear least
7  change we're talking about continuing the incumbent's district
8  and continuing the relationship from the last election -- of
9  the previous constituency into the redrawn constituency that
10 that incumbent enjoyed with his voters, whether they choose to
11 retain him or reject him.
12 Q  Is there any problem with a legislature pursuing a least
13 change map?
14 A  Well, again, if you have any institutionalized bias in the
15 shape of your map, you are going to continue those in a least
16 change map.  It may be that a legislature's majorities change;
17 majorities have different priorities.
18 Q  Is there any requirement that legislatures follow a least
19 change approach?
20 A  For the State of Wisconsin I have no knowledge of a
21 requirement.  I have never seen that requirement articulated
22 outside the court context, and I have articulated it myself in
23 legislation, in litigation, but least change isn't just about
24 moving the fewest people around, it's also about maintaining
25 the political balance in the district.  It's about maintaining

1    possibly the distribution of seats in terms of geography

2    mindful of one person, one vote.  It's about not substantially

3    deviating the compactness of the districts compared to the

4    baseline map.  It is about maintaining the previous map in as

5    much of its form as possible, mindful of one person, one vote.

6    Q  Very good.  Can we go to Exhibit 1017, please.  Turn to

7    Exhibits 2 and 3 to that expert report.

8    A  Can I get some more water?  I have picked up a dry cough.

9    Q  Thank you.  Can you tell me what Exhibits 2 and 3 show us in

10   Dr. Mayer's report?

11   A  Exhibit 2 is the population shifts in the assembly

12   districts.  Exhibit 3 is the population shifts in the senate

13   districts.

14   Q  All right.  In Column 7 of Exhibit 2 he has a column headed,

15   "Ratio of Total Population Shift to Required Shift."  Do you

16   see that?

17   A  Yes.

18   Q  Did he ever identify what the required shift is?

19   A  The acquired shift is the minimum number of people who would

20   have to be moved into the district or out of the district to

21   bring it to population ideal.

22   Q  Okay.  Now in the context of actually drawing a statewide

23   map, does that number actually represent the required shift?

24   A  More than likely not.

25   Q  Why is that?

1  A  Well, again, the nature of how the districts are allocated,
2  parts of the state grow faster than others parts, some parts of
3  the state may even lose population.  The consequence is that
4  the shift required in one district is going to be dependent on
5  the shifts required of the districts around it.  A legislative
6  map is an organic thing in that respect, which is that changes
7  in one area are going to require -- are going to affect the
8  changes made in other areas, and this is one of the issues we
9  run into in equalizing population.  Every once in awhile you
10  will find a map, maybe a congressional map, where you can pull
11  this off, but the more parts you have in motion, the more
12  difficult it will become to do this.
13  Q  And in the State of Wisconsin there are 99 parts in motion
14  with respect to the assembly, is that right?
15  A  Yes, and those parts are in motion with respect to 33 other
16  parts that sit over top of them.
17  Q  Okay.  In order to find out what the ratio of total
18  population shift to what's actually required, wouldn't you have
19  to draw a map that considered nothing but least change and then
20  compare that map to the map that was drawn?
21  A  You might actually have to draw several maps.
22  Q  Why is that?
23  A  Well, because one of the issues in redistricting is where
24  you start.  Depending on the corridor you pick, that's going to
25  dictate your subsequent moves.  It's like the gag about the guy

1    who starts painting the floor of his house and paints himself

2    into a corner.  This is something of an issue.

3        If we start in an area of high population and we start

4    pulling numbers down, we might arrive at the temptation to, for

5    example, just create a new district.  This new district -- We

6    may end up with a whole new district.  This district has no

7    core or it has a complete core because you took another

8    district and cut it in half.

9        So what's going to happen is, depending upon where you

10   start, that's going to dictate where you can take population

11   from surrounding areas.  As Professor Mayer pointed out, which

12   direction you go will have an impact.  You don't have to move

13   in one direction.  Maybe you have one district that has three

14   other districts around it and you can pick three directions to

15   go in.

16       Let me clarify.  In the previous trial Judge Easterbrook

17   made note of the value and power of hexagons.  If you look at a

18   hexagon, it's surrounded by six other hexagons.  If a district

19   is a hexagon and we have six other hexagons around it, each of

20   which has variable and different amounts of population, the

21   number of people who have to be moved in each hexagon is going

22   to be dictated in part upon which hexagon we took population

23   away from to create the district.  So where we start is going

24   to have a strong influence on where we end up.

25   Q  All right.  Do you have an opinion, Dr. Gaddie, on whether

1  Act 43 impermissibly assigned population to new districts?

2  A  I don't believe it did.

3  Q  What do you base that opinion on?

4  A  Well, again, it's, you know, again, in part just based upon

5  experience.  These were not -- It's not a least change map, but

6  we don't have a situation where substantial majority of the

7  voters are finding themselves in new districts.  We have a

8  reasonable degree of core retention.

9      But beyond that, we have substantial variability in core

10 retention across the incumbents of both parties.  There are

11 some districts that have very high retention and some districts

12 that have very low retention, and there are reasons why this is

13 the case.  Because map makers consider more than core retention

14 in equalizing population, the application of other

15 redistricting criteria influence the degree of core retention

16 in addition to the availability of people.

17 Q  Dr. Gaddie, do you hold your opinion with respect to core

18 retention/population movement to a reasonable degree of

19 scientific certainty?

20 A  To a reasonable degree of scientific certainty, yes.

21 Q  Okay.  Dr. Gaddie, were you retained to do a Thornburg

22 versus Gingles analysis of Act 43?

23 A  I was not retained to do a Thornburg versus Gingles analysis

24 of Act 43.

25 Q  Do you recall being asked about some of the Gingles factors

1  in your deposition?

2  A  Yes, I do.

3  Q  Do you recall being asked whether you believed that the

4  Latino community was politically cohesive in the neighborhood

5  of Assembly Districts 8 and 9?

6  A  I do recall making that statement in my deposition.

7  Q  What did you say?

8  A  Well, I was asked about my degree of agreement with

9  Paragraph 23 of one of plaintiffs' filings, and what I

10 indicated was, I don't recall the exact words, but I agreed

11 that I thought that the Latino vote was cohesive, that it had a

12 good level of cohesiveness, political cohesion.

13 Q  And what did you mean by political cohesion when you said

14 that?

15 A  Well, two things.  One is that in the United States in

16 general Latino voters, outside of South Florida, Cubans, are

17 generally Democratic voters.  The electoral data I looked at in

18 the process of this redistricting and the creation of the map

19 indicated a strong Democratic preference in the areas that

20 Districts 8 and 9 are in Act 43.  In addition to this, looking

21 at the political behavior of the area in old Assembly 8, which

22 has consistently elected a Democrat, and in particular a Latino

23 Democrat for 14 years, this shaped my opinion.

24 Q  All right.  When you made that statement were you referring

25 to their preference for voting for Democrats or were you

1  expressing an opinion on ethnic cohesion?

2  A  I was expressing a preference for political cohesion within

3  the ethnic group.

4  Q  Okay.  And that political cohesion was in voting for

5  Democrats?

6  A  Yes.

7  Q  Dr. Gaddie, did you consider delayed voting issues when

8  giving instructions on how to develop this matter?

9  A  Yes.

10  Q  And what instructions did you give?

11  A  As I noted previously, the instruction that I gave to the

12  map makers was to be mindful of previous delayed voting and to

13  be mindful, in particular, of how the courts have dealt with it

14  and to make reference to the previous maps of the court and the

15  previous court's opinion regarding delayed voting in Wisconsin.

16  Q  All right.  Do you know if there's any maximum threshold

17  beyond which delayed voting may not occur?

18  A  I don't know.

19  Q  Okay.  Let's just back up half-a-step.  Let's talk a little

20  bit about what actually happens with this concept of delayed

21  voting.  What are we talking about when we say "delayed

22  voting?"

23  A  Well, in the context of this redistricting cycle, if I were

24  a voter who lived in a district that had voted in 2008 for the

25  state senate and redistricting had moved my residency into a

1   district, districts lines that have been drawn around my

2   residency to move me into a district that had voted in 2010 and

3   would vote again in 2014, this would delay my opportunity to

4   vote for state senator for two additional years.

5   Q  So come Election Day 2012, that voter can go to the polls,

6   yes?

7   A  Yes.

8   Q  And would be casting a ballot, right?

9   A  Yes.

10   Q  Wouldn't be prohibited from voting?

11   A  Correct.

12   Q  It would just be that there was no senator on the ballot for

13   him to vote?

14   A  There would be no senate race on the ballot to vote in,

15   correct.

16   Q  What role in the whole pantheon of redistricting principles

17   does delayed voting play?

18   A  Well, again, I have only seen this here.  I have only seen

19   this at issue here.  I appreciate Professor Mayer bringing to

20   my attention the California Redistricting Commission's notation

21   regarding this, as well, but this is a check on the map.  It

22   could be a principle that the legislature could draw -- choose

23   to draw map on, if they wanted to, but it is not a principle

24   that I have run into like the preservation of county and

25   municipal boundaries or compactness across the country.  It is

```
 1   an area of -- there are certain -- If we look at redistricting
 2   principles, we have superior principles of equal population and
 3   racial fairness.  Then we have a variety of secondary and
 4   neutral principles that are often involved, compactness,
 5   treatment of political subdivisions, communities of interest
 6   which most anyone can define now.  It's in the eye of the
 7   beholder, as Bruce Cain has observed, a political scientist at
 8   Cal, but then there are these back checks on the political
 9   impact of the map.  Evaluating the partisan competitiveness of
10   the map before and after redistricting might be a check.
11   Courts will often engage this.
12       Similarly, a disenfranchisement check would be a good back
13   end check, if it's an issue of concern, as it is here in
14   Wisconsin, but I have never seen it advanced as the first
15   principle to be accomplished in the redistricting.
16   Q  Did you analyze Act 43 in terms of whether there was too
17   much delayed voting?
18   A  I did analyze the amount of delayed voting in Act 43, yes.
19   Q  Did you compare that to anything else?
20   A  Yes, I did.  I looked at the previous two maps crafted in my
21   rebuttal report.  I also made note of proposed maps from the
22   previous redistricting with regard to the amount of delayed
23   voting that was contained in those maps.
24   Q  Are you aware of the -- that Dr. Mayer opined about various
25   maps in the 2002 redistricting efforts in the State of
```

1    Wisconsin?

2    A   Yes.

3    Q   What do you know about those?

4    A   Those maps, as a general rule, had higher rates of delayed

5    voting than the maps that were adopted by the court, and higher

6    rates of delayed voting than the maps that I testified -- that

7    I analyzed and testified on behalf of in that trial.

8    Q   And how do some of those maps compare to Act 43?

9    A   They are comparable or higher in terms of delayed voting.

10   Q   That is the maps about which Dr. Mayor testified in 2002 had

11   higher delayed voting than Act 43?

12   A   That's correct.

13   Q   Dr. Gaddie, do you have an opinion as to whether Act 43

14   causes an unusual amount of delayed voting?

15   A   No.

16   Q   Well, do you have an opinion?

17   A   Yes.

18   Q   What's your opinion?

19   A   My apologies.  My opinion is that it does not create an

20   unusual amount of delayed voting.  I have put this into two

21   comparative -- three comparative contexts.  The first is that

22   compared to previous maps in the State of Wisconsin, by

23   proportion or number the level of delayed voting is not higher

24   than what we have witnessed in the state in the past.

25       The second is looking at Wisconsin as one of the

half-a-dozen states in the U. S. that have delayed voting in
their state senates, as Professor Mayer previously noted in his
testimony, looking at my report Wisconsin ranks ahead of four
of the six states, four of the other five states, ranking only
behind Oregon.

Professor Mayer does note that there are a variety of
differences in these states, but one is a commission state, two
are political commission states and one was a map drawn by a
Republican dominated state legislature, actually, in my home
state.  But Wisconsin fared well compared to the comparison
set, and the Legislatures map this year does fair better than
the maps that were advanced by Plaintiffs in the previous
litigation ten years ago for this court to adopt.

Q  Dr. Gaddie, do you know of any factors that may have caused
some of the delayed voting that is a part of Act 43?

A  Again, part of the delayed voting is occurring because of
the necessity of equalizing population across districts.

Q  Do you know would it be fair for a legislature to decide
that it wanted to reunite communities of interest, even though
that might cause some additional delayed voting?

A  Well, again, it's up to the legislature to decide which
criteria they want to apply, but the consideration of
communities of interest has also been recognized as a criterion
to be applied by legislatures.

Q  Dr. Gaddie, do you hold your opinion with respect to the

1    topic of delayed voting with respect to Act 43 to a reasonable

2    degree of scientific certainty?

3    A   To a reasonable degree of scientific certainty, yes.

4    Q   And then just in general as we close, can you tell me what

5    role these traditional redistricting principles are supposed to

6    play in a legislature's efforts to adopt a new map?

7    A   They are there for legislatures to consider.  Legislatures

8    set their criteria based upon their constitutional obligations

9    or legal obligations and their state constitutional

10   obligations.  Beyond that, it's within their right, depending

11   on their state law, to designate criteria that they might

12   pursue in crafting maps.

13   Q   And would you expect the legislature to keep an exhaustive

14   record of every decision they made about where to place

15   individual district lines?

16   A   It would be difficult.  You are talking about keeping up

17   with every decision that's been made about the placement of, in

18   this state, 5 million people across 99 constituencies.

19   Q   Do you know how long it took to develop the map that became

20   Act 43?

21   A   At least months.

22   Q   And there was a team of people working on it?

23   A   That's my understanding, yes.

24   Q   Do you know if this was an iterative process?

25   A   Redistricting is an iterative process.  It is a process of

1  taking an initial look at the map, crafting working templates,

2  working with districts, interacting with law makers.

3    For example, I have a former student who was the

4  Redistricting Coordinator for the State of Oklahoma, and his

5  process in the state house of representatives was satisfy the

6  needs of 101 law makers, each of whom had a district, and the

7  puzzle pieces each of them demanded did not fit together

8  perfectly.  So there are, for staff doing this work, a variety

9  of inputs coming from those individuals who control the mapping

10 from leadership, from law makers, from the people who -- on

11 whose behalf they staff and on whose behalf they work.

12 Q  Would it be fair to say the final map is a distillation of

13 all the prior iterations and trials and errors in getting to a

14 final product?

15 A  Yes.  Yes, it is the consequence of numerous inputs.

16       MR. KELLY:  Thank you, Dr. Gaddie.  I have nothing

17 further at this point.

18       JUDGE STADTMUELLER:  Thank you, Mr. Kelly.  Mr.

19 Earle?

20       MR. EARLE:  Thank you, Your Honor.  I'm going to go

21 first, Your Honor, and be very brief because Professor Gaddie

22 focused mostly on the other issues in the case.

23                    CROSS-EXAMINATION

24 BY MR. EARLE:

25 Q  Good afternoon, Professor Gaddie.

1    A   Hello, Mr. Earle.  How are you?

2    Q   Good.  Nice to see you again.

3    A   Likewise.

4    Q   Do you recall when I deposed you back on January 20th of

5    2012?

6    A   Yes.

7    Q   Okay.  And I asked you a whole series of questions about the

8    work you did when you were under contract to Michael, Best &

9    Friedrich to help them develop the map for the state

10   legislature, correct?

11   A   Yes.

12   Q   Okay.  And you were architecturally involved in creating

13   these maps in Act 43, correct?

14   A   I'm going to ask you to define the term "architecturally

15   involved."  I want to know what you think the term means before

16   I agree to it.

17   Q   Well, I will substitute another term so we don't have to

18   quibble.  You were hands-on involved in helping to draft the

19   map that became Act 43, correct?

20   A   I was present when the maps were being created.  I did not

21   lay hand on a mouse.  I did not draft a district.

22   Q   But you analyzed statistics and you provided advice to the

23   folks who were doing those things?

24   A   Yes.

25   Q   Okay.  And you are very experienced in the area of

1    redistricting?

2    A   Yes.

3    Q   Okay.  And you are familiar with the Gingles prongs, right,

4    the three Gingles prongs?

5    A   Yes.

6    Q   You have dealt with those in the course of your work many,

7    many times, right?

8    A   Yes.

9    Q   You have written about them?

10   A   Yes.

11   Q   You understand the import of each one?

12   A   Yes.

13   Q   And you know how they are applied to the facts in each case

14   that you study?

15   A   Yes.

16   Q   Okay.  And during your deposition at Page 83, if we could

17   call that up, the Keith Gaddie deposition, Page 83, Line 20

18   through Line 24, if you would call that up.  I asked you

19   whether you were aware of what the allegations against Act 43

20   were in the complaint when you were told that you were to

21   defend the maps in Act 43, correct?

22   A   Yes.

23   Q   And you answered?

24   A   Yes.

25   Q   Okay.  And that's because you had reviewed the Voces de La

1  Frontera complaint?

2  A  I had examined it when I received it, yes.

3  Q  And then a little later in the deposition at Page 90, Line 9

4  through Page 91, Line 19 -- Can we get them side by side and

5  highlight it?

6  A  I can read it.

7  Q  But I want the Court to be able to see it, as well.  I

8  wonder if we can get them together.

9  A  My apologies, Mr. Earle.

10  Q  That's fine.  We will take a moment here.  There we go.  Now

11  when I asked you this question you had in front of you a copy

12  of the Voces de la Frontera complaint, right?

13  A  Yes.

14  Q  And I read to you, I said, "Okay.  Paragraph 23.  Over the

15  course of the last decade, the political and electoral conduct

16  of Latino voters on Milwaukee's near south side in the vicinity

17  of the recently reapportioned 8th and 9th Assembly Districts

18  demonstrates that the Latino community is politically

19  cohesive," and I asked you, "Do you agree with that statement,"

20  and you answered?

21  A  "I generally agree with that statement," close quote.

22  Q  And then I asked you again, I said, "In fact, you wrote a

23  note that's on your thumb drive that says you think the Latino

24  community is remarkably political cohesive," and you said?

25  A  "Yes, that's correct."

1  Q  Okay.  Then I went on to the next paragraph of the complaint

2  starting at Line 25, and I said, "I'm sorry.  Okay.

3  Twenty-four, Paragraph 24.  Over the course of the last decade,

4  the political and electoral conduct of the non-Latino Caucasian

5  voter on Milwaukee's near south side in the vicinity of the

6  recently reapportioned 8th and 9th Assembly Districts

7  demonstrates the existence of a pattern of ethnically polarized

8  voting in that said non-Latino Caucasian voters usually vote as

9  a block in the absence of a special circumstances to defeat the

10  preferred candidates of the Latino voters," close quote, and I

11  said, "Do you agree with that statement," and you answered?

12  A  "I don't know."

13  Q  And I said, "Okay.  And it's accurate to say that you will

14  not be providing any testimony at trial that contradicts that

15  statement, correct?"

16  A  "Yes."

17  Q  And that's where we are here today, correct?

18  A  Correct.

19  Q  Okay.  Now you know Professor Mayer, correct?

20  A  Yes.

21  Q  And you believe and it's your opinion that he's qualified by

22  experience and training to conduct a racially polarized voting

23  analysis, correct?

24  A  This is the first time I have seen Professor Mayer conduct

25  such an analysis, but by virtue of background and methodology,

1    he should have all the tools to be able to do that, yes.

2    Q  And you, similarly, have all the tools to do it?

3    A  Yes.

4    Q  But you didn't do it in this case, right?

5    A  Correct.

6    Q  Okay.  And that's because when you were -- after you were

7    hired by Michael, Best & Friedrich on behalf of the

8    legislature, you were then hired by Reinhardt on behalf of the

9    Government Accountability Board, and they didn't ask you to do

10   that?

11   A  That's correct.

12   Q  But you could have?

13   A  I can do that analysis.

14            MR. EARLE:  Thank you.  Nothing further.

15            JUDGE STADTMUELLER:  Thank you, Mr. Earle.

16   Mr. Poland?

17            MR. POLAND:  Thank you, Your Honor.

18                    CROSS-EXAMINATION

19   BY MR. POLAND:

20   Q  Good morning, Dr. Gaddie.

21   A  Good morning, Mr. Poland.

22   Q  I'd like to get a couple things out of the way first.  Can

23   we please have Exhibit 1021 brought up on the screen.  I'd like

24   to put two pages up there.  One is Page 3.  It's actually Page

25   3 of the Summary and Conclusions from the report that's

1    attached.  Do you still have your binder up there?

2    A   Yes.

3    Q   Do you have, Dr. Gaddie, Exhibit 1021 in front of you?

4    A   Give me a moment and I will find it.  What page, Mr. Poland?

5    Q   It's Dr. Mayer's Partisan Analysis of Redistricting Plans

6    there a Page 3.  I'd like you to have that open, and then also

7    in the same document there's Page 29.  I'd like you to have

8    that open, as well.

9    A   Yes.

10   Q   Okay.  I'd like to focus your attention on the Summary and

11   Conclusions, first of all, on Page 3.  This is Dr. Mayer's

12   analysis that you were referring to when Mr. Kelly was asking

13   you questions, correct?

14   A   Counselor, I'm sorry.

15   Q   This is the report by Dr. Mayer in the Baumgart case in 2002

16   that you were referring to before, is that correct?

17   A   Yes.

18   Q   And if I draw your attention to Page 3, in Paragraph 1, the

19   last sentence, Dr. Mayer does conclude, does he not, on the

20   topic of disenfranchisement, he says, "Democratic plans are

21   superior while on others (split

22   municipalities/disenfranchisement) the Republican plans are

23   marginally preferable," correct?

24   A   Yes.

25   Q   I'd like you to turn then to Page 20 of the same report.

1  Dr. Mayer concludes there that are the Republican plans are

2  better on disenfranchisement, correct?

3  A  Yes.

4  Q  All right.  You can set that to the side.  Dr. Gaddie, you

5  signed an engagement letter with Michael, Best & Friedrich as

6  part of your -- for the legislature doing the redistricting

7  last year, correct?

8  A  Correct.

9  Q  Could we please have Exhibit 66 up on the screen, please.

10  Is this a copy of the engagement letter that you signed with

11  Michael, Best & Friedrich to perform the redistricting work for

12  the legislature last year?

13  A  Yes.

14  Q  Dr. Gaddie, this is not the first time you had worked with

15  Michael, Best & Friedrich on redistricting in Wisconsin, is

16  that correct?

17  A  That's correct.

18  Q  In 2002 you worked where Mr. McLeod and Mr. Troupis,

19  correct?

20  A  Correct.

21  Q  And did you work with Mr. Handrick in 2002, as well?

22  A  Yes.

23  Q  And you and Mr. Handrick are friends?

24  A  Yes.

25  Q  I'd like to turn your attention to the very first paragraph

1   of Exhibit 66.  Now this states that Michael, Best & Friedrich

2   is currently engaged to represent the Wisconsin State Senate by

3   its Majority Leader Scott L. Fitzgerald and the Wisconsin State

4   Assembly by its Speaker Jeff Fitzgerald in connection with

5   matters relating to the reapportionment of the Wisconsin

6   Senate, Assembly and Congressional Districts arising out of the

7   2010 census, correct?

8   A  Correct.

9   Q  And you are being retained as a consultant to Michael, Best

10  & Friedrich in connection with the representation, correct?

11  A  Yes.

12  Q  And that's who you understood your client to be or who you

13  understood you were working for, correct?

14  A  Yes.

15  Q  Now I'd like to turn your attention to the paragraph under

16  the heading, "Scope of Engagement and Expectations."  That

17  provides that as a consultant to MB&F, and that's Michael, Best

18  & Friedrich, in connection with representation, we expect your

19  duties to include services as an independent advisor on the

20  appropriate racial and/or political makeup of legislative and

21  congressional districts in Wisconsin.  Do you see that?

22  A  Yes.

23  Q  And that's what you were retained to do, correct?

24  A  Yes.

25  Q  You were not retained as an expert to testify to that in

1   this case, though, correct?

2   A   Correct.

3   Q   The last sentence of the same paragraph states that these

4   consulting services may include, as well, testifying on the

5   results of your work, correct?

6   A   Correct.

7   Q   And you knew from the get-go that sitting in the courtroom

8   today was a possibility, correct?

9   A   Correct.

10  Q   You knew it was a possibility you might have to defend the

11  maps that you helped to draw, correct?

12  A   I knew it was a possibility I'd have to testify when they

13  were defended, if they were brought to litigation, yes.

14  Q   Now the next paragraph down provides that all work performed

15  by you in connection with the representation shall be for the

16  sole purpose of assisting MB&F in rendering legal advice to the

17  senate and assembly, correct?

18  A   Correct.

19  Q   And following or continuing on, it states, "Said work

20  contemplates services of a character and quality that are

21  adjunct to our services as lawyers and you shall perform said

22  work at our direction," correct?

23  A   Correct.

24  Q   And you were working at the direction of Michael, Best &

25  Friedrich, correct?

1    A   Correct.

2    Q   It continues on, "Accordingly, all communications between

3    you and MB&F, as well as communications with the senate and

4    assembly and work performed by you in connection with the

5    representation shall be confidential and made solely for the

6    purpose of assisting counsel in rendering legal advice,"

7    correct?

8    A   Correct.

9    Q   And then continuing on, the last paragraph.  It instructs

10   that you will not discuss with or otherwise disclose to anyone

11   or with any entity other than MB&F and the senate or assembly

12   without our written authorization the nature and content of any

13   oral or written communications or any information or work

14   performed related to the representation.  Correct?

15   A   Correct.

16   Q   And did you follow that admonition?

17   A   I believe I did, yes.

18   Q   Did you have any communications with anyone in the senate

19   about the work that you performed in the redistricting?

20   A   Did I have any communication with anyone in the senate about

21   the work I performed in the course of the redistricting?

22   Q   Correct.

23   A   I had contact with the majority leader, but we did not

24   discuss the redistricting.  I presented to him -- I had been

25   asked by the staff to present to him the nature of how we might

1  be able to illustrate the responsiveness of maps with regard to

2  some of that work, but that's my only contact with the senate.

3  Q   Thank you.  Continuing on, it states that you will not

4  disclose or permit inspection of any papers or documents

5  related to the representation without our written authorization

6  in advance.  All work papers, records or other documents or

7  other things, regardless of their nature and the source from

8  which they emanate, which are related to the representation

9  shall be held by you solely for our convenience and subject to

10  our own qualified right to instruct you with respect to

11  possession and control.  It continues on that any work papers

12  or materials prepared by you or under your direction belong to

13  the senate pursuant to the representation, and every page must

14  be sealed or otherwise stamped attorney-client/work-product

15  privilege/confidential.  Do you see that?

16  A   Yes.

17  Q   Were you ever instructed by Michael, Best & Friedrich to

18  release or make public any of the documents that you prepared

19  or created in the course of your redistricting work?

20  A   No.

21  Q   And other than what you produced in this litigation, have

22  you continued to abide by that admonition?

23  A   Yes.

24  Q   Dr. Gaddie, you had testified when Mr. Kelly was asking you

25  some questions that there is no diminimous population, correct?

1   A  That is correct.

2   Q  Population deviation, correct?

3   A  That's correct.

4   Q  There is no safe harbor, correct?

5   A  That's correct.

6   Q  Dr. Gaddie, in the course of your work in the redistricting

7   -- Strike that question.

8      Have you studied the Hispanic districts in Milwaukee County

9   that are at issue in this case?

10  A  For the purpose of my expert reports, no.

11  Q  Now as far as recall elections, you were asked some

12  questions by Mr. Kelly in his direct examination, correct?

13  A  Correct.

14  Q  Do you recall those questions?

15  A  To be honest, I would ask that they be read back.

16  Q  You recall the general subject matter, correct?

17  A  Yes, I recall the general subject matter.

18  Q  It's true, isn't it, that people who are moved into a new

19  district by Act 43 will not vote in the 2012 general election

20  in the same district that they voted in in the recall election,

21  correct?

22  A  I'm going to ask you to repeat the question.  Okay.  Yes,

23  yes, that would be correct.  Yes.

24  Q  Okay.  So they will have voted in 2011 in one district, but

25  not in 2012 for officials in that same district, correct?

1  A  Correct.

2  Q  And that means that there will be people who will remain in

3  that district and not be moved and they will have voted twice,

4  and others who will have voted twice in the span of a little

5  bit more than a year, correct?  I will strike that question.

6     That means there are people who will remain in that district

7  and not be moved, they will have voted twice in the span of a

8  little bit more than one year, while others will have only

9  voted once in that same district, correct?

10 A  Yes.

11 Q  Now it's true, isn't it, that less disenfranchisement

12 generally is better than more?  Less voter delay is better than

13 more in the State of Wisconsin?

14 A  That is the historic opinion, yes.

15 Q  We talked a little bit about disenfranchisement both in the

16 direct examination and then I asked you a question about it a

17 minute or two ago.  It's true that some of the states that you

18 use as comparators to Wisconsin for percentages of

19 disenfranchised voters have different requirements than

20 Wisconsin, correct?

21 A  Yes.

22 Q  And we talked a little bit in your deposition about the

23 State of Iowa, correct?

24 A  Not in this context, but yes.

25 Q  Okay.  And we did determine that Iowa requires districts to

1  be composed of entire counties, to the extent that's possible,

2  correct?

3  A   Correct.

4  Q   And that's not a requirement in Wisconsin?

5  A   Correct.

6  Q   And California, likewise, we established has a non-partisan

7  redistricting process, correct?

8  A   Yes.

9  Q   They have a commission that they started to use, right?

10  A   Yes.

11  Q   Do you know that Article 21 of the California Constitution

12  states that the place of residence of an incumbent cannot be

13  considered in redistricting?

14  A   Yes, which is consistent with the Iowa Commission.

15  Q   And in Wisconsin the place of residence of the incumbent may

16  be considered, correct?

17  A   Yes.

18  Q   Now Ohio, which is another state to which there is a

19  comparison made in disenfranchisement rates, also conducts its

20  reapportionment with a reapportionment board, it's not a task

21  of the legislature, correct?

22  A   Correct.  Ohio used a reapportionment board, but it's not a

23  non-partisan commission.

24  Q   And Missouri does have a commission, correct?

25  A   Correct.

1    Q   And could we have Exhibit 204 pulled up on the screen,

2    please.  Could we go to Page 26, please.  I'd like to draw your

3    attention to the paragraph immediately above III, Details About

4    the Districts.  It's true that the California Commission

5    determined that an approach that minimized deferrals would

6    result in the most fair and effective representation for voters

7    throughout the state, correct?

8    A   Correct.

9    Q   I'd like to talk about Districts 8 and 9 in Milwaukee.

10   Those are Latino districts and you are familiar with those,

11   correct?

12   A   I am familiar with them, yes.

13   Q   And it's true that in the act of reorienting Districts 8 and

14   9 under 2011 Wisconsin Act 43, that caused low or caused the

15   core retention to be much lower than if they had been left in

16   their horizontal orientation, is that true?

17   A   Yes.

18   Q   Now we talked a little bit about or I think you were asked

19   some questions about the orientation -- about some of the

20   changes that were made in your testimony about core retention

21   and disenfranchisement and the justification for reconfiguring

22   some of the districts.  Did you look at the reconfiguration of

23   all of the senate districts in the State of Wisconsin under Act

24   43 for the purposes of looking at core retention and

25   disenfranchisement?

1  A  My report does report information on core retention for the

2  entire state, and it does report a disenfranchisement number

3  based upon all the districts in the state, yes.

4  Q  Did you look at the districts around Racine and Kenosha, the

5  senate districts?

6  A  In the context of the senate and in the context of

7  disenfranchisement I did not look at those districts

8  specifically.

9  Q  Do you know how many voter were disenfranchised by the

10 reconfiguration of Senate Districts 21 and 22?

11 A  I was in the room when Professor Mayer testified to the

12 fact.  I don't recall the exact number, but it is a five-figure

13 number.

14 Q  Could we have Exhibit 178 brought up on the screen, please.

15 Dr. Gaddie, Act 43 draws the districts around Racine and

16 Kenosha in a different way than they had been drawn by the

17 court in 2002, correct?

18 A  Yes.

19 Q  And you don't know why there was a decision made to change

20 the districts in the way they were changed, correct?

21 A  Well, actually, the -- Counsel, I will direct you to

22 Exhibit 58, and I will direct you to Bullet 8A which looks at

23 the reorientation of assembly districts in the Racine/Kenosha

24 area.  I was curious about the relatively low income of core

25 retention in these areas and asked staff about this, and they

1    said this was an effort to create urban-based and rural-based

2    community of interest districts, so that's my understanding of

3    why these assembly seats and senate seats reorient the way they

4    do.

5    Q   Could you please have Dr. Gaddie's deposition brought up,

6    Page 73.  Looking at Line 14, 14 to 21, Dr. Gaddie, were you

7    asked this question and give this answer at your deposition on

8    January 20th.  "Question:  Does Act 43 draw districts around

9    Racine and Kenosha in a different way than they had been drawn

10   by the court in 2002.  Answer:  Yes.  Question:  Do you know

11   why there was a decision made to change the districts in the

12   way that they were changed?  Answer:  No."

13       Dr. Gaddie, were you asked that question and did you give

14   that answer?

15   A   I gave that answer.

16   Q   Okay.  Thank you.  Now in the analysis that you performed of

17   core retention, you did eliminate nine of the Democratic

18   incumbent districts with the lowest core retention, correct?

19   A   The exact analysis -- I was queried as to the impact of

20   these changes in these areas on incumbent core retention, so

21   while the nine lowest Democratic districts were eliminated,

22   there were also a total of four other Democratic districts and

23   five other Republican districts that were removed from the

24   analysis to test whether or not the removal of those cases from

25   the analysis makes a difference in ascertaining core retention

1    difference.  This would be at tables -- This would be the

2    discussion in Section 8-1 through 8-3 in the rebuttal report

3    and reference to Tables 7 and 8 in the expert report.

4    Q  And that was an exclusion from a core analysis that you had

5    never performed before you were asked to do it in this case,

6    correct?

7    A  That's correct.

8    Q  Turning your attention back to Districts 21 and 22, do you

9    know how the lines that encompass both Districts 21 and 22

10    changed at all, the outer boarder around Districts 21 and 22,

11    from the 2002 plan?

12    A  No.  My understanding is that Districts 21 and 22 -- It's

13    evident from looking at the map that District 22 was a Kenosha

14    County based district, excluding Wheatland, and District 21 was

15    a Racine County based district.  The map has been reoriented to

16    put the City of Kenosha and City of Racine together in one

17    district, and put the rural areas of the counties into another

18    district.

19    Q  In terms of the outer boundary of the combined districts,

20    though, there was essentially no change from 2002 to the

21    districts as they were bounded by the 2011 Wisconsin Act 43, is

22    that fair to say?

23    A  The only differences were near Twin Lakes and Burlington.

24    Q  Dr. Gaddie, at least as of the time we took your deposition

25    on January 20th, you didn't know who had made the decision to

1  draw specific districts identified in your rebuttal report, is

2  that correct?

3  A  That's correct.

4  Q  Dr. Gaddie, when you were working with Mr. Troupis and Mr.

5  McLeod and others at Michael, Best & Friedrich as part of the

6  redistricting last summer, you did look at Latino districts in

7  Milwaukee District 8 and then District 9, correct?

8  A  Correct.

9  Q  And you did inquire about citizen voting age population or

10  CVAP data, correct?

11  A  Correct.

12  Q  And you did that because you recognized that CVAP data is

13  important to assess the ability to draw a district with an

14  effective voting majority of Latinos?

15  A  Yes.

16  Q  And you agree that's basically fundamental to this process,

17  correct?

18  A  It's a very important input, yes.

19  Q  From the time that you were retained by Michael, Best &

20  Friedrich in mid-February 2011 until the time you finished with

21  your work, you traveled to Madison for that work, is that

22  correct?

23  A  Yes.

24  Q  For some of it, at least?

25  A  Yes.

1   Q   How many times did you travel to Madison?

2   A   In total -- Again, I'd have to go back and review the travel

3   records.  The first trip was in April.  There should have been

4   travel in May or June.  I believe there was travel in June, as

5   well.  So those two trips for certain.  Again, I'd have to go

6   back and look at my travel logs.  I was spending a lot of time

7   also traveling to Chicago and Atlanta, and sometimes trips get

8   piggybacked.

9   Q   Fair enough.  When you did travel to Madison to work on the

10  redistricting project, you worked at the offices of Michael,

11  Best & Friedrich, correct?

12  A   Yes.

13  Q   And while you were there, you worked with people, including

14  Mr. Troupis, correct?

15  A   Actually, I had one encounter with Jim Troupis in the

16  Michael Best offices, and we had one phone conversation about

17  this redistricting process after I was retained, and I believe

18  we had drinks out near the village out near his office one

19  evening, but my contact with Mr. Troupis was very limited.

20  Q   While you were at the Michael, Best & Friedrich offices

21  working on the map, you also worked with Mr. Foltz, correct?

22  A   Yes.

23  Q   And Mr. Foltz is a legislative aide for Speaker Fitzgerald?

24  A   Yes.

25  Q   You worked with Tad Ottman, who is a legislative aide for

1  Senator Fitzgerald?

2  A  Yes.

3  Q  And you also worked with Handrick who was a consultant for

4  the Legislature, correct?

5  A  Yes.

6  Q  There were also instances where you worked with Mr. McLeod,

7  correct?

8  A  Yes.

9  Q  When you were working out of Michael, Best & Friedrich's

10 offices on the map, you saw parts of maps and not whole maps,

11 correct?

12 A  Correct.

13 Q  And you did see configurations of Districts 8 and 9,

14 correct?

15 A  Yes.

16 Q  Now with respect to the subject of Districts 8 and 9, you

17 looked specifically at the question of whether it was possible

18 to draw a map with an effective Latino voting majority in the

19 vicinity of the 8th Assembly District, correct?

20 A  Yes.

21 Q  And you recognized again the importance of the CVAP data for

22 that purpose?

23 A  Yes.

24 Q  You advised your clients with whom you were consulting of

25 your view that it was important to look at CVAP data for the

1  purpose of drawing that district, correct?

2  A  Yes.  And while we are on the issue of CVAP data, briefly,

3  the CVAP data issue has been a difficult one for redistricters

4  in this cycle.  Many states were moving forward with remapping

5  in advance of release of the latest ACS, and one thing we

6  observed was that the ACS population estimates, especially for

7  major urban areas, were often off substantially.  There was a

8  great deal of chatter and concern in the redistricting

9  community about the availability of reliable CVAP data.  So,

10  for example, down in Illinois we were proceeding without

11  effective CVAP data to guide the redistricting, and we

12  encountered the same situation in Georgia and also up here in

13  Wisconsin.

14  Q  Now you discussed the topic of getting an effective Latino

15  voting majority in the vicinity of the 8th Assembly District

16  with Mr. Troupis and Mr. Handrick at Michael Best, correct?

17  A  Yes.

18  Q  And in the course of those discussions you've had with them,

19  you told them it was important to make sure the maps allowed

20  for the maximum effective voting majority of Latinos possible,

21  correct?

22  A  I told them it was important to craft maps that would allow

23  for the continued effect of performance of the districts as had

24  Assembly 8, yes.

25  Q  And in the course of that, after looking at data on voter

1  turnout in the area, you said that you couldn't ascertain if

2  there was a circumstance where any district created down there

3  would guarantee a majority of the electorate that would Latino,

4  correct?

5  A  Correct.

6  Q  And the estimates that you had of Latino participation were

7  sufficiently low that you didn't have confidence that a

8  maximized district would be sufficient to guarantee that

9  Latinos by themselves could control the electoral process and

10 the outcome, correct?

11 A  Correct.

12 Q  And you recommended that they go to the community and ask

13 what it wanted, correct?

14 A  Yes.

15 Q  Could we please pull up Exhibit 63.  Dr. Gaddie, these are

16 notes that you produced in this litigation, correct?

17 A  Yes.

18 Q  I'd like to draw your attention to the first numbered

19 paragraph.  It was your conclusion that no configuration will

20 have enough Hispanic turnout to guarantee control of the

21 district based only on Hispanic votes, correct?

22 A  Correct.

23 Q  And you asked a question whether -- that two community

24 groups had come out strong in support of the districts,

25 correct?

1  A  Yes.

2  Q  All right.  And you then went on to say, "If not, strong

3  credence should be paid to these communities and their desire

4  for representation," right?

5  A  Correct.

6  Q  And then you concluded by saying, "If this is how the

7  community wants to slice things up, the Legislature is being

8  responsive to a group of voters who are members of a

9  potentially suspect class," correct?

10  A  Correct.

11  Q  So you told the map makers at the time that as they moved

12  forward with this process, that the district was -- that you

13  couldn't tell them any specific percentage, 69 percent,

14  64 percent, 60 percent, 57 percent that the district was going

15  to be certain to perform, and so they needed to go to the

16  community and get that input, right?

17  A  Yes.

18          JUDGE STADTMUELLER:  Mr. Poland, given that the court

19  reporter may be drowned out by grueling stomachs, I think this

20  might be an appropriate time to break for lunch.  We will stand

21  in recess until 1:50.

22          THE BAILIFF:  All rise.

23

24

25

1  UNITED STATES DISTRICT COURT  )
                                 )SS
2  EASTERN DISTRICT OF WISCONSIN )

3

4

5

6

7              I, KATHY A. HALMA, Official Court Reporter

8  for the United States District Court, Eastern District of

9  Wisconsin, do hereby certify that I reported the foregoing

10 proceedings and that the same is true and correct in accordance

11 with my original shorthand notes taken at said time and place.

12

13

14  _____

15 KATHY A. HALMA
   Official Court Reporter
16 United States District Court

17

18

19

20

21

22

23

24

25