UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

-----------------------------------------------------------------

ALVIN BALDUS, CARLENE BECHEN, ELVIRA        )
BUMPUS, RONALD BIENDSEIL, LESLIE W.          )
DAVIS, III, BRETT ECKSTEIN, GLORIA           )
ROGERS, RICHARD KRESBACH, ROCHELLE           )
MOORE, AMY RISSEEUW, JUDY ROBSON, JEANNE      )
SANCHEZ-BELL, CECELIA SCHLIEPP, TRAVIS        )
THYSSEN, CINDY BARBERA, RON BOONE, VERA       )
BOONE, EVANJELINA CLEERMAN, SHEILA            )
COCHRAN, MAXINE HOUGH, CLARENCE JOHNSON, ) Case No. 11-CV-562
RICHARD LANGE, and GLADYS MANZANET,          )       JPS-DPW-RMD
                                             )
              Plaintiffs,                    )
                                             ) Milwaukee, Wisconsin
TAMMY BALDWIN, GWENDOLYNNE MOORE and          )
RONALD KIND,                                 ) February 24, 2012
                                             ) 1:50 p.m.
         Intervenor-Plaintiffs,              )
                                             ) VOLUME VIII
v.                                           ) P.M. SESSION
                                             )
Members of the Wisconsin Government           )
Accountability Board, each only in his        )
official capacity; MICHAEL BRENNAN,          )
DAVID DEININGER, GERALD NICHOL, THOMAS        )
CANE, THOMAS BARLAND, and TIMOTHY VOCKE, )
and KEVIN KENNEDY, Director and General       )
Counsel for the Wisconsin Government          )
Accountability Board,                        )
                                             )
              Defendants,                    )
                                             )
(caption continued on next page)             )

-----------------------------------------------------------------

TRANSCRIPT OF COURT TRIAL

BEFORE DIANE WOOD, CIRCUIT JUDGE; ROBERT DOW, JR., DISTRICT
        JUDGE, and J.P. STADTMUELLER, DISTRICT JUDGE

Contract Reporters:      Halma-Jilek Reporting 414-271-4466

Proceedings recorded by computerized stenography, transcript
produced by computer-aided transcription.

```
 1   F. JAMES SENSENBRENNER, JR., THOMAS E.   )
     PETRI, PAUL D. RYAN, JR., REID J.         )
 2   RIBBLE, and SEAN P. DUFFY,                )
                                               )
 3              Intervenor-Defendants.         )
                                               )
 4   ---------------------------------------   )
                                               )
 5   VOCES DE LA FRONTERA, INC., RAMIRO        )
     VARA, OLGA VARA, JOSE PEREZ, and          )
 6   ERICA RAMIREZ,                            )
                                               )
 7              Plaintiffs,                    )
                                               )  Case No. 11-CV-1011
 8   v.                                        )      JPS-DPW-RMD
                                               )
 9   Members of the Wisconsin Government       )
     Accountability Board, each only in his    )
10   official capacity; MICHAEL BRENNAN,       )
     DAVID DEININGER, GERALD NICHOL, THOMAS    )
11   CANE, THOMAS BARLAND, and TIMOTHY VOCKE,  )
     and KEVIN KENNEDY, Director and General   )
12   Counsel for the Wisconsin Government      )
     Accountability Board,                     )
13                                             )
                Defendants.                    )
14
     --------------------------------------------------------------
15
     APPEARANCES:
16
     For the Plaintiffs:         Douglas M Poland
17                               Godfrey & Kahn, SC
                                 780 N Water St
18                               Milwaukee, WI 53202-3590
                                 414-273-3500
19                               Fax:  414-273-5198
                                 Email: dpoland@gklaw.com
20
                                 Dustin B Brown
21                               Godfrey & Kahn SC
                                 1 E Main St - Ste 500
22                               Madison, WI 53701-2719
                                 608-257-3911
23                               Fax:  608-257-0609
                                 Email: dbrown@gklaw.com
24

25
```

**Brady C Williamson**
Godfrey & Kahn SC
1 E Main St – Ste 500
Madison, WI 53701–2719
608–257–3911
Fax:  608–257–0609
Email: bwilliam@gklaw.com

**Rebecca K Mason**
Godfrey & Kahn, SC
780 N Water St
Milwaukee, WI 53202–3590
414–273–3500
Fax:  414–273–5198
Email: rmason@gklaw.com

FOR THE CONSOLIDATED
PLAINTIFFS:

**Jacqueline E Boynton**
Law Offices of Jacqueline Boynton
2266 N Prospect Ave – Ste 505
Milwaukee, WI 53202–6306
414–276–1066
Fax: 414–276–9119
Email: jackie@jboynton.com

**Peter G Earle**
Law Offices of Peter Earle LLC
839 N Jefferson St – Ste 300
Milwaukee, WI 53202
414–276–1076
Fax: 414–276–0460
Email: peter@earle-law.com

FOR THE DEFENDANTS:

**Colleen E Fielkow**
Reinhart Boerner Van Deuren SC
1000 N Water St – Ste 1700
PO Box 2965
Milwaukee, WI 53202
414–298–1000
Fax: 414–298–8097
Email: cfielkow@reinhartlaw.com

**Patrick J Hodan**
Reinhart Boerner Van Deuren SC
1000 N Water St – Ste 1700
PO Box 2965
Milwaukee, WI 53202
414-298-1000
Fax: 414-298-8097
Email: phodan@reinhartlaw.com

**Daniel Kelly**
Reinhart Boerner Van Deuren SC
1000 N Water St – Ste 1700
PO Box 2965
Milwaukee, WI 53202
414-298-1000
Fax: 414-298-8097
Email: dkelly@reinhartlaw.com

**Joseph W Voiland**
Reinhart Boerner Van Deuren SC
1000 N Water St – Ste 1700
PO Box 2965
Milwaukee, WI 53202
414-298-1000
Fax: 414-298-8097
Email: jvoiland@reinhartlaw.com

**Maria S Lazar**
Wisconsin Department of Justice
Office of the Attorney General
17 W Main St
PO Box 7857
Madison, WI 53707-7857
608-267-3519
Fax: 608-267-2223
Email: lazarms@doj.state.wi.us

FOR INTERVENOR PLAINTIFFS:   **James A Olson**
Lawton & Cates SC
10 E Doty St – Ste 400
PO Box 2965
Madison, WI 53701-2965
608-282-6200
Fax: 608-282-6252
Email: dlenz@lawtoncates.com

1  FOR INTERVENOR DEFENDANTS:   **Kellen C Kasper**
                                Foley & Lardner LLP
2                               777 E Wisconsin Ave
                                Milwaukee, WI 53202-5300
3                               414-297-5783
                                Fax: 414-297-4900
4                               Email: kkasper@foley.com

5                               **Thomas L Shriner, Jr**
                                Foley & Lardner LLP
6                               777 E Wisconsin Ave
                                Milwaukee, WI 53202-5300
7                               414-297-5601
                                Fax: 414-297-4900
8                               Email: tshriner@foley.com

9

10                      I N D E X

11   WITNESS              EXAMINATION                    PAGE

12   KEITH GADDIE         Cross by Mr. Poland            558
                          Redirect by Mr. Kelly         567
13                        Recross by Mr. Poland         572
                          Further Redirect by Mr. Kelly 573
14                        Recross by Mr. Earle          575
                          Further Redirect by Mr. Kelly 575
15                        Further Recross by Mr. Earle  576

16   BERNARD GROFMAN      Direct by Mr. Hodan           577
                          Cross by Mr. Earle            637
17                        Redirect by Mr. Hodan         671
                          Recross by Mr. Earle          676
18
     PLAINTIFFS' EXHIBITS:                              RECEIVED
19
     2, 2A                                              683
20   3 - 17                                             683
     19 - 22                                            683
21   24 - 27                                            683
     31 - 34                                            683
22   36                                                 683
     38, 38A, 39                                        683
23   41 - 45                                            683
     49 - 55                                            683
24   57, 58                                             683
     60                                                 683
25   63                                                 683
     66, 67                                             683

| | PLAINTIFFS' EXHIBITS: (Cont'd) | RECEIVED |
|---|---|---|
| 1 | | |
| 2 | 71 – 73 | 683 |
| | 77 | 683 |
| 3 | 79 | 683 |
| | 81 | 683 |
| 4 | 83 – 85 | 683 |
| | 88 – 90 | 683 |
| 5 | 92, 93 | 683 |
| | 95 – 125 | 683 |
| 6 | 128 | 683 |
| | 130 – 136 | 683 |
| 7 | 139 – 144 | 683 |
| | 155, 156 | 683 |
| 8 | 166 | 683 |
| | 169 | 683 |
| 9 | 173 – 176 | 683 |
| | 178 | 683 |
| 10 | 181, 182 | 683 |
| | 184, 185 | 683 |
| 11 | 188 | 683 |
| | 197 – 209 | 683 |
| 12 | 220 – 232 | 683 |
| | 237 | 683 |
| 13 | 240 | 683 |

| | DEFENDANTS' EXHIBITS | |
|---|---|---|
| 14 | | |
| 15 | 1002 | 683 |
| | 1017 | 683 |
| 16 | 1020, 1021 | 683 |
| | 1025 | 683 |
| 17 | 1028 – 1034 | 683 |
| | 1038, 1039 | 683 |
| 18 | 1041 – 1061 | 683 |
| | 1065 – 1076 | 683 |
| 19 | 1078 – 1080 | 683 |
| | 1082 – 1084 | 683 |
| 20 | 1086 – 1111 | 683 |
| | 1112 – 1114 | 683 |
| 21 | 1117, 1118 | 683 |
| | 1120 – 1138 | 683 |
| 22 | 1151 – 1159 | 683 |
| | 1166 | 683 |
| 23 | 1174 – 1192 | 683 |
| 24 | | |
| 25 | | |

1          TRANSCRIPT OF PROCEEDINGS

2              THE BAILIFF:  All rise.

3              JUDGE STADTMUELLER:  Let the record reflect that

4      we've reconvened in the bench trial of Baldus, et al. versus

5      Brennan, et al.  Mr. Poland, you may continue with your

6      questions.

7              MR. POLAND:  Thank you, your Honor.

8                  CROSS-EXAMINATION (Continued)

9      BY MR. POLAND:

10     Q  Dr. Gaddie, I'd like you to take a look at Exhibit 63,

11     please.  I think we had left off talking about that exhibit

12     before the lunch break.

13     A  Yes.

14     Q  And turning your attention again, Dr. Gaddie, these notes

15     again reflect your assessment of the situation in creating

16     Districts 8 and 9; correct?

17     A  Yes.

18     Q  And turning your attention to paragraph 5, you ask the

19     question are any groups coming out in opposition.  Do you see

20     that?

21     A  Yes.

22     Q  You asked that because the legislature needs to take into

23     consideration the community's concerns and ascertain what they

24     are before they make their choices in attempt to reflect the

25     community's will in a matter like this; correct?

1  A  Yes, this reflects my intention to having community input in

2  the process, yes.

3  Q  And part of the work that you did in looking at these

4  districts is you looked at them on the basis of turnout data;

5  correct?

6  A  Yes.

7  Q  And you concluded you couldn't get the percentage high

8  enough to get a majority Hispanic turnout?

9  A  That's correct.

10  Q  Now, Dr. Gaddie, turnout is important in assessing Latino

11  voting power; correct?

12  A  Yes.

13  Q  And the Latino community had a very low turnout rate in

14  District 8; correct?

15  A  Yes.

16  Q  Did you make any attempt to your correlate that turnout rate

17  to the newly proposed Assembly district?

18  A  No.

19  Q  Why not?

20  A  Because I was not sure which Assembly district would be the

21  new Assembly district.

22  Q  And it's true you never saw data from the final map you were

23  retained in this litigation; correct?

24  A  Correct.

25  Q  Now, you told the lawyers at Michael Best and the other

1  folks working for the legislature that comparatively that the

2  Hispanic community of Milwaukee in the old 8th Assembly

3  District a very low turnout rate; correct?

4  A  Yes.

5  Q  And the white turnout rate in those districts would have

6  been higher; correct?

7  A  Yes.

8  Q  And that could be anywhere from two to four times higher?

9  A  Yes.

10  Q  Now, Dr. Gaddie, again with Exhibit 63, you told either

11  Mr. Foltz, Mr. Handrick or Mr. McLeod about the concerns that

12  you expressed in paragraph 5; correct?

13  A  Yes.

14  Q  And you expected that they would go to the community;

15  correct?

16  A  Yes.

17  Q  If there was a group called Latino Redistricting Committee

18  that purported to be a coalition of every community

19  organization in the area, you would have expected your clients

20  to be aware of them; correct?

21  A  I suppose some, yes of them, yes.

22  Q  And you and Mr. Troupis discussed the importance of getting

23  good input to draw a good district; correct?

24  A  Briefly, yes.

25  Q  Dr. Gaddie, I'd like you to take a look, please, at

1  Exhibit No. 71.

2  A  Yes.

3  Q  Now, this is an e-mail that you and others received on

4  June 6th, 2011; correct?

5  A  I do not a recall receiving this e-mail.  I'm not on the --

6  I'm on the receipt list for the first e-mail at 8:00 p.m.

7         MR. KELLY:  Your Honor, I'm going to object.  The

8  stipulation between the parties is that the intent element of

9  their Voting Rights Act claims have been dismissed as have

10  their partisan gerrymandering claims.  So this doesn't really

11  go to any remaining issue in the case.

12         JUDGE STADTMUELLER:  Mr. Poland?

13         MR. POLAND:  I'd be happy to argue it right now,

14  your Honor, certainly.  The point that I'm going to make is

15  there is an express reference to Voces de la Frontera.  This is

16  on June 6th, 2011.  We're clearly getting into whether the

17  redistricting team actually went out into the community and

18  obtained the community support in the Latino community from all

19  the groups that were known to it at the time.  It might have

20  been important to do that.

21         MR. KELLY:  And, of course, that has nothing to do

22  with the constitutionality of Act 43 in the absence of any

23  claims of intentional discrimination or political

24  gerrymandering.

25         JUDGE STADTMUELLER:  That may be, Mr. Kelly, but as

1   the Court noted earlier in the trial, ultimately the Court will

2   be in the best position to make that evaluation and against

3   that backdrop the Court is constrained to overrule the

4   objection.  You may continue with your questions.

5           MR. POLAND:  Thank, your Honor.

6   BY MR. POLAND:

7   Q  Dr. Gaddie, the date of this e-mail is June 6, 2011;

8   correct?

9   A  Yes.

10  Q  It's an e-mail that Mr. Foltz sent to a number of

11  recipients; correct?

12  A  Correct.

13  Q  You are one of the recipients on this e-mail; correct?

14  A  Correct.

15  Q  You don't recall receiving it right now?

16  A  No.  I was -- I mean, having seen this, and this was brought

17  to my attention in deposition as well, at the time this e-mail

18  was sent, I was on a ship headed for the Dutch Antilles.  My

19  wedding anniversary is two days after this, so I was

20  incommunicado for this entire week.

21  Q  Dr. Gaddie, you see that the heading of this e-mail is the

22  Hispanic community speaks in Milwaukee; correct?

23  A  Yes.

24  Q  You don't deny that you received this e-mail, do you?

25  A  No, no.

1   Q  Now, as of June 6th, 2001, the redistricting team, which

2   includes Mr. Troupis, Mr. McLeod, Mr. Ottman, Mr. Handrick and

3   Mr. Foltz, they were being asked to consider how the issues in

4   this press release relate to the team's thinking about

5   District 8; correct?

6   A  That's what it says here in the e-mail, yes.

7   Q  All right, and that's down at the bottom; right?  Any

8   thoughts on how this could tie into our current thought process

9   regarding the South Side?

10  A  Yes.

11  Q  And specifically, in the first paragraph just under team, it

12  says "Please take a look at the attached press release from

13  Voces de la Frontera regarding Milwaukee's aldermanic

14  districts."  Notes that they're lobbying for a third Hispanic

15  aldermanic district and increasing the Hispanic voting age

16  population in the proposed Hispanic districts; correct?

17  A  Yes.

18  Q  Do you know whether anyone on the redistricting team ever

19  contacted Voces de la Frontera to get its input on

20  Assembly District 8?

21  A  I have no idea.

22  Q  Dr. Gaddie, could you take a look at Exhibit 77, please?

23  A  Yes.

24  Q  And I'd like to draw your attention to the very last e-mail

25  in the chain, which is on the bottom of page 2 and the top of

1    page 3.

2    A  Yes.

3    Q  Mr. Ottman is providing this information for you on July 17

4    in response to a question that you had; correct?

5    A  Now, let's see.  I have a contact from Jim Troupis, if we go

6    back to the beginning of the chain, asking about my -- asking

7    me about my availability to speak.  There is -- actually it

8    says that Jim Troupis asked that I have you look at this

9    amendment.  I was supposed to look into the amendment.  It was

10   provided to me.  I don't know if I requested it or not.  It was

11   requested that it be sent to me.

12   Q  Do you recall requesting information to be sent to you?

13   A  If I was going to make an assessment, I would have to ask

14   for information.  I don't recall asking for it, but --

15   Q  Okay.  Do you recall you were asking for the information

16   because you were being asked for your recommendations on what

17   essentially was a twin 57-57 district in AD 8 and 9?

18   A  That's what's indicated here, and that is those are the

19   options that I was -- that information was -- I was requested

20   my opinion between those choices, yes.

21   Q  And you were concerned at setting two districts below a

22   level set by the Court nine years ago, and by level, I mean the

23   Hispanic voting age population level; correct?

24   A  Yes.

25   Q  And you wanted to know what the number was as you made your

1  assessment; correct?

2  A  Yes, yes, that's correct.

3  Q  And you had no indication that you could have a district

4  that could perform based on having majority Hispanic voter

5  turnout; correct?

6  A  Correct.

7  Q  But you expressed the opinion that if they had -- if there

8  was strong community support to create two districts of this

9  sort and the community thought they could perform, then the

10  redistricting team could go either way; correct?

11  A  Correct.

12  Q  Dr. Gaddie, I'd like you to take a look at Exhibit No. 67,

13  please.

14  A  Yes.

15  Q  Actually this is an e-mail from you in the middle, the

16  middle e-mail.  An e-mail from you to joeminocqua@msn.com.  Do

17  you see that?

18  A  Yes.

19  Q  And that's Mr. Handrick; correct?

20  A  Correct.

21  Q  You were sending this on Wednesday, April 20, 2011?

22  A  Yes.

23  Q  You talk about running regression models on a number of

24  previous elections; correct?

25  A  Yes.

1    Q  And you refer in there to the expected -- I'm sorry -- they

2    expect GOP open seat Assembly vote -- I think that's supposed

3    to be "the"; correct?

4    A  Yes.

5    Q  GOP open seat Assembly vote using equations correlates at

6    .96 with a 2004-2010 composite and at a .93 level with a 2006

7    to 2010 state constitutional office composite.  And you say

8    both of them are running a little strong relative to one

9    cluster of precincts.  I'll look and see if they are up North.

10   Now, you're running a -- what would you call this analysis that

11   you were running?

12   A  Well, this was an effort to build a partisanship index for

13   the legislative map.  The -- one of the back checks that we

14   make sometimes in redistricting is on the shift in partisan

15   competition, and we sit here in litigation if -- if litigation

16   directed itself towards the issue of partisan performance or

17   partisan fairness, this is the type of information we would

18   have wanted to have explored and have available.  Indeed, these

19   techniques described are very similar to what Professor Mayer

20   did in the trial in 2002.

21   Q  And this was an effort to create a partisan normal vote

22   measure or baselining measure to use to apply to different

23   districts to ascertain their political tendency; correct?

24   A  Yes.

25   Q  And you were sending this to Mr. Handrick; correct?

1    A   Yes.

2                MR. POLAND:   No further questions.

3                JUDGE STADTMUELLER:   Thank you.  Mr. Kelly?

4                        REDIRECT EXAMINATION

5    BY MR. KELLY:

6    Q   Good afternoon, Dr. Gaddie.

7    A   Good afternoon, Mr. Kelly.

8    Q   One of the things that Mr. Poland was asking you about

9    earlier today was about a population equality amongst the

10   districts.  Do you recall that?

11   A   Yes.

12   Q   And he was suggesting perhaps that the population deviation

13   in the districts in this map might be something less than he

14   would like to see.  I'd like to ask you what your experience is

15   with respect to what courts find to be reasonable population

16   deviations.  Do you have an opinion on that?

17   A   Yes.  First of all, there's no such thing as a de minimis

18   acceptable population deviation, but unlike congressional

19   district lines where the only standard -- the only -- the only

20   standard of population equality that cannot be challenged is

21   absolute equality, as equal as practicable is acceptable for

22   state legislative maps.

23       I've been involved in one piece of litigation that ever

24   challenged a map on the basis of population deviations, and

25   that was Larios v. Cox in the state of Georgia in '03, '04,

1    where the state of Georgia had crafted legislative districts

2    with a population deviation range approaching ten points with

3    two-thirds of the majority party seats being at plus four

4    points or above, approaching plus five -- excuse me, minus four

5    points or below approaching minus five, and with two-thirds of

6    the minority party seats being at a population range of four

7    points or more above the average.  The Court threw out that map

8    because of the regional bias in the population deviations.  The

9    overall range in that map was plus 9.98 percentage points.

10   Q  Have you ever seen or are you aware of any Court that has

11   ever struck down a map for failure to get close enough to equal

12   population where the population deviation was below 9 percent?

13   A  Not in my personal experience, no.

14   Q  And how does the population equality in the Act 43 map

15   compare to that?

16   A  Well, the range of population, as I noted previously, in the

17   two Act 43 maps are within a range of one point, which is an

18   order of magnitude smaller than what we had in Larios.

19   Q  One of the other issues that Mr. Poland was talking with you

20   about was this question of citizenship voting age population.

21   Do you recall that?

22   A  Yes.

23   Q  Let me just walk back through the process of actually

24   drafting a map.  When the -- when the staff were drafting this

25   map or engaged in that process, did they have citizenship

 1    information in the set of data they were given by the Census

 2    Bureau?

 3    A  No.

 4    Q  All right.  Let's turn to Exhibit 63.

 5    A  Yes.

 6    Q  Mr. Polled highlighted several pieces of this, of this

 7    document.  These are notes that you made to yourself?

 8    A  Yes, these were my own reference notes.

 9    Q  And this isn't meant to be an expert analysis?

10    A  No.

11    Q  All right.  The first line there says no configuration will

12    have enough Hispanic turnout to guarantee control of the

13    district based only on Hispanic votes.  Do you see that?

14    A  Yes.

15    Q  All right.  Do you -- is it your understanding that the

16    Voting Rights Act requires the Latino community to have a

17    guarantee they will control the district based only on Latino

18    votes?

19    A  My understanding has always been the district should afford

20    an equal opportunity to elect.

21    Q  And that's not the same thing as guarantee.

22    A  No.

23    Q  An equal opportunity is below a guarantee.

24    A  Yes.

25    Q  And it's an opportunity -- in other words, an opportunity

1    equal to any other group of voters.

2    A  Yes.

3    Q  Now, you continued on in that paragraph, the part that's not

4    highlighted.

5    A  Yes.

6    Q  It says that being said, there's ample evidence that white

7    crossover voting, that both districts should perform.  Do you

8    see that?

9    A  Yes.

10   Q  Why do you say that?

11   A  Well, because in developing the political performance

12   measures that were indicated in -- that were developed in the

13   regression equations and looking at political competition,

14   districts in that area had been heavily Democratic.  In

15   District 8 we had had a Hispanic representative being elected

16   for over a decade.  Democratic candidates winning there based

17   upon the low Hispanic turnout couldn't have been winning on

18   Hispanic votes only.  There had to be crossover coming from

19   somewhere.  The Hispanic turnout was just too low to create

20   those majorities by themselves.

21   Q  All right.  Let's go to Exhibit 73.

22   A  Yes.

23   Q  Can you tell me what that is?

24   A  This is an e-mail from Tad Ottman to Jim Troupis, Adam

25   Foltz, Raymond Taffora, Eric McLeod and myself.

1   Q  All right.  Do you see in the second-to-last paragraph where

2   it says there was testimony?

3   A  Yes.

4   Q  Okay.  It says there was testimony by two different Hispanic

5   groups in favor of the configuration in Amendment 2.  Do you

6   see that?

7   A  Yes.

8   Q  Is Amendment 2 the configuration of Assembly Districts 8 and

9   9 that eventually were finalized in Act 43.

10  A  That's my understanding, yes.

11  Q  So that's the 60-54 percent Latino voting age population

12  district.

13  A  Yes.

14  Q  And you were told that there was testimony by two different

15  Hispanic groups?

16  A  Yes.

17  Q  Now, you had suggested that it would be good to have

18  community input to determine what's -- what map configuration

19  should be adopted for Assembly Districts 8 and 9; correct?

20  A  Yes.

21  Q  Does -- in the testimony that they're referring to here,

22  does that refer to testimony at the public hearing on Act 43?

23  A  I suppose so, yes.

24  Q  All right.  Is testimony in a public hearing before the

25  legislature some indication of what the public might think?

1    A   It is a form, yes.

2    Q   And there are two Hispanic groups that testified in favor of

3    the way Act 43 configured with Assembly Districts 8 and 9?

4    A   According to this e-mail, yes.

5    Q   All right.  Now, the next line is "No one that I'm aware of

6    testified in favor of either the bill configuration that we

7    have at 57-57," do you see there, "or in favor of Amendment 1,

8    which would have made a 64 percent Assembly District 8 and a

9    50 percent Assembly District 9."  Do you see that?

10   A   I see that, yes.

11   Q   Now, that Amendment 1 would make the Assembly District 8

12   even higher Latino voting age population than what was

13   eventually adopted; is that correct?

14   A   Yes.

15   Q   And based on this e-mail, you don't have any information

16   that anyone in the community came out in support of that

17   amendment.

18   A   Not based on this e-mail.

19            MR. KELLY:  Thank you.  Nothing further.

20            JUDGE STADTMUELLER:  Mr. Poland?

21            MR. POLAND:  Very quickly, your Honor.  Thank you.

22                    RECROSS-EXAMINATION

23   BY MR. POLAND:

24   Q   Could I have Exhibit 63 back up, please.  In paragraph 1,

25   the non-highlighted sentence, Dr. Gaddie, it states "That being

1    said, there is ample evidence with a white crossover voting

2    that both districts should perform."  That was in the former

3    Assembly District 8 as configured under the 2002 Court-drawn

4    plan, not the new District 8 under Act 43; correct?

5    A  Yes.

6    Q  And then please turn to Exhibit 73 that was just up.

7    There's a reference to two different Hispanic groups that

8    testified in favor of the configuration or Amendment 2.  Do you

9    see that?

10   A  Yes.

11   Q  Do you know what the groups -- what groups those were?

12   A  No.

13   Q  Do you know whether one was Hispanics for School Choice?

14   A  I have no idea.

15   Q  And do you know whether the second was not actually a group

16   but an individual, Manny Perez?

17   A  I have no idea.

18           MR. POLAND:  Nothing further.

19                FURTHER REDIRECT EXAMINATION

20   BY MR. KELLY:

21   Q  Dr. Gaddie, do you recall what the Latino voting age

22   population in old Assembly District 8 was in comparison to

23   Latino voting age population in new Assembly District 8?

24   A  The population in the old Assembly 8 is somewhat higher than

25   the new Assembly district, as I recall.

1    Q   And in going back to using 2002 census data --

2    A   Yes.

3    Q   -- the old Assembly District 8 do you recall was 58 point

4  something percent Latino voting age population?

5    A   Yes.

6    Q   And under Act 43 Assembly District 8, Latino voting age

7  population was 60 percent.

8    A   Just over I think 61 and a half, yes.

9    Q   All right.  So it's a couple percentage points higher under

10  Act 43 than it was back in 2002 under the old

11  Assembly District 8.

12    A   Yes.

13    Q   And was the old Assembly District 8 able to elect the

14  Hispanic community's candidate of choice?

15    A   Yes.

16    Q   How often had they done that?

17    A   I believe starting in 1998.

18    Q   And until?

19    A   Continuing until today.

20    Q   Has there ever -- since 1998 has there ever been to your

21  knowledge a non-Hispanic representative in Assembly District 8?

22    A   Not to my knowledge.

23           MR. KELLY:  Thank you.

24           JUDGE STADTMUELLER:  Anything further, Mr. Earle,

25  Mr. Poland?

1                         RECROSS-EXAMINATION

2   BY MR. EARLE:

3   Q   Your testimony just now was based on the old configuration

4   of Assembly District 8; correct?

5   A   Yes.

6   Q   You have no information as to how the Latino community would

7   perform electorally under the new configuration of Act 43;

8   isn't that correct?

9   A   I have no analysis to indicate that, correct.

10  Q   So none of your testimony about the old Assembly District 8

11  in response to Mr. Kelly's questions would apply to Act 43's

12  Assembly District 8.

13  A   Not directly.

14              MR. EARLE:   Thank you.

15              MR. KELLY:   Your Honor, if I might ask one final

16  question.

17              JUDGE STADTMUELLER:   Very good.

18                  FURTHER REDIRECT EXAMINATION

19  BY MR. KELLY:

20  Q   Dr. Gaddie, is it some indication of Assembly District 8's

21  ability to elect the Hispanic community's candidate of choice

22  that it was 58 percent Latino voting age population in 2002 and

23  it was able to perform and how would that relate to currently?

24  A   Yes, it is.  The configuration of the district previously

25  had allowed the community to elect a representative of choice

1  under a lower Hispanic voting age population concentration than

2  the district's configuration at the end of the decade or the

3  reconfiguration in Act 43.

4  MR. KELLY:  Thank you.

5  MR. EARLE:  May I have one more Ping-Pong?

6  JUDGE STADTMUELLER:  You may.

7  FURTHER RECROSS-EXAMINATION

8  BY MR. EARLE:

9  Q  Professor Gaddie, that observation does not account for the

10  importation of a new significantly large group of high turnout

11  white voters from a different community, does it?

12  A  I have no -- I have no testimony that has any bearing on

13  that, on that change, no.  I have no analysis that has any

14  bearing on that change.

15  MR. EARLE:  Thank you.

16  JUDGE STADTMUELLER:  Very well.  Thank you,

17  Dr. Gaddie.  You may step down.  You may call your next

18  witness.

19  MR. HODAN:  Your Honor, the defense would call

20  Professor Grofman.

21  MS. LAZAR:  Your Honor, just a note on scheduling.

22  We got a little bit slow in the morning, then caught up and got

23  a little bit ahead.  We're still a little bit ahead but we have

24  technically scheduled a break to happen right about now.  Can

25  we just adjourn that for a little bit and have break maybe at

1    3:00, 3:30?

2              JUDGE STADTMUELLER:  Certainly.

3              MS. LAZAR:  Thank you.

4         BERNARD GROFMAN, DEFENDANT WITNESS, DULY SWORN

5              THE CLERK:  Mr. Grofman, would you please state and

6    spell your full name for the court reporter.

7              THE WITNESS:  My full name is Bernard Grofman,

8    G-R-O-F as in Frank, M-A-N.

9              THE CLERK:  Thank you.

10                    DIRECT EXAMINATION

11   BY MR. HODAN:

12   Q  Good afternoon, Dr. Grofman.

13   A  Good afternoon.

14   Q  You've testified in Wisconsin in redistricting cases in 1992

15   and 2002; is that right?

16   A  Yes, I have.

17   Q  Since it's getting late in the second day, I don't want to

18   waste --

19   A  I'll just grab some water if I might.  I apologize to the

20   Court and to you, but the transition from Southern California

21   to Wisconsin has given me a cold and a sore throat.

22   Q  Dr. Grofman, you have a very distinguished career and

23   I don't want to waste a lot of the Court's time, but I would

24   like to spend just a little time discussing your background.

25   Could you briefly summarize the most important work you've done

1    in the past decade as an academic that's related to the issues

2    in this case.

3    A   Probably the most important work that I have done that is

4    redistricting and voting rights related would be the book which

5    I am a co-editor of published by Oxford University Press on

6    redistricting in comparative perspective that looks at

7    redistricting practices in a dozen plus countries around the

8    world.   I have also written two articles that have appeared in

9    Election Law Journal that deal with issues of how to measure

10   minority influence.   These are articles that appeared shortly

11   after Georgia v. Ashcroft was decided by the U.S. Supreme

12   Court.

13       I've also written articles on the research methodology that

14   is relevant to voting rights determinations such as ecological

15   inference and ecological regression.   I have written a number

16   of articles dealing with issues of electoral laws in different

17   countries, countries like France, Italy, Jap, Fiji, that deal

18   with the consequences of changes in election laws for

19   representation of various kinds.

20   Q   Have you been the involved in litigation in the past decade

21   since your involvement as an expert witness in Wisconsin?

22   A   No, I have actually not been directly involved in

23   litigation.   I have, however, continued to be very actively

24   involved in issues that are related to redistricting.   In

25   particular, I have served as a probably the senior consultant

1   to the specialist master for the Federal District Court,

2   Southern District of New York, in the drawing of congressional

3   district lines at a time when the governor and the branches of

4   the legislature of the state of New York were unable to agree

5   on a congressional plan.

6       In addition, I have served in a more minor role as a

7   consultant to the Federal District Court in Georgia in a case

8   which was the follow-up to Larios v. Cox where I was providing

9   testimony -- where I was providing consulting information about

10  minority vote dilution issues.

11  Q   Have you submitted any amicus briefs to the Supreme Court?

12  A   Yes.  In the last decade I have been involved in the

13  preparation of amicus briefs for the United States Supreme

14  Court on major cases that deal with redistricting and voting

15  rights issues.  These amicus briefs have been written with

16  other distinguished academics or law professors and they are

17  written to provide to the Court non-partisan guidance about

18  issues of measurement and concept definition in the areas

19  relating to voting rights and redistricting.

20  Q   And were any of those briefs cited by the Supreme Court in

21  any cases?

22  A   Yes.  My memory is that in terms of briefs I've been cited

23  by the Supreme Court in one case, but, of course, in two of

24  those other cases my memory is that I've been cited by the

25  Supreme Court with respect to articles that I have written that

1  bear on the issues that the Court was considering in those

2  cases.

3  Q  And was one of those cases Bartlett versus Strickland?

4  A  Yes.  In Bartlett versus Strickland, which was the case

5  where an amicus brief that I was the second author of with

6  Nathan Persily, who is at Columbia Law School as a professor in

7  the law school, there that brief, that amicus brief was,

8  in fact, cited by the U.S. Supreme Court.  So there, if you do

9  a Lexus search for my name, you will have to look for it under

10  the variant spelling of et al.

11  Q  I know in the past you've testified or been a consultant in

12  a number of cases outside of Wisconsin in addition to working

13  for courts.  In the past have you done any work on behalf of

14  the U.S. Department of Justice?

15  A  Yes.  For at least two decades I was a fairly regular

16  consultant to the U.S. Department of Justice, primarily with

17  respect to Section 5 issues in the Voting Rights Act but also

18  in at least two cases with respect to Section 2 Voting Rights

19  Act issues.

20  Q  Have you ever worked for a non-partisan redistricting

21  commission?

22  A  Yes.  In the city of New York I was the chief consultant

23  with respect to voting rights for the New York City

24  Redistricting Commission, which was a non-partisan

25  organization.

1    Q   Have you ever consulted with minority groups?

2    A   Yes, I have regularly consulted with a variety of minority

3    groups, perhaps most notably beginning with Thornburg versus

4    Gingles, where I was working for the NAACP Legal Defense and

5    Educational Fund.  I have worked with the Mexican American

6    Legal Defense and Education Fund either directly or jointly

7    with cases in which they have been coplaintiffs with the U.S.

8    Department of Justice, probably most notably in Garza versus

9    County Board of Supervisors of Los Angeles.  And I've been a

10   consultant to a variety of other civil rights groups in various

11   ways, including the Asian-American Legal Defense and

12   Educational Fund and the Southern Regional Council.

13   Q   Doctor, have you worked for both Republicans and Democrats?

14   A   Yes, I have, indeed, worked for both Republicans and

15   Democrats, though a perusal of the cases in which I have

16   testified revealed that, in fact, I have more often worked for

17   Republicans than Democrats.

18   Q   Do you consider yourself a partisan expert or are you

19   considered that way by others?

20   A   No.  I -- it is fair to say that I both consider myself and

21   am considered by others as an academic, a non-partisan expert.

22   I am usual, I think it is fair to say, among experts who

23   testify in redistricting cases in that I have -- I was invited

24   to attend the secret strategy sessions of both Democratic Party

25   and Republican Party congressional committees in one previous

1    round of redistricting.

2    Q   And where was that redistricting?

3    A   Oh, that was at the national level.  This was the Republican

4    National Committee and at Democratic National Committee

5    concerned with plotting -- I'll use the word "plotting" -- with

6    planning strategies for redistricting, and what I did in both

7    cases was to simply provide expert witness information about

8    the state of case law and expert witness testimony in -- on

9    redistricting and how it had changed over the years.

10   Q   In this past year were you nominated by the Connecticut

11   legislature to do any work on its behalf?

12   A   I was nominated by the leadership of both the Republicans

13   and the Democrats in Connecticut as one of two people who were

14   nominated by them to the State Supreme Court for the position

15   of special master in that state to be concerned with

16   congressional redistricting, and I was not chosen but I was,

17   indeed, deeply honored by having been one of the two people

18   nominated by both parties and the governor.

19   Q   I know that you've been previously cited in a number of

20   other Supreme Court cases, most notably Thornburg versus

21   Gingles.  Are there any other Supreme Court citations to your

22   work this decade?

23   A   I think there is one additional citation to my work this

24   decade.  So there are three cases, cases in which I submitted

25   amicus briefs in which my work is cited by the Court, either

1  the amicus itself or some other work of mine; and there is an
2  additional case, Georgia v. Ashcroft, in which my work is cited
3  by the Court.
4  Q  And was that article that was cited there, is that relevant
5  to the issues in this case?
6  A  Yes, very much so.
7  Q  And why is that?
8  A  That article, which is an article by myself as first author
9  along with a former student of mine and another faculty member.
10 That would be Grofman, Loveland, Hanley appearing in the
11 North Carolina Law Review in 2001, looks at new ways to think
12 about how we would measure the equal opportunity for minorities
13 to elect candidates of choice.
14 Q  Dr. Grofman, have you written more than a couple hundred
15 articles and authored several books on redistricting?
16 A  Well, I haven't written a couple hundred articles on
17 redistricting.  I certainly have written a couple hundred
18 articles and I've written a fair number of books -- and edited,
19 I should say, a fair number of books that, in fact,
20 specifically deal with the topics of redistricting.
21 Q  Are there any other particular honors or distinctions you've
22 received this decade that you wish to mention?
23 A  Probably the most important for me personally would be that
24 in 2010 I received an honorary doctorate in political science
25 from the University of Copenhagen at a ceremony the queen

1   attended.

2   Q   Dr. Grofman, switching gears, is Exhibit 1153 a copy of your

3   CV?

4   A   Yes.

5   Q   Did you prepare a rebuttal report in this case?

6   A   Yes.

7   Q   Is Exhibit 1181 a copy of your rebuttal report?

8   A   Yes.

9   Q   Is this report still accurate?

10  A   Yes.

11  Q   One last question before we move on to your testimony in

12  this case.  Did you ever provide advice to anyone regarding the

13  creation of the maps in Act 43?

14  A   No.

15  Q   Doctor, there's been a lot of disagreement over the past

16  couple of days about whether the Latino community has an equal

17  opportunity to elect a candidate of choice in Assembly District

18  No. 8 under Act 43 in the upcoming 2012 elections and beyond,

19  and why don't we just cut right to the chase.  You were in

20  Court this morning?

21  A   Yes.

22  Q   And you heard Professor Mayer testify?

23  A   Yes.

24  Q   And you heard him testify that in order to know whether the

25  Latino community could elect a candidate of its choice in

1   Assembly District 8, one needed to know whether the Latino

2   candidate would win the Democratic primary?

3   A   Yes.

4   Q   Do you share Dr. Mayer's opinion?

5   A   Yes.

6   Q   Why?

7   A   In order to have an equal opportunity to elect, the minority

8   community must be able to either have a district which

9   effectively they control, that is, a district in which they

10  constitute a majority of the electorate, and that has been the

11  standard that had been used for most of the recent history of

12  the Voting Rights Act.  That's a standard that one might call

13  effective voting equality.  At least that is the name that I

14  gave it in a 1987 or so article.

15     At alternative way to answer the question as to whether a

16  minority group has an equal opportunity to elect a candidate of

17  choice is to ask whether the minority community is sufficiently

18  numerous such that given the reliable crossover votes of

19  individuals who are not members of that particular minority

20  community -- that might be other minorities, that might be

21  whites, in this instance it might be non-Hispanic whites --

22  whether or not that minority community, taking its voting

23  strength together with reliable crossover voting, has

24  sufficient strength to essentially ensure that minority

25  community an equal opportunity to elect candidates of its

1    choice.

2    Q  Are you aware of any other voting rights cases where this

3    type of view about partisan primaries has been made by an

4    expert witness and accepted by a Court?

5    A  Yes.  The most important case here, one where there was

6    conflicting expert witness testimony with one expert arguing

7    for effective voting quality -- that is, the ability of the

8    minorities to be so large and numerous that they could control

9    the district on their own -- and two other expert witnesses

10   testifying that no, what was needed was a district in which

11   minorities could, together with reliable non-minority

12   crossover, elect candidates of choice.

13       The Court in Page v. Bartels in 2001 did, in fact, decide

14   that the testimony of the expert witnesses who were arguing for

15   a two-step process to determine the opportunity of minorities

16   to equally elect -- equal opportunity of minorities to elect a

17   candidate of choice, a two-step process involving a partisan

18   primary followed by a general election, that that two-step

19   process better reflected the realistic opportunity of

20   minorities to, in fact, have an opportunity to elect candidates

21   of choice.

22   Q  And which side prevailed in Page v. Bartels?

23   A  The side that was defending a plan which in four

24   instances -- sorry, three instances dramatically reduced the

25   African-American voting age populations in districts but in

1  which there was expert witness testimony that despite that
2  reduction in African-American voting age population in the
3  districts, the districts would nonetheless continue to elect
4  African-American candidates of choice thanks to the votes of
5  others, minority voters and others who would, in fact, reliably
6  support the African-American candidates of choice.
7  Q  Now, before we go on to examine that two-stage test
8  involving a primary election and a general election, I want to
9  ask you some questions about elections in general.  Doctor, if
10  a Hispanic candidate were to want to win a contested Democratic
11  primary, what would they have to do to win?
12  A  Well, they would have to in a primary -- and I assume are we
13  talking about a partisan primary or a non-partisan primary?
14  Q  Partisan primary.
15  A  In a partisan primary they would have to have a majority, or
16  at least a plurality if it was a multi-candidate contest -- and
17  let's assume for simplicity a majority -- of the voters in the
18  Democratic primary, which would not, of course, be all the
19  voters in the district because not all the voters in any given
20  district are Democratic.  Some of them would be Republican and
21  some of them might well be individuals who did not have a clear
22  partisan affiliation and did not participate in either the
23  Democratic or the Republican primary.
24  Q  Doctor, do you have an opinion to a reasonable degree of
25  scientific certainty whether a Hispanic candidate can win the

1    Democrat primary in Assembly District 8 in the upcoming 2012

2    primary election?

3    A   Yes, I do.

4    Q   And what is your opinion?

5    A   My opinion is that a Hispanic candidate can and will win the

6    Democratic primary in Assembly District 8 and that having done

7    so, essentially the winning of the Democratic primary in

8    Assembly District 8 is tantamount to election in the district.

9    Q   What -- do you know who the incumbent is in

10   Assembly District 8?

11   A   I believe that the name of the incumbent in that Assembly

12   district is JoCasta Zamarripa.

13   Q   So we would have an incumbent running in

14   Assembly District 8?

15   A   Yes.

16   Q   What's the significance of that?

17   A   In the political science literature there is absolutely no

18   disagreement that individuals who run with the advantage of

19   incumbency are greatly advantaged in elections.  They are

20   advantaged in part because of name recognition.  They are

21   advantaged in part because they may have an existing campaign

22   organization in place.  They are advantaged because the very

23   fact that they are in the contest is likely or may have the

24   effect of deterring the stronger challengers.

25       So that while we can debate exactly the magnitude of the

1    incumbency advantage, there is absolutely no doubt that there

2    is such incumbency advantage, and it operates either to favor

3    or to disfavor minority candidates of choice.  When the

4    minority candidate of choice is herself or himself an

5    incumbent, then incumbency advantage operates to benefit the

6    minority candidate.  When incumbency advantage is found among a

7    candidate, found with a candidate who is not the minority

8    candidate of choice, that tends to have often a chilling effect

9    upon the ability of minorities to elect candidates of choice.

10   Q  Do you have an opinion about whether the incumbent in

11   Assembly District 8 would receive any support from the

12   African-American community in the Democratic primary in 2012?

13   A  I do not know of Assemblywoman Zamarripa's support from the

14   African-American community, but it is reasonable to generalize

15   from the support of the African-American community to a

16   previous incumbent in Assembly District 8 to see whether or not

17   in the African-American areas of Milwaukee there might,

18   in fact, be some level, indeed, perhaps some strong level of

19   support from African-American voters of the candidacy of a

20   Hispanic who was a clearly visible and viable and previous

21   Assembly district incumbent to win office.

22            MR. HODAN:  Could you please put up Exhibit 1185.

23   BY MR. HODAN:

24   Q  Doctor, I'm showing you the election results from a race

25   involving Pedro Colon versus Mr. Lipscomb with the election

1    results from that race.  Do you see that?

2    A  Yes.  This is a documentary exhibit basically taken from

3    public data indicating ward by ward in the city of Milwaukee

4    what were the raw vote numbers for Mr. Colon and for

5    Mr. Lipscomb.

6    Q  And what do you, in simple terms, take out of this exhibit?

7    What's the significance of this exhibit?

8    A  Well, in the form in which the exhibit is presently before

9    me, the answer to that is not much because --

10   Q  Could you please turn to the fourth page of the exhibit.

11   A  Yes, thank you.

12   Q  Does that help at all?

13   A  It certainly clarifies the point of this exhibit, because

14   what the exhibit does is it shows in this case it would be

15   previous, that is, 2002 lines, the Senate District 4 and

16   Senate District 6, and I will simply note for the record that

17   Senate District 4 and Senate District 6 are overwhelmingly,

18   largely African-American districts.

19       And if we look at the total vote, and here we are including

20   some individuals who are voting who are not African-American

21   because this is not an entirely African-American district, but

22   in District 4 and District 6 combined, we see that Mr. Colon in

23   his candidacy receives the vote of 30,349 persons as compared

24   to only 17,407 for Mr. Lipscomb, and that means that when we do

25   the percentages by dividing the Colon vote by the total vote,

1    what we find is that Mr. Colon, in fact, receives a

2    63.6 percent vote from the voters in these heavily

3    African-American Senate districts.

4    Q   What would the impact of having Republicans in Assembly

5    District 8 have on the incumbent's ability to win the

6    Democratic primary?

7    A   Well, this is very interesting.  This is, in fact, the topic

8    of the 2001 North Carolina Law Review that I am the principal

9    author of.  Common sense would say that having Republicans in a

10   district hurts Democrats.  Common sense would further say that

11   minority candidates, at least in Milwaukee, are Democrats.

12   That would lead to the apparent implication that having more

13   Republicans in a district would harm minorities, but to borrow

14   a phrase, that would be linear thinking.

15       That is to say, what actually is going to happen is that if

16   you have too many Republicans, that is going to be bad for the

17   minority community for the common sense reason that the

18   minority candidates are almost certainly going to be running,

19   if they're candidates of choice of the Hispanic community, as

20   Democrats.  And if there are too many Republicans, the minority

21   candidate of choice is going to lose in a general election to a

22   Republican.  That's the downside, but it's a two-step process.

23       The positive aspects of having numbers of Republicans in the

24   district is that those Republicans, presumably

25   disproportionately white -- because I can show that the

1    minority voters are disproportionately Democratic, so if there

2    are Republicans, they're going to be whites, non-Hispanic

3    whites -- that having those non-Hispanic white Republicans in

4    the district may actually operate if not to advantage, at least

5    not to disadvantage the minority community for the very simple

6    reason that those Republicans are not voting in the Democratic

7    primary.

8              MR. HODAN:  Could you please put up Exhibit 1151.

9    BY MR. HODAN:

10   Q  Doctor, Exhibit 1151 is a summary of the 2010 election

11   results for Districts 8 and 9 in a race involving now

12   Governor Walker and Mr. Barrett.  Do you see that?

13   A  Yes, I do.

14   Q  And what is the significance of those election results with

15   respect to what you just testified about Republicans in

16   Districts 8 and 9?

17   A  We know that the minority population percentages in, for

18   example, District 8 haven't changed that much, but we also know

19   that there has been from -- as evident from this chart, a

20   substantial change in the percent Democratic in old District 8,

21   old Assembly District 8 and in new Assembly District 8.  That

22   is to say, old Assembly District 8 was 79 percent Democratic,

23   overwhelmingly strong Democratic district.  New

24   Assembly District 8 is only -- only, I use the word

25   guardedly -- only 71 percent Democratic.

1     What this means is that the population, which is different

2   between the composition of old Senate -- old

3   Assembly District 8 and the population which is now found in

4   new Assembly District 8, has to have more Republicans in it

5   than it did before; and furthermore, since we know that the

6   minorities are not the, generally speaking, the voters who are

7   giving support to the Republicans, what this is telling us is

8   that we must have been adding to District 8 a non-trivial

9   number of non-Hispanic, non-other, non-minority, generally

10  speaking, white Republicans.

11  Q  And does that make it more likely that the incumbent in

12  District 8 will win the Democratic primary?

13  A  Certainly that has to be correct in terms of the Democratic

14  primary.  If you subtract out non-Hispanic white voters from

15  the Democratic primary, then the proportion of Hispanics who

16  are within the Democratic primary relative to other groups is

17  only going to increase, all other things being equal.

18  Q  Before we continue exploring your opinion about why you

19  believe a Hispanic candidate can win the Democratic primary,

20  I'd like to take a step back and perhaps you had a chance to

21  review the Act 43 maps as they relate to minority districts?

22  A  Yes.

23  Q  Could you give the Court sort of your big picture assessment

24  or observations of what happened with the minority districts in

25  Act 43.

1    A  Well, as a professor I have one particular word that I would

2    use to characterize the way in which the legislature drew the

3    minority districts in 2011, and that word is plagiarism.

4                MR. HODAN:  Could you please put up Dr. Grofman's

5    rebuttal report, Exhibits B and D, side by side, please.  Maybe

6    if you could enlarge those just a little.  Thank you.

7    BY MR. HODAN:

8    Q  Dr. Grofman, what did you mean when you said plagiarize?

9    A  I meant that essentially what it appears the legislature

10   did -- and I indicated appears because I have no personal

11   knowledge what actually the legislature or the members of the

12   legislature involved in redistricting were thinking, but based

13   on their effects by which they may be judged here, what they

14   did was they looked at the 2002 Court map and they said this

15   map must be constitutional.  It was drawn by a federal district

16   court and so we are going to essentially copy the minority

17   population and voting age population percentages.

18               MR. EARLE:  I object.  I believe the witness at this

19   point is speculating.  There is absolutely no foundation for

20   his belief at this point and I think he actually said so, so

21   I would object to the testimony.

22               JUDGE STADTMUELLER:  The objection is noted.

23   BY MR. HODAN:

24   Q  Please continue, Dr. Grofman.

25   A  So if we look at the actual choices made by the legislature

1    and we compare those choices to the choices made by the 2002

2    Court confronted with a similar set of issues and actually

3    rather similar demography, because the minority districts in

4    2010 were underpopulated —- that was true for all of the

5    African-American districts and it was also true for

6    Assembly District 8 but not true for Assembly District 9 —- and

7    what you see basically is that in terms of black voting age

8    population, the proportion picked by the legislature was

9    roughly 60 percent, which is essentially comparable to the

10   average characteristics of the 2002 Court map or the

11   characteristics of the 2002 Court map in those districts which

12   were majority-minority voting age population.

13        And similarly, and here I do want to emphasize this point,

14   if you look at what the legislature actually did in drawing its

15   Hispanic districts, focusing on voting age population and

16   population, what we will see is that both with respect to

17   population and voting age population, the legislature drew

18   districts which were larger, more Hispanic than the districts

19   which were drawn in 2002 by the Court.  In Assembly District 8

20   the Hispanic voting age population circa 2002 was 58.3 percent.

21   In 2011 in Act 43 the Hispanic voting age population in

22   Assembly District No. 8 was 60.52 percentage points.

23        And similarly we could also talk about Districts 12 and

24   District 9.  These were districts which the 2002 Court drew as

25   minority influence districts.  They were not claimed to be

1 districts which would realistically elect a minority candidate

2 of choice but they were districts in which minorities were said

3 to have potential influence.

4  If you compare Assembly District 12 drawn by the Court in

5 2002, it had a 32.77 percent African-American voting age

6 population.  In contrast, if you look at 2011 legislative map,

7 Assembly District 12 has now gone up to become a 51.4,

8 51.5 percent African-American voting age majority district.

9 And similarly, if you look at Assembly District No. 9, which

10 was only 22.9 percent in 2002, you will see that that district

11 now has risen to a 54 percent, 54.03 percent Hispanic voting

12 age population district; that is, to say in voting age

13 population terms a majority Hispanic voting age population

14 district.

15  So if we take the 60 percent number for black voting age

16 population as a number which -- about which there is no dispute

17 that it provides minorities a realistic opportunity to elect

18 candidates of choice, then if we compare the 2002 plan to the

19 2011 plan, the 2002 plan had five clear opportunities to elect

20 districts for African-Americans at the Assembly district level

21 and the 2011 plan has five African-American clear majority

22 opportunities to elect districts.

23  Similarly, if we compare the 2002 Court map in terms of

24 Hispanic voting age population, if the district in 2002 at

25 58.34 percent elected a minority candidate of choice, then

1   potentially and perhaps even presumptively the district in

2   2011, which has an even higher Hispanic voting age population,

3   must be, at least presumptively, a district which has the

4   opportunity to elect a Hispanic candidate of choice that is,

5   in fact, higher in Hispanic voting age population and like what

6   happened in 2002, it has in place in the district a Hispanic

7   incumbent who can benefit from the advantages of incumbency in

8   a direction that favors the minority community.

9   Q  Dr. Grofman, I'm going to read a short passage from the

10  opinion in 2002 that's on page 7 of this document, the sixth

11  paragraph down.  I'm just going to read one line.  This is what

12  the Court wrote about the minority districts in 2002.  The

13  racial and cultural minority populations in these districts

14  appear sufficient to permit African-Americans and Latinos to

15  elect candidates of choice.  Was the 2002 Court correct in its

16  assertion?

17  A  Yes, it certainly was.

18  Q  And why was that?

19  A  Because if we look at the five black Assembly districts,

20  majority black Assembly districts, the two black

21  African-American majority Senate districts, those districts

22  elected, at the proportions that were drawn in the 2002 plan,

23  they elected African-Americans.  Moreover, they elected

24  African-Americans in contests in which often there was not even

25  a general election challenge and in contests in which very

1    often, in fact, perhaps all the time but certainly often, that

2    the only candidates in the Democratic primary were

3    African-American candidates.

4        And if we turn to the Assembly District 8 as created in

5    2002, we see exactly the same pattern.  The Court predicted,

6    projected, estimated this Latino district at a minority

7    population of only -- minority voting age population of only

8    about 58 percent.

9              MR. HODAN:  Would you please put up 1181.  Thank you.

10   Side by side.  From Dr. Grofman's report.  I apologize.

11             THE WITNESS:  That the district as created in 2002 at

12   a minority voting age population of around 58 percent, that

13   that Hispanic voting age population with an incumbent in place

14   was enough for the minority community to have not just an

15   opportunity to elect a candidate of choice but essentially --

16   not quite a guarantee -- certainly a district which as minority

17   population grew over the course of the decade, elected a

18   minority incumbent, elected, reelected a minority incumbent,

19   and eventually in an open seat contest elected in a Democratic

20   primary in which the only candidates competing were Hispanic,

21   elected a Democratic primary winner as the winner of the

22   general election in District -- Assembly District 8.

23   BY MR. HODAN:

24   Q  Dr. Grofman, you talked about plagiarism.  Were there any

25   differences between the 2002 Court-drawn plan and the maps

1   passed by the legislature?

2   A   The only real differences were slight improvements in the

3   Hispanic voting age population in Assembly District No. 8 and

4   dramatic improvements in the minority populations in

5   Assembly District 12, vis-a-vis African-Americans, and

6   Assembly District 9, vis-a-vis Hispanics.  These were districts

7   which were clearly quite low circa 2002, which is the relevant

8   baseline, in terms of their minority voting age populations,

9   32.8 percent and 23 percent in the case of Assembly District 9.

10  Each of these districts has been transformed into a district

11  with a minority voting age population majority.

12          MR. HODAN:  Your Honors, I'm about to turn to a new

13  subject.  I note there was some mention of a break.  Now would

14  be a good time if you'd like or I'm happy to continue.

15          JUDGE STADTMUELLER:  We'll take a 15-minute break.

16  Resume at 3:20.

17          THE BAILIFF:  All rise.

18          (A recess was taken.)

19          THE BAILIFF:  All rise.

20          JUDGE STADTMUELLER:  Mr. Hodan, you may continue with

21  the questions.

22  BY MR. HODAN:

23  Q   Professor Grofman, with respect to Assembly District 8,

24  could you tell us what the combined minority population is?

25  A   Yes.  The combined minority population in that district is

1    77.2 percent.  That is, by combined minority population I'm

2    referring to the Hispanic population plus the African-American

3    population, which would actually be the next largest minority

4    in the group, plus various other much smaller minority

5    populations, which together equal roughly ten percentage

6    points -- sorry, 12 percentage points of population.

7    Q  What is the significance of that number with respect to your

8    opinion that a Hispanic candidate has an equal opportunity --

9    pardon me, that the Hispanic community has an equal opportunity

10   to elect a candidate of its choice?

11   A  It is relevant in large part because there is reason to

12   believe at best that some non-Hispanic but minority voters are

13   prepared to vote for the Hispanic candidate, and here we have

14   the evidence from the African-American vote for Judge Colon.

15   But even if there were not a coalition core between

16   African-Americans and Hispanics, it is relevant because,

17   I think quite misleadingly and confusingly, the ways in which

18   we have been discussing the non-Hispanic population has

19   neglected the obvious point that not everyone who is

20   non-Hispanic is a non-Hispanic white.  There are, in fact,

21   considerable non-trivial minority populations, primarily

22   African-American, that are also located in

23   Assembly District 12.

24       So if you, for example, only looked at Hispanic population

25   share or Hispanic voting age population share, you are

1   neglecting the fact that the non-Hispanic white voter is not

2   100 percent minus that number but rather a smaller number which

3   must be reduced to take into account the fact that some

4   proportion of the population, voting age population and, for

5   that matter, citizen voting age population is minority but

6   non-Hispanic.

7   Q   I think you just accidentally used -- you mentioned

8   Assembly District 12.

9   A   I'm sorry.  I meant Assembly District 8, though I would also

10  say the same thing actually also applies to

11  Assembly District 12, but the numbers I gave were for

12  Assembly District 8.

13  Q   Dr. Grofman, during the past few days we've heard testimony

14  from a number of the plaintiffs or at least the Voces

15  organization and others about apparent obstacles that would

16  prevent a Hispanic candidate from winning in new District 8 and

17  you were hear to listen to that testimony.  Is that correct?

18  A   Yes, I was.

19  Q   And one of the first complaints appears to be that the

20  Hispanic citizen voting age population is too low in District 8

21  to allow the Hispanic community to elect a candidate of its

22  choice; is that correct?

23  A   Yes.

24  Q   And do you have an opinion with respect to that?

25  A   Yes.  My opinion is twofold.  First of all, the real legal

1    significance of the claim that Hispanic citizen voting age

2    population is not large enough for the Hispanics to constitute

3    a clear majority of their own in the district is really an

4    issue to be determined on legal grounds by the Court.  There is

5    no expert witness dispute that Assembly District 8 as presently

6    configured lacks a substantial enough minority population for

7    it in citizen voting age population terms, or terms of the

8    electorate as a whole, for it to constitute a majority.

9        If as a matter of law this Court were to decide that the

10   only way you can satisfy a Section 2 challenge is by

11   demonstrating that the proposed district which is proposed as a

12   remedy, or in this case defended as a remedy, is sufficiently

13   minority, that the minority constitute a majority of the actual

14   electorate, if that is the legal decision of this Court, then

15   plaintiffs win and it is no more complicated than that, because

16   there is absolutely no expert witness dispute that the

17   population numbers, the voting age population numbers and their

18   translation into citizen voting age is not such as to allow

19   Hispanics to essentially on their own control with the

20   guarantee the outcome of the district regardless of how anyone

21   else votes.

22   Q  Now, given the minority population in District 8, do you

23   have an opinion about whether the percentages of the Hispanic

24   voting age population or citizen voting age population are

25   sufficient in District 8 to allow the Latino community to elect

1    a candidate of their choice?

2    A   What we see from the data that is in front of us in this

3    exhibit is that the combined minority population in this

4    district is 77 percent.  That number is higher than the

5    combined minority population was in 2002 in the district that

6    the Court drew.

7        If we look at the non-white -- sorry, at the non-Hispanic

8    white population, well, if the non-white population is going to

9    be 7717, the white population in the district is going to be

10   something like 23 percent of population.  If we look even at

11   the white population, non-Hispanic white population, that rises

12   all the way up to 30 percent.  So we're looking at a district

13   in which the non-Hispanic white population even when we're

14   looking at voting age population is 30 percent, and so the

15   issue becomes whether that non-Hispanic white population is

16   large enough to control the outcome of elections in this

17   district in a Democratic primary and then presumably in a

18   general election.

19   Q   And do you have an opinion in that respect?

20   A   Yes, I do.

21   Q   And what is it?

22   A   My opinion is based on the previous history of the district

23   and the evidence about the degree to which the population which

24   has been added to the district is a disproportionately

25   Republican population which will not be participating in the

1   Democratic primary, at least in elections where there is a
2   high-stakes Republican primary contest in which they might
3   vote. Under those circumstances this district has a realistic
4   opportunity for the Hispanic candidate to be elected, candidate
5   of choice to be elected.

6       This realistic opportunity for a Hispanic candidate of
7   choice to be elected is further enhanced by the simple fact
8   that there is a Hispanic incumbent in place, and it is further
9   enhanced by the undisputed testimony in the record that the
10  Hispanic and minority populations, but in particular the
11  Hispanic population, in this district is going to continue to
12  grow over the course of the decade. What that suggests to me
13  is that if there is any possible question about the ability of
14  minorities to elect, it is going to be in 2012, because the
15  minority population in this district is going to continue to
16  grow over the course of the decade.

17      But there is something quite important about 2012 in
18  addition even to the fact that there is a Hispanic incumbent
19  who presumably will be running for reelection. 2012 is a
20  presidential election year, and in a presidential election
21  year, while minority turnout may be lower than non-minority
22  turnout relative to its population, the incentives for
23  minorities to turn out and vote in a high-stakes election are
24  higher than in the kind of countywide, very, very low
25  visibility contests in which we have seen these abysmal levels

1  of minority turnout.

2      And while it remains true that minorities will not vote at

3  quite as high a rate relative to their population or even

4  voting age population as non-minorities, the ratio of turnout

5  in the minority community to the turnout in the non-minority

6  community is going to be much higher.  We are not going to be

7  seeing in 2012 in a primary and in a general election the same

8  kinds of low levels of turnout that we have seen, or if we are

9  going to see those low levels of turnout in a primary election,

10  it will be because the only candidate in the contest is the

11  president incumbent.

12  Q  I'd like to move to the second criticism that has been

13  leveled against Assembly District 8, and that is that somehow

14  its geographic configuration will prevent the incumbent from

15  winning the Democratic primary.  Do you believe the new

16  configuration will prevent the incumbent from winning the

17  Democratic primary?

18  A  No, I do not for the reasons that I have identified, that

19  the district remains more heavily Hispanic than it was in 2002,

20  more heavily minority, combined minority than it was in 2002,

21  and to the extent that there has been change in the composition

22  of the white -- non-Hispanic whites in the district, and there

23  has been, that change is essentially to bring in high turnout

24  Republicans into the district.

25          MR. HODAN:  Could you please put up Exhibit 1189.

1    BY MR. HODAN:

2    Q   Dr. Grofman, you were in Court when the executive director

3    of Voces testified yesterday?

4    A   Yes, I was.

5    Q   And you heard Miss Neumann-Ortiz testify about the

6    Aldermanic Districts 8 and 12 for the city of Milwaukee?

7    A   Yes.

8    Q   I'm showing you Exhibit 1189 and that is an aldermanic --

9    A   An overlay.

10   Q   An overlay.  Why don't we go to Exhibit 1190 first.  Thank

11   you for pointing that out, Dr. Grofman.  Exhibit 1190 is the

12   current configuration of the Milwaukee Aldermanic districts 8

13   and 12?

14   A   Yes.  These are the aldermanic districts for the Milwaukee

15   city council.

16   Q   And you hired the executive director of Voces testimony

17   about how they worked very hard to get these maps in place and

18   that they were very happy about it and they felt that they were

19   successful?

20   A   Yes, I heard that testimony.

21   Q   What's the significance of that testimony to your analysis?

22   A   Well, one of the arguments that was raised was that it was

23   improper to divide the -- what I will call for want of a better

24   word, the older Hispanic community, which was the community

25   located in old -- in old, that is, 2002, Assembly District 8,

1    into pieces, two pieces, one of which would go into new

2    Assembly District 8 and one of which would go into new

3    Assembly District 9.  And then in particular there was a

4    problem with drawing a north-south line, splitting the Hispanic

5    districts AD 8 and AD 9 rather than having those districts

6    basically being one on top of the other.

7        What we see in Exhibit 1190 is that the line that splits

8    Assembly District 12 -- sorry, Aldermanic 12, which corresponds

9    to Assembly District 8 and Aldermanic District 8, which

10   corresponds to Assembly District 9, that line is a line that

11   runs north and south.  It is a line that splits old

12   Assembly District 8 in a north-south fashion and this is a

13   configuration which the Voces plaintiffs in their testimony in

14   front of the Milwaukee city council apparently had no trouble

15   with.

16   Q  Is there anything else to be learned from the testimony of

17   Miss Neumann-Ortiz?  And I ask you to put up Exhibit 1189.

18   A  Exhibit 1189 was prepared at my direction to deal with the

19   question of what would happen if we began with Aldermanic

20   District 12 and Aldermanic District 8 in place, which, of

21   course, is not the actual sequence that occurred; but if we

22   were to begin with these two districts, what would we do in

23   order to go from an aldermanic district, which is, I believe,

24   about 40,000, to an Assembly district which is over 57,000.  So

25   you have to find additional people to put into these aldermanic

1   districts in order to make them large enough to constitute an

2   Assembly district that was equal populous.

3       And here this is, the red areas, the darker red areas show

4   areas which are just barely, 50 percent and up.  They're

5   actually higher than 50 percent.  They're simply 50 percent and

6   up in terms of their proportion of I believe it is Hispanic

7   population.  It might be voting age and I apologize.  I don't

8   remember because the exhibit right now is not labeled.  The

9   orange areas are areas which are substantial but not 50 percent

10  or over Hispanic population.

11      So when we look at the configuration, and imagine that we

12  began with essentially Aldermanic Ward 12 and we had to find

13  additional population to configure it, to make it equal

14  populous were other Assembly districts, there are four choices.

15  We could go east but that would put us into white areas.  We

16  could go west but if you will notice -- and I'm sorry, I don't

17  want to touch the screen and have a repetition of things that

18  I've seen before -- if you look at the little orange piece over

19  to the left, you might think you would want to go west in order

20  to pick up that little piece of more Hispanic geography but it

21  turns out that particular piece of geography, at least so I am

22  told, is located in West Milwaukee as opposed to just ordinary

23  Milwaukee.  So you don't really want to go west, because again,

24  you're dealing with areas that are much lower in Hispanic

25  population.  You don't clearly want to go east and if you go

1    north you're running into the black areas.

2         Therefore it sort of logically follows if you are drawing

3    the district that you are going to go south, young man.  And

4    when you do that, you see that you pick up both in new

5    Assembly District 8 and in new Assembly District 9 substantial

6    pockets of Hispanic population.

7         Now, those pockets in the orange areas are not usually as

8    heavily Hispanic as the areas that were in old

9    Assembly District 8, but they are sufficiently Hispanic so that

10   the population in old -- in new Assembly District 8 exceeds --

11   the Hispanic population exceeds the Hispanic population as it

12   existed in old Assembly District 8, that is, the 2002 plan.  So

13   that these districts are relatively heavily Hispanic districts.

14   Eight, as we have talked about before, is 65.9 percent Hispanic

15   in population, 60.5 percent Hispanic in voting age population.

16   And District 9, which is sort of the -- what I refer to as the

17   missing link in the discussion of what actually is happening

18   with respect to minority vote dilution issues in this state,

19   that district is 60.5 percent Hispanic population and

20   54 percent Hispanic voting age population.

21        So if you were -- and I am someone who has drawn maps for

22   courts in areas of heavy minority population -- if you were to

23   look at this configuration beginning with the most heavily

24   Hispanic areas, if there is no apparent problem with drawing a

25   north-south line, because the Voces plaintiffs themselves drew

1   a north-south line distinguishing AD -- sorry, Aldermanic
2   District 8 from Aldermanic District 12, then this is a
3   perfectly reasonable way to configure two, and I emphasize two,
4   Hispanic voting age population districts.
5   Q  Professor Grofman, there was testimony from the Voces
6   plaintiffs that by dividing Districts 8 and 9 along 16th Street
7   that the business district was divided.  Are there some
8   advantages to the Hispanic community where there's a
9   possibility of two Hispanic seats to have a divided business
10  district?
11  A  Well, I don't of my own knowledge know exactly where the
12  Hispanic business community is located.  Taking the idea that
13  it is located along 16th Street, the advantage, potential
14  advantage for long-run minority opportunity to elect candidates
15  of choice over the course of this decade is to take that
16  business area and place a portion of it in the district which
17  already has a Hispanic incumbent and to place a portion of it
18  in the district which has the potential to have a Hispanic
19  candidate of choice elected sometime over the course of the
20  decade.
21      If I may, let me just indicate what I as someone who has
22  drawn plans for minorities would say about the choices that the
23  legislature had to make.  I have no way of knowing how they
24  chose but I certainly can identify the choices or the choice
25  that they had to make.  That choice is really quite simple.

1    Either they could do as the Voces plaintiffs want them to do,
2    which is to draw a super majority district in
3    Assembly District 8, a district which already elects a Hispanic
4    candidate of choice, and then take the population, Hispanic
5    population which would have gone into Assembly District 9 and
6    put it in 8.
7        My view is as I testified in my declaration is that that is,
8    from my standpoint as an expert, a bad idea for the Hispanic
9    community, because what it does is it delays the time at which
10   it would be possible to elect a second Hispanic candidate of
11   choice from what is now admittedly only an opportunity
12   district, namely Assembly District 9.
13   Q  Dr. Grofman, a third complaint that has been leveled against
14   Assembly District 8 is that it was drawn in such a way that
15   there were new white voters from District 9 and that these new
16   voters have come in and that they have higher turnout rates;
17   therefore that will jeopardize the ability of the incumbent to
18   win in the next primary or next election.  Do you have an
19   opinion about whether that infusion will have that effect?
20   A  Yes.  My opinion is that it will not have that effect.
21   Q  And why is that?
22   A  Let me step back a moment.  We have heard testimony about
23   the inability of now Judge Colon to win an election in the new
24   portion of Assembly District 8, a portion of that district that
25   comes from old Assembly District 9.  And that contest which he

1  lost in the new portion of the district, the portion that comes

2  from old Assembly District 9, did not, in fact, vote for him,

3  but the contest that we were talking about is a contest in

4  which there was a long-standing incumbent contesting the

5  contest. And we know one very important fact about

6  Judge Colon. He is not a Republican. He, in fact, was elected

7  from Aldermanic 8 as a Democrat, winning the Democratic primary

8  and going on to win the general election several times.

9  Q  You meant Assembly District 8.

10  A  Assembly District 8. Sorry. The reason that that's

11  important is that it is undisputed, at least in my view, that

12  there are more Republicans from the portion of new District 8,

13  the district that's just been created, coming from old

14  District 9 than there are Republicans coming from old

15  District 8 and the portion of old District 8, the 2002

16  district, that remains in new District 8.

17     If Colon, Judge Colon is recognizable as a Democrat, it is

18  not so surprising that he will not do well in the portions of

19  old district -- sorry, of old District 9 that are now in new

20  District 8 and he was running against an incumbent.

21     I was in honesty surprised to see this contest. I had not

22  seen this contest explored by plaintiffs' expert before, even

23  though there were two different polarization analyses that were

24  conducted, one in Dr. Mayer's first declaration and another

25  that was provided as -- along with his deposition, and it

1   seemed to me since the Colon contest in 2011 where Judge Colon

2   sought election -- actually reelection since I believe he was

3   appointed to the bench -- sought reelection as a judge in the

4   2011 Circuit Court election, somehow it seemed to me strange

5   that I didn't see analysis of that district since it was

6   found -- analysis of that district was found or that contest

7   was found in both Exhibit 7 in Dr. Mayer's original report and

8   also in Exhibit 134 and then subsequently I believe 1089, just

9   renamed the exhibit, renaming these various exhibits from one

10  deposition to Court.

11      I don't know why we didn't see this analysis of Colon's

12  contest for the Circuit Court, but it seemed to me that the

13  Court, this Court ought to see that analysis, and so I

14  requested that counsel do it.  I say I requested of counsel

15  that they provide sufficient staff assistance to allow me to

16  conduct this analysis.

17              MR. HODAN:  Could you please put up Exhibit 1186.

18  BY MR. HODAN:

19  Q  Professor Grofman, this is a document that shows the

20  election result in the race between Pedro Colon and Christopher

21  Lipscomb in the 2011 spring election for Milwaukee County

22  Circuit Court judge?

23  A  Yes.

24  Q  Okay.  And on it it indicates the results in wards from old

25  8 that were entirely within -- or I should say that are

1    entirely within new 8 and wards from other seats that are not

2    entirely within new 8.  Could you tell us the significance of

3    these election results with respect to your opinion in this

4    case?

5    A  As I would expect in a non-partisan contest, the support for

6    Judge Colon from the wards that are now entirely in the new

7    Assembly District 8 is lower than it is in his old

8    Assembly District 8, a district which he represented for a

9    long, long time as an incumbent.

10       But nonetheless, even in these wards that have been

11   imported, if you will, from Assembly District 9 that are

12   essentially part of the extension of Assembly District 8

13   southward toward the areas of greatest growing Hispanic

14   population strength, even these wards elected Mr. Colon.  And

15   when we combine the vote from the old wards that were

16   previously in the previous District 8 with the new wards, it is

17   clear that not only does Mr. Colon win but he wins his

18   judgeship by a fairly comfortable margin.

19       And this I repeat is a non-partisan contest in which the

20   Republicans in the portion of old district, Assembly District 9

21   who are now in new Assembly District 8 are, in fact,

22   participating in the election.

23            MR. HODAN:  Dr. Grofman, I'd like to switch gears a

24   little.  Could you please put up Exhibit 1025.

25            MR. EARLE:  Your Honor, may I interrupt for a moment?

1   This is something we saw for the first time last night and it's
2   essentially new work, and so we would request that at the end
3   of this examination that we be allowed to bring Dr. Mayer back
4   up on the stand to respond to this.  This came over the e-mail
5   last night, I think at midnight.
6           JUDGE STADTMUELLER:  I thought you were going to say
7   over the transom at midnight.
8           JUDGE WOOD:  The metaphorical transom.
9           JUDGE STADTMUELLER:  We'll address it then.  You may
10  continue, Mr. Hodan.
11  BY MR. HODAN:
12  Q  You were hear in Court when Dr. Mayer talked about his
13  polarization study?
14  A  Yes.
15  Q  And you heard that he testified that his polarization
16  studies would not be helpful in predicting whether a Latino
17  candidate could win the Democratic primary in
18  Assembly District 8?
19  A  Yes.
20  Q  Do you share this view?
21  A  Yes.  As I have previously testified, these are without
22  exception non-partisan, relatively low visibility contests.
23  Even I think the Aldermanic 12 election is -- would probably
24  count as a low visibility contest, and they are held without a
25  partisan cube because they are non-partisan and they are held

1   off the election cycle, which is the cycle for partisan

2   election also which motivates voters, both minority and

3   non-minority, to go to the polls.

4   Q  Dr. Grofman, do you have an opinion about what the best

5   evidence is to use, the best races to look at in order to

6   determine the racial polarization in an Assembly district?

7   A  Yes, I do.

8   Q  And what is that opinion?

9   A  That opinion is the best evidence is evidence that embodies

10  three elements.  The first element is that there is, in fact, a

11  minority candidate who is contesting.  The second element is

12  that it is an election of the same type as that which is at

13  issue, vis-a-vis Voting Rights Act violation here in Assembly

14  district or at least similar in nature, such as, for example, a

15  Senate district election.  And the third aspect is that if an

16  election is going to be taking place within a given population,

17  then it is appropriate to look at elections which are, in fact,

18  looking at the behavior of voters within the jurisdiction where

19  the voting rights challenge is taking place.

20  Q  And taking each one of those three elements, does

21  Dr. Mayer's polarization study as represented in Exhibit 1025

22  meet any of those elements?

23  A  It does include the projection of countywide or in one case

24  aldermanic district elections into the population that is found

25  in new district -- new Assembly District 8 and new

1   Assembly District 9, which desirable, but that is only one

2   aspect of what the best evidence must consist of.  It appears

3   to have another element of best evidence, and I say it appears

4   for reasons I'll make clear in a moment, because it has

5   candidates who have Hispanic surnames who are contesting, and

6   that, indeed, is one of the three elements that I identified.

7       The element that is lacking is that these are all

8   non-partisan, low-intensity, off-the-election-cycle contests,

9   and therefore I give very little weight to these elections.

10  Nonetheless, they are informative of some aspects of voting

11  behavior of the Hispanic community.

12  Q  And how are they informative with respect to cohesion of the

13  Hispanic community?

14  A  Well, before I do that, it's important for me to identify

15  for the Court how it is that what is apparently seven contests

16  actually become three contests.

17  Q  Could you please explain that to the Court.

18  A  The state superintendent contest has a candidate in it whose

19  name is Fernandez.  By stipulation, though that candidate has a

20  Hispanic surname, that candidate is not, in fact, a person of

21  Spanish heritage or does not so identify himself or herself as

22  a person of Spanish heritage.  The county supervisor race,

23  which Dr. Mayer yesterday indicated he no longer wished to

24  consider, is because the candidate who is listed under the name

25  Peggy West, not a Hispanic surname candidate, is by agreement,

1   by stipulation effectively, in fact, a Hispanic candidate.

2       So therefore what we have in the county supervisor contest

3   is a contest between a Spanish surname candidate who is

4   actually Hispanic and a non-Spanish surname candidate who is

5   also Hispanic.  It therefore logically follows, since bot

6   candidate are Hispanic, that a Hispanic is going to win, and

7   that is, indeed, what happened in this election.

8       And I'm going to mention the actual data for each of these

9   four elections even though Dr. Mayer dismissed those elections,

10  if for no other reason than if we -- because if we dismiss

11  those four elections, we're left with all the evidence

12  presented by Dr. Mayer about polarization and cohesion,

13  essentially three contests in this exhibit, one contest that is

14  not in this exhibit that was in his Exhibit No. 7, which is a

15  contest that does not take place actually in this Hispanic

16  population area but is an Assembly district contest elsewhere,

17  though involving a Hispanic candidate, and then the analysis

18  that was presented of Judge Colon's contest for city attorney.

19  And that would be the only evidence that would have been

20  presented by Dr. Mayer about either cohesiveness or racially

21  polarized voting.

22  Q  And what would that evidence tell us about whether the

23  plaintiffs have satisfied prong two of Gingles to show that the

24  Hispanic community is cohesive?

25  A  If I may ask you to turn to the next page of this exhibit.

1    Unfortunately it's very confusing.  If you can show both pages

2    on the same screen, that will make it easier for the Court and

3    for me to follow.  And could you blow it up just a little bit

4    if you can.

5        I wish to call your and the Court's attention to the second

6    page of Dr. Mayer's exhibit and to the second column of the

7    second page.  And I apologize that in order for me to be able

8    to identify which contest we are talking about, I have to show

9    this on the screen in a way that makes it very, very difficult

10   even for me right in front of it to read the text, but I assume

11   the Court has its own exhibits.  They can look directly at hard

12   copy.

13       If I turn the Court's attention to the second column, which

14   is called -- which would be called Hispanic vote for the

15   Hispanic candidate.  That would be the correct column labeling.

16   Q  And Dr. Grofman, we're talking about Exhibit 1025.

17   A  Yes, we're talking about Exhibit 1025.

18   Q  Please continue.

19   A  So the second column is an estimate of the Hispanic vote for

20   the Hispanic candidate in the area that encompasses the present

21   Assembly District 8 and the present Assembly District 9.  And I

22   see that the Court is getting hard copy out, so I will wait

23   until this they've had an opportunity to get hard copy before I

24   continue.

25       Turning to the second column of the second page of

1    Exhibit 1025 from Dr. Mayer, what that shows is the level of

2    support from the minority community to the minority candidate.

3    Now, it is a truism in political science that you cannot win

4    elections unless you have the support of the community from

5    which your natural supporters would come.  If we look at the

6    numbers here, what we see is that with the notable exception of

7    Judge Colon's two contests where he is first running in a

8    primary for Circuit Court and then running in a general

9    election for Circuit Court, that would be the sixth and seventh

10   lines, the numbers .548 and .644, if we look at the other five

11   contests, the five contests in which minorities lost, a

12   Hispanic candidate lost -- arguably in each of those contests

13   the Hispanic surname candidate lost in each of these

14   contests -- what do we see?

15       Well, essentially we see that in none of these contests is

16   it the case that we can be confident that the Hispanic

17   candidate got a majority of the Hispanic vote.  The way in

18   which we know that is by looking at the first item in the

19   brackets, which is a lower bound estimate for the Hispanic

20   share of the Hispanic vote, and what we see is the Hispanic

21   candidate could have gotten 49 percent, 46 percent, 48 percent,

22   49 percent and then in the seventh line 43 percent, as low as,

23   otherwise known as less than, 50 percent.

24       To the usual level of political science confidence, the

25   95 percent confidence limit or the two standard deviation

1    confidence limit, we cannot be certain that the Hispanic
2    candidate got a majority of the Hispanic vote.  Forget the
3    non-Hispanic vote.  We cannot even be certain that the Hispanic
4    candidate got a majority of the Hispanic vote.

5        The best analogy I can give the Court would be for a
6    presidential election poll where there are two candidates
7    contesting for president.  We might observe that one of them
8    seems to have gotten more votes than the other but within the
9    margin of error we can't really be sure, and such an election
10   contest would normally by called by pollsters too close to
11   call.  And effectively in five of these seven contests with
12   Spanish surname candidates, the level of minority, that is,
13   Hispanic, cohesion for the minority candidate is essentially
14   50 percent.

15       An equally more or a more common sense way to think about
16   this is to say, well, forget about statistical estimates, just
17   add up -- or confidence limits, simply add up the best
18   estimate.  So the best estimate is going to be 52 percent, 50
19   percent, 49.8 percent, 50.5 percent, and 46.9 percent in the
20   seventh column.  So there are five numbers there in those five
21   elections where a minority candidate loses.

22       And what we discover when we do that, if I did my arithmetic
23   correctly, is the average level of minority support for the
24   minority candidate is something like 50.05 percent, or in other
25   words essentially there is no minority candidate in these

1    contests.  And if there is no minority candidate in these

2    contests, meaning the candidate who receives a clear majority

3    of the minority vote, then it's also impossible to conclude

4    that voting is racially polarized, because for voting to be

5    racially polarized according to Thornburg versus Gingles, the

6    candidate in the race must not merely be a minority.  The

7    candidate in the race must be the minority candidate of choice,

8    where candidate of choice is a candidate who receives from the

9    minority community majority support.

10        So we have essentially no evidence for these five contests

11   where minorities lost that there is minority cohesion, and in

12   the two contests for which there is evidence for minority

13   political cohesion, we know that the minority candidate won,

14   which is to say that if we look now not to prong two of the

15   Thornburg versus Gingles test but to prong three of the

16   Thornburg versus Gingles test, that a minority candidate of

17   choice must usually, regularly lose from these seven contests.

18        There only are two where there is a minority candidate of

19   choice whose success or failure could be evaluated, and in

20   those two the minority candidate of choice actually wins.  So

21   that clearly does not demonstrate under prong three of

22   Thornburg versus Gingles that a minority candidate regularly

23   loses.  And even if we go back to earlier analyses offered by

24   Dr. Mayer, if we turn, for example, to Exhibit 7 in Dr. Mayer's

25   original deposition, if I can find -- perhaps that might be --

1   if we can call that up --

2   Q   Dr. Mayer's first report, 1071, please.  1072.

3   A   Exhibit 1017 and Exhibit 7.  It should be at the back.

4           MR. HODAN:  If you could go to the back of that.

5   Thank you.  And maybe blow that up just a little.  Thanks.

6           THE WITNESS:  There are five contests that are shown

7   in Exhibit 7, that's Dr. Mayer's original declaration, and four

8   of these are also found in Exhibit 1025, which we have

9   previously looked at.  One of them, the 2004 State Senate

10  District 8, in fact, is not located within the minority area.

11  That actually, even though the candidate is a Hispanic

12  candidate, the district is a district with a very, very, very

13  low percentage of Hispanic voters.

14          Of these five contests, Colon, Judge Colon wins in

15  his 2011 Circuit Court primary, entering a general election.

16  He wins in the general, and Rose Fernandez, who is a Hispanic

17  surname candidate but not actually Hispanic, wins in the

18  primary but not in the general election for the state

19  superintendent of public instruction.

20          But I want to call the Court's attention to the

21  numbers, because if we believe those numbers, there is

22  something quite important to be said, and that is if, for

23  example, state superintendent of public instruction

24  Rose Fernandez is receiving 40 percent of the support of the

25  non-Hispanic voters and 95.7 percent of the support of the

1  Latino voters -- which is a different estimate than shown in

2  the other exhibit but let's use this one for the moment -- if

3  that were the case and you put her in present

4  Assembly District 8 with 40 percent of the vote from the

5  non-Latinos and 95.7 percent of the vote from the Latinos,

6  essentially she is going to win an election in

7  Assembly District 8.

8         And similarly, if we look at 2004 State

9  Senate District -- sorry, State Senate District 8 and the

10 Jennifer Morales/Alberta Darling contest, using Dr. Mayer's

11 estimates, 89.2 percent Hispanic support for the Hispanic

12 candidate, overwhelming support, and 49.6 percent non-Latino

13 support for the Hispanic candidate, it does not take a degree

14 in mathematics to realize that a candidate who is getting

15 49.6 percent estimated support from the non-minorities will,

16 with any level of support from any reasonably substantial

17 minority community, in fact, be the winner.

18        And the reason that Jennifer Morales is not the

19 winner in State Senate District No. 8 is there are almost no

20 Hispanics there.  She's losing barely in the non-Hispanic white

21 community, non-Hispanic community, but even her incredibly high

22 levels of support from the Hispanic community are not enough in

23 a district with almost no minorities for her to win.

24        But Assembly District 8 is not a district with no

25 minorities.  We can argue about exactly what percentage

1   minorities will constitute of this district and its electorate

2   in the general election or in a Democratic primary, but simply

3   using Dr. Mayer's numbers, it's very clear from those numbers,

4   that essentially what he is doing through his exhibits, if not

5   through his testimony, is to say that in the new

6   Assembly District 8 a minority candidate can win.  And that's

7   before we take out the non-Hispanic white Republicans.  Here

8   they've already been taken out because in Senate -- State

9   Senate District 8, presumably many of the people voting against

10  are Republicans.

11          But in any case, even using these numbers, it seems

12  essentially not a matter of argument that a minority could win.

13  So we have polarization analysis that shows that Pedro Colon

14  wins, which we know, and he wins even though barely in the part

15  of the district that was in old Assembly District 9 but he wins

16  overall quite easily; and if we use the 2004 state Senate

17  district race with an 89.2 percent Hispanic cohesion and a

18  49.6 percent crossover, once again the Hispanic candidate wins

19  in present as new Assembly District 8.

20          So for all the reasons that I have identified, you

21  either -- you either believe that Hispanics have no cohesion,

22  which is what Exhibit 1025 seems to suggest, in which case

23  there are no Hispanic candidates of choice and JoCasta

24  Zamarripa is a mirage, because the data in this exhibit, in

25  Exhibit 1025, suggests that if this were true, there is no way

1    for a Hispanic to win even old Assembly District 8, much less

2    new Assembly District 8.  But, in fact, Assemblywoman Zamarripa

3    is not a mirage.  She is a Hispanic who has been elected and

4    who, I believe, based on the kinds of evidence that Dr. Mayer

5    has presented, will, in fact, be reelected in a Democratic

6    primary where there are fewer white voters because of white

7    Republicans being in the district and she will then go on --

8    and I can go back to an earlier exhibit -- she will then go on

9    to win the election, the general election in the district with

10   71 percent of the vote, assuming she has an opponent.

11        If we look at the previous history of old

12   Assembly District 8, the Hispanic candidate who wins that

13   district, first Judge Colon and now Ms. Zamarripa, have only

14   rarely ever had a Republican opponent.  In the one instance

15   where there was a Republican -- actually not a Republican -- an

16   independent opponent to the winner of the Democratic primary,

17   that person was himself Hispanic and that person electorally

18   got buried.  That is to say, the winner of the Democratic

19   primary received, as I recall, 87 percent of the vote in the

20   general election.

21        And while I will admit quite cheerfully that the

22   winner of the Democratic primary in the new Assembly District 8

23   might only get 73 percent of the vote in the general election

24   as opposed to 83 percent of the vote in the general election, I

25   do not believe that that in any way changes the calculus as to

1  how likely it is that the winner of the Democratic primary in

2  Assembly District 8 will, in fact, go on to win the general

3  election.

4  BY MR. HODAN:

5  Q  Dr. Grofman, aside from your critique of the polarization

6  study and the cohesion in this exhibit, do you have any

7  opinions with respect to the testimony that Dr. Mayer has given

8  with respect to turnout?

9  A  Dr. Mayer's testimony is twofold.  If you look at

10  Exhibit 1025, and here, if I may, I would like to call the

11  Court's attention to the first page of Exhibit 1025, and

12  I would call the Court's attention to column three -- I'm

13  sorry, let me look again -- to column 5 and to column 7.

14  Column 5 reflects the proportion of minorities of voting age

15  population who are estimated to have voted in the contest, and

16  column 7 shows the proportion of non-minorities who are

17  estimated to have voted in the election relative to their

18  voting age population.  So the denominator is voting age

19  population, the fraction of voting age population that actually

20  participated in this particular contest showing up at the

21  polls.

22     As Dr. Mayer himself demonstrated, the levels of minority

23  turnout relative to the level of the non-minority turnout are

24  abysmal in these non-partisan, mostly countywide contests.  The

25  way to see that is to take the number that is shown in the

1    fifth column and compare it to the number that is shown in the

2    seventh column.  So, for example, 6.3 percent turnout among

3    minorities, Hispanic; 16.7 percent turnout, roughly three to

4    one; 7.7 versus 21.4, again roughly three to one; .23 versus

5    .57, little bit more like two and a half to one; .25 to .109,

6    four to one; .25 to .117, again, almost five to one; .03 to

7    .298, that's roughly ten-to-one levels of minority turnout,

8    lower than one-tenth the size of non-minority turnout; 17.2 to

9    0.5.

10        If you believe those numbers, and I am prepared to believe

11   them, they would seem to say that no Hispanic candidate could

12   possibly win in old Assembly District No. 8 because the levels

13   of minority turnout relative to non-minority turnout are just

14   miniscule, anywhere from two and a half to one to ten to one in

15   terms of high non-minority turnout versus low minority turnout.

16        But Dr. Mayer also said in his testimony on the witness

17   stand that these numbers, while representative of the actual

18   turnout levels in low ticket contests, non-partisan contests,

19   they were not representative of minority turnout in

20   top-of-the-ticket contests, such as, for example, in 2012.

21   Here I believe -- and I apologize because I did not write this

22   number down so this can be checked -- I believe the exact

23   percentage -- and I really don't care because the point is a

24   general one -- that Dr. Mayer gave something on the order of 30

25   percentage points of turnout rather than, say, three percentage

1    points of turnout.

2        And he also noted that white turnout was going to be higher

3    as well, but even so, the ratio of proportion of white turnout

4    to white -- or sorry, non-Hispanic turnout to non-Hispanic

5    voting age population to Hispanic turnout to Hispanic voting

6    age population, that ratio is a lot lower than the ten to one

7    or six to one or four to one that we see in these non-partisan

8    contests.

9        And you must understand that fact from an expert witness

10   perspective, because otherwise you have this puzzle which is

11   that this district which was not 50 percent citizen voting age

12   population in 2002 -- there's no argument about that -- and

13   which certainly did not have a majority of its electorate

14   Hispanic in 2002, nonetheless elected a Hispanic.  The only way

15   in which it is possible to understand the puzzle of

16   Assemblywoman Zamarripa's success is to recognize that she is

17   winning a Democratic primary and then with overwhelming

18   Democratic support, both Hispanic and non-Hispanic, winning the

19   general election.

20   Q  Doctor, do you believe the -- you heard Dr. Mayer testify

21   about his estimates of registration by Hispanics.  Do you think

22   those are reliable estimates?

23   A  My general answer to that is no.  However, my view as an

24   expert is that to the extent possible the debates in a case

25   should be about the relevant case law, not about exactly which

1  estimates particular experts prefer.  I've used willingly the

2  estimates generated for racially polarized voting generated by

3  Dr. Mayer even though I have some quibbles about the way in

4  which they were generated, but they are, in fact, quibbles.

5  I similarly have doubts about the way in which the estimates of

6  a three-to-one ratio of non-Hispanic turnout -- sorry,

7  registration rate to Hispanic registration rate was generated.

8  Q  And why is that?

9  A  Well, we know some things more or less indisputably.  We

10  know, or at least I believe we know, that if a candidate runs

11  for office in Aldermanic District 8, that candidate is a

12  registered voter.  So clearly we ought to see candidates who

13  are registered voters captured in the 639 names which are the

14  list which Dr. Mayer used to generate his estimates of Hispanic

15  registration.  Dr. Morrison criticized that number because --

16  639, because he said that it was without support in the social

17  science literature, and I would say exactly the same.  Using

18  the 639 names will underestimate the number and the proportion

19  of Hispanic registrants.

20      And the way we can see that is if we look at an exhibit

21  which has the names of the people who ran in Aldermanic

22  District 8 between 2000 and 2010.  It turns out that there are

23  11 people in that list who are identified by consent as

24  Hispanic.

25          MR. HODAN:  Could you put up Table 16 from the

1 pretrial report?  That would be the election history in

2 District 8, please.  And Attorney Poland indicated this

3 morning, let's put up the one with the -- that has the

4 stipulation on it, please.

5   THE WITNESS:  If we turn to Exhibit 1099, as

6 I believe you've asked me to, essentially, this is a stipulated

7 list of actual candidates in the Democratic primary or for the

8 Republican primary or for the general election.

9   MR. HODAN:  Could you blow that up just a little,

10 please.  Thank you.

11   THE WITNESS:  And we can ask which of those names are

12 names which appear on Dr. Mayer's 639 name, Spanish surname

13 list.  And the answer to that will be the names which appear on

14 the Spanish surname list are Pedro Colon, who is on that list;

15 Roberto Escamilla, who is the last name on that list; and also

16 continuing down Pedro Colon is repeated several times because

17 he won successfully.  Note, by the way, without opposition in

18 either the Democratic primary or the general election.  And

19 then you come to a few additional names.  Those names, Jose

20 Guzman is in the list of 639; Romona Rivas, Rivas is in the

21 list of 639; and there is confusion about Angel Zanchez

22 because, as far as I can figure out, even though this is the

23 official stipulation, it's wrong.

24   MR. EARLE:  Your Honor, we will stipulate that Angel

25 Sanchez's name is Sanchez.

1          THE WITNESS:  This I had guessed, shall we say.  And

2     I don't know whether or not because Sanchez's name is listed as

3     Zanchez, it would have, in fact, been picked up on the list of

4     639.  If, in fact -- so if it's actually listed as Zanchez

5     somewhere, perhaps it would not be.  So what we see is there is

6     five names on the list of 639 that is identified as Hispanic

7     based on Hispanic surname matchups, Spanish surname matchups.

8          So now the question is how many names are there that

9     are not accurately reflected in the Spanish surname matchup,

10    and the answer to that is, well, we go down the list and we see

11    who's actually Hispanic.  Well, the names I've already

12    identified, Colon, Escamilla, Guzman and Rivas, those are

13    clearly Hispanic because we've identified them in the 639 list

14    and they are Hispanic.  Some additional names, Victor Huyke,

15    H. Nelson Goodson for another two, and also JoCasta Zamarripa

16    and Laura Manriquez, these are names which are Hispanic people

17    but they are not on the list of 639.

18    BY MR. HODAN:

19    Q  What is the significance of that to your testimony?

20    A  The significance of that is that names are being missed in a

21    way that is not consistent with the beliefs actually stated not

22    just by Dr. Mayer but by the Census Bureau, in fairness to

23    Dr. Mayer, about the way in which this list of 639 would

24    perform, because the apparent -- it should pick up about

25    80 percent of the Hispanic names -- sorry, it should pick up

1    about 80 percent of the Hispanic and it doesn't.  It picks up

2    five out of the 11.

3        Now, of course, some -- no surname list will pick up all

4    these names.  H. Nelson Goodson is not a Hispanic name, and no

5    matter what you do with a Hispanic surname list, it will not

6    classify someone with that name as Hispanic.  I think that's

7    relatively straightforward to say.  And that's a kind of error

8    that is inevitable when you're dealing with Spanish surname

9    matchups.

10       Nonetheless, we can ask how many Hispanics are there?

11   Eleven.  How many Hispanics did Dr. Mayer's estimate say there

12   were?  Five.  That's assuming he correctly got Sanchez.

13   Therefore, out of the 11 there are six that were missed.  So

14   that the estimate of the proportion of Hispanics who are of

15   Spanish surname -- sorry, the proportion of those of Spanish

16   surname who are Hispanic and registered is going to be too low

17   because some of those Hispanics are classified as white or

18   non-Hispanic, and if they're classified as non-Hispanic,

19   they're not counted in the ratio of the proportion of Spanish

20   surname people who are registered to the proportion of the

21   population that is Hispanic voting age.

22       But because they're not counted among the Hispanic

23   registrants, they are being counted among the non-Hispanic

24   registrants, and the consequence of that is that the proportion

25   of non-Hispanic registrants who are seen to be registered is

1   going to be higher than it really is.

2       So there's a double whammy.  If you miss the Spanish surname

3   people, the Hispanic -- sorry, if you miss these Hispanics with

4   your surname list, then you're underestimating the registration

5   rates of Hispanic and you're overestimating the registration

6   rates of non-Hispanics, as a consequence of which when

7   Dr. Mayer says that the ratio is three to one, I don't believe

8   it.  It's going to be some ratio that is actually less than

9   three to one.

10      And that's really where I will end, I think, given the time

11  we've spent.  I could work through a hypothetical.  Dr. Mayer

12  indicated that the error rate might be as high as 20 percent.

13  I can work through a hypothetical that will show you that if

14  the error rate were as high as even 20 percent, that you will

15  go from a three-to-one estimate down to something like a

16  2.2-to-one estimate of the relative registration rates among

17  Hispanic and non-Hispanics in -- actually in this case in the

18  city as a whole.

19  Q  Dr. Mayer -- pardon me, Dr. Grofman.  Earlier --

20  A  I'm happy -- I don't have any problem being confused.  I

21  happen to think very highly of Dr. Mayer.  I've been more than

22  delighted to use his estimates.

23  Q  Dr. Grofman, earlier you used the term "missing link" in

24  referring to Assembly District 9.

25  A  Yes.

1  Q  Can you explain in more detail what you mean by that and how
2  this impacts either the choice the legislature made or the
3  choice that the Court has to make?
4  A  The missing link, as I see it, is Assembly District 9.  All
5  the focus has been on Assembly District 8, and yet there is
6  some evidence in terms of testimony that took place that,
7  in fact, even Assembly District 9, which is presently an
8  influence district at best, okay, but I think is an influence
9  district, has the potential to become an opportunity-to-elect
10 district over the course of a decade.
11    I've testified here in Wisconsin now, this will be my third
12 decade, and I do remember similar situations which previous
13 courts have confronted.  So before I talk more about
14 Assembly District 9, I'm actually going to talk instead about
15 Senate District 4.  Senate District 4 was created --
16          MR. EARLE:  Your Honor, I'm going to object on
17 relevancy.  There's not a claim under the VRA for Assembly
18 District 9's relationship to the 8th Assembly District and has
19 to do with how reapportionment occurred and now we're going to
20 Senate District 4.  I interpose an objection on that basis, in
21 the interest of time.
22          JUDGE STADTMUELLER:  Mr. Hodan?
23          MR. HODAN:  Your Honor, the manner in which
24 Assembly District 8 was formed directly impacted how
25 Assembly District 9 was formed, and the choice that the Court

1 has to make relates to whether 8 was drawn appropriately and

2 part of that analysis has to consider the impact on 9.

3    JUDGE WOOD:  And 4 fits in where?

4    THE WITNESS:  Yes.  Sorry.

5    MR. HODAN:  Okay.  Well if you allow us just a couple

6 of minutes on 4, because 4 fits in because 4 was a district

7 that had a population less than 50 percent and it elected.

8    MR. POLAND:  Your Honors, Senate District 4 was one

9 of the African-American Senate districts.  The two districts we

10 are talking about here, 8 and 9, are three, and what happened

11 in a different district, we agreed to drop those claims.  And

12 so it seems to me that those claims for the African-American

13 district really ought to be out of play.

14    MR. HODAN:  Your Honor, given the lateness of the

15 hour, we'll move on.

16    JUDGE STADTMUELLER:  All right.  Thank you.

17    MR. HODAN:  If you could bring up Exhibit No. 19,

18 please, and if you could turn to page 133.  This is a

19 transcript of proceedings dated July 13, 2011 in the matter of

20 the joint public hearing on Wisconsin redistricting plan.

21 BY MR. HODAN:

22 Q  Professor Grofman, Representative Zamarripa said this at the

23 hearing.  The 8th and the 9th, the 8th is my district, it is a

24 Latino super majority district.  The 9th was trending that way.

25 It has already been a Latino-influenced district, and this does

1  give us a larger percentage.  But the truth is that, you know,

2  that Latinos have grown by leaps and bounds and we are trending

3  that way anyway.  It's almost inevitable.  We just grew it.

4  It's not that you created another one.  There's not three now.

5  There continues to be and I'm glad to hear that we're moving

6  from a majority to a super majority in the 8th and 9th.

7      Do you share Representative Zamarripa's views?

8  A  Yes, I do.

9          MR. HODAN:  I have no further questions, your Honor.

10          JUDGE STADTMUELLER:  All right.  Thank you,

11  Mr. Hodan.  Mr. Earle?

12          MR. EARLE:  Thank you, your Honor.  I will try to be

13  as brief as possible.  I have a fair amount of ground to cover.

14          JUDGE STADTMUELLER:  Well, we're reasonably ahead of

15  our schedule.

16                      CROSS-EXAMINATION

17  BY MR. EARLE:

18  Q  I would ask, Professor Grofman, if you would constrain your

19  answer to the question and be as brief as possible so we can

20  have mercy for everybody in this room.

21  A  Certainly.

22  Q  Thank you.  Did I understand your testimony correctly when

23  you said you just have quibbles with Professor Mayer's

24  racially -- racially polarized voting analysis?

25  A  Yes, that's essentially correct, but I would agree with

1   Dr. Morrison that there would have been a potentially better
2   way to have done it, but that's a quibble.
3   Q  So the Court can accept Professor Mayer's racially polarized
4   voting analysis.
5   A  Yes.
6   Q  Okay, and I just wanted to understand.  Let's go through
7   some quick things here that we can nail down
8   non-controversially.  We'll start with your assertion that the
9   8th Assembly district as created by Act 43 lacks a Hispanic
10  citizen voting age majority.
11  A  No, I did not say that.
12  Q  I thought you said no expert can dispute that the 8th
13  Assembly district lacks a Hispanic citizen voting age majority.
14  A  I'm sorry.  There was a word that I apologize if it was
15  inadvertently omitted.  What I said was that no one can dispute
16  that it lacks a clear voting age population, citizen voting age
17  population majority.
18  Q  So you accept the proposition from Professor Mayer that the
19  8th Assembly district as created by Act 43 does not have a
20  majority of Latinos for citizens of voting age?
21  A  Sir, the best I can do is to repeat my testimony.
22  I inserted an adjective.  You took it out.  I'll put it back
23  in.  The adjective was "clear."
24  Q  Did you testify about whether it was possible to draw a
25  district that had a clear Hispanic citizen voting age majority?

1    A  No, I did not.

2    Q  And did you testify about that in your deposition?

3    A  Yes.

4    Q  And you agree that it is possible?

5    A  Yes.

6    Q  So we don't have a dispute about that?

7    A  No, we do not.

8    Q  And you saw Professor Mayer's illustrative map that was

9    placed up earlier; correct?

10   A  Yes.

11   Q  And you agree that that's a viable map demographically?

12   A  It is a viable map demographically in terms of its

13   consequences for Assembly District 8.  There is no evidence

14   that I can judge on what its consequences are for

15   Assembly District 9.

16   Q  Okay.  I'm going to focus here on Assembly District 8 as

17   created by Act 43.  Okay?  And when we deposed you, you got a

18   chance to testify about Professor Mayer's second analysis you

19   did that was -- I think at your deposition it was Exhibit 134.

20   I forgot what number it was here.  134, yes, in the deposition

21   but we have it up on the screen.  This is what you were

22   testifying about earlier; correct?

23   A  Yes, that's correct.

24   Q  Okay.  And at your deposition we asked you lots of questions

25   about that; correct?

1   A   Yes, that's correct.

2   Q   And you commented at length about that.  You said you

3   thought it was a helpful?

4   A   Yes, that's correct also.

5   Q   Okay.  And then I asked you if you saw -- if you had a

6   chance to review the complaint that had been filed by Voces de

7   la Frontera.  Do you recall that?

8   A   Yes.

9   Q   And you said you did?

10  A   Yes.

11  Q   And then we went through the paragraphs of the complaint and

12  I was trying to figure out where you had a quarrel with us and

13  where you agreed with us.  Do you remember that?

14  A   Yes.

15  Q   And we got to paragraph 23.

16          MR. EARLE:  Will you call up paragraph 23 of the

17  Voces de la Frontera complaint, please.  Perhaps while they're

18  looking for it -- well, we'll wait for a second.  I'll use the

19  Elmo.

20  BY MR. EARLE:

21  Q   Now, you see paragraph 23.  It has the answer below it too,

22  but I read it to you during the deposition.  This is the

23  question at page 165, line 5 of your deposition --

24  A   Yes.

25  Q   -- which occurred on February 3rd, 2012.

1   A  Yes.

2   Q  Let's go to paragraph 23.  And I read, quote, "Over the

3   course of the last decade, the political, electoral conduct of

4   Latino voters on Milwaukee's south side in the vicinity of the

5   recently apportioned 8th and 9th Assembly districts

6   demonstrates that the Latino community is politically

7   cohesive."  And I then said "You already testified that you

8   agree with that statement," and you said "I testified that I

9   agree with that statement with respect to District 8 because

10   I've reviewed elections in District 8 in which the Latino

11   community has supported a Hispanic candidate.  District 9 is

12   less clear because I have no way of judging whether or not the

13   Hispanic incumbent in place is a candidate of choice of the

14   Hispanic community."  And I asked you do you know who that is

15   and you said you did not.  Do you recall that testimony?

16   A  Yes.

17   Q  And you sat here today and listened to Professor Gaddie

18   testify; correct?

19   A  Yes.

20   Q  And you know Professor Gaddie?

21   A  Yes.

22   Q  And you have great respect for Professor Gaddie?

23   A  Certainly.

24   Q  And he sat in that chair and similarly indicated that in his

25   deposition he had also testified that way; correct?

1    A   Yes.

2    Q   And, in fact, he believed that the political cohesiveness

3    and political and electoral cohesiveness of the Latino

4    community in the context of prong two was that it was

5    remarkably cohesive.

6    A   Yes.

7    Q   And your testimony at your deposition was similar; correct?

8    A   Yes, and will be today.

9    Q   And is today.  That's good, because I didn't want to

10   misunderstand what you said earlier about political

11   cohesiveness.  So we don't have a quarrel with Voces de la

12   Frontera satisfying prong two of the Gingles preconditions;

13   correct?

14   A   Here I have to say yes and no.  My testimony was and is that

15   the minority community, Latino community is politically

16   cohesive in elections involving a viable candidate in a

17   partisan election where this is no non-Hispanic incumbent.

18   What I said in my testimony on the witness stand was if I had

19   to reach that judgment based solely on the evidence presented

20   by Dr. Mayer, I wouldn't be able to do that because that would

21   be very weak evidence indeed.  I never said that my view was

22   not that Hispanics were not politically cohesive.  I merely

23   noted that Dr. Mayer's evidence by the time he lops off four of

24   the seven elections that he analyzes is down to a very limited

25   number of elections, in a number of which there is no direct

1   evidence from his reports that minorities are -- Hispanics are

2   politically cohesive.

3   Q  I just want the record to be clear, though, that there is

4   not one expert who's testified in this case in this trial who

5   believes that the Latino community is not politically cohesive.

6   A  Yes, that's certainly.

7   Q  We have complete consensus across the board.

8   A  That's certainly correct.

9   Q  We don't have to quibble about the first prong because

10  everybody agrees that.  The defendants stipulated to it;

11  correct?

12  A  Exactly.

13  Q  So we're really focused on prong three and the totality of

14  the circumstances; correct?

15  A  Yes.

16  Q  As a matter of fact, if I understood you testimony, I think

17  you would agree with me that we really don't have a quibble

18  about prong three either.  I mean, it's really about the

19  totality of the circumstances.

20  A  With the same yes-and-no answer that I gave previously; that

21  is to say, I have absolutely no quibble if the question is am I

22  prepared to believe and on the basis of what I know that there

23  is racially polarized voting or voting along Hispanic,

24  non-Hispanic lines, the answer is I believe it.  But if you

25  really forced me to write down what evidence I had to lead to

1   that belief, it would be problematic because the contests that

2   Dr. Mayer has analyzed are contests where in many cases there

3   is no Hispanic candidate of choice and Dr. Mayer has testified

4   that in elections where there is no opposition, it is

5   impossible to estimate racially polarized voting.

6   Q  And you agree with that?

7   A  No, actually I don't.

8   Q  Okay.  We'll come back to that.  All right.  So if

9   I understand it then, we agree on prong one, we agree on prong

10  two, and we kind of agree on prong three.  You believe it but

11  you don't -- you have a question as to whether

12  Professor Mayer's report quite gets you there.

13  A  Yes, that will be correct.

14  Q  So the issue in this case is more about the totality of the

15  circumstances.

16  A  Yes.

17  Q  And let's go there, all right?  Let's go there.  In your

18  deposition at page 145 --

19           MR. EARLE:  Do we have Professor Grofman's deposition

20  at page 145, line 22?

21  BY MR. EARLE:

22  Q  I asked you if you took a Latino district like District 8 or

23  9 and you either reduced the Latino population or added other

24  geographic areas that had a high turnout of non-Latino whites,

25  could that affect the ability of the Latino community to elect

1    a candidate of choice, and I got an objection to form from

2    Mr. Hodan and then we had the question read back, and would you

3    read your answer?

4    A   Yes.  My answer is "If you take a district which has Latinos

5    in it and you remove Latinos, that reduces the likelihood of

6    minority electoral success."

7    Q   Continue.

8    A   And it continues -- if you want me to read all of it --

9    Q   Yes.  Let's go through the whole thing.

10   A   If you take a district which has Latinos in it and you

11   somehow add a white population to it without at the same time

12   reducing the Hispanic population, and which I am not sure is

13   mathematically possible given the ideal population constraints,

14   but somehow if you could do it, given, of course, that if

15   you're adding white population to a district the Latino

16   population proportion will decline and therefore the Latino

17   ability to elect the candidate of choice may be affected if,

18   indeed, the Latino population was at a cusp such that its

19   ability to have a realistic equal opportunity to elect

20   candidates of choice would be affected one way or the other,

21   and affected one way or the other by the proportion of

22   non-Latino whites who were added into the district.

23   Q   So hypothetically if we had a politically cohesive,

24   geographically compact Latino community and we chop it in

25   half -- maybe not quite half.  Let's chop it at 55 percent,

1  okay?  And we chop off --
2  A  Sixty percent, sir, if I may.  I don't want to -- I don't
3  want to agree to what appears to be a statement of fact in your
4  testimony.  I believe that the proportion of Hispanics who
5  are -- who remain in old District 8 is 60 percent.
6  Q  I'm talking about the core retention.  You take the
7  community and you chop it at 55 percent.
8  A  That one I will quibble just the slightest.  Dr. Mayer gave
9  a 55 percent number.  When I did the arithmetic, I got 57.
10  Q  Core retention?
11  A  Yes.
12  Q  Okay.  So, well, I think at this point --
13  A  One of us is correct and I'm happy to split on 56.
14  Q  Okay.  So we basically split the community in half, a little
15  bit more than half, and then we take a completely different
16  community that has a high turnout significant white population
17  where the Latino total population is just barely above that and
18  we tack that on.  That would raise -- you testified -- what
19  this testimony meant was that you would be concerned about that
20  that terms of how that would affect the Latino community's
21  ability to elect the candidates of its choice; isn't that true?
22  A  In a hypothetical that you have just given, which does not
23  match anything except Assembly District 9, it certainly would
24  be correct that reduction of a barely majority Hispanic voting
25  age population further would affect the likely likelihood of

1  Hispanic electoral success.

2  Q  All right.  Let's go to.  I'm going to -- you talked a lot

3  about how important it is from your perspective that we think

4  about the Democratic primary.

5  A  Yes.

6  Q  And in particular in the context of Assembly -- Act 43

7  Assembly District 8?

8  A  Yes.

9  Q  Because there's in your view a substantial Republican white

10  population amongst those that have been added to the 8th

11  Assembly; correct?

12  A  Yes.

13  Q  And those whites are concentrated in the southern parts of

14  the district?

15  A  I do not know the demography of the district well enough to

16  indicate exactly where in the southern part, but because old

17  Assembly District 9 that is now in new Assembly District 8 is,

18  generally speaking, the southern portion of the district, the

19  answer would be yes.

20  Q  Okay.  Well, let's call up Exhibit 185.  Here you've got a

21  picture of the old 8th in blue and you have the new 8th in --

22  outlined in black and you have the 9th next to it.  Do you see

23  that?

24  A  Yes.

25  Q  And you can see that the color code indicates the Latino

1    voting age population density by 2002 wards.

2    A   Yes.

3    Q   And you see the yellow areas in the south of the

4    8th Assembly District?

5    A   Yes.

6    Q   Okay.  And then if we can put next to that Exhibit 184.

7    You've seen these exhibits before; right?

8    A   I believe so, yes.

9    Q   And you've studied them in preparation for your trial

10   testimony today; right?

11   A   That the answer would be no.  I've studied the equivalent

12   exhibits that were created for my own expert witness

13   declaration.

14   Q   Okay.  And you've heard the testimony about 184; correct?

15   A   I believe the answer to that one is yes.

16   Q   And this represents turnout.

17   A   Yes.

18   Q   And you see how the green areas, the dark green areas in the

19   southern area of the 8th have high turnout and they also happen

20   to be the areas that are most white and the areas that are most

21   Latino are the areas with the lowest turnout?

22   A   Yes.

23   Q   And then we were able to kind of overlay the two so you can

24   see how they match perfectly, almost perfectly.  Could we do

25   that?  You see how there's almost a perfect correspondence

1    between turnout and Latino voting age population density?

2    A   Certainly.

3    Q   Now, in this scenario you indicated that what was

4    significant to you was that this white high turnout area was

5    heavily -- or you said predominantly Republican, I think.

6    A   No, I would say heavily -- it's -- using the methodology

7    that I used, I would estimate it's a Republican voting strength

8    of somewhere between 40 percent -- sorry.  Of those -- of the

9    non-Hispanic whites, I would estimate that somewhere between

10   40 percent and 58 percent were Republican.

11   Q   And your basis for saying that is?

12   A   My basis for saying that is basically the election returns

13   and one further predicate for my expert witness judgment.  The

14   further predicate for my expert witness judgment is that the

15   Republican percentage among non-Hispanic whites is going to be

16   higher than, perhaps even considerably higher than the

17   Republican percentage among Hispanics and/or among non-Hispanic

18   minorities.  That is to say, I believe that, generally

19   speaking, whites are more Republican than minorities.

20   Q   One of the first maps we had here had the 8th Assembly

21   District.  It shows the 9th Assembly District in color below

22   it.  It was -- maybe can we call that one up?  Do you know --

23   it had the -- it had the 8th Assembly District and the 9th

24   Assembly District outlined in yellow and then it had the old

25   Assembly districts outlined in color.  There was a tan and a

1    red.  176?  Can we try 176.  Wonderful.  Can you see that?  Can

2    we enlarge that a little bit so that we can -- this will

3    demonstrate for you the percentage of the 9th Assembly District

4    that was added to the 8th Assembly District to create the

5    Act 8th Assembly District.  Do you see that there?

6    A  Yes, that's correct.  In the area.

7    Q  And that is the area that you're talking about being

8    predominantly Republican amongst the whites.

9    A  Amongst whites, that is correct, amongst non-Hispanic

10   whites.  Some Hispanics self-identify in the census as white,

11   but we are talking about a non-Hispanic white population.

12   Q  And that's based on the performance of whites in the 9th

13   Assembly District and presidential elections or gubernatorial

14   elections?

15   A  Gubernatorial elections.

16   Q  So you looked at the Walker/Barrett gubernatorial election?

17   A  Yes, that's correct.

18   Q  Did you look at any other elections?

19   A  No, I did not except for general comparisons of the levels

20   of white support for candidates for other contests.

21   Q  So the inferences you're drawing, you're drawing from the

22   fact that in the Barrett/Walker race in the 9th Assembly

23   District, Walker did pretty well.

24   A  Walker did better than he did in the 8th Assembly District.

25   To say that a candidate who got 30 -- sorry, 31 percent of the

1    vote in new District 8 -- actually sorry.  We have to go back
2    to old District 8 -- who got 39 percent of the vote in old
3    District 8 is not necessarily to say that that candidate did
4    pretty well.
5    Q  And that is the basis for you drawing an inference that
6    there are -- that whites are heavily Republican in that area.
7    A  Yes, that's correct.
8    Q  And is there --
9    A  Sorry.  That is one of the bases for that inference.
10   Q  I meant the others.
11   A  The other I have not previously spoken about.
12   Q  Oh, okay.  Well, tell us.
13   A  Okay.  The other is to look at the turnout in the Democratic
14   primary as opposed to the Republican primary.
15   Q  And the Democratic primary for what?
16   A  Let me see.  That would probably be the Democratic primary
17   in the partisan election.  If you give me a moment, I will
18   actually have to find that.  That was not done in time to be an
19   exhibit, and so I have to find the relevant piece of paper that
20   has that for me.
21   Q  While you're looking for it we can talk.  So you basically
22   took a Democratic primary and a gubernatorial race and from
23   that you inferred that the white population is mostly
24   Republican.
25   A  The combination of the -- the predicate for this is

1  essentially twofold.  The first predicate is that you can look
2  at the votes in the African-American districts and you can look
3  at exit poll data and that that data shows that
4  African-Americans are not Republicans.
5  Q  We're not talking about the African-Americans.  We're
6  talking about the 9th Assembly District.
7  A  With apology, sir, yes, we are, in fact, talking about the
8  African-Americans, because even though they're only a
9  relatively small proportion of the district, we have to rule
10  them out as a possible source of votes to the Republican
11  candidate.  So we can establish essentially that the votes for
12  the Republican not coming from the handful of -- the 8 percent
13  or whatever it is, African-American voters in the district.
14  Then we ask what can we say about the votes of the Hispanics in
15  this district, and here, looking at the votes in old
16  Assembly District 8, which gave a 79 percent vote to the
17  Democratic candidate --
18  Q  We're talking about 9.
19  A  Please, allow me to complete my answer.
20  Q  In the interest of time, I want to understand how you --
21  this is an inquiry about how it was that you concluded that the
22  whites in the southern section of the 8th Assembly District
23  under Act 43 from the 9th Assembly District, prior Assembly
24  District, are predominantly Republican.  Could you --
25              MR. HODAN:  Your Honor, if I may interpose an

1    objection, I believe he's trying to explain the answer and he's

2    not being permitted to answer.

3         JUDGE STADTMUELLER:  Well, the problem, you may be

4    true in your representation, Mr. Hodan, but it doesn't appear

5    from Dr. Grofman's response that it's what Mr. Earle is looking

6    for and so he's trying to clarify the question.  So why don't

7    we get the witness and the lawyer on the same page and do what

8    is necessary, Mr. Earle, to bring the witness to the page

9    you're looking for some explanation.

10        MR. EARLE:  Thank you, your Honor.

11   BY MR. EARLE:

12   Q  If you could constrain your answer to the question I've

13   asked.  I'm asking you to explain how it is you concluded that

14   the whites in the southern part of the 8th Assembly District

15   are predominantly Republican and you've excluded the blacks by

16   a statistical analysis of a Democratic primary.  You looked at

17   a gubernatorial race.  Now, let's get to the hub of it.  How do

18   you conclude that?

19   A  If the African-Americans are not voting for the Republican

20   and the Hispanics are not voting for the Republican, then it

21   must follow that the only -- since there are Republican voters,

22   they have to come from somewhere.

23   Q  Okay.  This is basis of your expert opinion.

24   A  This is one of the two bases, as I started to explain, of my

25   expert opinion.

1    Q   Okay.  Well, now, given your view, wouldn't you presume that
2    there would be Republican candidates generated in partisan
3    races out of the 9th Assembly District?
4    A   Certainly.  There may well be Republican candidates coming
5    in that district, but that district, even though it has more
6    Republicans than in old District 8, is still a very safely
7    Democratic district.
8    Q   This was an exhibit which we began to prepare but pulled --
9    it's a summary from the bluebooks in Wisconsin going back to
10   2002 through 2010.  We had the data here introduced into
11   evidence from Pedro Colon's races where he ran basically
12   unopposed in each general election.  There was never a
13   Republican opponent the entire time that Pedro Colon ran for
14   office in the old 8th Assembly District.  But what I found
15   curious was you said something about the 9th because lo and
16   behold, there's never been a Republican candidate who's run
17   against Josh Zepnick since 2002 to today in the 9th Assembly
18   District.
19   A   The 9th Assembly District is also a safely Democratic
20   district.  It is not, however, as overwhelmingly, and I do mean
21   overwhelmingly, Democratic as the 8th.
22   Q   So why would a Democratic primary for the new 8th Assembly
23   District have any bearing on the conduct of the white voters
24   from the southern part of that district?  I mean, that
25   doesn't -- that doesn't make sense, sir.

1  A   The conduct of the white Republican, non-Hispanic white

2  Republican voters is dependent on the context.  If you are

3  telling me that that -- those Republican voters have not

4  bothered to contest even in old District 9, then I would simply

5  say that that reinforces my previous testimony that in new

6  District 8 the winner of the Democratic primary is going to

7  win.

8  Q   The bottom line sir, is that you didn't look at the partisan

9  electoral history of the 9th Assembly District nor the

10  8th Assembly District in formulating your opinions; isn't that

11  true?

12  A   That -- I know the partisan electoral history of the

13  8th Assembly District because it is a district which is -- has

14  been -- has been won by a Democrat.  While it's true that I do

15  not know of my own knowledge the partisan affiliation of

16  Mr. Zepnick, my belief, based on the election results for the

17  Barrett/Walker race in District 9 as it previously was

18  configured, is that this is still a Democratic district.

19  I don't know whether or not Mr. Zepnick is a Democrat or not,

20  but I would guess that he might be.

21  Q   I guess my question wasn't quite that, sir.  My question was

22  what you did to prepare for your opinion, and you did not look

23  at and research and review the partisan conduct of the voters

24  in the 9th Assembly District over time.  You just simply didn't

25  do that.  You looked at a gubernatorial race and you looked at

1  a Democratic primary and you drew an inference.

2  A  Yes --

3  Q  Isn't that right?

4  A  Yes and no.  The data on who wins the Assembly district

5  contest was, in fact, available to me.  It was available to me

6  basically from the bluebook and from data provided to me by

7  counsel for both old Assembly District 8 and old

8  Assembly District 9.  Reviewing that data, it became quite

9  clear that these were overwhelmingly Democratic districts and

10  now with respect to the Barrett/Walker race, I have

11  confirmation of that historical data with recent data that

12  demonstrates that what was true in the past is still true now.

13  These are overwhelmingly Democratic seats, whether or not one

14  looks at old 8 or new 8 or old 9 or new 9, but there has been a

15  movement of Republicans shifted between old 9 and now new 8

16  such that the proportion of Republicans in new 8 as configured

17  under Act 43 is higher than it was as in AD 8 as configured in

18  2002.

19  Q  Do you know what the racial composition of the old 9th

20  Assembly District was on census day?

21  A  No, I do not.  I would have to check those numbers.

22  Q  And did you check before you formulated your opinions?

23  A  I know -- I know that the composition of present district --

24  Assembly District 9 is essentially 60.554 percent Hispanic and

25  54.03 percent Hispanic voting age population, and I would

1 believe that the composition of that district was also highly
2 Hispanic even as of the 2010 census, even though it began in
3 2002 as a much, much less Hispanic district. I believe the
4 correct answer to that question -- and I won't swear to this
5 even though I'm on the witness stand -- I believe the correct
6 answer is that it was something like 46 percent Hispanic voting
7 age population in AD 9 circa 2011, but I may be in error.
8 Q  I'm curious about this form of reasoning that you come here
9 to testify about where you present opinions based on these
10 types of inferences, and I guess I want to go to the next one
11 because I thought I heard you say that you looked at the 2002
12 12th Assembly District and you said that the 2012 9th Assembly
13 District was a plagiarization of that. Is that accurate?
14 A  No.
15 Q  No? Let's -- well, let's look at it.
16 A  In order to save some time, if I appeared to say that, I
17 certainly did not intend to say that. What I meant to say was
18 there were two influence districts created in 2002. Those
19 numbers had numbers AD 12 and AD 9, and that there were also
20 two influence districts created in 2011 under Act 43 and that
21 those districts had numbers AD 9 and AD 12 but that they had
22 been changed by the legislature in such a fashion that their
23 minority population percentages had been increased over that
24 which was found in the identically numbered districts in 2002.
25 Q  Well, what I wrote down was that the legislature had

1 plagiarized this Court's design of the old 12th Assembly

2 district from 2002 and when it designed the new 9th Assembly

3 District in 2012. And you drew -- you drew analogy between the

4 fact that in 2002 the AD 12 was 32 percent African-American and

5 that that grew over ten years to 51 percent --

6 A To 49.8 percent. Then it was changed to increase the 49.8

7 percent to 51 percent to create a majority black but still

8 arguably influence district.

9 Q And then you cited that as the basis for an inference about

10 what might happen from today into the future ten years from now

11 by citing that the 9th Assembly District is at 54 percent and

12 that it's your hypothesis that it will become a majority

13 district in the future?

14 A Based on my review of evidence from now two decades worth of

15 political history and electoral history, the minority

16 population in these areas has continued to grow. Districts

17 such as Senate District 4 when created in 1992 as only an

18 influence district, nonetheless immediately, even though less

19 than a majority black voting age population, elected a black

20 candidate of choice.

21 Having observed this pattern in which districts which were

22 originally created as influence districts over the course of

23 the decade, and perhaps even quite quickly in the decade, came

24 to elect a minority candidate of choice, it is reasonable for

25 me to believe based on that history, plus the undisputed

1  testimony about minority population growth over the past decade

2  and expected minority population growth over the next decade,

3  to believe that these two influence districts, one

4  African-American, one Hispanic, have at least the potential to

5  become opportunity districts by the end of the next decade, or

6  in other words, when I come back in 2022 for my next appearance

7  before a federal district court.

8  Q  Okay.  Perhaps we'll save you that trip.

9          JUDGE WOOD:  Our sympathies.

10  BY MR. EARLE:

11  Q  I guess what escapes me, Professor Grofman, is what does the

12  2002 12th Assembly District, which was an influence

13  African-American district at the time, have to do with the 9th

14  Assembly District and the 8th Assembly District in 2011 in a

15  completely different neighborhood with a completely different

16  racial composition.  What are the variables?  Have you

17  identified any variables in common other than some very loose

18  comparison of percentages ten years apart and one court in

19  common?

20  A  The basic predicate on which I based my comparison is the

21  fact that observing Senate District 4 as an influence district

22  in 1992 with black population percentages expected to grow over

23  the course of the decade but still with black population growth

24  less dynamic than Hispanic population growth, having observed

25  that a district which I labeled as an influence district in

1   1992 did, in fact, convert into an equal opportunity district

2   as early as 1992, it seemed to me to be reasonable, based on

3   the evidentiary history of past practices, that a district like

4   AD 9 would, given Hispanic population growth patterns, also be

5   a district which over the course of a decade, not necessarily

6   2012, have such an opportunity.

7       And that, if you want further evidentiary basis, that view

8   is, of course, echoed -- or I shouldn't say echoed because

9   that's the wrong word -- it, in fact, is stated by

10  Assemblywoman Zamarripa in her view about Hispanic population

11  growth and the potential for AD 9 to, in fact, become a

12  Hispanic majority seat which might elect.

13  Q  So cutting through all of those words, what those two

14  districts have in common ten years apart is your prediction.

15  A  Yes, that's right.

16  Q  Okay.  So because you predicted that then and you're

17  predicting something now, that is the basis of an opinion

18  that -- that's the foundation for the opinion in terms of its

19  weight; correct?

20          MR. HODAN:  Objection.  That's a mischaracterization

21  of his prior testimony.

22          JUDGE STADTMUELLER:  Okay.

23          THE WITNESS:  There is an evidentiary basis for my

24  testimony.  It is also the case that when I look at my own

25  record of predictive success, there is a record which suggests

1    that it is not unreasonable for me to believe what I suggest

2    might be the case will happen over the course of the decade.

3    For example, in 1992 there were a group of African-American

4    incumbents who said we need 75 percent. We will lose our

5    districts if we are not --

6    BY MR. EARLE:

7    Q    Now you're going into a different area so I'm going to cut

8    you off because that's not responsive to my question. Okay.

9    Let's go to this question of crossover and your views about the

10   African-American population within the 8th Assembly District.

11   A    Yes.

12   Q    Remember you testified about that?

13   A    No, I did not testify about that except indirectly. What I

14   testified was that if you look at the bluebook data for

15   present -- sorry, past Senate District 4 and past Senate

16   district 8 -- sorry, 6, past 4 and past 6, which are heavily

17   African-American areas, one observes that the vote share

18   received by Judge Colon in his Circuit Court contest general

19   election in that overwhelmingly African-American area is,

20   in fact, a percentage of the vote share that is comparable to,

21   if not identical to, the estimates that are give by Dr. Mayer

22   for the degree to which Hispanic voters have supported

23   Judge Colon even in the Hispanic areas of present Assembly

24   Districts 8 and 9. That is, he's getting by this estimate

25   64.7 percent of the vote from Hispanic voters. That's

1    Dr. Mayer's estimate, not mine.  The actual bluebook shows that

2    he's getting roughly comparable numbers among the

3    African-Americans and that's the district as a whole, not the

4    most heavily African-Americans districts within it.

5    Q  I'm going to ask you again to keep your answers short.

6    I think you can get to the point without quite so much

7    verbiage.  Okay?

8    A  I will try to give answers that are responsive.  If the only

9    way in which I can answer a complex question or a seemingly

10   simple question is with a complex answer, I will do so.

11   Q  I'm understanding that, I guess, is the point.  So you

12   looked to the two African-American Senate races and how

13   Judge Colon did in those Senate races and based on the

14   electoral conduct of the African-American voters in those

15   African-American Senates.

16   A  No.

17   Q  No?

18   A  No.

19   Q  So what do the two African-American Senate districts have to

20   do with how African-Americans in the 8th Assembly District are

21   going to vote?

22   A  Insofar as I have any way of making inferences about

23   African-American voters, because I drew on what I could say

24   with confidence about those districts where you can reliably

25   make inferences about African-American voting behavior,

1  districts where the African-American population is so high that

2  you can basically say this is how African-American voters are

3  voting.  There are African-American voters within

4  Assembly District 8, but they are scattered, at least as far as

5  I'm aware.  I've not done detailed demographic --

6  Q  That's not what I'm asking.  And you're --

7           MR. HODAN:  Your Honor, I understand counsel would

8  like a short answer but he's repeating to interrupt the

9  witness.  I would just ask for a little courtesy.

10           MR. EARLE:  Your Honor, I'm trying to control the

11  cross as best I can and keep it focused.

12           JUDGE STADTMUELLER:  And I understand both sides.  So

13  give Dr. Grofman a little bit of leeway and if you after a

14  minute or two believe he's going somewhere that you are not

15  interested in, simply say, as you just did, that's not what I'm

16  asking.

17           MR. EARLE:  Okay.

18  BY MR. EARLE:

19  Q  I'm going to repeat the question, what we're asking about.

20  We're talking about the African-American voters in the

21  8th Assembly District who you seem to have inferred or opined

22  to this Court will vote in coalition with the Latinos in the

23  8th Assembly District.

24  A  Yes, that's correct.

25  Q  Okay.  And the basis for your view that they're going to

1   vote in coalition with the Latinos in the 8th Assembly District
2   is your observations about electoral conduct in the 4th and 8th
3   Senate districts; is that correct?
4   A  Yes.
5   Q  That's all I'm trying to get at.  See, this was easy.  We
6   can do this.  All right?  So this is you're resorting to
7   exogenous races to predict the behavior of African-Americans in
8   the 8th Assembly District; isn't that true, sir?
9   A  No.
10  Q  Well, you have this thing called the best evidence rule;
11  right?
12  A  Yes.
13  Q  And one of your criticisms of Professor Mayer's work in this
14  case and his analysis was that he didn't conduct his -- he
15  didn't base his racially polarized voting analysis on the
16  districts in question; correct?
17  A  Yes, that's correct.
18  Q  All right.  So Professor Mayer, in response to your
19  criticism, went off and gathered ward evidence from that
20  district and looked -- did a second analysis; correct?
21  A  Yes, that's correct.
22  Q  And you only have quibbles with both of those analyses;
23  right?
24  A  Yes.  The data.  The data, not the conclusions.  The data.
25  Q  Right, right.  And so now, isn't what you're doing, you're

1  going off to the 4th and 8th Senate districts and observing

2  behavior involving Judge Colon and you're saying, oh, those

3  folks voted for Judge Colon, so the African-Americans in the

4  8th Assembly District must be supportive of Latino candidates?

5  A  Yes, that's correct.

6  Q  Okay.  Let's stop there then.  That's what I thought you

7  were doing.  If we could call up Exhibit 1190.  Now, here you

8  drew some conclusions.  You criticized the testimony of

9  Christine Neumann-Ortiz.

10  A  I did not criticize the testimony.  I heard the testimony.

11  Q  Okay.  Well, you commented on it in a way that was critical

12  of the quality of the reasoning.  Isn't that basically what --

13  you said that on one hand Voces de la Frontera and the Latino

14  Redistricting Committee oppose District 8 and 9, Assembly

15  Districts 8 and 9 under Act 43 because it's splitting the

16  community down 16th Street, yet look what they did with the

17  city council.  Isn't that the evidence?

18  A  Yes, that is exactly right.

19  Q  So you're criticizing what you perceive to be a lack of

20  consistency.

21  A  Yes.

22  Q  And you base that lack of consistency by looking at this

23  map.

24  A  Yes.

25  Q  And you say, oh, my gosh, this is not the same thing; right?

1   A  Yes.

2   Q  So let's --

3   A  Lack of -- please, if I may add one more point.

4   Q  Sure.  Keep it brief.

5   A  Which is when asked she indicated that this was a map which

6   Voces was, in fact, happy with.

7   Q  Now, in your deposition you testified you didn't know

8   anything about the community in question.

9   A  That's certainly correct.

10   Q  You'd never been there?

11   A  That's also correct.

12   Q  You've never driven down 16th Street?

13   A  That's correct.

14   Q  So -- and you think that this is inconsistent, so let's look

15   at this.  The aldermanic districts are 39,000 people apiece;

16   correct?

17   A  Yes.

18   Q  And the Assembly districts are 57,000 people apiece.

19   A  Exactly, yes.

20   Q  How big is the Latino community in the vicinity of the 8th

21   and 9th?

22   A  The Latino community in the vicinity of the 8th and 9th is

23   going to be -- I have to find the sheet that actually has

24   population figures on it, but it's going to be something

25   like -- well, Latino community, the people who are only Latino

1   is going to be something like 60,000.

2   Q   How much?

3   A   60,000 would be my quick guess.

4   Q   That's a guess?

5   A   Yeah.  If you wish me to calculate it, I'll find the right

6   chart and I'll give you the exact number.

7   Q   Did you research that for your opinions in this case?

8   A   Certainly, but the approximate answer is 37,700 something

9   people in Assembly District 8, and if that is approximately

10  65.9 percent of the -- of that district, then it would

11  logically follow if I do the appropriate arithmetic that I can

12  calculate the exact you number but it's going to be somewhere

13  in the thirties, and so when I add the two numbers together, if

14  we're talking about Hispanic population, it should be the case

15  that I'm getting a number somewhere in the 60 to 70,000 range.

16  Q   Well, we're --

17  A   That's just the Hispanic.  That's not the people.

18  Q   That's right.

19  A   That's not the people.

20  Q   You're an expert and you've researched this carefully and

21  you've predicated your opinions on facts and evidence that's

22  presumably a good foundation for it; correct?

23  A   Yes, I've looked at numbers.

24  Q   What?

25  A   Yes, I have looked at numbers.

1   Q  And so what is your testimony as to the size of the Latino

2   community on the near South Side of Milwaukee?

3   A  My testimony about the size of the Latino community is that

4   it includes something like 60 to 70,000 voters of whom a large

5   portion are concentrated within Aldermanic District 8 and

6   Aldermanic District 12.

7   Q  So if we took a community of approximately 70,000 people,

8   that's a community that could support two aldermanic districts

9   that were 39,000 people, each that true?

10  A  Certainly.

11  Q  And the community would not be sacrificing the ability to

12  elect candidates of its choice by dividing itself into two in

13  order to accomplish that objective; correct?

14  A  Yes, that also is correct.

15  Q  Okay, and -- but you found it interesting that in

16  Exhibit 1190 we have 16th Street here dividing the two

17  districts.

18  A  Yes.

19  Q  And you found that inconsistent with the position taken by

20  Voces in this lawsuit.

21  A  Generally speaking, yes.

22  Q  Okay.  Now, you indicated to me that you weren't familiar

23  with the geography.  You hadn't actually been there.

24  A  That's correct.

25  Q  I would suggest to you, Professor Grofman, that if you drove

1   down 16th Street, that straight line at the top, and I have a

2   little pointer here, right there, that's 16th Street; right?

3   A  Yes.

4   Q  Somebody told you that was 16th Street.  Maybe the lawyers

5   did?

6   A  That is correct.

7   Q  And you relied on that; right?

8   A  That is also correct.

9   Q  Did they tell you that this was the Menomonee Valley and

10  nobody lived there and it's industrial and there was a viaduct?

11  A  No, they did not.

12  Q  Did they tell you that National crosses where that little --

13  see where I'm pointing right there?

14  A  Yes.

15  Q  That's national.  And then so rather than split the business

16  district, the 8th -- the 12th aldermanic district jogged over a

17  few blocks so as to keep the business district intact.

18          MR. HODAN:  Counsel, are you asking a question or are

19  you testifying?

20          MR. EARLE:  I'm asking whether you told him that.

21  I'm asking him whether you told him that.

22          MR. HODAN:  Withdraw the objection then.

23  BY MR. EARLE:

24  Q  I'm sorry, I didn't mean to do that.  Sorry.  I'm like

25  Darth Vader here.

1    A   Again, I am not an expert on Milwaukee.  I would simply note

2    that if the business district is the tracts that are to the --

3    the brown -- the tracts in brown that are to the left of the

4    line that shows the aldermanic boundaries, then if those are

5    the tracts that we're arguing about, if you put them together

6    with -- if you put them together with Aldermanic District 12,

7    they are together; if you put them together with

8    Aldermanic District 8, they are together.  And I'm simply not

9    in a position to debate with you the demography or geography of

10   the Hispanic community other than to point to the map as shown.

11   Q   But I will represent to you that the business district in

12   the 12 Aldermanic District is not split.  Okay?  That's simply

13   a matter of fact that the Court I think could take judicial

14   notice of and --

15            MR. HODAN:  Objection, your Honor.  Counsel is

16   testifying again.

17            MR. EARLE:  All right.  Well, we will find a map

18   that -- you will not stipulate that 16th Street is right there?

19            MR. HODAN:  I'm not -- you're testifying, counsel.

20            MR. EARLE:  Okay.

21   BY MR. EARLE:

22   Q   Well, now, on the other hand, Professor Grofman, the Act 43

23   did split the business community of the Latino community; isn't

24   that correct?

25   A   Certainly if that's -- that is unrebutted testimony and

1    I have no reason to believe otherwise.

2    Q  And the Assembly districts require 57,444 people, don't

3    they?

4    A  That also is indisputable.

5    Q  And the Latino community in Milwaukee is not large enough to

6    support two majority Assembly districts with effective voting

7    majorities; is that correct?

8    A  That also is correct.

9    Q  But it is possible to support one Assembly district with an

10   effective voting majority; isn't that correct?

11   A  Yes, that also is correct.

12              MR. EARLE:  Thank you.  No further questions.

13              JUDGE STADTMUELLER:  Thank you.  Mr. Poland, do you

14   have any questions of the witness?

15              MR. POLAND:  No, your Honor.

16              JUDGE STADTMUELLER:  All right.  You may redirect,

17   Mr. Hodan.

18                    REDIRECT EXAMINATION

19   BY MR. HODAN:

20   Q  Just a couple of questions, Dr. Grofman.

21   A  Certainly, sir.

22   Q  It was suggested that you did not look at the census day

23   population for Assembly District No. 9.

24              MR. HODAN:  Could you please bring up Exhibit 1181,

25   please?  And turn to Exhibit No. C in Professor Grofman's

1    expert rebuttal report.

2    BY MR. HODAN:

3    Q  Professor Grofman, is that a copy of Exhibit C in your

4    report?

5    A  Yes, it is.

6    Q  Do you see any reference to the sentence state Hispanic

7    voting age population in Exhibit No. 9?

8    A  Yes, it is exactly 46.18 as opposed to my recollection that

9    it was 46 percent.

10   Q  It was also suggested that or at least inferred that you

11   didn't consider the population of the Hispanic community in the

12   general vicinity of Assembly Districts 8 and 9.

13   A  Yes, it seemed to have been suggested and that, of course,

14   is in error since I reported in my declaration exactly the

15   data, at least in percentages terms, for the Hispanic voting

16   age population and voting age population in 8 and 9, which is

17   to say the area of the Hispanic community.

18   Q  Could you turn to paragraph 16 of that same exhibit, please.

19   Professor Grofman, do you see paragraph 16?

20   A  Yes.

21   Q  And could you indicate whether you calculated the Hispanic

22   population in the areas of Assembly District 8 and 9 and what

23   your conclusions were?

24   A  Yes.  I calculated the Hispanic population and voting age

25   population proportions and those were contained in a somewhat

1  different exhibit, I believe it's Exhibit B or Exhibit D to my

2  declaration, which shows, I believe the number would be

3  65.9 percent Hispanic population in Assembly District 9 and a

4  smaller number in Assembly District -- sorry, the first number

5  was for Assembly District 8 and then a somewhat smaller number

6  for Assembly District 9.

7  Q  Professor Grofman, I just have one more question that has to

8  do with cohesion.  You were asked whether the Hispanic

9  community is politically cohesive and I believe you were about

10  to give an answer and perhaps did not have an opportunity to

11  answer that as you might have liked, would have liked.  Could

12  you tell us again whether you believe the Hispanic community is

13  politically cohesive, and if so, in what type of races.

14  A  I believe the Hispanic community is politically cohesive in

15  contests which are partisan in character where there is a

16  Hispanic candidate of choice available to the Hispanic

17  community and where there is not a non-Hispanic incumbent in

18  place whose presence might have a chilling effect on Hispanic

19  political opportunities to elect and also may have an effect on

20  Hispanic political cohesion because of the advantages of

21  incumbency.

22  Q  And is it -- do you believe that based on the evidence that

23  we've seen through this trial that there has been evidence

24  indicating that the Hispanic community is cohesive in

25  non-partisan races?

1    A  The available evidence from the non-partisan races suggests
2    that either the Hispanic community is not cohesive or
3    essentially it's pretty close to too close to call.
4    Q  Professor Grofman, you testified in many cases.  You've
5    submitted numerous articles, amicus briefs to the
6    Supreme Court.  How would you characterize this Voting Rights
7    Act claim?
8    A  We satisfy the prongs of Gingles thanks primarily to the
9    testimony of the expert witnesses for defendants, who, despite
10   the relative paucity of clear evidence in favor of minority
11   political cohesion or in favor of racially polarized voting,
12   nonetheless both Keith Gaddie and I have testified that in our
13   honest view, the Hispanic political community is cohesive and
14   that there is the potential for racially polarized voting even
15   though the evidence for it is, shall we say, scant on the
16   ground in terms of that which was presented at this trial.
17   Q  And do you have an opinion again, and we'll end here, based
18   on that evidence whether the incumbent is going to win the
19   Democratic primary in 2012?
20   A  It is based -- it is my testimony that based on what I have
21   seen about elections in every minority district, including, but
22   not restricted to, Assembly District 8, that when there is a
23   minority incumbent in place, that minority incumbent has a
24   virtual certainty of winning the Democratic primary and
25   effectively in the heavily minority areas a certainty of

1  winning the general election.

2  Q  You were asked about your analysis of the African-American

3  support for Hispanic candidates.  How would we be able to tell

4  whether any African-American supported Hispanic candidates in

5  Assembly District No. 8 since 1998?

6  A  The minority population, African-American population in

7  Assembly District 8 is simply too small to identify its voting

8  behavior from any of the standard statistical tools that I or

9  any of the other experts have at our disposal.  The only way to

10  make inferences about African-American voting behavior in

11  Assembly District 8 is to look at African-American voting

12  behavior in other areas where the size of the African-American

13  population is large enough and concentrated enough to be able

14  to draw reliable inferences from voting behavior in the

15  district about the voting behavior of African-Americans.

16  Q  Now, you were accused of being inconsistent in doing that.

17  Is it true that there are elections, election history in

18  Assembly District 8 that we can look at to figure out how the

19  Hispanic community has done?

20  A  No, I was not being inconsistent because --

21  Q  No, pardon me.  I was suggesting you were being accused of

22  being.  Go ahead.

23  A  I was not being inconsistent because, first of all, one is

24  comparing apples and apples.  That is to say, one is comparing

25  in this case the Circuit Court contest in Assembly District 8

 1    as those voters voted for or did not vote for Judge Colon with

 2    the Circuit Court contest in Senate Districts 4 and 6 insofar

 3    as the African-American voters in those contests did or did not

 4    vote for Judge Colon.

 5        And in fairness to Mr. Earle, it would be reasonable for me

 6    to add, as I have in my previously published work, one more

 7    caveat to the definition of best evidence, which is the best

 8    evidence is evidence you can get.  Evidence that you can't find

 9    is almost by definition not the best evidence.

10            MR. HODAN:  I have no further questions.

11            MR. EARLE:  Just a brief.

12            JUDGE STADTMUELLER:  Certainly.

13            MR. EARLE:  Brief cross.

14                    RECROSS-EXAMINATION

15    BY MR. EARLE:

16    Q  So I guess where we are is in the totality of the

17    circumstances; correct?

18    A  Yes, that's correct.

19    Q  And the question is what is going to happen in the next

20    election; correct?

21    A  Yes.

22    Q  Could we get up 202, please?  Now, let's put up 199 first.

23    If you look at this map, 199, do you have any suppositions

24    about how the African-Americans in the city attorney race in

25    April of 2008 voted?

1  A  No, I have not looked at that.

2  Q  Well, based on the studies that you've done and the opinions

3  you've rendered in this case, how do you suppose the

4  African-American residents in the old 8th Assembly District

5  voted with regards to the race of Pedro Colon versus

6  Grant Langley?

7  A  I'm sorry.  The legend here can you please explain for me?

8  Q  Oh, sure.  I'm sorry.  The legend is -- blue is Latino

9  votes.  So blue are supporters of voters who voted for Pedro

10  Colon.  The darker the blue, the higher the percentage.  And

11  the reddish maroon is Grant Langley.  The darker the red, the

12  more heavier the percentage for Grant Langley.

13  A  Yes.

14  Q  So these are actual votes and what really happened.

15  A  Yes.

16  Q  And so if you can see the configuration of the Act 43

17  8th Assembly District there, you can see that in the northern

18  part Pedro Colon won.

19  A  Yes.

20  Q  Now, are you -- is it your inference based on what you've

21  looked at in this case that the African-Americans living in

22  that area voted for Pedro Colon?

23  A  That is not possible -- it is not possible for me to make

24  any inference from the data that you presently have before me

25  or any other data which has been made available to me or that

1  I can imagine being made available to me that will would allow

2  me to directly determine the voting behavior of the

3  African-American voters located within Assembly District 8.

4  Q  Okay, okay.  So maybe I misunderstood your testimony.  So

5  where we are then is that prognostically at this point for

6  Assembly District 8 as drawn by Act 43, you're not saying that

7  the African-American voters in that district will likely

8  coalesce with the Latino voters in that district; is that

9  right?

10  A  Yes and no.  There is no evidence directly from

11  Assembly District 8.  The only evidence is how

12  African-Americans voted in Senate District 4 and

13  Senate District 6 for Colon, and the evidence from those other

14  African-American voters is that they voted for Mr. Colon.

15  That's all that I can say and I don't think we need to belabor

16  this.

17  Q  What happened in the 4th and the 8th; right?

18  A  Yes.

19  Q  Fair enough.  So but you do agree, I presume, that the

20  results of this race depicted here that really happened is

21  relevant to the totality of the circumstances; correct?

22  A  Yes.

23  Q  And it's something that the Court ought to take into account

24  in deciding under whether the totality of the circumstances the

25  ability of the Latino community to elect the candidates of its

1   choice have been impermissibly impaired by Act 43.

2   A   Yes.   Again, subject to the stipulation with those

3   qualifications I have made about this contest.

4   Q   So in other words, it would be a reasonable ruling of this

5   Court to conclude that Act 43 violates the Section 2 of the

6   Voting Rights Act with regards to Latinos in

7   Assembly District 8; right?

8   A   No.   I'm sorry, I don't follow the logic.   If you'll

9   clarify, I can respond to individual questions that address

10  factual questions.

11  Q   Okay.   Well, we've cleared all the prongs.   I mean, there's

12  no dispute there; right?

13  A   Yes.

14  Q   So now we're in the totality of the circumstances, right,

15  and we have clear evidence of an election; correct?

16  A   Yes.

17  Q   And it's relevant and it shows that Pedro Colon would have

18  lost an election against a white opponent in the new district;

19  right?

20  A   Yes.

21  Q   And we know that the Latino community suffers from

22  socioeconomic burdens; correct?

23  A   Yes.

24  Q   That the whites who live in that area don't; correct?

25  A   Yes.

1  Q  And we know that they have a lower turnout rate than the

2  whites who live in that area; correct?

3  A  Yes also.

4  Q  And while you quibble about the statistics, we know that the

5  their registration rates are lower than those of the whites in

6  the area; correct?

7  A  Also correct.

8  Q  So can you identify one factor, just one, that would support

9  a conclusion that the voting rights of the Latino community

10 under the totality of the circumstances have not been impaired?

11 A  There are essentially at least three, so let's take them

12 kind of one at a time.  The first is whether or not reasonable

13 inferences can be drawn from this election, which I believe is

14 a non-partisan election, though perhaps I am wrong about that.

15 I don't know.  I've not seen this exhibit until rather

16 recently.  And in any case, it is an election which is on

17 I believe a different time calendar than the general elections.

18 That would be first.

19     The second relevant differentiation would be the

20 characteristics of the candidates in this contest as compared

21 to the candidates in the Colon, Judge Colon contest where he

22 wins in the district.  Here Mr. Colon is running against a

23 very, very well-established candidate, an incumbent of

24 long-term, and, in fact, that incumbent wins and has won in

25 this district and probably most others for a while.  So that's

1   the second difference.

2       And the third difference is, as I indicated in my previous

3   testimony, that when -- that inferences from non-partisan

4   contests to partisan contests are highly problematic, and,

5   indeed, as I started to say at one point but did not really

6   complete my answer, there is evidence that the Republicans, the

7   whites, the non-Hispanic whites in old 9 who are now in new 8

8   are, in fact, more Republican or the district itself is more

9   Republican than is the case with old District 8 as evidenced

10  here by actual turnout on election day in Democratic and

11  Republican primaries.

12          MR. EARLE:  Thank you.  I have no further questions.

13          JUDGE STADTMUELLER:  Mr. Hodan?

14          MR. HODAN:  Nothing further, your Honor.

15          JUDGE STADTMUELLER:  Thank you, Dr. Grofman.  You may

16  step down and you're excused.  Mr. Kelly, any further evidence?

17          MR. KELLY:  We have no further witnesses at this

18  time, your Honor.

19          JUDGE STADTMUELLER:  All right.  Mr. Poland,

20  Mr. Earle?

21          MR. EARLE:  Your Honor, we had contemplated the

22  possibility of recalling Professor Mayer on that one question

23  we talked about earlier and I guess at this point we'll retract

24  the request and rest as well.

25          JUDGE STADTMUELLER:  All right.  With that knowledge

1   subject to counsel reviewing with my staff the receipt of all

2   of the exhibits, the Court does herewith declare the receipt of

3   evidence in this case closed.

4        That brings us to the point in our schedule where we

5   are going to recess until 7:00 o'clock.  During that period

6   I would like counsel to review among yourselves and at about

7   ten minutes to 7:00 to meet with Mr. Willenbrink to ensure that

8   the Court has, in fact, possession of all of the exhibits that

9   were actually received during the trial and at 7:00 o'clock we

10  will begin with counsel's closing arguments.

11       Are there any other matters that we need to address

12  in the interim?  Hearing none, the courtroom will be open and

13  I believe there is a court security officer at the Jackson

14  Street entrance for those of you who are awaiting the delivery

15  of an evening meal, and to the extent that there are others who

16  would like to leave the building and come back, please be at

17  the entrance at about 6:55, about five minutes before the Court

18  reconvenes, and someone will allow you to return.  The Court

19  stands in recess.

20            THE BAILIFF:  All rise.

21            (A recess was taken.)

22            MS. LAZAR:  We're on the record.  This is Assistant

23  Attorney General Maria Lazar, also Dustin Brown and Jacqueline

24  Schwartz, paralegal, and we're going to read the list of

25  exhibits that are accepted by both parties or acceptable to

1    both parties to be introduced into the record.

2            They are -- and I'm going start with pages, so

3    they'll be a little bit odd.  So, for example, we have 2, 2A, 3

4    through -- 3 through 17, not 18, 19 through 22, not 23, 24

5    through 27, then 30.  31 is going to be the subject of a

6    stipulation but it does go in.  32 through 34, not 35, 36 and

7    38, 38A, 39, 41 through 45, 49, 49A, then 50 through 55, 57 and

8    58, 60, 63, 66 and 67, 71 through 73, 77, 79, 81.

9            Then Exhibits 83, 84 and 85 are the subject of a

10   stipulation but they will go in.  88 through 90, 92 through 93,

11   95 through 125, 128, 130 through 136, 139, 140 through 144, 155

12   and 156, 166, 169, 173 through 176, 178, 181, 182, 184, 185,

13   188, 197 through 205, 206 through 209, 220 through 231 --

14   actually make that through 232, 237, 240.  And that's where we

15   end on the plaintiffs' numbers.

16           Going to the defendants' numbers that start with

17   1000, the first number going in is 1002, then 1017, 1020 and

18   1021, 1025, 1028 through 1034, 1038 and 1039, 1041 through

19   1061, 1065 through 1076, 1078 to 1080, 1082 through 1084, 1086

20   through 1111, 1112 through 1114, 1117, 1118, 1120 through 1138,

21   1151 through 1159, 1166, 1174 through 1192, and that is it.

22   Can you guys say you agree?

23           MR. BROWN:  We agree.

24           MS. LAZAR:  And you have our designations.  You want

25   us to move these in officially?  Then still on the record,

1    we're moving in the deposition designations for the defendants.

2    They include Peter Barca, Adam Foltz, Joel Gratz, Joseph

3    Handrick, Tad Ottman, Jesus "Zeus" Rodriguez, Michael White and

4    James Troupis, and those are the ones attached on a document

5    that is being handed to the clerk at this point in time.

6            MR. BROWN:  And the deposition designations for the

7    Baldus plaintiffs, these have all been filed under the docket

8    ECF and I will also submit them in paper.  The first is in

9    docket number 158-2 as Exhibit B to the joint pretrial report.

10   These designations are for witnesses Adam Foltz, Joel Gratz,

11   Joseph Handrick, Tad Ottman and Jesus Rodriguez.

12           We also have counterdesignations that appear at ECF

13   docket number 180-1.  This is Exhibit A to plaintiffs' response

14   to defendants' statements of contested facts and proposed

15   conclusions of law.  These are counterdesignations of witnesses

16   Peter Barca, Adam Foltz, Joel Gratz, Joseph Handrick, David

17   Maier, Jesus Rodriguez, Tony Vander Wheelen, and Michael White.

18   And finally, on docket number 200, there are deposition

19   designations for Peter Morrison and James Troupis.  Thank you.

20           (A recess was taken.)

21           THE BAILIFF:  All rise.

22           JUDGE STADTMUELLER:  Let the record reflect that we

23   have once again reconvened in the matter of Baldus, et al.,

24   versus Brennan, et al., and we will call upon counsel for the

25   Baldus bailiffs for their closing argument.  I believe counsel

1  have made their record with regard to the receipt of all of the

2  exhibits.  Is that correct, Mr. Willenbrink?

3  MS. LAZAR:  We just wanted to put one thing on the

4  record that we had agreed to.  It was four of the exhibits.  We

5  did not call one of our experts John Diez, D-I-E-Z, but we had

6  stipulated, all parties, to the admission of the evidence, his

7  report.  Those exhibits 31, 83, 84 and 85.  We submitted them

8  in with the court reporter before.  But we just wanted to make

9  sure that that was clear on the record that we had that

10  stipulation.

11  JUDGE STADTMUELLER:  All right.  Thank you,

12  Miss Lazar.  Mr. Poland?

13  MR. POLAND:  Your Honor, I believe Mr. Earle is going

14  to precede me.  He will argue the Section 2 claims for both the

15  Voces plaintiffs and the Baldus plaintiffs.

16  JUDGE STADTMUELLER:  Thank you.  Mr. Earle?

17  MR. EARLE:  May it please the Court.  If the

18  legislature had done what this Court did in 2002, we would not

19  be here today trying this case.  The state of Wisconsin and the

20  city of Milwaukee, the Latino community of Milwaukee has

21  suffered through an unnecessary experience.  This has been a

22  fool's errand, initiated by the state of Wisconsin, the

23  legislature of the state of Wisconsin.

24  And the words "fool's errand" don't quite capture

25  what happened here.  I was, struggling, I wanted to come up

1    with a phrase that would capture the essence of this experience

2    we've been through in this litigation, and the best word I

3    found, because I wanted -- a fool's errand doesn't quite

4    express the paradoxical silliness of it and the serious,

5    serious consequences of it.  And so the best word is in

6    Spanish.  It's a babosada.  In Spanish babosada means this

7    situation should not have happened.

8            We have suffered in Wisconsin badly as a result of

9    the poor judgment of the leadership of the legislature.  They

10   chose to initiate a process in secrecy, hide it from the

11   public.  I won't go into all the details about that, but what

12   they did in that process is they deprived the community of the

13   ability to scrutinize what was being done.  They provided --

14   they denied the community to participate, they denied the

15   community the ability to participate in a meaningful fashion

16   and provide insight.  If you contrast that with what happened

17   in the city of Milwaukee where it was wide open, it was

18   transparent, everybody could participate, people could look at

19   the maps, criticize the maps, make their points of view known.

20   The legislators could account for that and if there was

21   something wrong, it was likely to get pointed out.  Every

22   constituency that was affected had an opportunity to speak, and

23   if that constituency had a claim, had a basis to criticize

24   something in the process, they could, and the -- that

25   legislative body had the benefit of all of that input.

1          Here in this case, the legislature in Wisconsin
2     privatized the whole process behind the walls of a private law
3     firm, required the legislators who were a party to the process
4     to sign secrecy agreements, and then trotted out their product
5     on July 8th.  And they trotted it out in a fashion which
6     deprived the community of being able to evaluate what it was
7     that the community was being presented with, despite the advice
8     of Professor Gaddie, who specifically said consult the
9     community.  He was emphatic about that, and the emphasize in
10    that is even more clearly set forth in the transcript of his
11    deposition.  He told Eric McLeod, he told Adam Foltz, he told
12    Jim Troupis, he told Tad Ottman, consult the community.  And
13    they didn't do it.

14          And if you look at the e-mail that -- I think it was
15    Adam Foltz who sent it to Professor Gaddie and to all the
16    others on the team saying here's Voces de la Frontera, here's
17    what they're saying about the city map, in June, early June,
18    you know, they knew the Latino Redistricting Committee was out
19    there, they knew Voces de la Frontera was out there, they knew
20    the community was acutely interested in what was going to be
21    happening in terms of redistricting in Milwaukee.  And I'm not
22    arguing this as intent.  I'm arguing this as the sad reality in
23    which all of this happened.  All right.

24          So then June 8th, here we have the maps, and they
25    preempted state law that had been -- they changed it, because

1    at that point in time, at the point that we got to this point,

2    the law required the municipalities to go first, define the

3    ward lines, and then the state would follow. And in this

4    instance what we have is -- and the municipalities did go first

5    and the community did have an opportunity to participate at the

6    municipal level.

7         But then we get this map and this plan on July 8th,

8    and it's drawn by census blocks, census tracts. It was

9    virtually impossible to take a look at those maps and

10   understand the consequences in terms of the different

11   communities of interest and it was impossible for the Latino

12   community to do that in the context of 8 and 9.

13        So the Latino community went to Madison, testified at

14   the hearing on July 13 and said we need more time. We don't

15   know what is being done here. We can't understand what is

16   being done. And that's the tragedy of it all, because if it

17   had been an open process, if adequate time had been given, the

18   case that you've heard here today about the reality of -- for

19   the last couple of days about the reality of the Latino

20   community, how it is configured and how this map would affect

21   it could have been made to the legislature, and the wisdom of

22   proceeding with that knowledge at that point would have been in

23   the hands of the legislature.

24        They deprived themselves of that opportunity and as a

25   result, they themselves are not here today but they're the real

1  party in interest in terms of being an adversary on the other

2  side.  They've been calling the shots.  They're the ones who

3  declined the Court's clear invitation to revisit this matter

4  and fix it once and for all.  So here we are and I'm arguing to

5  this Court that we need to have justice done for the Latino

6  community and the 8th and 9th Assembly Districts.

7          We've heard a lot -- you know, this is the kind of --

8  reminds me of a situation where we're truly talking about

9  apples and oranges.  The entire argument that the defendants

10 have made is based on the political history of the 8th Assembly

11 District as it was initially -- as it existed on census day.

12 It successfully elected Pedro Colon for a decade.  As a matter

13 of fact, the predecessor district which had 98 percent core

14 retention or 90 something percent -- excuse me.  I don't think

15 it was 98 percent but it was 90 something percent core

16 retention into 2002, that district reflected the community

17 effectively and provided the community with an opportunity to

18 elect the candidates of its choice.  That community grew over

19 the course of the decade and when we got to census day, they

20 cut it in half.

21          And they insist, they insist that the political

22 experience of being able to successfully elect Latinos from

23 that district means somehow that Act 43 passes muster with the

24 Voting Rights Act, but it's a different district.  It's

25 fundamentally different.

1          So it's not -- let's look at what's not disputed here

2    today, what's absolutely clear.  What's absolutely clear is

3    that the Latino community is big enough to sustain a single

4    district with an effective voting majority in it.  That

5    takes -- that requires a population of 57,000 reapportioned

6    into a district.  And if you -- and Dr. -- Professor Mayer

7    testified that there are approximately 71,000 Latinos living in

8    the visit of the 8th and 9th Assembly districts.  That's

9    obviously not a number that's going to support two districts.

10   There are a hundred and three Latinos living in the city of

11   Milwaukee.

12        So we have 71,000 people in the vicinity in the near

13   South Side in one community, and Cesar Chavez Drive runs right

14   down the middle and is the core, the heart of the community.

15   That's where the community goes to celebrate spontaneously on

16   Mexican Independence Day.  That's where the community goes to

17   shop.  That's where the community goes for health care.  That's

18   where the community goes just to be out in the community.  It

19   is, I would contend, the modern day United States equivalent of

20   a soca [phonetic] in a Mexican community.  It is the heart of

21   the community, and they chopped right down the middle without

22   any regard for how the community felt about that.  And they

23   went so far as to irrationally make a little dog leg and a

24   little block that they chopped out where they chopped out

25   El Rey Supermarket.  They chopped out the 16th Street Community

1    Health Center and a McDonald's that's along the way and put

2    that in the 9th Assembly District.  Now, so that's not

3    disputed.  None of this is disputed.

4         And apparently, despite some of the testimony, the

5    conflicting testimony, it's not disputed that that community is

6    politically and electorally cohesive.  Each of the defendants'

7    experts in the deposition, in response to the complaint with

8    the complaint in front of them, testified it was politically

9    cohesive.  It was a politically cohesive community.  There was

10   no dispute walking into this trial.  I was surprised to hear

11   testimony to the contrary, but under cross-examination it

12   became clear that each of these experts stuck by their

13   testimony in reality, in the end.  There is no dispute that the

14   Latino community in Milwaukee is cohesive.  And if there's one

15   thing that the old 8th Assembly District does show, it shows

16   that cohesiveness in electing Pedro Colon over and over and

17   over again.

18        Finally, there's no real dispute regarding whether or

19   not the common is racially polarized.  We have the clear,

20   unequivocal testimony of Professor Mayer.  We have two reports,

21   one corroborating the other, and we have no counter racially

22   polarized voting analysis by any of the defendants' experts,

23   and they knew that that was front and center in this case.  It

24   was in the complaint and it's a necessary precondition to

25   bringing such a claim.

1          If the defendants felt that there was a lack of

2    racially polarized voting here, they could have hired an expert

3    to do that.  And each of their experts -- well, at least two of

4    their experts are qualified to do that.  Professor Gaddie and

5    Professor Grofman are qualified to perform racially polarized

6    voting analysis, and both of them only had quibbles, quibbles

7    with the racially polarized voting analysis of Professor Mayer.

8          So in the end, pushed on cross, Professor Grofman

9    said I concede the three Gingles preconditions.  He agreed that

10   this case stood or fell on the totality of the circumstances.

11   And that's where we are, and that's where we are.  And when I

12   asked him, I said Professor Grofman, what do we have to counter

13   the evidence that we have put in in support of our position on

14   the totality of the circumstances.  I didn't quite those words

15   but your Honors were witnesses to what I said, and Professor

16   Grofman relied on -- he said there were three things.  I didn't

17   quite understand the first one, but incumbency he said, and I

18   forgot what the third one was, but he identified three things,

19   you know.

20        Now, what do we have on our side to show that the

21   totality of the circumstances weigh in our favor on this

22   question?  And this is the most important thing.  I think it's

23   necessary that we start with Exhibit 199.  It's the

24   configuration, the geography of what was done.  I'm sorry.

25   Wrong map.  If we could go to 185.

1          This shows the general distribution of the community,

2     and you can see that down here in the southern part we have an

3     area that is more heavily white than it is Latino.  And your

4     Honors have seen repeatedly the green map that goes with that,

5     184, that demonstrates the differential in vote turnout.  And

6     it's clear that this non-Latino area with high voter turnout is

7     a different neighborhood, a different community, which can and

8     will overwhelm the vote, the vote of the Latino community and

9     impair the ability of the Latino community to elect its

10    candidates of choice.

11         And the proof is in the pudding when we look at

12    Exhibit 199.  In Exhibit 199 we can see what happened when

13    Pedro Colon ran against Grant Langley.  When Pedro Colon ran

14    against Grant Langley in 2008, he had been the elected

15    representative of the 8th Assembly District for ten years.  He

16    was in a leadership position in the state legislature.  He was

17    on the joint finance committee.  He had run for mayor,

18    all right.  He ran against Grant Langley and won almost every

19    single ward in the old 8th and he lost every single ward in

20    those portions that came from the 9th Assembly District.  This

21    was a dry run of what the future holds under Act 43.

22         Professor Grofman said the best evidence is what

23    actually happens when you look at the districts and this is

24    what actually happened in 2008, April 2008.  This is the most

25    concrete, clear evidence of what will happen in this election,

1    in the upcoming 2012 election.

2              And when you combine that with the clear -- nobody

3    disputed the differential and socioeconomic burdens.  Nobody

4    disputed the differential in turnout.  No one disputed although

5    they quibbled with the form of analysis with regards to voter

6    registration.  Every single identifiable factor that applies to

7    these circumstances weighs in favor of the plaintiffs' claims

8    that the voting rights of the Latino community will be impaired

9    by this map.  It will deprive the Latino community of the

10   effective voting majority for the next ten years.

11             According to Professor Morrison, if we credit his

12   1 percent per year growth rate, the Latino community will not

13   recover from this blow for eight years in the 8th Assembly

14   District and they won't get anywhere in the next decade in the

15   9th Assembly District.  This is a serious deprivation of 12

16   years of political progress, electoral progress by the Latino

17   community in Milwaukee, and the Latino community in Milwaukee

18   should not have to suffer the consequences of this babosada,

19   this fool's errand that this legislature embarked upon.

20             I respectfully but forcefully request and ask that

21   this Court rule in favor of Voces de la Frontera and the Baldus

22   plaintiffs on the Section 2 voting rights claim as it affects

23   the 8th Assembly District in Milwaukee.

24             JUDGE STADTMUELLER:  Thank you, Mr. Earle.

25   Mr. Poland?

1          MR. POLAND:  Thank you, your Honors.  Judges

2     Stadtmueller, Wood and Dow, may it please the Court, the

3     redistricting legislation before this Court has three fatal

4     flaws under federal, not state, law.  Mr. Earle has already

5     explained that Act 43 violates the Voting Rights Act for its

6     treatment of the Latino community on Milwaukee's South Side.

7     It violates the federal Equal Protection Clause as well for the

8     massive population movements, without any explanation or

9     justification, that needlessly destroys communities of

10    interest, including core populations of existing districts.  It

11    violates the Equal Protection Clause as well for its

12    disenfranchisement of so many voters in State Senate elections

13    without any rational basis.

14         The defendants have argued that the legislative

15    process is not on trial here, but as Mr. Earle explained, it is

16    because the process, like the product, defies a rational

17    explanation.  In the first days of discovery taken in this

18    case, once the privilege arguments began to fall, the drafters

19    of the boundaries testified under oath in depositions that

20    politics played no role in the design of the 99 Assembly and 33

21    Senate districts.  Those three people, Tad Ottman, Adam Foltz

22    and Joseph Handrick, testified politics played no role.  You

23    can read that in their deposition testimony that's been

24    designated, and we take them at their word when they say that.

25         Well, now that begs the question, what did play a

1  role?  There must be some explanation for legislative

2  boundaries that needlessly move massive numbers of Wisconsin

3  residents from one district to another, disenfranchised nearly

4  300,000 voters, for the first time placed Kenosha and Racine,

5  the cities in the same district, and it has weakened the

6  ability of Latinos in Milwaukee's South Side to elect a

7  representative of their choice.

8  Other than Dr. Gaddie, no one involved in the actual

9  redistricting process came into the courtroom to defend or

10  explain what they did and why, to justify the radical change in

11  the legislative districts wrought by Act 43.  Whether or not

12  they used the phrase "safe harbor," the defendants seek it

13  here.  But they seek a safe harbor from the application of the

14  Equal Protection Clause.  Under the case law, there is a

15  presumption of validity, but even if there is such presumption,

16  there must be at least a rational basis for any legislation

17  and, no less, legislation such as Act 43 that affects the

18  democratic process.  Given the secretive process that sought to

19  shield from the public and from the minority party what should

20  have been an open and public process, we do not believe Act 43

21  should receive any presumption of validity.

22  Getting directly to the constitutional violations at

23  issue here, other than the Section 2 claims, I'd first like to

24  address the lack of core district retention that was forced by

25  the population movements.  Could I have Exhibit 55 up on the

 1    screen, please, and Exhibit 2.

 2              As Dr. Mayer testified, with Assembly District 24 --

 3    could we have that highlighted -- the total population shift

 4    was 25 times larger than necessary to equalize the population.

 5    There's no explanation justifying the large population shift in

 6    that district.  In Assembly District 60 -- could we bring that

 7    up -- only ten people needed to be moved to equalize the

 8    population in that district.  As Dr. Mayer testified you didn't

 9    need to move anyone because that is essentially equal

10    population.  Nevertheless, Act 43 moved 17,594 people into the

11    district and 17,643 out.  That's more than 700 times the number

12    of people that needed to be moved to equalize population.

13    There is no explanation justifying the massive shift there.

14              Could we look at Assembly District 97, please.  In

15    Assembly District 97 they only needed to move 145 people into

16    the district to equalize the population.  Instead, they moved

17    20 people out of the district.  In other words, they moved that

18    district further away from population equality rather than

19    closer to population equality, and to do that, they moved 1,353

20    times more people than was necessary.

21              Now, the Court will not find in the record any

22    explanation for this massive population shift that actually

23    took place in this district and took this district further away

24    from population equality.  All we have are general references

25    to ripple effects statewide.

1          The same thing can be said for the Senate districts.
2    Could we have Exhibit 3, please, from Dr. Mayer's report.  In
3    Senate District 2, there were 286 people below population
4    quality.  They could have left it alone and done nothing.
5    Instead they moved 49,705 people in and 49,291 people out.
6    That's more than 346 times the number of people necessary who
7    had to be moved into that district.  There's no explanation
8    justifying that large population shift.

9          Senate District 17, they only needed to subtract 58
10   people.  Instead, they added 159, again moving that district
11   farther away from population equality, and to achieve that they
12   moved 19,666 people into the district, 19,507 out, 675 times
13   the number of people that needed to be moved.  Again, no
14   explanation justifying the massive population shift there,
15   especially when it moved the district further away from
16   population equality.

17         Could we see Senate District 21, please.  In
18   District 21, they needed to add 5,598 people.  They moved
19   72,431 in and 66,842 out.  And as your Honors will recall, I'll
20   put up on the screen in a minute, that's the Kenosha, involves
21   the Kenosha and Racine districts.  That's 25 times more people
22   than were necessary than to equalize population.

23         In Senate District 22 they needed to subtract 7,749
24   people.  To do that, they moved 66,837 people in, 74,586 out.
25   That's 18 times more people than necessary to achieve

1    population equality.

2            And what essentially happened -- and could we have

3    Exhibit 178 up on the screen, please.  What essentially

4    happened is that they radically reconfigured Senate Districts

5    21 and 22 in a way that they never had previously been

6    configured and they created these newly configured districts in

7    the process.  Now, this was a massive shift in the two

8    districts.  The only evidence that the Court will find in the

9    record, either in testimony live before the Court or in the

10    depositions when the Court reads those, the only evidence the

11    Court will find for radically reconfiguring these districts in

12    this way is some general deposition testimony about supposedly

13    reuniting the cities of Racine and Kenosha.  But as

14    Representative Barca testified, this was not a reunification,

15    because these cities never had been joined in this way in this

16    configuration, and as a lifelong resident of the city of

17    Kenosha, Representative Barca testified these two Downtown

18    areas, these two urban areas are not, in fact, a community of

19    interest.

20            Dr. Mayer similarly testified about his familiarity

21    with the city of Kenosha having testified in a local

22    redistricting case down there in October and November, and he

23    too agreed, these are not a community of interest for

24    districting purpose.  The Court will not find any evidence that

25    the people who live in the areas joined together in newly

1    configured District 22 were consulted before this was done to

2    be asked if they considered themselves to be a community of

3    interest that should be configured in this way, nor did anyone

4    involved in this process, including Dr. Gaddie, because he

5    wasn't involved in Racine and Kenosha.  No one came before you

6    to explain why this was done.

7         Now, along with these massive population shifts came

8    massive disenfranchisement.  Could we have Table 28 from the

9    pretrial report, please.  If we look at Senate District 21,

10   again, 72,431 people were moved in from Senate District 22 as

11   you can see depicted there.  These voters -- these voters were

12   moved into Senate District 21 in this massive reconfiguration.

13   They lost all their right to vote in the 2012 regular

14   elections.

15        Senate District 27, that district needed to lose

16   25,541 people.  Instead 69,372 people were moved in and 94,797

17   people were moved out.  The number of people who moved into

18   Senate District 27 from an even district numbered approximately

19   50,000.  As you can there, the number's actually 49,867.

20        Now, none of those people will be able to vote in a

21   recall election.  So even if you were to credit the idea that

22   voting in a recall election may be considered the equivalent of

23   voting in a regular election, and Dr. Mayer's testimony is that

24   it is not going to be equivalent, these 50,000 people are

25   disenfranchised needlessly.  The Court will not find any

1   justification for the massive population shift in this district

2   either.

3          Finally, I'd like to come to count 9, which is our

4   count for the recall elections, and Judge Stadtmueller

5   mentioned this yesterday.  I want to address first the

6   sovereign immunity that's been raised.  I know Judge Dow had

7   asked about it initially, I think in our pretrial conference,

8   and there's been an argument that this claim is barred by

9   Pennhurst.

10          Well, before you even get to the Pennhurst analysis,

11   there's a question that you have to go through first, an

12   analysis.  That's the analysis under Ex parte Young.  We argued

13   in our trial brief.  The Court will see it in another brief

14   that we filed today responding to the summary judgment motion

15   that the Government Accountability Board filed.

16          Now, under Ex parte Young, the question is whether

17   there is an allegation of an ongoing violation of federal law.

18   It's the first prong, and the second prong is whether there has

19   been a request for prospective relief.

20          Could I get the Elmo brought up, please.  I'd like to

21   put before your Honors a case.  This is Verizon Maryland, Inc.

22   versus Public Service Commission of Maryland.  The cite is 535

23   U.S. 635.  We do cite this in one of our briefs.  The

24   United States Supreme Court is very clear that in determining

25   whether the doctrine of Ex parte Young avoids an Eleventh

1     Amendment bar to suit, the court need only conduct a

2     straightforward inquiry into whether the complaint alleges an

3     ongoing violation of federal law and seeks relief properly

4     characterized as prospective.  That's all that needs to be

5     done.

6          The U.S. Supreme Court also makes clear that the

7     inquiry into whether the suit lies under Ex parte Young does

8     not include an analysis of the merits of the claim.  In the

9     parenthetical the Supreme Court writes an allegation, an

10    allegation of an ongoing violation of federal law is ordinarily

11    sufficient.  Here the plaintiffs' in their count nine allege an

12    ongoing violation of federal law and they seek prospective,

13    injunctive and declaratory relief to end those continuing

14    violations of federal law.

15         Could I have Exhibit 12 brought up, please.  Please

16    go to paragraph 94.  Now, this was the answer to the

17    plaintiffs' second amended complaint.  This was the one that

18    was filed around November 25th.  In answering paragraph 94, the

19    Government Accountability Board alleged in its answer that

20    elections conducted under the 2002 districts, quote, "will

21    deprive the individual plaintiffs of their civil rights under

22    color of state law in violation of 42 USC Sections 1983 and

23    1988.  We alleged it, the plaintiffs alleged it.  It's alleged

24    right there in paragraph 94, and the defendants alleged it too

25    in their answer.

1          Could we go to paragraph 100, please.  In

2     paragraph 100, the plaintiffs allege the challenged 2011

3     districts cannot serve as districts for any future elections,

4     whether regular, special or recall elections, unless and until

5     this Court rules on the constitutionality of the districts, and

6     the defendants denied that.

7          And could we see paragraph 100, please.  In

8     paragraph 100 -- I'm sorry, did I -- 101, apologize.

9     Paragraph 101 alleges that the 2002 districts are the only

10    legal, valid and proper districts for any election prior to

11    final disposition of this case, that was denied.

12         And finally, could we go to the request for relief in

13    paragraph 4.  It's actually not the affirmative defense.  It's

14    further down.  The request for relief.  It's a couple of pages

15    after.  Paragraph 4.  The defendants themselves ask that this

16    Court declare and establish the election district boundaries

17    under which the defendants should conduct the recall and

18    special elections prior to the regular, primary and general

19    2012 elections.  Now, again this was the original answer.

20         Could we go to the amended answer.  That's

21    Exhibit 12A.  Now, if your Honors remember, I did pull this up

22    yesterday.  Could we go to paragraph 94 again.  Went through

23    this yesterday and walked through this with Mr. Kennedy.

24    Paragraph 94.  As the Court can see, there's an allegation of

25    violation of civil rights under color of state law and there's

1    a denial.  The defendants lack knowledge and information

2    sufficient to form a belief as to whether any elections

3    conducted under those boundaries will deprive any of the

4    individual plaintiffs of their civil rights and deny it.  We

5    have an allegation of a violation of a federal right.  We have

6    a denial of a violation of a federal right.

7          Could we go to paragraph 100.  100, again, we have

8    the challenged 2011 districts cannot serve as districts for any

9    future elections, whether regular, special or recall elections,

10   unless and until this Court rules on the constitutionality of

11   the districts.  We have a denial.

12         And then paragraph 101, the allegation is that the

13   2002 districts are the only legal, valid and proper districts

14   for any election prior to final disposition of this case.

15   Again, this is under federal law, and there is a denial there.

16         And then finally could we look at Request No. 4 for

17   relief again.  And here we have a request for relief saying if

18   the Court determines that the GAB's compliance with Act 43,

19   Section 10(2) will violate any law with regard to the

20   allegations herein, again, including federal law, they're

21   asking the Court to declare and establish the election district

22   boundaries under which the defendants should conduct the recall

23   and special elections prior to the regular, primary and general

24   2012 elections.  We had both an allegation of a violation, a

25   continuing violation of federal law, as well as a request for

1    prospective relief.

2           Now, in addition we have a stipulation.  One or more

3    of the plaintiffs has filed a recall petition.  Could we have

4    paragraph 98 of the final pretrial report pulled up, please.

5    This is a stipulated fact and at least one plaintiff has signed

6    a State Senate recall petition.  Relying on the general

7    Government Accountability Board's determination that the 2002

8    districts will govern the recall elections, the GAB's stated

9    intention that it will conduct the recall elections under the

10   2002 districts and it's refusal to stipulate or admit that it

11   will not be violating the plaintiffs' federal constitutional

12   rights in doing so.  We've had a couple of denials of that

13   stipulation now.  The Court put it to Mr. Kelly the other day.

14   I put it to the defendants today.  They refused to stipulate

15   that that right that this plaintiff has, one or more plaintiffs

16   has, will not be violated, the constitutional rights will not

17   be violated by using the districts.  That's been denied.  They

18   won't enter into that stipulation that joins issue in this case

19   whether the use of the 2002 districts will violate the

20   plaintiff's federal constitutional rights, and in addition the

21   Baldus plaintiffs believe that the Court has continuing

22   jurisdiction over the districts that this Court drew in 2002

23   such that if their continuing use does violate the federal

24   constitution, this Court's jurisdiction over count nine is

25   proper and is appropriate.

1          Now, even if we were to overcome all of that and

2     naturally reach the application of the Pennhurst doctrine, we

3     believe that the defendants have waived their right to

4     sovereign immunity here under Pennhurst.  Now, the defendants

5     simultaneously argue that they raised sovereign immunity

6     multiple t motion as they had strategic reasons for not raising

7     it earlier.

8          Now, the defendants cannot have it both ways.  They

9     first raised sovereign immunity in their February 10, 2012

10    summary judgment motion in brief.  The Court will not find any

11    reference to it in the serial answers that the defendants filed

12    in their August 4th, 2011 motion to dismiss or in any other

13    pleading in the eight months of this litigation.

14         And I believe that they've argued that they've

15    reserved the right to assert by incorporation one of the

16    intervenor defendants' defenses.  That is not the same thing as

17    affirmatively raising waiver under the Pennhurst doctrine under

18    sovereign immunity in their affirmative defenses.  The

19    defendants' belated assertion of the sovereign immunity and

20    their conduct throughout this litigation is proxy to waiver of

21    any such right.

22         Now, waiver has been found when the state's conduct

23    during the litigation, quote, "clearly manifests acceptance of

24    the Federal Court's jurisdiction or is otherwise incompatible

25    with an assertion of an Eleventh Amendment immunity," and that

1    comes from a case Hill versus Blind Industries and Services of

2    Maryland.  The cite on that is 179 F. 3d 754, 9th Circuit 1999.

3    We have -- in our briefs we've identified the Hill case for the

4    Court.  We believe that it provides persuasive authority that

5    should be applied here.

6         Could I have the Elmo brought up, please.  In the

7    Hill case, the 9th Circuit said when an Eleventh Amendment

8    defense is first raised late in the case, the record may be

9    inadequate to permit informed appellate review, and the

10   plaintiff may have difficulty obtaining evidence necessary to

11   oppose the motion.  A party may gain an improper advantage

12   through this tactic even without waiting until the first day of

13   trial.  The ruling on a motion for summary judgment, or on

14   pretrial matters such as motions in limine, can signal the

15   probable outcome of the case.  The integrity of the judicial

16   process is undermined if a party, unhappy with the trial

17   court's rulings or anticipating defeat, can unilaterally void

18   the entire proceeding and begin anew in a different forum.  The

19   rules of procedure in federal courts are structured to prevent

20   such abuses.  Defects in personal jurisdiction, venue or

21   service of process are waived unless asserted in a party's

22   initial pleading.  The 9th Circuit continues on.

23        I think I have the wrong copy of the case.  Excuse

24   me, your Honors.  I think I have the wrong copy of the case.

25   It's okay.  We'll just make do.  Your Honors, we will -- oh,

1    there we go, okay.  I don't have it highlighted but I do have

2    it.  It's up at the top.  A waiver of the Eleventh Amendment

3    immunity has been found when the state's conduct during the

4    litigation clearly manifests acceptance of the federal court's

5    jurisdiction or is otherwise incompatible with an assertion of

6    Eleventh Amendment immunity.  And the Court goes on and the

7    Court can pull the case and the Court can read the case and I

8    certainly hope that it will.

9         The quote that I was looking for is the 9th Circuit

10   said timely disclosure provides fair warning to the plaintiff,

11   who can amend the complaint, dismiss the action, refile it in

12   state court, or request a prompt ruling on the Eleventh

13   Amendment defense before the parties and the court have

14   invested substantial resources in the case, and it continues

15   on.

16        Now, the defendants admit that their failure to raise

17   sovereign immunity until February 10th was motivated by

18   strategic reasons.  Could we have the defendants' brief in

19   response to the plaintiffs' trial brief brought up, please.

20   Could we go to page 7, please, footnote four.  If we look down

21   about the one, two, three, fourth -- the fourth line up, the

22   fourth line up from the bottom -- just go ahead and highlight

23   that line.  Clearly there are strategic reasons for not filing

24   a motion to dismiss after plaintiffs filed their second amended

25   complaint and have nothing to do with an intent to waive

1    sovereign immunity.  Strategic reasons, clearly strategic

2    reasons.

3            Now, we know they could have done it.  We know they

4    could have raised the issue when they did because the

5    intervenor defendants filed a motion for judgment on the

6    pleadings against the Baldus plaintiffs' second amended

7    complaint in early December and they included a footnote citing

8    to the Pennhurst case.  There were strategic reasons for doing

9    it and we saw those the other day, yesterday, as a matter of

10   fact, when I was examining Mr. Kennedy.

11           We saw that on November 25th there was an answer

12   filed to the Baldus plaintiffs' complaint that we saw, and this

13   was Exhibit 17.  Just a couple of days later Waukesha County

14   complaint was filed by co-counsel, the counsel for the

15   Government Accountability Board, that asserted a constitutional

16   violation allegation with respect to the recall districts, and

17   then we saw just a day or two later that the amended answer --

18   the answer was amended in this case to try to remove the

19   allegation of a constitutional violation from the answer to the

20   second amended complaint.  Clearly there was a strategic move.

21   And then the Pennhurst doctrine wasn't raised formally to this

22   Court until February 10th, a couple of months later.

23           This is a case, we believe, of collusive forum

24   shopping to attempt to maneuver into state court the resolution

25   of an issue that was pending before this Court and then for

strategic reasons a determination not to raise the Eleventh
Amendment defense until days before trial.

And then finally, I think that we've established
pretty conclusively there is a case in controversy here as to
claim nine. The -- we've seen that the Government
Accountability Board through Mr. Kennedy's testimony yesterday,
it's their clear intention to use the 2002 districts and
plaintiffs have no reason to doubt their sincerity. There's no
dispute as to what Act 43 actually says about when it applies.
But again, what the defendants will not say is that maintaining
the 2002 boundaries for the pending recalls is constitutional.
And that, therein lies the controversy.

So the question is one of federal constitutional law.
Does the effective date of Act 43, which necessitates the 2002
district boundaries remain in place until the 2012 general
election, comply with the constitutional mandate of one person,
one vote. Now, the mandate necessarily includes resolution of
this question. The Court need not enter an injunction that the
Government Accountability Board comply with Act 43 which would,
in the absence of waiver implicate Pennhurst. Instead, the
plaintiffs only request that declaratory relief that compliance
with the statutory effective date of Act 43 is constitutional.

On behalf of the Baldus plaintiffs, I thank your
Honors for your time and attention and we respectfully request
that you enter judgment in our favor.

1          JUDGE STADTMUELLER:  Thank you, Mr. Poland.

2     Mr. Kelly?

3          MR. OLSON:  May it please the Court, I'm Jim Olson

4     and I'm from Lawton & Cates and I'm one of the attorneys

5     representing the intervenor plaintiffs.  I'm going to be

6     speaking on behalf, asking the Court to find Act 44

7     unconstitutional.

8          Act 44 was really written by one man by the name of

9     Andrew Speth.  When asked what he used to determine the

10    boundaries for Act 44, Mr. Speth said zero deviation.  We then

11    asked him are you familiar with a term "core retention."  He

12    said no.  We explained the term to him and then he said, no,

13    I didn't use that.  All I used was zero retention -- or zero

14    deviation.

15         Now, zero deviation, of course, is important, one

16    man, one vote, but zero deviation by itself does not assure

17    that there will be fair and effective representation.  That

18    requires looking at the traditional principles that have

19    applied to redistricting:  Core retention, compactness, and

20    community of interest.

21         Now, would you bring up Exhibits 1014 and 1015,

22    please.  These are the maps.  On the left is 1014.  These are

23    the congressional districts in the -- before Act 44; on the

24    right are the congressional districts after Act 44.  And you

25    can see on the left that the districts were about as compact as

1    they could be, whereas on the right they changed considerably.

2           Now, to get zero deviation, anybody really can get

3    zero deviation.  It doesn't take much.  It just takes a

4    computer and you can come up with any number of plans which

5    will show zero deviation, and all you really need to do when

6    it's done is you get the districts fairly close and then you

7    rearrange things on the boundaries.

8           And if you look at these maps closely, you can see

9    that there are a few places where the maps have been rearranged

10   a little bit so you can get a few counties -- or until you get

11   a few townships brought in and you bring a few thousand people

12   in and a few thousand people out; and, in fact, that was what

13   was done in 2002.  Here we have Clark County, and if you look

14   at it closely, there's an upper tier of towns that are brought

15   in and then there's a little squiggle up there, which means

16   that another town had to be brought in to make it zero

17   deviation.

18          Now, when it came to this year, what happened was

19   that there were changes in the boundary.  District 7 was

20   underpopulated by about 21,000, and District 3 was

21   overpopulated by about 19,000.  So the numbers were relatively

22   close, and the logical thing to do would have been the

23   Clark County solution again.  Move Clark County into District 3

24   and if there were any problems, if you still didn't get quite

25   exactly, and Mr. Speth said, well, there still would be a

1    couple thousand off, it would have been very easy to have moved

2    just a few townships and you would have achieved zero

3    deviation.

4              Now, if that had been the case, each of the 3rd and

5    the 7th would have had about 99 percent core retention.  But

6    instead what was done instead of the Clark County solution was

7    a massive redrawing of the boundaries between 7 and 3.  This

8    gold area is 3 and you can see that it starts over at the

9    Mississippi River, winds around, goes below a few counties,

10   circles back up north and goes east to take in Portage County

11   over on the Wisconsin River.

12             This was a massive redistribution.  There were

13   190,000 people that were moved from the 3rd out of the 3rd and

14   171,000 were shifted in, and in the 7th it was -- all they

15   needed to shift was 21,000 and 171,989 were shifted in and

16   150,000 shifted out.  So there was a massive change in the

17   populations of who were voting in these two districts.

18             And the biggest change really came over here on the

19   east.  I'm pointing now to Portage County.  Portage County has

20   the city of Stevens Point.  Portage County has been in the 7th

21   Congressional District at least for 75 years.  We have

22   Exhibit 205, and Exhibit 205 are the bluebooks since 1935, and

23   Portage County has always been in the 7th Congressional

24   District.

25             Wood County right next to it contains the cities of

1    Wisconsin Rapids and Marshfield, and Wisconsin Rapids and

2    Marshfield have also been in the 7th Congressional District for

3    at least 75 years, and only a small portion of the lower part

4    of Wood County has ever not in the 7th Congressional District,

5    and that was because it had equalized its boundaries with what

6    was then the 6th.

7            So what has happened is this area that I'm circling

8    now and which has been over here -- you can see it's really a

9    nice square box area -- was broken up and an area which had

10   really been for 75 years in the 7th Congressional District was

11   now split up.

12           Now, let's -- could I have the next map on the board.

13   Okay.  I have a couple of highway maps, because I think these

14   really show the community of interest better than the other

15   maps.  On the left is an enlargement of Wood County, Marathon

16   County and Portage County, and as you can see it's a compact

17   box.  Now, starting up around here in Rhinelander, we have the

18   Wisconsin River, and the Wisconsin River flows down through the

19   7th Congressional District, it flows through Wausau, through

20   Stevens Point and through Wisconsin Rapids.

21           And this has had a tremendous impact on the area

22   because there are paper mills, there are hydro dams, there's

23   recreational area up here, there's Lake Dubay, which is in

24   the -- on the Wisconsin River, and Lake Dubay controls the

25   water levels.  And with all these different aspects are things

1    that are important to a representative, because there are water

2    quality problems, there are air quality issues, there's

3    recreational issues.  Some of these are controversial and the

4    representative has to know about all of these issues.

5         There is an airport around this area, the Central

6    Wisconsin Airport, which serves this community of interest.

7    You can see the highway.  I don't know whether highways follow

8    communities or communities follow highways, but regardless,

9    when you have a highway -- this is Interstate 39 that goes

10   right through -- that really helps define the community of

11   interest.  Yet Portage County and a good share of Wood County

12   were wrenched out of this area and placed over in the 3rd

13   Congressional District.

14        Now I want to look at this little larger highway map,

15   and particularly let's go up here.  And this is

16   St. Croix County up in this area, and as you can see, St. Croix

17   County is very close to the Twin Cities, so you have a whole

18   different dynamic with St. Croix County.  Furthermore, St.

19   Croix County has grown 33 percent in the last ten years.  So

20   it's a large county as far as growth is concerned and it has a

21   number of issues which obviously relate to the Twin Cities

22   area.  Yet that, that area, St. Croix County, which has never

23   been in the 7th Congressional District, has been taken out of

24   the 7th congressional district and moved over into the 3rd

25   Congressional District.

1          So you have St. Croix County, which is part of the

2     Mississippi River Valley watershed, which is no longer voting

3     in that area and moved into the Wisconsin River Valley

4     watershed.  And likewise, you have Stevens Point where the

5     Wisconsin River flows right through and Wisconsin Rapids, they

6     have been moved into a district which is primarily the

7     Mississippi River Valley area.

8          In addition, you can look at the roads.  You have

9     Interstate 94 and Interstate 90 which flow through the

10    3rd District, connecting the various communities of interest in

11    the 3rd District, where as you have Highway 39 connecting the

12    areas in the central Wisconsin area.

13         So as far as -- then can we go back to the other maps

14    just for a second?  As far as the 8th Congressional District,

15    which is up here, and that only had a 4,000 person under

16    population.  All that was needed to make that area a zero

17    deviation was to add 4,000 people from the adjoining district;

18    and as you can see in this map, there was quite a few changes

19    and they did move it south somewhat.  So what this shows is

20    that really for three-fourths of the state, very little,

21    in fact, almost nothing had to be done in order to make the

22    areas back to equal population.

23         Now, what's important in this case is effective

24    representation and how do these concepts relate to effective

25    representation.  And in our materials there is an affidavit

1   from Congressman Dave Obey, who represented the

2   7th Congressional District for 41 years, and that attests to

3   the fact that he was an effective representative being

4   reelected that many times.  Furthermore, he held the leadership

5   position in Congress, and furthermore, he was deeply involved

6   in the redistricting process all the time he was in Congress,

7   and he has indicated how the concepts of core retention and

8   various things like community of interest and compactness are

9   important.

10       The poor representative now up in the

11  7th Congressional District has to travel all the way from

12  St. Croix County all the way over to Florence County, about a

13  five-hour drive.  It adds a good hour to the commute time.  The

14  poor people in Florence County are not going to get to see

15  their representative that much, and there are reasons that a

16  representative should actually go to the areas.  So the

17  compactness of the area has been greatly increased, and that

18  affects effective representative.

19       Also the media markets.  There's a central Wisconsin

20  media market around Wausau and that's important, but now you

21  have St. Croix County in there and that's going to bring in the

22  very expensive Twin Cities media market, which is expensive

23  both for campaigning and also for getting the word out to

24  people.

25       And so we agree that zero deviation is important but

1    zero deviation could have been achieved very easily.  There's

2    never been any explanation as to why they had to move all these

3    people.  It was not consistent with compactness, it was not

4    consistent with core retention, and it certainly wasn't

5    consistent with community of interest.

6         And so, your Honors, on behalf of the plaintiff

7    intervenors, we would like to ask that Act 44 be thrown out

8    because it does not comply with what is necessary for effective

9    representation.  Thank you.

10        JUDGE STADTMUELLER:  Thank you, Mr. Olson.

11   Mr. Shriner?

12        MR. SHRINER:  May it please the Court, I started out

13   with a question with respect to the challenge to Act 44, which

14   is being maintained by the intervenor plaintiffs, the

15   plaintiffs having dismissed their Act 44 claims last night,

16   asking what's the claim.  It started out being a political

17   gerrymandering claim.  We moved back in early December to

18   dismiss that claim, moved for judgment on the pleadings as to

19   the plaintiffs' claim, moved to dismiss the Democratic members'

20   claims as I'll refer to them.  We've joined issue on that.  We

21   suggested that the familiar case law, Vieth versus Jubelirer

22   and the LULAC case from Texas, U.S. Supreme Court cases from

23   the last decade, most recently applied in the two Illinois

24   District Court decisions upholding both the state and the

25   congressional redistricting laws in Illinois.  So we don't need

1     to go far to figure out how they apply to modern life.

2           They showed that plaintiffs had a political

3     gerrymandering claim, had a burden to show that there was a

4     manageable judicial standard by which to judge whether what

5     happened in the redistricting was excessively political. The

6     Supreme Court has never found a standard that meets a

7     judicially manageable standard.

8           I always think of this as being like the jump that

9     took us into -- took us from the political thicket that nobody

10     could go into to Baker versus Carr. The secret to having a

11     constitutional claim there was that there was a judicially

12     manageable standard. When the Court finally decided it would

13     go into that thicket, it did so because you could take a number

14     and divide it by eight in our case and say that's the number.

15     It's a judicially manageable standard. That's what the

16     Supreme Court has said you have to have for a political

17     gerrymandering claim is a judicially manageable standard, and

18     the Court has said that the plaintiffs have the burden of

19     pleading it, proving it. Here they didn't plead it. We called

20     them on that at the briefing. We got a suggestion in the

21     response brief that a standard could be something having to do

22     with core retention and basically justifying every deviation

23     from a least change. We responded to that in our reply

24     briefs -- the briefs are before you, I'm sure you can look at

25     them -- why we think that doesn't meet the test.

1          That's the last we've heard about that claim.  The

2    plaintiffs have put on nothing.  They've said in their briefing

3    that they would on proof to support the judicially manageable

4    standard that they propose, which we didn't think was one.  We

5    never heard about it again from the plaintiffs.

6          The defendants -- or the Democratic members have

7    expressly repudiated that.  They filed a brief for this Court

8    the other day, document number 171, their response to the GAB

9    defendant's motion for summary judgment, in which they say on

10   page 5 that the intervenor plaintiffs do not rely on political

11   gerrymandering as a basis for rejection of Act 44.  Rather,

12   Act 44 is unconstitutional they say under the Equal Protection

13   Clause since it deprives voters of the 3rd, 7th and 8th

14   Districts of fair and effective representation.  That's what

15   they say.  There certainly has been no proof of anything in

16   this respect.  So what's left?  What have we got here with

17   respect to the challenge to an act of the Wisconsin

18   legislature?  It seems to me that what we need is a

19   constitutional basis for challenging.

20         I noticed that my friend in his interesting

21   presentation of the delights of the Wisconsin River Valley and

22   what's the matter with this map never once mentioned the

23   U.S. Constitution or a provision of the U.S. Constitution that

24   made it necessary for the Court to -- for the legislature to

25   take into consideration compactness or community of interest or

1   core retention.  They're not in the Constitution.  There has

2   never been a case saying that the Constitution imposes a burden

3   on legislatures to use those methods.

4          Rather, there's been a recognition in all of the

5   cases, in the U.S. Supreme Court cases, that redistricting is a

6   political act engaged in by politicians, that there is nothing

7   wrong with a redistricting that is politically driven.  There

8   is nothing wrong with it at all and I feel no shame about

9   standing before you and telling you that this was a

10  redistricting that was done by politicians.

11         Now, it turns out that the politicians who actually

12  made the decisions on this -- sure, the legislature voted for

13  it and passed it -- the decisions were actually made by the

14  incumbent congressmen, as it has -- as has happened, as

15  Mr. Olson's friend, former Congressman Obey, tells us in his

16  affidavit, which is in the record, it has always happened that

17  way in Wisconsin for as long as he can remember.  The

18  congressmen get together and they decide what should be done

19  with the map of the congressional districts and the legislature

20  passes it.  That's the evidence.

21         There's a very clear set of evidence here about how

22  this map was drawn.  There isn't any secret about it all.  It's

23  in the stipulation we've submitted.  The stipulation that we've

24  submitted tells you where you can find it, starting at

25  paragraph 7, which tells you the -- something on the order of

1    40 paragraphs of stipulated facts, then going through the trial

2    exhibits that you can look at, and then submitting

3    Congressman Obey's affidavit, but also the testimony offered in

4    lieu of testimony by Mr. Andy Speth, chief of staff to

5    Congressman Ryan who actually sat down at the computer and

6    carried out the directions to draw the map of the congressional

7    districts in Wisconsin, and he tells you exactly how it was

8    done.  He told the plaintiffs this in his deposition a long

9    time ago exactly how this was done.

10          And what's the story he tells?  He says, first of

11   all, what the process was was that this is how it was always

12   done.  The congressmen talk together, and he tells about the

13   conversations that Congressman Ryan had with Congresswoman

14   Moore, what did she want; with Congresswoman Baldwin, what did

15   she want; with Congressman Kind, what did he want; with the

16   other Republican congressmen.

17          There's always been a tradition, which Mr. Obey talks

18   about in his affidavit.  In the past it's been Congressman Obey

19   for the Democrats and Congressman Sensenbrenner for the

20   Republicans.  This time around it was Congressman Kind for the

21   Democrats and Congressman Ryan for the Republicans, and they

22   decided how the redistricting ought to be done and the

23   legislature agreed.  There is nothing wrong with that.  That is

24   perfectly legitimate.

25          The U.S. Supreme Court said that if this is seen as

1  a -- as a decision that favors the incumbent congressmen, that

2  that's perfectly legitimate, that's perfectly rational of the

3  legislature.  Mr. Olson mentioned the great seniority that

4  Congressman Obey built up that allowed him to become chairman

5  of the Appropriations Committee, which a rational legislator in

6  Wisconsin might well decide works to the benefit of the state

7  of Wisconsin.  Congressman Sensenbrenner's the chairman of the

8  judiciary.  Congressman Ryan's chairman of the budget.  There's

9  a long history.  Congressman Steiger was a committee chairman

10  before that, Congressman Laird, Congressman Aspen.  And that's

11  something that is perfectly rational for the legislature to

12  decide to do.

13       Mr. Speth explained how he went about doing it, and

14  you'll find that in this stipulation.  He told us how he

15  started.  He said, as Professor Mayer said would be a sensible

16  way to strawing drawing any map in Wisconsin, he started in

17  Milwaukee.  He started in Milwaukee because, first of all, it's

18  the county which has the largest minority population, so one

19  has Voting Rights Act issues in Milwaukee County one has to

20  take care.

21       But for another reason he had to start in the

22  Milwaukee-Madison corridor because Milwaukee County or the city

23  of Milwaukee, largely Milwaukee County, the 4th Congressional

24  District represented by Congresswoman Moore had the biggest

25  need to gain population.  It's the city district, the urban

district and it needed to gain the most substantial number.
Congressman Baldwin, who represents Madison, had the most to
give up.

Now here's the problem. Those two districts aren't
next to each other. The 2nd District and the 4th District
aren't next to each other. The 5th is in between. You've got
to take this whole idea of least change. You know, you take
Clark County and drop it into the 7th instead of being in the
3rd and that takes care of the problem. That isn't the way the
world works, and Mr. Speth explains how he did, what he did and
why he did it.

Generally speaking, the three congressional districts
across the bottom of the state, the first in Kenosha, the
second in Janesville, the third over in the southwestern corner
of the state, needed to lose population and the other five
needed to gain. Well, the 8th District isn't next to any of
those. The 8th District up in the Green Bay area isn't next to
any of those. So you've got to move things through, and when
that happens, people's interests are engaged and each of them
chimed in -- and again, this is in the record, you can look at
it, you can see it -- what people wanted.

Congressman -- let me start with the three Democrats,
the intervenor plaintiffs who Mr. Olson represents. Did they
want something? Yes. Did they get what they wanted? Yes.
Congresswoman Moore, who had to gain, didn't want to gain from

1    the southern suburbs of Milwaukee County.  She has the city of

2    Milwaukee.  She wanted the North Shore suburbs which vote

3    Democrat and contribute heavily to Democratic candidates.

4          Congresswoman Baldwin said she didn't want to have

5    such a spread-out district.  She wanted to have it more

6    compact.  Particularly she wanted to get rid of Jefferson

7    County, which was full of Republicans, and she got her way.

8    Congressman Kind wanted to have Fort McCoy in his district, and

9    so he got his way.  Other congressmen had other concerns.

10         But as these things moved around, there is an

11   explanation, Mr. Speth gave it, for why the moves were made,

12   not why every line was drawn.  Nobody looks at a legislative

13   map and subjects it to that level of scrutiny.  The

14   Constitution doesn't require it.  It's inconsistent with the

15   function of a court.

16         But what happened here is these were moved around for

17   reasons.  They were reasons that were political, they were

18   reasons that reflected communities of interest, they were

19   reasons that reflected compactness, not in some technical sense

20   of least circle or whatever you call it, but in the sense that,

21   you know, the 4th District is very compact, the 5th District is

22   compact, the 1st District is compact.  When you get up North,

23   you can't be compact.  There are a lot more people than

24   trees -- or trees than people up there.  You cannot make the

25   northwest corner of Wisconsin a compact district.  You cannot

1    make the 8th District compact.  You cannot make the

2    3rd District compact.  It's just way spread out.

3         And where you draw the lines, is it affected by

4    politics?  Sure.  Did Congressman Duffy, recently elected to

5    replace the very effective Congressman Obey, Congressman Duffy,

6    a Republican, replacing Congressman Obey after 41 years, did he

7    want to have a more Republican district?  Yes.  He had a

8    majority Democratic district and he wanted to have a more

9    Republican district.  He wanted his district to come down some.

10   Is Congressman Kind weeping crocodile tears because he had to

11   take a bunch of Democrats?

12        Well, we've got some indication of that, and again,

13   it's in the record, because one of the things that went on is

14   that the Democrats were asked and made to give what map they

15   would have wanted.  You'll find this in Exhibit 43B.  It's in

16   the record.  It's a nice colored map, and if you follow the

17   black lines on there, you'll see that the districts that the

18   Democratic congressmen wanted.

19        Well, what did they want?  My Lord, don't ever break

20   up Wood, Portage and Marathon Counties you think?  Well, yeah,

21   put Wood County, they suggested, down in the 3rd District,

22   which is what happened, and we're now told that it breaks up

23   the community of interest for the Wisconsin River.

24        St. Croix County, with all the Republicans in the

25   Twin Cities suburbs, ends up in Duffy's county.  Well, is --

1    Duffy's district, the 7th District.  Does that make Duffy

2    happy?  Yes.  Does that make Kind happy?  Yes.  It's in the

3    record.  It's in the record where staff members are going back

4    and forth, we're happy about this.  You know, we got

5    Portage County and they had to take St. Croix.  So that's how

6    it was done.  There's nothing wrong with it.  It's not

7    unconstitutional.  The very notion that it's unconstitutional

8    in our system is ridiculous.

9          So -- and again, I suggest that you read our briefs.

10   I don't want to repeat all the arguments we've made.  All the

11   arguments that are made here really are not core retention, why

12   did you move more than you had to move, and I've explained part

13   of the reason.  It's just simply the process of moving things

14   around.

15         But another part of the reason is there isn't any

16   magic about 20 -- or 10 years ago's congressional districts.

17   The legislature in 2002 decided that the congressional map of

18   Wisconsin ought to be drawn a certain way.  The legislature in

19   2011 came to a different conclusion.  So what?  That's not a

20   violation of the Constitution.  It's not even bad policy.

21         So what if some of Congressman Obey's political base

22   ends up in the 3rd District and some in the 7th District?  It

23   doesn't make any difference.  I used to live in the 9th

24   District and then we ended up with the 8th and ten years ago I

25   moved into the 5th District.  I liked it fine and now I'm going

1    to be in the 4th District.  You know, I wake up in the morning
2    and I'm just as happy, the life goes on.  It really doesn't
3    have anything to do with.  It doesn't affect any of the rights
4    of the people.

5          It isn't -- you know, there's this trope that
6    everybody uses, including the social scientists, about moving
7    people, moving too many people.  People don't move.  This isn't
8    about somebody having to move out of the house or have a line
9    drawn down his street so that the congressional district is on
10   one side or the other.  You know, the Wisconsin River Valley
11   might be better off with two congresspeople looking after its
12   interests.  That's something that is perfectly rational for a
13   legislature to conclude.

14         So, you know, I get back to the point at the end that
15   in our system the legislatures make the laws.  They do it with
16   politics.  That's how legislatures work.  And, you know,
17   redistricting is about as political as anything could be, as
18   the Supreme Court has often recognized.  Courts intervene only
19   when it's necessary to uphold a superior source of law, the
20   U.S. Constitution in this case.  You're not enforcing Wisconsin
21   law.  You can't.

22         And I'm the one who raised tempers.  I think my
23   friend was a little confused on what the challenge was to his
24   claim, although I'll let Mr. Kelly talk about that.  I think
25   the challenge really has been loss of a case or controversy.

1    The Pennhurst argument obviously is, that a federal court

2    cannot order the officers of the state to carry out state law.

3              But these ideas of core retention and compactness and

4    community of interest, they're not even in Wisconsin law.

5    They're not in our Constitution.  They don't apply.  Whatever

6    is in Article 4, Section 3 with respect to the legislature

7    doesn't apply to Congress.  The power of the legislature to

8    draw the maps comes from the fact that the U.S. Constitution in

9    Article 1 gives it to the legislatures, and the Wisconsin

10   Constitution in Article 4, Section 1 says that's the law-making

11   body in our state.  That's where it comes from.  Those are the

12   rules.  And there is no violation of the Constitution to

13   challenge to Act 44.  It is really lacking in merit and ought

14   to be dismissed.  Thank you, your Honor.

15             JUDGE STADTMUELLER:  Thank you, Mr. Shriner.

16   Mr. Kelly?

17             MR. KELLY:  May it please the Court, before I begin

18   my closing remarks, I do believe I need to clear up one matter

19   in particular.  Mr. Poland made a suggestion that somehow the

20   Reinhart firm was involved with the filing of the state court's

21   complaint with respect to the recall issues, and just to set

22   the record straight, the Reinhart firm had absolutely nothing

23   to do with that.  My understanding is that was handled by an

24   entirely separate law firm, then handed off in the middle of

25   the process, but at no point at all did Reinhart have anything

1    to do with that.

2            As far as closing remarks, it seems the plaintiffs

3    have chosen to put on two very distinct cases.  One case

4    addresses the legal question; that is, has there been a

5    violation of the Voting Rights Act.  The second case addresses

6    nothing but political questions.  They ask whether the

7    legislature could have adopted a map that would have reflected

8    different prudential considerations.  Specifically they say

9    they would have preferred to see a map that would assign fewer

10   people to new districts that would have less delayed voting

11   consequences and that there would be somehow some political

12   reason for reducing population deviation amongst the districts.

13   But each one of those is a political issue addressed to the

14   legislature and not to a court.

15           With respect to -- I will note at this point with

16   respect to Act 44 we join Mr. Shriner's arguments and comments.

17           So we start with the legal case, and we find that we

18   are not beginning this analysis in a vacuum.  There's a history

19   to this and in particular we look at the last iteration of the

20   map that was drawn for the state of Wisconsin, it was drawn by

21   this Court in 2002.  And we have a significant amount of

22   guidance from the Court in what constitutes a constitutionally

23   acceptable map, specifically with respect to voting rights

24   issues for the minority communities.

25           Now, Mr. Earle says he's incensed by the map that the

1    legislature adopted last year, incensed.  I wonder, is he also

2    incensed by what this Court did ten years ago.  Because what

3    the legislature adopted with respect to Assembly District 8,

4    which is the focus of his concern, is very close to identical

5    to what this Court did with respect to the Latino voting age

6    population in that district.  Now, it's oriented a little bit

7    differently, but let's start with a couple of indisputable

8    facts.

9           The first is that in 2002 this Court drew a map that

10   had a Latino voting age population at 58 percent.  Now, there

11   is no -- there's no disagreement that when this Court drew that

12   map, it was acting constitutionally.  The court was not

13   violating the Voting Rights Act in creating a district with a

14   Hispanic voting age population of 58.34 percent.

15          So now we look at what they did, what happened as a

16   consequence of that map that the Court drew.  Well, the people

17   in that district immediately elected a Hispanic candidate and

18   they've continued doing so ever since and have never stopped.

19   Now -- well, in fact, Assembly District 8 has been represented

20   by no one but a Latino for the past 14 years.

21          Now, the legislature, looking at that, actually went

22   a little bit better in what was able to be accomplished in

23   2002, and the legislature in 2011 drew a map, including

24   Assembly District 8, that had the Latino voting age population

25   of 60.52 percent.  Now, I understand that's not citizen voting

1    age population, but for purposes of comparison we looked at

2    what the Court did in 2002, and the Court's district was

3    measured in terms of Latino voting age population, so we

4    compare apples and apples.

5         So the legislature actually did two points better in

6    drawing Assembly District 8 than the Court was able to do in

7    2002.  So there's no reason to believe that the new district

8    with higher Hispanic voting age population than it had in 2002

9    will not do what it did in 2002, which is elect another

10   Hispanic representative.

11        Now, the plaintiffs say that the Hispanics need a

12   super majority of citizen voting age population to have a

13   reasonable chance to win.  To agree with the plaintiffs on this

14   point would require a conclusion that this Court acted

15   unconstitutionally in 2002.  It would be to conclude that this

16   Court failed to create a Latino majority-minority district.  So

17   this Court did not fail in doing that in 2002, and we know it

18   did not fail for the same reason that we know that a Hispanic

19   will continue to represent this district into the future if we

20   look at what happens.

21        Now, the reason, the reason this Court did not fail,

22   without even having to look at citizen voting age population

23   when it created the district in 2002, the secret to the success

24   lies in this fact.  We are looking at a partisan race.  The

25   most important factor in determining whether the people who

live in Assembly District 8 will elect a Hispanic candidate is
who will win the Democrat primary. We know there's been
testimony, there's a high degree of correlation between --
between the Latino community and voting for a Democratic
candidate, and we know this is not a contested matter. Both
Dr. Mayer and Dr. Grofman agree that in Assembly District 8 the
primary's everything. If you win the primary, absent some
shocking occurrence, you'll win the general election as well.
So that's where we focus, that's where the focus of our
inquiry, the focus of our efforts need to be.

Now, we know that's true because Assembly District 8
has shown itself to be a reliably Democratic district.
In fact, even in new Assembly District 8, the general
proportion of the Republicans -- of Democrats to Republicans is
71 to 29. That is the very definition of a safe seat.

Now, based on this, Dr. Grofman looked at the
demographics of this district as it's been composed. He's
looked at its partisan makeup, he's looked at its history, and
he said this. Hispanic candidates can and will win Democrat
primaries in Assembly District 8, and having done so, will go
on to win the general election, because winning the primary
essentially guarantees winning the general.

So the question before us, is it possible for a
Hispanic to win the Democratic primary in Assembly District 8,
and the answer to that is yes, and here's why. First, the

1   non-minority population that's been moved into Assembly

2   District 8, and that's the population that Mr. Earle is so

3   concerned about, are largely Republicans. They're not going to

4   be voting in the Democratic primary. Largely Republican. So

5   they don't constitute a significant danger that the Democratic

6   candidates will -- that the Latino community will not be able

7   to nominate a Hispanic candidate.

8        Second, we know that other minorities are willing to

9   support Hispanic candidates and Assembly District 8 does have a

10  small but distinct population of other minorities. And we know

11  this because we can see in Exhibit 1185, we can see that

12  Judge Colon receives a significant amount of support in

13  overwhelmingly African-American Senate Districts 4 and 6.

14  There is this concept of minority voters banding together to

15  vote for a minority of choice of the larger minority, and it's

16  perfectly permissible when analyzing the Voting Rights Act to

17  look at what actually happens.

18       Now, all the numbers that we look at and all the

19  analyses, the racial polarization and all of that, they give us

20  clues, they give us insights, they tell us something about what

21  we're looking at. But what we really need to do is after

22  having looked at those flags and those indicators, we have to

23  look at what actually happens.

24       So as the Supreme Court has noted in Johnson versus

25  DeGrandy, it emphasized that majority-minority districts are

1    not always necessary to ensure that minority groups are able to

2    elect the candidates of their choice.  They said this.  If the

3    lesson of Gingles is that society's racial and ethnic cleavages

4    sometimes necessitate majority-minority districts to ensure

5    equal political and electoral opportunity, that should not

6    obscure the fact that there are communities in which minority

7    citizens are able to form coalitions with voters from other

8    racial and ethnic groups, having no need to be a majority

9    within a single district in order to elect a candidate of their

10   choice.  And that's what we see here.  We see that there is

11   this coalition building.

12           So when we look at the citizen voting age population

13   in Assembly District 8, it's not sufficient that we look only

14   at the Latino citizen voting age population.  We need to look

15   also at those other minority groups who are likely to reliably

16   vote for a Hispanic candidate, and what we find is that there

17   is sufficient minority population there that in the Democratic

18   primary the Hispanic candidate has, at the very least, an equal

19   opportunity to win.

20           Now, going into that aspect a little bit further, as

21   we all know, Gingles, Thornburg versus Gingles has three prongs

22   that need to be there.  First, the large compact community,

23   sufficient to form at least one district, and certainly that's

24   true here.

25           So then we move on to Gingles prong two where we're

1    looking at political cohesion, and what we find in

2    Assembly District 8 is perhaps not the easiest picture to look

3    at.  It is a little complex but what we see is this.

4    Distilling all of the testimony that we've heard and all of the

5    documents that have been submitted to the Court, what we see is

6    this.  When Hispanics vote together, they win.  When they

7    don't, they lose.  Sometimes they vote together; sometimes they

8    don't.

9           So here's how we need to look at cohesion.  We look

10   first at what are called endogenous races.  That is, testing

11   the races that are actually at issue.  In this case it would be

12   Assembly District 8, races for that -- for that seat.  Now, we

13   can't really do that here but for a very interesting reason.

14   We can't do it because more often than not there's no contest,

15   and the reason for that is because the Hispanic candidate is so

16   dominant in this district that no one even bothers to challenge

17   him.  That's been the history in Assembly District 8.

18          So having found no illustrative evidence there other

19   than the fact that Hispanics consistently win in

20   Assembly District 8, we go to the second layer of evidence, and

21   what we look at is exogenous partisan races in which there's an

22   identifiable Hispanic candidate, and we do that to find out if

23   there is any, if there's any evidence of cohesive voting.  And

24   what we find is that when there is that partisan flag, right,

25   then the Hispanics are more likely to vote together than when

1    there's not a partisan flag.  When there's non-partisan races,

2    as Dr. Mayer's political cohesion test on Exhibit 1025 -- but

3    you don't need to bring it up, it's hard to look at -- in that

4    exhibit Dr. Mayer demonstrated that in nine, nine partisan

5    races it's basically a tossup whether the Hispanic community is

6    acting in a politically cohesive way.

7           And Dr. Grofman went through a considerable amount of

8    testimony, considerable amount of analysis and discussion in

9    looking at that very question.  He clearly made a distinction

10   between partisan races and non-partisan races, and the reason

11   he did that is because when we look at partisan races, we are

12   adding additional influence into the analysis, and it's the

13   party tag, and we know from the undisputed testimony that the

14   Latino community is much more likely to vote for a Democratic

15   candidate than they are for a Republican candidate.  So when we

16   focus on partisan races, we are looking not necessarily at

17   whether the Latino voters are casting their vote for someone

18   because of their ethnicity as much as they are casting their

19   vote because of their party affiliation.

20          So then we go to the next level of evidence, and

21   those are the exogenous non-partisan races, and that's where we

22   find there's no clear evidence of cohesion.  So when we look at

23   the races that Dr. Mayer analyzes -- and these are the races

24   that he chose to look at.  He picked these out for the purposes

25   of analyzing racial cohesion.  And what we find is that in that

1    confidence interval, on five out of the seven of those races,

2    the confidence interval extends below 50 percent.  Now, it also

3    extends slightly above 50 percent, but what that tells us is

4    it's a flip of the coin.  You've got no more than half of the

5    Hispanic community supporting five of the seven people in the

6    races that Dr. Mayer chose.  Half.  That's no evidence of

7    cohesive voting but that's what we -- that's the best evidence

8    that we have because it's non-partisan.  So the party tag is

9    not an indicator, it's not an influence under voting behavior.

10   We're looking strictly at are they preferring people because of

11   their ethnicity or not, and it's a flip of the coin.

12           Now, there are two races that he picked in which the

13   confidence interval did not go below 50 percent, but we could

14   say, well, it does look like they voted together there, but

15   that goes back to what we were saying earlier about when

16   Hispanics vote together, they win, because those two races were

17   Judge Colon and he won both of those races.

18           And that's significant because under the third prong

19   of Gingles what we have to do is figure out if the non-minority

20   population votes in a way, in a block, in a way that is

21   sufficient to prevent the minority candidate from winning.  And

22   what we find is when the Hispanic vote together, they can't

23   stop them from winning and they have won and won consistently.

24           So there's not a -- on Exhibit 1025 there's not a

25   single race there that tells us that there is a violation of

the Voting Rights Act. We have to strike them out because they don't show cohesion or we have to strike them out because there's no evidence that the non-minority community was able to prevent the minority candidate from winning because the minority candidate did win.

So let's look at what the real aspect of this question is. And there is a -- there's currently a representative of Assembly District 8. Her name is JoCasta Zamarripa. She is a Hispanic. The question before the Court is will she win, will she have an equal opportunity to win in 2012. That's the real question here, and we can talk about numbers all we want and that gives us some good information, good and useful information as Dr. Mayer gave us in Exhibit 1025.

But really, when we get to real life, when we step out of this building and we see what happens in November of this year, we want to know will JoCasta Zamarripa have an equal opportunity to win. Well, and it's not just win the general, right? We've got to step back and we say is she going to win the primary.

Well, we don't know anything about that from Dr. Mayer. We know nothing about that. Dr. Mayer conceded that none of the political or none of the racial polarization studies that he did say anything about who's going to win the primary in Assembly District 8. Nothing. There's not a scrap

1  of evidence presented to this Court by the plaintiffs to tell

2  you what's going to happen or what's likely to happen in the

3  primary for Assembly District 8, and Dr. Mayer conceded that

4  the primary's the thing.  That's the race we need to be

5  concerned about.  So there's no evidence for the plaintiffs to

6  show that JoCasta Zamarripa is not going to be able to win the

7  Democratic primary.

8      Now, can we bring up Exhibit 1186, please.  Now, the

9  plaintiffs are concerned about the new non-Hispanics that have

10  been assigned to Assembly District 8.  They say these are high

11  turnout white voters and they're going to frustrate the Latino

12  community's ability to elect a candidate of their choice.  But

13  when we look at -- when we look at a race that analyzes that,

14  we find an entirely different story.

15      So what we see in this Circuit Court race between

16  Pedro Colon and Christopher Lipscomb is this.  The top part of

17  the chart are those -- are those wards that were in the old

18  Assembly District 8 and are in the -- still in the new

19  Assembly District 8.  And we see that Judge Colon won -- this

20  is historical fact -- Judge Colon won with 69.7 percent of the

21  vote.  So clearly the wards that were already in

22  Assembly District 8 has no problems.

23      So the question is what happens with the wards that

24  are being introduced, the ones that the plaintiffs are so

25  concerned about are going to destroy their ability to elect a

1    Hispanic candidate.  Well, let's look at the bottom of that

2    chart.  What we see is in those new wards that have been

3    brought in, it's 51.8 percent, and might I remind you, of

4    course this is a non-partisan race, non-partisan.  So we're not

5    even looking at a Democratic primary.  We're looking at a

6    general election, 51.8 percent.  No partisan tag to give any

7    guidance, no partisan tag to influence voting behavior, and yet

8    over half voted for Judge Colon.

9              Now, that percentage I think is a useful comparison

10   to the percentages that Dr. Mayer was getting in Exhibit 1025.

11   I mean, he had -- he had estimates and guesses and ranges of

12   confidence, and the range of confidence fell below 50 percent

13   and he said, oh, that's good enough.  That's good enough for us

14   to tell that that -- that the Hispanic community is acting in a

15   cohesive way.

16             Well, if that's true, then it's also true that the

17   members that live in these new wards that have been added to

18   Assembly District 8, they're acting in a cohesive way in favor

19   of a Hispanic candidate.  That number's higher than the ones

20   that Dr. Mayer came up with five -- with respect to five of the

21   seven races that he put in his racial polarization analysis.

22   This tells us that the additions to Assembly District 8 will

23   not be a problem for the Hispanic candidates.

24             Now, we're still operating at one level of

25   abstraction, I think, from the reality on the ground.  There is

1    one person who is more directly affected by this map with

2    respect to Assembly District 8 than anyone else in the state,

3    one person, and that person is JoCasta Zamarripa.  She's the

4    incumbent.  She's the one that's going to be running for

5    reelection in 2012.  She's the one that if there's a problem

6    with this district is going to be the most concerned.  She's

7    the one that has to deal with this problematic new part of her

8    district, if it is, indeed, problematic.

9         But she didn't say it's problematic.  In fact, let's

10   see what she did say.  It's Exhibit 19.  And we'll go to

11   page 33, please -- 133, 133, please.  Thank you.  All right.

12   And you saw this today but it's worth -- it's worth going over

13   again.  The 8th and 9th, the 8th is my district.  It is a

14   Latino super majority district.  The 9th was trending that way.

15   It has already been a Latino-influenced district and this does

16   give us a larger percentage.  But the truth is that you know

17   that Latinos have grown by leaps and bounds here.  And we were

18   trending that way anyway.  It's almost inevitable.  We just

19   grew it.  It's not that you created another one.  There's not

20   three now.  She was content with what the legislature did in

21   this case.

22        Now, if she was really worried about her chances,

23   don't you think that she would be beating down the door of the

24   Voces plaintiffs or the Baldus plaintiffs and saying, "Let me

25   come in.  Let me come in and tell this Court how problematic

this is going to be for me.  Let me come in and explain to them what kind of problems I'm going to have running for reelection. Let me come in and tell you what this is doing to my community that I represent."  Well, JoCasta Zamarripa wasn't here.  There are circumstances in which silence says an awful lot.  After we see what Miss Zamarripa said in the public hearing on this legislation, that silence says she's not concerned about what the -- what Act 43 does with respect to Assembly District 8.

So what does this evidence say about how we should look at Assembly District 8?  Well, we first need to look to the past.  Hispanics have not lost that seat for 14 years.  And we need to look to the present.  The incumbent is grateful for the district that Act 43 created, her district, Assembly District 8.  And we need to look to the future.  It's only going to get better.

The Hispanic community continues to grow by leaps and bounds.  Not only is Assembly District 8 going to stay a Latino majority-minority district, but 9 is going to become that way as well, something that would not happen if the plaintiffs had their way.  They would reduce Assembly District 9 down to a nub.  It would have no realistic opportunity of growing into a majority-minority district over the next ten years.  The real person who would have a complaint says she's fine with this. She's grateful for it and she's not here today to tell you otherwise.

1        All right.  So what about the political case?  The

2   plaintiffs complain there's no testimony to support every

3   decision on where to put every district line in Act 43.  Well,

4   they're right.  There's not, nor could there be.  This is an

5   iterative process that took months to do and required a staff

6   of people to accomplish.  This is -- this is not a situation

7   where you can document every single decision on every district

8   line on every single iteration until you get to the final

9   process -- to the final product.  It's not realistic.

10        And besides, ignore the deposition testimony that's

11   been designated in this case.  Joe Handrick has described the

12   concepts that directed how they made the decisions on where to

13   draw the lines.  Tad Ottman did too and Adam Foltz had some

14   input on that as well, and that's in the record.  These are

15   the -- this is the best that you can do in describing why

16   specific decisions were made.  One decision, as Dr. Mayer said,

17   one decision branches out into many others and it has a ripple

18   and a cumulative effect.  Well, that's very true, it does, and

19   that's what happened in this process, and to expect individual

20   legislators to come into this Court and explain why every line

21   was where it was is just not realistic.

22        Now, let's take a look at their actual complaints

23   with respect to politics.  Well, we start with equal

24   population.  Now, that could be a legal claim.  There is a

25   requirement that you -- that you have a minimal amount of

population deviation.  So that could have been a legal claim,
but it can't be in this case because the population deviation
was .76 percent.  That's miniscule.  And as Dr. Gaddie
testified, he's unaware of any Court anywhere that has ever
struck down a map that had a population deviation lower than
9 percent, 9 percent.  This is an order of magnitude lower than
that.  So there's no legal impediment here.  It can only be a
political impediment.

Now, they didn't present any evidence of what
political goal would be achieved or served by reducing
population deviation any further than it already was.  They
didn't introduce any evidence of any lawful obligations that
were violated by having the population deviation where it was.
So there's no evidence before this Court whatsoever on which to
find that there is any problem with the population deviation.

And then the balance of the plaintiffs' case does
nothing more than present their misunderstanding that the role
of traditional redistricting principles encases reviewing a
redistricting plan.  This Court is doing something it hasn't
done for 30 years now.  It's not drafting a map.  It's
reviewing a map that was adopted.

Now, it's different when you are in the position of
drafting a map in the first instance.  Well, that's when you
look at these traditional redistricting principles.  They help
guide your decisions.  They are, for lack of a better term,

1   best practices.  It gives you parameters and guidelines and

2   helps you get to a final product that has some coherence.

3           But in reviewing a map that has been adopted, the

4   reviewing Court is no longer in the position of drafting.  It's

5   reviewing.  So these political considerations, these political

6   factors, prudential factors, they fall by the wayside.  These

7   are not legal standards.  These are considerations that go into

8   guiding those with the responsibility for drawing a map.  It

9   helps them to make their discretionary decisions.

10          Now, in the -- that's not to say that they don't have

11  any place in a Court's review of the map, but it's a very

12  different place, and here's what it is.  If there is a

13  violation of a legal requirement, then the Court can look to

14  these traditional redistricting principles to see if they

15  justify that violation.  So, for example, let's say that

16  instead of .76 percent population deviation there was instead

17  10 percent population deviation.  And the Court were to say,

18  I'm sorry, that's too high.  As a legal matter, that's too

19  high.  You could look then at these traditional redistricting

20  principles to see if the legislature was pursuing one of those

21  and that that's what caused the higher population deviation.

22  That's the role in a Court review of these kinds of principles.

23  They're not legal standards at all.  In fact, in this -- in

24  this context they are a rationale for not meeting a legal

25  standard.

1          Now, as the Court has reminded the parties on a
2    number of occasions, drafting a map is the province of the
3    legislature, not the Court, and that's because it is a
4    political act to adopt a redistricting map, and because it's a
5    political act, it best fits within the political branch.  So
6    that if the people that they represent are not content with the
7    decisions they make, they can hold them accountable, and the
8    people of Wisconsin are most capable of doing that.

9          We had a round of recall elections last summer
10   because the legislature made decisions that some people were
11   very unhappy about.  We're going to have some recall elections
12   coming up this summer because there are people who are still
13   very unhappy about some of the decisions the legislature has
14   made.  They can hold them accountable, and it's that place that
15   the map needs to be drawn so that they can be held politically
16   accountable if they adopt a map that is repulsive to the people
17   of the state of Wisconsin.

18         So let's look at the individual worries that the
19   plaintiffs have.  They address the question of population
20   movement, or as they times call it, core retention.  They call
21   it an equal protection violation but they don't identify any
22   right that's being violated.  It does devolve once again into a
23   political factor.  And, in fact, as Dr. Gaddie testified, they
24   didn't even properly identify the topic that they were talking
25   about.

1          All of this talk about least change and the required
2    number of people to move or to be reassigned to a new district,
3    there was no foundation for any of that conversation, because
4    the first thing they have to do is figure out, well, how many
5    people do you actually -- is it actually necessary to move, and
6    they didn't do that.  And the reason they didn't do that is
7    because you can't just look at a map that shows population
8    inequality and say we need to add ten here and subtract there
9    and therefore the total population movement necessary is 20.
10   You can't do that.  As Dr. Mayer testified, when you make a
11   decision to one part of the map, it's going to ripple out.

12         So what you have to do first is you would have to
13   draw a map with the sole goal in mind of moving the fewest
14   people necessary and then count it up and see how many you
15   moved.  Well, Dr. Mayer didn't do that.  He didn't draw any
16   map.  He has no idea how many people it's necessary to move to
17   get to population equality.  No idea.

18         With respect to delayed voting, and again, this is
19   one of these political considerations, and this is political
20   because there's not really -- we talk about disenfranchisement
21   as if somebody's right to vote is being taken away, but that's
22   not really true.  Let's be clear about what's happening.
23   November comes along.  You go to your polling place, everybody
24   gets to go to their polling place and there's going to be a
25   ballot presented to them and they're going to be able to vote

1       for everybody that's on the ballot.

2               Now, for those who are affected by delayed voting,

3       there's simply not going to be a state senator on the ballot.

4       Now, that's not nothing but it's not a legal requirement to

5       eliminate that.  If it was we'd have to change our

6       Constitution.  So this can't be an issue of constitutional

7       magnitude because our Constitution says four-year staggered

8       terms.  You're always going to have some delayed voting effect.

9               So what did Dr. Mayer tell us today?  Well, he told

10      us about maps that he testified to ten years ago and he said

11      that the maps that he -- in which he testified in favor of were

12      on the neutral principles.  They were superior to the

13      Republican maps.  Well, each of the maps that he supported had

14      more delayed voting than any of the Republican maps that were

15      proposed at that time and they also all had more delayed voting

16      than occurs under Act 43.

17              Now, he properly pointed out that he did, in fact,

18      note in his report that on that factor the Republican maps were

19      superior, and that's a fair thing to note.  But what he didn't

20      do, what he didn't say was, well, you have to reject the

21      Democratic maps because of the amount of delayed voting.

22      In fact, he said that overall on the neutral principles, like

23      delayed voting, he said the Democratic maps were marginally

24      preferable.

25              Well, and there's a reason he said that.  It's

because delayed voting is not a constitutional issue.  It's not
even a legal issue.  It's a prudential issue, and he put that
in the mix with all of the other traditional redistricting
principles and he understands that one principle plays off
another and that if you -- if you drive down delayed voting,
that's going to affect other redistricting principles and in
his case partisan fairness.  That's what he said he was
primarily concerned about in 2002.

So he knew that those things had some interplay.  So
he privileged partisan fairness above delayed voting.  He said
it's okay to have more delayed voting when I'm trying to get to
partisan fairness, or it's okay that I can have delayed voting
when I'm trying to get to another redistricting principle.  So
he can't tell this Court that the amount of delayed voting
caused by Act 43 is impermissible.  He can't because he told
the Court ten years ago that it's not.

Now, the other factor that he dismisses very lightly
is that we're really not talking about 299,000 people who would
go six years between voting for Senate.  As we've all noted,
and it's indisputable, we had recall elections this past
summer, and there were approximately 160,000 or so who lived in
districts where there was a recall election.  So they voted for
Senate last summer.  That means they're only going to go three
years between voting for a senator.

And Dr. Mayer didn't explain why that was an

irrelevancy, why it's an irrelevancy to vote -- oh, dear.
Thank you.  Apologize.  He didn't explain why there was an
irrelevancy to vote for a senator in one election but not in
another.  He began by saying the constitutional violation is
that you go six years between votes for senator.  So we showed
them evidence that there are 160,000 people who only go three
years, and he says don't pay attention to that.  It's not
really the amount of time, as it turns out.  It's that you must
vote on a schedule of every four years and that's the interest
that must be protected, even though ten years ago he said it
was okay not to.  And again, they address the standard to the
wrong body.  This standard is addressed to the body that drafts
the map in the first place.

Now, briefly on recall, their count nine, there
simply is no case or controversy here.  We have expressed in
open court that it is the GAB's position that they will conduct
the recall elections this summer under the districts developed
by this Court in 2002.  It is a necessity for the Court subject
matter jurisdiction that there be a case or controversy that
persists all the way through to judgment, but based on our
representations to the Court, there is now and has not been for
some time now any case or controversy with respect to which
districts the recalls will be conducted in.  And so there is
no -- there is no jurisdiction to address that question.

Now, finally, we understand that Act 43 does not please

1   everyone.  I know.  There is no map that will please everyone.

2   This is a political process and political decisions are not

3   going to be universally accepted.

4       What we do know is that in this case the representatives of

5   the people of the state of Wisconsin adopted this map.  This is

6   their judgment, and it's inappropriate for a small group of

7   people dissatisfied with the political aspects of a map to come

8   to this Court in an attempt to reverse the legitimate political

9   decisions embodied in Acts 43 and 44.  Your Honors, we request

10  that you dismiss the complaint.  Thank you.

11          JUDGE STADTMUELLER:  Thank you, Mr. Kelly.  On behalf

12  of the Court and our respective staffs, I want to express our

13  collective sincere appreciation.  The case was very hard

14  fought.  It's been a very long process, a very focused process

15  in the last couple of days, but nonetheless, one that I think

16  in the final analysis will provide the Court with appropriate

17  set of facts against the guiding legal principles to issue a

18  written decision that will be forthcoming in the coming weeks.

19  The Court stands adjourned.

20          THE BAILIFF:  All rise.

21          (Proceedings adjourned at 9:08 p.m.)

22

23

24

25

1   UNITED STATED DISTRICT COURT

2   EASTERN DISTRICT OF WISCONSIN

3

4       I, MICHELLE HAGEN, RPR, Official Court Reporter for the

5   United States District Court, Eastern District of Wisconsin, do

6   hereby certify that I reported the foregoing proceedings, and

7   that the same is true and correct in accordance with my

8   original machine shorthand notes taken at said time and place.

9

10

11  Dated this 27th day of February,

12  Milwaukee, Wisconsin

13

14

15  _____

16  Michelle Hagen

17  Official Court Reporter

18  United States  District Court

19

20

21

22

23

24

25