# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ALVIN BALDUS, CARLENE BECHEN, ELVIRA BUMPUS, RONALD BIENDSEIL, LESLIE W DAVIS, III, BRETT ECKSTEIN, GLORIA ROGERS, RICHARD KRESBACH, ROCHELLE MOORE, AMY RISSEEUW, JUDY ROBSON, JEANNE SANCHEZ-BELL, CECELIA SCHLIEPP, TRAVIS THYSSEN, CINDY BARBERA, RON BOONE, VERA BOONE, EVANJELINA CLEERMAN, SHEILA COCHRAN, MAXINE HOUGH, CLARENCE JOHNSON, RICHARD LANGE, and GLADYS MANZANET | Case No. 11-CV-562 JPS-DPW-RMD |

Plaintiffs,

TAMMY BALDWIN, GWENDOLYNNE MOORE and RONALD KIND,

Intervenor-Plaintiffs,

v.

Members of the Wisconsin Government Accountability Board, each only in his official capacity: MICHAEL BRENNAN, DAVID DEININGER, GERALD NICHOL, THOMAS CANE, THOMAS BARLAND, and TIMOTHY VOCKE, and KEVIN KENNEDY, Director and General Counsel for the Wisconsin Government Accountability Board,

Defendants,

F. JAMES SENSENBRENNER, JR., THOMAS E. PETRI, PAUL D. RYAN, JR., REID J. RIBBLE, and SEAN P. DUFFY,

Intervenor-Defendants.

| | |
|---|---|
| VOCES DE LA FRONTERA, INC., RAMIRO VARA, OLGA VARA, JOSE PEREZ, and ERICA RAMIREZ, | Case No. 11-CV-1011 JPS-DPW-RMD |

Plaintiffs,

v.

Members of the Wisconsin Government Accountability Board, each only in his official capacity: MICHAEL BRENNAN, DAVID DEININGER, GERALD NICHOL, THOMAS CANE, THOMAS BARLAND, and TIMOTHY VOCKE, and KEVIN KENNEDY, Director and General Counsel for the Wisconsin Government Accountability Board,

MEMORANDUM OPINION and ORDER

Defendants.

Tried to the Court February 21–24, 2012
Decided March 22, 2012

Before WOOD, *Circuit Judge*, STADTMUELLER *District Judge,* and DOW, *District Judge.*

PER CURIAM. There was once a time when Wisconsin was famous for its courtesy and its tradition of good government. In 2006, James J. Conant was able to write that:

> The most important feature of Wisconsin's society, government, and politics during the twentieth century was its progressive nature. Wisconsin had a highly developed civil society, its elected and administrative officials continuously attempted to improve the state's political institutions, and they attempted to enhance the economic and social circumstances of the state's citizens. Throughout the century Wisconsin's politics were issue-oriented, state government institutions operated free of scandal, and the administration of state policies and programs was conducted efficiently and effectively.[1]

Students of American history still read about Robert M. La Follette, Sr., an independent thinker who came to prominence at the end of the 19th century and whose views defied the partisan pigeonholes of his day. More recently, Wisconsin has been called a "purple" state–that is, a state whose people regularly elect comparable numbers of Democrats and Republicans. Over roughly the last half-century, six Republicans and six Democrats have served as governor. Over the same time, one of its two seats in the U.S. Senate has been held continuously by a Democrat, while the other one has been occupied by three Republicans and two Democrats.

---

[1] James J. Conant, WISCONSIN POLITICS AND GOVERNMENT: AMERICA'S LABORATORY OF DEMOCRACY at xv (2006).

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 03/22/12   Page 2 of 38   Document 210

This bipartisan tradition has not, unfortunately, exempted Wisconsin from the contentious side of the redistricting process that takes place every ten years in the wake of the United States Census. Before the events leading to this lawsuit, the last time the Wisconsin legislature successfully passed a redistricting plan was in 1972, following the 1970 census. See Wis. Stat. § 4.001(1); *Wisconsin State AFL-CIO v. Elections Board,* 543 F. Supp. 630, 631 (E.D. Wis. 1982). After the 1980 census, however, the state was not so fortunate. Beginning with that round, decennial litigation was just as much a feature of the political scene as was decennial redistricting. See *Wisconsin State AFL-CIO,* 543 F. Supp. 630 (1980 census); *Prosser v. Elections Board,* 793 F. Supp. 859 (W.D. Wis. 1992) (1990 census); *Arrington v. Elections Board,* 173 F. Supp. 2d 856 (E.D. Wis. 2001) (2000 census) and then *Baumgart v. Wendelberger,* Nos. 01 121 and 02 366, 2002 WL 34127471 (E.D. Wis. May 30, 2002) (*per curiam*), amended by 2002 WL 34127473 (E.D. Wis. July 11, 2002 ) (also 2000 census). In 1982, 1992, and 2002, Wisconsin's legislative districts were drawn by a three-judge court. It is notable that in each of these earlier cases, the only contested matter related to the state's legislative districts; until now, no one has called on the federal court to intervene with respect to the state's congressional districts.

Now it is our turn. The U.S. Constitution, see Art. I, sec. 2, cl. 3,[2] requires the federal government to conduct an actual enumeration of the U.S.

---

[2] The Enumeration Clause is actually the fourth to appear in the original Constitution, but the original Clause 3, which established the infamous three-fifths rule for counting population, was abrogated by section 2 of the Fourteenth Amendment. We therefore skip over the now-repudiated clause and count the Enumeration Clause as the third. See *Utah v. Evans*, 536 U.S. 452, 457 (2002); *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 362 (1999) (Stevens, J., dissenting).

population once every ten years; that enumeration provides the basis for representation in the House of Representatives. Article IV, section 3, of the Wisconsin Constitution independently requires the state legislature to update its senate and assembly districts following each federal census. In 2010, the Bureau of the Census complied with its constitutional duty, and on December 21, 2010, it announced and certified that Wisconsin's population was 5,686,986 as of April 1, 2010. This represented a slight increase over the 2000 population of 5,363,675. These new numbers required Wisconsin to take a fresh look at both its state assembly and senate districts, and its eight congressional districts (the overall number of districts remained the same) to ensure compliance with the one-person, one-vote principle announced by the Supreme Court in *Reynolds v. Sims,* 377 U.S. 533 (1964). Wisconsin has attempted to do so. Regrettably, like many other states, Wisconsin chose a sharply partisan methodology that has cost the state in dollars, time, and civility. Nevertheless, our task is to assess the legality of the outcome, not whether it lived up to any particular ideal.

1.      The Redistricting Process

The mid-term election in November 2010 resulted in a shift in political control in the State of Wisconsin. Scott Walker, the Republican candidate for governor, defeated Tom Barrett, the Democratic candidate, in the race to replace Governor Jim Doyle, a Democrat. Control of both Wisconsin's State Assembly (its lower house) and State Senate shifted from the Democratic to the Republican party. Thus, as of the time the Census results were certified and the state was ready to begin drawing whatever new legislative and congressional district lines were necessary, all three critical players were in the hands of a single party for the first time in many years. (Throughout this

opinion, when we refer to "legislative" redistricting, we mean the two state houses; we use the term "congressional" redistricting for the lines drawn for seats in the U.S. House of Representatives.) The new governor and legislators were sworn in on January 3, 2011, and the very next day the Republican legislative leadership announced to members of the Democratic minority that the Republicans would be provided unlimited funds to hire counsel and consultants for the purposes of legislative redistricting. They informed the Democrats that they would not receive any funding for this process.

True to their word, the Republicans immediately began work in earnest, retaining the law firm of Michael Best & Friedrich LLP ("Michael Best") to advise their caucus. Every effort was made to keep this work out of the public eye and, most particularly, out of the eye of the Democrats. Indeed, it was widely assumed that redistricting work would not begin until Wisconsin's units of local government had a chance to review their ward lines. Wards in Wisconsin are the smallest unit of government. In the past, redistricting has always proceeded on a "bottom up" basis: ward lines would be redrawn based on the new census figures, villages and towns would re-compute their populations, and the counties would build on those figures. The Census does not use these units of government; instead, it proceeds on the basis of "census blocks" that do not always correspond to local government boundaries. Some care must be taken, therefore, to translate the census data into information that is compatible with actual governing units.

As we noted, the venue of the redistricting work was the offices of Michael Best. The actual drafters included: Adam Foltz, a staff member to Assembly Speaker Jeff Fitzgerald; Tad Ottman, a staff member to Senate Majority Leader Scott Fitzgerald; and Joseph Handrick, a consultant with the

law firm of Reinhart Boerner Van Duren s.c. Others involved in the process were James Troupis, Eric McLeod, Ray Taffora, Speaker Fitzgerald, Majority Leader Fitzgerald, Sarah Troupis, Robin Vos, Senator Rich Zipperer, and Dr. Keith Gaddie. The drafters relied on a computer program called autoBound to work with various district lines. They testified that the partisan makeup of the potential new districts played no part at all in their decisions. Handrick, for instance, testified that he did not know if partisan makeup was considered, that he had no access to voting data from past elections, and that only "population equality, municipal splits, compactness, contiguity, [and] communities of interest" were considered. Foltz testified that he worked with legal counsel and experts, and that Speaker Fitzgerald, Senator Fitzgerald, Robin Vos, and Senator Zipperer advised him where to draw the boundaries.

In June and July 2011, Foltz had meetings about redistricting with every single Republican member of the State Assembly. He did not meet with any Democrats. Nevertheless, he testified that it was not "a part of the goal to increase the Republican membership in the legislature." Before his meetings with the Republicans, each person was required to sign a confidentiality agreement promising not to discuss anything that was said. Ottman had similar meetings, conducted under the same cloak of secrecy. The drafters did not limit their outreach to public officials; they also held meetings behind closed doors with selected outsiders. In January 2011, they met with certain private business interests, including representatives from realtor and banking associations, and a hybrid state chamber of commerce called Wisconsin Manufacturers & Commerce.

In addition, the drafters reached out to certain members of the Latino community. They contacted Jesus Rodriguez, a co-founder and member of

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 03/22/12   Page 6 of 38   Document 210

Hispanics for Leadership, a political organization comprised of local business people, educators, and community advocates who work toward "getting the most representation possible for the Latino community on all levels." Rodriguez is also the President of Hispanics for School Choice, a nonprofit organization dedicated to advancing school choice for Hispanic children, notably through school vouchers. Hispanics for School Choice, available online at http://www.hispanicsforschoolchoice.com/ (last visited March 14, 2012). Through Hispanics for School Choice, Rodriguez developed a professional and personal relationship with former Assembly Speaker Scott Jensen (a Republican), who presently serves as a senior advisor for another school choice advocacy organization, American Federation for Children. American Federal for Children, available online at: http://www.federationforchildren.org/ (last visited March 15, 2012). Troupis also contacted the Mexican American Legal Defense Education Fund (MALDEF), a national Latino civil rights organization, in an attempt to secure its support for the Republicans' plan. He hoped to "take the largest legal fund for the Latino community off the table in any later court battle," by courting their approval.

The process followed for the congressional districts was somewhat different. Like the state legislature, the Wisconsin congressional delegation ended up with a majority of Republicans after the 2010 mid-term elections (specifically, five Republicans and three Democrats, as we can see from the intervening parties to this case). In keeping with long-standing practice, the legislature in 2011 permitted the incumbent Wisconsin members of the House of Representatives to draft a map delineating the new congressional districts. Andrew D. Speth, chief of staff to Republican Congressman Paul D. Ryan, Jr.,

took primary responsibility for that task. Speth had some communications with Erik Olson, chief of staff to Democratic Congressman Ronald Kind, and later on, Congressman Ryan consulted with the three Democratic members of Wisconsin's delegation. In meetings that Speth held with the Republican members, they expressed their desire to draw districts that would maximize the chances for Republicans to be elected. (Note the contrast with the disclaimers of partisanship offered by those who were working on the legislative redistricting process.) Speth's first complete draft was ready by May 13, 2011. That draft was shared exclusively with the Republicans. A second draft of June 1, 2011, was circulated to all members of Wisconsin's House delegation. The Democrats offered an alternative map two days later, but it was quickly rejected for failing to reflect minimal deviation from the ideal population for each district. Speth finalized a draft on June 8, 2011.

On July 8, 2011, the bills that would become Act 43 (legislative redistricting) and Act 44 (congressional redistricting) were introduced by the Republican leadership in the Wisconsin legislature. Simultaneously, the bill that became Act 39 was introduced. This was crucial, because it was Act 39 that permitted the legislature to draw new districts before Wisconsin's municipalities drew or re-drew their ward lines based on the new Census. Instead, upending more than a century of practice in Wisconsin, Act 39 required the municipalities to adjust their ward lines to the new state legislative districts. The legislature held a single public hearing on Acts 43 and 44 on July 13, 2011. On July 19, 2011, the legislature passed Act 43, and on July 20, 2011, it passed Act 44; both bills were then transmitted to the Governor. Act 39 was passed on July 25, 2011.

2. Procedural History

On August 9, 2011, Governor Scott Walker signed into law each of the three critical bills discussed here: Act 39, which enabled redistricting based only on census blocks; Act 43, establishing the new legislative districts for both the State Assembly and the State Senate; and Act 44, establishing the new lines for Wisconsin's eight congressional districts. In the meantime, correctly suspecting that something like the process we have described was afoot, on June 10, 2011, a group of voters filed suit against the Wisconsin Government Accountability Board (GAB) and its members in their official capacity, alleging that Acts 43 and 44 both violate federal and state law. The GAB is the state body charged with administering and enforcing all of Wisconsin's laws related to campaign finance, elections, ethics, lobbying, and contract disclosures. We refer to these voters as the Baldus plaintiffs, using the name of the lead party. On October 31, 2011, Voces de la Frontera, Inc. ("Voces"), an organization that describes itself as a grassroots group organized under the laws of Wisconsin, filed its own complaint against GAB and its members. Voces charged that Act 43 violates Section 2 of the Voting Rights Act; it did not challenge Act 44.

Because these two lawsuits qualified as actions "challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body," 28 U.S.C. § 2284(a), the Chief Judge of the United States Court of Appeals for the Seventh Circuit entered an order assigning this litigation to a three-judge court and appointing this panel to serve as the members of the court. In an order entered on November 21, 2011, the court permitted the three Democratic members of Wisconsin's delegation to the United States House of

Representatives to intervene as plaintiffs, and it permitted the five Republican members of that delegation to intervene as defendants. The next day, the court consolidated the Baldus and the Voces cases. Pretrial discovery took place on an expedited basis, with the expectation that trial would begin on February 21, 2012. That morning, however, the court urged the parties to make one last good-faith effort to settle, in the interest of all citizens of the State of Wisconsin and out of respect for the role of the state legislature in redistricting matters. See *Perry v. Perez,* 132 S.Ct. 934, 940 (2012). Those efforts, unfortunately, were unsuccessful, and so the trial continued on February 23 and 24, 2012.

With the benefit of the full record, the panel now makes its findings of fact and conclusions of law for the case. For ease of reading, these are not presented separately. Our analysis of each of the plaintiffs' claims leads us to the conclusion that Act 43 violates Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973(a), by improperly diluting the citizen voting age population of Latinos across Assembly Districts 8 and 9. Otherwise, we find no judicially redressable injury in any of the plaintiffs' and intervenor-plaintiffs' remaining claims.

3.     Analysis of Claims

3.1     Overview

Before turning to our detailed analysis of each claim, we must review what is still properly before us. For ease of reference, we begin by summarizing the claims of the Second Amended Complaint, noting the statute to which each one pertains, the current status of the claim, and, where pertinent, which parties are pursuing it:

!   Claim One (Act 43): Legislative boundaries unconstitutionally sacrifice redistricting principles required by the U.S. Constitution. This claim went to trial on behalf of the Baldus plaintiffs.

!   Claim Two (Act 43): The new legislative districts violate federal standards because they impermissibly disrupt local governmental boundaries. The Baldus plaintiffs were the only ones raising this, and they abandoned it at trial. Trial Trans. Vol. VI, 398-99.

!   Claim Three (Act 43): The statute violates federal law because it disenfranchises 299,704 voters whose state senate districts have been moved. It does so by shifting them from an odd-numbered district to an even-numbered district; this shift means that voters in the affected districts will have to wait six years, not just four, until they have an opportunity to vote again for their state senator. This claim went to trial for the Baldus plaintiffs only.

!   Claim Four (Act 44): Congressional districts are not compact and fail to preserve communities of interest, in violation of the Equal Protection Clause. The Baldus plaintiffs abandoned this claim at trial, but the congressional plaintiff-intervenors continued to maintain it.

!   Claim Five (Acts 43 and 44): The legislative (Act 43) and congressional (Act 44) districts reflect partisan gerrymandering forbidden by both the Equal Protection Clause and the First Amendment. The Baldus plaintiffs abandoned this claim at trial; the congressional plaintiff-intervenors continued to maintain it.

!   Claim Six: (Act 43): The new legislative districts violate the Voting Rights Act of 1965, 42 U.S.C. §§ 1973-1973aa-6, in two ways: first, because Act 43 "packs" African-American voters in Milwaukee into six districts and thus foregoes the opportunity to create a seventh "influence" district; and, second, because the statute "cracks" the Latino community into two districts,

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 03/22/12   Page 11 of 38   Document 210

neither one of which is a majority-minority district of *citizen* voting age Latinos. The Baldus plaintiffs abandoned at trial their challenge to the African-American districts, but they, along with the Voces de la Frontera plaintiffs in the consolidated case, pursued the second claim at trial. (Indeed, this claim consumed nearly all of the trial time.)

!        Claim Seven (Act 43): Act 43 is unconstitutional because the legislative drafters used race or ethnicity as the predominant reason for drawing certain districts, in violation of the Equal Protection Clause as explained in cases such as *Shaw v. Reno*, 509 U.S. 630 (1993). The Baldus plaintiffs abandoned this claim at trial.

!        Claim Eight (Act 43): The legislative redistricting accomplished in Act 43 violates the Equal Protection Clause because the new districts break up communities of interest. This claim went to trial.

!        Claim Nine (Act 43): This claim seeks a declaratory judgment and an injunction requiring the GAB not to use the new 2012 district lines for any recall elections that may take place in Wisconsin between the present time and the date of the general election in November. This claim, too, went to trial.

In summary, therefore, most of this case remains before us in one way or another. Only Claim Two, part of Claim Six (dealing with the African-American districts), and Claim Seven are entirely out of the case.

As we noted earlier, the total "official" population of Wisconsin for purposes of redistricting is 5,686,986. Using that number and applying the "one person, one vote" command, the ideal population for each of Wisconsin's 33 senate districts is 172,333, and for its 99 assembly districts 57,444. As for the congressional districts, the ideal population is either 710,873 or 710,874. (Two of the eight congressional districts must have an additional person because the total population does not divide evenly by

eight.) As we discuss below, there is some deviation from these ideals for the legislative districts, but, reflecting the capabilities of modern computer programs, the congressional districts from a headcount standpoint could not be improved.

The Baldus plaintiffs are seeking declaratory and injunctive relief against Wisconsin's Government Accountability Board and its members. They ask the court to bar the implementation of both redistricting plans for the reasons we have just outlined and discuss in more detail below. The intervenor-plaintiffs are still pursuing a claim against the new congressional districts drawn in Act 44. The Voces de la Frontera plaintiffs, joined by the Baldus plaintiffs, charge that Act 43 violates Section 2 of the Voting Rights Act because it dilutes the Latino community's voting strength in the 8th Assembly District. Both the GAB defendants and the congressional intervenor-defendants filed motions to dismiss both complaints on the pleadings; they have also denied that there is any cognizable federal violation in either Act.

We now turn to the merits of the case. In doing so, we say nothing about any arguments that could be understood to be based on allegations that the state officials have failed to follow state law. As defendants rightly point out, such claims are beyond our authority under the principles announced in *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 106 (1984). We note, however, that the facts underlying some points that touch on state law may still be relevant for the federal issues that are properly before us. Thus, for example, we may examine plaintiffs' allegation that Act 43 fails to honor traditional redistricting criteria or to maintain local government boundaries, even if we refrain from expressing any opinion on

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 03/22/12   Page 13 of 38   Document 210

the question whether this may also state a claim for violating the Wisconsin Constitution.

> ### 3.2 Claims One and Eight: The New Legislative Districts Fail To Comply with Constitutional Standards and Are Not Justified by any Legitimate State Interest.

Claim One addresses redistricting principles in general, while Claim Eight focuses on the specific principle against breaking up communities of interest. Since the latter is subsumed within the former, we have grouped these two claims together for purposes of discussion.

Only 323,026 people needed to be moved from one assembly district to another in order to equalize the populations numerically, but instead Act 43 moves more than seven times that number–2,357,592 people–for a net change that results in districts that are roughly equal in size. Similarly, only 231,341 people needed to move in order to create equal senate districts, but Act 43 moves 1,205,216–more than five times as many. Even accepting the argument urged by the GAB that one cannot change one district without affecting another, these are striking numbers. (Physicists would remind us that the amplitude of waves, whether in water or in air, diminishes unless one is in a vacuum because energy is absorbed; so too, a "wave" of population shifts in one corner of Wisconsin is likely to dissipate long before the other corners are reached.)

When Act 43 is compared to the 2010 census precise ideal population, the total population deviation (from the most populous to the least populous district) is 438 persons for the newly adopted assembly districts, and 1,076 persons for the newly adopted senate districts. Plaintiffs, therefore, allege that the Act violates the "one-person, one-vote" principle. *Reynolds v. Sims*, 377 U.S. 533, 568 (1964). And indeed, it is an interesting question whether

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 03/22/12   Page 14 of 38   Document 210

deviations that might have been acceptable in an earlier time ought to be tolerated now that–as Wisconsin proved in Act 44–it is possible for a computer to draw not one, but an unlimited number of districts with the perfect number of voting inhabitants. But putting that thought to one side, it was the plaintiffs who had the initial burden to show (1) the existence of a population disparity that (2) could have been reduced or eliminated by (3) a good-faith effort to draw districts of equal proportion. *Karcher v. Daggett*, 462 U.S. 725, 730 (1983). If the plaintiffs accomplish this, the burden shifts to the GAB to show that "each significant variance between districts was necessary to achieve some legitimate goal." *Karcher*, 462 U.S. at 731. Accepted justifications include: core retention; avoidance of split municipalities; contiguity; compactness; and maintenance of communities of interest. *Id.* at 740; *Wisconsin State AFL-CIO*, 543 F. Supp. at 636.

The defendants do not defend the state's new legislative districts on the ground that they are the best that could be managed. What the three-judge court said in 1992 remains just as true today: "representative democracy cannot be achieved merely by assuring population equality across districts," *Prosser,* 793 F. Supp. at 863; factors like homogeneity of needs and interests, compactness, contiguity, and avoidance of breaking up counties, towns, villages, wards, and neighborhoods are all necessary to achieve this end. *Id.* Nor do the defendants appear to argue that it is impossible to draw a plan that serves these democratic and neutral purposes. That is plainly not the case, since the court-drawn plans have consistently and scrupulously striven to be politically neutral. *Id.* at 867; see generally *Abrams v. Johnson,* 521 U.S. 74, 98 (1997). Instead, defendants begin by observing that the Supreme Court has said that "state reapportionment statutes are not subject to the same strict standards applicable to reapportionment of congressional seats."

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 03/22/12   Page 15 of 38   Document 210

*White v. Regester*, 412 U.S. 755, 763 (1973). As *Abrams* pointed out, the Court has also held state legislatures to a lower standard of population equality than it imposes on courts. 521 U.S. at 98. Although times may be changing, in the past the Court has opined that "an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations" that are insufficient to make out a *prima facie* case. *Brown v. Thomson*, 462 U.S. 835, 842 (1983).

This does not mean, of course, that deviations under the 10% point are beyond challenge. It does, however, indicate that plaintiffs bear a greater burden to show a violation of their voting rights for deviations of 10% or lower. Several courts have expressed this thought by concluding that legislative population disparities under 10% are subject to a rebuttable presumption of validity, but that they may nevertheless be unconstitutional if the drafting process was arbitrary, discriminatory, or otherwise unsupported by traditional redistricting criteria. *Daly v. Hunt*, 93 F.3d 1212, 1220 (4th Cir. 1996); *Cecere v. County of Nassau*, 274 F. Supp. 2d 308, 311-12 (E.D.N.Y. 2003); *Montiel v. Davis*, 215 F. Supp. 2d 1279, 1285-86 (S.D. Ala. 2002) (three-judge court); *Hulme v. Madison County*, 188 F. Supp. 2d 1041, 1047 (S.D. Ill. 2001); *Abate v. Rockland County Legislature*, 964 F. Supp. 817, 819 (S.D.N.Y. 1997); *Marylanders for Fair Representation v. Schaefer*, 849 F. Supp. 1022, 1032 (D. Md. 1994) (three-judge court). Notably, the Northern District of Georgia concluded in a case quite similar to ours that it "need not decide [ ] whether the mere use of a 10% population window renders Georgia's state legislative plans unconstitutional, because the policies the population window was used to promote in this case were not free from any taint of arbitrariness or discrimination." *Larios v. Cox*, 300 F. Supp. 2d 1320, 1341-42 (N.D. Ga. 2004). The Georgia court was appalled by the "baldly

Case 2:11-cv-00562-JPS-DPW-RMD    Filed 03/22/12    Page 16 of 38    Document 210

unconstitutional scheme" to protect the legislative influence of traditional communities at the expense of growing populations elsewhere and to protect incumbents in a discriminatory and arbitrary fashion. *Id.* With this case law in mind, we address the merits of the plaintiffs' claim.

The plaintiffs' redistricting expert, Dr. Kenneth Mayer, testified that Act 43 fails to comply with traditional redistricting principles. He was particularly concerned with the excessive shifts in population, disregard for core district populations, arbitrary and partisan motivations related to compactness, and unnecessary disenfranchisement. The defendants' experts, in particular Professor Bernard Grofman, had little to say about these points beyond the generic comment that when an underpopulated district must seize population from a neighboring district in order to reach its optimal size, the neighboring district may need to do the same, until such time as an overpopulated district is encountered and matters balance out. Conspicuously missing from Professor Grofman's testimony was anything precise about the magnitude of the population shifts here; Dr. Mayer, in contrast, offered testimony about many districts that could have been balanced out by moving vastly fewer numbers of people.

While we share Dr. Mayer's concerns in many respects and find ourselves largely unpersuaded by Professor Grofman's incomplete testimony to the contrary, we return to the degree of the deviations, which were nowhere close to the 10% number that the Supreme Court mentioned in 1983. The maximum deviation for assembly districts is 0.76% and 0.62% for senate districts. Numbers like these place a very heavy burden on the plaintiffs to show a constitutional violation. In the final analysis, they have failed to surmount that burden. We come to that conclusion not because we credit the testimony of Foltz, Ottman, and the other drafters to the effect that they were

not influenced by partisan factors; indeed, we find those statements to be almost laughable. But the partisan motivation that, in our view, clearly lay behind Act 43 is not enough to overcome the *de minimis* population deviations that the drafters achieved, at least under this theory. We therefore find no merit in Claims One or Eight and conclude that they must be dismissed.

Before leaving this point, we add a few words about communities of interest. It is important not to assume that the mere ability to elect a representative of one's preferred political party is a perfect substitute for the ability to elect a representative who will more broadly identify with and serve his or her constituents' needs. The two major political parties are both big tents that contain within them people of significantly different viewpoints. That is precisely why, especially when the court must also take into account the rights of minority groups as we must with Assembly Districts 8 and 9, careful attention is necessary. As we discuss in greater detail in section 3.5 below, the concept of community of interest is one that sweeps in much more than party label. Thus, for example, even if the re-configured Assembly District 8 were seen as a reliably Democratic district, as Professor Grofman testified, that does not necessarily mean that the successful candidate would be the candidate of choice for the Latino community there. The whole point of the analysis under section 2 of the Voting Rights Act is to ensure that qualifying minorities have an opportunity to elect representatives who will have strong voices on the topics that matter to them. Thus, the concept of community of interest will have an important role to play when we come to Claim Six. Untethered from section 2 of the Voting Rights Act, however, we do not have enough evidence before us to

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 03/22/12   Page 18 of 38   Document 210

conclude that the remaining new districts created by Act 43 can be disturbed on that basis alone.

### 3.3 Claim Three: Disenfranchisement of Voters For State Senators

In Claim Three, the Baldus plaintiffs assert that the movement of 299,704 voters (5.26% of all persons in Wisconsin, according to the 2010 Census) from certain even-numbered senate districts to odd-numbered senate districts deprives those voters of their constitutional right to vote for a state senator in a regular election for two years. (Obviously, as the defendants point out, those voters have the right to vote for any other office on the ballot, but we do not understand defendants to be arguing that a voter can constitutionally be deprived of the right to vote in a particular race–maybe for the House of Representatives–as long as he/she may vote for dog-catcher or the library board. The right to vote is a fundamental right for every elective office in a democracy.) Pursuant to Wisconsin Constitution Article IV, section 5, state senators serve four-year, staggered terms with half of the senators elected in presidential years and the other half during mid-term years. The redistricting plan shifts voters among senate districts in a manner that causes certain voters who previously resided in an even-number district (which votes in presidential years) to be moved to an odd-numbered district (which votes in mid-term years); this shift means that instead of voting for a state senator in 2012, as they would have done, they must wait until 2014 to have a voice in the composition of the State Senate. The number of persons experiencing this type of disenfranchisement per district ranges from 133 to 72,431, with an average of 17,630 for the 17 districts involved.

The Baldus plaintiffs argue that this disenfranchisement violates the Equal Protection Clause's requirement that "a State make an honest and

Case 2:11-cv-00562-JPS-DPW-RMD    Filed 03/22/12    Page 19 of 38    Document 210

good faith effort" to avoid vote dilution. *Reynolds*, 377 U.S. at 577. Some degree of temporary disenfranchisement in the wake of redistricting is seen as inevitable, and thus as presumptively constitutional, so long as no particular group is uniquely burdened. *Donatelli v. Mitchell*, 2 F.3d 508, 515-16 (3d Cir. 1993); *Republican Party of Oregon v. Keisling*, 959 F.2d 144, 145-46 (9th Cir. 1992). The Supreme Court has never articulated a hard-and-fast standard for how much of this type of disenfranchisement is too much, nor did the Baldus plaintiffs offer any concrete standard to which we might turn. Although the GAB suggested that earlier maps drawn by courts for Wisconsin have established a floor of 500,000, or even 750,000, for permissible moves, we reject that proposition. These numbers cannot be assessed in a vacuum, and we have no indication of any other factors that might have compelled these significant numbers. Each case, and each decade, should be assessed on its own record, and factors like the number of people moved, the overall population shifts in the state (both internally and from out-of-state), the impact on particular demographic groups, and comparable points, will all enter into the assessment. It is important to us here that the evidence presented at trial did not indicate that any particular group will suffer more disenfranchisement than the remainder of the population. While we are sympathetic to the nearly 300,000 voters who have lost their opportunity to vote for a state senator for two years, we find that Act 43 does not violate the Equal Protection Clause on this basis.

### 3.4 Claims Four and Five: Congressional Districts Fail Constitutional Standards for Compactness, Communities of Interest, and Partisan Gerrymandering

The intervenor-plaintiffs (the three Democratic members of Congress from Wisconsin) assert that Act 44 violates *Reynolds* by focusing on

population equality to the detriment of other principles, especially that of effective representation. They had no other choice, given the fact (as the parties stipulated) that Act 44 apportions the 2010 census population of the state of Wisconsin perfectly. Lacking any evidence of population deviation whatsoever, the intervenor-plaintiffs have no traction on this aspect of their Equal Protection Clause claim. Whatever else may have happened in Wisconsin, it has without a doubt preserved the one person, one vote principle for its citizens.

Second, the intervenor-plaintiffs argue that the Republican majority's legislative leadership in the Wisconsin legislature systematically created congressional districts to give their party an unfair electoral advantage in an attempt to preserve political majorities. The intervenor-defendants demur to that point, asserting frankly that there is nothing wrong with political considerations motivating redistricting. They further argue that the intervenor-plaintiffs did not offer a workable standard for the court to use in evaluating the political gerrymandering claim.

Justice Kennedy made a similar comment in his opinion concurring in the judgment in *Vieth v. Jubelirer,* 541 U.S. 267 (2004). Writing for a plurality, Justice Scalia had argued that *Davis v. Bandemer,* 478 U.S. 109 (1986), which had recognized the possibility of a constitutional claim based exclusively on the existence of partisan political gerrymandering, should be overruled. But five members of the Court did not agree with him, even though it was also the case that they could not agree on exactly what legal standard ought to apply in these cases. Interestingly, however, Justice Kennedy's pivotal opinion on this point appeared to throw the ball to the litigating parties to come up with a manageable legal standard.

Case 2:11-cv-00562-JPS-DPW-RMD    Filed 03/22/12    Page 21 of 38    Document 210

Whether the parties bear full responsibility for the development of the law, or if the Court shares that duty, is a topic beyond the scope of this case. We do note that the right to vote is an individual right, not a group right, see *Burdick v. Takushi,* 504 U.S. 428 (1992) (strict scrutiny is required for election laws that impose a severe restriction on an individual's right to vote). And few acts in a democracy are more expressive than the individual's marking a ballot (in whatever way it is done these days) to indicate which candidates he or she would like to see win the race. If, as the Supreme Court has held, the First Amendment protects persons from politically-based hiring decisions, see *Elrod v. Burns,* 427 U.S. 347 (1976), *O'Hare Truck Service, Inc. v. City of Northlake,* 518 U.S. 712, 717 (1996), *Board of County Com'rs, Wabaunsee County v. Umbehr,* 518 U.S. 668 (1996), *Rutan v. Republican Party of Illinois,* 497 U .S. 62 (1990), then perhaps the Court will find some day that the First Amendment also protects persons against state action that intentionally uses their partisan affiliation to affect the weight of their vote. Legislative districts drawn behind a Rawlsian veil of ignorance would arguably give each voter the best chance to express his or her views without anyone putting a thumb on the scale in advance. But those developments, we concede, lie in the future, and so we return to the case at hand.

For now, we find that the intervenor-defendants have the better of the argument, because we are unable to discern what standard the intervenor-plaintiffs propose. Their failure to offer a workable standard means that no one has had a chance to test a suggested rule through the adversarial process. Without a specific proposal on the table, we are unable to evaluate the merits of this partisan gerrymandering claim. To the extent that the point is about process rather than results, we add that our review of the drafting of Act 44

leads us to believe that it was a significantly more bipartisan process than that associated with the drafting of Act 43. As discussed above, Speth did begin by meeting with the Republican members of Congress to discuss their priorities and concerns about redistricting. But well before the process was over, Congressman Ryan consulted his three Democratic colleagues to discuss their preferences. Speth testified that he attempted to incorporate all of the feedback (not just the Republican comments) into the draft. He avoided putting incumbents together in the same district, and he did not flip districts from majority-Democrat to majority-Republican or *vice versa*. Accordingly, we hold that the intervenor-plaintiffs cannot succeed on their partisan gerrymandering claim.

      3.5.    Claim Six: Voting Rights Act Claim of Latinos

      This claim, which concerns only Act 43, is the most troubling. As matters now stand, both the Baldus and the Voces plaintiffs charge only that the legislative redistricting plan, as it applies to one particular area of Milwaukee County, violates the rights of Latino voters under Section 2 of the Voting Rights Act. To succeed, plaintiffs are required to meet the threshold requirements for such a case spelled out in *Thornburg v. Gingles*, 478 U.S. 30, 48-51 (1986): (1) the minority groups are sufficiently large and geographically compact to create a majority-minority district; (2) the minority groups are politically cohesive in terms of voting patterns; and (3) voting is racially polarized, such that the majority group can block a minority's candidate from winning. If plaintiffs can meet this threshold, the court must evaluate the totality of the circumstances to determine whether the minority groups have been denied an equal opportunity to participate in the political process

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 03/22/12   Page 23 of 38   Document 210

and elect candidates of their choice. 42 U.S.C. § 1973(b); *Gingles*, 478 U.S. at 44-45.

The defendants argue that the districts drawn in Act 43 give Latinos 60.52% of the voting age population in New Assembly District 8 and 54.03% of the voting age population in New Assembly District 9. As the trial unfolded, however, it appeared that they conceded that the relevant measure is *citizen* voting age population, at least for an ethnic group with as high a proportion of lawful non-citizen residents as the Latinos. This is correct. For the obvious reason that non-citizens are not entitled to vote, we cannot ignore citizenship status, particularly given the Supreme Court's express endorsement of the centrality of this point. *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 429 (2006) (concluding that citizen voting age population "fits the language of § 2 because only eligible voters affect a group's opportunity to elect candidates").

The defendants' expert, Dr. Gaddie, chose not to testify on this claim. He was, however, involved in the drafting process for Assembly Districts 8 and 9. Foltz testified that Dr. Gaddie instructed the drafters on how to draw the Latino districts in the way he believed was appropriate, but that the drafters did not follow his instructions for the final version. Rather, Foltz said, changes from Dr. Gaddie's recommendations were made in response to MALDEF's input. Ottman testified that Dr. Gaddie "looked at some of the minority district configurations that we had prepared and kind of evaluated them."

Turning to the *Gingles* factors, the parties have stipulated that the Latino community in the area of Milwaukee covered by both former and New Assembly Districts 8 and 9 satisfies the first criterion (*i.e.,* the Latino

group is sufficiently large and geographically compact to create a majority-minority district). Professor Grofman, the defendants' lead Section 2 expert, testified at trial that he agrees with the plaintiffs that they have also satisfied the second requirement (*i.e.,* that the Latinos in Milwaukee are politically cohesive in their voting behavior). Finally, Dr. Grofman agreed that we may accept Dr. Mayer's racial polarization analysis for the third inquiry (*i.e.,* that voting is racially polarized, such that the majority group can block the Latino candidate from winning). In fact, when asked whether "the issue in this case is more about the totality of the circumstances" than the *Gingles* factors, Dr. Grofman agreed. We see no reason to disagree with this assessment, which as far as it goes is shared by Dr. Mayer.

Inquiry into the totality of the circumstances inevitably requires us to get into the weeds and decide, based on all of the facts in the record, whether Latinos in the vicinity of New Assembly Districts 8 and 9 have been denied an equal opportunity to participate in the political process and elect candidates of their choice. 42 U.S.C. § 1973(b). The parties do not dispute that Milwaukee's Latino community bears the socioeconomic effects of historic discrimination in employment, education, health, and other areas, and that its depressed socioeconomic status hinders its ability to participate in the electoral process on an equal basis with other members of the electorate.

The dispute surprisingly centers on whether two Latino influence districts are superior to one majority-minority district.[3] The defendants assert

---

[3] "In majority-minority districts, a minority group composes a numerical, working majority of the voting-age population. …At the other end of the spectrum are influence districts, in which a minority group can influence the outcome of an election even if its preferred candidate cannot be elected." *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009). In light of *LULAC*, *supra,* we understand the Court to be referring to citizen voters, where that qualification is pertinent.

Case 2:11-cv-00562-JPS-DPW-RMD    Filed 03/22/12    Page 25 of 38    Document 210

that "[t]he Latino community itself is divided on this point.…[S]ome members want the chance to have a second seat, they want 8 and 9 as they were prepared." There is a preliminary legal question to be answered, however, which will dictate whether this argument can prevail. It is whether, in a Section 2 claim, a state is entitled to deprive a minority group of one majority-minority district and substitute for that two influence districts. We have searched both Supreme Court decisions and those of other courts around the country, and we cannot find anything holding that this is an acceptable trade-off. In fact, the Supreme Court specified in *Bartlett v. Strickland* that "[u]nder present doctrine, § 2 can require the creation of [majority-minority] districts" but that "[t]his Court has held that § 2 does not require the creation of influence districts." *Bartlett*, 556 U.S. at 13 (2009). We interpret the Court's language to mean that if we find a Section 2 violation, the creation of influence districts *in lieu of* a majority-minority district is not on the menu of options for relief.

The defendants argue that "[o]thers, such as Voces, appear to want to make a 100-percent guarantee in 8 sacrificing the influence that was given to them in 9." But this argument flies in the face of Section 2's protection against cracking minority populations–in a sense, its assurance that a bird in the hand really is better than two in the bush, even though everyone realizes that a good hunter might actually snare both of the latter. The fundamental question for a Section 2 claim is whether the redistricting plan in Act 43 provides Latino voters with an opportunity to elect a candidate of choice. *LULAC*, 548 U.S. at 430-31.

Dr. Mayer estimates that eligible Latinos constitute 47.07% of New Assembly District 8's and 40.52% of New Assembly District 9's citizen voting

age population. Taking into account not only that number, but also actual voting experience in the races for the 2011 primary for Milwaukee County Circuit Judge, the 2008 State Superintendent of Public Instruction general election, the 2008 12th Aldermanic race, the 2008 Milwaukee City Attorney race, and the 2004 State Senate election, he concludes that this number is not enough to create the opportunity that Section 2 mandates. He also identified 36 elections since 1989 in which one or more Latino candidates ran against one or more Caucasian, non-Latino candidates, and showed that only four Latino candidates won over this time period, which represents only 11.1% success by Latino candidates. He proposes an alternative Assembly District 8 with a Latino voting age population of 70.07%, which he estimates amounts to 60.06% citizen voting age population.

One of the defendants' other experts, Peter Morrison, largely agreed with Dr. Mayer's conclusions. Mr. Morrison, a demographer, estimates that by November 2012 Latinos will constitute at least 44.9% of the citizen voting age population in New Assembly District 8; that number coincides with Dr. Mayer's estimate. Morrison estimates that the Latino share of the citizen voting age population is increasing at a rate of at least 1.1% annually, which means Latinos will continue to lack an effective majority in New Assembly District 8 through 2018. The parties' experts also agree that Latinos do not have an effective majority in New Assembly Districts 8 and 9, but that if the lines were drawn differently, they could immediately achieve a majority-minority district in a reconfigured Assembly District 8.

In light of this evidence, coupled with the fact that voting is racially polarized and cohesive in this area, it is apparent that Latino voters have a distinctly better prospect of electing a candidate of choice with one majority-

Case 2:11-cv-00562-JPS-DPW-RMD    Filed 03/22/12    Page 27 of 38    Document 210

minority district than with two influence districts. Notably, the 25,590 individuals who were added to New Assembly District 8 include a high percentage of Caucasian voters who come from neighborhoods where the effects of past discrimination are less burdensome than those experienced by the Latinos from the predecessor Assembly District 8. The newly added voters–who represent 45% of the New Assembly District 8–are approximately 41% non-Latino and are expected to continue to engage in racially polarized voting. Moreover, given the lower degree of historic discrimination, they are more likely to register and cast a ballot on election day. Dr. Mayer testified that the voter turnout rates among the newly-added Caucasian voters in New Assembly District 8 are higher by a factor of 10 when compared to Latino voters in that new district.

This is where our earlier observations about community of interest come back into play. The evidence shows that the new lines for Districts 8 and 9 will be disruptive to the Latino community of interest. This is so despite Professor Grofman's prediction that the voters of New District 8 are likely to support candidates from the Democratic party. But the Democratic candidate favored by the Latino community will not necessarily be the same as the Democratic candidate favored by the new non-Latino voters in the district. The latter are people who, as the record shows, have a vastly higher turn-out rate than do the Latinos. In other words, we may simply have a situation in which the real race is at the primary level, not during the general election, but all of the same problems will simply be pushed back one stage. As the Supreme Court pointed out in *O'Brien v. Brown*, 409 U.S. 1, 15-16 (1972), quoting from *United States v. Classic*, 313 U.S. 299, 308 (1941), "where the state law has made the primary an integral part of the procedure of

choice, or where in fact the primary effectively controls the choice, the right of the elector to have his ballot counted at the primary, is likewise included in the right protected by Article I, § 2."

Dr. Grofman argues that Latinos in New Assembly District 8 can elect their candidate of choice because the district is more properly understood as a coalition district. In a coalition district, "two minority groups form a coalition to elect the candidate of the coalition's choice." *Bartlett*, 556 U.S. at 13. Dr. Grofman believes that non-Latino minorities in New Assembly District 8–specifically African-American voters–will support the Latinos' candidate of choice. This argument is more commonly presented by plaintiffs seeking to protect the minority coalition's Section 2 rights. *Nixon v. Kent County*, 76 F.3d 1381 (6th Cir. 1996) (*en banc*). That said, the Supreme Court has suggested that a proven coalition district may dodge Section 2 intervention. *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994) ("If the lesson of *Gingles* is that society's racial and ethnic cleavages sometimes necessitate majority-minority districts to ensure equal political and electoral opportunity, that should not obscure the fact that there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice.").

Certainly, if the GAB had offered concrete evidence demonstrating that New Assembly District 8 is a coalition district, such a showing would have supported a finding of no Section 2 violation. But Dr. Grofman did not conduct a racial polarization analysis, for Latinos or any other minority community. The only racial polarization analysis in the record is Dr. Mayer's, where he independently examined the Latino and African-American

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 03/22/12   Page 29 of 38   Document 210

communities. While the plaintiffs have abandoned their Section 2 claim on behalf of African-American voters, we note that Dr. Mayer showed that African-Americans tend to vote nearly unanimously for African-American candidates, whereas Caucasian voters were "uniformly less likely to support the African-American candidate, often by huge margins." Dr. Mayer also testified at trial that there is no evidence of coalition building in New Assembly District 8 among Latino, African American, or Asian voters. He concluded, in fact, that "there's quite a bit of tension" among the distinct racial groups. Testimony by Christine Neumann-Ortiz, the founder of Voces de la Frontera, and Pedro Colon, Milwaukee County Circuit Court Judge, support Dr. Mayer's conclusion. Presented with this record, we cannot make the leap that African-American voters would prefer a Latino candidate to a Caucasian candidate merely because they tend to prefer African-American candidates to a Caucasian candidate. Dr. Grofman would have us rely on his hunch that African-Americans would vote for Latino candidates, but that is plainly inadequate. Section 2 rights are too valuable to be evaluated on an expert's unsubstantiated prediction.

Dr. Grofman also argues that there is no Section 2 violation because the current Assemblywoman, Jocasta Zamarripa, from the former Assembly District 8 is Latina. He did not estimate the extent of such an incumbency advantage and whether it sufficiently counteracts Dr. Mayer's concerns with low registration and low voter turnout among Latino voters. It is no matter, however, because Dr. Grofman's supposition utterly ignores the radical reconfiguration that the New Assembly District 8 imposes. Assemblywoman Zamarripa is not an incumbent with respect to fully 45% of the population of New Assembly District 8. It seems to this court that the alleged

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 03/22/12   Page 30 of 38   Document 210

incumbency advantage tracks the racial divide, thus rendering its significance minimal.

Finally, the defendants assert that New Assembly District 8 should pass muster under the Voting Rights Act because Act 43 is, in certain ways, consistent with this court's 2002 map. The former Assembly District 8 had a Latino voting age population in 2002 of 58.3%, which is less than the New Assembly District 8's 60.52% Latino voting age population. We first point out that the Supreme Court did not highlight the importance of focusing on citizenship status until 2006. *LULAC*, 548 U.S. at 429. Since 2006, we have been required to take real voting majorities into consideration; just as we do not include children in those numbers, we cannot include non-citizens who do not enjoy the franchise. Second, the record shows that the Latino community's success under the 2002 map is mixed at best. We are not tied down by history when better evidence of the present and likely future is before us, and when the last decade has produced demographic changes that now make it possible to draw an effective majority-minority district. We find persuasive, in this context, the experience of the 2008 Milwaukee City Attorney race between Grant Langley (Caucasian) and Pedro Colon, in which Langley won the position. When Colon ran, he had been the Assemblyman from the former Assembly District 8 for 10 years. He was on the joint finance committee during his tenure, and had previously run for mayor, and thus was hardly an unknown to Milwaukee's voters. Colon won nearly every ward in the former Assembly District 8. He lost every ward in those areas that represent the former Assembly District 9–areas that would be added to New Assembly District 8 by Act 43. Whether or not this election result was, as Dr. Mayer put it, "a dry run of what the future holds under Act 43," we

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 03/22/12   Page 31 of 38   Document 210

cannot turn a blind eye to this evidence, which supports the need for a functioning majority-minority district for Milwaukee's Latino community, not just one or two influence districts.

### 3.6 Claim Nine: Use of the New Districts in Any Future Recall Election Before November 6, 2012

Plaintiffs ask the court to declare as unconstitutional and enjoin the conduct of any special or recall elections under Act 43 prior to November 6, 2012. The defendants counter that no case or controversy exists because the GAB Board does not intend to conduct recall elections in accord with the legislative districts created by Act 43. At first we had trouble understanding why this claim reflected any kind of controversy between the parties, because the GAB has insisted that it intends to conduct the recall elections under the 2002 district lines, just as plaintiffs want. But the plot thickens when we realize that there is pending litigation in the state courts of Wisconsin in which some Republican plaintiffs have sued the GAB to compel it to conduct the recall elections using the 2012 districts.

This puts us in a difficult position. On the one hand, there is no authoritative statement from the state (either its legislature, or a court proceeding, or an administrative order from the GAB) with which any decree of this court would conflict. But there's the rub: there is also nothing concrete on which any such decree could operate. We have concluded, based on the GAB's formal representations to us in the present proceeding, that there is no question ripe for determination before us at this time. We take the GAB at its word that it will use the 2002 districts. This is sensible, especially in light of the command in the Wisconsin Constitution not to re-district more than once each 10 years. *State ex rel. Smith v. Zimmerman*, 266 Wis. 307, 63 N.W.2d

52 (1954).[4] District lines may be close to perfect from a population standpoint when they are initially drawn, but they slip away from perfection as time goes on, people are born, die, move, and become naturalized citizens. Both the state and the federal Constitutions recognize that line-drawing is essential, and they have both chosen a 10-year period for that line. Taking that into account, it becomes clear that there is nothing unconstitutional at all about the 2002 districts for the period of time between the adoption of the map based on the 2000 census and the adoption of the map based on the 2010 census. We note as well that we have no authority to enjoin on-going state court proceedings, see the Anti-Injunction Act, 28 U.S.C. § 2283, and so our hands are tied with respect to the state court case. If, however, a time comes when the GAB proposes to take a different action, either on its own or by virtue of a state court ruling, and there is a live controversy, plaintiffs may return to this court and present whatever arguments they may have on this question.

4.      Conclusion

In conclusion, we find that the Baldus and Voces plaintiffs are entitled to relief on their Section 2 claim concerning New Assembly Districts 8 and 9, because Act 43 fails to create a majority-minority district for Milwaukee's Latino community. Two influence districts have never been held to be an

---

[4] Indeed, the GAB claimed before trial that it is barred by the Wisconsin Constitution from making any amendments to the redistricting plan for the next ten years. We saw nothing in the Wisconsin Constitution or in *Zimmerman* that stood in the way of further revision by the General Assembly in the context of reaching a settlement with the plaintiffs, but for present purposes we will take the GAB at its word that it finds its hands tied to make any changes to the plan whatsoever until 10 years has elapsed, and assume that this position will also require it to argue to a competent court that any effort on the part of the legislature to advance the effective date of Act 43 is blocked by the state constitution.

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 03/22/12   Page 33 of 38   Document 210

adequate substitute for such a district under the factual circumstances that we have before us. This holding is not intended to affect any other district drawn by Act 43. Indeed, to avoid disrupting other lines, the court emphasizes that the re-drawing of the lines for Districts 8 and 9 must occur within the combined outer boundaries of those two districts. Recognizing as we have throughout this litigation the primary role that the state has in this area, we are giving the legislature the first opportunity to address this point, but it must act quickly given the impending elections. This should not be an impossible task, given that Dr. Mayer has prepared at least one alternative configuration that should be a useful starting point.

As for the other claims, we find that although the drafting of Act 43 was needlessly secret, regrettably excluding input from the overwhelming majority of Wisconsin citizens, and although the final product needlessly moved more than a million Wisconsinites and disrupted their long-standing political relationships, the resulting population deviations are not large enough to permit judicial intervention under the Supreme Court's precedents. Act 44 has zero population deviation, which is why we find that the intervenor-plaintiffs have no meritorious "one person, one vote" claim. The intervenor-plaintiffs' partisan gerrymandering claim never made it out of the gate because no workable standard was offered to the court.

Tempers can flare when people are excluded from the political process, whether they are shut out because of their party affiliation, because of their race, because of their economic status, or because of any other trait. Such a contentious atmosphere is neither necessary nor desirable. We know that it is not necessary, because courts hold themselves to a higher standard and have succeeded in drawing successful maps time and again. We should

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 03/22/12   Page 34 of 38   Document 210

have learned that it is not desirable because of the rancor that it fosters. Some states, like Iowa and California, have adopted nonpartisan systems that seem successfully to have overcome this. New York is seriously thinking right now of taking a similar step, and there has been some talk of it in Wisconsin in the wake of this litigation. But we must deal with the here-and-now, and we therefore must acquiesce in the approach that Wisconsin (not alone among the states in this circuit, we hasten to add–see *Committee for a Fair and Balanced Map v. Illinois State Bd. of Elections*, — F. Supp. 2d —, 2011 WL 6318960, (N.D. Ill. Dec 15, 2011); *Radogno v. Illinois State Bd. of Elections*, — F. Supp. 2d —, 2011 WL 5025251 (N.D. Ill. Oct. 21, 2011))–has chosen.

Before concluding, the court must finally address a number of motions that the parties have submitted and that remain outstanding, all of which may now be dispatched.

The first, the intervenor-defendants' Motion for Judgment on the Pleadings (Docket #75), has effectively been granted by the Court's determination that all of the plaintiffs' and consolidated plaintiffs' Act 44 claims fail. Thus, the motion requires no further ruling beyond dismissing it as moot. Similarly, the Court is also obliged to deny the defendants' Motion for Summary Judgment (Docket #128) as moot, given that, through this order, the Court has addressed the substance of all of the outstanding claims in this matter.

Further, the plaintiffs' and intervenor-plaintiffs' motions to defer a judicial decision (Docket #117, #119), in which they invited the Court to delay ruling on the intervenor-defendants' Motion for Judgment on the Pleadings (Docket #75), have also become moot. Through the passage of time, allowing trial to proceed before rendering a decision on the intervenor-defendants'

motion, the Court effectively deferred its decision. Therefore, the Court will also deny the motions to defer as moot.

A number of other motions may be taken care of administratively. At trial, the Court clarified the scope of its prior order relating to the subpoena issued to James Troupis, essentially granting Mr. Troupis's motion for clarification. (Tr. 58:14–60:4 (clarifying scope of Court's prior order, as requested by Mr. Troupis in Docket #179)). Thus, that motion (Docket #179) can be administratively terminated as having been granted at trial. Additionally, the defendants' motion *in limine* (Docket #160) is hereby administratively terminated. The Court never specifically addressed the motion at trial, and the parties did not go to great lengths to elicit testimony regarding anomalies in redistricting boundaries (the subject of the motion *in limine*); further, in this order, the Court does not discuss those anomalies. Therefore, the Court has no reason to grant or deny that motion (Docket #160), and will thus terminate it without making a decision on its merits.

Finally, the Court must also deny a request from members of the group Citizens for Fair and Competitive Redistricting to appear as *amicus curiae*. (Docket #126). Through counsel, that group submitted a proposed brief and several maps which, taken together, urge the Court to adopt an entirely different redistricting plan than the plan adopted by the legislature. (Docket #126). Heeding the instruction of the United States Supreme Court that "[r]edistricting is 'primarily the duty and responsibility of the State,'" the Court will not tread into the black water of re-drawing the redistricting boundaries itself. *Perry*, 132 S. Ct. at 940 (citing *Chapman v. Meier*, 420 U.S. 1, 27, 95 S. Ct. 751, 42 L. Ed. 2d 766 (1975)). Instead, as discussed above, the Court will allow the Legislature to sort out the redistricting maps' infirmities

on its own. The Court will thus deny the *amicus*' request to appear without consideration of the group's submissions.

Accordingly,

IT IS ORDERED that the plaintiffs' and intervenor-plaintiffs' Sixth Claim for relief be and the same is hereby GRANTED, the Court having found that New Assembly Districts 8 and 9 violate the Voting Rights Act, and, accordingly, the Government Accountability Board is hereby ENJOINED from implementing Act 43 in its current form;

IT IS FURTHER ORDERED that plaintiffs' and intervenor-plaintiffs' remaining claims be and the same are hereby DISMISSED with prejudice;

IT IS FURTHER ORDERED that the intervenor-defendants' motion for judgment on the pleadings (Docket #75) be and the same is hereby DENIED as moot;

IT IS FURTHER ORDERED that the defendants' motion for summary judgment (Docket #128) be and the same is hereby DENIED as moot;

IT IS FURTHER ORDERED that the plaintiffs' motion to defer a judicial decision (Docket #117) be and the same is hereby DENIED as moot;

IT IS FURTHER ORDERED that the intervenor-plaintiffs' motion to defer a judicial decision (Docket #119) be and the same is hereby DENIED as moot;

IT IS FURTHER ORDERED that James Troupis' motion for clarification (Docket #179), having been granted at trial, be and the same is hereby TERMINATED administratively;

IT IS FURTHER ORDERED that the defendants' motion *in limine*, as related to the presentation of evidence related to redistricting anomalies

(Docket #160), having not been addressed at trial or in this Order, be and the same is hereby TERMINATED administratively;

IT IS FURTHER ORDERED that the intervenor-defendants' motion to dismiss for lack of standing (Docket #198) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that the motion of Citizens for Fair and Public Redistricting to appear as *amicus curiae*, (Docket #126) be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that each party is to bear its own costs.

The Clerk is directed to enter judgment accordingly.

Case 2:11-cv-00562-JPS-DPW-RMD   Filed 03/22/12   Page 38 of 38   Document 210